IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
COLUMBUS DIVISION

| | |
|---|---|
| **JACOB SMITH**<br>9503 Chesapeake Drive<br>North Royalton, OH  44133<br><br>       Plaintiff,<br><br>      v.<br><br>**FIRSTENERGY CORP.**<br>c/o Agent:  CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, OH  43219<br><br>AND<br><br>**FIRSTENERGY SERVICE COMPANY**<br>c/o Agent:  CT Corporation System<br>4400 Easton Commons Way<br>Suite 125<br>Columbus, OH  43219<br><br>       Defendants. | Case No. 2:20-cv-3755<br><br>**<u>CLASS ACTION COMPLAINT</u>** |

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Plaintiff, Jacob Smith, individually and on behalf of a proposed class of all others similarly situated, submits this Complaint against Defendants, FirstEnergy Corp., a public utility holding company, and FirstEnergy Service Company, a subsidiary of FirstEnergy Corp. which provides legal, financial, and other corporate support to obtain money damages and injunctive relief or other appropriate relief against the Defendants for systematically violating and knowingly and intentionally conspiring with Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and

Generation Now, and others known and unknown, being persons employed by and associated with an enterprise, which engaged in, and the activities of which affected interstate commerce, and did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c), (d), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple wrongful acts under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion) 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code §2921.02.  It was part of the conspiracy that these Defendants, FirstEnergy Corp. and FirstEnergy Service Company, agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. §1962(c), (d).  Plaintiff further states as follows:

## THE PARTIES

1.      Plaintiff, Jacob Smith, is a legal resident of the State of Ohio and resides in Lorain County, who has been damaged by Defendants by his payment of monthly surcharges as set forth in House Bill 6 (hereinafter "HB 6") which provided massive customer/ratepayer subsidies for Defendants' Davis-Besse and Perry Nuclear Power

Plants. Plaintiff owns the home with his wife in whose name service is placed. Plaintiff pays the electric bill and therefore is the party with damages.

2. Defendant, FirstEnergy Corp., is a public utility holding company which directs and controls various subsidiary entities organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio. FirstEnergy Corp. is involved in the generation, transmission, and distribution of electricity. This Defendant's agent is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

3. Defendant, FirstEnergy Service Company, is organized under the laws of the State of Ohio with its principal place of business located in Akron, Ohio and provides legal, financial, and other corporate support services to affiliated companies. It is under the control of FirstEnergy Corp.'s management. It does not have its own CEO or Board of Directors. This Defendant's agent is CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and 18 U.S.C. §§ 1961-68. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. Venue is proper in this Court in that this is a judicial district in which a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Venue is further proper in that this is a judicial district in which the Defendants agent, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219, is found or transacts affairs. 18 U.S.C. §1965(a).

## GENERAL STATEMENT OF THE LAW

5.    Title 18, United States Code, Section 1962(c) and (d) provides as follows:

(c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

(d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . . (c) of this section.

Section 1961 in turn, defines the terms "enterprise" and "pattern of racketeering activity" as used in Section 1962 as follows:

(4)    "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5)    "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

Section 1961(1) defines "racketeering activity", in relevant part, as follows:

(A) [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

6.    On or about July 21, 2020, a criminal Complaint was filed by the United States of America against Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now in the United States District Court for the

Southern District of Ohio, Case No. 1:20-mj-00525, alleging defendants violated 18 U.S.C. §1962(d), conspiracy to participate, directly or indirectly, in the conduct of an enterprises affairs through a pattern of racketeering activity.  The criminal Complaint was supported by an 81 page Affidavit (Affidavit, Doc #5, PageID# 91-172).  Based upon information and belief, Plaintiff states that Defendant, FirstEnergy Corp., is Company A Corp. in the Affidavit.  Defendant, FirstEnergy Service Company, is Company A Service Co. in the Affidavit.

## FACTUAL ALLEGATIONS

7.     Plaintiff incorporates by reference those factual allegations set forth in the Affidavit attached to the criminal Complaint in Case No. 1:20-mj-00525, in the United States District Court for the Southern District of Ohio (Doc #5, PageID# 91-172).

8.     From March 2017 to March 2020, the Householder Enterprise, as described and defined in the Affidavit and herein, received approximately $60 million from Defendants paid through Generation Now and controlled by Householder and the Enterprise.  In exchange for payments from Defendants, the Householder Enterprise helped pass HB 6, legislation, described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with Defendants.  The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative.  To achieve these ends, and to conceal the scheme, the Householder Enterprise passed money received from Defendants through multiple entities that it controlled.  The Householder Enterprise then used these bribe payments to further the goals of the Enterprise, which include:  (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and

5

use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and, (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

## BACKGROUND

9.      In 2016, FirstEnergy Corp.'s nuclear generation future looked grim.  In its November 2016 Annual Report to Shareholders, FirstEnergy Corp. and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate.   Given this backdrop, FirstEnergy Corp. announced future options for its generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

10.     Consistent with this forecast, FirstEnergy Corp. actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio.  For example, during FirstEnergy's fourth-quarter 2016 earnings conference call, its President and CEO stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security.  Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon.  The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation.  We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets.  We are optimistic, given these*

> *discussions we have had so far and we will keep you posted as this process unfolds.*

11.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

12.     While FirstEnergy Corp. was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019. Following his January 2017 trip on FirstEnergy's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from FirstEnergy Corp. and/or FirstEnergy Service Company into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation Now.  In 2017 and 2018, the Householder Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from FirstEnergy Corp. and/or FirstEnergy Service Company. Members of The Householder Enterprise used these payments for their own personal benefit and to gain support for Householder's political bid to become Speaker.  In the spring and fall of 2018, the Enterprise spent millions in Defendants' money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for FirstEnergy Corp.

13.     Householder-backed candidates that benefitted from Defendants' money received by Generation Now (described throughout this Complaint and the Affidavit as "FirstEnergy-to-Generation Now" payments) helped elect Householder as the Ohio Speaker of the House in January 2019.  And Householder fulfilled his end of the corrupt

bargain shortly thereafter.  Three months into his term as Speaker, HB 6 was introduced to save from closure FirstEnergy Corp.'s two failing nuclear power plants.  Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills.  Neil Clark described the legislation as a "bailout" for FirstEnergy's nuclear assets, worth $1.3 billion to FirstEnergy.

14.     After the introduction of the bailout legislation, Defendants began increasing its payments into Generation Now for the benefit of the Enterprise.  On April 30, 2019, roughly two weeks after introduction of the legislation, Defendants wired $1.5 million to Generation Now.  In the month of May 2019, while the controversial legislation was pending before lawmakers, Defendants wired four additional payments totaling $8 million.  The Enterprise used some of that money for mailers and media advertisements to pressure members to support the legislation; the Enterprise also used Defendants' money for their personal benefit, as described herein and in the Affidavit.  In the same month that the Enterprise received $8 million from Defendants, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder's attempt to gain support for HB 6 from the representative.

15.     On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor.  That process took about two months.  However, the law would not go into effect until October 22, 2019.  Shortly after the Governor signed the legislation, a campaign began, to organize a statewide ballot-initiative referendum, ("Ballot Campaign"), to overturn the legislation.  This effort required Ballot Campaign organizers

to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot. And so, Defendants' and the Enterprise's fight continued.

16. In response, from July 24,2020 to October 22, 2019, accounts controlled by Defendants wired over $38 million into Generation Now to defeat the ballot initiative so HB 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors seeking signatures to support the referendum. The members and associates of the Enterprise also used the Defendants' money to enrich themselves and further their personal interests.

17. Defendants paid the Householder Enterprise $60,886,835.86 in secret payments over the approximately three-year period in exchange for the billion-dollar-bailout. The Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions paid into the entity are akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny—and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Neil Clark stated in a 2019 recorded conversation, Defendants operated as the Enterprise's "Bank"—Clark explained, "*Generation Now is the Speaker's (c)(4)*", and Defendants "*deep pockets*", and the money to the Enterprise through Generation Now was "*unlimited*". Matthew Borges similarly described Defendants' payments to the Enterprise as "*Monopoly money*".

18.     The Enterprise used some of the Defendants' money to help enact the bailout legislation.  Additionally, the Enterprise used millions of dollars of Defendants' bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker.  Defendants' payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff.  Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and/or Generation Now also paid themselves personally millions of dollars in bribe payments, funneled through Generation Now and other entities controlled by the Enterprise.  This includes allowing for the payment of at least $500,000 in what appears to be personal benefits to Householder that was passed through Longstreth-controlled accounts.  In addition, the Enterprise had over $8 million of Defendants' money in their controlled accounts at the end of 2019, which represents further profit to its Enterprise members.

**THE ENTERPRISE**

19.     Larry Householder is the current Speaker of the Ohio House of Representatives.  He previously served as a House member representing Ohio's 72nd District from 1997 to 2004, including as Ohio Speaker of the House from 2001 to 2004.  Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publically referred to the FBI.  He was never charged.  Householder won his House seat back in the fall of 2016.  He was elected Speaker again in January 2019, after what the media described as a bitter leadership battle that lasted nearly a year.

20.    Householder's path to Speakership was unusual.   Householder and another House member Representative, both of whom are Republicans, were candidates to be Speaker of the House of Representatives for the 133rd General Assembly.   After the then-Speaker's resignation in May 2018, a protracted conflict lasting eight weeks began to select a Speaker for the remainder of the 132nd General Assembly.   Ultimately, the other representatives became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite the other representatives' selection in mid-2018 for the House Speaker for he remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker.   He did so in a number of ways, including by providing financial support, paid for in large part by Defendants, to certain candidates running for House seats in the spring 2018 primary and the November 2018 general election.   In the end, his strategy was successful, as he won the Speakership despite another representative serving in that role prior to the 2018 election.

21.    The Householder Enterprise had several purposes, one of which was to increase Householder's political power through corrupt means.   In his role, Householder solicited and accepted payments from Defendants into his 501(c)(4) account; he used the bribe payments to further his political interest, enrich himself and other members and associates of the Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

22.     Householder benefitted personally through the Enterprise.  For example, while funded by Defendants-to-Generation-Now bribe money, at least $300,000 passed through and funded accounts controlled by Jeff Longstreth, which the Enterprise used to pay legal fees and settle a lawsuit against Householder.  Over $100,000 of the Defendants-to-Generation-Now bribe money was passed through Longstreth-controlled accounts and used to pay costs associated with Householder's Florida home.  In addition, at least $97,000 of the Defendants-to-Generation-Now bribe money was used to pay expenses for Householder's 2018 Ohio House campaign.

23.     Jeff Longstreth is Householder's longtime campaign and political strategist.  Neil Clark identified Longstreth as Householder's "*political guy*", his "*implementer*", and one of his "*closest advisors*", who was instrumental to the Enterprise's efforts to pass HB 6.

24.     Although Longstreth is not employed by the State of Ohio, he has been Householder's chief political strategist.  He ran Householder's political campaign, and he and his staff managed the 2018 campaigns for the Enterprise-backed candidates (at times internally referred to by the Enterprise as "Team Householder" candidates).  Householder ad Longstreth shared office space, rented from their Political Advertising Agency.  In addition, Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for Defendants.

25.     Longstreth also played a critical role with respect to the Enterprise's finances.  He was a signatory on both of the Generation Now bank accounts and the person who transfers money out of the accounts to other entities to further the Enterprise.   Longstreth also controlled entities that receive Defendants-through-

Generation Now payments to further the Enterprise. Among these, Longstreth owns and operates JPL & Associates. Throughout the relevant period, Longstreth transferred over $10.5 million of Defendants' bribe payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account. In addition, Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity and then into accounts that he controlled. Longstreth then use Defendants' payments funneled through Generation Now to further Householder's and Defendants' interests and to pay personal benefits to members and associates of the Enterprise. Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in Defendants-to-Generation-Now money during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

26. Neil Clark owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to becoming a lobbyist, Clark served as a budget director for the Ohio Senate Republic Caucus. During the relevant period, Clark worked as a lobbyist for various interest groups.

27. Along with Longstreth, Clark is, in his own words, one of Householder's "*closest advisors*". According to Clark during recorded conversations in 2019, Clark served as Householder's "*proxy*" in the Enterprise's efforts to further the enactment of HB 6 an ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark also communicated directly with House members to further the Enterprise. In 2019, Clark described himself in recorded communications as

13

Householder's "*hit man*" who will do the "*dirty shit*". Clark stated, "*when [Householder's] busy, I get complete say. When we're working on stuff, if he says, 'I'm busy,' everyone knows. Neil has the final say, not Jeff. Jeff is his implementer*". Borges confirmed Clark's role, and similarly described Clark as Householder's "*proxy*" relating to Defendants' matters. Clark benefitted personally from Defendants' payments to the Enterprise, receiving at least $290,000 in Defendants-to-Generation-Now money.

28. Matthew Borges is a registered lobbyist for a subsidiary of FirstEnergy Corp. Borges was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive. On August 5, 2019, shortly after the Ballot Campaign was announced, Borges incorporated 17 Consulting Group. Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account. Over the next few months Generation Now wired a total of $1.62 million into the account.

29. Approximately a month after Generation Now began wiring money into Borges' 17 Consulting account, Borges paid $15,000 in exchange for inside information about the Ballot Campaign, which Borges would use to help defeat the Ballot Campaign. Bank account records show that the $15,000 paid came from the 17 Consulting Group account, which was funded by Generation Now wires. Borges also paid Juan Cespedes $600,000 of Generation Now money from his account. With the money wired from Generation Now, Borges also paid a private investigator during this period, which, as described below, is consistent with the Enterprise's strategy of investigating the signature collectors that worked for the Ballot Campaign.

30.     Borges had contact with Householder in January 2019 and April 2019—key time-periods, as described below, involving official action by Householder.  Borges benefitted directly from the $1.62 million from Generation Now wires.  Specifically, he paid himself over $350,000 from Defendants-to-Generation-Now proceeds.

31.     Juan Cespedes served as a key middleman, participating in strategy meetings and communicating with Enterprise members and associates regarding strategic decisions.  Cespedes is a multi-client lobbyist, whose services were retained by a subsidiary of FirstEnergy Corp.  He was central to this company's efforts to get the bailout legislation passed in Ohio.  As explained herein and in the Affidavit, a contract between this company and Cespedes' lobbying company, the Oxley Group, shows this company hired Cespedes to pursue the bailout legislation starting in the spring of 2018.  Consistent with this, records show that Cespedes was the "lead consultant" relating to attempts to pursue legislation would save FirstEnergy's failing nuclear power plants.  In internal documents, Cespedes tracked "Householder camp" candidates who later received Defendants-to-Generation-Now money, and he advised that if Householder becomes Speaker, the nuclear energy bailout "will likely be led from his Chamber".

32.     Cespedes received approximately $600,000 from the Enterprise and $227,000 from Defendants in 2019.   He also was in regular contact with both Defendants and Enterprise members during the relevant period.  As set forth below, Cespedes and Longstreth communicated regularly through text messages discussing the coordination of millions of dollars in Defendants' payments to the Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot campaign, among

other things. Cespedes coordinated the timely payment of $15 million from Defendants to Generation Now.

33.    Generation Now, Inc. received approximately $60 million from Defendants and/or their entities during the relevant period. As set forth more fully below, Generation Now registered with the IRS as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization. Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection. The Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny. Generation Now's accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Enterprise. As described herein below and in the Affidavit, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire from Energy Pass-Through (a non-profit 501(c)(4) that was incorporated in Ohio on February 28, 2017, two days after Generation Now was incorporated in Delaware) in March 2020, bringing the combined balance of the accounts to approximately $2.9 million, again, money that is a direct benefit to the Enterprise.

## RELATED ENTITIES CONTROLLED BY THE ENTERPRISE

34.    The Enterprise used and relied on a number of different entities to further the conspiracy. The following entities were controlled by, worked directly with, or funneled payments for the benefit of the Enterprise:

a.    JPL & Associates LLC is controlled by Longstreth. Longstreth is the signor on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content". Numerous internal money transfers to Generation

16

Now money were made among Longstreth-controlled accounts. In total, JPL's main business account received over $10.5 million in Defendants-to-Generation-Now wires during the relevant period, which Longstreth then transferred internally to his other accounts. Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity ("Front Company", discussed below) and into Longstreth's Constant Content accounts. Analysis of the accounts by the Federal Bureau of Investigation shows that the money was used to pay benefits directly to Enterprise members and to further the Enterprise's interests by paying campaign staff for preferred Householder candidates, among other things. After the ballot initiative campaign failed and HB 6 became law for the benefit of FirstEnergy, Longstreth consolidated most of the Enterprise funding into JPL-controlled accounts. As of January 1, 2020 that total balances within JPL-controlled accounts exceeded $6.5 Million. This money is a direct benefit to the Enterprise.

b.       "PAC" is a federal PAC through which Generation Now funneled FirstEnergy payments in furtherance of the conspiracy. The Enterprise primarily used the PAC during the May 2018 primary as a way to conceal the source of media buys for Team Householder candidates. The attorney who is listed as the treasurer for Generation Now and who is a signor on the Generation Now accounts along with Longstreth, is the treasurer and a signor of the PAC account.

c.       Although Longstreth was not a signor on the PAC bank account, documents obtained by the FBI confirm Longstreth's control over the PAC. For example, a Word document titled "Client Information Request Form", last modified by Longstreth in October 2016, listed Longstreth as the "Executive Director or President" of the PAC. In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC. Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's email and phone number. Toll records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

d.       In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire and a $750,000 wire from Generation Now, on April 2 and April 12, 2018, respectively. By April 30, 2018, nearly all of the million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder candidates, including Householder himself, in advance of the May 8, 2018 Ohio primary election.

e.       The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the fall 2018 election. Close to $40,000 of that wire was paid to a political strategy group within weeks of the wire. Aside from payments to the attorney's law firm, the balance remained in the account.

f.       The account remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of money from Defendants to the "Coalition", (described below), which passed through to PAC roughly the same amount of money over the next two months. Expenditures from the PAC in

FEC filings, along with media purchased by PAC, show that the Enterprise used the Defendants' money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

g.        "Coalition" is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signor for the PAC is the signor on the Coalition's bank account. The attorney incorporated the Coalition in Delaware one day after he incorporated PAC. Longstreth's resume states that he oversees political activities for the Coalition. An FBI investigation indicated that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition. He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

h.        For calendar years 2017 through 2019, the Coalition was funded almost exclusively through: A) $90,000 from First Energy, B) $300,000 from "Energy Pass-Through" (a FirstEnergy Corp. pass-through, as set forth below), and C) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid $150,000 to Generation Now during the relevant period. Outgoing payments from the Coalition account were over $100,000 in two wires to JPL & Associates; $54,000 wired to Generation Now; $191,000 wired to Media Placement Company 1; and $200,000 wired to a public relations firm.

i.        The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Enterprise used the Coalition as a pass-through for FirstEnergy Corp.-to-Generation-Now money to PAC, which the Enterprise then used to support Householder-backed candidates in the 2020 primary election. The benefit of passing the money through the Coalition first, was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now. The Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained herein and in the Affidavit, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it.

j.        Thus, this account is a mechanism for Generation Now to spend secret money for the benefit of Householder and the Enterprise.

k.        "Dark Money Group 1" is an entity used by the Enterprise to conceal the source of media buys during the 2018 general election, similar to the way the Enterprise used PAC for the primaries in 2018 and 2020. An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018 and opened its bank account on September 25, 2018.

l.        The majority of activity in the account occurred roughly a month later, between October 2018 and Election Day on November 6, 2018. From October 19 to October 29, 2018, Generation Now wired $670,000 into the account; FirstEnergy Corp. wired $500,000 into the account; and other corporate interests wire $300,000 into the account, totaling $1,470,000. From October 22 to November 2, 2018, Media Placement Company 2 then spent $1,438,510 on media buys for ads paid for by Dark

Money Group 1 that generally targeted rivals of candidates aligned with Householder. Since Election Day in 2018, the account has been largely unused.

        m.        "Front Company" is a pass-through entity used by the Enterprise to fund the campaign against the referendum in furtherance of the conspiracy.  The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began.

        n.        From August 1, 2019 through October 2019, FirstEnergy Corp. controlled accounts wired Generation Now $38 million; Generation Now then wired  $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing the Ballot Campaign.  Generation Now as the sole source of money deposited into the Front Company account.  By November 2019, less than $5,000 remained in the Front Company account.

## THE USE OF GENERATION NOW TO RECEIVE BRIBE PAYMENTS FROM DEFENDANTS

35.    On or about February 6, 2017, Generation Now, Inc. was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (x3310 and x6847). Bank records show that an attorney and Jeff Longstreth were signatories on both accounts.  On or about July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ("the Code"), or the corresponding section of any future federal tax code."  The attorney signed the application as the treasurer of Generation Now.

36.    Although Householder was not listed on registration documents or in account records for Generation Now, the Enterprise used Generation Now to receive secret payments for Householder.

37.    At the time, there was aggressive lobbying for legislative action to save FirstEnergy Corp.'s two nuclear power plants.  Table One, in paragraph 47 of the

Affidavit in *United States of America v. Larry Householder, et al.*, in the United States District Court for the Southern District of Ohio, Case No. 1:20-mj-00525 (Doc #5, PageID# 106-107), lists each of Defendants' payments received by Generation Now during the period from March 2017 until March 2020, totaling $59,996.835.86.

38.    In addition to the $59,996.835.86 that FirstEnergy Corp. paid directly to Generation Now, FirstEnergy, made $890,000 in other timely payments to the Enterprise, including:  payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed in the Affidavit.  These payments bring the total amount of direct payments from Defendants to the Enterprise during the relevant period as $60,886,835.86.  During the time of the conspiracy, other entities besides Defendants deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by the Defendants' payments.

39.    Although Householder's name is not on Generation Now's paperwork, an FBI investigation concluded, based on Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas, that Householder controls Generation Now to further the Enterprise's goals (Affidavit, ¶ 50-65, Doc #5, PageID# 108-112).

40.    FirstEnergy Corp. funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants.

41.    The volume of FirstEnergy Corp.'s payments, the timing of these payments, communications and coordination amongst co-conspirators and FirstEnergy Corp., the official action taken by Householder, and the actions to maintain the official

20

action, show the corrupt arrangement of FirstEnergy Corp.'s funding of Householder's speakership bid in exchange for a legislative fix.

42.     As described herein and in the Affidavit, the vehicle to collect the vast amounts of money needed for Householder's Speakership bid was Generation Now. From the time the Generation Now bank accounts were opened in 2017 through November 2018 general election, the Enterprise received approximately $4.6 million into Generation Now. More than half of that money came from FirstEnergy Corp. or the Energy Pass-Through, fully funded by FirstEnergy Corp. More than a half million of the remaining money came from energy-related entities that either had a relationship with FirstEnergy Corp. or an interest in the bailout legislation. The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

43.     FirstEnergy Corp. made regular, quarterly payments of $250,000 into Generation Now's main bank account almost immediately after Longstreth opened it in 2017. But, in March 2018, approximately two weeks before FirstEnergy Corp. affiliates filed for bankruptcy, FirstEnergy Corp. began funneling payments to Generation Now through Energy Pass-Through. The payments wired from FirstEnergy Service Co. into the Energy-Pass-Through originated from account x6496, the same account used to wire payments directly from FirstEnergy Service Co into Generation Now. In the final month before the 2018 general election, FirstEnergy Corp. dropped another $500,000 into the Generation Now account. This time the money was paid by check from account x4788.  The payments from FirstEnergy Corp. from 2017-2018 are summarized in ¶82 of the Affidavit to the Criminal Complaint in Case No. 1:20-MJ-00525 in the United States District Court for the Southern District of Ohio (Doc #5 at PageID #117). Other

payments are set forth in ¶83 of the same Affidavit. The close coordination between defendants and Householder is set forth in ¶84-86 of the Affidavit (Doc# 5 at PageID# 117-119).

44.     On or about July 24, 2018, a few months after the primaries, $215,000 was wired from Longstreth-controlled accounts to settle a personal lawsuit against Householder. On August 1, 2018, the same day that Householder was meeting with FirstEnergy Corp. executives in Columbus, according to documents in Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Householder and Householder Ltd. The main JPL account was funded with wire transfers from Generation Now, which was funded in large part by FirstEnergy Corp. wires. In addition, bank records will show that JPL's main account also paid Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000. At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded in part by a $250,000 wire from FirstEnergy Corp. and $200 deposit from Longstreth on the date he opened the account. JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

## BAILOUT LEGISLATION PASSED FOR DEFENDANTS

45.     The Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with FirstEnergy Corp.-passing nuclear bailout legislation. In fact on January 7, 2019, the day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation. Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

46.     The Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by FirstEnergy Corp., through payments to Generation Now. While HB 6 was pending in the House, FirstEnergy Corp. wired Generation Now $9,500,000. When the bill was pending in the Senate, FirstEnergy Corp. wired Generation Now $7,358,255. And, to fund its efforts to defeat the Ballot Campaign, FirstEnergy Corp. wired an additional $38,000,000 to Generation Now. The volume and frequency of these payments provide further evidence of the Enterprise's corrupt arrangement with FirstEnergy Corp. These facts, including the Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and FirstEnergy Corp.'s involvement and coordination funding these efforts, are set forth herein and in the Affidavit.

## HOUSE BILL 6

47.     Consistent with their agreement, the Enterprise implemented a strategy to pass a legislative fix for FirstEnergy Corp. shortly after Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation – HB 6 – through the House and pushing the Senate to agree. First, Householder picked freshman representatives, which Householder helped elect by using FirstEnergy Corp.-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft. Second, Householder created a new subcommittee to hear the bill, which was comprised mostly of Householder supporters. Third, the Enterprise engaged in an expensive media blitz, funded by FirstEnergy Corp.-to-Generation-Now payments, to pressure public officials to support the bill. Fourth, Householder strong-armed House members, particularly opponents of the bill. Finally, Householder and the Enterprise

pressured Senators to pass the legislation. The expediency and funding of this legislative effort and the tactics used by the Enterprise-along with timely communications between Enterprise members and agents of FirstEnergy Corp. are further evidence of the agreement between Householder and FirstEnergy Corp.

48.    On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced.  Although titled "Ohio Clean Air Program," the FBI investigation showed the HB 6 essentially was created to prevent the shutdown of FirstEnergy Corp.'s nuclear plants as explained in ¶111-186 of the Affidavit.

49.    HB 6 was important to the Householder Enterprise because it received millions of dollars into Generations Now from FirstEnergy Corp. in exchange for enactment of the bailout legislation. And, thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to the Householder Enterprise.

50.    FirstEnergy Corp. and/or FirstEnergy Service Company funded and/or participated in the funding of the Householder Enterprise to defeat the Ballot Campaign to repeal HB 6 (Affidavit, ¶187-215, Doc #5, PageID# 153-162).  The efforts to prevent the repeal of HB 6 included bribing an employee of the Ballot Initiative for inside information, and bribes to signature collectors (Affidavit, ¶216-239, Doc #5, PageID# 162-169).

51.    The Enterprise worked closely with FirstEnergy Corp. to defeat the repeal of HB 6.  During this period, FirstEnergy Corp. paid the Enterprise over $38 million.  As an example, on October 10, 2019, FirstEnergy Company wired $10 million to Energy

Pass-Through, which then wired $10 million to Generation Now (Affidavit, ¶240-242, PageID# 169-170).

52.     The efforts to prevent a repeal of HB 6 were successful.  On October 212019, the Ballot Campaign failed to collect enough signatures and HB 6 went into effect.  Additional relevant wire transfers are set forth in the Affidavit, (Affidavit, ¶244-247, Doc #5, PageID# 170).

53.     The State of Ohio may well repeal and replace HB 6.  But having hijacked Ohio's democracy and damaged Ohio's trust of an elected government, Defendants are not entitled to "keep the change" of their ill-gotten gains.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action under Ohio Civ.R. 23(a); (b)(1)(A); (b)(2); and, (b)(3), on behalf of himself and the other members of the Plaintiff Class defined as: All persons and entities who have and/or will have to pay a monthly surcharge for electric pursuant to HB 6.

55.     Based on information and belief, the members of the Class exceed tens of thousands in number, making joinder of all Class members impracticable.

56.     The claims set forth in this Complaint are common to each member of the Plaintiff Class.  The Plaintiff and each Class member are subject to the same rate increases set forth in HB 6.

57.     There are questions of law and/or fact common to the Class which predominate over any questions effecting individual members of the Class.  These include:  (a) whether Defendants bribed the members of the Householder Enterprise to obtain bailout nuclear power plant legislation, HB 6; (b) whether the conduct set forth in

this Complaint violated the Racketeer Influenced and Corrupt Organizations Act; (c) whether the Class members are entitled to actual damages, punitive damages, statutory damages, or both; and (d) whether Defendants' conduct entitles the Class to recovery of attorneys' fees and expenses.

58.    The Plaintiff is an adequate representative of the Class members because: i) he is a member of the Class; ii) the claims he asserts in the Complaint are typical of the claims of the Class members; iii) Plaintiff's claims are not subject to any unique defenses, and, iv) Plaintiff's interests do not conflict with those of any other Class member.

59.    The named Plaintiff will fairly and adequately protect the interests of the Class.  None of the Plaintiff's interests conflict with any interest of the Class.

60.    The claims set forth herein are proper for certification as a class action under the provisions of Rule 23 of the Ohio Rules of Civil Procedure.

61.    After addressing the questions common to the Class, only the determination of individual damages will remain, and that calculation is one of simple mathematics using records of the Defendants.

62.    This class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because there are tens of thousands of members in the proposed Class and repeated individual discovery and litigation of the common issues shared by all Class members would needlessly waste judicial resources. The names and addresses of Class members will be readily identifiable from records of Defendants and through discovery of this action.

63.     The Class members' interests in individually controlling the prosecution of separate actions do not outweigh the benefits of class-based litigation on those issues.

64.     It is desirable to concentrate the litigation of these claims in one forum. Any difficulty in managing this case as a class action is outweighed by the immense benefits the class action has in efficiently disposing of common issues of law and fact among the large number of litigants. Moreover, no Class member has enough at stake to warrant individual litigation against these obviously well-funded and ruthless defendants.

65.     The prosecution of this civil action by all Class members individually in separate actions would create a risk of inconsistent or varying adjudications of claims by the individual Class members that would establish incompatible standards of conduct for Defendants, could be dispositive of interests of other Class members not parties to the adjudications, or substantially impair or impede Class members ability to protect their interests.

66.     Upon information and belief, there are no other similar cases pending against the named Defendants which address the issues as are raised in this case.

67.     Furthermore, Plaintiff has retained competent counsel experienced in class action litigation to further insure such representation and protection of the Class. To prosecute this case, the prospective Class Representative has chosen the law firm of Murray and Murray Co., L.P.A. of Sandusky, Ohio. Plaintiff and his counsel intend to vigorously prosecute this action.

68.     Managing this case as a Class Action should not present any particular difficulty.

## CIVIL FEDERAL RICO AGAINST ALL DEFENDANTS
### (28 U.S.C. § 1962(c) & (d))

69.     Plaintiff realleges and incorporates every allegation contained in each of the preceding paragraphs as if fully set forth herein.

70.     Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

71.     Defendants are corporate entities, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

72.     Defendants conspired with Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now, to participate, directly or indirectly, in the conduct of an enterprises affairs through a pattern of racketeering activity, in violation of 18 U.S.C. 1962(c) – a civil RICO claim.  Plaintiff states Defendants' wrongful conduct may also fall under other subsections of 18 U.S.C. § 1962 other than (c).

73.     The Defendants comprise a distinct group of persons separate from the Enterprise within the meaning of 18 U.S.C. § 1961(4).  However, each and every Defendant is associated with the Enterprise.  The entities that constitute the Defendants together with Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now, are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).  The Householder Enterprise is separate from Defendants as the liable "persons", participating in the affairs of the Householder Enterprise.

74.     The purpose of the Enterprise and/or Enterprises (collectively "Enterprise") was to secure legislation favorable to Defendants through the use of bribes paid by Defendants to the members of the Householder Enterprise and/or others.  How this was

accomplished is set forth in this Complaint, and the Affidavit attached to the Criminal Complaint in *United States of America v. Larry Householder, et al.*, in the United States District Court for the Southern District of Ohio, Case No. 1:20-mj-00525.

75.     The Enterprise has been engaged in, since approximately 2017, and continues to be engaged in, activities that affect interstate commerce.  Defendants' unlawful Enterprise in violation of RICO has been and remains longstanding, continuous and open ended.  Defendants engaged in a pattern of Racketeering Activity described in the Affidavit attached to the Criminal Complaint in *United States of America v. Larry Householder, et al.*, in the United States District Court for the Southern District of Ohio, Case No. 1:20-mj-00525.  This Affidavit and this Complaint describes multiple predicate acts of racketeering activity including, but not limited to, the numerous/extensive use of the mails and/or wires on different dates, to bribe Householder and/or others to pass nuclear plant bailout legislation (HB 6), defeat the Ballot Campaign (anti-HB6 referendum effort), and expand Householder's power to enable HB 6 to be passed and the Ballot Campaign defeated..

### **PATTERN OF RACKETEERING ACTIVITY – MAIL AND WIRE FRAUD**

76.     Defendants, individually and collectively, as an Enterprise and/or in conjunction with and/or coordinated with the members of the Householder Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) and (d).

77.     Defendants, acting individually and/or as part of the Enterprise, devised a scheme to obtain legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations, and through the payment of bribes.

78.     Defendants, acting individually and/or as part of an Enterprise, have used the mails and wires and have caused the mails and wires to be used, or reasonably knew the mails and wires would be used, in furtherance of their fraudulent scheme(s) and the payment of bribes in return for the passage of nuclear plant bailout legislation (HB6) and to prevent its repeal.

79.     Defendants have used the mails and wires in connection with the payment of bribes for the passage of bailout legislation (the passage of HB 6), fraudulently obtained, and through the use of the mails and wires which has furthered this illegal scheme and enabled Defendants to take money and property from Plaintiff and putative class members by means of false pretenses and representations and the payment of bribes, to obtain the passage of bailout legislation (HB 6) and preventing its repeal.

80.     On information and belief, each and every Defendant has specific knowledge that the mails and wires are/were being utilized in furtherance of the overall purpose of executing the illegal scheme, and/or it was reasonably foreseeable that the mails and wires would be so used.

81.     Each of the mails and wires in connection with Defendants' schemes, spanning a period from 2017 to the present, constitutes a separate instance of mail and/or wire fraud within the meaning of 18 U.S.C. §1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.  Other predicate acts, including payment of bribes for the passage of HB6 and the payment of bribes to prevent its repeal are set forth in this Complaint and the Affidavit attached to the criminal Complaint in *United States of America v. Larry Householder, et al.*, Case No. 1:20-mj-00525, in the United

States District Court for the Southern District of Ohio, incorporated into this Complaint by reference.

82.     In connection with Defendants' scheme, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.*, and on countless occasions over a substantial time period within ten years of each other.  The acts of racketeering were an ongoing part of Defendants' regular way of doing business.  The predicate acts were repeated over and over again.

## RELATIONSHIP OF PATTERN OF RACKETEERING ACTIVITY TO ENTERPRISE

83.     As described, the goal of Defendants' Enterprise was to obtain the passage of HB 6 through fraudulent, illegal means, through the payment of bribes to extract money and property from Plaintiff and putative class members by requiring them to pay a surcharge on their electric utility bills.

84.     The pattern of racketeering activity described above was integral to Defendants' scheme.  Without engaging in mail and wire fraud, and the payment of bribes, Defendants would be unable to obtain passage of HB 6.

85.     Each Defendant, individually and/or as a member of an Enterprise, has conducted or participated, directly or indirectly, in the conduct of an Enterprise's affairs through the pattern of racketeering activity previously described.  Accordingly, each Defendant has violated 18 U.S.C. § 1962(c).

86.     Moreover, each Defendant has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail, wire fraud, and the payment of bribes described above, and has thus violated 18 U.S.C. § 1962(d).

87.     As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff and putative class members have suffered substantial injuries. Plaintiff and putative class members have and/or will pay monthly surcharges that range from 85 cents per month for residential customers to $2,400 per month for commercial customers operating large industrial plants, thus constituting an injury to Plaintiff's property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) and (d).

88.     Defendants' bribery scheme supports a claim for honest services fraud. The Defendant payors provided benefits/bribes to public officials intending the public officials would take favorable official acts that the public officials would not otherwise take – a *quid pro quo*.  The bribes were specifically for the passage of HB 6 and to prevent its repeal.

89.     Defendants also entered into a straw-donor scheme, including payments to and by Generation Now, which were used for the payment and concealment of the payment of bribes to pass HB 6 and prevent its repeal.  This scheme was intended to deprive Plaintiff and class members of money or property – HB6's surcharges on electric utility customers/ratepayers.

90.     Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced as long ago as 2017 and has continued.  The pattern of racketeering activity has been directed towards tens of thousands, if not hundreds of thousands of persons, including Plaintiff and the Class members, and the pattern has spanned for many years.

91. The facts establish that Defendants are part of, or associated with the Householder Enterprise, which is an association-in-fact enterprise affecting interstate commerce, and the Defendants conspired with others to commit a pattern of racketeering activity. The Defendants enriched themselves by the bailout legislation passage by engaging in a scheme to defraud the public of the honest services of Householder and other legislators, involving the receipt of millions of dollars in secret bribe payments through Householder's 501(c)(4) account in return for Householder taking official action to help pass a legislative bailout for Defendants' two nuclear power plants; bribing and attempting to bribe individuals working on behalf of the Ballot Campaign in an attempt to receive inside information and defeat the Ballot Campaign; and concealing the scheme, their illegal activity, and the source of the funds by transferring Defendants-to-Generation-Now payments through other controlled entities and knowingly engaging in monetary transactions with the proceeds.

92. For violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiff is entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all claims in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against all Defendants, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing the undersigned counsel as Class Counsel for the Class;

B. Ordering Defendants to pay actual damages to Plaintiff and the other members of the Class;

C. Ordering Defendants to pay treble damages, as allowable by law, to Plaintiff and the other members of the Class;

D. Ordering Defendants to pay statutory damages, as provided by law;

E. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and other members of the Class;

F. Ordering Defendants to pay both pre and post-judgment interest on any amounts awarded; and

G. Ordering such other and further relief as may be just and proper.

Respectfully submitted,

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
Margaret M. Murray (0066633)
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio 44870-2517
Direct Dial: (419) 624-3126
Facsimile: (419) 624-0707
dmj@murrayandmurray.com

*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all triable issues.

*s/ Dennis E. Murray, Jr.*
Dennis E. Murray, Jr. (0038509)
MURRAY & MURRAY CO., L.P.A.
*Attorneys for Plaintiff*