## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **JACOB SMITH,** | |
| Plaintiff, | |
| v. | |
| **FIRSTENERGY CORP. AND FIRSTENERGY SERVICE CO.,** | |
| Defendants. | |
| **BRIAN HUDOCK AND CAMEO COUNTERTOPS, INC.,** | **Case Nos. 2:20-cv-03755, 03954, 03987** |
| Plaintiffs, | **Judge Edmund A. Sargus** |
| v. | **Magistrate Judge Kimberly A. Jolson** |
| **FIRSTENERGY CORP.,** *et al.,* | |
| Defendants. | |
| **JAMES BULDAS,** | |
| Plaintiff, | |
| v. | |
| **FIRSTENERGY CORP.,** *et al.,* | |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), and for the reasons set forth in the accompanying memorandum, Defendants move for an order dismissing these cases.

October 21, 2020

Carole S. Rendon (0070345)
Daniel R. Warren (0054595)
Terry M. Brennan (0065568)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: (216) 861-7485
crendon@bakerlaw.com
dwarren@bakerlaw.com
tbrennan@bakerlaw.com

*Counsel for Defendant Charles E. Jones*

John F. McCaffrey (0039486)
John A. Favret (0080427)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
Telephone: (216) 592-5000
john.mccaffrey@tuckerellis.com
john.favret@tuckerellis.com

*Counsel for Defendant Michael J. Dowling*

Respectfully submitted,

*/s/      Michael R. Gladman*
Michael R. Gladman (0059797)
*Trial Attorney*
Tiffany D. Lipscomb-Jackson (0084382)
Margaret M. Dengler (0097819) (*pro hac vice*)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Telephone: (614) 469-3939
mrgladman@jonesday.com
tdlipscombjackson@jonesday.com
mdengler@jonesday.com

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
yroth@jonesday.com

*Counsel for Defendants FirstEnergy Corp., FirstEnergy Service Co., James F. Pearson, Steven E. Strah, and K. Jon Taylor*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JACOB SMITH,<br><br>    Plaintiff,<br><br>v.<br><br>FIRSTENERGY CORP. AND FIRSTENERGY SERVICE CO.,<br><br>    Defendants. | |
| BRIAN HUDOCK AND CAMEO COUNTERTOPS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>FIRSTENERGY CORP., *et al.*,<br><br>    Defendants. | Case Nos. 2:20-cv-03755, 03954, 03987<br><br>Judge Edmund A. Sargus<br><br>Magistrate Judge Kimberly A. Jolson |
| JAMES BULDAS,<br><br>    Plaintiff,<br><br>v.<br><br>FIRSTENERGY CORP., *et al.*,<br><br>    Defendants. | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................... iii

INTRODUCTION ......................................................................................................1

FACTUAL BACKGROUND .......................................................................................3

LEGAL STANDARD ..................................................................................................8

ARGUMENT .............................................................................................................9

I.     PLAINTIFFS HAVE NOT SUFFERED COGNIZABLE INJURIES FROM HB 6 ..................... 10

A civil RICO plaintiff must have suffered an injury in his business or property. 18 U.S.C. § 1964(c); *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 563–64 (6th Cir. 2013) (en banc). Plaintiffs have not suffered any such injuries.

A.     The HB 6 Surcharges Have Not Yet Taken Effect...................................................... 10

RICO's civil cause of action is available only to those who *already* have suffered injury to business or property—not those who fear future injury. 18 U.S.C. § 1964(c); *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988). The alleged harm from HB 6—surcharges on electric bills—will not occur until at least next year, and may never occur if the Legislature repeals HB 6, which Plaintiffs admit the Legislature is considering. RICO suits cannot rest on an injury that is contingent on future events or may not occur at all. *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990).

B.     Under the Filed-Rate Doctrine, Utility Costs Are Not Cognizable RICO
       Injuries in Any Event................................................................................................ 14

Even if HB 6's surcharges take effect, the "filed-rate doctrine" bars Plaintiffs from challenging utility rates adopted or approved by a regulator. *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 796 (6th Cir. 2012). Every circuit to have considered the issue has dismissed civil RICO claims premised on increased utility rates allegedly stemming from bribery, fraud, or other predicate crimes. *E.g., H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485 (8th Cir. 1992); *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *Taffet v. Southern Co.*, 967 F.2d 1483, 1485 (11th Cir. 1992) (en banc). If the HB 6 surcharges take effect, they will be set by the Public Utilities Commission of Ohio. *See* Ohio Rev. Code § 3706.46(A)(2). The filed-rate doctrine prevents Plaintiffs from seeking damages based on those rates.

II.     THE ALLEGED RICO VIOLATIONS DID NOT PROXIMATELY CAUSE HB 6.................. 18

RICO requires civil plaintiffs to show that underlying racketeering conduct *proximately* caused their injury. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). Plaintiffs cannot show proximate cause here because too many steps and too much distance separate the alleged predicate acts and the ultimate enactment of HB 6.

A.    A Civil RICO Plaintiff Must Have Suffered a Direct Injury from the Alleged
      Racketeering Acts ........................................................................................................ 18

Proximate cause requires a "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). In a case similar to this one, the Seventh Circuit held that plaintiffs failed to allege that alleged bribery payments to the Governor of Illinois in exchange for his support of a bill proximately caused it to pass. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 728–31 (7th Cir. 2014). Bribery of a single official was insufficient to coopt the entire legislature that passed the bill.

B.    The Enactment of HB 6 Was Many Steps and Independent Actions
      Removed from Defendants' Alleged Racketeering Acts ............................................. 21

Plaintiffs have not plausibly alleged that Defendants' predicate acts proximately caused the enactment of HB 6. Too many independent decisions by people not alleged to be part of the conspiracy were necessary to HB 6's passage, including a majority of legislators in the House, a majority of the Senate, and the Governor. But there are no plausible allegations of "improper influence" on these groups. *See Empress Casino*, 763 F.3d at 729–30.

C.    Other Doctrines Further Disrupt the Chain of Causation .......................................... 24

Two additional problems defeat causation here. *First*, Plaintiffs' theory is antithetical to core First Amendment values, as it rests on the idea that *advocacy* funded by Defendants caused voters and legislators to take action. But those voters and legislators are independent actors and Defendants cannot be blamed for *convincing* them to support HB 6. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011). *Second*, legislative immunity breaks the causal chain. That doctrine protects the legislative process by preventing courts from probing too deeply into its working. *Chappell v. Robins*, 73 F.3d 918, 921 (9th Cir. 1996). Defendants were not legislators, but Plaintiffs' claims still require proof that legislators voted for HB 6 for illicit reasons. Legislative immunity prevents that inquiry. *See NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 196–97 (2d Cir. 2019).

III.   THE STATE-LAW CLAIMS FAIL FOR THE SAME (AND ADDITIONAL) REASONS ............. 27

Plaintiffs' remaining state-law claims similarly fail. *First*, every claim except unjust enrichment requires an injury. *E.g.*, *Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 808 (S.D. Ohio 2010) (civil conspiracy); *Foster v. Health Recovery Servs., Inc.*, No. 2:19-CV-4453, 2020 WL 5943021, at *3–6 (S.D. Ohio Oct. 7, 2020) (injury by criminal acts). Any injury here is future and speculative. *Second*, the filed-rate doctrine applies equally to state-law torts. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 62 (2d Cir. 1998). *Third*, every claim except unjust enrichment requires proximate cause. *E.g.*, *Lagowski v. Shelly & Sands, Inc.*, 38 N.E.3d 456, 458 (Ohio Ct. App. 2015) (negligence). As explained, Defendants' actions did not proximately cause HB 6's enactment. *Finally*, Plaintiffs cannot satisfy the elements of unjust enrichment because they did not confer any benefit on Defendants. *See Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 625 (6th Cir. 2017). Even if the HB 6 surcharges come to pass, Plaintiffs admit that FirstEnergy will not receive those subsidies.

**CONCLUSION** ............................................................................................................. **30**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AES-Apex Emp'r Servs., Inc. v. Rotondo,*
924 F.3d 857 (6th Cir. 2019) ............................................................................27

*Alexander v. Glob. Tel Link Corp.,*
816 F. App'x 939 (5th Cir. 2020) ......................................................................17

*Anderson v. Ayling,*
396 F.3d 265 (3d Cir. 2005) ..............................................................................13

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006) ...........................................................................................18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................... 3, 7, 8

*Astech-Marmon, Inc. v. Lenoci,*
349 F. Supp. 2d 265 (D. Conn. 2004) ........................................................11, 12

*Bankers Tr. Co. v. Rhoades,*
859 F.2d 1096 (2d Cir. 1988) ......................................................................10, 12

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................7, 8

*Bradley v. Miller,*
96 F. Supp. 3d 753 (S.D. Ohio 2015) ................................................................9

*Brandenburg v. Ohio,*
395 U.S. 444 (1969) (per curiam) .....................................................................25

*Buckley v. Valeo,*
424 U.S. 1 (1976) ...............................................................................................25

*California ex rel. Lockyer v. Dynegy, Inc.,*
375 F.3d 831 (9th Cir. 2004) .............................................................................28

*Carnegie-Mellon Univ. v. Cohill,*
484 U.S. 343 (1988) ...........................................................................................27

*Chappell v. Robins,*
73 F.3d 918 (9th Cir. 1996) ...............................................................................26

*Citizens United v. FEC,*
558 U.S. 310 (2010) ........................................................................................6, 25

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) .............................................................................................6

*Eisnnicher v. Bob Evans Farms Rest.,*
310 F. Supp. 2d 936 (S.D. Ohio 2004) .............................................................28

*Empress Casino Joliet Corp. v. Johnston,*
   763 F.3d 723 (7th Cir. 2014)..................................................................................................*passim*

*First Nat'l Bank of Bos. v. Bellotti,*
   435 U.S. 765 (1978)....................................................................................................................6, 25

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994)..............................................................................................................10

*Fletcher v. Peck,*
   10 U.S. (6 Cranch) 87 (1810) ..........................................................................................................14

*Foster v. Health Recovery Servs., Inc.,*
   No. 2:19-CV-4453, 2020 WL 5943021 (S.D. Ohio Oct. 7, 2020)....................................27

*Gator Dev. Corp. v. VHH, Ltd.,*
   No. C–080193, 2009 WL 1027584 (Ohio Ct. App. Apr. 17, 2009)................................28

*Godwin v. Facebook, Inc.,*
   No. 109203, 2020 WL 5949862 (Ohio Ct. App. Oct. 8, 2020) ........................................28

*H.J. Inc. v. Nw. Bell Tel. Co.,*
   954 F.2d 485 (8th Cir. 1992)....................................................................................................16, 17

*Hecht v. Commerce Clearing House, Inc.,*
   897 F.2d 21 (2d Cir. 1990) ..............................................................................................................11

*Hemi Grp., LLC v. City of N.Y.,*
   559 U.S. 1 (2010)..........................................................................................................18, 19, 23

*Holmes v. Sec. Inv'r Prot. Corp.,*
   503 U.S. 258 (1992)............................................................................................................................18

*Huff v. FirstEnergy Corp.,*
   972 F. Supp. 2d 1018 (N.D. Ohio 2013) ......................................................................................9

*In re Bridgestone/Firestone, Inc. Tire Prods. Liab. Litig.,*
   155 F. Supp. 2d 1069 (S.D. Ind. 2001)..................................................................................11, 12

*Jackson v. City of Columbus,*
   194 F.3d 737 (6th Cir. 1999)............................................................................................................8

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.,*
   731 F.3d 556 (6th Cir. 2013) (en banc) ......................................................................................10

*Johnson v. Microsoft Corp.,*
   106 Ohio St. 3d 278, 834 N.E.2d 791 (2005)............................................................................29

*Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.,*
   166 Ohio St. 254, 141 N.E.2d 465 (1957) ..................................................................................28

*Keogh v. Chi. & Nw. Ry. Co.,*
   260 U.S. 156 (1922)....................................................................................................................15, 16

*Kinzer v. Serv. Trucking, Inc.,*
   No. 2:17-CV-675, 2020 WL 815665 (S.D. Ohio Feb. 19, 2020)....................................28

*Lagowski v. Shelly & Sands, Inc.,*
   38 N.E.3d 456 (Ohio Ct. App. 2015)............................................................................................28

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,*
    440 U.S. 391 (1979) ............................................................................................26

*Leo v. Nationstar Mortg. LLC,*
    964 F.3d 213 (3d Cir. 2020) ..............................................................................17

*Lincoln House, Inc. v. Dupre,*
    903 F.2d 845 (1st Cir. 1990) ........................................................................ 11, 12

*Maio v. Aetna, Inc.,*
    221 F.3d 472 (3d Cir. 2000) ........................................................................ 10, 12

*Marcus v. AT&T Corp.,*
    138 F.3d 46 (2d Cir. 1998) ................................................................................28

*McCormick v. United States,*
    500 U.S. 257 (1991) .............................................................................................7

*MCI Telecomms. Corp. v. Ohio Bell Tel. Co.,*
    376 F.3d 539 (6th Cir. 2004) ..............................................................................15

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) .............................................................................................6

*Mendelovitz v. Vosicky,*
    40 F.3d 182 (7th Cir. 1994) ......................................................................... 19, 22

*Nat'l Credit Union Admin. Bd. v. Jurcevic,*
    867 F.3d 616 (6th Cir. 2017) ..............................................................................29

*NRP Holdings LLC v. City of Buffalo,*
    916 F.3d 177 (2d Cir. 2019) ..............................................................................27

*Nwanguma v. Trump,*
    903 F.3d 604 (6th Cir. 2018) ..............................................................................25

*Perry v. Am. Tobacco Co.,*
    324 F.3d 845 (6th Cir. 2003) ....................................................................... 19, 23

*Religious Tech. Ctr. v. Wollersheim,*
    796 F.2d 1076 (9th Cir. 1986) ............................................................................14

*RJR Nabisco, Inc. v. European Cmty.,*
    136 S. Ct. 2090 (2016) .........................................................................................9

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,*
    806 F.3d 71 (2d Cir. 2015) ................................................................................24

*Skilling v. United States,*
    561 U.S. 358 (2010) .............................................................................................9

*Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs,*
    641 F.3d 197 (6th Cir. 2011) (en banc) .............................................................25

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ...........................................................................................25

*Sosa v. Alvarez-Machain,*
    542 U.S. 692 (2004) .............................................................................................9

*Square D Co. v. Niagara Frontier Tariff Bureau,*
 476 U.S. 409 (1986)..................................................................................................15

*Steele v. Hosp. Corp. of Am.,*
 36 F.3d 69 (9th Cir. 1994)......................................................................................10

*Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,*
 45 F.3d 58 (2d Cir. 1995) ................................................................................. 16, 17

*Taffet v. S. Co.,*
 967 F.2d 1483 (11th Cir. 1992) (en banc)....................................................... 16, 17

*Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.,*
 729 F.2d 1128 (7th Cir. 1984) ................................................................................26

*Thornhill v. Alabama,*
 310 U.S. 88 (1940)...................................................................................................25

*Twp. of Marlboro v. Scannapieco,*
 545 F. Supp. 2d 452 (D.N.J. 2008) ........................................................................13

*United States v. Siegelman,*
 640 F.3d 1159 (11th Cir. 2011) .................................................................................7

*Wagner v. Circle W. Mastiffs,*
 732 F. Supp. 2d 792 (S.D. Ohio 2010)..................................................................27

*Wah Chang v. Duke Energy Trading & Mktg., LLC,*
 507 F.3d 1222 (9th Cir. 2007) ................................................................................17

*Wall v. Mich. Rental,*
 852 F.3d 492 (6th Cir. 2017)..................................................................................13

*Wegoland Ltd. v. NYNEX Corp.,*
 27 F.3d 17 (2d Cir. 1994) ..........................................................................15, 16, 17

*Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co.,*
 221 F.3d 924 (6th Cir. 2000)..................................................................................14

*Williams v. Duke Energy Int'l, Inc.,*
 681 F.3d 788 (6th Cir. 2012) ..................................................................................15

**STATUTES**

15 U.S.C. § 15 ................................................................................................................15

18 U.S.C. § 1341 .............................................................................................................9

18 U.S.C. § 1343 .............................................................................................................9

18 U.S.C. § 1346 .............................................................................................................9

18 U.S.C. § 1961 .............................................................................................................9

18 U.S.C. § 1962 ........................................................................................................9, 18

18 U.S.C. § 1963 ...........................................................................................................13

18 U.S.C. § 1964 .....................................................................................................*passim*

Ohio Rev. Code § 2307.60................................................................................... 27, 28

Ohio Rev. Code § 2923.32.................................................................................................8

Ohio Rev. Code § 3706.46...................................................................................11, 12, 17

Ohio Rev. Code § 3706.49..............................................................................................11

Ohio Rev. Code § 3706.55...................................................................................11, 12, 13

**OTHER AUTHORITIES**

1 CV Ohio Jury Instr. 455.01..........................................................................................28

Andy Chow, *Ohio House Holds Hearings On HB 6 Repeal Process*,
    CINCINNATI PUBLIC RADIO (Sept. 10, 2020)..............................................................12

Fed. R. Civ. P. 12............................................................................................................8

Erica Murphy, *State Lawmakers Meet to Look at House Bill 6: Should it Stay in Place
    or be Tossed Out?*, 13 ABC ACTION NEWS (Sept. 23, 2020) .......................................12

Jeremy Pelzer, *Ohio House Bill 6 Legislative Opponents Make Case for Repeal*,
    CLEVELAND.COM (Sept. 10, 2020)..............................................................................12

Darrel Rowland, *Capitol Insider: Ohio Senate Likely to Repeal HB 6 Before Election Day*,
    THE COLUMBUS DISPATCH (Aug. 23, 2020) ...............................................................12

## INTRODUCTION

This past July, a federal grand jury returned an indictment charging the former speaker of the Ohio House, Larry Householder, and some of his associates, with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), by allegedly accepting bribes and engaging in other misconduct in connection with HB 6, a piece of energy legislation enacted into law in the summer of 2019. The bribes allegedly took the form of contributions to a Householder-controlled 501(c)(4) advocacy organization called Generation Now, which used the funds to promote HB 6 and candidates who supported the bill. The indictment does not name the companies that contributed to Generation Now, much less assert any criminal charges against them, but they have been identified in the media to include FirstEnergy Corp. ("FirstEnergy"), one of its subsidiaries, and one of its former subsidiaries.

Plaintiffs in these cases are individuals and businesses in Ohio who claim to be injured by HB 6. Piggybacking on the indictment—and pushing further—they assert claims under civil RICO and state law against FirstEnergy, one of its subsidiaries, and five of its executives. The gist is that Defendants allegedly conspired with Householder; their efforts resulted in passage of HB 6; and that legislation imposes utility surcharges that harm Plaintiffs.

FirstEnergy and the other Defendants vigorously deny that they engaged in bribery or other misconduct. The actions that FirstEnergy took—engaging in the legislative process, contributing to advocacy groups, donating to political campaigns, and hiring lobbyists—were protected exercises of its First Amendment rights. *Participating* in the political process is not a crime. And despite what Householder and his associates are alleged to have done, there are no factual allegations in the Householder criminal indictment, or the civil complaint here, that suggest FirstEnergy ever crossed the line to *corrupt* the process.

Regardless, this Court need not wade into the merits of the underlying criminal case against Householder to resolve the instant cases. Even accepting as true all of the allegations of racketeering activity, Plaintiffs have no civil cause of action under RICO. To state a claim, a plaintiff must have suffered: (i) an injury to business or property that (ii) was proximately caused by the alleged racketeering. As a matter of law, Plaintiffs cannot satisfy *either* element.

*First*, Plaintiffs' claimed injury is legally insufficient. They identify their injury as HB 6's utility surcharges to support two nuclear plants, but those surcharges *have not yet taken effect*. And that is meaningful, given the substantial likelihood—expressly admitted by Plaintiffs— that the Legislature will repeal HB 6 before the surcharges ever take effect. Courts uniformly dismiss civil RICO suits that rely on future hypothetical injuries, which is all Plaintiffs have. The claimed injury also fails for an independent reason: Under the "filed rate doctrine," courts across the country have categorically rejected RICO claims premised on utility charges. Even if they do take effect, the HB 6 surcharges are simply not cognizable injuries.

*Second*, even if the HB 6 surcharges were a cognizable injury, Plaintiffs cannot surmount the proximate-cause hurdle. Between Defendants' contributions to Generation Now and the enactment of HB 6 lie countless actions and decisions by independent actors (including voters, a majority of the Ohio House, the Senate, and the Governor). As the Seventh Circuit has recognized, that breaks the causal chain. So too does the First Amendment (which is offended by the notion that *persuading* someone could be a trigger for liability) and legislative immunity (which shields the legislative process from intrusive scrutiny). In short, Defendants cannot be liable for the product of the legislative process, even if that process was allegedly tainted.

As for Plaintiffs' state-law claims, they all legally fail for similar reasons.

The Householder indictment no doubt raises serious allegations. The Court presiding over the criminal prosecution will, in due course, test those allegations, and FirstEnergy is confident that no misconduct on its part will be shown. But in all events, these civil cases—a misguided effort to turn a public-integrity prosecution into a civil damages class action—fail as a matter of law and must therefore be dismissed.

## FACTUAL BACKGROUND

At this stage, the well-pleaded factual allegations of the Complaint (Dkt. 19, "Compl.") are assumed true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Those allegations, summarized below, are that Defendants conspired with the former Speaker to provide "bribes," principally in the form of contributions to Generation Now, in exchange for efforts to enact HB 6.

1.   **The Alleged Conspiracy.**   The Complaint alleges a conspiracy between Defendants and the "Householder Enterprise." (Compl. at 2–3.) Defendants are FirstEnergy Corp. (an Ohio-based holding company), FirstEnergy Service Company (a subsidiary that provides legal, financial, and other corporate support services to FirstEnergy and its affiliates), and five current and former executives at FirstEnergy (Charles Jones, James Pearson, Steven Strah, Jon Taylor, and Michael Dowling). (Compl. ¶¶ 5–7.) Although it is improper to conflate the various entities and individuals, the distinctions are immaterial to this motion, which refers to all Defendants as "FirstEnergy." The "Householder Enterprise" is a construct of the federal indictment; it comprises the former Speaker, several of his political associates, and a 501(c)(4) social-welfare group (Generation Now) he allegedly "controlled." (Compl. ¶¶ 10, 30.) According to the Complaint, the goals of the Householder Enterprise were to advance the Speaker's political power and enrich its members. (Compl. ¶¶ 12, 39.)

The Complaint alleges that Defendants conspired with the Householder Enterprise in executing a bribery scheme. FirstEnergy was allegedly confronting the prospect of "hundreds of millions of dollars in losses" from its "nuclear energy affiliate." (Compl. ¶ 27.) It needed a "legislative solution" to save its two "nuclear power plants in Ohio." (Compl. ¶ 28.) At the same time, Householder was "re-entering politics" and coveted a return to the Speakership he had once held. (Compl. ¶¶ 30, 37.) The general thrust of the Complaint is that Defendants agreed to direct some $60 million toward Generation Now, which Householder and his allies could use to "further their political interests," in "exchange" for Householder's assistance in promoting a "billion-dollar-bailout" for FirstEnergy's two struggling nuclear plants. (Compl. ¶ 35.) Generation Now allegedly used the funds from FirstEnergy "to help enact the bailout legislation," such as by supporting the "political campaign[s]" of Householder and his allies, and paying the "operating costs" of various "political and campaign staff" and lobbyists who are defined to be part of the Enterprise. (Compl. ¶¶ 36, 41–50.)

To be more specific, the Complaint alleges a scheme that played out over a period of years and involved three basic steps. First, laying the groundwork, in "the Spring and Fall of 2018, the Householder Enterprise spent millions of dollars of FirstEnergy's money to support Ohio House of Representatives candidates involved in primary and general elections." (Compl. ¶ 30.) These were candidates who Householder "believed" would follow his lead if elected, including out of gratitude or loyalty for his financial support. (Compl. ¶¶ 30, 38.) And in January 2019, these "Householder-backed candidates that benefitted from FirstEnergy's money received by Generation Now" allegedly "helped elect Householder as the Speaker of the House." (Compl. ¶ 31.)

Second, in April 2019, a bill known as HB 6 was introduced "to save from closure FirstEnergy's two supposedly failing nuclear power plants." (*Id.*) Householder allegedly helped shepherd HB 6 through the House by "pick[ing] freshman representatives" loyal to him "to sponsor" the bill and "creat[ing] a new subcommittee," made up "mostly of his political supporters," to review it. (Compl. ¶ 65.) After HB 6's introduction, the Householder Enterprise used a continuing stream of funding from FirstEnergy to Generation Now "for mailers and media advertisements to pressure members of the House to support the legislation." (Compl. ¶¶ 32–33.) This was an "expensive media blitz ... to pressure public officials to support the bill." (Compl. ¶ 65.) Householder and his associates also allegedly "pressured House members to vote for HB 6" in unspecified ways. (Compl. ¶ 32.) The House passed the bill in May 2019. (Compl. ¶ 33.)

Over the next "two months," after passage by the House, the Householder Enterprise allegedly "exerted pressure on the Senate," which also passed the legislation. (*Id.*) The bill was then "signed into law by Governor DeWine." (*Id.*)

The third and last step of the alleged scheme was to defeat "a statewide ballot-initiative referendum" that sought "to overturn the legislation." (*Id.*) To do so, Householder and his associates allegedly used Generation Now funds (ultimately deriving from FirstEnergy) to "purchase media advertisements and mailers against the Ballot Campaign, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the referendum." (Compl. ¶ 34.) "The efforts to prevent a referendum of HB 6 … were successful," as the ballot initiative "failed to collect enough signatures" to get on the ballot. (Compl. ¶ 70.)

**2. FirstEnergy's Alleged Role.** Although it is ultimately unnecessary to the dismissal of these cases, it is worth observing that the Complaint does not allege facts showing bribery on the part of FirstEnergy. What the Complaint does allege are facts showing robust political engagement by the company on a matter of public concern. The Complaint then infers, in conclusory fashion with no supporting facts, an illicit *quid pro quo* agreement.

More specifically, the Complaint alleges that Defendants directed money to a 501(c)(4) advocacy group to promote and advance certain legislative objectives. The 501(c)(4) then used those funds to support the political campaigns of Householder and his allies, to promote HB 6 through "an expensive media blitz" (Compl. ¶ 65), and to oppose a ballot initiative with, among other things, "advertisements and mailers" (Compl. ¶ 34). To execute these advocacy campaigns, Generation Now donated money to a PAC, hired "media services firms" and a "political strategy group," and paid various lobbyists. (Compl. ¶¶ 44, 46, 52.)

All of those actions are presumptively protected by the Constitution. Corporations are entitled to speak on matters of public concern. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978). This First Amendment right extends to speech advocating for or against the election of candidates for office. *Citizens United v. FEC*, 558 U.S. 310 (2010). Anonymous political speech retains constitutional protection. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). And the fundamental right to petition the government includes the right to hire lobbyists and consultants to do so. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). Insofar as the Complaint alleges various ways in which FirstEnergy engaged in the political process by supporting candidates aligned with its policy goals and advocating for legislation that served its interests, the Complaint is describing core First Amendment activity.

Of course, one cannot use the exercise of those rights as a bribe, as part of a corrupt exchange for official action. For example, the Constitution protects the right to make campaign donations, but one cannot trade a campaign donation for a promise of official action. *See McCormick v. United States*, 500 U.S. 257, 273 (1991). However, to avoid the risk of chilling or even penalizing constitutionally protected conduct, the Supreme Court has held that an exercise of First Amendment rights may be deemed a "bribe" only if there existed an "*explicit promise*" to trade it for official action. *Id.* (emphasis added). That is, when a bribery charge "impact[s] the First Amendment's core values," the prosecution must establish an "explicit" agreement that involved a "*quid pro quo*" for "a *specific* official action"—not merely a temporal nexus. *United States v. Siegelman,* 640 F.3d 1159, 1169–71 (11th Cir. 2011).

Bribery in this context would thus require an explicit agreement between Householder and FirstEnergy to trade 501(c)(4) support for Householder's HB 6 efforts. Yet although the Complaint alleges a corrupt agreement, those allegations are totally conclusory. *Iqbal*, 556 U.S. at 678. Plaintiffs merely label the payments as "illicit and unlawful" "bribe money" and assert they were in "exchange" for help in passing HB 6. (Compl. ¶¶ 12, 35.) But they allege no *facts* showing any agreement. As in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007), Plaintiffs try to infer an illegal conspiracy from facts—a company supporting candidates aligned with its policy goals, and those candidates' efforts to advance those goals—that do not give rise to any inference of corruption. *See McCormick*, 500 U.S. at 272–73 (calling this "unavoidable" and "the everyday business of a legislator"). And the claims against the Individual Defendants are even more faulty. Plaintiffs allege that they "oversee FirstEnergy's operations" (Compl. ¶ 7), without tying them to a single unlawful act. That is insufficient. *Iqbal*, 550 U.S. at 664.

Having said all that, this motion does not ask the Court to evaluate the plausibility of Plaintiffs' bribery allegations. Even treating those allegations as both factually true and legally sufficient, Plaintiffs' civil RICO (and other) claims fail as a matter of law.

**3. The Civil Actions.** Plaintiffs are Ohio residents and businesses who allege that they are "injured" by the "payment of monthly surcharges" that HB 6 imposes as "subsidies for FirstEnergy's Davis-Besse and Perry Nuclear Power Plants." (Compl. ¶¶ 1–4.) Based on that alleged injury, Plaintiffs assert civil claims under RICO, 18 U.S.C. § 1964(c), and the parallel Ohio Corrupt Practices Act ("OCPA"), Ohio Rev. Code § 2923.32(A)(1), on behalf of a putative class of everyone in Ohio who "have and/or will have to pay a monthly surcharge for electric service pursuant to HB 6." (Compl. ¶ 78.) Plaintiffs also assert state-law claims for civil conspiracy, injury through criminal acts, unjust enrichment, and negligence. (Compl. ¶¶ 109–120.) By way of relief, they seek treble damages, an order enjoining HB 6, and a declaration that the legislation is "illegal and invalid." (Compl. at 48.)

## LEGAL STANDARD

Under Rule 12(b)(6), Plaintiffs must plead facts that, if true, are sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678. Rather, Plaintiffs must plead sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts accept well-pleaded factual allegations, but not bare conclusions. *Id.* The court may take judicial notice of facts not subject to reasonable dispute, including (as relevant here) the provisions of HB 6. *See Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999).

# ARGUMENT

Plaintiffs principally assert claims under RICO and its Ohio analogue. RICO's criminal provisions make it "unlawful" to take certain actions "through a pattern of racketeering activity," which is defined as at least two enumerated predicate crimes. *See* 18 U.S.C. § 1961(1), (5); *id.* § 1962(a)–(c). RICO also forbids conspiring to violate its prohibitions. *Id.* § 1962(d). Among the enumerated predicate acts are mail and wire fraud, *id.* §§ 1341, 1343, which in turn cover bribery, *id.* § 1346; *see also Skilling v. United States*, 561 U.S. 358 (2010).

"Separately, RICO creates a private civil cause of action that allows '[a]ny person injured in his business or property by reason of a violation of section 1962' to sue in federal district court and recover treble damages, costs, and attorney's fees." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2097 (2016) (quoting 18 U.S.C. § 1964(c)). RICO's civil cause of action is distinct from its substantive criminal prohibitions. After all, "[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).

Here, Plaintiffs' RICO claims fail even assuming that Defendants violated the statute, because Plaintiffs cannot establish the two additional elements required for a civil claim under § 1964(c). *First*, Plaintiffs have not been "injured in [their] business or property." *Second*, any such injury was not "by reason of" the alleged racketeering conduct.[1] Plaintiffs' state-law tort claims fail largely for the same reasons—all require cognizable injury and proximate cause—and because Defendants were not unjustly enriched by any benefit conferred by Plaintiffs.

---

[1] The OCPA tracks the federal statute in all material respects. Defendants therefore do not address that claim separately; it fails for the same reasons. *See Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1039 (N.D. Ohio 2013) (dismissing OCPA claim for lack of injury); *Bradley v. Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015) (applying federal proximate cause rules to OCPA claim).

# I. PLAINTIFFS HAVE NOT SUFFERED COGNIZABLE INJURIES FROM HB 6.

The most basic element of a civil RICO claim is that the plaintiff must have suffered injury in his business or property. 18 U.S.C. § 1964(c); *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 563–64 (6th Cir. 2013) (en banc). Here, Plaintiffs' theory of injury is simple: They say that HB 6 requires them to pay surcharges on their electric bills to subsidize nuclear power plants. (Compl. ¶¶ 1–4, 108.) But that theory fails for at least two reasons. To start, those surcharges have not yet taken effect and might never take effect. Moreover, utility rates cannot give rise to cognizable injuries under the venerable "filed-rate" doctrine. Each of those reasons legally deprives Plaintiffs of standing to pursue their RICO claims.

## A. The HB 6 Surcharges Have Not Yet Taken Effect.

The threshold problem with Plaintiffs' "injury" is that it is a speculative future injury, not an actual current one. They claim to be injured by the nuclear-subsidy surcharges imposed by HB 6. But this Court need only look at the text of that bill to see that those charges have not taken effect. Plaintiffs have thus not yet been "injured in [their] business or property." 18 U.S.C. § 1964(c). And, as Plaintiffs recognize, they might *never* be injured.

Courts uniformly hold that RICO's civil cause of action is available only to those who have *already* suffered injury to their business or property—not those who fear or predict injury in the future. "Until such injury occurs, there is no right to sue for damages under § 1964(c)." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988); *see also, e.g., Maio v. Aetna, Inc.*, 221 F.3d 472, 495 (3d Cir. 2000) (holding that a "theory of RICO injury" based on "future events," rather than "the actual occurrence of those events," is "insufficient to support a cause of action"); *Steele v. Hosp. Corp. of Am.*, 36 F.3d 69, 71 (9th Cir. 1994) ("[S]peculative injuries do not serve to confer standing under RICO, unless they become concrete and actual."); *First*

*Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767–68 (2d Cir. 1994) (rejecting RICO claim based on "unforeclosed loans," since injury from those loans remained "indefinite"); *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990) (rejecting RICO injury that was "contingent on events that may not occur as anticipated or may not occur at all"); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (dismissing RICO claim "because Hecht only alleges that he would have lost commissions in the future, and not that he has lost any yet"); *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 270 (D. Conn. 2004) ("A speculative injury ... or a future injury are not legally sufficient."); *In re Bridgestone/Firestone, Inc. Tire Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1090 (S.D. Ind. 2001) ("An injury that is speculative or contingent on future events that may or may not occur is insufficient to satisfy [RICO's] injury requirement.").

Plaintiffs correctly allege that HB 6, as a general matter, took effect in October 2019. (Compl. ¶ 70.) But certain parts of the legislation did not take effect until later—and the parts that allegedly injured Plaintiffs have *still not* taken effect. Again, they challenge the surcharges that subsidize the "Davis-Besse and Perry Nuclear Power Plants." (Compl. ¶ 1.) HB 6 created those surcharges by enacting a provision that directs the Public Utilities Commission of Ohio ("PUCO") to determine the "level and structure" of surcharges that every "electric distribution utility" in Ohio will then "collect from all of its retail electric customers" on a monthly basis. Ohio Rev. Code § 3706.46(A). Those collected funds are to be deposited into a "nuclear generation fund" and "renewable generation fund." *Id.* § 3706.49(A). The contents of said nuclear generation fund, in turn, are then to be remitted to "qualifying nuclear resource[s]" (like the two nuclear plants) pursuant to a specified formula. *Id.* § 3706.55(A).

The critical point is this: The surcharges under § 3706.46 apply to "all bills rendered on or after January 1, 2021." *Id.* § 3706.46(A)(1). The nuclear subsidies, in turn, begin to be remitted only as of April 2021. *See id.* § 3706.55(A). Accordingly, Plaintiffs have not yet paid any of the electricity surcharges that their lawsuit complains about. They have not yet been injured; the alleged injury is only a potential future injury that would begin next year. "Until such injury occurs, there is no right to sue for damages under § 1964(c)." *Bankers Tr.*, 859 F.2d at 1102. As a matter of law, "future injury" is "not legally sufficient." *Astech-Marmon*, 349 F. Supp. 2d at 270; *see also Maio*, 221 F.3d at 495 (rejecting injury based on "future events").

Nor is this merely a technical deficiency that will inevitably be cured in short order. For one thing, Plaintiffs themselves admit that HB 6 might be repealed before the surcharges kick in: "The Ohio Legislature may well repeal and replace HB 6." (Compl. ¶ 77.) Indeed, following the Householder criminal indictment, the Governor has called for just that, and the Legislature is actively working on it.[2] The admittedly meaningful prospects of repeal (or amendment) of HB 6 confirm that Plaintiffs' claimed injury stemming from a not-yet-effective provision of that statute are not only *future* but also *speculative*. Yet a RICO suit cannot be founded on an injury that is "contingent on events that may not occur as anticipated or may not occur at all." *Lincoln House*, 903 F.2d at 847; *see also In re Bridgestone/Firestone*, 155 F. Supp. 2d at 1090 (rejecting injury "that is speculative or contingent on future events that may or may not occur"). A RICO claim based on HB 6's surcharges is plainly unripe.

---

[2] Andy Chow, *Ohio House Holds Hearings On HB 6 Repeal Process*, CINCINNATI PUBLIC RADIO (Sept. 10, 2020); Darrel Rowland, *Capitol Insider: Ohio Senate Likely to Repeal HB 6 Before Election Day*, THE COLUMBUS DISPATCH (Aug. 23, 2020); Jeremy Pelzer, *Ohio House Bill 6 Legislative Opponents Make Case for Repeal*, CLEVELAND.COM (Sept. 10, 2020); Erica Murphy, *State Lawmakers Meet to Look at House Bill 6: Should it Stay in Place or be Tossed Out?*, 13 ABC ACTION NEWS (Sept. 23, 2020).

In response to the prospect of repeal, Plaintiffs insist they would still be injured by the "hijack[ing]" of "democracy" and "damaged ... trust." (Compl. ¶ 77.) But, even if true, those are not injuries to *business or property*; they cannot support a civil RICO claim. *Twp. of Marlboro v. Scannapieco*, 545 F. Supp. 2d 452, 459 n.7 (D.N.J. 2008) ("Loss of faith in government is ... not the kind of injury contemplated by RICO statutes."); *Anderson v. Ayling*, 396 F.3d 265, 271 (3d Cir. 2005) (corruption "is not a cognizable injury that can create RICO standing").

Plaintiffs also suggest that, repeal or not, Defendants are "not entitled to 'keep the change' of their ill-gotten gains." (Compl. ¶ 77.) It is not clear what "gains" they mean. The nuclear subsidies, as noted, would not begin to be remitted until April 2021. Ohio Rev. Code § 3706.55(A). And monies paid to Generation Now were paid *by* Defendants, not *to* them. In any event, RICO does not authorize private parties to obtain forfeiture of "ill-gotten gains." Forfeiture is a criminal penalty. 18 U.S.C. § 1963(a). A private plaintiff is limited to "threefold the damages he sustains." 18 U.S.C. § 1964(c). "In the absence of an injury," civil claims must be dismissed. *Wall v. Mich. Rental*, 852 F.3d 492, 495–96 (6th Cir. 2017). Finally, Plaintiffs say that, even if HB 6 is repealed or replaced, Defendants would "remain liable for the costs to ratepayers proximately caused by their unlawful conduct." (Compl. ¶ 77.) That is incoherent, since the repeal of HB 6 would necessarily prevent its "costs" from taking effect.

Even beyond the prospect of *legislative* repeal, Plaintiffs' injury might also be avoided by state *judicial* action. Notably, Plaintiffs contend that HB 6 is "illegal and invalid legislation" because it was allegedly tainted by bribery. (Compl. at 48.) If that is true, then a court can so declare, and the electric surcharges would never take effect—in which case, again, Plaintiffs would never suffer an injury to business or property. But *this Court* cannot award that relief,

as this is an action against a private party, not against the relevant state officials. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810) ( "[A] court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."); *see also Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986) ("Taken together, the legislative history and statutory language suggest overwhelmingly that no private equitable action should be implied under civil RICO."), *cited with approval in Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co.*, 221 F.3d 924, 927 n.2 (6th Cir. 2000).

In short, Plaintiffs have premised this lawsuit on surcharges that they have not yet paid and that they may *never* pay, in light of the prospect of repeal and the availability of state-law remedies. They have not been "injured in [their] business or property," 18 U.S.C. § 1964(c), and their civil RICO claims must consequently be dismissed as a matter of law.

### B. Under the Filed-Rate Doctrine, Utility Costs Are Not Cognizable RICO Injuries in Any Event.

Even if the HB 6 surcharges take effect and increase utility rates for Plaintiffs, that still would not constitute a cognizable injury to business or property. The reason is the "filed-rate doctrine," which generally bars plaintiffs from challenging, as fraudulent, tainted, or otherwise unreasonable, utility rates that were adopted or approved by a regulator. Although the Sixth Circuit has not confronted the issue, at least five other Courts of Appeals have applied that doctrine to RICO, dismissing civil claims premised on increased utility rates that allegedly stemmed from bribery, fraud, or other predicate crimes. No Circuit has held otherwise. The doctrine independently requires dismissal here, where Plaintiffs object to surcharges that PUCO (the utility regulator) has been directed to impose pursuant to HB 6.

As a general matter, "[t]he filed rate doctrine requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies." *MCI Telecomms. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547 (6th Cir. 2004). "[A]ny 'filed rate'—that is, one approved by the governing regulatory agency—is ... *unassailable* in judicial proceedings brought by ratepayers." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) (emphasis added). Under this doctrine, any challenge to "the setting or reasonableness" of a rate "approved by an appropriate regulatory agency" is "barred." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 796 (6th Cir. 2012). The Sixth Circuit has explained that this doctrine serves two purposes: It prevents rate discrimination by ensuring that courts do not alter filed rates, and it preserves the primacy of administrative agencies in rate-setting. *See id.*

The Courts of Appeals have applied the filed-rate doctrine to preclude civil RICO claims based on increased utility rates. In doing so, these courts followed the Supreme Court's holding in *Keogh v. Chicago & Northwestern Railway Co.*, which construed the identical "injured in his business or property" language in the civil cause of action of the federal antitrust statutes. 260 U.S. 156, 163 (1922); *see also* 15 U.S.C. § 15. The Court held that a customer could not pursue a claim against the railroads for allegedly engaging in anticompetitive rate-fixing. *See* 260 U.S. at 163. Even if the anticompetitive conduct had increased overall shipping rates, there was no cognizable injury, Justice Brandeis wrote, because "[i]njury implies violation of a legal right" and the "legal rights of shipper as against carrier in respect to a rate are measured by the published tariff." *Id.* This filed-rate principle created a "stringent rule" precluding such suits, the Court determined. *Id.* at 163–64; *see also Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 424 (1986) (reaffirming and refusing to overrule *Keogh*).

The Eighth Circuit was the first to consider the filed-rate doctrine's application to civil RICO. *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485 (8th Cir. 1992). The plaintiffs alleged that the defendant had "bribed members of the Minnesota Public Utilities Commission" to induce higher telephone rates. *Id.* at 486. The court held that the filed-rate doctrine, which "prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue," barred this claim. *Id.* at 486, 488. The court rejected all of the plaintiffs' grounds for distinguishing the doctrine, including an argument that it does not cover claims of "extrinsic" impropriety. *See id.* at 488–94.

Two other Circuits quickly followed. In *Taffet v. Southern Co.*, plaintiffs filed RICO suits to "recover for excessive charges for electrical power resulting from the utility's fraudulent and material misrepresentations." 967 F.2d 1483, 1485 (11th Cir. 1992) (en banc). Hearing the appeal en banc, the Eleventh Circuit described the filed-rate doctrine as "bar[ring] recovery by those who claim injury by virtue of having paid a filed rate." *Id.* at 1488. Thus, "even if the filed rate is obtained through fraud, it remains true that one does not suffer the predicate 'injury to business or property' by paying the filed rate." *Id.* at 1495. On that basis, the court affirmed dismissal for lack of "a legally cognizable injury." *Id.* at 1487–88.

Likewise, the Second Circuit in *Wegoland*—citing *Keogh*, *H.J.*, and *Taffet*—affirmed the dismissal of putative class actions alleging fraud in setting telephone rates. 27 F.3d at 22. As the court explained, "government officials" are free to pursue impropriety in rate-setting, but "individual ratepayers simply have no role" beyond "participating in the political process and filing complaints with the regulatory agencies." *Id.* at 21–22; *see also Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995) (reaffirming *Wegoland*).

Just this year, the Third Circuit joined the consensus, affirming the dismissal of RICO (and other) claims alleging collusion between a reverse-mortgage lender and a hazard insurance company designed to inflate insurance rates. *See Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 215 (3d Cir. 2020). "Once [a] ... rate is filed with the appropriate regulatory body," the court explained, "we have no ability to effectively reduce it by awarding damages," regardless of any alleged fraud, conspiracy, or misconduct tainting that rate. *Id.* at 217–18.

Finally, the Ninth Circuit has expressly "agree[d]" with *Sun City*, *Wegoland*, *Taffet*, and *H.J* that RICO actions based on higher utility rates are "barred." *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 n.4 (9th Cir. 2007). And the Fifth Circuit has "assume[d]" the same, noting that "every circuit court to consider the question has concluded the doctrine applies to lawsuits brought under [18 U.S.C.] § 1964(c)." *Alexander v. Glob. Tel Link Corp.*, 816 F. App'x 939, 943 & n.5 (5th Cir. 2020).

Under this uniform approach, Plaintiffs' suit must be dismissed. They allege injury from surcharges on electric bills. (Compl. ¶¶ 1–4.) But those surcharges, if they take effect, will be set *by the PUCO*, within the parameters set by law. *See* Ohio Rev. Code § 3706.46(A)(2) (directing agency to determine method of allocation of surcharges and set "level and structure of the charge"). Accordingly, any surcharge that consumers ultimately pay will have been set by the regulatory agency; the filed-rate doctrine prevents courts from awarding damages based on those rates. This is not a "cognizable injury" under RICO. *Taffet*, 967 F.2d at 1487–88. And the bribery allegations do not change the result. *See H.J.*, 954 F.2d at 486. In short, while "government officials" may enforce the bribery laws, ratepayers "simply have no role" beyond demanding repeal of HB 6. *Wegoland*, 27 F.3d at 21–22. Their claims must be dismissed.

## II. THE ALLEGED RICO VIOLATIONS DID NOT PROXIMATELY CAUSE HB 6.

Even if HB 6 and its surcharges could constitute cognizable RICO injuries, Plaintiffs' claims still remain non-starters as a matter of law. Civil RICO requires Plaintiffs to causally link their injuries to the underlying racketeering conduct—and the latter must not only be the *but-for* cause of the injury, but also its *proximate* cause. Plaintiffs cannot satisfy the proximate cause requirement. There are simply too many steps, and too much distance, between the alleged predicate acts and the ultimate enactment of HB 6. As the Seventh Circuit recently explained, bribery of a single official—even an influential one—cannot be characterized as the proximate cause of a bill backed by a majority of both chambers and signed into law by the Governor. And that is before layering on top the First Amendment and legislative immunity principles that further disrupt and destroy the chain of causation here.

### A. A Civil RICO Plaintiff Must Have Suffered a Direct Injury from the Alleged Racketeering Acts.

RICO provides a civil remedy for a "person injured in his business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). The Supreme Court has interpreted the italicized language to require proximate cause. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (finding no proximate cause due to the "attenuation between the plaintiff's harms and the claimed RICO violation"). "[E]valuated in light of its common-law foundations," proximate cause requires a "direct relation between the injury asserted and the injurious conduct alleged." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010). A link "too remote," "contingent," or "indirec[t]" is insufficient. *Id.* Indeed, if a "theory of causation" would require the court to move "beyond the first step," RICO's "direct relationship requirement" is not satisfied. *Id.* at 10.

In *Hemi Group*, for example, New York City alleged that the defendant, a company that sold cigarettes online, committed fraud by failing to submit customer information to the state, which impaired the City's ability to collect taxes. *Id.* at 4. The Court refused to "extend RICO liability to situations where the defendant's fraud on the third party (the State) ... made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* at 11.

The Sixth Circuit's decision in *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003), provides another good example of an overly indirect causal chain. There, plaintiffs pursued a civil RICO action against tobacco manufacturers, alleging that the costs of smoking-related illness increased their health insurance premiums. *Id.* at 847–48. The Sixth Circuit held that these injuries were "too remote," and "contingent" on independent actions by third parties, such as cost allocations by the insurance companies. *Id.* at 848–49; *see also, e.g., Mendelovitz v. Vosicky*, 40 F.3d 182, 185 (7th Cir. 1994) (finding absence of proximate cause where damages did not flow "*directly* from the alleged predicate acts" but instead "require[d] actions and decisions by third parties before coming into being").

As relevant here, the closest application of proximate-cause principles can be found in *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014). In that case, Illinois casinos asserted RICO claims premised on allegations of bribery in connection with two bills, signed into law by former Governor Rod Blagojevich in 2006 and 2008, that imposed a tax on certain in-state casinos to fund a trust for the benefit of the horseracing industry. *Id.* at 725–27. The Seventh Circuit analyzed each law (the '06 Act and the '08 Act) separately, concluding that the plaintiffs could establish proximate cause as to one of the bills but not the other. *Id.* at 728. The difference between the two analyses is illustrative here.

For the '06 Act, the plaintiffs alleged that the racetracks bribed the Governor "to push" the bill through the legislature. *Id.* The Seventh Circuit described a RICO suit "based on such an allegation" as "a questionable proposition," but ultimately concluded that the plaintiffs had failed to show proximate cause. *Id.* They made "no allegation" that the racetracks had "ever bribed or attempted to bribe state legislators." *Id.* at 729. Nor did the plaintiffs show that the Governor exerted "*improper* influence," as opposed to "simple logrolling," over the legislators. *Id.* (emphasis added). And the fact that a similar initiative had failed in the past, but garnered a majority after the alleged scheme, was not enough. *Id.* at 730. "It takes more," the court held, to support an inference "that the workings of an entire state legislature were coopted by the bribery of one official." *Id.* It would be "extraordinary to conclude that one corrupt official, whether the governor or anyone else, had hijacked" the legislature, the "foundational institution of state sovereignty." *Id.* at 730–31.

The '08 Act was "another matter." *Id.* at 731. In that instance, the Governor did not immediately sign the bill into law, and the racetracks allegedly agreed to pay $100,000 to the Governor's campaign fund *in exchange for his signature. Id.* at 731–32. The direct result of that "signature on the bill" was to "caus[e] the '08 Act to become law." *Id.* at 732. There was accordingly a direct link between the alleged RICO conduct (the *quid pro quo* effectuating the Governor's signature) and the passage of the '08 Act: The bill "became law as a direct result of the alleged agreement to trade money for one person's action." *Id.* In those circumstances, and unlike the claims as to the '06 Act, a jury could find that "the causal chain between the Racetracks' bribe and the governor's signing of the bill was not broken by any intervening acts of third parties." *Id.* The court therefore permitted that claim to move forward.

## B.  The Enactment of HB 6 Was Many Steps and Independent Actions Removed from Defendants' Alleged Racketeering Acts.

In this case, Plaintiffs have not plausibly alleged that Defendants' racketeering activity proximately caused the enactment of HB 6.  The Complaint alleges that FirstEnergy directed large contributions to Generation Now, and that the "Householder Enterprise" used the funds to help elect supportive candidates and to help advocate for the bill's passage and against its repeal.  Householder is the only official, however—of the many dozens necessary to enact HB 6—who was allegedly corrupted.  As in *Empress Casino*, there are simply too many independent decisions by other people, who are not alleged to have been part of the conspiracy or even implicated by it, to generate a plausible inference of proximate causation.

A step-by-step review of the Complaint's allegations quickly exposes Plaintiffs' theory of RICO causation as far too attenuated.  The scheme allegedly began with contributions from FirstEnergy that were deployed, by Generation Now, on media to support House candidates in both "primary and general elections."  (Compl. ¶¶ 30, 52(d).)  Some of those Householder-backed candidates won and allegedly helped elect Householder as Speaker in January 2019.  (Compl. ¶ 30.)  Now in power, Householder (and some of those "freshman representatives") allegedly helped facilitate the progress of HB 6 through the House.  (Compl. ¶ 65.)  Generation Now also spent money on mailers and media "to pressure public officials to support the bill."  (Compl. ¶¶ 31, 65.)  After a majority of the House passed the bill, it proceeded to the Senate, and Householder allegedly "pressured members of the Senate" to support it.  (Compl. ¶¶ 33, 65.)  The Senate passed the bill; Governor DeWine signed it into law.  (Compl. ¶ 33.)  After passage, FirstEnergy spent more money "to defeat the ballot initiative" that sought to repeal HB 6, through advertising and retention of signature-collection firms.  (Compl. ¶ 34.)

Breaking down this narrative, Plaintiffs essentially contend that Defendants' predicate acts helped cause the enactment of HB 6 in two different ways: by bribing Householder to push the bill forward, and by spending millions of dollars advocating for the bill and for its supporters. But neither causal path is direct. Both "require[d] actions and decisions by third parties before" HB 6 could "com[e] into being." *Mendelovitz*, 40 F.3d at 185.

*First*, Householder is only one legislator. He cannot enact bills into law by himself; he needs the support of a majority of his colleagues, a majority of the Senate, and the Governor. In a bid to bridge that gap, the Complaint offers conclusory allegations that Householder "strong-armed" House colleagues with political arm-twisting and put unspecified "pressure" on the Senate. (Compl. ¶¶ 32–33, 65.) But, as in *Empress Casino*, there are no allegations showing "improper influence" on these other legislators, as opposed to "simple logrolling," which is nothing more than the "usual give-and-take" of lawmaking. 763 F.3d at 729–30. As the Seventh Circuit explained, it is not plausible, absent "extraordinary" circumstances not alleged here, for a court to infer "that the workings of an entire state legislature were coopted by the bribery of one official." *Id.* at 730. And the pleading failure is even more acute as to the Governor: Plaintiffs makes *no* allegations that his decision to sign the bill into law—a *sine qua non* of enactment—was tainted, even indirectly, by Householder or his efforts.

*Second*, as to the role of Defendants' *money* in the passage of HB 6, that too rests on the independent decisions of numerous third parties. Generation Now allegedly spent money to promote Householder-aligned candidates in primary and general elections, but spending is no guarantee of success; it was ultimately the Ohio voters' decision to elect the candidates they chose. Likewise, Defendants allegedly funded an "expensive media blitz" (Compl. ¶ 65) to

advocate for the legislation, but it was the independent members of the House and Senate who cast the votes.  And, in a similar vein, while Defendants are alleged to have meddled in the ballot initiative in various ways, the fact remains that the requisite number of Ohio citizens were not willing to provide signatures for the repeal effort.  (Compl. ¶ 70.)

At bottom, Plaintiffs allege that one legislator was bribed, and that Defendants spent money to persuade others to support (and not repeal) HB 6.  That is not nearly enough for proximate causation, given the number of steps and independent actors involved in the chain.  As in *Hemi*, Plaintiffs' theory rests on "separate actions carried out by separate *parties*."  559 U.S. at 11 (emphasis added).  It requires the court to move "well beyond the first step" of the predicate acts, highlighting a lack of directness between those acts and the alleged injuries.  *Id.* at 10.  As in *Perry*, causation is "too remote," 324 F.3d at 848–49, insofar as it requires tracing the independent decisions of voters, legislators, and the Governor—none of whom was part of the conspiracy.  And, as with the claims respecting the '06 Act in *Empress Casino*, Plaintiffs here cannot plausibly allege that Defendants' actions "caused the legislature to pass" HB 6.  763 F.3d at 729.  Perhaps Householder helped set the legislative process in motion; he and the 501(c)(4) advocacy may even have been necessary to its success.  But that cannot amount to *proximate cause* when so many other officials—whom Plaintiffs do not allege were "ever bribed," *id.*—were also necessary to transform the bill into law.  By contrast, Plaintiffs' theory of causation is nowhere near as direct as the claim in *Empress Casino* concerning the '08 Act, which became law as a direct result of an alleged agreement to trade money for the Governor's signature—the final and critical step.  *Id.* at 732.  Here, unlike there, countless intervening actors had to make independent decisions that break Plaintiffs' causal chain.

As if all of that were not enough, there is now the additional factor that Ohio's elected officials are actively considering whether to repeal or replace HB 6 based on the allegations in the federal indictment of Householder. *Supra* at 13 & n.2. Of course, if the Legislature does repeal the bill, that would moot Plaintiffs' alleged injuries and end this case. *Supra* Part I.A. But even if the Legislature chooses to *retain* the bill, that decision—after all of the allegations were brought to light—would snip the causal chain yet again. The Legislature's decision to stand by HB 6 and the policies it embodies would leave no doubt that Defendants' alleged actions did not proximately cause the bill to take effect. *Cf. Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) (explaining that if someone "would have acted in the same way regardless" of a predicate act, that act "cannot be a but-for, much less proximate, cause of the plaintiffs' injury").

### C. Other Doctrines Further Disrupt the Chain of Causation.

As explained, the link from Defendants' alleged racketeering to the enactment of HB 6 into law is too indirect, attenuated, and contingent on the actions of third parties. There are also two additional, unique problems that defeat Plaintiffs' causal chain in this case.

*First*, insofar as Plaintiffs' theory of causation takes us through the persuasive force of Defendants' speech, it is antithetical to core First Amendment values. Part of the causal chain alleged by the Complaint is that Ohio's voters and legislators were *convinced* by Generation Now's advocacy—its "media blitz" (Compl. ¶ 65)—to support candidates and legislation. Yet our Constitution cannot tolerate holding a speaker liable for *persuading* others on a matter of politics or policy; that is an unprecedented, dangerous notion. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened

self-government and a necessary means to protect it." *Citizens United*, 558 U.S. at 339–40; *see also Buckley v. Valeo*, 424 U.S. 1, 14 (1976). "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth." *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). And, of course, "the fact that advocacy may persuade the electorate is hardly a reason to suppress it," *Bellotti*, 435 U.S. at 790, much less to penalize it through civil liability. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011) ("[T]he fear that speech might persuade provides no lawful basis for quieting it."). Only when advocacy "is directed to inciting or producing imminent lawless action" may it be constitutionally punished for its success. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *see also Nwanguma v. Trump*, 903 F.3d 604, 609–13 (6th Cir. 2018).

It is one thing to say that a bribe caused the corrupt legislator to vote a certain way, but quite another to say that money used for advertisements and media "caused" the independent citizenry or independent officials to vote a certain way. Treating a speaker—rather than the merits of his ideas—as the "proximate cause" of a vote denies the autonomy of that voter, reduces public debate to the equivalent of an exploding widget, and undermines core principles of the First Amendment. Any causal chain that rests on the success of Defendants' advocacy is an aberrant offense to the Constitution and must therefore be firmly rejected.

*Second*, legislative immunity erects an additional barrier to Plaintiffs' causation theory. That doctrine generally shields legislators from liability for their "legislative actions, sound or unsound." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 218 (6th Cir. 2011) (en banc). Courts have applied this doctrine to immunize legislators from damages claims resting on bribery—even though the bribe itself is accepted *before* any legislative act—because a

plaintiff alleging injury would need to intrude into the legislative process to establish proximate cause. In *Chappell v. Robins*, 73 F.3d 918 (9th Cir. 1996), for example, the court dismissed a RICO claim premised on bribery because, "to show proximate cause," the plaintiff "would at a minimum have to demonstrate that the bribes were a factor in the passage of the legislation," and "[p]roof" of that would require evaluating "legislative acts of writing a bill, voting for it, and persuading others to vote for it." *Id.* at 921. "Plaintiff could not state a claim ... because the conduct by which the bribe proximately caused his injury was legislative, and therefore immune." *Id.* As the Seventh Circuit taught in a similar case, "[o]fficial immunity was designed to prevent a plaintiff from using a civil action to peer so deeply into the legislative process." *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill., Inc.*, 729 F.2d 1128, 1131 (7th Cir. 1984).

This case differs from *Chappell* and *Thillens* in that Defendants here were not themselves legislators. But that distinction does not make a difference, as Plaintiffs' claims would still require proof that legislators voted for HB 6 for illicit reasons; that is what proximate causation would require. And the purpose of the immunity is to protect the *legislative process* by preventing courts from engaging in close scrutiny of "motives of legislators." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 405 (1979). The doctrine thus bars a claim against a non-legislator defendant if adjudicating it would require proof that legislative acts were tainted by bad motives. Regardless of the identity of the defendant, the immunity doctrine "prevent[s] a plaintiff from using a civil action to peer so deeply into the legislative process," *Thillens*, 729 F.2d at 1131, as Plaintiffs would need to do by linking Defendants' alleged bribes to decisions of dozens of legislators. Immunity plainly blocks Plaintiffs from suing Householder for *taking* bribes to enact HB 6; it equally precludes suing those who allegedly *gave* the bribes.

On this point, the Second Circuit's decision in *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177 (2d Cir. 2019), is instructive. That court reasoned that because a civil RICO claim could not be proved "without reliance" on "legislative conduct" by a mayor, the claims against "all three individual defendants" were "barred by the legislative immunity that attaches to [the mayor's] protected legislative conduct." *Id.* at 196–97. The plaintiff could not prove an injury "proximately caused" by the other defendants "without inquiring into" the mayor's legislative acts; the latter thus "amount[ed] to an intervening cause sufficient to break the causal chain." *Id.* Here too, Plaintiffs cannot establish injury proximately caused by Defendants' alleged racketeering without inquiring into the Ohio Legislature's deliberations into HB 6. Legislative immunity prevents that inquiry, and thereby breaks the causal chain.

## III. THE STATE-LAW CLAIMS FAIL FOR THE SAME (AND ADDITIONAL) REASONS.

In their consolidated complaint, Plaintiffs include a series of state-law claims (beyond the OCPA claim) arising out of the same alleged injuries: civil conspiracy (Count Two), injury by criminal acts under Ohio Rev. Code § 2307.60 (Count Three), unjust enrichment (Count Four), and negligence or gross negligence (Count Five). (Compl. ¶¶ 109–120.) These claims fail as a matter of law for the same reasons as the RICO claims, and some others.[3]

*First*, all of the claims other than unjust enrichment require Plaintiffs to show injury. *See Wagner v. Circle W. Mastiffs*, 732 F. Supp. 2d 792, 808 (S.D. Ohio 2010) (dismissing civil conspiracy claim based on lack of cognizable injury); *Foster v. Health Recovery Servs., Inc.*, No. 2:19-CV-4453, 2020 WL 5943021, at *3–6 (S.D. Ohio Oct. 7, 2020) (conducting injury inquiry

---

[3] The Court could also decline to exercise supplemental jurisdiction over these claims after the only federal claim is dismissed. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988); *AES-Apex Emp'r Servs., Inc. v. Rotondo*, 924 F.3d 857, 868 (6th Cir. 2019). But because the state-law claims fail for related reasons, it would be efficient for this Court to dispose of all claims together.

for claims, including claim under § 2307.60); Ohio Rev. Code § 2307.60(A)(1) (creating cause of action for injury to "person or property"); *Eisnnicher v. Bob Evans Farms Rest.*, 310 F. Supp. 2d 936, 962 (S.D. Ohio 2004) (rejecting negligence claim when plaintiffs "offered no evidence of any injury"). As explained, however, the only injury that Plaintiffs identify has not yet been suffered, and may never be suffered. *See supra* Part I.A. That dooms these claims too.

*Second*, the filed-rate doctrine applies equally to state-law torts as to federal statutory claims. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 62 (2d Cir. 1998) (explaining that "filed rate doctrine likewise bars all of the remaining state law claims," since they, "for identical reasons, implicate" the doctrine's concerns); *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004); *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 258, 141 N.E.2d 465, 468 (1957). Because the alleged injury giving rise to Plaintiffs' state-law claims remains increased utility rates, the filed-rate doctrine bars these claims too. *Supra*, Part I.B.

*Third*, all of these tort claims (again, other than unjust enrichment) require proximate cause. *See Gator Dev. Corp. v. VHH, Ltd.*, No. C–080193, 2009 WL 1027584, at *6 (Ohio Ct. App. Apr. 17, 2009) ("A civil conspiracy claim requires an underlying tortious act that causes an injury."); *Godwin v. Facebook, Inc.*, No. 109203, 2020 WL 5949862, at *9 (Ohio Ct. App. Oct. 8, 2020) (finding that defendant's alleged criminal act did not cause injury under § 2307.60); 1 CV Ohio Jury Instr. 455.01 (listing proximate cause as element of a § 2307.60 claim); *Kinzer v. Serv. Trucking, Inc.,* No. 2:17-CV-675, 2020 WL 815665, at *5 (S.D. Ohio Feb. 19, 2020) ("[T]here is no evidence to support that [Defendant's] actions were the proximate cause of the collision. Accordingly, Plaintiffs cannot establish the elements of their negligence claim ...."); *Lagowski v. Shelly & Sands, Inc.*, 38 N.E.3d 456, 458 (Ohio Ct. App. 2015) (affirming dismissal

of negligence claim due to lack of proximate cause). Just as Plaintiffs cannot recover under RICO for losses not proximately caused by Defendants' alleged conduct, they cannot recover under Ohio tort law for such indirect, remote harms. As explained, the enactment of HB 6 cannot be characterized as proximately caused by Defendants' actions. *Supra*, Part II.

*Finally*, with respect to unjust enrichment, Plaintiffs cannot satisfy its basic elements— that they conferred a benefit upon Defendants—let alone show that such an enrichment was unjust. *Nat'l Credit Union Admin. Bd. v. Jurcevic*, 867 F.3d 616, 625 (6th Cir. 2017) ("To succeed on its claim for unjust enrichment, the [plaintiff] had to prove," among other things, that "it conferred a benefit upon [defendants]" and defendants "retained the benefit."); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 286, 834 N.E.2d 791, 799 (2005) (explaining "rule of law" that a common-law claim for unjust enrichment requires plaintiff to establish that "a benefit had been conferred upon that defendant by the purchaser").

Plaintiffs try to plead these elements by pointing to the "receipt and retention of the monthly surcharges paid by Plaintiffs." (Compl. ¶ 117.) But even putting aside the fact that those surcharges have not been paid or collected by *anyone* to date, *see supra* Part I.A, Plaintiffs admit that FirstEnergy is not the entity that stands to *ever* receive those subsidies. FirstEnergy no longer owns the subsidized nuclear plants; they were spun off in bankruptcy and are now owned by an independent company, Energy Harbor (which is not a defendant here). (Compl. ¶ 71.) Thus, as Plaintiffs admit, it is "Energy Harbor" that "st[ands] to receive ... the nuclear subsidies." (*Id.*) Attempting to circumvent that problem, Plaintiffs hypothesize that the future flow of funds to Energy Harbor somehow put FirstEnergy in a better position in the bankruptcy proceedings. (*See id.*) Even if that were true, that intangible and speculative benefit

is not one *Plaintiffs conferred* on FirstEnergy; nor is it the benefit that Plaintiffs ask the Court to hold in "constructive trust" for their benefit. It cannot support an unjust enrichment claim, and Count Four therefore also fails as a matter of law with the rest of the Complaint.

## **CONCLUSION**

Defendants recognize the seriousness of allegations that call the integrity of Ohio's democratic process into question. At least as far as FirstEnergy's conduct is concerned, those allegations will be disproved in due course. For now, it suffices that Plaintiffs cannot turn these public corruption allegations into legally viable civil claims. They have suffered no injury, and for a multitude of reasons are legally unable to allege or prove proximate cause. For these reasons, the Court should grant Defendants' motion to dismiss.

October 21, 2020

Carole S. Rendon (0070345)
Daniel R. Warren (0054595)
Terry M. Brennan (0065568)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: (216) 861-7485
crendon@bakerlaw.com
dwarren@bakerlaw.com
tbrennan@bakerlaw.com

*Counsel for Defendant Charles E. Jones*

John F. McCaffrey (0039486)
John A. Favret (0080427)
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
Telephone: (216) 592-5000
john.mccaffrey@tuckerellis.com
john.favret@tuckerellis.com

*Counsel for Defendant Michael J. Dowling*

Respectfully submitted,

*/s/      Michael R. Gladman*
Michael R. Gladman (0059797)
        *Trial Attorney*
Tiffany D. Lipscomb-Jackson (0084382)
Margaret M. Dengler (0097819) (*pro hac vice*)
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Telephone: (614) 469-3939
mrgladman@jonesday.com
tdlipscombjackson@jonesday.com
mdengler@jonesday.com

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
yroth@jonesday.com

*Counsel for Defendants FirstEnergy Corp., FirstEnergy Service Co., James F. Pearson, Steven E. Strah, and K. Jon Taylor*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of this filing to all

counsel of record at the email addresses that they have provided to the Court.


*/s/ Michael R. Gladman*

*Counsel for Defendants FirstEnergy Corp.,*
*FirstEnergy Service Co., James F. Pearson, Steven*
*E. Strah, and K. Jon Taylor*