**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JACOB SMITH,** | |
|        **Plaintiff,** | |
|   **v.** | |
| **FIRSTENERGY CORP. AND FIRSTENERGY SERVICE CO.,** | |
|        **Defendants.** | |
| **BRIAN HUDOCK AND CAMEO COUNTERTOPS, INC.,** | **Case Nos. 2:20-cv-03755, 03954, 03987** |
|        **Plaintiffs,** | **JUDGE EDMUND A. SARGUS, JR.** |
|   **v.** | **Magistrate Judge Kimberly A. Jolson** |
| **FIRSTENERGY CORP.,** *et al.*, | |
|        **Defendants.** | |
| **JAMES BULDAS,** | |
|        **Plaintiff,** | |
|   **v.** | |
| **FIRSTENERGY CORP.,** *et al.*, | |
|        **Defendants.** | |

## OPINION & ORDER DENYING DEFENDANTS' MOTION TO DISMISS (ECF No. 25)

In the summer of 2020, former Speaker of the Ohio House of Representatives

Larry Householder and his political associates were indicted for a $60 million-dollar

1

federal racketing conspiracy.  The criminal complaint alleged that in exchange for hefty bribes from "Company A," Householder and members of his racketeering enterprise ("Householder Enterprise") worked to pass and uphold House Bill 6 ("HB 6"), a near billion-dollar nuclear power plant bailout for "Company A" and its affiliates.  According to the Complaint, it is widely known that "Company A" is FirstEnergy Corp.  In the instant case, Plaintiffs, individual and commercial ratepayers of FirstEnergy Corp., bring civil claims on behalf of a proposed class against Defendants, FirstEnergy Corp., FirstEnergy Service Co., and various individuals in decision-making roles at either entity.  Plaintiffs allege that as a result of FirstEnergy's racketeering alongside the Householder Enterprise, they have been injured by having to pay costs and fees set forth in HB 6.  Before the Court is Defendants' motion to dismiss.

## I.  Background

As extensively alleged in the federal criminal indictment and complaint, both of which Plaintiffs incorporate in their amended complaint, Defendant FirstEnergy Corp., a public utility, owned two failing nuclear power plants.  (ECF No. 19 at ¶ 5, 11–12.)  In 2016, FirstEnergy Corp. predicted that it would lose "hundreds of millions of dollars from its nuclear energy affiliate," and that its affiliates involved in nuclear energy would soon seek bankruptcy.  (*Id.* at ¶ 27.)  FirstEnergy Corp. and FirstEnergy Service, Co., one of these nuclear affiliates, (collectively "FirstEnergy") began pursuing a "legislative solution" to avoid disastrous financial fallout from the failure of the two nuclear power plants.  (*Id.* at ¶ 28.)

2

According to the Complaint, Householder appeared to hold the keys to such a solution.  Plaintiffs claim that as he was seeking to regain his seat in the Ohio House and his role as Speaker, he and FirstEnergy began to cultivate a relationship.  (*Id.* at ¶ 30.)  The Complaint asserts that a charitable entity called Generation Now, formed pursuant to 26 U.S.C. § 501(c)(4), began to receive payments from FirstEnergy.  (*Id.* at ¶¶ 30, 35.)  Generation Now was secretly controlled by the Householder Enterprise.  (*Id.*)  Unlike political action committee or campaign contributions, payments to 501(c)(4) entities are not regulated or publicly reported.  (*Id.* at ¶ 35.)  Thus, FirstEnergy could put as much money as it wished into Generation Now and the Householder Enterprise could spend any amount of this money in any manner, all without any of the typical oversights or public scrutiny of other political or campaign committees.  (*See id.* at ¶¶ 35, 51.)  Plaintiffs allege that in exchange for these payments, the Householder Enterprise, but particularly Householder, would deliver HB 6.  (*Id.*  at ¶ 67.)

The Complaint claims that the Householder Enterprise via Generation Now received more than $60 million dollars in bribes from FirstEnergy between 2017 and 2020.  (*Id.* at ¶ 35.)  The Plaintiffs contend that the Householder Enterprise spent this money on ten Ohio House campaigns in which the candidates were likely to support Householder's bid for Speaker.  (*Id.* at ¶¶ 30, 36, 39, 76.)  The Complaint also claims that large sums were spent on a campaign to defeat a referendum of HB 6 after it was passed, including media outreach, investigations to conflict out signature-collection firms, and bribery of signature collectors.  (*Id.* at ¶¶ 34, 68.)  Allegedly, the Householder Enterprise created other entities to feed

Generation Now funds into, and foot the bill for these efforts, to conceal the source of funding.  (*E.g.*, *id.* at ¶ 52.j.)  Plaintiffs also claim that Householder utilized his unique procedural powers as Speaker to ensure the passage of HB 6 by appointing eight House members, replacing retired or deceased members, who were likely to support his efforts to pass HB 6. (*Id.* at ¶ 76.)  Plaintiffs' plead that the "volume of FirstEnergy's payments [to Generation Now], the timing of these payments" with actions taken by the Householder Enterprise to ensure the passage of HB 6, and the communications between Defendants and the Householder Enterprise coinciding with these payments and actions demonstrates a *quid pro quo* between FirstEnergy and the Householder Enterprise.  (*Id.* at ¶¶ 59, 65.)

According to the Complaint, the Householder Enterprise received via Generation Now at least $2.9 million from FirstEnergy before Householder's election as Speaker of the House, meaning the vast majority of payments made by FirstEnergy came after Householder had secured his influential position.  (*Id.* at 30–31.)  Plaintiffs allege that on the day he was elected as Speaker in January 2019, Householder created a subcommittee on energy generation, mostly selecting his supporters and allies as committee members.  (*Id.* at ¶ 63, 65.)  Three months after Householder became Speaker, HB 6 was introduced.  (*Id.* at ¶ 31.)  Plaintiffs claim that he handpicked the House members who introduced the bill—all of whom received Generation Now funds for their campaigns.  (*Id.* at ¶ 65.)  Householder also "strong-armed House members" and pressured members of the Ohio Senate to pass the bill and the governor to sign the bill into law.  (*Id.*)

HB 6, though widely characterized as nuclear "bailout" legislation (*id.* at ¶ 67), included other provisions that FirstEnergy won the inclusion of in exchange for its payments to the Householder Enterprise.  The nuclear "bailout" provision appears as a "surcharge" and is capped per month at 85 cents for individuals and $2,400 for commercial customers.  (*Id.* at ¶ 108 (citing Ohio Rev. Code § 2923.34(E)).)  FirstEnergy also secured "decoupling" and "legacy generation cost recovery" provisions, which would lead to higher costs for ratepayers.  (*Id.* at ¶¶ 74–75.)  According to Plaintiffs, experts estimate that Ohio ratepayers could pay as much as $355 million to FirstEnergy due to the decoupling provision alone and shoulder the cost of $16 million for the legacy provision.  At bottom, FirstEnergy's goal was to secure for itself favorable legislation.  (*Id.* at ¶ 97.)

On October 7, 2020, Plaintiffs filed the operative amended class-action complaint raising five counts.  (ECF No. 19.)  First, they allege that Defendants engaged in a pattern of racketeering activity by committing mail fraud, wire fraud, bribery, money laundering, and other offenses to obtain passage of HB 6 in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"),18 U.SC. §§ 1961–68, and the Ohio Corrupt Practices Act, ("OCPA"), Ohio Rev. Code §§ 2923.31 to 2923.36.  (*Id.* at ¶¶ 92–108.)  Plaintiffs also raise state-law claims of civil conspiracy, injury through criminal acts, unjust enrichment, and negligence and/or gross negligence.  (*Id.* at ¶¶ 109–19.)

Defendants subsequently filed the instant motion to dismiss for failure to state a claim.  (ECF No. 25.)  On December 21, 2020, a state court judge entered a preliminary injunction, enjoining Energy Harbor Corp., previously FirstEnergy

Services, and various state officials and entities from accepting or collecting fees associated with HB 6. (ECF No. 34 (notation order); ECF No. 35-1.)

## II.     Legal Standards

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,'" but pleadings cannot consist only of "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," or "'naked assertion[s] devoid of "further factual enhancement."'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). In order to survive a motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a plaintiff must 'allege[ ] facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level."'" *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This "is not akin to a probability requirement," but requires "'more than a sheer possibility that a defendant has acted unlawfully.'" *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). Federal courts must "construe the complaint in the light most favorable to the plaintiff and accept all [well-pleaded factual] allegations as true." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). In addition to the allegations in a complaint, a federal court may consider documents and exhibits incorporated in, referenced by, and attached to the complaint, *Meyers*, 983 F.3d at 880, as well as matters of public record or for which judicial

6

notice is appropriate, *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017).

## III.    Analysis

Defendants raise two primary arguments in their motion to dismiss:  that Plaintiffs do not identify a cognizable injury or plead the requisite level of causation for their RICO and OCPA claims.  (ECF No. 25 at PageID #331, 339.)  Plaintiffs respond that they have alleged cognizable injuries and causation for the RICO claims and that Defendants fail to address the OCPA separately, which is interpreted more broadly than the RICO statute.  (ECF No. 26 at PageID #370–95.)  Defendants also contend that the lack of injury and causation doom Plaintiffs' other state-law claims.  (ECF No. 25 at PageID #348–51.)  The Court first considers Defendants' motion to dismiss Plaintiff's RICO and OCPA claims before turning to the other state-law claims.

### A.  RICO and OCPA Claims

The crux of Plaintiffs' RICO and OCPA claims is that Defendants violated the statutes by engaging in a pattern of racketeering activity by making bribes to the Householder Enterprise to ensure the ultimate enactment of HB 6.  RICO provides a civil cause of action to (1) "[a]ny person injured in his business or property" (2) "by reason of" (3) "a violation of section 1962," which prohibits a pattern of racketeering activity. 18 U.S.C. § 1964(c).  Defendants explain that the grounds for their motion to dismiss do not include any challenges to Defendants' alleged 18 U.S.C. § 1962 violations.  (ECF No. 25 at PageID #329.)  Instead, Defendants argue that Plaintiffs fail to plead an injury and causation under § 1964(c).  For the reasons below, Plaintiffs' complaint pleads both injury and causation adequately under § 1964(c), and thus the OCPA, which is interpreted more broadly than federal civil RICO.  *See Bradley v Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015); Ohio Rev. Code Ann. § 2923.34(A), (E).

7

### 1. Injury

Defendants contend that Plaintiffs have not suffered a cognizable injury because HB 6's surcharge provision has not yet taken effect and may never take effect. (ECF No. 25 at PageID #331–35.) Additionally, Defendants argue that the filed-rate doctrine applies, which prohibits civil RICO claims from challenging the reasonableness of filed utility rates. (*Id.* at PageID #335–38.) In response, Plaintiffs argue that their surcharge injury is cognizable, that they suffered other injuries from the decoupling and legacy provisions, that they are entitled to equitable relief, and that the filed-rate doctrine does not foreclose their claims. (ECF No. 26 at PageID #370–74, 376–80.) Plaintiffs adequately plead injuries from the surcharge, decoupling, and legacy provisions and that they are entitled to equitable relief.

#### a. Surcharge Provision

Whether a plaintiff has properly alleged an injury to "business or property" under § 1964(c) is a statutory standing, or statutory interpretation, issue. *Aces High Coal Sales, Inc. v. Cmty. Bank & Trust of W. Ga.*, 768 F. App'x 446, 458 n.5 (6th Cir. 2019); *Jackson v. Sedgwick Claims Mgmt. Servs. Inc.*, 731 F.3d 556, 562 n.2 (6th Cir. 2013) (en banc).[1] Money is a form of property, and "a person whose property is diminished by a payment of money wrongfully induced is injured in his property." *County of Oakland v. City of Detroit*, 866 F.2d 839, 845 (6th Cir. 1989). Payment of HB 6 surcharges are thus injuries under § 1964(c).

The wrinkle here, Defendants counter, is that the surcharge provision of HB 6 has not yet taken effect, and so Plaintiffs have not yet been "injured" under § 1964(c). (ECF No. 25 at PageID #331–35.) HB 6 provides that the surcharges were to be collected starting in January 2021, though

---

[1] Plaintiffs focus their arguments on Article III or constitutional standing, rather than statutory standing. (ECF No. 26 at PageID #370–73.) There is no indication that Defendants contest Plaintiffs' Article III standing or that Plaintiffs lack it.

as addressed more fully below, a state court has enjoined this provision. (ECF No. 19 at ¶¶ 74–75.)[2] But HB 6 has not been repealed, and this injunction is temporary at the moment because it is a preliminary injunction (ECF No. 35-1 at PageID #494), meaning the Court must assume for now that the legislation is in effect.

Defendants do not argue that Plaintiffs' claims are not justiciable because they are unripe, nor can they. In this circuit, a federal civil RICO claim is ripe when the injury is "ascertainable and definable." *Jackson v. Segwick Claims Mgmt. Servs., Inc.*, 699 F.3d 466, 477–79 (6th Cir. 2012), *rev'd on other grounds*, 731 F.3d 556 (6th Cir. 2013) (en banc) (holding that frustration of a state worker's compensation claim was not a cognizable civil RICO injury). Here, Plaintiffs injury is ascertainable and definable because the exact amount of injury—85 cents or $2,400 per month—and the imminent date at which it will begin—January 2021—are exceedingly clear. Thus, Defendants' argument is purely a matter of statutory standing, or interpretation of the word "injured."

As Defendants argue, "injured" is in the past tense. (ECF No. 25 at PageID #331.) But Defendants' argument is insufficient to show that only injuries that have actually occurred are those contemplated by federal civil RICO. If statutes were construed in such a vice-like manner, then the doctrine of ripeness would do little work. Moreover, prospective equitable relief would never be appropriate under the statute. Equitable relief is generally available under § 1964(c), and no court has concluded that this excludes any particular type of equitable relief. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 139 (2d Cir. 2016) (holding that equitable relief is available under § 1964(c)); *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001) (same),

---

[2] Marc Kovac, *FirstEnergy to forgo $102 million 'decoupling' provision in scandal-ridden House Bill 6*, The Columbus Dispatch (Feb. 1, 2021, 11:25 a.m.), https://www.dispatch.com/story/news/politics/state/2021/02/01/firstenergy-corp-forgo-102-million-house-bill-6-fees-decoupling-lawsuit/4337874001/ (last updated Feb. 1, 2021, 3:23 pm.).

*rev'd on other grounds sub nom. Scheidler v. Nat'l Org. for Women*, 537 U.S. 393 (2003). *But see Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986). For example, a preliminary injunction seeking to prevent a defendant from taking a certain action would be untenable under Defendants' interpretation, which makes little sense because preliminary injunctions contemplate "imminent," not just past, harms. *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (setting forth the test for a preliminary injunction, including "imminent" harm).

Defendants provide no authority that supports the proposition that Plaintiffs fail to state a claim under § 1964(c) by alleging an imminent and ascertainable injury. Defendants cite *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), for the proposition that "[u]ntil such injury occurs, there is no right to sue for damages under § 1964(c)." (ECF No. 25 at PageID #333 (quoting *Rhoades*, 859 F.3d at 1102).) But *Rhoades* did not interpret the text of § 1964(c) to discern the meaning of "injured"; rather, it drew from § 1964(c) to conclude that the accrual of civil RICO claims is tied to the time of injury—not the underlying RICO violations. *Id.* at 1102–03. *Rhoades* thus has minimal persuasive authority here, where the question is not when a claim accrued, but whether Plaintiffs have plausibly pleaded a cognizable injury as a matter of statutory interpretation.

Defendants also rely on cases about ripeness and those in which courts have rejected RICO claims premised upon a speculative future harm. (ECF No. 25 at PageID #331–32.) But as discussed above, Plaintiff's claims are ripe as HB 6 has actually been enacted. And in the cases rejecting RICO claims because they raised a speculative injury, the events upon which the injuries were contingent were much more speculative than here. In *Maio v. Aetna, Inc.*, the Third Circuit rejected a RICO claim where plaintiffs alleged that when they would one day need medical

10

treatment, it would be deficient medical treatment due to the "inferior" nature of their health insurance.  221 F.3d 472, 495 (3d Cir. 2000).  Unlike an unknowable future injury at an undiscernible point in time, the injury here is defined monetarily and there is no vague contingent future event—the surcharges are part of an enacted law with an effective date.

Defendants assert that the surcharges may never be collected due to state judicial or legislative action.  (ECF No. 25 at PageID #344–45.)  This is speculation.  HB 6, as of now, is an enacted state law that contains a specific date for collecting the surcharges.  True, a state court has issued a preliminary injunction enjoining the Public Utilities Commission of Ohio ("PUCO") and FirstEnergy from implementing and/or executing provisions of HB 6 that would lead to the collection and distribution of fees, of which the Court may take judicial notice.  But Defendants provide no authority demonstrating that an award of preliminary injunctive relief in parallel state proceedings renders an injury pleaded in an already-filed complaint incognizable, or even unripe.  (*See* ECF No. 35.)[3]  State proceedings, legislative or judicial, could certainly moot this case at some point or impact the relief available to Plaintiffs.  But these concerns are not raised before the Court.  The issue here is one of statutory standing, and Defendants fail to show that "injured" in § 1964(c) does not contemplate imminent, ascertainable, and specified injuries.

Finally, Defendants argue that the filed-rate doctrine applies to civil RICO claims, requiring dismissal of Plaintiffs' RICO claims based on the surcharges.  (ECF No. 25 at PageID #335.)  The filed-rate doctrine prohibits lawsuits against common carriers so long as they charge

---

[3] The Court did not permit supplemental briefing on the impact of the state court injunction on the motion to dismiss but on a motion to stay. (ECF No. 34.) Defendants filed a non-responsive supplemental brief addressing the impact of the preliminary injunction on their motion to dismiss. (ECF No. 35.) Defendants should have sought permission to file this brief under Local Rule 7.2(a)(2). S.D. Ohio Civ. R. 7.2(a)(2). This Court has ignored arguments made in contravention of this Rule, which is sensible and fair considering that the opposing party has not had the opportunity to respond. *Roshon v. Eagle Rsch. Grp., Inc.*, 314 F. Supp. 3d 852, 858 n.2 (S.D. Ohio 2018). But here, Defendants' arguments are unpersuasive, mitigating any risk of unfairness to Plaintiffs.

the rates "filed and approved by the appropriate regulatory agencies." *MCI Telecomms. Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547 (6th Cir. 2004). "[A] key justification for the filed-rate doctrine is the need for knowledgeable regulatory agencies to police 'generally monopolistic and oligopolistic industries' to ensure reasonable rates, rather than leaving a rate-reasonableness calculation in the hands of the less knowledgeable courts." *Brown v. Cassens Transp. Co.*, 675 F.3d 946, 956 (6th Cir. 2012) (quoting *Wegoland Ltd. v. NYNEW Corp.*, 27 F.3d 17, 21 (2d Cir. 1994)), *overruled on other grounds by Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556 (6th Cir. 2013) (en banc). The Sixth Circuit has determined that the two purposes undergirding the doctrine are "prevent[ing] carrier discrimination by committing the carriers to the one set tariff and preserv[ing] the role of administrative agencies in approving and setting rates, a practice at which they are particularly adept." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 796 (6th Cir. 2012) (quoting *MCI*, 376 F.3d at 547–48). Accordingly, the doctrine does not apply to "payments made outside of the rate scheme," such as rebates, *id.* at 797, or when the wrong rate is applied because such claims do not challenge the reasonableness of the filed tariffs themselves, *MCI*, 376 F.3d at 547.

Defendants do not persuade that the doctrine should apply to rates that are not filed by the carriers but specifically mandated by the legislature. The focus of the doctrine is to protect carriers, here, utilities, from claims that are based on the billing of rates that the carriers have duly filed with the proper agency. *See Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 414–15 (1986); *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). The Sixth Circuit has been clear on this point: "[i]t is the *filing* of tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Williams*, 681 F.3d at 797 (quoting *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000)) (considering a case in which the state

12

agency was PUCO). Defendants' arguments that PUCO will ultimately utilize its discretion to dictate the allocation and structure of the surcharge and hence set the rate do not address the filing of the rates. (ECF No. 25 at PageID #338.) Here, Plaintiffs allege that the Defendants did not file the rates with PUCO; instead, HB 6 overrode the normal rate-filing process. *See Ohio Rev. Code Ann.* §§ 4905.30, 4905.32.[4] Thus, concerns about carriers discriminating against certain ratepayers and deferring to state-agency expertise in approving rates filed in the normal process are not at play.[5]

For these reasons, injuries from the surcharges are cognizable under § 1964(c).

### b. *Decoupling and Legacy Provisions*

Next, Defendants argue that Plaintiffs fail to sufficiently plead an injury stemming from the decoupling and legacy provisions of HB 6—both of which have already been implemented. (ECF No. 32 at PageID #459–60.) Both injuries are plausibly pleaded.

As a preliminary matter, it appears that FirstEnergy and the state of Ohio have reached an agreement that FirstEnergy will not collect any costs associated with the decoupling provision.[6]

---

[4] Defendants assert that "'government officials' *are free to pursue impropriety in rate-setting*, but 'individual ratepayers simply have no role' beyond 'participating in the political process and filing complaints with the regulatory agencies.'" (ECF No. 25 at PageID #337 (quoting *Wegoland*, 967 F.3d at 21–22) (emphasis added).) The Second Circuit in *Wegoland* hardly endorsed impropriety as a government official's prerogative, much less one without any recourse. What the court actually explained was that although ratepayers may only file complaints with the state agency, not the courts, and that although courts may not intervene by assessing the reasonableness of filed rates, "the filed rate doctrine does not leave regulated industries immune from suit under the RICO or antitrust statutes. While individual ratepayers are precluded from challenging the reasonableness of the rates, *the proper government officials remain free to pursue this avenue in appropriate circumstances*." *Wegoland*, 967 F.3d at 22 (emphasis added). Far from condoning government corruption, the Second Circuit relied on the fact that government officials may police filed rates.

[5] Defendants' argument implies that additional charges on a utility bill are part of the rate. Some courts have taken an expansive view of rates, concluding that the rate consists of all charges included in a filing with a utility commission. *E.g.*, *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 216 (3d Cir. 2020). It is unnecessary to decide if the surcharges had been included in a filed rate whether the filed-rate doctrine would foreclose a civil RICO claim based on these surcharges.

[6] *E.g.*, Jeremy Pelzer, "FirstEnergy agrees to end controversial 'decoupling' policy allowing them to collect millions from customers," Cleveland.com (Feb. 1, 2021), https://www.cleveland.com/open/2021/02/firstenergy-agrees-to-end-controversial-decoupling-policy-allowing-them-to-collect-millions-from-customers.html; *see also Kovac, supra.*

However, this agreement does not impact the Plaintiffs' pleadings that FirstEnergy had *already* collected money relying on the decoupling provision because it was currently in effect. Moreover, there is no indication that this agreement is permanent, removing no sense of immediacy or imminence from the Plaintiffs' injuries stemming from the decoupling provision. Plaintiffs' injuries from the decoupling provision, like the surcharge provision, are neither moot nor unripe for the purposes of this motion to dismiss.

To reiterate, a complaint "need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Keys*, 684 F.3d at 608 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam)) (alteration in original). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Ambiguity in the complaint is construed in favor of the plaintiff. *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017). Importantly, all allegations of a complaint must be considered. For example, in *Dassault Sytèmes, SA v. Childress*, the Sixth Circuit reversed the district court for failing to consider all allegations in the complaint, as opposed to only those under a claim's heading in the complaint. 828 F. App'x 299, 239–40 (6th Cir. 2020). In *Childress*, the complaint incorporated all previous allegations under the claim's heading. *Id.*

The Complaint asserts that "[i]n exchange for these illicit and unlawful payments, the Householder Enterprise helped pass HB 6, described . . . as a billion-dollar 'bailout' . . . *together with other substantial benefits to FirstEnergy.*" (ECF No. 19 at ¶ 12.) Similar statements are made throughout the Complaint. (*E.g.*, *id.* at ¶ 97 ("The purpose(s) of the [scheme] was to secure favorable legislation to FirstEnergy and FirstEnergy Service . . . .").) The emphasis of the Complaint is on the surcharges, but Plaintiffs also adequately allege all of the effects of HB 6,

14

which includes the costs from the decoupling and the legacy provisions.  Plaintiffs plead that these provisions are estimated cost to ratepayers $355 million and $16 million, respectively.  Nothing in Plaintiffs' Complaint limits their injuries to those from the nuclear bailout provision, *i.e.* the surcharge provision, as Defendants argue.  (ECF No. 32 at PageID #459–60.)

Defendants counterarguments fail.  First, they assert that under the Complaint's heading, "Relationship of Pattern of Racketeering Activity And/Or Corrupt Activity to the Enterprise(s)," the other provisions of HB 6 are not mentioned.  (ECF No. 19 at ¶ 106–08.)  But under the broader heading, "Count One, Violations of Federal RICO and Ohio Corrupt Activity Act," the Complaint incorporates all previous allegations.  (*Id.* at ¶ 91.)  And as *Childress* reinforces, the emphasis of a motion-to-dismiss analysis is not on the organization or formatting of a complaint, but on the *contents* of the complaint.  *See also Iqbal*, 556 U.S. at 678.  The Complaint contains sufficient allegations such that the Defendants are on notice that Plaintiffs' civil RICO claims are premised on the passage of HB 6, in which the decoupling and legacy provisions are included.

Next, Defendants contend that the Complaint fails to plead whether the decoupling and legacy provisions result in increased rate charges.  (ECF No. 32 at PageID #640.)  The Complaint alleges that the cost of these provisions will impact ratepayers by increasing their electricity costs and by forcing ratepayers to "shoulder[ ]" the "expenses."  (ECF No. 19 at ¶¶ 74–75.)  Ratepayers are such because they pay specified rates for electricity.  Thus, it is a fair and reasonable inference that increased costs for ratepayers are from increased rates.  Additionally, a document Plaintiffs incorporate by reference into their complaint more expressly states this point with regard to the decoupling provision.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (listing documents incorporated by reference as sources courts may consider on a motion to dismiss); 5B Fed. Prac. & Pro. Civ. § 1357 (3d ed.) (Westlaw Update October 2020).  Plaintiffs

point to a memorandum from a trade association (ECF No. 19 at ¶ 74), which states that the decoupling provision "increases customer bills."[7]  This is sufficient at the motion-to-dismiss stage.[8]

### c. Equitable Relief

For the sake of clarity, the Court separately addresses the arguments concerning equitable relief, although Part III.A.1. of this opinion a resolves most of these arguments.  In their motion, Defendants suggest equitable relief is entirely unavailable for civil RICO claims.  (ECF No. 25 at PageID #335.)  The weight of authority, however, shows that equitable relief is available. *Donziger*, 833 F.3d at 139; *Scheidler*, 267 F.3d at 695.  *But Wollersheim*, 796 F.2d at 1088 (concluding equitable relief is unavailable).  And although the Sixth Circuit has not expressly decided whether equitable relief is available under § 1964(c), it has permitted claims seeking injunctive relief to survive the motion-to-dismiss stage. *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 606–07 (6th Cir. 2004).[9]

Defendants also argue that because the surcharges have not yet been implemented, Plaintiffs fail to state claims for equitable relief based on the surcharges.  (ECF No. 32 at PageID #461–62.)  But Plaintiffs have pleaded a sufficient injury as set forth above.  Moreover, this argument does not address Plaintiffs' clams premised on the decoupling and legacy provisions.

Accordingly, Plaintiffs have adequately pleaded the availability of equitable relief.

---

[7] RunnerStone, LLC, Memorandum, Page 3 (Sept. 17, 2020), https://ohiomfg.informz.net/ohiomfg/data/images/-%20HB%206%20Decoupling%20101%20Memo%20-%209.17.2020%20-%20FINAL.pdf.

[8] Defendants do not argue that the filed-rate doctrine applies here, though the same reasoning above would apply because all of these provisions were part of HB 6 and hence not filed as rates.

[9] As Defendants note, the Sixth Circuit has cited *Wollersheim* favorably before (ECF No. 25 at PageID #335), but it did so in dicta to support the court's reliance on legislative history to determine whether a different statute permitted injunctive relief, *Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co., Inc.*, 221 F.3d 924, 927 n.2 (6th Cir. 2000).

## 2. Proximate Causation

Defendants argue that Plaintiffs fail to plead adequately that Plaintiffs were injured "by reason of" Defendants' alleged racketeering because other independent actors broke the chain of causation between Plaintiffs' injuries and Defendants' RICO violations. (ECF No. 25 at PageID #339.) Plaintiffs argue that there was a direct relation between their injuries and Defendants' racketeering, as well as that their injuries were foreseeable, and neither illogical, speculative, nor untraceable. (ECF NO. 26 at PageID #381–39.) The parties' arguments require the Court to clarify what § 1964(c)'s "by reason of" language refers to—statutory standing, traditional common-law causation, or Article III standing. As an initial matter, Article III standing, on which Plaintiffs rely in making their traceability arguments (ECF No. 26 at PageID #383–85), is simply not at issue on this motion to dismiss; Defendants neither raise this argument nor do the authorities that they cite. However, whether statutory standing or proximate cause is at issue is less clear.

The Sixth Circuit determined that the "by reason of" language of § 1964(c) gives rise to statutory standing and traditional proximate causation limitations on civil RICO claims. *Trollinger*, 370 F.3d at 612–13. In *Trollinger*, the court of appeals explained that Supreme Court cases such as *Holmes v. Securities Protection Corp.*, 503 U.S. 258 (1992), speak to statutory standing, *i.e.* is this plaintiff the right plaintiff to bring this claim, though there is certainly "overlap" with traditional proximate causation. *Trollinger*, 370 F.3d at 612. In *Holmes*, the Supreme Court concluded that a plaintiff must show "proximate cause," specifically a "direct relation between the injury asserted and the injurious conduct alleged." 503 U.S. at 268. Proximate cause, though it has many common-law formations, under these circumstances cannot be "too remote," "purely contingent," or "indirect[t]." *Id.* at 271; *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 4848 (6th Cir. 2003). Relying on this rationale, the court in *Trollinger* concluded

17

that *Holmes* relied on the notion of a direct relation or directness to hold that plaintiffs with "derivative or passed-on injuries" lack statutory standing under the civil RICO statute, which is a separate consideration from traditional proximate cause requirements usually based on foreseeability.  370 F.3d at 612–13.

Prior to 2010, Supreme Court precedent applied the directness requirement in cases that only appeared to implicate statutory standing.  In *Holmes*, the issue was not whether another force or person was to blame for the plaintiff's injuries, but whether the plaintiff or third parties suffered a direct harm as a result of the defendant's actions.  503 U.S. at 270–71 (considering whether an organization or its member broker-dealers were directly injured).  The Supreme Court did not conclude that there was no common-law causation; rather, its emphasis was on which party is "first injured," *id.* at 271, and whether these particular plaintiffs "were allowed to sue," *id.* at 273.  The three purposes underlying the direct-relation rule further demonstrate that this requirement emphasized which plaintiff should file suit, as opposed to whether the defendant is the cause of the plaintiff's injury:  (1) the ease of ascertaining damages, (2) the difficulty of "apportioning damage among plaintiffs removed as different levels of injury from the violative acts," and (3) which plaintiffs can best "vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."  *Id.* at 269–70; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458–61 (2006) (holding that the state, rather than the plaintiff, was the directly injured party).

More recently in *Hemi Group, LLC v. City of New York*, the Supreme Court held that the City plaintiff, though it could not enforce a city cigarette tax, did not suffer a direct injury as a result of the defendant's fraudulent failure to submit customer information regarding cigarette sales to the state of New York—the State, not the City, was the directly injured party as a result of

18

the fraud. 559 U.S. 1, 11–12 (2010). To reach this conclusion, the Supreme Court considered *Holmes*'s three policies, particularly whether the State or the City was best situated to bring suit. *Id.* at 12. But the Supreme Court went further, explaining that not only was the City the wrong party to bring suit under § 1964(c), but that taxpayers "directly caused" the plaintiff's harm, an inability to collect taxes, by not paying the taxes, not the defendant. *Id.* at 11. In doing so, it expressly rejected a foreseeability standard in this causation context. *Id.* at 12. Although the court had also rejected a foreseeability standard before in relation to the statutory standing context, *id.* at 12, it had not yet done so in the tort-law causation context, *i.e.* whether this defendant was the cause of plaintiff's injury, as opposed to whether this plaintiff is the right plaintiff to bring suit. In the sole published decision applying *Hemi* to a civil RICO claim, the Sixth Circuit applied the direct relation standard, foreseeability standard, *and* a neither-illogical-nor-speculative standard to address statutory standing and traditional causation sense. *Wallace v. Midwest Finan. & Mortg. Servs., Inc.*, 714 F.3d 414, 419–21 (6th Cir. 2013).

Given all of this, the directness standard governs proximate cause under § 1964(c) in terms of statutory standing (is this the right plaintiff) and traditional common-law proximate cause (is this the right defendant). Traditional common-law notions of proximate cause such as foreseeability further inform the analysis. *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008). Even under a directness standard, Plaintiffs plausibly plead that their surcharge, decoupling, and legacy provision injures were "by reason of" Defendants' RICO violations.

First, Plaintiffs' allegations show that there is no better plaintiff or group of plaintiffs to bring this civil RICO claim, which argues that Defendants, through their alleged bribery to enact HB 6, caused the increased costs to them as ratepayers. Applying the three *Holmes* policies underlying the directness requirement makes this clear. Permitting Plaintiffs, FirstEnergy

19

ratepayers, to bring suit does not pose any difficulty in ascertaining damages.  *Holmes*, 503 U.S. at 269.  The damages are or will be reflected on the Plaintiffs' bills.  Second, there is no issue with appropriating damages to plaintiffs suffering different levels of injuries.  *Id.*  There are no other possible plaintiffs.  For example, the state of Ohio was not injured by Defendants' bribery, as opposed to *Hemi*, where the State was the first victim of the defendant's fraud.  And finally, there are no better plaintiffs to vindicate the civil RICO statute.  *Id.*  There was only ever one group of individuals or entities who could be injured by Defendants' scheme to bribe legislators to ensure favorable legislation—the ratepayers.

Second, the Complaint alleges that no other possible defendants are to blame directly for Plaintiffs' injuries.  Relying on *Hemi*'s analysis, Defendants argue that the actions of other Ohio legislators, both in the House and Senate, the Governor, and the voters via the ballot referendum were intervening, independent causes of Plaintiffs' injuries.  (ECF NO. 25 at PageID #342–45.) But nothing in *Hemi* suggests that other common-law principles regarding proximate causation should not apply here.  Proximate cause does not require that a defendant's conduct be the sole cause; just a substantial cause.  *Trollinger*, 370 F.3d at 620.  Moreover, proximate cause contemplates multiple independent causes, even under the directness standard.  *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) ("[I]t is axiomatic under tort law that the exercise of judgment by [a later] decisionmaker does not prevent the earlier agent's action . . . from being the proximate cause of the harm. Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" (quoting *Hemi*, 559 U.S. at 9)).

For HB 6 to be enacted, four independent, equally necessary steps had to occur—the bill had to pass in the Ohio House, to pass in the Ohio Senate, to be signed into law by the governor,

and to survive a ballot referendum.  That these steps had to occur in some sequential order does not necessarily cut off liability for the actors at an earlier stage—here, passage in the Ohio House. Defendants cite no authority for that proposition.  This is not the sort of moving "beyond the first step" *Hemi* condemned. 559 U.S. at 2.  Rather, this is more like multiple, concurrent first steps.  If it is plausible from the face of the Complaint that Defendants' RICO violations caused HB 6 to pass in the Ohio House or to survive the referendum, that is sufficient to plead proximate cause. Plaintiffs' complaint successfully pleads proximate causation in two of the four independent steps necessary to enact a bill into law:  passage in the House and survival of a referendum.

First, passage in the House.  The Complaint contains factual allegations that claim Defendants bribed the Householder Enterprise, including Householder, to ensure the passage of favorable legislation in the Ohio House.  According to the Complaint, not only did the Householder Enterprise funnel money from the bribes to ten campaigns, Householder appointed eight legislators to replace retired or deceased House members.  It is also clear from the face of the Complaint that Householder relied on these members to become Speaker, permitting him to exercise his influence by introducing HB 6.  Then, Householder appointed the subcommittee that considered HB 6 and the House members who introduced the bill (all of whom received Generation Now funds). Therefore, it is plausible from the Complaint that Householder had enough cache and sway as speaker to propel HB 6 to pass, meaning that Defendants' alleged bribes were directly connected to the passage of HB 6.  And regardless of whether proximate cause in the civil RICO context requires directness or merely foreseeability, "alleged weaknesses in the chain of causation "[a]re matters for summary judgment" or juries, "not dismissal on the pleadings" due to the fact-dependent nature of causation. *Trollinger*, 370 F.3d at 619.

Defendants raise several counterarguments.  First, they point to *Empress Casino Joliet*

*Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014). (ECF No. 25 at PageID #340.) There, the plaintiffs claimed that the former governor of Illinois had, in exchange for bribes, (1) pressured the legislature to push through a bill and (2) had signed a bill into law. *Johnston*, 763 F.3d at 728–32. The Seventh Circuit concluded that the second claim survived summary judgment because there was a factual dispute whether the bribes caused the governor to sign the bill. *Id.* at 731–32. But as to the first claim, the Court concluded that there no evidence that the governor "unduly pressur[ed] members of the legislature." *Id.* at 730. For instance, "no legislator was bribed." *Id.* Here, however, a member of the legislature *was* bribed according to the Complaint in this case—Householder—and so Plaintiffs have sufficiently alleged a direct connection between the passage of HB 6 in the House and Defendants' bribes to the Householder Enterprise. And importantly, *Empress* is a summary judgment case based upon sworn testimony, supporting the conclusion that causation is an issue typically most appropriate for summary judgment, not the pleading stage. *In Re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 790 (N.D. Ohio 2020).

Next, Defendants assert that Ohio voters disrupted the chain of causation between FirstEnergy's alleged bribery and enactment of the law at the referendum stage. (ECF No. 25 at PageID #343–44.) This ignores that the referendum is an independent, equally necessary step to the enactment of HB 6 that has no direct impact on the passage of a bill in the Ohio House.

This leads to Plaintiffs' other allegations of proximate causation—the referendum. The Complaint asserts that Defendants spent $38 million on the Householder Enterprise's efforts to stymie the ballot referendum on HB 6. (ECF No. 19 at ¶¶ 34, 69.) It is a fair inference that Defendants would not have spent such an incredible amount of money if there were really no chance that the Householder Enterprise's efforts would defeat the referendum. And the Complaint specifies a variety of ways that the Householder Enterprise used this money to achieve its goal. It

waged a media blitz, it sent fliers to voters, it engaged in a campaign to "conflict out signature-collection firms," and it paid signature collectors to stop collecting signatures. (*Id.* at ¶ 34.)  At the motion to dismiss stage, it is certainly plausible that Defendants' allegedly massive financing of the efforts to defeat the referendum directly led to its failure and hence the enactment of HB 6.

Defendants argue that Plaintiffs' proximate cause theory related to the ballot referendum raises fatal First Amendment concerns.  (ECF No. 25 at PageID #345–46.)  This argument only pertains to the media efforts, not those to disrupt the signature-collecting process.  (*Id.*)  But the terms of Defendants' own motion defeat this argument.  Defendants themselves posit that bribes, explicit *quid pro quos*, are not protected by the First Amendment.  (ECF No. 25 at PageID #328 (exploring precedent).)  But curiously, Defendants expressly state that they treat Plaintiffs' allegations of bribery as true for the purposes of this motion.  (ECF No. 25 at PageID #328–29 ("[T]his motion does not ask the Court to evaluate the plausibility of Plaintiffs' bribery allegations.").)  Thus, for the purposes of this motion, Defendants committed bribery, which is not protected by the First Amendment.[10]

Defendants try to sidestep this conclusion, arguing that notwithstanding bribery, which is unprotected speech, it would be antithetical to the First Amendment to conclude that their illegal funding of media efforts caused HB 6's survival of the ballot referendum because it negates the will of the voters.  Specifically, they contend that this theory of causation "[t]reat [s] a speaker—rather than the merits of his ideas—as the 'proximate cause' of a vote that denies the autonomy of that voter, reduces public debate to the equivalent of an exploding widget, and undermines core

---

[10] Even if Defendants did challenge this aspect of the Complaint, it would be futile. It is plausible that such an express *quid pro quo* occurred based on the allegations in the Complaint, specifically that Defendants would provide ample funds to Householder and his associates in exchange for favorable legislation.  As set forth in the facts, Plaintiffs point to a coordination amongst Defendants and the Householder Enterprise, which is sufficient to infer an explicit agreement.

principles of the First Amendment." (*Id.* at PageID #346.) Defendants provide no reason to conclude that the intended effects of their bribery, though not the bribery itself, is protected under the First Amendment, which in actuality has the effect of conferring First Amendment protections upon their bribery. They fail to point to any authority suggesting that this is a tenable approach. The authorities Defendants rely on address picketing, *Thornhill v. Alabama*, 310 U.S. 88 (1040); *legal* campaign contributions (which, according to the Complaint, Defendants' payments to Generation Now were assuredly not), *Citizens United v. FEC*, 558 U.S. 310 (2010); *Buckley v. Valeo*, 424 U.S. (1976); and the applicability of the First Amendment to corporations generally, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978), among other issues. But noticeably absent is any authority suggesting that Defendants can argue that the effects of their illegal conduct are protected by the First Amendment, defeating the causal chain here.

Defendants also argue that there is a chance that HB will be repealed or reaffirmed, which would cut off causation for both of theories of causation, the passage of HB 6 in the House and the defeat of the ballot referendum. (ECF No. 25 at PageID #345.) Again, this is mere speculation. If HB 6 were repealed, the issue would not be one of causation, but mootness—as Defendants appear to acknowledge. (*Id.*) And until a possible repeal is rejected, any argument that there is no proximate causation because the other lawmakers would have acted in the same manner absent alleged bribes is premature, particularly at the pleading stage.

Finally, Defendants argue that Plaintiffs' claim that Defendants caused injury by enabling the passage of HB 6 in the House is incognizable because of legislative immunity. (ECF No. 25 at PageID #346–48.) Defendants' argument expands legislative immunity far past its boundaries, however. Legislative immunity protects all legislators, including state legislators, from federal damages liability for "actions taken in their legislative capacities." *Lake Country Ests., Inc. v.*

24

*Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 403–04 (1979).  And although Defendants are correct that legislative immunity operates in part to prevent judicial scrutiny of legislative motives, the emphasis is on protecting legislators from liability and the inconvenience of litigation so that they are not discouraged from discharging "their legislative duty" to the best of their abilities.  *Id.* at 405.  Permitting Defendants, corporate entities, to raise legislative immunity does not accomplish these objectives.  Thus, it is no bar to Plaintiffs' claims.[11]

This is not to say that legislative immunity has no teeth in federal civil RICO cases or that Ohio's legislators will necessarily undergo depositions that pry into their legislative motivations. But this is not an issue appropriate for the motion-to-dismiss stage which simply requires the Court to evaluate the facial plausibility of the complaint.  At the summary judgment stage, judgment can be granted on claims that rely on evidence that cannot be presented in an admissible form at trial. *E.g.*, *McGuire v. Mich. Dep't of Cmty. Health*, 526 F. App'x 494, 497–98 (6th Cir. 2013).  But at this stage, it is unclear if the only form of evidence that would permit Plaintiffs claims to go to trial involve the type of evidence that may be forbidden by legislative immunity.

For these reasons, Plaintiffs adequately plead causation for their civil RICO claims.

**B.  State law claims**

Defendants also argue that Plaintiffs fail to state a claim for civil conspiracy, injury by criminal acts, unjust enrichment, and negligence/gross negligence claims, all state-law claims. (ECF No. 25 at PageID #348.)  Defendants argue that like the RICO and OCPA claims, all claims except the unjust enrichment claim fail for a lack of injury, a lack of proximate cause, and because

---

[11] Defendants cite one case in which a court has permitted a defendant to coopt a legislator's immunity to dismiss a claim, but there the legislator was a defendant in the case before the court.  *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177 (2d. Cir. 2019).  The Second Circuit takes an exceedingly broad interpretation of legislative immunity which would prevent many, if not all civil RICO claims related to lawmaking activity—a position that no other circuit appears to share.  *See e.g.*, *Johnston*, 763 F.3d at 731–32 (permitting a federal civil RICO claim to go forward against a state governor based on his approval of a bill).

the filed-rate doctrine blocks them.  (*Id.* at PageID #348–50.)  But for the same reasons *supra*, Plaintiffs adequately plead injury and causation, and the filed-rate doctrine does not apply.  Finally, Defendants argue that because no plaintiff has yet to pay a surcharge, the Complaint fails to state Plaintiffs conferred a benefit upon Defendants.  (*Id.* at PageID #350 (citation omitted).)  But again, the surcharge injury is imminent, ascertainable, and specific, and Defendants provide no authority that such injuries are incognizable under Ohio law.  Defendants' argument goes to the proper relief eventually available, as opposed to the legal cognizability of an injury.  Moreover, Defendants mount no argument as to the other injuries that Plaintiffs plead from the decoupling and legacy provisions.  Plaintiffs allege that they paid charges related to this provision, and so they allege that they conferred a benefit upon Defendants.

Thus, Plaintiffs adequately states state-law claims for relief.

## IV.     Conclusion

Accordingly, Defendants' motion to dismiss (ECF No. 25) is **DENED**.

**IT IS SO ORDERED.**


**2/10/2021**                                        **s/Edmund A. Sargus, Jr.**
**DATE**                                              **EDMUND A. SARGUS, JR.**
                                                      **UNITED STATES DISTRICT JUDGE**