# TAB 1



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**AMENDED COMPLAINT $75**
**December 30, 2021 12:20**

By: GREG M. GALVIN 0075612

Confirmation Nbr. 2437790

MICHAEL EMMONS                                     CV 20 935557

       vs.

FIRSTENERGY CORPORATION, ET AL          **Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 320

# IN THE COURT OF COMMON PLEAS
## FOR CUYAHOGA COUNTY

| | | |
|---|---|---|
| **MICHAEL EMMONS, individually and on behalf of all those similarly situated,** 28049 Misty Morning Ln. Beloit, Ohio 44069 | ) ) ) ) ) ) ) ) ) ) ) | **CASE NO.: CV-20-935557** **JUDGE: SHANNON M. GALLAGHER** **SECOND AMENDED CLASS ACTION COMPLAINT** **JURY DEMAND ENDORSED HEREON** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **FIRSTENERGY CORP.** 76 S. Main Street Akron, Ohio 44308 | ) ) ) ) | |
| **And** | ) ) | |
| **FIRSTENERGY SERVICE COMPANY** 76 S. Main Street Akron, Ohio 44308 | ) ) ) ) | |
| **And** | ) ) | |
| **OHIO EDISON COMPANY** 76 S. Main Street Akron, Ohio 44308 | ) ) ) ) | |
| **And** | ) ) | |
| **TOLEDO EDISON COMPANY** 6099 Angola Road Holland, Ohio 44308 | ) ) ) ) | |
| **And** | ) ) | |
| **CLEVELAND ELECTRIC ILLUMINATING COMPANY A/K/A THE ILLUMINATING COMPANY** | ) ) ) ) ) | |

**11517 Fruitland Ct.**               )
**Cleveland, Ohio 44102**      )
                                      )
**And**                                  )
                                      )
**FIRSTENERGY SOLUTIONS N/K/A**  )
**ENERGY HARBOR CORP.**    )
**341 White Pond Drive**      )
**Akron, Ohio 44320**        )
                                      )
         **Defendants.**     )

## NATURE OF THE CASE

1.    This is an action for damages arising out of the conduct of Defendants FirstEnergy Corp. (FirstEnergy), FirstEnergy Service Company (FirstEnergy Service), Ohio Edison Company (Ohio Edison), Toledo Edison Company (Toledo Edison), the Cleveland Electric Illuminating Company (Illuminating Company) [collectively FE Defendants], and Defendant FirstEnergy Solutions n/k/a Energy Harbor Corp. (Energy Harbor), in the illegal and unethical passage and implementation of House Bill 6 (HB 6),[1] a law providing enormous fiscal benefits to Defendants.

2.    In so doing, the FE Defendants and Energy Harbor knowingly and intentionally acted in concert and conspired with a number of individuals and entities, including Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now, Inc. (collectively the members of "Householder Enterprise"), all of whom were persons employed by and associated with an "enterprise" and knowingly and intentionally acted in concert and conspired with each other and others to violate the Ohio Corrupt Practices Act, R.C. 2923.31, *et seq.*[2] As part of this conspiracy, FE Defendants and Energy Harbor agreed that a conspirator

---

[1] *See* H.B. 6, 133rd Gen.Assem., Reg.Sess. (Ohio 2019), the Ohio Clean Air Program.
[2] As set forth more fully in this complaint, FirstEnergy and Energy Harbor engaged directly or indirectly in the conduct of the affairs of the enterprise through a "pattern of corrupt activity," as that term is defined in R.C. 2923.31(E) & (I), consisting of multiple wrongful acts under 18

2

would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of R.C. 2923.32(A)(1).

3.      Plaintiff seeks monetary and declaratory relief against Defendants for their conduct, including but not limited to Defendants' negligence, gross negligence, violation of the Ohio Corrupt Practices Act, and civil conspiracy, all of which directly and proximately resulted in harm.

## PARTIES

4.      At all times relevant to this complaint, Plaintiff Michael Emmons has been a resident and citizen of Ohio, a FirstEnergy electricity customer who receives electricity through Ohio Edison, and a customer receiving power from Energy Harbor.

5.      At all times relevant to this complaint, FirstEnergy has been an investor-owned energy holding company providing utility services by and through its subsidiaries, including Ohio Edison, Toledo Edison, and Illuminating Company, and has maintained a principal place of business in Akron, Ohio.

6.      At all times relevant to this complaint, FirstEnergy has received revenue through its subsidiaries, including Ohio Edison, Toledo Edison, and Illuminating Company, all of whom receive direct payment from members of the Class, which are then transferred to FirstEnergy.

---

U.S.C. §§ 1343 and 1346 (relating to honest services wire fraud); R.C. 2913.05 (relating to wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under R.C. 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery that are chargeable under R.C. 2921.02.

3

7.     At all times relevant to this complaint, Ohio Edison has been an electric distribution company organized and existing pursuant to Ohio law with a service territory including more than 1,000,000 customers across Central and Northeastern Ohio.[3]

8.     At all times relevant to this complaint, Toledo Edison has been an electric distribution company organized and existing pursuant to Ohio law with a service territory including more than 313,000 customers across Northwestern Ohio.[4]

9.     At all times relevant to this complaint, Illuminating Company has been an electric distribution company organized and existing pursuant to Ohio law with a service territory including more than 752,000 customers across Northeastern Ohio.[5]

10.     At all times relevant to this complaint, FirstEnergy Service has been a for-profit corporation organized and existing pursuant to Ohio law. FirstEnergy Service provided legal, financial, administrative, and other corporate support services to FirstEnergy and Energy Harbor. FirstEnergy Service is under the control of FirstEnergy's management and does not have its own Chief Executive Officer or Board of Directors.

11.     At all times relevant to this complaint, Energy Harbor has been an energy supplier and retailer organized and existing pursuant to Ohio law with a principal place of business in Akron, Ohio and a service territory of more than 1,000,000 customers in a number of states, including Ohio. Energy Harbor provides power through nuclear and fossil fuel generation. Since 2016, Energy Harbor has operated with a Board of Directors independent from FirstEnergy. Energy Harbor emerged from bankruptcy proceedings pursuant to Chapter 11 of the United States

---

[3] *FirstEnergy Annual Report 2019*, FirstEnergy Corp., 8,
https://www.firstenergycorp.com/content/dam/investor/files/annual-reports/current.pdf (last visited Aug. 19, 2020).
[4] *Id.*
[5] *Id.*

Bankruptcy Code and separated from its former parent, FirstEnergy. The terms of that separation were memorialized in a 2018 separation agreement.[6] Energy Harbor maintains its primary place of business in Akron, Ohio, and owns the Davis-Besse Nuclear Power Station and Perry Nuclear Power Station. Upon information and belief, and at all times relevant to this complaint, Energy Harbor had independent relationships and obligations with each member of the Class, including as a direct supplier of energy, and received payment from or through members of the Class.

12.     Upon information and belief, at all times relevant to this complaint, FirstEnergy and Energy Harbor acted by and through their officers, executives, employees, lobbyists, agents, affiliates, and/or authorized representatives, who acted within the course and scope of their employment and were responsible for exercising adequate oversight and control to ensure adherence and compliance with applicable codes, ordinances, regulations, advisories, and internal policies and procedures.

13.     At all times relevant to this complaint, FirstEnergy and Energy Harbor were responsible for conducting their corporate operations consistent with the appropriate standard of care, to safeguard customer funds, and to ensure that substantial misuses and abuses of funds did not occur.

14.     At all times relevant to this complaint, FirstEnergy exercised and maintained significant control over the daily operations, budget, staffing, and organization of each of the other FE Defendants, sufficient for it to have actual and/or constructive knowledge of the facts set forth in this complaint.

---

[6] *Our Values*, Energy Harbor, http://www.EnergyHarbor.com/en/about/our-values.html (last visited Aug. 19, 2020).

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

15.     At all times relevant to this complaint, Energy Harbor, including by and through its executives and members of its Board of Directors, had knowledge of the activities and conduct of FE Defendants related to HB 6 and actively participated in and agreed to the course of conduct related to drafting, passage, and implementation of HB 6.

## JURISDICTION AND VENUE

16.     Each of the acts and/or omissions complained of occurred in the State of Ohio, and Defendants are entities organized and existing pursuant to Ohio law with principal places of business in Ohio that have transacted substantial and pervasive business in Ohio, including issuing bills and correspondence and accepting payment by and through the mail, phone lines, and internet in Ohio.  This matter arises under Ohio law, involves issues critical to the State of Ohio, and should be determined by the courts of the State of Ohio.

17.     Venue is proper in Cuyahoga County pursuant to Civ.R. 3(B)(2) and Civ.R. 3(B)(3).  Each Defendant conducted activity in Cuyahoga County that gave rise to the claims for relief, and part of the claims for relief arose in Cuyahoga County.

18.     This Court has jurisdiction over this action as the proposed class is comprised of individuals and entities who are citizens and residents of Ohio, and Defendants are corporations organized and existing pursuant to Ohio law with primary places of business in Ohio. Civ. R. 3(C)(2) and (3).

## INTRODUCTION

19.     Plaintiff incorporates by reference the factual allegations set forth in the Criminal Complaint and Affidavit in Support (Criminal Complaint),[7] the FirstEnergy Corp. Deferred

---

[7] Criminal Complaint and Affidavit in Support, *United States v. Householder*, 1:20-MJ-00525 (S.D. Ohio July 21, 2020) (attached hereto as **Exhibit A**).

6

Prosecution Agreement (Deferred Prosecution Agreement),[8] and the FirstEnergy Corp. 2020 Annual 10-k.[9]

20.     By and through its Ohio subsidiaries, FirstEnergy provides services throughout the State of Ohio, working in conjunction with certain Ohio electric generation suppliers such as Energy Harbor.

21.     Ohio Edison, Toledo Edison, and Illuminating Company, at all times relevant to this complaint, acted as conduits for funds used by FirstEnergy to perpetrate the conduct alleged herein.

22.     At all times relevant to this complaint, Energy Harbor has been a private energy producer and Competitive Retail Electric Service (CRES) provider (referred to as a "marketer" or "retailer") supplying electricity (excluding distribution services) to residential, commercial, and industrial customers through nuclear and fossil fuel generation.[10]

23.     At all times relevant to this complaint, Energy Harbor has been a participant in Ohio's regional transmission organization[11]—the PJM Interconnection, which coordinates wholesale electricity.

24.     At all times relevant to this complaint, Energy Harbor has issued charges and collected fees for its services in a number of ways, including by and through customer electric distribution utilities (EDU), and has been identified as a supplier on the monthly EDU statements

---

[8] *See* FirstEnergy Corp. Deferred Prosecution Agreement at 26, *United States v. FirstEnergy Corp.*, No. 1:21-cr-86 (S.D. Ohio July 22, 2021), attached hereto as **Exhibit B**. ("[From when House Bill 6 was introduced in April 2019 to October 2019] [Energy Harbor] paid over $40 million through wire transfers to Generation Now for Public Official A's benefit, while [Energy Harbor] was involved in bankruptcy proceedings.").

[9] Attached hereto as **Exhibit C**.

[10] *See* Safe, Reliable, Sustainable Energy | Energy Harbor (last visited Oct. 5, 2021).

[11] As used herein, "regional transmission organization" refers to an electric power transmission system operator that operates and controls the electric grid for a geographic region.

7

to its customers, including customers of FirstEnergy's Ohio subsidiaries, Ohio Edison, Toledo Edison, and Illuminating Company.

25.     At all times relevant to this complaint, Ohio Edison, Toledo Edison, and Illuminating Company have been regulated electric distribution utilities as defined by R.C. 4928.01(A)(6).[12]

26.     In general, electric distribution utilities have an obligation to provide affordable and reliable power to customers.

27.     Because Energy Harbor participates in the PJM Interconnection, Energy Harbor had a direct pecuniary interest in the energy marketplace.

28.     PJM Interconnection's primary function is to deliver reliable electric power at the lowest effective cost. PJM structures its market operations, in part, to incentivize efficiency by prioritizing the most cost-effective reliable market participants over more costly alternatives.

29.     In this case, however, Defendants advanced legislation that specifically and intentionally bypassed the authority of PUCO and PJM Interconnection for the purpose of collecting unauthorized amounts from customers that far exceeded the cost of providing reliable electric service.

30.     In so doing, and upon information and belief, FirstEnergy and Energy Harbor also artificially skewed the competitive bidding process (CBP), which set the retail price of electricity for Standard Service Offer (SSO) electricity customers.

---

[12] R.C. 4928.01(A)(6) defines an "electric distribution utility" as an electric utility that supplies at least retail electric distribution service.

8

31.     In addition, because the CRES providers, including Energy Harbor, look to the CBP to establish their prices, the conduct of FirstEnergy and Energy Harbor, set forth more fully herein, also artificially skewed the CRES offers to commercial and residential customers.

32.     The PJM Interconnection operates irrespective of PUCO, and the rates charged pursuant to PUCO are not at issue here.

33.     Moreover, the CRES and SSO prices are not established through PUCO and are instead treated as a cost pass-through.

34.     Therefore, the adverse effects and impacts of Defendants' conduct addressed in this complaint do not seek to interfere with the function of PUCO or to otherwise engage in a challenge to any fee that that should or could be deemed a filed rate.

35.     Rather, this lawsuit is intended to address Defendants' internal abuses and misuses of funds that converted customers into unwitting financial guarantors of Defendants in amounts far beyond the costs associated with affordable, reliable electric service. Defendants' conduct would guarantee them massive financial benefits for decades into the future at exorbitant costs to customers.  Defendants' actions give rise to torts that are properly addressed in this Court.

36.     At all times relevant to this complaint, FirstEnergy has had an internal Code of Business Conduct[13] to which all of its employees, executives, subsidiaries, and affiliates were required to adhere.

---

[13]     *FirstEnergy Corp. Policy 101*: *Code of Business Conduct*,     FirstEnergy Corp., https://firstenergycorp.com/content/dam/investor/files/policies-charters/code-of-business-conduct.pdf (last visited Sept. 17, 2020) **(**attached hereto as **Exhibit D**).

37. The Code of Business Conduct—endorsed by FirstEnergy's Board of Directors—"is to be used as a guide for ethical conduct and [to] help foster a culture of honesty and accountability."[14]

38. The Code of Business Conduct provides: "It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this code and related policies and procedures."[15]

39. Among its specific provisions, the Code of Business Conduct requires FirstEnergy executives, officers, employees, and authorized personnel to engage in "fair dealing," stating:

> When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the company's customers, suppliers, competitors, and personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts, or other unfair business practices.[16]

40. The Code of Business Conduct also mandates protection of corporate assets, including corporate funds, stating:

> We have a responsibility to use company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may only be used for legitimate business purposes and may never be used for illegal purposes.[17]

---

[14] *Id.* at p. 4.
[15] *Id.* at p. 5.
[16] *Id.* at p. 7.
[17] *Id.* at p. 9.

10

41.     As a final caution, the Code of Business Conduct directs: "All financial reporting has to be accurate; our customers and shareholders depend upon it."[18]

42.     Therefore, under their own policies and procedures, FE Defendants are responsible for safeguarding customer funds, using funds appropriately, and not engaging in unfair business practices.

43.     Following the public revelations contained in the Criminal Complaint, FirstEnergy terminated its former Chief Executive Officer, Senior Vice President of Product Development, Marketing and Branding, and Senior Vice President of External Affairs in October 2020, and its Senior Vice President and Chief Legal Officer and Vice President and General Counsel in November 2020.  The reasons given were, among others, inaction and violation of FirstEnergy policies and its code of conduct. (*See* FirstEnergy 10-k, p. 8).

44.     Meanwhile, at all times relevant to this complaint, Energy Harbor has held itself out as a safe, reliable, and economically stable producer and retailer providing customers with cost-effective electricity options.  Though formerly associated with FirstEnergy, beginning in or around 2016, Energy Harbor acted autonomously by and through an independent board of directors.

45.     Upon information and belief, Energy Harbor maintains its own Code of Business Conduct, which includes a set of core values such as social responsibility.[19] Moreover, Energy Harbor maintains a Supplier Code of Conduct that requires its suppliers to comply with all applicable legal requirements, laws, regulations, and disclosure obligations.

---

[18] *Id.*
[19] *See* Energy Harbor Supplier Code of Conduct, *available at* https://energyharbor.com/en/about/supplier-information (last visited Oct. 20, 2021).

## FACTUAL ALLEGATIONS

46.     In 1999, the Ohio Electric Restructuring Act authorized the 2001 deregulation of the electric power industry and encouraged the development of a competitive wholesale market for electric power generation in Ohio.  The restructuring required electric utilities to separate (or "unbundle") their services and charges for electricity generation, transmission, and distribution and to allow retail customers to choose their electric retail suppliers.

47.     Following its passage, an electric bill in Ohio became partially deregulated—the bill itemized separate costs for supply or generation, transmission, and distribution and included the various "riders" authorized by PUCO.

48.     While the stated goal of this legislative effort was to cultivate an open market, the effort proved unprofitable for many utilities, resulting in customers being saddled with higher bills.

49.     In May 2008, the General Assembly passed Senate Bill 221 (SB 221), whose stated goal was to provide stable and predictable electricity rates, to develop renewable energy technologies, and to increase energy efficiency through clean energy standards.  Under SB 221, PUCO regained oversight of electric distribution utilities. Generation remained largely disconnected from PUCO.

50.     Additionally, SB 221 established clean energy standards.  The standards required utilities to meet 12.5 percent of electricity demand with renewable resources and to decrease energy use by more than 22 percent through energy efficiency programs by 2025.  These changes were implemented to provide significant cost savings to all Ohio customers—both consumer and industrial.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

51.     To offset some of the losses utilities alleged they would experience based upon cost savings to customers, SB 221 allowed utilities to impose additional charges for costs incurred in complying with energy efficiency mandates.

52.     Following the passage of SB 221, two trends emerged: (1) natural gas became cheaper, and (2) clean energy standards correlated to significant cost savings for customers.

53.     At the same time, Energy Harbor had no natural gas generation.

54.     Meanwhile, reports filed with PUCO showed that from 2009 to 2012 energy efficiency programs resulted in more than $1 billion in savings for customers.  At that time, projections showed customers could realize $4 billion in savings from energy efficiency over a ten-year period.[20]

55.     In a 2013 report on Ohio Energy Efficiency Standards, the American Council for an Energy Efficient Economy reported that if SB 221's energy efficiency standards continued, Ohioans could save $5.6 billion.  Ohio also saw an increase in energy efficiency-related employment, predominantly in the construction sector, further demonstrating the enormous economic benefits provided to the state by energy efficiency programs.

56.     Upon information and belief, increased energy efficiency concomitantly meant decreased profits for FirstEnergy and Energy Harbor.

57.     Additionally, the supply market provided customers with easier access to low-cost alternatives compared to Energy Harbor's expensive supply.

---

[20] *See* Testimony of Kim Bojko, "Am.Sub. Senate Bill 310," Testimony before the Public Utilities Committee of the Ohio House of Representatives, May 14, 2014, available at http://www.ohiomfg.com/wp-content/uploads/2014-05-20_LB_Energy_SB-310-will-increaseKB.pdf (last visited Oct. 1, 2020).

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

58.     In 2014, FirstEnergy aggressively lobbied for Senate Bill 310's (SB 310) freeze on the clean energy standards.  Upon information and belief, FirstEnergy's support of SB 310 was motivated by a continuing decrease in revenue associated with energy efficiency, as well as the continuing falling price of natural gas.

59.     In June 2014, backed by substantial FirstEnergy support, SB 310 was signed into law.

60.     Despite passage of SB 310, however, FirstEnergy's revenue and profits continued to decline.

61.     By 2016, FirstEnergy's future looked bleak.  In its November 2016 Annual Report, FirstEnergy reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses associated with its energy producing affiliate, Energy Harbor.

62.     Following the November meeting, FirstEnergy publicly announced that it would exit competitive (non-regulated) generation due in large part to weak power prices associated with coal and nuclear power.

63.     Yet, during a fourth quarter earnings call in 2016, FirstEnergy discussed the possibility of a "legislative solution" intended to "preserve valuable nuclear resources * * *."[21]

64.     As part of the legislative solution, FirstEnergy championed the Zero Emissions Nuclear Resource Program (ZEN).  The purpose of this program was to mandate credits for kilowatts produced by nuclear reactors in an effort to align the price of nuclear fuel with the price of natural gas.  This program, an effort to artificially increase the costs of supply to customers, did not generate sufficient support.

65.     In 2017, FirstEnergy announced a drop in its share price.

---

[21] Criminal Complaint at ¶ 11.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

66.     By early 2018, Moody's Investors Services downgraded FirstEnergy's bond rating to Baa3, and though Moody's indicated the outlook for FirstEnergy was stable, FirstEnergy acknowledged the likelihood that Energy Harbor would default on a $100 million bond payment causing bondholders to lose significant investments.

67.     In March 2018, Energy Harbor filed for voluntary Chapter 11 bankruptcy protection.  Energy Harbor announced it would decommission Davis-Besse Nuclear Power Station and Perry Nuclear Power Station.  Practically, it could not compete in the market with cheaper sources of energy, including natural gas and next-generation renewables.

68.     Energy Harbor Chief Nuclear Officer, Don Moul, stated that "[t]hough the plants have taken aggressive measures to cut costs, the market challenges facing these units are beyond their control." [22]

69.     During this timeframe, studies indicated that Energy Harbor could decommission the two nuclear reactors without substantially impacting the available supply of electric power on which Ohio customers relied.

70.     Meanwhile, Energy Harbor and FirstEnergy entered into final negotiations in or around 2018 to fully separate their businesses from each other.

71.     Though the nuclear plants would not be deactivated until May 2020 and October 2021, in the interim, Energy Harbor and FirstEnergy sought legislative policy solutions for these failing reactors and Energy Harbor's foothold in the energy market.

---

[22]*FirstEnergy Solutions Files Deactivation Notice for Three Competitive Nuclear Generating Plants in Ohio and Pennsylvania,*
https://www.sec.gov/Archives/edgar/data/1407703/000119312518104000/d561242dex991.htm
(last visited Oct. 1, 2020).

15

72.     While FirstEnergy and Energy Harbor searched for a legislative solution to their nuclear energy problem, Larry Householder looked to re-enter politics.

73.     Householder was first elected to the House of Representatives and served from 1997 until 2004 when he resigned amidst corruption allegations.

74.     In or around 2017, FirstEnergy and Energy Harbor, by and through FirstEnergy Service, began funneling money to Householder to benefit his campaign as well as the campaigns of Householder-selected cronies, nearly all of whom would endorse a bailout for First Energy and Energy Harbor's nuclear and financial problems.

75.     The scheme was successful, eventually leading to Householder's election as Speaker of the House in January 2019 and, in turn, the October 2019 passage of HB 6—written to directly benefit FirstEnergy and Energy Harbor to the detriment of all Ohio utility customers.

76.     The day after HB 6's passage, Energy Harbor announced that rather than decommissioning its reactors, it would refuel Perry and Davis-Besse at a cost of $52 million.

77.     On July 21, 2020, the United States of America filed the Criminal Complaint against the members of the "Householder Enterprise"—namely, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now—alleging that the enterprise violated 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity.[23]

---

[23] At present, members of the Householder Enterprise are not named as defendants in this complaint. Consistent with the provisions of Civ. R. 15, Plaintiff reserves the right, after appropriate and sufficient fact discovery has been conducted, to seek leave of court to name additional defendants.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935857 / Confirmation Nbr. 2437790 / CLDLJ

78.    The Criminal Complaint was supported by an eighty-one-page affidavit executed by an agent of the Federal Bureau of Investigation (FBI).

79.    On information and belief, FirstEnergy is "Company A Corp." identified in the affidavit, FirstEnergy Service is "Company A Service Co." identified in the affidavit, and Energy Harbor is "Company A-1" identified in the Criminal Complaint.

80.    On July 20, 2021, FirstEnergy entered into the Deferred Prosecution Agreement with the Department of Justice, which identified both FirstEnergy and Energy Harbor as separate entities critical to the passage of HB 6.

81.    For FirstEnergy and Energy Harbor, the Householder Enterprise's primary purpose was to increase Householder's political power to ensure passage of a legislative solution for Defendants' fiscal problems through corrupt means.

82.    To that end, Energy Harbor and FirstEnergy paid illegal money to create the Householder Enterprise and induce the Householder Enterprise to ensure coordination, passage, and implementation of HB 6, which guaranteed billions of dollars of monetary benefits to Defendants.

83.    In his role, Householder solicited and accepted payments on behalf of Defendants FirstEnergy and Energy Harbor into an account for a 501(c)(4) organization, Generation Now, Inc., and used these bribe payments to further his political interests, enrich himself and other members and associates of the Householder Enterprise, and to assist in passing and preserving HB 6.

84. Throughout the course of this scheme, Generation Now received approximately $60 million (the "bribe money") from FirstEnergy and Energy Harbor, by and through FirstEnergy Service, including in excess of $42 million from Energy Harbor.[24]

85. Generation Now registered with the Internal Revenue Service (IRS) as a Section 501(c)(4) organization, an IRS designation for a tax-exempt social welfare organization. Pursuant to federal law, the names and addresses of contributors to Section 501(c)(4) organizations are not made available for public inspection.

86. As set forth in the Deferred Prosecution Agreement, Defendants purposefully sought to use 501(c)(4) entities for their HB 6 contributions to avoid scrutiny and any connection between their business operations and HB 6.

87. Through Generation Now, the members of the Householder Enterprise concealed from public scrutiny FirstEnergy's and Energy Harbor's payments and the scheme to pass and enforce HB 6.

88. Through the scheme, Householder garnered significant personal benefits. At least $300,000 in bribe money was used to pay legal fees and settle a lawsuit against him, over $100,000 of the bribe money was used to pay costs associated with his Florida home, and at least $97,000 of the bribe money was used to help fund his 2018 political campaign.

89. The bribe money was funneled through Generation Now and into accounts controlled by Householder's longtime campaign and chief political strategist, Jeff Longstreth. Identified as Householder's "*political guy,*" his "*implementer,*" and one of his "*closest advisors,*" Longstreth was instrumental to the Householder Enterprise's efforts surrounding HB 6.

---

[24] *See* Criminal Complaint at ¶ 9.

18

90.     Longstreth and his staff managed the 2018 campaigns for the Householder Enterprise-backed candidates (at times internally referred to by members of the Householder Enterprise as "Team Householder" candidates).  Longstreth led the messaging efforts in the campaigns to pass HB 6 and to defeat the ballot initiative to have it repealed, and he was a point of contact for FirstEnergy and Energy Harbor.

91.     Longstreth also played a critical role in the Householder Enterprise's finances.  He was a signatory on both of the Generation Now bank accounts, transferred money out of those accounts to other entities to further the Householder Enterprise, and owned and operated other entities that received tens of millions of dollars of the bribe money, including JPL & Associates LLC.[25]

92.     Longstreth used the bribe money to further the interests of Householder, FirstEnergy, and Energy Harbor and to pay personal benefits to members and associates of the Householder Enterprise.

93.     Longstreth also benefitted personally through the Householder Enterprise's actions, receiving over $5 million of the bribe money during the relevant period.

94.     Neil Clark (now deceased) owned and operated Grant Street Consultants, LLC, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse.  During the relevant period, Clark worked as a lobbyist for various political interest groups.

95.     Along with Longstreth, Clark was, in his own words, one of Householder's "*closest advisors.*"[26]  In recorded conversations from 2019, Clark stated that he served as Householder's

---

[25] During the relevant timeframe, JPL & Associates received over $10.5 million from Generation Now that was funded by FirstEnergy.
[26] *See* Criminal Complaint at ¶ 28.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

"*proxy*" in the Householder Enterprise's efforts to further the enactment of HB 6 and ensured HB 6 went into effect in October 2019 by defeating the subsequent ballot initiative to have it repealed. Clark also communicated directly with House members to further the Householder Enterprise.

96.    In 2019, Clark described himself in recorded communications as Householder's "*hit man*" who will do the "*dirty shit.*" Clark stated that "*when [Householder's] busy, I get complete say.  When we're working on stuff, if he says, 'I'm busy,' everyone knows. Neil has the final say, not Jeff, Jeff is his implementer.*"  Matthew Borges confirmed Clark's role and similarly described Clark as Householder's "*proxy*" relating to FirstEnergy matters. Clark received at least $290,000 in bribe money during the Householder Enterprise.[27]

97.    Matthew Borges was a registered lobbyist for Energy Harbor.  He was a key middleman at the heart of the effort to thwart the ballot initiative to have HB 6 repealed.

98.    On August 5, 2019, shortly after the ballot initiative was announced, Borges formed 17 Consulting Group, LLC.  Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account.  Over the next few months, Generation Now wired a total of $1.62 million into the account.

99.    Approximately one month after Generation Now began transferring money into the 17 Consulting Group account, Borges paid $15,000 from the account for inside information used to help defeat the ballot initiative.[28]

100.    Borges also paid Juan Cespedes $600,000 of Generation Now money and paid a private investigator to investigate signature collectors who worked on behalf of the ballot initiative

---

[27] *Id.*
[28] *Id.* at ¶ 30.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935857 / Confirmation Nbr. 2437790 / CLDLJ

to have HB 6 repealed. Borges also benefitted directly by paying himself over $350,000 from the Generation Now bribe money.

101. Borges had contact with Householder in January 2019 and April 2019—key time periods in the life of HB 6.

102. Juan Cespedes is a multi-client lobbyist whose services were retained by Energy Harbor in the spring of 2018 through his lobbying company, The Oxley Group, LLC.[29] He was central to Defendants' efforts to get HB 6 passed. Records show that Cespedes was the "lead consultant" relating to attempts to pursue legislation to save Energy Harbor's failing nuclear power plants. In internal documents, Cespedes tracked "Team Householder" candidates who later received the bribe money, and he advised that if Householder became the Speaker, the nuclear energy bailout "will likely be led from his Chamber."[30]

103. Over the course of the scheme, Cespedes received approximately $827,000.00. He also communicated regularly with Longstreth during the relevant time period through text messages discussing the coordination of millions of dollars in payments from FirstEnergy and Energy Harbor to the Householder Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot initiative, among other things. Cespedes coordinated the timely payment of $15 million from FirstEnergy to Generation Now.[31]

---

[29] In March 2018, as it was publicly announcing its plans to decommission and mothball its nuclear generating stations, Energy Harbor entered into a contract to "assist * * * in attaining necessary funding through government action to allow for the financial stability/sustainability of its two nuclear plants." Criminal Complaint at ¶ 40.
[30] *See* Criminal Complaint at ¶ 32.
[31] *Id.* at ¶ 33.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

**Related Entities Controlled by the Householder Enterprise**

104. The Householder Enterprise used and relied on several entities to further Defendants' plan. The following entities were controlled by, worked directly with, or funneled payments for the benefit of the Householder Enterprise:

a.     JPL & Associates LLC, controlled by Longstreth, received over $10.5 million in bribe money wire transfers during the relevant period, which Longstreth then transferred internally to his other accounts.

b.     Longstreth also indirectly received another $4.4 million funneled from Generation Now through "Front Company" (discussed below) and into Longstreth's Constant Content accounts. According to FBI analysis, the money was used to pay benefits directly to Householder Enterprise members and to further the Householder Enterprise's interests. After the ballot initiative failed and HB 6 became law, Longstreth consolidated most of the Householder Enterprise funding into JPL-controlled accounts. As of January 1, 2020, the total balances within JPL-controlled accounts exceeded $6.5 million.

c.     The federal political action committee referred to in the Criminal Complaint as "PAC" is an entity through which Generation Now funneled payments from FirstEnergy and Energy Harbor in furtherance of the conspiracy. The Householder Enterprise primarily used the PAC during the May 2018 primary election to conceal the source of media buys for "Team Householder" candidates. Generation Now's attorney is the treasurer and a signatory on the PAC bank account.[32]

---

[32] Although Longstreth was not a signor on the PAC bank account, documents obtained by the FBI confirm Longstreth's control over the PAC. For example, a Microsoft Word document titled "Client Information Request Form," last modified by Longstreth in October 2016, listed Longstreth as the "Executive Director or President" of the PAC. In addition, Longstreth's resume,

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

d.     In early 2018, the PAC bank account was funded almost entirely by two wire transfers of nearly $1 million from Generation Now made on April 2 and April 12, 2018, respectively. By April 30, 2018, nearly all of the money was paid to two media services firms that spent the money on media buys and other efforts to benefit Householder political candidates, including Householder himself, in advance of the May 8, 2018, Ohio primary election.

e.     The account remained unused until Generation Now wired an additional $50,000 in September 2018 in advance of the fall 2018 election, close to $40,000 of which was paid to a political strategy group within weeks of the transfer.

f.     The account remained largely inactive from October 2018 until early 2020, when the Householder Enterprise wired $1,010,000 from FirstEnergy and the "Coalition" (described below). Expenditures from the PAC disclosed in Federal Election Commission filings, along with media purchased by the PAC, show that the Householder Enterprise used FirstEnergy's money to benefit Team Householder candidates in the 2020 primary election.

g.     The 501(c)(4) organization referred to in the Criminal Complaint as "Coalition" is another non-profit entity through which Generation Now funneled bribe money in furtherance of the conspiracy. The same attorney who is the treasurer and signatory for the PAC is also the signatory on the Coalition's bank account. The attorney incorporated Coalition in Delaware one day after he incorporated the PAC. Longstreth

---

created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC. Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's e-mail address and telephone number. Phone records corroborate Longstreth's role, showing frequent contact with Generation Now's attorney when Generation Now needed to move money to and from the PAC.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

oversees political activities for the Coalition. According to the FBI investigation, Longstreth possessed a copy of the Coalition's W-9 taxpayer identification. He also saved Microsoft Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

h.      From 2017 through 2019, more than half of the funding received by the Coalition came from FirstEnergy and Energy Harbor, by and through FirstEnergy Service.

i.      The Coalition account was largely unused from August 2018 until January 2020 when the Householder Enterprise used the Coalition as a pass-through for the bribe money to the PAC to support Householder-backed candidates in the 2020 primary election. Passing the money through the Coalition allowed the PAC to list the Coalition, and not Generation Now, as the source of the $1,010,000. The Householder Enterprise sought to conceal Generation Now as the source of the PAC funds in 2020 for numerous reasons, including negative media publicity Generation Now received in 2019, as well as concerns certain candidates expressed to Householder about their association with Generation Now.

j.      The Coalition account was an additional mechanism for Generation Now to spend secret money for the benefit of Householder and the Householder Enterprise.

k.      The group referred to in the Criminal Complaint as "Dark Money Group 1" was used by the Householder Enterprise to conceal the source of media buys during the 2018 general election. An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018 and opened its bank account on September 25, 2018.

l.      The majority of activity in Dark Money Group 1's account occurred between October 2018 and Election Day on November 6, 2018. From October 19 to October 29, 2018, FirstEnergy and Generation Now contributed over $1.1 million into this

account.  Dark Money Group 1 paid Media Placement Company 2 $1,438,510 between October 22 and November 2, 2018 for media buys targeting Householder Enterprise rivals. Following Election Day 2018, the account has been largely unused.

m.     The entity referred to in the Criminal Complaint as "Front Company" is a pass-through entity used by the Householder Enterprise in furtherance of the conspiracy to fund the campaign against the ballot initiative to have HB 6 repealed.  The for-profit entity was organized in Ohio on July 30, 2019, just days after the ballot initiative began.

n.     From August 1, 2019 through October 2019, accounts controlled by FirstEnergy and Energy Harbor wired Generation Now $38 million.  Generation Now then wired $23 million to Front Company, the vast majority of which was used to pay signature collection firms to fight against the ballot initiative and to pay for media opposing the ballot initiative.  Generation Now was the sole source of money deposited into the Front Company account.  By November 2019, less than $5,000 remained in the Front Company account.

105.     On or about February 6, 2017, Generation Now was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (account numbers 3310 and 6847).  Bank records show that an attorney and Longstreth were signatories on both accounts.  On or about July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ("the Code"), or the corresponding section of any future federal tax code."  The attorney signed the application as the treasurer of Generation Now.

106.     Upon information and belief, after its formation, FirstEnergy and Energy Harbor used Generation Now to funnel secret payments to Householder and the Householder Enterprise.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

107. Over the course of three years, FirstEnergy and Energy Harbor poured money into Generation Now and other clandestine organizations to ensure passage and implementation of HB 6. Table One in Paragraph 47 of the Criminal Complaint lists each of FirstEnergy and Energy Harbor's illicit payments received by Generation Now during the period from March 2017 until March 2020, totaling $59,996.835.86.

108. In addition to the $59,996.835.86 paid directly to Generation Now, FirstEnergy and Energy Harbor also paid another $890,000 to the Householder Enterprise.

109. In total, FirstEnergy and Energy Harbor paid the Householder Enterprise $60,886,835.86.

110. Although Householder's name is not on Generation Now's paperwork, based on Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas, as set forth in the Criminal Complaint and as later acknowledged in the Deferred Prosecution Agreement, the goal of Generation Now was to further the Householder Enterprise, designed in large part to guarantee billions of dollars of future revenue to FirstEnergy and Energy Harbor.

111. The number and amount of payments from FirstEnergy and Energy Harbor, the timing of these payments, the communications and coordination amongst co-conspirators, and the official and unofficial actions taken by Householder, along with other concerted action, demonstrate Defendants' role in buying a legislative solution to guarantee their future profitability.

112. Generation Now was the vehicle used to collect the vast amounts of money needed for Householder's Speakership. From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Householder Enterprise received

26

approximately $4.6 million from Generation Now. More than half of that money came from Energy Harbor and/or FirstEnergy and its affiliates, including FirstEnergy Service.

113.    From the time the Generation Now's accounts were opened in 2017, FirstEnergy made regular, quarterly payments of $250,000 into Generation Now's main bank account.  In March 2018, approximately two weeks before Energy Harbor filed for bankruptcy protection, FirstEnergy began funneling payments to Generation Now through Energy Pass-Through, another 501(c)(4) incorporated to further the scheme.  In the final month before the 2018 general election, FirstEnergy deposited another $500,000 into the Generation Now account.[33]

114.    In total, Defendants spent money on twenty-one different candidates, fifteen (including Householder) in the primary, and six in the general election. Every candidate who won voted for Householder as Speaker, and all but two voted in favor of HB 6.[34]

### The Bailout Legislation (HB 6)

115.    Prior to HB 6, FirstEnergy and Energy Harbor had publicly expressed financial concerns. Specifically, Energy Harbor expressed concerns surrounding its nuclear generation business.  In 2017, the ZEN legislation, which was intended to provide subsidies to keep Energy Harbor's nuclear operations afloat, failed to gain the support necessary to pass.

116.    The purpose of the Householder Enterprise was to stack the legislature and ensure passage of bailout legislation.

117.    Ultimately, HB 6 changed the energy landscape in much more pervasive ways than guaranteeing Energy Harbor's continued viability.

---

[33] The payments from FirstEnergy during 2017-2018 are summarized in Paragraph 82 of the Criminal Complaint. Other payments are described in Paragraph 83 of the Criminal Complaint. The close coordination of activities between FirstEnergy and Householder is set forth in Paragraphs 84-86 of the Criminal Complaint.
[34] *See* Criminal Complaint at ¶ 70.

27

118.    On January 7, 2019, the day he was elected Speaker of the House, Householder pledged to create a standing subcommittee on energy generation.

119.    The Householder Enterprise thereafter rammed HB 6 through the House.

120.    On April 12, 2019, HB 6 was introduced.  Householder picked freshman Representatives, who he helped elect with the bribe money, to sponsor the bill.

121.    Although the bill is entitled "Ohio Clean Air Program," a plain reading of the text demonstrates that HB 6 was conceived to provide lucrative subsidies to qualifying utilities and suppliers—chief among them FirstEnergy and Energy Harbor.[35]

122.    By way of example, HB 6 included language that saved Energy Harbor's nuclear reactors by authorizing a non-bypassable nuclear surcharge assessed to all Ohioans.  Energy Harbor reversed its decision to decommission its two nuclear reactors the day after HB 6 passed.

123.    To avoid any regulation of this surcharge by PUCO, HB 6 contained the following proviso: "The level and structure of the charge shall be authorized by the commission through a process that the commission shall determine is not for an increase in any rate, joint rate, toll, classification, charge, or rental * * *."[36]

124.    The charge was intended to create a pool of funding totaling more than $150 million annually (the "Nuclear Generation Fund") through 2027, with a provision allowing the deadline to be extended under certain circumstances.

125.    In addition to the Nuclear Generation Fund, HB 6 also created a "decoupling mechanism" for the benefit of FirstEnergy, which separated customer base distribution rates from base distribution revenue and revenue resulting from implementation of R.C. 4925.66.

---

[35] *See* Criminal Complaint at ¶¶ 111-186.
[36] HB 6, R.C. 3706.46(A)(2).

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

126.     The decoupling mechanism authorized by HB 6 perpetually guaranteed FirstEnergy a minimum yearly income of $978 million—the amount FirstEnergy earned in 2018, a year in which it made more money than in other recent years thanks to hot weather and other factors. According to a statement by former FirstEnergy Chief Executive Officer Chuck Jones during an earnings call in November 2019, the decoupling mechanism made the corporation "recession proof."

127.     Upon information and belief, HB 6 prohibited legacy generating resources from participating in the procurement auctions that set retail electricity prices, skewing the retail price-setting mechanism for the vast majority of Ohioans and directly resulting in a benefit to Energy Harbor as a market participant, as well as other entities that compete in those auctions to supply SSO load on behalf of FirstEnergy's distribution operations to class members. The same is true for class members purchasing electricity directly from CRES providers, such as Energy Harbor, as the CRES providers set contract offers based in large part on the CBP.

128.     Despite the fact that HB 6 eliminated energy efficiency standards, the act authorized FirstEnergy to continue its pre-HB 6 collection of lost distribution revenue, a tariff predicated on FirstEnergy's alleged decrease in revenue caused by those previously mandated (but now nonexistent) energy efficiency standards.

129.     With no requirements to further increase energy efficiency, and with no incentive to increase renewables in an otherwise artificial market construct, HB 6 cost FirstEnergy customers billions of future dollars, as well as the value of the energy efficiency investments made in the prior years, and requires these same customers to continue funding purported energy efficiency losses that no longer exist.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

130. HB 6 also extended the legacy generation cost recovery mechanism. The Ohio Valley Electric Corporation (OVEC) operates two outdated coal plants. Prior to HB 6, all or most electricity providers in Ohio owned part of OVEC and purchased electricity from them. The customers of the providers paid a fee subsidizing the OVEC coal plants. HB 6 extended the fee to all FirstEnergy customers, regardless of whether they received power from the coal plants.

131. To review the bill, Householder created a new subcommittee comprised mostly of his political supporters. Unlike other subcommittees, this subcommittee had only one bill on its agenda—HB 6.

132. Over the next several months, Householder's subcommittee held a number of hearings, inviting proponent and opponent testimony. Far from abstaining from these hearings, FirstEnergy and Energy Harbor actively solicited public officials as proponents and drafted their proponent testimony supporting HB 6.

133. The Householder Enterprise also engaged in an expensive media blitz, funded by money FirstEnergy and Energy Harbor funneled through Generation Now, to pressure public officials to support the bill.

134. On April 30, 2019, roughly two weeks after introduction of the legislation, FirstEnergy and/or Energy Harbor wired $1.5 million to Generation Now. During May 2019, while the controversial legislation was pending before Ohio lawmakers, FirstEnergy and/or Energy Harbor wired Generation Now four additional payments totaling $8 million.

135. The Householder Enterprise used some of that money for mailers and media advertisements to pressure members to support the legislation. Members of the Householder Enterprise also used the bribe money for their personal benefit, pressured House members to vote

30

for HB 6, and instructed at least one representative to destroy text messages sent by Householder after Householder's failed attempt to gain the representative's support for HB 6.

136. HB 6 passed in the House on May 29, 2019.

137. On July 23, 2019, after passage by the Senate, the House passed the Senate's final version of HB 6.

138. The next day, Energy Harbor announced its plan to suspend decommissioning of its nuclear plants and to refuel its nuclear stations at a cost of approximately $52 million.[37]

139. Shortly after Governor Mike DeWine signed the legislation, efforts to organize a statewide referendum to repeal HB 6 began. These efforts required ballot initiative organizers to collect signatures of registered voters in order to put the HB 6 referendum on the 2020 ballot.

140. Again, the members of the Householder Enterprise worked closely with FirstEnergy and Energy Harbor to defeat the ballot initiative. During this period, FirstEnergy and/or Energy Harbor wired over $38 million to Generation Now. The members of the Householder Enterprise funneled the money to various accounts and entities they controlled in order to purchase media advertisements and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the ballot initiative.[38]

141. The efforts to prevent a repeal of HB 6 were successful. On October 21, 2019, the ballot initiative failed to collect enough signatures, and HB 6 went into effect.

---

[37] Daniel Carson, *FirstEnergy Solutions Announces it Will Refuel at Davis-Besse*, The News-Messenger (July 24, 2019, 7:47 PM), https://www.thenews-messenger.com/story/news/local/2019/07/24/firstenergy-solutions-announces-refuel-davis-besse-nuclear-power-station/1822494001/ (last visited Sept. 23, 2020).

[38] The efforts to prevent the repeal of HB 6 included bribes to an employee of the ballot initiative to gain inside information and bribes to signature collectors. Criminal Complaint at ¶¶ 216-39.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

142.    Following passage of HB 6, during an earnings call in November 2019, FirstEnergy's CEO acknowledged the impact of HB 6's decoupling mechanism, stating in part:

> Decoupling fixes our base revenues and specifically it takes about one-third of our company and I think makes it somewhat recession-proof. So, I get a question a lot about where I'm worried about a future recession. *It's 2 million customers in Ohio that this is going to help make sure that doesn't impact us.*

(Emphasis added).[39]

143.    Collectively, HB 6 guaranteed billions of dollars in future revenue to FirstEnergy and Energy Harbor, and it enabled Energy Harbor to continue as a going concern even after it had publicly announced its decision to decommission its two Ohio nuclear reactors.

144.    In addition, executives and high-ranking officials of FirstEnergy and Energy Harbor reaped lucrative compensation benefits during the scheme, all while either knowingly participating in the scheme or otherwise turning a blind eye to the conduct underlying passage of HB 6.

145.    Subsequent legislation does not course correct FirstEnergy's and Energy Harbor's underlying bad conduct, including resorting to bribery and corruption to reap massive future benefits.

146.    From March 2017 to March 2020, the Householder Enterprise received approximately $60 million from FirstEnergy and Energy Harbor paid through Generation Now for the purpose of ensuring the ill-gotten gains and additional benefits created by HB 6.

147.    Upon information and belief, prior to HB 6, FirstEnergy and Energy Harbor relied almost exclusively on their customers for revenue.  As such, customers paid nearly every dollar FirstEnergy and Energy Harbor used for bribes, kickbacks, and illegal support for HB 6, and to

---

[39] Criminal Complaint at ¶ 169.

32

quash the ballot initiative to repeal HB 6, and they will pay the majority of the money associated with implementation of HB 6.

148.    In exchange for these illicit and unlawful payments, the Householder Enterprise helped pass HB 6, described by one Householder Enterprise member as a billion-dollar "bailout," and corruptly worked to ensure HB 6 went into effect by defeating the ballot initiative. To achieve these ends, and to conceal the scheme, the Householder Enterprise engaged in conduct that includes: (a) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (b) enriching and benefitting the Householder Enterprise, its members, and associates; and (c) promoting, concealing, and protecting purposes (a) and (b) from public exposure and possible criminal prosecution.

149.    Upon information and belief, FirstEnergy's and Energy Harbor's conduct included, but was not limited to:

     a.    Abusing the political system by creating 501(c)(4) entities for the purpose of concealing payments to support and ensure passage and implementation of HB 6;

     b.    Funneling tens of millions of dollars of customer revenue into 501(c)(4)s and PACs to be transferred to state legislators in exchange for their support of HB 6;

     c.    Paying direct and indirect contributions to ensure the election of Householder as Speaker of the House in exchange for the *quid pro quo* of passage of HB 6;

     d.    Paying direct and indirect contributions to ensure the election of legislators supportive of a "legislative solution" to FirstEnergy's and Energy Harbor's fiscal problems and falling revenues;

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

e.  Lobbying for and/or assisting in drafting HB 6 and proponent testimony, which created billions of dollars of guaranteed income for FirstEnergy and Energy Harbor contrary to their responsibilities to customers to deliver low cost energy;

f.  Misappropriating or misusing funds to ensure continual collection of a fixed income that was not based on usage, prudency, actual costs, or best interests of the customers, and that could not be challenged;

g.  Undoing the clean energy cost savings that directly benefited all Ohio customers;

h.  Collecting lost distribution revenue from customers despite the repeal of energy efficiency mandates;

i.  Failing to return lost distribution revenue associated with repealed energy efficiency mandates;

j.  Skewing the Ohio energy marketplace;

k.  Obstructing, bribing, and/or engaging in harassment to prevent a ballot initiative to repeal HB 6;

l.  Violations of internal policies and procedures related to corporate conduct and political activity;

m.  Violations of the Ohio Corrupt Practices Act; and

n.  Such other conduct as may be revealed during discovery and/or trial.

150.  As a direct and proximate result of the conduct of FirstEnergy and Energy Harbor, Plaintiff and the Class were directly and proximately harmed, and they have incurred and will continue to incur significant damages.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

151.    In addition to their direct liability, FirstEnergy and Energy Harbor are also liable for damages to Plaintiff and the Class based on the doctrine of respondeat superior.

152.    At all times relevant to this complaint, Defendants operated by and through their executives, directors, employees, personnel, and authorized representatives, and Defendants had the right and responsibility to exercise control over these individuals when acting in the course and scope of their employment and when conducting business on behalf of Defendants.

153.    FirstEnergy and Energy Harbor failed to exercise reasonable control, oversight, and management over their executives, directors, employees, personnel, and authorized representatives in one or more of the following particulars:

a.      Failing to ensure that employees engaged in good faith and fair dealing;

b.      Failing to enforce policies and procedures surrounding good faith negotiations, honest representations, unfair business practices, protection of corporate assets, and political activity;

c.      Allowing employees, agents, and/or authorized representatives to engage in illegal lobbying and political action to secure passage and implementation of HB 6;

d.      Allowing employees, agents, and/or authorized representatives to misuse customer funds to secure passage of HB 6; and

e.      Failing to adequately train, monitor, and/or enforce internal policies and procedures and external rules, codes, ordinances, and regulations.

154.    Defendants had a financial motive to engage in the conduct set forth above and have financially benefitted from their employees' conduct.

155.    As a direct and proximate result of First Energy and Energy Harbor's failures related to their employees, agents, and/or authorized representatives, Plaintiff and the Class have sustained and will continue to sustain past, current, and future damages.

156.    Defendants' failures, described above, individually and under respondeat superior, constitute the complete absence of care.

## CLASS ALLEGATIONS

157.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

158.    Plaintiff brings this action on behalf of himself and all those similarly situated for one or more classes defined as:

a.      All citizens of Ohio who paid costs or will pay costs associated with or affected by implementation of HB 6 (the "Class").

b.      Plaintiff reserves the right to expand, limit, modify, or amend the class definition, including the addition of one or more subclasses and/or the addition or subtraction of any named representatives.

c.      Excluded from the Class are:

i.      Defendants, their legal representatives, elected officials, officers, directors, assigns, and successors;

ii.     The judge, magistrate, and any special master to whom this case is assigned, and any member of their immediate families; and

iii.    To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the Class.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935857 / Confirmation Nbr. 2437790 / CLDLJ

159.    The Class consists of millions of individuals and businesses whose joinder in this action would be impracticable, satisfying Civ. R. 23(A)(1). The disposition of the claims in a single action will provide substantial benefits to all parties and the court.

160.    There are questions of law and fact common to Plaintiff and the Class, satisfying Civ. R. 23(A)(2). These questions include, but are not limited to:

a.    Whether FirstEnergy and Energy Harbor paid bribes, kickbacks, and/or other illegal funds to secure passage and implementation of HB 6;

b.    Whether FirstEnergy and Energy Harbor paid bribes, kickbacks, and other illegal funds to elect legislators who pledged to support legislation that was introduced as HB 6;

c.    Whether FirstEnergy and Energy Harbor paid bribes, kickbacks, and other illegal funds to elect Householder Speaker of the House;

d.    Whether FirstEnergy and Energy Harbor bribed the members of the Householder Enterprise to obtain a nuclear bailout and other financial compensation through legislation;

e.    Whether the conduct set forth in this complaint violated the Ohio Corrupt Practices Act;

f.    Whether Defendants used money paid by the Class to fund illegal efforts to pass HB 6;

g.    Whether FirstEnergy's and Energy Harbor's payments related to HB 6 constituted misuses of corporate assets;

h.    Whether FirstEnergy's and Energy Harbor's payments related to HB 6 constituted unfair business practices;

i. Whether Defendants have collected money from customers as a result of HB 6;

j. Whether Defendants violated the public trust through their conduct surrounding HB 6;

k. Whether Defendants owed duties associated with public trust and/or customers related to appropriate uses of funds;

l. Whether money collected pursuant to HB 6 was taken *ultra vires*;

m. Whether Defendants breached their responsibilities to customers by funding illegal efforts to pass HB 6;

n. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory damages;

o. Whether Defendants' conduct entitles the Class to recovery of attorneys' fees and expenses; and

p. Such other common questions of law or fact as may be revealed during discovery and/or trial.

161. The claims and corresponding defenses of the representative parties are typical of the claims and defenses of the Class, satisfying Civ. R. 23(A)(3).

162. The named representative will fairly and adequately represent and protect the interests of the Class, satisfying Civ. R. 23(A)(4).

163. In addition, certification is proper under Civ. R. 23(B)(1), in that prosecuting separate actions might create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class, or adjudications with respect to individual Class members that, as a practical

38

matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

164.    Defendants have acted or refused to act in a way that is universal to the Class, and the Class is therefore entitled to declaratory and injunctive relief against Defendants, satisfying Civ. R. 23(B)(2).

165.    Questions of law or fact common to the Class members predominate over questions affecting individual members making a class action superior to other available methods of fairly and efficiently adjudicating the controversy, satisfying Civ. R. 23(B)(3).

**FOR A FIRST CAUSE OF ACTION**
**Negligence and/or Gross Negligence**
**On Behalf of the Class Against All Defendants**

166.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

167.    At all times relevant to this complaint, Defendants owed duties to Plaintiff and Class members to use due and reasonable care in providing services, as well as duties to Plaintiff and the Class arising from their capacity as Defendants' financial guarantors.

168.    Defendants breached their duties to Plaintiff and Class members in one or more of the following particulars:

a.    Engaging in reckless and illegal action contrary to the best interests of Plaintiff and the Class;

b.    Violating internal policies and procedures related to good faith and fair dealing;

c.    Violating internal policies and procedures related to political action;

d.    Engaging in conduct contrary to the best interests of customers;

e.      Failing to train employees, managers, personnel, and authorized agents on policies and procedures;

f.      In the event such training occurred, failing to adequately monitor and/or implement policies and procedures.

g.      Failing to properly oversee, manage, and control the conduct of executives, employees, and/or authorized representatives;

h.      Engaging in bad faith and/or fraudulent conduct at the expense of Plaintiff and the Class;

i.      Abusing public trust;

j.      Abusing a position of power;

k.      Paying bribes and kickbacks and engaging in other illegal conduct for the purpose of securing passage and implementation of HB 6;

l.      Delegitimizing the function of the legislature;

m.      Unjustly depriving all Class members of billions of dollars paid toward energy efficiency;

n.      Unjustly denying Class members the benefit of billions of dollars in savings and investment in energy efficiency measures and technology;

o.      Artificially skewing the PJM and CBP and/or similar supplier markets;

p.      Unjustly collecting funds from Class members that would not have been authorized but for the passage of HB 6;

q.      Propping up Defendants' businesses contrary to the best interests of Class members;

r.      Illegally converting customer funds; and

s.       Such other particulars as may be revealed during discovery and/or trial.

169.    Defendants engaged in the conduct set forth above knowingly and/or with a reckless disregard for the impact on Plaintiff and Class members.

170.    As a direct and proximate result of Defendants' negligent, grossly negligent, and reckless conduct, Plaintiff and Class members have suffered and will continue to suffer substantial losses and are entitled to judgment against Defendants for all actual damages, including costs associated with or affected by implementation of HB 6, along with punitive damages, pre- and/or post-judgment interest, and such other damages as may be determined at trial.

### FOR A SECOND CAUSE OF ACTION
**Unjust Enrichment**
**On Behalf of the Class Against Defendants FirstEnergy and Energy Harbor**

171.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

172.    Since the passage of HB 6, Plaintiff and Class members have conferred non-gratuitous benefits on First Energy and Energy Harbor  in the form of illegally inflated monthly payments.  Plaintiff and Class members had no choice but to pay these continuing monthly charges arising out of HB 6 or risk losing access to electricity.

173.    FirstEnergy and Energy Harbor have realized a benefit by and through, among other things, illegally increased revenues, which inured to the benefit of FirstEnergy and Energy Harbor and their executives and directors, and which bolstered bonuses, salaries, and/or share prices.

174.    Despite conferring substantial benefits on FirstEnergy and Energy Harbor, Plaintiff and Class members will receive nothing in exchange for the increased costs they are forced to pay and are paying in excess of what they would in the absence of HB 6.

175.     FirstEnergy's and Energy Harbor's conduct surrounding HB 6 in bribing, bullying, and illegally paying for its passage and implementation makes their continued collection and retention of the moneys resulting from HB 6 inequitable.

176.     Plaintiff and Class members are therefore entitled to equitable relief, including disgorgement of FirstEnergy's and Energy Harbor's ill-gotten gains and restitution both of the amount they used to fund illegal efforts to secure passage of HB 6 and the amounts collected from Plaintiff and Class members as a result of the implementation of HB 6.

### FOR A THIRD CAUSE OF ACTION
**Declaratory and Injunctive Relief**
**On Behalf of the Class Against Defendants**

177.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

178.     As set forth above, at all times relevant to this complaint, Plaintiff and Class members have had valid contractual relationships and/or relationships of public trust and confidence with Defendants.

179.     Based upon these relationships, Defendants have owed and continue to owe duties to Plaintiff and Class members, including duties not to engage in unfair business practices and to safeguard customer funds against abuse, misuse, and misappropriation.

180.     Pursuant to R.C. 2721.03, Plaintiff and Class members seek a declaration of their rights by this Court arising from their relationships with Defendants, and further seek a declaration from this Court that Defendants' conduct constitutes a violation of rights guaranteed to Plaintiff and Class members.

### FOR A FOURTH CAUSE OF ACTION
**Violation of the Ohio Corrupt Practices Act, R.C. 2923.31, *et seq*.**
**On Behalf of the Class Against Defendants FirstEnergy and Energy Harbor**

181.     Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

182.    Plaintiff and Class members meet the definition of "person" set forth in R.C. 2923.31(G), which includes an individual, corporation, business trust, estate, trust, partnership, and association, and any governmental officer, employee, or entity.

183.    FirstEnergy and Energy Harbor are each a "person" within the meaning of R.C. 2923.31(G).

184.    At all times relevant to this case, FirstEnergy and Energy Harbor, as corporate entities acting together, constituted an "enterprise" as that term is defined in R.C. 2923.31(C).  This enterprise is referred to herein as the "FirstEnergy Enterprise."  At all times relevant to this case and for the reasons set forth in the Criminal Complaint, the Householder Enterprise also constituted an "enterprise."  As alleged in this complaint, FirstEnergy, Energy Harbor, and the members of the Householder Enterprise constituted an "enterprise," and this enterprise is referred to herein as the "FirstEnergy-Householder Enterprise."

185.    In violation of R.C. 2923.32(A)(1), FirstEnergy and Energy Harbor conducted the affairs of the FirstEnergy-Householder Enterprise through a pattern of racketeering activity and a pattern of corrupt activity and/or conspired to do so.[40]

186.    The purpose of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to secure legislation favorable to Defendants through bribes.

187.    Since 2017, the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise have been engaged in, and continue to be engaged in, activities that have been and remain

---

[40] *See* Deferred Prosecution Agreement, p. 32: "For example, on October 9, 2019, Executive 1 texted [Energy Harbor] Executive A, 'Just got word the $ is being wired today. $10m.' Executive 1 told Executive 2, 'I did speak with Public Official A and he says they need it and will spend it.' * * * In exchange for Executive 1's agreement to wire $10 million to Public Official A, [Energy Harbor] Executive A promised Executive 1 that [Energy Harbor] would pay additional funds in connection with transfer of real estate to FirstEnergy Corp. after [Energy Harbor's] bankruptcy."

longstanding, continuous, and open-ended. FirstEnergy and Energy Harbor have engaged in a pattern of racketeering activity and a pattern of corrupt activity, as described in this complaint, the Criminal Complaint, and the Deferred Prosecution Agreement, including, but not limited to, the extensive use of the U.S. mails and/or interstate wire facilities on different dates to expand Householder's power to enable HB 6 to be passed and to bribe Householder and others to pass HB 6 and defeat the ballot initiative.

*Pattern of Racketeering Activity*

188.     FirstEnergy and Energy Harbor, by and through FirstEnergy Service, collectively and/or in conjunction with and/or coordinated with the Householder Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity and a pattern of corrupt activity.

189.     As elaborated in this complaint, FirstEnergy and Energy Harbor, collectively and/or in conjunction with others, devised an illegal scheme to obtain legislation and prevent the repeal of legislation by means of false or fraudulent pretenses and representations and through the payment of bribes and kickbacks.

190.     In furtherance of the scheme, FirstEnergy and Energy Harbor took money from Plaintiff and Class members by means of false pretenses and representations and used the U.S. mails and/or interstate wire facilities, or reasonably knew the mails and wires would be used, for the payment of bribes to secure the passage of HB 6 and to prevent its repeal.

191.     As documented in the Criminal Complaint and Deferred Prosecution Agreement, FirstEnergy and Energy Harbor had specific knowledge that the mails and wires were being utilized in furtherance of the overall purpose of executing the illegal scheme and/or it was reasonably foreseeable that the mails and wires would be so used.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

192.     Each of the mails and wires in connection with the scheme described in this complaint and the Criminal Complaint, spanning a period from 2017 to the present, constitutes a separate instance of mail and/or wire fraud and, thus, is also a predicate act of racketeering activity and/or corrupt activity, which, taken together, constitute a pattern of racketeering activity and/or a pattern of corrupt activity within the meaning of the Ohio Corrupt Practices Act. Other predicate acts, including payment of bribes to secure the passage of HB 6 and to prevent its repeal, are set forth in this complaint and in the Criminal Complaint.

193.     In addition, as alleged in this complaint, the Criminal Complaint, and the Deferred Prosecution Agreement, FirstEnergy and Energy Harbor have engaged in a variety of wrongful acts that constitute racketeering activity and/or corrupt activity, including: (a) violations of 18 U.S.C. § 1951, relating to interference with commerce, robbery, or extortion; (b) violations of 18 U.S.C. § 1952, relating to racketeering, including multiple acts of bribery in violation of R.C. 3517.22(a)(2); (c) violations of 18 U.S.C. § 1956, relating to money laundering; (d) violations of 18 U.S.C. § 1957, relating to engaging in monetary transactions in property derived from specified unlawful activity; and (e) multiple acts involving bribery that are chargeable under R.C. 2921.02.

*Relationship of Pattern of Racketeering Activity and/or Corrupt Activity to the Enterprise*

194.     The goal of the FirstEnergy Enterprise and the FirstEnergy-Householder Enterprise was to obtain passage of HB 6 through fraudulent, illegal means, including the payment of bribes, which enabled Defendants to extract money and property from Plaintiff and Class members through mandatory monthly surcharges on their electric utility bills.

195.     The pattern of racketeering activity and the pattern of corrupt activity described herein was integral to the scheme.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

196.    Without engaging in mail and wire fraud and the payment of bribes, FirstEnergy and Energy Harbor would have been unable to obtain passage of HB 6.

197.    As a direct and proximate result of FirstEnergy's and Energy Harbor's violations of the Ohio Corrupt Activity Act described in this complaint, Plaintiff and Class members have suffered substantial injuries, including the payment of money used to fund the illegal scheme to secure passage and implementation of HB 6 and those costs incurred as a result of HB 6.

198.    By virtue of these violations of R.C. 2923.34, FirstEnergy and Energy Harbor are liable for three times the damages Plaintiff and Class members have sustained, plus the costs of this suit, including reasonable attorneys' fees.

## FOR AN FIFTH CAUSE OF ACTION
### Civil Conspiracy
### On Behalf of the Class Against Defendants FirstEnergy and Energy Harbor

199.    Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

200.    FirstEnergy and Energy Harbor, along with members of the Householder Enterprise, have engaged in a civil conspiracy to unlawfully injure Plaintiff and Class members. Their actions evidence a malicious combination with the purpose of causing injury to the property of Plaintiff and Class members in a way not competent for one alone, resulting in actual damages.

201.    Apart from liability for a conspiracy to engage in racketeering or corrupt practices violations, and independent of those violations, the actions of FirstEnergy and Energy Harbor demonstrate a civil conspiracy with one or more members of the Householder Enterprise under state law to commit fraud, theft, and the other illegal activities, including the scheme to secure passage of HB 6 and prevent its repeal by means of false or fraudulent pretenses and representations and through the payment of bribes.

202.    The unlawful or tortious acts undertaken by FirstEnergy, Energy Harbor, and the

Householder Enterprise were agreed to and acted on in pursuance of a common plan or design to commit unlawful or tortious acts; FirstEnergy and Energy Harbor actively took part in the plan; and they ratified and adopted the wrongdoers' acts done for their benefit.

203. As a direct and proximate result of FirstEnergy and Energy Harbor's civil conspiracy, Plaintiff and Class members have been damaged by, among other particulars, the loss of significant public confidence, amounts used to enable the conspiracy, costs and/or damages arising out of HB 6, and those costs incurred to mitigate and/or reverse the effects of HB 6, and all such additional damages connected to the conspiracy itself as may be determined at trial.

## **REQUEST FOR RELIEF**

Plaintiff now prays that this Court enter judgment in favor of the Class against Defendants and for relief as follows:

1. An order certifying the Class defined in this complaint, appointing Plaintiff as Class Representative, and appointing the undersigned as Class Counsel;

2. Awarding actual, incidental, consequential, and punitive damages in such amounts as determined by this Court;

3. Imposing statutory damages, including, where applicable, liquidated and/or treble damages;

4. Awarding reasonable attorneys' fees and costs, pre- and post-judgment interest, and requiring that Defendants bear the cost of notifying the Class;

5. Requiring Defendants to pay restitution in an amount to be ascertained by the Court and requiring Defendants to disgorge any ill-gotten gains;

6. Awarding declaratory and injunctive relief; and

7. Awarding such additional relief in law or equity as this Court deems proper.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

## JURY TRIAL DEMAND

Plaintiff requests that, to the extent applicable, this matter be tried to a jury.

Respectfully Submitted,

s/ *Gregory Michael Galvin*
Gregory Michael Galvin, Esq. (Ohio Bar No.75612)
Galvin Law Group, LLC
23 Plantation Park, Suite 503 (physical)
P.O. Box 887 (mailing)
Bluffton, SC 29910
Telephone: 843-227-2231
Fax: 888-362-0714
ggalvin@galvinlawgroup.com

Dated: December 30, 2021

# Exhibit A

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| United States of America | ) | |
| v. | ) | |
| Larry Householder | ) | Case No. **1:20-MJ-00525** |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 16, 2020_____ in the county of _____Hamilton_____ in the
___Southern___ District of _____Ohio_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1962(d) | Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity |

This criminal complaint is based on these facts:

    See Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Blane J. Wetzel, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence. **via Facetime Video.**

Date: ___**Jul 17, 2020**___

_____
*Judge's signature*

City and state: _____Cincinnati, Ohio_____

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

UNITED STATES

V.

**LARRY HOUSEHOLDER,**
**JEFFREY LONGSTRETH,**
**NEIL CLARK,**
**MATTHEW BORGES,**
**JUAN CESPEDES, and**
**GENERATION NOW**

Case No. 1:20-MJ-00525

<u>Filed Under Seal</u>

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Blane J. Wetzel, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of a criminal complaint against defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW**.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since August 21, 2016.  I am assigned to the Public Corruption Squad of the Cincinnati Division Columbus Resident Agency. In my capacity as a Special Agent, I work on the Southern Ohio Public Corruption Task Force - comprised of various state and federal agencies, and am responsible for investigating violations of federal law, including, but not limited to, public corruption, extortion, bribery, and theft from programs receiving federal funds. I have conducted and participated in public corruption investigations that involved the use of advanced investigative techniques such as the use of: Title III interceptions; confidential human sources; consensually-monitored meetings; execution of search warrants on computers, emails, other electronic communication devices and physical structures; pen register and trap/trace devices; financial record analysis; and physical surveillance. During these investigations, which included bribery, extortion, and efforts to defraud the government, I have participated in monitoring court authorized wire interceptions, conducted consensually recorded conversations, conducted witness interviews, analyzed telephone toll data, and analyzed documents such as legislation and financial records.

3.      By virtue of my training and experience, through conversations with and review of reports from other experienced agents who have conducted numerous public corruption investigations, I have become familiar with how some public officials improperly solicit or accept benefits or other things of value from a private citizen with intent to be influenced or rewarded in connection with the business or transaction of the governmental agency for which they work. I also investigated public officials and their associates who employ various deceptive means to further corrupt activity to include orally and electronically communicating in coded conversation, using a middleman to distance oneself from corrupt activity, and providing false exculpatory

information as an attempt to disguise the nature of their corrupt activity. I have had the opportunity to assist in multiple public corruption wiretap investigations, including monitoring and reviewing transcripts of court authorized intercepted communications involving bribery and extortion.

4.        Prior to joining the FBI, I worked as policy director for a member of the Michigan House of Representatives. I performed duties such as: drafting legislation, managing constituent relations, managing legislative issues, and providing strategic political advice to my employer. In addition to working in an official capacity for the State of Michigan, I was also employed by that same legislator as a member of his campaign team. Working on the campaign, I became familiar with the rules, regulations, practices, and norms of campaign finance.

5.        The information set forth in this affidavit was obtained during the course of my employment with the FBI, through personal observations, the statements of witnesses/cooperators, and recordings of conversations. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause that federal crimes have been committed.

6.        As set forth in this affidavit, there is probable cause to believe that, beginning in or about 2016 and continuing to the present, in the Southern District of Ohio and elsewhere, the Defendants, **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, being persons employed by and associated with an enterprise, which engaged in, and the activities of which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

## GENERAL STATEMENT OF THE LAW

7.        Title 18, United States Code, Section 1962(c) and (d) provides as follows:

(c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . . (c) of this section.

Section 1961 in turn, defines the terms "enterprise" and "pattern of racketeering activity" as used in Section 1962 as follows:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

Section 1961(1) defines "racketeering activity," in relevant part, as follows:

(A) [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

## PROBABLE CAUSE

8.     Defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, constituted an "Enterprise," (hereinafter "Householder's Enterprise") as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. Householder's Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce. As described below, there is probable cause to believe that the named defendants conspired to conduct and participate in the conduct of the affairs of Householder's Enterprise through a pattern of racketeering activity.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 939557 / Confirmation Nbr. 2437790 / CLDLJ

9. To summarize, from March 2017 to March 2020, Householder's Enterprise received approximately $60 million from Company A[1] entities,[2] paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from Company A, Householder's Enterprise helped pass House Bill 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with Company A. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from Company A Corp. affiliates through multiple entities that it controlled. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

## I.    Background

10. In 2016, Company A Corp.'s nuclear generation future looked grim. (Company A Corp. is described further below.) In its November 2016 Annual Report to Shareholders, Ohio-based Company A Corp. and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, Company A-1. Given this backdrop, Company A announced future options for its generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

11. Consistent with this forecast, Company A actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio. For example, during Company A's fourth-quarter 2016 earnings conference call, Company A Corp. President and CEO stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this*

---

[1] I have used pseudonyms for all people and entities except for the Defendants, and the entities registered by the Defendants or for which they are signatories on bank accounts.

[2] As described in this affidavit, "Company A" refers collectively to Company A Corp., Company A-1, and Company A Service Co., all of which are defined below. Prior to February 2020, Company A-1 and Company A Service Co. were both wholly-owned subsidiaries of Company A Corp. Company A-1 and its affiliates filed for bankruptcy in 2018 and were divested from Company A Corp. in February 2020. Notably, all three entities share a common first name, and Enterprise members and associates often just referred generically to the "company" or used the common first name in communications, as quoted below.

*legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*

*We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [Company A] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

12.    However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

13.    While Company A was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019.  Following his January 2017 trip on Company A's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from Company A into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation Now.  In 2017 and 2018, Householder's Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from Company A. Members of Householder's Enterprise used Company A's payments for their own personal benefit and to gain support for Householder's political bid to become Speaker.  In the spring and fall of 2018, the Enterprise spent millions in Company A money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for Company A.

14.    The investigation shows that the plan worked.  Householder-backed candidates that benefitted from Company A money received by Generation Now (described throughout this affidavit as, "Company A-to-Generation-Now" payments[3]) helped elect Householder as the Ohio Speaker of the House in January 2019.  And Householder fulfilled his end of the corrupt bargain shortly thereafter.  Three months into his term as Speaker, HB 6 was introduced to save from closure Company A-1's two failing nuclear power plants.  Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills.  Neil Clark described the legislation as a "bailout" for Company A's nuclear assets, worth $1.3 billion to Company A.

15.    After the introduction of the bailout legislation, Company A began increasing its payments into Generation Now for the benefit of the Enterprise.  On April 30, 2019, roughly two weeks after introduction of the legislation, Company A wired $1.5 million to Generation Now.  In the month of May 2019, while the controversial legislation was pending before lawmakers, Company A wired four additional payments totaling $8 million.  The Enterprise used some of that

---

[3] "Company A-to-Generation-Now" payments is an inclusive label describing payments from accounts controlled by Company A Service Co., Company A-1, and Energy Pass-Through, which, as set forth below, is funded solely by wires from Company A Service Co.

5

money for mailers and media advertisements to pressure members to support the legislation; the Enterprise also used Company A money for their personal benefit, as described below. In the same month that the Enterprise received $8 million from Company A, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder attempt to gain support for HB 6 from the representative.

16.     On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor. That process took about two months. However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to organize a statewide ballot-initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot. And so, Company A's and the Enterprise's fight continued.

17.     In response, from July 24 to October 22, 2019, Company A-controlled accounts wired over $38 million into Generation Now to defeat the ballot initiative so HB 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the Company A money to enrich themselves and further their personal interests.

18.     Company A entities paid Householder's Enterprise $60,886,835.86 in secret payments[4] over the approximately three-year period in exchange for the billion-dollar-bailout. The Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions paid into the entity are akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny—and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Defendant Neil Clark stated in a 2019 recorded conversation,[5] Company A operated as the Enterprise's "Bank"—Clark explained, "*Generation Now is the Speaker's (c)(4)*," and Company A's "*deep pockets*," and the money to the Enterprise through Generation Now was "*unlimited*." Defendant Matthew Borges similarly described Company A's payments to the Enterprise as "*Monopoly money*."

19.     The Enterprise used some of the Company A money to help enact the bailout legislation. Additionally, the Enterprise used millions of dollars of Company A bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. The Company A payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff. The Defendants also paid themselves personally millions of dollars

---

[4] This includes Company A payments into Generation Now and other Enterprise-controlled entities.
[5] ███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
██████████████

in Company A bribe payments, funneled through Generation Now and other entities controlled by the Enterprise. This includes allowing for the payment of at least $500,000 in what appears to be personal benefits to Householder that was passed through Longstreth controlled accounts. In addition, the Enterprise had over $8 million of Company A money in their controlled accounts at the end of 2019, which represents further profit to Enterprise members.

## A. The Defendants and Householder's Enterprise

20.    **Larry Householder** is the current Speaker of the Ohio House of Representatives. He previously served as a House member representing Ohio's 72nd District from 1997 to 2004, including as Ohio Speaker of the House from 2001 to 2004. In 2004, Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publically referred to the FBI. He was never charged. Householder won his House seat back in the fall of 2016. He was elected Speaker again in January 2019, after what the media described as a bitter leadership battle that lasted nearly a year.

21.    Householder's path to Speakership was unusual. Householder and then-House-member Representative 1, both of whom are Republicans, were both candidates to be Speaker of the House of Representatives for the 133rd General Assembly. After the then-Speaker's resignation in May 2018, a protracted conflict lasting eight weeks began to select a Speaker for the remainder of the 132nd General Assembly. Ultimately, Representative 1 became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite Representative 1's selection in mid-2018 for the remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker. He did so in a number of ways, including by providing financial support, paid for in large part by Company A, for certain candidates running for House seats in the spring 2018 primary and the November 2018 general election. In the end, his strategy was successful, as he won the Speakership despite Representative 1 serving in that role prior to the election.

22.    Householder's Enterprise has several purposes, one of which is to increase Householder's political power through corrupt means. In his role, Householder solicited and accepted payments from Company A into his 501(c)(4) account; he used the bribe payments to further his political interests, enrich himself and other members and associates of the Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

23.    Householder benefitted personally through the Enterprise. For example, while funded by Company A-to-Generation-Now bribe money, at least $300,000 passed through and funded accounts controlled by Jeff Longstreth, which the Enterprise used to pay legal fees and settle a lawsuit against Householder. Over $100,000 of the Company A-to-Generation-Now bribe money was passed through Longstreth-controlled accounts and used to pay costs associated with Householder's Florida home. In addition, at least $97,000 of the Company A-to-Generation-Now bribe money was used to pay expenses for Householder's 2018 House campaign.

7

24.     **Jeff Longstreth** is Householder's longtime campaign and political strategist.  Neil Clark identified Longstreth as Householder's "*political guy*," his "*implementer*," and one of his "*closest advisors*," who was instrumental to the Enterprise's efforts to pass HB 6.

25.     The investigation corroborates Clark's statements.  Although Longstreth is not employed by the State of Ohio, he is Householder's chief political strategist.  Longstreth runs Householder's political campaign, and the investigation shows that he and his staff managed the 2018 campaigns for the Enterprise-backed candidates (at times internally referred to by the Enterprise as "Team Householder" candidates).  Householder and Longstreth even shared office space, rented from their Political Advertising Agency.  In addition, Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for Company A.  Phone records show that Householder and Longstreth have communicated on a regular basis for years.

26.     Longstreth also plays a critical role with respect to the Enterprise's finances.  He is a signatory on both of the Generation Now bank accounts and the person who transfers money out of the accounts to other entities to further the Enterprise.  Longstreth also controls entities that receive Company A-through-Generation-Now payments to further the Enterprise.  Among these, Longstreth owns and operates JPL & Associates.  Throughout the relevant period, Longstreth transferred over $10.5 million of Company A's bribe payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account.  In addition, Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity (Front Company, described below) and then into accounts that he controlled.  Longstreth then used Company A payments funneled through Generation Now to further Householder's and Company A's interests and to pay personal benefits to members and associates of the Enterprise.  Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in Company A-to-Generation-Now money during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

27.     **Neil Clark** owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse.  Prior to becoming a lobbyist, Clark served as a budget director for the Ohio Senate Republican Caucus.  During the relevant period, Clark worked as a lobbyist for various interest groups.

28.     Along with Longstreth, Clark is, in his own words, one of Householder's "*closest advisors*."  According to Clark during recorded conversations in 2019, Clark served as Householder's "*proxy*" in the Enterprise's efforts to further the enactment of HB 6 and ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge.  Clark also communicated directly with House members to further the Enterprise.  In 2019, Clark described himself in recorded communications as Householder's "*hit man*" who will do the "*dirty shit*."  Clark stated, "*when [Householder's] busy, I get complete say.  When we're working on stuff, if he says, 'I'm busy,' everyone knows, Neil has the final say, not Jeff,  Jeff is his implementer*."  Borges confirmed Clark's role, and similarly described Clark as Householder's "*proxy*" relating to Company A's matters in a recorded conversation with CHS 1.  Clark benefitted personally from Company A's payments to the Enterprise, receiving at least $290,000 in Company A-to-Generation-Now money.

8

29.    **Matthew Borges** is a registered lobbyist for Company A-1, a subsidiary of Company A. As described below, the investigation has shown that Borges was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive. On August 5, 2019, shortly after the Ballot Campaign was announced, Borges incorporated 17 Consulting Group. Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account. Over the next few months Generation Now wired a total of $1.62 million into the account.

30.    There is probable cause to believe that, approximately a month after Generation Now began wiring money into Borges' 17 Consulting account, Borges paid $15,000 to CHS 1 in exchange for inside information about the Ballot Campaign, which Borges would use to help defeat the Ballot Campaign. Bank account records show that the $15,000 paid to CHS 1 came from the 17 Consulting Group account, which was funded by Generation Now wires. Borges also paid another co-conspirator Juan Cespedes, $600,000 of Generation Now money from his account. With the money wired from Generation Now, Borges also paid a private investigator during this period, which, as described below, is consistent with the Enterprise's strategy of investigating the signature collectors that worked for the Ballot Campaign.

31.    Toll records show Borges had contact with Householder in January 2019 and April 2019—key time-periods, as described below, involving official action by Householder. Borges benefitted directly from the $1.62 million from Generation Now wires. Specifically, he paid himself over $350,000 from Company A-to-Generation-Now proceeds.

32.    **Juan Cespedes** served as a key middleman, participating in strategy meetings and communicating with Enterprise members and associates regarding strategic decisions. Cespedes is a multi-client lobbyist, whose services were retained by Company A-1. He was central to Company A-1's efforts to get the bailout legislation passed in Ohio. As explained below, a contract between Company A-1 and Cespedes's lobbying company, the Oxley Group, shows Company A-1 hired Cespedes to pursue the bailout legislation starting in the spring of 2018. Consistent with this, records show that Cespedes was the "lead consultant" relating to Company A-1's attempts to pursue legislation that would save its failing nuclear power plants. In internal documents, Cespedes tracked "Householder camp" candidates who later received Company A-to-Geneartion-Now money, and he advised that if Householder becomes Speaker, the nuclear energy bailout "will likely be led from his Chamber."

33.    He was paid by both, receiving approximately $600,000 from the Enterprise[6] and $227,000 from Company A in 2019. He also was in regular contact with both Company A and Enterprise members during the relevant period. As set forth below, Cespedes and Longstreth communicated regularly through text messages discussing the coordination of millions of dollars in Company A payments to the Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot campaign, among other things. In one telling exchange, which is supported by toll

---

[6] The $600,000 paid to Cespedes was passed through the 17 Consulting Group bank account, which was funded exclusively by Generation Now.

records and search warrant returns, Cespedes coordinated the timely payment of $15 million from Company A to Generation Now.

34.     **Generation Now, Inc.**, received approximately $60 million from Company A entities during the relevant period.  As set forth more fully below, Generation Now registered with the IRS as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization. Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.  The Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny. Generation Now's accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Enterprise.  As described below, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire from Energy Pass-Through in March 2020, bringing the combined balance of the accounts to approximately $2.29 million, again, money that is a direct benefit to the Enterprise.

**B.    Related Entities Controlled by the Enterprise**

35.     The Enterprise used and relied on a number of different entities to further the conspiracy.  The following entities were controlled by, worked directly with, or funneled payments for the benefit of the Enterprise:

        a.      **JPL & Associates LLC** is controlled by Longstreth.  Longstreth is the signor on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content."  Bank records show numerous internal money transfers of Generation Now money among Longstreth-controlled accounts.  In total, JPL's main business account received over $10.5 million in Company A–to-Generation-Now wires during the relevant period, which Longstreth then transferred internally to his other accounts.  Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity, ("Front Company," discussed below) and into Longstreth's Constant Content accounts.  Analysis of the accounts shows that the money was used to pay benefits directly to Enterprise members and to further the Enterprise's interests by paying campaign staff for preferred Householder candidates, among other things.  After the ballot initiative campaign failed and HB 6 became law for the benefit of Company A, Longstreth consolidated most of the Enterprise funding into JPL-controlled accounts. As of January 1, 2020 that total balances within JPL-controlled accounts exceeded $6.5 million.  This money is a direct benefit to the Enterprise.

        b.      **"PAC"** is a federal PAC through which Generation Now funneled Company A payments in furtherance of the conspiracy.  The Enterprise primarily used the PAC during the May 2018 primary as a way to conceal the source of media buys for Team Householder candidates.  The attorney who is listed as the treasurer for Generation Now and who is a signor on the Generation Now accounts along with Longsreth, is the treasurer and a signor of the PAC.

        c.      Although Longstreth was not a signor on the PAC bank account, documents obtained via a search warrant, , confirm Longstreth's control over the PAC.  For example, a Word document titled "Client Information Request Form," last modified by Longstreth in October 2016,

listed Longstreth as the "Executive Director or President" of the PAC.[7]  In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC.  Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's email and phone number.   Toll records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

      d.    In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire and a $750,000 wire from Generation Now, on April 2 and April 12, 2018, respectively.[8]  By April 30, 2018, nearly all of the million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder candidates, including Householder himself, in advance of the May 8, 2018 Ohio primary election.

      e.    The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the fall 2018 election.  Close to $40,000 of that wire was paid to a political strategy group within weeks of the wire.  Aside from payments to the attorney's law firm, the balance remained in the account.

      f.    The account remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of money from Company A to the "Coalition," (described below), which passed through to PAC roughly the same amount of money over the next two months.  Expenditures from the PAC in FEC filings, along with media purchased by PAC, show that the Enterprise used the Company A money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

      g.    **"Coalition"** is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signor for the PAC is the signor on the Coalition's bank account.  The attorney incorporated the Coalition in Delaware one day after he incorporated PAC.  Longstreth's resume states that he oversees political activities for the Coalition.  Search warrant returns indicate that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition.  He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

      h.    For calendar years 2017 through 2019 the Coalition was funded almost exclusively through: A) $90,000 from Company A, B) $300,000 from "Energy Pass-Through" (a Company A pass-through, as set forth below), and C) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid $150,000 to Generation Now during the relevant period.  Outgoing payments from the Coalition account were over $100,000 in two wires to JPL & Associates; $54,000 wired to Generation Now; $191,000 wired to Media Placement Company 1; and $200,000 wired to a public relations firm.

---

[7] ████████████████████████████████████████████████████████

[8] Prior to the wire transfers from Generation Now, the PAC's bank account had a balance of $2,703.20.

i.      The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Enterprise used the Coalition as a pass-through for Company A-to-Generation-Now money to PAC, which the Enterprise then used to support Householder-backed candidates in the 2020 primary election. The benefit of passing the money through the Coalition first, was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now. The Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained below, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it.

j.      Thus, this account is a mechanism for Generation Now to spend secret money for the benefit of Householder and the Enterprise.

k.      **"Dark Money Group 1"** is an entity used by the Enterprise to conceal the source of media buys during the 2018 general election, similar to the way the Enterprise used PAC for the primaries in 2018 and 2020. An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018 and opened its bank account on September 25, 2018.

l.      The majority of activity in the account occurred roughly a month later, between October 2018 and Election Day on November 6, 2018. From October 19 to October 29, 2018, Generation Now wired $670,000 into the account; Company A wired $500,000 into the account; and other corporate interests wired $300,000 into the account, totaling $1,470,000. From October 22 to November 2, 2018, Media Placement Company 2 then spent $1,438,510 on media buys for ads paid for by Dark Money Group 1 that generally targeted rivals of candidates aligned with Householder. Since Election Day in 2018, the account has been largely unused.

m.      **"Front Company"** is a pass-through entity used by the Enterprise to fund the campaign against the referendum in furtherance of the conspiracy. The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began. "Associate 1" and "Associate 4" of Longstreth and Householder are signers on its bank account.

n.      From August 1, 2019 through October 2019, Company A-controlled accounts wired Generation Now $38 million; Generation Now then wired $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing the Ballot Campaign. Generation Now was the sole source of money deposited into the Front Company account. By November 2019, less than $5,000 remained in the Front Company account.

## C. Company A and Its Affiliates

36.      **Company A Corp.** Incorporated in Ohio, Company A Corp. is a public utility holding company for its subsidiaries. As a holding company, Company A Corp. directs and controls the various subsidiary entities within Company A Corp. Per United States Securities and Exchange Commission documents, Company A Service Co. is a principle subsidiary, and

Company A-1 is a wholly-owned subsidiary of Company A Corp. Company A Corp. and its subsidiaries are involved in the generation, transmission, and distribution of electricity.

37.     **Company A Service Co.** "provides legal, financial and other corporate support services at cost, in accordance with its cost allocation manual, to affiliated [Company A] companies." Company A Service Co. is under the management of Company A Corp.'s leadership team. The Service Co. does not have its own CEO or board of directors. Among the shared services Company A Service Co. provides to Company A's affiliated companies, including Company A-1, are "external affairs," including "corporate contributions"; "Federal/State/Local Regulatory Affairs"; and "advocacy at the Federal, State, and Local levels." According to Company A's SEC Form 10-K, Company A Service Co. provided: $112 million in shared services for Company A-1 and other debtors from April 1, 2018 to December 31, 2018; and $152 million in shared services to these entities from January 1, 2019 to December 31, 2019. Pursuant to Company A-1's governmental affairs contract with Cespedes relating to its efforts to pass legislation to save Company A's failing nuclear power plants, explained in detail below, Company A Service Co. acted as "*the authorized agent of [Company A-1] for purposes of executing and administering this Agreement and is acting in each such case solely in its capacity as authorized agent.*" As set forth below, Company A Service Co. was the Company A affiliated entity that wired the bulk of the millions of dollars to Generation Now for the benefit of Company A-1.

38.     **Company A-1** "provides energy-related products and services to retail and wholesale customers." Company A-1 owns and operates nuclear generating facilities through affiliates, one of which owns two nuclear power plants in Ohio and sells the entire output from these plants to Company A-1. Another affiliate, by agreement, operates the nuclear generation plants. During most of the relevant period, Company A Corp. was the parent company for each of these entities.

39.     On March 28, 2018, Company A-1 announced that Company A-1 was closing the two power plants by 2021. Three days later, Company A-1 and other Company A affiliates, filed Chapter 11 bankruptcy. Company A Corp. and Company A Service Co. did not seek bankruptcy protection. Pursuant to the bankruptcy plan, Company A Corp. proposed separating from Company A-1, its nuclear generation arm.[9]

40.     Records obtained by the FBI indicate that, on June 4, 2018, a few months after filing Chapter 11 bankruptcy, Company A-1 entered a contract with Oxley Group LLC, which listed Cespedes as the "supplier contact."[10] The term of the contract was from May 1, 2018 to April 30, 2019. Under scope of services, Cespedes was contracted to perform "Government Relations" for Company A-1, which included "*assist[ing] [Company A-1] in attaining necessary funding through government action to allow for the financial stability/sustainability of its two nuclear power plants.*" In other words, Cespedes's job was to help Company A-1 attain

---

[9] In February 2020, Company A-1 emerged from bankruptcy under a new name and Company A Corp. divested its ownership interest in the company.

[10] ████████████████████████████████████████████████████████████

government funding—*i.e.,* legislative help—to save its two nuclear power plants from closure. Pursuant to the contract, among other things, Company A-1 was actively seeking specific legislative help to save the two nuclear plants, including "*getting a resolution*" passed, "*making our issue a campaign priority for incoming elected officials to achieve a solution in the first quarter of 2019,*" and receiving "*consistent updates on the pending House Speaker race,*" a reference to the Speakership race between Householder and Representative 1.

41.     These priorities became reality. As described below, on April 12, 2019, just three months after Householder became Speaker with the help of Company A bribe payments, HB 6 was introduced by two freshman, "Team Householder," representatives. HB 6 created a new Ohio Clean Air program to subsidize power plants fueled by nuclear and solar power, which had the effect of saving Company A's nuclear plants from closure with over $1 billion in subsidies for nuclear energy.

42.     **"Energy Pass-Through"** is a non-profit 501(c)(4) that was incorporated in Ohio on February 8, 2017—two days after Generation Now was incorporated in Delaware. A week later, on February 16, 2017, Company A wired $5 million into the Energy Pass-Through bank account—the first transaction in the account. The account was thus funded solely by the initial $5 million wire from Company A. The Energy Pass-Through account then made the following transactions:

- $300,000 wire to Generation Now on March 15, 2018 (weeks before Company A filed for bankruptcy);
- $300,000 wire to Coalition on May 1, 2018;
- $100,000 wire to Generation Now on May 4, 2018; and
- $500,000 wire to Generation Now on August 16, 2018.

43.     Aside from the initial $5 million seed money, the account received no other deposits until October 10, 2019. On that date, Company A wired $10 million to its Energy Pass-Through account. That same day, Energy Pass-Through wired $10 million to Generation Now. Similarly, on October 18, 2019, Company A wired another $10 million to Energy Pass-Through. On October 22, 2019, the day the ballot initiative failed and HB 6 officially became law, Energy Pass-Through wired $3 million to Generation Now, and wrote a $4,330.86 cashier's check to Generation Now. On March 3, 2020, Energy Pass-Through wired another $2 million to Generation Now. Based on my training and experience, there is probable cause to believe that this account was used as a pass-through from Company A to the Enterprise.

## II.     Enterprise Creates and Uses Generation Now to Receive Bribe Payments

### A.  Creation of Generation Now

44.     On or about February 6, 2017, Generation Now, Inc. was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (x3310 and x6847). Subpoenaed bank records show that an attorney and Jeff Longstreth were signatories on both accounts. On or about

July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ('the Code'), or the corresponding section of any future federal tax code." The attorney, signed the application as the treasurer of Generation Now.

45. Although Householder was not listed on registration documents or in account records for Generation Now, the Enterprise used Generation Now to receive secret payments for Householder. Recorded conversations indicate that the Enterprise intended to use Generation Now, a 501(c)(4), in this way. For example, in a recorded call, Clark discussed with Householder, the use of a 501(c)(4), controlled by Householder, to receive payments: "*what's interesting is that there's a newer solution that didn't occur in, 13 years ago, is that they can give as much or more to the (c)(4) and nobody would ever know. So you don't have to be afraid of anyone because there's a mechanism to change it.*" Clark believed that Householder should utilize his 501(c)(4) to gain political support in his campaign for Speaker against Representative 1 because reportable-hard dollars will cause industry groups to give to both sides, the implication being that Householder would obtain larger amounts of cash through a (c)(4).[11]

46. Similarly, in a recorded conversation in mid-2019, Clark summed up the benefit of 501(c)(4)s to Householder as follows: "*it's secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account, it is controlled by his people, one of his people, and it's not recorded. A (c)(4) is non-recorded.*"[12]

**B. Use of Generation Now to Receive Millions in Secret Payments from Company A**

47. At the time it was aggressively lobbying for legislative action to save its two nuclear power plants, Company A was paying millions in secret payments to the Enterprise through Generation Now. Table 1 lists each Company A payment received by Generation Now during the relevant period, starting from March 2017 (shortly after Company A started its ZEN energy legislative campaign and Householder won his House seat back) until March 2020:

Table 1: Company A Payments to Generation Now Bank Account x3310

| Date | Amount | Method | Source |
|---|---|---|---|
| 3/16/2017 | $250,000 | Wire | Company A Service Co. |
| 5/17/2017 | $250,000 | Wire | Company A Service Co. |
| 8/10/2017 | $250,000 | Wire | Company A Service Co. |
| 12/8/2017 | $250,000 | Wire | Company A Service Co. |
| 3/15/2018 | $300,000 | Wire | Energy Pass-Through |
| 5/4/2018 | $100,000 | Wire | Energy Pass-Through |
| 8/16/2018 | $500,000 | Wire | Energy Pass-Through |

---

[11] ███████████████████████████

[12] ███████████████████████████

55

| Date | Amount | Method | Source |
|---|---|---|---|
| 10/16/2018 | $400,000 | Check | Company A Service Co. |
| 10/29/2018 | $100,000 | Check | Company A Service Co. |
| 4/30/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/7/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/15/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/22/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/29/2019 | $1,500,000 | Wire | Company A Service Co. |
| 6/5/2019 | $2,000,000 | Wire | Company A Service Co. |
| 6/13/2019 | $1,361,899 | Wire | Company A Service Co. |
| 6/20/2019 | $2,116,899 | Wire | Company A Service Co. |
| 7/5/2019 | $1,879,457 | Wire | Company A-1 Corp. |
| 8/2/2019 | $734,250 | Wire | Company A Service Co. |
| 8/7/2019 | $4,390,000 | Wire | Company A Service Co. |
| 8/22/2019 | $653,000 | Wire | Company A Service Co. |
| 8/29/2019 | $2,003,000 | Wire | Company A Service Co. |
| 9/5/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/12/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/19/2019 | $4,695,000 | Wire | Company A Service Co. |
| 9/26/2019 | $2,445,000 | Wire | Company A Service Co. |
| 10/3/2019 | $4,160,000 | Wire | Company A Service Co. |
| 10/8/2019 | $1,600,000 | Wire | Company A Service Co. |
| 10/10/2019 | $10,000,000 | Wire | Energy Pass-Through |
| 10/17/2019 | $248,000 | Wire | Company A Service Co. |
| 10/22/2019 | $3,000,000<br>$4,330.86 | Wire<br>Cashier Check | Energy Pass-Through |
| 3/3/2020 | $2,000,000 | Wire | Energy Pass-Through |
| **Total:** | **$59,996,835.86** | | |

48.     In addition to the $59,996,835.86 that Company A paid directly to Generation Now, Company A made $890,000 in other timely payments to the Enterprise, to include: Company A payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed below. These payments bring the total amount of direct payments from Company A to the Enterprise during the relevant period as $60,886,835.86. During the time of the conspiracy, other entities besides Company A deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by the Company A payments.

| Generation Now Deposits (2017-2020) | | |
|---|---|---|
| **Funding Entity** | **Total** | **Percentage** |
| Company A & Energy Pass-Through | $59,996,835.86 | 93% |
| Energy Interested Parties | $1,500.000.00 | 2% |
| Other | $2,853,319.82 | 5% |
| **Total** | $64,350,155.68 | |

## C. Householder's Control of Generation Now

49.    Although Householder's name is not on Generation Now's paperwork, Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas shows that Householder controls Generation Now to further the Enterprise's goals.

50.    Clark stated expressly in multiple recorded conversations in 2019 that Generation Now is Householder's entity.[13] In a 2019 recorded meeting, Clark discussed making "soft money" payments to Householder relating to the passage of unrelated legislation. Clark stated that the Speaker would have to see the check before it goes to Generation Now. Clark explained that they could write a check—a "*noticeable number . . . $15-20-25,000*"— to "*Gen Now* and hand deliver the check to *the Speaker*." Clark then made clear: "*Generation Now is the Speaker's (c)(4), that's the one I work for.*"

51.    The next day, Clark again referenced "*Gen Now*" as a (c)(4) that works like a PAC but there's "*no reporting.*" Clark stated that he was "*not on any documents*" connected to Generation Now, but they call him "*the overseer*" of Generation Now, explaining further, "*I'm the Speaker's appointed guy to do that. Okay, so, it's like having him in the room.*" Clark then explained an upcoming Generation Now meeting that will be attended by Householder:

> *When I, so like, we have a meeting on Friday, he's going to be in the room, so I'll be just like everyone else, I'll be, I'll be another fucking staffer. When he's out of the room, I'm the guy.*

Later in the conversation, Clark indicated again that "*Gen Now*" "*is the Speaker's (c)(4),*" that Householder created for himself. Clark stated that he spent $450,000 out of the Generation Now account that very day; and Clark further stated that he "*spent close to $20 million in the last eight weeks.*" Bank records corroborate both statements. When asked how much money was in Generation Now, Clark said, "*it's unlimited.*"

---

[13]  ███████████████████████████████

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 936557 / Confirmation Nbr. 2437790 / CLDLJ

52.    Later that day, Clark explained that the $450,000 paid out of Generation Now went to pay off fifteen signature collection firms nationwide so that they would be conflicted out from working on behalf of the Ballot Campaign, which bank records confirm, as described below.

53.    In subsequent recorded calls and meetings, Clark discussed Householder's connection to Generation Now.  For example, in a recorded call on August 8, 2019, Clark stated that Jeff Longstreth was Householder's "*political guy*" who "*could influence the Speaker.*"  He similarly explained later in the call, Longstreth is Householder's "*political guy, he's the guy that does, remember that Committee I work for, Generation Now, I've been talking about.*"

54.    Clark also discussed the individuals making a payment to Householder into Generation Now.[14]  During a call on August 19, 2019, Clark discussed taking a trip with Householder or his advisors to further the unrelated legislation.  During the call, Clark stated, "[*Longstreth] and I are the two principal advisors to the Speaker.*"  According to Clark, "*Jeff actually runs all the races and selects people, etc.*"  Clark also stated that the individuals "*might write a check to the (c)(4)*" of the Speaker totaling $50,000.  Clark said it would be ideal if they could hand the check to Householder personally—as Clark explained, "*it's his (c)(4)*"—though Clark explained that typically the (c)(4) money is wired into the account.  Bank records corroborate Clark's assertion that money into Generation Now is usually wired into the account.

55.    Recorded statements by Borges to CHS 1 also show Householder's use of Generation Now, and further confirm Clark's statements.  As explained fully below, in August 2019, Borges received $1.62 million in wire transfers from Generation Now and then used a portion of that money to attempt to bribe CHS 1 to help defeat the ballot initiative.  On September 10, 2019, during a recorded conversation, Borges discussed the divide between the ballot initiative supporters (to include the CHS 1) and the supporters of HB 6 and stated, "*The only people on my side is this fucking company,*" which Borges confirmed was "[Company A]."  Borges described the relationship between Company A and Householder to CHS 1 as follows:

> *And, and Larry also, you know, so it's this unholy alliance between Larry and [Company A] and [Borges' firm]. . . . [Borges' firm] doesn't care about Larry; he's helping with the issue our single largest client cares a lot about and [] unless you are somehow affiliated directly to [Company A] or work for one of their interests or you just want to suck up to Larry, you're on your side (as to whether to overturn HB 6).*

56.    Borges also discussed Householder's direct involvement in managing Generation Now.  Specifically, on September 13, 2019, he stated the following about Associate 3, who is Generation Now's public relations spokesperson:

> *Like [Associate 3] who has to, who has to, answer to the press obviously, he wants to quit so bad 'cause he's like "this is my*

---

14 ███████████████████████████████████████████████ .

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

> *reputation now" you know . . . <u>but he can't because the Speaker won't let him</u>, but he god he hates this shit.*

57.     When CHS 1 asked whether Householder was "*putting the squeeze on [Associate 3]*," Borges responded that, "*Larry thinks that this stuff is good for us.*" When CHS 1 asked Borges why Householder does not just retire, Borges responded, "*No. That's just not how he's wired.*" Borges indicated he was not aware of what Householder was making off the relationship with Company A, but Borges stated it was "*insane*" what "*Jeff and those guys*" are making off the relationship.

58.     Borges also reinforced Clark's role in the Enterprise, specifically his role as Householder's proxy to Generation Now:  "*Neil sits in meetings and he'll say 'I'm the proxy for the Speaker in this meeting . . . so anything you tell me' and you kind of think it's typical Neil bullshit stuff except it is not; <u>he's really acting as his proxy</u>.*"  This corroborates Clark's own statements that he was acting as Householder's proxy for purposes of passage of HB 6 and the effort to defeat the ballot initiative through the use of Generation Now.

59.     Householder's admissions confirm Clark's and Borges' statements that Householder controls Generation Now.  In a January 10, 2018 recorded call[15] with Clark, Householder discussed financial contributions from various industries, including payday lenders and nursing homes, two industries for which Clark is a lobbyist.  During the call, the following conversation occurred:

> LH: "*Now switching gears. So we are looking at the payday lenders.  <u>And we are expecting big things in (c)(4) money from payday lenders....</u>*
>
> NC:  *Right. Right.*
>
> LH: "*So far, I think we are what, fifty? I think* [speaking to someone else in the room]
>
> NC:  *Are you, you're checking now with Jeff right?*
>
> LH:  *Right.*
>
> NC:  *You should have gotten twenty-five or fifty from [owner of firm], correct?*
>
> LH:  *Yes.*
> . . . .
>
> LH: [After confirming with someone in the background] *Twenty five total . . . Twenty-five total is what we've got.*"

---

60.     Generation Now's bank records match the description of the checks discussed during ███████████ Subpoenaed bank records from Generation Now's account show, indeed, that at the time of the call, a check for $25,000 from payday lending company (written on October 18, 2017) had been deposited into the Generation Now account.  Clark's reference to "[the owner of the firm]" was a reference to president of the company, which wrote the $25,000 check.  The reference to "Jeff" during the ███████ is likely a reference to Jeff Longstreth.  During another portion of the same ███████, Householder and Clark discussed another industry's "501(c)(4)."  Householder confirmed to Clark during the call that this entity gave 30,000 to "the (c)(4)."  Again, Generation Now's bank account revealed a $30,000 check (written on October 19, 2017) from the entity that was deposited into the Generation Now account prior to the ███████.

61.     Householder's connection to Generation Now was further clarified during a call on February 5, 2018 between Householder and Clark, during which Householder again inquired about "(c)(4) money."  Specifically, Householder stated, "*I'm sitting here with [Associate 2] . . . we're talking about (c)(4) money, and we're trying to figure out where the payday lenders were going to be at.  Can you help me with that?*"  Associate 2 is the Finance Director for Householder's campaign; text communications show that he/she solicited and collected money for Generation Now, and he/she was paid out of the Generation Now account.  This call is consistent with the January 10, 2018 call with Clark where Householder was seeking 501(c)(4) money from Clark's clients.

62.     Text message communications between Householder and Longstreth also show that Householder controlled Generation Now.  For example, in a June 12, 2019 text message, Householder asked Longstreth, "*When does the Gen Now TV message change?  I think it is burnt in - well burnt in.*"  Longstreth responded, "*They are working on a draft now. Polling shows it's working.*"  Similarly, on June 23, 2019, Householder texted to Longstreth that "*Gen Now has had issues,*" explaining that "*I've had several members - including members of House leadership come in privately and discuss their concern over next years [sic] House campaigns based on HB 6 messaging, mail, TV and radio.*"  In addition, Householder sent messages to Longstreth asking about "*running positive radio*" for a member, explaining, "*[g]ot to protect the troops – especially make sure they believe we are protecting them.*"  These text messages show that Householder is involved in Generation Now media buys to further HB 6.  They also show that the pressure the Enterprise was putting on House members through Generation Now media efforts to further HB 6 created political problems for some House members, and those members went directly to Householder to voice their "concern" about Generation Now's activities.

63.     Finally, search warrant returns also confirm that Householder is involved directly in Generation Now.  For example, a Word document originally created by Longstreth on February 5, 2017 and titled "Friends of LH Meeting Template," listed a meeting agenda for the Friends of Larry Householder campaign, and on the same page of the Word document and directly below, a meeting agenda for Generation Now.  According to the template, the Friends of Householder campaign listed Associate 1, Householder, and Staffer[16] as "Attendees" of a Monday meeting that lasted from "11-12:00pm" (highlights in original)[17]:

---

[16] ██████████████████████████████████

[17] The investigation indicates that Enterprise members refer to Householder in writing as "SLH."

**Friends of LH Staff Meeting Template**

11-12:00 PM on Mondays at 25. Attendees- ▮▮▮▮, SLH

Goal – recap the previous week and set goals and expectations for the following week.

64.     The meeting involved discussion about fundraising and member recruitment, among other things.  The Generation Now meeting—detailed directly below on the same, two-page Word document—listed Householder, Longstreth, and Associate 1 as "Attendees" of that meeting, which was scheduled one hour later from "12:00-1:00":

**Generation Now- Monday Staff Meeting**

12:00-1:00 Mondays at 25
Lunch will be served promptly at noon.
Attendees- SLH, JPL, ▮▮▮

Goal:  recap the previous week and set goals and expectations for the following week.

65.     The format of the Generation Now meeting was the same as the Friends of Householder[18] meeting and involved discussion about fundraising, messaging, budget, and campaigns, among other things.  This document shows that, immediately after he met with his campaign staff, Householder met personally with his Enterprise members and associates about their collective efforts involving Generation Now, further showing Householder's direct involvement and connection with Generation Now.

### III.     Enterprise Used Company A Payments to Increase Householder's Political Power

66.     The Householder's Enterprise benefitted from Company A's money by spending Company A-to-Generation Now funds to back Householder-selected candidates who would help elect Householder as Speaker.  The Enterprise also used the money to pay for part of Householder's own campaign.

### A.  Building Team Householder

67.     Members of the Ohio House of Representatives serve two-year terms, and are limited to four, consecutive, two-year elected terms.  At the end of 2018, the then-current Speaker would be term-limited and the legislature would elect a new Speaker to begin the 2019 legislative session.  The investigation shows that by the end of 2016, the Enterprise implemented a strategy for Householder to take over the Speakership in 2019.

---

[18] "Friends of Householder" is the name of Householder's public campaign committee.

68.     The Enterprise's strategy included raising money through a "C4" and recruiting candidates who, if elected, would support Householder for Speaker.  Documents such as "Game plan 2018," possessed by Longstreth illustrate this point:



69.     That this document was created in October 2016, a few months before Longstreth opened the Generation Now account in February 2017, shows that the Enterprise followed this strategy and its level of commitment in so doing.  The question "who is our [redacted]" is a reference to the wealthy, financial backer of the then-current Speaker; and thus, the Enterprise is asking in its "Game plan 2018" document, "who will be our financial backer?" Longstreth's proposed option, "[redacted]?" is the CEO of Company C, which is a company whose interests align with Company A.

70.     To implement the two-fold strategy of recruitment and fundraising, the Enterprise needed to recruit a team of electable candidates who would support Householder's bid for speakership.  A combination of financial records, documents recovered from search warrants, media reports, legislative records, and witness interviews show that the Enterprise selected a group of candidates to run for open seats in the primary against supporters of Householder's rival, Representative 1, who was backed by the then-current Speaker.  The Enterprise managed the selected candidates' campaigns, paid to staff them, and designed and paid for their mailers and commercials. The Enterprise spent Generation Now money on approximately 21 different candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.[19]  Most of these candidates won the 2018 general election.  All who won voted for Householder as Speaker; and all but two, voted for the legislative bailout for Company A.[20]

---

[19] Some of the candidates supported in the primary election were not supported in the general election, which based on my training and experience is likely because the candidates were in safe districts and would prevail without spending resources on the campaign.

[20] ████████████████████████████████████████████████████

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

71.     Additionally, Householder's political campaign benefited from Company A-to-Generation Now money directly in two ways.  First, Company A-to-Generation Now money was used to pay for staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.  Not having to pay staff salaries using campaign dollars gave Householder a competitive advantage against his opponents.   Secondly, Householder benefited because Company A-to-Generation Now money, which passed through the PAC, purchased advertisements for Householder's race for the 72nd district. In total, at least $97,000 was spent by the Enterprise on Ohio house district 72 between April 16th and April 25th to purchase direct mail and radio advertisements.

72.     Documents recovered from Longstreth show the Enterprise's planning and preparation in building Team Householder.  For example, a document entitled "Team Skills," which was last modified in February 2018, proposed a list of individuals for a leadership team for 2019, including Speaker of the House, Speaker Pro Tempore, Majority Floor Leader, Assistant Majority Leader, Majority Whip, and Assistant Majority Whip.  After Householder was elected Speaker in 2019, all of the individuals, except for one, became part of Householder's leadership team.  (The exception was a representative who did not support Householder for Speaker).

73.     In terms of the actual candidates selected to be part of Householder's team, agents recovered numerous documents from Longstreth, which listed largely the same select group of candidates, such as one entitled "2018 Official Primary Matchups," that provide evidence of the recruitment and vetting process.  Agents recovered dozens of similar documents, which referred to this group of candidates as "recruitment updates," "our team," or "Team Householder." Regardless of the name, however, it is clear the Enterprise considered the election of these candidates an integral part of its strategy for a Householder Speakership.

74.     Notably, Longstreth's list mirrored House members that Company A intended to support in the 2018 election.  For example, a Word document in Cespedes' possession, titled "Householder" and created May 8, 2018 at 10:49pm—after polls closed the night of the Ohio Primary—listed the Householder candidates versus the Representative 1 candidates.

**B.  Funding "Team Householder"**

75.     Based on my training and experience, I know that in order to execute its strategy of electing Team Householder candidates, the Enterprise needed to raise a substantial amount of money.  The House's then-current Speaker had picked Representative 1, not Householder, to be his successor.  As Cespedes explained in a document  created March 18, 2018, "[Redacted] is a lame duck Speaker but is heavily involved in the campaign to elect [Representative 1] as the next Ohio Speaker."  This meant that the war chest of the then-current Speaker had accumulated through the Ohio House Republican Organizational Committee (OHROC) would be spent on Speaker/Representative 1-backed candidates.[21]  Based on my  training, experience, and the

---

[21] Media reports indicate that the then-current Speaker controlled OHROC and determined how funds were dispersed. *E.g.* https://www.dispatch.com/news/2018051 O/householder-flexes-muscles-within-ohio-house-gop. Bank records show funds controlled by representatives were deposited into OHROC and that corporate contributions also were deposited into the fund.

investigation, to beat the OHROC-backed candidates in the primaries, the Enterprise needed to out-fundraise them and execute successful campaign messaging for the "Team Householder" candidates.

76.     An excel spreadsheet recovered from Longstreth, titled "Campaign Budget 2017-18" and last edited in September 2017, shows that the Enterprise estimated the amount needed to implement its strategy was more than $2 million:

| Position | Salary | Team Lead | FT/PT/IND | Overhead factor | Employment factor | Total Cost to employ |
|---|---|---|---|---|---|---|
| Driver | $ 10,000.00 | | 1ND | 1 | 1 $ | 10,000.00 |
| Research/Content | $ 108,000.00 | | FT | 1.7 | 1.25 $ | 229,500.00 |
| Finance Team | $ 72,000.00 | | 1ND | 1 | 1 $ | 72,000.00 |
| Political Team | $ 65,000.00 | | FT | 1.7 | 1.25 $ | 138,125.00 |
| Communications Team | $ 150,000.00 | | FT | 1.7 | 1.25 $ | 318,750.00 |
| Creative Team | $ 72,000.00 | | 1ND | 1 | 1 $ | 72,000.00 |
| Field/Grassroots Directs | $ 80,000.00 | | FT | 1.7 | 1.25 $ | 170,000.00 |
| Digital Media Team | $ 300,000.00 | | FT | 1.7 | 1.25 $ | 637,500.00 |
| Administrative | $ 42,000.00 | | FT | 1.7 | 1.25 $ | 89,250.00 |
| Executive Director | $ 120,000.00 | | 1ND | 1 | 1 $ | 120,000.00 |
| Transportation | | $ 24,000.00 | | | | |
| Rent | | $ 91,000.00 | | | | |
| Office Supplies | | $ 12,000.00 | | | | |
| Legal | | $ 36,000.00 | | | | |
| Misc. | | $ 36,000.00 | | | | |
| i360 Data | | $ 48,000.00 | | | | |
| | $ 1,019,000.00 | $ 247,000.00 | ######## | | | $ 1,857,125.00 |

77.     Similarly, during a January 10, 2018 recorded conversation, Clark and Householder discussed their plan to "*orchestrate (c)(4) checks*" to help Householder fund campaigns for his benefit.  Specifically, Clark estimated that Householder would "*need a hundred and twenty thousand per race*," to which Householder responded, "*I'd say one fifty, but yeah, you're in the ballpark.*"  They then discussed how to raise the amount they need in 501(c)(4) checks to fund candidate campaigns.  Clark also mentioned that, "*some people decided to help [Representative 1]*" for Speaker, to which Householder responded, "*yeah, we can fuck them over later.*"

78.     Ultimately, the Enterprise funded approximately twenty-one candidate campaigns, which, using the metric discussed by Clark and Householder in the January 2018 call, meant that Householder would need to raise between roughly $2.5 million and $3.0 million to fund the campaigns.

## C. Volume and Timing of Company A Payments to Enterprise during 2018 Election Cycle

79.     At the same time the Enterprise worked on a "game plan" to secure Householder's ascension to Speakership, Company A needed a solution for its Ohio nuclear plants.  The investigation shows that the Enterprise and Company A formed, what Company A-1 lobbyist

Borges called, "an unholy alliance." Company A funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants.

80.    The volume of Company A's payments, the timing of these payments, communications and coordination amongst co-conspirators and Company A, the official action taken by Householder, and the actions to maintain the official action, show the corrupt arrangement was Company A  funding Householder's speakership bid in exchange for a legislative fix.

81.    As described above, the vehicle to collect the vast amounts of money needed for Householder's Speakership bid was Generation Now.  From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Enterprise received approximately $4.6 million into Generation Now.  More than half of that money came from Company A or the Energy Pass-Through, fully funded by Company A.  More than a half million of the remaining money came from energy-related entities that either had a relationship with Company A or an interest in the bailout legislation.  The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

82.    The investigation shows Company A made regular, quarterly payments of $250,000 into Generation Now's main bank account almost immediately after Longstreth opened it in 2017. But, in March 2018, approximately two weeks before Company A's Corp. affiliates filed for bankruptcy, Company A began funneling payments to Generation Now through Energy Pass-Through.  The payments wired from Company A Service Co. into the Energy Pass-Through originated from account x6496, the same account used to wire payments directly from Company A Service Co into Generation Now.  In the final month before the 2018 general election, Company A dropped another $500,000 into the Generation Now account.  This time the money was paid by check from account x4788.[22]  The payments from Company A from 2017-2018 are summarized below.

---

[22] Bank records indicate that x4788 is also a Company A Service Co. account.  For example, the checks to Generation Now from x4788 were signed by the Senior VP and CFO for Company A Service Co, who is now the President of Company A Corp.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

| March 16, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| May 17, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| August 10, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| December 8, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| March 15, 2018 | $300,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| May 4, 2018 | $100,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| August 8, 2018 | $54,000 | wire | Coalition (originally from Co. A Service Co. x6496 through Energy Pass-Through) |
| August 16, 2018 | $500,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| October 9, 2018 | $400,000 | check | Company A Service Co. (x4788) |
| October 29, 2018 | $100,000 | check | Company A Service Co. (x4788) |
| **Total:** | **$2,454,000** | | |

83.    In addition, Company A Service Co. paid the Enterprise an additional $500,000 to Dark Money Group 1 on October 29, 2018, bringing the total that Company A paid to the Enterprise through Generation Now in 2017-2018 as $2,954,000.[23]

84.    Toll records corroborate the close coordination between the Enterprise and Company A during the 2018 primary, even though the payments were sent via Energy Pass-Through.  For example, several days before a $300,000 payment through Energy Pass-Through on March 15, 2018, multiple communications between Householder and Company A occurred:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| March 12, 2018 | 14:03 | Householder | Sr. VP of External Affairs for Company A Service Co. | 24 seconds |
| March 12, 2018 | 15:06 | Sr. VP of External Affairs for Company A Service Co. | Householder | 3:03 minutes |
| March 12, 2018 | 15:11 | Sr. VP of External Affairs for Company A Service Co. | Householder | 9 seconds |
| March 12, 2018 | 16:59 | Householder | Ohio Director of State Affairs, Company A Corp.[24] | 11:34 minutes |

---

[23] This number does not include $90,000 that Company A paid to the Coalition on March 21, 2017 and $300,000 that Company A paid to the Coalition on May 1, 2018 (through Energy Pass-Through).

[24] ██████████████████████████████████████████████████

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 0 seconds |
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 13 seconds |
| March 12, 2018 | 19:55 | Householder | Ohio Director of State Affairs. Company A Corp. | 11:17 minutes |
| March 13, 2018 | 17:22 | Sr. VP of External Affairs for Company A Service Co. | Householder | 1:32 minutes |
| March 13, 2018 | 17:24 | Sr. VP of External Affairs for Company A Service Co. | Householder | 56 seconds |
| March 15, 2018 | Energy Pass-Through Payment for $300,000 | | | |

85. A similar pattern occurred with respect to the May 4, 2018 payment of $100,000 through Energy Pass-Through, just days before the May primary, this time between Longstreth and Company A:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 0 seconds |
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 3 seconds |
| April 27, 2018 | 10:55 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:47 minutes |
| April 27, 2018 | 13:37 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:56 minutes |
| April 28, 2018 | 10:38 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 1:30 minutes |
| April 28, 2018 | 11:40 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:14 minutes |
| April 30, 2018 | 9:11 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:11 minutes |

17

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| May 1, 2018 | 18:41 | Ohio Director of State Affairs, Company A Corp. | Longstreth | 15:49 minutes |
| May 3, 2018 | 22:09 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:10 | Longstreth | Ohio Director of State Affairs, Company A Corp. | Text |
| May 4, 2018 | 6:18 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:25 | Longstreth | Ohio Director of State Affairs, Company A Corp. | 14:12 minutes |
| May 4, 2018 | Energy Pass-Through Payment for $100,000 | | | |

86. Toll records around this period do not otherwise show regular contact between Householder and Company A employees or Longstreth and Company A employees, further demonstrating the significance of these calls.

**D. Enterprise Spending Company A Money on Spring 2018 Election**

87. Not only was the volume of the Company A payments critical to the Enterprise's efforts, but the timing was also significant. As noted above, during the 2018 election, the then-current Speaker was a lame duck Speaker, who had picked Representative 1 to be his successor. Thus, the Enterprise needed a substantial amount of money to beat the Representative 1 candidates in the May primary election. Company A came through, paying the Enterprise $1.4 million before the May 8, 2018 primary date.

88. But the Enterprise's ability to capitalize on an unexpected opportunity that arose a month before the primary election date also demonstrates how critical the volume and timing of payments from Company A was. On April 12, 2018, about a month before the primary, the then-current Speaker abruptly resigned. The Enterprise seized upon this opportunity.

89. Because of the money accumulated in the Generation Now war chest, the majority of which came from Company A, the Enterprise was able to move close to $1 million in the three weeks before the primary. In fact, the same day that the Speaker resigned, bank records reveal that the Enterprise wired $750,000 to the PAC. (That wire followed a $250,000 wire Generation Now sent to the PAC in early April.) The majority of the $1 million from Generation Now was wired to a media services company and a political strategy firm for media buys and mailers for Team Householder candidates. In addition, Generation Now wired $234,450 to JPL in three increments between April 12 and May 7, adding to the already $775,054 it wired to JPL in the first quarter of 2018. This money also was mostly spent on the campaign to elect Team Householder

candidates. The disbursements from Generation Now and their relative distribution dates to the PAC and JPL leading up to the primary were as follows:

| Jan. 29, 2018 | Generation Now | $109,513 wire | JPL |
| Jan. 30, 2018 | Generation Now | $14,514 wire | JPL |
| Feb. 21, 2018 | Generation Now | $109,513 wire | JPL |
| Mar. 12, 2018 | Generation Now | $132,000 wire | JPL |
| Mar. 22, 2018 | Generation Now | $200,000 wire | JPL |
| April 2, 2018 | Generation Now | $250,000 wire | PAC |
| April 5, 2018 | Generation Now | $209,513 wire | JPL |
| **April 12, 2018** | **Speaker resigns** | | |
| April 12, 2018 | Generation Now | $750,000 wire | PAC |
| April 12, 2018 | Generation Now | $109,513 wire | JPL |
| April 19, 2018 | Generation Now | $71,337 wire | JPL |
| May 7, 2018 | Generation Now | $53,600 wire | JPL |
| **May 8, 2018** | **Ohio primary** | | |

**Total: over $2 million**

90.     Phone records corroborate the fact that the Speaker's resignation marked a significant moment of mobilization for the Enterprise, which was made possible because of the payments from Company A. On the day of the Speaker's resignation, Householder and Longstreth had a 31-minute call. Shortly thereafter, they both began making the rounds. Householder contacted Company A Service Co.'s Sr. Vice President of External Affairs, and proceeded to have a 5-minute phone call. Longstreth communicated with Company A Corp.'s Ohio Director of State Affairs, and followed immediately with a call to the attorney for the PAC and then communication with an executive of Political Strategy Firm 1. Longstreth and Householder then communicated with many Team Householder candidates throughout the day.

91.     All told, Generation Now spent more than $1.8 million on the Spring 2018 primary races—largely by funneling the Company A-to-Generation-Now money through the PAC.[25] The specific use of the money is confirmed by subpoenaed records. For example, nearly all of the Generation Now money wired into the PAC was sent to either to Media Services Company 1 or the Political Strategy Firm 1. Checks were issued from Media Services Company 1 to various radio stations for media buys. Many of these checks note the House district race related to the buy, and the district races denoted on those checks correspond with Longstreth's lists of Team Householder candidates.

92.     Not only did Generation Now spend $1.8 million on Team Householder candidates, but at least $90,000 of that money funded campaign expenses for Householder's own campaign, thus benefitting him personally, outside the context of his public campaign fund.

---

[25] This figure excludes payments to Associate 2 for salary and Generation Now rent payments to the Political Advertising Agency during the same time frame.

93.     In addition to bank records, the PAC filed an FEC mid-year report in 2018, outlining its expenditures in the primary.  Although the report failed to list candidates by name—and those candidates did not report in-kind gifts or contributions from the PAC—the report did list expenditures in connection with certain Ohio House districts.  And, those House Districts again corresponded with the Enterprise's candidates.  The amounts listed in the PAC's FEC report, which correspond to particular House Districts, total more than $800,000.

94.     While the investigations shows that the PAC paid Media Services Company 1 and Political Strategy Firm 1 nearly the entire million dollars it had received before the Spring 2018 primary, bank records from JPL x9192 show that Longstreth also dispersed approximately $1 million of the money he received from Generation Now to media, communication, and strategy consulting companies, in support of the Enterprise's primary efforts from January to May 2018.

95.     The timing of these payments also evidence money laundering by the Enterprise in furtherance of its purposes with the payments from Company A.  For example, on March 12, 2018, Generation Now wired the JPL x9192 account $132,200 for "advertising."  The next day, JPL x9192 wired $132,240 to Election Marketing Company 1.  Between April 5 and 12, 2018, Generation Now wired a total of $319,026 to JPL x9192, which then wired Direct Mail Company 1 $250,000 between April 6 and April 13, 2018.  The evidence of money laundering is even stronger considering that Longstreth is a signatory on the Generation Now and x9192 accounts, demonstrating that he used the JPL account as a pass-through to pay the companies.

96.     Ultimately, the Enterprise's efforts were successful, with most Team Householder candidates winning their primaries.  On or about July 24, 2018, a few months after the primaries, $215,000 was wired from Longstreth-controlled accounts to settle a personal lawsuit against Householder.  On August 1, 2018, the same day that Householder was meeting with Company A executives in Columbus, according to documents in Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Householder and Householder Ltd.  The main JPL account was funded with wire transfers from Generation Now, which was funded in large part by Company A wires.  In addition, bank records show that JPL's main account also paid Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000.  At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded solely by a $250,000 wire from Company A, a $25,000 deposit from the CEO of Company C, and $200 deposit from Longstreth on the date he opened the account.[26]  JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

### E.  Fall 2018 Election

97.     The investigation shows that, after the primaries, the Enterprise refocused its efforts on ensuring the Team Householder candidates won the general election in November.  As set forth below, the Enterprise used a new corporate entity (Dark Money Group 1) to further its purposes, which was funded by Company A, Generation Now (as funded by Company A), and related interests, and then used almost all of those funds to further the campaigns of Team Householder candidates.

---

[26] As set forth above, Company C has interests aligned with Company A.

98.     First, for its part, from August to October 2018, Company A paid an additional $1.5 million into the Generation Now war chest.  As detailed in the chart above, the payments from Company A came in the form of checks or via Energy Pass-Through.  Prior to these payments, the Enterprise needed money—Generation Now had less than $4,000 in its account just prior to an Energy Pass-Through $500,000 wire in August 2018.  Just like in the primary season, Generation Now funneled a substantial amount of its Company A money through a separate entity—this time Dark Money Group 1—to run negative ads against Team Householder opponents.

99.     Within days of its incorporation in September 2018, Dark Money Group 1 opened a bank account at Huntington Bank, the same bank used by Longstreth.  A few weeks later, Generation Now wired a total of $670,000.  Bank records show that the only deposits in the account were as follows:

| | | | |
|---|---|---|---|
| October 19, 2018 | $400,000 | wire | Generation Now |
| October 24, 2018 | $150,000 | wire | Generation Now |
| October 26, 2018 | $100,000 | wire | Company B[27] |
| October 29, 2018 | $500,000 | EFT | Company A Service |
| October 29, 2018 | $120,000 | wire | Generation Now |
| October 29, 2018 | $100,000 | check | CEO of Company C[28] |
| October 30, 2018 | $100,000 | check | Individual 3[29] |
| **Total:** | **$1.47 million** | | |

100.     No other money was paid into Dark Money Group 1's account.  Again, the volume and timing of the payments from Company A proved crucial to the Enterprise's success.  Funneled through Energy Pass-Through to Generation Now, Company A infused over a million dollars into Dark Money Group 1 in the fall of 2018 alone, which allowed the Enterprise to flood the airways with negative ads against its opponents in the final days before the election.

101.     Specifically, bank records show that out of the $1.47 million deposited into the Dark Money Group 1 account, Dark Money Group 1 paid more than $1.438 million to Media Placement Company 2, a firm that bought television and radio ads in Dark Money Group 1's name.  Federal Communications Commission (FCC) records confirm the expenditures.  Specifically, public documents filed with the FCC show Media Placement Company 2 purchased more than $1.3 million worth of advertisements for Dark Money Group 1 in the ten days before the election.  Based on the television and radio stations targeted, the bulk of the media buys were spent on ads in the districts of Team Householder candidates in tight races.

102.     The strategy worked.  The clearest example comes from one highly contested House District race.  Although the Enterprise initially backed Candidate 1 in the primary, Candidate 1 lost in the Spring 2018 primary, beat by Representative 2.  In the general election, Representative 2 faced a tight race against the opposing party's candidate.  However,

---

[27] Company B is an energy company with interests aligned with Company A.
[28] Company C has interests aligned with Company A.
[29] Individual 3 does not appear to be related to Company A or have aligning interests.

Representative 2 ultimately prevailed by 137 votes. Representative 2's victory was credited to a negative ad run by Dark Money Group 1, which showed the opposing candidate taking a field sobriety test, yet only receiving a speeding ticket. The ad essentially accused the candidate of misusing his authority. Although the candidate and the police union condemned the ad, the damage was done—the opposing candidate, who reportedly had a 10-point lead before the ad aired, lost the election. Media reports credited the Dark Money Group 1 ad with tipping the scales.

103.    After the election, Householder took credit for the ad against the opposing candidate, remarking to Individual 1, that he (Householder) had put $500,000 into that race in the final weeks. Householder's comment was made during a meeting after the election in November 2018, where Individual 1, who was a prospective Team Householder candidate for the 2020 election, was being interviewed by Householder. Based on this discussion, Individual 1 understood from Householder that if he/she were selected, he/she would have Householder's financial backing, just like Representative 2. This showed Householder's control over Dark Money Group 1 funds. Individual 1 has provided other information relevant to the investigation that has been independently corroborated.

104.    A copy of the video ad run against the opposing candidate was recovered by agents from Longstreth. Notably, the video in Longstreth's possession appears to be a "draft" or "rough cut" of the Dark Money Group 1 ad, evidenced by the file name of the video, which appears in the left-hand corner of the recovered video. The fact that this video was recovered from Longstreth also demonstrates the Enterprise's control over Dark Money Group 1, and how the payments from Company A were spent.

105.    Representative 2's race exemplifies the benefit Company A provided to the Enterprise by way of its timely payments during election seasons. However, the benefit to the Enterprise was not limited to the cash infused to Dark Money Group 1. Generation Now paid Longstreth another $809,000 between the time of the May primary and November election. Through JPL, Longstreth paid himself, his associates, and a number of campaign managers working on the campaigns of Team Householder candidates. Indeed, CHS 1, who has provided reliable and credible information corroborated by the investigation, advised that he/she was working on the campaign of a Team Householder candidate during the fall 2018 general election, but that CHS 1 was paid by Longstreth. (Subpoenaed records confirm the main JPL account, which had received money from Generation Now, paid the CHS.) This shows that Company A-to-Generation-Now money was used by the Enterprise to benefit Team Householder candidates—thus, providing a benefit to Householder himself. Longstreth also paid several media, communications, strategy and direct mail groups. Besides Dark Money Group 1 and JPL, Generation Now also paid rent to Political Advertising Agency and $10,000 a month to Associate 2 for "fundraising."

106.    Ultimately, the Enterprise's "Game plan 2018" worked. By coordinating and financially backing the Team Householder candidates using Company A money, the Enterprise helped elect a group of representatives loyal to Householder. All of the candidates who were financially supported by the Enterprise and won in the 2018 general election voted to make Householder, instead of Representative 1, Speaker. With their votes, Householder secured the

Speakership in 2019. And, as described in the next section, two of the Team Householder candidates carried the Company A legislative bailout for him.

## II.     The Bailout:  Enterprise Passes Legislation for Company A

107.    Having secured Householder's power as Speaker, the Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with Company A—passing nuclear bailout legislation. In fact, on January 7, 2019, the day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation.[30] Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

108.    The Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by Company A, through payments to Generation Now. While HB 6 was pending in the House, Company A wired Generation Now $9,500,000. When the bill was pending in the Senate, Company A wired Generation Now $7,358,255. And, to fund its efforts to defeat the Ballot Campaign, Company A wired an additional $38,000,000 to Generation Now. The volume and frequency of these payments provide further evidence of the Enterprise's corrupt arrangement with Company A. These facts, including the Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and Company A's involvement and coordination funding these efforts, are set forth fully below.

### A.  House Bill 6

109.    Consistent with their agreement, the Enterprise implemented a strategy to pass a legislative fix for Company A shortly after Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation—HB 6—through the House and pushing the Senate to agree. First, Householder picked freshman representatives, which Householder helped elect by using Company A-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft. Second, Householder created a new subcommittee to hear the bill, which was comprised mostly of Householder supporters. Third, the Enterprise engaged in an expensive media blitz, funded by Company A-to-Generation-Now payments, to pressure public officials to support the bill. Fourth, Householder strong-armed House members, particularly opponents of the bill. Finally, Householder and the Enterprise pressured Senators to pass the legislation. The expediency and funding of this legislative effort and the tactics used by the Enterprise—along with timely communications between Enterprise members and agents of Company A—are further evidence of the agreement between Householder and Company A.

110.    This is precisely what Enterprise-member-and-Company A-lobbyist Juan Cespedes planned. In a Word document agents recovered from Cespedes titled "Ohio Legislator Background" and authored May 3, 2018, Cespedes referenced Householder as a "*current*

---

[30] https://www.daytondailynews.com/news/state--regional-govt--politics/larry-householder-elected-new-ohio-house-speaker/a3ltKxDAm3jT5HTd7vrDWK/

candidate for Ohio Speaker," and noted that, "*he is willing to work on energy legislation. Traditionally close to Company A*." In another document titled "Ohio Fundraising Suggestions" and created on September 6, 2018, Cespedes suggested that Company A should continue to support the "Larry Householder Caucus" financially because "*Householder has a history of favorably rewarding those who provide both early and late money into his efforts*." Cespedes mentioned in the document that Company A's CEO had a conversation with Householder "*where [CEO] suggested that we would/should independently support him as Company A-1*." Cespedes also laid out Company A's aspirations for the bailout legislation in a document titled "[Company A-1] Ohio 1st Draft Timeline" and authored by Cespedes on November 20, 2018. In this document, Cespedes wrote that although the next Speaker remains unclear, there should be "Speaker's race clarity mid-December" 2018, and "*[i]f Householder is successful, the effort will likely be led from his Chamber*," with "*potential legislative introduction*" for [Company A-1] in early 2019.

### i. House Bill 6 Background

111. On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced. Although titled "Ohio Clean Air Program," the investigation shows that HB 6 essentially was created to prevent the shutdown of Company A's nuclear plants. HB 6 creates the Ohio Clean Air Program, which allows nuclear or solar clean air resources to apply to be certified clean air resources, and therefore, eligible for a subsidy of $9 per megawatt hour produced. In order to pay for the subsidy, the Ohio Air Quality Development Authority, which is tasked with administering the Ohio Clean Air Program, will institute and collect a monthly fixed charge to all residential, commercial, industrial, and large consumers. The fixed fee is projected to produce $140 million annually for the first year, then $200 million annually thereafter.

112. Ohio currently has six solar facilities over 50 megawatts of nameplate capacity, which serves as the minimum threshold necessary to apply to receive the subsidy. They produce a combined 1,095 megawatts of power. For comparison, the Company A-1 nuclear plants produced a combined 18,315,007 megawatts in 2018. Given the power produced, Company A-1 would collect approximately 94% of the subsidy, which total more than $160 million annually. Newspaper reporting throughout the state characterized HB 6 as a "bailout" for the benefit of Company A-1 specifically.[31] Clark also characterized HB 6 as a bailout for Company A.

113. Under HB 6, the subsidy will be dispersed at the direction of the Ohio Air Quality Development Authority. As passed, HB 6 will add six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen. Pursuant to HB 6, three of those new appointees will be selected by the Speaker of the House.

---

[31] *See* https://www.cincinnati.com/story/news/politics/2019/05/29/ohio-house-passes-nuclear-plant-bailout /1270558001/; https://www.toledoblade.com/local/environment/2019/06/03/Protesters-oppose-House-Bill-6/ stories/20190603170.

### ii. Householder "Crafts" HB 6 and Creates Subcommittee for HB 6

114. Freshman representatives, Representatives 3 and 4, who were elected in November 2018, sponsored HB 6. Both were "Householder" candidates and Generation Now spent money supporting both by paying for advertising, campaign strategy, and staffing.[32] Although Householder was not a listed sponsor of the legislation, on the day of the introduction, he publically supported the legislation and gave a press conference to explain how it would affect Ohio. During the recorded press conference, Householder characterized HB 6 as "*the mysterious energy bill we've been working on for quite a while in the House of Representatives*."

115. Householder further admitted during the April 12, 2019 press conference that he "*crafted*" the legislation with the freshman representatives. Specifically, when Householder was asked where the amount of the subsidy came from, Householder responded, "*it's based on our brains. For me, I look back, for two years I've had this in my head, and I've had various versions on that white board over the last several months. And as I talked with [the freshman representatives], we were able to define it even closer.*" As described above, Householder received his first $250,000 payment from Company A in March 2017, roughly two years prior to introduction of the bill.

116. HB 6 was referred to the House Energy and Natural Resources Committee after introduction. But during the Committee's first meeting, HB 6 was then referred to a newly created subcommittee, the House Energy and Natural Resources Subcommittee on Energy Generation (the "Energy Generation Subcommittee"). Householder publically announced that he would form a subcommittee on energy generation on February 6, 2019 in conjunction with a press release about House rules for the 133rd General Assembly. Two days later, Householder formalized the Energy Generation Subcommittee in a press release announcing the committee assignments of House members. Since its inception, the subcommittee only has been assigned one bill—HB 6. At the April 12, 2019 press conference, Householder admitted that HB 6 "*is why that Subcommittee was created.*"

117. Eight House members were assigned to the Energy Generation Subcommittee. Six of the eight members had voted for Householder for Speaker. The two members who did not record votes for Householder signed on to be co-sponsors of HB 6. In the end, all but two members of the subcommittee voted to pass HB 6.

118. The subcommittee held four meetings on the legislation, before referring the bill back to the full House Energy and Natural Resources Committee on May 2, 2019 with a substitution. HB 6 then had multiple committee meetings within the House Energy and Natural Resources Committee, and was amended further before being referred back to the House floor less than a month later on or about May 23, 2019.

119. After HB 6 was referred from committee on May 23, 2019, it was subsequently referred to another committee for a substitution—the Rules and Reference Committee, which is run by Householder. Generally every bill going from a substantive committee to a floor vote

---

[32] Representative 3 also received $18,700 in direct contributions to his campaign account from Company A.

passes through the House Rules and Reference Committee to receive a date for a floor vote. However, it is unusual for a bill to be amended during such passage. Based upon my training and experience, once a bill has been vetted by committee and recommended for passage, it is uncommon for it be amended in another committee. For context, the House Energy and Natural Resources Committee and Energy Generation Subcommittee held ten committee meetings and heard testimony from dozens of stakeholder groups before amending the legislation, a process lasting just under sixty days. But, on May 28, 2019, HB 6 was referred to the Rules and Reference committee, and was amended through the introduction of a substitute bill.

120. Among other things, the substitute bill added a provision permitting an electric company with taxable property that is fueled by nuclear power (a company such as Company A) to file a petition for a reduction in taxable property value. This provision was an added benefit to Company A Corp.

121. After its final set of substitutions, HB 6 returned to the House floor—the same day that HB 6 was amended by the Rules and Reference House Committee chaired by Householder— where it was scheduled to be voted out on May 29, 2019. When a vote was called, the House elected to informally pass, which based on my training and experience, I know is a procedure used by Speakers to reschedule legislation that would have failed to pass if a vote were taken at the time of roll call. When an informal pass is taken, further negotiations and compromises are necessary for the Speaker to acquire the necessary votes for the bill to pass. After the informal pass was taken, the House stood at recess. Based on my training and experience, this shows that Householder did not have support for passage of the bill in the House at that time.

122. The Speaker gained support for passage later that day, likely through the pressure tactics described below. Upon returning from the aforementioned pass, HB 6 was amended four additional times. After those amendments, HB 6 was called to vote by the Speaker and passed 53-43.

### iii. Generation Now Media Blitz to Provide "Cover"

123. The uncertain path to passage is significant. To members of the Enterprise, there was a real possibility, up until the final vote, that HB 6 would not pass. The investigation shows that, during this time, the Enterprise created a media campaign costing approximately $15 million dollars.

124. The Enteprise's media campaign demonstrates the significance of HB 6 to the Enterprise, and thus, provides further evidence of the corrupt arrangement with Company A. Documents possessed by Longstreth show that the Enterprise had budgeted for an 8-week campaign, where the "overall budget would be $15-16m for a full burn." The media campaign was designed to pressure legislators to vote for HB 6 by targeting their constituents. The media campaign urged Ohioans to contact their representatives to save jobs in Ohio and protect their communities from "big oil." The campaign provided cover for those representatives who were voting for HB 6 and applied constituent pressure to unsupportive House members and those who were undecided.

125.    Bank records and text messages between Longstreth and Cespedes show that Company A funded the entire campaign.  For just the House portion of the media blitz, Company A wired approximately $9.5 million into the main Generation Now account between April and May 2019:

| | | | |
|---|---|---|---|
| April 30, 2019 | $1,500,000 | wire | Company A Service Co |
| May 7, 2019 | $1,500,000 | wire | Company A Service Co |
| May 15, 2019 | $2,500,000 | wire | Company A Service Co |
| May 22, 2019 | $2,500,000 | wire | Company A Service Co |
| May 29, 2019 | $1,500,000 | wire | Company A Service Co |
| **Total:** | **$9,500,000** | | |

126.    Text messages recovered from Longstreth show communications with Cespedes about the $15 million budget:



127.    The money from Company funded a media blitz—television ads, radio ads, mailers, and digital media—with all of the Company A money running through the Enterprise, which got paid for the work.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

128. Based on my training and experience, the fact that Generation Now, the Speaker's 501(c)(4) entity, conducted the media campaign is significant. First, it is further evidence of the corrupt relationship with Company A—the Enterprise likely would not be spending millions of dollars from Company A that was passed through a 501(c)(4) account for the benefit of Company A's main legislative priority absent an agreement with Company A. Second, it allowed the Enterprise to control the messaging in a way that would benefit the Enterprise and provided the autonomy to spend the money how it deemed appropriate. Third, based on my training and experience, it solidified Householder's political power by showing members the strength and reach of his political operation. Finally, the members of the Enterprise financially benefited from this arrangement.

129. The messaging of the media campaign focused on the loss of jobs if HB 6 did not pass, and urged constituents to contact their representatives to support HB 6. The media campaign also claimed that not passing HB 6 would allow "big oil" to harm constituents' communities. In the search warrant return from Longstreth's possession, the FBI recovered a draft script for a Generation Now HB 6 commercial to run in the districts of two representatives from the Cincinnati area (highlights in original):



130. The draft transcript was written on the letterhead of Political Advertising Agency 1, which is consistent with publicly filed FCC documents, showing television ad time purchased

by the Political Advertising Agency or its sister company, Media Placement Company 1 during this timeframe. For example, Media Placement Company 1 purchased $63,105 of airtime on Generation Now's behalf, from WKRC Channel 12 in Cincinnati, beginning on May 24, 2019. WKRC airs in the representatives' districts. The content shows Householder and the Enterprise influencing public officials through the ad buys.

131. The media campaign was successful and provided "cover" for Householder supporters to vote in favor of a bailout they otherwise may not support. In fact, Representative 3, a freshman sponsor of the bill, texted Longstreth after the vote and celebration about "the cover":



132. Likewise, Householder himself acknowledged the importance of "protecting" the representatives who had voted in favor of HB 6. A little more than two weeks following HB 6's passage from the House, Householder texted Longstreth to inquire as to whether "we" were running positive advertisements for Representative 5, who had voted "yes":



133.    The exchange about the representative is particularly interesting given that Representative 5 voted against Householder for Speaker, but supported HB 6.    Thus, Householder's message appears to convey a newfound allegiance for a representative who voted for HB 6, thus showing HB 6's significance to Householder.    The exchange also showed Householder's direct involvement in the Enterprise's messaging and media campaign and Householder's understanding that public officials know that Householder is behind Generation Now messaging.

134.    The media campaign was effective in using constituents to pressure the targeted representative.    For example, even mailers that unexpectedly arrived after the vote prompted constituents of "no" voters to call and complain.  For example, Representative 6, angrily contacted Longstreth about a mailer that arrived in his district after the vote, urging Representative 6 to have the "courage" to save jobs and vote for HB 6.





135.    The text exchange also shows that Representative 6 knew exactly who to contact about the Generation Now ads.  The same day, after receiving Representative 6's angry texts,

Longstreth texted Householder to warn him about what had happened in Representative 6's district.



This further shows Householder's involvement in using Generation Now money for mailers targeting public officials to support HB 6.

### iv. Householder Attempts to Gain Votes for Bailout

136. The investigation provides probable cause to believe that Householder and the Enterprise attempted to influence and provide advice to legislators in an effort to pass HB 6 after receiving millions of dollars from Company A.

137. Representative 7 was one such legislator who was contacted directly by Householder to gain support for HB 6. On or about Tuesday, May 28, 2019—the same day that HB 6 was sent to the Rules and Reference House Committee chaired by Householder—I interviewed Representative 7, a current member of the Ohio House of Representatives. Representative 7 advised that HB 6 had been handled unlike any legislation that Representative 7 had seen before. Representative 7 advised that Householder had been attempting to secure yes votes for HB 6 for several weeks. According to Representative 7, despite his efforts, Householder did not have enough votes to pass HB 6. Representative 7 was aware of fourteen Republican Caucus members who had committed to be no votes and was aware of only two Democratic members who would vote yes. Representative 7 felt the bill would not pass unless something drastic changed.

138. Representative 7 also explained that he was in frequent contact with Clark, at the direction of Householder. Representative 7 explained that Clark is a close advisor of Householder, and was working with Representative 7 extensively on a piece of legislation unrelated to HB 6. Representative 7 felt it was unusual and odd that Clark was assigned by Householder to work with a member on legislation, instead of House policy staff, but complied with Householder's request. Clark and Representative 7 had daily contact, and Representative 7 felt that they had become friends.

139. On the day before the meeting with Representative 7, Clark had spoken with Representative 7. According to Representative 7, Clark warned him not to vote against HB 6. Clark told Representative 7 that people who vote against Householder lose a lot, including committee chairmanships, caucus financial aid, and that their legislation may not continue to legislatively progress. Representative 7 relayed that he was unsure if the information from Clark

was meant to be a threat from Householder, passed to him via Clark, or if it was a warning from a friend.

140.    During the interview, Representative 7 received a text message from Householder, which said:



Representative 7 showed FBI Agents, including me, the message when it was received. Representative 7 then responded to the text, addressing Representative 7 by his title, politely reiterating Representative 7's contrary position.  Householder immediately responded, "*I just want you to remember – when I needed you – you weren't there. twice.*"  These messages show that Householder was attempting to gain legislative support vote for HB 6.

141.    Representative 7, later provided screen shots of the aforementioned text message exchange with Householder.  The screen shots matched the messages Representative 7 showed FBI agents during the interview.  In addition, Representative 7 provided a screen shot of the stored contact information for the sender of the text messages, Householder.  That contact information contains Householder's name and phone number.

142.    The day after I interviewed Representative 7, HB 6 passed.

143.    Representative 7's statements about Householder's active interest in HB 6 were corroborated by a recorded conversation involving Clark referenced above, on or about May 31, 2019.  During the call, Clark first confirmed that the "clean air bill" was really "a nuclear plant bailout."  Clark then mentioned Representative 7 by name, stating that Householder had called Representative 7 three or four times about the vote and that Clark then had to meet with Representative 7 about the vote.  Clark relayed that he told Representative 7 that Householder would not let Representative 7 carry separate legislation unless he voted for the energy bill.  Clark then stated that Representative 7 decided to vote against the bill and Householder was very angry.

144.    In a subsequent recorded call, Clark elaborated about Representative 7. Clark stated that Householder had told him (Clark) that Clark was going to have to get Representative 7's vote on HB 6.  Clark then called Representative 7, who told Clark he could not vote for HB 6.  When Representative 7 tried to explain why, Clark told him, "No one cares about your opinion."  Clark further explained that Representative 7 tried to call Householder a few days later and tried to negotiate with him.  Householder asked Clark what he should do and Clark told Householder to kill Representative 7's bill.

145.    On May 31, 2019, Representative 7 contacted me and indicated that he had been instructed to delete certain messages sent to him by Householder.  This message was delivered to Representative 7 through a third party, ██████████████████████████ Individual 2, who communicated a message from Jeff Longstreth.  Representative 7 told me that Longstreth was charged with managing Householder's campaign operations.  That included both his individual campaign, and the campaigns of all Republican candidates throughout the state.  This is corroborated by the Enterprise's use of Generation Now to support House member campaigns.

146.    Specifically, Individual 2 told Representative 7 that he (Individual 2) had spoken to Longstreth earlier that day.  During their conversation, Longstreth reportedly told Individual 2 to instruct Representative 7 to delete the text messages that he received about HB 6 from Householder.  If Representative 7 complied with this instruction, all would be forgiven in terms of his vote against HB 6.  Individual 2 then relayed the message to Representative 7.  Upon receiving the message from Individual 2, Representative 7 was immediately concerned and contacted me.  Representative 7 relayed the message delivered by Individual 2.

147.    Toll records corroborate the instruction that Representative 7 received to delete his messages.  Specifically, toll records show that Longstreth contacted Individual 2 at 8:29AM, 11:21AM and 8:14PM.  The 8:14PM call lasted for 6 minutes and 53 seconds, immediately after which, Individual 2 contacted Representative 7.  That call lasted for nearly 10 minutes.  Immediately after the call with Individual 2 ended, Representative 7 contacted me.

148.    For context, Householder maintained control of the Enterprise and OHROC, which Householder renamed the House Republican Campaign Committee (HRCC).  As outlined in this affidavit, Householder's Enterprise selects political candidates and supports their election efforts.  That support comes in a variety of forms, including individual campaign contributions, money and staffing from HRCC, and dark money resources provided by the Enterprise. Overwhelmingly, the candidates selected by the Enterprise are successful in their election or reelection efforts.  Therefore, based on my training and experience, not complying with a command from Householder, and as a result losing your support or worse having an opponent supported, would decrease the chances of reelection.

## v.  The Enterprise Pressures Senators to Pass HB 6

149.    HB 6 passed the House on May 29, 2019.  In reference to HB 6, Company A-1 released a statement on May 29, 2019:  "*This bill provides an effective legislative solution to keep [Company A-1's] nuclear power plants open for many years to come, while preserving 4,300 highly-skilled jobs and an important revenue source*."  The statement went on, "*Until the Senate vote, [Company A-1] will continue to engage in a constructive dialogue with legislators about the need to protect 90% of the state's zero-emissions electricity and provide the majority of Ohioans considerable savings on their electricity bills*."

150. The day after Company A-1's press release, HB 6 was introduced to the Ohio Senate. Although HB 6 passing the House helped the Enterprise maintain its agreement with Company A, it did not fulfill the agreement. Rather, the Enterprise needed to ensure HB 6 passed the Senate and was signed into law.

151. Shortly after the bill was introduced in the Senate, the Enterprise began pressuring for Senate passage. To fund the effort, Company A wired more than $7 million into Generation Now, which records show used the money, in part, for polls, media buys, and mailers:

| June 5, 2019 | $2,000,000 | wire from Company A Service Co. |
| June 13, 2019 | $1,361,899 | wire from Company A Service Co. |
| June 20, 2019 | $2,116,899 | wire from Company A Service Co. |
| July 5, 2019 | $1,879,457 | wire from Company A-1. |
| **Total:** | **$7,358,255** | |

152. Text messages from Longstreth recovered during the investigation show that Company A had budgeted for, and was paying for the costs associated with the campaign to pass HB 6 through Senate.

153. The Enterprise's efforts regarding the Senate began a few days after HB 6's House passage. On June 3, 2019, Longstreth pulled the "whole HB 6 team" together for a strategy session. This meeting appears to have been partially prompted by Householder's response to the negative press the passage of HB received.





154.    Following the above message and phone call from Householder, Longstreth texted Company A-1 lobbyist Cespedes:  *"Speaker has asked me to pull together the whole HB 6 team on Monday. Are you available?"*  Longstreth added, the *"Speaker is on a rampage."*  Cespedes responded, *"Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol."*  After Longstreth stated that Householder *"was pissed"* about a newspaper article, Cespedes replied, *"Aw fuck. Sorry to hear that. I've got your back. You have been great. Let's just regroup and get the rest of the deal done."*  Consistent with the investigation, the context of these messages indicates that the Longstreth and Householder's "win" is the same "deal" referenced by Company A-lobbyist Cespedes—successful passage of HB 6.

155.    Based on text messages recovered during the investigation, the meeting went forward as planned, and Associate 1 drafted meeting minutes, which were sent to Longstreth and were recovered by agents.  Portions of the minutes are excerpted below.

# GENERATION

**Generation Now, Inc. Meeting**
**Monday, June 3, 2019**

I.   Recap HB 6 strategy for House
    A.  Member feedback: what worked, what didn't
        1.  What didn't work: our calls, the TV was weak (didn't mention the
           members' names) – new strategy needs to be targeted cable mentioning
           the names.
        2.  What didn't work: the bill repeatedly changing, which meant the message
           repeatedly changed.
        3.  What did work: calls for "on the fence" members ( █████ relayed
           she was feeling the heat from calls, talked to █████ and he was feeling
           an influence by proxy).
        4.  What did work: their names. Anything that mentioned their names, they
           got lots of feedback from friends, family, district people: radio, mail.

II.  Senate strategy
    A.  Senator-by-Senator game plan: hyper local
    B.  Change in media/ digital approach
    C.  Timeline
        **1.  Hard stop June 30 (based off refueling for the Nukes)**

Need to develop a 10-day plan to decide what we're doing going forward. If we're not
successful in the next 10 days, the Nukes need to be stripped out and put into the budget. Have
10 days to run through a media strategy and see where we are.
• Sub bill introduced June 10-11
• Conference committee will begin June 15

Run through a direct mail piece (named), direct cable (named), direct radio (named), continue
our broadcast strategy

156.   These meeting minutes not only outline the Senate campaign, but confirm what
Generation Now did during the House's consideration of the bill. The investigation showed that
the Enterprise followed the steps outlined in the notes, and that Householder remained engaged
during the process. For example, the same day as the June 3, 2019 meeting, Householder and
Longstreth had the following exchange:



157.    Longstreth attempted to call Householder directly after these text messages.  The next morning at 8:04 a.m., Householder and Longstreth had a call lasting 34 minutes and 39 seconds.

158.    Householder then followed up with Neil Clark regarding the June 3 meeting that same day:

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935857 / Confirmation Nbr. 2437790 / CLDLJ



159.    These exchanges show Householder directly involved in the Enterprise's efforts to persuade Ohio senators to pass HB 6.

160.    The messages also show that Householder was chief decision maker regarding Generation Now, even providing direction with respect to the Generation Now ads.  On June 12, 2019, about a week after the HB 6 team meeting, Householder reached out to Longstreth regarding the Generation Now television ads, essentially telling Longstreth to change them.  Moreover, Longstreth acquiesced to Householder, indicating that he would change them the following week, thus demonstrating that Householder had the final word as to Generation Now messaging:







+17407072500 SLH
When does the Gen Now TV message change ?
Status: Read
Read: 6/12/2019 10:14:37 AM(UTC+0)
6/12/2019 10:14:25 AM(UTC+0)

Source Extraction:
Legacy (5)

+17407072500 SLH
I think it is burnt in - well burnt in
Status: Read
Read: 6/12/2019 10:15:03 AM(UTC+0)
6/12/2019 10:15:02 AM(UTC+0)

Source Extraction:
Legacy (5)

+16143781107 Jeff Longstreth
They are working on a draft now. Polling shows it's working.
Status: Sent
Delivered: 6/12/2019 10:15:20 AM(UTC+0)
6/12/2019 10:15:19 AM(UTC+0)

Source Extraction:

+17407072500 SLH
I agree - it's funny though - in district the number one question is - just what the hell is this House Bill 6 ?
Status: Read
Read: 6/12/2019 10:16:38 AM(UTC+0)
6/12/2019 10:16:31 AM(UTC+0)

Source Extraction:
Legacy (5)

+17407072500 SLH
Nobody knows what it is or what it does including the Senate
Status: Read
Read: 6/12/2019 10:17:02 AM(UTC+0)
6/12/2019 10:17:01 AM(UTC+0)

Source Extraction:
Legacy (5)

+16143781107 Jeff Longstreth
Polling shows the more we explain it, the worse it does.
Status: Sent
Delivered: 6/12/2019 10:17:16 AM(UTC+0)
6/12/2019 10:17:16 AM(UTC+0)

161.    Householder's mention of the "*poor sum bitch*" driving his pickup truck and crying about losing his job is likely a reference to an HB 6 advertisement paid for by Generation Now, which depicts an employee at one of Company A-1's nuclear power plants describing job losses if the plant closes, while he drives his pickup truck down a road.  This further shows Householder's involvement in the Generation Now media buys supporting the Company A bailout.

162.    Consistent with the strategy outlined in the June 3 team meeting, numerous commercials "*paid for by Generation Now*" began airing while HB 6 was in the Senate under consideration. These commercials featured the same actors depicted in the May commercials, however, consistent with the June 3rd meeting notes, the commercials targeted particular senators and urged voters to call the particular senator and urge them to support HB 6 so thousands of Ohioans will not lose their jobs.  For example, one ad targeted Senator 1, The ad states in part, "*Senator [1] can save our jobs in Ohio for Ohio . . . Senator [1], Ohio families need your help before June 30... ask Senator [1] to pass HB 6 before summer break . . . more jobs, lower bills, for Ohio.*" The commercial ends with "*Paid for by Generation Now, Inc.*"

163.    A document recovered by agents from Longstreth's possession appears to be a draft script, complete with redlining and highlights, for a set of commercials targeting senators, including Senator 1.  The text is similar to the commercial described above.  Senator 1, and the

other senators on the draft transcript, were the same senators identified in the June 3rd meeting minutes as senators to target with messaging. Direct mail pieces were recovered from Longstreth's possession that targeted other senators identified in the June 3rd meeting minutes. For example, Senator 2 was identified as a senator to target with a message of saving jobs and money and to convey a sense of urgency. Messages recovered from Longstreth state that the Enterprise was spending $68,000 per week in Senator 2's district.

164. Mock mailers targeting Senator 2's district were also recovered from Longstreth's possession, consistent with the messages discussed at the meeting:





165.    In addition to the draft mailers copied above, budget documents recovered from Longstreth that track Generation Now's spending per week of 20 senators, including Senator 2, corroborate Longstreth's statement that he was spending $68,000 in Senator 2's district.  For example, the following excel spreadsheet entitled "HB 6 Paid Media Week 6 June 2019" (copied below), shows that the Enterprise spent approximately $45,780 on radio, social, and mail advertisements during that week.  The $45,780 does not include the amount spent on television ads, which the spreadsheet depicts as $500,000 for all 20 senators.  If that $500,000 amount were divided equally amongst the 20 senators, $25,000 would be added to Senator 2's amount, totaling $70,780—which is close to what Longstreth approximated in his text message.

| Week 6 June 7-14 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DIST | LAST | FIRST | CALLS | CABLE | RADIO | SOCIAL | MAIL | NOTES |
|  |  |  |  |  | $ 7,177 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 16,279 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 12,805 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 10,525 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 16,304 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 16,304 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 7,425 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 8,260 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 13,127 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 10,280 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 18,417 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 7,400 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 19,417 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 19,318 | $ 5,500 | $ 30,000 |  |
|  |  |  | See Separate Sheet |  | $ 9,081 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 7,870 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 7,212 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 8,938 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 7,600 | $ 5,500 | $ 30,000 |  |
|  |  |  |  |  | $ 9,800 | $ 5,500 | $ 30,000 |  |
|  |  |  | $ 66,160 | $ 500,000 | $ 233,539 | $ 110,000 | $ 600,000 |  |

| Survey | $0 |
|---|---|

| Cincinnati | $122,500 |
|---|---|
| Columbus | $134,400 |
| Cleveland | $195,300 |
| TOTAL | $452,200 |

| GRAND TOTAL: | $  1,961,899 |
|---|---|

166.    Like the media campaign during the House's consideration of HB 6, the costly media campaign targeting Senators provides further evidence of the corrupt arrangement.

167.    In addition to a media blitz, Householder continued to use his Team-Householder-candidate-turned-sponsor-of-HB 6, Representative 3, to support the bill through the Senate.  On June 10, 2019, Longstreth and Householder had the following exchange:



168.     Consistent with this exchange, Representative 3 testified before the Senate Energy and Public Utilities Committee as a proponent of HB 6 the next day.  This shows Householder working with "the team" to coordinate support for passage of HB 6 by using Team Householder candidates to influence public officials in the Senate.

169.     While in the Senate, HB 6 was further amended.  Those amendments included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple its energy rates.  Decoupling is the dissociation of annual revenue from volume of energy sales.  The decoupling mechanism was based upon the baseline revenue the company received in 2018.  Therefore, if a given year's annual revenue is less than it was in 2018, the company may charge retail customers a rider, or surcharge, to compensate for the lost revenue.  Company A Corp.'s CEO referred to this provision, in a call with investors on November 4 2019, as addressing company risk.  In response to an investor question, the CEO stated "*[decoupling] fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof. So, I get a question a lot about where I'm worried about a future recession. It's 2 million customers in Ohio that this is going to help make sure that that doesn't impact us.*"  This addition was a further benefit to Company A Corp., and, based on my training, experience, and the investigation in this matter, likely came as a result of the successful influence campaign waged by Company A and the Enterprise.

170. The Enterprise's strategy, funded by Company A, worked. The Senate passed HB 6 approximately a month and half after it was introduced. The House, which concurred in the Senate's amendments, adopted the Senate's version of HB 6 on July 23, 2019. It was signed by the governor later that same day (July 23, 2019).

171. In a press release the next day, Company A-1 stated that it "*applauded the enactment of House Bill 6 into law, a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio.*" Company A-1 CEO commended the legislature for "*drafting a bill that preserves the state's nuclear assets,*" and stated specifically that Company A-1 was "*thankful for the support and commitment by Speaker Householder and Senate President [Redacted].*"

172. As explained in detail below, a campaign to overturn the legislation through a ballot initiative began immediately after passage and continued until the campaign to overturn HB 6 failed on October 21, 2019, at which point the bailout legislation became law, saving the two nuclear power plants from closure.

### vi.    The Enterprise and Company A's Coordination

173. Enterprise members and associates coordinated with Company A executives and lobbyists while it was receiving millions of secret dollars from Company A and pressuring public officials to support the bailout.

174. According to a review of text messages and toll records, Cespedes was in regular contact with Company A and served as a conduit between Company A and other members and associates of the Enterprise while the Enterprise pushed for passage of HB 6. For example, the aforementioned exchange between Cespedes and Longstreth, where, in the context of planning an HB 6 team meeting, Cespedes told Longsteth "*Let's just regroup and get the rest of the deal done*[,]" illustrates this point. These messages, which were premised on the Speaker's "*rampage*" also show Householder's direct involvement in Company A's and Generation Now's efforts to get the "*the rest of the deal done*"—specifically, passage of HB 6.

175. Longstreth and Cespedes also discussed Generation Now mailers supporting HB 6. On June 3, 2019, Cespedes texted "*gen now mail is still dropping. We are getting reports that's [sic] it's been hitting late,*" to which Longstreth responded that "*90% was delivered by the vote*" and "*Members like seeing the mail because voters don't know when the vote was.*" Several days later, Cespedes told Longstreth, "*Mail and radio looks good to me.*" These communications show that Company A—through Cespedes—was involved directly in Generation Now's media strategy to promote member support of HB 6.

176. In addition, Longstreth and Cespedes discussed coordinating Company A payments to Generation Now. On June 4, 2019, Cespedes texted to Longstreth, "*Text me the # I need an invoice for $2M*"; Longstreth responded, "*working on it now.*" On June 10, 2019, Cespedes texted, "*Make sure I get the invoice for this week as early as possible, please. Thanks.*" Longstreth

responded, "*Yeah, I'm thinking it will be lower this week. Probably 1.3 ish.*" Cespdedes replied, "*Ok, thanks. I appreciate everything that you are doing. <u>Let's keeping pushing this group</u>.*"

177. On June 12, Cespedes and Longstreth had the following exchange:



178. Two days later, Cespedes followed up:



179.    One minute later, Longstreth texted the Chief Operating Officer of Political Advertising Company, to check on Company A's media spend, as requested by Cespedes:



180.    After sending the message to COO, Longstreth immediately resumed his text exchange with Cespedes:

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 939857 / Confirmation Nbr. 2437790 / CLDLJ



Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935857 / Confirmation Nbr. 2437790 / CLDLJ



181. After further discussion between Cespedes and Longstreth in the following days about coordinating payment, public officials' support for the bailout, hiring signature firms to defeat the Ballot Campaign, and media and mailers, Longstreth and Cespedes again discussed Company A payments to Generation Now. For example, on June 18, 2019, Cespedes to Longstreth, "*I think we have to shave off the 33k, but I'll check*," and "*Just confirmed to round down to $16M even.*"

182.    The combination of phone records, bank records, and text messages paint a clear picture of the partnership between the Enterprise and Company A in working towards their agreement.  Indeed, key Enterprise members had regular and timely phone contact with Company A  executives as Householder was taking official action on Company A's behalf while the Enterprise received millions from Company A.  For example, toll records show that Householder had 30 phone contacts with Company A Corp.'s CEO from January 2019 to July 2019—the period from when Householder became Speaker until HB 6 was introduced and signed into law.  This includes a phone call on January 7, 2019, the day Householder was elected Speaker; and multiple, lengthy phone calls in the weeks leading up to introduction of HB 6 and shortly after passage of the bill.  Indeed, over the period from February 2017 to July 2019, Householder had 84 phone contacts with the Company A Corp.'s CEO, 14 phone contacts with Company A Service Co.'s VP of External Affairs, and 188 contacts with Company A Corp.'s Ohio Director of State Affairs. Similarly, Longstreth had timely phone contact in the first half of 2019 with Company A Service Co.'s VP of External Affairs and Company A-1's VP of Government Affairs.  Longstreth's contact with Company A exceeded even Householder's over the course of the conspiracy, to include significant phone contacts with Company A executives during the period from February 2017 to October 2019.[33]

183.    Clark described Householder's corrupt arrangement with Company A during a recorded meeting in June 2019.[34]  Clark first described how another Ohio public official received money from Company A into that public official's 501(c)(4) but did not come through for Company A when they needed help passing HB 6.  Clark stated, when that public official "*knew that Larry did not have his votes, ran away from him*."  Clark then stated that Householder, on the other hand, took millions from Company A "*but he went to war for them*."  Clark concluded that he wanted to be around politicians like Householder who "*will go to the wall, but those guys that go to the wall can only do it once a year because if they do it all the time everybody knows they're pay to play*."  Clark explained that the way politicians get exposed for "pay to play" is through "stupidity" or "people who get aggrieved leak it."

184.    Householder admitted his official action for the benefit of Company A in text messages with Longstreth.  In a June 10, 2019 exchange, Longstreth told Householder that one of the "*biggest issues we've heard from the Senate*" was "*Does [Company A-1] really need the money?*"; Householder responded, for the Company A-1 "subsidy":  "*we only put in what they need*"—showing Householder and the Enterprise drafted the bill for Company A's benefit and with Company A's specific interests in mind.  Similarly, in a June 25, 2019 exchange, after Longstreth referenced the potential ballot referendum that could overturn HB 6, Householder stated, "*Stay on the good side of [Company A-1] and we'll do the defend*" of the referendum, exactly what the Enterprise did.

185.    Because Company A appeared to provide whatever the Enterprise needed to achieve its goals, the Enterprise members referred to Company A as their "Bank" for the benefit

---

[33] These toll records likely underrepresent the total volume of phone contacts between the Enterprise and Company A because messages from iPhone to iPhone are not captured in toll records due to end-to-end encryption.  For example, most text messages between Cespedes and Longstreth, the content of which are captured in search warrant returns, are not contained in toll records because they are both iPhone users.

[34] ████████████████████████████████████████████████████████████

of the Enterprise. As Clark stated in a recorded conversation[35] in July 2019: "*We call Company A 'the Bank' because they can do, they can do, they can fund these things for 20 years if they want to. . . . They've got too much money, too much power.*" Later in the conversation, Clark discussed the individuals giving a $15,000 to $25,000 check to Householder's 501(c)(4), relative to other contributions into Generation Now, specifically payments by Company A. Clark stated, "*you'll walk in with your check and you'll be respectful, and they'll remember it as that number. Remember, he gets checks from 'the Bank'; remember, I told you what the 'the Bank' is, you know, $1.5 million dollars, $2 million dollars.*"[36]

186.    Indeed, according to Clark, the amount of money from Company A to the Enterprise was "*unlimited.*" As he later explained, "*on HB 6, Company got $1.3 billion in subsidies, free payments, . . . so what do they care about putting in $20 million a year for this thing, they don't give a shit.*" Clark went on: "*[Company A] is deep pockets. Clark explained: I did this campaign. All we cared about was getting the subsidy.*" In other words, Company A paid the Enterprise millions of dollars in exchange for the Enterprise's efforts to pass HB 6 because it received "*$1.3 billion in subsidies*" in return—the essence of the corrupt exchange.

### III.    The Enterprise Fights the Ballot Campaign to Ensure HB 6 Goes Into Effect

187.    Immediately after passage of HB 6, "Ballot Campaign" mobilized to repeal HB 6 through a ballot referendum. Under Ohio law, in order to place a referendum on the ballot, a group must collect 1,000 certified signatures and submit proposed ballot language to the Ohio Attorney General for approval.[37] The approval ensures that the description of the referendum meets the "fair and truthful" standard outlined in the Ohio Revised Code.

188.    After the Ohio Attorney General approves the language, and the Ohio Secretary of State certifies the signatures collected, the proponents of the ballot referendum must collect signatures from registered voters totaling six percent of the voters who participated in the last gubernatorial election. In this case, six percent equals approximately 265,000 signatures. Those signatures also must be validated by the Ohio Secretary of State. If the requisite number of signatures are collected and validated, the referendum appears on the ballot for a popular vote by the residents of Ohio.

### A.  The Enterprise Fights Back

189.    Ballot Campaign's original ballot proposal language was submitted on July 29, 2019 and rejected by the Ohio Attorney General on August 12, 2019. A revised petition was filed on August 16, 2019, and subsequently approved by the Ohio Attorney General on August 29, 2019. After approval, the Ballot Campaign had until October 21, 2019 to collect the requisite number of signatures.

---

[35] ████████████████████████████████████████
[36] ████████████████████████████
[37] *See* Ohio Rev. Code § 3519.01.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 938557 / Confirmation Nbr. 2437790 / CLDLJ

190.     Even before the Governor signed HB 6 into law, and the Ballot Campaign organized, the Enterprise was mobilizing to defeat a ballot initiative in June 2019.  On June 19, 2019, Cespedes wrote to Longstreth, "*Borges mentioned this morning that the opposition has engaged signature gatherers. Not sure who or if it's real. Just want u to be aware*."  Longstreth responded, "Thanks for letting me know."  Then, on June 27, 2019, Cespedes wrote Longstreth, "*Let's just get all of the signature firms hired tomorrow*."  Longstreth responded, "*We can hire the good ones.  We can't hire them all*."  To which Cespedes replied, "*Yeah, let's get all the good ones?  If I need to up the budget, I will*."  Cespedes later texted his intent with regards to the ballot initiative, "*I was hoping that we could take out all the big players and limit their chances.  It's impossible to referendum proof imo.  We can make it tougher*."  This shows Company A actively working with the Enterprise to preserve the HB 6 bailout.

191.     But the investigation indicates that the Enterprise was concerned that a ballot initiative would block HB 6 from taking effect.  For example, on July 22, 2019, the day before the bill passed the Senate, Clark discussed a potential referendum during a recorded conversation.[38] He explained that it would "*piss off the Speaker*," and if the opposition succeeded in getting it on the ballot in 2021, the bill would be "stayed" until then.  Clark further explained that he was in charge of the effort to kill the signature collection effort for the Speaker, and estimated that it had a 20% success rate.

## B.  Generation Now Takes Heat in the Media for Funding HB 6 Ads

192.     At the same time discussion of a ballot initiative was ramping up, the media was reporting that Generation Now was the source of dark money behind the passage of HB 6.[39] The Cincinnati Enquirer and Dayton Daily News reported that millions of dollars in dark money from Generation Now flooded the airways with television and radio ads supporting HB 6.  Although some articles tied Generation Now to Jeff Longstreth, none made the link to Householder or understood that Company A was funding Generation Now.  In fact, the news reports at that time attributed Company A as funding an alliance, which had spent about $275,000 on HB 6 ads.  In what appears to be an effort to deflect attention, Householder was quoted in the media as saying:

> It's a priority bill for me because I've always cared about the energy in the state of Ohio. I'll tell you who's paying for these ads: it's working men and women from Ohio, who want to save their jobs and it's Ohio corporations, headquartered in Ohio, that want to stay here. That's who's paying for it.[40]

193.     Householder was also receiving pressure from House members about his use of Generation Now to further HB 6, as Householder told Longstreth in a text exchange:

---

[38] █████████████████████████████████
[39] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343 (July 2, 2019).
[40] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343.

194.     In addition to showing Householder's knowledge that Generation Now was taking a hit in the media, the message also shows that some public officials knew that Householder was behind the Generation Now campaign to pressure members to support HB 6, particularly relevant given the millions of dollars Householder's Enterprise spent on media buys and ads urging Ohio citizens to pressure public officials to support House Bill 6.

195.     In the wake of the negative press and pressure from House leadership relating to Generation Now media buys supporting HB 6, the Enterprise used "Front Company," which was controlled by the Enterprise, to conceal their efforts to combat the referendum.  As described below, the Enterprise pumped $23,000,000 of Company A-to-Generation-Now money into Front Company and used the organization to fund criminal acts to defeat the referendum.

## C.  The Enterprise Used Front Company to Defeat Ballot Campaign

196.     HB 6 was important to the Householder's Enterprise because it received millions of dollars into Generation Now from Company A in exchange for enactment of the bailout legislation.  And, thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to Householder's Enterprise.  But, the Enterprise also viewed the Ballot Campaign as a threat to its power and territory generally.

197.     For example, at the dinner club meeting on September 23, 2019, in the context of a discussion about the Ballot Campaign, Householder told Clark in a recorded meeting[41]: "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*"  Staffer followed up, "*it's the beginning of your Speakership; it sets a bad precedent for the next six years, what we need to make them realize is that you (Householder) can't be fucked with.*"  Clark then agreed, "*it sends the message to everyone else . . . . if you attack a member, we're going to fucking rip your dick off.*"  Enterprise members thus made clear that preserving their legislative victory was necessary to proving the strength of the Enterprise going forward.

198.     As set forth above, Front Company—organized and registered under Ohio law on July 30, 2019, less than a week after the bill was signed by the governor—is a pass-through entity through which the Enterprise funneled Company A-to-Generation-Now money to further the conspiracy.  Associate 1, along with Associate 4—who had hundreds of phone contacts with Enterprise members from July to October 2019, including regular calls with Clark, Longstreth,

[41] ███████████████████████████████████████████████████████

and Borges—opened the Fifth-Third Bank checking account for the Front Company on August 12, 2019. Between August 1, 2019 and October 31, 2019, over $23 million was deposited into Front Company's account. Subpoenaed bank records show that *every penny of that $23 million came from Generation Now via Company A entities—specifically, Company A Service Co. and Energy Pass-Through—wired approximately $38 million to Generation Now.*

199. The Enterprise funneled the Company A payments through the Front Company account to defeat the Ballot Campaign. One of the clearest examples, again, comes from Longstreth. On September 26, 2019, Company A wired $2,445,000 to Generation Now (Longstreth-controlled), which wired a total of $2.1 million to Front Company (Associate 1-controlled) (over the next several days), which wired $2.2 million on September 30, 2019 to Constant Content (Longstreth-controlled), which wired $1.22 million to Direct Mail Company the same day. The Enterprise passed the remaining $21 million through Front Company to pay Media Placement Company 1 and the Political Advertising Agency for television commercials[42] (approximately $6.9 million), Petition Signature Services Co 1 (approximately $11 million) and Petition Signature Services Co 2 ($688,000) for ballot petition signature services, Billboard Co for billboards ($150,000), and approximately $3,500 for t-shirts. Front Company also funneled another $2.2 million to a different Constant Content account controlled by Longstreth.

200. In terms of commercials and fliers, the Company A money wired from Generation Now to Front Company funded a media blitz of commercials and fliers orchestrated by the Enterprise. Again, the media campaign against the ballot initiative is indicative of the corrupt exchange with Company A.

201. These advertisements intended to invoke fear by asserting that China was invading Ohio's energy grid, and that signing the petition equated with ceding control of Ohio energy to China. For example, Front Company mailed the following fliers to hundreds of thousands of Ohioans:



---

[42] Public filings on the FCC website show that Media Placement Company 1 bought television ads for Front Company between August 2019 and October 2019.



These above fliers were mailed to voters throughout the state of Ohio.

202.    During the September 23, 2019 recorded dinner-party, in which Householder also was present, Clark relayed the story behind the second flier, which Clark and Householder thought was hilarious.  Through laughter, Clark described what he termed "*the direct mail piece*" as "*so fucking cold-blooded.*"  He stated that Jeff designed it.  He explained that because 15 out of the 150 signature collectors hired by the opposition had prior arrests, they were technically criminals under the law.    When Representative 8 (another representative of the Ohio House of Representatives, who is not known to be part of the Enterprise asked how they knew the signature collectors had prior arrests, Householder explained, "*they have to sign up and when they sign up, we run a background check.*"[43]  Clark went on to explain, "*[s]o Jeff, of course, designs a piece going 'they're coming to your house, criminals . . . don't answer the door . . . decline to sign.'*"  As Clark explained, he later had to explain the direct mail piece to Associate 4—that they were mailing 4.9 million pieces explaining that the people coming to your house for signatures are criminals, and Associate 4 refused to put his name on it.  Clark played hardball with Associate 4, and told him that he (Clark) had to get off the phone now and tell his boss (presumably Householder) that Associate 4 didn't want to do it.  Clark explained that eventually, Associate 4 agreed on a softer piece.

203.    The investigation later revealed that payment for the postage on these same fliers was ultimately paid for by Generation Now, but had been funneled through at least three bank accounts.  Specifically, the fliers were sent "presorted standard US Postage PAID Columbus OH Permit 6871."  According to U.S. Postal records, a Digital & Print Marketing Group is the account holder of Permit 6871, and the customer reference ID lists a company related to Direct Mail Company 2.  Subpoenaed bank records show that the Digital & Print Marketing Group received approximately $3.5 million from Direct Mail Group 2 in October 2019, which received approximately $3.6 million combined from Longstreth's Constant Content bank accounts, which received a combined $4.4 million from Front Company—all of which originally came from

---

[43] Householder was likely referring to Ohio Secretary of State Form 15, which Ohio law requires to be filed by people working being compensated for working on behalf of a statewide ballot petition.  *See* Ohio Rev. Code 3501.381.

Company A through Generation Now. In other words, the Enterprise funneled Company A money through three different Enterprise-controlled accounts before purchasing the fliers through third parties. The efforts made by Enterprise members in this regard are further evidence of their intent and the corrupt exchange with Company A.

204. Generation Now money also funded television commercials purportedly sponsored by Front Company, which continued the same theme from the fliers. These ads asserted that China was taking over Ohio's energy, igniting fear that the Chinese government is behind the drive to repeal HB 6 and wanting to take Ohio energy jobs.[44] The ads proposition Ohioans to choose between supporting HB 6 or handing over Ohio's energy to the Chinese Government.

For example, one ad aired in Cincinnati claimed:

> *They took our manufacturing jobs. They shuttered our factories. Now they are coming for our energy jobs. The Chinese government is quietly invading the American electric grid, intertwining them financially in our energy infrastructure. Now a special interest group boosting Chinese financial interests is targeting Ohio energy, taking Ohio money, exporting Ohio jobs, even risking our national security. They are meddling in our elections. In the coming weeks you may be approached on the street or at your door to sign a petition to defund U.S. jobs and energy. They will ask for your name, your address, your signature. Tell them no. Don't sign your name to a plan that kills Ohio jobs, harms Ohio communities, and endangers our energy independence. China turned off the power on Ohio manufacturing. Don't let them do it to you. Don't sign the petition allowing China to control Ohio's power.*

During the commercial, images of the Chinese government and leadership were displayed:

 

---

[44]https://www.cincinnati.com/story/news/politics/2019/09/30/ads-claim-foreign-entities-are-invading-ohios-energy-grid/2423655001/.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 938557 / Confirmation Nbr. 2437790 / CLDLJ



The ad ended with a plea to not sign the petition, because doing so would allow China to take control over Ohio's power:



205.    Thus, although the fliers and ads claimed they were paid for by Front Company, in reality, the Enterprise paid for them and concealed that fact by wiring money from Generation Now to Front Company.  By using Front Company for the media campaign, the Enterprise further concealed its corrupt arrangement with Company A

206.    Other evidence demonstrates that the Enterprise used Front Company as a front for Generation Now.  For example, public filings on the FCC website show that Media Placement Company 1, which received approximately $6.9 million from Front Company bank account, bought television airtime between August 2019 and October 2019 across Ohio for Front Company. For instance, for the week of September 5, 2019 to September 9, 2019, records show that Media Placement Company 1 bought approximately $66,300 in television spots from WKRC Cincinnati for Front Company.  (Media Placement Company 1 had purchased airtime slots for Generation Now in the past, including advertisements that supported candidates associated with Householder during the 2018 election cycle.)

207.    The FCC filings also match the commercials' content.  In one disclosure statement that was filed with the FCC, Front Company stated that the issue addressed by the advertisements was "Chinese influence of Ohio Energy."  This description ties both the fliers and commercial content back to Front Company.  Additionally, the content of the commercials themselves contain a clue as to their origin and funding source, tying the Enterprise to Front Company.  Specifically, M.M., pictured below, who served as project manager at one of the Company A-1 nuclear power plants, appeared both in Generation Now advertisements in support of the passage of HB 6 in the

spring of 2019, as well as the aforementioned commercial by Front Company opposing the referendum, which aired in the fall of 2019.



208.    The Generation Now money also was used to buy t-shirts for Front Company. Bank records, subpoena returns, and photos from social media provide the confirmation.

**D.  The Enterprise Conflicts Out Signature Firms**

209.    Besides paying for advertisements, mailers and t-shirts, Generation Now subverted the Ballot Campaign by hiring signature collection firms in an effort to conflict them from working for the Ballot Campaign.  Bank records show that between July 23, 2019 and July 30, 2019, Generation Now spent over $549,250 retaining the services of national signature collection firms to defeat the ballot initiative. The retention of signature collection firms is in keeping with practices outlined by Clark in multiple recorded conversations.  In those instances, Clark advised his clients that if they would retain as many of the signature collection firms as possible, then those firms could not work for their opposition, which would decrease the likelihood that the referendum would collect the requisite number of signatures for a ballot initiative.

210.    For example, in a meeting on July 24, 2019, which was recorded,[45] Clark stated that he wired about $450,000 today hiring signature collections people to not work.  He repeated that

---

[45] ██████████████████████████████████████

he had "*hired them not to work.*" Clark continued, explaining that he had hired 15 companies nationwide—nine of the biggest ones—and sent them all checks ranging $50,000 to $100,000 to not to work, and $10,000 payments to the smaller firms. Clark stated that these people on the phone, "*they are all full of shit. I have been a lobbyist for 39 years, been around a long time. It always goes circular to someone going well we'll give you a kickback.*" Clark later confirmed, during the same conversation, that the $450,000 used to pay the collection firms came from Generation Now.

211. A spreadsheet tracking the hiring and payment of signature firms in July 2019 was recovered from Cespedes' possession. The document's properties reveal that Associate 1 created the spreadsheet on July 26, 2019—two days after Clark's statements detailed directly above. (That it was recovered from Cespedes' possession demonstrates the close coordination between members and associates of the Enterprise and Company A.) The document shows the signature firms that the Enterprise retained, whether the firms are under contract, the contract price, and the status of payments, which reflected payments of $431,750 by July 29, 2019.

212. A review of Generation Now's subpoenaed bank records and Clark's toll records corroborate his statements and the contents of the spreadsheet. Generation Now bank records confirm that payments were made from the Generation Now bank accounts. The records further show that some of these firms, along with other petition firms, received additional payments in the fall of 2019.

213. Further, Clark's toll records show contact with some of these firms around the same time period. For example, on July 23, 2019, the same day that Generation Now wired one firm $75,000, Clark's toll records show he had multiple contacts with a founding member of the firm. Similarly, Clark placed calls to an executive of Petitioner Signature Services Co 3 on July 22 and 29, 2019, in close proximity to Generation Now's wire of $50,000.[46]

214. These wires also are consistent with text message exchanges recovered during the investigation. On June 19, 2019, while HB 6 was still pending in the Ohio Senate, Cespedes told Longstreth that "*Borges mentioned this morning that opposition has engaged signature gathers. Not sure who or if it's real. Just want you to be aware.*" As explained above, about a week later, on June 26, 2019, while HB6 was still pending in the Senate, Cespedes and Longstreth discussed the need to hire signature firms and that Cespedes would "up" the budget if necessary:

---

[46] Petition Signature Services Co 3 received approximately $6,205,154 from Generation Now between July 2019 and October 2019. Phone records also show Jeff Longstreth had phone contact with the same executive during the same time period.



215.    Less than an hour later, Clark sent Longstreth a message stating, *"I have a new list to send you."* Clark then texted Longstreth an excel spreadsheet listing various petition gathering firms, which included firms that received wires from Generation Now a month later as indicated by Clark on the recording.

### E. The Enterprise Bribes an Employee of Ballot Initiative for Inside Information

216.    Based on my training, experience, and the investigation in this case, in order defeat the Ballot Campaign and ensure HB 6 went into effect in October 2019, the Enterprise would benefit from real-time information about how successful the signature collection effort was in order to best allocate their resources. However, the investigation revealed that the Enterprise's own daily, internal estimates about the signature collection were not adding up to the numbers claimed by the ballot initiative proponents.

217.    Indeed, during the September 23, 2019 recorded dinner party, Clark explained, in the presence of Householder, how the Enterprise was addressing the ballot campaign:

> *Every day we send out a crew of 235 people and we survey about 2600 sites . . . and we stay there to see if they have people there . . . so then we do every day do a report estimating how many signatures they've done . . . [they now have about 80 people collecting signatures] . . . how many signatures do you think you can collect in an hour; how many can you collect in a shift; they were working in the first few weeks 10 hours shifts, most people just working 6; so in all the math that was done, they weren't getting where they were, so we kept saying it wasn't right, until last week they started advertising they needed more people; they went to some of our subs, they couldn't get any of our A class subs . . .*

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

As this conversation shows, until the previous week, the Enterprise could not determine the reason for the discrepancy between their numbers and the numbers claimed by the signature gatherers. Thus, they needed inside information about the ballot initiative.

218. The Enterprise attempted to obtain such information by utilizing Borges to bribe CHS 1, who was associated with the Ballot Campaign. CHS 1 was employed by Ballot Campaign in its efforts to repeal HB 6 through a ballot initiative. CHS 1 has provided reliable information proven credible through multiple sources. CHS 1 managed signature collectors. As described below, Borges offered to and did pay CHS 1 to provide inside information about the Ballot Campaign such as the number of signatures collected, the number of collectors, and geographic focus of collection efforts. CHS 1 was upset about Borges' solicitation and contacted the FBI after meeting with Borges in early September. Thereafter, CHS 1 recorded his conversations with Borges, including Borges' payment of $15,000 to him.

219. On or about September 1, 2019, Borges contacted CHS 1 and, during a meeting the next day, offered a substantial amount of money for inside information that Borges would use for his client to defeat the referendum campaign. Specifically, according to CHS 1, Borges offered that if CHS 1 provided inside information, Borges would provide CHS 1 with monetary payments, a job, or agree to pay CHS's debts. Borges further indicated that others are getting "fat" off the HB 6 issue, so they might as well benefit, too. Then Borges asked CHS 1 to think about the offer and get back to him. Borges initially reached out to CHS 1 just two days after the Ohio Attorney General approved the ballot language and just weeks after Generation Now wired over a million dollars of Company A money to Borges' LLC, 17 Consulting.

220. In a text message following the meeting, CHS 1 told Borges he could not accept the bribe payment. These text messages were provided to me. Specifically, CHS 1 told Borges, "*I've thought about it. I don't need overnight.*" CHS 1 went on: "*At the beginning of this I thought I could walk my information into Larry's office and sell it for enough to retire on.*'" CHS 1 continued, he "*would LOVE to have those wiped out, to be debt free, and not to have to worry... but, I can't put a price tag on my integrity or my word.*" CHS 1 explained that he could not "*sell this team down the river,*" concluding: "*So. It may not land me in the car, house, job, or financial situation I want to be in – but I couldn't face myself if I did anything but work for this and do it honestly.*" Borges responded that he understood, but made clear his intent: "<u>*No matter what – don't ever tell anyone about our conversation from earlier*</u>."

221. At the direction of the FBI, CHS 1 reconnected with Borges and expressed interest in Borges' offer. During telephonic contact between the two, Borges advised CHS 1 that he would need to evaluate how to move forward. Borges followed up asking for CHS's employment contract and stating, "*I'll make an offer to buy you out. It will be substantial.*" Operating at the direction of agents, CHS 1 responded, "*What will a buyout entail? Like. . . what would I be doing, work-wise?*" Borges responded simply*, "Give me a day or two to figure this out."* Borges then started soliciting CHS 1 for inside information about Ballot Campaign. For example, Borges texted: "*Have you guys started door to door*?" Borges and CHS 1 then had the following exchange:



CHS 1 then provided a limited amount of inside information—the "ballpark" vote count for one region in the state. Borges responded, "*Got it. I'll get this done.*"

222. These messages indicate that the *substantial* "buy out" Borges previously offered was tied to sensitive information the CHS 1 would provide about the Ballot Campaign. Borges made clear that he was working on behalf of a group of individuals, and that Borges needed inside information—the signature count, for example—to "*nail down the opportunity*" because "*they just want to know they have the right source.*"

223. A series of text message exchanges followed, during which Borges and CHS 1 set a time to meet in person. In one of those messages Borges stated, "*I've gotten more clarity. Protects you.*" In another, Borges texted, "*I promise this will be worth your while.*"

224. CHS 1 eventually met with Borges on September 10, 2019 to discuss the deal. The meeting was recorded. Borges framed the exchange as a private transaction between the two of them that no one would know—despite the prior solicitation and text messages, which made clear that Borges was working on behalf of others. But Borges' true motivations became clear, and demonstrate how much Borges and the Enterprise wanted inside information about the Ballot Campaign. For example, when CHS 1 asked how the deal would work, Borges told CHS 1 that it would help to know locations in advance and they "*really need to know how many signatures you have.*" Borges then asked CHS 1 whether he had access to the statewide numbers or only his region. Borges also stated that he and his firm were working for Company A on the ballot project, and that Householder, Company A, and Borges' firm formed an "*unholy alliance.*"

225. On September 13, 2019, during a consensually recorded meeting, Borges gave CHS 1 a $15,000 check, funded entirely by Company A-to-Generation-Now money. Although in initial conversations Borges had indicated that the money was an advance for insider information to defeat Ballot Campaign, when Borges handed the check to CHS 1, he said that it was Borges's own money, that no one knew about the transaction, and that it was for the CHS 1's help in planning a reunion amongst former staffers. This contradicted what Borges had previously stated. Showing his corrupt intent, Borges also told the CHS that if this transaction came to light, it would be bad for both CHS 1 and Borges—in fact, Borges told CHS 1 he would "blow up" the CHS's house if the information got out, a threat that CHS 1 treated as a joke. Borges then proceeded to ask CHS 1 about the number of signature collectors working on behalf of the ballot campaign. Borges also made numerous statements about the Enterprise, including identifying Householder, Clark, and Longstreth as being involved. For example, Borges stated, "*Larry was putting the squeeze*" on Associate 3, Generation Now's spokesperson, and would not allow Associate 3 to quit; Clark was serving as Householder's proxy; and that it was "*insane*" how much Enterprise members were making off Company A. Borges also described being present when Enterprise members met with Company A executives to look at advertisements, and driving the Company A CEO to see signature collectors who were working on behalf of the Ballot Campaign.

226. On multiple occasions following the meeting, Borges reached out in recorded phone calls and text messages to CHS 1 to receive the same type of insider information relating to signature collection to repeal HB 6 that Borges offered payment for during their conversation on September 1. For example, Borges sent CHS 1 the following messages, among others:

> We were told you guys had 120,000 signatures. Any idea if that's right?
>
> Any idea how many total signatures you guys have? We were told 80,000 today.
>
> Any intel you have would make me a hero. Thanks.

And, despite repeatedly asking for inside information after paying the CHS 1 $15,000 in Company A-to-Generation-Now money, Borges never again mentioned CHS 1 performing any specific work unrelated to the Ballot Campaign.

227. Other evidence corroborates that Borges' actions were in furtherance of the Enterprise's efforts to defeat the Ballot Campaign. Significantly, around the same time that Borges was in contact with the CHS 1, Borges was in contact with Cespedes. Specifically, on September 1, 2019, Borges' cellphone contacted Cespedes' cellphone around 5:14PM. That call lasted for approximately 28 minutes. Less than ten minutes after that call, Borges called CHS 1 and spoke to the CHS for nine minutes. Within one minute of the completion of the call with CHS 1, Borges attempted to call Cespedes, who did not answer. They eventually connected 10 minutes later and toll records show the call lasted for 25 minutes and 30 seconds. Within one minute of the

completion of that call, Borges then called Associate 4, of Front Company.[47] Toll records also show that Borges was in regular contact with Clark, Longstreth, and Cepedes during this period.

228. Moreover, as set forth above, bank records obtained via grand jury subpoena show that the $15,000 came from Generation Now, by way of an account Borges opened in August 2019 under the name of 17 Consulting Group LLC. Borges registered "17 Consulting Group LLC" with the Ohio Secretary of State on August 5, 2019. Two days later, Borges opened a bank account under the name "17 Consulting Group LLC." Bank records indicated that Borges is the only signatory on the account and opened the account as President/Owner/CEO of 17 Consulting Group LLC. A day after Borges opened the account, Generation Now wired $400,000 into the account. In fact, Generation Now wired a total of $1.15 million into the account between August 8, 2019, the day the account was opened, and September 13, 2019, the day CHS 1 was given the aforementioned $15,000 check. During that period, aside from $100 Borges deposited when he opened the account, Generation Now was the sole source of deposits. In addition to the $15,000 check to CHS 1, the bank records show that, on September 16, 2019, three days after the $15,000 check was given to CHS 1, a check for $100,000 was written to 614 solutions LLC, which is an Ohio business registered to Juan P. Cespedes.

**F. The Enterprise Bribes Signature Collectors**

229. In addition to attempting to bribe CHS 1, the Enterprise tried to subvert the Ballot Campaign's efforts by bribing signature collectors working on behalf of the Ballot Campaign. Specifically, through intermediaries, the Enterprise offered Ballot Campaign signature collectors approximately $2500 and plane fare to stop collecting signatures and provide inside information relating to the Ballot Campaign's HB 6 referendum efforts. The payment was split into two segments—half upon signing a contract with Front Company and half upon proof the plane fare was used to fly home, away from Ohio. The Enterprise believed that if it could reduce the number of people collecting signatures for the Ballot Campaign, they could ensure the Ballot Campaign would fail to collect the requisite number of signatures.

230. Clark outlined this very strategy during the recorded dinner conversation on September 23, 2019. Concerned that the Ballot Campaign would collect enough signatures, Clark explained, "*so we have to go out on the corners and buy out their people every day. We started doing that today and everybody's having a fucking shit fit.*" When questioned about the logistics of the operation, Clark was very coy, but explained that they have 235 spotters in the field and that the spotters call and say people are here and then others go buy them off. Clark continued, "*if we knock off 25 people, collecting signatures, it virtually wipes them out in next 20 days; this ends the whole fucking thing, ends in, that's how hard it is, in addition to the TV, the direct mail, and everything else. . . .*" It was at this point in the conversation, when Householder interrupted, as explained above, and said, "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*"

231. Toll records show that Clark was not exaggerating during the dinner. Following the dinner, Clark had 45 contacts with Contractor 1, a principal of Petition Signature Services Co 2, who markets himself/herself as a leading expert in ballot initiative access and strategy. The

---

[47] https://www.dispatch.com/news/20190828/nuclear-bailout-supporters-cry-chinese-conspiracy-but-get-funding-from-same-bank.

contacts occurred in October 2019, when as, explained below, "Meghan" and "Marcus" were contacting and trying to bribe signature collectors working for the ballot initiative.

232.    With the money wired from Generation Now to Front Company, the Enterprise paid the Petition Signature Services Co 2 over $600,000 in October 2019.  The same day as the first wire transfer from Front Company to the Petition Signature Services Co 2, Signature Collector 1 for the Ballot Campaign received the following unsolicited text message from "Meghan," which toll records identify as Contractor 1:



233.    The following day, "Marcus" purportedly from Front Company, contacted Signature Collector 1, Signature Collector 2, and Signature Collector 3, via text (copied below) and several other signature collectors.  The subscriber records for "Marcus's" telephone number show contact with these signature collectors on the date and time in question.  Moreover, "Marcus" had contact with Contractor 1 around the same time



234.    The text messages copied above were attached as exhibits to the sworn statements of Signature Collectors 1, 2, and 3 in a lawsuit filed by proponents of the Ballot Campaign, claiming among other things, interference by Front Company.  While working for the Ballot Campaign, Signature Collector 2 explained in his/her affidavit that after he/she received the text message, he/she spoke to "Marcus" briefly but hung up before he gave the details of the offer. Signature Collector 3's sworn affidavit states that after he/she received the text, "Marcus" called him/her and offered him/her a plane ticket home and $2500 split into two parts. Three other affidavits were filed in support of the lawsuit, demonstrating similar communications with "Marcus" who identified himself as working on behalf of Front Company, one of which was accompanied by a recording of the call, described the same offer as Signature Collector 3, and included a proposed contract (described below) that "Marcus" sent.

235.    The contract attached to one of the affidavits described the "services" to be provided as follows:  "*provide statewide ballot issue advice and expert consultation on Ohio statewide ballot measures and the associated petition circulation and signature collection matters related to the referendum of HB 6 related issues, which occurs within a 90 day period upon enactment HB 6.*"  This shows that the Enterprise was again paying agents of the ballot campaign for inside information relating to the Ballot Campaign to hurt the campaign's efforts.

236.    Each affidavit disclosed that the signature gatherer had completed an Ohio Secretary of State "Form 15" as required by Ohio law, which included their name and telephone number.  These forms were filed with the Ohio Secretary of State.  Significantly, the investigation shows that the Enterprise likely had access to those forms.  During the recorded conversation on September 23, 2019, which preceded the above text messages from "Meghan" and "Marcus," Clark and Householder referred the forms.  In the context of explaining the mailer, which alleged the signature gatherers were criminals, Representative 8 asked, "*how do you know they have arrests?*"  Householder responded that "*they have to sign up and when they sign up we run a background check.*"  Based on my training and experience and the investigation to date, "sign up" is likely a reference to the Form 15.

77

237. The Enterprise having access to the Form 15s is consistent with subpoenaed records. Bank records for Borges' 17 Consulting account show that he paid a private investigations firm, over $177,880 between September 13 and October 15, 2019. The last check Borges paid to the investigation firm indicated that it was for "10/8/19," which is the same date of Contractor 1's texts to one of the above signature collectors. This information is consistent with what Householder's statements on September 23, 2019.

238. Moreover, any ambiguity as to Marcus' affiliation when he attempted to bribe the signature collectors is resolved by one of the affidavits filed in federal court, which included a copy of the contract sent by "Marcus" to the signature collectors. The contract confirmed that the contracting party was Front Company and confirmed the cash buyout in the affidavits: $2500, split into two payments: One half (50%) immediately upon execution of this Agreement and One half (50%) *immediately following the fulfillment of initial instructions shared with you through additional conversations with a representative from [Front Company]...*" The contract was signed by Longstreth on behalf of Front Company and further required that notices be sent to:

Generation Now
c/o Jeff Longstreth
Columbus, OH
jefflongstreth@gmail.com

239. The contract further had a confidentiality requirement aimed at concealing both Generation Now and the agreement itself, showing the Enterprise's role in bribing the signature collectors. The confidentiality provision prohibited the signature collector from disclosing: "(a*) the identity of GenNow*; (b) that [name] has been engaged by the [Front Company] to perform the Services described herein, or (c) the existence, terms, provisions, or conditions of this Agreement or the agreement with [Front Company]."[48] Again, the "Services" included providing inside information relating to the campaign to overturn HB 6.

240. Like the Enterprise's efforts to pass HB 6, the Enterprise was working closely with Company A to defeat the ballot initiative. For example, in September 2019, while the Enterprise was spending millions trying to defeat the Ballot Campaign, Enterprise-Member-and-Company A-1-Lobbyist Borges referenced a meeting between members of the Enterprise and Company A executives, including "the CEO of the company", a few days earlier:

> *I was driving those guys back to the airport and they were like we want to stop and see somebody (a signature gatherer). Well . . . I know for sure there will be one at the Worthington library because there's one there every day. So we stopped and for sure there was one there . . . the guy wants to get out and talk to him. . . . It was the CEO of the company . . . .*

---

[48] Emphasis added.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

241.     Later during the conversation, Borges again referenced the meeting with Company A, stating, "*I had the Company brass there – and they were up at [redacted] looking at ads, I mean, Dispatch calls our ads a lie today.*"  Again, as set forth above, in a prior conversation, Borges described Householder's interest in the bailout and his firm's relationship with Company A as "*an unholy alliance.*"  This shows the Enterprise working with Company A to discuss strategy for defeating the ballot initiative, to include bribing and paying off employees and signature collectors for the ballot campaign.

242.     Toll records also show frequent and close contact between the Enterprise and Company A during this period in which, Company A paid the Enterprise over $38 million.  For example, on October 10, 2019, Longstreth had multiple phone contacts with a person associated with Energy Pass-Through, the same day that Company A Service Co. wired $10 million to Energy Pass-Through, which then wired $10 million to Generation Now.

243.     The Enterprise's efforts were a success:  on October 21, 2019, the Ballot Campaign failed to collect enough signatures, and HB 6 went into effect.  Householder celebrated enactment of the law through an October 21, 2019 press release, in which he noted expressly that the new law would bailout Company A's failed nuclear power plants.  Specifically, Householder stated:  "*I am pleased that House Bill 6 will go into effect at midnight tonight and am confident it will produce positive results for Ohio.*"  Among the benefits of the bill, Householder highlighted, "*First, HB 6 will save the operation of two Ohio nuclear power plants.*" (Emphasis added.)

244.     The next day, Energy Pass-Through wired $3 million to Generation Now, which wired $2,921,000 to JPL's main account two days later.  That money and some of the Company A-to-Generation Now money remaining in other accounts were consolidated into Longstreth-controlled accounts, which personally benefitted Longstreth and Householder.  For example, on or about January 13, 2020, Longstreth wired $1 million to his brokerage account.  After the transfer, over $5 million remained in Longstreth-controlled accounts.

245.     Similarly, between September and December, Householder used $101,825 in Company A-to-Generation Now payments funneled through Longstreth-controlled accounts to pay for costs associated with his residence in Florida.  This was in addition to payments made to settle Householder's personal lawsuit in 2017 and 2018, and to pay off approximately $20,000 in credit card debt owed by Householder in 2020.

246.     On January 22, 2020 and February 6, 2020, Generation Now wired to the Coalition a total of $1,010,000, which then transferred the money to PAC.  According to FEC filings, PAC spent $1,039,131.11 between February and March on legal services, bank fees, polling, research, direct mail services, advertising via TV, radio and digital, and media production.

247.     Additionally, bank records show that on February 13, 2020, Generation Now wired the Coalition an additional $250,000. Subsequent to that transfer, Generation Now's funds were replenished by a $2,000,000 wire transfer from Energy Pass-Through on March 3, 2020.  This occurred shortly after Company A-1 was divested from Company A Corp. as a result of the bankruptcy proceedings, which was premised in part on the financial solvency of Company A-1 due to HB 6.  In May 2020, Company A-1 announced a $300 million buyback plan, whereby

79

Company A-1 would spend $300 million repurchasing shares from shareholders thereby boosting stock prices.[49]

## CONCLUSION

248.    The above facts establish probable cause that Householder's Enterprise is an association-in-fact enterprise affecting interstate commerce, and the Defendants conspired to participate in the conduct of the affairs of the enterprise by agreeing that a co-conspirator would commit a pattern of racketeering activity.    To summarize, while operating together—and functioning as Householder's "team"—the Defendants enriched themselves and increased Householder's political power by:  engaging in a scheme to defraud the public of the honest services of Householder, involving the receipt of millions of dollars in secret bribe payments through Householder's 501(c)(4) account in return for Householder taking official action to help pass a legislative bailout for two nuclear power plants; bribing and attempting to bribe individuals working on behalf of the Ballot Campaign in an attempt to receive inside information and defeat the Ballot Campaign; and concealing the scheme, their illegal activity, and the source of the funds by transferring the Company A-to-Generation-Now payments through other controlled entities and knowingly engaging in monetary transactions with the proceeds.

249.    Based on the forgoing, I request that the Court issue the proposed criminal complaint, and arrest warrants for the individuals listed below, as there is probable cause to believe **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW** have violated 18 U.S.C. § 1962(d) (Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity).

---

[49] Ohio nuclear bailout beneficiary OKs extra stock buybacks: Capitol Letter, 2020 WLNR 13486449 (May 13, 2020); https://www.cleveland.com/open/2020/05/with-ohio-bailout-law-secured-firstenergy-solutions-successor-moves-to-increase-share-buybacks-by-300-million.html.

## REQUEST FOR SEALING

250. I further request that the Court order that all papers related to this application, including the affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Blane J. Wetzel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ July 17 _____, 2020 **via Facetime Video.**

STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

# Exhibit B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO.** _1:21-cr-86_ |
| **Plaintiff,** | |
| vs. | **JUDGE BLACK** |
| **FIRSTENERGY CORP.,** | <u>**DEFERRED PROSECUTION**</u> |
| **Defendant.** | <u>**AGREEMENT**</u> |

The United States Attorney's Office for the Southern District of Ohio ("USAO-SDOH" or "government") and the Defendant, FirstEnergy Corp., by its undersigned representative and counsel, pursuant to the authority granted by the Board of Directors, agree as follows:

1. **Criminal Information and Acceptance of Responsibility:** FirstEnergy Corp. acknowledges and agrees that the government will file the accompanying Information in the United States District Court for the Southern District of Ohio charging FirstEnergy Corp. with conspiracy to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343, 1346, 1349. FirstEnergy Corp. knowingly waives any right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b), and agrees to the filing of a joint motion to toll Section 3161 upon the filing of this Agreement.

FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible under United States law for the acts of its current and former officers, employees, and agents. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts, attached as Attachment A and incorporated by reference into this Agreement, and that the facts alleged in the Information and described in the Statement of Facts are true and accurate.

Should the USAO-SDOH pursue the prosecution that is deferred by this Agreement, FirstEnergy Corp. agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any trial, guilty plea, or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

2. **Elements of the Offense:** The elements of the offense set forth in the Information, to which the Defendant agrees are established by the Statement of Facts, attached as Attachment A, are as follows:

**Count One, Conspiracy to Commit Honest Services Wire Fraud**

A. That two or more persons conspired or agreed to devise a scheme:

    1. to defraud the public of its right to the honest services of a public official through bribery or kickbacks;

    2. that included a material misrepresentation or concealment of a material fact;

    3. with the intent to defraud;

    4. that used wire communications in interstate commerce in furtherance of the scheme;

B. That the Defendant knowingly and voluntarily joined the conspiracy to defraud;

C. That the Defendant intentionally participated in the conspiracy to defraud;

D. That some or all of the acts alleged in the Information occurred in the Southern District of Ohio, on or about the dates alleged in the Information.

3. **Term of the Agreement**: This Agreement shall have a term of three (3) years from the date on which the fully-executed Agreement is filed with the Court (the "Term"), except for specific provisions that specify a longer period as described below. FirstEnergy Corp. agrees, however, that in the event the government determines, in its sole discretion, that FirstEnergy Corp. has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of its obligations under this Agreement, an extension or extensions of the Term may be imposed by the government, in its sole discretion, for up to a total additional time period of one year, without prejudice to the government's right to proceed as provided in the breach provisions of this Agreement below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment C, for an equivalent period. Conversely, in the event the government finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment C, the Agreement may be terminated early. In such event, FirstEnergy Corp.'s cooperation obligations described below shall survive until the date upon which all such investigations and prosecutions are concluded, as determined by the USAO-SDOH.

4. **Relevant Considerations**: The government enters into this Agreement based on the individual facts and circumstances presented by this case, including, FirstEnergy Corp.'s acceptance of responsibility; early self-reporting in the investigation of the conduct of the company and its former officers, directors, employees, agents, lobbyists, and consultants, described more fully below; its implementation of remedial measures, described more fully below; the payment of a monetary penalty; and the collateral consequences of prosecution, among others.

5.    **Defendant's Obligations**:  Pursuant to this Agreement, FirstEnergy Corp. shall do the following:

A.    **Cooperation.**  To date, FirstEnergy Corp. has provided substantial cooperation, including:  conducting a thorough internal investigation; proactively identifying issues and facts that would likely be of interest to the government; making regular factual presentations to the government; sharing information that would not have been otherwise available to the government; and making such material available to the government on an expedited basis.

This agreement is contingent upon FirstEnergy Corp.'s continued, full cooperation with the USAO-SDOH in all matters relating to the conduct described in this Agreement and other conduct under investigation by the government, until the later of the date the Term ends or the date upon which all investigations and prosecutions arising out of such conduct are concluded, as determined by the government.

FirstEnergy Corp. agrees that its cooperation shall include, but not be limited to, the following:

1)    Continued full, complete, and truthful cooperation in any matter in which it is called upon to cooperate by a representative of the USAO-SDOH;

2)    Timely disclosure of all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, lobbyists and consultants, including any evidence or allegations and internal or external investigations, about which the government may inquire;

3)    Disclosure of any information, items, records, databases, or data in FirstEnergy Corp.'s possession, custody, or control or in the possession or control of any subsidiary or affiliate, wherever located, requested by the government in connection with the investigation or prosecution relating to any current or former officers, directors, employees, agents, lobbyists, and consultants;

4)    Use of good faith efforts to make available, at FirstEnergy Corp.'s cost, current and former officers, directors, employees, agents, lobbyists, and consultants, when requested by the government, to provide additional information and materials concerning any and all investigations; to testify, including providing sworn testimony before a grand jury or in a judicial proceeding; and to be interviewed by law enforcement authorities.  Cooperation under this paragraph includes identification of witnesses who, to the knowledge of FirstEnergy Corp., may have material information regarding these matters;

5)    Disclosure of information, materials, and testimony, at FirstEnergy Corp.'s cost, as necessary or as requested by the USAO-SDOH to

establish authenticity, or other basis for the admission into evidence in any criminal or judicial proceeding;

6) With respect to any information, testimony, documents, records or other tangible evidence provided to the government pursuant to this Agreement, FirstEnergy Corp. consents to any and all disclosures to other governmental authorities of such materials as the government, in its sole discretion, shall deem appropriate.

7) Promptly report any evidence or allegation of a violation of U.S. criminal law by FirstEnergy Corp. to the USAO-SDOH. On the date that the Term expires, FirstEnergy Corp., by its Chief Executive Officer and Chief Financial Officer, will certify to the government that FirstEnergy Corp. has met its disclosure obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by FirstEnergy Corp. to the executive branch of the United States for purposes of 18 U.S.C. § 1001.

FirstEnergy Corp.'s cooperation pursuant to this paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege, settlement privilege, or attorney work product doctrine; however, FirstEnergy Corp. must provide to the government a log of any information or cooperation that is not provided based on an assertion of law, regulation, privilege, or attorney work product, and FirstEnergy Corp. bears the burden of establishing the validity of any such assertion.

Failure to provide full, complete, and truthful cooperation as described above will constitute a violation of this Agreement. The parties agree that the USAO-SDOH, in its sole discretion, will determine if FirstEnergy Corp. has violated this Agreement by failing to provide full, complete, and truthful cooperation.

**B.** **Payment of a Monetary Penalty.** FirstEnergy Corp. agrees to pay a criminal monetary penalty totaling $230,000,000. This amount reflects 1) a discount for FirstEnergy Corp.'s substantial remediation, self-reporting, and cooperation as set forth in this Agreement; 2) the collateral consequences of imposition of a greater penalty; 3) and the difficulty of quantifying with precision the benefits resulting from some official action.

Within sixty (60) days of the filing of this Agreement, FirstEnergy Corp. shall pay $115,000,000 to the United States Treasury.

Within sixty (60) days of the filing of this Agreement, FirstEnergy Corp. shall pay $115,000,000 to the Ohio Development Service Agency's Percentage of Income Payment Plan Plus program for the benefit of Ohio electric-utility customers. If the Ohio Development Service Agency's Percentage of Income Payment Plan Plus program is unable or unwilling to accept the funds, FirstEnergy Corp. shall pay the

$115,000,000 to the United States Treasury after consultation with the USAO-SDOH.

Nothing in the Agreement shall be deemed an agreement regarding a maximum penalty that may be imposed in any future prosecution, and the government is not precluded from arguing in any future prosecution that the Court should impose a higher fine, disgorgement, or civil or criminal forfeiture, although the government agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine imposed as part of a future judgment. FirstEnergy Corp. agrees that no tax deduction may be sought in connection with the payment of any part of the monetary penalty, and FirstEnergy Corp. may not seek to recover any portion of the monetary penalty from customers, directly or indirectly. Without the prior approval of the USAO-SDOH, FirstEnergy Corp. shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the monetary penalty amount or any other amount it pays pursuant to any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

The USAO-SDOH agrees, except as provided in this Agreement, that it will not bring any criminal or civil case (except for tax cases, as to which the government does not make any agreement) against FirstEnergy Corp. or any of its present subsidiaries or affiliates relating to any of the conduct described in the attached Statement of Facts, or to conduct self-reported to the USAO-SDOH by FirstEnergy Corp. in the investigation. The government, however, may use any information related to the conduct described in the attached Statement of Facts against FirstEnergy Corp.: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by FirstEnergy Corp. or any of its present or former parents or subsidiaries. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with FirstEnergy Corp. or with any of its present or former parents or subsidiaries.

C.    **Forfeiture.** The USAO-SDOH has determined that it could institute a criminal or civil forfeiture proceeding against the following funds that passed through accounts controlled by FirstEnergy Corp. (the "subject property"):

- Contents of PNC Bank, Account No. ending in 5348, in the name of Partners for Progress Inc. in the amount of $6,366,476.29; and

- Contents of PNC Bank, Account No. ending in 3639, in the name of Partners for Progress Inc. in the amount of $108,960.32.

FirstEnergy Corp. hereby acknowledges that the subject property constitutes or is derived from proceeds traceable to conspiracy to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343, 1346, and 1349, as charged in the Information and set forth in the Statement of Facts; therefore, the subject property is forfeitable to the United States pursuant to Title 18, United States Code, Section 981. FirstEnergy Corp. hereby agrees to settle and does settle all civil and criminal forfeiture claims presently held by the USAO-SDOH against the subject property. FirstEnergy Corp. agrees that the subject property shall be forfeited to the United States pursuant to Title 18, United States Code, Section 981; releases all claims it may have to such property; waives any right to notice of forfeiture it may have under the law; and waives any right it may have to seek remission or mitigation of the forfeiture.

D.    **Transparency in Corporate Contributions.**  Within 30 days of the execution of this Agreement, FirstEnergy Corp. shall publish a list of (1) all payments, if any, made in 2021 to entities incorporated under 26 U.S.C. § 501(c)(4) ("501(c)(4)" entities) and (2) all payments, if any, made in 2021 to entities known by FirstEnergy Corp. to be operating for the benefit of a public official, either directly or indirectly. FirstEnergy Corp. shall update the list on a quarterly basis for the Term of this Agreement. The list shall include the following information:  the entity's name and address, date of contribution, amount of contribution, and purpose of contribution. The list shall be labeled "Corporate Contributions" and accessible on FirstEnergy's webpage (www.firstenergycorp.com). The accessibility of the list is subject to the prior approval of undersigned government counsel.

E.    **Issuance of Public Statement.**  FirstEnergy Corp. shall publish a press release for broad public distribution and posting on FirstEnergy Corp.'s website, which includes the following statement:

> *Central to FirstEnergy's Corp.'s effort to influence the legislative process in Ohio was the use of 501(c)(4) corporate entities. FirstEnergy Corp. used the 501(c)(4) corporate form as a mechanism to conceal payments for the benefit of public officials and in return for official action. FirstEnergy Corp. used 501(c)(4) entities in this way because the law does not require disclosure of donors to a 501(c)(4) and there is no ceiling that limits the amount of expenditures that can be paid to a 501(c)(4) entity for the purpose of influencing the legislative process. This effort would not have been possible, both in the nature and volume of money provided, without the use of a 501(c)(4) entity.*

F.    **Remediation, Corporate Compliance Program, and Reporting.**  FirstEnergy Corp. represents that it has implemented and will continue to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect violations of the U.S. laws throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include accounting, financial reporting,

lobbying, government relations, consulting, and interactions with candidates for public office, public officials, and governmental agencies including, but not limited to, the minimum elements set forth in Attachment B.

FirstEnergy Corp. further represents that it has implemented four broad categories of remedial measures, including: (1) employment consequences for executives and employees who engaged in misconduct, (2) enhancements to Company's compliance program, (3) improvements to the Company's policies and procedures, and (4) monetary remediation to ratepayers. The specific changes implemented include, but are not limited to, the following:

- Establishing an Executive Director role for the Board of Directors, whichsupports the development of enhanced controls and governance policies and procedures;

- Hiring a new Chief Legal Officer, who oversees the Company's Legal and Internal Audit departments;

- Separating the Chief Legal Officer and Chief Ethics/Compliance Officer functions, and hiring a new Chief Ethics and Compliance Officer, who reports directly to the Audit Committee of the Board and administratively to the Chief Legal Officer;

- Working to establishing a culture of ethics, integrity, and accountability at every level of the organization;

- Creating a Compliance Oversight Subcommittee of the Audit Committeeto implement compliance recommendations received from outside counseland enhanced compliance trainings; and

- Reviewing and revising political activity and lobbying/consulting policies, including requiring robust disclosures about lobbying activities.

In order to address any deficiencies in its internal controls, policies, and procedures, FirstEnergy Corp. represents that it will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its internal controls, policies, and procedures regarding compliance with U.S. law. Where necessary and appropriate, FirstEnergy Corp. agrees to adopt a new compliance program, or to modify its existing one, to ensure that it maintains a system of internal controls designed to effectively detect and deter violations of U.S. law. The compliance program will include, but not be limited to, the minimum elements set forth in Attachment B.

**G.** **Public Statements by the Company.** FirstEnergy Corp. agrees that if it or any of its affiliates or subsidiaries issues a press release or holds any press conference in

connection with this Agreement, FirstEnergy Corp. shall first consult the government to determine (1) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters relating to this Agreement; and (2) whether the government has any objection to the release on those grounds.

FirstEnergy Corp. expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for FirstEnergy Corp., make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by FirstEnergy Corp. set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights described below, constitute a violation of this Agreement, and FirstEnergy Corp. thereafter shall be subject to prosecution as set forth below in paragraph 7.

The decision as to whether any public statement contradicting a fact contained in the Statement of Facts will be imputed to FirstEnergy Corp. for the purpose of determining whether it has violated this Agreement shall be at the sole discretion of the USAO-SDOH. If USAO-SDOH determines that a public statement contradicted in whole or in part a statement contained in the Statement of Facts, USAO-SDOH shall so notify FirstEnergy Corp., and FirstEnergy Corp. may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business after notification.

This Agreement does not prohibit FirstEnergy Corp. from raising defenses or asserting affirmative claims in civil litigation or regulatory proceedings relating to the matters set forth in the Statement of Facts, provided that such defenses and claims do not contradict in whole or in part, a statement contained in the Statement of Facts.

This Agreement does not apply to any statement made by any present or former officer, director, employee, or agent of FirstEnergy Corp. in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of FirstEnergy Corp.

H.    **Changes in Corporate Form.**  Except as may otherwise be agreed by the USAO-SDOH and FirstEnergy Corp. in connection with a particular transaction, FirstEnergy Corp. agrees that in the event that, during the  term of any of its obligations under this Agreement, it undertakes any change in corporate form, including applying for bankruptcy protection or if it sells, merges, or transfers business operations that are material to FirstEnergy Corp. as they exist as of the date of this Agreement, whether such transaction is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the USAO-SDOH's ability to determine there has been a breach under this

Agreement is applicable in full force to that entity. FirstEnergy Corp. agrees that the failure to include this Agreement's violation provisions in the transaction will make any such transaction null and void.

FirstEnergy Corp. shall provide notice to the USAO-SDOH at least sixty (60) days prior to the consummation of any such sale, merger, transfer, or other change in corporate form. The USAO-SDOH shall notify FirstEnergy Corp. at least fifteen (15) days prior to the consummation of such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term FirstEnergy Corp. engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the USAO-SDOH may deem it a violation of this Agreement pursuant to the violation provisions of this Agreement. Nothing herein shall restrict FirstEnergy Corp. from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the USAO-SDOH.

6. **<u>Obligations of the USAO (Deferred Prosecution)</u>:** In consideration of: (a) FirstEnergy Corp.'s past and future cooperation as described above; (b) FirstEnergy Corp.'s payment of a monetary penalty of $230,000,000; (c) FirstEnergy Corp.'s adoption and maintenance of remedial measures, and review and audit of such measures, including the compliance undertakings described in Attachment B; and (d) other obligations specified in this Agreement, the USAO-SDOH agrees to request that the United States District Court for the Southern District of Ohio defer proceedings on the charge in the Information pursuant to Title 18, United States Code, Section 3161(h)(2), for the Term of this Agreement.

The USAO-SDOH further agrees that if FirstEnergy Corp. fully complies with all of its obligations under this Agreement, the government will not continue the criminal prosecution against FirstEnergy Corp. described in Paragraph 1. Within thirty (30) days of the successful completion of the Term, FirstEnergy's obligations pursuant to paragraphs 5 (B), (C) (E) and (F) will end. FirstEnergy's remaining obligations under paragraph 5 will continue until the completion of any investigation, criminal prosecution, or civil proceeding brought by the USAO-SDOH related to any conduct set forth in the Statement of Facts. Within 30 days of the completion of any related investigation, criminal prosecution, and civil proceeding, the USAO-SDOH shall seek dismissal of the Information filed against FirstEnergy Corp., which will terminate the remainder of FirstEnergy Corp.'s obligations under this Agreement.

The USAO-SDOH further agrees, if requested to do so, to bring to the attention of governmental and other authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, and the nature and quality of FirstEnergy's cooperation and remediation. By agreeing to the provide this information, if requested to do so, the USAO-SDOH is not agreeing to advocate on behalf of the FirstEnergy Corp., but rather is agreeing to provide facts to be evaluated independently by other authorities.

7. **Violation of the Agreement:** If the USAO-SDOH determines that FirstEnergy Corp. (a) committed any crime under U.S. law during the Term of this Agreement; (b) at any time, provided in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with a disclosure of information about individual culpability – even if the USAO-SDOH becomes aware of such conduct after the Term of this Agreement; or (c) otherwise violated its obligations under this Agreement – even if the USAO-SDOH becomes aware of the violation after the Term of this Agreement, at the USAO-SDOH's discretion, FirstEnergy Corp. shall thereafter be subject to prosecution for any federal criminal violation of which the USAO-SDOH has knowledge, including the charges in the Information described in Paragraph 1. Any such prosecution may be premised on information provided by FirstEnergy Corp. prior or subsequent to the signing of this Agreement. In addition, the parties agree as follows:

A. **Determination of Violation.** The parties agree that the USAO-SDOH has the sole discretion to determine whether FirstEnergy Corp. has violated this Agreement.

B. **Statute of Limitations.** Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against FirstEnergy Corp. notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the period described above in Paragraph 3 plus one year. Thus, by signing this Agreement, FirstEnergy Corp. agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the period described in Paragraph 3 plus one year.

In addition, FirstEnergy Corp. agrees that the statute of limitations as to any violation of U.S. law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the government is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

C. **Written Notice.** In the event the government determines that FirstEnergy Corp. has breached this Agreement, the government agrees to provide FirstEnergy Corp. with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, FirstEnergy Corp. shall have the opportunity to respond to the government in writing to explain the nature and circumstances of such breach, as well as the actions FirstEnergy Corp. has taken to address and remediate the situation, which explanation the government shall consider in determining whether to pursue prosecution of FirstEnergy Corp.

D. **Admissibility of Statements.** In the event that the government determines that FirstEnergy Corp. has breached this Agreement: (1) all statements made by or on behalf of FirstEnergy Corp. or its affiliates or subsidiaries to the government or to the Court, including the attached Statement of Facts, and any testimony given before a grand jury, a court, or any tribunal, or at any legislative hearings, and any leads or evidence derived from such statements or testimony, shall be admissible in evidence in

any criminal proceeding brought by the government against FirstEnergy Corp. or its affiliates or subsidiaries; and (b) FirstEnergy Corp. or its affiliates or subsidiaries shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of FirstEnergy Corp. or its affiliates or subsidiaries prior or subsequent to this Agreement, or any leads or evidence derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, FirstEnergy Corp. or its affiliates or subsidiaries, will be imputed to FirstEnergy Corp. for the purpose of determining whether FirstEnergy Corp. has violated any provision of this Agreement shall be in the sole discretion of the government.

8. **Limitations of Agreement:** This agreement is binding upon FirstEnergy Corp. and the USAO-SDOH and does not bind (a) other components of the Department of Justice, (b) other federal agencies, (c) any state or local law enforcement or regulatory agency. However, the USAO-SDOH will bring the cooperation of FirstEnergy Corp. and its compliance with its obligations under this Agreement to the attention of any such authorities or agencies if requested to do so by FirstEnergy Corp.

9. **Notice:** Any notice to the government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, addressed to the United States Attorney's Office for the Southern District of Ohio, 221 East Fourth Street, Suite 400, Cincinnati, OH 45213. Any notice to FirstEnergy Corp. shall be given by personal delivery, overnight delivery by a recognized delivery service, addressed to Chief Executive Officer, FirstEnergy Corp., 76 South Main Street, Akron, OH 44308, with Copy to the Chief Legal Officer, FirstEnergy Corp., 76 South Main Street, Akron, OH 44308.

10. **Entire Agreement:** This agreement, along with any attachment(s), is the complete agreement between the parties. It supersedes all other promises, representations, understandings, and agreements between the parties. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the government, the attorneys for FirstEnergy Corp., and a duly authorized representative of FirstEnergy Corp.

VIPAL J. PATEL
Acting United States Attorney

*Emily N. Glatfelter / Matthew C. Singer*
EMILY N. GLATFELTER
MATTHEW C. SINGER
Assistant United States Attorneys

## CORPORATE OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for FirstEnergy Corp. I understand it, I voluntarily agree to it, on behalf of FirstEnergy Corp. Before signing this Agreement, I consulted outside counsel for FirstEnergy Corp. Counsel fully advised me of the rights of FirstEnergy Corp., of possible defenses, of the applicable Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I also carefully reviewed the terms of this Agreement with the FirstEnergy Corp. Board of Directors. I have advised and caused outside counsel for FirstEnergy Corp. to advise the Board of Directors fully of the rights of FirstEnergy Corp., of possible defenses, of the applicable Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement. I acknowledge, on behalf of FirstEnergy Corp., that I am completely satisfied with the representation of counsel.

By signing below, I certify that no promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or any other person authorized this Agreement on behalf of FirstEnergy Corp., in any way to enter into this Agreement. I also certify that I am an officer of FirstEnergy Corp. and that I have been duly authorized by FirstEnergy Corp. to execute this Agreement on behalf.

July 20, 2021
_____
Date

_____
Steven E. Strah, President & CEO
FIRSTENERGY CORP.

## CERTIFICATE OF COUNSEL

We are counsel for FirstEnergy Corp. in the matter covered by this Agreement. In connection with such representation, we have examined carefully the relevant FirstEnergy Corp. records and have discussed the terms of this Agreement with Steven E. Strah, President & Chief Executive Officer, and the FirstEnergy Corp. Board of Directors. Based upon our review of the foregoing matters and discussions with FirstEnergy Corp. and its Board of Directors, we are of the opinion that the representative of FirstEnergy Corp. has been duly authorized to enter into this Agreement on behalf of FirstEnergy Corp. and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of FirstEnergy Corp. and is a valid and binding obligation of FirstEnergy Corp.. Further, we have carefully reviewed the terms of this Agreement with the FirstEnergy Corp. Board of Directors and the Chief Executive Officer of FirstEnergy Corp. We have fully advised them of the rights of FirstEnergy Corp., of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of FirstEnergy Corp. to enter into this Agreement, based on the authorization of its Board of Directors, is an informed and voluntary one.

July 20, 2021
Date

Stephen G. Sozio
James R. Wooley
Adam Hollingsworth
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Phone: +1.216.586.3939
sgsozio@jonesday.com
jrwooley@jonesday.com
ahollingsworth@jonesday.com
*Attorneys for FirstEnergy Corp.*

## ATTACHMENT A:
## STATEMENT OF FACTS

*The United States and FirstEnergy Corp. stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. They further stipulate and agree that these are not all of the facts that the United States would prove if this case had proceeded to trial.*

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of Ohio and FirstEnergy Corp. FirstEnergy Corp. hereby agrees and stipulates that the following information is true and accurate. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible for the acts of its current and former officers, directors, employees, and agents. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible for the conduct set forth below.

FirstEnergy Corp. is an Akron, Ohio–based public utility holding company. During the relevant period (2016 until in or about February 2020), FirstEnergy Corp. was the parent company to entities involved in energy generation, including the entity formerly known as FirstEnergy Solutions ("FES"). As of November 16, 2016, FES had a separate and independent Board of Directors from FirstEnergy Corp., and on March 31, 2018, FES filed for Chapter 11 bankruptcy protections. FirstEnergy Corp. also serves as the parent company for FirstEnergy Service Company ("FirstEnergy Service"), which provided financial and other corporate support services to FirstEnergy Corp. and its subsidiaries.

FirstEnergy Corp. and its subsidiaries are subject to civil enforcement by the Securities and Exchange Commission ("SEC"), and are regulated directly by the Federal Energy Regulatory Commission ("FERC"), which is an independent agency within the United States Department of Energy ("DOE"). FirstEnergy Corp.'s Ohio utility subsidiaries are regulated directly by the Public Utilities Commission of Ohio ("PUCO").

## I.    Relevant Entities and Individuals

Executive 1 served in senior executive positions for FirstEnergy Corp. and FirstEnergy Service from approximately 2015 to October 2020.

Executive 2 served in a senior executive position from approximately 2011 until October 2020.

Partners for Progress, Inc. was incorporated in Delaware on or about February 6, 2017, weeks after certain FirstEnergy Corp. senior executives traveled with Public Official A on the FirstEnergy Corp. jet to the presidential inauguration in January 2017.  On or about February 8, 2017, Partners for Progress registered as a foreign nonprofit corporation in Ohio, specifically as a 501(c)(4) entity "to engage in activities consistent with those permitted of an organization exempt from tax under Section 501(c)(4) of the Internal Revenue Code…."

Although Partners for Progress appeared to be an independent 501(c)(4) on paper, in reality, it was controlled in part by certain former FirstEnergy Corp. executives, who funded it and directed its payments to entities associated with public officials.  For example, FirstEnergy Corp. executives directed the formation of Partners for Progress and decided to incorporate the entity in Delaware, rather than Ohio, because Delaware law made it more difficult for third parties to learn background information about the entity.  Certain FirstEnergy Corp. executives were also involved in choosing the three directors of Partners for Progress, two of whom were FirstEnergy Corp. lobbyists.  Before Partners for Progress was formally organized, Executive 2 directed that $5 million be designated for an unnamed 501(c)(4) in December 2016.

FirstEnergy Corp. exclusively funded Partners for Progress through payments from FirstEnergy Service, which totaled approximately $25 million between 2017 and 2019, approximately $15 million of which was paid to Generation Now.  Certain former FirstEnergy

Corp. executives directed Partners for Progress to make payments in 2018, 2019, and 2020, including payments to Generation Now, which helped conceal FirstEnergy Corp. as the source of the payments from the public.

Public Official A represented the State of Ohio's 72 District in the Ohio House of Representatives since January 2017. Public Official A served as the Speaker of the Ohio House of Representatives from January 7, 2019 to July 30, 2020.

Between 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES) to Generation Now – a purported 501(c)(4), which FirstEnergy Corp. knew was operated for the benefit of and controlled by Public Official A, upon its inception in early 2017. For example, on March 7, 2017, Individual A emailed wiring instructions for Generation Now to Executive 2, noting that "*[t]his is the organization that [Executive 1] and [Public Official A] discussed.*" In response, Executive 2 forwarded the email internally, and carbon copied Individual A, stating, "*Let's do $250,000 asap and we will do $1M by year-end 2017.*" Similarly, on August 1, 2017, Executive 2 asked, "*Are we at $500k for the c(4) now?*" to which Individual A replied, "*Yes.*"

Public Official B was the Chairman of the Public Utilities Commission of Ohio ("PUCO") from April 2019 until November 21, 2020, when he resigned. PUCO regulates FirstEnergy Corp.'s Ohio utility subsidiaries. Prior to serving as the Chairman of PUCO, Public Official B worked for a private law firm and served as the general counsel for an industrial group of energy users whose interests often conflicted with FirstEnergy Corp.'s interests. Public Official B also was the sole owner of Company 1 and Company 2, both of which entered a contract with FirstEnergy Corp. in 2010. Public Official B, through Company 1, also entered into a consulting services agreement with FirstEnergy Corp., through FirstEnergy Service, in 2013. Between 2010 and January 2, 2019,

FirstEnergy Corp. paid the Company 1 and Company 2 over $22 million, including $4,333,333, which was wired on or about January 2, 2019, through FirstEnergy Service to Company 1 for Public Official B's benefit.

## II.    Conduct

FirstEnergy Corp., through the acts of its officers, employees, and agents, conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit.

FirstEnergy Corp. paid millions of dollars to Public Official A through his 501(c)(4), Generation Now, in return for Public Official A pursuing nuclear legislation for FirstEnergy Corp.'s benefit in his capacity as a public official. Use of 501(c)(4) entities was central to the scheme because it allowed certain FirstEnergy Corp. executives and co-conspirators to conceal from the public the nature, source, and control of payments to and for the benefit of Public Official A.

FirstEnergy Corp. paid $4.3 million dollars to Public Official B through his consulting company in return for Public Official B performing official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose.

Primary among FirstEnergy Corp.'s priorities was the passage of nuclear legislation. FirstEnergy Corp. sought official action from Public Official A and Public Official B in the form of helping draft nuclear legislation that would further the interests of FirstEnergy Corp. and FES and by pressuring and advising public officials to support nuclear legislation for FirstEnergy Corp.'s and FES's benefit. FirstEnergy Corp. prioritized nuclear legislation in part because of the

"decoupling" provision in House Bill 6 that was pursued by FirstEnergy Corp., along with FirstEnergy Corp.'s interest in bailing out the Ohio nuclear plants. The decoupling provision allowed FirstEnergy Corp.'s Ohio electric distribution subsidiaries to receive a fixed amount of distribution-related revenue from residential and commercial customers based on the 2018 collection period, which was a year of high electricity sales for FirstEnergy Corp. In addition, the decoupling provision enacted by House Bill 6 allowed FirstEnergy Corp. to continue to recover lost distribution revenue ("LDR") in a fixed amount based on its 2018 LDR recovery, despite the elimination of energy efficiency programs in House Bill 6. Decoupling therefore would guarantee FirstEnergy Corp.'s Ohio electric distribution subsidiaries a fixed amount of revenue by tying its distribution revenue to the 2018 level and continued collection of LDR.

FirstEnergy Corp. also relied on Public Official B to help FirstEnergy Corp. address its concern that the future earning power of its Ohio utility subsidiaries would be negatively impacted by the rate distribution case scheduled for 2024. The electric security plan ("ESP") that FirstEnergy Corp. and its relevant entities were operating under—ESP IV—was set to terminate in 2024, at which time FirstEnergy Corp. would be required to file a new rate case. FirstEnergy Corp. believed that the expiration of ESP IV and filing of the new rate case in 2024 would result in decreased revenue and negatively impact FirstEnergy Corp.'s financial outlook, and therefore, sought a "*fix for the Ohio hole.*" In November 2019, under Public Official B's leadership, PUCO terminated the requirement of FirstEnergy Corp.'s Ohio electric distribution subsidiaries to file a new rate case in 2024.

### A. Relevant Background

In 2016, FirstEnergy Corp. reported a bleak outlook with respect to its energy generation business. In its November 2016 Form 10-Q, FirstEnergy Corp. reported a weak energy market,

poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear

energy affiliate, FES. FirstEnergy Corp. announced future options for its generation portfolio as

follows:  legislative and regulatory solutions for generation assets; asset sales and plant

deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its

affiliates involved in nuclear generation. FirstEnergy Corp. repeated these options in its 10-K filed

on February 21, 2017 and reported a "*substantial uncertainty as to FES' ability to continue as a*

*going concern and substantial risk that it may be necessary for FES, and possibly FENOC, to seek*

*protection under U.S. bankruptcy laws, which would have a material adverse impact on*

*FirstEnergy's and FES' business, financial condition, results of operations and cash flows.*"

FirstEnergy Corp. further noted that,

> *[b]ased upon continued depressed prices in the wholesale energy and capacity markets, weak demand for electricity and anemic demand forecasts, FES' cash flow from operations may be insufficient to repay its indebtedness or trade payables in the long- term. Although management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory type solution, the obligations and their impact to liquidity raise substantial doubt about FES' ability to meet its obligations as they come due over the next twelve months and, as such, its ability to continue as a going concern.*

During FirstEnergy Corp.'s fourth-quarter 2016 earnings conference call on February 22,

2017, Executive 1 focused on legislative and regulatory efforts:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*

> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long- term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

In 2017 and 2018, FirstEnergy Corp. attempted to seek relief for its nuclear power generation facilities through a federal solution for its energy generation business. To further a federal solution, certain FirstEnergy Corp. executives met with federal officials and hired consultants with close connections to federal officials to lobby and assist in securing official action to subsidize the nuclear and coal plants through DOE action and the FERC rulemaking process. FirstEnergy Service also approved a $5,000,000 wire to a 501(c)(4) entity connected to federal official(s), on or about May 1, 2017, shortly after hiring a consultant with close connections to those federal official(s).

By the fall of 2018, FirstEnergy Corp. believed the federal government may not take FirstEnergy Corp.'s requested action. Accordingly, while FirstEnergy Corp. continued conversations about a potential federal solution, they focused on a state solution to save the Ohio nuclear power plants.

## B. Public Official A

### *The State Solution for the Nuclear Plants*

At the same time FirstEnergy Corp. had been pursuing a federal solution for its Ohio nuclear power plants, FirstEnergy Corp. was pursing state legislation in Ohio to save the power plants through help from Public Official A, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017, which failed to gain the support necessary for passage before Public Official A became Speaker in 2019. For example, on or about November 5, 2016, Executive 1 told Individual B,

"*Pass on to [Public Official A]. When we were talking on Weds I told him there was gonna be a sense of urgency but couldn't tell him all the details. If we don't move on some type of supplant in first half of 2017 it will be too late. These plants will be shut, sold, or bankrupt. I don't have any contact info for him.*"

Central to FirstEnergy Corp.'s state solution strategy was payments for Public Official A's benefit to Generation Now, which was Public Official A's 501(c)(4), as Public Official A pursued the Ohio House Speakership. The FirstEnergy Corp. payments began in 2017, as Public Official A began executing his strategy to regain the Speakership. This was consistent with the strategy that Executive 2 had outlined in an internal presentation, explaining that 2017 political contributions are "*strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation*" and that FirstEnergy Corp.'s "*preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from.*" The presentation noted that "*the bulk of our contribution decisions are to c(4)s.*"

In furtherance of its strategy, in 2017, FirstEnergy Corp., through FirstEnergy Service, wired $1,000,000 to Generation Now consisting of four quarterly payments for Public Official A's benefit, following Public Official A's trip to Washington D.C. with certain FirstEnergy Corp. executives for the inauguration. These payments were intended to contribute to Public Official A's power and visibility for the speakership and allowed him to support other candidates who would in turn support his speakership.

In return, FirstEnergy Corp. expected and intended that Public Official A and his team would further FirstEnergy Corp.'s efforts to save the power plants. Throughout 2017, FirstEnergy Corp. executives discussed with members of the Public Official A team ways in which Public

Official A could assist with FirstEnergy Corp.'s efforts to save the nuclear power plants.

FirstEnergy Corp. continued to contribute to Generation Now to assist Public Official A in winning the speakership but changed its method of payment in 2018. Rather than send the money directly from FirstEnergy Service to Generation Now, the FirstEnergy Corp. payments came from Partners for Progress, which had been fully funded by FirstEnergy Corp. On or about March 15, 2018 – two weeks before FirstEnergy Corp. subsidiaries filed for bankruptcy protection and FirstEnergy Corp. requested emergency action from the Department of Energy – FirstEnergy Corp. wired $300,000 from Partners for Progress to Generation Now for Public Official A's benefit. Four days before the payment, Executive 1 met with Public Official A to "*[d]iscuss Speaker race and votes needed.*" Likewise, certain FirstEnergy Corp. executives wired $100,000 from Partners for Progress to Generation Now on or about May 4, 2018, four days before the Ohio primary election.

FirstEnergy Corp. also sent approximately $400,000 for Public Official A's benefit, at Public Official A's request, through another 501(c)(4) in late April 2018, which through a series of transactions ultimately paid approximately $400,000 for media benefiting Public Official A before the May 2018 primary.

FirstEnergy Corp. continued to fund Public Official A's campaign for Speaker leading up to the fall 2018 election. On August 5, 2018, Executive 1 asked Executive 2, "*[Is] [Public Official A] looking for more money?*" to which Executive 2 responded, "*You know the answer to the [Public Official A] question, but I don't know for how much he'll ask. I'll get a list from [Ohio Director of State Affairs] as to the House races he's most interested in winning and I'll have something for you as to what fepac is doing in those races. He'll want hard money first and then C(4) money for sure. I'll be back to you today.*" Later that day, Executive 2 followed up and said, "*[Public Official A] wants to hear about us – status of company, what's important to us this year*

and next year. Money will come up – help with key races and C(4)." Following a meeting involving Executive 1 and Public Official A, on or about August 16, 2018, FirstEnergy Corp. wired $500,000 from Partners for Progress to Generation Now for Public Official A's benefit.

A few weeks later, on or about August 24, 2018, Executive 1 and Executive 2 arranged for Public Official A to attend a presidential roundtable, during which Public Official A would ask whether Federal Official 1 intended to fix FirstEnergy Corp.'s issues at the federal level. Public Official A told Ohio Director of State Affairs, "*I simply said [Federal Official 1], I'm [Public Official A] former Ohio Speaker and I was planning on discussing this in the Roundtable but the acoustics were horrible. He said yes they were – I couldn't really hear much of anything – I then stated that his support in replacing the CPP was beneficial to Ohio but we need more in order for our zero emissions nuclear plants and coal fired facilities to remain an important part of our overall energy solution. He then stated that he had put a plug in it and now plans to fix it.*" Public Official A reported the same information to Executive 1, explaining that "*I opted to talk to him during the photo opt one on one*" and that "*He said they plan on fixing it.*" The following exchange then occurred:

> Executive 1: "*Got it. Thanks for the help*!"
>
> Public Official A: "*Thank you for your help.*"
>
> Executive 1: "*We are rooting for you and your team!*"
>
> Public Official A: "*I'm rooting for you as well . . . we are on the same team*"

In October 2018, FES paid Generation Now another $500,000 for Public Official A's benefit – $400,000 of which was hand-delivered to Public Official A during an in-person meeting on or about October 10, 2018. On October 2, 2018, about a week before the payment, Executive 2 told Executive 1, "*I know you know this, but this is where companies and people get in political*

*trouble – everyone is in a rush and they all need a ton of hel$p. Let me gather everything. I'll bring it to you and you/we can decide.*" On October 10, 2018, the day of the meeting, Executive 1 texted Executive 2, "*FES meeting with Public Official A today. I told him to be nice but listen to us.*" Executive 2 replied, "*He'll learn about the $400k at this mtg.*" Executive 1 then responded, "*They better get it done quick or he won't be able to spend it.*" Following the meeting, Public Official A thanked Executive 1 via text for the money from FES, stating, "*$400k… thank you.*"

In addition to the $500,000 directly from FES to Generation Now in October 2018, FirstEnergy Corp. made a $500,000 electronic transfer of funds to Dark Money Group 1 for Public Official A's benefit on October 29, 2018, a few days before the November election. This funds transfer occurred after Public Official A traveled to Akron to meet with Executive 1 on October 23, 2018.

Following the October 23, 2018 meeting, FirstEnergy Corp., through Executive 1 and Executive 2, also persuaded other energy-interested companies to send payments to Dark Money Group 1 to support Public Official A. For example, following the meeting with Public Official A, Executive 2 texted Executive 1, "*I talked to [Company Executive C]. He's going to contribute $100k to our effort with [Dark Money Group 1]. As for your [ ] Friday morning message to [CEO of Company B]: . . . I met with [Public Official A] a few days ago. We believe in [Public Official A] and think he can and will be Ohio's next Speaker. That's important to all of us. He has a need for a final push. We've committed $700k to the effort and I'd like to ask for your help with $100k.*" A few days later, on October 26, 2018, Executive 2 asked Executive 1 if he could call CEO of Company B "*on the [Public Official A] $100k matter?*" Executive 1 responded, "*I'm on it.*" Executive 2 texted Executive 1 later the same day indicating that Company B is going to do "$100k." Executive 1 responded that "[*Company B Executive*]" should "*take credit with Public*

*Official A too*" and later that day indicated that "*the money has already been wired.*" In total, following Public Official A's October 23, 2018 trip to Akron to meet with Executive 1, the following payments were made to Dark Money Group 1:

| | | | |
|---|---|---|---|
| October 26, 2018 | $100,000 | wire | Company B |
| October 29, 2018 | $500,000 | EFT | FirstEnergy Service |
| October 29, 2018 | $100,000 | check | CEO of Company C |

The day before the November 2018 general election, Executive 1 texted Public Official A, asking, "*24 hours left. How's it looking*?" Public Official A responded, "*I am encouraged by the House races. Unless this blue wave shows up in the some races – I think we look great.*"

On November 7, 2018, the day after the election, Executive 1 texted Public Official A and asked, "*How did your candidates do*?" Public Official A responded that "*we were a net -4.*" Public Official A told Executive 1 that "*I literally need 1 more vote for Speaker.*" Executive 1 asked if Public Official A was "*counting [Representative 11] or not?*" and stated that, "*I'll make sure it happens.*" Later that day, Public Official A asked Executive 1 "*if you would just ask [Individual C] to set up a meeting w me and engage in getting this Spkrs race worked out [sic] so the way we want it. That would be perfect. Need him to focus.*" Executive 1 responded, "*On it.*"

FirstEnergy Corp.'s plan to fund Public Official A-approved House races through payments to Generation Now to help get Public Official A elected Speaker in return for introducing nuclear legislation was successful. On January 7, 2019, the Ohio House of Representatives selected Public Official A as Speaker. The day of his election, Public Official A texted Executive 1: "*[t]hank you for everything it was historical.*" In a separate text exchange that day, Individual C texted Executive 1, Executive 2, and two FE lobbyists, "*Congrats [Executive 1] and [Executive 2]. Big win in Ohio Speaker vote*," and then, "*2019 could be FE's year.*" Executive 1 responded,

"*Hate to say this but we still need to get DOE help for plants so we can use Ohio to help the parent.*"

### Passage of House Bill 6

Following Public Official A's election as Speaker, FirstEnergy Corp. executives and representatives worked directly with Public Official A in drafting the nuclear legislation leading up to House Bill 6's introduction in the House. FirstEnergy Corp. sought the nuclear legislation both for the interests of its subsidiaries, including FES, and to further the interests of the FirstEnergy Corp. parent company.

From when House Bill 6 was introduced in April 2019 to October 2019, FirstEnergy Corp. worked directly with FES to support Public Official A through payments to Generation Now with the intent and for the purpose that, in return, Public Official A would take specific official action relating to the passage of House Bill 6 and the defeat of the ballot referendum initiative to overturn House Bill 6. FirstEnergy Corp. paid the money to Public Official A through Generation Now intending to influence and reward Public Official A in connection with passage of House Bill 6 and defeating the ballot referendum.

During that period, FES paid over $40 million through wire transfers to Generation Now for Public Official A's benefit, while FES was involved in bankruptcy proceedings. In addition, FirstEnergy Corp. paid over $13 million through wire transfers from Partners for Progress to Generation Now during this period.

Money paid from FirstEnergy Corp. to Generation Now in April 2019 through October 2019 was intended to benefit Public Official A; was intended to help Public Official A in his campaign to pressure and advise public officials to support passage of House Bill 6; and was intended to help Public Official A's efforts to defeat the ballot referendum, which included a plan

to pass alternate legislation if the proponents of the ballot referendum gained enough signatures to put the repeal of House Bill 6 on the ballot for a referendum. Certain FirstEnergy Corp. executives knew that the money paid to Generation Now was controlled by Public Official A and was for Public Official A's benefit to use as he directed. Public Official A and his team instructed how much money to pay into Generation Now to further their efforts to pass House Bill 6 and to defeat the ballot referendum. A purpose of the Generation Now ads was to provide legislators with the necessary cover to support House Bill 6.

For example, following opponent testimony in a House subcommittee that challenged House Bill 6 on April 23, 2019, Executive 2 told Executive 1, "*Today was opponent testimony. Went long. Expected stuff. Tell [Public Official A] to put his big boy pants on. Ha.*" Later that day, Executive 1 forwarded Executive 2 the content of a message from Public Official A that read, "*I hope FES is ready for a fight because the first shot was fired at us tonight. Nobody screws with my members … my name ain't [Representative 10] or [Representative 1]. I asked [Individual D] to make ads this morning.*" Executive 1 then texted Executive 2, "*FES Needs [sic] to pay for these ads*," explaining, "*they can spend some money on the real fight.*" Executive 1 later texted Public Official A, "*I will be pushing FES to engage,*" and then followed up, "*I'll talk to FES tomorrow about paying for [the ads.] What kind of budget.*" Public Official A responded, "*I'll find out – I'd like to blister Columbus and eastern Ohio where the shale play is.*"

The next day, Executive 1 texted Public Official A, "*Spoke to FES creditor rep. They will step in and help.*" Public Official A responded that he is having breakfast with Individual A to discuss and will call Executive 1 after they meet. Public Official A responded to Executive 1, "*I may want to run things past [Individual A] to make sure [Individual D] doesn't overcharge. I'm cheap.*" Executive 1 replied to Public Official A, "*OK. I would say you are a bargain – not cheap.*"

On May 1, 2019, FES Executive A texted Executive 2, "*Can someone change the Generation Now website so it looks more like our positive commercial? Less conventional power plants, more blue skies, fields and some wind turbines.*" Executive 2 responded, "*[FES Executive A] – don't disagree, but remember, you're just the bank for these spots. They're not yours if you know what I mean. You change them, and they're yours – along with the criticism and results.*"

Specific official action by Public Official A relating to the passage of House Bill 6 included helping draft the nuclear bailout legislation at FirstEnergy Corp.'s and FES's direction and pressuring and advising other public officials to take official action to support the nuclear legislation. While House Bill 6 was pending, FirstEnergy Corp. sought from Public Official A specific official action in the form of pressuring and advising other officials to support the "decoupling" provision supported by FirstEnergy Corp. and to support an extension of the term of the nuclear subsidy duration to ten years.

For example, on April 15, 2019, three days after Public Official A introduced House Bill 6, Executive 2 emailed Executive 1 and several other FirstEnergy Corp. executives and employees about "*talking points*" for "*educating legislators*" relating to the "*decoupling language which we proposed be included in the recently-introduced Ohio Clean Energy Bill (House Bill 6).*" In the same email chain, Executive 2 made clear that the decoupling language in House Bill 6 was the result of coordination with the Speaker's office.

In a May 4, 2019 text message, Public Official A told Executive 1 he needed information about FirstEnergy Corp. "*[a]s I begin to enter into the 'all out war' part of the HB 6 debate,*" so that Executive 1 could help Public Official A "*shap[e] an argument*" in gaining support for House Bill 6.

On June 27, 2019, while House Bill 6 was pending in the Senate, Public Official A texted Executive 1 that "*House / Senate negotiations are occurring.*" Executive 1 responded, "*Negotiate hard. 10 years and decoupling back in*!" Public Official A then replied, "*10 years?*"; "*[FES Executive B] told me $148M for 6yrs was what was necessary.*" Executive 1 then responded, "*I was told you knew about it. They fucked up. You'll be fighting this same issue in 5 years because they will not be able to take it public without more years.*" Executive 1 later told Public Official A, "*You don't want to have to deal with this twice as Speaker.*"

On July 13, 2019, Executive 1 texted Executive 2 and FES Executive A that he told Public Official A "*why 10 years is a must*" and Public Official A is "*on board with pushing HB6 to 10 if he can.*"

On July 16, 2019, FES Executive A texted Executive 1 and Executive 2, "*Speaker is saying he needs at least a little help from Governor to get our years increased.*" The next day, FES Executive A again texted Executive 1, "*House doesn't have quite enough votes,*" to which Executive 1 responded, "*[Public Official A]  is negotiating. I'm in the loop.*" Later that day, Executive 1 texted Executive 2, "*Some big concessions by the speaker on the budget. Hopefully he did a little horse trading along the way.*" That day, Executive 2 texted Executive 1 and FES Executive A, "*HB 6 passed Committee (with decoupling). 9-4 vote. No additional years for FES – 7 years.*" HB 6 then went back to the House for a vote on the Senate's amendments to the bill, and Executive 2 texted Executive 1, "*Now I'm hearing the Speaker is scrambling for one vote.*"

On July 17, 2019, FES Executive A pleaded to Executive 1 that, "*If we only end up w the 7 years I will do exactly as you say, which is say thank you and go back to my nose on the grindstone,*" but, FES Executive A continued, "*[t]hat said, is there anything we can do to get another year or 2? If that is not feasible and all hope is lost, can we get a 2 or 3 year extension*

*option at year 7? We could base it on some type of test of whether FERC has given subsidies etc.*"
Executive 1 responded FES Executive A: "*[State Official 2], [Public Official B], [Company C Executive] and [Official Aide 1] are fighting to the end and we've been talking to them all day. Conference on budget is ongoing and Speakers [sic] delegation is gonna try to negotiate budget movement for tenure on HB6. Everything that can be done is being done. If we don't get it, we work to pass an addendum as soon as [Senator 3] is out.*"

On July 23, 2019, the day that House Bill 6 was signed into law with the decoupling provision included, Executive 2 texted Executive 1 a screenshot showing House Bill 6 passing with 51-38 votes, and the following conversation occurred:

> Executive 2: *Boom! Congrats. This doesn't happen without ceo leadership.*
>
> Executive 2: [Image of House vote]
>
> Executive 1: *We made a bbiiiiiiig bet and it paid off. Actually, 2 big bets. Congrats to you and the entire team! See if [name] has any Pappy and we'll all head to Columbus tonight.*
>
> Executive 2: *Huge bet and we played it all right on the budget and HB 6 – so we can go back for more!*
>
> Executive 2: *No party tonight. We are going to plan one with the Speaker later.*
>
> Executive 2: *You should call the Speaker today.*
>
> Executive 1: *Already texted him…*

### Defeating the Ballot Referendum

FirstEnergy Corp. and FES agreed to pay millions of dollars to Public Official A through payments to Generation Now in return for and in connection with Public Official A's efforts to defeat the ballot referendum, which included specific official action by Public Official A. Specific official action agreed to included efforts by Public Official A to have House Bill 6 interpreted as a "tax" such that it could not be challenged through a ballot referendum under law; and, if the ballot initiative gained enough signatures to put the referendum of House Bill 6 on the ballot, to

advance alternate legislation by Public Official A, to include making clear that House Bill 6 was a tax and thus could not be challenged through a ballot referendum.

For example, on July 16, 2019, prior to passage of House Bill 6, Executive 2 texted Official Aide 1 that he "*[j]ust remembered some language added late to House version to help make it harder to challenge via referendum. Speaker worked with fes on it. Senate probably took it out and now folks want it back in.*"

On July 24, 2019, FES Executive A texted to Executive 2: "*[Individual H], [FES Executive C] and myself are point on referendum. He has a mtg w [sic] Speaker on it tomorrow. I am talking to Speaker later today . . .*" Executive 2 later responded, "*I'm very concerned about the referendum.*" FES Executive A replied, "*We are taking [Public Official A's] lead on fighting the referendum.*" FES Executive A replied further, "*Am I supposed to go against what [Public Official A] is telling us to do?*" Two days later, Executive 2 texted FES Executive A, "*I had a good conversation with [Public Official A] today re: the referendum issue. I think you're in excellent hands. I know more about his personal involvement and engagement. We should all be following his lead. I know you/fes are and we will as well.*"

On September 4, 2019, Executive 2 told Executive 1 he intended to take steps to convince another Ohio public official to publicly state that House Bill 6 was a tax because, under Ohio law, a tax would not be subject to a ballot referendum. In response, Executive 1 texted Executive 2, "*We should check with [Public Official A] to make sure he's on board with this before we step in. He seemed pretty confident in his referendum strategy and plans to pass it as a tax in a new bill if they get enough signatures. Just want to make sure he agrees.*"

To further the scheme, FirstEnergy Corp. used Partners for Progress, a 501(c)(4) controlled

by and operating for the benefit of FirstEnergy Corp., to conceal payments to Public Official A. In October 2019, FirstEnergy Corp. paid $10 million (October 10, 2019) and $3 million (October 22, 2019) to Generation Now for Public Official A's benefit by first wiring the money through Partners for Progress rather than paying the money to Generation Now directly. FirstEnergy Corp. paid the $13 million at Public Official A's and FES's request, knowing and with the intent that the money was in return for Public Official A's efforts to defeat the ballot referendum and ensure House Bill 6 became law, to include specific official action for alternate legislation if the ballot referendum received enough signatures to get on the ballot.

For example, on October 9, 2019, Executive 1 texted FES Executive A, "*Just got word the $ is being wired today. $10M.*" Executive 1 told Executive 2, "*I did speak with Public Official A and he says they need it and will spend it. Talked to him about future and he says the future is now. He understands it's not our issue and truly appreciates the support.*" In exchange for Executive 1's agreement to wire the $10 million to Public Official A, FES Executive A promised Executive 1 that FES would pay additional funds in connection with the transfer of real estate to FirstEnergy Corp. after FES's bankruptcy.

On October 19, 2019, a few days before the ballot referendum's signatures were due, Executive 1 texted Executive 2 and FES Executive B, "*Just spoke to the big guy. He's got the 'tax' bill ready to go and believes he's got [Senator 3] on board….*" FES Executive B responded, "*That is good news. Having both [Public Official A and Senator 3] on board and ready is critical for us next week to be ready to deal with the outcome of the signatures and the court.*" Executive 2 also texted Executive 1, "*I wish we had this state and federal team in place when we first started our generation push. Darn it.*"

On October 23, 2019, Executive 1 texted FES Executive A: "*You are a worrier but then*

it's a pretty big deal. For what it's worth [State Official 3] and [Public Official A] think it's game over. But that's private conversation unless they've told you the same thing. And [Public Official A] has a 'quick fix' anyway." Executive 1 went on, "*he and I have been chatting too. More about raising him $$$$.*"

### Public Official A's Term Limit Ballot Initiative

In February 2020, Public Official A and his team approached FirstEnergy Corp. about funding a ballot initiative championed by Public Official A, which would change Ohio law to increase term limits for Ohio public officials. The term limit initiative would allow Public Official A to potentially remain in power as Speaker for up to sixteen additional years, which would give Public Official A additional time as Speaker to further FirstEnergy Corp.'s interests through official action.

For example, on February 28, 2020, Executive 1 and Individual B had the following conversation:

> Executive 1: . . . . *Talked to Speaker today. He's an expensive friend*
>
> Individual B: *I did not know what he wanted to talk to you about.*
>
> Executive 1: *His term limit initiative. 16 years lifetime max in legislature starting when it passes. No need to switch houses. But after 16 your [sic] done for good.*
>
> Individual B: *I think it's a great idea especially if he stays there*
>
> Executive 1: *He told me he'll retire from there but get [sic] a lot done in 16 more years.*
>
> Individual B: *Probably more than five previous Speakers combined*
>
> Individual B: *He will make Ohio great again*
>
> Executive 1: *Yep*

The next day, Executive 1 texted Public Official A, "*Work with [Individual A] on ballot initiative? You coming up for Home Opener?*" Public Official A responded, "*Yes. I haven't thought much about Opening Day yet.*" Executive 1 later texted Public Official A, "*[Executive 2] is contacting [Individual A] to do 2 early next week,*" to which Public Official A responded, "*Very much appreciated.*" In text message exchanges the next day, Executive 2 stated, "*On Monday/Tuesday of next week, we are hoping to do a $2M contribution from our C(4) to Generation Now*"; and "*[w]e are going to make a significant contribution to Generation Now from Partners for Progress next Monday/Tuesday.*" Executive 2 stated in a subsequent message that Public Official A's term limit initiative "*extends and stabilizes existing leadership – good for the home team.*"

On March 2, 2020, FirstEnergy Corp. paid $2 million to Public Official A by wiring the money from FirstEnergy Corp.'s 501(c)(4), Partners for Progress, to Public Official A's 501(c)(4), Generation Now, to advance Public Official A's term limits initiative.

### C. Public Official B

#### *FirstEnergy Corp.'s Consulting Agreement with Public Official B*

Prior to December 2018, FirstEnergy Corp. made payments to Public Official B pursuant to agreements with Public Official B through Company 1. The payments were made from FirstEnergy Service to Company 1's bank account, in part, for Public Official B's benefit.

A 2013 consulting agreement was subsequently amended in 2015. The 2015 amendment coincided with and was made in exchange for Public Official B's industrial group withdrawing its opposition to a 2014 PUCO Electric Security Plan settlement package involving FirstEnergy Corp.'s Ohio electric distribution subsidiaries. The amended agreement called for an increase in

Public Official B's retainer and supplemental payments through 2024. Although the amended agreement does not appear to have been executed, from 2015 through June 2018, FirstEnergy Corp. paid into the Company 1 account pursuant to the terms of the agreement with Public Official B. Invoices from Company 1 were structured to bypass FirstEnergy Corp.'s Level of Signature Authority levels for purposes of internal approval of the payments.

In January 2019, Public Official B received a payment of $4,333,333, which represented the remaining payment amounts designated in the amended consulting agreement from 2019 through 2024. FirstEnergy Corp. was under no legal obligation to make the payment at that time.

### *Public Official B as PUCO Chairman*

FirstEnergy Corp. paid the entire $4,333,333 to Company 1 for Public Official B's benefit with the intent and for the purpose that, in return, Public Official B would perform official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose.

In December 2018, Public Official B discussed the $4,333,333 payment with Executive 1 and Executive 2. For example, on December 17, 2018, Public Official B emailed Executive 2 and others the announcement stating that PUCO was seeking applications for a commissioner. The next day, on December 18, 2018, Executive 1 and Executive 2 met with Public Official B at Public Official B's condominium. During the meeting at Public Official B's condominium, Executive 1, Executive 2, and Public Official B discussed the remaining payments under the consulting agreement and Public Official B's candidacy for the open PUCO chair position.

The next day, Public Official B texted Executive 1 and Executive 2 detailing the remaining payments under his consulting agreement with FirstEnergy Corp. from 2019 to 2024. The

payments totaled $4,333,333. Public Official B added, "*Thanks for the visit. Good to see both of you,*" to which Executive 2 responded immediately, "*Got it, [Public Official B]. Good to see you as well. Thanks for the hospitality. Cool condo.*"

Later that day, Executive 1 texted Public Official B and Executive 2, "*We're gonna get this handled this year, paid in full, no discount. Don't forget about us or Hurricane [Executive 1] may show up on your doorstep! Of course, no guarantee he won't show up anyway.*" Executive 1 then attached an image of a venomous snake protruding from a hurricane. Public Official B replied, "*Made me laugh – you guys are welcome anytime and any whereI [sic] can open the door. Let me know how you want me to structure the invoices. Thanks.*" Public Official B then added, "*I think I said this last night but just in case – if asked by the administration to go for the Chair spot, I would say yes.*"

After meeting with Public Official B in December 2018 to discuss the payout and Public Official B's candidacy for PUCO Chairman, certain FirstEnergy Corp. executives pushed to have Public Official B appointed as the PUCO Chairman. Under Ohio law, PUCO consists of five public utilities commissioners appointed by the governor with the advice and consent of the senate. The governor must designate one commissioner to be chairperson of PUCO, who serves at the governor's pleasure. PUCO commissioners are selected from a list of individuals submitted to the governor by the public utilities commission nominating council. FirstEnergy Corp. executives' efforts to have Public Official B appointed as PUCO Chairman included working directly to advance the appointment of Public Official B as PUCO Chairman so that Public Official B could further FirstEnergy Corp.'s interests in that role through official action. FirstEnergy Corp.'s plan was for Public Official B to be appointed to the open seat as PUCO Chair and another individual appointed to a second projected opening on PUCO.

On January 2, 2019, FirstEnergy Service wired the $4,333,333 to Public Official B's Company 1 bank account. That same day, Executive 2 texted Executive 1:

> *[Executive 1] - this text came to me this morning from [Public Official B]. His mtg with Gov.-elect is this Friday and I suspect, absent any problem, things will go down as we've discussed, with [Individual E] getting [PUCO Official 1]'s seat as soon as [PUCO Official 1] leaves. In any event, pls see [Public Official B]'s mssg re: meeting with us soon in Akron.*

> *[Executive 2], I would like to come to Akron on 1/10, 1/11, 1/14 or 1/15 to get a better understanding of the "hole" (size, shape, life expectancy and so on). Also, I would like to discuss a couple concepts that I landed on after our recent meeting. If [Executive 1] is available to discuss concepts, that would be a plus. If none of the above days work, get me a couple that do, please.*

Executive 1 responded with a date and time for meeting Public Official B, then stated: "*So you're saying [Public Official B] as Chair and [Individual E] on later?*" Executive 2 replied, "*That's their plan, but nothing certain until [Public Official B]'s meeting. Four people in [State Official 1] world, you, [Public Official B] and I know about this.*"

Later that day, Executive 2 and Executive 1 discussed the upcoming meeting between Executive 1, Executive 2, and Public Official B further. Executive 2 asked Executive 1, "*Is there anyone internally you'd like to include? I'll ask him about his location preference. My guess is that he's on point to figure out what we need and to report back as to how it should be/could be fixed.*" Executive 1 replied, "*I think just you and me. Don't want too many on the inside right now. That's probably his preference also.*" Executive 2 then forwarded a text from Public Official B: "*From [Public Official B]. Probably best if it is you and [Executive 1]. If more is required, I can follow up. I don't think that we will get into the weeds. That can come once we get comfortable with a conceptual framework.*"

On January 14, 2019, Executive 2 texted Executive 1 about the "*Ohio hole*," "*extending*

our *ESP*," among other things. Executive 2 then texted Executive 1 about the timing of what would become House Bill 6: "*[Public Official B] was talking about the number of weeks needed for him to coalesce parties on the broad construct of an energy bill. Before introduction.*" According to Executive 2, Public Official B estimated "*the 6 to 8 week time frame to pull together (not necessarily pass) the legislative component assumes that the new administration makes the appointment ASAP and runs from the date of the appointment.*"

On January 18, 2019, Executive 1 texted Executive 2, "*…Once [Public Official B] is announced, we need him to help with [Individual E]. Sounds like he already did but will need more.*" Executive 2 responded, "*[Individual F] told me that once [Public Official B] is in, [State Official 1] will lean on him on everything including who should be the next commissioner.*"

On January 28, 2019, at the same time certain FirstEnergy Corp. executives were lobbying to have Public Official B appointed PUCO Chair, Executive 2 texted Executive 1 about a solution to the Ohio "hole" and an update on Public Official B's nomination: "*[Executive 1] – [Individual G] and I just finished a good meeting with [Public Official B] on the way to solve the 2024 issue. No one internal knows we met with him.*" Executive 1 responded, "*Any word on his status?*" Executive 2's reply indicated he spoke with State Official 2 and, "*no decision but that he had a great conversation with Gov this morning.*"

Days later, Executive 2 and Executive 1 became concerned that Public Official B would need to pull out of the PUCO selection process because a disclosure in connection with an FES bankruptcy filing indicated that Company 1 had received payments from FES. In response to the news, Executive 1 lamented in a text message to Executive 2 on January 31, 2019, "*Great. Now we have none on the list.*" Executive 2 responded, "*This is awful.*" Executive 1 then texted, "*Back to legislative fix for Ohio hole.*"

Later that day, however, their concern dissipated as Public Official B cleared the selection process. Executive 2 texted Executive 1, "*Nominating Council has been delayed and is now in Executive Session.*" Executive 2 later texted Executive 1, "*That bullet grazed the temple.*" Executive 1 responded, "*Forced [State Official 1]/[State Official 2] to perform battlefield triage. It's a rough game.*" Minutes later, Executive 2 forwarded an email that read, "*[Public Official B] got the most votes.*" Executive 1 texted Public Official B the next day, "*Most of the media coverage is very fair. There will be some shots take but that's inevitable. Hang in there til it's done and it will quiet quickly.*"

The plan to get Public Official B appointed PUCO chairman was successful. On February 4, 2019, Public Official B's selection as the Chairman of PUCO was announced. That day Executive 1 texted Company C Executive, "*Now work on the [Public Official B]/[Individual E] parlay. Once [Public Official B] is in he'll help with [Individual E] and my Speaker friend will too.*" The next day, Executive 1 texted Public Official B, "*Congratulations!*" Public Official B responded, "*Thanks, [Executive 1] – the last four days have been tuff.*" Public Official B went on, "*Thanks goes to some great good friends.*"

The day Public Official B's confirmation as PUCO became public, Company C Executive texted Executive 1: "*Let's try not to fuck this up*," while attaching an article announcing Public Official B was selected as the next PUCO Chair.

On or about February 13, 2019, Executive 2 told Public Official B, "*[Executive 1] is meeting with [Public Official A] today*" and asked him, "*Anything you think [Executive 1] should raise?*" Public Official B responded that "*We need coordination between executive and legislative branches to get sensible stuff over the goal line. Absent that, the current polarization will pull everything under.*"

*Official Action by Public Official B*

After his appointment as PUCO Chairman, Public Official B performed official action, including acts related to House Bill 6 and the elimination of FirstEnergy Corp.'s requirement to file a new base rate case in 2024, furthering FirstEnergy Corp.'s specific legislative and regulatory interests at the direction of and in coordination with certain FirstEnergy Corp. executives, as FirstEnergy Corp. requested and as opportunities arose.

For example, with respect to House Bill 6, on June 28, 2019, Executive 2 texted Executive 1, "*Just heard from [Public Official B].. [sic] decoupling looks good.*" Executive 2 explained to FES Executive A on July 10, 2019, that Public Official B told Executive 2 regarding the "*audit issue*": "*I am engaged and hope I can help.*" Executive 2 went on, "*Having [Public Official B] engaged is key. He doesn't use the word lightly.*"

On July 11, 2019, Executive 2 texted Executive 1: "*[Executive 1] – I had a long talk with [Public Official B] last night about audit language. He is mtg today with [Senator 4] and Senate Counsel. We have a good plan to help. Just wanted u to know your team is engaged and helping – and we will get it if we can keep fes from negotiating against themselves.*"

On July 13, 2019, Executive 2 texted Executive 1 that he heard from Public Official B regarding "*the audit*" language, explaining, "*[Public Official B] thinks he has it nailed and the language works. Confidentially, [FES Executive B] agrees.*"

On July 16, 2019, Executive 2 and Executive 1 texted relating to the status of House Bill 6 and the budget. The conversation went as follows:

> Executive 2: *Budget conferees are meeting now - so the budget looks to be good to go (or they wouldn't be meeting). Our SEET language is in the bill. Still awaiting word on HB6 but our intel is that [Official Aide 1], [State Official 2] and [Public Official B]*

*are still trying to get fes some more years.*

Executive 1: *Decoupling?*

Executive 2: *Will be offered tomorrow by [Senator 5] with help from [Senator 6]. Stupid they're making her offer it, but we are convinced there's no monkey business. It's greased.*

About a week later, on July 23, 2019, House Bill 6 passed the legislature with the decoupling provision advocated by FirstEnergy Corp. That day, Executive 1 sent to Public Official B a photo-shopped image of Mount Rushmore with the face of Public Official B, alongside Executive 2, Ohio Director of State Affairs, and Company C Executive, imposed over the four presidential faces with the caption, "*HB 6 FUCK ANYBODY WHO AINT US.*" Public Official B commented that his picture was smaller than the others and then responded, "*funny.*"

In addition, at FirstEnergy Corp.'s request and direction, Public Official B performed official action to fix FirstEnergy Corp.'s "Ohio hole" through a PUCO opinion eliminating the requirement that FirstEnergy Corp.'s Ohio electric distribution subsidiaries file a new base rate case when ESP IV ended in 2024.

For example, on November 5, 2019, Executive 1 texted to Executive 2 an article published that day, in which Morgan Stanley projected low growth for FirstEnergy Corp. because of "*a rate case review in 2024.*" In his note accompanying the article, Executive 1 told Executive 2, "*Here's the MS down grade due to the 'Ohio hole.'*"

On November 10, 2019, Executive 1 texted Company C Executive, "*And, the FE rescue project is not over. At EEI financial conference. Stock is gonna get hit with Ohio 2024. Need [Public Official B] to get rid of the 'Ohio 2024' hole.*" A few days later, on November 15, 2019, Executive 2 texted Executive 1, "*I spoke with [Public Official B] today. Told me 2024 issue will be handled next Thursday (November 21).*" Executive 2 later texted, "*he's going to make the*

requirement to file go away, but I do not know specifically how he plans to do it."

On November 21, 2019, Executive 2 texted Executive 1, "*Today is our day for action on the 2024 issue.*" Executive 1 suggested that Public Official B make a "*public statement*" about the ruling, to which Executive 2 responded, "*On it.*" Later that day, PUCO issued a ruling that FirstEnergy Corp.'s Ohio electric distribution subsidiaries were no longer required to file a new rate distribution case in 2024. Executive 2 later texted Executive 1 the PUCO decision, which highlighted the following language from the Opinion and Order: "*we find that it is no longer necessary or appropriate for the Companies to be required to file a new distribution rate case at the conclusion of the Companies' current ESP.*"

Pursuant to House Bill 6, part of FirstEnergy Corp.'s revenue would have been decoupled at least until its next base distribution rate case, which was scheduled for 2024. The November 21, 2019 decision by PUCO eliminated FirstEnergy Corp.'s Ohio electric distribution subsidiaries' requirement to file its new rate distribution case at the conclusion of ESP IV in 2024. The November 21, 2019 PUCO decision addressed the 2024 "Ohio hole" by extending the time before the FirstEnergy Ohio utility subsidiaries were required to file a base rate case.

On November 22, 2019, approximately a day after PUCO's rate case policy change benefitting the energy company, and the day after news of the decoupling rider application became public, Executive 1 thanked Public Official B via text message. Specifically, Executive 1 texted Public Official B an image showing FirstEnergy Corp.'s stock increase with a note that stated, "*Thank you!!*" Public Official B responded, "*Ha – as you know, what goes up may come down. [Name] helped. Thanks for the note. Spoke to [name] last night.*" Executive 1 replied, "*Every little bit helps. Those guys are good but it wouldn't happen without you. My Mom taught me to say Thank you,*" to which Public Official B replied, "*Thanks.*"

On January 15, 2020, a few months later, it appeared that another commissioner would be appointed to PUCO in 2020. Public Official A texted Executive 1, "*Who do you like for this PUCO board appointment.*" That evening, Executive 1 texted Public Official A's message to Executive 2: "*Who do you like for this PUCO board appointment*"; Executive 1 followed up, "*Got this from [Public Official A] a little while ago.*" Executive 1 then texted, "*But I think [Public Official B] wants the incumbent D re-upped because he's very cooperative with [Public Official B].*" Executive 1 later told Executive 2, "*Tell [Public Official B] [Public Official A] asked me I [sic] my response was whoever [Public Official B] wants.*"

Executive 1 then texted Public Official A back as follows: "*[PUCO Official 2] is the commissioner who's up this April. [Public Official B] likes [PUCO Official 2]. [Public Official B] has been outstanding. Approved our decoupling filing today and got a 5-0 vote including [PUCO Official 2], even though Staff bureaucrats wanted to modify HB 6 language.*" Public Official A responded, "*Very good.*" Public Official A then stated, "*I need to have my appointee to make recommendation for Gov. I will take care of it tomorrow.*"

In a March 4, 2020 text message exchange about possible future favorable action by Public Official B, Executive 1 summarized official action already performed by Public Official B at the request of FirstEnergy and stated: "*He will get it done for us but cannot just jettison all process.*" After describing certain acts taken by Public Official B, Executive 1 explained that there is "*a lot of talk going on in the halls of PUCO about does he work there or for us? He'll move it as fast as he can. Better come up with a short term work around.*"

As set forth in the Corporate Officer's Certificate, I am duly authorized to execute this Agreement on behalf of FirstEnergy Corp. I have read the Statement of Facts and have carefully reviewed it with counsel for FirstEnergy Corp. and FirstEnergy Corp.'s Board of Directors. On behalf of FirstEnergy Corp., I acknowledge that the Statement of Facts is true and correct.

July 20, 2021
Date

Steven E. Strah, President & CEO
FIRSTENERGY CORP.

July 20, 2021
Date

Stephen G. Sozio
James R. Wooley
Adam Hollingsworth
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Phone: +1.216.586.3939
sgsozio@jonesday.com
jrwooley@jonesday.com
ahollingsworth@jonesday.com
*Attorneys for FirstEnergy Corp.*

## ATTACHMENT B:
## CORPORATE COMPLIANCE PROGRAM

Recognizing the remedial measures undertaken by FirstEnergy Corp. set forth in the Deferred-Prosecution Agreement, FirstEnergy Corp. agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures and to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with U.S. law.

Where necessary and appropriate, FirstEnergy Corp. agrees to modify its compliance program, including internal controls, compliance policies, and procedures to ensure that it maintains an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts, as well as policies and procedures designed to effectively detect and deter violations of U.S. law. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of FirstEnergy Corp.'s existing internal controls, compliance code, policies, and procedures:

### *High-Level Commitment*

1.      FirstEnergy Corp. will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of U.S. law and its compliance code.

### *Policies and Procedures*

2.      FirstEnergy Corp. will develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. law, which policy shall be memorialized in a written compliance code.

3.      FirstEnergy Corp. will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. law and FirstEnergy Corp.'s compliance code, and FirstEnergy Corp. will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of U.S. law by personnel at all levels of FirstEnergy Corp. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties including consultants and lobbyists acting on behalf of FirstEnergy Corp. FirstEnergy Corp. shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

4.      FirstEnergy Corp. will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts. This system should be designed to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

5.      FirstEnergy Corp. will ensure that all contributions made to entities incorporated under 26 U.S.C. § 501(c)(4) ("501(c)(4)" entities) and all payments to entities operating for the benefit of a public official, either directly or indirectly, are reviewed and approved by a compliance officer trained to ensure such payments comport with company policy and U.S. law.    In addition, the amount, beneficiary, and purpose of all such contributions and payments must be reported to the Board on a quarterly basis.

6.      FirstEnergy Corp. will ensure that lobbying and consultant contracts are reviewed and approved by a compliance officer trained to evaluate whether the purpose of the contracts and payments made pursuant to the contracts comport with company policy and U.S. law.

7.      FirstEnergy Corp. will ensure that its written compliance code prohibits billing and payment practices used to subvert internal controls.

### Periodic Risk-Based Review

8.      FirstEnergy Corp. will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of FirstEnergy Corp.  FirstEnergy Corp. shall review these policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### Proper Oversight and Independence

9.      FirstEnergy Corp. will assign responsibility to one or more senior corporate executives of FirstEnergy Corp. for the implementation and oversight of FirstEnergy Corp. compliance code, policies, and procedures. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, FirstEnergy Corp.'s Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Training and Guidance

10.      FirstEnergy Corp. will implement mechanisms designed to ensure that its compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where appropriate, agents and business partners including consultants and lobbyists. These mechanisms shall include:  (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance, and government relations), and, where appropriate, agents and business partners including consultants and lobbyists; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners certifying compliance with the training requirements.

11.      FirstEnergy Corp. will maintain, or where necessary establish, an effective

system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners including consultants and lobbyists, on complying with FirstEnergy Corp.'s compliance code, policies, and procedures, including when they need advice on an urgent basis.

### Internal Reporting and Investigation

12.     FirstEnergy Corp. will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners including consultants and lobbyists concerning violations of U.S. law or FirstEnergy Corp.'s compliance code, policies, and procedures.

13.     FirstEnergy Corp. will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. law or FirstEnergy Corp.'s compliance code, policies, and procedures.

### Enforcement and Discipline

14.     FirstEnergy Corp. will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

15.     FirstEnergy Corp. will institute appropriate disciplinary procedures to address, among other things, violations of U.S. law and FirstEnergy Corp. compliance code, policies, and procedures by FirstEnergy Corp.'s directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. FirstEnergy Corp. shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program is effective.

### Mergers and Acquisitions

16.     FirstEnergy Corp. will develop and implement policies and procedures for mergers and acquisitions requiring that FirstEnergy Corp. conduct appropriate risk-based due diligence on potential new business entities.

17.     FirstEnergy Corp. will ensure that FirstEnergy Corp. compliance code, policies, and procedures regarding U.S. law apply as quickly as is practicable to newly acquired businesses or entities merged with FirstEnergy Corp. and will promptly train the directors, officers, employees, agents, and business partners consistent with Paragraph 5 of the Deferred Prosecution Agreement on FirstEnergy Corp.'s compliance code, policies, and procedures.

*Periodic Reviews and Testing*

18.     FirstEnergy Corp. will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of U.S. law and FirstEnergy Corp.'s code, policies, and procedures, taking into account relevant developments in the field and evolving industry standards.

# ATTACHMENT C:
## REPORTING REQUIREMENTS

FirstEnergy Corp. agrees that it will report to the U.S. Attorney's Office for the Southern District of Ohio (the "government") periodically, at no less than twelve-month intervals during a three-year term, regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment B. During this three-year period, FirstEnergy Corp. shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

    a.    By no later than one year from the date this Agreement is executed, FirstEnergy Corp. shall submit to the government a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve its internal controls, policies, and procedures for ensuring compliance with U.S. law, and the proposed scope of the subsequent reviews. The report shall be transmitted to the following representatives of the government, unless other instructions are provided by the government:

> Assistant U.S. Attorneys Emily N. Glatfelter and Matthew C. Singer
> U.S. Attorney's Office for the Southern District of Ohio
> 221 East Fourth Street, Suite 400
> Cincinnati, OH 45213

FirstEnergy Corp. may extend the time period for issuance of the report with prior written approval of the government.

    b.    FirstEnergy Corp. shall undertake at least two follow-up reviews and reports, incorporating the views of the government on its prior reviews and reports, to further monitor and assess whether its policies and procedures are reasonably designed to detect and prevent violations of U.S. law.

    c.    The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the government. The second follow-up review and report shall be completed and delivered to the government no later than thirty days before the end of the Term.

    d.    The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the government determines in its sole discretion that disclosure would be in furtherance of the government's discharge of its duties and responsibilities or is otherwise required by law.

    e.    FirstEnergy Corp. may extend the time period for submission of any of the follow-up reports with prior written approval of the government.

# Exhibit C

FOCUSED ON OUR FUTURE



ANNUAL REPORT   **First*Energy***

# 2020 FINANCIAL HIGHLIGHTS

## KEY ACCOMPLISHMENTS

- Paid annualized dividend of $1.56 per common share consistent with dividend policy.
- Provided three-year dividend growth: $1.44 in 2018; $1.52 in 2019; $1.56 in 2020.
- Invested $1.15 billion in 2020 to modernize our transmission system as part of our *Energizing the Future* initiative.
- Invested $1.76 billion in our distribution system in 2020.

## FINANCIALS AT A GLANCE

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| **TOTAL REVENUES** (in millions) | $11,261 | $11,035 | $10,790 |
| **BASIC EARNINGS PER SHARE** (GAAP) | $1.99 | $1.70 | $1.99 |
| **OPERATING EARNINGS PER SHARE** (non-GAAP*) | $2.59 | $2.58 | $2.39 |
| **DIVIDENDS PAID PER COMMON SHARE** | $1.44 | $1.52 | $1.56 |



**CAPITAL SPEND** (in $ millions)

**TRANSMISSION RATE BASE** (in $ millions)

**DISTRIBUTION RATE BASE** (in $ millions)

*See non-GAAP Financial Measures information on the inside back cover of this report.

**On the cover:** Alex Greathouse, line worker, installs automated reclosing devices on Penn Power lines to help limit the frequency and duration of service interruptions for customers.

# A MESSAGE TO OUR SHAREHOLDERS

In 2020, our company continued its strong operational performance and advanced our regulated growth strategy. We also established new goals for key areas of our business that support our mission to be a forward-thinking electric utility powered by a diverse team of employees committed to making customers' lives brighter, the environment better and our communities stronger.

At the same time, we encountered unprecedented challenges. Our employees demonstrated flexibility and resiliency in adapting to the COVID-19 pandemic while continuing to serve our customers safely. Our company, employees and communities also confronted the impact of ongoing racial injustice and social unrest across the country.

In addition, our Board of Directors implemented significant senior leadership changes last year, including the removal of five executives, as a result of an internal investigation related to the ongoing governmental investigations into FirstEnergy. These critical changes, among other decisive actions, enabled us to begin the process of rebuilding trust with our stakeholders and placed FirstEnergy on the right path forward.

As part of the changes to our senior leadership team, I was named acting CEO in October 2020, and then I was named CEO and elected as a member of the Board in March 2021. I am honored by the Board's confidence in me. Since beginning as a meter reader with The Illuminating Company years ago, I have worked in many different areas of our business, and I care deeply about our employees and the future of this company.

Under my leadership, and with guidance from our Board and support from our Executive Council, we are intently focused on fostering a culture of compliance, ethics and integrity. As part of that effort, we have appointed strong new leaders, both at the board and executive levels, who are actively engaged with our existing leaders in creating an environment where not only our words, but our actions, align with our core values and behaviors. We are also working to centralize and strengthen our compliance model and ensure that every employee understands their responsibility to consistently act in accordance with our core values and behaviors anywhere in the organization.

We are making significant changes in our approach to governmental affairs engagement, as well. Our participation in the political process will be much more limited than it has been in the past, with closer alignment to our strategic goals and more robust oversight and disclosure of the company's advocacy going forward.

Our Board and senior leadership team also remain focused on advancing our strategy and business priorities in a way that reflects the culture we are working to instill at FirstEnergy. Toward that end, our FE Forward initiative, launched in December 2020, is designed to re-evaluate our policies, practices and processes and make improvements to how we work and make decisions – including ensuring that we foster trust, transparency and integrity. By optimizing operations, accelerating our digital transformation and improving productivity, FE Forward intends to enhance customer and shareholder value and improve our credit profile. This effort is expected to transform FirstEnergy in a way that provides near-term value while opening new opportunities for long-term growth.



**Steven E. Strah**
President and CEO

Over the past year, our company has rallied in response to the pandemic, and our employees – working remotely and in the field – have excelled in their new circumstances. In addition, our business model and rate structure continued to provide stability during the pandemic and economic slowdown. We have not experienced significant disruptions in our supply chain or workforce, and we successfully completed approximately $3 billion in transmission and distribution investments last year as we continued our service reliability and modernization programs to benefit customers.

Our long-term regulated growth strategy is proving successful, and the fundamental drivers of our business remain intact. Our strong execution of this strategy continued in 2020, and we remain confident about the significant investment opportunities intended to drive solid earnings and growth in the years ahead.

We are proactively addressing a range of uncertainties created by the ongoing Department of Justice and Securities and Exchange Commission investigations by implementing a comprehensive

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

flexibility. This includes work being done as par

1



JCP&L line worker, Vanessa Patterson, helps deliver reliable electricity to our customers.

of FE Forward to generate capital expenditure efficiencies and working capital improvements and enable a more strategic approach to operating expenditures. We recently shared details about what this program is projected to achieve over the next several years, including $250 million in working capital improvements by 2022 and $300 million in annualized capital expenditure efficiencies by 2024. We look forward to updating you on our progress in the coming months.

Looking ahead, our updated strategic plan will guide our efforts to transform FirstEnergy into a more innovative, diverse and sustainable company. The plan encompasses company goals targeting improvements in many key areas of our business and supporting our vision for the future. For example, we're building a more diverse and inclusive workplace with the aspirational goal of increasing the racial and ethnic diversity of our workforce and leadership by 30% by 2025. We're also creating a more sustainable energy future by working toward carbon neutrality by 2050 and an interim 30% reduction in greenhouse gases within our direct control by 2030.

Our efforts to achieve these and other new goals will lay the groundwork for continued growth in the coming years.

## INVESTING IN OUR ELECTRIC INFRASTRUCTURE

We continue to strengthen our transmission and distribution systems through significant investments designed to improve reliability and support our customers' evolving energy needs.

For instance, we're upgrading and modernizing our transmission system through our multibillion-dollar *Energizing the Future* program. These infrastructure investments are driving measurable performance improvements for our customers, including a 39% reduction through 2020 in equipment-related transmission outages on our ATSI system, which serves our three utility companies in Ohio and our Penn Power utility in western Pennsylvania. Key *Energizing the Future* projects in 2020 included rebuilding and revitalizing sections of our transmission system in our Ohio Edison and Penn Power regions, improving system voltage

extending lines and building new supporting infrastructure in our Met-Ed service area.

We plan to invest up to $1.2 billion in 2021 to continue reliability improvements on our transmission system. Future initiatives will increase network automation, add operational flexibility and make the energy grid more resilient — all of which are key to reliably supporting increased renewable energy sources and enabling a clean energy future. As we make these investments, we're targeting a 20% reduction in Transmission Outage Frequency on 100 kV-and-above lines by 2025, compared to our 2019 baseline.

To support continued investments in our transmission system, we filed an application with FERC to move to forward-looking formula rates for our transmission assets in the Allegheny Power System zone, effective January 1, 2021. This includes transmission assets in our West Penn Power, Mon Power and Potomac Edison territories. In addition, we created a new standalone transmission company, Keystone Appalachian Transmission Company (KATCo), and filed for forward-looking formula rates, also effective

accepted by FERC on December 31, 2020, subject to refund, pending further hearing and settlement proceedings. The approvals mean that 100% of our transmission investments are now recovered through formula rates. We plan to seek regulatory approval to transfer certain transmission assets from West Penn Power and Potomac Edison to the new KATCo affiliate at an appropriate time in the future.

On the distribution side of our business, we are strengthening our system with smart technologies and advanced automation to prepare the grid for the future. For example, we're in the process of executing our three-year *Grid Modernization Plan* in Ohio, which is designed to modernize the distribution system with automated equipment, real-time voltage controls and smart meters. As part of the program, we have installed over 250,000 smart meters across our Ohio service area to enable automated readings and help customers make more informed decisions about their energy usage. We've also implemented more than 300 automated reclosers and voltage-regulating devices to reduce the scope of outages and optimize voltage levels on the system. These improvements are already producing reliability benefits for customers. By using automated reclosers over the seven-month period ended December 2020, we reduced the average outage duration by approximately 19 minutes and eliminated about 619,000 customer minutes of interrupted service. Capital costs associated with the *Grid Modernization Plan* are recoverable through Rider AMI.

In February 2021, we began taking proactive steps to resolve a range of regulatory proceedings affecting our Ohio utilities through comprehensive and transparent discussions with key stakeholders, including our Ohio regulators. As a result of this engagement, we decided not to seek recovery of lost distribution revenues from residential and commercial customers authorized under our current Electric Security Plan through May 31, 2024. This decision builds upon a partial settlement with the Ohio Attorney General to end the collection of decoupling revenues permitted under Ohio House Bill 6. We believe these actions will help us resolve matters in a comprehensive and constructive manner, which is a critical step in demonstrating our commitment to transparency and integrity, rebuilding our relationships with regulators and other stakeholders, and positioning FirstEnergy for the future.

In Pennsylvania, the second phase of our Long-Term Infrastructure Improvement Plans (LTIIP II) will continue through 2024. This $572 million investment accelerates infrastructure improvements in the state to enhance service reliability and minimize the impact of outages for over 2 million Pennsylvania customers. Key projects include installing new automated reclosing devices that help limit the frequency, duration and scope of service interruptions; replacing hundreds of miles of existing power lines with larger, durable wire designed to withstand tree debris and severe weather; and implementing new substation fencing to deter climbing animals and protect against equipment interference that can cause outages.

These targeted LTIIP II investments are making a positive difference for customers. For instance, Met-Ed's projects reduced the frequency of service interruptions from line and equipment failure by about 9% in 2020, compared to 2019. Our four utility companies are currently recovering their LTIIP II investments under the Pennsylvania Public Utility Commission-approved Distribution System Improvement Charges rider.

These and other distribution programs across our six-state service area are designed to upgrade our system and increase service reliability for customers. It is our goal that by 2025, the average customer will see a 5%, or nine-minute, reduction in the duration of service interruptions, compared to our 2019 baseline.

We completed our $97 million *JCP&L Reliability Plus* program in December 2020, on time and on budget. Through this program, we sought to reduce the frequency of power outages, mitigate potential tree damage during severe weather events, and modernize our electric grid to provide additional flexibility and resiliency for the JCP&L system. For instance, we completed vegetation management along more than 1,300 miles of lines and installed over 1,700 automated reclosing devices. In addition, we implemented new distribution automation technology that can automatically detect damage on the system, safely isolate it and reroute power flow, reducing the number of customers out of service until repairs are made. We also installed flood mitigation systems at two JCP&L substations to protect them from potential flooding that can impact substations during storms and cause outages. Recovery of our *JCP&L Reliability Plus* investments was incorporated into the new base rate as a result of the settlement approved by the New Jersey Board of Public Utilities (BPU) in October 2020.

The base rate settlement also accounts for the sale of JCP&L's interest in the Yards Creek pumped-storage hydro generation facility and provides for recovery of storm costs incurred over the past few



We continue to support transportation electrification and advocate for the buildout of electric vehicle (EV) charging infrastructure in our service territory. Toward that end, we're supporting Maryland's goal to have 300,000 zero-emission vehicles on the road by 2025. Through our *EV Driven* program, Potomac Edison is installing utility-owned public charging stations throughout its Maryland service area. Thus far, we have completed the installation of 17 charging stations, including four direct-current fast chargers, which can provide an 80% charge for most EVs in less than an hour, and 13 Level 2 charging stations that accommodate two vehicles simultaneously and deliver 8 to 24 miles of range per hour of charging.

years, as well as increasing costs associated with providing safe and reliable electric service for customers. It includes a $94 million annual increase in distribution revenues based on a 9.6% return on equity. To assist customers during the pandemic, we've delayed implementation of the rate increase until November 2021. Even after the increase, JCP&L customers will still pay the lowest residential rates among New Jersey's four regulated electric distribution companies.

To further support our JCP&L customers, we have filed a plan for an Advanced Metering Infrastructure Program with the BPU. If approved, we would install 1.2 million smart meters and related infrastructure across our New Jersey service area over a three-year period, beginning in 2023. Together with our deployment efforts in Pennsylvania and Ohio, this project will help us reach our companywide goal of installing smart meters for two-thirds of our total customers by 2025.

## BUILDING AN INCLUSIVE AND SUSTAINABLE FUTURE

Although we have faced unprecedented challenges over the past year, we are focused on the future of our company and the opportunities ahead. To chart our path forward, we recently updated our strategic plan and outlined our vision for transforming our culture and becoming a truly sustainable company. We also identified a series of bold companywide goals to support our vision and help us achieve our strategic objectives.

Our ongoing commitment to diversity and inclusion (D&I) remains essential to our forward-looking strategy, and in the wake of our country's widespread response to racial injustice, we are focused on accelerating our D&I progress. Our aspirational goal is to achieve a 30% increase in racially and ethnically diverse employees, both companywide and at the supervisor-and-above leadership level by 2025. Our approach to D&I extends beyond our workforce to include our suppliers, as well. Accordingly, we have also committed to achieving 20% of our supply chain spend with diverse suppliers by 2025. Success in these areas will enable us to better serve our customers, improve operational performance and increase innovation.

We have made significant strides in promoting workplace equity and creating an open and inclusive culture. For the third consecutive year, we have been included in the Bloomberg Gender-Equality Index (GEI) for our investment in gender equality in the workplace and the communities we serve. The GEI measures gender equality across five pillars: female leadership and talent pipeline, equal pay and gender pay parity, inclusive culture, sexual harassment policies and factors like supply chain and community support.

Additionally, our score in the Human Rights Campaign Foundation's Corporate Equality Index – a national benchmarking tool for corporate policies, practices and benefits pertinent to LGBTQ employees – increased from 80 points in 2020 to 90 points in 2021, out of a total possible score of 100. We are encouraged by this recognition and motivated to continue raising the bar for workplace equity to ensure all our employees feel their contributions and opinions are valued.

Environmental stewardship is also a key part of our forward-looking strategy. We believe climate change is among the most important issues of our time, and we're committed to doing our part to ensure



CEI line worker, Ben DeBottis, repairs windstorm damage in the Bay Village, Ohio, area.

## ENVIRONMENTAL STEWARDSHIP

Many of our new companywide goals focus on mitigating our impact on the environment and improving the sustainability of our operations. In addition to executing our climate strategy and targeting carbon neutrality by 2050, we will work to achieve these environmental goals over the next five to ten years:

- **WASTE:** By 2025, we will recycle or beneficially reuse 50% of our wood poles at the end of their useful lives, when they previously would have been landfilled.

- **WATER:** We are targeting a 20% reduction in water consumption at our two coal plants by 2030.

- **VEGETATION:** By 2025, we will create 225 acres of biodiverse pollinator habitats by planting seed mix in the transmission rights-of-way and company properties across our service area.



REUSE
**50%**
OF OUR
WOOD POLES
BY 2025

**20%**
REDUCTION
IN WATER
CONSUMPTION
BY 2030

**225**
ACRES
OF BIODIVERSE
POLLINATOR HABITATS
BY 2025

a bright and sustainable future for the communities we serve. That's why we've pledged to achieve carbon neutrality by 2050, with an interim 30% reduction in greenhouse gases within our direct operational control by 2030, based on 2019 levels.

In 2020, we announced our climate strategy, which will help us achieve our carbon neutral goal and build a more sustainable energy future. Our plan is focused on mitigating risks posed by climate change; reducing greenhouse gas emissions across our transmission, distribution and generation business units; and enabling our customers and communities to thrive in a carbon-neutral economy.

As a key action step in our climate strategy, we're replacing our conventional utility vehicles with electric and hybrid alternatives as we work toward 30% electrification of our light-duty and aerial truck fleet by 2030, and 100% electrification by 2050. To make progress toward our goal, 100% of new vehicle purchases for our light-duty and aerial truck fleet are now electric or hybrid moving forward.

In addition, we plan to execute a thoughtful transition away from our two coal-fired plants in West Virginia by 2050. More near-

generation source of at least 50 megawatts in the state, and we'll be seeking approval for that later this year. We believe our new climate strategy and related goals better reflect our recent transformation to a regulated utility and support our renewed commitment to environmental stewardship.

We're also supporting organizations that enable transformative and sustainable changes in the communities we serve. Because of the hardships created by the COVID-19 pandemic and the events of 2020 that highlighted racial and social injustices impacting our nation, supporting our communities is more vital than ever. We recently launched the FirstEnergy Foundation's new *Investing with Purpose* initiative, which is focused on supporting organizations that advance health and safety, workforce development, educational, and social justice initiatives. The Foundation donated $3.4 million to organizations in December 2020, representing the first round of approximately $7 million in charitable contributions planned as part of the initiative. Grants awarded through *Investing with Purpose* are an additional commitment on top of the company's annual charitable giving, which averages approximately $10 million per year.

In addition, we're dedicated to the prosperity and vitality of our communities through our support of economic development initiatives that create jobs and attract new businesses to our service area. Over the past decade, our economic development efforts have helped attract more than $29 billion in capital investment and create over 95,000 new jobs in our service area. To build on our strong economic development track record, we have set a goal to create $25 billion in cumulative economic impact by 2025.

## STRENGTHENING OUR SAFETY-FIRST CULTURE

We have taken a well-informed, decisive and measured response to the COVID-19 pandemic to protect the health and safety of our employees and the public, while also providing the power our customers rely on every day.

In March of last year, we successfully transitioned more than half of our workforce – about 7,000 employees – to work remotely and implemented preventive measures to keep our essential utility personnel safe on the job. For instance, we divided many field crews into smaller work groups, called pods, to ensure crew members work with the same individuals each day and consistently use

the same vehicle and equipment to limit exposure. We also increased cleaning and disinfecting measures, adjusted work schedules, and relocated job briefs and reporting locations to sites conducive to social distancing. We continue to follow established precautions from the Centers for Disease Control and Prevention and other medical experts, including wearing masks, conducting temperature checks, following social distancing protocols and performing enhanced cleaning when required.

This increased focus on COVID-19 protections has facilitated process improvements in our utility operations and helped drive stronger overall safety performance. In 2020, we achieved a companywide OSHA-recordable injury rate of 0.70, which is fewer than one injury per 200,000 hours worked. This reflects an improvement of 0.28 from 2019. During the year, we also experienced no life-changing events, which are work-related injuries that result in a fatality, require immediate life-saving measures or affect an employee's ability to continue normal activities. To build on this strong safety performance, we will continue to focus on proactively identifying and mitigating employees' exposure to potentially life-changing events.

Our commitment to safety extends beyond our employees into the communities we serve. We are developing a comprehensive public safety program, and as part of that effort, we launched our new *STOP.LOOK.LIVE.* outreach campaign in 2020 to educate the public on how to stay safe around electricity. The campaign targets groups that are most at-risk of encountering safety hazards, such as first responders and contractors, and also features engaging content for school children about electrical safety. *STOP.LOOK.LIVE.* reflects our proactive approach to safety and will help customers and community members identify and avoid potentially dangerous situations.

## MOVING OUR COMPANY FORWARD, TOGETHER

This has been a challenging year for our company, customers and communities. Delivering the energy to power our customers' lives is an important responsibility at any time, but it has been especially vital during the pandemic.

I am proud to be a part of such a talented and dedicated group of employees. Together, we have risen to the challenges we've faced and successfully executed our regulated strategy. Because of our agility and determination, we have again delivered a strong performance in 2020, continued to provide safe and reliable service to our customers, and taken proactive steps to enhance shareholder value.

This past year has also provided an opportunity to rethink how we work and make decisions. We are evaluating the practices and processes in place across FirstEnergy and making improvements that will establish a more open and transparent way of running our company. We are also refocusing on our core values and behaviors, which are essential to living our mission and executing our forward-looking strategy.

These efforts will provide the solid foundation we need to achieve the goals we have set to become a more innovative, diverse and sustainable company. Thank you for your continued support. We look forward to working together toward our vision for the future of FirstEnergy.

Steven E. Strah
President and Chief Executive Officer
March 18, 2021



At FirstEnergy, we are working to increase diversity across our company and establish an inclusive environment where all employees feel respected and valued.



# FIRSTENERGY CORPORATE PROFILE

Headquartered in Akron, Ohio, FirstEnergy is a forward-thinking, fully regulated utility powered by a diverse team of employees committed to making customers' lives brighter, the environment better and our communities stronger. Our subsidiaries are involved in the transmission, distribution and regulated generation of electricity.

Our workforce of approximately 12,000 employees is dedicated to safety, reliability and operational excellence. Our 10 electric distribution companies form one of the nation's largest investor-owned electric systems, based on serving more than 6 million customers in Ohio, Pennsylvania, New Jersey, West Virginia, Maryland and New York. The company's transmission subsidiaries operate approximately 24,000 miles of transmission lines connecting the Midwest and Mid-Atlantic regions.

FirstEnergy subsidiaries control 3,580 megawatts of generating capacity from two regulated coal plants and one pumped-storage hydro facility.

## FIRSTENERGY LEADERSHIP TEAM

**John W. Somerhalder II***
Vice Chairperson and Executive Director

**Steven E. Strah***
President and Chief Executive Officer

**Samuel L. Belcher***
Senior Vice President and President, FirstEnergy Utilities

**Gary D. Benz***
Senior Vice President, Strategy

**Bennett L. Gaines**
Senior Vice President, Corporate Services and Chief Information Officer

**Jason J. Lisowski***
Vice President, Controller and Chief Accounting Officer

**Eileen M. Mikkelsen**
Vice President, Rates and Regulatory Affairs and Acting Vice President, External Affairs

**Hyun Park***
Senior Vice President and Chief Legal Officer

**Irene M. Prezelj**
Vice President, Investor Relations and Acting Vice President, Communications and Corporate Affairs

**K. Jon Taylor***
Senior Vice President and Chief Financial Officer

**Christine L. Walker***
Senior Vice President and Chief Human Resources Officer

*Indicates an Executive Officer of FirstEnergy. More detailed information on the principal occupation or employment of each of FirstEnergy's Executive Officers and the principal business of any organization by which FirstEnergy Executive Officers are employed may be found on page 116 of this report.

## OHIO
Ohio Edison

The Illuminating Company

Toledo Edison

## PENNSYLVANIA
Met-Ed

Penelec

Penn Power

West Penn Power

## WEST VIRGINIA/ MARYLAND
Mon Power

Potomac Edison

## NEW JERSEY
Jersey Central Power & Light

## GENERATING FACILITIES
**Regulated Coal Plants**
1. Fort Martin Power Station
2. Harrison Power Station
3. Bath County



# FIRSTENERGY BOARD OF DIRECTORS

**Michael J. Anderson**
Chairman of the board of The Andersons, Inc. (diversified agribusiness)

**Steven J. Demetriou**
Chairman, chief executive officer and director of Jacobs Engineering Group Inc. (professional services, including consulting, technical, scientific and project delivery)

**Julia L. Johnson**
President of NetCommunications, LLC (regulatory and public affairs firm)

**Jesse A. Lynn**
General counsel of Icahn Enterprises L.P., a diversified holding company engaged in a variety of businesses, including investment, energy, automotive, food packaging, metals, real estate, home fashion and pharma

**Donald T. Misheff**
Non-executive Chairman of the FirstEnergy Corp. Board of Directors. Retired, formerly managing partner of the Northeast Ohio offices of Ernst & Young LLP

**Thomas N. Mitchell**
Chairman of the World Association of Nuclear Operators (nonprofit promoting nuclear safety). Retired, formerly president, chief executive officer and director of Ontario Power Generation Inc.

**James F. O'Neil III**
Chief executive officer and vice chairman of Orbital Energy Group (acquires and develops innovative companies)

**Christopher D. Pappas**
Retired, formerly president and chief executive officer of Trinseo S.A. (plastics, latex and rubber producer)

**Sandra Pianalto**
Retired, formerly president and chief executive officer of the Federal Reserve Bank of Cleveland

**Luis A. Reyes**
Retired, formerly regional administrator of the U.S. Nuclear Regulatory Commission

**John W. Somerhalder II**
Vice Chairperson of the FirstEnergy Corp. Board of Directors and Executive Director

**Steven E. Strah**
President and Chief Executive Officer of FirstEnergy Corp.

**Andrew Teno**
Portfolio manager of Icahn Capital LP, the investment management subsidiary of Icahn Enterprises L.P.

**Leslie M. Turner**
Retired, formerly senior vice president, general counsel and corporate secretary of The Hershey Company

## DEAR SHAREHOLDERS:

In 2020, your company achieved solid operational and financial results, while effectively managing employee and customer safety during the COVID-19 pandemic. At the same time, we took proactive and decisive actions to address the challenges associated with the ongoing governmental investigations, rebuild trust with our stakeholders and position the company for long-term success. We are proud of the resilience and commitment demonstrated by FirstEnergy's employees, especially considering the many changes and challenges that marked the year.

Your Board of Directors and management team are deeply committed to fostering a strong culture of ethics and integrity – one in which compliance is endemic to our organization. To accomplish this, we must ensure that every leader sets the right example and creates an environment where transparent communication is prioritized, and all employees feel empowered to act in accordance with our core values and behaviors.

The steps your Board has taken in this regard include, among others:

• Promptly putting in place a committee of independent directors with independent counsel to oversee an internal investigation and to monitor the status of the various regulatory and legal matters facing the company.

• Acting swiftly in the removal of five executives after the internal investigation discovered conduct inconsistent with our policies and the code of conduct; hiring a chief legal officer, Hyun Park, with extensive legal expertise and energy industry experience; hiring a chief ethics and compliance officer, Antonio Fernández, with significant experience as a compliance executive in the utility and power sectors; establishing an executive director role; and expanding my role as Board chair.

• Endorsing the principle of full cooperation with both the DOJ and the SEC on investigation-related matters while supporting our own thorough internal investigation, led by independent counsel.

• Establishing a sub-committee of the Audit Committee with independent counsel and leading compliance advisors to analyze and improve the corporate compliance policy and culture at FirstEnergy.

• Working with the management team to significantly change FirstEnergy's involvement in governmental affairs and limit our participation in the political process.

• Supporting the management team's efforts to help FirstEnergy become a more resilient, industry-leading organization. This includes FE Forward, a comprehensive project focused on optimizing operations, accelerating the company's digital transformation and improving productivity to provide near-term value while opening new opportunities for longer-term growth.

In addition, we welcomed John W. Somerhalder II as vice chairperson of the Board and executive director in March 2021. John is helping lead efforts to rebuild trust with our external stakeholders and is serving as a member of our Executive Council, in a transitional capacity, to support the senior leadership team's efforts to achieve its priorities and strengthen our governance and corporate compliance program. He reports to the Board, working closely with me and Chris Pappas, who was appointed executive director in October 2020 and will return to his regular duties as an independent Board member on April 1, 2021.

In March of this year, we appointed Steven E. Strah chief executive officer and elected him as a member of the Board. The Board has full confidence in Steve, who served as acting CEO since October 2020, and believes he has the leadership skills, strategic acumen and deep institutional knowledge needed to guide FirstEnergy forward and position the company for long-term success.

Also, we recently entered into an agreement with Icahn Capital to appoint Andrew Teno and Jesse Lynn – both of whom are employees of Icahn Capital – to the Board as non-voting directors. We will be working with Icahn Capital to obtain regulatory clearance and approvals so that they can become voting directors. We are pleased to have reached this agreement with Icahn Capital and look forward to the insights and experiences Andrew and Jesse will bring to our Board.

As the Board looks ahead, we are confident in your company's path forward. Together with the leadership team, we are keenly focused on enhancing the value of your investment by making FirstEnergy a better and more trusted company and delivering strong financial and operational results in the years to come.

Sincerely,

*Donald T. Misheff*

Donald T. Misheff
March 18, 2021

2020 ANNUAL REPORT

**CONTENTS**

1..........Glossary of Terms

4..........Selected Financial Data

5..........Management's Discussion and Analysis

51..........Report of Independent Registered Public Accounting Firm

53..........Consolidated Statements of Income (Loss)

54..........Consolidated Statements of Comprehensive Income (Loss)

55..........Consolidated Balance Sheets

56..........Consolidated Statements of Common Stockholders' Equity

57..........Consolidated Statements of Cash Flows

58..........Notes to the Consolidated Financial Statements

116..........Executive Officers as of February 18, 2021

**GLOSSARY OF TERMS**

The following abbreviations and acronyms are used in this report to identify FirstEnergy Corp. and its current and former subsidiaries:

| | |
|---|---|
| AE Supply | Allegheny Energy Supply Company, LLC, an unregulated generation subsidiary |
| AGC | Allegheny Generating Company, a generation subsidiary of MP |
| ATSI | American Transmission Systems, Incorporated, a subsidiary of FET, which owns and operates transmission facilities |
| BSPC | Bay Shore Power Company |
| CEI | The Cleveland Electric Illuminating Company, an Ohio electric utility operating subsidiary |
| CES | Competitive Energy Services, formerly a reportable operating segment of FirstEnergy |
| FE | FirstEnergy Corp., a public utility holding company |
| FENOC | Energy Harbor Nuclear Corp. (formerly known as FirstEnergy Nuclear Operating Company), a subsidiary of EH, which operates NG's nuclear generating facilities |
| FES | Energy Harbor LLC. (formerly known as FirstEnergy Solutions Corp.), a subsidiary of EH, which provides energy-related products and services |
| FES Debtors | FES, FENOC, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage LLC, and FGMUC |
| FESC | FirstEnergy Service Company, which provides legal, financial and other corporate support services |
| FET | FirstEnergy Transmission, LLC, formerly known as Allegheny Energy Transmission, LLC, which is the parent of ATSI, KATCo, MAIT and TrAIL, and has a joint venture in PATH |
| FEV | FirstEnergy Ventures Corp., which invests in certain unregulated enterprises and business ventures |
| FG | Energy Harbor Generation LLC (formerly known as FirstEnergy Generation, LLC), a subsidiary of EH, which owns and operates fossil generating facilities |
| FGMUC | FirstEnergy Generation Mansfield Unit 1 Corp., a wholly owned subsidiary of FG, which has certain leasehold interests in a portion of Unit 1 at the Bruce Mansfield plant |
| FirstEnergy | FirstEnergy Corp., together with its consolidated subsidiaries |
| Global Holding | Global Mining Holding Company, LLC, a joint venture between FEV, WMB Marketing Ventures, LLC and Pinesdale LLC |
| Global Rail | Global Rail Group, LLC, a subsidiary of Global Holding that owns coal transportation operations near Roundup, Montana |
| GPU | GPU, Inc., former parent of JCP&L, ME and PN, that merged with FE on November 7, 2001 |
| GPUN | GPU Nuclear, Inc., a subsidiary of FE, which operates TMI-2 |
| JCP&L | Jersey Central Power & Light Company, a New Jersey electric utility operating subsidiary |
| KATCo | Keystone Appalachian Transmission Company, a subsidiary of FET |
| MAIT | Mid-Atlantic Interstate Transmission, LLC, a subsidiary of FET, which owns and operates transmission facilities |
| ME | Metropolitan Edison Company, a Pennsylvania electric utility operating subsidiary |
| MP | Monongahela Power Company, a West Virginia electric utility operating subsidiary |
| NG | Energy Harbor Nuclear Generation LLC (formerly known as FirstEnergy Nuclear Generation, LLC), a subsidiary of EH, which owns nuclear generating facilities |
| OE | Ohio Edison Company, an Ohio electric utility operating subsidiary |
| Ohio Companies | CEI, OE and TE |
| PATH | Potomac-Appalachian Transmission Highline, LLC, a joint venture between FE and a subsidiary of AEP |
| PATH-Allegheny | PATH Allegheny Transmission Company, LLC |
| PATH-WV | PATH West Virginia Transmission Company, LLC |
| PE | The Potomac Edison Company, a Maryland and West Virginia electric utility operating subsidiary |
| Penn | Pennsylvania Power Company, a Pennsylvania electric utility operating subsidiary of OE |
| Pennsylvania Companies | ME, PN, Penn and WP |
| PN | Pennsylvania Electric Company, a Pennsylvania electric utility operating subsidiary |
| Signal Peak | Signal Peak Energy, LLC, an indirect subsidiary of Global Holding that owns mining operations near Roundup, Montana |
| TE | The Toledo Edison Company, an Ohio electric utility operating subsidiary |
| TrAIL | Trans-Allegheny Interstate Line Company, a subsidiary of FET, which owns and operates transmission facilities |
| Transmission Companies | ATSI, MAIT and TrAIL |
| Utilities | OE, CEI, TE, Penn, JCP&L, ME, PN, MP, PE and WP |
| WP | West Penn Power Company, a Pennsylvania electric utility operating subsidiary |

The following abbreviations and acronyms are used to identify frequently used terms in this report:

| | | | |
|---|---|---|---|
| ACE | Affordable Clean Energy | EGS | Electric Generation Supplier |
| ADIT | Accumulated Deferred Income Taxes | EGU | Electric Generation Units |
| AEP | American Electric Power Company, Inc. | EmPOWER Maryland | EmPOWER Maryland Energy Efficiency Act |
| AFS | Available-for-sale | ENEC | Expanded Net Energy Cost |
| AFUDC | Allowance for Funds Used During Construction | EPA | United States Environmental Protection Agency |
| AMT | Alternative Minimum Tax | EPS | Earnings per Share |
| AOCI | Accumulated Other Comprehensive Income (Loss) | ERO | Electric Reliability Organization |
| ARO | Asset Retirement Obligation | ESP IV | Electric Security Plan IV |
| ARP | Alternative Revenue Program | Facebook® | Facebook is a registered trademark of Facebook, Inc. |
| ASC | Accounting Standard Codification | FASB | Financial Accounting Standards Board |
| ASU | Accounting Standards Update | FERC | Federal Energy Regulatory Commission |
| AYE DCD | Allegheny Energy, Inc. Amended and Restated Revised Plan for Deferral of Compensation of Directors | FES Bankruptcy | FES Debtors' voluntary petitions for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code with the Bankruptcy Court |
| AYE Director's Plan | Allegheny Energy, Inc. Non-Employee Director Stock Plan | Fitch | Fitch Ratings |
| Bankruptcy Court | U.S. Bankruptcy Court in the Northern District of Ohio in Akron | FMB | First Mortgage Bond |
| BCF | Beneficial Conversion Feature | FPA | Federal Power Act |
| BGS | Basic Generation Service | FTR | Financial Transmission Right |
| bps | Basis points | GAAP | Accounting Principles Generally Accepted in the United States of America |
| CAA | Clean Air Act | GHG | Greenhouse Gases |
| CBA | Collective Bargaining Agreement | HB 6 | House Bill 6, as passed by Ohio's 133rd General Assembly |
| CCR | Coal Combustion Residuals | IBEW | International Brotherhood of Electrical Workers |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | ICP 2007 | FirstEnergy Corp. 2007 Incentive Compensation Plan |
| CFL | Compact Fluorescent Light | ICP 2015 | FirstEnergy Corp. 2015 Incentive Compensation Plan |
| CFR | Code of Federal Regulations | IIP | Infrastructure Investment Program |
| CO2 | Carbon Dioxide | IRS | Internal Revenue Service |
| CPP | EPA's Clean Power Plan | ISO | Independent System Operator |
| CSAPR | Cross-State Air Pollution Rule | ITC | Investment Tax Credit |
| CTA | Consolidated Tax Adjustment | JCP&L Reliability Plus | JCP&L Reliability Plus IIP |
| CWA | Clean Water Act | kV | Kilovolt |
| D.C. Circuit | United States Court of Appeals for the District of Columbia Circuit | KWH | Kilowatt-hour |
| DCPD | Deferred Compensation Plan for Outside Directors | LED | Light Emitting Diode |
| DCR | Delivery Capital Recovery | LIBOR | London Interbank Offered Rate |
| DMR | Distribution Modernization Rider | LOC | Letter of Credit |
| DSIC | Distribution System Improvement Charge | LS Power | LS Power Equity Partners III, LP |
| DSP | Default Service Plan | LSE | Load Serving Entity |
| DTA | Deferred Tax Asset | LTIIPs | Long-Term Infrastructure Improvement Plans |
| E&P | Earnings and Profits | MDPSC | Maryland Public Service Commission |
| EDC | Electric Distribution Company | MGP | Manufactured Gas Plants |
| EDCP | Executive Deferred Compensation Plan | MISO | Midcontinent Independent System Operator, Inc. |
| EDIS | Electric Distribution Investment Surcharge | Moody's | Moody's Investors Service, Inc. |
| EE&C | Energy Efficiency and Conservation | MW | Megawatt |

| | | | |
|---|---|---|---|
| MWH | Megawatt-hour | PURPA | Public Utility Regulatory Policies Act of 1978 |
| NAAQS | National Ambient Air Quality Standards | RCRA | Resource Conservation and Recovery Act |
| NAV | Net Asset Value | REC | Renewable Energy Credit |
| NDT | Nuclear Decommissioning Trust | Regulation FD | Regulation Fair Disclosure promulgated by the SEC |
| NERC | North American Electric Reliability Corporation | RFC | ReliabilityFirst Corporation |
| NJBPU | New Jersey Board of Public Utilities | RFP | Request for Proposal |
| NOL | Net Operating Loss | RGGI | Regional Greenhouse Gas Initiative |
| NOx | Nitrogen Oxide | ROE | Return on Equity |
| NPDES | National Pollutant Discharge Elimination System | RSS | Rich Site Summary |
| NRC | Nuclear Regulatory Commission | RTEP | Regional Transmission Expansion Plan |
| NSR | New Source Review | RTO | Regional Transmission Organization |
| NUG | Non-Utility Generation | S&P | Standard & Poor's Ratings Service |
| NYPSC | New York State Public Service Commission | SBC | Societal Benefits Charge |
| OAG | Ohio Attorney General | SCOH | Supreme Court of Ohio |
| OCA | Office of Consumer Advocate | SEC | United States Securities and Exchange Commission |
| OCC | Ohio Consumers' Counsel | SIP | State Implementation Plan(s) Under the Clean Air Act |
| OPEB | Other Post-Employment Benefits | SO2 | Sulfur Dioxide |
| OPEIU | Office and Professional Employees International Union | SOS | Standard Offer Service |
| OPIC | Other Paid-in Capital | SREC | Solar Renewable Energy Credit |
| OSHA | Occupational Safety and Health Administration | SSO | Standard Service Offer |
| OVEC | Ohio Valley Electric Corporation | SVC | Static Var Compensator |
| PA DEP | Pennsylvania Department of Environmental Protection | Tax Act | Tax Cuts and Jobs Act adopted December 22, 2017 |
| PCRB | Pollution Control Revenue Bond | TMI-2 | Three Mile Island Unit 2 |
| PJM | PJM Interconnection, L.L.C. | TO | Transmission Owner |
| PJM Region | The aggregate of the zones within PJM | Twitter® | Twitter is a registered trademark of Twitter, Inc. |
| PJM Tariff | PJM Open Access Transmission Tariff | UCC | Official committee of unsecured creditors appointed in connection with the FES Bankruptcy |
| POLR | Provider of Last Resort | UWUA | Utility Workers Union of America |
| PPA | Purchase Power Agreement | VEPCO | Virginia Electric and Power Company |
| PPB | Parts per Billion | VIE | Variable Interest Entity |
| PPUC | Pennsylvania Public Utility Commission | VSCC | Virginia State Corporation Commission |
| PUCO | Public Utilities Commission of Ohio | WVPSC | Public Service Commission of West Virginia |
| | | ZEC | Zero Emissions Certificate |

**COMMON STOCK**

The common stock of FirstEnergy Corp. is listed on the New York Stock Exchange under the symbol "FE" and is traded on other registered exchanges.

**HOLDERS OF COMMON STOCK**

There were 67,527 holders of 543,117,533 shares of FE's common stock as of December 31, 2020, and 67,252 holders of 543,215,090 shares of FE's common stock as of January 31, 2021. We have historically paid quarterly cash dividends on our common stock. Dividend payments are subject to declaration by the Board and future dividend decisions determined by the Board may be impacted by earnings growth, cash flows, credit metrics and other business conditions. Information regarding retained earnings available for payment of cash dividends is given in Note 11, "Capitalization," of the Notes to Consolidated Financial Statements.

**SHAREHOLDER RETURN**

The following graph shows the total cumulative return from a $100 investment on December 31, 2015, in FE's common stock compared with the total cumulative returns of EEI's Index of Investor-Owned Electric Utility Companies and the S&P 500.



FirstEnergy had no transactions regarding purchases of FE common stock during the fourth quarter of 2020.

FirstEnergy does not have any publicly announced plan or program for share purchases.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

Forward-Looking Statements: This Form 10-K includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 based on information currently available to management. Such statements are subject to certain risks and uncertainties and readers are cautioned not to place undue reliance on these forward-looking statements. These statements include declarations regarding management's intents, beliefs and current expectations. These statements typically contain, but are not limited to, the terms "anticipate," "potential," "expect," "forecast," "target," "will," "intend," "believe," "project," "estimate," "plan" and similar words. Forward-looking statements involve estimates, assumptions, known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements, which may include the following (see Glossary of Terms for definitions of capitalized terms):

- The results of the ongoing internal investigation matters and evaluation of our controls framework and remediation of our material weakness in internal control over financial reporting.
- The risks and uncertainties associated with government investigations regarding HB 6 and related matters including potential adverse impacts on federal or state regulatory matters including, but not limited to, matters relating to rates.
- The risks and uncertainties associated with litigation, arbitration, mediation and similar proceedings.
- Legislative and regulatory developments, including, but not limited to, matters related to rates, compliance and enforcement activity.
- The ability to accomplish or realize anticipated benefits from strategic and financial goals, including, but not limited to, maintaining financial flexibility, overcoming current uncertainties and challenges associated with the ongoing governmental investigations, executing our transmission and distribution investment plans, controlling costs, improving our credit metrics, strengthening our balance sheet and growing earnings.
- Economic and weather conditions affecting future operating results, such as a recession, significant weather events and other natural disasters, and associated regulatory events or actions in response to such conditions.
- Mitigating exposure for remedial activities associated with retired and formerly owned electric generation assets.
- The extent and duration of COVID-19 and the impacts to our business, operations and financial condition resulting from the outbreak of COVID-19 including, but not limited to, disruption of businesses in our territories, volatile capital and credit markets, legislative and regulatory actions, the effectiveness of our pandemic and business continuity plans, the precautionary measures we are taking on behalf of our customers, contractors and employees, our customers' ability to make their utility payment and the potential for supply-chain disruptions.
- The potential of non-compliance with debt covenants in our credit facilities due to matters associated with the government investigations regarding HB 6 and related matters.
- The ability to access the public securities and other capital and credit markets in accordance with our financial plans, the cost of such capital and overall condition of the capital and credit markets affecting us, including the increasing number of financial institutions evaluating the impact of climate change on their investment decisions.
- Actions that may be taken by credit rating agencies that could negatively affect either our access to or terms of financing or our financial condition and liquidity.
- Changes in assumptions regarding economic conditions within our territories, the reliability of our transmission and distribution system, or the availability of capital or other resources supporting identified transmission and distribution investment opportunities.
- Changes in customers' demand for power, including, but not limited to, the impact of climate change or energy efficiency and peak demand reduction mandates.
- Changes in national and regional economic conditions affecting us and/or our major industrial and commercial customers or others with which we do business.
- The risks associated with cyber-attacks and other disruptions to our information technology system, which may compromise our operations, and data security breaches of sensitive data, intellectual property and proprietary or personally identifiable information.
- The ability to comply with applicable reliability standards and energy efficiency and peak demand reduction mandates.
- Changes to environmental laws and regulations, including, but not limited to, those related to climate change.
- Changing market conditions affecting the measurement of certain liabilities and the value of assets held in our pension trusts and other trust funds, or causing us to make contributions sooner, or in amounts that are larger, than currently anticipated.
- Labor disruptions by our unionized workforce.
- Changes to significant accounting policies.
- Any changes in tax laws or regulations, or adverse tax audit results or rulings.
- The risks and other factors discussed from time to time in our SEC filings.

Dividends declared from time to time on our common stock during any period may in the aggregate vary from prior periods due to circumstances considered by our Board of Directors at the time of the actual declarations. A security rating is not a recommendation to buy or hold securities and is subject to revision or withdrawal at any time by the assigning rating agency. Each rating should be evaluated independently of any other rating.

These forward-looking statements are also qualified by, and should be read together with, the risk factors included in (a) Item 1A. Risk Factors to FE's Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on February 18, 2021, (b) this Management's Discussion and Analysis of Financial Condition and Results of Operations, and (c) other factors discussed herein and in FirstEnergy's other filings with the SEC. The foregoing review of factors also should not be construed as exhaustive. New factors emerge from time to time, and it is not possible for management to predict all such factors, nor assess the impact of any such factor on our business or the extent to which any factor, or combination of factors, may cause results to differ materially from those contained in any forward-looking statements. We expressly disclaim any obligation to update or revise, except as required by law, any forward-looking statements contained herein or in the information incorporated by reference as a result of new information, future events or otherwise.

**FIRSTENERGY CORP.**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**FIRSTENERGY'S BUSINESS**

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity through its reportable segments, Regulated Distribution and Regulated Transmission.

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, and purchases power for its POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland. This segment also controls 3,790 MWs of regulated electric generation capacity located primarily in West Virginia, Virginia and New Jersey, of which, 210 MWs are related to the Yards Creek generating station that is being sold pursuant to an asset purchase agreement as further discussed below. The segment's results reflect the costs of securing and delivering electric generation from transmission facilities to customers, including the deferral and amortization of certain related costs.

The service areas of, and customers served by, FirstEnergy's regulated distribution utilities as of December 31, 2020, are summarized below:

| Company | Area Served | Customers Served |
|---------|-------------|-----------------:|
| | | *(In thousands)* |
| OE | Central and Northeastern Ohio | 1,060 |
| Penn | Western Pennsylvania | 169 |
| CEI | Northeastern Ohio | 755 |
| TE | Northwestern Ohio | 314 |
| JCP&L | Northern, Western and East Central New Jersey | 1,147 |
| ME | Eastern Pennsylvania | 580 |
| PN | Western Pennsylvania and Western New York | 588 |
| WP | Southwest, South Central and Northern Pennsylvania | 734 |
| MP | Northern, Central and Southeastern West Virginia | 395 |
| PE | Western Maryland and Eastern West Virginia | 426 |
| | | 6,168 |

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies as well as stated transmission rates at MP, PE and WP; although as explained in Note 14, "Regulatory Matters", effective January 1, 2021, subject to refund, MP's, PE's and WP's existing stated rates became forward-looking formula rates. JCP&L previously had stated transmission rates, however, effective January 1, 2020, JCP&L implemented forward-looking formula rates, subject to refund, pending further hearing and settlement proceedings. Both forward-looking formula and stated rates recover costs that FERC determines are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. The segment's results also reflect the net transmission expenses related to the delivery of electricity on FirstEnergy's transmission facilities.

**Corporate/Other** reflects corporate support costs not charged to FE's subsidiaries, including FE's retained Pension and OPEB assets and liabilities of the FES Debtors, interest expense on FE's holding company debt and other businesses that do not constitute an operating segment. Additionally, reconciling adjustments for the elimination of inter-segment transactions and discontinued operations are included in Corporate/Other. As of December 31, 2020, 67 MWs of electric generating capacity, representing AE Supply's OVEC capacity entitlement, was included in continuing operations of Corporate/Other. As of December 31, 2020, Corporate/Other had approximately $8.2 billion of FE holding company debt.

**EXECUTIVE SUMMARY**

FirstEnergy is a forward-thinking fully regulated electric utility focused on stable and predictable earnings and cash flow from its regulated business units - Regulated Distribution and Regulated Transmission - through delivering enhanced customer service and reliability that supports FE's dividend.

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. In addition to the subpoenas referenced above, the OAG, certain FE shareholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, each relating to the allegations against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers.

As previously disclosed, a committee of independent members of the Board of Directors is directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. FirstEnergy believes that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement. Immediately following these terminations, the independent members of its Board appointed Mr. Steven E. Strah to the position of Acting Chief Executive Officer and Mr. Christopher D. Pappas, a current member of the Board, to the temporary position of Executive Director, each effective as of October 29, 2020. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Additionally, on November 8, 2020, Robert P. Reffner, Senior Vice President and Chief Legal Officer, and Ebony L. Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top. The matter is a subject of the ongoing internal investigation as it relates to the government investigations.

Also, in connection with the internal investigation, FirstEnergy recently identified certain transactions, which, in some instances, extended back ten years or more, including vendor services, that were either improperly classified, misallocated to certain of the Utilities and Transmission Companies, or lacked proper supporting documentation. These transactions resulted in amounts collected from customers that were immaterial to FirstEnergy, and the Utilities and Transmission Companies will be working with the appropriate regulatory agencies to address these amounts.

On January 31, 2021, FirstEnergy reached a partial settlement with the OAG and other parties regarding decoupling, which resulted in the Ohio Companies requesting PUCO approval to set the respective decoupling riders (Rider CSR) to zero effective February 9, 2021. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue in an appropriate manner with respect to a number of regulatory proceedings currently underway, including several audits, and multi-year SEET and ESP quadrennial review, among other matters. FirstEnergy believes a holistic, transparent discussion with the PUCO staff, and interested stakeholders in the regulatory process, is an important step towards removing uncertainties about regulatory concerns in Ohio and critical to re-establishing trust in FirstEnergy and restoring its reputation.

The Board has formed a new sub-committee of our Audit committee to, together with the Board, assess FirstEnergy's compliance program and implement potential changes, as appropriate. In addition, in his role as Executive Director, Mr. Pappas assisted the FirstEnergy leadership team with execution of strategic initiatives, engage with FirstEnergy's external stakeholders, and support the development of enhanced controls and governance policies and procedures. Additionally, on February 17, 2021, the Board appointed Mr. John Somerhalder to the positions of Vice Chairperson of the Board and Executive Director, each effective as of March 1, 2021, increasing the size of the Board from 10 to 11 members. Mr. Somerhalder has been elected to serve for a term expiring at the Company's 2021 Annual Meeting of Shareholders and until his successor shall have been

elected. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Mr. Pappas, who was named to the temporary role of Executive Director in October 2020, will continue to serve on the Board of the Company as an independent director. Mr. Somerhalder will help lead efforts to enhance the company's reputation.

Despite the many disruptions FirstEnergy is currently facing, the leadership team remains committed and focused on executing its strategy and running the business. See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6. See also "Outlook - State Regulation - Ohio" below for details on the PUCO proceeding reviewing political and charitable spending and legislative activity in response to the investigation of HB 6. The outcome of the government investigations, PUCO proceedings, legislative activity, and any of these lawsuits is uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. FirstEnergy is considering reductions to its Regulated Distribution and Regulated Transmission capital investment plans and reductions to operating expenses, as well as changes to its planned equity issuances, to allow for flexibility should a fine or other regulatory actions be imposed as a result of the government investigations.

FirstEnergy is also working to improve how it conducts business and serve its customers. To address opportunities for improvement, FirstEnergy kicked off a new initiative to make process and cultural improvements across our entire organization that will keep FirstEnergy moving forward in a positive direction. Called "FE Forward," the initiative will play a critical first step in our transformation journey as it looks to align business practices with our values and behaviors. FirstEnergy will do this by reviewing policies and practices as well as the structure and processes around how decisions are made. FirstEnergy expects that this project will not only help FirstEnergy overcome current uncertainties and challenges, but it will further our goal of creating a truly sustainable company and provide opportunities to reinvest in our employees and customers. The initial phase of FE Forward, which is expected to go through the first quarter of 2021, will involve a comprehensive assessment that will pinpoint the areas of opportunity across all business units and outline the project's scope.

The outbreak of COVID-19 is a global pandemic. FirstEnergy is taking steps to mitigate known risks and is continuously evaluating the rapidly evolving situation based on guidance from governmental officials and public health experts. The full impact on FirstEnergy's business from the COVID-19 pandemic, including the governmental and regulatory responses, is unknown at this time and difficult to predict. FirstEnergy provides a critical and essential service to its customers and the health and safety of FirstEnergy's employees, contractors and customers are its first priority. FirstEnergy is effectively managing its operations, while still providing flexibility for approximately 7,000 of its 12,000 employees to work from home.

Beginning March 13, 2020, FirstEnergy temporarily suspended customer disconnections for nonpayment and ceased collection activities as a result of the ongoing pandemic. Starting September 15, 2020, certain FirstEnergy utilities began non-residential disconnections for non-payment, and began the same on October 5, 2020 for residential disconnections. FirstEnergy is actively monitoring the impact COVID-19 is having on customers' receivable balances, which include increasing arrears balance since the pandemic has begun. Additionally, FirstEnergy has incurred, and it is expected to incur for the foreseeable future, incremental uncollectible and other COVID-19 related expenses. Such incrementally incurred COVID-19 pandemic related expenses consist of additional costs that FirstEnergy is incurring to protect its employees, contractors and customers, and to support social distancing requirements. These costs include, but are not limited to, new or added benefits provided to employees, the purchase of additional personal protection equipment and disinfecting supplies, additional facility cleaning services, initiated programs and communications to customers on utility response, and increased technology expenses to support remote working, where possible. The Ohio Companies and JCP&L had existing regulatory mechanisms in place prior to the outbreak of COVID-19, where incremental uncollectible expenses are able to be recovered through riders with no material impact to earnings. Additionally, in response to the COVID-19 pandemic, the MDPSC, NJBPU and WVPSC issued orders allowing PE, JCP&L and MP to track and create a regulatory asset for future recovery of incremental costs, including uncollectible expenses, incurred as a result of the pandemic. In Pennsylvania, the PPUC authorized utilities to track all prudently incurred incremental costs arising from COVID-19, and to create a regulatory asset for future recovery of incremental uncollectible expense incurred as a result of COVID-19 above what is included in the Pennsylvania Companies' existing rates.

FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact of COVID-19 to its business and does not currently expect disruptions in its ability to deliver service to customers or any material impact to its capital spending plan. FirstEnergy's Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory. Two-thirds of base distribution revenues come from the residential customer class. FirstEnergy's commercial and industrial revenues are primarily fixed and demand-based, rather than volume-based. As a result of this, FirstEnergy's Distribution and Transmission investments provide stable and predictable earnings. However, due to the actions taken by state governments in our service territories limiting certain commercial and industrial activities, FirstEnergy's residential load has increased, while commercial and industrial loads have declined; however, the magnitude of future load trends are currently unknown and difficult to predict. FirstEnergy believes it is well positioned to manage the economic slowdown resulting from the COVID-19 pandemic. However, the situation remains fluid and future impacts to FirstEnergy, that are presently unknown or unanticipated, may occur.

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. Under the FE credit facility, an aggregate amount of $2.5 billion is available to be borrowed, repaid and reborrowed, subject to separate borrowing sublimits for each borrower including FE and its regulated distribution subsidiaries. Under the FET credit facility, an aggregate

amount of $1.0 billion is available to be borrowed, repaid and reborrowed under a syndicated credit facility, subject to separate borrowing sublimits for each borrower including FE's transmission subsidiaries. On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendments provide for modifications and/or waivers of: (i) certain representations and warranties, and (ii) certain affirmative and negative covenants, contained therein, which allowed FirstEnergy to regain compliance with such provisions. In addition, among other things, the amendment to the FE credit facility reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

On November 23, 2020, FE and its regulated distribution subsidiaries, JCP&L, ME, Penn, TE and WP, borrowed $950 million in the aggregate under the FE Revolving Facility, bringing the outstanding principal balance under the FE Revolving Facility to $1.2 billion, with $1.3 billion of remaining availability under the FE Revolving Facility. On November 23, 2020, FET and its regulated transmission subsidiary, ATSI, borrowed $1 billion in the aggregate under the FET Revolving Facility, bringing the outstanding principal balance under the FET Revolving Facility to $1 billion, with no remaining availability under the FET Revolving Facility. FE, FET and certain of their respective subsidiaries increased their borrowings under the Revolving Facilities as a proactive measure to increase their respective cash positions and preserve financial flexibility.

In 2020, FirstEnergy continues to execute its regulated growth plans, through the following achievements and plans:

- Implemented forward-looking rates, subject to refund, at JCP&L effective January 1, 2020,
- In October 2020, the NJBPU approved JCP&L's distribution base rate case settlement agreement, resulting in, among other things, a $94 million increase in annual base distribution revenues,
- Filed for rider recovery of smart meters in NJ, to be deployed beginning in 2023 with a total program cost estimated at $732 million,
- PAPUC-approved DSIC waiver for Penn, which increased the cap from 5% to 7.5% on March 12, 2020,
- Completed final step of FirstEnergy's strategy to exit the competitive generation business with FES Debtors' emergence from bankruptcy on February 27, 2020,
- Integrated resource plan filing in West Virginia made on December 30, 2020,
- Issued Climate Position and Strategy Statement, including a pledge to be carbon neutral by 2050, and
- FERC approval that converted the existing stated transmission rates of MP, PE and WP to a forward-looking formula transmission rate, effective January 1, 2021.

With an operating territory of 65,000 square miles, the scale and diversity of the ten Utilities that comprise the Regulated Distribution business uniquely position this business for growth through opportunities for additional investment. Over the past several years, Regulated Distribution has experienced rate base growth through investments that have improved reliability and added operating flexibility to the distribution infrastructure, which provide benefits to the customers and communities those Utilities serve. Additionally, this business is exploring other opportunities for growth, including investments in electric system improvement and modernization projects to increase reliability and improve service to customers, as well as exploring opportunities in customer engagement that focus on the electrification of customers' homes and businesses by providing a full range of products and services.

With approximately 24,500 miles of transmission lines in operation, the Regulated Transmission business is the centerpiece of FirstEnergy's regulated investment strategy with, 100% of its capital investments recovered under forward-looking formula rates at the Transmission Companies effective January 1, 2021. Regulated Transmission has also experienced significant growth as part of its Energizing the Future transmission plan with plans to invest up to $7 billion in capital from 2018 to 2023.

FirstEnergy believes there are incremental investment opportunities for its existing transmission infrastructure of over $20 billion beyond those identified through 2023, which are expected to strengthen grid and cyber-security and make the transmission system more reliable, robust, secure and resistant to extreme weather events, with improved operational flexibility.

While FirstEnergy continues to have customer-focused investment opportunities across its distribution and transmission businesses of up to $3 billion annually, it has discontinued providing a long-term compound annual growth rate until there is further clarity regarding Ohio regulatory matters and the ongoing government investigations.

In November 2018, the Board of Directors approved a dividend policy that includes a targeted payout ratio. Dividend payments are subject to declaration by the Board and future dividend decisions determined by the Board may be impacted by earnings, cash flows, credit metrics and other business conditions, including the risk and uncertainties of the government investigations.

In November 2020, FirstEnergy published its Climate Story which includes our climate position and strategy, as well as a new comprehensive and ambitious greenhouse gas emission goal. FirstEnergy pledged to achieve carbon neutrality by 2050 and set an interim goal for a 30% reduction in greenhouse gases within the company's direct operational control by 2030, based on 2019 levels. In addition, FirstEnergy has also set a fleet electrification goal in which beginning in 2021, FirstEnergy plans for 100% of new purchases for our light duty and aerial truck fleet to be electric or hybrid vehicles, creating a path to 30% fleet electrification by 2030. Also, in 2021, FirstEnergy will seek approval to construct a solar generation source of at least 50 MWs in West Virginia. Future resource plans to achieve carbon reductions, including any determination of retirement dates of our regulated coal-fired generating facilities, will be developed by working collaboratively with regulators in West Virginia. Determination of the useful life

of our regulated coal-fired generating facilities could result in changes in depreciation, and/or continued collection of net plant in rates after retirement, securitization, sale, impairment or regulatory disallowances. If MP is unable to recover these costs, it could have a material adverse effect on FE and/or MP's financial condition, results of operations, and cash flow.

In January 2021, our updated Strategic Plan – Powered by our Core Values & Behaviors was published. This comprehensive update provides a vision of our company's path forward in an evolving electric industry. It also articulates significant new goals that will help us achieve our long-term strategic commitments in a transparent, sustainable and responsible manner.

The $2.5 billion equity issuance in 2018 strengthened FirstEnergy's balance sheet and supported the company's transition to a fully regulated utility company. The shares of preferred stock participated in the dividend paid on common stock on an as-converted basis and were non-voting except in certain limited circumstances. Because of this equity issuance, FirstEnergy does not currently anticipate the need to issue additional equity through 2021 and expects to issue, subject to, among other things, market conditions, pricing terms and business operations, up to $600 million of equity annually in 2022 and 2023, including approximately $100 million in equity for its regular stock investment and employee benefit plans. FirstEnergy's expectations regarding the amount and timing of any potential equity issuances are subject to, among other matters, the ongoing government investigations and related lawsuits.

On March 31, 2018, the FES Debtors announced that, in order to facilitate an orderly financial restructuring, they filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court. In September 2018, the Bankruptcy Court approved a FES Bankruptcy settlement agreement by and among FirstEnergy, two groups of key FES creditors (collectively, the FES Key Creditor Groups), the FES Debtors and the UCC. The FES Bankruptcy settlement agreement resolved certain claims by FirstEnergy against the FES Debtors, all claims by the FES Debtors and the FES Key Creditor Groups against FirstEnergy, as well as releases from third parties who voted in favor of the FES Debtors' plan of reorganization, in return for among other things, a cash payment of $853 million upon emergence. The FES Bankruptcy settlement was conditioned on the FES Debtors confirming and effectuating a plan of reorganization acceptable to FirstEnergy.

On February 18, 2020, the FES Debtors and FirstEnergy entered into an IT Access Agreement that provided IT support to enable the FES Debtors to emerge from bankruptcy prior to full IT separation by the FES Debtors. As part of the IT Access Agreement, the FES Debtors and FirstEnergy resolved, among other things, the on-going reconciliation of outstanding tax sharing payments for tax years 2018, 2019 and 2020 for a total of $125 million. On February 25, 2020, the Bankruptcy Court approved the IT Access Agreement. On February 27, 2020, the FES Debtors effectuated their plan, emerged from bankruptcy and FirstEnergy tendered the settlement payments totaling $853 million and the $125 million tax sharing payment to the FES Debtors, with no material impact to net income in 2020.

As contemplated under the FES Bankruptcy settlement agreement, AE Supply entered into an agreement on December 31, 2018, to transfer the 1,300 MW Pleasants Power Station and related assets to FG, while retaining certain specified liabilities. Under the terms of the agreement, FG acquired the economic interests in Pleasants as of January 1, 2019, and AE Supply operated Pleasants until ownership was transferred on January 30, 2020. AE Supply will continue to provide access to the McElroy's Run CCR impoundment facility, which was not transferred, and FE will provide guarantees for certain retained environmental liabilities of AE Supply, including the McElroy's Run CCR impoundment facility.

As of June 30, 2020, FirstEnergy had substantially ceased providing post-emergence services to FES Debtors under the terms of the amended and restated shared services agreement. In connection with the FES Debtors emergence from bankruptcy, FirstEnergy entered into an amended separation agreement with the FES Debtors to implement the separation of FES Debtors and their businesses from FirstEnergy.

The emergence of the FES Debtors from bankruptcy represents the final step in FirstEnergy's previously announced strategy to exit the competitive generation business and become a fully regulated utility company with a stronger balance sheet, solid cash flows and more predictable earnings.

The Form 10-K discusses 2020 and 2019 items and year-over-year comparisons between 2020 and 2019. Discussions of 2018 items and year-over-year comparisons between 2019 and 2018 that are not included in this Form 10-K can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on February 10, 2020.

**RESULTS OF OPERATIONS**

The financial results discussed below include revenues and expenses from transactions among FirstEnergy's business segments. A reconciliation of segment financial results is provided in Note 17, "Segment Information," of the Notes to Consolidated Financial Statements.

Net income by business segment was as follows:

| *(In millions, except per share amounts)* | For the Years Ended December 31, | | | Increase (Decrease) | |
|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2020 vs 2019** | **2019 vs 2018** |
| **Net Income By Business Segment:** | | | | | |
| Regulated Distribution | $ 959 | $ 1,076 | $ 1,242 | $ (117) | $ (166) |
| Regulated Transmission | 464 | 447 | 397 | 17 | 50 |
| Corporate/Other | (420) | (619) | (617) | 199 | (2) |
| Income from Continuing Operations | $ 1,003 | $ 904 | $ 1,022 | $ 99 | $ (118) |
| Discontinued Operations | 76 | 8 | 326 | 68 | (318) |
| Net Income | $ 1,079 | $ 912 | $ 1,348 | $ 167 | $ (436) |
| Earnings per share of common stock | | | | | |
| Basic - Continuing Operations | $ 1.85 | $ 1.69 | $ 1.33 | $ 0.16 | $ 0.36 |
| Basic - Discontinued Operations | 0.14 | 0.01 | 0.66 | 0.13 | (0.65) |
| Basic - Net Income Attributable to Common Stockholders | $ 1.99 | $ 1.70 | $ 1.99 | $ 0.29 | $ (0.29) |
| Earnings per share of common stock | | | | | |
| Diluted - Continuing Operations | $ 1.85 | $ 1.67 | $ 1.33 | $ 0.18 | $ 0.34 |
| Diluted - Discontinued Operations | 0.14 | 0.01 | 0.66 | 0.13 | (0.65) |
| Diluted - Net Income Attributable to Common Stockholders | $ 1.99 | $ 1.68 | $ 1.99 | $ 0.31 | $ (0.31) |

*Summary of Results of Operations — 2020 Compared with 2019*

Financial results for FirstEnergy's business segments for the years ended December 31, 2020 and 2019, were as follows:

| 2020 Financial Results | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|
| | *(In millions)* | | | |
| Revenues: | | | | |
| Electric | $ 9,130 | $ 1,613 | $ (139) | $ 10,604 |
| Other | 233 | 17 | (64) | 186 |
| Total Revenues | 9,363 | 1,630 | (203) | 10,790 |
| | | | | |
| Operating Expenses: | | | | |
| Fuel | 369 | — | — | 369 |
| Purchased power | 2,687 | — | 14 | 2,701 |
| Other operating expenses | 3,178 | 282 | (169) | 3,291 |
| Provision for depreciation | 896 | 313 | 65 | 1,274 |
| Amortization (deferral) of regulatory assets, net | (64) | 11 | — | (53) |
| General taxes | 770 | 232 | 44 | 1,046 |
| Total Operating Expenses | 7,836 | 838 | (46) | 8,628 |
| | | | | |
| Operating Income (Loss) | 1,527 | 792 | (157) | 2,162 |
| | | | | |
| Other Income (Expense): | | | | |
| Miscellaneous income, net | 332 | 30 | 70 | 432 |
| Pension and OPEB mark-to-market adjustment | (323) | (40) | (114) | (477) |
| Interest expense | (501) | (219) | (345) | (1,065) |
| Capitalized financing costs | 37 | 39 | 1 | 77 |
| Total Other Expense | (455) | (190) | (388) | (1,033) |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | 1,072 | 602 | (545) | 1,129 |
| Income taxes (benefits) | 113 | 138 | (125) | 126 |
| Income (Loss) From Continuing Operations | 959 | 464 | (420) | 1,003 |
| Discontinued Operations, net of tax | — | — | 76 | 76 |
| Net Income (Loss) | $ 959 | $ 464 | $ (344) | $ 1,079 |

| 2019 Financial Results | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|
| | | | *(In millions)* | |
| Revenues: | | | | |
| Electric | $ 9,452 | $ 1,510 | $ (128) | $ 10,834 |
| Other | 246 | 16 | (61) | 201 |
| Total Revenues | 9,698 | 1,526 | (189) | 11,035 |
| | | | | |
| Operating Expenses: | | | | |
| Fuel | 497 | — | — | 497 |
| Purchased power | 2,910 | — | 17 | 2,927 |
| Other operating expenses | 2,836 | 272 | (156) | 2,952 |
| Provision for depreciation | 863 | 284 | 73 | 1,220 |
| Amortization (deferral) of regulatory assets, net | (89) | 10 | — | (79) |
| General taxes | 760 | 209 | 39 | 1,008 |
| Total Operating Expenses | 7,777 | 775 | (27) | 8,525 |
| | | | | |
| Operating Income (Loss) | 1,921 | 751 | (162) | 2,510 |
| | | | | |
| Other Income (Expense): | | | | |
| Miscellaneous income, net | 174 | 15 | 54 | 243 |
| Pension and OPEB mark-to-market adjustment | (290) | (47) | (337) | (674) |
| Interest expense | (495) | (192) | (346) | (1,033) |
| Capitalized financing costs | 37 | 33 | 1 | 71 |
| Total Other Expense | (574) | (191) | (628) | (1,393) |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | 1,347 | 560 | (790) | 1,117 |
| Income taxes (benefits) | 271 | 113 | (171) | 213 |
| Income (Loss) From Continuing Operations | 1,076 | 447 | (619) | 904 |
| Discontinued Operations, net of tax | — | — | 8 | 8 |
| Net Income (Loss) | $ 1,076 | $ 447 | $ (611) | $ 912 |

| Changes Between 2020 and 2019 Financial Results Increase (Decrease) | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|
| | | *(In millions)* | | |
| Revenues: | | | | |
| Electric | $ (322) | $ 103 | $ (11) | $ (230) |
| Other | (13) | 1 | (3) | (15) |
| Total Revenues | (335) | 104 | (14) | (245) |
| | | | | |
| Operating Expenses: | | | | |
| Fuel | (128) | — | — | (128) |
| Purchased power | (223) | — | (3) | (226) |
| Other operating expenses | 342 | 10 | (13) | 339 |
| Provision for depreciation | 33 | 29 | (8) | 54 |
| Amortization (deferral) of regulatory assets, net | 25 | 1 | — | 26 |
| General taxes | 10 | 23 | 5 | 38 |
| Total Operating Expenses | 59 | 63 | (19) | 103 |
| | | | | |
| Operating Income (Loss) | (394) | 41 | 5 | (348) |
| | | | | |
| Other Income (Expense): | | | | |
| Miscellaneous income, net | 158 | 15 | 16 | 189 |
| Pension and OPEB mark-to-market adjustment | (33) | 7 | 223 | 197 |
| Interest expense | (6) | (27) | 1 | (32) |
| Capitalized financing costs | — | 6 | — | 6 |
| Total Other Expense | 119 | 1 | 240 | 360 |
| | | | | |
| Income (Loss) Before Income Taxes (Benefits) | (275) | 42 | 245 | 12 |
| Income taxes (benefits) | (158) | 25 | 46 | (87) |
| Income (Loss) From Continuing Operations | (117) | 17 | 199 | 99 |
| Discontinued Operations, net of tax | — | — | 68 | 68 |
| Net Income (Loss) | $ (117) | $ 17 | $ 267 | $ 167 |

*Regulated Distribution — 2020 Compared with 2019*

Regulated Distribution's net income decreased $117 million in 2020, as compared to 2019, primarily resulting from the charge associated with the impairment of an Ohio regulatory asset in 2020, as further discussed below, higher pension and OPEB mark-to-market adjustments, lower weather-related customer usage, the absence of the DMR revenues that ended in July 2019, and higher operating and maintenance expenses including the impact of non-deferred COVID-19 costs, partially offset by lower pension and OPEB non-service costs, higher revenues from incremental riders in Ohio and Pennsylvania and increased weather-adjusted residential sales due to the impact of COVID-19.

*Revenues —*

The $335 million decrease in total revenues resulted from the following sources:

| Revenues by Type of Service | For the Years Ended December 31, | | Decrease |
| | 2020 | 2019 | |
| | *(In millions)* | | |
| Distribution services [1] | $ 5,302 | $ 5,314 | $ (12) |
| Generation sales: | | | |
| Retail | 3,577 | 3,727 | (150) |
| Wholesale | 251 | 411 | (160) |
| Total generation sales | 3,828 | 4,138 | (310) |
| Other | 233 | 246 | (13) |
| Total Revenues | $ 9,363 | $ 9,698 | $ (335) |

[1] Includes $43 million and $181 million of ARP revenues for the years ended December 31, 2020 and 2019, respectively.

Distribution services revenues decreased $12 million in 2020, as compared to 2019, primarily resulting from the charge associated with the impairment of an Ohio regulatory asset in 2020, as further discussed below, the absence of the New Jersey storm recovery rider and DMR revenues that ended in July 2019, lower weather-related customer usage, the expiration of a NUG contract and lower commercial and industrial sales due to the impact of COVID-19, partially offset by higher rates associated with incremental riders in Ohio and Pennsylvania, including the recovery of distribution capital investment programs and transmission expenses, increased weather-adjusted residential sales due to the impact of COVID-19 and the implementation of the New Jersey Zero Emission Program in June 2019. Distribution services by customer class are summarized in the following table:

| Electric Distribution MWH Deliveries | For the Years Ended December 31, | | Increase (Decrease) |
| | 2020 | 2019 | |
| | *(In thousands)* | | |
| Residential | 54,978 | 54,159 | 1.5 % |
| Commercial[1] | 34,811 | 37,888 | (8.1)% |
| Industrial | 52,034 | 55,649 | (6.5)% |
| Total Electric Distribution MWH Deliveries | 141,823 | 147,696 | (4.0)% |

[1] Includes street lighting.

Distribution services to residential customers primarily reflects an increase in weather-adjusted load due to the impact of COVID-19, partially offset by lower weather-related usage. Deliveries to commercial customers reflects lower weather-related usage and the impact of COVID-19. Heating degree days were 6% below 2019 and 10% below normal. Cooling degree days were 1% below 2019, and 14% above normal. Deliveries to industrial customers were also negatively impacted due to the impact of COVID-19, contributing to lower steel, mining, and educational services customer usage, partially offset by higher shale customer usage.

The following table summarizes the price and volume factors contributing to the $310 million decrease in generation revenues in 2020, as compared to 2019:

| Source of Change in Generation Revenues | (Decrease) |
|---|---|
| | *(In millions)* |
| Retail: | |
| Change in sales volumes | $ (54) |
| Change in prices | (96) |
| | (150) |
| Wholesale: | |
| Change in sales volumes | (94) |
| Change in prices | (3) |
| Capacity revenue | (63) |
| | (160) |
| Change in Generation Revenues | $ (310) |

Retail generation revenues decreased $150 million, primarily due to lower weather-related usage, partially offset by an increase in weather-adjusted residential load due to the impact of COVID-19 and decreased customer shopping in Pennsylvania and New Jersey. Total generation provided by alternative suppliers as a percentage of total MHW deliveries decreased to 64% from 66% in Pennsylvania and to 47% from 48% in New Jersey. The decrease in retail generation prices primarily resulted from lower non-shopping generation auction rates in New Jersey and Pennsylvania.

Wholesale generation revenues decreased $160 million, primarily due to decreased volumes associated with lower economic dispatch of MP's generating units, resulting from low spot market energy prices and an increase in the number of planned outages as compared to 2019, the expiration of a NUG contract and lower capacity revenues. The difference between current wholesale generation revenues and certain energy costs incurred are deferred for future recovery or refund, with no material impact to earnings.

*Operating Expenses —*

Total operating expenses increased $59 million primarily due to the following:

- Fuel expense decreased $128 million in 2020, as compared to 2019, primarily due to lower unit costs and lower fuel consumption as a result of economic dispatch and an increase in the number of planned outages as compared to 2019.

- Purchased power costs decreased $223 million in 2020, as compared to 2019, primarily due to lower prices and capacity expenses, the absence of the termination of Morgantown Energy Associates PPA and decreased purchases resulting from the expiration of a NUG contract, partially offset by the implementation of the New Jersey Zero Emission Program in June 2019 and an increase in the number of planned outages as compared to 2019.

| Source of Change in Purchased Power | Increase (Decrease) |
|---|---|
| | *(In millions)* |
| Purchases | |
| Change due to unit costs | $ (185) |
| Change due to volumes | 21 |
| | (164) |
| Capacity expense | (59) |
| Change in Purchased Power Costs | $ (223) |

- Other operating expenses increased $342 million primarily due to:

  - Higher incremental uncollectible and other COVID-19 related expenses of $157 million, of which $99 million was deferred for future recovery.
  - Higher storm restoration costs of $75 million, which were mostly deferred for future recovery, resulting in no material impact on current period earnings.

- - Higher network transmission expenses of $49 million. These costs are deferred for future recovery, resulting in no material impact on current period earnings.
  - Higher pension and OPEB service costs of $33 million.
  - Higher employee benefit costs of approximately $30 million.
  - Higher other operating and maintenance expense of $40 million, primarily associated with increased material and contractor spend and an additional planned generation outage in 2020,
  - Lower energy efficiency program costs of $42 million, which are deferred for future recovery, resulting in no material impact on earnings.

- Depreciation expense increased $33 million, primarily due to a higher asset base.

- Net amortization (deferral) of regulatory assets increased $25 million, primarily due to lower generation and transmission deferrals including the absence of the termination of the Morgantown Energy Associates PPA, the recovery of distribution investment programs and lower energy efficiency related costs, partially offset by the deferral of higher storm restoration costs, and uncollectible and other COVID-19 related costs.

- General taxes increased $10 million primarily due to higher Ohio property taxes and payroll taxes.

*Other Expense —*

Total other expense decreased $119 million, primarily due to lower pension and OPEB non-service costs, partially offset by a $33 million increase in pension and OPEB mark-to-market adjustments, higher interest expense from debt issuances primarily at WP and MP, and increased borrowings under the Revolving Facilities. The 2020 mark-to-market adjustment resulted from a decrease in the discount rate used to measure benefit obligations, partially offset by higher than expected asset returns.

*Income Taxes*

Regulated Distribution's effective tax rate was 10.5% and 20.1% for 2020 and 2019, respectively. The change in the effective tax rate was primarily due to the recognition of $52 million in deferred gains relating to prior intercompany transfers of generation assets that were triggered by the deconsolidation of the FES Debtors from FirstEnergy's consolidated federal income tax group as a result of their emergence from bankruptcy in the first quarter of 2020. Additionally, FirstEnergy recorded a $40 million benefit related to reversals of certain tax regulatory liabilities resulting from the transfer of TMI-2.

***Regulated Transmission — 2020 Compared with 2019***

Regulated Transmission's operating results increased $17 million in 2020, as compared to 2019, primarily resulting from the impact of a higher rate base at ATSI, MAIT, and JCP&L, and higher capitalized financing costs, partially offset by higher interest expense at FET and a true-up of the forward-looking formula rate at ATSI and MAIT.

*Revenues —*

Total revenues increased $104 million in 2020, as compared to 2019, primarily due to the recovery of incremental operating expenses and a higher rate base at ATSI, MAIT and JCP&L, partially offset by the impact of a true-up of the forward-looking rate.

Revenues by transmission asset owner are shown in the following table:

| Revenues by Transmission Asset Owner | For the Years Ended December 31, | | Increase |
|---|---|---|---|
| | 2020 | 2019 | |
| | *(In millions)* | | |
| ATSI | $ 809 | $ 758 | $ 51 |
| TrAIL | 255 | 251 | 4 |
| MAIT | 254 | 227 | 27 |
| JCP&L | 178 | 160 | 18 |
| Other | 134 | 130 | 4 |
| Total Revenues | $ 1,630 | $ 1,526 | $ 104 |

*Operating Expenses —*

Total operating expenses increased $63 million in 2020, as compared to 2019, primarily due to higher property taxes and depreciation due to a higher asset base. The majority of operating expenses are recovered through formula rates, resulting in no material impact on current period earnings.

*Income Taxes —*

Regulated Transmission's effective tax rate was 22.9% and 20.2% for 2020 and 2019, respectively due to changes in the amortization of excess deferred income taxes and the absence of certain tax benefits recognized in 2019.

### Corporate/Other — 2020 Compared with 2019

Financial results from Corporate/Other and reconciling adjustments resulted in a $199 million increase in income from continuing operations for 2020 compared to 2019, primarily due to a $223 million decrease in the pension and OPEB mark-to-market adjustment, $10 million tax benefits from accelerated amortization of certain investment tax credits and lower other Pension and OPEB non-service costs. These were partially offset by higher other operating expenses from investigation-related costs and lower returns on certain equity method investments.

For the years ended December 31, 2020 and 2019, FirstEnergy recorded income from discontinued operations, net of tax, of $76 million and $8 million, respectively. The change in discontinued operations, net of tax was primarily due to lower settlement-related expenses with the FES Debtors, including adjustments to the estimated worthless stock deduction and Intercompany Tax Allocation Agreement, as well as the acceleration of net pension and OPEB prior service credits in 2020 and the absence of tax expense in 2019 associated with non-deductible interest.

## CAPITAL RESOURCES AND LIQUIDITY

FirstEnergy's business is capital intensive, requiring significant resources to fund operating expenses, construction expenditures, scheduled debt maturities and interest payments, dividend payments, and contributions to its pension plan.

The $2.5 billion equity issuance in 2018 strengthened FirstEnergy's balance sheet and supported the company's transition to a fully regulated utility company. The shares of preferred stock participated in the dividend paid on common stock on an as-converted basis and were non-voting except in certain limited circumstances. Because of this equity issuance, FirstEnergy does not currently anticipate the need to issue additional equity through 2021 and expects to issue, subject to, among other things, market conditions, pricing terms and business operations, up to $600 million of equity annually in 2022 and 2023, including approximately $100 million in equity for its regular stock investment and employee benefit plans. FirstEnergy's expectations regarding the amount and timing of any potential equity issuances are subject to, among other matters, the ongoing government investigations and related lawsuits.

In addition to this equity investment, FE and its distribution and transmission subsidiaries expect their existing sources of liquidity to remain sufficient to meet their respective anticipated obligations. In addition to internal sources to fund liquidity and capital requirements for 2021 and beyond, FE and its distribution and transmission subsidiaries expect to rely on external sources of funds. Short-term cash requirements not met by cash provided from operations are generally satisfied through short-term borrowings. Long-term cash needs may be met through the issuance of long-term debt by FE and certain of its distribution and transmission subsidiaries to, among other things, fund capital expenditures and refinance short-term and maturing long-term debt, subject to market conditions and other factors.

On February 1, 2019, FirstEnergy made a $500 million voluntary cash contribution to the qualified pension plan. FirstEnergy expects no required contributions until 2022.

With an operating territory of 65,000 square miles, the scale and diversity of the ten Utilities that comprise the Regulated Distribution business uniquely position this business for growth through opportunities for additional investment. Over the past several years, Regulated Distribution has experienced rate base growth through investments that have improved reliability and added operating flexibility to the distribution infrastructure, which provide benefits to the customers and communities those Utilities serve. Additionally, this business is exploring other opportunities for growth, including investments in electric system improvement and modernization projects to increase reliability and improve service to customers, as well as exploring opportunities in customer engagement that focus on the electrification of customers' homes and businesses by providing a full range of products and services.

Capital expenditures for 2019 and 2020 and forecasted expenditures for 2021, 2022, and 2023 by reportable segment are included below:

| Reportable Segment | 2019 Actual | 2020 Actual | 2021 Forecast | 2022 Forecast | 2023 Forecast |
|---|---|---|---|---|---|
| | | | *(In millions)* | | |
| Regulated Distribution | $1,698 | $1,756 | $1,725 | $1,745 | $1,680 |
| Regulated Transmission | 1,189 | 1,150 | 1,200 | 1,200 - 1,450 | 1,200 - 1,450 |
| Corporate/Other | 105 | 80 | 90 | 80 | 75 |
| Total | $2,992 | $2,986 | Up to $3,015 | Up to $3,025 - $3,275 | Up to $2,955 - $3,205 |

FirstEnergy believes there are incremental investment opportunities for its existing transmission infrastructure of over $20 billion beyond those identified through 2023, which are expected to strengthen grid and cyber-security and make the transmission system more reliable, robust, secure and resistant to extreme weather events, with improved operational flexibility.

In alignment with FirstEnergy's strategy to invest in its Regulated Transmission and Regulated Distribution segments as a fully regulated company, FirstEnergy is focused on maintaining balance sheet strength and flexibility. Specifically, at the regulated businesses, regulatory authority has been obtained for various regulated distribution and transmission subsidiaries to issue and/ or refinance debt.

Any financing plans by FE or any of its consolidated subsidiaries, including the issuance of equity and debt, and the refinancing of short-term and maturing long-term debt are subject to market conditions and other factors. No assurance can be given that any such issuances, financing or refinancing, as the case may be, will be completed as anticipated or at all. Any delay in the completion of financing plans could require FE or any of its consolidated subsidiaries to utilize short-term borrowing capacity, which could impact available liquidity. In addition, FE and its consolidated subsidiaries expect to continually evaluate any planned financings, which may result in changes from time to time.

On March 31, 2018, the FES Debtors announced that, in order to facilitate an orderly financial restructuring, they filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court. In September 2018, the Bankruptcy Court approved a FES Bankruptcy settlement agreement by and among FirstEnergy, two groups of key FES creditors (collectively, the FES Key Creditor Groups), the FES Debtors and the UCC. The FES Bankruptcy settlement agreement resolved certain claims by FirstEnergy against the FES Debtors, all claims by the FES Debtors and the FES Key Creditor Groups against FirstEnergy, as well as releases from third parties who voted in favor of the FES Debtors' plan of reorganization, in return for among other things, a cash payment of $853 million upon emergence. The FES Bankruptcy settlement was conditioned on the FES Debtors confirming and effectuating a plan of reorganization acceptable to FirstEnergy.

On February 18, 2020, the FES Debtors and FirstEnergy entered into an IT Access Agreement that provided IT support to enable the FES Debtors to emerge from bankruptcy prior to full IT separation by the FES Debtors. As part of the IT Access Agreement, the FES Debtors and FirstEnergy resolved, among other things, the on-going reconciliation of outstanding tax sharing payments for tax years 2018, 2019 and 2020 for a total of $125 million. On February 25, 2020, the Bankruptcy Court approved the IT Access Agreement. On February 27, 2020, the FES Debtors effectuated their plan, emerged from bankruptcy and FirstEnergy tendered the settlement payments totaling $853 million and the $125 million tax sharing payment to the FES Debtors, with no material impact to net income in 2020.

The outbreak of COVID-19 is a global pandemic. FirstEnergy is continuously evaluating the global pandemic and taking steps to mitigate known risks. FirstEnergy is actively monitoring the continued impact COVID-19 is having on its customers' receivable balances, which include increasing arrears balances since the pandemic has begun. FirstEnergy has incurred, and it is expected to incur for the foreseeable future, incremental uncollectible and other COVID-19 pandemic related expenses. COVID-19 related expenses consist of additional costs that FirstEnergy is incurring to protect its employees, contractors and customers, and to support social distancing requirements. These costs include, but are not limited to, new or added benefits provided to employees, the purchase of additional personal protection equipment and disinfecting supplies, additional facility cleaning services, initiated programs and communications to customers on utility response, and increased technology expenses to support remote working, where possible. The full impact on FirstEnergy's business from the COVID-19 pandemic, including the governmental and regulatory responses, is unknown at this time and difficult to predict. FirstEnergy provides a critical and essential service to its customers and the health and safety of its employees, contractors and customers is its first priority. FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact the COVID-19 pandemic is having on its business, however, FirstEnergy does not currently expect disruptions in its ability to deliver service to customers or any material impact on its capital spending plan.

FirstEnergy continues to effectively manage operations during the pandemic in order to provide critical service to customers and believes it is well positioned to manage through the economic slowdown. FirstEnergy Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory, which also allows for flexibility with capital investments and measures to maintain sufficient liquidity over the next twelve months. However, the situation remains fluid and

future impacts to FirstEnergy that are presently unknown or unanticipated may occur. Furthermore, the likelihood of an impact to FirstEnergy, and the severity of any impact that does occur, could increase the longer the global pandemic persists.

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. In addition to the subpoenas referenced above, the OAG, certain FE shareholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, each relating to the allegations against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers.

The Board has formed a new sub-committee of our Audit committee to, together with the Board, assess FirstEnergy's compliance program and implement potential changes, as appropriate. In addition, in his role as Executive Director, Mr. Pappas assisted the FirstEnergy leadership team with execution of strategic initiatives, engage with FirstEnergy's external stakeholders, and support the development of enhanced controls and governance policies and procedures. Additionally, on February 17, 2021, the Board appointed Mr. John Somerhalder to the positions of Vice Chairperson of the Board and Executive Director, each effective as of March 1, 2021, increasing the size of the Board from 10 to 11 members. Mr. Somerhalder has been elected to serve for a term expiring at the Company's 2021 Annual Meeting of Shareholders and until his successor shall have been elected. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Mr. Pappas, who was named to the temporary role of Executive Director in October 2020, will continue to serve on the Board of the Company as an independent director. Mr. Somerhalder will help lead efforts to enhance the company's reputation.

Despite the many disruptions FirstEnergy is currently facing, the leadership team remains committed and focused on executing its strategy and running the business. See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6. See also "Outlook - State Regulation - Ohio" below for details on the PUCO proceeding reviewing political and charitable spending and legislative activity in response to the investigation of HB 6. The outcome of the government investigations, PUCO proceedings, legislative activity, and any of these lawsuits is uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. FirstEnergy is considering reductions to its Regulated Distribution and Regulated Transmission capital investment plans and reductions to operating expenses, as well as changes to its planned equity issuances, to allow for flexibility should a fine or other regulatory actions be imposed as a result of the government investigations.

FirstEnergy is also working to improve how it conducts business and serve its customers. To address opportunities for improvement, FirstEnergy kicked off a new initiative to make process and cultural improvements across our entire organization that will keep FirstEnergy moving forward in a positive direction. Called "FE Forward," the initiative will play a critical first step in our transformation journey as it looks to align business practices with our values and behaviors. FirstEnergy will do this by reviewing policies and practices as well as the structure and processes around how decisions are made. FirstEnergy expects that this project will not only help FirstEnergy overcome current uncertainties and challenges, but it will further our goal of creating a truly sustainable company and provide opportunities to reinvest in our employees and customers. The initial phase of FE Forward, which is expected to go through the first quarter of 2021, will involve a comprehensive assessment that will pinpoint the areas of opportunity across all business units and outline the project's scope.

As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (Rider CSR) to zero. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further discussed herein. As a result of the partial settlement, and the decision to not seek lost distribution revenue, FirstEnergy recognized a $108 million pre-tax charge ($84 million after-tax) in the fourth quarter of 2020, and $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue. FirstEnergy does not believe a refund for previously collected amounts under decoupling, which was approximately $18 million, is probable. Furthermore, as FirstEnergy would not have financially benefited from the Clean Air Fund included in HB 6, which is the mechanism to provide support to nuclear energy in Ohio, there is no expected additional impact to FirstEnergy due to any repeal of that provision of HB 6.

As of December 31, 2020, FirstEnergy's net deficit in working capital (current assets less current liabilities) was primarily due to accounts payable, short-term borrowings, and accrued interest, taxes, compensation and benefits. FirstEnergy believes its cash from operations and available liquidity will be sufficient to meet its current working capital needs.

### Short-Term Borrowings / Revolving Credit Facilities

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. Under the FE credit

facility, an aggregate amount of $2.5 billion is available to be borrowed, repaid and reborrowed, subject to separate borrowing sublimits for each borrower including FE and its regulated distribution subsidiaries. Under the FET credit facility, an aggregate amount of $1.0 billion is available to be borrowed, repaid and reborrowed under a syndicated credit facility, subject to separate borrowing sublimits for each borrower including FE's transmission subsidiaries.

Borrowings under the credit facilities may be used for working capital and other general corporate purposes, including intercompany loans and advances by a borrower to any of its subsidiaries. Generally, borrowings under each of the credit facilities are available to each borrower separately and mature on the earlier of 364 days from the date of borrowing or the commitment termination date, as the same may be extended. Each of the credit facilities contains financial covenants requiring each borrower to maintain a consolidated debt-to-total-capitalization ratio (as defined under each of the credit facilities) of no more than 65%, and 75% for FET, measured at the end of each fiscal quarter.

FirstEnergy's revolving credit facilities bear interest at fluctuating interest rates, primarily based on LIBOR. LIBOR tends to fluctuate based on general interest rates, rates set by the U.S. Federal Reserve and other central banks, the supply of and demand for credit in the London interbank market and general economic conditions. FirstEnergy has not hedged its interest rate exposure with respect to its floating rate debt. Accordingly, FirstEnergy's interest expense for any particular period will fluctuate based on LIBOR and other variable interest rates. On July 27, 2017, the Financial Conduct Authority (the authority that regulates LIBOR) announced that it intends to stop compelling banks to submit rates for the calculation of LIBOR after 2021. It is unclear whether new methods of calculating LIBOR will be established such that it continues to exist after 2021, and there is considerable uncertainty regarding the publication of LIBOR beyond 2021. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, is considering replacing U.S. dollar LIBOR with a newly created index, calculated based on repurchase agreements backed by treasury securities. It is not possible to predict the effect of these changes, other reforms or the establishment of alternative reference rates in the United Kingdom, the United States or elsewhere. To the extent these interest rates increase, interest expense will increase. If sources of capital for FirstEnergy are reduced, capital costs could increase materially. Restricted access to capital markets and/or increased borrowing costs could have an adverse effect on our results of operations, cash flows, financial condition and liquidity.

On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendments provide for modifications and/or waivers of: (i) certain representations and warranties, and (ii) certain affirmative and negative covenants, contained therein, which allowed FirstEnergy to regain compliance with such provisions. In addition, among other things, the amendment to the FE credit facility reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

On November 23, 2020, FE and its regulated distribution subsidiaries, JCP&L, ME, Penn, TE and WP, borrowed $950 million in the aggregate under the FE Revolving Facility, bringing the outstanding principal balance under the FE Revolving Facility to $1.2 billion, with $1.3 billion of remaining availability under the FE Revolving Facility. On November 23, 2020, FET and its regulated transmission subsidiary, ATSI, borrowed $1 billion in the aggregate under the FET Revolving Facility, bringing the outstanding principal balance under the FET Revolving Facility to $1 billion, with no remaining availability under the FET Revolving Facility. FE, FET and certain of their respective subsidiaries increased their borrowings under the Revolving Facilities as a proactive measure to increase their respective cash positions and preserve financial flexibility.

FirstEnergy had $2.2 billion and $1.0 billion of short-term borrowings as of December 31, 2020 and 2019, respectively. FirstEnergy's available liquidity from external sources as of February 15, 2021, was as follows:

| Borrower(s) | Type | Maturity | Commitment | | Available Liquidity | |
|---|---|---|---|---|---|---|
| | | | *(In millions)* | | | |
| FirstEnergy[1] | Revolving | December 2022 | $ | 2,500 | $ | 1,296 |
| FET[2] | Revolving | December 2022 | | 1,000 | | — |
| | | Subtotal | $ | 3,500 | $ | 1,296 |
| | Cash and cash equivalents | | | — | | 1,792 |
| | | Total | $ | 3,500 | $ | 3,088 |

[1] FE and the Utilities. Available liquidity includes impact of $4 million of LOCs issued under various terms.
[2] Includes FET and the Transmission Companies.

The following table summarizes the borrowing sublimits for each borrower under the facilities, the limitations on short-term indebtedness applicable to each borrower under current regulatory approvals and applicable statutory and/or charter limitations as of January 31, 2021:

| Borrower | FirstEnergy Revolving Credit Facility Sublimit | FET Revolving Credit Facility Sublimit | Regulatory and Other Short-Term Debt Limitations | |
|---|---|---|---|---|
| | *(In millions)* | | | |
| FE | $ 1,500 | $ — | $ — | [1] |
| FET | — | 1,000 | — | [1] |
| OE | 500 | — | 500 | [2] |
| CEI | 500 | — | 500 | [2] |
| TE | 300 | — | 300 | [2] |
| JCP&L | 500 | — | 500 | [2] |
| ME | 500 | — | 500 | [2] |
| PN | 300 | — | 300 | [2] |
| WP | 200 | — | 200 | [2] |
| MP | 500 | — | 500 | [2] |
| PE | 150 | — | 150 | [2] |
| ATSI | — | 500 | 500 | [2] |
| Penn | 100 | — | 100 | [2] |
| TrAIL | — | 400 | 400 | [2] |
| MAIT | — | 400 | 400 | [2] |

[1] No limitations.
[2] Includes amounts which may be borrowed under the regulated companies' money pool.

Subject to each borrower's sublimit, $250 million of the FE credit facility and $100 million of the FET credit facility, is available for the issuance of LOCs (subject to borrowings drawn under the Facilities) expiring up to one year from the date of issuance. The stated amount of outstanding LOCs will count against total commitments available under each of the Facilities and against the applicable borrower's borrowing sublimit.

The Facilities do not contain provisions that restrict the ability to borrow or accelerate payment of outstanding advances in the event of any change in credit ratings of the borrowers. Pricing is defined in "pricing grids," whereby the cost of funds borrowed under the Facilities is related to the credit ratings of the company borrowing the funds. Additionally, borrowings under each of the Facilities are subject to the usual and customary provisions for acceleration upon the occurrence of events of default, including a cross-default for other indebtedness in excess of $100 million.

As of December 31, 2020, the borrowers were in compliance with the applicable debt-to-total-capitalization ratio covenants in each case as defined under the respective Facilities.

### FirstEnergy Money Pools

FirstEnergy's utility operating subsidiary companies also have the ability to borrow from each other and FE to meet their short-term working capital requirements. Similar but separate arrangements exist among FirstEnergy's unregulated companies with AE Supply, FE, FET, FEV and certain other unregulated subsidiaries. FESC administers these money pools and tracks surplus funds of FE and the respective regulated and unregulated subsidiaries, as the case may be, as well as proceeds available from bank borrowings. Companies receiving a loan under the money pool agreements must repay the principal amount of the loan, together with accrued interest, within 364 days of borrowing the funds. The rate of interest is the same for each company receiving a loan from their respective pool and is based on the average cost of funds available through the pool. The average interest rate for borrowings in 2020 was 0.89% per annum for the regulated companies' money pool and 1.19% per annum for the unregulated companies' money pool.

*Long-Term Debt Capacity*

FE's and its subsidiaries' access to capital markets and costs of financing are influenced by the credit ratings of their securities. The following table displays FE's and its subsidiaries' credit ratings as of February 15, 2021:

| | Corporate Credit Rating | | | Senior Secured | | | Senior Unsecured | | | Outlook/Watch [1] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Issuer | S&P | Moody's | Fitch | S&P | Moody's | Fitch | S&P | Moody's | Fitch | S&P | Moody's | Fitch |
| FE | BB | Ba1 | BB+ | | | | BB | Ba1 | BB+ | CW-N | N | N |
| AGC | BB | Baa2 | BBB- | | | | | | | CW-N | S | N |
| ATSI | BB | A3 | BBB- | | | | BB+ | A3 | BBB | CW-N | S | N |
| CEI | BB | Baa2 | BBB- | BBB | A3 | BBB+ | BB+ | Baa2 | BBB | CW-N | N | N |
| FET | BB | Baa2 | BB+ | | | | BB | Baa2 | BB+ | CW-N | N | N |
| JCP&L | BB | A3 | BBB- | | | | BB+ | A3 | BBB | CW-N | S | N |
| ME | BB | A3 | BBB- | | | | BB+ | A3 | BBB | CW-N | S | N |
| MAIT | BB | A3 | BBB- | | | | BB+ | A3 | BBB | CW-N | S | N |
| MP | BB | Baa2 | BBB- | BBB | A3 | BBB+ | BB+ | Baa2 | | CW-N | S | N |
| OE | BB | A3 | BBB- | BBB | A1 | BBB+ | BB+ | A3 | BBB | CW-N | N | N |
| PN | BB | Baa1 | BBB- | | | | BB+ | Baa1 | BBB | CW-N | S | N |
| Penn | BB | A3 | BBB- | BBB | A1 | BBB+ | | | | CW-N | S | N |
| PE | BB | Baa2 | BBB- | BBB | A3 | BBB+ | | | | CW-N | S | N |
| TE | BB | Baa1 | BBB- | BBB | A2 | BBB+ | | | | CW-N | N | N |
| TrAIL | BB | A3 | BBB- | | | | BB+ | A3 | BBB | CW-N | S | N |
| WP | BB | A3 | BBB- | BBB | A1 | BBB+ | | | | CW-N | S | N |

[1] S = Stable, P = Positive, N = Negative, CW-N = CreditWatch with Negative implications

On May 27, 2020, Moody's upgraded the issuer and senior unsecured ratings of JCP&L to A3 from Baa1 and the rating outlook was changed to stable.

On July 23, 2020, S&P placed the ratings of FE and its subsidiaries on CreditWatch with negative implications.

On July 24, 2020, Moody's revised FE's ratings outlook to negative from stable. FE's Baa3 corporate credit rating and Baa3 senior unsecured rating were affirmed.

On July 28, 2020, Fitch revised FE and its subsidiaries, with the exception of MP, AGC and PE, ratings outlook to negative from stable. The outlook of MP, AGC and PE is stable. Fitch also affirmed FE and its subsidiary ratings.

On August 14, 2020, Moody's affirmed OE's A3 senior unsecured and issuer ratings and Penn's A3 issuer rating. The outlooks were changed to stable from positive.

On October 30, 2020, Fitch downgraded FE and FET's issuer default ratings and senior unsecured ratings one notch to BBB- from BBB. Fitch also downgraded FE's subsidiaries issuer default ratings one notch to BBB from BBB+, except for PE, MP, and AGC, whose ratings were affirmed at BBB. Senior unsecured issue ratings for the subsidiaries were downgraded one notch, where applicable, to BBB+ from A-. Senior secured issue ratings for the subsidiaries were downgraded one notch, where applicable, to A- from A. The rating outlook is negative for FE and its subsidiaries.

On October 30, 2020, S&P downgraded FE and its subsidiaries issuer credit ratings two notches to BB+ from BBB, except for AGC which was lowered to BB from BBB-. The senior unsecured issue ratings of FE and FET were changed one notch to BB+ from BBB-. The senior unsecured issue ratings of the subsidiaries, where applicable, were lowered one notch to BBB- from BBB. Additionally, the senior secured issue ratings of the subsidiaries, where applicable, were lowered one notch to BBB+ from A-. The ratings on FE and its subsidiaries remain on CreditWatch with negative implications.

On November 20, 2020, Fitch downgraded the issuer default rating (IDR) and senior unsecured ratings of FE and FET one notch, to BB+ from BBB-. The IDRs of the remaining subsidiaries were also lowered one notch to BBB- from BBB, the senior unsecured ratings were lowered (where applicable) one notch to BBB from BBB+, and the senior secured ratings were lowered (where applicable) one notch to BBB+ from A-. The outlook for FE and its subsidiaries remains negative.

On November 24, 2020, Moody's downgraded the ratings of FE Corp, including its senior unsecured rating to Ba1 from Baa3. Moody's also assigned a Ba1 Corporate Family Rating to FE and withdrew FE's Baa3 Issuer Rating. The outlook for FE remains negative. Additionally, the outlooks for OE, TE, CE, and FET were changed to negative from stable.

On November 24, 2020, S&P downgraded FE and its subsidiaries issuer credit ratings to BB from BB+ and affirmed the BB issuer credit rating of AGC. The senior unsecured ratings on FE and FET were lowered to BB from BB+. The subsidiary senior unsecured ratings were lowered, where applicable, to BB+ from BBB-, and the senior secured ratings, where applicable, were lowered to BBB from BBB+. The ratings remain on CreditWatch Negative.

On December 17, 2020, Moody's assigned senior secured ratings of A3 to PE and A1 to WP.

On December 21, 2020, S&P assigned senior secured ratings of BBB to PE, Penn and WP.

As of December 31, 2020, $20 million of collateral has been posted by FE or its subsidiaries, of which, $19 million was posted as a result of the credit rating downgrades in the fourth quarter of 2020.

The applicable undrawn and drawn margin on the FE and FET credit facilities are subject to ratings-based pricing grids. The applicable fee paid on the undrawn commitments under the FE and FET credit facilities are based on FE and FET's senior unsecured non-credit enhanced debt ratings as determined by S&P and Moody's. The fee paid on actual borrowings are determined based on each borrower's senior unsecured non-credit enhanced debt ratings as determined by S&P and Moody's.

The interest rate payable on approximately $3.85 billion in FE's senior unsecured notes are subject to adjustments from time to time if the ratings on the notes from any one or more of S&P, Moody's and Fitch decreases to a rating set forth in the applicable documents. Generally a one-notch downgrade by the applicable rating agency may result in a 25 bps coupon rate increase beginning at BB, Ba1, and BB+ for S&P, Moody's and Fitch, respectively, to the extent such rating is applicable to the series of outstanding senior unsecured notes, during the next interest period, subject to an aggregate cap of 2% from issuance interest rate.

Debt capacity is subject to the consolidated debt-to-total-capitalization limits in the credit facilities previously discussed. As of December 31, 2020, FE and its subsidiaries could issue additional debt of approximately $4.8 billion, or incur a $2.6 billion reduction to equity, and remain within the limitations of the financial covenants required by the FE credit facility.

### Changes in Cash Position

As of December 31, 2020, FirstEnergy had $1,734 million of cash and cash equivalents and approximately $67 million of restricted cash compared to $627 million of cash and cash equivalents and approximately $52 million of restricted cash as of December 31, 2019, on the Consolidated Balance Sheets.

### Cash Flows From Operating Activities

FirstEnergy's most significant sources of cash are derived from electric service provided by its distribution and transmission operating subsidiaries. Beyond the cash settlement and tax sharing payments to the FES Debtors in 2020, and pension contribution in 2019, the most significant use of cash from operating activities is buying electricity to serve non-shopping customers and paying fuel suppliers, employees, tax authorities, lenders and others for a wide range of materials and services.

Net cash provided from operating activities was $1,423 million during 2020, $2,467 million during 2019 and $1,410 million during 2018.

_2020 compared with 2019_

Cash flows from operations decreased $1,044 million in 2020 as compared with 2019. The year-over-year change in cash from operations is primarily due to the $978 million cash settlement and tax sharing payments made to the FES Debtors upon their emergence in February 2020, an increase to accounts receivable customer balances due to the impact of COVID-19, and higher storm restoration costs, partially offset by the absence of a $500 million cash contribution to the qualified pension plan in 2019.

FirstEnergy's Consolidated Statements of Cash Flows combine cash flows from discontinued operations with cash flows from continuing operations within each cash flow category. The following table summarizes the major classes of operating cash flow items from discontinued operations for the years ended December 31, 2020, 2019 and 2018:

| (In millions) | For the Years Ended December 31, | | |
| | 2020 | 2019 | 2018 |
| --- | --- | --- | --- |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Income from discontinued operations | $ 76 | $ 8 | $ 326 |
| Gain on disposal, net of tax | (76) | (59) | (435) |
| Depreciation and amortization, including nuclear fuel, regulatory assets, net, intangible assets and deferred debt-related costs | — | — | 110 |
| Deferred income taxes and investment tax credits, net | — | 47 | 61 |
| Unrealized (gain) loss on derivative transactions | — | — | (10) |

*Cash Flows From Financing Activities*

Cash provided from financing activities was $2,607 million, $656 million, and $1,394 million in 2020, 2019, and 2018, respectively. The following table summarizes new equity and debt financing, redemptions, repayments, make-whole premiums paid on debt redemptions short-term borrowings and dividends:

| Securities Issued or Redeemed / Repaid | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | *(In millions)* | | |
| *New Issues* | | | |
| Preferred stock issuance | $ — | $ — | $ 1,616 |
| Common stock issuance | — | — | 850 |
| Unsecured notes | 3,250 | 1,850 | 850 |
| PCRBs | — | — | 74 |
| FMBs | 175 | 450 | 50 |
| Term loan | — | — | 500 |
| | $ 3,425 | $ 2,300 | $ 3,940 |
| | | | |
| *Redemptions / Repayments* | | | |
| Unsecured notes | $ (250) | $ (725) | $ (555) |
| PCRBs | — | — | (216) |
| FMBs | (50) | (1) | (325) |
| Term loan | (750) | — | (1,450) |
| Senior secured notes | (64) | (63) | (62) |
| | $ (1,114) | $ (789) | $ (2,608) |
| | | | |
| Tender premiums paid on debt redemptions | $ — | $ — | $ (89) |
| | | | |
| Short-term borrowings, net | $ 1,200 | $ — | $ 950 |
| | | | |
| Preferred stock dividend payments | $ — | $ (6) | $ (61) |
| | | | |
| Common stock dividend payments | $ (845) | $ (814) | $ (711) |

On February 20, 2020, FE issued $1.75 billion in senior unsecured notes in three separate series: (i) $300 million aggregate principal amount of 2.050% Notes, Series A, due 2025, (ii) $600 million aggregate principal amount of 2.650% Notes, Series B, due 2030 and (iii) $850 million aggregate principal amount of 3.400% Notes, Series C, due 2050. Proceeds from the issuance of the notes, together with cash on hand, were used: (i) to repay the entire $750 million two-year term loan due September 2021, (ii) to make the $853 million in bankruptcy settlement payments and $125 million tax sharing agreement payment with the FES Debtors as discussed above, (iii) to repay $250 million of the $1 billion outstanding 364-day term loan due September 2020, and (iv) for working capital needs and general corporate purposes.

On March 31, 2020, MAIT issued $125 million of 3.60% senior unsecured notes due 2032 and $125 million of 3.70% senior unsecured notes due 2035. Proceeds from the issuance of the notes were used: (i) to refinance existing debt, (ii) for capital expenditures, and (iii) for general corporate purposes.

On April 20, 2020, PN issued $125 million of 3.61% senior unsecured notes due 2032 and $125 million of 3.71% senior unsecured notes due 2035. Proceeds of the issuance of the notes were used: (i) to refinance indebtedness, including short-term borrowings incurred under the FirstEnergy regulated money pool to repay a portion of the $250 million aggregate principle amount of PN's 5.20% Senior Notes due April 1, 2020, (ii) to fund capital expenditures, (iii) to fund general corporate purposes, or (iv) for any combination of the above.

On June 8, 2020, FE issued $750 million in senior unsecured notes in two separate series: (i) $300 million aggregate principal amounts of 1.600% Notes, Series A, due 2026 and (ii) $450 million aggregate principal amount of 2.250% Notes, Series B, due 2030. Proceeds from the issuance of the notes were used to repay all amounts outstanding under the 364-day term loan due September 2020.

On June 29, 2020, PE issued $75 million of 2.67% FMBs due 2032 and $100 million of 3.43% FMBs due 2051. Proceeds of the issuance of the FMBs were used to repay short-term borrowings under the FirstEnergy regulated money pool, to fund capital expenditures, and for general corporate purposes.

On July 20, 2020, CEI issued $150 million of 2.77% senior unsecured notes due 2034 and $100 million of 3.23% senior unsecured notes due 2040. Proceeds from the issuance of the notes were used to refinance existing short-term borrowings, to fund capital expenditures, and for general corporate purposes.

### *Cash Flows From Investing Activities*

Cash used for investing activities in 2020 principally represented cash used for property additions. The following table summarizes investing activities for 2020, 2019 and 2018:

| Cash Used for (Provided from) Investing Activities | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | *(In millions)* | | |
| Property Additions: | | | |
| Regulated Distribution | $ 1,514 | $ 1,473 | $ 1,411 |
| Regulated Transmission | 1,067 | 1,090 | 1,104 |
| Corporate/Other | 76 | 102 | 160 |
| Proceeds from asset sales | (2) | (47) | (425) |
| Investments | 22 | 38 | 54 |
| Notes receivable from affiliated companies | — | — | 500 |
| Asset removal costs | 224 | 217 | 218 |
| Other | 7 | — | (4) |
| | $ 2,908 | $ 2,873 | $ 3,018 |

FirstEnergy's Consolidated Statements of Cash Flows combines cash flows from discontinued operations with cash flows from continuing operations within each cash flow category. The following table summarizes the major classes of investing cash flow items from discontinued operations for the years ended December 31, 2020, 2019 and 2018:

| (In millions) | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Property additions | $ — | $ — | $ (27) |
| Sales of investment securities held in trusts | — | — | 109 |
| Purchases of investment securities held in trusts | — | — | (122) |

## REGULATORY ASSETS AND LIABILITIES

Regulatory assets represent incurred costs that have been deferred because of their probable future recovery from customers through regulated rates. Regulatory liabilities represent amounts that are expected to be credited to customers through future regulated rates or amounts collected from customers for costs not yet incurred. FirstEnergy, the Utilities and the Transmission Companies net their regulatory assets and liabilities based on federal and state jurisdictions.

Management assesses the probability of recovery of regulatory assets at each balance sheet date and whenever new events occur. Factors that may affect probability relate to changes in the regulatory environment, issuance of a regulatory commission order or passage of new legislation. Management applies judgment in evaluating the evidence available to assess the probability of recovery of regulatory assets from customers, including, but not limited to evaluating evidence related to precedent for similar items at FirstEnergy and information on comparable companies within similar jurisdictions, as well as assessing progress of communications between FirstEnergy and regulators. Certain of these regulatory assets, totaling approximately $117 million and $111 million as of December 31, 2020 and December 31, 2019, respectively, are recorded based on prior precedent or anticipated recovery based on rate making premises without a specific order, of which, $79 million and $73 million as of December 31, 2020 and December 31, 2019, respectively, are being sought for recovery in a formula rate amendment filing at ATSI that is pending before FERC. See Note 14, "Regulatory Matters" for additional information.

The following table provides information about the composition of net regulatory assets and liabilities as of December 31, 2020 and December 31, 2019, and the changes during the year ended December 31, 2020:

| Net Regulatory Assets (Liabilities) by Source | December 31, 2020 | | December 31, 2019 | | Change | |
|---|---|---|---|---|---|---|
| | *(In millions)* | | | | | |
| Customer payables for future income taxes | $ | (2,369) | $ | (2,605) | $ | 236 |
| Nuclear decommissioning and spent fuel disposal costs | | (102) | | (197) | | 95 |
| Asset removal costs | | (721) | | (756) | | 35 |
| Deferred transmission costs | | 316 | | 298 | | 18 |
| Deferred generation costs | | 104 | | 214 | | (110) |
| Deferred distribution costs | | 136 | | 155 | | (19) |
| Contract valuations | | 41 | | 51 | | (10) |
| Storm-related costs | | 748 | | 551 | | 197 |
| Uncollectible and COVID-19 related costs | | 97 | | 3 | | 94 |
| Other | | 6 | | 25 | | (19) |
| Net Regulatory Liabilities included on the Consolidated Balance Sheets | $ | (1,744) | $ | (2,261) | $ | 517 |

The following is a description of the regulatory assets and liabilities described above:

**Customer payables for future income taxes** - Reflects amounts to be recovered or refunded through future rates to pay income taxes that become payable when rate revenue is provided to recover items such as AFUDC-equity and depreciation of property, plant and equipment for which deferred income taxes were not recognized for ratemaking purposes, including amounts attributable to tax rate changes such as tax reform. These amounts are being amortized over the period in which the related deferred tax assets reverse, which is generally over the expected life of the underlying asset.

**Nuclear decommissioning and spent fuel disposal costs** - Reflects a regulatory liability representing amounts collected from customers and placed in external trusts including income, losses and changes in fair value thereon (as well as accretion of the related ARO) primarily for the future decommissioning of TMI-2 and spent nuclear fuel disposal costs. As further discussed below, TMI-2, along with the NDT and related decommissioning liabilities, was transferred to TMI-2 Solutions, LLC, a subsidiary of Energy*Solutions*, LLC, on December 18, 2020, and therefore the related regulatory liabilities were written off. The remaining balance as of December 31, 2020, reflects liabilities for spent nuclear fuel disposal costs from former nuclear generating facilities, Oyster Creek and TMI-2.

**Asset removal costs** - Primarily represents the rates charged to customers that include a provision for the cost of future activities to remove assets, including obligations for which an ARO has been recognized, that are expected to be incurred at the time of retirement.

**Deferred transmission costs** - Principally represents differences between revenues earned based on actual costs for the formula-rate Transmission Companies and the amounts billed. Amounts are recorded as a regulatory asset or liability and recovered or refunded, respectively, in subsequent periods.

**Deferred generation costs** - Primarily relates to regulatory assets associated with the securitized recovery of certain electric customer heating discounts, fuel and purchased power regulatory assets at the Ohio Companies (amortized through 2034) as well as the ENEC at MP and PE. MP and PE recover net power supply costs, including fuel costs, purchased power costs and related expenses, net of related market sales revenue through the ENEC. The ENEC rate is updated annually.

**Deferred distribution costs** - Primarily relates to the Ohio Companies' deferral of certain expenses resulting from distribution and reliability related expenditures, including interest (amortized through 2036), which are recorded as a regulatory asset or liability and recovered or refunded, respectively, in subsequent periods.

**Contract valuations** - Includes the amortization of purchase accounting adjustments at PE which were recorded in connection with the Allegheny Energy, Inc. merger representing the fair value of NUG purchased power contracts (amortized over the life of the contracts through 2030).

**Storm-related costs** - Relates to the recovery of storm costs, which vary by jurisdiction. Approximately $167 million and $193 million are currently being recovered through rates as of December 31, 2020 and 2019, respectively.

**Uncollectible and COVID-19 related costs** - Includes the deferral of prudently incurred incremental costs arising from COVID-19, including uncollectible expenses under new and existing riders prior to the pandemic.

The following table provides information about the composition of net regulatory assets that do not earn a current return as of December 31, 2020 and 2019, of which approximately $195 million and $228 million, respectively, are currently being recovered through rates over varying periods, through 2068, depending on the nature of the deferral and the jurisdiction:

| Regulatory Assets by Source Not Earning a Current Return | December 31, 2020 | December 31, 2019 | Change |
|---|---|---|---|
| | (in millions) | | |
| Deferred transmission costs | $ 29 | $ 27 | $ 2 |
| Deferred generation costs | 5 | 15 | (10) |
| Storm-related costs | 654 | 471 | 183 |
| COVID-19 related costs | 66 | — | 66 |
| Other | 35 | 32 | 3 |
| Regulatory Assets Not Earning a Current Return | $ 789 | $ 545 | $ 244 |

## CONTRACTUAL OBLIGATIONS

As of December 31, 2020, FirstEnergy's estimated undiscounted cash payments under existing contractual obligations that it considers firm obligations are as follows:

| Contractual Obligations | Total | 2021 | 2022-2023 | 2024-2025 | Thereafter |
|---|---|---|---|---|---|
| | (In millions) | | | | |
| Long-term debt[1] | $ 22,377 | $ 132 | $ 2,337 | $ 3,269 | $ 16,639 |
| Short-term borrowings | 2,200 | 2,200 | — | — | — |
| Interest on long-term debt[2] | 12,808 | 999 | 1,874 | 1,647 | 8,288 |
| Operating leases[3] | 366 | 50 | 95 | 74 | 147 |
| Finance leases[3] | 61 | 18 | 23 | 8 | 12 |
| Fuel and purchased power[4] | 3,049 | 499 | 883 | 652 | 1,015 |
| Capital expenditures[5] | 2,028 | 548 | 778 | 702 | — |
| Pension funding | 870 | — | 399 | 471 | — |
| Total | $ 43,759 | $ 4,446 | $ 6,389 | $ 6,823 | $ 26,101 |

[1] Excludes unamortized discounts and premiums, fair value accounting adjustments and finance leases.
[2] Interest on variable-rate debt based on rates as of December 31, 2020.
[3] See Note 8, "Leases," of the Notes to Consolidated Financial Statements.
[4] Amounts under contract with fixed or minimum quantities based on estimated annual requirements.
[5] Amounts represent committed capital expenditures as of December 31, 2020.

Excluded from the table above are estimates for the cash outlays from power purchase contracts entered into by most of the Utilities and under which they procure the power supply necessary to provide generation service to their customers who do not choose an alternative supplier. Although actual amounts will be determined by future customer behavior and consumption levels, management currently estimates these cash outlays will be approximately $2.7 billion in 2021.

The table above also excludes regulatory liabilities (see Note 14, "Regulatory Matters"), AROs (see Note 13, "Asset Retirement Obligations"), reserves for litigation, injuries and damages, environmental remediation, and annual insurance premiums since the amount and timing of the cash payments are uncertain. The table also excludes accumulated deferred income taxes and investment tax credits since cash payments for income taxes are determined based primarily on taxable income for each applicable fiscal year.

GUARANTEES AND OTHER ASSURANCES

FirstEnergy has various financial and performance guarantees and indemnifications which are issued in the normal course of business. These contracts include performance guarantees, stand-by letters of credit, debt guarantees, surety bonds and indemnifications. FirstEnergy enters into these arrangements to facilitate commercial transactions with third parties by enhancing the value of the transaction to the third party. The maximum potential amount of future payments FirstEnergy and its subsidiaries could be required to make under these guarantees as of December 31, 2020, was approximately $1.7 billion, as summarized below:

| Guarantees and Other Assurances | Maximum Exposure |
|---|---:|
| | *(In millions)* |
| **FE's Guarantees on Behalf of its Consolidated Subsidiaries** | |
| AE Supply asset sales[1] | $ 570 |
| Deferred compensation arrangements | 475 |
| Fuel related contracts and other | 7 |
| | 1,052 |
| **FE's Guarantees on Other Assurances** | |
| Global Holding Facility | 108 |
| Deferred compensation arrangements | 146 |
| Surety Bonds | 328 |
| LOCs and other | 16 |
| | 598 |
| **Total Guarantees and Other Assurances** | $ 1,650 |

[1] As a condition to closing AE Supply's sale of four natural gas generating plants and an approximately 59% portion of AGC's interest in the Bath Power Station, FE provided the purchaser two limited three-year guarantees totaling $555 million of certain obligations of AE Supply and AGC, which by their terms expire in May 2021. In addition, as a condition to closing AE Supply's transfer of Pleasants Power Station and as contemplated under the FES Bankruptcy settlement agreement, FE has provided two additional guarantees for certain retained liabilities of AE Supply, the first totaling up to $15 million for certain environmental liabilities associated with Pleasants Power Station, and the second being limited solely to environmental liabilities for the McElroy's Run CCR impoundment facility, for which an ARO of $46 million is reflected on FirstEnergy's Consolidated Balance Sheet, and which is not reflected on the table above.

*Collateral and Contingent-Related Features*

In the normal course of business, FE and its subsidiaries may enter into physical or financially settled contracts for the sale and purchase of electric capacity, energy, fuel and emission allowances. Certain agreements contain provisions that require FE or its subsidiaries to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon FE's or its subsidiaries' credit rating from each of the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty.

As of December 31, 2020, $20 million of collateral has been posted by FE or its subsidiaries, of which, $19 million was posted as a result of the credit rating downgrades in the fourth quarter of 2020, as further discussed above.

These credit-risk-related contingent features stipulate that if the subsidiary were to be downgraded or lose its investment grade credit rating (based on its senior unsecured debt rating), it would be required to provide additional collateral. The following table discloses the potential additional credit rating contingent contractual collateral obligations as of December 31, 2020:

| Potential Collateral Obligations | Utilities and FET | FE | Total |
|---|---:|---:|---:|
| | *(In millions)* | | |
| Contractual Obligations for Additional Collateral | | | |
| Upon Further Downgrade | $ 37 | $ — | $ 37 |
| Surety Bonds (Collateralized Amount)[1] | 55 | 258 | 313 |
| Total Exposure from Contractual Obligations | $ 92 | $ 258 | $ 350 |

[1] Surety Bonds are not tied to a credit rating. Surety Bonds' impact assumes maximum contractual obligations, which is ordinarily 100% of the face amount of the surety bond except with the respect to $39 million of surety obligations for which the collateral obligation is capped at 60% of the face amount, and typical obligations require 30 days to cure.

*Other Commitments and Contingencies*

FE is a guarantor under a $120 million syndicated senior secured term loan facility due November 12, 2024, under which Global Holding's outstanding principal balance is $108 million as of December 31, 2020. Signal Peak, Global Rail, Global Mining Group, LLC and Global Coal Sales Group, LLC, each being a direct or indirect subsidiary of Global Holding, and FE continue to provide their joint and several guaranties of the obligations of Global Holding under the facility.

In connection with the facility, 69.99% of Global Holding's direct and indirect membership interests in Signal Peak, Global Rail and their affiliates along with FEV's and WMB Marketing Ventures, LLC's respective 33-1/3% membership interests in Global Holding, are pledged to the lenders under the current facility as collateral.

## MARKET RISK INFORMATION

FirstEnergy uses various market risk sensitive instruments, including derivative contracts, primarily to manage the risk of price and interest rate fluctuations. FirstEnergy's Risk Policy Committee, comprised of members of senior management, provides general oversight for risk management activities throughout the company.

*Commodity Price Risk*

FirstEnergy has limited exposure to financial risks resulting from fluctuating commodity prices, including prices for electricity, natural gas, coal and energy transmission. FirstEnergy's Risk Management Committee is responsible for promoting the effective design and implementation of sound risk management programs and oversees compliance with corporate risk management policies and established risk management practice.

The valuation of derivative contracts is based on observable market information. As of December 31, 2020, FirstEnergy has a net liability of $3 million in non-hedge derivative contracts that are related to FTRs at certain of the Utilities. FTRs are subject to regulatory accounting and do not impact earnings.

*Equity Price Risk*

As of December 31, 2020, the FirstEnergy pension plan assets were allocated approximately as follows: 23% in equity securities, 35% in fixed income securities, 7% in hedge funds, 4% in insurance-linked securities, 9% in real estate, 5% in private equity and 17% in cash and short-term securities. A decline in the value of pension plan assets could result in additional funding requirements. FirstEnergy's funding policy is based on actuarial computations using the projected unit credit method. On February 1, 2019, FirstEnergy made a $500 million voluntary cash contribution to the qualified pension plan. As a result of this contribution and pension investment performance returns to date, FirstEnergy expects no required contributions until 2022. As of December 31, 2020, FirstEnergy's OPEB plan assets were allocated approximately 55% in equity securities, 28% in fixed income securities and 17% in cash and short-term securities. Investment markets experienced elevated market volatility during 2020 as a result of the U.S. general election and the COVID-19 pandemic. In order to reduce the effect of market volatility on the plan's funded status and to preserve capital gains experienced during the first half of 2020, approximately $1.4 billion of return-seeking assets were sold (including approximately $800 million of equity securities) during the third quarter of 2020. These assets are expected be reinvested in return seeking investments (including equity securities) during 2021, which will more consistently align the pension and OPEB trust portfolios to the company's target asset allocations. See Note 5, "Pension and Other Post-Employment Benefits," of the Notes to Consolidated Financial Statements for additional details on FirstEnergy's pension and OPEB plans.

During 2020, FirstEnergy's pension and OPEB plan assets gained approximately 14.8% and 13.2%, respectively, as compared to an annual expected return on plan assets of 7.50%. On February 27, 2020, FirstEnergy remeasured its plan assets, and from that date through December 31, 2020, FirstEnergy's pension and OPEB plan assets gained approximately 11.6% and 12.5%, respectively.

*Interest Rate Risk*

FirstEnergy's exposure to fluctuations in market interest rates is reduced since a significant portion of debt has fixed interest rates, as noted in the table below. FirstEnergy is subject to the inherent interest rate risks related to refinancing maturing debt by issuing new debt securities.

**Comparison of Carrying Value to Fair Value**

| Year of Maturity | 2021 | 2022 | 2023 | 2024 | 2025 | There- after | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| | | | | *(In millions)* | | | | |
| **Assets:** | | | | | | | | |
| Investments Other Than Cash and Cash Equivalents: | | | | | | | | |
| Fixed Income | $  — | $  — | $  — | $  — | $  — | $  276 | $  276 | $  401 |
| Average interest rate | — % | — % | — % | — % | — % | 4.0 % | 4.0 % | |
| | | | | | | | | |
| **Liabilities:** | | | | | | | | |
| Long-term Debt: | | | | | | | | |
| Fixed rate | $  132 | $ 1,143 | $ 1,194 | $ 1,246 | $ 2,023 | $16,639 | $22,377 | $ 25,465 |
| Average interest rate | 3.7 % | 4.1 % | 4.1 % | 4.7 % | 3.8 % | 4.6 % | 4.5 % | |

FirstEnergy recognizes net actuarial gains or losses for its pension and OPEB plans in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement. A primary factor contributing to these actuarial gains and losses are changes in the discount rates used to value pension and OPEB obligations as of the measurement date and the difference between expected and actual returns on the plans' assets.

## CREDIT RISK

Credit risk is the risk that FirstEnergy would incur a loss as a result of nonperformance by counterparties of their contractual obligations. FirstEnergy maintains credit policies and procedures with respect to counterparty credit (including requirement that counterparties maintain specified credit ratings) and require other assurances in the form of credit support or collateral in certain circumstance in order to limit counterparty credit risk. In addition, in response to the COVID-19 pandemic, FirstEnergy has increased reviews of counterparties, customers and industries that have been negatively impacted, which could affect meeting contractual obligations with FirstEnergy. FirstEnergy has concentrations of suppliers and customers among electric utilities, financial institutions and energy marketing and trading companies. These concentrations may impact FirstEnergy's overall exposure to credit risk, positively or negatively, as counterparties may be similarly affected by changes in economic, regulatory or other conditions. In the event an energy supplier of the Ohio Companies, Pennsylvania Companies, JCP&L or PE defaults on its obligation, the affected company would be required to seek replacement power in the market. In general, subject to regulatory review or other processes, it is expected that appropriate incremental costs incurred by these entities would be recoverable from customers through applicable rate mechanisms, thereby mitigating the financial risk for these entities. FirstEnergy's credit policies to manage credit risk include the use of an established credit approval process, daily credit mitigation provisions, such as margin, prepayment or collateral requirements, and surveys to determine negative impacts to essential vendors as a result of the COVID-19 pandemic. FirstEnergy and its subsidiaries may request additional credit assurance, in certain circumstances, in the event that the counterparties' credit ratings fall below investment grade, their tangible net worth falls below specified percentages or their exposures exceed an established credit limit.

## OUTLOOK

### CARES ACT

On March 27, 2020, President Trump signed into law the CARES Act, an economic stimulus package in response to the COVID-19 pandemic containing several corporate income tax provisions, including making remaining AMT credits immediately refundable; providing a 5-year carryback of NOLs generated in tax years 2018, 2019, and 2020, and removing the 80% taxable income limitation on utilization of those NOLs if carried back to prior tax years or utilized in tax years beginning before 2021; and temporarily liberalizing the interest deductibility rules under Section 163(j) of the Tax Act, by raising the adjusted taxable income limitation from 30% to 50% for tax years 2019 and 2020 and giving taxpayers the election of using 2019 adjusted taxable income for purposes of computing 2020 interest deductibility. FirstEnergy has applied for refund of its remaining approximately $18 million refundable AMT credits. FirstEnergy does not expect to generate additional income tax refunds from the carryback of NOLs and expects interest to be fully deductible in the 2020 consolidated federal income tax return and going forward. FirstEnergy does not currently expect the other provisions of the CARES Act to have a material effect on current income tax expense or the realizability of deferred income tax assets.

On July 28, 2020, the IRS issued final regulations implementing interest expense deduction limitation rules under section 163(j) of the Internal Revenue Code. The final regulations changed certain rules on the computation of interest expense and limitation amount, as well as rules relevant to status as a regulated utility business and the allocation of consolidated group interest expense between utility and non-utility businesses. After reviewing the final regulations, FirstEnergy recorded a true-up to prior years' reserve estimates during the third quarter of 2020, which did not have a material impact to FirstEnergy's income statement. On January 6, 2021, the IRS released an additional set of final regulations under Section 163(j) primarily addressing partnership, real estate, and certain controlled foreign corporation issues, which do not materially impact FirstEnergy.

### STATE REGULATION

Each of the Utilities' retail rates, conditions of service, issuance of securities and other matters are subject to regulation in the states in which it operates - in Maryland by the MDPSC, in New Jersey by the NJBPU, in Ohio by the PUCO, in Pennsylvania by the PPUC, in West Virginia by the WVPSC and in New York by the NYPSC. The transmission operations of PE in Virginia, ATSI in Ohio, and the Transmission Companies in Pennsylvania are subject to certain regulations of the VSCC, PUCO and PPUC, respectively. In addition, under Ohio law, municipalities may regulate rates of a public utility, subject to appeal to the PUCO if not acceptable to the utility. Further, if any of the FirstEnergy affiliates were to engage in the construction of significant new transmission facilities, depending on the state, they may be required to obtain state regulatory authorization to site, construct and operate the new transmission facility.

The following table summarizes the key terms of distribution rate orders in effect for the Utilities:

| Company | Rates Effective | Allowed Debt/ Equity | Allowed ROE |
|---|---|---|---|
| CEI | May 2009 | 51% / 49% | 10.5% |
| ME[1] | January 2017 | 48.8% / 51.2% | Settled[2] |
| MP | February 2015 | 54% / 46% | Settled[2] |
| JCP&L[3] | January 2017 | 55% / 45% | 9.6% |
| OE | January 2009 | 51% / 49% | 10.5% |
| PE (West Virginia) | February 2015 | 54% / 46% | Settled[2] |
| PE (Maryland) | March 2019 | 47% / 53% | 9.65% |
| PN[1] | January 2017 | 47.4% / 52.6% | Settled[2] |
| Penn[1] | January 2017 | 49.9% / 50.1% | Settled[2] |
| TE | January 2009 | 51% / 49% | 10.5% |
| WP[1] | January 2017 | 49.7% / 50.3% | Settled[2] |

[1] Reflects filed debt/equity as final settlement/orders do not specifically include capital structure.
[2] Commission-approved settlement agreements did not disclose ROE rates.
[3] On October 28, 2020, the NJBPU approved JCP&L's distribution rate case settlement with an allowed ROE of 9.6% and a 48.56% debt / 51.44% equity capital structure. Rates are effective for customers on November 1, 2021, but beginning January 1, 2021, JCP&L will offset the impact to customers' bills by amortizing an $86 million regulatory liability.

### MARYLAND

PE operates under MDPSC approved base rates that were effective as of March 23, 2019. PE also provides SOS pursuant to a combination of settlement agreements, MDPSC orders and regulations, and statutory provisions. SOS supply is competitively procured in the form of rolling contracts of varying lengths through periodic auctions that are overseen by the MDPSC and a third-party monitor. Although settlements with respect to SOS supply for PE customers have expired, service continues in the same manner until changed by order of the MDPSC. PE recovers its costs plus a return for providing SOS.

The EmPOWER Maryland program requires each electric utility to file a plan to reduce electric consumption and demand 0.2% per year, up to the ultimate goal of 2% annual savings, for the duration of the 2018-2020 and 2021-2023 EmPOWER Maryland program cycles, to the extent the MDPSC determines that cost-effective programs and services are available. PE's approved 2018-2020 EmPOWER Maryland plan continues and expands upon prior years' programs, and adds new programs, for a projected total cost of $116 million over the three-year period. PE recovers program costs through an annually reconciled surcharge, with most costs subject to a five-year amortization. Maryland law only allows for the utility to recover lost distribution revenue attributable to energy efficiency or demand reduction programs through a base rate case proceeding, and to date, such recovery has not been sought or obtained by PE. On September 1, 2020, PE filed its proposed plan for the 2021-2023 EmPOWER Maryland program cycle. The new plan largely continues PE's existing programs and is estimated to cost approximately $148 million over the three-year period. The MDPSC approved the plan on December 18, 2020.

On January 19, 2018, PE filed a joint petition along with other utility companies, work group stakeholders and the MDPSC electric vehicle work group leader to implement a statewide electric vehicle portfolio in connection with a 2016 MDPSC proceeding to consider an array of issues relating to electric distribution system design, including matters relating to electric vehicles, distributed energy resources, advanced metering infrastructure, energy storage, system planning, rate design, and impacts on low-income customers. PE proposed an electric vehicle charging infrastructure program at a projected total cost of

$12 million, to be recovered over a five-year amortization. On January 14, 2019, the MDPSC approved the petition subject to certain reductions in the scope of the program. The MDPSC approved PE's compliance filing, which implements the pilot program, with minor modifications, on July 3, 2019.

On August 24, 2018, PE filed a base rate case with the MDPSC, which it supplemented on October 22, 2018, to update the partially forecasted test year with a full twelve months of actual data. The rate case requested an annual increase in base distribution rates of $19.7 million, plus creation of an EDIS to fund four enhanced service reliability programs. In responding to discovery, PE revised its request for an annual increase in base rates to $17.6 million. The proposed rate increase reflected $7.3 million in annual savings for customers resulting from the recent federal tax law changes. On March 22, 2019, the MDPSC issued a final order that approved a rate increase of $6.2 million, approved three of the four EDIS programs for four years, directed PE to file a new depreciation study within 18 months, and ordered the filing of a new base rate case in four years to correspond to the ending of the approved EDIS programs. On September 22, 2020, PE filed its depreciation study reflecting a depreciation expense of $36.2 million, which represented a slight increase, and as a result, is seeking difference in depreciation be deferred for future recovery in PE's next base rate case. The MDPSC has set the matter for hearing and delegated it to a public utility law judge. On November 6, 2020, an order was issued scheduling evidentiary hearings in April 2021. On January 29, 2021, the Maryland Office of People's Counsel filed testimony recommending a reduction in depreciation expense of $10.8 million, and the staff of the MDPSC filed testimony recommending a reduction of $9.6 million. PE's rebuttal testimony is due on March 2, 2021.

Maryland's Governor issued an order on March 16, 2020, forbidding utilities from terminating residential service or charging late fees for non-payment for the duration of the COVID-19 pandemic. On April 9, 2020, the MDPSC issued an order allowing utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic, including incremental uncollectible expense, incurred from the date of the Governor's order (or earlier if the utility could show that the expenses related to suspension of service terminations). On July 8, 2020, the MDPSC issued a notice opening a public conference to collect information from utilities and other stakeholders about the impacts of the COVID-19 pandemic on the utilities and their customers. The MDPSC subsequently issued orders allowing Maryland electric and gas utilities to resume residential service terminations for non-payment on November 15, 2020, subject to various restrictions, and clarifying that utilities could resume charging late fees on October 1, 2020.

### NEW JERSEY

JCP&L operates under NJBPU approved rates that were effective as of January 1, 2017. JCP&L provides BGS for retail customers who do not choose a third-party EGS and for customers of third-party EGSs that fail to provide the contracted service. All New Jersey EDCs participate in this competitive BGS procurement process and recover BGS costs directly from customers as a charge separate from base rates.

On April 18, 2019, pursuant to the May 2018 New Jersey enacted legislation establishing a ZEC program to provide ratepayer funded subsidies of New Jersey nuclear energy supply, the NJBPU approved the implementation of a non-bypassable, irrevocable ZEC charge for all New Jersey electric utility customers, including JCP&L's customers. Once collected from customers by JCP&L, these funds will be remitted to eligible nuclear energy generators.

In December 2017, the NJBPU issued proposed rules to modify its current CTA policy in base rate cases to: (i) calculate savings using a five-year look back from the beginning of the test year; (ii) allocate savings with 75% retained by the company and 25% allocated to ratepayers; and (iii) exclude transmission assets of electric distribution companies in the savings calculation, which were published in the NJ Register in the first quarter of 2018. JCP&L filed comments supporting the proposed rulemaking. On January 17, 2019, the NJBPU approved the proposed CTA rules with no changes. On May 17, 2019, the Rate Counsel filed an appeal with the Appellate Division of the Superior Court of New Jersey. Oral Argument is scheduled for March 10, 2021. JCP&L is contesting this appeal but is unable to predict the outcome of this matter.

Also, in December 2017, the NJBPU approved its IIP rulemaking. The IIP creates a financial incentive for utilities to accelerate the level of investment needed to promote the timely rehabilitation and replacement of certain non-revenue producing components that enhance reliability, resiliency, and/or safety. On May 8, 2019, the NJBPU approved a stipulation of settlement submitted by JCP&L, Rate Counsel, NJBPU staff and New Jersey Large Energy Users Coalition to implement JCP&L's infrastructure plan, JCP&L Reliability Plus. The plan provides that JCP&L will invest up to approximately $97 million in capital investments beginning on June 1, 2019 through December 31, 2020, to enhance the reliability and resiliency of JCP&L's distribution system and reduce the frequency and duration of power outages. JCP&L shall seek recovery of the capital investment through an accelerated cost recovery mechanism, provided for in the rules, that includes a revenue adjustment calculation and a process for two rate adjustments. The NJBPU approved adjusted rates that took effect on March 1, 2020. As further discussed below, JCP&L will recover the IIP capital investments, which totaled $97 million, as part of its distribution base rate case.

On February 18, 2020, JCP&L submitted a filing with the NJBPU requesting a distribution base rate increase of $186.9 million on an annual basis, which represents an overall average increase in JCP&L rates of 7.8%. The filing seeks to recover certain costs associated with providing safe and reliable electric service to JCP&L customers, along with recovery of previously incurred storm costs. JCP&L proposed a rate effective date of March 19, 2020. The NJBPU issued orders suspending JCP&L's proposed rates

until November 19, 2020. JCP&L filed updates to the requested distribution base rate in both June and July 2020, resulting in JCP&L seeking a total annual distribution base rate increase of approximately $185 million. On October 16, 2020, the parties submitted a stipulation of settlement to the administrative law judge, providing for, among other things, a $94 million annual base distribution revenues increase for JCP&L based on an ROE of 9.6%, which will become effective for customers on November 1, 2021. Until the rates become effective, and starting on January 1, 2021, JCP&L is permitted to amortize an existing regulatory liability totaling approximately $86 million to offset the base rate increase that otherwise would have occurred in this period. The parties also agreed that the actual net gain from the sale of JCP&L's interest in the Yards Creek pumped-storage hydro generation facility in New Jersey (210 MWs), as further discussed below, shall be applied to reduce JCP&L's existing regulatory asset for previously deferred storm costs. Lastly, the parties agreed that $95.1 million of Reliability Plus capital investment for projects through December 31, 2020 is included in rate base effective December 31, 2020, with a final prudence review of only those capital investment projects from July 1, 2020 through December 31, 2020 to occur in January 2021. On October 22, 2020, the administrative law judge entered an initial decision adopting the settlement. On October 28, 2020, the NJBPU approved the settlement and directed an upcoming management audit for JCP&L. On January 4, 2021, JCP&L submitted its review of storm costs as required under the stipulation of settlement. On January 15, 2021, JCP&L filed a written report for its Reliability Plus projects placed in service from July 1, 2020 through December 31, 2020, also as required under the stipulation of settlement.

On April 6, 2020, JCP&L signed an asset purchase agreement with Yards Creek Energy, LLC, a subsidiary of LS Power to sell its 50% interest in the Yards Creek pumped-storage hydro generation facility. Subject to terms and conditions of the agreement, the base purchase price is $155 million. On July 31, 2020, FERC approved the transfer of JCP&L's interest in the hydroelectric operating license. On October 8, 2020, FERC issued an order authorizing the transfer of JCP&L's ownership interest in the hydroelectric facilities. On October 28, 2020, the NJBPU approved the sale of Yards Creek. Completion of the transaction is subject to several closing conditions; there can be no assurance that all closing conditions will be satisfied or that the transaction will be consummated. JCP&L currently anticipates closing of the transaction to occur during the first quarter of 2021. Assets held for sale on FirstEnergy's Consolidated Balance Sheets associated with the transaction consist of property, plant and equipment of $45 million, which is included in the regulated distribution segment.

On August 27, 2020, JCP&L filed an AMI Program with the NJBPU, which proposes the deployment of approximately 1.2 million advanced meters over a three-year period beginning on January 1, 2023, at a total cost of approximately $418 million, including the pre-deployment phase. The 3-year deployment is part of the 20-year AMI Program that is expected to cost a total of approximately $732 million and proposes a cost recovery mechanism through a separate AMI tariff rider. On January 13, 2021, a procedural schedule was established, which includes evidentiary hearings the week of May 24, 2021.

On June 10, 2020, the NJBPU issued an order establishing a framework for the filing of utility-run energy efficiency and peak demand reduction programs in accordance with the New Jersey Clean Energy Act. Under the established framework, JCP&L will recover its program investments over a ten year amortization period and its operations and maintenance expenses on an annual basis, be eligible to receive lost revenues on energy savings that resulted from its programs and be eligible for incentives or subject to penalties based on its annual program performance, beginning in the fifth year of its program offerings. On September 25, 2020, JCP&L filed its energy efficiency and peak demand reduction program. JCP&L's program consists of 11 energy efficiency and peak demand reduction programs and subprograms to be run from July 1, 2021 through June 30, 2024. The program also seeks approval of cost recovery totaling approximately $230 million as well as lost revenues associated with the energy savings resulting from the programs. While a procedural order has been established in this matter, on January 20, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions. The Clean Energy Act contemplates a final order from the NJBPU by May 2, 2021.

On July 2, 2020, the NJBPU issued an order allowing New Jersey utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic beginning March 9, 2020 through September 30, 2021, or until the Governor issues an order stating that the COVID-19 pandemic is no longer in effect. New Jersey utilities can request recovery of such regulatory asset in a stand-alone COVID-19 regulatory asset filing or future base rate case. On August 21, 2020, the Governor of New Jersey issued a press release announcing that the New Jersey utilities agreed to extend their voluntary moratorium preventing shutoffs to both residential and commercial customers during the COVID-19 pandemic until October 15, 2020. On October 15, 2020, the Governor issued an Executive Order prohibiting utilities from terminating service to any residential gas, electric, public and private water customer, through March 15, 2021, requiring the reconnection of certain customers, and disallowing the charging of late payment charges or reconnection fees during the public health emergency. On October 28, 2020, the NJBPU issued an order expanding the scope of the proceeding to examine all pandemic issues, including recovery of the COVID-19 regulatory assets, by way of a generic proceeding. On November 30, 2020, JCP&L submitted comments.

The recent credit rating actions taken on October 28, 2020, by S&P and Fitch triggered a requirement from various NJBPU orders that JCP&L file a mitigation plan, which was filed on November 5, 2020, to demonstrate that JCP&L has sufficient liquidity to meet its BGS obligations. On December 11, 2020, the NJBPU held a public hearing on the mitigation plan. Written comments on JCP&L's mitigation plan were submitted on January 8, 2021.

OHIO

The Ohio Companies operate under base distribution rates approved by the PUCO effective in 2009. The Ohio Companies' residential and commercial base distribution revenues were decoupled, through a mechanism that took effect on February 1, 2020 and under which the Ohio Companies billed customers until February 9, 2021, to the base distribution revenue and lost distribution revenue associated with energy efficiency and peak demand reduction programs recovered as of the twelve-month period ending on December 31, 2018. The Ohio Companies currently operate under ESP IV effective June 1, 2016, and continuing through May 31, 2024, that continues the supply of power to non-shopping customers at a market-based price set through an auction process. ESP IV also continues the DCR rider, which supports continued investment related to the distribution system for the benefit of customers, with increased revenue caps of $20 million per year from June 1, 2019 through May 31, 2022; and $15 million per year from June 1, 2022 through May 31, 2024. In addition, ESP IV includes: (1) continuation of a base distribution rate freeze through May 31, 2024; (2) the collection of lost distribution revenue associated with energy efficiency and peak demand reduction programs, which is discussed further below; (3) a goal across FirstEnergy to reduce $CO_2$ emissions by 90% below 2005 levels by 2045; and (4) contributions, totaling $51 million to: (a) fund energy conservation programs, economic development and job retention in the Ohio Companies' service territories; (b) establish a fuel-fund in each of the Ohio Companies' service territories to assist low-income customers; and (c) establish a Customer Advisory Council to ensure preservation and growth of the competitive market in Ohio.

ESP IV further provided for the Ohio Companies to collect through the DMR $132.5 million annually for three years beginning in 2017, grossed up for federal income taxes, resulting in an approved amount of approximately $168 million annually in 2018 and 2019. On appeal, the SCOH, on June 19, 2019, reversed the PUCO's determination that the DMR is lawful, and remanded the matter to the PUCO with instructions to remove the DMR from ESP IV. The PUCO entered an order directing the Ohio Companies to cease further collection through the DMR, credit back to customers a refund of the DMR funds collected since July 2, 2019 and remove the DMR from ESP IV. On July 15, 2019, OCC filed a Notice of Appeal with the SCOH, challenging the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017 for OE and claiming a $42 million refund is due to OE customers. On December 1, 2020, the SCOH reversed the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for OE for calendar year 2017, and remanded the case to the PUCO with instructions to conduct new proceedings which includes the DMR revenues in the analysis, determines the threshold against which the earned return is measured, and makes other necessary determinations. FirstEnergy is unable to predict the outcome of these proceedings but has not deemed a liability probable as of December 31, 2020.

On July 23, 2019, Ohio enacted HB 6, which established support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, HB 6 included provisions implementing a decoupling mechanism for Ohio electric utilities and ending current energy efficiency program mandates on December 31, 2020, provided that statewide energy efficiency mandates are achieved as determined by the PUCO. On February 26, 2020, the PUCO ordered a wind-down of statutorily required energy efficiency programs to commence on September 30, 2020, that the programs terminate on December 31, 2020, with the Ohio Companies' existing portfolio plans extended through 2020 without changes.

On November 21, 2019, the Ohio Companies applied to PUCO for approval of a decoupling mechanism, which would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. On January 15, 2020, the PUCO approved the Ohio Companies' decoupling application, and the decoupling mechanism took effect on February 1, 2020. Legislation has been introduced in the first quarter of 2021 to, among other things, repeal parts of HB 6, the legislation that established support for nuclear energy supply in Ohio, provided for a decoupling mechanism for Ohio electric utilities, and provided for the ending of current energy efficiency program mandates. As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (Rider CSR) to zero. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further discussed herein. As a result of the partial settlement, and the decision to not seek lost distribution revenue, FirstEnergy recognized a $108 million pre-tax charge ($84 million after-tax) in the fourth quarter of 2020, and $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue. FirstEnergy does not believe a refund for previously collected amounts under decoupling, which was approximately $18 million, is probable. Furthermore, as FirstEnergy would not have financially benefited from the Clean Air Fund included in HB 6, which is the mechanism to provide support to nuclear energy in Ohio, there is no expected additional impact to FirstEnergy due to any repeal of that provision of HB 6.

On July 17, 2019, the PUCO approved, with no material modifications, a settlement agreement that provides for the implementation of the Ohio Companies' first phase of grid modernization plans, including the investment of $516 million over three years to modernize the Ohio Companies' electric distribution system, and for all tax savings associated with the Tax Act to flow back to customers. The settlement had broad support, including PUCO staff, the OCC, representatives of industrial and commercial customers, a low-income advocate, environmental advocates, hospitals, competitive generation suppliers and other parties.

In March 2020, the PUCO issued entries directing utilities to review their service disconnection and restoration policies and suspend, for the duration of the COVID-19 pandemic, otherwise applicable requirements that may impose a service continuity hardship or service restoration hardship on customers. The Ohio Companies are utilizing their existing approved cost recovery mechanisms where applicable to address the financial impacts of these directives. On July 31, 2020, the Ohio Companies filed with the PUCO their transition plan and requests for waivers to allow for the safe resumption of normal business operations, including service disconnections for non-payment. On September 23, 2020, the PUCO approved the Ohio Companies' transition plan, including approval of the resumption of service disconnections for non-payment, which the Ohio Companies began on October 5, 2020.

On July 29, 2020, the PUCO consolidated the Ohio Companies' Applications for determination of the existence of significantly excessive earnings, or SEET, under ESP IV for calendar years 2018 and 2019, which had been previously filed on July 15, 2019, and May 15, 2020, respectively, and set a procedural schedule with evidentiary hearings scheduled for October 29, 2020. The calculations included in the Ohio Companies' SEET filings for calendar years 2018 and 2019 demonstrate that the Ohio Companies did not have significantly excessive earnings, however, FirstEnergy and the Ohio Companies are unable to predict the PUCO's ultimate determination of the applications. On August 3, 2020, the OCC filed an interlocutory appeal asking the PUCO to stay the SEET proceeding until the SCOH determines whether DMR should be excluded from the SEET, as further discussed above. Furthermore, on January 21, 2021, Senate Bill 10 was introduced, which would repeal legislation passed in 2019 that permitted the Ohio Companies to file their SEET results on a consolidated basis instead of on an individual company basis. On September 4, 2020, the PUCO opened its quadrennial review of ESP IV, consolidated it with the Ohio Companies' 2018 and 2019 SEET Applications, and set a procedural schedule for the consolidated matters. On October 29, 2020, the PUCO issued an entry extending the deadline for the Ohio Companies to file quadrennial review of ESP IV testimony to March 1, 2021, with the evidentiary hearings to commence no sooner than May 3, 2021. On January 12, 2021, the PUCO consolidated these matters with the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017, which the SCOH had remanded to the PUCO.

On September 8, 2020, the OCC filed motions in the Ohio Companies' corporate separation audit and DMR audit dockets, requesting the PUCO to open an investigation and management audit, hire an independent auditor, and require FirstEnergy to show it did not improperly use money collected from consumers or violate any utility regulatory laws, rules or orders in its activities regarding HB 6. The Ohio Companies' filed a response in opposition to the OCC's motions on September 23, 2020. On December 30, 2020, in response to the OCC's motion, the PUCO reopened the DMR audit docket, and directed PUCO staff to solicit a third-party auditor and conduct a full review of the DMR to ensure funds collected from ratepayers through the DMR were only used for the purposes established in ESP IV. Deadlines relating to the selection of the auditor and the issuance of the final audit report have not yet been set.

On September 15, 2020, the PUCO opened a new proceeding to review the political and charitable spending by the Ohio Companies in support of HB 6 and the subsequent referendum effort, directing the Ohio Companies to show cause, demonstrating that the costs of any political or charitable spending in support of HB 6, or the subsequent referendum effort, were not included, directly or indirectly, in any rates or charges paid by ratepayers. The Ohio Companies filed a response on September 30, 2020, stating that any political and charitable spending in support of HB 6 or the subsequent referendum were not included in rates or charges paid for by its customers. Several parties requested that the PUCO broaden the scope of the review of political and charitable spending.

In connection with an on-going audit of the Ohio Companies' policies and procedures relating to the code of conduct rules between affiliates, on November 4, 2020, the PUCO initiated an additional corporate separation audit as a result of the FirstEnergy leadership transition announcement made on October 29, 2020, as further discussed above. The additional audit is to ensure compliance by the Ohio Companies and their affiliates with corporate separation laws and the Ohio Companies' corporate separation plan. The additional audit is for the period from November 2016 through October 2020, with a final audit report to be filed in June 2021. On January 27, 2021, the PUCO selected an auditor.

On November 24, 2020, the Environmental Law and Policy Center filed motions to vacate the PUCO's orders in proceedings related to the Ohio Companies' settlement that provides for the implementation of the first phase of grid modernization plans and for all tax savings associated with the Tax Act to flow back to customers, the Ohio Companies' energy efficiency portfolio plans for the period from 2013 through 2016, and the Ohio Companies' application for a two-year extension of the DMR, on the grounds that the former Chairman of the PUCO should have recused himself in these matters. On December 30, 2020, the PUCO denied the motions, and reinstated the requirement under ESP IV that the Ohio Companies file a base distribution rate case by May 31, 2024, the end of ESP IV, which the Ohio Companies had indicated they would not oppose.

In the fourth quarter of 2020, motions were filed with the PUCO requesting that the PUCO amend the Ohio Companies' riders for collecting charges required by HB 6, which the Ohio Companies are further required to remit to other Ohio electric distribution utilities or to the State Treasurer, to provide for refunds in the event HB 6 is repealed. The Ohio Companies contested the motions, which are pending before the PUCO.

On December 7, 2020, the Citizens' Utility Board of Ohio filed a complaint with the PUCO against the Ohio Companies. The complaint alleges that the Ohio Companies' new charges resulting from HB 6, and any increased rates resulting from proceedings over which the former PUCO Chairman presided, are unjust and unreasonable, and that the Ohio Companies violated Ohio corporate separation laws by failing to operate separately from unregulated affiliates. The complaint requests, among other things, that any rates authorized by HB 6 or authorized by the PUCO in a proceeding over which the former Chairman presided be made refundable; that the Ohio Companies be required to file a new distribution rate case at the earliest possible date; and that the Ohio Companies' corporate separation plans be modified to introduce institutional controls. The Ohio Companies are contesting the complaint.

On December 9, 2020, the Ohio Manufacturers' Association Energy Group filed an appeal to the SCOH challenging the PUCO's generic order directing the form of rider all Ohio electric distribution utilities must charge to recover the costs of the HB 6 Clean Air Fund. The appeal contends that the PUCO erred in adopting the rate design for the riders, in establishing the riders during ongoing proceedings and investigations related to HB 6, and in not requiring electric distribution utilities to include refund language in the rider tariffs. On December 30, 2020, the PUCO vacated its generic order establishing the Clean Air Fund riders, as required by a preliminary injunction issued by the Court of Common Pleas of Franklin County, Ohio. On January 11, 2021, the SCOH granted a joint application of the Ohio Manufacturers' Association Energy Group and the PUCO and dismissed the appeal.

See "Outlook - Other Legal Proceedings" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6.

**PENNSYLVANIA**

The Pennsylvania Companies operate under rates approved by the PPUC, effective as of January 27, 2017. These rates were adjusted for the net impact of the Tax Act, effective March 15, 2018. The net impact of the Tax Act for the period January 1, 2018 through March 14, 2018 was separately tracked and its treatment will be addressed in a future rate proceeding. The Pennsylvania Companies operate under DSPs for the June 1, 2019 through May 31, 2023 delivery period, which provide for the competitive procurement of generation supply for customers who do not choose an alternative EGS or for customers of alternative EGSs that fail to provide the contracted service. Under the 2019-2023 DSPs, supply will be provided by wholesale suppliers through a mix of 3, 12 and 24-month energy contracts, as well as two RFPs for 2-year SREC contracts for ME, PN and Penn.

Pursuant to Pennsylvania Act 129 of 2008 and PPUC orders, Pennsylvania EDCs implement energy efficiency and peak demand reduction programs. The Pennsylvania Companies' Phase III EE&C plans for the June 2016 through May 2021 period, which were approved in March 2016, with expected costs up to $390 million, are designed to achieve the targets established in the PPUC's Phase III Final Implementation Order with full recovery through the reconcilable EE&C riders. On June 18, 2020, the PPUC entered a Final Implementation Order for a Phase IV EE&C Plan, operating from June 2021 through May 2026. The Final Implementation Order set demand reduction targets, relative to 2007 to 2008 peak demands, at 2.9% MW for ME, 3.3% MW for PN, 2.0% MW for Penn, and 2.5% MW for WP; and energy consumption reduction targets, as a percentage of the Pennsylvania Companies' historic 2009 to 2010 reference load at 3.1% MWH for ME, 3.0% MWH for PN, 2.7% MWH for Penn, and 2.4% MWH for WP. The Pennsylvania Companies' Phase IV plans were filed November 30, 2020. A settlement has been reached in this matter, and a joint petition seeking approval of that settlement by the parties was filed on February 16, 2021. A PPUC decision on the settlement is expected in March 2021.

Pennsylvania EDCs may file with the PPUC for approval of an LTIIP for infrastructure improvements and costs related to highway relocation projects, after which a DSIC may be approved to recover LTIIP costs. On August 30, 2019, the Pennsylvania Companies filed Petitions for approval of new LTIIPs for the five-year period beginning January 1, 2020 and ending December 31, 2024 for a total capital investment of approximately $572 million for certain infrastructure improvement initiatives. On January 16, 2020, the PPUC approved the LTIIPs without modification. The Pennsylvania Companies' approved DSIC riders for quarterly cost recovery went into effect July 1, 2016. On August 30, 2019, Penn filed a Petition seeking approval of a waiver of the statutory DSIC cap of 5% of distribution rate revenue and approval to increase the maximum allowable DSIC to 11.81% of distribution rate revenue for the five-year period of its proposed LTIIP. On March 12, 2020, an order was entered approving a settlement by all parties to that case which provides for a temporary increase in the recoverability cap from 5% to 7.5%, to expire on the earlier of the effective date of new base rates following Penn's next base rate case or the expiration of its LTIIP II program.

Following the Pennsylvania Companies' 2016 base rate proceedings, the PPUC ruled in a separate proceeding related to the DSIC mechanisms that the Pennsylvania Companies were not required to reflect federal and state income tax deductions related to DSIC-eligible property in DSIC rates, which decision was appealed by the Pennsylvania OCA to the Pennsylvania Commonwealth Court. The Commonwealth Court reversed the PPUC's decision and remanded the matter to require the Pennsylvania Companies to revise their tariffs and DSIC calculations to include ADIT and state income taxes. On April 7, 2020, the Pennsylvania Supreme Court issued an order granting Petitions for Allowance of Appeal by both the PPUC and the Pennsylvania Companies of the Commonwealth Court's Opinion and Order. Briefs and Reply Briefs of the parties were filed, and oral argument before the Supreme Court was held on October 21, 2020. An adverse ruling by the Pennsylvania Supreme Court is not expected to result in a material impact to FirstEnergy.

The PPUC issued an order on March 13, 2020, forbidding utilities from terminating service for non-payment for the duration of the COVID-19 pandemic. On May 13, 2020, the PPUC issued a Secretarial letter directing utilities to track all prudently incurred incremental costs arising from the COVID-19 pandemic, and to create a regulatory asset for future recovery of incremental uncollectibles incurred as a result of the COVID-19 pandemic and termination moratorium. On October 13, 2020, the PPUC entered an order lifting the service termination moratorium effective November 9, 2020, subject to certain additional notification, payment procedures and exceptions, and permits the Pennsylvania Companies to create a regulatory asset for all incremental expenses associated with their compliance with the order.

### WEST VIRGINIA

MP and PE provide electric service to all customers through traditional cost-based, regulated utility ratemaking and operate under rates approved by the WVPSC effective February 2015. MP and PE recover net power supply costs, including fuel costs, purchased power costs and related expenses, net of related market sales revenue through the ENEC. MP's and PE's ENEC rate is updated annually.

On March 13, 2020, the WVPSC urged all utilities to suspend utility service terminations except where necessary as a matter of safety or where requested by the customer. On May 15, 2020, the WVPSC issued an order to authorize MP and PE to record a deferral of additional, extraordinary costs directly related to complying with the various COVID-19 government shut-down orders and operational precautions, including impacts on uncollectible expense and cash flow related to temporary discontinuance of service terminations for non-payment and any credits to minimum demand charges associated with business customers adversely impacted by shut-downs or temporary closures related to the pandemic. MP and PE resumed disconnection activity for commercial and industrial customers on September 15, 2020, and for residential customers on November 4, 2020.

On August 28, 2020, MP and PE filed with the WVPSC their annual ENEC case requesting a decrease in ENEC rates of $55 million beginning January 1, 2021, representing a 4% decrease in rates compared to those in effect on August 28, 2020. The decrease in the ENEC rates is net of recovering approximately $10.5 million in previously deferred, incremental uncollectible and other related costs resulting from the COVID-19 pandemic. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 with rates effective January 1, 2021.

Also, on August 28, 2020, MP and PE filed with the WVPSC for recovery of costs associated with modernization and improvement program for their coal-fired boilers. The proposed annual revenue increase for these environmental compliance projects is $5 million beginning January 1, 2021. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 approving the recovery of these costs.

On December 30, 2020, MP and PE filed an integrated resource plan with the WVPSC. The plan projects a small capacity deficit but an energy surplus in MP's and PE's supply resources when compared with current WV load demand and projects the capacity deficit growing over the next 15 years. The plan does not recommend additional supply-side resources with a possible exception for small utility-scale solar resources and recommends that the capacity deficit be met through the PJM capacity market. MP currently expects to seek approval in 2021 to construct solar generation sources of up to 50 MWs.

On December 30, 2020, MP and PE filed with the WVPSC a determination of the rate impact of the Tax Act with respect to ADIT. The filing proposes an annual revenue reduction of $2.6 million annually, effective January 1, 2022, with reconciliation and any resulting adjustments incorporated into the annual ENEC proceedings.

### FERC REGULATORY MATTERS

Under the FPA, FERC regulates rates for interstate wholesale sales, transmission of electric power, accounting and other matters, including construction and operation of hydroelectric projects. With respect to their wholesale services and rates, the Utilities, AE Supply and the Transmission Companies are subject to regulation by FERC. FERC regulations require JCP&L, MP, PE, WP and the Transmission Companies to provide open access transmission service at FERC-approved rates, terms and conditions. Transmission facilities of JCP&L, MP, PE, WP and the Transmission Companies are subject to functional control by PJM and transmission service using their transmission facilities is provided by PJM under the PJM Tariff.

The following table summarizes the key terms of rate orders in effect for transmission customer billings for FirstEnergy's transmission owner entities:

| Company | Rates Effective | Capital Structure | Allowed ROE |
|---|---|---|---|
| ATSI | January 1, 2015 | Actual (13-month average) | 10.38% |
| JCP&L | January 2020[1] | Actual (13-month average)[1] | 10.80%[1] |
| MP | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| PE | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| WP | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| MAIT | July 1, 2017 | Lower of Actual (13-month average) or 60% | 10.3% |
| TrAIL | July 1, 2008 | Actual (year-end) | 12.7% (TrAIL the Line & Black Oak SVC) 11.7% (All other projects) |

[1] As filed in docket ER20-227, effective on January 1, 2020, which has been accepted by FERC, subject to refund, pending further hearing and settlement procedures. The settlement agreement that was filed on February 2, 2021, seeking approval by FERC sets JCP&L's Allowed ROE at 10.2%.

[2] Effective on January 1, 2021, MP, PE, and WP have implemented a forward-looking formula rate, which has been accepted by FERC, subject to refund, pending further hearing and settlement procedures.

[3] FERC-approved settlement agreements did not specify.

[4] See FERC Actions on Tax Act below.

FERC regulates the sale of power for resale in interstate commerce in part by granting authority to public utilities to sell wholesale power at market-based rates upon showing that the seller cannot exert market power in generation or transmission or erect barriers to entry into markets. The Utilities and AE Supply each have been authorized by FERC to sell wholesale power in interstate commerce at market-based rates and have a market-based rate tariff on file with FERC, although in the case of the Utilities major wholesale purchases remain subject to review and regulation by the relevant state commissions.

Federally enforceable mandatory reliability standards apply to the bulk electric system and impose certain operating, record-keeping and reporting requirements on the Utilities, AE Supply, and the Transmission Companies. NERC is the ERO designated by FERC to establish and enforce these reliability standards, although NERC has delegated day-to-day implementation and enforcement of these reliability standards to six regional entities, including RFC. All of the facilities that FirstEnergy operates are located within the RFC region. FirstEnergy actively participates in the NERC and RFC stakeholder processes, and otherwise monitors and manages its companies in response to the ongoing development, implementation and enforcement of the reliability standards implemented and enforced by RFC.

FirstEnergy believes that it is in material compliance with all currently effective and enforceable reliability standards. Nevertheless, in the course of operating its extensive electric utility systems and facilities, FirstEnergy occasionally learns of isolated facts or circumstances that could be interpreted as excursions from the reliability standards. If and when such occurrences are found, FirstEnergy develops information about the occurrence and develops a remedial response to the specific circumstances, including in appropriate cases "self-reporting" an occurrence to RFC. Moreover, it is clear that NERC, RFC and FERC will continue to refine existing reliability standards as well as to develop and adopt new reliability standards. Any inability on FirstEnergy's part to comply with the reliability standards for its bulk electric system could result in the imposition of financial penalties, or obligations to upgrade or build transmission facilities, that could have a material adverse effect on its financial condition, results of operations and cash flows.

*ATSI Transmission Formula Rate*

On May 1, 2020, ATSI filed amendments to its formula rate to recover regulatory assets for certain costs that ATSI incurred as a result of its 2011 move from MISO to PJM, certain costs allocated to ATSI by FERC for transmission projects that were constructed by other MISO transmission owners, certain income tax-related adjustments, including, but not limited to impacts from the Tax Act discussed further below, and certain costs for transmission-related vegetation management programs. The amount on FirstEnergy's Consolidated Balance Sheet for these regulatory assets was approximately $79 million and $73 million, as of December 31, 2020 and December 31, 2019, respectively. Per prior FERC orders, ATSI included a "cost-benefit study" to support recovery of ATSI's costs to move to PJM, and the MISO transmission project costs that were allocated to ATSI. Certain intervenors filed protests of the formula rate amendments on May 29, 2020, and ATSI filed a reply on June 15, 2020. On June 30, 2020, FERC issued an initial order accepting the tariff amendments subject to refund, suspending the effective date for five months to be effective December 1, 2020, and setting the matter for hearing and settlement proceedings. ATSI is engaged in settlement negotiations with the other parties to the formula rate amendments proceeding.

*FERC Actions on Tax Act*

On March 15, 2018, FERC initiated proceedings on the question of how to address possible changes to ADIT and bonus depreciation as a result of the Tax Act. Such possible changes could impact FERC-jurisdictional rates, including transmission rates. On November 21, 2019, FERC issued a final rule (Order No. 864). Order No. 864 requires utilities with transmission formula rates to update their formula rate templates to include mechanisms to (i) deduct any excess ADIT from or add any deficient ADIT to their rate base; (ii) raise or lower their income tax allowances by any amortized excess or deficient ADIT; and (iii) incorporate a new permanent worksheet into their rates that will annually track information related to excess or deficient ADIT. Per FERC directives, ATSI submitted its compliance filing on May 1, 2020. MAIT submitted its compliance filing on June 1, 2020. Certain intervenors filed protests of the compliance filings, to which ATSI and MAIT responded. On October 28, 2020, FERC staff requested additional information about ATSI's proposed rate base adjustment mechanism, and ATSI submitted the requested information on November 25, 2020. On May 15, 2020, TrAIL submitted its compliance filing and on June 1, 2020, PATH submitted its required compliance filing. These compliance filings each remain pending before FERC. MP, WP and PE (as holders of a "stated" transmission rate) are addressing these requirements in the transmission formula rates amendments that were filed on October 29, 2020. JCP&L is addressing these requirements as part of its pending transmission formula rate case.

*Transmission ROE Methodology*

FERC's methodology for calculating electric transmission utility ROE has been in transition as a result of an April 14, 2017 ruling by the D.C. Circuit that vacated FERC's then-effective methodology. On May 21, 2020, FERC issued Opinion No. 569-A that changed FERC's ROE methodology. Under this methodology FERC established an ROE that is based on three financial models – discounted cash flow, capital-asset pricing, and risk premium – to calculate a composite zone of reasonableness. FERC noted that utilities could, in utility-specific proceedings, ask to have the expected earnings methodology included in calculating the utility's authorized ROE. FERC also noted that, going forward, it will divide that zone into three equal parts, to be used for high risk, normal risk, and low risk utilities. A given utility will be assigned to one of these three parts of the zone of reasonableness, and its ROE will be set at the median or midpoint of the other utilities that are in the applicable third of the zone. FirstEnergy filed a request for rehearing, which FERC denied on July 22, 2020. On November 19, 2020, FERC issued Opinion No. 569-B, which affirmed the Opinion No. 569-A rulings. FirstEnergy initiated, but subsequently withdrew, appeals of these orders. Appeals of Opinion Nos. 569, 569-A and 569-B are pending before the D.C. Circuit. Any changes to FERC's transmission rate ROE and incentive policies would be applied on a prospective basis.

On March 20, 2020, FERC initiated a rulemaking proceeding on the transmission rate incentives provisions of Section 219 of the 2005 Energy Policy Act. Initial comments were submitted July 1, 2020, and reply comments were filed on July 16, 2020. FirstEnergy participated through EEI and through a consortium of PJM Transmission Owners. This proceeding is pending before FERC.

*JCP&L Transmission Formula Rate*

On October 30, 2019, JCP&L filed tariff amendments with FERC to convert JCP&L's existing stated transmission rate to a forward-looking formula transmission rate. JCP&L requested that the tariff amendments become effective May 1, 2020. On December 19, 2019, FERC issued its initial order in the case, allowing JCP&L to transition to a forward-looking formula rate as of January 1, 2020 as requested, subject to refund, pending further hearing and settlement proceedings. JCP&L and the parties to the FERC proceeding subsequently were able to reach settlement, and on February 2, 2021, a settlement agreement was filed for approval by FERC.

*Allegheny Power Zone Transmission Formula Rate Filings*

On October 29, 2020, MP, PE and WP filed tariff amendments with FERC to convert their existing stated transmission rate to a forward-looking formula transmission rate, effective January 1, 2021. In addition, on October 30, 2020, KATCo filed a proposed new tariff to establish a forward-looking formula rate and requested that the new rate become effective January 1, 2021. In its filing, KATCo explained that while it currently owns no transmission assets, it may build new transmission facilities in the Allegheny zone, and that it may seek required state and federal authorizations to acquire transmission assets from PE and WP by January 1, 2022. These transmission rate filings were approved by FERC on December 31, 2020, subject to refund, pending further hearing and settlement proceedings. MP, PE and WP, and KATCo are engaged in settlement negotiations with the other parties to the formula rate proceedings. KATCo will be included in the Regulated Transmission reportable segment.

## ENVIRONMENTAL MATTERS

Various federal, state and local authorities regulate FirstEnergy with regard to air and water quality, hazardous and solid waste disposal, and other environmental matters. While FirstEnergy's environmental policies and procedures are designed to achieve compliance with applicable environmental laws and regulations, such laws and regulations are subject to periodic review and potential revision by the implementing agencies. FirstEnergy cannot predict the timing or ultimate outcome of any of these reviews or how any future actions taken as a result thereof may materially impact its business, results of operations, cash flows and financial condition.

*Clean Air Act*

FirstEnergy complies with $SO_2$ and NOx emission reduction requirements under the CAA and SIP(s) by burning lower-sulfur fuel, utilizing combustion controls and post-combustion controls and/or using emission allowances.

CSAPR requires reductions of NOx and $SO_2$ emissions in two phases (2015 and 2017), ultimately capping $SO_2$ emissions in affected states to 2.4 million tons annually and NOx emissions to 1.2 million tons annually. CSAPR allows trading of NOx and $SO_2$ emission allowances between power plants located in the same state and interstate trading of NOx and $SO_2$ emission allowances with some restrictions. The D.C. Circuit ordered the EPA on July 28, 2015, to reconsider the CSAPR caps on NOx and $SO_2$ emissions from power plants in 13 states, including West Virginia. This follows the 2014 U.S. Supreme Court ruling generally upholding the EPA's regulatory approach under CSAPR but questioning whether the EPA required upwind states to reduce emissions by more than their contribution to air pollution in downwind states. The EPA issued a CSAPR update rule on September 7, 2016, reducing summertime NOx emissions from power plants in 22 states in the eastern U.S., including West Virginia, beginning in 2017. Various states and other stakeholders appealed the CSAPR update rule to the D.C. Circuit in November and December 2016. On September 13, 2019, the D.C. Circuit remanded the CSAPR update rule to the EPA citing that the rule did not eliminate upwind states' significant contributions to downwind states' air quality attainment requirements within applicable attainment deadlines. Depending on the outcome of the appeals, the EPA's reconsideration of the CSAPR update rule and how the EPA and the states ultimately implement CSAPR, the future cost of compliance may materially impact FirstEnergy's operations, cash flows and financial condition.

In February 2019, the EPA announced its final decision to retain without changes the NAAQS for $SO_2$, specifically retaining the 2010 primary (health-based) 1-hour standard of 75 PPB. As of December 31, 2020, FirstEnergy has no power plants operating in areas designated as non-attainment by the EPA.

In March 2018, the State of New York filed a CAA Section 126 petition with the EPA alleging that NOx emissions from nine states (including West Virginia) significantly contribute to New York's inability to attain the ozone NAAQS. The petition seeks suitable emission rate limits for large stationary sources that are affecting New York's air quality within the three years allowed by CAA Section 126. On September 20, 2019, the EPA denied New York's CAA Section 126 petition. On October 29, 2019, the State of New York appealed the denial of its petition to the D.C. Circuit. On July 14, 2020, the D.C. Circuit reversed and remanded the New York petition to the EPA for further consideration. FirstEnergy is unable to predict the outcome of these matters or estimate the loss or range of loss.

*Climate Change*

There are a number of initiatives to reduce GHG emissions at the state, federal and international level. Certain northeastern states are participating in the RGGI and western states led by California, have implemented programs, primarily cap and trade mechanisms, to control emissions of certain GHGs. Additional policies reducing GHG emissions, such as demand reduction programs, renewable portfolio standards and renewable subsidies have been implemented across the nation.

At the international level, the United Nations Framework Convention on Climate Change resulted in the Kyoto Protocol requiring participating countries, which does not include the U.S., to reduce GHGs commencing in 2008 and has been extended through 2020. The Obama Administration submitted in March 2015, a formal pledge for the U.S. to reduce its economy wide GHG emissions by 26 to 28 percent below 2005 levels by 2025. In 2015, FirstEnergy set a goal of reducing company-wide CO2 emissions by at least 90 percent below 2005 levels by 2045. As of December 31, 2018, FirstEnergy has reduced its CO2 emissions by approximately 62 percent. In September 2016, the U.S. joined in adopting the agreement reached on December 12, 2015, at the United Nations Framework Convention on Climate Change meetings in Paris. The Paris Agreement's non-binding obligations to limit global warming to below two degrees Celsius became effective on November 4, 2016. On June 1, 2017, the Trump Administration announced that the U.S. would cease all participation in the Paris Agreement. On January 20, 2021, President Biden signed an executive order re-adopting the agreement on behalf of the U.S. FirstEnergy cannot currently estimate the financial impact of climate change policies, although potential legislative or regulatory programs restricting CO2 emissions, or litigation alleging damages from GHG emissions, could require material capital and other expenditures or result in changes to its operations.

In December 2009, the EPA released its final "Endangerment and Cause or Contribute Findings for GHG under the Clean Air Act," concluding that concentrations of several key GHGs constitutes an "endangerment" and may be regulated as "air pollutants" under the CAA and mandated measurement and reporting of GHG emissions from certain sources, including electric generating plants. The EPA released its final CPP regulations in August 2015 to reduce CO2 emissions from existing fossil fuel fired EGUs and finalized separate regulations imposing CO2 emission limits for new, modified, and reconstructed fossil fuel fired EGUs. Numerous states and private parties filed appeals and motions to stay the CPP with the D.C. Circuit in October 2015. On February 9, 2016, the U.S. Supreme Court stayed the rule during the pendency of the challenges to the D.C. Circuit and U.S. Supreme Court. On March 28, 2017, an executive order, entitled "Promoting Energy Independence and Economic Growth," instructed the EPA to review the CPP and related rules addressing GHG emissions and suspend, revise or rescind the rules if appropriate. On October 16, 2017, the EPA issued a proposed rule to repeal the CPP. On June 19, 2019, the EPA repealed the CPP and replaced it with the ACE rule that establishes guidelines for states to develop standards of performance to address GHG emissions from existing coal-fired power plants. On January 19, 2021, the D.C. Circuit remanded the ACE rule declaring

that the EPA was "arbitrary and capricious" in its rule making, as such, the ACE rule is no longer in effect and all actions thus far taken by States to implement the federally mandated rule are now null and void. The D.C. Circuit decision is subject to legal challenge. Depending on the outcomes of further appeals and how any final rules are ultimately implemented, the future cost of compliance may be material.

*Clean Water Act*

Various water quality regulations, the majority of which are the result of the federal CWA and its amendments, apply to FirstEnergy's facilities. In addition, the states in which FirstEnergy operates have water quality standards applicable to FirstEnergy's operations.

The EPA finalized CWA Section 316(b) regulations in May 2014, requiring cooling water intake structures with an intake velocity greater than 0.5 feet per second to reduce fish impingement when aquatic organisms are pinned against screens or other parts of a cooling water intake system to a 12% annual average and requiring cooling water intake structures exceeding 125 million gallons per day to conduct studies to determine site-specific controls, if any, to reduce entrainment, which occurs when aquatic life is drawn into a facility's cooling water system. Depending on any final action taken by the states with respect to impingement and entrainment, the future capital costs of compliance with these standards may be material.

On September 30, 2015, the EPA finalized new, more stringent effluent limits for the Steam Electric Power Generating category (40 CFR Part 423) for arsenic, mercury, selenium and nitrogen for wastewater from wet scrubber systems and zero discharge of pollutants in ash transport water. The treatment obligations were to phase-in as permits are renewed on a five-year cycle from 2018 to 2023. However, on April 13, 2017, the EPA granted a Petition for Reconsideration and on September 18, 2017, the EPA postponed certain compliance deadlines for two years. On August 31, 2020, the EPA issued a final rule revising the effluent limits for discharges from wet scrubber systems, retaining the zero-discharge standard for ash transport water, (with some limited discharge allowances), and extending the deadline for compliance to December 31, 2025 for both. In addition, the EPA allows for less stringent limits for sub-categories of generating units based on capacity utilization, flow volume from the scrubber system, and unit retirement date. Depending on the outcome of appeals, how final rules are ultimately implemented and the compliance options MP elects to take with the new rules, compliance with these standards, which could include capital expenditures at the Ft. Martin and Harrison power stations, may be substantial and changes to MP's operations at those power stations may also result.

On September 29, 2016, FirstEnergy received a request from the EPA for information pursuant to CWA Section 308(a) for information concerning boron exceedances of effluent limitations established in the NPDES Permit for the former Mitchell Power Station's Mingo landfill, owned by WP. On November 1, 2016, WP provided an initial response that contained information related to a similar boron issue at the former Springdale Power Station's landfill. The EPA requested additional information regarding the Springdale landfill and on November 15, 2016, WP provided a response and intends to fully comply with the Section 308(a) information request. On March 3, 2017, WP proposed to the PA DEP a re-route of its wastewater discharge to eliminate potential boron exceedances at the Springdale landfill. On January 29, 2018, WP submitted an NPDES permit renewal application to PA DEP proposing to re-route its wastewater discharge to eliminate potential boron exceedances at the Mingo landfill. On February 20, 2018, the DOJ issued a letter and tolling agreement on behalf of the EPA alleging violations of the CWA at the Springdale and Mingo landfills while seeking to enter settlement negotiations in lieu of filing a complaint. The EPA has proposed a penalty of $900,000 to settle alleged past boron exceedances at both facilities. Negotiations are continuing and WP is unable to predict the outcome of this matter.

*Regulation of Waste Disposal*

Federal and state hazardous waste regulations have been promulgated as a result of the RCRA, as amended, and the Toxic Substances Control Act. Certain CCRs, such as coal ash, were exempted from hazardous waste disposal requirements pending the EPA's evaluation of the need for future regulation.

In April 2015, the EPA finalized regulations for the disposal of CCRs (non-hazardous), establishing national standards for landfill design, structural integrity design and assessment criteria for surface impoundments, groundwater monitoring and protection procedures and other operational and reporting procedures to assure the safe disposal of CCRs from electric generating plants. On September 13, 2017, the EPA announced that it would reconsider certain provisions of the final regulations. On July 17, 2018, the EPA Administrator signed a final rule extending the deadline for certain CCR facilities to cease disposal and commence closure activities, as well as, establishing less stringent groundwater monitoring and protection requirements. On August 21, 2018, the D.C. Circuit remanded sections of the CCR Rule to the EPA to provide additional safeguards for unlined CCR impoundments that are more protective of human health and the environment. On December 2, 2019, the EPA published a proposed rule accelerating the date that certain CCR impoundments must cease accepting waste and initiate closure to August 31, 2020. The proposed rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On July 29, 2020, the EPA published a final rule revising the date that certain CCR impoundments must cease accepting waste and initiate closure to April 11, 2021. The final rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On November 30, 2020, AE Supply submitted a closure deadline extension request to the EPA seeking to extend the closure date until 2024 of McElroy's Run CCR impoundment facility, for which AE Supply continues to provide access to FG.

FE or its subsidiaries have been named as potentially responsible parties at waste disposal sites, which may require cleanup under the CERCLA. Allegations of disposal of hazardous substances at historical sites and the liability involved are often unsubstantiated and subject to dispute; however, federal law provides that all potentially responsible parties for a particular site may be liable on a joint and several basis. Environmental liabilities that are considered probable have been recognized on the Consolidated Balance Sheets as of December 31, 2020, based on estimates of the total costs of cleanup, FirstEnergy's proportionate responsibility for such costs and the financial ability of other unaffiliated entities to pay. Total liabilities of approximately $107 million have been accrued through December 31, 2020. Included in the total are accrued liabilities of approximately $67 million for environmental remediation of former MGP and gas holder facilities in New Jersey, which are being recovered by JCP&L through a non-bypassable SBC. FE or its subsidiaries could be found potentially responsible for additional amounts or additional sites, but the loss or range of losses cannot be determined or reasonably estimated at this time.

**OTHER LEGAL PROCEEDINGS**

*United States v. Larry Householder, et al.*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Legal Proceedings Relating to United States v. Larry Householder, et al.*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al.", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to HB 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Owens v. FirstEnergy Corp. et al.* and *Frand v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 28, 2020 and August 21, 2020, purported stockholders of FE filed putative class action lawsuits against FE and certain FE officers, purportedly on behalf of all purchasers of FE common stock from February 21, 2017 through July 21, 2020, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, alleging misrepresentations or omissions by FirstEnergy concerning its business and results of operations. These actions have been consolidated and a lead plaintiff has been appointed by the court.
- *Gendrich v. Anderson, et al.* and *Sloan v. Anderson, et al.* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty. These actions have been consolidated.
- *Miller v. Anderson, et al.* (Federal District Court, N.D. Ohio); *Bloom, et al. v. Anderson, et al.; Employees Retirement System of the City of St. Louis v. Jones, et al.; Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Anderson et al.; Massachusetts Laborers Pension Fund v. Anderson et al.; The City of Philadelphia Board of Pensions and Retirement v. Anderson et al.; Atherton v. Dowling et al; Behar v. Anderson, et al.* (U.S. District Court, S.D. Ohio, all actions have been consolidated); beginning on August 7, 2020, purported stockholders of FE filed shareholder derivative actions alleging the board and officers breached their fiduciary duties and committed violations of Section 14(a) of the Securities Exchange Act of 1934. The cases in the Southern District of Ohio have been consolidated and co-lead plaintiffs have been appointed by the court.
- *Smith v. FirstEnergy Corp. et al., Buldas v. FirstEnergy Corp. et al., and Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 27, 2020, July 31, 2020, and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC, as well as certain current and former FirstEnergy officers, alleging civil Racketeer Influenced and Corrupt Organizations Act violations and related state law claims. These actions have been consolidated.
- *State of Ohio ex rel. Dave Yost, Ohio Attorney General v. FirstEnergy Corp., et al. and City of Cincinnati and City of Columbus v. FirstEnergy Corp.* (Common Pleas Court, Franklin County, OH); on September 23, 2020 and October 27, 2020, the OAG and the cities of Cincinnati and Columbus, respectively, filed complaints against several parties including FE, each alleging civil violations of the Ohio Corrupt Activity Act in connection with the passage of HB 6. The OAG sought a preliminary injunction to prevent each of the defendants, including FE, through the end of 2020, from: (i) contributing to any groups whose purpose is to keep or modify HB 6; (ii) making any public statements for or against any repeal or modification legislation concerning HB 6; (iii) lobbying, consulting, or advising on these matters; or (iv) contributing to any Ohio legislative candidates. The court denied the OAG's request for preliminary injunctive relief on October 2, 2020. On January 13, 2021, the OAG filed a motion for a temporary restraining order and preliminary injunction against FirstEnergy seeking to enjoin FirstEnergy from collecting the Ohio Companies' decoupling rider. On January 31, 2021, FE reached a partial settlement with the OAG and the cities of Cincinnati and Columbus with respect

to the temporary restraining order and preliminary injunction request and related issues. In connection with the partial settlement, the Ohio Companies filed an application on February 1, 2021, with the PUCO to set their respective decoupling riders (Rider CSR) to zero. On February 2, 2021, the PUCO approved the application of the Ohio Companies setting the rider to zero and no additional customer bills will include new decoupling rider charges after February 8, 2021. The cities of Dayton and Toledo have also been added as plaintiffs to the action. These actions have been consolidated.

- *Emmons v. FirstEnergy Corp. et al.* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, along with FES, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices. On October 1, 2020, plaintiffs filed a First Amended Complaint, adding as a plaintiff a purported customer of FirstEnergy and alleging a civil violation of the Ohio Corrupt Activity Act and civil conspiracy against FE, FESC and FES.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages (unless otherwise noted). In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, on January 26, 2021, staff of FERC's Division of Investigations issued a letter directing FirstEnergy to preserve and maintain all documents and information related to an ongoing audit being conducted by FERC's Division of Audits and Accounting, including activities related to lobbying and governmental affairs activities concerning HB 6. The outcome of any of these lawsuits, investigations and audit are uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Internal Investigation Relating to United States v. Larry Householder, et al.*

As previously disclosed, a committee of independent members of the Board of Directors is directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. FirstEnergy believes that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement. Immediately following these terminations, the independent members of its Board appointed Mr. Steven E. Strah to the position of Acting Chief Executive Officer and Mr. Christopher D. Pappas, a current member of the Board, to the temporary position of Executive Director, each effective as of October 29, 2020. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Additionally, on November 8, 2020, Robert P. Reffner, Senior Vice President and Chief Legal Officer, and Ebony L. Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top. The matter is a subject of the ongoing internal investigation as it relates to the government investigations.

*Nuclear Plant Matters*

On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of Energy*Solutions*, LLC, concerning the transfer and dismantlement of TMI-2. This transfer of TMI-2 to TMI-2 Solutions, LLC will include the transfer of: (i) the ownership and operating NRC licenses for TMI-2; (ii) the external trusts for the decommissioning and environmental remediation of TMI-2; and (iii) related liabilities. On August 10, 2020, JCP&L, ME, PN, GPUN, TMI-2 Solutions, LLC, and the PA DEP reached a settlement agreement regarding the decommissioning of TMI-2. On December 2, 2020, the NJBPU issued an order approving the transfer and sale under the conditions requested by Rate Counsel and agreed to by JCP&L. Also, on December 2, 2020, the NRC issued its order approving the license transfer as requested. With the receipt of all required regulatory approvals, the transaction was consummated on December 18, 2020. See Note 1, "Organization and Basis of Presentation," for additional discussion.

*FES Bankruptcy*

On March 31, 2018, FES, including its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy

Storage L.L.C. and FGMUC, and FENOC filed voluntary petitions for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court and emerged on February 27, 2020. See Note 3, "Discontinued Operations," for additional discussion.

*Other Legal Matters*

There are various lawsuits, claims (including claims for asbestos exposure) and proceedings related to FirstEnergy's normal business operations pending against FE or its subsidiaries. The loss or range of loss in these matters is not expected to be material to FE or its subsidiaries. The other potentially material items not otherwise discussed above are described under Note 14, "Regulatory Matters."

FirstEnergy accrues legal liabilities only when it concludes that it is probable that it has an obligation for such costs and can reasonably estimate the amount of such costs. In cases where FirstEnergy determines that it is not probable, but reasonably possible that it has a material obligation, it discloses such obligations and the possible loss or range of loss if such estimate can be made. If it were ultimately determined that FE or its subsidiaries have legal liability or are otherwise made subject to liability based on any of the matters referenced above, it could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

FirstEnergy prepares consolidated financial statements in accordance with GAAP. Application of these principles often requires a high degree of judgment, estimates and assumptions that affect financial results. FirstEnergy's accounting policies require significant judgment regarding estimates and assumptions underlying the amounts included in the financial statements. Additional information regarding the application of accounting policies is included in the Notes to Consolidated Financial Statements.

### *Revenue Recognition*

FirstEnergy follows the accrual method of accounting for revenues, recognizing revenue for electricity that has been delivered to customers but not yet billed through the end of the accounting period. The determination of electricity sales to individual customers is based on meter readings, which occur on a systematic basis throughout the month. At the end of each month, electricity delivered to customers since the last meter reading is estimated and a corresponding accrual for unbilled sales is recognized. The determination of unbilled sales and revenues requires management to make estimates regarding electricity available for retail load, transmission and distribution line losses, demand by customer class, applicable billing demands, weather-related impacts, number of days unbilled and tariff rates in effect within each customer class. FirstEnergy has elected the optional invoice practical expedient for most of its revenues and utilizes the optional short-term contract exemption for transmission revenues due to the annual establishment of revenue requirements, which eliminates the need to provide certain revenue disclosures regarding unsatisfied performance obligations. See Note 2, "Revenue," for additional information.

### *Regulatory Accounting*

FirstEnergy's Regulated Distribution and Regulated Transmission segments are subject to regulations that set the prices (rates) the Utilities and the Transmission Companies are permitted to charge customers based on costs that the regulatory agencies determine are permitted to be recovered. At times, regulators permit the future recovery through rates of costs that would be currently charged to expense by an unregulated company. This ratemaking process results in the recording of regulatory assets and liabilities based on anticipated future cash inflows and outflows. Management applies judgment in evaluating the evidence available to assess the probability of recovery of regulatory assets from customers, including, but not limited to evaluating evidence related to precedent for similar items experienced at the Company and comparable companies within similar jurisdictions, as well as assessing progress of communications between the Company and regulators. Certain regulatory assets are recorded based on prior precedent or anticipated recovery based on rate making premises without a specific rate order. FirstEnergy regularly reviews these assets to assess their ultimate recoverability within the approved regulatory guidelines. Impairment risk associated with these assets relates to potentially adverse legislative, judicial or regulatory actions in the future. See Note 14, "Regulatory Matters," for additional information.

FirstEnergy reviews the probability of recovery of regulatory assets at each balance sheet date and whenever new events occur. Similarly, FirstEnergy records regulatory liabilities when a determination is made that a refund is probable or when ordered by a commission. Factors that may affect probability include changes in the regulatory environment, issuance of a regulatory commission order or passage of new legislation. If recovery of a regulatory asset is no longer probable, FirstEnergy will write off that regulatory asset as a charge against earnings. FirstEnergy considers the entire regulatory asset balance as the unit of account for the purposes of balance sheet classification rather than the next years recovery and as such net regulatory assets and liabilities are presented in the non-current section on the FirstEnergy Consolidated Balance Sheets.

*Pension and OPEB Accounting*

FirstEnergy provides noncontributory qualified defined benefit pension plans that cover substantially all of its employees and non-qualified pension plans that cover certain employees. The plans provide defined benefits based on years of service and compensation levels. Under the cash-balance portion of the pension plan (for employees hired on or after January 1, 2014), FirstEnergy makes contributions to eligible employee retirement accounts based on a pay credit and an interest credit.

FirstEnergy provides a minimum amount of noncontributory life insurance to retired employees in addition to optional contributory insurance. Health care benefits, which include certain employee contributions, deductibles and co-payments, are also available upon retirement to certain employees, their dependents and, under certain circumstances, their survivors. FirstEnergy recognizes the expected cost of providing pension and OPEB to employees and their beneficiaries and covered dependents from the time employees are hired until they become eligible to receive those benefits. FirstEnergy also has obligations to former or inactive employees after employment, but before retirement, for disability-related benefits.

FirstEnergy recognizes a pension and OPEB mark-to-market adjustment for the change in the fair value of plan assets and net actuarial gains and losses annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement. The remaining components of pension and OPEB expense, primarily service costs, interest on obligations, assumed return on assets and prior service costs, are recorded on a monthly basis.

Under the approved bankruptcy settlement agreement discussed above, upon emergence, FES and FENOC employees ceased earning years of service under the FirstEnergy pension and OPEB plans. The emergence on February 27, 2020, triggered a remeasurement of the affected pension and OPEB plans and as a result, FirstEnergy recognized a non-cash, pre-tax pension and OPEB mark-to-market adjustment of approximately $423 million in the first quarter of 2020. The first quarter 2020 pension and OPEB mark-to-market adjustment primarily reflects a 38 bps decrease in the discount rate used to measure benefit obligations from December 31, 2019, partially offset by a slightly higher than expected return on assets. In the fourth quarter 2020, FirstEnergy recognized a $54 million pension and OPEB mark-to-market adjustment, primarily reflecting a 29 bps decrease in the discount rate used to measure benefit obligations from February 27, 2020, partially offset by higher than expected return on assets. Of the $54 million, approximately $21 million was allocated to certain of the Transmission Companies that are expected to be recovered through formula transmission rates. The annual pension and OPEB mark-to-market adjustments for the years ended December 31, 2020, 2019, and 2018 were $477 million (including the $423 million in the first quarter of 2020 described above), $676 million, and $145 million, respectively. Of these amounts, approximately $2 million and $1 million are included in discontinued operations for the years ended December 31, 2019, and 2018, respectively. Furthermore, of these annual pension and OPEB mark-to-market amounts, approximately $40 million, $47 million and $8 million were allocated to certain of the Transmission Companies and expected to be recovered through formula transmission rates, respectively.

In selecting an assumed discount rate, FirstEnergy considers currently available rates of return on high-quality fixed income investments expected to be available during the period to maturity of the pension and OPEB obligations. The assumed discount rates for pension were 2.67%, 3.34% and 4.44% as of December 31, 2020, 2019 and 2018, respectively. The assumed discount rates for OPEB were 2.45%, 3.18% and 4.30% as of December 31, 2020, 2019 and 2018, respectively.

Effective in 2019, FirstEnergy changed the approach utilized to estimate the service cost and interest cost components of net periodic benefit cost for pension and OPEB plans. Historically, FirstEnergy estimated these components utilizing a single, weighted average discount rate derived from the yield curve used to measure the benefit obligation. FirstEnergy has elected to use a spot rate approach in the estimation of the components of benefit cost by applying specific spot rates along the full yield curve to the relevant projected cash flows, as this provides a better estimate of service and interest costs by improving the correlation between projected benefit cash flows to the corresponding spot yield curve rates. This election was considered a change in estimate and, accordingly, accounted for prospectively, and did not have a material impact on FirstEnergy's financial statements.

FirstEnergy's assumed rate of return on pension plan assets considers historical market returns and economic forecasts for the types of investments held by the pension trusts. In 2020, FirstEnergy's qualified pension and OPEB plan assets experienced gains of $1,225 million or 14.7%, compared to gains of $1,492 million, or 20.2% in 2019, and losses of $371 million, or (4)% in 2018 and assumed a 7.50% rate of return on plan assets in 2020, 2019 and 2018, which generated $651 million, $569 million and $605 million of expected returns on plan assets, respectively. The expected return on pension and OPEB assets is based on the trusts' asset allocation targets and the historical performance of risk-based and fixed income securities. The gains or losses generated as a result of the difference between expected and actual returns on plan assets will decrease or increase future net periodic pension and OPEB cost as the difference is recognized annually in the fourth quarter of each fiscal year or whenever a plan is determined to qualify for remeasurement. The expected return on plan assets for 2021 is 7.50%.

During 2020, the Society of Actuaries published new mortality tables that include more current data than the RP-2014 tables as well as new improvement scales. An analysis of FirstEnergy pension and OPEB plan mortality data indicated the use of the Pri-2012 mortality table with projection scale MP-2020 was most appropriate. As such, the Pri-2012 mortality table with projection scale MP-2020 was utilized to determine the 2020 benefit cost and obligation as of December 31, 2020 for the FirstEnergy pension and OPEB plans. The impact of using the Pri-2012 mortality table with projection scale MP-2020 resulted in a decrease

to the projected benefit obligation of approximately $74 million and $2 million for the pension and OPEB plans, respectively, and was included in the 2020 pension and OPEB mark-to-market adjustment.

FirstEnergy expects its 2021 pre-tax net periodic benefit credit to be approximately $267 million based upon the following assumptions:

| Assumptions | Pension | OPEB |
|---|---|---|
| Service cost weighted-average discount rate | 3.10 % | 3.03 % |
| Interest cost weighted-average discount rate | 2.58 % | 1.66 % |
| Expected long-term return on plan assets | 7.50 % | 7.50 % |

The following table reflects the portion of pension and OPEB costs that were charged to expense, including any pension and OPEB mark-to-market adjustments, in the three years ended December 31, 2020, 2019, and 2018:

| Postemployment Benefits Expense (Credits) | 2020 | 2019 | 2018 |
|---|---|---|---|
| | | *(In millions)* | |
| Pension | $ 254 | $ 622 | $ 247 |
| OPEB | (47) | (21) | (45) |
| Total | $ 207 | $ 601 | $ 202 |

Health care cost trends continue to increase and will affect future OPEB costs. The composite health care trend rate assumptions were approximately 6.0%-5.5% in 2020 and 2019, gradually decreasing to 4.5% in later years. In determining FirstEnergy's trend rate assumptions, included are the specific provisions of FirstEnergy's health care plans, the demographics and utilization rates of plan participants, actual cost increases experienced in FirstEnergy's health care plans, and projections of future medical trend rates.

The effects on 2021 pension and OPEB net periodic benefit costs from changes in key assumptions are as follows:

**Increase in Net Periodic Benefit Costs from Adverse Changes in Key Assumptions**

| Assumption | Adverse Change | Pension | OPEB | Total |
|---|---|---|---|---|
| | | *(In millions)* | | |
| Discount rate | Decrease by 0.25% | $ 400 | $ 16 | $ 416 |
| Long-term return on assets | Decrease by 0.25% | $ 22 | $ 1 | $ 23 |
| Health care trend rate | Increase by 1.0% | N/A | $ 16 | $ 16 |

See Note 5, "Pension and Other Postemployment Benefits," for additional information.

### Income Taxes

FirstEnergy records income taxes in accordance with the liability method of accounting. Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts recognized for tax purposes. Investment tax credits, which were deferred when utilized, are being amortized over the recovery period of the related property. Deferred income tax liabilities related to temporary tax and accounting basis differences and tax credit carryforward items are recognized at the statutory income tax rates in effect when the liabilities are expected to be paid. Deferred tax assets are recognized based on income tax rates expected to be in effect when they are settled.

FirstEnergy accounts for uncertainty in income taxes in its financial statements using a benefit recognition model with a two-step approach, a more-likely-than-not recognition criterion and a measurement attribute that measures the position as the largest amount of tax benefit that is greater than 50% likely of being ultimately realized upon settlement. If it is not more likely than not that the benefit will be sustained on its technical merits, no benefit will be recorded. Uncertain tax positions that relate only to timing of when an item is included on a tax return are considered to have met the recognition threshold. FirstEnergy recognizes interest expense or income related to uncertain tax positions by applying the applicable statutory interest rate to the difference between the tax position recognized and the amount previously taken, or expected to be taken, on the tax return. FirstEnergy includes net interest and penalties in the provision for income taxes.

See Note 7, "Taxes," for additional information on FirstEnergy income taxes.

**NEW ACCOUNTING PRONOUNCEMENTS**

See Note 1, "Organization and Basis of Presentation," for a discussion of new accounting pronouncements.

**QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

The information relating to market risk is set forth in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and Board of Directors of FirstEnergy Corp.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of FirstEnergy Corp. and its subsidiaries (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of income, of comprehensive income, of stockholders' equity and of cash flows for each of the three years in the period ended December 31, 2020, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date related to its senior management failing to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Report on Internal Control over Financial Reporting appearing under "Controls and Procedures." We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2020 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Recoverability of Regulatory Assets That Do Not Have an Order for Recovery*

As described in Note 1 to the consolidated financial statements, the Company accounts for the effects of regulation through the application of regulatory accounting to its regulated distribution and transmission subsidiaries as their rates are established by a third-party regulator with the authority to set rates that bind customers, are cost-based and can be charged to and collected from customers. This ratemaking process results in the recording of regulatory assets and liabilities based on anticipated future cash inflows and outflows. Management assesses the probability of recovery of regulatory assets at each balance sheet date and whenever new events occur. Factors that may affect probability relate to changes in the regulatory environment, issuance of a regulatory commission order or passage of new legislation. Management applies judgment in evaluating the evidence available to assess the probability of recovery of regulatory assets from customers and certain of these assets, totaling approximately $117 million as of December 31, 2020, have been recorded based on precedent and rate making premises without a specific order.

The principal considerations for our determination that performing procedures relating to the recoverability of regulatory assets that do not have an order for recovery is a critical audit matter are (i) the significant judgment by management when assessing the probability of recovery of these regulatory assets from customers, which in turn led to (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating audit evidence related to the recoverability of these regulatory assets.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's regulatory accounting process, including controls over management's assessment of the recoverability of regulatory assets that do not have an order for recovery. These procedures also included, among others, evaluating the reasonableness of management's assessment of recoverability of regulatory assets. Testing the recoverability of regulatory assets involved evaluating evidence related to precedent for similar items at the Company and information on comparable companies within similar regulatory jurisdictions as well as assessing progress of communications between management and regulators.

/s/ PricewaterhouseCoopers LLP
Cleveland, Ohio
February 18, 2021

We have served as the Company's auditor since 2002.

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF INCOME**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| *(In millions, except per share amounts)* | **2020** | **2019** | **2018** |
| **REVENUES:** | | | |
| Distribution services and retail generation | $ 8,688 | $ 8,720 | $ 8,937 |
| Transmission | 1,613 | 1,510 | 1,335 |
| Other | 489 | 805 | 989 |
| Total revenues[1] | 10,790 | 11,035 | 11,261 |
| **OPERATING EXPENSES:** | | | |
| Fuel | 369 | 497 | 538 |
| Purchased power | 2,701 | 2,927 | 3,109 |
| Other operating expenses | 3,291 | 2,952 | 3,133 |
| Provision for depreciation | 1,274 | 1,220 | 1,136 |
| Deferral of regulatory assets, net | (53) | (79) | (150) |
| General taxes | 1,046 | 1,008 | 993 |
| Total operating expenses | 8,628 | 8,525 | 8,759 |
| **OPERATING INCOME** | 2,162 | 2,510 | 2,502 |
| **OTHER INCOME (EXPENSE):** | | | |
| Miscellaneous income, net | 432 | 243 | 205 |
| Pension and OPEB mark-to-market adjustment | (477) | (674) | (144) |
| Interest expense | (1,065) | (1,033) | (1,116) |
| Capitalized financing costs | 77 | 71 | 65 |
| Total other expense | (1,033) | (1,393) | (990) |
| **INCOME BEFORE INCOME TAXES** | 1,129 | 1,117 | 1,512 |
| **INCOME TAXES** | 126 | 213 | 490 |
| **INCOME FROM CONTINUING OPERATIONS** | 1,003 | 904 | 1,022 |
| Discontinued operations (Note 3)[2] | 76 | 8 | 326 |
| **NET INCOME** | $ 1,079 | $ 912 | $ 1,348 |
| **INCOME ALLOCATED TO PREFERRED STOCKHOLDERS (Note 1)** | — | 4 | 367 |
| **NET INCOME ATTRIBUTABLE TO COMMON STOCKHOLDERS** | $ 1,079 | $ 908 | $ 981 |
| **EARNINGS PER SHARE OF COMMON STOCK:** | | | |
| Basic - Continuing Operations | $ 1.85 | $ 1.69 | $ 1.33 |
| Basic - Discontinued Operations | 0.14 | 0.01 | 0.66 |
| Basic - Net Income Attributable to Common Stockholders | $ 1.99 | $ 1.70 | $ 1.99 |
| Diluted - Continuing Operations | $ 1.85 | $ 1.67 | $ 1.33 |
| Diluted - Discontinued Operations | 0.14 | 0.01 | 0.66 |
| Diluted - Net Income Attributable to Common Stockholders | $ 1.99 | $ 1.68 | $ 1.99 |
| **WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING:** | | | |
| Basic | 542 | 535 | 492 |
| Diluted | 543 | 542 | 494 |

(1) Includes excise and gross receipts tax collections of $362 million, $373 million and $386 million in 2020, 2019 and 2018, respectively.

(2) Net of income tax benefit of $59 million, $5 million, and $1.3 billion in 2020, 2019 and 2018, respectively.

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| (In millions) | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| **NET INCOME** | $ 1,079 | $ 912 | $ 1,348 |
| **OTHER COMPREHENSIVE INCOME (LOSS):** | | | |
| Pension and OPEB prior service costs | (34) | (31) | (83) |
| Amortized losses on derivative hedges | 1 | 2 | 21 |
| Change in unrealized gains on available-for-sale securities | — | — | (106) |
| Other comprehensive loss | (33) | (29) | (168) |
| Income tax benefits on other comprehensive loss | (8) | (8) | (67) |
| Other comprehensive loss, net of tax | (25) | (21) | (101) |
| **COMPREHENSIVE INCOME** | $ 1,054 | $ 891 | $ 1,247 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

**FIRSTENERGY CORP.**
**CONSOLIDATED BALANCE SHEETS**

| *(In millions, except share amounts)* | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 1,734 | $ 627 |
| Restricted cash | 67 | 52 |
| Receivables- | | |
| Customers | 1,367 | 1,137 |
| Less — Allowance for uncollectible customer receivables | 164 | 46 |
| | 1,203 | 1,091 |
| Affiliated companies, net of allowance for uncollectible accounts of $0 in 2020 and $1,063 in 2019 | — | — |
| Other, net of allowance for uncollectible accounts of $26 in 2020 and $21 in 2019 | 236 | 203 |
| Materials and supplies, at average cost | 317 | 281 |
| Prepaid taxes and other | 157 | 157 |
| Current assets - discontinued operations | | 33 |
| | 3,714 | 2,444 |
| **PROPERTY, PLANT AND EQUIPMENT:** | | |
| In service | 43,654 | 41,767 |
| Less — Accumulated provision for depreciation | 11,938 | 11,427 |
| | 31,716 | 30,340 |
| Construction work in progress | 1,578 | 1,310 |
| | 33,294 | 31,650 |
| **PROPERTY, PLANT AND EQUIPMENT, NET - HELD FOR SALE (NOTE 15)** | 45 | — |
| **INVESTMENTS:** | | |
| Nuclear fuel disposal trust | 283 | 270 |
| Other | 322 | 299 |
| Investments - held for sale (Note 15) | — | 882 |
| | 605 | 1,451 |
| **DEFERRED CHARGES AND OTHER ASSETS:** | | |
| Goodwill | 5,618 | 5,618 |
| Regulatory assets | 82 | 99 |
| Other | 1,106 | 1,039 |
| | 6,806 | 6,756 |
| | $ 44,464 | $ 42,301 |
| **LIABILITIES AND CAPITALIZATION** | | |
| **CURRENT LIABILITIES:** | | |
| Currently payable long-term debt | $ 146 | $ 380 |
| Short-term borrowings | 2,200 | 1,000 |
| Accounts payable | 827 | 918 |
| Accounts payable - affiliated companies | — | 87 |
| Accrued interest | 282 | 249 |
| Accrued taxes | 640 | 545 |
| Accrued compensation and benefits | 349 | 258 |
| Other | 560 | 1,425 |
| | 5,004 | 4,862 |
| **CAPITALIZATION:** | | |
| Stockholders' equity- | | |
| Common stock, $0.10 par value, authorized 700,000,000 shares - 543,117,533 and 540,652,222 shares outstanding as of December 31, 2020 and December 31, 2019, respectively | 54 | 54 |
| Other paid-in capital | 10,076 | 10,868 |
| Accumulated other comprehensive income (loss) | (5) | 20 |
| Accumulated deficit | (2,888) | (3,967) |
| Total stockholders' equity | 7,237 | 6,975 |
| Long-term debt and other long-term obligations | 22,131 | 19,618 |
| | 29,368 | 26,593 |
| **NONCURRENT LIABILITIES:** | | |
| Accumulated deferred income taxes | 3,095 | 2,849 |
| Retirement benefits | 3,345 | 3,065 |
| Regulatory liabilities | 1,826 | 2,360 |
| Asset retirement obligations | 159 | 165 |
| Adverse power contract liability | 30 | 49 |
| Other | 1,637 | 1,667 |
| Noncurrent liabilities - held for sale (Note 15) | — | 691 |
| | 10,092 | 10,846 |
| **COMMITMENTS, GUARANTEES AND CONTINGENCIES (Note 15)** | | |
| | $ 44,464 | $ 42,301 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| (In millions) | Series A Convertible Preferred Stock | | Common Stock | | OPIC | AOCI | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, January 1, 2018 | — | $ | $ 445 | $ 44 | $10,001 | $ 142 | $ (6,262) | 3,925 |
| Net income | | | | | | | 1,348 | 1,348 |
| Other comprehensive loss, net of tax | | | | | | (101) | | (101) |
| Stock-based compensation | | | | | 60 | | | 60 |
| Cash dividends declared on common stock | | | | | (906) | | | (906) |
| Cash dividends declared on preferred stock | | | | | (71) | | | (71) |
| Stock Investment Plan and certain share-based benefit plans | | | 4 | 1 | 61 | | | 62 |
| Stock issuance (Note 11)(1) | 1.6 | 162 | 30 | 3 | 2,297 | | | 2,462 |
| Conversion of Series A Convertible Stock | (0.9) | (91) | 33 | 3 | 88 | | | — |
| Impact of adopting new accounting pronouncements | | | | | | | 35 | 35 |
| Balance, December 31, 2018 | 0.7 | 71 | 512 | 51 | 11,530 | 41 | (4,879) | 6,814 |
| Net income | | | | | | | 912 | 912 |
| Other comprehensive loss, net of tax | | | | | | (21) | | (21) |
| Stock-based compensation | | | | | 41 | | | 41 |
| Cash dividends declared on common stock | | | | | (824) | | | (824) |
| Cash dividends declared on preferred stock | | | | | (3) | | | (3) |
| Stock Investment Plan and certain share-based benefit plans | | | 3 | — | 56 | | | 56 |
| Conversion of Series A Convertible Stock | (0.7) | (71) | 26 | 3 | 68 | | | |
| Balance, December 31, 2019 | — | — | 541 | 54 | 10,868 | 20 | (3,967) | 6,975 |
| Net income | | | | | | | 1,079 | 1,079 |
| Other comprehensive loss, net of tax | | | | | | (25) | | (25) |
| Stock-based compensation | | | | | 26 | | | 26 |
| Cash dividends declared on common stock | | | | | (846) | | | (846) |
| Stock Investment Plan and certain share-based benefit plans | | | 2 | | 28 | | | 28 |
| Balance, December 31, 2020 | — | $ | 543 | $ 54 | $10,076 | $ (5) | $ (2,888) | $ 7,237 |

(1) The Preferred Stock included an embedded conversion option at a price that is below the fair value of the Common Stock on the commitment date. This BCF, which was approximately $296 million, was recorded to OPIC as well as the amortization of the BCF (deemed dividend) through the period from the issue date to the first allowable conversion date (July 22, 2018) and as such there is no net impact to OPIC for the year ended December 31, 2018.

Dividends declared for each share of common stock and as-converted share of preferred stock was $1.56 during 2020, $1.53 during 2019, and $1.82 during 2018.

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

**FIRSTENERGY CORP.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| (In millions) | | **2020** | | **2019** | | **2018** |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | | |
| Net income | $ | 1,079 | $ | 912 | $ | 1,348 |
| Adjustments to reconcile net income to net cash from operating activities- | | | | | | |
| Gain on disposal, net of tax (Note 3) | | (76) | | (59) | | (435) |
| Depreciation and amortization | | 1,199 | | 1,217 | | 1,384 |
| Pension trust contributions | | — | | (500) | | (1,250) |
| Retirement benefits, net of payments | | (301) | | (108) | | (137) |
| Pension and OPEB mark-to-market adjustment | | 477 | | 676 | | 144 |
| Deferred income taxes and investment tax credits, net | | 113 | | 252 | | 485 |
| Asset removal costs charged to income | | 36 | | 28 | | 42 |
| Settlement agreement and tax sharing payments to the FES Debtors | | (978) | | — | | — |
| Changes in current assets and liabilities- | | | | | | |
| Receivables | | (129) | | 271 | | (248) |
| Materials and supplies | | (32) | | (37) | | 24 |
| Prepaid taxes and other | | 6 | | 10 | | (61) |
| Accounts payable | | (138) | | (49) | | 109 |
| Accrued taxes | | 159 | | 12 | | — |
| Accrued interest | | 33 | | 6 | | (25) |
| Accrued compensation and benefits | | 97 | | (60) | | 37 |
| Other current liabilities | | (16) | | (21) | | (121) |
| Other | | (106) | | (83) | | 114 |
| Net cash provided from operating activities | | 1,423 | | 2,467 | | 1,410 |
| | | | | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | | |
| New financing- | | | | | | |
| Long-term debt | | 3,425 | | 2,300 | | 1,474 |
| Short-term borrowings, net | | 1,200 | | — | | 950 |
| Preferred stock issuance | | — | | — | | 1,616 |
| Common stock issuance | | — | | — | | 850 |
| Redemptions and repayments- | | | | | | |
| Long-term debt | | (1,114) | | (789) | | (2,608) |
| Tender premiums paid on debt redemptions | | — | | — | | (89) |
| Preferred stock dividend payments | | — | | (6) | | (61) |
| Common stock dividend payments | | (845) | | (814) | | (711) |
| Other | | (59) | | (35) | | (27) |
| Net cash provided from financing activities | | 2,607 | | 656 | | 1,394 |
| | | | | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | | |
| Property additions | | (2,657) | | (2,665) | | (2,675) |
| Proceeds from asset sales | | 2 | | 47 | | 425 |
| Sales of investment securities held in trusts | | 186 | | 1,637 | | 909 |
| Purchases of investment securities held in trusts | | (208) | | (1,675) | | (963) |
| Notes receivable from affiliated companies | | — | | — | | (500) |
| Asset removal costs | | (224) | | (217) | | (218) |
| Other | | (7) | | — | | 4 |
| Net cash used for investing activities | | (2,908) | | (2,873) | | (3,018) |
| | | | | | | |
| Net change in cash, cash equivalents and restricted cash | | 1,122 | | 250 | | (214) |
| Cash, cash equivalents, and restricted cash at beginning of period | | 679 | | 429 | | 643 |
| Cash, cash equivalents, and restricted cash at end of period | $ | 1,801 | $ | 679 | $ | 429 |
| | | | | | | |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | | | | |
| Non-cash transaction: beneficial conversion feature | $ | — | $ | — | $ | 296 |
| Non-cash transaction: deemed dividend convertible preferred stock | $ | — | $ | — | $ | (296) |
| Cash paid during the year- | | | | | | |
| Interest (net of amounts capitalized) | $ | 970 | $ | 960 | $ | 1,071 |
| Income taxes, net of refunds | $ | 6 | $ | 12 | $ | 49 |

The accompanying Notes to Consolidated Financial Statements are an integral part of these financial statements.

**FIRSTENERGY CORP. AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| Note Number | | Page Number |
|:---:|---|:---:|
| 1 | Organization and Basis of Presentation | 59 |
| 2 | Revenue | 68 |
| 3 | Discontinued Operations | 71 |
| 4 | Accumulated Other Comprehensive Income | 73 |
| 5 | Pension and Other Postemployment Benefits | 74 |
| 6 | Stock-Based Compensation Plans | 80 |
| 7 | Taxes | 82 |
| 8 | Leases | 86 |
| 9 | Intangible Assets | 89 |
| 10 | Fair Value Measurements | 90 |
| 11 | Capitalization | 93 |
| 12 | Short-Term Borrowings and Bank Lines of Credit | 96 |
| 13 | Asset Retirement Obligations | 97 |
| 14 | Regulatory Matters | 97 |
| 15 | Commitments, Guarantees and Contingencies | 106 |
| 16 | Transactions with Affiliated Companies | 111 |
| 17 | Segment Information | 111 |

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**1. ORGANIZATION AND BASIS OF PRESENTATION**

Unless otherwise indicated, defined terms and abbreviations used herein have the meanings set forth in the accompanying Glossary of Terms.

FE was incorporated under Ohio law in 1996. FE's principal business is the holding, directly or indirectly, of all of the outstanding equity of its principal subsidiaries: OE, CEI, TE, Penn (a wholly owned subsidiary of OE), JCP&L, ME, PN, FESC, MP, AGC (a wholly owned subsidiary of MP), PE, WP, and FET and its principal subsidiaries (ATSI, MAIT and TrAIL). In addition, FE holds all of the outstanding equity of other direct subsidiaries including: AE Supply, FirstEnergy Properties, Inc., FEV, FirstEnergy License Holding Company, GPUN, Allegheny Ventures, Inc., and Suvon, LLC doing business as both FirstEnergy Home and FirstEnergy Advisors.

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity. FirstEnergy's ten utility operating companies comprise one of the nation's largest investor-owned electric systems, based on serving over 6 million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's transmission operations include approximately 24,500 miles of lines and two regional transmission operation centers. AGC, JCP&L and MP control 3,790 MWs of total capacity, 210 MWs of which is related to the Yards Creek generating plant that is being sold pursuant to an asset purchase agreement as further discussed below.

FE and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU. The preparation of financial statements in conformity with GAAP requires management to make periodic estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and disclosure of contingent assets and liabilities. Actual results could differ from these estimates. The reported results of operations are not necessarily indicative of results of operations for any future period. FE and its subsidiaries have evaluated events and transactions for potential recognition or disclosure through the date the financial statements were issued.

FE and its subsidiaries consolidate all majority-owned subsidiaries over which they exercise control and, when applicable, entities for which they have a controlling financial interest. Intercompany transactions and balances are eliminated in consolidation as appropriate and permitted pursuant to GAAP. As further discussed below, FE and its subsidiaries consolidate a VIE when it is determined that it is the primary beneficiary. Investments in affiliates over which FE and its subsidiaries have the ability to exercise significant influence, but do not have a controlling financial interest, follow the equity method of accounting. Under the equity method, the interest in the entity is reported as an investment in the Consolidated Balance Sheets and the percentage of FE's ownership share of the entity's earnings is reported in the Consolidated Statements of Income and Comprehensive Income.

Certain prior year amounts have been reclassified to conform to the current year presentation.

*Restricted Cash*

Restricted cash primarily relates to the consolidated VIE's discussed below. The cash collected from JCP&L, MP, PE and the Ohio Companies' customers is used to service debt of their respective funding companies.

*COVID-19*

The outbreak of COVID-19 is a global pandemic. FirstEnergy is continuously evaluating the global pandemic and taking steps to mitigate known risks. FirstEnergy is actively monitoring the continued impact COVID-19 is having on its customers' receivable balances, which include increasing arrears balances since the pandemic has begun. FirstEnergy has incurred, and it is expected to incur for the foreseeable future, incremental uncollectible and other COVID-19 pandemic related expenses. COVID-19 related expenses consist of additional costs that FirstEnergy is incurring to protect its employees, contractors and customers, and to support social distancing requirements. These costs include, but are not limited to, new or added benefits provided to employees, the purchase of additional personal protection equipment and disinfecting supplies, additional facility cleaning services, initiated programs and communications to customers on utility response, and increased technology expenses to support remote working, where possible. The full impact on FirstEnergy's business from the COVID-19 pandemic, including the governmental and regulatory responses, is unknown at this time and difficult to predict. FirstEnergy provides a critical and essential service to its customers and the health and safety of its employees, contractors and customers is its first priority. FirstEnergy is continuously monitoring its supply chain and is working closely with essential vendors to understand the continued impact the COVID-19 is having on its business, however, FirstEnergy does not currently expect disruptions in its ability to deliver service to customers or any material impact on its capital spending plan.

FirstEnergy continues to effectively manage operations during the pandemic in order to provide critical service to customers and believes it is well positioned to manage through the economic slowdown. FirstEnergy Distribution and Transmission revenues benefit from geographic and economic diversity across a five-state service territory, which also allows for flexibility with capital

investments and measures to maintain sufficient liquidity over the next twelve months. However, the situation remains fluid and future impacts to FirstEnergy that are presently unknown or unanticipated may occur. Furthermore, the likelihood of an impact to FirstEnergy, and the severity of any impact that does occur, could increase the longer the global pandemic persists.

**RECEIVABLES**

Activity in the allowance for uncollectible accounts on receivables for the years ended December 31, 2020, 2019 and 2018 are as follows:

| (In millions) | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| **Customer Receivables** | | | | | | |
| **Beginning of year balance** | $ | 46 | $ | 50 | $ | 49 |
| Charged to income [1] | | 174 | | 81 | | 77 |
| Charged to other accounts [2] | | 46 | | 47 | | 60 |
| Write-offs | | (102) | | (132) | | (136) |
| **End of year balance** | $ | 164 | $ | 46 | $ | 50 |
| **Other Receivables** | | | | | | |
| **Beginning of year balance** | $ | 21 | $ | 2 | $ | 1 |
| Charged to income | | 7 | | 27 | | 13 |
| Charged to other accounts [2] | | 10 | | 1 | | — |
| Write-offs | | (12) | | (9) | | (12) |
| **End of year balance** | $ | 26 | $ | 21 | $ | 2 |
| **Affiliated Companies Receivables [3]** | | | | | | |
| **Beginning of year balance** | $ | 1,063 | $ | 920 | $ | — |
| Charged to income | | — | | 143 | | 920 |
| Charged to other accounts [2] | | — | | — | | — |
| Write-offs | | (1,063) | | — | | — |
| **End of year balance** | $ | — | $ | 1,063 | $ | 920 |

[1] Customer receivable amounts charged to income for the years ended December 31, 2020, 2019 and 2018 include approximately $103 million, $25 million, and $24 million respectively, deferred for future recovery.
[2] Represents recoveries and reinstatements of accounts previously written off for uncollectible accounts.
[3] Amounts relate to the FES Debtors and are included in discontinued operations. Write-off of $1.1 billion in 2020 was recognized upon their emergence in February 2020. See Note 3, "Discontinued Operations" for additional information.

Receivables from customers include retail electric sales and distribution deliveries to residential, commercial and industrial customers for the Utilities. There was no material concentration of receivables as of December 31, 2020 and 2019, with respect to any particular segment of FirstEnergy's customers. Billed and unbilled customer receivables as of December 31, 2020 and 2019, net of allowance for uncollectible accounts, are included below.

| Customer Receivables | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | *(In millions)* | | | |
| Billed | $ | 636 | $ | 564 |
| Unbilled | | 567 | | 527 |
| Total | $ | 1,203 | $ | 1,091 |

The allowance for uncollectible customer receivables is based on historical loss information comprised of a rolling 36-month average net write-off percentage of revenues, in conjunction with a qualitative assessment of elements that impact the collectability of receivables to determine if allowances for uncollectible accounts should be further adjusted in accordance with the accounting guidance for credit losses. Management contemplates available current information such as changes in economic factors, regulatory matters, industry trends, customer credit factors, amount of receivable balances that are past-due, payment options and programs available to customers, and the methods that the Utilities are able to utilize to ensure payment.

FirstEnergy reviews its allowance for uncollectible customer receivables utilizing a quantitative and qualitative assessment, which includes consideration of the outbreak of COVID-19 and the impact on customer receivable balances outstanding and the ability of customers to continue payment since the pandemic began. Beginning March 13, 2020, FirstEnergy temporarily suspended customer disconnections for nonpayment and ceased collection activities as a result of the ongoing pandemic and in accordance with state regulatory requirements. The temporary suspension of disconnections for nonpayment and ceased collection activities extended into the fourth quarter of 2020 and resumed for most customers before the end of 2020. Customers are subject to each state's applicable regulations on winter moratoriums for residential customers, which begin as early as November 1, 2020, and are in effect until April 15, 2021. See Note 14, "Regulatory Matters," for further discussion on applicable regulations that may alter residential customer disconnection and collection activity, such as winter moratoriums.

The impact of COVID-19 on customers' ability to pay for service, along with the actions FirstEnergy has taken in response to the pandemic, is expected to result in an increase in customer receivable write-offs as compared to historically incurred losses. In order to estimate the additional losses and impacts expected, FirstEnergy analyzed the likelihood of loss based on increases in customer accounts in arrears since the pandemic began in mid-March 2020 as well as what collection methods are or were suspended, and that have historically been utilized to ensure payment. Based on this assessment, and consideration of other qualitative factors described above, FirstEnergy recognized incremental uncollectible expense of $121 million in the year 2020, of which approximately $90 million is not currently being collected through rates and as a result was deferred for future recovery under regulatory mechanisms described below.

The Ohio Companies and JCP&L had existing regulatory mechanisms in place prior to the outbreak of COVID-19, where incremental uncollectible expenses are able to be recovered through riders with no material impact to earnings. Additionally, in response to the COVID-19 pandemic, the MDPSC, NJBPU and WVPSC issued orders allowing PE, JCP&L and MP, respectively, to track and create a regulatory asset for future recovery of incremental costs, including uncollectible expenses, incurred as a result of the pandemic. In Pennsylvania, the PPUC has authorized the Pennsylvania Companies to track all prudently incurred incremental costs arising from COVID-19, and to create a regulatory asset for future recovery of incremental uncollectible expenses incurred as a result of COVID-19 above what is included in the Pennsylvania Companies existing rates. On October 13, 2020, the PPUC entered an order that permits the Pennsylvania Companies to create a regulatory asset for incremental expenses associated with lifting the service termination moratorium, as further discussed below.

Receivables from customers also include PJM receivables resulting from transmission and wholesale sales. FirstEnergy's credit risk on PJM receivables is reduced due to the nature of PJM's settlement process whereby members of PJM legally agree to share the cost of defaults and as a result there is no allowance for doubtful accounts.

### ACCOUNTING FOR THE EFFECTS OF REGULATION

FirstEnergy accounts for the effects of regulation through the application of regulatory accounting to the Utilities and the Transmission Companies since their rates are established by a third-party regulator with the authority to set rates that bind customers, are cost-based and can be charged to and collected from customers.

FirstEnergy records regulatory assets and liabilities that result from the regulated rate-making process that would not be recorded under GAAP for non-regulated entities. These assets and liabilities are amortized in the Consolidated Statements of Income concurrent with the recovery or refund through customer rates. FirstEnergy believes that it is probable that its regulatory assets and liabilities will be recovered and settled, respectively, through future rates. FirstEnergy, the Utilities and the Transmission Companies net their regulatory assets and liabilities based on federal and state jurisdictions.

Management assesses the probability of recovery of regulatory assets at each balance sheet date and whenever new events occur. Factors that may affect probability relate to changes in the regulatory environment, issuance of a regulatory commission order or passage of new legislation. Management applies judgment in evaluating the evidence available to assess the probability of recovery of regulatory assets from customers, including, but not limited to evaluating evidence related to precedent for similar items at FirstEnergy and information on comparable companies within similar jurisdictions, as well as assessing progress of communications between FirstEnergy and regulators. Certain of these regulatory assets, totaling approximately $117 million and $111 million as of December 31, 2020 and December 31, 2019, respectively, are recorded based on prior precedent or anticipated recovery based on rate making premises without a specific order, of which, $79 million and $73 million as of December 31, 2020 and December 31, 2019, respectively, are being sought for recovery in a formula rate amendment filing at ATSI that is pending before FERC. See Note 14, "Regulatory Matters" for additional information.

The following table provides information about the composition of net regulatory assets and liabilities as of December 31, 2020 and December 31, 2019, and the changes during the year ended December 31, 2020:

| Net Regulatory Assets (Liabilities) by Source | December 31, 2020 | December 31, 2019 | Change |
|---|---|---|---|
| | *(In millions)* | | |
| Customer payables for future income taxes | $ (2,369) | $ (2,605) | $ 236 |
| Nuclear decommissioning and spent fuel disposal costs | (102) | (197) | 95 |
| Asset removal costs | (721) | (756) | 35 |
| Deferred transmission costs | 316 | 298 | 18 |
| Deferred generation costs | 104 | 214 | (110) |
| Deferred distribution costs | 136 | 155 | (19) |
| Contract valuations | 41 | 51 | (10) |
| Storm-related costs | 748 | 551 | 197 |
| Uncollectible and COVID-19 related costs | 97 | 3 | 94 |
| Other | 6 | 25 | (19) |
| Net Regulatory Liabilities included on the Consolidated Balance Sheets | $ (1,744) | $ (2,261) | $ 517 |

The following table provides information about the composition of net regulatory assets that do not earn a current return as of December 31, 2020 and 2019, of which approximately $195 million and $228 million, respectively, are currently being recovered through rates over varying periods, through 2068, depending on the nature of the deferral and the jurisdiction:

| Regulatory Assets by Source Not Earning a Current Return | December 31, 2020 | December 31, 2019 | Change |
|---|---|---|---|
| | *(in millions)* | | |
| Deferred transmission costs | $ 29 | $ 27 | $ 2 |
| Deferred generation costs | 5 | 15 | (10) |
| Storm-related costs | 654 | 471 | 183 |
| COVID-19 related costs | 66 | — | 66 |
| Other | 35 | 32 | 3 |
| Regulatory Assets Not Earning a Current Return | $ 789 | $ 545 | $ 244 |

## EARNINGS PER SHARE OF COMMON STOCK

Basic EPS available to common stockholders is computed using the weighted average number of common shares outstanding during the relevant period as the denominator. The denominator for diluted EPS of common stock reflects the weighted average of common shares outstanding plus the potential additional common shares that could result if dilutive securities and other agreements to issue common stock were exercised.

During 2019 and 2018, EPS was computed using the two-class method required for participating securities. The convertible preferred stock issued in January 2018 were considered participating securities since the shares participated in dividends on common stock on an "as-converted" basis. All convertible preferred stock was converted to common stock during 2019.

The two-class method uses an earnings allocation formula that treats participating securities as having rights to earnings that otherwise would have been available only to common stockholders. Under the two-class method, net income attributable to common stockholders is derived by subtracting the following from income from continuing operations:

- preferred stock dividends,
- deemed dividends for the amortization of the beneficial conversion feature recognized at issuance of the preferred stock (if any), and
- an allocation of undistributed earnings between the common stock and the participating securities (convertible preferred stock) based on their respective rights to receive dividends.

Net losses were not allocated to the convertible preferred stock as they did not have a contractual obligation to share in the losses of FirstEnergy. FirstEnergy allocated undistributed earnings based upon income from continuing operations.

Diluted EPS reflects the dilutive effect of potential common shares from share-based awards and convertible shares of preferred stock. The dilutive effect of outstanding share-based awards was computed using the treasury stock method, which assumes any proceeds that could be obtained upon the exercise of the award would be used to purchase common stock at the average market price for the period. The dilutive effect of the convertible preferred stock was computed using the if-converted method, which assumes conversion of the convertible preferred stock at the beginning of the period, giving income recognition for the add-back of the preferred stock dividends, amortization of beneficial conversion feature, and undistributed earnings allocated to preferred stockholders.

| Reconciliation of Basic and Diluted EPS of Common Stock | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| *(In millions, except per share amounts)* | | | |
| **EPS of Common Stock** | | | |
| Income from continuing operations | $ 1,003 | $ 904 | $ 1,022 |
| Less: Preferred dividends | — | (3) | (71) |
| Less: Amortization of beneficial conversion feature | — | — | (296) |
| Less: Undistributed earnings allocated to preferred stockholders[1] | N/A | (1) | — |
| ***Income from continuing operations available to common stockholders*** | 1,003 | 900 | 655 |
| Discontinued operations, net of tax | 76 | 8 | 326 |
| Less: Undistributed earnings allocated to preferred stockholders [1] | N/A | — | — |
| ***Income from discontinued operations available to common stockholders*** | 76 | 8 | 326 |
| ***Income attributable to common stockholders, basic*** | $ 1,079 | $ 908 | $ 981 |
| *Income allocated to preferred stockholders, preferred dilutive [2]* | N/A | 4 | N/A |
| ***Income attributable to common stockholders, dilutive*** | $ 1,079 | $ 912 | $ 981 |
| **Share Count information:** | | | |
| Weighted average number of basic shares outstanding | 542 | 535 | 492 |
| Assumed exercise of dilutive stock options and awards | 1 | 3 | 2 |
| Assumed conversion of preferred stock | — | 4 | — |
| Weighted average number of diluted shares outstanding | 543 | 542 | 494 |
| **Income attributable to common stockholders, per common share:** | | | |
| Income from continuing operations, basic | $ 1.85 | $ 1.69 | $ 1.33 |
| Discontinued operations, basic | 0.14 | 0.01 | 0.66 |
| **Income attributable to common stockholders, basic** | $ 1.99 | $ 1.70 | $ 1.99 |
| Income from continuing operations, diluted | $ 1.85 | $ 1.67 | $ 1.33 |
| Discontinued operations, diluted | 0.14 | 0.01 | 0.66 |
| **Income attributable to common stockholders, diluted** | $ 1.99 | $ 1.68 | $ 1.99 |

[1]   Undistributed earnings were not allocated to participating securities for the year ended December 31, 2018, as income from continuing operations less dividends declared (common and preferred) and deemed dividends were a net loss. Undistributed earning allocated to participating securities for the years ended December 31, 2019 and 2020 were immaterial.

[2]   The shares of common stock issuable upon conversion of the preferred shares (26 million shares) were not included for 2018 as their inclusion would be anti-dilutive to basic EPS from continuing operations. Amounts allocated to preferred stockholders of $4 million for the year ended December 31, 2019 are included within Income from continuing operations available to common stockholders for diluted earnings.

For the year ended December 31, 2018, approximately 1 million shares from stock options and awards were excluded from the calculation of diluted shares outstanding, as their inclusion would be antidilutive. For the year ended December 31, 2019, no shares from stock options or awards were excluded from the calculation of diluted shares. For the year ended December 31, 2020, approximately 80 thousand shares from stock options and awards were excluded from the calculation of diluted shares outstanding, as their inclusion would be antidilutive.

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

**PROPERTY, PLANT AND EQUIPMENT**

Property, plant and equipment reflects original cost (net of any impairments recognized), including payroll and related costs such as taxes, employee benefits, administrative and general costs, and interest costs incurred to place the assets in service. The costs of normal maintenance, repairs and minor replacements are expensed as incurred. FirstEnergy recognizes liabilities for planned major maintenance projects as they are incurred. Property, plant and equipment balances by segment as of December 31, 2020 and 2019, were as follows:

| Property, Plant and Equipment | In Service[1] | | Accum. Depr. | | Net Plant | | CWIP | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| Regulated Distribution | $ | 29,775 | $ | (8,800) | $ | 20,975 | $ | 841 | $ | 21,816 |
| Regulated Transmission | | 12,912 | | (2,609) | | 10,303 | | 671 | | 10,974 |
| Corporate/Other | | 1,039 | | (556) | | 483 | | 66 | | 549 |
| Total | $ | 43,726 | $ | (11,965) | $ | 31,761 | $ | 1,578 | $ | 33,339 |

**December 31, 2020**

| Property, Plant and Equipment | In Service[1] | | Accum. Depr. | | Net Plant | | CWIP | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In millions) | | | | | |
| Regulated Distribution | $ | 28,735 | $ | (8,540) | $ | 20,195 | $ | 744 | $ | 20,939 |
| Regulated Transmission | | 12,023 | | (2,383) | | 9,640 | | 526 | | 10,166 |
| Corporate/Other | | 1,009 | | (504) | | 505 | | 40 | | 545 |
| Total | $ | 41,767 | $ | (11,427) | $ | 30,340 | $ | 1,310 | $ | 31,650 |

**December 31, 2019**

[1] Includes finance leases of $153 million and $163 million as of December 31, 2020 and 2019, respectively.

The major classes of Property, plant and equipment are largely consistent with the segment disclosures above. Regulated Distribution has approximately $2.1 billion of total regulated generation property, plant and equipment. Included within Regulated Distribution is $882 million of assets classified as held for sale as of December 31, 2019 associated with the asset purchase and sale agreements with TMI-2 Solutions to transfer TMI-2 to TMI-2 Solutions, LLC. With the receipt of all required regulatory approvals, the transaction was consummated on December 18, 2020. As a result, during the fourth quarter of 2020 FirstEnergy recognized an after tax-gain of approximately $33 million, primarily associated with the write-off of a tax related regulatory liability. See Note 15, "Commitments, Guarantees and Contingencies" for additional information. Also included within the segment is $45 million of assets classified as held for sale as of December 31, 2020 associated with the asset purchase agreement with Yards Creek Energy, LLC to transfer JCP&L's 50% interest in the Yards Creek pumped-storage hydro generation station (210 MWs). See Note 14, "Regulatory Matters" for additional information.

FirstEnergy provides for depreciation on a straight-line basis at various rates over the estimated lives of property included in plant in service. The respective annual composite depreciation rates for FirstEnergy were 2.7%, 2.7% and 2.6% in 2020, 2019 and 2018, respectively.

For the years ended December 31, 2020, 2019 and 2018, capitalized financing costs on FirstEnergy's Consolidated Statements of Income include $49 million, $45 million and $46 million, respectively, of allowance for equity funds used during construction and $28 million, $26 million and $19 million, respectively, of capitalized interest.

*Jointly Owned Plants*

FE, through its subsidiary, AGC, owns an undivided 16.25% interest (487 MWs) in the 3,003 MW Bath County pumped-storage, hydroelectric station in Virginia, operated by the 60% owner, VEPCO, a non-affiliated utility. Total property, plant and equipment includes $157 million representing AGC's share in this facility as of December 31, 2020. AGC is obligated to pay its share of the costs of this jointly owned facility in the same proportion as its ownership interests using its own financing. AGC's share of direct expenses of the joint plant is included in operating expenses on FirstEnergy's Consolidated Statements of Income. AGC provides the generation capacity from this facility to its owner, MP.

*Asset Retirement Obligations*

FE recognizes an ARO for the future remediation of environmental liabilities associated with all of its long-lived assets. The ARO liability represents an estimate of the fair value of FirstEnergy's current obligation related to nuclear decommissioning and the retirement or remediation of environmental liabilities of other assets. A fair value measurement inherently involves uncertainty in the amount and timing of settlement of the liability. FirstEnergy uses an expected cash flow approach to measure the fair value of the nuclear decommissioning and environmental remediation AROs, considering the expected timing of settlement of the ARO based on the expected economic useful life of associated asset and/or regulatory requirements. The fair value of an ARO is

recognized in the period in which it is incurred. The associated asset retirement costs are capitalized as part of the carrying value of the long-lived asset and are depreciated over the life of the related asset. In certain circumstances, FirstEnergy has recovery of asset retirement costs and, as such, certain accretion and depreciation is offset against regulatory assets.

Conditional retirement obligations associated with tangible long-lived assets are recognized at fair value in the period in which they are incurred if a reasonable estimate can be made, even though there may be uncertainty about timing or method of settlement. When settlement is conditional on a future event occurring, it is reflected in the measurement of the liability, not the timing of the liability recognition.

AROs as of December 31, 2020, including the transfer of TMI-2, its NDT and related decommissioning liabilities to TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, in the fourth quarter of 2020, are described further in Note 13, "Asset Retirement Obligations."

### Asset Impairments

FirstEnergy evaluates long-lived assets classified as held and used for impairment when events or changes in circumstances indicate the carrying value of the long-lived assets may not be recoverable. First, the estimated undiscounted future cash flows attributable to the assets is compared with the carrying value of the assets. If the carrying value is greater than the undiscounted future cash flows, an impairment charge is recognized equal to the amount the carrying value of the assets exceeds its estimated fair value.

### GOODWILL

In a business combination, the excess of the purchase price over the estimated fair value of the assets acquired and liabilities assumed is recognized as goodwill. FirstEnergy evaluates goodwill for impairment annually on July 31 and more frequently if indicators of impairment arise. In evaluating goodwill for impairment, FirstEnergy assesses qualitative factors to determine whether it is more likely than not (that is, likelihood of more than 50%) that the fair value of a reporting unit is less than its carrying value (including goodwill). If FirstEnergy concludes that it is not more likely than not that the fair value of a reporting unit is less than its carrying value, then no further testing is required. However, if FirstEnergy concludes that it is more likely than not that the fair value of a reporting unit is less than its carrying value or bypasses the qualitative assessment, then the quantitative goodwill impairment test is performed to identify a potential goodwill impairment and measure the amount of impairment to be recognized, if any.

As of July 31, 2020, FirstEnergy performed a qualitative assessment of the Regulated Distribution and Regulated Transmission reporting units' goodwill, assessing economic, industry and market considerations in addition to the reporting units' overall financial performance. Key factors used in the assessment included: growth rates, interest rates, expected capital expenditures, utility sector market performance, regulatory and legal developments, and other market considerations. It was determined that the fair values of these reporting units were, more likely than not, greater than their carrying values and a quantitative analysis was not necessary.

FirstEnergy's reporting units are consistent with its reportable segments and consist of Regulated Distribution and Regulated Transmission. The following table presents goodwill by reporting unit as of December 31, 2020:

| (In millions) | Regulated Distribution | Regulated Transmission | Consolidated |
|---|---|---|---|
| Goodwill | $ 5,004 | $ 614 | $ 5,618 |

### INVENTORY

Materials and supplies inventory includes fuel inventory and the distribution, transmission and generation plant materials, net of reserve for excess and obsolete inventory. Materials are generally charged to inventory at weighted average cost when purchased and expensed or capitalized, as appropriate, when used or installed. Fuel inventory is accounted for at weighted average cost when purchased and recorded to fuel expense when consumed.

### DERIVATIVES

FirstEnergy is exposed to financial risks resulting from fluctuating interest rates and commodity prices, including prices for electricity, coal and energy transmission. To manage the volatility related to these exposures, FirstEnergy's Risk Policy Committee, comprised of senior management, provides general management oversight for risk management activities throughout FirstEnergy. The Risk Policy Committee is responsible for promoting the effective design and implementation of sound risk management programs and oversees compliance with corporate risk management policies and established risk management practice. FirstEnergy may use a variety of derivative instruments for risk management purposes including forward contracts, options, futures contracts and swaps.

FirstEnergy accounts for derivative instruments on its Consolidated Balance Sheets at fair value unless they meet the normal purchases and normal sales criteria. Derivative instruments meeting the normal purchases and normal sales criteria are accounted for under the accrual method of accounting with their effects included in earnings at the time of contract performance.

### VARIABLE INTEREST ENTITIES

FirstEnergy performs qualitative analyses based on control and economics to determine whether a variable interest classifies FirstEnergy as the primary beneficiary (a controlling financial interest) of a VIE. An enterprise has a controlling financial interest if it has both power and economic control, such that an entity has: (i) the power to direct the activities of a VIE that most significantly impact the entity's economic performance; and (ii) the obligation to absorb losses of the entity that could potentially be significant to the VIE or the right to receive benefits from the entity that could potentially be significant to the VIE. FirstEnergy consolidates a VIE when it is determined that it is the primary beneficiary.

In order to evaluate contracts for consolidation treatment and entities for which FirstEnergy has an interest, FirstEnergy aggregates variable interests into categories based on similar risk characteristics and significance.

**Consolidated VIEs**

VIEs in which FirstEnergy is the primary beneficiary consist of the following (included in FirstEnergy's consolidated financial statements):

- *Ohio Securitization* - In June 2013, SPEs formed by the Ohio Companies issued approximately $445 million of pass-through trust certificates supported by phase-in recovery bonds to securitize the recovery of certain all electric customer heating discounts, fuel and purchased power regulatory assets.
- *JCP&L Securitization* - JCP&L Transition Funding II sold transition bonds to securitize the recovery of deferred costs associated with JCP&L's supply of BGS.
- *MP and PE Environmental Funding Companies* - Bankruptcy remote, special purpose limited liability companies that are indirect subsidiaries of MP and PE which issued environmental control bonds.

See Note 11, "Capitalization," for additional information on securitized bonds.

**Unconsolidated VIEs**

FirstEnergy is not the primary beneficiary of the following VIEs:

- ***Global Holding*** - FEV holds a 33-1/3% equity ownership in Global Holding, the holding company for a joint venture in the Signal Peak mining and coal transportation operations with coal sales in U.S. and international markets. FEV is not the primary beneficiary of the joint venture, as it does not have control over the significant activities affecting the joint ventures economic performance. FEV's ownership interest is subject to the equity method of accounting. As of December 31, 2020, the carrying value of the equity method investment was $30 million.

  As discussed in Note 15, "Commitments, Guarantees and Contingencies," FE is the guarantor under Global Holding's $120 million syndicated senior secured term loan facility due November 12, 2024, under which Global Holding's outstanding principal balance is $108 million as of December 31, 2020. Failure by Global Holding to meet the terms and conditions under its term loan facility could require FE to be obligated under the provisions of its guarantee, resulting in consolidation of Global Holding by FE.

- ***PATH WV*** - PATH, a proposed transmission line from West Virginia through Virginia into Maryland which PJM cancelled in 2012, is a series limited liability company that is comprised of multiple series, each of which has separate rights, powers and duties regarding specified property and the series profits and losses associated with such property. A subsidiary of FE owns 100% of the Allegheny Series (PATH-Allegheny) and 50% of the West Virginia Series (PATH-WV), which is a joint venture with a subsidiary of AEP. FirstEnergy is not the primary beneficiary of PATH-WV, as it does not have control over the significant activities affecting the economics of PATH-WV. FirstEnergy's ownership interest in PATH-WV is subject to the equity method of accounting. As of December 31, 2020, the carrying value of the equity method investment was $18 million.

- ***Purchase Power Agreements*** - FirstEnergy evaluated its PPAs and determined that certain NUG entities at its Regulated Distribution segment may be VIEs to the extent that they own a plant that sells substantially all of its output to the applicable utilities and the contract price for power is correlated with the plant's variable costs of production.

  FirstEnergy maintains six long-term PPAs with NUG entities that were entered into pursuant to PURPA. FirstEnergy was not involved in the creation of, and has no equity or debt invested in, any of these entities. FirstEnergy has determined that for all but one of these NUG entities, it does not have a variable interest, or the entities do not meet the criteria to be considered a VIE. FirstEnergy may hold a variable interest in the remaining one entity; however, it applied the scope exception that exempts enterprises unable to obtain the necessary information to evaluate entities.

Because FirstEnergy has no equity or debt interests in the NUG entities, its maximum exposure to loss relates primarily to the above-market costs incurred for power. FirstEnergy expects any above-market costs incurred at its Regulated Distribution segment to be recovered from customers. Purchased power costs related to the contract that may contain a variable interest were $113 million and $116 million, respectively, during the years ended December 31, 2020 and 2019.

## NEW ACCOUNTING PRONOUNCEMENTS

### Recently Adopted Pronouncements

ASU 2016-13, "*Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*" (Issued June 2016 and subsequently updated): ASU 2016-13 removes all recognition thresholds and will require companies to recognize an allowance for credit losses for the difference between the amortized cost basis of a financial instrument and the amount of amortized cost that the company expects to collect over the instrument's contractual life. Prior to adoption, FirstEnergy analyzed its financial instruments within the scope of this guidance, primarily trade receivables and AFS debt securities. The adoption of this standard upon January 1, 2020 did not have a material impact to FirstEnergy's financial statements and required additional disclosures in these Notes to the Consolidated Financial Statements. Please see above for additional information on FirstEnergy's allowance for uncollectible customer receivables.

ASU 2018-15, "*Intangibles-Goodwill and Other-Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract*" (Issued August 2018): ASU 2018-15 allows implementation costs incurred by customers in cloud computing arrangements to be deferred and recognized over the term of the arrangement, if those costs would be capitalized by the customers in a software licensing arrangement. FirstEnergy adopted this standard as of January 1, 2020, with no material impact to its financial statements.

ASU 2020-04, "*Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting*" (Issued March 2020 and subsequently updated): ASU 2020-04 provides temporary optional expedients and exceptions to the current guidance on contract modifications to ease the financial reporting burdens related to the expected market transition from LIBOR and other interbank offered rates to alternative reference rates. FirstEnergy's $3.5 billion Revolving Credit Facility bears interest at fluctuating interest rates based on LIBOR and contains provisions (requiring an amendment) in the event that LIBOR can no longer be used. As of December 31, 2020, FirstEnergy has not utilized any of the expedients discussed within this ASU.

### Recently Issued Pronouncements - The following new authoritative accounting guidance issued by the FASB has not yet been adopted. Unless otherwise indicated, FirstEnergy is currently assessing the impact such guidance may have on its financial statements and disclosures, as well as the potential to early adopt where applicable. FirstEnergy has assessed other FASB issuances of new standards not described below based upon the current expectation that such new standards will not significantly impact FirstEnergy's financial reporting.

ASU 2019-12, "*Simplifying the Accounting for Income Taxes*" (Issued in December 2019): ASU 2019-12 enhances and simplifies various aspects of the income tax accounting guidance including the elimination of certain exceptions related to the approach for intraperiod tax allocation, the methodology for calculating income taxes in an interim period and the recognition of deferred tax liabilities for outside basis differences. The new guidance also simplifies aspects of the accounting for franchise taxes and enacted changes in tax laws or rates and clarifies the accounting for transactions that result in a step-up in the tax basis of goodwill. The guidance will be effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2020, with early adoption permitted. FirstEnergy continues to evaluate the new guidance, but currently does not expect a material impact upon adopting this standard.

## 2. REVENUE

FirstEnergy accounts for revenues from contracts with customers under ASC 606, "*Revenue from Contracts with Customers.*" Revenue from leases, financial instruments, other contractual rights or obligations and other revenues that are not from contracts with customers are outside the scope of the standard and accounted for under other existing GAAP.

FirstEnergy has elected to exclude sales taxes and other similar taxes collected on behalf of third parties from revenue as prescribed in the standard. As a result, tax collections and remittances are excluded from recognition in the income statement and instead recorded through the balance sheet. Excise and gross receipts taxes that are assessed on FirstEnergy are not subject to the election and are included in revenue. FirstEnergy has elected the optional invoice practical expedient for most of its revenues and utilizes the optional short-term contract exemption for transmission revenues due to the annual establishment of revenue requirements, which eliminates the need to provide certain revenue disclosures regarding unsatisfied performance obligations.

FirstEnergy's revenues are primarily derived from electric service provided by the Utilities and Transmission Companies. The following represents a disaggregation of revenue from contracts with customers for the year ended December 31, 2020:

| Revenues by Type of Service | Regulated Distribution | | Regulated Transmission | | Corporate/Other and Reconciling Adjustments [1] | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | *(In millions)* | | | |
| Distribution services [2] | $ | 5,259 | $ | — | $ | (88) | $ | 5,171 |
| Retail generation | | 3,577 | | — | | (60) | | 3,517 |
| Wholesale sales | | 251 | | — | | 9 | | 260 |
| Transmission [2] | | — | | 1,613 | | — | | 1,613 |
| Other | | 140 | | — | | — | | 140 |
| Total revenues from contracts with customers | $ | 9,227 | $ | 1,613 | $ | (139) | $ | 10,701 |
| ARP [3] | | 43 | | — | | — | | 43 |
| Other non-customer revenue | | 93 | | 17 | | (64) | | 46 |
| Total revenues | $ | 9,363 | $ | 1,630 | $ | (203) | $ | 10,790 |

[1] Includes eliminations and reconciling adjustments of inter-segment revenues.
[2] Includes reductions to revenue related to amounts subject to refund resulting from the Tax Act ($2 million at Regulated Distribution and $7 million at Regulated Transmission).
[3] ARP revenue for the year ended December 31, 2020, is primarily related to shared savings revenue in Ohio.

The following represents a disaggregation of revenue from contracts with customers for the year ended December 31, 2019:

| Revenues by Type of Service | Regulated Distribution | | Regulated Transmission | | Corporate/Other and Reconciling Adjustments [1] | | Total | |
|---|---|---|---|---|---|---|---|---|
| | | | | | *(In millions)* | | | |
| Distribution services [2] | $ | 5,133 | $ | — | $ | (83) | $ | 5,050 |
| Retail generation | | 3,727 | | — | | (57) | | 3,670 |
| Wholesale sales [2] | | 411 | | — | | 12 | | 423 |
| Transmission [2] | | — | | 1,510 | | — | | 1,510 |
| Other | | 150 | | — | | 2 | | 152 |
| Total revenues from contracts with customers | $ | 9,421 | $ | 1,510 | $ | (126) | $ | 10,805 |
| ARP [3] | | 181 | | — | | — | | 181 |
| Other non-customer revenue | | 96 | | 16 | | (63) | | 49 |
| Total revenues | $ | 9,698 | $ | 1,526 | $ | (189) | $ | 11,035 |

[1] Includes eliminations and reconciling adjustments of inter-segment revenues.
[2] Includes reductions to revenue related to amounts subject to refund resulting from the Tax Act ($16 million at Regulated Distribution and $19 million at Regulated Transmission).
[3] ARP revenue for the year ended December 31, 2019, includes DMR revenue, lost distribution and shared savings revenue in Ohio.

The following represents a disaggregation of revenue from contracts with customers for the year ended December 31, 2018:

| Revenues by Type of Service | Regulated Distribution | Regulated Transmission | Corporate/Other and Reconciling Adjustments [1] | Total |
|---|---|---|---|---|
| | *(In millions)* | | | |
| Distribution services[2] | $ 5,159 | $ — | $ (104) | $ 5,055 |
| Retail generation | 3,936 | — | (54) | 3,882 |
| Wholesale sales[2] | 502 | — | 22 | 524 |
| Transmission[2] | — | 1,335 | — | 1,335 |
| Other | 144 | — | 4 | 148 |
| Total revenues from contracts with customers | $ 9,741 | $ 1,335 | $ (132) | $ 10,944 |
| ARP [3] | 254 | — | — | 254 |
| Other non-customer revenue | 108 | 18 | (63) | 63 |
| Total revenues | $ 10,103 | $ 1,353 | $ (195) | $ 11,261 |

[1] Includes eliminations and reconciling adjustments of inter-segment revenues.
[2] Includes reductions to revenue related to amounts subject to refund resulting from the Tax Act ($131 million at Regulated Distribution and $16 million at Regulated Transmission).
[3] ARP revenue for the year ended December 31, 2018, includes DMR revenue, lost distribution and shared savings revenue in Ohio.

Other non-customer revenue includes revenue from late payment charges of $31 million, $37 million and $39 million, respectively, for the years ended December 31, 2020, 2019 and 2018. During 2020, certain late payment charges began to be waived in response to the COVID-19 pandemic, and as a result, FirstEnergy did not recognize these revenues. Late payment charges have resumed for most customers as of December 31, 2020. See Note 1, "Organization and Basis of Presentation," for further discussion on the COVID-19 pandemic.

Other non-customer revenue also includes revenue from derivatives of $14 million, $8 million and $18 million, respectively, for the years ended December 31, 2020, 2019 and 2018.

### Regulated Distribution

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies and also controls 3,790 MWs of regulated electric generation capacity located primarily in West Virginia, Virginia and New Jersey, 210 MWs of which are related to the Yards Creek generating plant that is being sold pursuant to an asset purchase agreement as further discussed below. Each of the Utilities earns revenue from state-regulated rate tariffs under which it provides distribution services to residential, commercial and industrial customers in its service territory. The Utilities are obligated under the regulated construct to deliver power to customers reliably, as it is needed, which creates an implied monthly contract with the end-use customer. See Note 14 "Regulatory Matters," for additional information on rate recovery mechanisms. Distribution and electric revenues are recognized over time as electricity is distributed and delivered to the customer and the customers consume the electricity immediately as delivery occurs.

**Retail generation sales** relate to POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland, as well as generation sales in West Virginia that are regulated by the WVPSC. Certain of the Utilities have default service obligations to provide power to non-shopping customers who have elected to continue to receive service under regulated retail tariffs. The volume of these sales varies depending on the level of shopping that occurs. Supply plans vary by state and by service territory. Default service for the Ohio Companies, Pennsylvania Companies, JCP&L and PE's Maryland jurisdiction are provided through a competitive procurement process approved by each state's respective commission. Retail generation revenues are recognized over time as electricity is delivered and consumed immediately by the customer.

The following table represents a disaggregation of the Regulated Distribution segment revenue from contracts with **distribution service and retail generation** customers for the years ended December 31, 2020, 2019 and 2018 by class:

| Revenues by Customer Class | For the Years Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2020** | | **2019** | | **2018** | |
| | *(In millions)* | | | | | |
| Residential | $ | 5,539 | $ | 5,412 | $ | 5,598 |
| Commercial | | 2,140 | | 2,252 | | 2,350 |
| Industrial | | 1,076 | | 1,106 | | 1,056 |
| Other | | 81 | | 90 | | 91 |
| Total | $ | 8,836 | $ | 8,860 | $ | 9,095 |

**Wholesale sales** primarily consist of generation and capacity sales into the PJM market from FirstEnergy's regulated electric generation capacity and NUGs. Certain of the Utilities may also purchase power in the PJM markets to supply power to their customers. Generally, these power sales from generation and purchases to serve load are netted hourly and reported as either revenues or purchased power on the Consolidated Statements of Income based on whether the entity was a net seller or buyer each hour. Capacity revenues are recognized ratably over the PJM planning year at prices cleared in the annual PJM Reliability Pricing Model Base Residual Auction and Incremental Auctions. Capacity purchases and sales through PJM capacity auctions are reported within revenues on the Consolidated Statements of Income. Certain capacity income (bonuses) and charges (penalties) related to the availability of units that have cleared in the auctions are unknown and not recorded in revenue until, and unless, they occur.

The Utilities' distribution customers are metered on a cycle basis. An estimate of unbilled revenues is calculated to recognize electric service provided from the last meter reading through the end of the month. This estimate includes many factors, among which are historical customer usage, load profiles, estimated weather impacts, customer shopping activity and prices in effect for each class of customer. In each accounting period, the Utilities accrue the estimated unbilled amount as revenue and reverse the related prior period estimate. Customer payments vary by state but are generally due within 30 days.

ASC 606 excludes industry-specific accounting guidance for recognizing revenue from ARPs as these programs represent contracts between the utility and its regulators, as opposed to customers. Therefore, revenue from these programs are not within the scope of ASC 606 and regulated utilities are permitted to continue to recognize such revenues in accordance with existing practice but are presented separately from revenue arising from contracts with customers. FirstEnergy currently has ARPs in Ohio, primarily under the DMR, lost distribution and shared savings revenue in 2019, and shared savings in 2020.

### Regulated Transmission

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies, as well as stated transmission rates at JCP&L, MP, PE and WP, although as further discussed in Note 14, "Regulatory Matters," MP, PE and WP filed with FERC on October 29, 2020, to convert their existing stated transmission rates to forward-looking formula rates, effective January 1, 2021. JCP&L had stated rates in 2019, but moved to forward-looking formula rates, subject to a refund, effective January 1, 2020, as further discussed in Note 14, "Regulatory Matters."

Both the forward-looking formula and stated rates recover costs that the regulatory agencies determine are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. Revenues and cash receipts for the stand-ready obligation of providing transmission service are recognized ratably over time.

The following table represents a disaggregation of revenue from contracts with regulated transmission customers for the years ended December 31, 2020, 2019 and 2018:

| Transmission Owner | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| ATSI | $ 804 | $ 754 | $ 664 |
| TrAIL | 247 | 242 | 237 |
| MAIT | 250 | 224 | 150 |
| JCP&L | 178 | 160 | 159 |
| Other | 134 | 130 | 125 |
| Total Revenues | $ 1,613 | $ 1,510 | $ 1,335 |

## 3. DISCONTINUED OPERATIONS

### FES and FENOC Chapter 11 Bankruptcy Filing

On March 31, 2018, the FES Debtors announced that, in order to facilitate an orderly financial restructuring, they filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code with the Bankruptcy Court. In September 2018, the Bankruptcy Court approved a FES Bankruptcy settlement agreement by and among FirstEnergy, two groups of key FES creditors (collectively, the FES Key Creditor Groups), the FES Debtors and the UCC. The FES Bankruptcy settlement agreement resolved certain claims by FirstEnergy against the FES Debtors, all claims by the FES Debtors and the FES Key Creditor Groups against FirstEnergy, as well as releases from third parties who voted in favor of the FES Debtors' plan of reorganization, in return for among other things, a cash payment of $853 million upon emergence. The FES Bankruptcy settlement was conditioned on the FES Debtors confirming and effectuating a plan of reorganization acceptable to FirstEnergy.

On February 18, 2020, the FES Debtors and FirstEnergy entered into an IT Access Agreement that provided IT support to enable the FES Debtors to emerge from bankruptcy prior to full IT separation by the FES Debtors. As part of the IT Access Agreement, the FES Debtors and FirstEnergy resolved, among other things, the on-going reconciliation of outstanding tax sharing payments for tax years 2018, 2019 and 2020 for a total of $125 million. On February 25, 2020, the Bankruptcy Court approved the IT Access Agreement. On February 27, 2020, the FES Debtors effectuated their plan, emerged from bankruptcy and FirstEnergy tendered the settlement payments totaling $853 million and the $125 million tax sharing payment to the FES Debtors, with no material impact to net income in 2020.

By eliminating a significant portion of its competitive generation fleet with the deconsolidation of the FES Debtors, FirstEnergy has concluded the FES Debtors meet the criteria for discontinued operations, as this represents a significant event in management's strategic review to exit commodity-exposed generation and transition to a fully regulated company.

### Services Agreement

Pursuant to the FES Bankruptcy settlement agreement, FirstEnergy entered into an amended and restated shared services agreement with the FES Debtors to extend the availability of shared services until June 30, 2020, subject to reductions in services if requested by the FES Debtors, and extensions of time, subject to FirstEnergy's approval. Under the amended shared services agreement, and consistent with the prior shared services agreements, costs are directly billed or assigned at no more than cost.

As of June 30, 2020, FirstEnergy had substantially ceased providing post-emergence services to FES Debtors under the terms of the amended and restated shared services agreement. In connection with the FES Debtors emergence from bankruptcy, FirstEnergy entered into an amended separation agreement with the FES Debtors to implement the separation of FES Debtors and their businesses from FirstEnergy.

### Income Taxes

For U.S. federal income taxes, the FES Debtors were included in FirstEnergy's consolidated tax return until emergence from bankruptcy on February 27, 2020. As a result of the FES Debtors' deconsolidation, FirstEnergy recognized a worthless stock deduction for the remaining tax basis in the FES Debtors of approximately $4.9 billion, net of unrecognized tax benefits of $316 million. Tax-effected, the worthless stock deduction is approximately $1.1 billion, net of valuation allowances recorded against the state tax benefit ($80 million) and the aforementioned unrecognized tax benefits ($72 million).

Additionally, the Tax Act amended Section 163(j) of the Internal Revenue Code, limiting interest expense deductions for corporations but with exemption for certain regulated utilities. Based on interpretation of subsequently issued proposed regulations, FirstEnergy estimated the amount of deductible interest for its consolidated group in 2018 and 2019, with

nondeductible portions being carried forward with an indefinite life and for which deferred tax assets were recorded. However, full valuation allowances were recorded against the deferred tax assets related to the carryforward of nondeductible interest as future utilization of the carryforwards requires taxable income from sources other than regulated utility businesses. Final regulations under Section 163(j) were issued in July 2020 and January 2021 but do not materially change these results. All tax expense related to nondeductible interest in 2018 and 2019 was recorded in discontinued operations as it was entirely attributed to the inclusion of the FES Debtors in FirstEnergy's consolidated tax group. Pursuant to certain safe harbor rules in the final regulations under Section 163(j), and due to the FES Debtors' emergence from bankruptcy on February 27, 2020, FirstEnergy expects all interest expense for 2020 to be fully deductible. See Note 7, "Income Taxes" for further information

Upon emergence, FirstEnergy paid the FES Debtors $125 million to settle all reconciliations under the Intercompany Tax Allocation Agreement for 2018, 2019 and 2020 tax years, including all issues regarding nondeductible interest. In September 2020, FirstEnergy filed its 2019 federal income tax return with the IRS and recognized a $6 million charge to discontinued operations in the third quarter of 2020, resulting from final adjustments to 2019 intercompany tax sharing related to the FES Debtors. The final intercompany tax sharing adjustment for the 2020 federal income tax return to be filed during 2021 is an estimated $12 million tax benefit and was recorded during the fourth quarter of 2020 in discontinued operations.

### *Competitive Generation Asset Sales*

As contemplated under the FES Bankruptcy settlement agreement, AE Supply entered into an agreement on December 31, 2018, to transfer the 1,300 MW Pleasants Power Station and related assets to FG, while retaining certain specified liabilities. Under the terms of the agreement, FG acquired the economic interests in Pleasants as of January 1, 2019, and AE Supply operated Pleasants until ownership was transferred on January 30, 2020. AE Supply will continue to provide access to the McElroy's Run CCR impoundment facility, which was not transferred, and FE will provide guarantees for certain retained environmental liabilities of AE Supply, including the McElroy's Run CCR impoundment facility. During the first quarter of 2020, FG paid AE Supply approximately $65 million of cash for related materials and supplies (at book value) and the settlement of FG's economic interest in Pleasants.

### *Summarized Results of Discontinued Operations*

Summarized results of discontinued operations for the years ended December 31, 2020, 2019, and 2018 were as follows:

| (In millions) | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018[1] |
| Revenues | $ 7 | $ 188 | $ 989 |
| Fuel | (6) | (140) | (304) |
| Purchased power | — | — | (84) |
| Other operating expenses | (6) | (63) | (435) |
| Provision for depreciation | — | — | (96) |
| General taxes | — | (14) | (35) |
| Pleasants economic interest[2] | 5 | 27 | — |
| Other expense, net | — | (2) | (83) |
| **Loss from discontinued operations, before tax** | — | (4) | (48) |
| Income tax expense (benefit) | — | 47 | 61 |
| **Loss from discontinued operations, net of tax** | — | (51) | (109) |
| Removal of investment in FES and FENOC | — | — | 2,193 |
| Assumption of benefit obligations retained at FE | — | — | (820) |
| Guarantees and credit support provided by FE | — | — | (139) |
| Reserve on receivables and allocated pension/OPEB mark-to-market | — | — | (914) |
| Settlement consideration and services credit | (1) | 7 | (1,197) |
| Accelerated net pension and OPEB prior service credits | 18 | — | — |
| Gain (loss) on Disposal of FES and FENOC, before tax | 17 | 7 | (877) |
| Income tax benefit including worthless stock deduction | (59) | (52) | (1,312) |
| **Gain on disposal of FES and FENOC, net of tax** | 76 | 59 | 435 |
| **Income from discontinued operations** | $ 76 | $ 8 | $ 326 |

[1] Discontinued operations include results of FES and FENOC through March 31, 2018, when deconsolidated from FirstEnergy's financial statements.
[2] Reflects the estimated amounts owed from FG for its economic interests in Pleasants effective January 1, 2019. As discussed above, settlement of the economic interests occurred during the first quarter of 2020.

FirstEnergy's Consolidated Statements of Cash Flows combines cash flows from discontinued operations with cash flows from continuing operations within each cash flow category. The following table summarizes the major classes of cash flow items from discontinued operations for the years ended December 31, 2020, 2019 and 2018:

| (In millions) | | For the Years Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2020 | | 2019 | | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | | |
| Income from discontinued operations | $ | 76 | $ | 8 | $ | 326 |
| Gain on disposal, net of tax | | (76) | | (59) | | (435) |
| Depreciation and amortization, including nuclear fuel, regulatory assets, net, intangible assets and deferred debt-related costs | | — | | — | | 110 |
| Deferred income taxes and investment tax credits, net | | — | | 47 | | 61 |
| Unrealized (gain) loss on derivative transactions | | — | | — | | (10) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | | |
| Property additions | | — | | — | | (27) |
| Sales of investment securities held in trusts | | — | | — | | 109 |
| Purchases of investment securities held in trusts | | — | | — | | (122) |

## 4. ACCUMULATED OTHER COMPREHENSIVE INCOME

The changes in AOCI for the years ended December 31, 2020, 2019 and 2018, for FirstEnergy are shown in the following table:

| | Gains & Losses on Cash Flow Hedges [1] | | Unrealized Gains on AFS Securities | | Defined Benefit Pension & OPEB Plans | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | *(In millions)* | | | | |
| AOCI Balance, January 1, 2018 | $ | (22) | $ | 67 | $ | 97 | $ 142 |
| Other comprehensive income before reclassifications | | — | | (97) | | (9) | (106) |
| Amounts reclassified from AOCI | | 8 | | (1) | | (74) | (67) |
| Deconsolidation of FES and FENOC | | 13 | | (8) | | — | 5 |
| Other comprehensive income (loss) | | 21 | | (106) | | (83) | (168) |
| Income tax (benefits) on other comprehensive income (loss) | | 10 | | (39) | | (38) | (67) |
| Other comprehensive income (loss), net of tax | | 11 | | (67) | | (45) | (101) |
| AOCI Balance, December 31, 2018 | $ | (11) | $ | — | $ | 52 | $ 41 |
| Other comprehensive income before reclassifications | | — | | — | | (2) | (2) |
| Amounts reclassified from AOCI | | 2 | | — | | (29) | (27) |
| Other comprehensive income (loss) | | 2 | | — | | (31) | (29) |
| Income tax (benefits) on other comprehensive income (loss) | | — | | — | | (8) | (8) |
| Other comprehensive income (loss), net of tax | | 2 | | — | | (23) | (21) |
| AOCI Balance, December 31, 2019 | $ | (9) | $ | — | $ | 29 | $ 20 |
| Amounts reclassified from AOCI | | 1 | | — | | (34) | (33) |
| Other comprehensive income (loss) | | 1 | | — | | (34) | (33) |
| Income tax (benefits) on other comprehensive income (loss) | | — | | — | | (8) | (8) |
| Other comprehensive income (loss), net of tax | | 1 | | — | | (26) | (25) |
| AOCI Balance, December 31, 2020 | $ | (8) | $ | — | $ | 3 | $ (5) |

[1] Relates to previous cash flow hedges used to hedge fixed rate long-term debt securities prior to their issuance.

The following amounts were reclassified from AOCI for FirstEnergy in the years ended December 31, 2020, 2019 and 2018:

| Reclassifications from AOCI [1] | Year Ended December 31, | | | Affected Line Item in Consolidated Statements of Income |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2018 [2] | |
| | *(In millions)* | | | |
| Gains & losses on cash flow hedges | | | | |
| Commodity contracts | $ — | $ — | $ 1 | Other operating expenses |
| Long-term debt | 1 | 2 | 7 | Interest expense |
| | — | — | (2) | Income taxes |
| | $ 1 | $ 2 | $ 6 | Net of tax |
| Unrealized gains on AFS securities | | | | |
| Realized gains on sales of securities | $ — | $ — | $ (1) | Discontinued operations |
| Defined benefit pension and OPEB plans | | | | |
| Prior-service costs | $ (34) | $ (29) | $ (74) [3] | |
| | 8 | 8 | 19 | Income taxes |
| | $ (26) | $ (21) | $ (55) | Net of tax |

[1] Amounts in parenthesis represent credits to the Consolidated Statements of Income (Loss) from AOCI.

[2] Includes stranded tax amounts reclassified from AOCI in connection with the adoption of ASU 2018-02, "*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*".

[3] Prior-service costs are reported within Miscellaneous income, net within Other Income (Expense) on FirstEnergy's Consolidated Statements of Income. Components are included in the computation of net periodic cost (credits), see Note 5, "Pension and Other Postemployment Benefits," for additional details.

## 5. PENSION AND OTHER POST-EMPLOYMENT BENEFITS

FirstEnergy provides noncontributory qualified defined benefit pension plans that cover substantially all of its employees and non-qualified pension plans that cover certain employees. The plans provide defined benefits based on years of service and compensation levels. Under the cash-balance portion of the pension plan (for employees hired on or after January 1, 2014), FirstEnergy makes contributions to eligible employee retirement accounts based on a pay credit and an interest credit. In addition, FirstEnergy provides a minimum amount of noncontributory life insurance to retired employees in addition to optional contributory insurance. Health care benefits, which include certain employee contributions, deductibles and co-payments, are also available upon retirement to certain employees, their dependents and, under certain circumstances, their survivors. FirstEnergy recognizes the expected cost of providing pension and OPEB to employees and their beneficiaries and covered dependents from the time employees are hired until they become eligible to receive those benefits. FirstEnergy also has obligations to former or inactive employees after employment, but before retirement, for disability-related benefits.

FirstEnergy recognizes a pension and OPEB mark-to-market adjustment for the change in the fair value of plan assets and net actuarial gains and losses annually in the fourth quarter of each fiscal year and whenever a plan is determined to qualify for a remeasurement. The remaining components of pension and OPEB expense, primarily service costs, interest on obligations, assumed return on assets and prior service costs, are recorded on a monthly basis.

Under the approved bankruptcy settlement agreement discussed above, upon emergence, FES and FENOC employees ceased earning years of service under the FirstEnergy pension and OPEB plans. The emergence on February 27, 2020, triggered a remeasurement of the affected pension and OPEB plans and as a result, FirstEnergy recognized a non-cash, pre-tax pension and OPEB mark-to-market adjustment of approximately $423 million in the first quarter of 2020. The first quarter 2020 pension and OPEB mark-to-market adjustment primarily reflects a 38 bps decrease in the discount rate used to measure benefit obligations from December 31, 2019, partially offset by a slightly higher than expected return on assets. In the fourth quarter 2020, FirstEnergy recognized a $54 million pension and OPEB mark-to-market adjustment, primarily reflecting a 29 bps decrease in the discount rate used to measure benefit obligations from February 27, 2020, partially offset by higher than expected return on assets. Of the $54 million, approximately $21 million was allocated to certain of the Transmission Companies that are expected to be recovered through formula transmission rates. The annual pension and OPEB mark-to-market adjustments for the years ended December 31, 2020, 2019, and 2018 were $477 million (including the $423 million in the first quarter of 2020 described above), $676 million, and $145 million, respectively. Of these amounts, approximately $2 million and $1 million are included in discontinued operations for the years ended December 31, 2019, and 2018, respectively. Furthermore, of these annual pension and OPEB mark-to-market amounts, approximately $40 million, $47 million and $8 million were allocated to certain of the Transmission Companies and expected to be recovered through formula transmission rates, respectively.

FirstEnergy's pension and OPEB funding policy is based on actuarial computations using the projected unit credit method. In January 2018, FirstEnergy satisfied its minimum required funding obligations to its qualified pension plan of $500 million and addressed anticipated required funding obligations through 2020 to its pension plan with an additional contribution of $750 million. On February 1, 2019, FirstEnergy made a $500 million voluntary cash contribution to the qualified pension plan. FirstEnergy expects no required contributions until 2022.

Pension and OPEB costs are affected by employee demographics (including age, compensation levels and employment periods), the level of contributions made to the plans and earnings on plan assets. Pension and OPEB costs may also be affected by changes in key assumptions, including anticipated rates of return on plan assets, the discount rates and health care trend rates used in determining the projected benefit obligations for pension and OPEB costs. FirstEnergy uses a December 31 measurement date for its pension and OPEB plans. The fair value of the plan assets represents the actual market value as of the measurement date.

FirstEnergy's assumed rate of return on pension plan assets considers historical market returns and economic forecasts for the types of investments held by the pension trusts. In 2020, FirstEnergy's qualified pension and OPEB plan assets experienced gains of $1,225 million or 14.7%, compared to gains of $1,492 million, or 20.2% in 2019, and losses of $371 million, or (4.0)% in 2018 and assumed a 7.50% rate of return on plan assets in 2020, 2019 and 2018, which generated $651 million, $569 million and $605 million of expected returns on plan assets, respectively. The expected return on pension and OPEB assets is based on the trusts' asset allocation targets and the historical performance of risk-based and fixed income securities. The gains or losses generated as a result of the difference between expected and actual returns on plan assets will decrease or increase future net periodic pension and OPEB cost as the difference is recognized annually in the fourth quarter of each fiscal year or whenever a plan is determined to qualify for remeasurement. The expected return on plan assets for 2021 is 7.50%.

During 2020, the Society of Actuaries published new mortality tables that include more current data than the RP-2014 tables as well as new improvement scales. An analysis of FirstEnergy pension and OPEB plan mortality data indicated the use of the Pri-2012 mortality table with projection scale MP-2020 was most appropriate. As such, the Pri-2012 mortality table with projection scale MP-2020 was utilized to determine the 2020 benefit cost and obligation as of December 31, 2020 for the FirstEnergy pension and OPEB plans. The impact of using the Pri-2012 mortality table with projection scale MP-2020 resulted in a decrease to the projected benefit obligation of approximately $74 million and $2 million for the pension and OPEB plans, respectively, and was included in the 2020 pension and OPEB mark-to-market adjustment.

Effective in 2019, FirstEnergy changed the approach utilized to estimate the service cost and interest cost components of net periodic benefit cost for pension and OPEB plans. Historically, FirstEnergy estimated these components utilizing a single, weighted average discount rate derived from the yield curve used to measure the benefit obligation. FirstEnergy has elected to use a spot rate approach in the estimation of the components of benefit cost by applying specific spot rates along the full yield curve to the relevant projected cash flows, as this provides a better estimate of service and interest costs by improving the correlation between projected benefit cash flows to the corresponding spot yield curve rates. This election was considered a change in estimate and, accordingly, accounted for prospectively, and did not have a material impact on FirstEnergy's financial statements.

Service costs, net of capitalization, are reported within Other operating expenses on FirstEnergy's Consolidated Statements of Income. Non-service costs, other than the pension and OPEB mark-to-market adjustment, which is separately shown, are reported within Miscellaneous income, net, within Other Income (Expense) on FirstEnergy's Consolidated Statements of Income.

| Obligations and Funded Status - Qualified and Non-Qualified Plans | Pension | | OPEB | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| | *(In millions)* | | | |
| **Change in benefit obligation:** | | | | |
| Benefit obligation as of January 1 | $ 11,050 | $ 9,462 | $ 654 | $ 608 |
| Service cost | 194 | 193 | 4 | 3 |
| Interest cost | 287 | 373 | 15 | 22 |
| Plan participants' contributions | — | — | 4 | 4 |
| Plan amendments | 9 | 2 | — | — |
| Special termination benefits | — | 14 | — | — |
| Medicare retiree drug subsidy | — | — | 1 | 1 |
| Actuarial loss | 1,011 | 1,535 | 41 | 64 |
| Benefits paid | (616) | (529) | (43) | (48) |
| Benefit obligation as of December 31 | $ 11,935 | $ 11,050 | $ 676 | $ 654 |
| **Change in fair value of plan assets:** | | | | |
| Fair value of plan assets as of January 1 | $ 8,395 | 6,984 | $ 458 | 408 |
| Actual return on plan assets | 1,165 | 1,419 | 60 | 73 |
| Company contributions | 24 | 521 | 23 | 21 |
| Plan participants' contributions | — | — | 4 | 4 |
| Benefits paid | (616) | (529) | (43) | (48) |
| Fair value of plan assets as of December 31 | $ 8,968 | $ 8,395 | $ 502 | $ 458 |
| **Funded Status:** | | | | |
| Qualified plan | $ (2,500) | (2,203) | $ — | — |
| Non-qualified plans | (467) | (452) | — | — |
| Funded Status (Net liability as of December 31) | $ (2,967) | $ (2,655) | $ (174) | $ (196) |
| **Accumulated benefit obligation** | $ 11,376 | $ 10,439 | $ — | $ — |
| **Amounts Recognized in AOCI:** | | | | |
| Prior service cost (credit) | $ 12 | $ 24 | $ (39) | $ (85) |
| **Assumptions Used to Determine Benefit Obligations (as of December 31)** | | | | |
| Discount rate | 2.67 % | 3.34 % | 2.45 % | 3.18 % |
| Rate of compensation increase | 4.10 % | 4.10 % | N/A | N/A |
| Cash balance weighted average interest crediting rate | 2.57 % | 2.57 % | N/A | N/A |
| **Assumed Health Care Cost Trend Rates (as of December 31)** | | | | |
| Health care cost trend rate assumed (pre/post-Medicare) | N/A | N/A | 6.0%-5.5% | 6.0%-5.5% |
| Rate to which the cost trend rate is assumed to decline (the ultimate trend rate) | N/A | N/A | 4.5 % | 4.5 % |
| Year that the rate reaches the ultimate trend rate | N/A | N/A | 2028 | 2028 |
| **Allocation of Plan Assets (as of December 31)** | | | | |
| Equity securities | 23 % | 29 % | 55 % | 54 % |
| Fixed Income | 35 % | 36 % | 28 % | 30 % |
| Hedge funds | 7 % | 9 % | — % | — % |
| Insurance-linked securities | 4 % | 2 % | — % | — % |
| Real estate funds | 9 % | 7 % | — % | — % |
| Private equity funds | 5 % | 4 % | — % | — % |
| Cash and short-term securities | 17 % | 13 % | 17 % | 16 % |
| Total | 100 % | 100 % | 100 % | 100 % |

| Components of Net Periodic Benefit Costs for the Years Ended December 31, | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2020 | 2019 | 2018 |
| | *(In millions)* | | | | | |
| Service cost | $ 194 | $ 193 | $ 224 | $ 4 | $ 3 | $ 5 |
| Interest cost | 287 | 373 | 372 | 15 | 22 | 25 |
| Expected return on plan assets | (618) | (540) | (574) | (33) | (29) | (31) |
| Amortization of prior service costs (credits) [1] | 12 | 7 | 7 | (46) | (36) | (81) |
| Special termination costs [2] | — | 14 | 31 | — | — | 8 |
| One-time termination benefits [3] | 8 | — | — | — | — | — |
| Pension & OPEB mark-to-market | 463 | 656 | 227 | 14 | 20 | (82) |
| Net periodic benefit costs (credits) | $ 346 | $ 703 | $ 287 | $ (46) | $ (20) | $ (156) |

[1] 2020 includes the acceleration of approximately $18 million in net credits as a result of the FES Debtors' emergence during the first quarter of 2020 and is a component of discontinued operations in FirstEnergy's Consolidated Statements of Income.

[2] Subject to a cap, FirstEnergy agreed to fund a pension enhancement through its pension plan, for voluntary enhanced retirement packages offered to certain FES employees, as well as offer certain other employee benefits. The costs are a component of discontinued operations in FirstEnergy's Consolidated Statements of Income.

[3] Costs represent additional benefits provided to FES and FENOC employees under the approved settlement agreement and are a component of discontinued operations in FirstEnergy's Consolidated Statements of Income.

| Assumptions Used to Determine Net Periodic Benefit Cost for the Years Ended December [1] | Pension | | | OPEB | | |
|---|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2020 | 2019 | 2018 |
| Service cost weighted-average discount rate [2] | 3.60%/3.24% | 4.66 % | 3.75 % | 3.63%/3.29% | 4.67 % | 3.50 % |
| Interest cost weighted-average discount rate [3] | 3.27%/2.90% | 4.37 % | 3.75 % | 2.71%/2.30% | 3.89 % | 3.50 % |
| Expected long-term return on plan assets | 7.50 % | 7.50 % | 7.50 % | 7.50 % | 7.50 % | 7.50 % |
| Rate of compensation increase | 4.10 % | 4.10 % | 4.20 % | N/A | N/A | N/A |

[1] Excludes impact of pension and OPEB mark-to-market adjustment.

[2] Weighted-average discount rates effect from January 1, 2020, through February 26, 2020, were 3.60% and 3.63% for pension and OPEB service cost, respectively. Discount rates were 3.24% and 3.29% for pension and OPEB service cost, respectively, for the period February 27, 2020 through December 31, 2020.

[3] Weighted-average discount rates in effect from January 1, 2020, through February 26, 2020, were 3.27% and 2.71% for pension and OPEB interest cost, respectively. Discount rates were 2.90% and 2.30% for pension and OPEB interest cost, respectively, for the period February 27, 2020, through December 31, 2020.

In selecting an assumed discount rate, FirstEnergy considers currently available rates of return on high-quality fixed income investments expected to be available during the period to maturity of the pension and OPEB obligations. The assumed rates of return on plan assets consider historical market returns and economic forecasts for the types of investments held by FirstEnergy's pension trusts. The long-term rate of return is developed considering the portfolio's asset allocation strategy.

The following tables set forth pension financial assets that are accounted for at fair value by level within the fair value hierarchy. See Note 10, "Fair Value Measurements," for a description of each level of the fair value hierarchy. There were no significant transfers between levels during 2020 and 2019.

| | December 31, 2020 | | | | Asset Allocation |
| | Level 1 | Level 2 | Level 3 | Total | |
| | *(In millions)* | | | | |
| Cash and short-term securities | $ — | $ 1,493 | $ — | $ 1,493 | 17 % |
| Equities | 1,903 | 162 | — | 2,065 | 23 % |
| Fixed income: | | | | | |
|   Corporate bonds | — | 2,672 | — | 2,672 | 31 % |
|   Other[3] | — | 387 | — | 387 | 4 % |
| Alternatives: | | | | | |
|   Derivatives | (13) | — | — | (13) | — % |
| Total [1] | $ 1,890 | $ 4,714 | $ — | $ 6,604 | 75 % |
| Private equity funds [2] | | | | 465 | 5 % |
| Insurance-linked securities [2] | | | | 323 | 4 % |
| Hedge funds [2] | | | | 645 | 7 % |
| Real estate funds [2] | | | | 815 | 9 % |
| Total Investments | | | | $ 8,852 | 100 % |

[1] Excludes $116 million as of December 31, 2020, of receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.
[2] Net Asset Value used as a practical expedient to approximate fair value.
[3] Includes insurance annuities, bank loans and emerging markets debt.

| | December 31, 2019 | | | | Asset Allocation |
| | Level 1 | Level 2 | Level 3 | Total | |
| | *(In millions)* | | | | |
| Cash and short-term securities | $ — | $ 1,069 | $ — | $ 1,069 | 13 % |
| Equities | 1,532 | 828 | — | 2,360 | 29 % |
| Fixed income: | | | | | |
|   Corporate bonds | — | 2,064 | — | 2,064 | 25 % |
|   Other[3] | — | 880 | — | 880 | 11 % |
| Alternatives: | | | | | |
|   Derivatives | (40) | — | — | (40) | — % |
| Total [1] | $ 1,492 | $ 4,841 | $ — | $ 6,333 | 78 % |
| Private equity funds [2] | | | | 342 | 4 % |
| Insurance-linked securities [2] | | | | 186 | 2 % |
| Hedge funds [3] | | | | 774 | 9 % |
| Real estate funds [2] | | | | 584 | 7 % |
| Total Investments | | | | $ 8,219 | 100 % |

[1] Excludes $176 million as of December 31, 2019, of receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.
[2] Net Asset Value used as a practical expedient to approximate fair value.
[3] Includes insurance annuities, bank loans and emerging markets debt.

As of December 31, 2020, and 2019, the OPEB trust investments measured at fair value were as follows:

| | December 31, 2020 | | | | Asset Allocation |
| | Level 1 | Level 2 | Level 3 | Total | |
| | (In millions) | | | | |
| Cash and short-term securities | $ — | $ 84 | $ — | $ 84 | 17 % |
| Equity investment: | | | | | |
| Domestic | 283 | — | — | 283 | 55 % |
| Fixed income: | | | | | |
| Government bonds | — | 104 | — | 104 | 20 % |
| Corporate bonds | — | 34 | — | 34 | 7 % |
| Mortgage-backed securities (non-government) | | 7 | — | 7 | 1 % |
| Total [1] | $ 283 | $ 229 | $ — | $ 512 | 100 % |

[1] Excludes $(10) million as of December 31, 2020, of receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.

| | December 31, 2019 | | | | Asset Allocation |
| | Level 1 | Level 2 | Level 3 | Total | |
| | (In millions) | | | | |
| Cash and short-term securities | $ — | $ 72 | $ — | $ 72 | 16 % |
| Equity investment: | | | | | |
| Domestic | 246 | — | — | 246 | 54 % |
| Fixed income: | | | | | |
| Government bonds | — | 100 | — | 100 | 22 % |
| Corporate bonds | — | 34 | — | 34 | 7 % |
| Mortgage-backed securities (non-government) | — | 5 | — | 5 | 1 % |
| Total [1] | $ 246 | $ 211 | $ — | $ 457 | 100 % |

[1] Excludes $1 million as of December 31, 2019, of receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.

FirstEnergy follows a total return investment approach using a mix of equities, fixed income and other available investments while taking into account the pension plan liabilities to optimize the long-term return on plan assets for a prudent level of risk. Risk tolerance is established through careful consideration of plan liabilities, plan funded status and corporate financial condition. The investment portfolio contains a diversified blend of equity and fixed-income investments. Equity investments are diversified across U.S. and non-U.S. stocks, as well as growth, value, and small and large capitalization funds. Other assets such as real estate and private equity are used to enhance long-term returns while improving portfolio diversification. Derivatives may be used to gain market exposure in an efficient and timely manner; however, derivatives are not used to leverage the portfolio beyond the market value of the underlying investments. Investment risk is measured and monitored on a continuing basis through periodic investment portfolio reviews, annual liability measurements and periodic asset/liability studies.

Investment markets experienced elevated market volatility during 2020 as a result of the U.S. general election and the COVID-19 pandemic. In order to reduce the effect of market volatility on the plan's funded status and to preserve capital gains experienced during the first half of 2020, approximately $1.4 billion of return-seeking assets were sold (including approximately $800 million of equity securities) during the third quarter of 2020. These assets are expected be reinvested in return seeking investments (including equity securities) during 2021, which will more consistently align the pension and OPEB trust portfolios to the company's target asset allocations.

FirstEnergy's target asset allocations for its pension and OPEB trust portfolios for 2020 and 2019 are shown in the following table:

| Target Asset Allocations | | |
|---|---|---|
| | 2020 | 2019 |
| Equities | 38 % | 38 % |
| Fixed income | 30 % | 30 % |
| Hedge funds | 8 % | 8 % |
| Real estate | 10 % | 10 % |
| Alternative investments | 8 % | 8 % |
| Cash | 6 % | 6 % |
| | 100 % | 100 % |

Taking into account estimated employee future service, FirstEnergy expects to make the following benefit payments from plan assets and other payments, net of participant contributions:

| | Pension | OPEB | |
|---|---|---|---|
| | | Benefit Payments | Subsidy Receipts |
| | | (In millions) | |
| 2021 | $ 579 | $ 49 | $ (1) |
| 2022 | 583 | 47 | (1) |
| 2023 | 598 | 46 | (1) |
| 2024 | 601 | 45 | (1) |
| 2025 | 610 | 44 | (1) |
| Years 2026-2030 | 3,129 | 197 | (2) |

## 6. STOCK-BASED COMPENSATION PLANS

FirstEnergy grants stock-based awards through the ICP 2020, primarily in the form of restricted stock and performance-based restricted stock units. There are also awards currently outstanding issued through the ICP 2015 primarily in the form of restricted stock and performance-based restricted stock units. The ICP 2020 and ICP 2015 include shareholder authorization to each issue 10 million shares of common stock or their equivalent. As of December 31, 2020, approximately 13.7 million shares were available for future grants under the ICP 2020 assuming maximum performance metrics are achieved for the outstanding cycles of restricted stock units. No shares are available for future grants under ICP 2015. Shares not issued due to forfeitures or cancellations originally granted through the ICP 2015 may be added back to the ICP 2020. Shares granted under the ICP 2020 and ICP 2015 are issued from authorized but unissued common stock. Vesting periods for stock-based awards range from two to ten years, with the majority of awards having a vesting period of three years. FirstEnergy also issues stock through its 401(k) Savings Plan, EDCP, and DCPD. Currently, FirstEnergy records the compensation costs for stock-based compensation awards that will be paid in stock over the vesting period based on the fair value on the grant date. FirstEnergy accounts for forfeitures as they occur.

FirstEnergy adjusts the compensation costs for stock-based compensation awards that will be paid in cash based on changes in the fair value of the award as of each reporting date. FirstEnergy records the actual tax benefit realized from tax deductions when awards are exercised or settled. Actual income tax benefits realized during the years ended December 31, 2020, 2019 and 2018, were $20 million, $24 million and $15 million, respectively. The income tax effects of awards are recognized in the income statement when the awards vest, are settled or are forfeited.

Stock-based compensation costs and the amount of stock-based compensation costs capitalized related to FirstEnergy plans for the years ended December 31, 2020, 2019 and 2018, are included in the following tables:

| Stock-based Compensation Plan | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| Restricted Stock Units | $ 22 | $ 73 | $ 102 |
| Restricted Stock | 1 | 1 | 1 |
| 401(k) Savings Plan | 33 | 33 | 33 |
| EDCP & DCPD | (5) | 9 | 7 |
| Total | $ 51 | $ 116 | $ 143 |
| Stock-based compensation costs capitalized | $ 26 | $ 54 | $ 60 |

There was no stock option expense for the years ended December 31, 2020, 2019 and 2018. Income tax benefits associated with stock-based compensation plan expense were $3 million, $10 million and $18 million for the years ended December 31, 2020, 2019 and 2018, respectively.

*Restricted Stock Units*

Beginning with the performance-based restricted stock units granted in 2015, two-thirds of each award will be paid in stock and one-third will be paid in cash. Restricted stock units payable in stock provide the participant the right to receive, at the end of the period of restriction, a number of shares of common stock equal to the number of stock units set forth in the agreement, subject to adjustment based on FirstEnergy's performance relative to financial and operational performance targets applicable to each award. The grant date fair value of the stock portion of the restricted stock unit award is measured based on the average of the high and low prices of FE common stock on the date of grant. Beginning with awards granted in 2018, restricted stock units include a performance metric consisting of a relative total shareholder return modifier utilizing the S&P 500 Utility Index as a comparator group. The estimated grant date fair value for these awards is calculated using the Monte Carlo simulation method.

Restricted stock units payable in cash provide the participant the right to receive cash based on the number of stock units set forth in the agreement and value of the equivalent number of shares of FE common stock as of the vesting date. The cash portion of the restricted stock unit award is considered a liability award, which is remeasured each period based on FE's stock price and projected performance adjustments. The liability recorded for the portion of performance-based restricted stock units payable in cash in the future as of December 31, 2020, was $16 million. During 2020, approximately $27 million was paid in relation to the cash portion of restricted stock unit obligations that vested in 2020.

The vesting period for the performance-based restricted stock unit awards granted in 2018, 2019 and 2020, were each 3 years. Dividend equivalents are received on the restricted stock units and are reinvested in additional restricted stock units and subject to the same performance conditions as the underlying award.

Restricted stock unit activity for the year ended December 31, 2020, was as follows:

| Restricted Stock Unit Activity | Shares (in millions) | Weighted-Average Grant Date Fair Value (per share) |
|---|---|---|
| Nonvested as of January 1, 2020 | 2.6 | $ 36.20 |
| Granted in 2020 | 1.6 | 44.42 |
| Forfeited in 2020 | (0.6) | 39.15 |
| Vested in 2020[1] | (1.8) | 44.40 |
| Nonvested as of December 31, 2020 | 1.8 | $ 40.25 |

[1] Excludes dividend equivalents of approximately 220 thousand shares earned during vesting period.

The weighted-average fair value of awards granted in 2020, 2019 and 2018 was $44.42, $41.23 and $36.78 per share, respectively. For the years ended December 31, 2020, 2019, and 2018, the fair value of restricted stock units vested was $80 million, $91 million, and $62 million, respectively. As of December 31, 2020, there was approximately $23 million of total unrecognized compensation cost related to nonvested share-based compensation arrangements granted for restricted stock units, which is expected to be recognized over a period of approximately three years.

*Restricted Stock*

Certain employees receive awards of FE restricted stock (as opposed to "units" with the right to receive shares at the end of the restriction period) subject to restrictions that lapse over a defined period of time or upon achieving performance results. The fair

value of restricted stock is measured based on the average of the high and low prices of FE common stock on the date of grant. Dividends are received on the restricted stock and are reinvested in additional shares of restricted stock, subject to the vesting conditions of the underlying award. Restricted stock activity for the year ended December 31, 2020, was not material.

*Stock Options*

Stock options have been granted to certain employees allowing them to purchase a specified number of common shares at a fixed exercise price over a defined period of time. Stock options generally expire ten years from the date of grant. There were no stock options granted in 2020. Stock option activity for the year ended December 31, 2020 was as follows:

| Stock Option Activity | Number of Shares (in millions) | Weighted Average Exercise Price (per share) | |
|---|---|---|---|
| Balance, January 1, 2020 (all options exercisable) | 0.1 | $ | 37.75 |
| Options exercised | — | | — |
| Options forfeited | (0.1) | | 37.75 |
| Balance, December 31, 2020 (all options exercisable) | — | $ | — |

Approximately $23 million and $12 million of cash was received from the exercise of stock options in 2019 and 2018, respectively.

*401(k) Savings Plan*

In 2020 and 2019, approximately 1 million shares of FE common stock, respectively, were issued and contributed to participants' accounts.

*EDCP*

Under the EDCP, certain employees can defer a portion of their compensation, including base salary, annual incentive awards and/or long-term incentive awards, into unfunded accounts. Annual incentive and long-term incentive awards may be deferred in FE stock accounts. Base salary and annual incentive awards may be deferred into a retirement cash account which earns interest. Dividends are calculated quarterly on stock units outstanding and are credited in the form of additional stock units. The form of payout as stock or cash vary depending upon the form of the award, the duration of the deferral and other factors. Certain types of deferrals such as dividend equivalent units, annual incentive awards, and performance share awards are required to be paid in cash. Until 2015, payouts of the stock accounts typically occurred three years from the date of deferral, although participants could have elected to defer their shares into a retirement stock account that would pay out in cash upon retirement. In 2015, FirstEnergy amended the EDCP to eliminate the right to receive deferred shares after three years, effective for deferrals made on or after November 1, 2015. Awards deferred into a retirement stock account will pay out in cash upon separation from service, death or disability. Interest accrues on the cash allocated to the retirement cash account and the balance will pay out in cash over a time period as elected by the participant.

*DCPD*

Under the DCPD, members of FE's Board of Directors can elect to defer all or a portion of their equity retainers to a deferred stock account and their cash retainers to deferred stock or deferred cash accounts. The net liability recognized for DCPD of approximately $7 million and $9 million as of December 31, 2020 and December 31, 2019, respectively, is included in the caption "Retirement benefits," on the Consolidated Balance Sheets.

## 7. TAXES

FirstEnergy records income taxes in accordance with the liability method of accounting. Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts recognized for tax purposes. Investment tax credits, which were deferred when utilized, are being amortized over the recovery period of the related property. Deferred income tax liabilities related to temporary tax and accounting basis differences and tax credit carryforward items are recognized at the statutory income tax rates in effect when the liabilities are expected to be paid. Deferred tax assets are recognized based on income tax rates expected to be in effect when they are settled.

FE and its subsidiaries are party to an intercompany income tax allocation agreement that provides for the allocation of consolidated tax liabilities. Net tax benefits attributable to FE, excluding any tax benefits derived from interest expense associated with acquisition indebtedness from the merger with GPU, are reallocated to the subsidiaries of FE that have taxable income. That allocation is accounted for as a capital contribution to the company receiving the tax benefit. Effective as of their emergence from bankruptcy, February 27, 2020, the FES Debtors no longer are part of FirstEnergy's consolidated federal income tax group or the intercompany income tax allocation agreement. Upon emergence, FirstEnergy paid the FES Debtors

$125 million to settle all reconciliations under the Intercompany Tax Allocation Agreement for 2018, 2019 and 2020 tax years, including all issues regarding nondeductible interest.

On March 27, 2020, President Trump signed into law the CARES Act, an economic stimulus package in response to the COVID-19 pandemic containing several corporate income tax provisions, including making remaining AMT credits immediately refundable; providing a 5-year carryback of NOLs generated in tax years 2018, 2019, and 2020, and removing the 80% taxable income limitation on utilization of those NOLs if carried back to prior tax years or utilized in tax years beginning before 2021; and temporarily liberalizing the interest deductibility rules under Section 163(j) of the Tax Act, by raising the adjusted taxable income limitation from 30% to 50% for tax years 2019 and 2020 and giving taxpayers the election of using 2019 adjusted taxable income for purposes of computing 2020 interest deductibility. FirstEnergy has applied for refund of its remaining approximately $18 million refundable AMT credits. FirstEnergy does not expect to generate additional income tax refunds from the carryback of NOLs and expects interest to be fully deductible in the 2020 consolidated federal income tax return and going forward. FirstEnergy does not currently expect the other provisions of the CARES Act to have a material effect on current income tax expense or the realizability of deferred income tax assets.

On December 27, 2020, President Trump signed into law the Consolidated Appropriations Act, 2021, an additional stimulus package providing financial relief for individuals and small businesses. The Appropriations Act contains a variety of tax provisions, including full expensing of business meals in 2021 and 2022, extensions of various energy tax incentives (including the ITC), and expansion of the employee retention tax credit. FirstEnergy does not currently expect the Appropriations Act to have a material tax impact.

On July 28, 2020, the IRS issued final regulations implementing interest expense deduction limitation rules under section 163(j) of the Internal Revenue Code. The final regulations changed certain rules on the computation of interest expense and limitation amount, as well as rules relevant to status as a regulated utility business and the allocation of consolidated group interest expense between utility and non-utility businesses. After reviewing the final regulations, FirstEnergy recorded a true-up to prior years' reserve estimates during the third quarter of 2020, which did not have a material impact to FirstEnergy's income statement. On January 6, 2021, the IRS released an additional set of final regulations under Section 163(j) primarily addressing partnership, real estate, and certain controlled foreign corporation issues, which do not materially impact FirstEnergy.

| INCOME TAXES[1] | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | 2018 |
| | (In millions) | | |
| Currently payable (receivable)- | | | |
| Federal [2] | $ (14) | $ (16) | $ (16) |
| State[3] | 21 | 24 | 17 |
| | 7 | 8 | 1 |
| Deferred, net- | | | |
| Federal[4] | 171 | 150 | 252 |
| State[5] | (38) | 60 | 243 |
| | 133 | 210 | 495 |
| Investment tax credit amortization | (14) | (5) | (6) |
| Total income taxes | $ 126 | $ 213 | $ 490 |

[1] Income Taxes on Income from Continuing Operations.
[2] Excludes $6 million of federal tax expense associated with discontinued operations for the year ended December 31, 2020.
[3] Excludes $1 million of state tax expense associated with discontinued operations for the year ended December 31, 2018.
[4] Excludes $66 million, $9 million and $1.3 billion of federal tax benefit associated with discontinued operations for the years ended December 31, 2020, 2019 and 2018, respectively.
[5] Excludes $1 million, $4 million and $12 million of state tax expense associated with discontinued operations for the years ended December 31, 2020, 2019 and 2018, respectively.

FirstEnergy tax rates are affected by permanent items, such as AFUDC equity and other flow-through items, as well as discrete items that may occur in any given period but are not consistent from period to period. The following tables provide a reconciliation of federal income tax expense (benefit) at the federal statutory rate to the total income taxes (benefits) for the years ended December 31, 2020, 2019 and 2018:

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| | *(In millions)* | | |
| Income from Continuing Operations, before income taxes | $ 1,129 | $ 1,117 | $ 1,512 |
| Federal income tax expense at statutory rate (21%) | $ 237 | $ 235 | $ 318 |
| Increases (reductions) in taxes resulting from- | | | |
| State income taxes, net of federal tax benefit | 75 | 96 | 90 |
| AFUDC equity and other flow-through | (38) | (36) | (31) |
| Amortization of investment tax credits | (14) | (5) | (5) |
| Remeasurement of deferred taxes | — | — | 24 |
| WV unitary group remeasurement | — | — | 126 |
| Excess deferred tax amortization due to the Tax Act | (56) | (74) | (60) |
| TMI-2 reversal of tax regulatory liabilities | (40) | — | — |
| Uncertain tax positions | (1) | (11) | 2 |
| Valuation allowances | (49) | 5 | 21 |
| Other, net | 12 | 3 | 5 |
| Total income taxes | $ 126 | $ 213 | $ 490 |
| Effective income tax rate | 11.2 % | 19.1 % | 32.4 % |

FirstEnergy's effective tax rate on continuing operations for 2020 and 2019 was 11.2% and 19.1%, respectively. The change in effective tax rate was primarily due to a $52 million reduction in valuation allowances from the recognition of deferred gains on prior intercompany generation asset transfers triggered by the FES Debtors' emergence from bankruptcy and deconsolidation from FirstEnergy's consolidated federal income tax group in the first quarter of 2020, a $10 million benefit from accelerated amortization of certain investment tax credits in the second quarter of 2020, and a $40 million benefit related to reversals of certain tax regulatory liabilities resulting from the transfer of TMI-2. See Note 3, "Discontinued Operations," for other tax matters relating to the FES Bankruptcy that were recognized in discontinued operations.

Accumulated deferred income taxes as of December 31, 2020 and 2019, are as follows:

| | As of December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| | *(In millions)* | |
| Property basis differences | $ 5,396 | $ 5,037 |
| Pension and OPEB | (769) | (698) |
| TMI-2 nuclear decommissioning | — | 89 |
| AROs | (28) | (226) |
| Regulatory asset/liability | 440 | 445 |
| Deferred compensation | (165) | (154) |
| Estimated worthless stock deduction | — | (1,007) |
| Loss carryforwards and AMT credits | (1,995) | (836) |
| Valuation reserve | 496 | 441 |
| All other | (280) | (242) |
| Net deferred income tax liability | $ 3,095 | $ 2,849 |

FirstEnergy has recorded as deferred income tax assets the effect of Federal NOLs and tax credits that will more likely than not be realized through future operations and through the reversal of existing temporary differences. As of December 31, 2020, FirstEnergy's loss carryforwards primarily consisted of $6.8 billion ($1.4 billion, net of tax) of Federal NOL carryforwards that will begin to expire in 2031.

The table below summarizes pre-tax NOL carryforwards and their respective anticipated expirations for state and local income tax purposes of approximately $12.4 billion ($540 million, net of tax) for FirstEnergy, of which approximately $3.8 billion ($155 million, net of tax) is expected to be utilized based on current estimates and assumptions. The ultimate utilization of these NOLs may be impacted by statutory limitations on the use of NOLs imposed by state and local tax jurisdictions, changes in statutory tax rates, and changes in business which, among other things, impact both future profitability and the manner in which future taxable income is apportioned to various state and local tax jurisdictions.

| Expiration Period | State | | Local | |
|---|---|---|---|---|
| | (In millions) | | | |
| 2021-2025 | $ | 2,253 | $ | 4,353 |
| 2026-2030 | | 1,447 | | — |
| 2031-2035 | | 1,152 | | — |
| 2036-2040 | | 1,087 | | — |
| Indefinite | | 2,091 | | — |
| | $ | 8,030 | $ | 4,353 |

The following table summarizes the changes in valuation allowances on federal, state and local DTAs related to disallowed interest and certain employee remuneration, in addition to state and local NOLs discussed above for the years ended December 31, 2020, 2019 and 2018:

| (In millions) | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| Beginning of year balance | $ | 441 | $ | 394 | $ | 312 |
| Charged to income | | 55 | | 47 | | 82 |
| Charged to other accounts | | — | | — | | — |
| Write-offs | | — | | — | | — |
| End of year balance | $ | 496 | $ | 441 | $ | 394 |

FirstEnergy accounts for uncertainty in income taxes recognized in its financial statements. A recognition threshold and measurement attribute are utilized for financial statement recognition and measurement of tax positions taken or expected to be taken on the tax return. As of December 31, 2020, and 2019, FirstEnergy's total unrecognized income tax benefits were approximately $139 million and $164 million, respectively. The change in unrecognized income tax benefits from the prior year is primarily attributable to a decrease of approximately $21 million for reserves on the estimated worthless stock deduction (see Note 3, "Discontinued Operations," for further discussion), as well as decreases of $2 million for an effective settlement with certain state taxing authorities and $2 million due to the lapse in statute in certain state taxing jurisdictions. If ultimately recognized in future years, approximately $121 million of unrecognized income tax benefits would impact the effective tax rate.

As of December 31, 2020, it is reasonably possible that approximately $57 million of unrecognized tax benefits may be resolved during 2021 as a result of settlements with taxing authorities or the statute of limitations expiring, of which $55 million would affect FirstEnergy's effective tax rate.

The following table summarizes the changes in unrecognized tax positions for the years ended December 31, 2020, 2019 and 2018:

|  | (In millions) |
|---|---|
| **Balance, January 1, 2018** | $ 80 |
| Current year increases | 125 |
| Prior year decreases | (45) |
| Decrease for lapse in statute | (2) |
| **Balance, December 31, 2018** | $ 158 |
| Current year increases | 22 |
| Prior year decreases | (12) |
| Decrease for lapse in statute | (4) |
| **Balance, December 31, 2019** | $ 164 |
| Current year increases | 7 |
| Prior years decreases | (28) |
| Decrease for lapse in statute | (2) |
| Effectively settled with taxing authorities | (2) |
| **Balance, December 31, 2020** | $ 139 |

FirstEnergy recognizes interest expense or income and penalties related to uncertain tax positions in income taxes by applying the applicable statutory interest rate to the difference between the tax position recognized and the amount previously taken, or expected to be taken, on the tax return. FirstEnergy's recognition of net interest associated with unrecognized tax benefits in 2020, 2019 and 2018, was not material. For the years ended December 31, 2020 and 2019, the cumulative net interest payable recorded by FirstEnergy was not material.

FirstEnergy has tax returns that are under review at the audit or appeals level by the IRS and state taxing authorities. Tax years 2018 and 2019 are currently under review by the IRS. FirstEnergy's tax returns for some state jurisdictions are open from 2009-2019.

*General Taxes*

General tax expense for the years ended December 31, 2020, 2019 and 2018, recognized in continuing operations is summarized as follows:

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | **2020** | **2019** | **2018** |
|  | *(In millions)* | | |
| KWH excise | $ 183 | $ 191 | $ 198 |
| State gross receipts | 182 | 185 | 192 |
| Real and personal property | 541 | 504 | 478 |
| Social security and unemployment | 112 | 100 | 103 |
| Other | 28 | 28 | 22 |
| Total general taxes | $ 1,046 | $ 1,008 | $ 993 |

## 8. LEASES

FirstEnergy primarily leases vehicles as well as building space, office equipment, and other property and equipment under cancellable and non-cancellable leases. FirstEnergy does not have any material leases in which it is the lessor.

FirstEnergy adopted ASU 2016-02, *"Leases (Topic 842)"* on January 1, 2019, and elected a number of transitional practical expedients provided within the standard. These included a "package of three" expedients that must be taken together and allowed entities to: (1) not reassess whether existing contracts contain leases, (2) carryforward the existing lease classification, and (3) not reassess initial direct costs associated with existing leases. In addition, FirstEnergy elected the option to apply the requirements of the standard in the period of adoption (January 1, 2019) with no restatement of prior periods. Adoption of the standard on January 1, 2019, did not result in a material cumulative effect adjustment upon adoption. FirstEnergy did not evaluate land easements under the new guidance as they were not previously accounted for as leases. FirstEnergy also elected not to separate lease components from non-lease components as non-lease components were not material.

Leases with an initial term of 12 months or less are recognized as lease expense on a straight-line basis over the lease term and not recorded on the balance sheet. Most leases include one or more options to renew, with renewal terms that can extend the lease term from 1 to 40 years, and certain leases include options to terminate. The exercise of lease renewal options is at FirstEnergy's sole discretion. Renewal options are included within the lease liability if they are reasonably certain based on various factors relative to the contract. Certain leases also include options to purchase the leased property. The depreciable life of leased assets and leasehold improvements are limited by the expected lease term unless there is a transfer of title or purchase option reasonably certain of exercise. FirstEnergy's lease agreements do not contain any material restrictive covenants.

For vehicles leased under master lease agreements, the lessor is guaranteed a residual value up to a stated percentage of the equipment cost at the end of the lease term. As of December 31, 2020, the maximum potential loss for these lease agreements at the end of the lease term is approximately $16 million.

Finance leases for assets used in regulated operations are recognized in FirstEnergy's Consolidated Statements of Income such that amortization of the right-of-use asset and interest on lease liabilities equals the expense allowed for ratemaking purposes. Finance leases for regulated and non-regulated operations are accounted for as if the assets were owned and financed, with associated expense recognized in Interest expense and Provision for depreciation on FirstEnergy's Consolidated Statements of Income, while all operating lease expenses are recognized in Other operating expense. The components of lease expense were as follows:

| (In millions) | For the Year Ended December 31, 2020 | | | |
|---|---|---|---|---|
| | Vehicles | Buildings | Other | Total |
| Operating lease costs [1] | $ 35 | $ 8 | $ 17 | $ 60 |
| Finance lease costs: | | | | |
| Amortization of right-of-use assets | 14 | — | 1 | 15 |
| Interest on lease liabilities | 2 | 3 | — | 5 |
| Total finance lease cost | 16 | 3 | 1 | 20 |
| Total lease cost | $ 51 | $ 11 | $ 18 | $ 80 |

[1] Includes $17 million of short-term lease costs.

| (In millions) | For the Year Ended December 31, 2019 | | | |
|---|---|---|---|---|
| | Vehicles | Buildings | Other | Total |
| Operating lease costs [1] | $ 28 | $ 9 | $ 12 | $ 49 |
| Finance lease costs: | | | | |
| Amortization of right-of-use assets | 15 | 1 | 1 | 17 |
| Interest on lease liabilities | 3 | 3 | — | 6 |
| Total finance lease cost | 18 | 4 | 1 | 23 |
| Total lease cost | $ 46 | $ 13 | $ 13 | $ 72 |

[1] Includes $13 million of short-term lease costs.

Supplemental cash flow information related to leases was as follows:

| (In millions) | For the Years Ended, | |
| --- | --- | --- |
| | December 31, 2020 | December 31, 2019 |
| *Cash paid for amounts included in the measurement of lease liabilities:* | | |
| Operating cash flows from operating leases | $ 44 | $ 29 |
| Operating cash flows from finance leases | 4 | 5 |
| Finance cash flows from finance leases | 15 | 25 |
| *Right-of-use assets obtained in exchange for lease obligations:* | | |
| Operating leases | $ 67 | $ 83 |
| Finance leases | — | 3 |

Lease terms and discount rates were as follows:

| | As of December 31, 2020 | As of December 31, 2019 |
| --- | --- | --- |
| *Weighted-average remaining lease terms (years)* | | |
| Operating leases | 8.55 | 9.42 |
| Finance leases | 7.74 | 4.62 |
| *Weighted-average discount rate [1]* | | |
| Operating leases | 4.21 % | 4.51 % |
| Finance leases | 11.58 % | 10.45 % |

[1] When an implicit rate is not readily determinable, an incremental borrowing rate is utilized, determining the present value of lease payments. The rate is determined based on expected term and information available at the commencement date.

Supplemental balance sheet information related to leases was as follows:

| (In millions) | Financial Statement Line Item | As of December 31, | |
| --- | --- | --- | --- |
| | | 2020 | 2019 |
| **Assets** | | | |
| Operating lease [1] | Deferred charges and other assets | $ 265 | $ 231 |
| Finance lease [2] | Property, plant and equipment | 57 | 73 |
| Total leased assets | | $ 322 | $ 304 |
| **Liabilities** | | | |
| *Current:* | | | |
| Operating | Other current liabilities | $ 42 | $ 32 |
| Finance | Currently payable long-term debt | 14 | 15 |
| *Noncurrent:* | | | |
| Operating | Other noncurrent liabilities | 263 | 241 |
| Finance | Long-term debt and other long-term obligations | 31 | 45 |
| Total leased liabilities | | $ 350 | $ 333 |

[1] Operating lease assets are recorded net of accumulated amortization of $51 million and $23 million as of December 31, 2020 and 2019, respectively.
[2] Finance lease assets are recorded net of accumulated amortization of $96 million and $90 million as of December 31, 2020 and 2019, respectively.

Maturities of lease liabilities as of December 31, 2020, were as follows:

| (In millions) | Operating Leases | Finance Leases | Total |
|---|---|---|---|
| 2021 | $ 50 | $ 18 | $ 68 |
| 2022 | 49 | 15 | 64 |
| 2023 | 46 | 8 | 54 |
| 2024 | 38 | 4 | 42 |
| 2025 | 36 | 4 | 40 |
| Thereafter | 147 | 12 | 159 |
| Total lease payments [1] | 366 | 61 | 427 |
| Less imputed interest | 61 | 16 | 77 |
| Total net present value | $ 305 | $ 45 | $ 350 |

[1] Operating lease payments for certain leases are offset by sublease receipts of $11 million over 12 years.

As of December 31, 2020, additional operating leases agreements, primarily for vehicles, that have not yet commenced are $14 million. These leases are expected to commence within the next 18 months with lease terms of 5 to 10 years.

## 9. INTANGIBLE ASSETS

As of December 31, 2020, intangible assets classified in Other Deferred Charges on FirstEnergy's Consolidated Balance Sheets include the following:

| (In millions) | Intangible Assets | | | Amortization Expense | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Actual | Estimated | | | | | | |
| | Gross | Accumulated Amortization | Net | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Thereafter |
| NUG contracts[1] | $ 124 | $ 51 | $ 73 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 48 |
| Coal contracts[2] | 102 | 102 | — | 2 | — | — | — | — | — | — |
| | $ 226 | $ 153 | $ 73 | $ 7 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 48 |

[1] NUG contracts are subject to regulatory accounting and their amortization does not impact earnings.

[2] The coal contracts were recorded with a regulatory offset and their amortization does not impact earnings.

**10. FAIR VALUE MEASUREMENTS**

### RECURRING FAIR VALUE MEASUREMENTS

Authoritative accounting guidance establishes a fair value hierarchy that prioritizes the inputs used to measure fair value. This hierarchy gives the highest priority to Level 1 measurements and the lowest priority to Level 3 measurements. The three levels of the fair value hierarchy and a description of the valuation techniques are as follows:

Level 1   -   Quoted prices for identical instruments in active market

Level 2   -   Quoted prices for similar instruments in active market

            -   Quoted prices for identical or similar instruments in markets that are not active

            -   Model-derived valuations for which all significant inputs are observable market data

            Models are primarily industry-standard models that consider various assumptions, including quoted forward prices for commodities, time value, volatility factors and current market and contractual prices for the underlying instruments, as well as other relevant economic measures.

Level 3   -   Valuation inputs are unobservable and significant to the fair value measurement

            FirstEnergy produces a long-term power and capacity price forecast annually with periodic updates as market conditions change. When underlying prices are not observable, prices from the long-term price forecast are used to measure fair value.

            FTRs are financial instruments that entitle the holder to a stream of revenues (or charges) based on the hourly day-ahead congestion price differences across transmission paths. FTRs are acquired by FirstEnergy in the annual, monthly and long-term PJM auctions and are initially recorded using the auction clearing price less cost. After initial recognition, FTRs' carrying values are periodically adjusted to fair value using a mark-to-model methodology, which approximates market. The primary inputs into the model, which are generally less observable than objective sources, are the most recent PJM auction clearing prices and the FTRs' remaining hours. The model calculates the fair value by multiplying the most recent auction clearing price by the remaining FTR hours less the prorated FTR cost. Significant increases or decreases in inputs in isolation may have resulted in a higher or lower fair value measurement.

            NUG contracts represent PPAs with third-party non-utility generators that are transacted to satisfy certain obligations under PURPA. NUG contract carrying values are recorded at fair value and adjusted periodically using a mark-to-model methodology, which approximates market. The primary unobservable inputs into the model are regional power prices and generation MWH. Pricing for the NUG contracts is a combination of market prices for the current year and next two years based on observable data and internal models using historical trends and market data for the remaining years under contract. The internal models use forecasted energy purchase prices as an input when prices are not defined by the contract. Forecasted market prices are based on Intercontinental Exchange, Inc. quotes and management assumptions. Generation MWH reflects data provided by contractual arrangements and historical trends. The model calculates the fair value by multiplying the prices by the generation MWH. Significant increases or decreases in inputs in isolation may have resulted in a higher or lower fair value measurement.

For investments reported at NAV where there is no readily determinable fair value, a practical expedient is available that allows the NAV to approximate fair value. Investments that use NAV as a practical expedient are excluded from the requirement to be categorized within the fair value hierarchy tables. Instead, these investments are reported outside of the fair value hierarchy tables to assist in the reconciliation of investment balances reported in the tables to the balance sheet. FirstEnergy has elected the NAV practical expedient for investments in private equity funds, insurance-linked securities, hedge funds (absolute return) and real estate funds held within the pension plan. See Note 5, "Pension And Other Post-Employment Benefits" for the pension financial assets accounted for at fair value by level within the fair value hierarchy.

FirstEnergy primarily applies the market approach for recurring fair value measurements using the best information available. Accordingly, FirstEnergy maximizes the use of observable inputs and minimizes the use of unobservable inputs. There were no changes in valuation methodologies used as of December 31, 2020, from those used as of December 31, 2019. The determination of the fair value measures takes into consideration various factors, including but not limited to, nonperformance risk, counterparty credit risk and the impact of credit enhancements (such as cash deposits, LOCs and priority interests). The impact of these forms of risk was not significant to the fair value measurements.

The following tables set forth the recurring assets and liabilities that are accounted for at fair value by level within the fair value hierarchy:

| | December 31, 2020 | | | | December 31, 2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | (In millions) | | | | |
| Corporate debt securities | $ — | $ — | $ — | $ — | $ — | $ 135 | $ — | $ 135 |
| Derivative assets FTRs[1] | — | — | 3 | 3 | — | — | 4 | 4 |
| Equity securities | 2 | — | — | 2 | 2 | — | — | 2 |
| U.S. state debt securities | — | 276 | — | 276 | — | 271 | — | 271 |
| Other[2] | 1,734 | 41 | — | 1,775 | 627 | 789 | — | 1,416 |
| **Total assets** | $ 1,736 | $ 317 | $ 3 | $ 2,056 | $ 629 | $ 1,195 | $ 4 | $ 1,828 |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Derivative liabilities FTRs[1] | $ — | $ — | $ — | $ — | $ — | $ — | $ (1) | $ (1) |
| Derivative liabilities NUG contracts[1] | — | — | — | — | — | — | (16) | (16) |
| **Total liabilities** | $ — | $ — | $ — | $ — | $ — | $ — | $ (17) | $ (17) |
| | | | | | | | | |
| **Net assets (liabilities)[3]** | $ 1,736 | $ 317 | $ 3 | $ 2,056 | $ 629 | $ 1,195 | $ (13) | $ 1,811 |

[1] Contracts are subject to regulatory accounting treatment and changes in market values do not impact earnings.
[2] Primarily consists of short-term cash investments.
[3] Excludes $1 million and $(16) million as of December 31, 2020, and December 31, 2019, respectively, of receivables, payables, taxes and accrued income associated with financial instruments reflected within the fair value table.

*Rollforward of Level 3 Measurements*

The following table provides a reconciliation of changes in the fair value of NUG contracts and FTRs that are classified as Level 3 in the fair value hierarchy for the years ended December 31, 2020 and December 31, 2019:

| | NUG Contracts[1] | | | FTRs[1] | | |
|---|---|---|---|---|---|---|
| | Derivative Assets | Derivative Liabilities | Net | Derivative Assets | Derivative Liabilities | Net |
| | | | (In millions) | | | |
| **January 1, 2019 Balance** | $ — | $ (44) | $ (44) | $ 10 | $ (1) | $ 9 |
| Unrealized gain (loss) | — | (11) | (11) | (1) | — | (1) |
| Purchases | — | — | — | 6 | (4) | 2 |
| Settlements | — | 39 | 39 | (11) | 4 | (7) |
| **December 31, 2019 Balance** | $ — | $ (16) | $ (16) | $ 4 | $ (1) | $ 3 |
| Unrealized gain (loss) | — | (3) | (3) | (3) | — | (3) |
| Purchases | — | — | — | 7 | (2) | 5 |
| Settlements | — | 19 | 19 | (5) | 3 | (2) |
| **December 31, 2020 Balance** | $ — | $ — | $ — | $ 3 | $ — | $ 3 |

[1] Contracts are subject to regulatory accounting treatment and changes in market values do not impact earnings.

*Level 3 Quantitative Information*

The following table provides quantitative information for FTRs contracts that are classified as Level 3 in the fair value hierarchy for the year ended December 31, 2020:

| | Fair Value, Net (In millions) | Valuation Technique | Significant Input | Range | | Weighted Average | Units |
|---|---|---|---|---|---|---|---|
| FTRs | $ 3 | Model | RTO auction clearing prices | $0.40 to | $2.20 | $1.10 | Dollars/MWH |

### INVESTMENTS

All temporary cash investments purchased with an initial maturity of three months or less are reported as cash equivalents on the Consolidated Balance Sheets at cost, which approximates their fair market value. Investments other than cash and cash equivalents include equity securities, AFS debt securities and other investments. FirstEnergy has no debt securities held for trading purposes.

Generally, unrealized gains and losses on equity securities are recognized in income whereas unrealized gains and losses on AFS debt securities are recognized in AOCI. However, the NDTs of JCP&L, ME and PN are subject to regulatory accounting with all gains and losses on equity and AFS debt securities offset against regulatory assets. On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of EnergySolutions, LLC, concerning the transfer and dismantlement of TMI-2. With the receipt of all required regulatory approvals, the transaction was consummated, including the transfer of external trusts for the decommissioning and environmental remediation of TMI-2, on December 18, 2020. Please see Note 15, "Commitments, Guarantees and Contingencies," for further information.

*Nuclear Decommissioning and Nuclear Fuel Disposal Trusts*

JCP&L holds debt securities within the nuclear fuel disposal trust, which are classified as AFS securities, recognized at fair market value.

The following table summarizes the amortized cost basis, unrealized gains, unrealized losses and fair values of investments held in NDT and nuclear fuel disposal trusts as of December 31, 2020 and December 31, 2019:

| | December 31, 2020[1] | | | | December 31, 2019[2] | | | |
|---|---|---|---|---|---|---|---|---|
| | Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value | Cost Basis | Unrealized Gains | Unrealized Losses | Fair Value[3] |
| | | | | *(In millions)* | | | | |
| Debt securities | $ 275 | $ 7 | $ (6) | $ 276 | $ 403 | $ 9 | $ (11) | $ 401 |

[1] Excludes short-term cash investments of $9 million.
[2] Excludes short-term cash investments of $751 million, of which $747 million is classified as held for sale.
[3] Includes $135 million classified as held for sale as of December 31, 2019.

Proceeds from the sale of investments in equity and AFS debt securities, realized gains and losses on those sales and interest and dividend income for the years ended December 31, 2020, 2019 and 2018, were as follows:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019[1] | 2018[1] |
| | | *(In millions)* | |
| Sale Proceeds | $ 186 | $ 1,637 | $ 800 |
| Realized Gains | 12 | 98 | 41 |
| Realized Losses | (8) | (31) | (48) |
| Interest and Dividend Income | 22 | 38 | 41 |

[1] Excludes amounts classified as discontinued operations.

*Other Investments*

Other investments include employee benefit trusts, which are primarily invested in corporate-owned life insurance policies, and equity method investments. Other investments were $322 million and $299 million as of December 31, 2020 and December 31, 2019, respectively, and are excluded from the amounts reported above.

**LONG-TERM DEBT AND OTHER LONG-TERM OBLIGATIONS**

All borrowings with initial maturities of less than one year are defined as short-term financial instruments under GAAP and are reported as Short-term borrowings on the Consolidated Balance Sheets at cost. Since these borrowings are short-term in nature, FirstEnergy believes that their costs approximate their fair market value. The following table provides the approximate fair value and related carrying amounts of long-term debt, which excludes finance lease obligations and net unamortized debt issuance costs, unamortized fair value adjustments, premiums and discounts as of December 31, 2020 and 2019:

| | As of December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | *(In millions)* | |
| Carrying Value [1] | $ 22,377 | $ 20,066 |
| Fair Value | 25,465 | 22,928 |

[1] The carrying value as of December 31, 2020, includes $3,425 million of debt issuances and $1,114 million of redemptions that occurred during 2020.

The fair values of long-term debt and other long-term obligations reflect the present value of the cash outflows relating to those securities based on the current call price, the yield to maturity or the yield to call, as deemed appropriate at the end of each respective period. The yields assumed were based on securities with similar characteristics offered by corporations with credit ratings similar to those of FirstEnergy. FirstEnergy classified short-term borrowings, long-term debt and other long-term obligations as Level 2 in the fair value hierarchy as of December 31, 2020 and December 31, 2019.

## 11. CAPITALIZATION

### COMMON STOCK

*Retained Earnings and Dividends*

As of December 31, 2020, FirstEnergy had an accumulated deficit of $2.9 billion. Dividends declared in 2020 and 2019 were $1.56 and $1.53 per share, respectively. Dividends of $0.39 per share and $0.38 per share were paid in the first, second, third and fourth quarters in 2020 and 2019, respectively. On December 15, 2020, the Board of Directors declared a quarterly dividend of $0.39 per share to be paid from OPIC in the first quarter of 2021. The amount and timing of all dividend declarations are subject to the discretion of the Board of Directors and its consideration of business conditions, results of operations, financial condition and other factors.

In addition to paying dividends from retained earnings, OE, CEI, TE, Penn, JCP&L, ME and PN have authorization from FERC to pay cash dividends to FirstEnergy from paid-in capital accounts, as long as their FERC-defined equity-to-total-capitalization ratio remains above 35%. In addition, AGC has authorization from FERC to pay cash dividends to its parent from paid-in capital accounts, as long as its FERC-defined equity-to-total-capitalization ratio remains above 45%. The articles of incorporation, indentures, regulatory limitations and various other agreements relating to the long-term debt of certain FirstEnergy subsidiaries contain provisions that could further restrict the payment of dividends on their common stock. None of these provisions materially restricted FirstEnergy's subsidiaries' abilities to pay cash dividends to FE as of December 31, 2020.

*Common Stock Issuance*

FE issued approximately 2 million shares of common stock in 2020, 3 million shares of common stock in 2019 and 3.2 million shares of common stock in 2018 to registered shareholders and its directors and the employees of its subsidiaries under its Stock Investment Plan and certain share-based benefit plans.

Additionally, on January 22, 2018, FE entered into a Common Stock Purchase Agreement for the private placement of 30,120,482 shares of FE's common stock, par value $0.10 per share, representing an investment of $850 million ($3 million of common shares and $847 million of OPIC). Please see below for information on preferred stock converted into shares of common stock during 2018 and 2019.

### PREFERRED AND PREFERENCE STOCK

FirstEnergy and the Utilities were authorized to issue preferred stock and preference stock as of December 31, 2020, as follows:

|  | Preferred Stock | | Preference Stock | |
|---|---|---|---|---|
|  | Shares Authorized | Par Value | Shares Authorized | Par Value |
| FE | 5,000,000 | $ 100 | | |
| OE | 6,000,000 | $ 100 | 8,000,000 | no par |
| OE | 8,000,000 | $ 25 | | |
| Penn | 1,200,000 | $ 100 | | |
| CEI | 4,000,000 | no par | 3,000,000 | no par |
| TE | 3,000,000 | $ 100 | 5,000,000 | $ 25 |
| TE | 12,000,000 | $ 25 | | |
| JCP&L | 15,600,000 | no par | | |
| ME | 10,000,000 | no par | | |
| PN | 11,435,000 | no par | | |
| MP | 940,000 | $ 100 | | |
| PE | 10,000,000 | $ 0.01 | | |
| WP | 32,000,000 | no par | | |

As of December 31, 2020 and 2019, there were no preferred stock or preference stock outstanding.

*Preferred Stock Issuance*

In January of 2018, FE entered into a Preferred Stock Purchase Agreement for the private placement of 1,616,000 shares of mandatorily convertible preferred stock, designated as the Series A Convertible Preferred Stock, par value $100 per share, representing an investment of nearly $1.62 billion ($162 million of mandatorily convertible preferred stock and $1.46 billion of OPIC).

During 2018, 911,411 shares of preferred stock were converted into 33,238,910 shares of common stock at the option of the preferred stockholders. During 2019, the remaining 704,589 shares of preferred stock were converted into 25,696,168 shares of common stock at the option of the preferred stockholders.

### LONG-TERM DEBT AND OTHER LONG-TERM OBLIGATIONS

The following tables present outstanding long-term debt and finance lease obligations for FirstEnergy as of December 31, 2020 and 2019:

| (Dollar amounts in millions) | As of December 31, 2020 | | As of December 31, | |
| --- | --- | --- | --- | --- |
| | Maturity Date | Interest Rate | 2020 | 2019 |
| FMBs and secured notes - fixed rate | 2021-2059 | 2.670% - 8.250% | $ 4,802 | $ 4,741 |
| Unsecured notes - fixed rate | 2022-2050 | 1.600% - 7.375% | 17,575 | 14,575 |
| Unsecured notes - variable rate | | | — | 750 |
| Finance lease obligations | | | 45 | 60 |
| Unamortized debt discounts | | | (34) | (33) |
| Unamortized debt issuance costs | | | (118) | (103) |
| Unamortized fair value adjustments | | | 7 | 8 |
| Currently payable long-term debt | | | (146) | (380) |
| Total long-term debt and other long-term obligations | | | $ 22,131 | $ 19,618 |

On February 20, 2020, FE issued $1.75 billion in senior unsecured notes in three separate series: (i) $300 million aggregate principal amount of 2.050% Notes, Series A, due 2025, (ii) $600 million aggregate principal amount of 2.650% Notes, Series B, due 2030 and (iii) $850 million aggregate principal amount of 3.400% Notes, Series C, due 2050. Proceeds from the issuance of the notes, together with cash on hand, were used: (i) to repay the entire $750 million two-year term loan due September 2021, (ii) to make the $853 million in bankruptcy settlement payments and $125 million tax sharing agreement payment with the FES Debtors as discussed above, (iii) to repay $250 million of the $1 billion outstanding 364-day term loan due September 2020, and (iv) for working capital needs and general corporate purposes.

On March 31, 2020, MAIT issued $125 million of 3.60% senior unsecured notes due 2032 and $125 million of 3.70% senior unsecured notes due 2035. Proceeds from the issuance of the notes were used: (i) to refinance existing debt, (ii) for capital expenditures, and (iii) for general corporate purposes.

On April 20, 2020, PN issued $125 million of 3.61% senior unsecured notes due 2032 and $125 million of 3.71% senior unsecured notes due 2035. Proceeds of the issuance of the notes were used: (i) to refinance indebtedness, including short-term borrowings incurred under the FirstEnergy regulated money pool to repay a portion of the $250 million aggregate principle amount of PN's 5.20% Senior Notes due April 1, 2020, (ii) to fund capital expenditures, (iii) to fund general corporate purposes, or (iv) for any combination of the above.

On June 8, 2020, FE issued $750 million in senior unsecured notes in two separate series: (i) $300 million aggregate principal amounts of 1.600% Notes, Series A, due 2026 and (ii) $450 million aggregate principal amount of 2.250% Notes, Series B, due 2030. Proceeds from the issuance of the notes were used to repay all amounts outstanding under the 364-day term loan due September 2020.

On June 29, 2020, PE issued $75 million of 2.67% FMBs due 2032 and $100 million of 3.43% FMBs due 2051. Proceeds of the issuance of the FMBs were used to repay short-term borrowings under the FirstEnergy regulated money pool, to fund capital expenditures, and for general corporate purposes.

On July 20, 2020, CEI issued $150 million of 2.77% senior unsecured notes due 2034 and $100 million of 3.23% senior unsecured notes due 2040. Proceeds from the issuance of the notes were used to refinance existing short-term borrowings, to fund capital expenditures, and for general corporate purposes.

See Note 8, "Leases," for additional information related to finance leases.

*Securitized Bonds*

### *Environmental Control Bonds*

The consolidated financial statements of FirstEnergy include environmental control bonds issued by two bankruptcy remote, special purpose limited liability companies that are indirect subsidiaries of MP and PE. Proceeds from the bonds were used to construct environmental control facilities. Principal and interest owed on the environmental control bonds is secured by, and payable solely from, the proceeds of the environmental control charges. Creditors of FirstEnergy, other than the limited liability company SPEs, have no recourse to any assets or revenues of the special purpose limited liability companies. As of December 31, 2020 and 2019, $300 million and $333 million of environmental control bonds were outstanding, respectively.

### *Transition Bonds*

In August 2006, JCP&L Transition Funding II sold transition bonds to securitize the recovery of deferred costs associated with JCP&L's supply of BGS. JCP&L did not purchase and does not own any of the transition bonds, which are included as long-term debt on FirstEnergy's Consolidated Balance Sheets. The transition bonds are the sole obligations of JCP&L Transition Funding II and are collateralized by its equity and assets, which consist primarily of bondable transition property. As of December 31, 2020 and 2019, $9 million and $25 million of the transition bonds were outstanding, respectively.

### *Phase-In Recovery Bonds*

In June 2013, the SPEs formed by the Ohio Companies issued approximately $445 million of pass-through trust certificates supported by phase-in recovery bonds to securitize the recovery of certain all electric customer heating discounts, fuel and purchased power regulatory assets. The phase-in recovery bonds are payable only from, and secured by, phase in recovery property owned by the SPEs. The bondholder has no recourse to the general credit of FirstEnergy or any of the Ohio Companies. Each of the Ohio Companies, as servicer of its respective SPE, manages and administers the phase in recovery property including the billing, collection and remittance of usage-based charges payable by retail electric customers. In the aggregate, the Ohio Companies are entitled to annual servicing fees of $445 thousand that are recoverable through the usage-based charges. The SPEs are considered VIEs and each one is consolidated into its applicable utility. As of December 31, 2020 and 2019, $245 million and $268 million of the phase-in recovery bonds were outstanding, respectively.

### *Other Long-term Debt*

The Ohio Companies and Penn each have a first mortgage indenture under which they can issue FMBs secured by a direct first mortgage lien on substantially all of their property and franchises, other than specifically excepted property.

Based on the amount of FMBs authenticated by the respective mortgage bond trustees as of December 31, 2020, the sinking fund requirement for all FMBs issued under the various mortgage indentures was zero.

The following table presents scheduled debt repayments for outstanding long-term debt, excluding finance leases, fair value purchase accounting adjustments and unamortized debt discounts and premiums, for the next five years as of December 31, 2020. PCRBs that are scheduled to be tendered for mandatory purchase prior to maturity are reflected in the applicable year in which such PCRBs are scheduled to be tendered.

| Year | | |
|------|---|---|
| | | *(In millions)* |
| 2021 | $ | 132 |
| 2022 | $ | 1,143 |
| 2023 | $ | 1,194 |
| 2024 | $ | 1,246 |
| 2025 | $ | 2,023 |

Certain PCRBs allow bondholders to tender their PCRBs for mandatory purchase prior to maturity. As of December 31, 2020, MP has a $74 million PCRB classified as current portion of long-term debt, which the debt holders may exercise their right to tender in 2021.

### *Debt Covenant Default Provisions*

FirstEnergy has various debt covenants under certain financing arrangements, including its revolving credit facilities and term loans. The most restrictive of the debt covenants relate to the nonpayment of interest and/or principal on such debt and the maintenance of certain financial ratios. The failure by FirstEnergy to comply with the covenants contained in its financing arrangements could result in an event of default, which may have an adverse effect on its financial condition. As of December 31, 2020, FirstEnergy remains in compliance with all debt covenant provisions.

Additionally, there are cross-default provisions in a number of the financing arrangements. These provisions generally trigger a default in the applicable financing arrangement of an entity if it or any of its significant subsidiaries, excluding AE Supply, default under another financing arrangement in excess of a certain principal amount, typically $100 million. Although such defaults by any of the Utilities, ATSI, TrAIL or MAIT would generally cross-default FE financing arrangements containing these provisions, defaults by AE Supply would generally not cross-default to applicable financing arrangements of FE. Also, defaults by FE would generally not cross-default applicable financing arrangements of any of FE's subsidiaries. Cross-default provisions are not typically found in any of the senior notes or FMBs of FE or the Utilities.

## 12. SHORT-TERM BORROWINGS AND BANK LINES OF CREDIT

FirstEnergy had $2.2 billion and $1.0 billion of short-term borrowings as of December 31, 2020 and 2019, respectively.

FE and the Utilities and FET and certain of its subsidiaries participate in two separate five-year syndicated revolving credit facilities providing for aggregate commitments of $3.5 billion, which are available until December 6, 2022. Under the FE credit facility, an aggregate amount of $2.5 billion is available to be borrowed, repaid and reborrowed, subject to separate borrowing sublimits for each borrower including FE and its regulated distribution subsidiaries. Under the FET credit facility, an aggregate amount of $1.0 billion is available to be borrowed, repaid and reborrowed under a syndicated credit facility, subject to separate borrowing sublimits for each borrower including FE's transmission subsidiaries.

On November 17, 2020, FE and the Utilities and FET and certain of its subsidiaries entered into amendments to the FE credit facility and the FET credit facility, respectively. The amendments provide for modifications and/or waivers of: (i) certain representations and warranties, and (ii) certain affirmative and negative covenants, contained therein, which allowed FirstEnergy to regain compliance with such provisions. In addition, among other things, the amendment to the FE credit facility reduces the sublimit applicable to FE to $1.5 billion, and the amendments increased certain tiers of pricing applicable to borrowings under the credit facilities.

On November 23, 2020, FE and its regulated distribution subsidiaries, JCP&L, ME, Penn, TE and WP, borrowed $950 million in the aggregate under the FE Revolving Facility, bringing the outstanding principal balance under the FE Revolving Facility to $1.2 billion, with $1.3 billion of remaining availability under the FE Revolving Facility. On November 23, 2020, FET and its regulated transmission subsidiary, ATSI, borrowed $1 billion in the aggregate under the FET Revolving Facility, bringing the outstanding principal balance under the FET Revolving Facility to $1 billion, with no remaining availability under the FET Revolving Facility. FE, FET and certain of their respective subsidiaries increased their borrowings under the Revolving Facilities as a proactive measure to increase their respective cash positions and preserve financial flexibility. As of December 31, 2020, available liquidity under the FE revolving credit facility was $1,296 million (reflecting $4 million of LOCs issued under various terms) and there was no available liquidity under the FET revolving credit facility.

Borrowings under the credit facilities may be used for working capital and other general corporate purposes, including intercompany loans and advances by a borrower to any of its subsidiaries. Generally, borrowings under each of the credit facilities are available to each borrower separately and mature on the earlier of 364 days from the date of borrowing or the commitment termination date, as the same may be extended. Each of the credit facilities contains financial covenants requiring each borrower to maintain a consolidated debt-to-total-capitalization ratio (as defined under each of the credit facilities) of no more than 65%, and 75% for FET, measured at the end of each fiscal quarter.

Subject to each borrower's sublimit, $250 million of the FE credit facility and $100 million of the FET credit facility, is available for the issuance of LOCs (subject to borrowings drawn under the Facilities) expiring up to one year from the date of issuance. The stated amount of outstanding LOCs will count against total commitments available under each of the Facilities and against the applicable borrower's borrowing sublimit.

The Facilities do not contain provisions that restrict the ability to borrow or accelerate payment of outstanding advances in the event of any change in credit ratings of the borrowers. Pricing is defined in "pricing grids," whereby the cost of funds borrowed under the Facilities is related to the credit ratings of the company borrowing the funds. Additionally, borrowings under each of the Facilities are subject to the usual and customary provisions for acceleration upon the occurrence of events of default, including a cross-default for other indebtedness in excess of $100 million.

As of December 31, 2020, the borrowers were in compliance with the applicable debt-to-total-capitalization ratio covenants in each case as defined under the respective Facilities.

### FirstEnergy Money Pools

FirstEnergy's utility operating subsidiary companies also have the ability to borrow from each other and FE to meet their short-term working capital requirements. Similar but separate arrangements exist among FirstEnergy's unregulated companies with AE Supply, FE, FET, FEV and certain other unregulated subsidiaries. FESC administers these money pools and tracks surplus funds of FE and the respective regulated and unregulated subsidiaries, as the case may be, as well as proceeds available from bank borrowings. Companies receiving a loan under the money pool agreements must repay the principal amount of the loan, together

with accrued interest, within 364 days of borrowing the funds. The rate of interest is the same for each company receiving a loan from their respective pool and is based on the average cost of funds available through the pool. The average interest rate for borrowings in 2020 was 0.89% per annum for the regulated companies' money pool and 1.19% per annum for the unregulated companies' money pool.

### Weighted Average Interest Rates

The weighted average interest rates on short-term borrowings outstanding, including borrowings under the FirstEnergy Money Pools, as of December 31, 2020 and 2019, were 1.86% and 2.88%, respectively.

## 13. ASSET RETIREMENT OBLIGATIONS

FirstEnergy has recognized applicable legal obligations for AROs and their associated cost, including reclamation of sludge disposal ponds, closure of coal ash disposal sites, underground and above-ground storage tanks and wastewater treatment lagoons. In addition, FirstEnergy has recognized conditional retirement obligations, primarily for asbestos remediation.

As contemplated under the FES Bankruptcy settlement agreement, AE Supply entered into an agreement on December 31, 2018, to transfer the 1,300 MW Pleasants Power Station and related assets to FG, while retaining certain specified liabilities. Under the terms of the agreement, FG acquired the economic interests in Pleasants as of January 1, 2019, and AE Supply operated Pleasants until ownership was transferred on January 30, 2020. AE Supply will continue to provide access to the McElroy's Run CCR impoundment facility, which was not transferred, and FE will provide guarantees for certain retained environmental liabilities of AE Supply, including the McElroy's Run CCR impoundment facility. Please see Note 15, "Commitments, Guarantees and Contingencies," for further information.

The following table summarizes the changes to the ARO balances during 2020 and 2019:

| ARO Reconciliation | (In millions) | |
| --- | --- | --- |
| Balance, January 1, 2019 | $ | 812 |
| Liabilities settled | | (2) |
| Accretion | | 46 |
| Balance, December 31, 2019 [(1)] | $ | 856 |
| Liabilities settled [(2)] | | (744) |
| Accretion | | 47 |
| Balance, December 31, 2020 | $ | 159 |

[(1)] Includes $691 million related to TMI-2 classified as held for sale for the year ended December 31, 2019.

[(2)] Includes $726 million related to the closing of the asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of Energy*Solutions*, LLC, concerning the transfer and dismantlement of TMI-2. See Note 15, "Commitments, Guarantees and Contingencies," for further information.

## 14. REGULATORY MATTERS

### STATE REGULATION

Each of the Utilities' retail rates, conditions of service, issuance of securities and other matters are subject to regulation in the states in which it operates - in Maryland by the MDPSC, in New Jersey by the NJBPU, in Ohio by the PUCO, in Pennsylvania by the PPUC, in West Virginia by the WVPSC and in New York by the NYPSC. The transmission operations of PE in Virginia, ATSI in Ohio, and the Transmission Companies in Pennsylvania are subject to certain regulations of the VSCC, PUCO and PPUC, respectively. In addition, under Ohio law, municipalities may regulate rates of a public utility, subject to appeal to the PUCO if not acceptable to the utility. Further, if any of the FirstEnergy affiliates were to engage in the construction of significant new transmission facilities, depending on the state, they may be required to obtain state regulatory authorization to site, construct and operate the new transmission facility.

The following table summarizes the key terms of base distribution rate orders in effect for the Utilities as of December 31, 2020:

| Company | Rates Effective | Allowed Debt/ Equity | Allowed ROE |
|---|---|---|---|
| CEI | May 2009 | 51% / 49% | 10.5% |
| ME[1] | January 2017 | 48.8% / 51.2% | Settled[2] |
| MP | February 2015 | 54% / 46% | Settled[2] |
| JCP&L[3] | January 2017 | 55% / 45% | 9.6% |
| OE | January 2009 | 51% / 49% | 10.5% |
| PE (West Virginia) | February 2015 | 54% / 46% | Settled[2] |
| PE (Maryland) | March 2019 | 47% / 53% | 9.65% |
| PN[1] | January 2017 | 47.4% / 52.6% | Settled[2] |
| Penn[1] | January 2017 | 49.9% / 50.1% | Settled[2] |
| TE | January 2009 | 51% / 49% | 10.5% |
| WP[1] | January 2017 | 49.7% / 50.3% | Settled[2] |

[1] Reflects filed debt/equity as final settlement/orders do not specifically include capital structure.

[2] Commission-approved settlement agreements did not disclose ROE rates.

[3] On October 28, 2020, the NJBPU approved JCP&L's distribution rate case settlement with an allowed ROE of 9.6% and a 48.56% debt / 51.44% equity capital structure. Rates are effective for customers on November 1, 2021, but beginning January 1, 2021, JCP&L will offset the impact to customers' bills by amortizing an $86 million regulatory liability.

## MARYLAND

PE operates under MDPSC approved base rates that were effective as of March 23, 2019. PE also provides SOS pursuant to a combination of settlement agreements, MDPSC orders and regulations, and statutory provisions. SOS supply is competitively procured in the form of rolling contracts of varying lengths through periodic auctions that are overseen by the MDPSC and a third-party monitor. Although settlements with respect to SOS supply for PE customers have expired, service continues in the same manner until changed by order of the MDPSC. PE recovers its costs plus a return for providing SOS.

The EmPOWER Maryland program requires each electric utility to file a plan to reduce electric consumption and demand 0.2% per year, up to the ultimate goal of 2% annual savings, for the duration of the 2018-2020 and 2021-2023 EmPOWER Maryland program cycles, to the extent the MDPSC determines that cost-effective programs and services are available. PE's approved 2018-2020 EmPOWER Maryland plan continues and expands upon prior years' programs, and adds new programs, for a projected total cost of $116 million over the three-year period. PE recovers program costs through an annually reconciled surcharge, with most costs subject to a five-year amortization. Maryland law only allows for the utility to recover lost distribution revenue attributable to energy efficiency or demand reduction programs through a base rate case proceeding, and to date, such recovery has not been sought or obtained by PE. On September 1, 2020, PE filed its proposed plan for the 2021-2023 EmPOWER Maryland program cycle. The new plan largely continues PE's existing programs and is estimated to cost approximately $148 million over the three-year period. The MDPSC approved the plan on December 18, 2020.

On January 19, 2018, PE filed a joint petition along with other utility companies, work group stakeholders and the MDPSC electric vehicle work group leader to implement a statewide electric vehicle portfolio in connection with a 2016 MDPSC proceeding to consider an array of issues relating to electric distribution system design, including matters relating to electric vehicles, distributed energy resources, advanced metering infrastructure, energy storage, system planning, rate design, and impacts on low-income customers. PE proposed an electric vehicle charging infrastructure program at a projected total cost of $12 million, to be recovered over a five-year amortization. On January 14, 2019, the MDPSC approved the petition subject to certain reductions in the scope of the program. The MDPSC approved PE's compliance filing, which implements the pilot program, with minor modifications, on July 3, 2019.

On August 24, 2018, PE filed a base rate case with the MDPSC, which it supplemented on October 22, 2018, to update the partially forecasted test year with a full twelve months of actual data. The rate case requested an annual increase in base distribution rates of $19.7 million, plus creation of an EDIS to fund four enhanced service reliability programs. In responding to discovery, PE revised its request for an annual increase in base rates to $17.6 million. The proposed rate increase reflected $7.3 million in annual savings for customers resulting from the recent federal tax law changes. On March 22, 2019, the MDPSC issued a final order that approved a rate increase of $6.2 million, approved three of the four EDIS programs for four years, directed PE to file a new depreciation study within 18 months, and ordered the filing of a new base rate case in four years to correspond to the ending of the approved EDIS programs. On September 22, 2020, PE filed its depreciation study reflecting a depreciation expense of $36.2 million, which represented a slight increase, and as a result, is seeking difference in depreciation be deferred for future recovery in PE's next base rate case. The MDPSC has set the matter for hearing and delegated it to a public utility law judge. On November 6, 2020, an order was issued scheduling evidentiary hearings in April 2021. On January 29, 2021, the Maryland Office of People's Counsel filed testimony recommending a reduction in depreciation expense of $10.8 million, and the staff of the MDPSC filed testimony recommending a reduction of $9.6 million. PE's rebuttal testimony is due on March 2, 2021.

Maryland's Governor issued an order on March 16, 2020, forbidding utilities from terminating residential service or charging late fees for non-payment for the duration of the COVID-19 pandemic. On April 9, 2020, the MDPSC issued an order allowing utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic, including incremental uncollectible expense, incurred from the date of the Governor's order (or earlier if the utility could show that the expenses related to suspension of service terminations). On July 8, 2020, the MDPSC issued a notice opening a public conference to collect information from utilities and other stakeholders about the impacts of the COVID-19 pandemic on the utilities and their customers. The MDPSC subsequently issued orders allowing Maryland electric and gas utilities to resume residential service terminations for non-payment on November 15, 2020, subject to various restrictions, and clarifying that utilities could resume charging late fees on October 1, 2020.

**NEW JERSEY**

JCP&L operates under NJBPU approved rates that were effective as of January 1, 2017. JCP&L provides BGS for retail customers who do not choose a third-party EGS and for customers of third-party EGSs that fail to provide the contracted service. All New Jersey EDCs participate in this competitive BGS procurement process and recover BGS costs directly from customers as a charge separate from base rates.

On April 18, 2019, pursuant to the May 2018 New Jersey enacted legislation establishing a ZEC program to provide ratepayer funded subsidies of New Jersey nuclear energy supply, the NJBPU approved the implementation of a non-bypassable, irrevocable ZEC charge for all New Jersey electric utility customers, including JCP&L's customers. Once collected from customers by JCP&L, these funds will be remitted to eligible nuclear energy generators.

In December 2017, the NJBPU issued proposed rules to modify its current CTA policy in base rate cases to: (i) calculate savings using a five-year look back from the beginning of the test year; (ii) allocate savings with 75% retained by the company and 25% allocated to ratepayers; and (iii) exclude transmission assets of electric distribution companies in the savings calculation, which were published in the NJ Register in the first quarter of 2018. JCP&L filed comments supporting the proposed rulemaking. On January 17, 2019, the NJBPU approved the proposed CTA rules with no changes. On May 17, 2019, the Rate Counsel filed an appeal with the Appellate Division of the Superior Court of New Jersey. Oral Argument is scheduled for March 10, 2021. JCP&L is contesting this appeal but is unable to predict the outcome of this matter.

Also, in December 2017, the NJBPU approved its IIP rulemaking. The IIP creates a financial incentive for utilities to accelerate the level of investment needed to promote the timely rehabilitation and replacement of certain non-revenue producing components that enhance reliability, resiliency, and/or safety. On May 8, 2019, the NJBPU approved a stipulation of settlement submitted by JCP&L, Rate Counsel, NJBPU staff and New Jersey Large Energy Users Coalition to implement JCP&L's infrastructure plan, JCP&L Reliability Plus. The plan provides that JCP&L will invest up to approximately $97 million in capital investments beginning on June 1, 2019 through December 31, 2020, to enhance the reliability and resiliency of JCP&L's distribution system and reduce the frequency and duration of power outages. JCP&L shall seek recovery of the capital investment through an accelerated cost recovery mechanism, provided for in the rules, that includes a revenue adjustment calculation and a process for two rate adjustments. The NJBPU approved adjusted rates that took effect on March 1, 2020. As further discussed below, JCP&L will recover the IIP capital investments, which totaled $97 million, as part of its distribution base rate case.

On February 18, 2020, JCP&L submitted a filing with the NJBPU requesting a distribution base rate increase of $186.9 million on an annual basis, which represents an overall average increase in JCP&L rates of 7.8%. The filing seeks to recover certain costs associated with providing safe and reliable electric service to JCP&L customers, along with recovery of previously incurred storm costs. JCP&L proposed a rate effective date of March 19, 2020. The NJBPU issued orders suspending JCP&L's proposed rates until November 19, 2020. JCP&L filed updates to the requested distribution base rate in both June and July 2020, resulting in JCP&L seeking a total annual distribution base rate increase of approximately $185 million. On October 16, 2020, the parties submitted a stipulation of settlement to the administrative law judge, providing for, among other things, a $94 million annual base distribution revenues increase for JCP&L based on an ROE of 9.6%, which will become effective for customers on November 1, 2021. Until the rates become effective, and starting on January 1, 2021, JCP&L is permitted to amortize an existing regulatory liability totaling approximately $86 million to offset the base rate increase that otherwise would have occurred in this period. The parties also agreed that the actual net gain from the sale of JCP&L's interest in the Yards Creek pumped-storage hydro generation facility in New Jersey (210 MWs), as further discussed below, shall be applied to reduce JCP&L's existing regulatory asset for previously deferred storm costs. Lastly, the parties agreed that $95.1 million of Reliability Plus capital investment for projects through December 31, 2020 is included in rate base effective December 31, 2020, with a final prudence review of only those capital investment projects from July 1, 2020 through December 31, 2020 to occur in January 2021. On October 22, 2020, the administrative law judge entered an initial decision adopting the settlement. On October 28, 2020, the NJBPU approved the settlement and directed an upcoming management audit for JCP&L. On January 4, 2021, JCP&L submitted its review of storm costs as required under the stipulation of settlement. On January 15, 2021, JCP&L filed a written report for its Reliability Plus projects placed in service from July 1, 2020 through December 31, 2020, also as required under the stipulation of settlement.

On April 6, 2020, JCP&L signed an asset purchase agreement with Yards Creek Energy, LLC, a subsidiary of LS Power to sell its 50% interest in the Yards Creek pumped-storage hydro generation facility. Subject to terms and conditions of the agreement, the base purchase price is $155 million. On July 31, 2020, FERC approved the transfer of JCP&L's interest in the hydroelectric operating license. On October 8, 2020, FERC issued an order authorizing the transfer of JCP&L's ownership interest in the

hydroelectric facilities. On October 28, 2020, the NJBPU approved the sale of Yards Creek. Completion of the transaction is subject to several closing conditions; there can be no assurance that all closing conditions will be satisfied or that the transaction will be consummated. JCP&L currently anticipates closing of the transaction to occur during the first quarter of 2021. Assets held for sale on FirstEnergy's Consolidated Balance Sheets associated with the transaction consist of property, plant and equipment of $45 million, which is included in the regulated distribution segment.

On August 27, 2020, JCP&L filed an AMI Program with the NJBPU, which proposes the deployment of approximately 1.2 million advanced meters over a three-year period beginning on January 1, 2023, at a total cost of approximately $418 million, including the pre-deployment phase. The 3-year deployment is part of the 20-year AMI Program that is expected to cost a total of approximately $732 million and proposes a cost recovery mechanism through a separate AMI tariff rider. On January 13, 2021, a procedural schedule was established, which includes evidentiary hearings the week of May 24, 2021.

On June 10, 2020, the NJBPU issued an order establishing a framework for the filing of utility-run energy efficiency and peak demand reduction programs in accordance with the New Jersey Clean Energy Act. Under the established framework, JCP&L will recover its program investments over a ten year amortization period and its operations and maintenance expenses on an annual basis, be eligible to receive lost revenues on energy savings that resulted from its programs and be eligible for incentives or subject to penalties based on its annual program performance, beginning in the fifth year of its program offerings. On September 25, 2020, JCP&L filed its energy efficiency and peak demand reduction program. JCP&L's program consists of 11 energy efficiency and peak demand reduction programs and subprograms to be run from July 1, 2021 through June 30, 2024. The program also seeks approval of cost recovery totaling approximately $230 million as well as lost revenues associated with the energy savings resulting from the programs. While a procedural order has been established in this matter, on January 20, 2021, JCP&L filed a letter requesting a suspension of the procedural schedule to allow for settlement discussions. The Clean Energy Act contemplates a final order from the NJBPU by May 2, 2021.

On July 2, 2020, the NJBPU issued an order allowing New Jersey utilities to track and create a regulatory asset for future recovery of all prudently incurred incremental costs arising from the COVID-19 pandemic beginning March 9, 2020 through September 30, 2021, or until the Governor issues an order stating that the COVID-19 pandemic is no longer in effect. New Jersey utilities can request recovery of such regulatory asset in a stand-alone COVID-19 regulatory asset filing or future base rate case. On August 21, 2020, the Governor of New Jersey issued a press release announcing that the New Jersey utilities agreed to extend their voluntary moratorium preventing shutoffs to both residential and commercial customers during the COVID-19 pandemic until October 15, 2020. On October 15, 2020, the Governor issued an Executive Order prohibiting utilities from terminating service to any residential gas, electric, public and private water customer, through March 15, 2021, requiring the reconnection of certain customers, and disallowing the charging of late payment charges or reconnection fees during the public health emergency. On October 28, 2020, the NJBPU issued an order expanding the scope of the proceeding to examine all pandemic issues, including recovery of the COVID-19 regulatory assets, by way of a generic proceeding. On November 30, 2020, JCP&L submitted comments.

The recent credit rating actions taken on October 28, 2020, by S&P and Fitch triggered a requirement from various NJBPU orders that JCP&L file a mitigation plan, which was filed on November 5, 2020, to demonstrate that JCP&L has sufficient liquidity to meet its BGS obligations. On December 11, 2020, the NJBPU held a public hearing on the mitigation plan. Written comments on JCP&L's mitigation plan were submitted on January 8, 2021.

**OHIO**

The Ohio Companies operate under base distribution rates approved by the PUCO effective in 2009. The Ohio Companies' residential and commercial base distribution revenues were decoupled, through a mechanism that took effect on February 1, 2020 and under which the Ohio Companies billed customers until February 9, 2021, to the base distribution revenue and lost distribution revenue associated with energy efficiency and peak demand reduction programs recovered as of the twelve-month period ending on December 31, 2018. The Ohio Companies currently operate under ESP IV effective June 1, 2016, and continuing through May 31, 2024, that continues the supply of power to non-shopping customers at a market-based price set through an auction process. ESP IV also continues the DCR rider, which supports continued investment related to the distribution system for the benefit of customers, with increased revenue caps of $20 million per year from June 1, 2019 through May 31, 2022; and $15 million per year from June 1, 2022 through May 31, 2024. In addition, ESP IV includes: (1) continuation of a base distribution rate freeze through May 31, 2024; (2) the collection of lost distribution revenue associated with energy efficiency and peak demand reduction programs, which is discussed further below; (3) a goal across FirstEnergy to reduce $CO_2$ emissions by 90% below 2005 levels by 2045; and (4) contributions, totaling $51 million to: (a) fund energy conservation programs, economic development and job retention in the Ohio Companies' service territories; (b) establish a fuel-fund in each of the Ohio Companies' service territories to assist low-income customers; and (c) establish a Customer Advisory Council to ensure preservation and growth of the competitive market in Ohio.

ESP IV further provided for the Ohio Companies to collect through the DMR $132.5 million annually for three years beginning in 2017, grossed up for federal income taxes, resulting in an approved amount of approximately $168 million annually in 2018 and 2019. On appeal, the SCOH, on June 19, 2019, reversed the PUCO's determination that the DMR is lawful, and remanded the matter to the PUCO with instructions to remove the DMR from ESP IV. The PUCO entered an order directing the Ohio Companies to cease further collection through the DMR, credit back to customers a refund of the DMR funds collected since July

2, 2019 and remove the DMR from ESP IV. On July 15, 2019, OCC filed a Notice of Appeal with the SCOH, challenging the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017 for OE and claiming a $42 million refund is due to OE customers. On December 1, 2020, the SCOH reversed the PUCO's exclusion of the DMR revenues from the determination of the existence of significantly excessive earnings under ESP IV for OE for calendar year 2017, and remanded the case to the PUCO with instructions to conduct new proceedings which includes the DMR revenues in the analysis, determines the threshold against which the earned return is measured, and makes other necessary determinations. FirstEnergy is unable to predict the outcome of these proceedings but has not deemed a liability probable as of December 31, 2020.

On July 23, 2019, Ohio enacted HB 6, which established support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, HB 6 included provisions implementing a decoupling mechanism for Ohio electric utilities and ending current energy efficiency program mandates on December 31, 2020, provided that statewide energy efficiency mandates are achieved as determined by the PUCO. On February 26, 2020, the PUCO ordered a wind-down of statutorily required energy efficiency programs to commence on September 30, 2020, that the programs terminate on December 31, 2020, with the Ohio Companies' existing portfolio plans extended through 2020 without changes.

On November 21, 2019, the Ohio Companies applied to the PUCO for approval of a decoupling mechanism, which would set residential and commercial base distribution related revenues at the levels collected in 2018. As such, those base distribution revenues would no longer be based on electric consumption, which allows continued support of energy efficiency initiatives while also providing revenue certainty to the Ohio Companies. On January 15, 2020, the PUCO approved the Ohio Companies' decoupling application, and the decoupling mechanism took effect on February 1, 2020. Legislation has been introduced in the first quarter of 2021 to, among other things, repeal parts of HB 6, the legislation that established support for nuclear energy supply in Ohio, provided for a decoupling mechanism for Ohio electric utilities, and provided for the ending of current energy efficiency program mandates. As further discussed below, in connection with a partial settlement with the OAG and other parties, the Ohio Companies filed an application with the PUCO on February 1, 2021, to set the respective decoupling riders (Rider CSR) to zero. While the partial settlement with the OAG focused specifically on decoupling, the Ohio Companies will of their own accord not seek to recover lost distribution revenue from residential and commercial customers. FirstEnergy is committed to pursuing an open dialogue with stakeholders in an appropriate manner with respect to the numerous regulatory proceedings currently underway as further discussed herein. As a result of the partial settlement, and the decision to not seek lost distribution revenue, FirstEnergy recognized a $108 million pre-tax charge ($84 million after-tax) in the fourth quarter of 2020, and $77 million (pre-tax) of which is associated with forgoing collection of lost distribution revenue. FirstEnergy does not believe a refund for previously collected amounts under decoupling, which was approximately $18 million, is probable. Furthermore, as FirstEnergy would not have financially benefited from the Clean Air Fund included in HB 6, which is the mechanism to provide support to nuclear energy in Ohio, there is no expected additional impact to FirstEnergy due to any repeal of that provision of HB 6.

On July 17, 2019, the PUCO approved, with no material modifications, a settlement agreement that provides for the implementation of the Ohio Companies' first phase of grid modernization plans, including the investment of $516 million over three years to modernize the Ohio Companies' electric distribution system, and for all tax savings associated with the Tax Act to flow back to customers. The settlement had broad support, including PUCO staff, the OCC, representatives of industrial and commercial customers, a low-income advocate, environmental advocates, hospitals, competitive generation suppliers and other parties.

In March 2020, the PUCO issued entries directing utilities to review their service disconnection and restoration policies and suspend, for the duration of the COVID-19 pandemic, otherwise applicable requirements that may impose a service continuity hardship or service restoration hardship on customers. The Ohio Companies are utilizing their existing approved cost recovery mechanisms where applicable to address the financial impacts of these directives. On July 31, 2020, the Ohio Companies filed with the PUCO their transition plan and requests for waivers to allow for the safe resumption of normal business operations, including service disconnections for non-payment. On September 23, 2020, the PUCO approved the Ohio Companies' transition plan, including approval of the resumption of service disconnections for non-payment, which the Ohio Companies began on October 5, 2020.

On July 29, 2020, the PUCO consolidated the Ohio Companies' Applications for determination of the existence of significantly excessive earnings, or SEET, under ESP IV for calendar years 2018 and 2019, which had been previously filed on July 15, 2019, and May 15, 2020, respectively, and set a procedural schedule with evidentiary hearings scheduled for October 29, 2020. The calculations included in the Ohio Companies' SEET filings for calendar years 2018 and 2019 demonstrate that the Ohio Companies did not have significantly excessive earnings, however, FirstEnergy and the Ohio Companies are unable to predict the PUCO's ultimate determination of the applications. On August 3, 2020, the OCC filed an interlocutory appeal asking the PUCO to stay the SEET proceeding until the SCOH determines whether DMR should be excluded from the SEET, as further discussed above. Furthermore, on January 21, 2021, Senate Bill 10 was introduced, which would repeal legislation passed in 2019 that permitted the Ohio Companies to file their SEET results on a consolidated basis instead of on an individual company basis. On September 4, 2020, the PUCO opened its quadrennial review of ESP IV, consolidated it with the Ohio Companies' 2018 and 2019 SEET Applications, and set a procedural schedule for the consolidated matters. On October 29, 2020, the PUCO issued an entry extending the deadline for the Ohio Companies to file quadrennial review of ESP IV testimony to March 1, 2021, with the evidentiary hearings to commence no sooner than May 3, 2021. On January 12, 2021, the PUCO consolidated these

matters with the determination of the existence of significantly excessive earnings under ESP IV for calendar year 2017, which the SCOH had remanded to the PUCO.

On September 8, 2020, the OCC filed motions in the Ohio Companies' corporate separation audit and DMR audit dockets, requesting the PUCO to open an investigation and management audit, hire an independent auditor, and require FirstEnergy to show it did not improperly use money collected from consumers or violate any utility regulatory laws, rules or orders in its activities regarding HB 6. The Ohio Companies' filed a response in opposition to the OCC's motions on September 23, 2020. On December 30, 2020, in response to the OCC's motion, the PUCO reopened the DMR audit docket, and directed PUCO staff to solicit a third-party auditor and conduct a full review of the DMR to ensure funds collected from ratepayers through the DMR were only used for the purposes established in ESP IV. Deadlines relating to the selection of the auditor and the issuance of the final audit report have not yet been set.

On September 15, 2020, the PUCO opened a new proceeding to review the political and charitable spending by the Ohio Companies in support of HB 6 and the subsequent referendum effort, directing the Ohio Companies to show cause, demonstrating that the costs of any political or charitable spending in support of HB 6, or the subsequent referendum effort, were not included, directly or indirectly, in any rates or charges paid by ratepayers. The Ohio Companies filed a response on September 30, 2020, stating that any political and charitable spending in support of HB 6 or the subsequent referendum were not included in rates or charges paid for by its customers. Several parties requested that the PUCO broaden the scope of the review of political and charitable spending.

In connection with an on-going audit of the Ohio Companies' policies and procedures relating to the code of conduct rules between affiliates, on November 4, 2020, the PUCO initiated an additional corporate separation audit as a result of the FirstEnergy leadership transition announcement made on October 29, 2020, as further discussed below. The additional audit is to ensure compliance by the Ohio Companies and their affiliates with corporate separation laws and the Ohio Companies' corporate separation plan. The additional audit is for the period from November 2016 through October 2020, with a final audit report to be filed in June 2021. On January 27, 2021, the PUCO selected an auditor.

On November 24, 2020, the Environmental Law and Policy Center filed motions to vacate the PUCO's orders in proceedings related to the Ohio Companies' settlement that provides for the implementation of the first phase of grid modernization plans and for all tax savings associated with the Tax Act to flow back to customers, the Ohio Companies' energy efficiency portfolio plans for the period from 2013 through 2016, and the Ohio Companies' application for a two-year extension of the DMR, on the grounds that the former Chairman of the PUCO should have recused himself in these matters. On December 30, 2020, the PUCO denied the motions, and reinstated the requirement under ESP IV that the Ohio Companies file a base distribution rate case by May 31, 2024, the end of ESP IV, which the Ohio Companies had indicated they would not oppose.

In the fourth quarter of 2020, motions were filed with the PUCO requesting that the PUCO amend the Ohio Companies' riders for collecting charges required by HB 6, which the Ohio Companies are further required to remit to other Ohio electric distribution utilities or to the State Treasurer, to provide for refunds in the event HB 6 is repealed. The Ohio Companies contested the motions, which are pending before the PUCO.

On December 7, 2020, the Citizens' Utility Board of Ohio filed a complaint with the PUCO against the Ohio Companies. The complaint alleges that the Ohio Companies' new charges resulting from HB 6, and any increased rates resulting from proceedings over which the former PUCO Chairman presided, are unjust and unreasonable, and that the Ohio Companies violated Ohio corporate separation laws by failing to operate separately from unregulated affiliates. The complaint requests, among other things, that any rates authorized by HB 6 or authorized by the PUCO in a proceeding over which the former Chairman presided be made refundable; that the Ohio Companies be required to file a new distribution rate case at the earliest possible date; and that the Ohio Companies' corporate separation plans be modified to introduce institutional controls. The Ohio Companies are contesting the complaint.

On December 9, 2020, the Ohio Manufacturers' Association Energy Group filed an appeal to the SCOH challenging the PUCO's generic order directing the form of rider all Ohio electric distribution utilities must charge to recover the costs of the HB 6 Clean Air Fund. The appeal contends that the PUCO erred in adopting the rate design for the riders, in establishing the riders during ongoing proceedings and investigations related to HB 6, and in not requiring electric distribution utilities to include refund language in the rider tariffs. On December 30, 2020, the PUCO vacated its generic order establishing the Clean Air Fund riders, as required by a preliminary injunction issued by the Court of Common Pleas of Franklin County, Ohio. On January 11, 2021, the SCOH granted a joint application of the Ohio Manufacturers' Association Energy Group and the PUCO and dismissed the appeal.

See Note 15, "Commitments, Guarantees and Contingencies" below for additional details on the government investigation and subsequent litigation surrounding the investigation of HB 6.

**PENNSYLVANIA**

The Pennsylvania Companies operate under rates approved by the PPUC, effective as of January 27, 2017. These rates were adjusted for the net impact of the Tax Act, effective March 15, 2018. The net impact of the Tax Act for the period January 1, 2018

through March 14, 2018 was separately tracked and its treatment will be addressed in a future rate proceeding. The Pennsylvania Companies operate under DSPs for the June 1, 2019 through May 31, 2023 delivery period, which provide for the competitive procurement of generation supply for customers who do not choose an alternative EGS or for customers of alternative EGSs that fail to provide the contracted service. Under the 2019-2023 DSPs, supply will be provided by wholesale suppliers through a mix of 3, 12 and 24-month energy contracts, as well as two RFPs for 2-year SREC contracts for ME, PN and Penn.

Pursuant to Pennsylvania Act 129 of 2008 and PPUC orders, Pennsylvania EDCs implement energy efficiency and peak demand reduction programs. The Pennsylvania Companies' Phase III EE&C plans for the June 2016 through May 2021 period, which were approved in March 2016, with expected costs up to $390 million, are designed to achieve the targets established in the PPUC's Phase III Final Implementation Order with full recovery through the reconcilable EE&C riders. On June 18, 2020, the PPUC entered a Final Implementation Order for a Phase IV EE&C Plan, operating from June 2021 through May 2026. The Final Implementation Order set demand reduction targets, relative to 2007 to 2008 peak demands, at 2.9% MW for ME, 3.3% MW for PN, 2.0% MW for Penn, and 2.5% MW for WP; and energy consumption reduction targets, as a percentage of the Pennsylvania Companies' historic 2009 to 2010 reference load at 3.1% MWH for ME, 3.0% MWH for PN, 2.7% MWH for Penn, and 2.4% MWH for WP. The Pennsylvania Companies' Phase IV plans were filed November 30, 2020. A settlement has been reached in this matter, and a joint petition seeking approval of that settlement by the parties was filed on February 16, 2021. A PPUC decision on the settlement is expected in March 2021.

Pennsylvania EDCs may file with the PPUC for approval of an LTIIP for infrastructure improvements and costs related to highway relocation projects, after which a DSIC may be approved to recover LTIIP costs. On August 30, 2019, the Pennsylvania Companies filed Petitions for approval of new LTIIPs for the five-year period beginning January 1, 2020 and ending December 31, 2024 for a total capital investment of approximately $572 million for certain infrastructure improvement initiatives. On January 16, 2020, the PPUC approved the LTIIPs without modification. The Pennsylvania Companies' approved DSIC riders for quarterly cost recovery went into effect July 1, 2016. On August 30, 2019, Penn filed a Petition seeking approval of a waiver of the statutory DSIC cap of 5% of distribution rate revenue and approval to increase the maximum allowable DSIC to 11.81% of distribution rate revenue for the five-year period of its proposed LTIIP. On March 12, 2020, an order was entered approving a settlement by all parties to that case which provides for a temporary increase in the recoverability cap from 5% to 7.5%, to expire on the earlier of the effective date of new base rates following Penn's next base rate case or the expiration of its LTIIP II program.

Following the Pennsylvania Companies' 2016 base rate proceedings, the PPUC ruled in a separate proceeding related to the DSIC mechanisms that the Pennsylvania Companies were not required to reflect federal and state income tax deductions related to DSIC-eligible property in DSIC rates, which decision was appealed by the Pennsylvania OCA to the Pennsylvania Commonwealth Court. The Commonwealth Court reversed the PPUC's decision and remanded the matter to require the Pennsylvania Companies to revise their tariffs and DSIC calculations to include ADIT and state income taxes. On April 7, 2020, the Pennsylvania Supreme Court issued an order granting Petitions for Allowance of Appeal by both the PPUC and the Pennsylvania Companies of the Commonwealth Court's Opinion and Order. Briefs and Reply Briefs of the parties were filed, and oral argument before the Supreme Court was held on October 21, 2020. An adverse ruling by the Pennsylvania Supreme Court is not expected to result in a material impact to FirstEnergy.

The PPUC issued an order on March 13, 2020, forbidding utilities from terminating service for non-payment for the duration of the COVID-19 pandemic. On May 13, 2020, the PPUC issued a Secretarial letter directing utilities to track all prudently incurred incremental costs arising from the COVID-19 pandemic, and to create a regulatory asset for future recovery of incremental uncollectibles incurred as a result of the COVID-19 pandemic and termination moratorium. On October 13, 2020, the PPUC entered an order lifting the service termination moratorium effective November 9, 2020, subject to certain additional notification, payment procedures and exceptions, and permits the Pennsylvania Companies to create a regulatory asset for all incremental expenses associated with their compliance with the order.

**WEST VIRGINIA**

MP and PE provide electric service to all customers through traditional cost-based, regulated utility ratemaking and operate under rates approved by the WVPSC effective February 2015. MP and PE recover net power supply costs, including fuel costs, purchased power costs and related expenses, net of related market sales revenue through the ENEC. MP's and PE's ENEC rate is updated annually.

On March 13, 2020, the WVPSC urged all utilities to suspend utility service terminations except where necessary as a matter of safety or where requested by the customer. On May 15, 2020, the WVPSC issued an order to authorize MP and PE to record a deferral of additional, extraordinary costs directly related to complying with the various COVID-19 government shut-down orders and operational precautions, including impacts on uncollectible expense and cash flow related to temporary discontinuance of service terminations for non-payment and any credits to minimum demand charges associated with business customers adversely impacted by shut-downs or temporary closures related to the pandemic. MP and PE resumed disconnection activity for commercial and industrial customers on September 15, 2020, and for residential customers on November 4, 2020.

On August 28, 2020, MP and PE filed with the WVPSC their annual ENEC case requesting a decrease in ENEC rates of $55 million beginning January 1, 2021, representing a 4% decrease in rates compared to those in effect on August 28, 2020. The

decrease in the ENEC rates is net of recovering approximately $10.5 million in previously deferred, incremental uncollectible and other related costs resulting from the COVID-19 pandemic. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 with rates effective January 1, 2021.

Also, on August 28, 2020, MP and PE filed with the WVPSC for recovery of costs associated with modernization and improvement program for their coal-fired boilers. The proposed annual revenue increase for these environmental compliance projects is $5 million beginning January 1, 2021. The WVPSC approved a unanimous settlement by the parties on December 16, 2020 approving the recovery of those costs.

On December 30, 2020, MP and PE filed an integrated resource plan with the WVPSC. The plan projects a small capacity deficit but an energy surplus in MP's and PE's supply resources when compared with current WV load demand and projects the capacity deficit growing over the next 15 years. The plan does not recommend additional supply-side resources with a possible exception for small utility-scale solar resources and recommends that the capacity deficit be met through the PJM capacity market. MP currently expects to seek approval in 2021 to construct solar generation sources of up to 50 MWs.

On December 30, 2020, MP and PE filed with the WVPSC a determination of the rate impact of the Tax Act with respect to ADIT. The filing proposes an annual revenue reduction of $2.6 million annually, effective January 1, 2022, with reconciliation and any resulting adjustments incorporated into the annual ENEC proceedings.

**FERC REGULATORY MATTERS**

Under the FPA, FERC regulates rates for interstate wholesale sales, transmission of electric power, accounting and other matters, including construction and operation of hydroelectric projects. With respect to their wholesale services and rates, the Utilities, AE Supply and the Transmission Companies are subject to regulation by FERC. FERC regulations require JCP&L, MP, PE, WP and the Transmission Companies to provide open access transmission service at FERC-approved rates, terms and conditions. Transmission facilities of JCP&L, MP, PE, WP and the Transmission Companies are subject to functional control by PJM and transmission service using their transmission facilities is provided by PJM under the PJM Tariff.

The following table summarizes the key terms of rate orders in effect for transmission customer billings for FirstEnergy's transmission owner entities as of December 31, 2020:

| Company | Rates Effective | Capital Structure | Allowed ROE |
|---|---|---|---|
| ATSI | January 1, 2015 | Actual (13-month average) | 10.38% |
| JCP&L | January 2020[1] | Actual (13-month average)[1] | 10.80%[1] |
| MP | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| PE | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| WP | March 21, 2018[2][4] | Settled[2][3] | Settled[2][3] |
| MAIT | July 1, 2017 | Lower of Actual (13-month average) or 60% | 10.3% |
| TrAIL | July 1, 2008 | Actual (year-end) | 12.7% (TrAIL the Line & Black Oak SVC) 11.7% (All other projects) |

[1] As filed in docket ER20-227, effective on January 1, 2020, which has been accepted by FERC, subject to refund, pending further hearing and settlement procedures. The settlement agreement that was filed on February 2, 2021, seeking approval by FERC sets JCP&L's Allowed ROE at 10.2%.
[2] Effective on January 1, 2021, MP, PE, and WP have implemented a forward-looking formula rate, which has been accepted by FERC, subject to refund, pending further hearing and settlement procedures.
[3] FERC-approved settlement agreements did not specify.
[4] See FERC Actions on Tax Act below.

FERC regulates the sale of power for resale in interstate commerce in part by granting authority to public utilities to sell wholesale power at market-based rates upon showing that the seller cannot exert market power in generation or transmission or erect barriers to entry into markets. The Utilities and AE Supply each have been authorized by FERC to sell wholesale power in interstate commerce at market-based rates and have a market-based rate tariff on file with FERC, although in the case of the Utilities major wholesale purchases remain subject to review and regulation by the relevant state commissions.

Federally enforceable mandatory reliability standards apply to the bulk electric system and impose certain operating, record-keeping and reporting requirements on the Utilities, AE Supply, and the Transmission Companies. NERC is the ERO designated by FERC to establish and enforce these reliability standards, although NERC has delegated day-to-day implementation and enforcement of these reliability standards to six regional entities, including RFC. All of the facilities that FirstEnergy operates are located within the RFC region. FirstEnergy actively participates in the NERC and RFC stakeholder processes, and otherwise monitors and manages its companies in response to the ongoing development, implementation and enforcement of the reliability standards implemented and enforced by RFC.

FirstEnergy believes that it is in material compliance with all currently effective and enforceable reliability standards. Nevertheless, in the course of operating its extensive electric utility systems and facilities, FirstEnergy occasionally learns of isolated facts or circumstances that could be interpreted as excursions from the reliability standards. If and when such occurrences are found, FirstEnergy develops information about the occurrence and develops a remedial response to the specific circumstances, including in appropriate cases "self-reporting" an occurrence to RFC. Moreover, it is clear that NERC, RFC and FERC will continue to refine existing reliability standards as well as to develop and adopt new reliability standards. Any inability on FirstEnergy's part to comply with the reliability standards for its bulk electric system could result in the imposition of financial penalties, or obligations to upgrade or build transmission facilities, that could have a material adverse effect on its financial condition, results of operations and cash flows.

*ATSI Transmission Formula Rate*

On May 1, 2020, ATSI filed amendments to its formula rate to recover regulatory assets for certain costs that ATSI incurred as a result of its 2011 move from MISO to PJM, certain costs allocated to ATSI by FERC for transmission projects that were constructed by other MISO transmission owners, certain income tax-related adjustments, including, but not limited to impacts from the Tax Act discussed further below, and certain costs for transmission-related vegetation management programs. The amount on FirstEnergy's Consolidated Balance Sheet for these regulatory assets was approximately $79 million and $73 million, as of December 31, 2020 and December 31, 2019, respectively. Per prior FERC orders, ATSI included a "cost-based study" to support recovery of ATSI's costs to move to PJM, and the MISO transmission project costs that were allocated to ATSI. Certain intervenors filed protests of the formula rate amendments on May 29, 2020, and ATSI filed a reply on June 15, 2020. On June 30, 2020, FERC issued an initial order accepting the tariff amendments subject to refund, suspending the effective date for five months to be effective December 1, 2020, and setting the matter for hearing and settlement proceedings. ATSI is engaged in settlement negotiations with the other parties to the formula rate amendments proceeding.

*FERC Actions on Tax Act*

On March 15, 2018, FERC initiated proceedings on the question of how to address possible changes to ADIT and bonus depreciation as a result of the Tax Act. Such possible changes could impact FERC-jurisdictional rates, including transmission rates. On November 21, 2019, FERC issued a final rule (Order No. 864). Order No. 864 requires utilities with transmission formula rates to update their formula rate templates to include mechanisms to (i) deduct any excess ADIT from or add any deficient ADIT to their rate base; (ii) raise or lower their income tax allowances by any amortized excess or deficient ADIT; and (iii) incorporate a new permanent worksheet into their rates that will annually track information related to excess or deficient ADIT. Per FERC directives, ATSI submitted its compliance filing on May 1, 2020. MAIT submitted its compliance filing on June 1, 2020. Certain intervenors filed protests of the compliance filings, to which ATSI and MAIT responded. On October 28, 2020, FERC staff requested additional information about ATSI's proposed rate base adjustment mechanism, and ATSI submitted the requested information on November 25, 2020. On May 15, 2020, TrAIL submitted its compliance filing and on June 1, 2020, PATH submitted its required compliance filing. These compliance filings each remain pending before FERC. MP, WP and PE (as holders of a "stated" transmission rate) are addressing these requirements in the transmission formula rates amendments that were filed on October 29, 2020. JCP&L is addressing these requirements as part of its pending transmission formula rate case.

*Transmission ROE Methodology*

FERC's methodology for calculating electric transmission utility ROE has been in transition as a result of an April 14, 2017 ruling by the D.C. Circuit that vacated FERC's then-effective methodology. On May 21, 2020, FERC issued Opinion No. 569-A that changed FERC's ROE methodology. Under this methodology FERC established an ROE that is based on three financial models – discounted cash flow, capital-asset pricing, and risk premium – to calculate a composite zone of reasonableness. FERC noted that utilities could, in utility-specific proceedings, ask to have the expected earnings methodology included in calculating the utility's authorized ROE. FERC also noted that, going forward, it will divide that zone into three equal parts, to be used for high risk, normal risk, and low risk utilities. A given utility will be assigned to one of these three parts of the zone of reasonableness, and its ROE will be set at the median or midpoint of the other utilities that are in the applicable third of the zone. FirstEnergy filed a request for rehearing, which FERC denied on July 22, 2020. On November 19, 2020, FERC issued Opinion No. 569-B, which affirmed the Opinion No. 569-A rulings. FirstEnergy initiated, but subsequently withdrew, appeals of these orders. Appeals of Opinion Nos. 569, 569-A and 569-B are pending before the D.C. Circuit. Any changes to FERC's transmission rate ROE and incentive policies would be applied on a prospective basis.

On March 20, 2020, FERC initiated a rulemaking proceeding on the transmission rate incentives provisions of Section 219 of the 2005 Energy Policy Act. Initial comments were submitted July 1, 2020, and reply comments were filed on July 16, 2020. FirstEnergy participated through EEI and through a consortium of PJM Transmission Owners. This proceeding is pending before FERC.

*JCP&L Transmission Formula Rate*

On October 30, 2019, JCP&L filed tariff amendments with FERC to convert JCP&L's existing stated transmission rate to a forward-looking formula transmission rate. JCP&L requested that the tariff amendments become effective January 1, 2020. On December 19, 2019, FERC issued its initial order in the case, allowing JCP&L to transition to a forward-looking formula rate as of

January 1, 2020 as requested, subject to refund, pending further hearing and settlement proceedings. JCP&L and the parties to the FERC proceeding subsequently were able to reach settlement, and on February 2, 2021, a settlement agreement was filed for approval by FERC.

*Allegheny Power Zone Transmission Formula Rate Filings*

On October 29, 2020, MP, PE and WP filed tariff amendments with FERC to convert their existing stated transmission rate to a forward-looking formula transmission rate, effective January 1, 2021. In addition, on October 30, 2020, KATCo filed a proposed new tariff to establish a forward-looking formula rate and requested that the new rate become effective January 1, 2021. In its filing, KATCo explained that while it currently owns no transmission assets, it may build new transmission facilities in the Allegheny zone, and that it may seek required state and federal authorizations to acquire transmission assets from PE and WP by January 1, 2022. These transmission rate filings were approved by FERC on December 31, 2020, subject to refund, pending further hearing and settlement proceedings. MP, PE and WP, and KATCo are engaged in settlement negotiations with the other parties to the formula rate proceedings. KATCo will be included in the Regulated Transmission reportable segment.

## 15. COMMITMENTS, GUARANTEES AND CONTINGENCIES

### GUARANTEES AND OTHER ASSURANCES

FirstEnergy has various financial and performance guarantees and indemnifications which are issued in the normal course of business. These contracts include performance guarantees, stand-by letters of credit, debt guarantees, surety bonds and indemnifications. FirstEnergy enters into these arrangements to facilitate commercial transactions with third parties by enhancing the value of the transaction to the third party.

As of December 31, 2020, outstanding guarantees and other assurances aggregated approximately $1.7 billion, consisting of parental guarantees on behalf of its consolidated subsidiaries' guarantees ($1.1 billion), other guarantees ($108 million) and other assurances ($490 million).

### COLLATERAL AND CONTINGENT-RELATED FEATURES

In the normal course of business, FE and its subsidiaries may enter into physical or financially settled contracts for the sale and purchase of electric capacity, energy, fuel and emission allowances. Certain agreements contain provisions that require FE or its subsidiaries to post collateral. This collateral may be posted in the form of cash or credit support with thresholds contingent upon FE's or its subsidiaries' credit rating from each of the major credit rating agencies. The collateral and credit support requirements vary by contract and by counterparty.

As of December 31, 2020 $20 million of collateral has been posted by FE or its subsidiaries, of which, $19 million was posted as a result of the credit rating downgrades in the fourth quarter of 2020.

These credit-risk-related contingent features stipulate that if the subsidiary were to be downgraded or lose its investment grade credit rating (based on its senior unsecured debt rating), it would be required to provide additional collateral. The following table discloses the potential additional credit rating contingent contractual collateral obligations as of December 31, 2020:

| Potential Collateral Obligations | Utilities and FET | | FE | | Total | |
|---|---|---|---|---|---|---|
| | *(In millions)* | | | | | |
| Contractual Obligations for Additional Collateral | | | | | | |
| Upon Further Downgrade | $ | 37 | $ | — | $ | 37 |
| Surety Bonds (Collateralized Amount)[1] | | 55 | | 258 | | 313 |
| Total Exposure from Contractual Obligations | $ | 92 | $ | 258 | $ | 350 |

[1] Surety Bonds are not tied to a credit rating. Surety Bonds' impact assumes maximum contractual obligations, which is ordinarily 100% of the face amount of the surety bond except with the respect to $39 million of surety obligations for which the collateral obligation is capped at 60% of the face amount, and typical obligations require 30 days to cure.

### OTHER COMMITMENTS AND CONTINGENCIES

FE is a guarantor under a $120 million syndicated senior secured term loan facility due November 12, 2024, under which Global Holding's outstanding principal balance is $108 million as of December 31, 2020. Signal Peak, Global Rail, Global Mining Group, LLC and Global Coal Sales Group, LLC, each being a direct or indirect subsidiary of Global Holding, and FE continue to provide their joint and several guaranties of the obligations of Global Holding under the facility.

In connection with the facility, 69.99% of Global Holding's direct and indirect membership interests in Signal Peak, Global Rail and their affiliates along with FEV's and WMB Marketing Ventures, LLC's respective 33-1/3% membership interests in Global Holding, are pledged to the lenders under the current facility as collateral.

## ENVIRONMENTAL MATTERS

Various federal, state and local authorities regulate FirstEnergy with regard to air and water quality, hazardous and solid waste disposal, and other environmental matters. While FirstEnergy's environmental policies and procedures are designed to achieve compliance with applicable environmental laws and regulations, such laws and regulations are subject to periodic review and potential revision by the implementing agencies. FirstEnergy cannot predict the timing or ultimate outcome of any of these reviews or how any future actions taken as a result thereof may materially impact its business, results of operations, cash flows and financial condition.

*Clean Air Act*

FirstEnergy complies with $SO_2$ and $NOx$ emission reduction requirements under the CAA and SIP(s) by burning lower-sulfur fuel, utilizing combustion controls and post-combustion controls and/or using emission allowances.

CSAPR requires reductions of $NOx$ and $SO_2$ emissions in two phases (2015 and 2017), ultimately capping $SO_2$ emissions in affected states to 2.4 million tons annually and $NOx$ emissions to 1.2 million tons annually. CSAPR allows trading of $NOx$ and $SO_2$ emission allowances between power plants located in the same state and interstate trading of $NOx$ and $SO_2$ emission allowances with some restrictions. The D.C. Circuit ordered the EPA on July 28, 2015, to reconsider the CSAPR caps on $NOx$ and $SO_2$ emissions from power plants in 13 states, including West Virginia. This follows the 2014 U.S. Supreme Court ruling generally upholding the EPA's regulatory approach under CSAPR but questioning whether the EPA required upwind states to reduce emissions by more than their contribution to air pollution in downwind states. The EPA issued a CSAPR update rule on September 7, 2016, reducing summertime $NOx$ emissions from power plants in 22 states in the eastern U.S., including West Virginia, beginning in 2017. Various states and other stakeholders appealed the CSAPR update rule to the D.C. Circuit in November and December 2016. On September 13, 2019, the D.C. Circuit remanded the CSAPR update rule to the EPA citing that the rule did not eliminate upwind states' significant contributions to downwind states' air quality attainment requirements within applicable attainment deadlines. Depending on the outcome of the appeals, the EPA's reconsideration of the CSAPR update rule and how the EPA and the states ultimately implement CSAPR, the future cost of compliance may materially impact FirstEnergy's operations, cash flows and financial condition.

In February 2019, the EPA announced its final decision to retain without changes the NAAQS for $SO_2$, specifically retaining the 2010 primary (health-based) 1-hour standard of 75 PPB. As of December 31, 2020, FirstEnergy has no power plants operating in areas designated as non-attainment by the EPA.

In March 2018, the State of New York filed a CAA Section 126 petition with the EPA alleging that $NOx$ emissions from nine states (including West Virginia) significantly contribute to New York's inability to attain the ozone NAAQS. The petition seeks suitable emission rate limits for large stationary sources that are affecting New York's air quality within the three years allowed by CAA Section 126. On September 20, 2019, the EPA denied New York's CAA Section 126 petition. On October 29, 2019, the State of New York appealed the denial of its petition to the D.C. Circuit. On July 14, 2020, the D.C. Circuit reversed and remanded the New York petition to the EPA for further consideration. FirstEnergy is unable to predict the outcome of these matters or estimate the loss or range of loss.

*Climate Change*

There are a number of initiatives to reduce GHG emissions at the state, federal and international level. Certain northeastern states are participating in the RGGI and western states led by California, have implemented programs, primarily cap and trade mechanisms, to control emissions of certain GHGs. Additional policies reducing GHG emissions, such as demand reduction programs, renewable portfolio standards and renewable subsidies have been implemented across the nation.

At the international level, the United Nations Framework Convention on Climate Change resulted in the Kyoto Protocol requiring participating countries, which does not include the U.S., to reduce GHGs commencing in 2008 and has been extended through 2020. The Obama Administration submitted in March 2015, a formal pledge for the U.S. to reduce its economy wide GHG emissions by 26 to 28 percent below 2005 levels by 2025. In 2015, FirstEnergy set a goal of reducing company-wide CO2 emissions by at least 90 percent below 2005 levels by 2045. As of December 31, 2018, FirstEnergy has reduced its CO2 emissions by approximately 62 percent. In September 2016, the U.S. joined in adopting the agreement reached on December 12, 2015, at the United Nations Framework Convention on Climate Change meetings in Paris. The Paris Agreement's non-binding obligations to limit global warming to below two degrees Celsius became effective on November 4, 2016. On June 1, 2017, the Trump Administration announced that the U.S. would cease all participation in the Paris Agreement. On January 20, 2021, President Biden signed an executive order re-adopting the agreement on behalf of the U.S. FirstEnergy cannot currently estimate the financial impact of climate change policies, although potential legislative or regulatory programs restricting CO2 emissions, or litigation alleging damages from GHG emissions, could require material capital and other expenditures or result in changes to its operations.

In December 2009, the EPA released its final "Endangerment and Cause or Contribute Findings for GHG under the Clean Air Act," concluding that concentrations of several key GHGs constitutes an "endangerment" and may be regulated as "air pollutants" under the CAA and mandated measurement and reporting of GHG emissions from certain sources, including electric generating plants. The EPA released its final CPP regulations in August 2015 to reduce $CO_2$ emissions from existing fossil fuel fired EGUs and finalized separate regulations imposing $CO_2$ emission limits for new, modified, and reconstructed fossil fuel fired EGUs. Numerous states and private parties filed appeals and motions to stay the CPP with the D.C. Circuit in October 2015. On February 9, 2016, the U.S. Supreme Court stayed the rule during the pendency of the challenges to the D.C. Circuit and U.S. Supreme Court. On March 28, 2017, an executive order, entitled "Promoting Energy Independence and Economic Growth," instructed the EPA to review the CPP and related rules addressing GHG emissions and suspend, revise or rescind the rules if appropriate. On October 16, 2017, the EPA issued a proposed rule to repeal the CPP. On June 19, 2019, the EPA repealed the CPP and replaced it with the ACE rule that establishes guidelines for states to develop standards of performance to address GHG emissions from existing coal-fired power plants. On January 19, 2021, the D.C. Circuit remanded the ACE rule declaring that the EPA was "arbitrary and capricious" in its rule making, as such, the ACE rule is no longer in effect and all actions thus far taken by States to implement the federally mandated rule are now null and void. The D.C. Circuit decision is subject to legal challenge. Depending on the outcomes of further appeals and how any final rules are ultimately implemented, the future cost of compliance may be material.

*Clean Water Act*

Various water quality regulations, the majority of which are the result of the federal CWA and its amendments, apply to FirstEnergy's facilities. In addition, the states in which FirstEnergy operates have water quality standards applicable to FirstEnergy's operations.

The EPA finalized CWA Section 316(b) regulations in May 2014, requiring cooling water intake structures with an intake velocity greater than 0.5 feet per second to reduce fish impingement when aquatic organisms are pinned against screens or other parts of a cooling water intake system to a 12% annual average and requiring cooling water intake structures exceeding 125 million gallons per day to conduct studies to determine site-specific controls, if any, to reduce entrainment, which occurs when aquatic life is drawn into a facility's cooling water system. Depending on any final action taken by the states with respect to impingement and entrainment, the future capital costs of compliance with these standards may be material.

On September 30, 2015, the EPA finalized new, more stringent effluent limits for the Steam Electric Power Generating category (40 CFR Part 423) for arsenic, mercury, selenium and nitrogen for wastewater from wet scrubber systems and zero discharge of pollutants in ash transport water. The treatment obligations were to phase-in as permits are renewed on a five-year cycle from 2018 to 2023. However, on April 13, 2017, the EPA granted a Petition for Reconsideration and on September 18, 2017, the EPA postponed certain compliance deadlines for two years. On August 31, 2020, the EPA issued a final rule revising the effluent limits for discharges from wet scrubber systems, retaining the zero-discharge standard for ash transport water, (with some limited discharge allowances), and extending the deadline for compliance to December 31, 2025 for both. In addition, the EPA allows for less stringent limits for sub-categories of generating units based on capacity utilization, flow volume from the scrubber system, and unit retirement date. Depending on the outcome of appeals, how final rules are ultimately implemented and the compliance options MP elects to take with the new rules, the compliance with these standards, which could include capital expenditures at the Ft. Martin and Harrison power stations, may be substantial and changes to MP's operations at those power stations may also result.

On September 29, 2016, FirstEnergy received a request from the EPA for information pursuant to CWA Section 308(a) for information concerning boron exceedances of effluent limitations established in the NPDES Permit for the former Mitchell Power Station's Mingo landfill, owned by WP. On November 1, 2016, WP provided an initial response that contained information related to a similar boron issue at the former Springdale Power Station's landfill. The EPA requested additional information regarding the Springdale landfill and on November 15, 2016, WP provided a response and intends to fully comply with the Section 308(a) information request. On March 3, 2017, WP proposed to the PA DEP a re-route of its wastewater discharge to eliminate potential boron exceedances at the Springdale landfill. On January 29, 2018, WP submitted an NPDES permit renewal application to PA DEP proposing to re-route its wastewater discharge to eliminate potential boron exceedances at the Mingo landfill. On February 20, 2018, the DOJ issued a letter and tolling agreement on behalf of the EPA alleging violations of the CWA at the Springdale and Mingo landfills while seeking to enter settlement negotiations in lieu of filing a complaint. The EPA has proposed a penalty of $900,000 to settle alleged past boron exceedances at both facilities. Negotiations are continuing and WP is unable to predict the outcome of this matter.

*Regulation of Waste Disposal*

Federal and state hazardous waste regulations have been promulgated as a result of the RCRA, as amended, and the Toxic Substances Control Act. Certain CCRs, such as coal ash, were exempted from hazardous waste disposal requirements pending the EPA's evaluation of the need for future regulation.

In April 2015, the EPA finalized regulations for the disposal of CCRs (non-hazardous), establishing national standards for landfill design, structural integrity design and assessment criteria for surface impoundments, groundwater monitoring and protection procedures and other operational and reporting procedures to assure the safe disposal of CCRs from electric generating plants.

On September 13, 2017, the EPA announced that it would reconsider certain provisions of the final regulations. On July 17, 2018, the EPA Administrator signed a final rule extending the deadline for certain CCR facilities to cease disposal and commence closure activities, as well as, establishing less stringent groundwater monitoring and protection requirements. On August 21, 2018, the D.C. Circuit remanded sections of the CCR Rule to the EPA to provide additional safeguards for unlined CCR impoundments that are more protective of human health and the environment. On December 2, 2019, the EPA published a proposed rule accelerating the date that certain CCR impoundments must cease accepting waste and initiate closure to August 31, 2020. The proposed rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On July 29, 2020, the EPA published a final rule revising the date that certain CCR impoundments must cease accepting waste and initiate closure to April 11, 2021. The final rule allows for an extension of the closure deadline based on meeting proscribed site-specific criteria. On November 30, 2020, AE Supply submitted a closure deadline extension request to the EPA seeking to extend the closure date until 2024 of McElroy's Run CCR impoundment facility, for which AE Supply continues to provide access to FG.

FE or its subsidiaries have been named as potentially responsible parties at waste disposal sites, which may require cleanup under the CERCLA. Allegations of disposal of hazardous substances at historical sites and the liability involved are often unsubstantiated and subject to dispute; however, federal law provides that all potentially responsible parties for a particular site may be liable on a joint and several basis. Environmental liabilities that are considered probable have been recognized on the Consolidated Balance Sheets as of December 31, 2020, based on estimates of the total costs of cleanup, FirstEnergy's proportionate responsibility for such costs and the financial ability of other unaffiliated entities to pay. Total liabilities of approximately $107 million have been accrued through December 31, 2020. Included in the total are accrued liabilities of approximately $67 million for environmental remediation of former MGP and gas holder facilities in New Jersey, which are being recovered by JCP&L through a non-bypassable SBC. FE or its subsidiaries could be found potentially responsible for additional amounts or additional sites, but the loss or range of losses cannot be determined or reasonably estimated at this time.

## OTHER LEGAL PROCEEDINGS

*United States v. Larry Householder, et al.*

On July 21, 2020, a complaint and supporting affidavit containing federal criminal allegations were unsealed against the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder. Also, on July 21, 2020, and in connection with the investigation, FirstEnergy received subpoenas for records from the U.S. Attorney's Office for the S.D. Ohio. FirstEnergy was not aware of the criminal allegations, affidavit or subpoenas before July 21, 2020. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Legal Proceedings Relating to United States v. Larry Householder, et al.*

In addition to the subpoenas referenced above under "—United States v. Larry Householder, et. al.", certain FE stockholders and FirstEnergy customers filed several lawsuits against FirstEnergy and certain current and former directors, officers and other employees, and the complaints in each of these suits is related to allegations in the complaint and supporting affidavit relating to HB 6 and the now former Ohio House Speaker Larry Householder and other individuals and entities allegedly affiliated with Mr. Householder.

- *Owens v. FirstEnergy Corp. et al.* and *Frand v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 28, 2020 and August 21, 2020, purported stockholders of FE filed putative class action lawsuits against FE and certain FE officers, purportedly on behalf of all purchasers of FE common stock from February 21, 2017 through July 21, 2020, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, alleging misrepresentations or omissions by FirstEnergy concerning its business and results of operations. These actions have been consolidated and a lead plaintiff has been appointed by the court.
- *Gendrich v. Anderson, et al.* and *Sloan v. Anderson, et al.* (Common Pleas Court, Summit County, OH); on July 26, 2020 and July 31, 2020, respectively, purported stockholders of FE filed shareholder derivative action lawsuits against certain FE directors and officers, alleging, among other things, breaches of fiduciary duty. These actions have been consolidated.
- *Miller v. Anderson, et al.* (Federal District Court, N.D. Ohio); *Bloom, et al. v. Anderson, et al.; Employees Retirement System of the City of St. Louis v. Jones, et al.; Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Anderson et al.; Massachusetts Laborers Pension Fund v. Anderson et al.; The City of Philadelphia Board of Pensions and Retirement v. Anderson et al.; Atherton v. Dowling et al; Behar v. Anderson, et al.* (U.S. District Court, S.D. Ohio, all actions have been consolidated); beginning on August 7, 2020, purported stockholders of FE filed shareholder derivative actions alleging the board and officers breached their fiduciary duties and committed violations of Section 14(a) of the Securities Exchange Act of 1934. The cases in the Southern District of Ohio have been consolidated and co-lead plaintiffs have been appointed by the court.
- *Smith v. FirstEnergy Corp. et al., Buldas v. FirstEnergy Corp. et al., and Hudock and Cameo Countertops, Inc. v. FirstEnergy Corp. et al.* (Federal District Court, S.D. Ohio); on July 27, 2020, July 31, 2020, and August 5, 2020, respectively, purported customers of FirstEnergy filed putative class action lawsuits against FE and FESC, as well as

certain current and former FirstEnergy officers, alleging civil Racketeer Influenced and Corrupt Organizations Act violations and related state law claims. These actions have been consolidated.

- *State of Ohio ex rel. Dave Yost, Ohio Attorney General v. FirstEnergy Corp., et al. and City of Cincinnati and City of Columbus v. FirstEnergy Corp.* (Common Pleas Court, Franklin County, OH); on September 23, 2020 and October 27, 2020, the OAG and the cities of Cincinnati and Columbus, respectively, filed complaints against several parties including FE, each alleging civil violations of the Ohio Corrupt Activity Act in connection with the passage of HB 6. The OAG sought a preliminary injunction to prevent each of the defendants, including FE, through the end of 2020, from: (i) contributing to any groups whose purpose is to keep or modify HB 6; (ii) making any public statements for or against any repeal or modification legislation concerning HB 6; (iii) lobbying, consulting, or advising on these matters; or (iv) contributing to any Ohio legislative candidates. The court denied the OAG's request for preliminary injunctive relief on October 2, 2020. On January 13, 2021, the OAG filed a motion for a temporary restraining order and preliminary injunction against FirstEnergy seeking to enjoin FirstEnergy from collecting the Ohio Companies' decoupling rider. On January 31, 2021, FE reached a partial settlement with the OAG and the cities of Cincinnati and Columbus with respect to the temporary restraining order and preliminary injunction request and related issues. In connection with the partial settlement, the Ohio Companies filed an application on February 1, 2021, with the PUCO to set their respective decoupling riders (Rider CSR) to zero. On February 2, 2021, the PUCO approved the application of the Ohio Companies setting the rider to zero and no additional customer bills will include new decoupling rider charges after February 8, 2021. The cities of Dayton and Toledo have also been added as plaintiffs to the action. These actions have been consolidated.
- *Emmons v. FirstEnergy Corp. et al.* (Common Pleas Court, Cuyahoga County, OH); on August 4, 2020, a purported customer of FirstEnergy filed a putative class action lawsuit against FE, FESC, OE, TE and CEI, along with FES, alleging several causes of action, including negligence and/or gross negligence, breach of contract, unjust enrichment, and unfair or deceptive consumer acts or practices. On October 1, 2020, plaintiffs filed a First Amended Complaint, adding as a plaintiff a purported customer of FirstEnergy and alleging a civil violation of the Ohio Corrupt Activity Act and civil conspiracy against FE, FESC and FES.

The plaintiffs in each of the above cases, seek, among other things, to recover an unspecified amount of damages (unless otherwise noted). In addition, on August 10, 2020, the SEC, through its Division of Enforcement, issued an order directing an investigation of possible securities laws violations by FE, and on September 1, 2020, issued subpoenas to FE and certain FE officers. Further, on January 26, 2021, staff of FERC's Division of Investigations issued a letter directing FirstEnergy to preserve and maintain all documents and information related to an ongoing audit being conducted by FERC's Division of Audits and Accounting, including activities related to lobbying and governmental affairs activities concerning HB 6. The outcome of any of these lawsuits, investigations and audit are uncertain and could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows. No contingency has been reflected in FirstEnergy's consolidated financial statements as a loss is neither probable, nor is a loss or range of a loss reasonably estimable.

*Internal Investigation Relating to United States v. Larry Householder, et al.*

As previously disclosed, a committee of independent members of the Board of Directors is directing an internal investigation related to ongoing government investigations. In connection with FirstEnergy's internal investigation, such committee determined on October 29, 2020, to terminate FirstEnergy's Chief Executive Officer, Charles E. Jones, together with two other executives: Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and Michael J. Dowling, Senior Vice President of External Affairs. Each of these terminated executives violated certain FirstEnergy policies and its code of conduct. These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates. FirstEnergy believes that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement. Immediately following these terminations, the independent members of its Board appointed Mr. Steven E. Strah to the position of Acting Chief Executive Officer and Mr. Christopher D. Pappas, a current member of the Board, to the temporary position of Executive Director, each effective as of October 29, 2020. Mr. Donald T. Misheff will continue to serve as Non-Executive Chairman of the Board. Additionally, on November 8, 2020, Robert P. Reffner, Senior Vice President and Chief Legal Officer, and Ebony L. Yeboah-Amankwah, Vice President, General Counsel, and Chief Ethics Officer, were separated from FirstEnergy due to inaction and conduct that the Board determined was influenced by the improper tone at the top. The matter is a subject of the ongoing internal investigation as it relates to the government investigations.

*Nuclear Plant Matters*

On October 15, 2019, JCP&L, ME, PN and GPUN executed an asset purchase and sale agreement with TMI-2 Solutions, LLC, a subsidiary of Energy*Solutions*, LLC, concerning the transfer and dismantlement of TMI-2. This transfer of TMI-2 to TMI-2 Solutions, LLC will include the transfer of: (i) the ownership and operating NRC licenses for TMI-2; (ii) the external trusts for the decommissioning and environmental remediation of TMI-2; and (iii) related liabilities. On August 10, 2020, JCP&L, ME, PN, GPUN, TMI-2 Solutions, LLC, and the PA DEP reached a settlement agreement regarding the decommissioning of TMI-2. On December 2, 2020, the NJBPU issued an order approving the transfer and sale under the conditions requested by Rate Counsel and agreed to by JCP&L. Also, on December 2, 2020, the NRC issued its order approving the license transfer as requested. With the receipt of all required regulatory approvals, the transaction was consummated on December 18, 2020. See Note 1, "Organization and Basis of Presentation," for additional discussion.

*FES Bankruptcy*

On March 31, 2018, FES, including its consolidated subsidiaries, FG, NG, FE Aircraft Leasing Corp., Norton Energy Storage L.L.C. and FGMUC, and FENOC filed voluntary petitions for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court and emerged on February 27, 2020. See Note 3, "Discontinued Operations," for additional discussion.

*Other Legal Matters*

There are various lawsuits, claims (including claims for asbestos exposure) and proceedings related to FirstEnergy's normal business operations pending against FE or its subsidiaries. The loss or range of loss in these matters is not expected to be material to FE or its subsidiaries. The other potentially material items not otherwise discussed above are described under Note 14, "Regulatory Matters."

FirstEnergy accrues legal liabilities only when it concludes that it is probable that it has an obligation for such costs and can reasonably estimate the amount of such costs. In cases where FirstEnergy determines that it is not probable, but reasonably possible that it has a material obligation, it discloses such obligations and the possible loss or range of loss if such estimate can be made. If it were ultimately determined that FE or its subsidiaries have legal liability or are otherwise made subject to liability based on any of the matters referenced above, it could have a material adverse effect on FE's or its subsidiaries' financial condition, results of operations and cash flows.

## 16. TRANSACTIONS WITH AFFILIATED COMPANIES

FE does not bill directly or allocate any of its costs to any subsidiary company. Costs are charged to FE's subsidiaries for services received from FESC. The majority of costs are directly billed or assigned at no more than cost. The remaining costs are for services that are provided on behalf of more than one company, or costs that cannot be precisely identified and are allocated using formulas developed by FESC. The current allocation or assignment formulas used and their bases include multiple factor formulas: each company's proportionate amount of FirstEnergy's aggregate direct payroll, number of employees, asset balances, revenues, number of customers, other factors and specific departmental charge ratios. Intercompany transactions are generally settled under commercial terms within thirty days.

The Utilities and Transmission Companies are parties to an intercompany income tax allocation agreement with FE and its other subsidiaries, that provides for the allocation of consolidated tax liabilities. Net tax benefits attributable to FE are generally reallocated to the subsidiaries of FirstEnergy that have taxable income. That allocation is accounted for as a capital contribution to the company receiving the tax benefit (see Note 7, "Taxes").

## 17. SEGMENT INFORMATION

FE and its subsidiaries are principally involved in the transmission, distribution and generation of electricity through its reportable segments, Regulated Distribution and Regulated Transmission.

The **Regulated Distribution** segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately six million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, and purchases power for its POLR, SOS, SSO and default service requirements in Ohio, Pennsylvania, New Jersey and Maryland. This segment also controls 3,790 MWs of regulated electric generation capacity located primarily in West Virginia, Virginia and New Jersey, of which, 210 MWs are related to the Yards Creek generating station that is being sold pursuant to an asset purchase agreement as further discussed below. The segment's results reflect the costs of securing and delivering electric generation from transmission facilities to customers, including the deferral and amortization of certain related costs. Included within the segment is $882 million of assets classified as held for sale as of December 31, 2019 associated with the asset purchase and sale agreements with TMI-2 Solutions to transfer TMI-2 to TMI-2 Solutions, LLC. With the receipt of all required regulatory approvals, the transaction was consummated on December 18, 2020. As a result, during the fourth quarter of 2020 FirstEnergy recognized an after tax-gain of approximately $33 million, primarily associated with the write-off of a tax related regulatory liability. See Note 15, "Commitments, Guarantees and Contingencies" for additional information. Also included within

the segment is $45 million of assets classified as held for sale as of December 31, 2020 associated with the asset purchase agreement with Yards Creek Energy, LLC to transfer JCP&L's 50% interest in the Yards Creek pumped-storage hydro generation station (210 MWs). See Note 14, "Regulatory Matters" for additional information.

The **Regulated Transmission** segment provides transmission infrastructure owned and operated by the Transmission Companies and certain of FirstEnergy's utilities (JCP&L, MP, PE and WP) to transmit electricity from generation sources to distribution facilities. The segment's revenues are primarily derived from forward-looking formula rates at the Transmission Companies as well as stated transmission rates at MP, PE and WP; although as explained in Note 14, "Regulatory Matters", effective January 1, 2021, subject to refund, MP's, PE's and WP's existing stated rates became forward-looking formula rates. JCP&L previously had stated transmission rates, however, effective January 1, 2020, JCP&L implemented forward-looking formula rates, subject to refund, pending further hearing and settlement proceedings. Both forward-looking formula and stated rates recover costs that FERC determines are permitted to be recovered and provide a return on transmission capital investment. Under forward-looking formula rates, the revenue requirement is updated annually based on a projected rate base and projected costs, which is subject to an annual true-up based on actual costs. Revenue requirements under stated rates are calculated annually by multiplying the highest one-hour peak load in each respective transmission zone by the approved, stated rate in that zone. The segment's results also reflect the net transmission expenses related to the delivery of electricity on FirstEnergy's transmission facilities.

**Corporate/Other** reflects corporate support costs not charged to FE's subsidiaries, including FE's retained Pension and OPEB assets and liabilities of the FES Debtors, interest expense on FE's holding company debt and other businesses that do not constitute an operating segment. Reconciling adjustments for the elimination of inter-segment transactions and discontinued operations are shown separately in the following table of Segment Financial Information. As of December 31, 2020, 67 MWs of electric generating capacity, representing AE Supply's OVEC capacity entitlement, was included in continuing operations of Corporate/Other. As of December 31, 2020, Corporate/Other had approximately $8.2 billion of FE holding company debt.

Financial information for each of FirstEnergy's reportable segments is presented in the tables below:

**Segment Financial Information**

| For the Years Ended | Regulated Distribution | Regulated Transmission | Corporate/ Other | Reconciling Adjustments | FirstEnergy Consolidated |
|---|---|---|---|---|---|
| | | | *(In millions)* | | |
| **December 31, 2020** | | | | | |
| External revenues | $ 9,168 | $ 1,613 | $ 9 | $ — | $ 10,790 |
| Internal revenues | 195 | 17 | — | (212) | — |
| Total revenues | 9,363 | 1,630 | 9 | (212) | 10,790 |
| Provision for depreciation | 896 | 313 | 4 | 61 | 1,274 |
| Amortization (deferral) of regulatory assets, net | (64) | 11 | — | — | (53) |
| Miscellaneous income (expense), net | 332 | 30 | 83 | (13) | 432 |
| Interest expense | 501 | 219 | 358 | (13) | 1,065 |
| Income taxes (benefits) | 113 | 138 | (125) | — | 126 |
| Income (loss) from continuing operations | 959 | 464 | (420) | — | 1,003 |
| Property additions | $ 1,514 | $ 1,067 | $ 76 | $ — | $ 2,657 |
| **December 31, 2019** | | | | | |
| External revenues | $ 9,511 | $ 1,510 | $ 14 | $ — | $ 11,035 |
| Internal revenues | 187 | 16 | — | (203) | — |
| Total revenues | 9,698 | 1,526 | 14 | (203) | 11,035 |
| Provision for depreciation | 863 | 284 | 5 | 68 | 1,220 |
| Amortization (deferral) of regulatory assets, net | (89) | 10 | — | — | (79) |
| Miscellaneous income (expense), net | 174 | 15 | 80 | (26) | 243 |
| Interest expense | 495 | 192 | 372 | (26) | 1,033 |
| Income taxes (benefits) | 271 | 113 | (171) | — | 213 |
| Income (loss) from continuing operations | 1,076 | 447 | (619) | — | 904 |
| Property additions | $ 1,473 | $ 1,090 | $ 102 | $ — | $ 2,665 |
| **December 31, 2018** | | | | | |
| External revenues | $ 9,900 | $ 1,335 | $ 26 | $ — | $ 11,261 |
| Internal revenues | 203 | 18 | 8 | (229) | — |
| Total revenues | 10,103 | 1,353 | 34 | (229) | 11,261 |
| Provision for depreciation | 812 | 252 | 3 | 69 | 1,136 |
| Amortization (deferral) of regulatory assets, net | (163) | 13 | — | — | (150) |
| Miscellaneous income (expense), net | 192 | 14 | 32 | (33) | 205 |
| Interest expense | 514 | 167 | 468 | (33) | 1,116 |
| Income taxes | 422 | 122 | (54) | — | 490 |
| Income (loss) from continuing operations | 1,242 | 397 | (617) | — | 1,022 |
| Property additions | $ 1,411 | $ 1,104 | $ 133 | $ 27 | $ 2,675 |
| **As of December 31, 2020** | | | | | |
| Total assets | $ 30,855 | $ 12,592 | $ 1,017 | $ — | $ 44,464 |
| Total goodwill | $ 5,004 | $ 614 | $ — | $ — | $ 5,618 |
| **As of December 31, 2019** | | | | | |
| Total assets | $ 29,642 | $ 11,611 | $ 1,015 | $ 33 | $ 42,301 |
| Total goodwill | $ 5,004 | $ 614 | $ — | $ — | $ 5,618 |

## CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

We have established disclosure controls and procedures to provide reasonable assurance that information is accumulated and communicated to our management, including our acting chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure, and ensure that information required to be disclosed in the reports we file or submit under the Securities Exchange Act of 1934, as amended (Exchange Act) is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

Our management, with the participation of our acting chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of December 31, 2020. Based on that evaluation, the acting chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2020, due to the material weakness in internal control over financial reporting described below.

Notwithstanding the material weakness described below, management has concluded that its consolidated financial statements included in the current and prior period filings were not materially misstated and presented fairly, in all material respects, our consolidated financial statements as of December 31, 2020, 2019 and 2018.

## Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2020 based on the framework in "Internal Control-Integrated Framework" (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of FirstEnergy's annual or interim financial statements will not be prevented or detected on a timely basis.

We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct.

This control deficiency did not result in a material misstatement of our annual or interim consolidated financial statements. However, this control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.

The effectiveness of our internal control over financial reporting as of December 31, 2020 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report, which is included herein.

## Remediation Plans

Management and the Board of Directors take FirstEnergy's internal control over financial reporting and the integrity of its financial statements seriously. Management, the Board of Directors, along with the Audit Committee, and its newly formed subcommittee, are currently working to remediate the material weakness identified above. The remedial activities include the following:

- the appointment of a new Acting Chief Executive Officer and Executive Director to improve the tone at the top;

- the termination of certain members of senior management, including FirstEnergy's former Chief Executive Officer, for violations of certain Company policies and its code of conduct;

- the separation of two senior members of the legal department, due to inaction and conduct that the Board of Directors determined was influenced by the improper tone at the top;

- the establishment of the new subcommittee of FirstEnergy's Audit Committee, who, with the Board of Directors, will oversee the assessment and implementation of potential changes (as appropriate) in FirstEnergy's compliance program;

- the appointment of a new Chief Legal Officer;

- the appointment of a new Vice Chairperson of the Board and Executive Director to help lead efforts to enhance the company's reputation with external stakeholders;

- the plan to appoint a Chief Ethics & Compliance Officer to oversee the ethics and compliance program and enhance the existing compliance structure and role;

- the Board of Directors' reinforcement of and executive team's recommitment to the importance of setting appropriate tone at the top and the expectation to demonstrate the Company's core values and behaviors which support an ethical and compliant culture, as well as adherence to internal control over financial reporting; and

- increased communication and training of employees with respect to:

  - our commitment to ethical standards and integrity of our business procedures,
  - compliance requirements,
  - our Code of Conduct and other Company policies, and
  - availability of and the process for reporting suspected violations of law or Code of Conduct.

Management and the Board of Directors are committed to maintaining a strong internal control environment and believes the above efforts will effectively remediate the material weakness; however, the material weakness cannot be considered remediated until the applicable remedial actions are implemented and operating for a sufficient period of time to allow management to conclude, through testing, that a remediation plan is implemented and the controls are operating effectively. Management, under the oversight of the Board of Directors, are developing a comprehensive remediation plan which includes defined responsibilities and measurable milestones to evaluate the progress of the remediation activities. Management and the Board of Directors are monitoring the progress of these activities on an ongoing basis.

**Changes in Internal Control over Financial Reporting**

During the quarter ended December 31, 2020, there were no changes in internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, FirstEnergy's internal control over financial reporting.

**Information About Our Executive Officers (as of February 18, 2021)**

| Name | Age | Positions Held During Past Five Years | Dates |
|------|-----|----------------------------------------|-------|
| S. E. Strah | 57 | President and Acting Chief Executive Officer (A) (B) | 2020-Present |
| | | Senior Vice President and Chief Financial Officer (A) (B) (C) (E) | 2018-2020 |
| | | President (D) | 2017-2018 |
| | | President (E) | 2016-2018 |
| | | Senior Vice President & President, FirstEnergy Utilities (B) | *-2018 |
| | | President (C) | *-2018 |
| H. Park | 59 | Senior Vice President and Chief Legal Officer (A) | 2021-Present |
| | | LimNexus, Partner and General Counsel | 2019-2021 |
| | | Latham & Watkins, Of Counsel | 2017-2019 |
| | | PG&E Corporation, Senior Vice President and Special Counsel to Chairman | 2017 |
| | | Senior Vice President and General Counsel | *-2017 |
| K. Jon Taylor | 47 | Senior Vice President and Chief Financial Officer (A) (B) (C) (E) | 2020-Present |
| | | Vice President, Utility Operations (B) | 2019-2020 |
| | | President (D) | 2019-2020 |
| | | President, Ohio Operations (B) | 2018-2019 |
| | | Vice President (C) | 2018-2019 |
| | | Vice President and Controller (E) | 2016-2018 |
| | | Vice President and Controller (C) | *-2018 |
| | | Vice President, Controller and Chief Accounting Officer (A) (B) | *-2018 |
| | | Vice President and Controller (D) (G) | *-2017 |
| | | Vice President and Controller (F) | *-2016 |
| C. L. Walker | 55 | Senior Vice President and Chief Human Resources Officer (B) | 2019-Present |
| | | Vice President, Human Resources (B) | 2018-2019 |
| | | Executive Director, Talent Management (B) | 2016-2018 |
| G. D. Benz | 61 | Senior Vice President, Strategy (B) | *-Present |
| J. J. Lisowski | 39 | Vice President, Controller and Chief Accounting Officer (A) (B) | 2018-Present |
| | | Vice President and Controller (C) (E) | 2018-Present |
| | | Controller and Treasurer (G) | 2017-2018 |
| | | Controller and Treasurer (F) | 2016-2018 |
| | | Assistant Controller (E) | 2016-2017 |
| | | Assistant Controller (A) (B) (C) (D) (F) (G) | *-2017 |
| S. L. Belcher | 52 | Senior Vice President and President, FirstEnergy Utilities (B) | 2018-Present |
| | | President (C) (E) | 2018-Present |
| | | President and Chief Nuclear Officer (G) | *-2018 |
| | | President, FirstEnergy Nuclear Operating Company (B) | *-2017 |

* Indicates position held at least since January 1, 2016

(A) Denotes position held at FE

(B) Denotes position held at FESC

(C) Denotes position held at the Ohio Companies, the Pennsylvania Companies, MP, PE, FET, KATCo, TrAIL and ATSI

(D) Denotes position held at AGC

(E) Denotes position held at MAIT

(F) Denotes position held at FES and FG

(G) Denotes position held at FENOC

## SHAREHOLDER SERVICES
### TRANSFER AGENT AND REGISTRAR
American Stock Transfer & Trust Company, LLC (AST) is the company's Transfer Agent and Registrar. Registered shareholders wanting to transfer stock, or who need assistance or information, can send their stock certificate(s) or write to FirstEnergy Corp., c/o American Stock Transfer & Trust Company, LLC, P.O. Box 2016, New York, NY 10272-2016. Shareholders also can call toll-free at 1-800-736-3402, between 8 a.m. and 8 p.m. Eastern time, Monday through Friday. For internet access to general shareholder and account information, visit the AST website at https://us.astfinancial.com/InvestOnline/Invest/AllPlan.

### STOCK INVESTMENT PLAN
Registered shareholders and employees of the company can participate in the FirstEnergy Corp. Stock Investment Plan. To learn more about the company's Stock Investment Plan, visit AST's website at https://us.astfinancial.com/InvestOnline/Invest/AllPlan, or contact AST toll-free at 1-800-736-3402.

### DIRECT DIVIDEND DEPOSIT
Registered shareholders can have their dividend payments automatically deposited to checking, savings or credit union accounts at any financial institution that accepts electronic direct deposits. Using this free service ensures that payments will be available to you on the payment date, eliminating the possibility of mail delay or lost checks. Contact AST toll-free at 1-800-736-3402 to receive a Direct Dividend Deposit Authorization Agreement.

### STOCK LISTING AND TRADING
The common stock of FirstEnergy Corp. is listed on the New York Stock Exchange under the symbol FE.

### FORM 10-K ANNUAL REPORT
The Annual Report on Form 10-K, as filed with the Securities and Exchange Commission, including the financial statements and financial statement schedules, will be sent to you without charge upon written request to Mary M. Swann, Corporate Secretary and Associate General Counsel, FirstEnergy Corp., 76 South Main Street, Akron, Ohio 44308-1890. You also can view the Form 10-K by visiting the company's website at www.firstenergycorp.com/investor.

## NON-GAAP FINANCIAL MEASURES
*Operating earnings (loss) excludes "special items" as described below and is a non-GAAP financial measure. Special items represent charges incurred or benefits realized that management believes are not indicative of, or may obscure, trends useful in evaluating the Company's ongoing core activities and results of operations or otherwise warrant separate classification. Special items are not necessarily non-recurring. Management uses Operating earnings (loss) and Operating earnings (loss) per share to evaluate the Company's performance and manage its operations and frequently references these non-GAAP financial measures in its decision making, using them to facilitate historical and ongoing performance comparisons. Additionally, management uses Operating earnings (loss) per share by segment to further evaluate the Company's performance by segment and references this non-GAAP financial measure in its decision making.

Operating earnings (loss) per share for each segment is calculated by dividing Operating earnings (loss), which excludes special items as discussed herein, for the periods presented by 542 million shares for the full year of 2020, 539 million shares for the full-year 2019, and 538 million shares for the full-year 2018, which reflects the full impact of share dilution from the equity issuance in January 2018. Basic earnings per share (GAAP) is based on 542 million shares for full-year 2020, 535 million shares for full-year 2019, and 492 million shares for full-year 2018.

Management believes that the non-GAAP financial measures of Operating earnings (loss) and Operating earnings (loss) per share and Operating earnings (loss) per share by segment provide consistent and comparable measures of performance of its businesses on an ongoing basis. Management also believes that such measures are useful to shareholders and other interested parties to understand performance trends and evaluate the Company against its peer group by presenting period-over-period operating results without the effect of certain charges or benefits that may not be consistent or comparable across periods or across the Company's peer group. Generally, a non-GAAP financial measure is a numerical measure of a company's historical or future financial performance, financial position, or cash flows that either excludes or includes amounts that are not normally excluded or included in the most directly comparable measure calculated and presented in accordance with accounting principles generally accepted in the United States (GAAP). These non-GAAP financial measures are intended to complement, and are not considered as alternatives to, the most directly comparable GAAP financial measures. Also, the non-GAAP financial measures may not be comparable to similarly titled measures used by other entities. Pursuant to the requirements of Regulation G, FirstEnergy has provided, where possible without unreasonable effort, quantitative reconciliations within this presentation of the non-GAAP financial measures to the most directly comparable GAAP financial measures.

| | 2018 | 2019 | 2020 |
|---|---|---|---|
| **Net Income Attributable to Common Stockholders (GAAP) - $M** | $ 981 | $ 908 | $ 1,079 |
| **Basic Earnings per Share (GAAP)** | $ 1.99 | $ 1.70 | $ 1.99 |
| Excluding Special Items*: | | | |
| Pension/OPEB Mark-to-Market Adjustments – | | | |
| Q1 Remeasurement | — | — | 0.59 |
| Q4 Remeasurement | 0.19 | 0.89 | 0.01 |
| Impact of Full Dilution | 0.52 | (0.01) | — |
| Regulatory Charges (credits) | (0.20) | (0.16) | 0.01 |
| Tax Reform | 0.04 | — | — |
| Debt Redemption Costs | 0.22 | — | — |
| Exit of Generation Costs (credits) | (0.17) | 0.16 | (0.21) |
| Total Special Items* | 0.60 | 0.88 | 0.40 |
| **Operating Earnings per Share (non-GAAP)** | $ 2.59 | $ 2.58 | $ 2.39 |

Per share amounts for the special items and earnings drivers above and throughout this report are based on the after-tax effect of each item divided by the number of shares outstanding for the period assuming full impact of dilution from the $2.5 billion equity issuance in January 2018. The current and deferred income tax effect, which ranges from 21% to 29% in all periods, was calculated by applying the subsidiaries' statutory tax rate to the pre-tax amount if deductible/taxable.



*76 South Main Street, Akron, Ohio 44308-1890*

# Exhibit D

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

FirstEnergy Corp. Policy 101

# Code of Business Conduct

*"Everything we do reflects on us both personally and as a Company. We owe it to each other to do our best, especially in the manner we conduct business activities."*

**Charles E. Jones**
**FirstEnergy Chief Executive Officer**



Dear FirstEnergy Personnel:

Maintaining high ethical standards builds trust with our customers, shareholders, fellow personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. Our Code of Business Conduct communicates the fundamentals of ethical behavior in the workplace and provides important guidelines to ensure we maintain our high standards. It applies equally to all FirstEnergy personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.

Everything we do reflects on us both personally and as a company. We owe it to each other to do our best, especially in the manner we conduct business activities.

If you know or have reason to suspect a Code of Business Conduct violation, please immediately talk to your supervisor, call our Employee Concerns Line (1-800- 683-3625) or contact our Chief Ethics Officer.

Sincerely,

Charles E. Jones
Chief Executive Officer

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

# FirstEnergy Code of Business Conduct
## Introduction

We are a forward-thinking electric utility powered by a diverse team of personnel, consisting of both employees and contractors, committed to making customers' lives brighter, the environment better and our communities stronger.

The Board of Directors, in concert with the CEO and Executive Council, will lead the Company in updating, communicating and implementing FirstEnergy's mission.

The mission is supported by a set of core values, including safety, customers, diversity & inclusion, innovation, performance, social responsibility and teamwork.

## Commitment to Maintaining the Highest Standards of Business Conduct

This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives. The Code is not intended to cover all situations we might encounter on the job; its guidelines help reinforce our own good judgment and personal integrity in all our business activities.

FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code. Violations will be dealt with promptly, consistently and may result in disciplinary action up to and including discharge. You are encouraged to direct questions regarding proper business conduct to your supervisor. Normally, these questions will be answered and issues resolved at this level. When that is not possible, or when your supervisor requires additional guidance, the Chief Ethics Officer is available for consultation.

Supervisors are responsible for ensuring that everyone within their work group is familiar with the provisions of this Code.

2

Code of Business Conduct

## Where to Go for Help and To Report Violations

FirstEnergy's Chief Ethics Officer is responsible for compliance oversight in relationship to the Code. The Chief Ethics Officer has been given the authority to resolve your questions regarding proper business conduct, except that waivers of our Code for our executive officers require consideration and approval by our Board of Directors or an applicable Board committee.

Known or suspected violations of laws, rules, regulations or this Code are serious matters and must be dealt with accordingly. If you become aware of or suspect a violation, you must report it immediately to your supervisor. Failure to report such violations, and failure to follow the provisions of this Code, may have serious legal consequences and may result in discipline by the Company. This reporting requirement includes any actual, potential or suspected violations of the securities laws (such as any accounting, investor or financial and financial reporting related matters). FENOC personnel also have the right to report concerns to the U.S. Nuclear Regulatory Commission as well as to the Company. FENOC personnel may also use an additional reporting method called the FENOC Employee Concerns Program for reporting issues such as nuclear safety, quality, reliability and regulatory compliance.

Supervisors are obliged to follow up on all reported violations of law or this Code, and to alert the Chief Ethics Officer if an actual violation is suspected or confirmed. In the event a supervisor receives a report related to violations of the securities laws, the Chief Ethics Officer is to be alerted immediately whether or not an actual violation has been confirmed.

When confidentiality is a concern, you may personally direct reports of violations or other business conduct inquiries to the Chief Ethics Officer or use the Employee Concerns Line. A toll-free Employee Concerns Line (1-800-683-3625) is maintained outside the Company to ensure that we have an effective and anonymous means to report compliance issues in the event that other reporting methods are not chosen. The line is operational 24 hours a day, seven days a week and affords complete anonymity to callers.

This Employee Concerns Line is a service established by the Company and made available to you for reporting actual or suspected violations of this Code and other Company policies and practices. Staffed by an outside agency not affiliated with the Company, the Employee Concerns Line can

3

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

be used to communicate your concerns by telephone instead of directly reporting them to your supervisor or the Chief Ethics Officer. When using this service, you will not be asked to identify yourself. You will be able to use the Employee Concerns Line to obtain updated information on any actions taken by the Company with respect to your report.

By following the procedures described above, personnel assist the Chief Ethics Officer and the Company to take prompt, appropriate and consistent action against violations of this Code.

## Using the Code of Business Conduct as Our Guide

No single book or code of conduct policy can provide answers to every situation. This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.

## Retaliation is Unacceptable

You may make use of the resources in this Code without fear of retaliation. It is unacceptable for anyone using these resources to be discharged, demoted, suspended, threatened, harassed, intimidated or negatively impacted, or in any other manner discriminated against in any way as a result of filing a good faith complaint or participating in an investigation of an internal discrimination complaint.

Supervisors are cautioned that any retaliatory or other personnel action taken against individuals as a result of their making a report or filing a complaint or otherwise participating in an investigation of a complaint or report under this policy shall in itself be treated as a violation of this policy and will subject the supervisor to discipline up to and including termination. As with any other personnel action contemplated by supervisors, personnel actions being considered with respect to anyone who has filed a complaint or made a report under this policy, the supervisor must seek further guidance from appropriate representatives within the Human Resources or Legal Departments in advance of taking such action.

4

Code of Business Conduct

If the Company confirms a violation of laws, rules, regulations or this Code, the Company will take corrective action against the offending individual, including discipline up to and including termination of employment, as appropriate.

## General Disclaimer

The policies, practices, and procedures set forth in this Code are for information only and may be changed at any time. This Code is not an employment or service contract or guarantee of employment or services, expressed or implied.

## Guiding Principles of Business Conduct

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

> *"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."*

## Relationships with Others

***Fair Dealing*** - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel,

5

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees. You should direct any questions about dealing with government employees to your supervisor.

**Dealing with Customers** - Strive to extend to our customers courteous and fair treatment. An honest effort must be made to satisfy their needs for accurate and complete information and to provide them timely and quality services of superior value consistent with established Company standards and practices.

**Dealing with Each Other** - You are encouraged to engage in professional debate, constructive feedback and straight talk on strategic issues and personal and organizational performance. You should provide open, mutual support and strive for team excellence by pulling together for the Company's success and to support strategic issues once a decision is made. You are entitled to mutual respect. It is the policy of the Company to provide and maintain a work environment that is free from all forms of unlawful discrimination, including, without limitation, sexual harassment and harassment based on race, color, religion, gender, national origin, age, disability, ancestry, sexual orientation, veteran status, or any other protected characteristic under applicable law.

This Code extends to every phase of employment, including: recruiting, hiring, training, promotion, compensation, benefits, transfers, discipline, termination, layoffs, recalls, and Company-sponsored educational, social and recreational programs, as well as all phases of engaging contractors, as applicable. Members of management are responsible for encouraging appropriate workplace behaviors and reporting known or suspected policy violations. Any form of unlawful discrimination is a breach of respect that must be reported.

> *Q: You recently received an unsolicited "inappropriate" e-mail that you thought was very funny. You want to forward it to a friend who is a co-worker. Since this is a private joke between two friends, is it okay to forward this e-mail?*
>
> *A: No. Our Company e-mail system is not to be used to send or receive this type of communication. If you are consistently*

Code of Business Conduct

> *receiving such material, request the recipients to stop sending it to you. All e-mails that you exchange with others, inside or outside of the Company, may be accessed and read by our Company at random. Further, e-mail transmitted on our network that violates any law or is deemed to be offensive may subject you to disciplinary action.*

**Dealing with Suppliers** - Deal with our suppliers and other vendors in a fair and impartial way so that no supplier is given an improper competitive advantage over another. Strive to objectively evaluate vendors' offers for goods and services, and make buying decisions that are in the best interest of the Company and our customers from a cost, value and ethical perspective. Avoid soliciting our vendors financially to support any Company or personnel sponsored function where the Company or the personnel directly benefits. If a decision is made to accept such support offered by a vendor, it must be approved by the Chief Ethics Officer.

**Conflicts of Interest** - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company. This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members.

You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

If you have or believe that you may have a conflict of interest with respect to outside work, financial interest or otherwise, you must immediately report this to your supervisor or the Chief Ethics Officer

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

or through the Employee Concerns Line.

> *Q: Some friends of yours are starting an Internet company. You're planning to work evenings and weekends until it gets off the ground, at which point you'll quit your current job. As long as all work for this startup is done on your own time, would joining the company be a conflict of interest?*
>
> *A: Your first responsibility is to perform your current job. If your job requires overtime, then you must be sure that your new venture does not interfere with this. Also, if your new venture is a potential competitor, consider waiting until you can afford to join them on a full-time basis. Because this situation represents a potential conflict of interest, you should discuss it with your supervisor or the Chief Ethics Officer or call the Employee Concerns Line.*
>
> *Q: Your job requires that you locate a vendor for a product needed in your department. Your supervisor has strongly suggested that you use a particular company that you know is owned by a relative of his. Is this a potential conflict of interest?*
>
> *A: Yes. You should talk about this with your supervisor. Then, solicit bids as you normally would. Consider all of the factors in choosing the vendor. The supervisor must maintain an arm's length relationship in the matter. If pressure from this supervisor continues, speak with the Chief Ethics Officer or call the Employee Concerns Line.*

**Corporate Opportunities -** Personnel owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. Corporate opportunities relating to the kinds of products and services we usually sell or the activities we typically pursue that arise during the course of your work or through the use of our property or information belong to the Company. Similarly, other corporate opportunities that fit into our strategic plans or satisfy our commercial objectives that arise under similar conditions also belong to the Company. You may not take personal advantage of any business or investment opportunity that you may learn about through your work for the Company and that the Company may want to pursue — unless and until the Company has had an opportunity to evaluate it and has chosen not to pursue it. Personnel are prohibited from: (a) taking for themselves personally, opportunities that are discovered through the use of corporate property, information or position; (b) using the Company's information, assets, or position for personal gain; or (c) competing with the Company for business

opportunities. Also, you may not direct corporate opportunities to our competitors, to other third parties or to other businesses that you own or are affiliated with.

**Protection of Corporate Assets, Including Corporate Funds -** We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes. Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. If you become aware of theft, waste or misuse of Company assets or funds or have any questions about your proper use of them, you should speak immediately with your supervisor or the Chief Ethics Officer or through the Employee Concerns Line.

> *Q: You usually fill out your boss's expense report. Occasionally your boss gives you receipts for dinner engagements and you know these were not business related. What should be your first step?*
>
> *A: Remind your boss that it's against Company policy to include the expenses. All financial reporting has to be accurate; our customers and shareholders depend upon it. Only legitimate expenses should be put on expense reports. Never falsify a Company document. If your boss insists on including the expenses, you should report the incident to the Chief Ethics Officer or call the Employee Concerns Line.*

**Confidential Information -** All personnel must maintain the confidentiality of information entrusted to them by the Company and any other confidential information about the Company or its customers that comes to them, from whatever source, in their work capacity, except when disclosure is authorized or legally mandated. Examples of confidential information include, but are not limited to, client or customer lists, non-public financial information, contracts with customers, new or developing products and trade secrets. Our business relations are built on trust, and our customers and suppliers count on that trust. If you learn information from them that is not otherwise public,

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

you should keep that information confidential also. For purposes of this Code, "confidential information" includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed.

*Q: In a request received from a customer, you are asked to provide account balance information contained in Account X. Should you provide the information, no questions asked?*

*A: No. Personnel are prohibited from releasing contents of an account before first verifying the requestor is the principal owner of the account. Disclosing this information to anyone other than the principal owner can result in a data loss violation.*

**Corporate Records** - Information derived from our records is provided to our shareholders and investors as well as government agencies. Ensure you accurately record all financial transactions in a timely manner in accordance with prescribed accounting principles. Make full, fair, accurate, timely and understandable disclosure of financial and nonfinancial information as required by law and regulation, including reports we file with the Securities and Exchange Commission (the "SEC") and other public communications. Never knowingly record false or misleading information on any Company record, report, or document, including those reports and documents submitted to any government agency, including but not limited to the SEC. Falsifying records or keeping unrecorded funds and assets is a severe offense and may result in prosecution or termination.

Corporate records, regardless of format, should be retained or discarded in accordance with our record retention policies and all applicable laws and regulations.

*Q: You noticed a coworker charged the Company for time she took to go to a doctor's appointment. What should you do?*

*A: Remind her she went to the doctor and advise her to fix her time sheet. All Company records, including time sheets, must be accurate. If she continues to abuse this situation, involve her supervisor or the Chief Ethics Officer or call the Employee Concerns Line.*

**Political Activities** - FirstEnergy participates in the political process through political action committees and lobbying activity to the extent permitted by law. Do not bring pressure on personnel, customers,

10

Code of Business Conduct

suppliers or shareholders, etc. to contribute to, support, or oppose any political group or candidate.

*Q: Your boss is a volunteer for a local political candidate's campaign. He wants you to use the Company copier to duplicate twenty flyers. Is this okay?*

*A: No. Our Company's resources may not be used to support any candidate or issue.*

**Environmental Commitment** - You have an obligation to help FirstEnergy protect the environment by striving to perform your work in a manner consistent with established Company standards and practices and all applicable environmental laws and regulations.

*Q: Your department regularly uses chemical solutions during equipment maintenance activities. You learn that coworkers are discarding the used chemicals down the floor drain. Is this an environmentally-friendly practice?*

*A: No. Always check chemical and manufacturer instructions for proper and safe disposal of chemicals. Report any unsafe practices to the environmental or safety contacts at your facility.*

**Fitness for Duty** - You have a duty to help FirstEnergy meet its responsibility and commitments to the public welfare, to comply with state and federal regulations, and to ensure a safe work environment for all personnel, by coming to work free from the effects of alcohol, illegal drugs, or other drugs that may impair your judgement and ability to safely operate any equipment that may be required by your job responsibilities.

*Q: You observe a coworker who appears to be impaired. What should you do?*

*A:* Report your observations to your supervisor or through the Employee Concerns Line for appropriate action.

**Compliance with the Law** - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the

11

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

applicable laws, rules and regulations that affect our work assignments.

**Insider Trading** - Because we are a public company, we are subject to a number of laws and regulations concerning the purchase and sale of our stock and other publicly traded securities, as well as laws and regulations concerning disclosure of Company information to anyone outside the Company. Regardless of your position with us, if you are aware of what is known as "material non-public information" regarding our Company, business, affairs or prospects, you may not disclose that information to anyone outside our Company, and you are not permitted to buy or sell our stock or other publicly-traded securities of the Company until the material non-public information is known not only by individuals within our Company, but also by the general public. "

"Material non-public information" is any information concerning us that is not available to the general public and which an investor would likely consider to be important in making a decision whether to buy, sell or hold our stock or other securities. A good rule of thumb to determine whether information about us is material non-public information is whether or not the release of that information to the public would have an effect on the price of our stock. The improper use of material non-public information is known as insider trading. Insider trading is unethical and a criminal offense and is strictly prohibited. All personnel should read and understand the Company's Insider Trading Policy, which is available on the Company's portal.

> *Q: Your department prepares financial statements. You learn that lower-than-expected quarterly earnings are about to be announced. Is this material non-public information?*
>
> *A: Yes. This is material non-public information because it has not yet been announced to the public and a reasonable investor would consider the information important for deciding whether to buy or sell the stock. Therefore, you must refrain from disclosing such information to anyone outside of our Company and transacting in our stock or other publicly-traded securities until such information is known by the general public.*

## Questions and Answers

Ethics-related questions arise almost every day in our personal and business lives. There is no doubt that, in the long run, honesty is always

12

---

Code of Business Conduct

the best policy. Unfortunately, it is not always easy for us to determine the most ethical course of action, particularly if the situation encountered is complex or is subject to different interpretations.

Our Code was developed to help you make good decisions when ethical issues arise thereby protecting the name and integrity of the Company. Many questions are dispersed throughout this Code. However, a good rule of thumb is, take this quick business conduct test ... ask yourself the following questions:

- *Will my actions be consistent with the guidelines provided by our Code?*

- *Could I comfortably reveal all of my actions to my supervisor, fellow personnel, the general public, and my family?*

- *How will your decision affect others, including our customers, shareholders, personnel and the community?*

- *How will your decision look to others? If your action is legal but can result in the appearance of wrongdoing, consider taking alternative steps.*

**And remember, when in doubt, ask.**

Below are some other questions typically asked:

**Q: If I only suspect a violation of the Code of Business Conduct, should I report it?**

A: Yes. Report all known and suspected violations of the law or of the Code to your supervisor immediately. If confidentiality is a factor, you may report the issue directly to the Chief Ethics Officer or use the Employee Concerns Line.

**Q: If I am not sure whether an action I am considering is a violation of the Code of Business Conduct, who should I contact for clarification?**

A: Address questions regarding proper business conduct to your supervisor or, if appropriate, the Chief Ethics Officer.

**Q: Why do I need a Code of Business Conduct since honesty is common sense?**

13

Electronically Filed 12/30/2021 12:20 / COMPLAINT / CV 20 935557 / Confirmation Nbr. 2437790 / CLDLJ

Code of Business Conduct

A: We all must maintain the highest standards of honesty and integrity. Even honest individuals are sometimes not sure of what is appropriate business conduct since not everyone shares the same perspective and values. The Code provides guidelines for appropriate business conduct and a formal method of establishing accountability for noncompliance.

**Q: What are some warning signs that actual or contemplated business activities may be contrary to the Code of Business Conduct?**

A: If you hear any of the following types of statements, there could be a problem:

- *"Shred those documents immediately."*
- *"No one will ever be the wiser."*
- *"This sounds too good to be true."*
- *"I know it's not totally above board, but it's the only way to get the results we need."*
- *"Everybody does it."*
- *"It never happened. Right?"*
- *"OK, but just this once."*
- *"I don't care how you do it, just make it happen within the deadline."*
- *"A little white lie won't hurt anything."*

Revised: May26, 2020

14