# TAB 3

Motion No. <u>4896331</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION TO DISMISS**
**November 9, 2020 15:52**

By: STUART G. PARSELL 0063510

Confirmation Nbr. 2112560

MICHAEL EMMONS                                  CV 20 935557

    vs.

FIRSTENERGY CORPORATION, ET AL          **Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 58

IN THE COURT OF COMMON PLEAS OF CUYAHOGA COUNTY, OHIO

MICHAEL EMMONS, et al.,                :
                                       :
            Plaintiff,                 :        Case No. CV 20 935557
                                       :
            v.                         :        Judge Shannon M. Gallagher
                                       :
FIRSTENERGY CORPORATION, et al.,       :
                                       :
            Defendants.                :

## MOTION OF DEFENDANT FIRSTENERGY SOLUTIONS N/K/A ENERGY HARBOR COMPANY TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Pursuant to Rule 12(B)(6) of the Ohio Rules of Civil Procedure, Defendant FirstEnergy Solutions n/k/a Energy Harbor Company ("Energy Harbor"),[1] moves for dismissal of Plaintiffs' Amended Complaint against Energy Harbor for failure to state a claim.  The grounds in support of this motion are set forth in the attached memorandum.

Respectfully submitted,

/s/ Stuart G. Parsell
Marion H. Little, Jr.  (0042679)
Stuart G. Parsell  (0063510)
Francesca R. Boland  (0098956)
ZEIGER, TIGGES & LITTLE LLP
41 South High Street, Suite 3500
Columbus, Ohio 43215
Telephone: (614) 365-9900
Fax: (614) 365-7900
little@litohio.com
parsell@litohio.com
boland@litohio.com

Attorneys for Defendant FirstEnergy
Solutions Corp. n/k/a Energy Harbor LLC

---

[1]      The company formerly known as FirstEnergy Solutions Corp. is now known as Energy Harbor LLC, not Energy Harbor Company.

## MEMORANDUM IN SUPPORT

I.    **Introduction**

> *Plaintiff "is unable to 'make out a prima facie case' on its RICO claim without reliance on . . . legislative conduct. [Plaintiff's] civil RICO claim as against all three individual defendants is therefore barred by the legislative immunity that attaches to [the mayor's] protected legislative conduct."*

> [*NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 197 (2nd Cir. 2019) (internal citations omitted)]

*See also Chappell v. Robbins*, 73 F.3d 921-22 (9th Cir. 1996) (affirming dismissal of civil RICO claim "because the conduct by which [the defendant senator's] bribe proximately caused [plaintiff's] injury was legislative, and therefore immune").

Plaintiffs' claims fail for the same reason here.  Plaintiffs, who claim to be two residential customers of Energy Harbor, purport to bring a putative class action against Energy Harbor arising from its alleged activities in support of House Bill 6 ("HB 6") that was enacted by the General Assembly and signed by Governor DeWine in July 2019.[2]  Plaintiffs allege the same two damage/causation theories for all of their purported claims against Energy Harbor.  (1) Plaintiffs allege that they have been damaged by HB 6's imposition of up to an 85-cent monthly charge on Ohio residential electric customers; and (2) Plaintiffs make the conclusory allegation that their electricity rates were increased as a result of Energy Harbor's costs associated with the enactment and implementation of HB 6.  [Am. Compl. ¶¶ 152, 157, 162, 167, 173, 183, 206, 212]

---

[2]    Plaintiffs cannot maintain a class action because they have not even stated an individual claim upon which relief can be granted. *Thomas v. Jackson-Hewitt, Inc.*, 192 Ohio App.3d 732, 2011-Ohio-618, ¶ 25 (8th Dist.) (putative class action properly dismissed because plaintiffs insufficiently alleged injury and thus failed to state a claim); *Bellman v. Am. Int'l Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, ¶¶ 1-3 (affirming dismissal of putative class action because plaintiffs' individual claims failed as a matter of law).

While Plaintiffs' claims and the alleged damages fail for numerous other substantive reasons, as a **threshold matter**, the alleged damages (the monthly charges) purportedly caused by HB 6 are not "fairly traceable" to Defendants' alleged conduct, are the "result of the independent action" of other parties "not before the Court," and are impermissibly based upon speculation. *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 22. This is readily apparent in two key respects. First, Plaintiffs' premise is false given the division of governmental powers and separation of powers plainly set forth in the Ohio Constitution, including the specific process for the passage of a bill into a law under Article II, § 15. HB 6 became the law of Ohio because both the House of Representatives and the Senate first approved HB 6 as a bill, as constitutionally required, and then Ohio's Governor signed the bill. In short, persons not before this Court engaging in constitutionally required "independent actions" "caused" the passage of HB 6 and Plaintiffs' alleged damages. The Amended Complaint contains no allegations of impropriety by the Senate, the Governor, or, for that matter, other members of the House, except for Larry Householder.

Second, Plaintiffs impermissibly challenge the legislative decisions of the disparate branches of State government. However, government actors are absolutely immune from inquiry on activity that falls "within the sphere of legitimate legislative activity." *NRP Holdings, LLC*, 916 F.3d at 190. Thus, the motive behind each legislator's vote may not be subject to judicial scrutiny. *State ex rel. Herron v. Smith*, 44 Ohio St. 348, 366-67 (1886).

Consistent with this Ohio law, in *NRP Holdings, LLC*, quoted above, the Second Circuit dismissed a civil RICO brought by a developer against the city mayor and other individuals for damages arising from the mayor's refusal to forward to city council certain resolutions allowing a development to proceed. The mayor allegedly made this decision because the developer

refused to hire the mayor's political ally for the project.  In dismissing the claim as a matter of law, the court reasoned that although the mayor "could have declined to introduce the resolution for either legitimate or illegitimate reasons; either way, this decision is protected by legislative immunity." *Id.* at 194.  The legislative immunity precluded inquiry into the mayor's motive, and thus the RICO claim failed not only against the mayor, but also against the other individual defendants because the official's legislative decision constituted an "intervening cause sufficient to break the casual chain." *Id.* at 197.

Ohio law dictates the same result here.  Legislative immunity forbids judicial inquiry into the motivation of the legislators.  The legislative process culminating in the passage of HB 6 is an intervening cause by non-parties not before the Court that breaks "the casual chain." The bottom line is that, irrespective of any of the conduct alleged in the Amended Complaint, Energy Harbor cannot be held responsible for the charges imposed by HB 6 as a matter of law. Plaintiffs' recourse, if any, is to seek a legislative amendment or repeal of the new monthly charge imposed by HB 6, not to seek damages against a company that supported its enactment.

Plaintiffs' second damage/causation theory fares no better.  Energy Harbor's pertinent contracts show that its electric rates at issue were established back in **December 2011** and have not varied from the agreed rates that were established several years **before** any of the alleged costs associated with the implementation of HB 6 were incurred in 2019 (or any earlier dates alleged in the Amended Complaint).  Thus, the plain terms of the governing contracts belie Plaintiffs' second damage theory.

Accordingly, Plaintiffs' entire Amended Complaint should be dismissed for failure to state the essential elements of damage and causation for all of their claims.  In addition to this case-dispositive issue, Plaintiffs' claims fail on other legal grounds as well:

- The breach of contract claim (Fourth Cause of Action) fails because Plaintiffs do not (and cannot) allege that Energy Harbor breached any duties contained in the pertinent contracts, and none of the "contractual" duties that Plaintiffs allege are even found in those contracts.

- The three claims of negligence or gross negligence (First, Second, and Third Causes of Action) are barred by the economic loss rule and also because any duties owed by Energy Harbor to Plaintiffs are admittedly governed by the express contracts.

- The unjust enrichment claim (Fifth Cause of Action) is barred by Plaintiffs' admission of the existence of express contracts.

- The claim for alleged violations of Ohio's RICO statute, the Ohio Consumer Sales Practices (Sixth Cause of Action), fails for (i) Plaintiffs' failure to plead any connection between the alleged unfair, deceptive or unconscionable acts and Plaintiffs' purported consumer transaction(s) with Energy Harbor, and (ii) lack of any allegation of materiality.

- The claim for alleged violations of the Ohio Corrupt Practices Act (Eighth Cause of Action) fails for lack of proximate cause and any actual injury by Plaintiffs.

- The claim for declaratory relief to invalidate HB 6 (Seventh Cause of Action) is barred by legislative immunity and the political question doctrine.

- And, the civil conspiracy claim (Ninth Cause of Action) fails because all of Plaintiffs' underlying claims must be dismissed.

For these reasons and those discussed below, these two individual Plaintiffs have no cognizable claims against Energy Harbor and, thus, are not the proper parties to challenge the propriety of Energy Harbor's conduct.

## II.    <u>Pertinent Complaint Allegations</u>

Plaintiffs Michael Emmons and Robert Brown are Ohio residents who purport to be customers of FirstEnergy Solutions Corp. n/k/a Energy Harbor LLC ("Energy Harbor"), as well as FirstEnergy Corp. ("FirstEnergy") and its subsidiaries, which are electric distribution utilities. [Amended Complaint ¶¶ 4-5]  Energy Harbor was previously a subsidiary of FirstEnergy, but the two companies separated from each other in February 2020 and are now completely independent of each other.  [Am. Compl. ¶¶ 12, 23]

Energy Harbor is a Competitive Retail Electric Service ("CRES") provider that provides certain communities with electric service.  [Am. Compl. ¶ 12]  Energy Harbor also operates the only two nuclear power plants in Ohio.  [Am. Compl. ¶ 58]  Given its understandable interest in the future viability of nuclear-generated clean energy, Energy Harbor exercised its First Amendment right to support favorable legislation (HB 6) that would help keep the nuclear power plants operating and save the jobs of thousands of Ohioans.  [Am. Compl. ¶ 70, 71]  Ultimately, the Ohio General Assembly enacted HB 6, and Governor DeWine signed it into law, in July 2019.  [Am. Compl. ¶¶ 122, 124]

While delving into the merits (or, more properly, the lack thereof) of Plaintiffs' claims at the dismissal stage is premature and is not the basis for this Civ.R. 12(B)(6) motion, it is important for the Court to understand at the outset that Energy Harbor denies Plaintiffs' allegations of unlawful conduct.  Despite Plaintiffs' hyped-up rhetoric and purposeful lumping of Energy Harbor with the so-called "Householder Enterprise" and other defendants, their allegations against Energy Harbor relate to conduct that is perfectly **lawful** under both Ohio and federal law and First Amendment jurisprudence.  It is legal for a corporation to contribute funds to 501(c)(4) organizations and to support clean energy legislation that is good for Ohio

communities, saves literally thousands of good-paying jobs, and supports Ohio's two nuclear-generated power plants. It is also legal for a corporation to anonymously contribute funds to more than one 501(c)(4) organization—that is not, by any definition, money laundering. And, it is legal to lobby public officials to enact favorable legislation. However, we need not resolve such issues at this stage given the obvious legal deficiencies in Plaintiffs' Amended Complaint.

## III.    The Amended Complaint Fails To State A Claim Against Energy Harbor

### A.    Plaintiffs Cannot Establish, As A Matter Of Law, A Causal Connection Between Energy Harbor's Purported Activities And Plaintiffs' Alleged Damages

In order to state any claim against Energy Harbor, Plaintiffs must allege (and ultimately prove) that Energy Harbor **proximately caused injury** to Plaintiffs – which are essential elements of every claim brought by Plaintiffs. *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 41 (2018) (breach of contract claim requires damages resulting from the alleged breach); *Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 2003-Ohio-2573, ¶ 8 (2003) (negligence requires proof of injury proximately caused by defendant); *Linn v. Roto-Rooter, Inc.*, 2004-Ohio-2559, ¶ 16 (8th Dist.) ("for unjust enrichment . . . each plaintiff must establish actual injury before [defendant's] liability can be determined"); *Thomas*, 2011-Ohio-618 at ¶ 25 (plaintiffs failed to state an OCSPA claim because they did not allege damages caused by defendant); *McIntyre v. Thriftoco, Inc.*, 8th Dist. No. 77767, 2001 Ohio App. LEXIS 2182, *14-15 (8th Dist. 2001) (same); *United States Demolition & Contracting v. O'Rourke Constr. Co.*, 94 Ohio App. 3d 75 (8th Dist. 1994) (affirming Civ.R. 12(C) dismissal of OCPA claims under R.C. 2923.32(A)(2) and (A)(3) because plaintiff failed to allege injuries); *City of Cleveland v. JP Morgan Chase Bank, N.A.*, 2013-Ohio-1035, ¶¶ 13, 18 (8th Dist.) (upholding Civ.R. 12(B)(6) dismissal when the actions of independent third parties conspired to cause injury); *Herakovic v.*

*Catholic Diocese*, 2005-Ohio-5985, ¶¶ 31-32 (8th Dist.) (upholding Civ.R. 12(B)(6) dismissal of an OCPA claim partly based on a lack of proximate cause where injuries did not arise from the alleged corrupt activity but instead from abuse that occurred years earlier); *McIntyre*, 2001 Ohio App. LEXIS 2182 at *13-14 (civil conspiracy claim dismissed as a matter of law where no damages were sustained as a result of conspiracy).

### 1. Plaintiffs' First Damage/Causation Theory Fails For Lack Of Proximate Cause

Plaintiffs' first damage/causation theory for all of their claims is that they supposedly have been damaged by HB 6's imposition of up to an 85-cent monthly charge on Ohio residential electric customers (now codified at R.C. 3706.46).[3]  [Am. Compl. ¶¶ 152, 157, 162, 167, 173, 183, 206, 212]  In other words, Plaintiffs' claims are predicated upon the allegation that Energy Harbor and other defendants were responsible for the passage of HB 6 into law, thus proximately causing the monthly charges imposed under R.C. 3706.46.

As a matter of law, Energy Harbor could **not** have proximately caused the monthly charges imposed by R.C. 3706.46 for two independent reasons.  *First*, independent governmental authorities enacted HB 6, thus breaking the chain of proximate cause.  As set forth in the Ohio Constitution, Article II, § 15, HB 6 became the law of Ohio because both the House of Representatives and the Senate approved HB 6 as a bill and then Governor DeWine signed the bill into law.  In short, government officials not before this Court engaging in constitutionally-required independent actions caused the passage of HB 6 and its monthly charges.  And, the

---

[3]     As a threshold matter, the plain language of R.C. 3706.46 belies Plaintiffs' contention that they have paid monthly charges imposed by HB 6.  Under R.C. 3706.46(A)(1), the new monthly charge does not even begin to be collected from electric customers until "on or after January 1, 2021."  Thus, Plaintiffs have not yet paid a dime of those charges.

Amended Complaint contains no allegation of impropriety by the Senate, the Governor, or for that matter other members of the House, except for Householder.

*Second*, legislative immunity bars Plaintiffs from seeking judicial scrutiny of the motives behind passage of HB 6 – another bar to Plaintiffs' effort to establish that Energy Harbor caused its enactment.

### a.   The Senate And Governor Were Integral In Enacting HB 6

Several third parties are noticeably absent from Plaintiffs' theory about the purportedly corrupt enactment of HB 6:  Ohio's Senate and its Governor.  [Am. Compl. ¶¶ 66, 205-206; Am. Compl. Ex. B, ¶¶ 13-14, 19, 67-74]  These omissions are critical because Householder could not enact HB 6 on his own.

Under the Ohio Constitution, a bill does not become law until it passes both houses of the General Assembly *and* is presented to the Governor for approval.  [Ohio Const. Article II]  "The general assembly shall enact no law except by bill, and no bill shall be passed without the concurrence of a majority of the members elected to each house."  Ohio Const. Article II, § 15. If a bill passes both chambers, it is then sent to the Governor for approval or disapproval.  [Ohio Const. Article II, § 16]  The bill becomes law if the Governor signs it or declines to act within ten days.  [*Id.*]

Plaintiffs admit in the Amended Complaint that HB 6 was not only approved by the House of Representatives, but also by the Senate: "[o]n July 23, 2019, after passage by the Senate, the House passed the Senate's final version of HB 6.  [Am. Compl. ¶ 120]  The Senate vote was 19 to 12, with 16 Republicans and 3 Democrats supporting HB 6.  Significantly, Plaintiffs do not allege **any impropriety**, let alone any illegal conduct, by a single Senator.  The Affidavit attached to the Amended Complaint instead focuses on Householder's media campaign

to persuade the Senate to pass HB 6 but does not even allege that any members of the Senate were improperly influenced. [Affidavit ¶¶ 149-172]

Plaintiffs also admit that Governor DeWine signed HB 6 into law on July 23, 2019. [Am. Comp. ¶ 122] But Plaintiffs do not even hint of any impropriety by the Governor who signed HB 6 into law. Nor could they. The Amended Complaint's solitary reference to the Governor is in passing: "Shortly after Governor Mike DeWine signed the legislation, the ballot initiative to organize a statewide referendum to repeal HB 6 began." [Am. Compl. ¶ 122]

The Senate's and Governor's independent exercise of their respective constitutional authority to enact HB 6 and sign it into law necessarily breaks the chain of causation with respect to any of Energy Harbor's alleged activities in support of HB 6. Under the Ohio Constitution, both chambers of the General Assembly and the Governor were solely responsible for making HB 6 the law of Ohio. These independent, constitutionally-sanctioned official acts constitute an even clearer intervening act that breaks the chain of causation than the intervening acts at issue in *City of Cleveland*, 2013-Ohio-1035 at ¶¶ 13, 18. In that case, proximate cause failed as a matter of law because "there [were] several intervening factors necessary for the harm suffered by the City to materialize." *Id.* at ¶ 13. Cleveland brought public nuisance and RICO claims against a bank, alleging its mortgage lending practices precipitated a foreclosure crisis in the City. *Id.* at ¶ 13. However, the complaint also alleged that several third-party actions were involved in the mortgage lending process: 1) mortgage originators offered mortgage products to potential borrowers, and 2) the borrowers applied for, received, and defaulted on mortgage loans. *Id.* at ¶ 14. Because of the actions of these independent third parties, the bank's practices were not the "traceable cause" of Cleveland's injuries, and the claims were dismissed. *Id.* at ¶¶ 15, 18, 31. The Court should reach the same result here.

**b.** **As A Matter Of Law, Legislative Immunity Prevents Plaintiffs From Establishing Proximate Cause**

Yet another reason why Plaintiffs' first damage/causation theory fails as a matter of law is that legislative immunity precludes Plaintiffs from establishing that Energy Harbor caused the passage of HB 6 (and its new monthly charge).

The judiciary may not inquire into the motivations behind legislation. "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *U.S. v. O'Brien*, 391 U.S. 367, 383 (1968). Ohio follows the same principle. *State ex rel. Kittel v. Bigelow*, 138 Ohio St. 497, 502 (1941) ("[i]t is not within the judicial province to nullify a statute or ordinance merely because of the alleged impropriety or mistaken beliefs underlying the legislators' reasons for enacting it," and thus "the court [should] not examine into the motives, whether expressed or unexpressed, which may have induced the exercise of this [legislative] power").

Under controlling Ohio law, the motives behind each legislator's vote are not subject to judicial scrutiny. In refusing a writ of quo warranto where the relator argued, in part, that legislators enacted a bill as part of a conspiracy, the Ohio Supreme Court held:

> As to the averment that the passage of the act was part of a conspiracy, entered into between the president of the senate and seventeen of the members, carried into effect in the absence from the state of a majority of the members of the senate, it is sufficient to say that *such suggestions have frequently been made for the purpose of inducing judicial inquiry into the conduct of legislative bodies, but the inquiry has as frequently been declined by the courts as not only indecorous, but as subversive of the independence of the legislature as a co-ordinate branch of the government. There is not authority for it in the constitution and laws of this state, and it is opposed to the practice and polity of our system of government.*
>
> [*State ex rel. Herron v. Smith*, 44 Ohio St. 348, 366-67 (1886) (emphasis added)]

Because Plaintiffs cannot question the motives of the legislators who passed HB 6 – or even the Governor who signed HB 6 into law – they cannot establish that any of Energy Harbor's alleged activities proximately caused the passage of HB 6.

Other courts have reached this same conclusion when deciding claims similar to those raised here. In *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177 (2d Cir. 2019), a mayor declined to forward to city council certain resolutions that would have allowed a construction development to proceed. The developer claimed this was retaliation for refusing to hire the mayor's political ally. *Id.* at 186, 188. Regardless whether the mayor behaved corruptly, the Second Circuit held the RICO claim brought against the mayor and several other individuals failed as a matter of law. *Id.* at 196-97. The mayor's refusal to forward the resolution was a legislative act shielded from judicial review by immunity. *Id.* at 194. This unreviewable act was essential to the chain of causation. *Id.* at 196. Because it was protected legislative conduct, the mayor's legislative immunity broke the chain of proximate cause for not only the mayor, but also the other individual defendants.[4] *Id.* at 197. The court reasoned:

> Plaintiff "is unable to 'make out a prima facie case' on its RICO claim without reliance on . . . legislative conduct. [Plaintiff's] civil RICO claim as against all three individual defendants is therefore barred by the legislative immunity that attaches to [the mayor's] protected legislative conduct."
>
> [*Id.* at 197]

Another case on point is *Chappell v. Robbins*, 73 F.3d 918, 921-22 (9th Cir. 1996), in which the court affirmed the dismissal of a civil RICO claim premised on allegedly corrupt legislation "because the conduct by which [the defendant senator's] bribe proximately caused [plaintiff's] injury was legislative, and therefore immune." In *Chappell*, the plaintiff sued on behalf of a class of persons injured by being forced to pay excessive insurance premiums as a

---

[4] The Eighth District considers federal case law when construing OCPA claims. *Herakovic*, 2005-Ohio-5985, ¶ 15 (8th Dist.).

result of legislation and regulations passed through the efforts of a state senator who admitted he had accepted bribes to advance an insurance company's legislative agenda. The court held that legislative immunity prevented plaintiff from proving the RICO violations proximately caused the injury because it could not prove the bribes were a factor in the passage of the legislation." *Id.* Plaintiff's recourse, the court concluded, lied "with the ballot box." *Id.* at 924.

The reasoning in *NRP* and *Chappell* applies with even more force here, inasmuch as the legislative actors—the House (other than Householder), Senate, and Governor—are not alleged by Plaintiffs to have engaged in any improper conduct. HB 6 would not be law today if the General Assembly and the Governor had not approved its passage. Their motivations for doing so are immune from judicial scrutiny and beyond this Court's purview, and their independent decisions to enact HB 6 break the chain of causation for all of Plaintiffs' claims.

## 2.   Plaintiffs' Second Damage/Causation Theory Fails Because Energy Harbor's Rates Were Set In 2011

Under Plaintiffs' second damage/causation theory, Plaintiffs contend that their electricity rates were increased as a result of Energy Harbor's costs associated with the enactment and implementation of HB 6, [Am. Compl. ¶¶ 152, 157, 162, 167, 173, 183, 206, 212] – which allegedly includes some portion of the alleged $60 million referenced in the Amended Complaint and the attached criminal Complaint.

But this damage/causation theory is belied by the plain terms of Energy Harbor's pertinent contract. The Beloit Contract, on its face, shows that Energy Harbor's electric service rates were set in **December 2011**, the effective date of the contract, for the next nine years: from "March 2012 – February 2021." [5] [Exhibit A, Attachment A] The residential rate schedule in

---

[5]    Although Plaintiffs assert a breach of contract claim, they fail to attach the contracts to their Amended Complaint. The governmental aggregation contract between Energy Harbor and the Village of Beloit ("Beloit Contract"), where Emmons resides, is attached as Exhibit A.

the Beloit Contract definitively shows that, since 2012, those rates have remained at a "6% Discount" to market rates over which Energy Harbor does not control. Inasmuch as this discount rate was set by contract multiple years **before** any of Energy Harbor's conduct alleged in the Amended Complaint, the only logical conclusion is that any costs allegedly incurred by Energy Harbor in connection with the implementation of HB 6 did not – and could not – affect Energy Harbor's residential rates under the Beloit Contract that were established years earlier.

Thus, the plain terms of the governing contract extinguish Plaintiffs' second damage/ causation theory for all of their claims against Energy Harbor. As such, Plaintiffs' entire Amended Complaint should be dismissed for failure to state the essential elements of damage and causation for all of their claims as a matter of law. As discussed below, Plaintiffs' purported causes of action should also be dismissed for failure to state a claim on several other fundamental grounds.

### B. The Breach Of Contract Claim Must Be Dismissed Because Plaintiffs Fail To Allege That Energy Harbor Breached Any Of Its Contractual Duties

In the Fourth Cause of Action, Plaintiffs allege that they have contracts with Energy Harbor, which it purportedly breached by supporting the passage of HB 6. [Am. Compl. ¶¶ 164-166] This claim is fundamentally flawed. *First*, the purported contractual duties listed in the Amended Complaint are **nowhere** found in the pertinent contracts. Put simply, a party to a contract cannot breach a duty that is not owed to the other party pursuant to the express terms of

---

Energy Harbor's terms and conditions ("Terms and Conditions Agreement") for residential customers is attached as Exhibit B. The Court may consider these contracts on a Civ.R. 12(B)(6) motion because Plaintiffs refer to and rely upon the contracts in their Amended Complaint. *Richardson v. Clinical Computing PLC*, 2016-Ohio-8065, ¶¶ 32-34 (1st Dist.) (affirming dismissal for failure to state a claim based on a contract attached to a motion to dismiss); *NCS Healthcare, Inc. v. Candlewood Partners, LLC*, 160 Ohio App. 3d 421, 2005-Ohio-1669 (8th Dist.) ("Documents attached or incorporated in the complaint may be considered on a motion to dismiss pursuant to Civ. R. 12(B)(6).").

the contract itself.[6] *Second*, FirstEnergy's Code of Business Conduct does not create contractual duties owed to Plaintiffs, much less any duties owed by Energy Harbor, a separate company.

### 1.    <u>Neither Contract Includes The Duties Alleged In The Complaint</u>

A complaint for breach of contract should be dismissed for failure to state a claim when the contract itself contradicts the plaintiff's conclusory allegations concerning a defendant's contractual obligations. *Spit Shine A Detailer, L.L.C. v. Rick Case Hyundai*, 2017-Ohio-8888, ¶ 14 (8th Dist.) (complaint failed to state a claim when it alleged that defendant stopped using plaintiff's services in breach of a contract but the contract had no provision for exclusivity); *Keenan v. Adecco Empl. Servs.*, 2006-Ohio-3633, ¶¶ 11-13 (3rd Dist.) (dismissal appropriate where contract did not obligate the defendant to use plaintiffs' staffing agency to provide eighty percent of its temporary staff as alleged in the complaint).

Plaintiffs do not allege a breach of any of the duties contained in either the Beloit Contract or the Terms and Conditions Agreement.  The Terms and Conditions Agreement simply provides that Energy Harbor "will supply the electric generation to your Electric Distribution Utility (EDU) based on your usage." [Exhibit B, second paragraph]  Under the Agreement, Energy Harbor also warrants title and the right to all electricity sold, and expressly excludes all other warranties.  [Exhibit B, ¶ 11]  Energy Harbor's obligations under the Beloit Contract are the same: provide a firm supply of electric power ("Electricity Supply"), and arrange for delivery of the Electricity Supply.  [Exhibit A, Section 1.2]

Significantly, Plaintiffs do not and cannot allege a violation of any of these contractual obligations.  Instead, Plaintiffs contend that Energy Harbor breached its contracts by supposedly

---

[6]     Energy Harbor cannot locate a contract for Plaintiff Robert Brown, who does not appear to be a customer of Energy Harbor.  Under Civ.R. 10(D)(1), Brown is obligated to attach to the Complaint his alleged contract with Energy Harbor.  *Spit Shine A Detailer, L.L.C.*, 2017-Ohio-8888, ¶ 11, citing Civ.R. 10(D)(1).  His failure to do so is a basis for striking his claim.

"misusing funds collected from Plaintiffs," "[e]ngaging in illegal political activities using Plaintiffs' … funds," and "incurring additional nuclear costs" in connection with HB 6. [Am. Complaint ¶ 166] But **none** of this alleged conduct breaches any contractual duties set forth in the governing contracts. There is not a single contract provision limiting how Energy Harbor uses or spends any funds collected from Plaintiffs or any other alleged customers or otherwise limiting Energy Harbor's activities. [Exhibits A and B]

Plaintiffs have failed to state a breach of contract claim because they have not alleged that Energy Harbor breached any duties contained in the governing contracts. *Spit Shine A Detailer, L.L.C.,* 2017-Ohio-8888, ¶ 14.

Plaintiffs are also barred by the parol evidence rule from trying to vary the express terms of the pertinent written contracts by contending that Energy Harbor owes contract duties that are not within the four corners of the integrated agreements. The parol evidence rule is a "rule of substantive law which, when applicable, defines the limits of a contract." *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27-28 (2000). The Ohio Supreme Court holds that "the parol-evidence rule assumes that the formal written agreement embodies all of the terms of the agreement between the parties and therefore precludes extrinsic evidence to vary or contradict its terms." *Bellman v. Am. Int'l Group*, 113 Ohio St.3d 323, 2007-Ohio-2071, ¶ 14. The rule applies to integrated contracts, and contracts that appear to be complete and unambiguous are presumed to be integrated regardless of whether they contain an integration clause. *Id.* at ¶ 11. *Accord: Carey v. Down River Specialties, Inc.,* 2016-Ohio-4864, ¶¶ 18-22, 30 (Ohio App. 8th Dist.) (holding there was no breach of contract where the claimed contract duty was not included in the written contract). Here, the Beloit Contract states that it "contains all of the terms and conditions of this Agreement reached by the Parties…." [Exhibit A, Article 11.2] The Terms and Conditions

Agreement is also complete and unambiguous.  [Exhibit B]  Thus, Plaintiffs cannot alter the terms of either contract to include duties that are found nowhere in the applicable contracts.

### 2. *FirstEnergy*'s Internal Policies Do Not Create Contractual Duties Owed To Plaintiffs Or Owed By *Energy Harbor*

Plaintiffs' breach of contract claim is premised, in part, on purported duties under FirstEnergy's Code of Business Conduct to act in the best interests of its customers.  [Am. Complaint ¶¶ 30-38, 165]  But **FirstEnergy**'s internal policies do not create any contractual obligations owed by **Energy Harbor** to Plaintiffs for two independent reasons.

*First*, it is well-settled that internal company policies and procedures do not create binding contractual obligations to any persons outside the company like Plaintiffs.  *See Hillier v. Fifth Third Bank*, 2020-Ohio-3679, ¶¶ 41 (2nd Dist.) (internal bank policies "could have no bearing" on contract with bank customer); *Milestone Inv. Enters. v. Mount Vernon Fire Ins. Co.*, 2019-Ohio-2777, ¶¶ 25-27 (5th Dist.) ("Nothing in this internal policy creates a duty to the insured separate and apart from the requirements of the contract between the parties and the statutory requirements").  Thus, Energy Harbor cannot be liable in contract to Plaintiffs for an alleged breach of a purported internal Code of Business Conduct.

*Second*, the Code of Business Conduct, on its face, is **not** even Energy Harbor's internal company policy.  Plaintiff admits that Energy Harbor has been an entity entirely separate from FirstEnergy since February 2020.  [Am. Compl. ¶ 12]  The Code of Business Conduct on which Plaintiffs rely is plainly that of FirstEnergy (not Energy Harbor) and is dated May 26, 2020 – months after Energy Harbor's separation from FirstEnergy.  [Am. Compl., Ex. A at pg. 14]  Obviously, Energy Harbor, a separate company, is not bound by – and cannot be held legally accountable for – **another company's** internal policies.

For all of these reasons, Plaintiffs' Fourth Cause of Action for breach of contract must be dismissed as to Energy Harbor.

**C.** **Plaintiffs Fail To State A Claim For Negligence Or Gross Negligence Against Energy Harbor**

In the First, Second, and Third Causes of Action of the Amended Complaint, Plaintiffs allege that Energy Harbor is liable for negligence or gross negligence based on its purported activities involving HB 6. [Am. Compl. ¶¶ 148-162] All three causes of action for negligence and gross negligence claims must be dismissed for two fundamental reasons. *First*, Plaintiffs allege only economic loss, which may not be recovered on claims of negligence or gross negligence as a matter of law. *Second*, the negligence claims are barred by Plaintiffs' own complaint admissions that they have contracts with Energy Harbor and, thus, any duties owed to Plaintiffs derive from the contracts, not common law.[7]

**1.** **Pure Economic Loss May Not Be Recovered In Tort**

The Ohio Supreme Court holds that the economic-loss rule bars negligence claims where, as here, the plaintiff has allegedly suffered only economic damages. "'[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'" *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, ¶ 6 (2005), quoting *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 44 (1989).[8]

---

[7] Gross negligence is merely a classification of negligence and is subject to these defenses. *See Payne v. Vance*, 103 Ohio St. 59, 65 (1921) ("Negligence has been classified by some authorities into three branches, slight, ordinary, and gross . . . . The distinctions can have no practical purpose or effect . . . ."); *Wells Fargo Bank, N.A. v. Fifth Third Bank*, 931 F.Supp.2d 834, 842 (S.D. Ohio 2013) (holding economic loss doctrine barred gross negligence claim).

[8] *See also Floor Craft Floor Covering, Inc. v. Parma Community General Hosp. Assn*, 54 Ohio St.3d 1, 8 (1990) ("recovery for economic loss is strictly a subject for contract negotiation and assignment").

Similarly, the Eighth District bars tort claims seeking to recover purely economic loss. "[W]here only economic losses are asserted, damages may be recovered only in contract; there can be no recovery in negligence due to the lack of physical harm to persons and tangible things." *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006-Ohio-5014, ¶ 21 (8th Dist.). This is so as a matter of law. *Id.* at ¶ 24; *Digiknow, Inc. v. PKXL Cards, Inc.*, 2011-Ohio-3592, ¶ 7 (8th Dist.) ("We find as a matter of law that the economic-loss doctrine barred the recovery of economic loss in a tort claim.").

Here, Plaintiffs' only purported damages are purely economic: "costs associated with or affected by implementation of HB 6," "monies used to fund Defendants' illegal efforts to pass and implement HB 6," and "costs associated with the refueling at the Perry and Davis-Besse nuclear stations following the passage of HB 6." [Am. Compl. ¶¶ 152, 157, 162] Accordingly, Ohio's well-established economic loss rule bars Plaintiffs' tort claims for negligence and gross negligence. *RWP, Inc.*, 2006-Ohio-5014, ¶ 21 (8th Dist.).

## 2. Plaintiffs May Not Recover In Tort For Alleged Breach Of Contract Duties

"[T]he existence of a contract action excludes the opportunity to present the same case as a tort claim." *Cord v. Victory Sols., LLC*, 2018-Ohio-590, ¶ 16 (8th Dist.), quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261 (9th Dist. 1996). "Where the causes of action in tort and contract are 'factually intertwined,' a plaintiff must show that the tort claims derive from the breach of duties that are independent of the contract and that would exist notwithstanding the contract." *Stancik v. Deutsche Nat'l Bank*, 2015-Ohio-2517, ¶ 40 (8th Dist.). The plaintiff must also plead actual damages separate from – and in addition to – those stemming from the breach of contract. *EverStaff, LLC v. Sansai Envtl. Techs., LLC*, 2011-Ohio-4824, ¶ 28 (8th Dist.), quoting *Textron Fin. Corp.*, 115 Ohio App.3d 137 at 151.

In Plaintiffs' three causes of action for negligence or gross negligence, they do not identify **any** duties owed by Energy Harbor to them that are independent of the alleged duties purportedly owed pursuant to their **contractual** relationships with Energy Harbor or that would exist if they were not customers of Energy Harbor by contract. Instead, Plaintiffs allege the same basic duties owed by Energy Harbor in both their breach of contract and negligence causes of action. [Am. Complaint ¶¶ 149, 154, 159, 164-66] In fact, Plaintiffs allege the same damages for their negligence/gross negligence claims as they allege in the breach of contract claim against Energy Harbor. *Compare* Amended Complaint ¶ 167 (contract damages are the "costs associated with passage of HB 6 and those incurred because of HB 6") to Amended Complaint ¶¶ 152, 157 (negligence/gross negligence damages are the "costs associated with or affected by implementation of HB 6," including monies used to fund Defendants' "efforts to pass and implement HB 6").

Thus, Plaintiffs' negligence claims must be dismissed because they are premised on alleged contract duties, and Plaintiffs fail to identify any duties or damages owed to them by Energy Harbor beyond those alleged in the breach of contract claim.

### D. Plaintiffs' Unjust Enrichment Claim Is Barred By The Existence Of Express Contracts

In their Fifth Cause of Action, Plaintiffs claim that Energy Harbor has been unjustly enriched because of the "increased monthly charges" required by HB 6 that Plaintiffs purportedly have paid to Energy Harbor. [Am. Compl. ¶¶ 168-173] As previously noted, the enactment and approval of HB 6 by the General Assembly and Governor DeWine breaks the chain of causation and, thus, Plaintiffs cannot recover from Energy Harbor for the monthly surcharges required by HB 6 (now, R.C. 3706.46) as a matter of law.

Beyond that dispositive issue, Plaintiffs' unjust enrichment claim fails for two more reasons. *First*, the plain language of R.C. 3706.46 belies Plaintiffs' contention that they have paid monthly charges imposed by HB 6. Under R.C. 3706.46(A)(1), the new monthly charge does not even begin to be collected from electric customers until "on or after January 1, 2021." In addition, under another provision of HB 6 (now codified at R.C. 3706.55(A)), none of the funds from the monthly charges can be remitted to an owner or operator of a qualifying nuclear resource until "April of 2021." In other words, contrary to Plaintiffs' allegations, Energy Harbor has not received **any** benefits from the new charges imposed by HB 6 and cannot receive any such remittances until April 2021 at the earliest.

*Second*, Plaintiffs' unjust enrichment claim is barred by their allegation that they have express contracts with Energy Harbor, the existence of which Energy Harbor does not dispute. A claim for unjust enrichment only exists "in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another." *Kwikcolor Sand v. Fairmount Minerals Ltd.,* 2011-Ohio-6646, ¶ 14 (8th Dist.), quoting *Gallo v. Westfield Natl. Ins. Co.*, 2009-Ohio-1094 (8th Dist.). A claim for unjust enrichment "does not exist where there is a valid and enforceable contract." *Gallo*, 2009-Ohio-1094, ¶ 19 (affirming dismissal of unjust enrichment claim for failure to state a claim where plaintiff also claimed breach of contract). *See also Graham v. City of Lakewood*, 2018-Ohio-1850, ¶¶ 59-60 (8th Dist.) (same); *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App. 3d 250, 262, 661 N.E. 2d 796 (1st Dist. 1995) ("A party seeking a remedy under a contract cannot also seek equitable relief for unjust enrichment."), citing *Ullman v. May*, 147 Ohio St. 468 (Syll. ¶ 4) (1947).

Thus, a party cannot assert an "alternative" unjust enrichment claim even though he is unable to directly secure contractual relief against the defendant. *See, e.g., Ford v. Pa. Higher Educ. Assistance Agency*, 2018 U.S. Dist. LEXIS 44549, *19-23 (N.D. Ohio, Mar. 19, 2018); *Abbott Labs. v. Adelphia Supply USA*, 2017 U.S. Dist. LEXIS 1007, *41 (E.D.N.Y., Jan. 4, 2017) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").

## E. Plaintiffs' OCSPA Claim Should Be Dismissed For Failure To State An OSCPA Violation

In the Sixth Cause of Action, Plaintiffs claim that Energy Harbor violated the Ohio Consumer Sales Practices Act ("OCSPA"). [Am. Compl. ¶¶ 174-184] Under the OCSPA, "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.02 (emphasis added). The OCSPA also prohibits suppliers from committing "an unconscionable act or practice in connection with a consumer transaction." R.C. 1345.03 (emphasis added). This claim must be dismissed because (1) the alleged unfair, deceptive or unconscionable acts or practices of Energy Harbor are not actionable under the OCSPA, and (2) Energy Harbor's alleged acts were not "in connection with a consumer transaction."[9]

### 1. The Alleged Unfair, Deceptive Or Unconscionable Act Or Practice Is Not Actionable Under The OCSPA

Ohio law defines an unfair or deceptive act as one that is connected to the nature of the product or service involved—here, the sale of electric service. *Whitaker v. M.T. Auto., Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, ¶ 10, quoting *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278,

---

[9] Whether an act or practice is unfair or deceptive is a question of law. *Chesnut v. Progressive Cas. Ins. Co.*, 166 Ohio App.3d, 2006-Ohio-2080, ¶ 25 (8th Dist.) (concluding that the defendant's alleged actions were not deceptive or unfair under the OCSPA as a matter of law); *Davis v. Byers Volvo*, 2012-Ohio-882, ¶ 27 ("whether an act or practice is deceptive is ordinarily a question of law").

2005-Ohio-4985, ¶ 24 (2005); *Tsirikos-Karapanos v. Ford Motor Co.*, 2017-Ohio-8487, ¶ 36 (8th Dist.). An unconscionable act involves a supplier manipulating a consumer's understanding of the nature of the transaction at issue—here again, the sale of electric service. *Id.*

An act is only unfair or deceptive for purposes of the OCSPA if it is both false **and** material to a customer's decision to purchase the good or service at issue.[10] *Barlow v. Gap, Inc.*, 2020-Ohio-4382 (8th Dist.) (only conduct that is "'both false and material to the consumer transaction'" is deceptive under the OCSPA); *Davis v. Byers Volvo*, 2012-Ohio-882, ¶ 29 (4th Dist.) ("a deceptive act contains two elements: (1) falsity; and (2) materiality"). The materiality requirement applies to allegedly unconscionable acts as well. *See Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 190-91 (1st Dist. 1998) (affirming summary judgment in favor of supplier when allegedly unconscionable act was "not inextricably intertwined with the consumer transaction itself").

Here, Plaintiffs fail to allege that any of Energy Harbor's activities identified in the Amended Complaint materially impacted Plaintiffs' decision to use Energy Harbor's electric service (the purported consumer transaction). In fact, Energy Harbor's alleged misconduct is wholly unconnected to the electric service that Energy Harbor provides. The allegedly unfair, deceptive and unconscionable practices are completely unrelated to, much less material to, Plaintiffs' purchase of electric service. Instead, Plaintiffs allege that Energy Harbor somehow violated the OCSPA by (1) "FES's actions assisting in and directing the illegal use of customer funds to secure passage and implementation of HB 6," and (2) "FES's use of customer funds paid as a result of HB 6...." [Am. Compl. ¶ 179] Nowhere do Plaintiffs claim that Energy

---

[10] *Accord: Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, ¶ 16 (8th Dist.) ("in order to be 'deceptive' under the [OCSPA], the act or practice in question must be both false and material to the consumer transaction"); *Rusk Indus. v. Alexander*, 2002-Ohio-2171, ¶¶ 47-19 (6th Dist.) (affirming summary judgment in defendant supplier's favor when the allegedly unfair or deceptive act "had no bearing on the plaintiffs' decision to enter into the contract for [services]").

Harbor committed an unfair, deceptive, or unconscionable act or practice in connection with the generation and provision of electricity to Plaintiffs or even their use of electricity – much less materially impacted Plaintiffs' decision to use Energy Harbor's services.

On point is *Johnson*, 106 Ohio St.3d 278 at ¶¶ 23-26, where an end-user of a Microsoft operating system claimed that Microsoft violated R.C. 1345.02 and R.C. 1345.03 by engaging in monopolistic pricing practices. *Id.* at ¶¶ 2-3. In affirming dismissal of the OCSPA claims, the Supreme Court held that manipulating market forces was not an unfair or deceptive practice that would "mislead consumers about the nature of the product they are receiving" or an unconscionable practice that would manipulate a consumer's understanding of a transaction. *Id.* at ¶ 24.

As in *Johnson*, Energy Harbor's alleged support of legislation – and potential future use of funds provided by such legislation – is not in any way connected to, let alone materially misleading concerning, the nature of the electric service that Plaintiffs allegedly received from Energy Harbor. This is fatal to the OCSPA claim. *Barlow*, 2020-Ohio-4382, ¶ 27 (affirming judgment as a matter of law on claim that a store's signs violated the OCSPA where plaintiff had not "alleged, argued, or presented evidence" that the signs were material to consumer transaction).

### 2. None Of Energy Harbor's Alleged Acts Was "In Connection With" A Consumer Transaction

The plain language of the OCSPA also requires that alleged unfair, deceptive, and unconscionable acts must occur "**in connection with a consumer transaction**." R.C. 1345.02(A); R.C. 1345.03 (emphasis added). Ohio courts hold that the OCSPA means what it says: a supplier only violates the OCSPA when it commits such acts in connection with a consumer transaction. *Garner v. Borcherding Buick, Inc.*, 84 Ohio App. 3d 61 (1st Dist. 1992)

("the [OCSPA] was designed to protect consumers damaged by a supplier's deceptive practices which occur in connection with consumer transactions") (emphasis added).

In *Lester v. Wow Car Co.*, 2014 U.S. Dist. LEXIS 77567, *25-26 (S.D. Ohio 2014), the court held that the plaintiffs failed to support the OCSPA claim as a matter of law where there was no assertion that the alleged unfair or deceptive acts were connected to plaintiff's transaction with the defendant. The plaintiffs alleged the defendant violated the OCSPA through marketing statements on the defendant's website, but the plaintiffs never asserted that they considered the webpage when deciding to make a purchase from the defendant. *Id.* at *26. Because the defendant's website was unconnected to the plaintiffs' purchase, plaintiffs could not prevail on their OCSPA claim. *Id.* at *25.

Here, Plaintiffs do not (and cannot) allege that Energy Harbor's purported unfair, deceptive or unconscionable acts had any connection with Plaintiff's alleged consumer transactions – their purchase of electric service. As such, Plaintiffs' OCSPA claim must be dismissed for failure to state a claim.

F.    **The Declaratory Judgment Claim Is Barred By Legislative Immunity And the Political Question Doctrine**

Plaintiffs assert, in their Seventh Cause of Action, that they are entitled to a declaratory judgment invalidating HB 6. [Am. Compl. ¶¶ 185-189] This claim must be dismissed for two independent reasons.

First, given the lack of any constitutional challenge to HB 6,[11] Plaintiffs' request for this Court to delve into the propriety of HB 6 is a **political question** that this Court lacks jurisdiction to consider, irrespective of any alleged illicit motive. Under the political question doctrine, the Ohio Supreme Court holds that courts do not have jurisdiction to delve into actions that are

---

[11]    Legislation is presumptively valid. *Derolph v. State*, 78 Ohio St.3d 193, 198 (1997).

"essentially legislative in character," because such "issues regarding them [are] best left to the legislative branch of government." *State ex rel. Meshel v. Keip*, 66 Ohio St.2d 379, 383 (1981). Under the doctrine, courts refrain from involvement in "the process of … enacting statutes." *Id.* at 384, citing *Baker v. Carr*, 369 U.S. 186 (1962). *Accord: County of Stark v. Ferguson*, 2 Ohio App.3d 72, 77 (5th Dist. 1981) (court held that whether county's decision to approve economic development bonds was made in the "public interest" as required by the Ohio Constitution "is essentially a political question, properly decided by the legislative and executive breaches of government, not the judiciary").

Second, Plaintiffs' declaratory judgment claim is barred by legislative immunity. As discussed above, Ohio legislators and the Governor are absolutely immune from inquiry on activity that falls "within the sphere of legitimate legislative activity." *NRP Holdings, LLC*, 916 F.3d at 190. Thus, the motive behind each legislator's vote and the Governor's signing HB 6 into law are not subject to judicial scrutiny. *State ex rel. Herron v. Smith*, 44 Ohio St. 348, 366-67 (1886).

### G. The Civil Conspiracy Claim Fails Because Plaintiffs Have Not Successfully Pled Any Underlying Claims

Plaintiffs' Ninth Cause of Action, a civil conspiracy claim, alleges that Energy Harbor, other Defendants, and the so-called "Householder Enterprise" conspired together to enact HB 6. [Am. Compl. ¶¶ 208-212] This last claim cannot survive dismissal under Civ.R. 12(B)(6) because Plaintiffs have failed to plead any cognizable underlying tort claims against Energy Harbor.

Under Ohio law, civil conspiracy is not an independent cause of action. *Davis v. Byers Volvo*, 2012-Ohio-882, ¶ 63 (4th Dist.). Such a claim requires "an underlying unlawful act, which would be actionable in the absence of the conspiracy…." *Bentkowski v. Trafis*, 2015-

Ohio-5139, ¶ 50 (8th Dist.). "[T]he underlying act must be a tort." *State ex rel. Morrison v. Wiener*, 2017-Ohio-364, ¶ 13 (9th Dist.). *Accord: Bentkowski*, 2015-Ohio-5139 at ¶ 60 (dismissing civil conspiracy claim where defendants "were not alleged to have committed any underlying tort" that was not also dismissed). Where, as here, a plaintiff cannot prevail on the underlying tort claims, the civil conspiracy claim must also be dismissed. *Dixon v. Huntington Nat'l Bank*, 2014-Ohio-4079, ¶ 26 (8th Dist.) (affirming dismissal of civil conspiracy claim when plaintiff failed to state a claim for an alleged underlying OCPA violation).

As in these cases, Plaintiffs have failed to plead any viable underlying tort claims against Energy Harbor. Because Plaintiffs' underlying claims should be dismissed, their claim for civil conspiracy must also be dismissed.

## IV.    Conclusion

For all of these reasons, the Amended Complaint should be dismissed with prejudice as to Energy Harbor (which is improperly named in the Amended Complaint as FirstEnergy Solutions n/k/a Energy Harbor Company).

Respectfully Submitted,

/s/ Stuart G. Parsell
Marion H. Little, Jr. (0042679)
Stuart G. Parsell (0063510)
Francesca R. Boland (0098956)
ZEIGER, TIGGES & LITTLE LLP
41 South Hight Street, Suit 3500
Columbus, Ohio 43215
Telephone: (614) 365-9900
Fax: (614) 365-7900
little@litohio.com
parsell@litohio.com
boland@litohio.com

Attorneys for Defendant FirstEnergy
Solutions Corp. n/k/a Energy Harbor LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed this 9th day of November, 2020, via the Court's authorized E-Filing system and, by Local Rule, is being served on all counsel of record in this case, who are registered users of the E-Filing system.

/s/ Stuart G. Parsell
Stuart G. Parsell (0063510)

1207-003:879199

**Exhibit A**

# Master Agreement To Provide Services

# To An Aggregated Group

### Between

### Village of Beloit, Ohio

### And

### FirstEnergy Solutions, Corp.

This Master Agreement To Provide Services ("Agreement"), is entered into as of this _12th_ day of _December_, 2011 ("Effective Date") by and between the Village of Beloit, Ohio ("Village " or "Governmental Aggregator"), an Ohio municipality, and FirstEnergy Solutions, Corp. ("FES"), an Ohio corporation with its principal place of business at 341 White Pond Drive, Akron, Ohio, (collectively, "Parties").

## RECITALS

A.      FES is certified by the Public Utilities Commission of Ohio ("PUCO") as a Competitive Retail Electric Service ("CRES") Provider to sell competitive retail electric service to customers in the State of Ohio utilizing the existing transmission and distribution systems.

B.      FES (directly or through its affiliates) is an energy services provider with extensive experience in the provision of a broad range of energy related services.

C.      FES sells competitive retail electric service and related services to inhabitants of municipal corporations, boards of Village trustees, or boards of county commissioners acting as governmental aggregators for the provision of competitive retail electric service ("Governmental Aggregators") under authority conferred under Section 4928.20 of the Ohio Revised Code.

D.     Both parties have the corporate, governmental and/or other legal capacity(s), authority(s) and power(s) to execute and deliver this Agreement and related agreements and to perform its obligations hereunder.

E.     The Governmental Aggregator has been or will be certified by the PUCO as a governmental aggregator pursuant to Chapter 4901:1-24-01, et. seq. OAC. FES is under no obligation to provide CRES Service until Governmental Aggregator has been certified by the PUCO.

F.     The Governmental Aggregator has established or desires to establish a program whereby the Governmental Aggregator may arrange for the provision of competitive retail electric service to its residential and commercial inhabitants that do not opt-out of or otherwise elect not to participate in the program ("Aggregation Program").

G.   By this Agreement, the Village  and FES desire to enter into a mutually beneficial energy and services provisions relationship whereby FES shall provide competitive retail electric service ("CRES Service") and related administrative services ("Administrative Services") necessary to fulfill the obligations of this Agreement.

H.   FES is willing to offer to the Village of Beloit a one-time grant in 2011 as consideration for the Village's agreement to participate in the *Powering Our Communities* program, for the term of the Master Agreement as provided in Attachment A;

I. The Village desires to enter into this Agreement with FES to provide energy and energy-related services to members through Government Aggregation under the *Powering Our Communities* program;

NOW, THEREFORE, the Parties, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree as follows:

## ARTICLE 1

### General Requirements

1.1    Governmental Aggregator Obligations and Authority.

1.1.1    The Governmental Aggregator, shall: (1) take all necessary action to become certified by the PUCO as a Governmental Aggregator following voter approval of an electric aggregation ballot question in the November 8, 2011 election, and to become so certified, and enact the appropriate legislation necessary to fulfill its role of Certified Governmental Aggregator; (2) establish an Aggregation Program available to those inhabitants, within the municipal boundaries, that the Governmental Aggregator, together with FES, have determined will be provided the opportunity to participate ("Eligible Customers"), which responsibility may be contracted for with FES; (3) mail out the required enrollment and opt-out notices, which responsibility may be contracted for with FES; and (4) authorize FES to contract for competitive retail electric service with those Eligible Customers that do not opt-out of the Aggregation Program, rescind their switch to FES as part of their enrollment in the Aggregation Program, otherwise terminate their participation in the Aggregation Program or CRES Service from FES, or have their participation terminated by the Governmental Aggregator, or their CRES Service terminated by FES or the Electric Distribution Utility (EDU), or otherwise ("Aggregation Program Member" or "Member"), including without limitation the right to collect upon past due bills and balances.

1.1.2   The Governmental Aggregator shall, on a best efforts basis and in a timely manner, forward to FES all notices from the EDU concerning Member accounts served pursuant to this Agreement, including but not limited to verbal or written notices regarding transition costs, changes in the terms and conditions of tariffs, rates or riders, and notices concerning the operation and reliability of the EDU's system.

1.1.3   Governmental Aggregator has the authority to designate, and has designated FES as its CRES Services provider.

1.2   <u>FES Obligations.</u>

1.2.1   FES shall provide a firm supply of electric power (subject to the terms of the appropriate transmission and/or distribution tariffs) sufficient to serve the total electric generation needs of the Commercial and Residential Aggregation Program Members ("Electricity Supply"). FES shall arrange for the delivery of Electricity Supply in accordance with the requirements of the Member's EDU and/or Independent System Operator ("ISO")/Regional Transmission Organization ("RTO") according to the rules, regulations, and tariffs governing Electricity Supply from an alternative supplier. These requirements may include electric energy, ancillary services, capacity, network transmission, losses, scheduling, unaccounted for energy, ISO/ EDU administration fees, and green power requirements. Notwithstanding the foregoing, FES is not responsible for the performance or failure to perform of the provider of such transmission, distribution, or ancillary services, or the consequences of such performance or failure to perform.

1.2.2  FES shall determine at its sole discretion, whether and at what rate and on what terms to accept into the Aggregation Program those customers who wish to join the Aggregation Program after the expiration of the opt-out period.

1.2.3  FES shall be responsible for all acts necessary for FES to perform its obligations hereunder, including but not limited to the scheduling of delivery of CRES Services hereunder.

1.2.4  FES shall provide Aggregation Program Members with the environmental disclosure data and other data it is required to provide, if any, to comply with the rules of the PUCO.

1.3    Term.    The term of the Master Agreement shall be for the term identified in the Attachment A, subject nonetheless to the provisions of Article 2.  Notwithstanding the foregoing, Members shall have the right to opt-out of the Aggregation Program at least every three years.  CRES Service to individual Members will commence with the initial flow of electric generation service provided by FES to that specific Member under the terms of the Electric Service and Supply Contract included with the opt-out notifications, and continue through December 2019 unless the Member opts-out of the Aggregation Program, or unless the Electric Service and Supply Contract is otherwise terminated, or this Agreement is terminated as provided in Section 1.4, below.

1.4    Interaction Between Termination Dates of This Agreement and Member Electric Service and Supply Contracts.    Members initially enrolled in the Aggregation Program shall receive CRES Services at the rate set forth in the Electric Services and Supply Contract. If this Agreement remains in force until December 2019, then individual Member

Electric Service and Supply Contracts will remain in force for this same period even if the Agreement expires and is not renewed prior thereto, unless the Member Electric Service and Supply Contract is terminated for another reason. If this Agreement is terminated prior to December 2019 due to a regulatory issue, then individual Member Electric Service and Supply Contracts will terminate early and the Members will be returned to EDU standard offer service in accord with the standard switching rules and applicable notices. If this Agreement is terminated due to the material breach of the Agreement, the Members' Electric Service and Supply Contracts will be terminated and the Members may choose another CRES Supplier or will be returned to EDU generation service in accord with the standard switching rules and applicable notices. These termination and/or contract term provisions set forth in this paragraph 1.4 shall apply and have force notwithstanding any conflicting termination and/or contract term provisions set forth in any Electric Services and Supply Contract or replacements thereof as between FES and Aggregation Program Members. Program Members are responsible for arranging for their supply of electricity upon expiration of this Agreement. If this Agreement is terminated prior to the end of the term, if Member has not selected another supplier, Member will be returned to the EDU.

1.5    Future Pricing. Pricing for CRES Service following the termination of this Agreement shall be determined by mutual agreement of the parties.

1.6    Governmental Aggregator Does Not Assume Credit Risk. As between the Governmental Aggregator and FES, FES shall be responsible for the risk of non-payment by any Member of the Aggregation Program.

1.7  <u>Customer Data and Load Forecast Information</u>.  FES and Governmental Aggregator shall cooperate to obtain the consent of Members to obtain all available customer data and historical load and load forecast information, related to the Member's load and consumption, from any entity in possession of such data.  Additional costs for Member(s) that are interval metered shall be borne by the Member(s).

1.8  <u>Term of Enrollment</u>.  Members shall remain enrolled in the Aggregation Program until the Member exercises the right to opt-out, set forth in paragraph 1.3 herein, or they otherwise terminate their participation in the Aggregation Program, their participation in the Aggregation Program is terminated by the Governmental Aggregator, their CRES Service is terminated by FES or the EDU, or their electric service is terminated by the EDU or until this Aggregation Program is terminated, whichever occurs first.  The Member(s) right to opt-out shall be determined based on paragraphs 1.3 and 1.4 herein.

1.9  <u>Service Inquiries and Service Notices to Aggregation Group Members</u>.  Members may direct inquiries regarding this Agreement, and CRES Services provided hereunder, and any electric generation supply or billing questions, to FES at the address and phone number provided in Section 11.1, which address and phone number shall be provided in communications with Members regarding the Aggregation Program.  Members should direct inquiries to concerning EDU related emergency, power outage, wire or service maintenance, metering, EDU service billing or other similar EDU related concerns to the EDU.

1.10  <u>Subcontracting</u>.  FES may subcontract the performance of its obligations under this Agreement.  However, no subcontract shall relieve FES of any of its obligations and/or

liabilities under this Agreement. FES shall be responsible for all payments and obligations as between FES and subcontractors, and Governmental Aggregator shall not be responsible for payments to any such subcontractor.

## ARTICLE 2

### Term, Termination, Succession, Assignment

2.1 <u>Effective Date of Agreement and Termination.</u> This Agreement shall commence on the Effective Date. This Agreement may be terminated prior to the initial Term, in compliance with this Agreement's provisions, if: (1) the Governmental Aggregator does not enact legislation authorizing the Aggregation Program, or does not receive or fails to maintain PUCO Certification; (2) the November 8, 2011 ballot issue is rejected by the electors, (3) either Party is in material breach of this Agreement; (4) FES fails to maintain its PUCO Certification; or (5) any of the situations described in paragraphs 2.2 or 2.3 occur and Parties are unable to mutually negotiate modification(s) to the Agreement so that the adversely-affected Party may be restored to a reasonably similar economic position that the adversely-affected Party would have been in but for the occurrence of the events set forth in paragraphs 2.2 or 2.3. This Agreement shall terminate upon the expiration of this Agreement's Term. This Agreement may be renewed by mutual agreement for a term agreed upon by the Parties.

2.2 <u>Regulatory Contingencies.</u>

(a) Regulatory Events. The following will constitute a "Regulatory Event" governing the rights and obligations of the Parties under this Agreement:

(i) Illegality. If, due to the issuance of an order, or adoption of, or change in, any applicable law, rule, or regulation, or in the interpretation of any applicable

law, rule, or regulation, by any judicial, regulatory, administrative or government authority with competent jurisdiction, it becomes unlawful for a Party to perform any obligation under this Agreement.

(ii)     Adverse Government Action.  If (A) any regulatory agency or court having competent jurisdiction over this Agreement requires a change to the terms of the Agreement that materially adversely affects a Party(s), or (B) any regulatory or court action adversely and materially impacts a Party's ability to perform or otherwise provide Services pursuant to this Agreement.

(iii)     New Taxes.  If any ad valorem, property, occupation, severance, transmission, distribution, generation, first use, conservation, Btu or energy, transmission, utility, gross receipts, privilege, sales, use, consumption, excise, lease, or transaction taxes or any other governmental charges, licenses, fees or assessments (other than such charges based on net income or net worth), or increases in such charges, or an application of such charges to a new or different class of parties, is levied or enacted and effective after the Effective Date of the this Agreement .

(b)     Notice, Negotiation, and Early Termination.  Upon the occurrence of a Regulatory Event, the adversely affected Party shall give notice to the other Party that such event has occurred.  The Parties will mutually attempt to negotiate modification(s) to the Agreement so that the adversely-affected Party may be restored to a reasonably similar economic position that the adversely-affected Party would have been in but for the occurrence of the Regulatory Event.  If the Parties are

unable, within thirty (30) days of entering into negotiations, to agree upon modification(s) to this Agreement, the adversely affected Party shall have the right, upon sixty (60) days notice, to terminate this Agreement and close out its obligations hereunder.

2.3    <u>Regulatory Events Defined.</u>  Regulatory changes or rulings, legislative and agency acts, and judicial rulings covered by preceding paragraph 2.2, include but are not limited to: i) material changes affecting FES' and/or Governmental Aggregator's electric supplier certification/franchise status, fees, costs, or requirements; ii) other changes or clarifications of federal, state or local government certification, licensing or franchise requirements for electric power suppliers; iii) changes to existing or new charges, fees, costs, and/or obligations, including without limitation transmission or capacity requirements or charges, that may be imposed upon FES by a regional transmission organization, independent transmission system operator, independent transmission provider, or government agency; iv) changes to existing or new charges, fees, costs, credits, emission allowance requirements, permitting requirements and/or obligations associated with environmental or energy law and regulations (including, without limitation, alternative energy requirements, carbon and greenhouse gas, or other similar controls); and v) other changes to or requirements of retail electric customer access or aggregation programs in a manner which will not reasonably allow a Party or the Parties to perform economically hereunder; and provided that in each such case such actions or effects were not known and in effect at the time of the Effective Date of this Agreement.

2.4    <u>Termination Notices.</u>  In the event of termination hereunder, the terminating party shall exercise its best efforts to communicate to the non-terminating party the upcoming

possibility of termination. In the event that this Agreement is terminated prior to the end of the term, each individual Member of the Aggregation Program will be provided written notification from the terminating party of the termination of the Agreement at least sixty (60) days prior to termination, or as set forth in the governance plan, and in compliance with other regulatory or legal requirements and Members will also be notified of their right to return to the EDU or to select an alternate generation supplier. All other notification(s) shall be in accordance with PUCO requirements.

2.5    Non-Assignability. This Agreement shall not be transferred or assigned by either Party without the express written authorization of the non-assigning Party, which authorization shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of any permitted successors and assigns, to the extent permitted by law.

2.6    Termination Obligations. Termination of this Agreement shall not relieve either Party of the obligation(s) to pay amounts owed for actual performance of obligations rendered prior to the termination of this Agreement.

**ARTICLE 3**

**Energy Scheduling, Transmission, Pricing and Delivery**

3.1    Scheduling, Transmission and Delivery of Power. FES shall schedule energy as required by the transmission supplier and the EDU and shall arrange for transmission and distribution service to Members. FES will arrange for necessary electric distribution and transmission rights for delivery of such electricity at levels of firmness as necessary to provide the CRES Services hereunder and subject to the understanding that FES has an

obligation to make firm deliveries to Members as set forth in Paragraph 1.2.1. Delivery of firm energy shall not be curtailed or interrupted by FES except pursuant to Article 2 or Article 7 of this Agreement. FES does not take responsibility for any delivery of services supplied by the EDU or transmission supplier, or for the consequences of the failure to provide such services.

3.2    <u>Activation of Service</u>. CRES Service to a Member will commence after the Member has been enrolled by FES and the Member has been switched by the EDU to FES on the Member's regularly scheduled meter read date in accordance with the standard switching rules, all as set forth in the Electric Service and Supply Contract(s).

3.3    <u>Failure of Delivery.</u> In the event that FES fails to deliver to the Member(s) electric generation sufficient to meet the needs of Member(s) as set forth herein and FES' failure is not due to a Force Majeure Event as defined hereunder, FES shall at its own expense procure replacement CRES Services, including replacement energy, to meet the needs of Member(s) without any increase in any rates, charges, or fees to Members and/or Governmental Aggregator. IN THE EVENT OF FES'S FAILURE TO PERFORM DUE TO A NON-FORCE MAJEURE EVENT, FES' OBLIGATION TO SUPPLY REPLACEMENT ENERGY AT THE AGGREGATION PROGRAM RATES SHALL BE THE MEMBER(S)'/GOVERNMENTAL AGGREGATOR'S SOLE REMEDY FOR FES' FAILURE TO DELIVER ENERGY PURSUANT TO THE TERMS OF THIS AGREEMENT AND THE MEMBER'S ELECTRIC SERVICE AND SUPPLY CONTRACT(S).

## ARTICLE 4

### Metering, Billing, and Payments

4.1 <u>Additional Equipment</u>. If additional metering or monitoring equipment is required by the EDU, such metering or monitoring equipment shall be installed at the Aggregation Program Member's sole expense and each Party shall cooperate as necessary with installation of additional metering or monitoring equipment.

4.2 <u>Additional Costs.</u> In addition to the Generation Charge described in the Pricing Schedule to Attachment A to Master Agreement, FES will charge Member for any and all fees, costs, and obligations imposed by a Regional Transmission Organization ("RTO"), such as the Midwest ISO, that are not otherwise reimbursed by the EDU to FES, regardless of whether such charges are greater than, less than, or equal to the charges Member currently pays for these services to the EDU ("Transmission and Ancillary Charges"). FES will pass these Transmission and Ancillary Charges, which may be variable, through to the Member and Member will receive no discount or percent-off of these Transmission and Ancillary Charges. Such pass through includes without limitation the cost of any capacity requirement imposed on FES by an ISO or RTO. No additional taxes, duties, fees or charges levied against FES by any governmental or regulatory entity or passed through to FES by capacity or energy suppliers, except as explicitly included in the Pricing Schedule to Attachment A to Master Agreement or as specifically allowed herein, shall be passed through by FES to the Governmental Aggregator or Members.

4.3 <u>Switching Fee</u>. Should the EDU charge FES a switching fee, FES will pay the switching fee on behalf of the Members.

4.4   Billing.   Billing shall be provided by the EDU under a consolidated billing format pursuant to the EDUs tariff provisions and PUCO rules applicable to the Member(s). FES retains the right to assess late payment fees on, or terminate service to, any Member that fails to pay amounts due within the specified time period for said payments in accord with the EDU's tariff and PUCO regulations.

## ARTICLE 5

### Aggregation Program Development and Administrative Services

5.1   Program Development Administrative Services.   The Governmental Aggregator has selected FES to perform certain Aggregation Program development and administrative services, as described in Attachment A hereto ("Pricing and Other Conditions to Retail Generation Service Offer"), in addition to the CRES Service set forth in Attachment A hereto.   These Administrative Services are specifically incorporated herein and made a part hereof.

## ARTICLE 6

### Default and Remedies

6.1   Default.   Any Party failing to comply with any material terms or conditions of this Agreement which non-compliance is not excused as a Force Majeure Event, as described in Article 7 herein, shall be in Default of this Agreement.

6.2   Notice and Remedies.   Subject to other provisions of this Agreement, if a party believes that the other party is in material breach of this Agreement, the party claiming breach shall give notice in writing to the offending party believed to be in breach detailing the alleged violations and requesting specific relief that is in accord with the terms and

conditions of this Agreement.  The party receiving the notice of violation shall respond in writing within five ("5") business days of receipt affirming or denying the alleged violation(s) and detailing how any such breach of this Agreement will be cured.  If the party claiming breach is not satisfied that an alleged breach(s) of this Agreement has been cured within twenty-five ("25") business days from the notice of breach hereunder, the party claiming breach shall be free to seek legal redress and take such other actions, including termination, as it sees fit, without prejudice to any rights and remedies of the non-defaulting Party and any other remedies that a Party may have under the law or this Agreement.

## ARTICLE 7

### Force Majeure

7.1     <u>Excused Failure to Comply.</u>  Neither Party shall be considered to be in default in the performance of its obligations under this Agreement, if its failure to perform results directly or indirectly from a Force Majeure Event.  Despite its commercially reasonable efforts, if the Party is unable, wholly or in part, to meet its obligations under this Agreement due to a Force Majeure Event, the obligations of each Party, other than the obligation to make payments due for performance rendered hereunder, so far as they are affected by such Force Majeure Event, shall be suspended during such Force Majeure period.  The Party claiming excuse due to a Force Majeure event shall exercise commercially reasonable efforts and due diligence to remove the inability to perform as soon as reasonably possible so that the affected period shall be no longer than that necessarily affected by the Force Majeure event and shall exercise commercially reasonable efforts and due diligence to mitigate the effects of the Force Majeure event. Nothing contained in this section shall be construed as requiring a Party to settle any strike or labor dispute in which it may be involved.

7.2 <u>Force Majeure Event</u>. For purposes of this Agreement, a Force Majeure Event shall mean any non-economic cause beyond the reasonable control of the Party affected and shall include, but not be limited to, Acts of God, floods, earthquakes, storms, droughts, fires, pestilence, destructive lightning, hurricanes, washouts, landslides and other natural catastrophes; strikes, lockouts, labor or material shortage, or other industrial disturbances; acts of the public enemies, epidemics, riots, civil disturbances or disobedience, sabotage, wars or blockades; the failure of facilities not owned by FES, governmental actions such as necessity to comply with any court order, law, statute, ordinance or regulation promulgated by a governmental authority; or any other reasonably unplanned or non-scheduled occurrence, condition, situation or threat not covered above, which renders either Party unable to perform its obligations hereunder, provided such event is beyond the reasonable control of the Party claiming such inability. A change in economic electric power market conditions shall not constitute a Force Majeure Event. Failure or interruptions, including without limitation government ordered interruptions, on the systems of generation, transmission or distribution relied upon for supplying energy under this Agreement shall constitute a Force Majeure Event provided that FES has arranged for service on these systems at a level of firmness as required to provide the CRES Service agreed upon herein.

7.3 <u>Notification.</u> If either Party is unable to perform any of its obligations under this Agreement due to a Force Majeure Event, then said Party shall notify the other Party in writing as soon as possible, but no later than seventy-two ("72") hours after the start of the Force Majeure Event. The written notice shall include a specific description of the cause and expected duration of the Force Majeure Event.

## ARTICLE 8

### Limitation of Liability

8.1.1   LIABILITY.   EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT TO THE OTHER, TO AN AGGREGATION PROGRAM MEMBER OR TO A THIRD PARTY FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES CONNECTED WITH OR RESULTING FROM PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH CLAIMS ARE BASED UPON BREACH OF WARRANTY, TORT (INCLUDING BUT NOT LIMITED TO NEGLIGENCE OF ANY DEGREE), STRICT LIABILITY, CONTRACT, OPERATION OF LAW OR OTHERWISE.

8.1.2   DISCLAIMER.   FES DOES NOT WARRANT OR GUARANTEE THE UNINTERRUPTED DELIVERY OF FIRM ENERGY TO AGGREGATION GROUP MEMBERS DURING FORCE MAJEURE EVENTS.   EXCEPT AS MAY BE SPECIFICALLY PROVIDED HEREIN, NO IMPLIED WARRANTIES OF ANY KIND, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE SHALL BE APPLICABLE TO THIS AGREEMENT.

## ARTICLE 9

### Confidential Information

9.1   Confidential Information.   Any Confidential Information, as defined in Paragraph 9.2 herein, made available pursuant to this Agreement and conspicuously market or stamped as "**Confidential**" shall be held in confidence by each of the Parties to protect the

legitimate business needs and/or privacy interests of the Parties. With respect to multi-page documents that contain Confidential Information, the Parties may make such a designation by marking or stamping only the first page thereof. The Parties shall identify any matter deemed to be Confidential Information at the time the information is provided. Any information not designated, as Confidential Information shall not be covered by the protection contemplated herein, provided, however, that the inadvertent provision of information without a confidential designation shall not itself be deemed a waiver of the Party's claim of confidentiality as to such information, and the Party may thereafter designated the same as confidential, if the information is deemed confidential as set forth herein.

9.2 <u>Confidential Information Defined</u>. "Confidential Information" means any and all data and information of whatever kind or nature (whether written, electronic or oral) which is disclosed by one Party (the "Disclosing Party") to the other Party ("the "Recipient") regarding itself, its business, the business of its affiliates, and/or the Aggregation Program. Confidential Information does not include information that: (a) is in the public domain at the time of disclosure; (b) passes into the public domain after disclosure, except by a wrongful act of the Recipient; (c) is disclosed to the Recipient by another not under an obligation of confidentiality; or (d) is already in the Recipient's possession prior to disclosure by the Disclosing Party.

9.3 <u>Obligation of Confidentiality</u>. Each Party agrees, for itself and its authorized representatives, to keep confidential all Confidential Information provided hereunder and to use the Confidential Information solely for purposes in connection with this Agreement, except to the extent that the Recipient determines that release of Confidential

Information is required by law or regulation. The Recipient shall make commercially reasonable efforts to notify the Disclosing Party if it intends to release any Confidential Information to afford the Disclosing Party an opportunity to seek a protective order prior to disclosure. The obligations for Confidentiality set forth in this Agreement, including but not limited to the non-disclosure obligations and the duty to return Confidential Information upon written request, shall survive the termination of this Agreement for a period of one (1) year thereafter.

9.4    Proprietary Rights.    Neither Party makes any representation as to the accuracy or completeness of the Confidential Information, but shall make reasonable efforts to ensure that all Confidential Information disclosed to Recipient is accurate and not misleading. Each Party acknowledges the proprietary rights of the other Party in and to the Confidential Information.

9.5    Press Releases. FES shall control the timing and content of all press releases and public statements relating to this Agreement without the need for prior approval by Governmental Aggregator due to the nature of the *Powering Our Communities* program and the funding that will be provided to participating communities.

9.6    Data.    All raw data, reports, data aggregations and analyses, product and service ideas, and other information, without limitation, collected and/or generated by Governmental Aggregator pursuant to this Agreement shall remain the sole and exclusive property of the Governmental Aggregator.    All reports, data aggregations and analyses, product and service ideas, and other information, without limitation, collected and/or generated by FES pursuant to this Agreement shall remain the sole and exclusive property of FES.

Each Party may use all such information furnished by the other Party solely for purposes of this Agreement.

## ARTICLE 10

### Dispute Resolution

10.1 <u>Dispute Resolution</u>. Prior to litigation, the Parties shall mutually attempt in good faith to resolve any dispute or claim arising out of or relating to this Agreement or the transactions contemplated hereby ("Dispute(s)") promptly, by negotiations between FES and Governmental Aggregator, including but not limited to through non-binding formal dispute resolution methods, such as non-binding mediation, if agreeable to both Parties. The Parties may mutually modify these requirements herein and select any manner of dispute resolution that is agreeable to both Parties, including but not limited to binding formal dispute resolution methods, such as binding arbitration. If the Parties choose to be referred to Arbitration, the arbitration shall be in accordance with the American Arbitration Association Arbitration Rules in effect at the time of the dispute resolution, unless the Parties mutually select some other rules. The place of arbitration shall be at a place agreeable to both Parties. The arbitrator(s) shall be empowered to order specific performance of this Agreement, but shall not be empowered to award punitive damages. The arbitrator(s) function shall be limited to the functions mutually agreeable to both Parties; however, the arbitrator(s)shall not have the power to change, add to, subtract, or amend or modify in any way any provision(s) of this Agreement, unless otherwise agreed to by the parties.

10.2 <u>Service of Process</u>. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio. Each of the Parties hereby consents to the service of

process by certified, registered, or overnight express mail, return receipt requested, postage prepaid, addressed to the parties designated in Paragraph 11.1 this Agreement.

10.3 <u>Parties to Continue Performance</u>. Subject to the other provisions of this Agreement, including but not limited to the termination and early termination provision, the Parties shall in good faith continue to perform their respective obligations under this Agreement while the Parties attempt to resolve the Dispute(s) as set forth in this Article 10. Notwithstanding the foregoing, but subject to Section 1.4 herein, both Parties shall continue to abide by all applicable statutes, administrative rules, tariffs, and codes of conduct during the term of this Agreement.

## **ARTICLE 11**

### **Miscellaneous**

11.1 <u>Notices.</u> Any notices, requests or demands regarding the Services provided under this Agreement or the ancillary agreements shall be deemed to be properly given or made five (5) business days after postmark date if sent by U.S. Postal Service mail to the other Party at the address shown below. The address of a party to which notices or other communications shall be mailed may be changed from time to time by giving written notice to the other party according to the terms set forth in Paragraph 10.2, Service of Process.

FES:
Brenda Fargo
Manager, Government Aggregation
FirstEnergy Solutions Corp.
341 White Pond Drive
Akron, OH 44320

Phone: 330-315-6898
Fax: 330-315-6889

GOVERNMENTAL AGGREGATOR
Village of Beloit
17893 5th Street
Beloit, OH 44609

Phone:
Fax: 330-427-8088

11.2    Entire Agreement.  This Agreement, including all Attachments hereto, contains all of the

terms and conditions of this Agreement reached by the Parties, and supercedes all prior

oral or written agreements with respect to this Agreement.  This Agreement may not be

modified, amended, altered or supplemented, except by written agreement signed by all

Parties hereto.  No waiver of any term, provision, or conditions of this Agreement,

whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or

shall constitute a waiver of any other provision hereof, whether or not similar, nor shall

such waiver constitute a continuing waiver, and no waiver shall be binding unless

executed in writing by the party making the waiver.

11.3    Waivers.  Any request for a waiver of the requirements and provisions of this Agreement

shall be in writing and must be approved in writing by the nonwaiving Party.  The failure

of either Party to insist upon strict performance of such requirements or provisions or to

exercise any right under this Agreement shall not be construed as a waiver or

relinquishment of such requirements, provisions or rights.

11.4    Applicable Law.  This Agreement shall be governed by and interpreted in accordance

with the laws of the State of Ohio

11.5    Controlling Provisions.  In the event of any inconsistency between the terms herein and t

he terms of the Attachments hereto, the provisions of this Agreement shall control.

11.6    Severability.  Any provision in this Agreement that is prohibited or unenforceable in any

jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition

or unenforceability without invalidating the remaining provisions or affecting the validity

or enforceability of such provision in any other jurisdiction. The non-enforcement of any provision by either Party shall not constitute a waiver of that provision nor shall it affect the enforceability of that provision or the remainder of this Agreement.

11.7    Authorization. Each Party to this Agreement represents and warrants that it has full and complete authority to enter into and perform this Agreement. Each person who executes this Agreement on behalf of either Party represents and warrants that he or she has full and complete authority to do so and that such Party will be bound by the Agreement.

11.8    Recitals. The Parties hereto agree and acknowledge that the prefatory statements and recitals in this Agreement are intended to be and shall be a part of the provisions of this Agreement.

11.9    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement to be effective on the date first written above.

**FirstEnergy Solutions Corp.:**

Signed: _____

Printed Typed Name:

__Jerry Bellitt__

Title: __V.P. Sales__

Date: __12/28/11__

**The Village of Beloit:**

Signed: _____

Printed Typed Name:

__ERIC  AUGUSTEIN__

Title: __MAYOR__

Date: __12-28-2011__

# ATTACHMENT A:

## Pricing and Other Conditions
## to Retail Generation Service Offer

The occurrence and ongoing continuation throughout the term of the Master Agreement of the following conditions must be met or FES shall have the right to declare this Amendment null and void:

1. EDU rate plan and EDU's PTC is instituted in such a manner that government aggregation programs can provide savings to members.
2. The Electric Security Plan (ESP), Market Rate Offer (MRO) and/or Competitive Bid Process (CBP), or other generation procurement process results in a PTC that is greater than or equal to the comparable annualized generation and transmission rates & riders in effect on June 1, 2009 (reflecting a monthly average rate including a seasonal adjustment).
3. Any PUCO approved phase-in credit for generation charges can be financed by FES at its discretion if commercially reasonable rates and terms are available for such financing and FES elects to do so.
4. A government aggregation program can be reasonably and practicably offered in such a manner which does not conflict with PUCO Orders or Entries or Ohio Administrative Code (OAC) rules and regulations or Ohio Revised Code (ORC) provisions related to governmental aggregation.
5. The EDU will provide percent off pricing calculation and consolidated billing consistent with previous practice.

IN WITNESS WHEREOF, the Parties have duly executed this agreement to be effective on the date first written above.

FirstEnergy Solutions Corp:

Signed: _____

Printed/
Typed Name:   Jerry Bellitt _____

Title:   V.P. Sales _____

Village of Beloit

Signed: _____

Printed
Typed Name:   ERIC  AUGUSTEIN

Title:   MAYOR _____

# Attachment A to Master Agreement

## Between

## The Village of Beloit, Ohio and FirstEnergy Solutions Corp.

## The program discounts are as follows:

### Term: March 2012 – February 2021

*Residential Rates*

**Standard Residential Rate (RS)**

*2012 - 6% Discount\**
*2013 – 6% Discount\**
*2014 – 6% Discount\**
*2015 – 6% Discount\**
*2016 – 6% Discount\**
*2017- 6% Discount\**
*2018 - 6% Discount\**
*2019- 6% Discount\**
*2020- 6% Discount\**
*2021 - 6% Discount\**

**Residential Water and/or Space Heating
Or Load Management Rates (RS)** (Eligible for
credits under Rider EDR.)

*March 2012 – February 2021 - 6% Discount\**

*Commercial Rates*

**General Service (GS) to 399 KWd**

*2012 - 4% Discount\**
*2013 – 4% Discount\**
*2014 – 4% Discount\**
*2015 – 4% Discount\**
*2016 – 4% Discount\**
*2017 – 4% Discount\**
*2018 - 4% Discount\**
*2019 - 4% Discount\**
*2020 – 4% Discount\**
*2021– 4% Discount\**

**Powering Our Communities one time grant to the Village in the amount of $20,000.00.** The grant is payable upon passage of the November 2011 ballot issue and scheduling and advertising of the subsequent public hearings. These funds are not subject to repayment and can be used for any purpose deemed appropriate by the Village.

National accounts (e.g. McDonald's, BP, Dollar General) as well as eligible commercial accounts with annual usage over 700,000 will be offered the above discounts but they must "opt-in" to the program.

\*For the term referenced above, the generation pricing under this Agreement will be calculated as the specified percentage off the Electric Utility Price to Compare ("PTC") for transmission, generation and generation related charges as set forth in the EDU's applicable tariff. However, any bypassable riders not included in the PTC will be billed at their full rate. FES reserves the right to terminate service and return members to standard offer service for the period June 2011 – December 2019 if the EDU standard service offer pricing and or tariff structure is modified. As described above, no discount will be given on such charges as transmission, ancillary services and renewable / alternative energy resources if they are identified in a separate tariff approved by the PUCO and are not included in the PTC.

Program Development/Administration – To be provided by FirstEnergy Solutions

- Design, print and mail the Opt-out letter to all eligible participants including a sheet of Frequently Asked Questions to provide assistance
- Administer the Opt-out process including database preparation, handling of opt-out form information, and final enrollment list compilation
- Provide a call center to handle information calls
- Preparation of required PUCO reports and on-going certification documents

**Exhibit B**

![FirstEnergy Solutions logo]

**FirstEnergy Solutions Corp. - Residential & Small Commercial Terms and Conditions**

These Terms and Conditions together with the enrollment information are your agreement for electric generation service with FirstEnergy Solutions Corp. ("FES") if you choose to remain in the community aggregation program by "opting-in" and not exercising the right of rescission ("Agreement"). _Please keep a copy of this Agreement for your records._

FES is certified by the Ohio Public Utility Commission ("PUCO") to offer and supply electric generation services in Ohio. As a Competitive Retail Electric Service ("CRES") provider, FES will supply the electric generation to your Electric Distribution Utility (EDU) based on your usage. Your EDU then distributes or delivers the electricity to you. FES sets the generation prices and charges that the customers pay. The PUCO regulates distribution prices and services. The Federal Energy Regulatory Commission regulates transmission prices and services.

**DEFINITIONS:**
**Generation Service** – The production of electricity.
**Transmission Service** – Moving high voltage electricity from a generation facility to the distribution lines of an Electric Distribution Utility ("EDU").
**Distribution Service** – Physical delivery of electricity to customers by EDU.

**RIGHT OF RESCISSION** – If you opt-in and are enrolled to receive generation service from FES, your EDU will send you a confirmation letter. You will have the right to rescind your enrollment within seven (7) calendar days following the postmark date of the confirmation letter by following the instructions contained in the letter. The Right of Rescission only applies when a customer switches to a generation supplier and not on renewal enrollments. Your EDU will not send a confirmation notice upon any renewal of this Agreement. Should you choose to opt-in to your community's program, you will be served by your EDU's standard service offer established pursuant to section 4928.14 of the Ohio Revised Code unless you choose an alternate supplier of electricity.

**TERMS AND CONDITIONS OF SERVICE**

1. **Eligibility.** Only Residential Customer accounts not enrolled in the Percentage of Income Plan Program (PIPP) and small commercial customers with a peak demand below 399 KW are eligible for this offer from FES. FES reserves the right to refuse enrollment to any customer with an outstanding balance.

2. **Basic Service Prices.** During the term of this Agreement, you agree to pay FES for a total combined Transmission, Generation, and Generation Related Charges. You will be billed at the percentage off your EDU Price to Compare per KWh per billing month, as specified in the opt-in notification. Your Price to Compare consists of bypassable transmission, generation and transmission and generation related components, which are charges associated with the costs of purchased power and the cost to deliver the power through the transmission system. These are the charges that you would avoid for that billing period when you switch to FES.

   Your price per KWh will vary because it will always be a percent off the Price to Compare, which may change based on any changes made by the EDU in its calculations. In addition to FES' charges, you will be charged by your EDU for distribution and various other charges. FES reserves the right to unilaterally modify this billing format in the event the EDU is unable or unwilling to provide consolidated billing in this format or changes the calculation of the Price to Compare.

   In addition to the charges described above, if any regional transmission organization or similar entity, EDU, governmental entity or agency, NERC and other industry reliability organization, or court requires a change to the terms of the Agreement, or imposes upon Supplier new or additional charges or requirements, or a change in the method or procedure for determining charges or requirements, relating to your electric supply under this Agreement (any of the foregoing, a "Pass-Through Event"), which are not otherwise reimbursed to FES, Customer agrees that Supplier may pass through the additional cost to Supplier of such Pass-Through Event, which may be variable, to Customer. Changes may include, without limitation, transmission or capacity requirements, new or modified charges or shopping credits, and other changes to retail electric customer access programs.

3. **Length of Agreement.** As a part of your community's program, your service from FES will commence with the next available meter reading and after processing of the enrollment by your EDU, and will continue for the term as specified in the opt-in notification, ending on the meter read for the last month of service. The program may be terminated or modified due to unforeseen regulatory action. Customer and FES agree that any such regulatory action may be filed electronically. If this Agreement is terminated, you will be returned to the standard service offer or its successor.

4. **Billing.** You will continue to receive a single bill from your EDU that will contain both your EDU and FES charges. FES does not offer budget billing. If you do not pay your bill by the due date, FES may cancel this Agreement after giving you a minimum of fourteen (14) days written notice. Upon cancellation you will be returned to your EDU as a customer. You will remain responsible to pay FES for any electricity used before this Agreement is cancelled, as well as any late payment charges.

5. **Penalties, Fees and Exceptions.** If you do not pay the full amount owed FES by the due date of the bill, FES may charge a 1.5% per month late payment fee.

6. **Cancellation/Termination Provisions.** If this Agreement is not rescinded during the rescission period, enrollment will be sent to your EDU. You may terminate this Agreement, without penalty, if you move out of the EDU service territory or into an area where FES will charge a different price. _There will be a $25 charge for each residential EDU account and a $50.00 charge for each commercial EDU account if you terminate this Agreement for any other reason, except as expressly provided herein. Should you cancel service with FES and return to standard offer service with your EDU, you may not be served under the same rates, terms, and conditions that apply to other EDU customers._

7. **Customer Consent and Information Release Authorization.** By choosing to opt-in to your community's aggregation program, you understand and agree to the terms and conditions of this Agreement with FES. You authorize FES to obtain information from the EDC that includes, but is not limited to: billing history, payment history, historical and future electricity usage, meter readings, and characteristics of electricity service. FES reserves the sole right to determine if your credit standing is satisfactory before accepting your enrollment request. This Agreement shall be considered executed by FES following acceptance of your enrollment request by FES, the end of the 7 day rescission period and subsequent acceptance of the enrollment by your EDU.

8. **Contract Expiration.** At least every three years, you will be given the opportunity to opt-in to your community's aggregation program at no cost. You are responsible for arranging for your electric supply upon termination of this Agreement.

9. **Dispute Procedures.** Contact FES with any questions concerning the terms of service by phone at 1-888-254-6359 (toll-free) M-F 8AM – 5PM EST or in writing at 341 White Pond Drive, Attn: Contract Administration, Akron, OH 44320. Our web address is www.firstenergysolutions.com. If your complaint is not resolved after you have called your electric supplier and/or your electric utility, or for general utility information, residential and business customers may contact the Public Utilities Commission of Ohio for assistance at 1-800-686-7826 (toll free) or TTY at 1-800-686-1570 (toll free) from 8:00 am to 5:00 pm weekdays or at www.PUCO.ohio.gov. Residential customers may also call the Ohio Consumers' Counsel (OCC) at 1-877-742-5622 (toll free) from 8:00 am to 5:00 pm weekdays or at www.pickocc.org.

10. **Miscellaneous.** You have the right to request from FES, twice within a 12 month period, up to 24 months of payment history, without charge.

    FES will not release your Social Security number and/or account number(s) without your written consent.

    FES' environmental disclosure statement is available for viewing on our website – www.firstenergysolutions.com. You agree that FES will make the required quarterly updates to the statement electronically on our website. We will also provide the information upon request.

    FES may assign its rights to another, including any successor, in accordance with the rules and regulations of the PUCO.

    FES assumes no responsibility or liability for the following items that are the responsibility of the EDC: operation and maintenance of the EDU's electrical system, any interruption of service, termination of service, or deterioration of the EDU's service. In the event of a power outage, you should contact your local EDU.

    Customer is responsible for providing FES with accurate account information. If said information is incorrect, FES reserves the right to reprice the applicable account(s) or terminate the Agreement.

    FES reserves the right to return any customer to the EDU if the customer's rate code is changed and the account is no longer eligible for this program.

11. **Warranty.** FES warrants title and the right to all electricity sold hereunder. THE WARRANTIES SET FORTH IN THIS PARAGRAPH ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE.

Exhibit C

## *ORC Ann. 3706.46*

Current through File 53 of the 133rd (2019-2020) General Assembly.

*Page's Ohio Revised Code Annotated  >  Title 37: Health — Safety — Morals (Chs. 3701 — 3799) > Chapter 3706: Air Quality Development Authority (§§ 3706.01 — 3706.99)  >  Advanced Energy Projects (§§ 3706.25 — 3706.99)*

## § 3706.46 **Charges; revenue requirements.**

**(A)**

**(1)** Beginning for all bills rendered on or after January 1, 2021, by an electric distribution utility in this state, such electric distribution utility shall collect from all of its retail electric customers in this state, each month, a charge or charges which, in the aggregate, are sufficient to produce the following revenue requirements:

**(a)** One hundred fifty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the nuclear generation fund;

**(b)** Twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the renewable generation fund.

**(2)** The public utilities commission shall determine the method by which the revenue is allocated or assigned to each electric distribution utility for billing and collection, provided that the method of allocation shall be based on the relative number of customers, relative quantity of kilowatt hour sales, or a combination of the two. The level and structure of the charge shall be authorized by the commission through a process that the commission shall determine is not for an increase in any rate, joint rate, toll, classification, charge, or rental, notwithstanding anything to the contrary in Title XLIX of the Revised Code.

**(B)** In authorizing the level and structure of any charge or charges to be billed and collected by each electric distribution utility, the commission shall ensure that the per-customer monthly charge for residential customers does not exceed eighty-five cents and that the per-customer monthly charge for industrial customers eligible to become self-assessing purchasers pursuant to division (C) of section 5727.81 of the Revised Code does not exceed two thousand four hundred dollars. For nonresidential customers that are not self-assessing purchasers, the level and design of the charge or charges shall be established in a manner that avoids abrupt or excessive total net electric bill impacts for typical customers.

**(C)** Each charge authorized by the commission under this section shall be subject to adjustment so as to reconcile actual revenue collected with the revenue needed to meet the revenue requirements under division (A)(1) of this section. The commission shall authorize each electric distribution utility to adopt accounting practices to facilitate such reconciliation. Notwithstanding any other provisions of the Revised Code, the charge or charges authorized by the commission may continue beyond December 31, 2027, only if it is necessary to reconcile actual revenue collected under this section during the period ending on December

Francesca Boland

ORC Ann. 3706.46

31, 2027, with the actual revenue needed to meet the revenue requirements under division (A)(1) of this section for required disbursements under section 3706.55 of the Revised Code that may be due and owing during the same period. Such continuation shall be authorized only for such period of time beyond December 31, 2027, as may be reasonably necessary to complete the reconciliation.

## History

*2019 hb6*, § 1, effective October 22, 2019.

Page's Ohio Revised Code Annotated

Copyright © 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

**End of Document**

## *ORC Ann. 3706.55*

Current through File 53 of the 133rd (2019-2020) General Assembly.

*Page's Ohio Revised Code Annotated  >  Title 37: Health — Safety — Morals (Chs. 3701 — 3799) > Chapter 3706: Air Quality Development Authority (§§ 3706.01 — 3706.99)  >  Advanced Energy Projects (§§ 3706.25 — 3706.99)*

## § 3706.55 Allocation of funds.

**(A)**For the period beginning with April of 2021 and ending with January of 2028, the Ohio air quality development authority shall, in April of 2021 and every three months thereafter through the end of the period, and not later than the twenty-first day of the month , direct the treasurer of state to remit money from the funds created under section 3706.49 of the Revised Code as follows:

**(1)**Subject to sections 3706.59 and 3706.61 of the Revised Code, from the nuclear generation fund to the owner or operator of a qualifying nuclear resource, in the amount equivalent to the number of credits earned by the resource during the quarter that ended twelve months prior to the last day of the previous quarter multiplied by the credit price, and as directed by the authority in accordance with section 3706.61 of the Revised Code;

**(2)**Subject to section 3706.59 of the Revised Code, from the renewable generation fund to the owners or operators of qualifying renewable resources, in the amount equivalent to the number of credits earned by the resources during the quarter that ended twelve months prior to the last day of the previous quarter multiplied by the credit price.

**(B)**Notwithstanding section 4905.32 of the Revised Code, any amounts remaining in the nuclear generation fund and the renewable generation fund as of December 31, 2027, minus the remittances that are required to be made between that date and January 21, 2028, shall be refunded to customers in a manner that shall be determined by the authority in consultation with the public utilities commission.

## History

*2019 hb6*, § 1, effective October 22, 2019.

Page's Ohio Revised Code Annotated
Copyright © 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**GENERAL PLEADING**
**January 11, 2021 18:08**

By: STUART G. PARSELL 0063510

Confirmation Nbr. 2153900

MICHAEL EMMONS                                  CV 20 935557

     vs.

FIRSTENERGY CORPORATION, ET AL          **Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 19

IN THE COURT OF COMMON PLEAS OF CUYAHOGA COUNTY, OHIO

MICHAEL EMMONS, et al.,                    :
                                           :
            Plaintiff,                     :        Case No. CV 20 935557
                                           :
      vs.                                  :        Judge Shannon M. Gallagher
                                           :
FIRSTENERGY CORPORATION, et al.,           :
                                           :
            Defendants.                    :

## REPLY OF DEFENDANT FIRSTENERGY SOLUTIONS N/K/A ENERGY HARBOR IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

I.      **INTRODUCTION**

Confronted with Ohio law requiring dismissal of the Amended Complaint in its entirety, Plaintiffs are forced to offer a Memo Contra that repeatedly ignores Ohio Supreme Court and Eighth District precedent, contradicts the express terms of the contracts at issue, ignores H.B. 6 (and specifically the timing of when nuclear resource funds are actually issued), disclaims their own damage claim, feigns a need for discovery in order to state a cognizable contract claim, and even manufactures brand new (and unfounded) allegations that are found nowhere in the Amended Complaint.

None of Plaintiffs' maneuvers can save their claims. A Rule 12(B)(6) motion to dismiss is intended to "test[] the sufficiency of the complaint" by scrutinizing whether the fact allegations that are actually pled state a cognizable legal claim. *Kleinfeld v. Huntington Nat'l Bank*, 8th Dist. Cuyahoga No. 90916, 2008-Ohio-6486, ¶¶ 29, 32. In applying this test, a plaintiff's "unsupported legal conclusions are not accepted as true," *Godwin v. Facebook, Inc.*, 8th Dist. Cuyahoga No. 109203, 2020-Ohio-4834, ¶ 14, and the Court cannot accept allegations that contradict the express terms of any contract or statute at issue. *Spit Shine A Detailer, L.L.C.*

*v. Rick Case Hyundai*, 2017-Ohio-8888, ¶ 14 (8th Dist.) (affirming Civ.R. 12(B)(6) dismissal of complaint for breach of contract when the contract did not create the duty allegedly breached). In addition, a plaintiff is "not entitled to discovery in order to seek out facts to defeat a motion to dismiss." *Smith v. Nat'l W. Life*, 8th Dist. Cuyahoga No. 104898, 2017-Ohio-4184, ¶ 8 (8th Dist.) (affirming dismissal of complaint despite plaintiff's argument that discovery was required to substantiate defamation claim). "[T]he purpose of discovery is not to permit one party to conduct a 'fishing expedition' for evidence to support their claim." *Keenen v. Adecco Empl. Servs.*, 3d Dist. Allen No. 1-06-10, 2006-Ohio-3633, ¶¶ 15-16 (affirming Rule 12(B)(6) dismissal of complaint and explaining that plaintiff was not entitled to discovery for the purpose of finding a contract to support his breach of contract claim).

Nor can a plaintiff avoid dismissal by raising new allegations in a Memo Contra – especially where, as here, those new "facts" contradict their own complaint allegations. *Smith*, 2017-Ohio-4184, at ¶¶ 8-9 (8th Dist.) (plaintiff was barred from asserting new matters in a memo contra to a motion to dismiss: "a Civ.R. 12(B)(6) motion cannot be decided on facts that are not contained in the complaint," and "the nonmoving party cannot raise additional facts in response to a motion to dismiss with the hope of having the motion converted to a motion for summary judgment").

Here, application of controlling law to Plaintiffs' allegations compels dismissal of all of their claims. Plaintiffs' maneuvers cannot avoid the Rule 12(B)(6) dismissal of the plainly deficient claims that are actually pled in their Amended Complaint.

## II.   LAW AND ARGUMENT

### A.   Plaintiffs Cannot Establish The Essential Element Of Proximately Caused Damages As A Matter Of Law

1.      **All Of Plaintiffs' Causes Of Action Are Premised On A Legislative Enactment And, Thus, Fail To State A Claim As A Matter Of Law**

The dispositive points fatal to Plaintiffs' claims are undisputed.  Proximately caused damages is an essential element for each of Plaintiffs' claims—*Plaintiffs do not contest this*. [Energy Harbor's Motion to Dismiss, at 7]  Plaintiffs' principal damage theory is that the passage of H.B. 6 damaged them by creating new monthly charges on electric customers—*a theory Plaintiffs cannot contest since they repeatedly stated it throughout their complaint*.  [Am. Compl. ¶¶ 152, 157, 162, 167, 173, 183, 206, 212]  Thus, Plaintiffs' causes of action are premised on legislative conduct – *i.e.*, the enactment of H.B. 6 by the General Assembly that was signed by the Governor—which is also undisputed.

As a matter of law, Energy Harbor's alleged conduct is not the "traceable cause" of the alleged damages under H.B. 6 (the statutory charges) in view of the "intervening" actions of independent non-parties – indeed, the constitutionally mandated actions of the Ohio Senate, House and Governor in order to enact a new law.  *City of Cleveland v. JP Morgan Chase Bank, N.A.*, 8th Dist. Cuyahoga No. 98656, 2013-Ohio-1035, ¶¶ 13, 15.  These non-party actions necessarily are "an intervening break in the causal chain" for all of Plaintiffs' claims. *Id.* at ¶ 14. The bottom line is that Plaintiffs, as a matter of law, cannot hold Energy Harbor responsible for the enactment of H.B. 6 or its new charges.

Plaintiffs fail to cite any authority to the contrary.  In fact, Plaintiffs do not (and cannot) cite a single case in which a plaintiff sought to hold a private party responsible for supposedly causing the enactment of statutory charges or fees or, for that matter, holding a private party liable because the plaintiff had to comply with statutory law.  Instead, Plaintiffs simply point to the supposed foreseeability of their purported damages and rely on inapposite personal-injury negligence cases that did not even involve damages resulting from legislative enactments.  *See,*

*e.g., Mudrich v. Standard Oil Co.*, 153 Ohio St. 31 (1950) (whether eight-year old child setting fire to negligently spilled gasoline constituted an intervening cause); *Strother v. Hutchinson*, 67 Ohio St. 2d 282 (1981) (whether shooting store robber, who was fleeing in a car, proximately caused the resulting car collision); *Ross v. Nutt*, 177 Ohio St. 113 (1964) (leaving keys in car did not proximately cause injuries stemming from collision after car was stolen by someone else).

Plaintiffs' foreseeability argument runs headlong into the Eighth District's holding in *City of Cleveland*, 2013-Ohio-1035, at ¶ 14 (8th Dist.). In that case, the court affirmed a 12(B)(6) dismissal of an OCPA (Ohio RICO) claim because the intervening acts of third parties precluded proximate cause on the plaintiffs' claim that JPMorgan caused a foreclosure crisis in Cleveland. *Id.* Just as in the instant dispute, the plaintiffs in *City of Cleveland* argued that the defendants intended the intervening acts to occur and foresaw the crisis because they directed the mortgage originators to offer high-risk mortgages. *Id.* The Eighth District rejected this argument, stating that "directness of injury 'is distinct from foreseeability and applies *even if the Defendants intentionally caused the alleged course of events*.'" *Id.* (emphasis added). The court dismissed the OCPA claim, explaining that JPMorgan's practices were not the "traceable cause" of the plaintiffs' injuries because the intervening acts of several independent third parties occurred in order to create the foreclosure crisis. *Id.* at ¶¶ 15, 18, 31.

Similarly here, the independent acts of the Senate, House, and Governor were necessary under the Ohio Constitution, Article II, for enacting H.B. 6 and its new charges. As in *City of Cleveland*, Energy Harbor cannot be the "traceable cause" of any charges imposed by H.B. 6. All of Plaintiffs' causes of action must therefore be dismissed for failure to establish the essential element of proximate cause.

**2.** **Legislative Immunity Also Bars Plaintiffs From Establishing Proximate Cause**

Application of the legislative immunity doctrine also precludes, as a matter of law, Plaintiffs from establishing proximate cause. Plaintiffs' response brief concerning legislative immunity is more telling for what it does *not* say than for what it says. Plaintiffs *do not* dispute that, under Ohio Supreme Court precedent, both they and the Court are barred from questioning the legislative motives behind the enactment of H.B. 6. *State ex rel. Kittel v. Bigelow*, 138 Ohio St. 497, 502 (1941) ("the court [should] not examine into the motives, whether expressed or unexpressed, which may have induced the exercise of this [legislative] power"); *State ex rel. Herron v. Smith*, 44 Ohio St. 348, 366-67 (1886) (judicial inquiry into legislative motive is "not only indecorous, but [is] subversive of the independence of the legislature as a co-ordinate branch of the government").

Plaintiffs also provide no answer to the two seminal RICO cases cited in Energy Harbor's motion to dismiss that hold that where, as here, claims are premised on damages allegedly arising from corrupt legislation, legislative immunity prevents a plaintiff from establishing the essential element of proximate cause. *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 197 (2d Cir. 2019) ("Plaintiff is unable to make out a prima facie case on its RICO claim without reliance on . . . legislative conduct. [Plaintiff's] civil RICO claim as against all three individual defendants is therefore barred by the legislative immunity that attaches to [the mayor's] protected legislative conduct"); *Chappell v. Robbins*, 73 F.3d 918, 921-22 (9th Cir. 1996) (affirming dismissal of a civil RICO claim premised on allegedly corrupt legislation creating increase insurance premiums "because the conduct by which [the defendant's] bribe proximately caused [plaintiff's] injury was legislative, and therefore immune"). Even though these two RICO cases are on "all fours" with this case, Plaintiffs completely ignore them and do not offer

any reason to deviate from these courts' holding conforming with the Ohio Supreme Court's decisions on legislative immunity.

Instead, Plaintiffs assert that legislative immunity does not apply because "Energy Harbor is not a legislator." [Pltfs' Memo Contra, at 8-9] But this misses the point, as a review of the cited cases readily makes clear. Energy Harbor does not claim that it has legislative immunity. Rather, Energy Harbor asserts that legislative immunity creates an insurmountable legal bar to Plaintiffs' ability to establish that the General Assembly's enactment of H.B. 6 (and its charges) were proximately caused by Energy Harbor. This is because Plaintiffs' claims are premised on improper legislative motive, which cannot be scrutinized in a civil lawsuit.

Thus, in *NRP Holdings*, the court held that a mayor's legislative immunity broke the chain of causation on a civil RICO claim as a matter of law not only for himself, but also for the other individual defendants, because proof of legislative motive was necessary to the RICO claim. 916 F.3d at 197. The same result attains here and dismissal is compelled on all of Plaintiffs' claims, including their Ohio RICO claim.[1]

The cases cited by Plaintiffs are inapposite. *None* of them involves damage claims that are premised on improper motive behind a legislative enactment like Plaintiffs' claims are. *See In re Grand Jury Investigation into Possible Violations of Title 18*, 587 F.2d 589, 598 (3d Cir. 1978) (permitting disclosure of congressman's telephone charge records in response to subpoena while holding that the record of calls that were legislative acts must be protected from disclosure); *Bigelow v. Brumley*, 138 Ohio St. 574 (1941) (speech writer who included

---

[1]     As Ohio courts have made clear, the "traditional common law notions of proximate cause" apply to the Ohio RICO statute. *City of Cleveland*, 2013-Ohio-1035, ¶¶ 13, 18 (8th Dist. 2013) (affirming dismissal of Ohio RICO claim where actions of third parties were intervening factors and defendant's action did not proximately cause plaintiff's injury); *Herakovic v. Catholic Diocese*, 2005-Ohio-5985 (8th Dist.) (same); *Lesick v. Manning*, 1992 Ohio App. LEXIS 6374 (7th Dist. 1992) (same).

defamatory content in an official's speech was not entitled to legislative immunity); *City of Dublin v. State*, 138 Ohio App. 3d 753, 757-59 (10th Dist. 2000) (constitutional challenge to budget bill, in which the court held that legislators had an absolute privilege against testifying and also precluded any inquiry that "would threaten [the legislature's] integrity and independence").

### 3.   **Plaintiffs Have Abandoned Their Second Damage Theory**

Plaintiffs' inability to establish that Energy Harbor was the proximate cause of the new H.B. 6 charges is dispositive of all of Plaintiffs' claims given their abandonment of their only damage theory that did not require proof of legislative intent: the unfounded allegation that their electric rates were increased as a result of the $60 million purportedly paid in support of H.B. 6. [Am. Compl. ¶¶ 152, 157, 162, 167, 173, 183, 206, 212]  Energy Harbor attached to its Motion the contracts relating to Plaintiff Emmons, which show that his electric service rates were last set *in 2011* – long before any of the conduct alleged in the complaint.  Plaintiffs do not challenge this.  Instead, they claim that "Energy Harbor misstates Plaintiffs' assertion of damages" and then proceed to expressly abandon this damage theory by maintaining at page 11 of their Memo Contra:  **"Plaintiffs are not arguing about rates, their formulation, or collection."**  (Emphasis added.)  Plaintiffs are bound by their representations to this Court, and thus their original damage claim that their rates increased as a result of the alleged costs to enact H.B. 6 must be dismissed.

### 4.   **Plaintiffs' New Damage Claim Also Fails As A Matter of Law**

Unable to advance their "rate increase" theory,  Plaintiffs attempt to recast it as a different (and new) damage claim: Defendants supposedly "misuse[d] *customer monies* in expending over $60 million in bribes."  [Memo Contra, at 10 (emphasis added)]

Plaintiffs do not allege any facts in the Amended Complaint to support the contention that they have any legal interest in *any* funds held or expended by Energy Harbor. Nor could they under Rule 11. What Plaintiffs now are calling "customer funds" are Energy Harbor's own funds. Energy Harbor's funds are not "customer funds" merely because it originally obtained them by selling electric services to customers. Like any other retail customer, Plaintiffs have no claim (or standing) to challenge how a business chooses to spend its own money, even if we assume, *arguendo*, some impropriety in its expenditures. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (in order to have standing, "the plaintiff must have suffered an 'injury in fact' - an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) 'actual or imminent,' not 'conjectural' or 'hypothetical'"). Plaintiffs provide no legal support for their new theory because there is none.

### B.    Plaintiffs' Contract Claim Fails As A Matter of Law

Plaintiffs do not dispute the two fatal deficiencies of their breach of contract claim as alleged in the Amended Complaint.

First, Plaintiffs have no response to Energy Harbor's argument that *FirstEnergy's* internal Code of Business Conduct does not create contractual duties owed to Plaintiffs, much less any duties owed by Energy Harbor, a separate company. [Motion to Dismiss, at 17] Plaintiffs abandon this allegation by not even opposing it.

Second, Plaintiffs cannot deny that they have failed to allege breach of any of the actual contract obligations set forth in the applicable Energy Harbor contracts referenced in the Amended Complaint (and attached as Exhibits A and B to Energy Harbor's motion to dismiss).[2]

---

[2]    Plaintiff Brown's breach of contract claim against Energy Harbor must be dismissed because he has no contract with Energy Harbor. [Motion to Dismiss, at pg. 15, n.6.] In response to this point and Exhibits A and B to Energy Harbor's motion, Plaintiffs remarkably declare that "[d]iscovery is needed to ascertain the various contractual agreement and arrangements governing the relationship between Energy

_None_ of Plaintiffs' allegations against Energy Harbor is a breach of any contract duties contained in the governing contracts, and Plaintiffs make no effort to contend otherwise. [Motion, at 15] There is not a single contract provision limiting how Energy Harbor spends any funds that were previously received from Plaintiffs or any other alleged electric customer, and the parol evidence rule precludes Plaintiffs from attempting to rewrite the contract to insert one. [Motion, at 16-17] Plaintiffs' breach of contract claim must be dismissed for this reason alone. _Spit Shine A Detailer, L.L.C. v. Rick Case Hyundai_, 2017-Ohio-8888, ¶ 14 (8th Dist.) (affirming dismissal of complaint for breach of contract when the contract did not create the duty allegedly breached).

Unable to identify the alleged breach of any express contract duties, Plaintiffs now assert that the implied duty of good faith and fair dealing is sufficient to save their breach of contract claim. [Memo Contra, at 12] But this new argument fails as a matter of law because, as Plaintiffs' own cases make clear, the implied duty of good faith must be in connection with the "performance and enforcement" of an express contractual duty. _Lucarell v. Nationwide Mut. Ins. Co._, 152 Ohio St. 3d 453, 2018-Ohio-15, ¶ 42 (a party to a contract has a "duty of good faith and fair dealing in [the contract's] performance and enforcement"). The Ohio Supreme Court holds that the implied duty of good faith and fair dealing cannot be breached "unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." _Id._ at ¶ 43. A breach of contract claim fails where, as here, it relies solely on an alleged violation of

---

Harbor and class members." Plaintiffs, however, are confusing class issues with their individual claims. The motion to dismiss challenges Plaintiffs' individual claims. Energy Harbor has tendered Plaintiff Emmons' contracts, which he does not challenge. Civ.R. 10(D) states that where any claim is based upon a written instrument "a copy of the . . . written instrument must be attached to the pleading." But Plaintiff Brown attached none, and Energy Harbor cannot identify one since Brown does not even appear to be a customer. In fact, the utility bills that Brown attached as Ex. B to his opposition to FirstEnergy's motion to dismiss show he is a customer of The Illuminating Company, but not Energy Harbor. Brown's lack of a contract is not only fatal to his contract claim, his obvious lack of standing to sue Energy Harbor requires dismissal of all of his claims with prejudice.

the duty of good faith and fair dealing without pointing to specific contractual terms that were supposedly breached. *Gianetti v. Teakwood, Ltd.*, 10th Dist. Franklin No. 15AP-413, 2016-Ohio-213, ¶¶ 15, 35 (where plaintiff alleged a breach of contractual terms not contained in the parties' contract, "he necessarily also failed to establish a breach of the duty of good faith and fair dealing").[3]

Here, Plaintiffs have failed to (and cannot) allege that Energy Harbor has breached any express contract duties. [Am. Compl. ¶¶ 163-167] Thus, their breach of contract claim must be dismissed.

**C.** **Plaintiffs' Claims For Negligence Or Gross Negligence Fail As A Matter of Law**

In attempting to defend their negligence claims, Plaintiffs mischaracterize Energy Harbor's argument, impermissibly ignore controlling Ohio law, and attempt to interject distinctions lacking any substance.

**1.** **Plaintiffs' Negligence Claims Are Barred By The Economic Loss Rule**

Plaintiffs ignore the controlling Supreme Court and Eighth District precedent that is cited in Energy Harbor's motion to dismiss, both of which hold that the economic loss rule bars negligence claims where, as here, the plaintiff alleges only economic damage. *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 106 Ohio St. 3d 412, 2005-Ohio-5409, ¶ 6; *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006-Ohio-5014, ¶ 21 (8th Dist.); *Digiknow, Inc. v. PKXL Cards, Inc.*,

---

[3] Ohio law does not recognize an independent cause of action for breach of the duty of good faith, as also explained by the Supreme Court in *Lucarell. See also Patrick v. CitiMortgage, Inc.*, 676 F. App'x 573, 577 (6th Cir. 2017) ("Ohio law recognizes only a breach of contract claim; it does not recognize a free-standing or independent claim for breach of the covenants of good faith and fair dealing"); *Kendell v. Phoenix Home Health Care Servs.*, 720 F. App'x 249, 254 (6th Cir. 2017) ("Ohio law does not recognize breach of the implied covenant of good faith and fair dealing as an independent cause of action apart from a valid breach of contract claim"); *Atlantis 2000 Group, Inc. v. MetroHealth Sys.*, 2012 U.S. Dist. LEXIS 89660, *23-24 (N.D. Ohio, Jun. 28, 2012) ("an allegation of a breach of a covenant of good faith and fair dealing 'cannot stand alone as a separate cause of action from a breach of contract claim'"); *Chesner v. Stewart Title Guar. Co.*, 2008 U.S. Dist. LEXIS 19303, *49 (N.D. Ohio, Jan. 23, 2008) ("This duty does not, however, authorize an independent cause of action ….").

2011-Ohio-3592, ¶ 7 (8th Dist.).  As the Eighth District plainly holds:  "[W]here only economic losses are asserted, damages may be recovered only in contract; there can be no recovery in negligence due to the lack of physical harm to persons and tangible things."  *RWP, Inc.*, 2006-Ohio-5014 at ¶ 24.

Turning a blind eye to this precedent, Plaintiffs declare that the economic loss rule is implicated only where a contract governs the relationship between parties, *i.e.*, they are in privity.  The Supreme Court holds just the opposite: "'In the **absence of privity of contract** between two disputing parties the general rule is 'there is **no … duty to exercise reasonable care to avoid intangible economic loss** or losses to others that do not arise from tangible physical harm to persons and tangible things.'" *Floor Craft Floor Covering v. Parma Cmty. Gen. Hosp. Ass'n*, 54 Ohio St. 3d 1, 3 (1990) (emphasis added).  Simply put, there is no common-law duty of reasonable care to protect against purely economic loss; instead, protection against economic loss is only a matter of contract if a contract term is breached.  *Id.*

Plaintiffs misleadingly offer two cases purportedly supporting their analysis, but they were careful not to include quotations or any substantive discussion.  Instead, they offer only general, non-descript references.  They did so because these cases stand for the opposite proposition than those represented by Plaintiffs.  Specifically, *Chemtrol Adhesives v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 44 (1989), states the economic loss rule is fatal to Plaintiffs' claims: "For actions sounding in negligence, '[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.'"  Similarly, in *Corporex Dev. & Constr. Mgmt.*, 106 Ohio St. 3d 412, the Court held that a company could not recover purely economic loss against a subcontractor on a negligence claim.  *Id.* at ¶ 11. The Court explained: "[Plaintiff]

may not … recover in tort when [the subcontractor] has no duty in tort to protect DSI from purely economic damages. We will not adopt a rule that ignores basic tort law and thwarts the intentions of parties to a contract….” *Id.* In short, Plaintiffs offer this Court nothing to support their argument and no reason to disregard Supreme Court and Eighth District precedent.

Thus, Plaintiffs' claims of negligence and gross negligence are barred by the economic loss rule as a matter of law, dismissal is compelled, and the Court's inquiry may end there.

## 2. Plaintiff Cannot Establish A Common-Law Duty Owed By Energy Harbor To Plaintiffs

Plaintiffs' negligence claim fails for a second reason: they cannot establish the existence of a common-law duty of reasonable care to support their negligence claims. *"[T]he existence of a duty is fundamental to establishing actionable negligence . . . . If there is no duty, then no legal liability can arise on account of negligence.*" *Feichtner v. City of Cleveland*, 95 Ohio App.3d 388, 394 (8th Dist. 1994) (emphasis in original) (affirming dismissal of a negligence claim because the plaintiff did not establish a duty or proximate cause). *Accord: Askew v. ABC Check Cashing*, 8th Dist. Cuyahoga No. 69906, 1996 Ohio App. LEXIS 4373 (Oct. 3, 1996) (“to maintain his cause of action against appellees, appellant first had to provide sufficient evidence to demonstrate each of them owed him an 'existing duty'"). And, "[t]he existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 45 Ohio St. 3d 314, 318 (1989).

In their Amended Complaint, Plaintiffs relied upon the identical duties for both of their claims for breach of contract and negligence. But in their response, Plaintiffs cannot challenge the legal proposition that any tort claims that they assert against Energy Harbor must derive from duties that are independent of contractual duties. *Stancik v. Deutsche Nat'l Bank*, 2015-Ohio-2517, ¶ 40 (8th Dist.); *see also* Motion to Dismiss, at 19-20. As such, Plaintiffs attempt to pivot

their argument by retorting that "[t]here is no allegation that the Class of all Ohioans … are in privity [of contract] with Energy Harbor." [Memo Contra, at 14]

Plaintiffs' pivoting cannot save their claim for three reasons. First, application of the economic loss rule is fatal to Plaintiffs' negligence claim, no matter how restyled. Second, Plaintiffs' contention that Energy Harbor had a common-law duty of care to "all Ohioans" to prevent purported economic loss to them by refraining from using Energy Harbor's own funds to support H.B. 6 (or other legislation) contradicts Ohio Supreme Court precedent. As noted above, in *Floor Craft Floor Covering*, the Court expressly held: "In the absence of privity of contract between two disputing parties the general rule is 'there is **no . . . duty to exercise reasonable care** to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things.'" 54 Ohio St.3d at 3. Because no duty exists, according to the Supreme Court, no negligence claim can be advanced.[4]

Finally, Plaintiffs cannot maintain a class action on behalf of "all Ohioans" where, as here, Plaintiffs themselves do not have viable individual claims against Energy Harbor. *Thomas v. Jackson-Hewitt, Inc.*, 192 Ohio App. 3d 732, 2011-Ohio-618, ¶ 25 (8th Dist.) (putative class action properly dismissed because plaintiffs insufficiently alleged injury and thus failed to state a claim); *Bellman v. Am. Int'l Group*, 113 Ohio St. 3d 323, 2007-Ohio-2071, ¶¶ 1-3 (affirming dismissal of putative class action because plaintiffs' individual claims failed as a matter of law).

---

[4]     None of the cases cited by Plaintiffs supports the existence of a common-law duty by Energy Harbor to avoid alleged economic losses by Plaintiffs, much less "all Ohioans." Rather, Plaintiffs' cases are inapplicable because they are personal injury cases involving a duty of care to avoid injury to persons or property. *See, e.g., Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St. 3d 257 (2015) (medical malpractice claim against a hospital following a little boy's death); *Wallace v. Ohio DOC*, 96 Ohio St.3d 266 (2002) (negligence action arising from fire that killed nine people); *Simmers v. Bentley Constr. Co.*, 64 Ohio St. 3d 642 (1992) (accident where plaintiff fell through a hole in a railroad bridge and sustained injuries); *Mussivand*, 45 Ohio St. 3d 314 (defendant had duty to disclose his venereal disease to his sexual partner); *Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335 (1934) (defendant's employee breached duty of care when he walked in front of traffic and caused a car accident).

For these reasons, Plaintiffs' claims of negligence and gross negligence must be dismissed.

### D.  Plaintiffs' Unjust Enrichment Claim Fails As A Matter of Law

Even if we were to assume, *arguendo*, that Plaintiffs could circumvent the Ohio Supreme Court's legislative immunity rule, several other independent legal grounds compel the dismissal of Plaintiffs' unjust enrichment claim.  The first is the basic proposition that a claim for "[u]njust enrichment cannot exist where there is a valid and enforceable contract."  *Gallo v. Westfield Nat'l Ins. Co.*, 8th Dist. Cuyahoga No. 91893, 2009-Ohio-1094, ¶ 20 (affirming Rule 12(B)(6) dismissal of an unjust enrichment claim because the parties' relationship was governed by a contract).  *Accord: Graham v. City of Lakewood*, 8th Dist. Cuyahoga No. 106094, 2018-Ohio-1850 (same). Thus, where a written contract governs the parties' relationship, a party cannot assert an "alternative" unjust enrichment claim even though he is unable to secure contractual relief against the defendant. *Ford v. Pa. Higher Educ. Assistance Agency*, 2018 U.S. Dist. LEXIS 44549, *19-23 (N.D. Ohio, Mar. 19, 2018).

Here, the existence of an express written contract between Plaintiff Emmons and Energy Harbor *is undisputed*.  [Am. Complaint ¶¶ 164] [Exs. A and B to Energy Harbor's Motion to Dismiss]  Thus, there is no basis for the unjust enrichment claim on grounds of "alternative pleading."

In their response, Plaintiffs flatly ignore the cited Eighth District precedent.  Instead, Plaintiffs attempt to confuse this issue by declaring they are permitted to assert an "alternative claim" for unjust enrichment in the event their "contract claim is ultimately deemed unenforceable" or if no contract remedy is available. [Memo Contra, at 19]  Plaintiffs fail to apprise the Court that the Eighth District holds that "an equitable action for unjust enrichment cannot exist where there is a valid and enforceable written contract," absent "bad faith, fraud, or

some other illegality" that invalidates the contract – which Plaintiffs do not (and cannot) allege. *Kwikcolor Sand v. Fairmount Minerals Ltd.*, 8th Dist. Cuyahoga No. 96717, 2011-Ohio-6646, ¶ 14. And, Plaintiffs' selective quote from *Banks v. Nationwide Mut. Fire Ins. Co.*, 10th Dist. No. 99AP-14113, 2000 Ohio App. LEXIS 5504 (Nov. 28, 2000), is misplaced since the court in that case upheld the dismissal of the plaintiff's unjust enrichment claim because, just like the instant case, the parties' relationship was governed by an express contract. *Id.* at *15-16.

Plaintiffs also have no response to the second basis for dismissing their unjust enrichment claim: Under the plain terms of H.B. 6, Energy Harbor has not received **any** nuclear resource payments (or other benefits) under H.B. 6. As conceded by Plaintiffs (Memo Contra, at 19), the defendant's receipt of a benefit conferred by the plaintiff is an essential element of an unjust enrichment claim. *Chesnut v. Progressive Cas. Ins. Co.*, 166 Ohio App. 3d 299, 2006-Ohio-2080, ¶ 29 (8th Dist.). R.C. 3706.55(A) expressly states that the funds from the new monthly charges under H.B. 6 cannot be paid to the owner or operator of a nuclear resource until April 2021 at the earliest. Thus, as a matter of law, there is no basis for Plaintiffs to assert that Energy Harbor has received any funds under H.B. 6. Such a claim is not ripe, is therefore not justiciable, and must be dismissed. *State ex rel. Quinn v. Del. Cty. Bd. of Elections*, 152 Ohio St. 568, 2018-Ohio-966, ¶ 37 ("[t]o be justiciable, a claim must be ripe for review, and a claim is not ripe 'if it rests on contingent events that may never occur at all'").

To avoid this outcome, Plaintiffs attempt to manufacture two new claims that are nowhere alleged in the Amended Complaint.[5] The first misstates both Plaintiffs' own complaint and H.B. 6: "[U]pon passage of H.B. 6, Energy Harbor *immediately received funds* for nuclear refueling from Plaintiffs and the Class valued at $52 million." [Memo Contra, at 20, citing Am.

---

[5] These new claims fail for the same reasons that their alleged damage claim arising from H.B. 6's new monthly charges fails as a matter of law: lack of proximate cause and legislative immunity.

Compl. ¶ 121 (emphasis added)] This is false, and is **not** what Plaintiffs alleged (or could have alleged) in the Amended Complaint. Paragraph 121 of the Amended Complaint specifically alleges:

> 121. The next day [July 24, 2019], FES announced its plan to suspend decommissioning of its nuclear plants and to refuel its nuclear stations at a cost of approximately $52 million.

Plaintiffs never alleged in their Amended Complaint that Energy Harbor had "received" this $52 million from H.B. 6—nor could they since, as noted above, new monthly charges under H.B. 6 cannot be paid to the owner or operator of a nuclear resource until April 2021 at the earliest.

Plaintiffs' other newly-minted claim is also not included in their complaint. They assert that they "paid non-gratuitous benefits to Defendants for energy efficiency measures" that are reduced under H.B. 6. [Memo Contra, at 20] Not only is this assertion untrue, it is *not* alleged in the Amended Complaint. Plaintiffs cannot avoid dismissal by raising new facts in their opposition brief – especially where, as here, those new "facts" contradict their own complaint allegations. *Smith v. Nat'l W. Life*, 2017-Ohio-4184, ¶¶ 8-9 (8th Dist.) (holding that plaintiff was barred from asserting new matters in response to a motion to dismiss, and explaining that "a Civ.R. 12(B)(6) motion cannot be decided on facts that are not contained in the complaint" and further that "the nonmoving party cannot raise additional facts in response to a motion to dismiss with the hope of having the motion converted to a motion for summary judgment").

For these reasons, Plaintiffs fail to state an unjust enrichment claim as a matter of law.

E.   **Plaintiffs' Claim Under The Ohio Consumer Sales Practices Act Has Been Withdrawn And Must Therefore Be Dismissed**

Confronted with the overwhelming Ohio case law, Plaintiffs are forced to withdraw their claim brought under the Ohio Consumer Sales Practices Act. Plaintiffs state: "Plaintiffs' Amended Complaint alleges claims under the Ohio Consumer Sales Practices Act, R.C.

1345.02…. However, Plaintiffs now withdraw that cause of action as to both Defendants." [Memo Contra, at 1 n.1] Accordingly, this claim should be dismissed with prejudice.

### F.  Plaintiffs' Claim For Declaratory Judgment Should Also Be Dismissed

Plaintiffs' claim for declaratory judgment asks this Court to invalidate H.B. 6 by requesting the Court to declare that "the circumstances surrounding passage and implementation of HB 6 render the law void as against public policy and unenforceable." [Am. Complaint ¶ 189] Plaintiffs' contention that this claim does not involve a political question directly conflicts with Ohio Supreme Court precedent.

Indeed, Plaintiffs' requested declaratory relief would violate basic principles of the separation of powers. Ohio's Constitution vests the General Assembly with plenary power to "pass any law unless it is specifically prohibited by the state or federal Constitutions." *State ex rel. Jackman v. Cuyahoga County Court of Common Pleas*, 9 Ohio St. 2d 159, 162 (1967). That is, "[t]he General Assembly has plenary power to enact legislation; it is limited only by the Ohio Constitution. Before any legislative power, as expressed in a statute can be held invalid, it must appear such power is clearly denied by some constitutional provision." *Board of Trustees of the Tobacco Use Prevention & Control Found. v. Boyce*, 127 Ohio St. 3d 511, ¶ 10 (2010). *Accord: State ex rel. Poe v. Jones*, 51 Ohio St. 492, 504 (1894) ("[t]he legislative power of the state is vested in the general assembly, and whatever limitation is placed upon the exercise of that plenary grant of power must be found in a clear prohibition by the constitution").

As this over seventy years of Ohio Supreme Court precedent makes clear, "[a] statute cannot be invalidated or enjoined unless it is unconstitutional." *City of Toledo v. State*, 154 Ohio St. 3d 41, 2018-Ohio-2358, ¶ 17. Here, Plaintiffs do *not* allege that H.B. 6 is unconstitutional.

As such, Plaintiffs may not seek, and the Court cannot issue, a judicial declaration invalidating H.B. 6.

Plaintiffs' separate request for a general declaration "of their rights" "arising from their relationships with Defendants," [Am. Complaint ¶ 188], fails for the same reasons for which their other claims against Energy Harbor should be dismissed. Where, as here, a plaintiff fails to state any underlying claim or right that has been violated, the declaratory judgment claim must be dismissed for lack of a justiciable controversy. *Festi v. Ohio Adult Parole Auth.*, 2005-Ohio-3622, ¶ 17 (10th Dist.) (declaratory judgment properly dismissed when the complaint failed to state a claim for the underlying constitutional claim); *Morrison v. Skestos*, 2004-Ohio-6985, ¶¶ 7, 19 (10th Dist.) (affirming dismissal of declaratory judgment claim when the underlying claims for fraud and an OCSPA violation were dismissed).

### G. Plaintiffs Fail To State A Civil Conspiracy Claim

Plaintiffs do not dispute that a civil conspiracy is not an independent cause of action and that they must assert a viable underlying tort against Energy Harbor in order the state a claim for civil conspiracy against it. *Bentkowski v. Trafis*, 2015-Ohio-5139, ¶ 50 (8th Dist.). Accordingly, Plaintiffs' civil conspiracy claim must be dismissed with the rest of their underlying tort claims.

## III. CONCLUSION

For all of these reasons, Plaintiffs' Amended Complaint should be dismissed in its entirety.

Respectfully submitted,

/s/ Stuart G. Parsell
Marion H. Little, Jr. (0042679)
Stuart G. Parsell (0063510)
Francesca R. Boland (0098956)
ZEIGER, TIGGES & LITTLE LLP
41 South Hight Street, Suit 3500
Columbus, Ohio 43215
Telephone: (614) 365-9900
Fax: (614) 365-7900
little@litohio.com
parsell@litohio.com
boland@litohio.com

Attorneys for Defendant FirstEnergy
Solutions Corp. n/k/a Energy Harbor LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed this 11th day of

January, 2021, via the Court's authorized E-Filing system which, by Local Rule, constitutes

service on all counsel of record in this case who are registered users of the E-Filing system.

/s/ Stuart G. Parsell
Stuart G. Parsell (0063510)

1207-003:888204

Motion No. <u>4896283</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION TO DISMISS**
**November 9, 2020 13:59**

By: RYAN A. DORINGO 0091144

Confirmation Nbr. 2112235

| | |
|---|---|
| MICHAEL EMMONS | CV 20 935557 |
| vs. | |
| FIRSTENERGY CORPORATION, ET AL | **Judge:** SHANNON M. GALLAGHER |

**Pages Filed:** 107

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

|  |  |
|---|---|
| MICHAEL EMMONS and ROBERT BROWN, individually and on behalf of all those similarly situated, | Case No. CV 20 935557 |
| Plaintiffs, | Judge Shannon M. Gallagher |
| v. | |
| FIRSTENERGY CORP. *et al.*, | |
| Defendants. | |

## FIRSTENERGY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants FirstEnergy Corp., FirstEnergy Service Company, Ohio Edison Company ("Ohio Edison"), The Toledo Edison Company ("Toledo Edison"), and The Cleveland Electric Illuminating Company ("CEI") (collectively, "the FirstEnergy Defendants") respectfully move, under Ohio Civ. R. 12(B)(6), to dismiss the Complaint. The grounds are set forth in the accompanying memorandum. A proposed Order is attached for the Court's consideration.

Dated: November 9, 2020

Respectfully submitted,

*/s/ Ryan A. Doringo*

Michael R. Gladman (0059797)
mrgladman@jonesday.com
Tiffany D. Lipscomb-Jackson (0084382)
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Phone: (614) 469-3939

Ryan A Doringo (0091144)
radoringo@jonesday.com
JONES DAY
901 Lakeside Avenue East
Cleveland, Ohio 44114
Phone: (216) 586-3939

Yaakov M. Roth (*pro hac vice*
forthcoming)
yroth@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-7658

*Counsel for FirstEnergy Defendants*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.      The Filed-Rate Doctrine Bars Plaintiffs' Complaint ................................................ 4

II.     Each of Plaintiffs' Causes of Action Also Fails for Additional Reasons ................... 6

      A.     The Negligence Claims Fail Because FirstEnergy Did Not Owe or Breach Any Legal Duty to Its Customers ............................................................. 7

      B.     The Contract Claims Fail Because Plaintiffs Do Not Identify Any Contract with FirstEnergy or Any Breach of Such a Contract .................... 10

      C.     The Unjust Enrichment Claim Fails Because Plaintiffs Did Not Unjustly Enrich FirstEnergy ............................................................................ 11

      D.     The OCSPA Claim Fails Because the Complaint's Allegations Do Not Relate to Any Consumer Transaction ..................................................... 12

      E.     The OCPA Claim Fails Because Defendants' Alleged Predicate Acts Did Not Proximately Cause the Enactment of HB 6 ..................................... 14

      F.     The Civil Conspiracy Claim Fails Because It Is Necessarily Derivative, and Plaintiffs Have Not Pleaded Any Viable Claims ..................................... 16

      G.     Plaintiffs Are Not Entitled To Declaratory Or Injunctive Relief ............... 17

CONCLUSION ................................................................................................................. 18

# TABLE OF AUTHORITIES

Page

## CASES

*Amann v. Clear Channel Commc'ns,*
    165 Ohio App.3d 291, 2006-Ohio-714, 846 N.E.2d 95 (1st Dist.) ....................................9

*Baghani v. Charter One Bank F.S.B.,*
    8th Dist. Cuyahoga No. 91373, 2009-Ohio-490........................................................8

*Baus v. Lowe,*
    8th Dist. Cuyahoga No. 87765, 2007-Ohio-275........................................................8

*Border City Sav. & Loan Ass'n v. Moan,*
    15 Ohio St.3d 65, 472 N.E.2d 350 (1984) ...........................................................3

*Brittingham v. Gen. Motors Corp,*
    2d Dist. Montgomery No. 24517, 2011-Ohio-6488 ...............................................8

*Burdge v. Subvest 4, L.L.C.,*
    1st Dist. Hamilton No. C-060354, 2007-Ohio-1488 ....................................... 13, 14

*Byrd v. Faber,*
    57 Ohio St.3d 56, 565 N.E.2d 584 (1991) ...........................................................3

*C4 Polymers, Inc. v. Huntington Nat'l. Bank,*
    2015-Ohio-3475, 41 N.E.3d 788 (8th Dist.) .......................................................10

*Cincinnati Gas & Elec. v. Joseph Chevrolet Co.,*
    153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016 (1st Dist.) ................................4

*Claris, Ltd. v. Hotel Dev. Servs.,*
    LLC, 2018-Ohio-2602, 104 N.E.3d 1076 (10th Dist.)........................................16

*Cleveland v. JP Morgan Chase Bank, N.A.,*
    8th Dist. Cuyahoga No. 98656, 2013-Ohio-1035 ......................................... 15, 16

*Corbin v. Dailey,*
    10th Dist. Franklin No. 08AP-802, 2009-Ohio-881 ....................................... 11, 12

*Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.,*
    106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701 ........................................9

*CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.,*
    5th Dist. Stark No. 2010CA00303, 2012-Ohio-897 .................................................... 15, 16

*Csubran v. Kaiser Found. Health Plan of Ohio,*
    8th Dist. Cuyahoga No. 67460, 1995 WL 350081 (June 8, 1995) ...................................... 11

*Empress Casino Joliet Corp. v. Johnston,*
    763 F.3d 723 (7th Cir. 2014) .......................................................................... 15, 16

*Episcopal Retirement Homes, Inc. v. Ohio Dep't of Indus. Relations,*
    61 Ohio St.3d 366, 575 N.E.2d 134 (1991) ............................................................ 11

*Ferro Corp. v. Blaw Knox Food & Chem. Eqip. Co.,*
    121 Ohio App.3d 434, 700 N.E.2d 94 (Ohio App. 8th Dist. 1997) .................................. 9

*Fletcher v. Peck,*
    10 U.S. (6 Cranch) 87 (1810) ........................................................................ 18

*Fletcher v. Univ. Hosps. of Cleveland,*
    120 Ohio St.3d 167, 897 N.E.2d 147 (2008) .......................................................... 10

*Funk v. Montgomery AMC/Jeep/Renault,*
    66 Ohio App.3d 815, 586 N.E.2d 1113 (1990) ....................................................... 13

*Gator Dev. Corp. v. VHH, Ltd.,*
    1st Dist. Hamilton No. C–080193, 2009-Ohio-1802 ................................................. 16

*Glazer v. Chase Home Fin., L.L.C.,*
    8th Dist. Cuyahoga No. 99875, 2013-Ohio-5589 .................................................... 17

*Green Cove Resort I Owners' Ass'n v. Pub. Util. Comm.,*
    103 Ohio St.3d 125, 2004-Ohio-4774, 814 N.E.2d 829 ............................................ 5, 6

*Herakovic v. Catholic Diocese of Cleveland,*
    8th Dist. Cuyahoga No. 85467, 2005-Ohio-5985 .................................................... 14

*Hillier v. Fifth Third Bank,*
    2d Dist. Miami No. 2019-CA-21, 2020-Ohio-3679 ............................................... 11, 16

*Holmes v. Secs. Investor Prot. Corp.,*
    503 U.S. 258 (1992) ................................................................................... 14

*Jeffers v. Olexo,*
    43 Ohio St.3d 140, 539 N.E.2d 614 (1989) ............................................................ 7

*Johnson v. Microsoft Corp.,*
   106 Ohio St.3d 278, 834 N.E.2d 791 ...................................................................11

*Johnson v. Microsoft Corp.,*
   155 Ohio App.3d 626, 2003-Ohio-7153, 802 N.E.2d 712, *aff'd*, 106 Ohio St.3d
   278, 2005-Ohio-4958, 834 N.E.2d 791 ......................................................... 13, 14

*Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.,*
   166 Ohio St. 254, 141 N.E.2d 465 (1957) ............................................. 4, 5, 6, 12

*Lagowski v. Shelly & Sands, Inc.,*
   2015-Ohio-2685, 38 N.E.3d 456 (7th Dist.) ......................................................16

*Lanning v. Delaware Rural Elec. Coop., Inc.,*
   3rd Dist. Union No. 14-83-2, 1985 WL 9091 (Mar. 14, 1985) ..............................7

*Lesick v. Manning,*
   7th Dist. Columbiana No. 91-C-70, 1992 WL 380284 (Dec. 17, 1992) ...............15

*Lucas Cty. Comm'rs v. Pub. Util. Comm.,*
   80 Ohio St.3d 344, 686 N.E.2d 501 (1997) ................................................. 4, 5, 6

*Malone v. Miami Univ.,*
   89 Ohio App.3d 527, 625 N.E.2d 640 (1993) .......................................................9

*Martin v. Lambert,*
   2014-Ohio-715, 8 N.E.3d 1024 (4th Dist.) ..........................................................7

*Menifee v. Ohio Welding Prod., Inc.,*
   15 Ohio St.3d 75, 472 N.E.2d 707 (1984) ...........................................................7

*Novomont Corp. v. Lincoln Elec. Co.,*
   8th Dist. Cuyahoga No. 78389, 2001 WL 1352641 (Nov. 1, 2001).......................11

*Otte v. Dayton Power & Light Co.,*
   37 Ohio St.3d 33, 523 N.E.2d 835 (1988) .................................................. 5, 7, 12

*Pattie v. Coach, Inc.,*
   29 F.Supp. 3d 1051 (N.D. Ohio 2014) .......................................................... 13, 14

*Pierce v. Bishop,*
   4th Dist. Meigs No. 10CA6, 2011-Ohio-371 .........................................................9

*Pittman v. Parillo,*
   6th Dist. Lucas No. L16-1140, 2017 WL 1422891 (Apr. 21, 2017) .....................17

*Rayess v. Educ. Comm. for Foreign Med. Graduates,*
    134 Ohio St. 3d 509, 2012-Ohio-5675, 983 N.E.2d 1267 ......................................................10

*RCI Asset Mgt., Inc. v. Cerni Motor Sales, Inc.,*
    7th Dist. Mahoning No. 10 MA 115, 2012-Ohio-3007 ......................................................12

*Saks v. E. Ohio Gas Co.,*
    2012-Ohio-2637, 971 N.E.2d 498 (8th Dist.) ......................................................13

*Samadder v. DMF of Ohio, Inc.,*
    154 Ohio App.3d 770, 2003-Ohio-5340, 798 N.E.2d 1141 ......................................................10

*Slagle v. White Castle Sys., Inc.,*
    79 Ohio App.3d 210, 607 N.E.2d 45 (10th Dist. 1992) ......................................................8

*Spoerke v. Abruzzo,*
    11th Dist. Lake No. 2013–L–093, 2014–Ohio–1362 ......................................................10

*State ex rel. Gelesh v. State Med. Bd. of Ohio,*
    172 Ohio App. 3d 365, 2007-Ohio-3328, 874 N.E.2d 1256 (10th Dist) ......................................................17

*State ex rel. Hickman v. Capots,*
    45 Ohio St.3d 324, 544 N.E.2d 639 (1989) ......................................................3

*State ex rel. Scott v. Masterson,*
    173 Ohio St. 402, 183 N.E.2d 376 (1962) ......................................................17

*Time Warner AxS v. Pub. Util. Comm.,*
    75 Ohio St.3d 229, 661 N.E.2d 1097 (1996) ......................................................6

*Vidovic v. Hoynes,*
    2015-Ohio-712, 29 N.E.3d 338 (11th Dist.) ......................................................7

*W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.,*
    54 F. Supp. 3d 888 (S.D. Ohio 2014) ......................................................15

*Williams v. U.S. Bank Shaker Square,*
    8th Dist. Cuyahoga No. 89760, 2008-Ohio-1414 ......................................................17

*Wilson v. Mercy Med. Ctr.,*
    5th Dist. Stark No. 2015CA00010, 2015 WL 5664500 (Sept. 21, 2015) ......................................................8

**STATUTES, RULES, AND REGULATIONS**

Civ. R. 10(D)(1) ......................................................10

Civ.R. 12(B)(6) .......................................................................................................................... 3

Civ. R. 12(E) ........................................................................................................................... 10

Ohio Consumer Sales Practices Act .................................................................. 1, 3, 12, 13, 14

Ohio Corrupt Practices Act ....................................................................................... 1, 14, 15

Ohio Revised Code Section 1345.01 .......................................................................................... 12

Ohio Revised Code Section 1345.01(A) ...................................................................................... 13

Ohio Revised Code Section 1345.02 .......................................................................................... 13

Ohio Revised Code Section 1345.02(A) ............................................................................... 12, 14

Ohio Revised Code Section 1345.05 .......................................................................................... 13

Ohio Revised Code Section 1345.09(B) ...................................................................................... 13

Ohio Revised Code Section 2721.03 .......................................................................................... 17

Ohio Revised Code Section 2923.34(A) ...................................................................................... 14

Ohio Revised Code Section 3706.46 .......................................................................................... 12

Ohio Revised Code Secion 3706.46(A) ........................................................................................ 6

Ohio Revised Code Section 4905.32 ................................................................................... 4, 5, 12

Ohio Revised Code Section 4909.17 ................................................................................... 4, 5, 12

## INTRODUCTION

This past summer, Ohio was rocked by the federal indictment of former House Speaker Larry Householder and his associates on charges relating to the energy bill known as HB 6. Seeking to capitalize on those charges, Plaintiffs here filed a putative class action lawsuit against FirstEnergy Corp. and some of its subsidiaries (including three electric utilities). Although FirstEnergy has not been charged with any wrongdoing in the Householder case, Plaintiffs allege that the company joined a bribery conspiracy with the aim of enacting HB 6, which imposes a utility surcharge to subsidize nuclear plants that FirstEnergy used to own. They claim to be injured by FirstEnergy's use of their utility payments for illicit purposes, and by higher utility rates under HB 6. Seeking, in effect, a refund of their utility payments, Plaintiffs press a series of common-law and statutory claims.

Although the underlying criminal allegations against Householder are serious, the civil claims against FirstEnergy are deficient on their face, and this Court should dismiss the Amended Complaint as a matter of law. Cutting across the claims, and requiring all to be dismissed, is the filed-rate doctrine. Under that doctrine, utility rates approved by the regulatory agency cannot be challenged in court or refunded. As the Ohio Supreme Court declared decades ago, the statutory regime for rate-setting abrogates common-law remedies in this space. Because Plaintiffs' only injuries are their payments to FirstEnergy pursuant to duly approved electricity rates, the filed-rate doctrine bars their suit.

Each of Plaintiffs' claims also fails for other reasons. The negligence claims fail because a business has no tort duty to customers concerning how it uses its revenues. The contract claim fails because Plaintiffs identify only an internal policy guide, not an enforceable contract. The unjust enrichment claim fails because retaining payments at rates set by law cannot be "unjust." The Consumer Sales Practices Act claim fails because utility transactions are expressly excluded from its scope. The Corrupt Practices Act claim fails because FirstEnergy did not "proximately cause" the enactment of HB 6. And the civil conspiracy claim fails because it is derivative of the others.

## BACKGROUND

This is a putative class action against FirstEnergy Corp. and four of its subsidiaries, including three that distribute electricity in Ohio (Ohio Edison, Toledo Edison, and CEI). For simplicity, this motion refers to all five of those Defendants as "FirstEnergy" and to the three utility subsidiaries as "the Utilities." (*See* Am. Compl. ¶¶ 6-11.)[1] The two named Plaintiffs are Ohio residents who receive their electric service from the Utilities. (*Id.* ¶¶ 4-5.) They seek to represent a class consisting of all of FirstEnergy's "customers." (*Id.* ¶ 140(b)(i).) This summary is drawn from their allegations.

In general terms, Plaintiffs allege that FirstEnergy conspired with former Ohio House Speaker Larry Householder, his political associates, and a 501(c)(4) social-welfare group called "Generation Now" to execute a bribery scheme that resulted in the enactment of energy legislation known as House Bill 6 ("HB 6"). (*Id.* ¶¶ 66, 68.) FirstEnergy allegedly directed some $60 million to Generation Now, which Householder and his allies used to further their "political interests" and to "ensure passage" of HB 6, which stood to benefit FirstEnergy's two struggling nuclear plants. (*Id.* ¶¶ 71, 103.)

More specifically, the Complaint alleges a three-stage plan. *First*, laying the groundwork, funds donated to Generation Now were used to support candidates in primary and general elections who went on to vote for Householder as Speaker. (*Id.* ¶ 101.) *Second*, after HB 6 was introduced in the House by freshman representatives loyal to Householder (*id.* ¶ 106), Generation Now "engaged in an expensive media blitz," funded by FirstEnergy's contributions, "to pressure public officials to support the bill." (*Id.* ¶ 116.) The House and Senate each passed the bill, and the Governor signed it into law. (*Id.* ¶¶ 119-120, 122.) *Finally*, Generation Now used additional funds from FirstEnergy to campaign against a ballot initiative to repeal HB 6. (*Id.* ¶¶ 122-23.) "The efforts to prevent a repeal of HB 6 were successful," as the initiative failed to collect the required signatures. (*Id.* ¶ 124.)

---

[1] A sixth Defendant is Energy Harbor, which is an independent company that formerly was a FirstEnergy subsidiary. (Am. Compl. ¶ 12.) Energy Harbor is separately represented.

Plaintiffs claim that this alleged conduct has harmed them in two ways, both stemming from their payments as electricity customers.  Plaintiffs first object that FirstEnergy used their payments "to fund efforts to pass and implement HB 6." (*Id.* ¶ 140(b)(i).)  They also object to the higher costs they must pay for electricity "following the passage of HB 6." (*Id.* ¶ 140(b)(ii).)

Plaintiffs press nine causes of action representing six legal theories. *First*, they assert claims for negligence or gross negligence (Counts 1-3), contending that FirstEnergy breached duties to its customers by supporting HB 6. (*Id.* ¶¶ 153-162.)  *Second*, they claim breach of contract (Count 4) stemming from Defendants' alleged misuse of its revenues. (*Id.* ¶ 166.)  *Third*, the Complaint alleges unjust enrichment (Count 5), arguing that FirstEnergy benefited from increased revenue while customers were "forced" to pay higher rates under HB 6. (*Id.* ¶¶ 170-71.)  *Fourth*, Plaintiffs allege that FirstEnergy violated the Consumer Sales Practices Act (Count 6) by "assisting in and directing the illegal use of customer funds to secure passage and implementation of HB 6." (*Id.* ¶ 179.)  *Fifth*, the Complaint asserts a violation of Ohio's civil RICO statute (Count 8) based on FirstEnergy's alleged participation in a bribery scheme. (*Id.* ¶ 193.)  *Sixth*, Plaintiffs put forth a civil conspiracy claim (Count 9), alleging agreement to breach the purported duties and obligations set forth in the other counts.

Plaintiffs principally seek monetary relief. (*Id.* ¶ 1.)  But Count 7 also seeks vague declaratory relief and an injunction against the enforcement or application of HB 6. (*Id.* ¶¶ 188-189.)

## LEGAL STANDARD

Dismissal is proper under Civ.R. 12(B)(6) when it appears "that the plaintiff can prove no set of facts entitling him to recovery." *Border City Sav. & Loan Ass'n v. Moan*, 15 Ohio St.3d 65, 66, 472 N.E.2d 350 (1984).  The complaint's "factual allegations . . . must be taken as true," and reasonable inferences drawn in a plaintiff's favor. *Byrd v. Faber*, 57 Ohio St.3d 56, 60, 565 N.E.2d 584 (1991).  "Unsupported conclusions," however, "are not sufficient to withstand a motion to dismiss." *State ex rel. Hickman v. Capots*, 45 Ohio St.3d 324, 324, 544 N.E.2d 639 (1989).

## ARGUMENT

The Complaint levels serious accusations of *criminal misconduct*. But these allegations, even if assumed to be true (as they must be at this stage), simply do not support Plaintiffs' *civil claims for damages*. The most cross-cutting problem is that Plaintiffs' "injuries" are the payments they made for electric service, which they seek to recover in whole or in part. Under the "filed-rate doctrine," however, a court may not grant that relief or interfere in any way with utility rates approved and published by the Public Utilities Commission of Ohio ("PUCO"). Because Plaintiffs' case hinges on their payment of those rates, the Court must dismiss the Complaint as a matter of law. In addition, even setting that aside, each of Plaintiffs' legal theories fails for other, independent legal reasons too.

## I.    THE FILED-RATE DOCTRINE BARS PLAINTIFFS' COMPLAINT.

Plaintiffs' case against FirstEnergy ultimately reduces to a request for a refund of amounts that they paid for electricity service—indeed, as customers, those are their only conceivable damages. But the filed-rate doctrine precludes Plaintiffs from seeking the return of utility payments in any form.

Simply put, the filed-rate doctrine bars recovery by those who claim injury by virtue of having paid utility rates approved by a regulator. The doctrine is based on the principle that rates, once set or approved by a regulatory body, are the only rates a utility may lawfully collect. *See Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 257, 141 N.E.2d 465 (1957). That doctrine is codified in Ohio under a statutory directive that the utility may charge only the rates fixed by its commission-approved tariff or otherwise dictated by the commission. R.C. §§ 4905.32, 4909.17. Thus, "a utility has no option but to collect the rates set by the commission and is clearly forbidden to refund any part of the rates so collected." *Cincinnati Gas & Elec. v. Joseph Chevrolet Co.*, 153 Ohio App.3d 95, 2003-Ohio-1367, 791 N.E.2d 1016, ¶ 17 (1st Dist.). This is a true even when a rate is later held unlawful, because "retroactive ratemaking is not permitted under Ohio's comprehensive statutory scheme." *Lucas Cty. Comm'rs v. Pub. Util. Comm.*, 80 Ohio St.3d 344, 348, 686 N.E.2d 501 (1997).

As a consequence, courts cannot effect a refund of lawfully charged utility rates, including when ratepayers assert tort claims or statutory claims against the utilities. This has been the rule in Ohio for over half a century, dating back to *Keco*. That case involved an unjust enrichment suit by a customer, seeking to recover amounts paid under a rate that was approved by PUCO but later set aside by the Ohio Supreme Court. The court rejected the claim, holding that the customer could not be refunded monies paid pursuant to approved PUCO rates and that Ohio's statutory scheme had "completely abrogated" common-law remedies in this regard. *Keco*, 166 Ohio St. at 257-259. Forty years later, the Court relied on *Keco* in affirming the dismissal of customer claims seeking rebates or credits for alleged overpayments by natural gas customers under a challenged pilot program. *See Lucas Cty.*, 80 Ohio St.3d at 348. The Court again recognized that Ohio statute does not authorize any refunds for "charges previously collected by a public utility." *Id.* at 349; *see also Green Cove Resort I Owners' Ass'n v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774, 814 N.E.2d 829, ¶ 23 ("Neither the commission nor this court can order a refund of previously approved rates," even where the utility allegedly withheld documents from or otherwise deceived the Commission into approving the rates).

The filed-rate doctrine precludes Plaintiffs' claims. The filed-rate doctrine applies to electric utilities like Defendants, which may only charge rates filed with and approved by PUCO. *See* R.C. §§ 4905.32, 4909.17; *Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 40, 523 N.E.2d 835 (1988). And although Plaintiffs assert a variety of claims under a bevy of legal theories, the only alleged *harm* is their payment of those utility rates and rate surcharges. Indeed, Plaintiffs say their utility payments were the "exclusive source" of the funds FirstEnergy allegedly used for corrupt purposes (Am. Compl. ¶ 129), and their only damages consist of those rate payments plus the HB 6 surcharges that have or will be implemented through utility rates (*id.* ¶¶ 152, 157, 162, 167, 206). Accordingly, the only damages Plaintiffs can and do seek are, effectively, the return of utility payments. That is precisely the type of relief the filed-rate doctrine bars. *See Keco*, 166 Ohio St. at 259-60 (plaintiff could not recover

on unjust enrichment theory when damages were based on payment of rates approved by PUCO); *see also Lucas Cty.*, 80 Ohio St.3d at 348; *Green Cove*, 103 Ohio St.3d at ¶ 27. Plaintiffs cannot circumvent the doctrine simply by asserting tort claims and demanding utility refunds as their damages.

Apparently recognizing this fundamental problem, Plaintiffs try to evade the filed-rate rule by alleging that HB 6 somehow "bypassed the authority of PUCO." (Am. Compl. ¶ 28.) Not so. As the Complaint concedes, the "level and structure of the [surcharge] *shall be authorized by the commission*." (*Id.* ¶ 109 (emphasis added).) The text of the statute confirms as much. *See* R.C. § 3706.46(A) (directing PUCO to set level and structure of the charge). The Utilities thus have no choice but to collect the rates authorized by PUCO, just as in *Keco* and other cases applying the doctrine. To be sure, HB 6— like all legislation—sets parameters for the regulatory agency. But that is not *bypassing* the agency; it is *directing* it. It is always true that PUCO "may exercise only that jurisdiction conferred upon it by statute." *Time Warner AxS v. Pub. Util. Comm.*, 75 Ohio St.3d 229, 234, 661 N.E.2d 1097 (1996). Nothing in the filed-rate doctrine or its purpose exempts the ordinary situation where a regulator's discretion in rate-setting is constrained by the Legislature. *See Lucas Cty.*, 80 Ohio St.3d at 347.

In short, Plaintiffs' suit is nothing more than a request, on various common-law and statutory grounds, for a refund of utility rates approved by PUCO pursuant to law. The filed-rate doctrine prevents the court from awarding that relief, and therefore requires dismissal of the action.

## II. EACH OF PLAINTIFFS' CAUSES OF ACTION ALSO FAILS FOR ADDITIONAL REASONS.

Each of Plaintiffs' substantive counts also fails for at least one additional reason. At bottom, their objection is to how FirstEnergy chose to use the money that Plaintiffs paid for electricity and the way in which FirstEnergy engaged in the political process. But Plaintiffs got the electricity they paid for, and nothing in Ohio tort, contract, or statutory law confers on electricity customers any legally enforceable interest in how the utility spends money. Nor does the law permit Plaintiffs to sue FirstEnergy over the effects of legislation enacted by the Legislature and signed by the Governor.

### A.    The Negligence Claims Fail Because FirstEnergy Did Not Owe or Breach Any Legal Duty to Its Customers.  (Counts 1-3)

Counts 1-3 assert tort claims for negligence based on allegations that FirstEnergy advocated for HB 6 and allegedly committed misconduct in doing so.  Plaintiffs claim that this breached a duty "to protect customer funds" as well as more general duties to follow the law, abide by an internal code of conduct, and uphold public trust.  (Am. Compl. ¶¶ 149-162.)  These claims fail because FirstEnergy owed no such duties to the Utilities' customers, as confirmed by Ohio's economic loss rule.

A plaintiff alleging negligence must establish that (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; and (3) the breach proximately caused the injury. *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).  Gross negligence further requires a plaintiff to show "willful and wanton conduct" and intentional failure to perform a duty "in reckless disregard of the consequences." *Vidovic v. Hoynes*, 2015-Ohio-712, 29 N.E.3d 338, ¶ 51 (11th Dist.).  No matter the level of negligence alleged, the existence of a legal duty to exercise due care toward the plaintiff is an essential "threshold question." *Martin v. Lambert*, 2014-Ohio-715, 8 N.E.3d 1024, ¶ 16 (4th Dist.).  "If there is no duty, then no legal liability can arise on account of negligence." *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614 (1989).

Plaintiffs have not identified any duty owed to them by FirstEnergy.  The parties' relationship determines the duty owed. *Martin*, 2014-Ohio-715, ¶ 16.  Plaintiffs are *customers* of the Utilities.  In the context of utilities, the only duties courts have recognized as owed to customers concern maintenance, construction, and inspection of electrical equipment, and transmission and distribution of electricity. *Otte*, 37 Ohio St.3d at 38 (holding that utilities must exercise "highest degree of care" in "construction, maintenance, and inspection of its equipment"); *Lanning v. Delaware Rural Elec. Coop., Inc.*, 3rd Dist. Union No. 14-83-2, 1985 WL 9091, at *4 (Mar. 14, 1985) (referencing "duty of care in transmitting and distributing electric current").  But Plaintiffs do not claim any breach of these duties.

Instead, Plaintiffs' principal argument appears to be that FirstEnergy had a duty to "protect customer funds against misuse" and use them "only as allowed by law." (Compl. ¶ 154(a), (b).)  There is no such duty owed to customers.  The relationship between the Utilities and their customers is not a fiduciary one, where one party is obligated to act for the benefit of another, as these parties operate at arms-length.  *See Baghani v. Charter One Bank F.S.B.*, 8th Dist. Cuyahoga No. 91373, 2009-Ohio-490, ¶ 18.  In other words, FirstEnergy is not a bank; its role is not to "protect" customer funds.  And the law does not recognize ordinary business-customer relationships as giving rise to tort duties respecting how the business spends its money after the customer completes a transaction.  *See Slagle v. White Castle Sys., Inc.*, 79 Ohio App.3d 210, 216, 607 N.E.2d 45 (10th Dist. 1992) (identifying relationships, like between common carrier and passenger, or innkeeper and guest, that give rise to special duties).  The customers' ownership of those funds ends once payment is made in exchange for electricity.  Put another way, a customer has no legal interest in how a business uses its funds after a transaction.  Whether the business "misus[es]" those payments or diverts them from "their ordinary use" (Am. Compl. ¶ 155) might be relevant to a regulator, but has nothing to do with customers like Plaintiffs.

Plaintiffs also invoke duties premised on FirstEnergy's "internal policies and procedures." (*Id.* ¶¶ 149(b), 154(c)-(d).)  But Ohio courts have repeatedly recognized that internal policies of this sort do not create independent common-law duties, and a violation of an internal policy does not breach the standard of care.  *See, e.g., Wilson v. Mercy Med. Ctr.*, 5th Dist. Stark No. 2015CA00010, 2015 WL 5664500, at *5 (Sept. 21, 2015) (finding that a medical center's internal policies "do not create an independent common law duty"); *Brittingham v. Gen. Motors Corp*, 2d Dist. Montgomery No. 24517, 2011-Ohio-6488, ¶ 46 (holding that company policies imposed no duty because they "provide that they are 'guidelines only'"); *Baus v. Lowe*, 8th Dist. Cuyahoga No. 87765, 2007-Ohio-275, ¶¶ 22-23 (finding that club regulations did not impose "a special, corporate duty" but rather were merely "internal rule[s] of conduct").  The FirstEnergy Code of Conduct—framed as only "a guide for ethical

conduct" and mainly composed of abstract "Guiding Principles" (Am. Compl. Ex. A at 4-5)—falls squarely within that line of authority. *Accord Pierce v. Bishop*, 4th Dist. Meigs No. 10CA6, 2011-Ohio-371, ¶ 22 (finding that "[i]mposition of a duty on the basis of aspirational policies" like these would "amount to adopting a rule that makes law out of the cliché, 'No good deed goes unpunished'").

Finally, Plaintiffs rely on alleged duties to "uphold the public trust" and act in a "legal manner" and "as allowed by law." (Am. Compl. ¶¶ 149(a), (c), 154(b), (e).) Those highly generalized duties to the world are not legally cognizable either. Other than duties owed by public officials by virtue of their offices, Ohio law does not recognize generalized duties owed to the "public trust" or the public at large. *See, e.g., Amann v. Clear Channel Commc'ns*, 165 Ohio App.3d 291, 2006-Ohio-714, 846 N.E.2d 95, ¶ 9 (1st Dist.) (finding that broadcasters did not owe a duty of care to their public audience even though broadcasting licenses are held in trust for the public); *Malone v. Miami Univ.*, 89 Ohio App.3d 527, 531, 625 N.E.2d 640 (1993) (holding that a social host has no duty to members of the public at large to protect them from injuries caused by an intoxicated guest). Indeed, the notion that everyone owes a duty to the public to act in a "legal manner" would effectively turn every criminal statute into a privately enforceable common-law cause of action. That is obviously not the law.

The absence of a legal duty is underscored by Ohio's economic loss rule. Under that doctrine, "a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. "[I]t is the character of the loss, here the economic losses incurred," that prevents recovery in tort. *Ferro Corp. v. Blaw Knox Food & Chem. Eqip. Co.*, 121 Ohio App.3d 434, 440, 700 N.E.2d 94 (Ohio App. 8th Dist. 1997). In effect, consistent with the above, there is no tort duty to protect others from purely economic harm. Here, the only harm to Plaintiffs is their payment of utility rates, which is solely an economic loss. The economic loss rule thus confirms that Plaintiffs' negligence claims are thus not viable under Ohio law.

**B.    The Contract Claims Fail Because Plaintiffs Do Not Identify Any Contract with FirstEnergy or Any Breach of Such a Contract.  (Count 4)**

Count 4 asserts that FirstEnergy breached a contract with Plaintiffs.  But the Complaint pleads no such contract, much less a breach, and therefore this count must also be dismissed.

A party asserting breach of contract must plead existence of a binding contract, performance by the nonbreaching party, breach by the defendant without legal excuse, and damages.  *C4 Polymers, Inc. v. Huntington Nat'l. Bank*, 2015-Ohio-3475, 41 N.E.3d 788 ¶ 30 (8th Dist.).  A contract is an enforceable promise.  *Rayess v. Educ. Comm. for Foreign Med. Graduates*, 134 Ohio St. 3d 509, 2012-Ohio-5675, 983 N.E.2d 1267, ¶ 19.  "The existence of an enforceable contract is a prerequisite to a claim for breach of contract."  *Spoerke v. Abruzzo*, 11th Dist. Lake No. 2013–L–093, 2014–Ohio–1362, ¶ 29.

Plaintiffs allege that they have "existing contractual relationships" as customers of the Utilities, involving payment "in exchange for the provision of goods and services."  (Am. Compl. ¶ 164.)  Yet they fail to identify any particular contracts, and violate the Civil Rules by failing to attach the written instrument to the pleading.  *See* Civ. R. 10(D)(1).  That alone is grounds for dismissal.[2]  Moreover, Plaintiffs do not allege *breach* of the payment-for-services contract that they imply.  They never say, for example, that the Utilities failed to provide them with electricity.  That too compels dismissal.  *See Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, 798 N.E.2d 1141, ¶ 23 (rejecting claim where plaintiff did "not specify what contractual terms were breached").

Instead of identifying any contract between themselves and FirstEnergy, Plaintiffs invoke the FirstEnergy Code of Business Conduct, an internal set of corporate policies.  (Am. Compl. ¶ 165.)  But the Complaint never alleges that this Code constitutes a contract, because it obviously does not.  Indeed, the Code expressly warns that it "is not an employment or service contract."  (Am. Compl.

---

[2] At minimum and in the alternative, this is grounds for ordering Plaintiffs to provide a more definite statement of their claim under Rule 12(E), with the written contract attached as required by law.  *Fletcher v. Univ. Hosps. of Cleveland*, 120 Ohio St.3d 167, 170, 897 N.E.2d 147 (2008).

Ex. A at 5.) It merely serves as guidance to FirstEnergy: "This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability ... ." (*Id.* at 4.) An internal FirstEnergy document, adopted unilaterally without customer assent and that does not impose any obligations on customers, is not a legally enforceable contract. *See Episcopal Retirement Homes, Inc. v. Ohio Dep't of Indus. Relations*, 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991) ("[T]o declare the existence of a contract, both parties to the contract must consent to its terms ... and the contract must be definite and certain."); *Hillier v. Fifth Third Bank*, 2d Dist. Miami No. 2019-CA-21, 2020-Ohio-3679, ¶ 41 (internal bank procedures "could have no bearing on the contract" between bank and its customers); *cf. Csuhran v. Kaiser Found. Health Plan of Ohio*, 8th Dist. Cuyahoga No. 67460, 1995 WL 350081, at *3 (June 8, 1995) (collecting cases holding that employee handbooks are not generally binding contracts). In the absence of an enforceable contract, the Court must dismiss Count 4 as a matter of law.

### C. The Unjust Enrichment Claim Fails Because Plaintiffs Did Not Unjustly Enrich FirstEnergy. (Count 5)

Count 5 claims unjust enrichment based on the alleged payment of higher "monthly charges" under HB 6. (Compl. ¶¶ 169-171.) But payment of utility rates dictated by law cannot be "unjust."

Unjust enrichment occurs when a person "retains money or benefits which in justice and equity belong to another." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 286, 2005-Ohio 4985, 834 N.E.2d 791, ¶ 20. It requires "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Id.* Unjust enrichment "does not apply," though, "when a contract actually exists; it is an equitable remedy applicable only when the court finds there is no contract." *Corbin v. Dailey*, 10th Dist. Franklin No. 08AP-802, 2009-Ohio-881, ¶ 10. In addition, it is not enough that the plaintiff paid money to the defendant, or else every commercial transaction would give rise to unjust enrichment. Rather, retention of that money by the defendant must also be *unjust*, such as where the plaintiff contracted for a good or service and did not receive it. *See Novomont*

*Corp. v. Lincoln Elec. Co.*, 8th Dist. Cuyahoga No. 78389, 2001 WL 1352641, at *6 (Nov. 1, 2001) (appellee provided expertise, which benefited appellant, and appellee received nothing in return); *RCI Asset Mgt., Inc. v. Cerni Motor Sales, Inc.*, 7th Dist. Mahoning No. 10 MA 115, 2012-Ohio-3007, ¶ 21 (buyer was entitled to return of deposit from seller where sale was never consummated).

Those principles defeat Plaintiffs' claim. Plaintiffs allege "existing contractual relationships" under which they pay FirstEnergy "for the provision of goods and services," *i.e.*, for electricity service. (Am. Compl. ¶ 164.) While that fails to state a contract claim (because Plaintiffs neither attach the instrument nor identify any breach of its provisions), their allegation does sink their unjust enrichment claim: If the parties' duties to one another are defined by contract, then any failure of FirstEnergy to perform its obligations would sound in contract. *Corbin*, 2009-Ohio-881, ¶ 10. That is, Plaintiffs got the electricity they paid for—and if they hadn't, they could simply sue to enforce that contract.

Relatedly, there is nothing "unjust" about the payment of rates for electricity services. The rates in question were dictated by law and by PUCO. *See* R.C. §§ 4905.32, 4909.17, 3706.46; *Otte*, 37 Ohio St.3d at 40. Plaintiffs allege that Defendants engaged in misconduct to ensure passage of HB 6, but there is no precedent for holding a private party liable for a product of the legislative process. And even *unlawful* rates—if approved by PUCO—cannot form the basis for an unjust enrichment action. *See Keco*, 166 Ohio St. at 259-60; *see also supra* Part I. Count 5 must also be dismissed.

### D. The OCSPA Claim Fails Because the Complaint's Allegations Do Not Relate to Any Consumer Transaction. (Count 6)

Count 6 is a claim under the Ohio Consumer Sales Practices Act ("OCSPA"), R.C. § 1345.01 *et seq.*, which forbids unfair or deceptive acts or practices "in connection with a consumer transaction." R.C. § 1345.02(A). This claim fails, *first*, because Plaintiffs identify no "consumer transaction" and, *second*, because the OCSPA requires "prior notice" to the defendant in putative class actions.

Under the statute, a "consumer transaction" means "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household." R.C. § 1345.01(A). *Expressly excluded* from that definition are "transactions between persons, defined in [R.C.] sections 4905.03"—*i.e.*, public utility companies—"and their customers." *Id.*; *see also Saks v. E. Ohio Gas Co.*, 2012-Ohio-2637, 971 N.E.2d 498, ¶ 18 (8th Dist.) ("[T]he CSPA generally excludes transactions between a utility ... and its customers from the scope of 'consumer transactions' covered by the statute.").

Further, to pursue a class action under the OCSPA, a plaintiff must allege "that [the] defendant had prior notice that its conduct was 'deceptive or unconscionable.'" *Pattie v. Coach, Inc.*, 29 F.Supp. 3d 1051, 1055 (N.D. Ohio 2014) (citing R.C. § 1345.09(B)). To satisfy that requirement, a plaintiff must identify either "(1) a specific rule or regulation [that] has been promulgated under R.C. § 1345.05 that specifically characterizes the challenged practice as unfair or deceptive, or (2) an Ohio state court [that] has found the specific practice either unconscionable or deceptive." *Johnson v. Microsoft Corp.*, 155 Ohio App.3d 626, 2003-Ohio-7153, 802 N.E.2d 712, ¶ 21, *aff'd*, 106 Ohio St.3d 278, 2005-Ohio-4958, 834 N.E.2d 791. Plaintiffs "must specifically inform the trial court of the decision or rule relied upon." *Burdge v. Subvest 4, L.L.C.*, 1st Dist. Hamilton No. C-060354, 2007-Ohio-1488, ¶ 5.

Here, the Complaint fails in both respects. *First*, Plaintiffs do not identify any "consumer transactions." Plaintiffs sue in their capacity as customers of the Utilities. (*See, e.g.*, Am. Compl. ¶¶ 4, 5, 38.) But, as noted, Plaintiffs' transactions with the Utilities are expressly carved out from the definition of "consumer transactions." *Saks*, 2012-Ohio-2637, ¶ 18. Nor, in any event, do Plaintiffs allege unfair or deceptive acts or practices in connection with those transactions. For example, Plaintiffs do not allege that the Utilities lied about their electricity service or their rates. *See Funk v. Montgomery AMC/Jeep/Renault*, 66 Ohio App.3d 815, 824, 586 N.E.2d 1113 (1990) (noting that the legislature intended R.C. § 1345.02 to reach "affirmative representations of inaccurate or false

information"). Instead, Plaintiffs allege that FirstEnergy used their payments for corrupt and illegal purposes, namely "to secure passage and implementation of HB 6." (Am. Compl. ¶ 179.) Those allegations are simply too far afield to trigger this statute, which is expressly limited to a supplier's acts or practices "*in connection with* a consumer transaction." R.C. § 1345.02(A) (emphasis added).

*Second*, the OCSPA claim fails for the independent reason that Plaintiffs have not adequately pleaded prior notice. They assert that FirstEnergy had prior notice of the unfair or deceptive nature of its practices due to (i) a recently filed criminal complaint relating to HB 6 and (ii) "prior criminal and civil complaints in this district." (Am. Compl. ¶ 182.) The former is obviously insufficient, since it *came after* the alleged misconduct. And the latter is far too vague to "specifically inform" this Court of the decisions that would put FirstEnergy on notice. *Burdge*, 2007 WL 949802, at *1. Plus, the law is clear that "complaints"—as opposed to an actual *decision* of an Ohio court—cannot establish notice. *See Johnson*, 155 Ohio App.3d 626, 2003-Ohio-7153, 802 N.E.2d 712, at ¶ 20. This failure of pleading independently requires the dismissal of Count 6. *See, e.g.*, *Pattie*, 29 F.Supp. 3d at 1055 (dismissing class claims where plaintiffs' three cited cases were insufficient to constitute prior notice).

### E. The OCPA Claim Fails Because Defendants' Alleged Predicate Acts Did Not Proximately Cause the Enactment of HB 6. (Count 8)

Count 8 asserts a civil claim under the Ohio Corrupt Practices Act ("OCPA"), which is Ohio's version of the federal RICO statute and allows suits where a defendant's pattern of criminal acts cause injury to the plaintiff. *See* R.C. § 2923.34(A). Plaintiffs contend that Defendants engaged in bribery and other criminal acts, which caused the enactment of HB 6, which allegedly injures Plaintiffs through its "surcharges" on their electricity bills. (Am. Compl. ¶¶ 198, 201, 206.) This claim fails as a matter of law for lack of proximate cause. There are simply too many steps between FirstEnergy's alleged predicate acts and the ultimate enactment of HB 6 to hold Defendants liable for the latter.

A federal RICO plaintiff must plead and prove proximate cause. *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992). Ohio law requires the same under OCPA. *Herakovic v. Catholic*

*Diocese of Cleveland*, 8th Dist. Cuyahoga No. 85467, 2005-Ohio-5985, ¶¶ 31-32; *CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, 5th Dist. Stark No. 2010CA00303, 2012-Ohio-897, ¶ 71; *Lesick v. Manning*, 7th Dist. Columbiana No. 91-C-70, 1992 WL 380284, at *3 (Dec. 17, 1992); *W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 919 (S.D. Ohio 2014).

Proximate cause means the plaintiff's injury cannot be "too remote." *Cleveland v. JP Morgan Chase Bank, N.A.*, 8th Dist. Cuyahoga No. 98656, 2013-Ohio-1035, ¶¶ 18–20. Where "there are several intervening factors necessary for the harm suffered by the [plaintiff] to materialize," proximate cause is not satisfied. *Id.* ¶ 13. In *JP Morgan*, for example, the City alleged that the bank engaged in a pattern of submitting fraudulent paperwork in foreclosure actions, thereby triggering a crisis that harmed the City. *Id.* ¶¶ 3, 5. The court found the injuries suffered by the City too "remote," because there were "intervening factors" contributing to the City's harm, including the mortgage originators and brokers who offered high-risk mortgage products to individuals with questionable credit histories and the home buyers who applied for, received, and failed to repay these loans. *Id.* ¶¶ 13-14, 20, 36. It was of no moment that the actions of these intervening players were foreseeable, since foreseeability is not the correct metric for a proximate cause analysis. *Id.*; *see also CSAHA*, 2012-Ohio-897, ¶ 71.

As relevant in the legislative context, it would be "extraordinary to conclude that one corrupt official ... had hijacked" the legislature, the "foundational institution of state sovereignty." *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 730 –31 (7th Cir. 2014). In *Empress Casino*, plaintiffs asserted RICO claims premised on allegations of bribery in connection with two legislative bills. *Id.* at 725-28. Despite allegations that the governor was bribed "to push" one of the bills through the legislature, the court refused to infer "that the workings of an entire state legislature were coopted by the bribery of one official," and dismissed the claim for lack of proximate cause. *Id.* at 730.

The same flaw defeats Plaintiffs' OCPA claim. Their theory is that FirstEnergy's predicate activity proximately caused "the passage of HB 6." (Am. Compl. ¶ 205.) But the Complaint alleges a

series of events involving many independent decisions by people who are not alleged to have been part of the conspiracy. *First*, voters had to decide to support candidates aligned with Householder. Generation Now advocated for those candidates, but it was the voters who elected them. *Second*, the Ohio House had to elect Householder as Speaker. *Third*, a majority of the House had to enact HB 6. Again, Defendants may have contributed to an "expensive media blitz" to pressure the legislators to support the bill (Am. Compl. ¶¶ 116, 118), but the legislators cast their own votes. *Fourth*, a majority of the Senate—legislators who Plaintiffs do not allege were "ever bribed," *Empress Casino*, 763 F.3d at 729–30—had to vote to pass HB 6. (Am. Compl. ¶ 120.) *Fifth*, Ohio's Governor had to sign the bill. (*Id.* ¶ 122.) *Sixth*, Ohio's voters had to withhold their signatures from the ballot initiative seeking to repeal HB 6. (*Id.* ¶ 123.) *Seventh*, the Legislature must *now* decide, in light of everything that has come to light, not to "repeal and replace HB 6." (*Id.* ¶ 127.) All of these actions by independent actors are necessary before the harm to Plaintiffs—increased electricity costs under HB 6—comes to pass.

Under these circumstances, there are "so many other factors" that are "intervening break[s] in the causal chain." *JP Morgan*, 2013-Ohio-1035, at ¶¶ 14, 20. Plaintiffs cannot allege that HB6 was the "direct and proximate result" of FirstEnergy's alleged bribery of one legislator, given the number of steps and independent actors that interrupt the "directness of the relationship between the conduct and the harm." *CSAHA*, 2012-Ohio-897, ¶ 71. The law thus requires dismissal of Count 8.[3]

**F.    The Civil Conspiracy Claim Fails Because It Is Necessarily Derivative, and Plaintiffs Have Not Pleaded Any Viable Claims. (Count 9)**

---

[3] The absence of proximate cause is also an independent basis for dismissal of the negligence, contract, and civil conspiracy claims (Counts 1-3, 4, and 9). *Lagowski v. Shelly & Sands, Inc.*, 2015-Ohio-2685, 38 N.E.3d 456, ¶ 8 (7th Dist.) (affirming dismissal of negligence claim due to lack of proximate cause); *Claris, Ltd. v. Hotel Dev. Servs.*, LLC, 2018-Ohio-2602, 104 N.E.3d 1076, ¶¶ 29, 50 (10th Dist.) (finding plaintiff failed to prove that breaches of the contract proximately caused the claimed damage); *Gator Dev. Corp. v. VHH, Ltd.*, 1st Dist. Hamilton No. C–080193, 2009-Ohio-1802, ¶ 31 ("A civil conspiracy claim requires an underlying tortious act that causes an injury.").

Because none of Plaintiffs' substantive claims is viable, their civil conspiracy claim—which is by its nature derivative—must also fail. As Ohio's courts have recognized, a civil conspiracy claim cannot stand on its own; it requires some other independent tort. *See, e.g., Glazer v. Chase Home Fin., L.L.C.*, 8th Dist. Cuyahoga No. 99875, 2013-Ohio-5589, ¶ 89; *Williams v. U.S. Bank Shaker Square*, 8th Dist. Cuyahoga No. 89760, 2008-Ohio-1414, ¶ 16 ("An action for civil conspiracy cannot be maintained unless an underlying unlawful act is committed."). As demonstrated above, all of Plaintiffs' independent tort claims fail. Their action for civil conspiracy cannot be maintained on its own, and the Court should therefore dismiss it too.

### G. Plaintiffs Are Not Entitled To Declaratory Or Injunctive Relief. (Count 7)

Count 7 of Plaintiffs' Complaint seeks declaratory and injunctive relief, but because all of their claims fail, they are not entitled to these forms of relief. *See Pittman v. Parillo,* 6th Dist. Lucas No. L16-1140, 2017 WL 1422891, at *3, 19 (Apr. 21, 2017) (affirming trial court finding that plaintiffs did not state "meritorious claim" for declaratory or injunctive relief because they "failed to establish an underlying claim").

More specifically, Plaintiffs invoke a statutory provision allowing any person interested under a contract to seek to "have determined any question of construction or validity arising under the instrument." R.C. § 2721.03. Since Plaintiffs have not even established the existence of a relevant contract, they certainly are not entitled to a declaratory judgment about it. *See State ex rel. Gelesh v. State Med. Bd. of Ohio*, 172 Ohio App. 3d 365, 2007-Ohio-3328, 874 N.E.2d 1256, ¶ 34 (10th Dist).

As for injunctive relief, Plaintiffs' demand that the Court invalidate and enjoin HB 6 on "public policy" grounds is baseless. Under the basic tenets of separation of powers and judicial review, courts may invalidate legislative enactments only if they "violate the basic law." *State ex rel. Scott v. Masterson*, 173 Ohio St. 402, 405, 183 N.E.2d 376 (1962). Here, Plaintiffs have not alleged that HB 6—a statute duly enacted by the Legislature—is unconstitutional. So there is no legal basis for an injunction. In

any case, a court could enjoin the statute only in an action against the appropriate public officials. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810) ("[A] court ... cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law.").  Since Plaintiffs have not sued those public officials, they cannot secure that relief in this case.

## **CONCLUSION**

For these reasons, Plaintiffs' claims against FirstEnergy should be dismissed.

Dated:  November 9, 2020

Respectfully submitted,

*/s/ Ryan A. Doringo*
Michael R. Gladman (0059797)
mrgladman@jonesday.com
Tiffany D. Lipscomb-Jackson (0084382)
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Phone: (614) 469-3939

Ryan A Doringo (0091144)
radoringo@jonesday.com
JONES DAY
901 Lakeside Avenue East
Cleveland, Ohio 44114
Phone: (216) 586-3939

Yaakov M. Roth (*pro hac vice*
forthcoming)
yroth@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-7658

*Counsel for FirstEnergy Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 9, 2020, a copy of the foregoing was filed via the Court's electronic filing system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Ryan A. Doringo<br>Counsel for FirstEnergy Defendants

# ATTACHMENT
# Copies of Statutes, Regulations, Unpublished Cases, and/or Out-of-State Cases

LAW Writer® Ohio Laws and Rules

Search ORC: [        ]  Go

Ohio Administrative Code  Home  Help

Route:

- Ohio Revised Code
- » Title [13] XIII COMMERCIAL TRANSACTIONS - OHIO UNIFORM COMMERCIAL CODE
- » Chapter 1345: CONSUMER SALES PRACTICES

# 1345.01 Consumer sales practices definitions.

As used in sections 1345.01 to 1345.13 of the Revised Code:

(A) "Consumer transaction" means a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. "Consumer transaction" does not include transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers, except for transactions involving a loan made pursuant to sections 1321.35 to 1321.48 of the Revised Code and transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers; transactions involving a home construction service contract as defined in section 4722.01 of the Revised Code; transactions between certified public accountants or public accountants and their clients; transactions between attorneys, physicians, or dentists and their clients or patients; and transactions between veterinarians and their patients that pertain to medical treatment but not ancillary services.

(B) "Person" includes an individual, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, association, cooperative, or other legal entity.

(C) "Supplier" means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer. If the consumer transaction is in connection with a residential mortgage, "supplier" does not include an assignee or purchaser of the loan for value, except as otherwise provided in section 1345.091 of the Revised Code. For purposes of this division, in a consumer transaction in connection with a residential mortgage, "seller" means a loan officer, mortgage broker, or nonbank mortgage lender.

(D) "Consumer" means a person who engages in a consumer transaction with a supplier.

(E) "Knowledge" means actual awareness, but such actual awareness may be inferred where objective manifestations indicate that the individual involved acted with such awareness.

(F) "Natural gas service" means the sale of natural gas, exclusive of any distribution or ancillary service.

(G) "Public telecommunications service" means the transmission by electromagnetic or other means, other than by a telephone company as defined in section 4927.01 of the Revised Code, of signs, signals, writings, images, sounds, messages, or data originating in this state regardless of actual call routing. "Public telecommunications service" excludes a system, including its construction, maintenance, or operation, for the provision of telecommunications service, or any portion of such service, by any entity for the sole and exclusive use of that entity, its parent, a subsidiary, or an affiliated entity, and not for resale, directly or indirectly; the provision of terminal equipment used to originate telecommunications service; broadcast transmission by radio, television, or satellite broadcast stations regulated by the federal government; or cable television service.

(H)

(1) "Loan officer" means an individual who for compensation or gain, or in anticipation of compensation or gain, takes

or offers to take a residential mortgage loan application; assists or offers to assist a buyer in obtaining or applying to obtain a residential mortgage loan by, among other things, advising on loan terms, including rates, fees, and other costs; offers or negotiates terms of a residential mortgage loan; or issues or offers to issue a commitment for a residential mortgage loan. "Loan officer" also includes a mortgage loan originator as defined in division (Z) of section 1322.01 of the Revised Code.

(2) "Loan officer" does not include an employee of a bank, savings bank, savings and loan association, credit union, or credit union service organization organized under the laws of this state, another state, or the United States; an employee of a subsidiary of such a bank, savings bank, savings and loan association, or credit union; or an employee of an affiliate that (a) controls, is controlled by, or is under common control with, such a bank, savings bank, savings and loan association, or credit union and (b) is subject to examination, supervision, and regulation, including with respect to the affiliate's compliance with applicable consumer protection requirements, by the board of governors of the federal reserve system, the comptroller of the currency, the office of thrift supervision, the federal deposit insurance corporation, or the national credit union administration.

(I) "Residential mortgage" or "mortgage" means an obligation to pay a sum of money evidenced by a note and secured by a lien upon real property located within this state containing two or fewer residential units or on which two or fewer residential units are to be constructed and includes such an obligation on a residential condominium or cooperative unit.

(J)

(1) "Mortgage broker" means any of the following:

(a) A person that holds that person out as being able to assist a buyer in obtaining a mortgage and charges or receives from either the buyer or lender money or other valuable consideration readily convertible into money for providing this assistance;

(b) A person that solicits financial and mortgage information from the public, provides that information to a mortgage broker or a person that makes residential mortgage loans, and charges or receives from either of them money or other valuable consideration readily convertible into money for providing the information;

(c) A person engaged in table-funding or warehouse-lending mortgage loans that are residential mortgage loans.

(2) "Mortgage broker" does not include a bank, savings bank, savings and loan association, credit union, or credit union service organization organized under the laws of this state, another state, or the United States; a subsidiary of such a bank, savings bank, savings and loan association, or credit union; an affiliate that (a) controls, is controlled by, or is under common control with, such a bank, savings bank, savings and loan association, or credit union and (b) is subject to examination, supervision, and regulation, including with respect to the affiliate's compliance with applicable consumer protection requirements, by the board of governors of the federal reserve system, the comptroller of the currency, the office of thrift supervision, the federal deposit insurance corporation, or the national credit union administration; or an employee of any such entity.

(K) "Nonbank mortgage lender" means any person that engages in a consumer transaction in connection with a residential mortgage, except for a bank, savings bank, savings and loan association, credit union, or credit union service organization organized under the laws of this state, another state, or the United States; a subsidiary of such a bank, savings bank, savings and loan association, or credit union; or an affiliate that (1) controls, is controlled by, or is under common control with, such a bank, savings bank, savings and loan association, or credit union and (2) is subject to examination, supervision, and regulation, including with respect to the affiliate's compliance with applicable consumer protection requirements, by the board of governors of the federal reserve system, the comptroller of the currency, the office of thrift supervision, the federal deposit insurance corporation, or the national credit union administration.

(L) For purposes of divisions (H), (J), and (K) of this section:

(1) "Control" of another entity means ownership, control, or power to vote twenty-five percent or more of the outstanding shares of any class of voting securities of the other entity, directly or indirectly or acting through one or

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

more other persons.

(2) "Credit union service organization" means a CUSO as defined in 12 C.F.R. 702.2.

Amended by 132nd General Assembly File No. TBD, HB 199, §1, eff. 3/23/2018.

Amended by 129th General AssemblyFile No.107, HB 383, §1, eff. 8/31/2012.

Amended by 128th General AssemblyFile No.17, SB 124, §1, eff. 12/28/2009.

Amended by 128th General AssemblyFile No.9, HB 1, §101.01, eff. 10/16/2009.

Effective Date: 05-17-2000; 01-01-2007; 2008 HB545 09-01-2008 .

**Related Legislative Provision:** *See 128th General AssemblyFile No.17, SB 124, §5 .*

*See 128th General AssemblyFile No.9, HB 1, §745.60.*

Go To: [                    ]  [ Go ]

Prev | Next

Lawriter - ORC - 1345.02 Unfair or deceptive acts or practices.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 113 of 259  PAGEID #: 7141

LAW Writer® Ohio Laws and Rules

Search ORC: [          ]  [ Go ]

Ohio Administrative Code Home Help

*Route*:

- Ohio Revised Code
- » Title [13] XIII COMMERCIAL TRANSACTIONS - OHIO UNIFORM COMMERCIAL CODE
- » Chapter 1345: CONSUMER SALES PRACTICES

# 1345.02 Unfair or deceptive acts or practices.

(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

(3) That the subject of a consumer transaction is new, or unused, if it is not;

(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;

(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

(7) That replacement or repair is needed, if it is not;

(8) That a specific price advantage exists, if it does not;

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

(C) In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended.

(D) No supplier shall offer to a consumer or represent that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers, or otherwise helping the supplier to enter into other consumer transactions, if earning the benefit is contingent upon an event occurring after the consumer enters into the transaction.

(E)     Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

Lawriter - ORC - 1345.02 Unfair or deceptive acts or practices.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 114 of 259 PAGEID #: 7142

(1) No supplier, in connection with a consumer transaction involving natural gas service or public telecommunications service to a consumer in this state, shall request or submit, or cause to be requested or submitted, a change in the consumer's provider of natural gas service or public telecommunications service, without first obtaining, or causing to be obtained, the verified consent of the consumer. For the purpose of this division and with respect to public telecommunications service only, the procedures necessary for verifying the consent of a consumer shall be those prescribed by rule by the public utilities commission for public telecommunications service under division (D) of section 4905.72 of the Revised Code. Also, for the purpose of this division, the act, omission, or failure of any officer, agent, or other individual, acting for or employed by another person, while acting within the scope of that authority or employment, is the act or failure of that other person.

(2) Consistent with the exclusion, under 47 C.F.R. 64.1100(a)(3), of commercial mobile radio service providers from the verification requirements adopted in 47 C.F.R. 64.1100, 64.1150, 64.1160, 64.1170, 64.1180, and 64.1190 by the federal communications commission, division (E)(1) of this section does not apply to a provider of commercial mobile radio service insofar as such provider is engaged in the provision of commercial mobile radio service. However, when that exclusion no longer is in effect, division (E)(1) of this section shall apply to such a provider.

(3) The attorney general may initiate criminal proceedings for a prosecution under division (C) of section 1345.99 of the Revised Code by presenting evidence of criminal violations to the prosecuting attorney of any county in which the offense may be prosecuted. If the prosecuting attorney does not prosecute the violations, or at the request of the prosecuting attorney, the attorney general may proceed in the prosecution with all the rights, privileges, and powers conferred by law on prosecuting attorneys, including the power to appear before grand juries and to interrogate witnesses before grand juries.

(F) Concerning a consumer transaction in connection with a residential mortgage, and without limiting the scope of division (A) or (B) of this section, the act of a supplier in doing either of the following is deceptive:

(1) Knowingly failing to provide disclosures required under state and federal law;

(2) Knowingly providing a disclosure that includes a material misrepresentation.

(G) Without limiting the scope of division (A) of this section, the failure of a supplier to obtain or maintain any registration, license, bond, or insurance required by state law or local ordinance for the supplier to engage in the supplier's trade or profession is an unfair or deceptive act or practice.

Amended by 131st General Assembly File No. TBD, SB 227, §1, eff. 4/6/2017.

Effective Date: 05-17-2000; 01-01-2007 .

Go To: [          ]  Go

Prev | Next

LAW Writer® Ohio Laws and Rules

Search ORC: [              ]  [ Go ]

<u>Ohio Administrative Code</u> <u>Home</u> <u>Help</u>

<u>Route</u>:

- <u>Ohio Revised Code</u>
- » <u>Title [13] XIII COMMERCIAL TRANSACTIONS - OHIO UNIFORM COMMERCIAL CODE</u>
- » <u>Chapter 1345: CONSUMER SALES PRACTICES</u>

# 1345.05 Attorney general powers and duties.

(A) The attorney general shall:

(1) Adopt, amend, and repeal procedural rules;

(2) Adopt as a rule a description of the organization of the attorney general's office, stating the general courses and methods of operation of the section of the office of the attorney general, which is to administer Chapter 1345. of the Revised Code and methods whereby the public may obtain information or make submissions or requests, including a description of all forms and instructions used by that office;

(3) Make available for public inspection all rules and all other written statements of policy or interpretations adopted or used by the attorney general in the discharge of the attorney general's functions, together with all judgments, including supporting opinions, by courts of this state that determine the rights of the parties and concerning which appellate remedies have been exhausted, or lost by the expiration of the time for appeal, determining that specific acts or practices violate section <u>1345.02</u>, <u>1345.03</u>, or <u>1345.031</u> of the Revised Code;

(4) Inform consumers and suppliers on a continuing basis of acts or practices that violate Chapter 1345. of the Revised Code by, among other things, publishing an informational document describing acts and practices in connection with residential mortgages that are unfair, deceptive, or unconscionable, and by making that information available on the attorney general's official web site;

(5) Cooperate with state and local officials, officials of other states, and officials of the federal government in the administration of comparable statutes;

(6) Report annually on or before the thirty-first day of January to the governor and the general assembly on the operations of the attorney general in respect to Chapter 1345. of the Revised Code, and on the acts or practices occurring in this state that violate such chapter. The report shall include a statement of investigatory and enforcement procedures and policies, of the number of investigations and enforcement proceedings instituted and of their disposition, and of other activities of the state and of other persons to promote the purposes of Chapter 1345. of the Revised Code.

(7) In carrying out official duties, the attorney general shall not disclose publicly the identity of suppliers investigated or the facts developed in investigations unless these matters have become a matter of public record in enforcement proceedings, in public hearings conducted pursuant to division (B)(1) of this section, or the suppliers investigated have consented in writing to public disclosure.

(B) The attorney general may:

(1) Conduct research, make inquiries, hold public hearings, and publish studies relating to consumer transactions;

(2) Adopt, amend, and repeal substantive rules defining with reasonable specificity acts or practices that violate sections <u>1345.02</u>, <u>1345.03</u>, and <u>1345.031</u> of the Revised Code. In adopting, amending, or repealing substantive rules defining acts or practices that violate section 1345.02 of the Revised Code, due consideration and great weight shall be given to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection

45(a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended.

In adopting, amending, or repealing such rules concerning a consumer transaction in connection with a residential mortgage, the attorney general shall consult with the superintendent of financial institutions and shall give due consideration to state and federal statutes, regulations, administrative agency interpretations, and case law.

(C) In the conduct of public hearings authorized by this section, the attorney general may administer oaths, subpoena witnesses, adduce evidence, and require the production of relevant material. Upon failure of a person without lawful excuse to obey a subpoena or to produce relevant matter, the attorney general may apply to a court of common pleas for an order compelling compliance.

(D) The attorney general may request that an individual who refuses to testify or to produce relevant material on the ground that the testimony or matter may incriminate the individual be ordered by the court to provide the testimony or matter. With the exception of a prosecution for perjury and an action for damages under section 1345.07 or 1345.09 of the Revised Code, an individual who complies with a court order to provide testimony or matter, after asserting a privilege against self incrimination to which the individual is entitled by law, shall not be subjected to a criminal proceeding on the basis of the testimony or matter discovered through that testimony or matter.

(E) Any person may petition the attorney general requesting the adoption, amendment, or repeal of a rule. The attorney general shall prescribe by rule the form for such petitions and the procedure for their submission, consideration, and disposition. Within sixty days of submission of a petition, the attorney general shall either deny the petition in writing, stating the reasons for the denial, or initiate rule-making proceedings. There is no right to appeal from such denial of a petition.

(F) All rules shall be adopted subject to Chapter 119. of the Revised Code.

(G) The informational document published in accordance with division (A)(4) of this section shall be made available for distribution to consumers who are applying for a mortgage loan. An acknowledgement of receipt shall be retained by the lender, mortgage broker, and loan officer, as applicable, subject to review by the attorney general and the department of commerce.

Amended by 129th General AssemblyFile No.127, HB 487, §101.01, eff. 9/10/2012.

Amended by 128th General AssemblyFile No.17, SB 124, §1, eff. 12/28/2009.

Amended by 128th General AssemblyFile No.9, HB 1, §101.01, eff. 10/16/2009.

Effective Date: 07-01-1983; 01-01-2007

**Related Legislative Provision:** *See 128th General AssemblyFile No.17, SB 124, §5 .*

*See 128th General AssemblyFile No.9, HB 1, §745.60.*

Go To: [                    ] Go

Prev | Next

LAW Writer® Ohio Laws and Rules

Search ORC: [                    ]  [Go]

Ohio Administrative Code Home Help

Route:

- Ohio Revised Code
- » Title [13] XIII COMMERCIAL TRANSACTIONS - OHIO UNIFORM COMMERCIAL CODE
- » Chapter 1345: CONSUMER SALES PRACTICES

# 1345.09 Private causes of action.

For a violation of Chapter 1345. of the Revised Code, a consumer has a cause of action and is entitled to relief as follows:

(A) Where the violation was an act prohibited by section 1345.02, 1345.03, or 1345.031 of the Revised Code, the consumer may, in an individual action, rescind the transaction or recover the consumer's actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages.

(B) Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02, 1345.03, or 1345.031 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code, the consumer may rescind the transaction or recover, but not in a class action, three times the amount of the consumer's actual economic damages or two hundred dollars, whichever is greater, plus an amount not exceeding five thousand dollars in noneconomic damages or recover damages or other appropriate relief in a class action under Civil Rule 23, as amended.

(C)

(1) Except as otherwise provided in division (C)(2) of this section, in any action for rescission, revocation of the consumer transaction must occur within a reasonable time after the consumer discovers or should have discovered the ground for it and before any substantial change in condition of the subject of the consumer transaction.

(2) If a consumer transaction between a loan officer, mortgage broker, or nonbank mortgage lender and a customer is in connection with a residential mortgage, revocation of the consumer transaction in an action for rescission is only available to a consumer in an individual action, and shall occur for no reason other than one or more of the reasons set forth in the "Truth in Lending Act," 82 Stat. 146 (1968), 15 U.S.C. 1635, not later than the time limit within which the right of rescission under section 125(f) of the "Truth in Lending Act" expires.

(D) Any consumer may seek a declaratory judgment, an injunction, or other appropriate relief against an act or practice that violates this chapter.

(E) When a consumer commences an individual action for a declaratory judgment or an injunction or a class action under this section, the clerk of court shall immediately mail a copy of the complaint to the attorney general. Upon timely application, the attorney general may be permitted to intervene in any private action or appeal pending under this section. When a judgment under this section becomes final, the clerk of court shall mail a copy of the judgment including supporting opinions to the attorney general for inclusion in the public file maintained under division (A)(3) of section 1345.05 of the Revised Code.

(F) The court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed and limited pursuant to section 1345.092 of the Revised Code, if either of the following apply:

(1) The consumer complaining of the act or practice that violated this chapter has brought or maintained an action that is

groundless, and the consumer filed or maintained the action in bad faith;

(2) The supplier has knowingly committed an act or practice that violates this chapter.

(G) As used in this section, "actual economic damages" means damages for direct, incidental, or consequential pecuniary losses resulting from a violation of Chapter 1345. of the Revised Code and does not include damages for noneconomic loss as defined in section 2315.18 of the Revised Code.

(H) Nothing in this section shall preclude a consumer from also proceeding with a cause of action under any other theory of law.

Amended by 129th General AssemblyFile No.97, HB 275, §1, eff. 7/3/2012.

Amended by 128th General AssemblyFile No.17, SB 124, §1, eff. 12/28/2009.

Amended by 128th General AssemblyFile No.9, HB 1, §101.01, eff. 10/16/2009.

Effective Date: 08-11-1978; 2006 SB185 01-01-2007; 2006 SB117 10-31-2007 .

**Related Legislative Provision:** *See 128th General AssemblyFile No.17, SB 124, §5 .*

*See 128th General AssemblyFile No.9, HB 1, §745.60.*

Go To: [_____] [ Go ]

*Prev* | *Next*

Lawriter - ORC - 2721.03 Construction or validity of instrument or legal provision.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 119 of 259 PAGEID #: 7147

LAW Writer® Ohio Laws and Rules

Search ORC: [＿＿＿＿＿＿＿] [Go]

Ohio Administrative Code  Home  Help

Route:

- Ohio Revised Code
- » Title [27] XXVII COURTS - GENERAL PROVISIONS - SPECIAL REMEDIES
- » Chapter 2721: DECLARATORY JUDGMENTS

# 2721.03 Construction or validity of instrument or legal provision.

Subject to division (B) of section 2721.02 of the Revised Code, any person interested under a deed, will, written contract, or other writing constituting a contract or any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it.

The testator of a will may have the validity of the will determined at any time during the testator's lifetime pursuant to Chapter 5817. of the Revised Code. The settlor of a trust may have the validity of the trust determined at any time during the settlor's lifetime pursuant to Chapter 5817. of the Revised Code.

Amended by 132nd General Assembly File No. TBD, HB 595, §1, eff. 3/22/2019.

Effective Date: 09-24-1999 .

Go To: [＿＿＿＿＿＿＿] [Go]

Prev | Next

Lawriter - ORC - 2923.34 Civil proceeding seeking relief from any person whose conduct constitutes corrupt activity.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 120 of 259  PAGEID #: 7148

LAW Writer® Ohio Laws and Rules

Search ORC: [          ] [ Go ]

- Ohio Revised Code
- » Title [29] XXIX CRIMES - PROCEDURE
- » Chapter 2923: CONSPIRACY, ATTEMPT, AND COMPLICITY; WEAPONS CONTROL; CORRUPT ACTIVITY

# 2923.34 Civil proceeding seeking relief from any person whose conduct constitutes corrupt activity.

(A) Any person who is injured or threatened with injury by a violation of section 2923.32 of the Revised Code may institute a civil proceeding in an appropriate court seeking relief from any person whose conduct violated or allegedly violated section 2923.32 of the Revised Code or who conspired or allegedly conspired to violate that section, except that the pattern of corrupt activity alleged by an injured person or person threatened with injury shall include at least one incident other than a violation of division (A)(1) or (2) of section 1707.042 or division (B), (C)(4), (D), (E), or (F) of section 1707.44 of the Revised Code, of 18 U.S.C. 1341, 18 U.S.C. 1343, 18 U.S.C. 2314, or any other offense involving fraud in the sale of securities.

(B) If the plaintiff in a civil action instituted pursuant to this section proves the violation by a preponderance of the evidence, the court, after making due provision for the rights of innocent persons, may grant relief by entering any appropriate orders to ensure that the violation will not continue or be repeated. The orders may include, but are not limited to, orders that:

(1) Require the divestiture of the defendant's interest in any enterprise or in any real property;

(2) Impose reasonable restrictions upon the future activities or investments of any defendant in the action, including, but not limited to, restrictions that prohibit the defendant from engaging in the same type of endeavor as the enterprise in which the defendant was engaged in violation of section 2923.32 of the Revised Code;

(3) Order the dissolution or reorganization of any enterprise;

(4) Order the suspension or revocation of a license, permit, or prior approval granted to any enterprise by any department or agency of the state;

(5) Order the dissolution of a corporation organized under the laws of this state, or the revocation of the authorization of a foreign corporation to conduct business within this state, upon a finding that the board of directors or an agent acting on behalf of the corporation, in conducting the affairs of the corporation, has authorized or engaged in conduct in violation of section 2923.32 of the Revised Code, and that, for the prevention of future criminal conduct, the public interest requires the corporation to be dissolved or its license revoked.

(C) Relief pursuant to division (B)(3), (4), or (5) of this section shall not be granted in any civil proceeding instituted by an injured person unless the attorney general intervenes in the civil action pursuant to this division.

Upon the filing of a civil proceeding for relief under division (B)(3), (4), or (5) of this section by an allegedly injured person other than a prosecuting attorney, the allegedly injured person immediately shall notify the attorney general of the filing. The attorney general, upon timely application, may intervene in any civil proceeding for relief under division (B)(3), (4), or (5) if the attorney general certifies that, in the attorney general's opinion, the proceeding is of general public interest. In any proceeding brought by an injured person under division (B)(3), (4), or (5) of this section, the attorney general is entitled to the same relief as if the attorney general instituted the proceeding.

Lawriter - ORC - 2923.34 Civil proceeding seeking relief from any person whose conduct constitutes corrupt activity.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 121 of 259 PAGEID #: 7149

(D) In a civil proceeding under division (B) of this section, the court may grant injunctive relief without a showing of special or irreparable injury.

Pending final determination of a civil proceeding initiated under this section, the court may issue a temporary restraining order or a preliminary injunction upon a showing of immediate danger or significant injury to the plaintiff, including the possibility that any judgment for money damages might be difficult to execute, and, in a proceeding initiated by an aggrieved person, upon the execution of proper bond against injury for an improvidently granted injunction.

(E) In a civil proceeding under division (A) of this section, any person directly or indirectly injured by conduct in violation of section 2923.32 of the Revised Code or a conspiracy to violate that section, other than a violator of that section or a conspirator to violate that section, in addition to relief under division (B) of this section, shall have a cause of action for triple the actual damages the person sustained. To recover triple damages, the plaintiff shall prove the violation or conspiracy to violate that section and actual damages by clear and convincing evidence. Damages under this division may include, but are not limited to, competitive injury and injury distinct from the injury inflicted by corrupt activity.

(F) In a civil action in which the plaintiff prevails under division (B) or (E) of this section, the plaintiff shall recover reasonable attorney fees in the trial and appellate courts, and the court shall order the defendant to pay to the state, municipal, or county law enforcement agencies that handled the investigation and litigation the costs of investigation and litigation that reasonably are incurred and that are not ordered to be paid pursuant to division (B)(2) of section 2923.32 of the Revised Code or division (H) of this section.

(G) Upon application, based on the evidence presented in the case by the plaintiff, as the interests of justice may require, the trial court may grant a defendant who prevails in a civil action brought pursuant to this section all or part of the defendant's costs, including the costs of investigation and litigation reasonably incurred, and all or part of the defendant's reasonable attorney fees, unless the court finds that special circumstances, including the relative economic position of the parties, make an award unjust.

(H) If a person, other than an individual, is not convicted of a violation of section 2923.32 of the Revised Code, the prosecuting attorney may institute proceedings against the person to recover a civil penalty for conduct that the prosecuting attorney proves by clear and convincing evidence is in violation of section 2923.32 of the Revised Code. The civil penalty shall not exceed one hundred thousand dollars and shall be paid into the state treasury to the credit of the corrupt activity investigation and prosecution fund created in section 2923.32 of the Revised Code. If a civil penalty is ordered pursuant to this division, the court shall order the defendant to pay to the state, municipal, or county law enforcement agencies that handled the investigation and litigation the costs of investigation and litigation that are reasonably incurred and that are not ordered to be paid pursuant to this section.

(I) A final judgment, decree, or delinquency adjudication rendered against the defendant or the adjudicated delinquent child in a civil action under this section or in a criminal or delinquency action or proceeding for a violation of section 2923.32 of the Revised Code shall estop the defendant or the adjudicated delinquent child in any subsequent civil proceeding or action brought by any person as to all matters as to which the judgment, decree, or adjudication would be an estoppel as between the parties to the civil, criminal, or delinquency proceeding or action.

(J) Notwithstanding any other provision of law providing a shorter period of limitations, a civil proceeding or action under this section may be commenced at any time within five years after the unlawful conduct terminates or the cause of action accrues or within any longer statutory period of limitations that may be applicable. If a criminal proceeding, delinquency proceeding, civil action, or other proceeding is brought or intervened in by the state to punish, prevent, or restrain any activity that is unlawful under section 2923.32 of the Revised Code, the running of the period of limitations prescribed by this division with respect to any civil action brought under this section by a person who is injured by a violation or threatened violation of section 2923.32 of the Revised Code, based in whole or in part upon any matter complained of in the state prosecution, action, or proceeding, shall be suspended during the pendency of the state prosecution, action, or proceeding and for two years following its termination.

Lawriter - ORC - 2923.34 Civil proceeding seeking relief from any person whose conduct constitutes corrupt activity.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 122 of 259 PAGEID #: 7150

(K) Personal service of any process in a proceeding under this section may be made upon any person outside this state if the person was involved in any conduct constituting a violation of section 2923.32 of the Revised Code in this state. The person is deemed by the person's conduct in violation of section 2923.32 of the Revised Code to have submitted to the jurisdiction of the courts of this state for the purposes of this section.

(L) The application of any civil remedy under this section shall not preclude the application of any criminal remedy or criminal forfeiture under section 2923.32 of the Revised Code or any other provision of law, or the application of any delinquency disposition under Chapter 2152. of the Revised Code or any other provision of law.

(M)

(1) Any person who prevails in a civil action pursuant to this section has a right to any property, or the proceeds of any property, criminally forfeited to the state pursuant to section 2981.04 of the Revised Code or against which any fine under section 2923.32 of the Revised Code or civil penalty under division (H) of this section may be imposed.

The right of any person who prevails in a civil action pursuant to this section, other than a prosecuting attorney performing official duties under that section, to forfeited property, property against which fines and civil penalties may be imposed, and the proceeds of that property is superior to any right of the state, a municipal corporation, or a county to the property or the proceeds of the property, if the civil action is brought within one hundred eighty days after the entry of a sentence of forfeiture or a fine pursuant to sections 2923.32 and 2981.04 of the Revised Code or the entry of a civil penalty pursuant to division (H) of this section.

The right is limited to the total value of the treble damages, civil penalties, attorney's fees, and costs awarded to the prevailing party in an action pursuant to this section, less any restitution received by the person.

(2) If the aggregate amount of claims of persons who have prevailed in a civil action pursuant to this section against any one defendant is greater than the total value of the treble fines, civil penalties, and forfeited property paid by the person against whom the actions were brought, all of the persons who brought their actions within one hundred eighty days after the entry of a sentence or disposition of forfeiture or a fine pursuant to section 2923.32 of the Revised Code or the entry of a civil penalty pursuant to division (H) of this section, first shall receive a pro rata share of the total amount of the fines, civil penalties, and forfeited property. After the persons who brought their actions within the specified one-hundred-eighty-day period have satisfied their claims out of the fines, civil penalties, and forfeited property, all other persons who prevailed in civil actions pursuant to this section shall receive a pro rata share of the total amount of the fines, civil penalties, and forfeited property that remains in the custody of the law enforcement agency or in the corrupt activity investigation and prosecution fund.

(N) As used in this section, "law enforcement agency" includes, but is not limited to, the state board of pharmacy.

Effective Date: 01-01-2002; 07-01-2007.

Go To: [          ]  Go

Prev | Next

LAW Writer® Ohio Laws and Rules

Search ORC: [          ] Go

Ohio Administrative Code Home Help

Route:

- Ohio Revised Code
- » Title [37] XXXVII HEALTH - SAFETY - MORALS
- » Chapter 3706: AIR QUALITY DEVELOPMENT AUTHORITY

# 3706.46 Revenue requirements.

(A)

(1) Beginning for all bills rendered on or after January 1, 2021, by an electric distribution utility in this state, such electric distribution utility shall collect from all of its retail electric customers in this state, each month, a charge or charges which, in the aggregate, are sufficient to produce the following revenue requirements:

(a) One hundred fifty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the nuclear generation fund;

(b) Twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the renewable generation fund.

(2) The public utilities commission shall determine the method by which the revenue is allocated or assigned to each electric distribution utility for billing and collection, provided that the method of allocation shall be based on the relative number of customers, relative quantity of kilowatt hour sales, or a combination of the two. The level and structure of the charge shall be authorized by the commission through a process that the commission shall determine is not for an increase in any rate, joint rate, toll, classification, charge, or rental, notwithstanding anything to the contrary in Title XLIX of the Revised Code.

(B) In authorizing the level and structure of any charge or charges to be billed and collected by each electric distribution utility, the commission shall ensure that the per-customer monthly charge for residential customers does not exceed eighty-five cents and that the per-customer monthly charge for industrial customers eligible to become self-assessing purchasers pursuant to division (C) of section 5727.81 of the Revised Code does not exceed two thousand four hundred dollars. For nonresidential customers that are not self-assessing purchasers, the level and design of the charge or charges shall be established in a manner that avoids abrupt or excessive total net electric bill impacts for typical customers.

(C) Each charge authorized by the commission under this section shall be subject to adjustment so as to reconcile actual revenue collected with the revenue needed to meet the revenue requirements under division (A)(1) of this section. The commission shall authorize each electric distribution utility to adopt accounting practices to facilitate such reconciliation. Notwithstanding any other provisions of the Revised Code, the charge or charges authorized by the commission may continue beyond December 31, 2027, only if it is necessary to reconcile actual revenue collected under this section during the period ending on December 31, 2027, with the actual revenue needed to meet the revenue requirements under division (A)(1) of this section for required disbursements under section 3706.55 of the Revised Code that may be due and owing during the same period. Such continuation shall be authorized only for such period of time beyond December 31, 2027, as may be reasonably necessary to complete the reconciliation.

Added by 133rd General Assembly File No. TBD, HB 6, §1, eff. 10/22/2019.

Go To: [Electronically Filed 11/09/2020 3:59:27 MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ]

LAW Writer® Ohio Laws and Rules

Search ORC: [＿＿＿＿＿＿] [ Go ]

Ohio Administrative Code Home Help

Route:

- Ohio Revised Code
- » Title [49] XLIX PUBLIC UTILITIES
- » Chapter 4905: PUBLIC UTILITIES COMMISSION - GENERAL POWERS

# 4905.03 Public utility company definitions.

As used in this chapter

, any person, firm, copartnership, voluntary association, joint-stock association, company, or corporation, wherever organized or incorporated, is:

(A) A telephone company, when engaged in the business of transmitting telephonic messages to, from, through, or in this state;

(B) A for-hire motor carrier, when engaged in the business of transporting persons or property by motor vehicle for compensation, except when engaged in any of the operations in intrastate commerce described in divisions (B)(1) to (9) of section 4921.01 of the Revised Code, but including the carrier's agents, officers, and representatives, as well as employees responsible for hiring, supervising, training, assigning, or dispatching drivers and employees concerned with the installation, inspection, and maintenance of motor-vehicle equipment and accessories;

(C) An electric light company, when engaged in the business of supplying electricity for light, heat, or power purposes to consumers within this state, including supplying electric transmission service for electricity delivered to consumers in this state, but excluding a regional transmission organization approved by the federal energy regulatory commission;

(D) A gas company, when engaged in the business of supplying artificial gas for lighting, power, or heating purposes to consumers within this state or when engaged in the business of supplying artificial gas to gas companies or to natural gas companies within this state, but a producer engaged in supplying to one or more gas or natural gas companies, only such artificial gas as is manufactured by that producer as a by-product of some other process in which the producer is primarily engaged within this state is not thereby a gas company. All rates, rentals, tolls, schedules, charges of any kind, or agreements between any gas company and any other gas company or any natural gas company providing for the supplying of artificial gas and for compensation for the same are subject to the jurisdiction of the public utilities commission.

(E) A natural gas company, when engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state. Notwithstanding the above, neither the delivery nor sale of Ohio-produced natural gas or Ohio-produced raw natural gas liquids by a producer or gatherer under a public utilities commission-ordered exemption, adopted before, as to producers, or after, as to producers or gatherers, January 1, 1996, or the delivery or sale of Ohio-produced natural gas or Ohio-produced raw natural gas liquids by a producer or gatherer of Ohio-produced natural gas or Ohio-produced raw natural gas liquids, either to a lessor under an oil and gas lease of the land on which the producer's drilling unit is located, or the grantor incident to a right-of-way or easement to the producer or gatherer, shall cause the producer or gatherer to be a natural gas company for the purposes of this section.

All rates, rentals, tolls, schedules, charges of any kind, or agreements between a natural gas company and other natural gas companies or gas companies providing for the supply of natural gas and for compensation for the same are subject to the jurisdiction of the public utilities commission. The commission, upon application made to it, may relieve any producer or gatherer of natural gas, defined in this section as a gas company or a natural gas company, of compliance with the obligations imposed by this chapter and Chapters 4901., 4903., 4907., 4909., 4921., and 4923. of the Revised Code, so long as the producer or gatherer is not affiliated with or under the control of a gas company or a natural gas

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 126 of 259 PAGEID #: 7154

company engaged in the transportation or distribution of natural gas, or so long as the producer or gatherer does not engage in the distribution of natural gas to consumers.

Nothing in division (E) of this section limits the authority of the commission to enforce sections 4905.90 to 4905.96 of the Revised Code.

(F) A pipe-line company, when engaged in the business of transporting natural gas, oil, or coal or its derivatives through pipes or tubing, either wholly or partly within this state, but not when engaged in the business of the transport associated with gathering lines, raw natural gas liquids, or finished product natural gas liquids;

(G) A water-works company, when engaged in the business of supplying water through pipes or tubing, or in a similar manner, to consumers within this state;

(H) A heating or cooling company, when engaged in the business of supplying water, steam, or air through pipes or tubing to consumers within this state for heating or cooling purposes;

(I) A messenger company, when engaged in the business of supplying messengers for any purpose;

(J) A street railway company, when engaged in the business of operating as a common carrier, a railway, wholly or partly within this state, with one or more tracks upon, along, above, or below any public road, street, alleyway, or ground, within any municipal corporation, operated by any motive power other than steam and not a part of an interurban railroad, whether the railway is termed street, inclined-plane, elevated, or underground railway;

(K) A suburban railroad company, when engaged in the business of operating as a common carrier, whether wholly or partially within this state, a part of a street railway constructed or extended beyond the limits of a municipal corporation, and not a part of an interurban railroad;

(L) An interurban railroad company, when engaged in the business of operating a railroad, wholly or partially within this state, with one or more tracks from one municipal corporation or point in this state to another municipal corporation or point in this state, whether constructed upon the public highways or upon private rights-of-way, outside of municipal corporations, using electricity or other motive power than steam power for the transportation of passengers, packages, express matter, United States mail, baggage, and freight. Such an interurban railroad company is included in the term "railroad" as used in section 4907.02 of the Revised Code.

(M) A sewage disposal system company, when engaged in the business of sewage disposal services through pipes or tubing, and treatment works, or in a similar manner, within this state.

(C) **[As added by 129th General Assembly File No.127, HB 487, §101.01 ]**As used in this section:

(1) "Gathering lines" has the same meaning as in section 4905.90 of the Revised Code.

(2) "Raw natural gas liquids" and "finished product natural gas liquids" have the same meanings as in section 4906.01 of the Revised Code.

Amended by 129th General AssemblyFile No.125, SB 315, §101.01, eff. 9/10/2012.

Amended by 129th General AssemblyFile No.127, HB 487, §101.01, eff. 6/11/2012.

Amended by 128th General AssemblyFile No.43, SB 162, §1, eff. 9/13/2010.

Effective Date: 01-01-2001 .

LAW Writer® Ohio Laws and Rules

*S*earch ORC: [_____] [ Go ]

Ohio Administrative Code   Home   Help

*Route*:

- Ohio Revised Code
- » Title [49] XLIX PUBLIC UTILITIES
- » Chapter 4905: PUBLIC UTILITIES COMMISSION - GENERAL POWERS

# 4905.32 Schedule rate collected.

No public utility shall charge, demand, exact, receive, or collect a different rate, rental, toll, or charge for any service rendered, or to be rendered, than that applicable to such service as specified in its schedule filed with the public utilities commission which is in effect at the time. No public utility shall refund or remit directly or indirectly, any rate, rental, toll, or charge so specified, or any part thereof, or extend to any person, firm, or corporation, any rule, regulation, privilege, or facility except such as are specified in such schedule and regularly and uniformly extended to all persons, firms, and corporations under like circumstances for like, or substantially similar, service.

Effective Date: 10-01-1953 .

*G*o To: [_____] [ Go ]

*Prev* | *Next*

Lawriter - ORC - 4909.17 Approval required for change in rate.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 129 of 259 PAGEID #: 7157

LAW Writer® Ohio Laws and Rules

Search ORC: [                    ] [ Go ]

Ohio Administrative Code Home Help
*Route*:

- Ohio Revised Code
- » Title [49] XLIX PUBLIC UTILITIES
- » Chapter 4909: PUBLIC UTILITIES COMMISSION - FIXATION OF RATES

# 4909.17 Approval required for change in rate.

No rate, joint rate, toll, classification, charge, or rental, no change in any rate, joint rate, toll, classification, charge, or rental, and no regulation or practice affecting any rate, joint rate, toll, classification, charge, or rental of a public utility shall become effective until the public utilities commission, by order, determines it to be just and reasonable, except as provided in this section and sections 4909.18, 4909.19, and 4909.191 of the Revised Code. Such sections do not apply to any rate, joint rate, toll, classification, charge, or rental, or any regulation or practice affecting the same, of railroads, street and electric railways, for-hire motor carriers, and pipe line companies.

Amended by 129th General AssemblyFile No.127, HB 487, §101.01, eff. 6/11/2012.

Amended by 129th General AssemblyFile No.20, HB 95, §1, eff. 9/9/2011.

Amended by 128th General AssemblyFile No.43, SB 162, §1, eff. 9/13/2010.

Effective Date: 10-01-1953 .

Go To: [                    ] [ Go ]
Prev | Next

**Empress Casino Joliet Corp. v. Johnston, 763 F.3d 723 (2014)**

RICO Bus.Disp.Guide 12,518

763 F.3d 723
United States Court of Appeals,
Seventh Circuit.

EMPRESS CASINO JOLIET
CORP., et al., Plaintiffs–Appellants,
v.
John JOHNSTON, Balmoral Racing
Club, Inc., and Maywood Park Trotting
Ass'n, Inc., Defendants–Appellees.

No. 13–2972.
|
Argued March 31, 2014.
|
Decided Aug. 15, 2014.

**Synopsis**

**Background:** Owners and operators of riverboat gambling casinos in Illinois brought action against Illinois governor and members of horse racing industry, alleging defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring to exchange campaign contributions for ensuring two bills were enacted imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry. The United States District Court for the Northern District of Illinois, Matthew F. Kennelly, J., granted defendants' motion for summary judgment. Casino owners appealed.

**Holdings:** The Court of Appeals, Wood, Chief Judge, held that:

[1] casino owners' RICO action was not barred by res judicata by two prior state court actions challenging the constitutionality of the bills; and

[2] there was no evidence that alleged scheme caused passage of first bill; but

[3] fact question as to proximate cause precluded summary judgment on casino owners' RICO claim as to passage of second bill.

Reversed in part and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (7)

[1]     **Judgment** ⟺ Nature and requisites of former recovery as bar in general

Under Illinois law, for the doctrine of res judicata to apply, the following three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies.

13 Cases that cite this headnote

[2]     **Judgment** ⟺ Identity of Cause of Action or Relief Sought

Casino owners' action against Illinois governor and members of horse racing industry, alleging defendants violated Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring to exchange campaign contributions for ensuring two bills were enacted imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry, was not barred by res judicata by two prior state court actions challenging the constitutionality of the bills; the claims in the state suits were materially different than the claims in casino owners' RICO action. 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

[3]     **Racketeer Influenced and Corrupt Organizations** ⟺ Business, property, or proprietary injury; personal injuries

**Racketeer Influenced and Corrupt Organizations** ⟺ Causal relationship; direct or indirect injury

Plaintiff in civil action under Racketeer Influenced and Corrupt Organizations Act (RICO) must allege that an injury to his business or property resulted from the underlying acts of racketeering. 18 U.S.C.A. § 1964(c).

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

11 Cases that cite this headnote

**[4]** **Racketeer Influenced and Corrupt Organizations** ⟜ Business, property, or proprietary injury; personal injuries

**Racketeer Influenced and Corrupt Organizations** ⟜ Causal relationship; direct or indirect injury

Under section of the Racketeer Influenced and Corrupt Organizations Act (RICO) providing a civil remedy to any person injured in his business or property, the plaintiff can only recover to the extent that he has been injured in his business or property by the conduct constituting the violation. 18 U.S.C.A. § 1964(c).

8 Cases that cite this headnote

**[5]** **Racketeer Influenced and Corrupt Organizations** ⟜ Causal relationship; direct or indirect injury

Section of the Racketeer Influenced and Corrupt Organizations Act (RICO) providing a civil remedy to any person injured in his business or property borrows the doctrine of proximate cause from antitrust law; in both the antitrust and RICO contexts, the focus is on the directness of the relationship between the defendant's alleged conduct and the harm. 18 U.S.C.A. § 1964(c).

5 Cases that cite this headnote

**[6]** **Racketeer Influenced and Corrupt Organizations** ⟜ Causal relationship; direct or indirect injury

There was no evidence that alleged scheme of members of horse racing industry to bribe Illinois governor caused passage of bill that imposed a tax on certain in-state casinos and placed the funds into a trust for the benefit of the horse racing industry, as required to support casino owners' Racketeer Influenced and Corrupt Organizations Act (RICO) claim against governor and racetracks. 18 U.S.C.A. § 1964.

3 Cases that cite this headnote

**[7]** **Federal Civil Procedure** ⟜ Racketeering cases

In action brought by casino owners alleging that members of horse racing industry bribed Illinois governor to ensure that a bill was enacted to renew a prior bill imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry, and that, in exchange for the governor's signature on the bill, the racetracks promised to give $100,000 to his campaign fund, fact question as to proximate cause precluded summary judgment on casino owners' Racketeer Influenced and Corrupt Organizations Act (RICO) claim against governor and racetracks. 18 U.S.C.A. § 1964.

3 Cases that cite this headnote

## Attorneys and Law Firms

**\*724** Robert Andalman, A & G Law LLC, Chicago, IL, for Plaintiffs–Appellants.

**\*725** William J. McKenna, Jr., Attorney, Martin J. Bishop, Attorney, Foley & Lardner LLP, Chicago, IL, for Defendants–Appellees.

Before WOOD, Chief Judge, and WILLIAMS and HAMILTON, Circuit Judges.

## Opinion

WOOD, Chief Judge.

Deals are the stuff of legislating. Although logrolling may appear unseemly some of the time, it is not, by itself, illegal. Bribes are. This case requires us once again to decide whether some shenanigans in the Illinois General Assembly and governor's office crossed the line from the merely unseemly to the unlawful. It involves a subject we have visited in the past: two industries that compete for gambling dollars. See *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 651 F.3d 722 (7th Cir.2011) (en banc). In 2006 and 2008, former Governor Rod Blagojevich signed into law two bills (to which we refer as the '06 and '08 Acts) that imposed a tax on certain in-state casinos of 3% of their revenue and placed the funds into a trust for the benefit of the horseracing industry. Smelling a rat, the

RICO Bus.Disp.Guide 12,518

plaintiff casinos brought suit under the federal Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, alleging that the defendants, all members of the horseracing industry, had bribed the governor to ensure that the bills were enacted. Viewing the evidence in the light most favorable to the plaintiffs (and of course not vouching for anything), we conclude that there was enough to survive summary judgment on the claim that the governor agreed to sign the '08 Act in exchange for a bribe. We therefore reverse in part and remand for further proceedings on that part of the case.

## I

Illinois legalized riverboat casino gambling in 1990. Ever since, the state's once-thriving horseracing industry has been in decline. In late 2005 and early 2006, the state General Assembly considered legislation to help the horseracers. One bill would have imposed a 3% tax on casinos earning more than $50 million annually and deposited the proceeds into a fund for the benefit of the horseracing industry. It was modeled on similar initiatives in three other states. Lobbying on all sides was intense. On the first few votes in the General Assembly, the bill failed to garner a majority.

The bill's fortunes changed later in the spring of 2006. For one thing, it was modified so that the tax applied only to casinos earning more than $200 million annually, thereby limiting its effect to the large casinos in northern Illinois near Chicago. For another, Governor Blagojevich began to take an interest in the matter after his senior aide and alleged pay-to-play facilitator, Christopher Kelly, met with a horseracing executive, John Johnston. On the floor of the General Assembly, the bill's opponents cried foul. "Why are some of you called down to the Governor's office, then you come back up and change your vote?" asked Representative William Black. Added Representative Brent Hassert, "The Governor has weighed in on [the '06 bill] ... heavily in the last night or so, calling people and asking people to vote on this. It is my understanding ... that there's promises have been made to support this bill." Soon after, the '06 Act cleared the House by a vote of 70–32; a week later, the Senate passed it 40–16. Governor Blagojevich signed the bill into law the next day. Johnston and other racing executives thanked the governor for his support of the bill in a personal letter. Using various *726 subsidiaries, they then contributed $125,000 to his campaign fund.

The '06 Act contained a two-year sunset provision. In early 2008, the General Assembly began to consider its renewal. Meanwhile, horseracing executive Johnston met with Governor Blagojevich and his chief of staff Alonzo Monk. Blagojevich gave no indication whether he would support the renewed bill, telling Johnston, "Appreciate your support in the past, hope you can continue to support me in the future." In the fall, with the bill stalled in the General Assembly, Blagojevich called Johnston to solicit campaign donations. Johnston pledged to give $100,000, but he did not send the money. Over the next few months, Monk repeatedly needled Johnston about following through on the pledge. In one conversation recorded by federal authorities, Johnston told Monk: "Look, tell the big guy [Blagojevich] I'm good for it.... I'm just figuring out which accounts to pull the checks from."

In November, the General Assembly voted to renew the Racing Act by a vote of 83–28; the Senate likewise did so by a vote of 37–13. Representative Robert Molaro, a sponsor of the original Racing Act legislation, testified later that Governor Blagojevich played no role in the passage of the '08 Act. But in contrast to his immediate signing of the '06 Act, the governor initially did nothing with the '08 Act. Johnston complained to Monk in a recorded conversation that the governor's delay in signing the bill was costing him $9,000 per day. "This is getting goofier," Johnston told a colleague in an email, "We are going to have to put a stronger bit in his mouth!?!" In another recorded conversation, Monk told the governor that Johnston was breathing down his neck about the bill. The governor replied that the bill would be signed, but it was a "timing issue." Possibly alluding to Johnston's $100,000 commitment, the governor explained that he would "like some separation between that and signing the bill."

By December, Johnston still had not ponied up the $100,000 and Governor Blagojevich still had not signed the '08 Act into law. In recorded conversations, the governor and Monk strategized about "how [Monk] [could] approach John Johnston to get the donation of one hundred thousand dollars." Monk made clear that Johnston was desperate to have the Racing Act renewal signed into law. He told the governor: "Look, I want to go to [Johnston] without crossing the line and say, give us the fuckin' money ... give us the money and one has nothing to do with the other.... But give us the fuckin' money, because they're losing 9,000 a day ... for every day it's not signed." Monk then met with Johnston to deliver a message, as he later recalled it, that "once [Johnston] made the contribution, the act would be signed." Johnston

asked Monk: "Do you want me to make some of the payment now and some of the payment after the beginning of the year?" Asked whether Johnston ever directly promised to deliver the money, Monk later testified: "I think he did to me." After the meeting, Monk called the governor to report that Johnston would soon pay up.

A few days later, federal authorities arrested Blagojevich. Despite the arrest, Blagojevich later signed the '08 Act into law. The charging documents against Blagojevich alleged that the governor had linked signage of the '08 Act to a commitment to donate $100,000 in discussions with an unnamed representative of the horseracing industry. Regarding that charge, Johnston admitted, "I didn't know if anybody else had given $100,000, but I knew I did." (Despite this statement, Johnston never actually delivered the money.) Johnston signed an immunity agreement *727 which represented that he "may have information relevant to the [Blagojevich] investigation" and acknowledged "that such information may tend to incriminate [himself]." Later, an investigative report by the General Assembly found that Blagojevich traded state action for campaign contributions, including from "Race Horse Executive 1," later revealed to be Johnston, in exchange for enactment of the '08 Act.

The appellants here are Empress Casino Joliet Corporation, Des Plaines Development Limited Partnership, Hollywood Casino–Aurora, Inc., and Elgin Riverboat Resort–Riverboat Casino (the Casinos). They are all Illinois casinos taxed under the '06 and '08 Acts. Their first move was to challenge the validity of the Acts in state court. The Illinois Supreme Court rejected their challenge to the '06 Act under the state and federal constitutions. *Empress Casino Joliet Corp. v. Giannoulias,* 231 Ill.2d 62, 324 Ill.Dec. 491, 896 N.E.2d 277 (2008), *cert. denied* 556 U.S. 1281, 129 S.Ct. 2764, 170 L.Ed.2d 270 (2009) (*Empress I* ). Illinois courts later rejected a similar challenge to the '08 Act. *Empress Casino Joliet Corp. v. Giannoulias,* 406 Ill.App.3d 1040, 347 Ill.Dec. 580, 942 N.E.2d 783 (2011), *app. denied,* 351 Ill.Dec. 2, 949 N.E.2d 1097 (Ill.2011) (*Empress II* ). The appellees here— horseracing tracks and executives that benefitted from the '06 and '08 Acts (the Racetracks)—intervened and participated in both state actions.

The Casinos then filed a federal RICO suit against the Racetracks and former Governor Blagojevich seeking damages and a constructive trust over the tax money received by the Racetracks under the '06 and '08 Acts. A panel of this court held that legislative immunity barred the

suit against Blagojevich but that the Tax Injunction Act permitted the constructive trust. *Empress Casino Joliet Corp. v. Blagojevich,* 638 F.3d 519 (7th Cir.2011) (*Empress III* ). Sitting *en banc,* we rejected the position that the panel had taken with regard to the Tax Injunction Act. *Empress Casino Joliet Corp. v. Balmoral Racing Club,* 651 F.3d at 726 (*Empress IV* ). On remand, the district court granted summary judgment for the Racetracks on the Casinos' claims of a conspiracy to exchange campaign contributions for state action in violation of RICO, 18 U.S.C. § 1962(d). The district court found that the Casinos had offered evidence from which a reasonable jury could find that there was a pattern of racketeering activity. It also found that a jury could find that an enterprise-in-fact, consisting of Governor Blagojevich, his associates, and various other participants, existed. The court concluded that there was sufficient evidence to support a jury finding that the defendants bribed Blagojevich to secure his signature on the '08 Act, but assumed, without deciding, the sufficiency of the evidence relating to the '06 Act. The court went on to determine that the Casinos could not show that the alleged bribes proximately caused their injury. The only element on which the Casinos lost was therefore proximate cause. The Casinos appealed to this court.

## II

We begin with the Racetracks' argument that the results of the two prior state actions foreclose the Casinos' claims under the claim preclusion branch of *res judicata.* We apply the same preclusive effect to a state court judgment as the state court itself would apply. 28 U.S.C. § 1738; see *Marrese v. Amer. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

[1]   Under Illinois law, "[f]or the doctrine of *res judicata* to apply, the following *728 three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park,* 184 Ill.2d 290, 234 Ill.Dec. 783, 703 N.E.2d 883, 889 (1998).

[2]   *Res judicata* does not bar the Casinos' claims here because the second element is not met: this action does not present the same claim under the transactional test Illinois adopted in *River Park, id.* at 893. In the first state action, the Casinos asked the court "to determine the constitutionality of [the '06 Act]," and the Illinois Supreme Court held that "[the

'06 Act] withst[ood] the constitutional challenges raised" under the state and federal constitutions. *Empress I,* 324 Ill.Dec. 491, 896 N.E.2d at 282. In the second state action, the Casinos "challeng[ed] the constitutionality of [the ' 08 Act]," and the Illinois courts upheld the new law. *Empress II,* 347 Ill.Dec. 580, 942 N.E.2d at 786, 789. Indeed, this is not the first time we have been asked to consider the *res judicata* effects of the earlier litigation. We concluded before that "the claims ... in the two [state] suits are materially different" than those involved here, see *Empress III,* 638 F.3d at 537, and we adhere to that assessment. (This conclusion makes it unnecessary for us to decide whether the cases involve the same parties.) The two state actions were facial challenges to the validity of the Racing Acts. Neither state action considered the question at issue here: whether the Racetracks are liable to the Casinos for bribing the governor to sign the '06 and '08 Acts.

### III

The circumstances surrounding the enactment of the two Acts differ significantly, and so we analyze them separately. We conclude that the Casinos failed to present sufficient evidence with respect to their allegations about the '06 Act. The '08 Act is another matter. For it, the Casinos presented sufficient evidence on proximate cause to withstand summary judgment. As we noted earlier, we naturally are not vouching for any of the facts on which we rely here; instead, as required, we are reviewing the district court's grant of summary judgment *de novo* and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Shaffer v. Amer. Med. Ass'n,* 662 F.3d 439, 442 (7th Cir.2011).

*The '06 Act.*—We begin with the allegation that the Racetracks bribed Governor Blagojevich to push the '06 Act through the state legislature. Even if a RICO suit could be based on such an allegation (a questionable proposition), the Casinos have not presented sufficient evidence to permit a trier of fact to find that Governor Blagojevich caused the legislature to pass the '06 Act.

**[3]** **[4]** RICO's private civil remedy provision states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue

therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C. § 1964(c). Prohibited activities under RICO include the "conduct of [an] enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), as well as a conspiracy to do the same, *id.* § 1962(d). To state a claim under this provision, the plaintiff must allege that "an injury to [his] business or property result[ed] from the underlying acts of racketeering." *Haroco, Inc. v. Amer. Nat'l B & *729 T Co. of Chi.,* 747 F.2d 384, 398 (7th Cir.1984). Under RICO, the plaintiff "can only recover to the extent that [ ] he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985). Bribery of government officials is one offense that can serve as a predicate for a RICO violation. 18 U.S.C. § 1961(1); see also *Salinas v. United States,* 522 U.S. 52, 62–66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

**[5]** RICO borrows the doctrine of proximate cause from antitrust law. *Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In both the antitrust and RICO contexts, "the focus is on the directness of the relationship between the [defendant's alleged] conduct and the harm." *Hemi Grp., LLC v. City of New York, N.Y.,* 559 U.S. 1, 12, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010); see also *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) ("[T]he central question [to] ask is whether the alleged violation led directly to the plaintiff's injuries."); *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311 (RICO requires "some direct relation between the injury asserted and the injurious conduct alleged"). As the Supreme Court has explained:

> '[P]roximate cause' [serves] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts, with a particular emphasis on the demand for some direct relation between the injury asserted and the injurious conduct alleged. The direct-relation requirement avoids the difficulties associated with attempting

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 5

to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors....

*Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

 **[6]**  The Casinos have not pointed to evidence that would allow a factfinder to conclude that the Racetracks' alleged bribery scheme caused the legislature to pass the '06 Act. To begin with, the Casinos make no allegation and have no evidence that the Racetracks ever bribed or attempted to bribe state legislators. Nor do the Casinos point to evidence that the governor agreed to exert improper influence over state legislators in order to win their support of the '06 Act in exchange for a bribe. See *McCutcheon v. Fed. Election Comm'n,* ─── U.S. ───, 134 S.Ct. 1434, 1450, 188 L.Ed.2d 468 (2014) ("[W]hile preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—'*quid pro quo* ' corruption."). In fact, every legislator who was deposed testified that the governor had not attempted to induce his vote on the '06 Act.

A careful look at the record also reveals that the Casinos' suggestion that the governor threatened to withhold funding to various legislators' districts is unsubstantiated, but to the extent this was more simple logrolling, it falls short of evidence that could support a RICO claim. The Casinos refer us to several exhibits that purportedly show that "Blagojevich or his staff link[ed] changed votes on the ['06] Act to capital expenditures like highway spending in the representatives' districts." But this is an exaggeration of the record. Representative Phelps, for example, when asked whether it was possible that Governor Blagojevich had called him to discuss the 3% fee, claimed not to remember. At the same time, when asked if it was possible that the topic came up and he just did not recall, he answered "no" and said that he would have remembered something like **\*730** that. Representative D'Amico flatly denied that the governor raised the issue of the 3% fee in a phone call about a different bill. Representative Giles's testimony was the same. Other exhibits referenced by the Casinos contain nothing but inadmissible hearsay on the point. See Ex. 85 (declaration of Maddox); Ex. 86 (email from Maddox) ("Brandon Phelps said ..."); Ex. 87 (email from Satz based on reports he heard); Ex. 88 (emails from James Morphew) ("Hassert told me this morning ..."). Finally, an admissible email from one of the defendants says

nothing about the governor's linkage of the '06 Act to highway spending or any other improper exertion of influence. See Ex. 89 (email from Tim Carey, president of Hawthorne Race Course) ("[T]he fact that the Gov was working the phones for us was a great sign that this could make it to his desk.").

The fact that the bill failed to garner a majority on the first few votes does not suffice to raise a genuine issue of material fact. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Numerous reasons, including the change to the bill restricting its application to the highest-earning casinos or just the usual give-and-take of legislative lawmaking, might explain the change in outcome.

The Casinos also point to statements on the floor of the General Assembly and in various media reports, but these statements are not admissible to prove the matters asserted therein. See FED.R.EVID. 801(c), 802. Even if they were admissible, they show very little; the fact that the governor met with unnamed legislators during the months-long period when the bill was under consideration does not show anything untoward. We do not know which legislators met with the governor, nor what was discussed. The worst comment the Casinos identify is Rep. Hassert's obviously inadmissible statement that it was his "understanding ... [that] promises [were] made to support this bill." Not only is that comment an out-of-court statement offered to prove the truth of the matter asserted; the underlying sentiment is not based on personal knowledge. See FED.R.EVID. 805. Worse, we have no idea what promises he was talking about. If the promise referred to support for re-election, or a commitment to co-sponsor a bill, without any taint of bribery, nothing would be wrong.

We accept for present purposes that, in an appropriate case, a "finding that bribery of a [government official] proximately caused a plaintiff's injury can [ ] rest on evidence of that individual's influence over the proceedings." *Bieter Co. v. Blomquist,* 987 F.2d 1319, 1327 (8th Cir.1993). But that principle does not apply to the '06 Act. The record contains no admissible evidence that Governor Blagojevich unduly pressured members of the legislature to support the '06 Act. Nor is there competent evidence that would permit an inference that any identifiable group of legislators "voted as a bloc" at the governor's behest. No legislator was bribed. It takes more than the Casinos have shown here to support their proposed conclusion that the workings of an entire state legislature were coopted by the bribery of one official.

RICO Bus.Disp.Guide 12,518

The work of state legislatures lies at the heart of the "Republican Form of Government" that the Constitution mandates. U.S. CONST. art. IV, § 4; see also THE FEDERALIST No. 51 (James Madison) ("In republican government, the legislative authority necessarily predominates."). The evidence would have to be extraordinary to conclude that one corrupt official, whether the governor or anyone else, had hijacked this foundational institution of **\*731** state sovereignty. And even if the evidence were strong, the cure may not lie in civil litigation in the courts. See *Fletcher v. Peck*, 10 U.S. 87, 131, 6 Cranch 87, 3 L.Ed. 162 (1810) ("[A] court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."). We do not need to explore the outer boundaries of the *Fletcher* holding here, because this record is devoid of admissible evidence that the governor exerted undue influence on legislators as they considered the '06 Act. The Casinos' case must fail insofar as it rests on that episode.

Evidence is similarly lacking to support a finding that the Racetracks bribed Governor Blagojevich to sign the '06 Act into law. The Casinos point to a meeting between Johnston and Blagojevich's aide Chris Kelly in 2006 while the Act was stalled in the legislature. But they provide no evidence that Johnston offered Kelly a bribe in exchange for Governor Blagojevich's signature during that meeting. The letter from the Racetracks to Blagojevich after the '06 Act passed merely thanked him for his support; it did not suggest that Blagojevich had agreed to sign the bill in exchange for a bribe. The fact that the Racetracks later made campaign contributions cannot, without more, support liability for acts of political corruption. To hold illegal an official's support of legislation furthering the interests of some constituents shortly before or after campaign contributions are solicited and received "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." See *McCormick v. United States*, 500 U.S. 257, 272, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991).

Because the evidence the Casinos presented in opposition to summary judgment with respect to the '06 Act would not permit a trier of fact to rule in their favor, the district court

properly granted summary judgment for the Racetracks on these claims.

**[7]** *The '08 Act.*—The circumstances surrounding the '08 Act are another matter. As with the '06 Act, the record contains little evidence to show that the Governor's influence caused the legislature to pass the '08 Act. But that is not all that the Casinos alleged. They also asserted that the Racetracks and the governor agreed to a *quid pro quo:* in exchange for the governor's signature on the '08 Act, the Racetracks promised to give $100,000 to his campaign fund.

The summary judgment record contains considerable evidence that, if credited, would support the allegation of a *quid pro quo* between the Racetracks and Governor Blagojevich. When Blagojevich did not immediately sign the '08 Act into law, Racetracks executive Johnston stated to a colleague in an email: "We are going to have to put a stronger bit in his mouth!?!" Johnston complained to Blagojevich's chief of staff Monk that the delays in signing the bill were costing Johnston $9,000 per day. A factfinder could conclude that Blagojevich was talking about Johnston's commitment to pay $100,000 when he informed Monk that he would "like some separation between that and signing the bill." After the FBI recorded Monk and Blagojevich scheming about getting Johnston to pay, Monk met with Johnston and, according to Monk, delivered the message that the bill would not be signed until he paid. According to Monk, Johnston countered **\*732** with an offer to pay half the money at once and half later. Monk called Blagojevich immediately after the meeting with Johnston to report his belief that Johnston would soon pay. After learning of the criminal allegation that Blagojevich threatened not to sign the '08 Act bill unless he was paid $100,000 by someone in the horseracing industry, Johnston admitted, "I didn't know if anybody else had given 100,000, but I knew I did." Finally, Johnston signed an immunity agreement in which he acknowledged that he had information that "may tend to incriminate" him. From this and other evidence in the record, a reasonable juror could conclude that the Racetracks agreed to pay $100,000 to Blagojevich's campaign fund in return for his signature on the '08 Act.

Blagojevich's signature on the bill caused the '08 Act to become law. Under Illinois law, bills passed by the General Assembly must be presented to the governor within 30 days. ILL. CONST., art. IV, § 9(a). "If the Governor approves the bill, he shall sign it and it shall become law." *Id.* "If the Governor does not approve the bill, he shall veto it by returning it with his objections to the house in which it

originated." *Id.* § 9(b). If the factfinder believes the evidence supporting the Casinos' allegations, it could conclude that the bill was presented to the governor and he signed it in exchange for a lucrative campaign contribution. Unlike the allegation that the Race-tracks bribed the governor to persuade the 150–member legislature to enact the bill, the ′08 Act became law as a direct result of the alleged agreement to trade money for one person's action—the governor's signature. A jury could find that the causal chain between the Racetracks' bribe and the governor's signing of the bill was not broken by any intervening acts of third parties. *Cf. Hemi Group,* 559 U.S. at 11, 130 S.Ct. 983 ("[T]he City's harm was directly caused by the customers, not Hemi."); *id.* at 25, 130 S.Ct. 983 (Breyer, J., dissenting) (taking issue with the majority's suggestion that "the intervening voluntary acts of third parties ... cut[ ] the causal chain"). Only the governor had authority to sign the bill into law, and he did so.

It does not matter that the ′08 Act passed the legislature by veto-proof majorities. See ILL. CONST.,, art. IV, § 9(c). It cannot be assumed that a veto-proof majority will hold in the face of an executive veto. See, *e.g.,* McGrath, Rogowski, & Ryan, *Gubernatorial Veto Powers and the Size of Legislative Coalitions* (Dec. 11, 2013) (S.Pol.Sci.Ass'n), https://pages.wustl. edu/files/pages/imce/rogowski/mrrcoalitions-nov13.pdf (demonstrating how the threat of a veto affects legislative coalitions and influences policymaking); Steven Dennis & Emma Dumain, ROLL CALL, "The 39 House Democrats Who Defied Obama's Veto Threat," (Nov. 15, 2013), http://blogs.rollcall.com/218/the-39-house-democrats-who-defiedobamas-veto-threat/ (last visited August 15, 2014). Many legislators, especially those in the governor's party, may hesitate to override a veto even if they originally voted for the bill. That the ′08 Act cleared the General Assembly by a veto-proof majority does not erase the significance of the governor's signature. If it did, it would be unnecessary to obtain the governor's signature on a bill that passed by veto-proof majorities.

Nor does it matter that the bill would have become law even if Governor Blagojevich had neither signed nor vetoed it. See ILL. CONST.,, art. IV, § 9(b) ("Any bill not so returned by the Governor within 60 calendar days after it is presented to him shall become law."). RICO claims sound in tort. See *Beck v. Prupis,* 529 U.S. 494, 501–06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (discussing historical relationship between tort and RICO claims and explaining **\*733** that "Congress meant to incorporate common-law principles when it adopted RICO"); *Anza,* 547 U.S. at

466–67, 126 S.Ct. 1991 (Thomas, J., concurring in part and dissenting in part) (applying causation and damages principles from RESTATEMENT (SECOND) OF TORTS (1977) to analysis of RICO claims). The alleged bribery here was an intentional tort. Like an arsonist who burns down a cabin the day before a natural forest fire, the Racetracks may be "jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct," regardless of innocent alternative causes. See RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIABILITY § 12 (2000).

That brings us to the heart of the matter: Was the Racetracks' alleged agreement to bribe the governor to sign the ′08 Act sufficiently immediate to serve as a legal cause of the Casinos' injuries for purposes of RICO? The focus of the inquiry is the directness of the injury resulting from the defendants' conduct. The Supreme Court has spoken to RICO's proximate-cause requirement on several occasions, and so we begin with a look at its guidance.

In *Anza,* the plaintiff alleged that the defendant, its business competitor, defrauded the State of New York by failing to charge certain sales taxes. 547 U.S. at 454–55, 126 S.Ct. 1991. As a result, the defendant was able to offer lower prices than the plaintiff; those prices had the foreseeable effect of hurting the plaintiff's business. The Court held, however, that the "direct victim of [the defendant's] conduct [was] the State of New York," not the plaintiff. *Id.* at 458, 126 S.Ct. 1991. The cause of plaintiff's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* The plaintiff's theory in *Anza* failed because it required a multi-step analysis: from the defendants' underpayment of taxes, to their reduced prices, to the plaintiff's loss of sales. The defendants' misconduct—underpayment of taxes—did not by itself harm the plaintiffs. That fact, in light of "the general tendency of the law, in regard to damages ..., not to go beyond the first step," *Hemi Grp.,* 559 U.S. at 10, 130 S.Ct. 983, quoting *S. Pac. Co. v. Darnell Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Holmes, J.), doomed the plaintiff's case. The case before us, by contrast, exemplifies direct effect. The object of the conspiracy was to bring the ′08 Act into effect in exchange for a cash bribe; the Act harmed the Casinos to the tune of 3% of their revenue. The Casinos thus sat in the center of the target of the conspiracy.

*Hemi Group* offers another example of an effect that is too indirect. There, the plaintiff City alleged that the defendant fraudulently avoided filing certain tax reports with the State

RICO Bus.Disp.Guide 12,518

regarding cigarette sales. 559 U.S. at 4, 130 S.Ct. 983. The City used the reports to assess back sales taxes against cigarette buyers, and so the defendant's fraud against the State ultimately allowed some buyers to avoid paying taxes they owed the City. "[T]he conduct directly responsible for the City's harm was the customer's failure to pay their taxes," not the defendant's failure to file reports. *Id.* at 11, 130 S.Ct. 983. Thus, as in *Anza,* "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* Both *Anza* and *Hemi Group* stand for the same general proposition: only persons injured directly by the defendant's misconduct may recover under RICO.

Until the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), parties *734 usually discussed this kind of limitation under the rubric of statutory standing. In *Lexmark,* however, the Supreme Court disapproved of the idea of "prudential" standing. Properly understood, the Court said, whether a plaintiff may sue "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 134 S.Ct. at 1387. The Court had already held in *Holmes* that Congress did not mean "to allow all factually injured plaintiffs to recover" under RICO. 503 U.S. at 266, 112 S.Ct. 1311. But in *Bridge,* the Court was equally clear that extra-statutory restrictions on the right to sue have no place. 553 U.S. at 648, 128 S.Ct. 2131. It therefore rejected a rule of first-party reliance that could be found nowhere in the statute.

We see nothing in RICO, as the Supreme Court has interpreted it, that would bar the Casinos from pursuing their claim with respect to the '08 Act. There was no more directly injured party standing between the Casinos and the alleged wrongdoer, and thus no one else to whom they could look for relief; their injuries were not derivative. The money they paid pursuant to the '08 Act did not compensate the State of Illinois for any losses to the state. Rather, the Casinos themselves suffered the only injury resulting from the Racetracks' alleged conspiracy to enact the '08 statute.

The Casinos do not occupy the role of disgruntled taxpayer here. That, too, would pose a problem for them, as *Ill. ex rel. Ryan v. Brown,* 227 F.3d 1042 (7th Cir.2000), demonstrates. There we rejected the plaintiffs' allegation that the defendant bribed the state treasurer in exchange for large deposits of state money. Plaintiffs, acting only in their capacity as ordinary Illinois taxpayers, sought to recover the state's losses.

But they had "suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty." *Id.* at 1045. Only "the State of Illinois itself was directly injured by the misdirection of its funds into ... the pockets of miscreants." *Id.* Therefore, we held, the "State [was] the proper party to be suing, not the plaintiffs." *Id.* at 1046.

Here, the general limitation on taxpayer standing found in Article III does not apply. The Casinos do not "challenge laws of general application where their own injur[ies] [are] not distinct from that suffered in general by other taxpayers or citizens." See *Hein v. Freedom from Religion Found., Inc.,* 551 U.S. 587, 598, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007), quoting *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 613, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (Kennedy, J.). The'08 Act taxed only five entities in the entire state. Other taxpayers and citizens were unaffected. Moreover, the Casinos are not challenging the tax itself in this litigation, having lost earlier efforts pursuing that theory. Rather, they seek damages from a private party for an alleged conspiracy to use the power of state government to take money from them. Their injury is easily measured, and it is directly traceable to the Racetracks' alleged conduct (bribing the governor to sign the '08 Act) and remediable by this court. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). They thus face no standing barrier to their lawsuit under Article III.

In closing, we stress that the only RICO element we are deciding is the issue of proximate cause. To sustain their section 1962(d) conspiracy claim, the Casinos must ultimately show "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern *735 of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *DeGuelle v. Camilli,* 664 F.3d 192, 204 (7th Cir.2011) (internal quotation marks omitted); see also *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.,* 424 F.3d 659, 674 (7th Cir.2005); *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 964 (7th Cir.2000). We recognize that our rejection of the Casinos' claims based on the '06 Act may have an impact on their ability to show that the defendants agreed to the commission of two predicate acts, see *Brouwer,* 199 F.3d at 964, or that the defendants "knowingly agreed to perform services of a kind [to] facilitate the activities of those ... operating the enterprise in an illegal manner," *id.* at 967. We are reluctant to delve into those issues without a proper adversary presentation. Instead, because the

**Empress Casino Joliet Corp. v. Johnston, 763 F.3d 723 (2014)**

RICO Bus.Disp.Guide 12,518

evaluation of the case as a whole may be affected by our decision on proximate cause, we confirm that the district court is free on remand to revisit its decisions on the other RICO elements should the parties choose to revisit them in light of this opinion.

## IV

If the Casinos are correct, the Racetracks agreed to pay Governor Blagojevich $100,000 in exchange for his signature on the '08 Act. The direct and immediate consequence of that illegal agreement was to deprive the Casinos of 3% of their annual revenue. There is "a direct relation between the injury asserted and the injurious conduct alleged." See *Bridge,* 553 U.S. at 654–55, 128 S.Ct. 2131. Accordingly, we REVERSE the district court's grant of summary judgment insofar as it relates to the signing of the '08 Act and REMAND for further proceedings consistent with this opinion.

**All Citations**

763 F.3d 723, RICO Bus.Disp.Guide 12,518

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    10

**Burdge v. Subvest 4, L.L.C., Not Reported in N.E.2d (2007)**

2007 WL 949802, 2007 -Ohio- 1488

---

KeyCite Yellow Flag - Negative Treatment

Distinguished by Charvat v. DFS Services LLC, S.D.Ohio, March 18, 2011

2007 WL 949802

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio,
First District, Hamilton County.

Nathaniel E. BURDGE, Plaintiff-Appellant,

v.

SUBVEST 4, LLC, d.b.a.
Subway, Defendant-Appellee.

No. C-060354.

|

Decided March 30, 2007.

Civil Appeal from Hamilton County Court of Common Pleas.

**Attorneys and Law Firms**

John W. Ferron, Lisa A. Wafer, and Ferron & Associates, LPA, for Plaintiff-Appellant.

Wendy R. Calloway, for Defendant-Appellee.

**Opinion**

CUNNINGHAM, Judge.

**\*1** {¶ 1} Plaintiff-appellant Nathaniel Burdge appeals from the entry granting summary judgment for defendant-appellee Subvest 4, LLC ("Subvest"), and denying summary judgment for Burdge on Burdge's complaint against Subvest, doing business as Subway, seeking relief under the Ohio Consumer Sales Practices Act.

{¶ 2} Burdge's claims stemmed from his visit to a Subway restaurant on September 17, 2005, where he purchased a food item with his credit card. The cashier provided him with an electronically printed sales receipt reflecting the charge. Burdge alleged that the receipt had contained more than the last five digits of his credit-card account number and the expiration date of his credit card. Burdge alleged also that Subvest had been doing business as "Subway," but that Subvest had not registered its use of this fictitious name with the Ohio Secretary of State when he visited the restaurant.

**Ohio's Consumer Sales Practices Act**

{¶ 3} Ohio's Consumer Sales Practices Act, R.C. 1345.01 et seq. ("CSPA"), prohibits suppliers from committing unfair, deceptive, or unconscionable acts or practices in connection with consumer transactions.[1] Unfair or deceptive consumer sales practices and acts are generally those "that mislead consumers about the nature of the product they are receiving." Unconscionable practices or acts, on the other hand, generally "relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue."[2]

[1]  See R.C. 1345.02 and 1345.03.

[2]  *Whitaker v. M.T. Automotive Inc.*, 111 Ohio St.3d 177, 2006-Ohio-5481, at ¶ 10 (internal citations omitted).

{¶ 4} The substantive provisions of the CSPA are found in R .C. 1345.02, R.C. 1345.03, and R.C. 1345.031. Additional substantive provisions are found in other sources, including laws that have been incorporated into the CSPA, regulations promulgated by Ohio's Attorney General as authorized under the CSPA, and Ohio court decisions holding certain acts to be unfair, deceptive, or unconscionable.

{¶ 5} This last source, Ohio court decisions, is at issue in this appeal. Generally, consumer remedies for a CSPA violation are equitable relief and either rescission or damages. But if a court holds that an act or practice violates the CSPA and that decision is made available for public inspection by the attorney general prior to substantially similar offending supplier conduct in a consumer transaction, R.C. 1345.09(B) permits a consumer in a subsequent transaction to recover the greater of three times the actual damages proven or statutory damages of $200. Additionally, R .C. 1345.09(B) authorizes consumers to seek certification of a class action. The special remedy provisions of R.C. 1345.09(B) also apply where the supplier violates a previously published administrative rule. A consumer intending to rely upon R.C. 1345.09(B) must specifically inform the trial court of the decision or rule relied upon.

{¶ 6} The attorney general's public inspection file for state-court decisions is accessible on-line at www.ag.state.oh.us/ legal/opif.asp. Pursuant to statute, this file must contain "all judgments, including supporting opinions, by courts of [Ohio] that determine the rights of the parties and concerning

**Burdge v. Subvest 4, L.L.C., Not Reported in N.E.2d (2007)**

2007 WL 949802, 2007 -Ohio- 1488

which appellate remedies have been exhausted, or lost by the expiration of the time for appeal, determining that specific acts or practices violate section 1345.02, 1345.03, or 1345.031 of the Revised Code." [3]

3    R.C. 1345.05(A)(3).

### Burdge's Claims

**\*2** {¶ 7} Burdge claimed that Subvest's actions were in violation of R.C.1345.02(A). Specifically, in counts one and two of his complaint, Burdge claimed that Subvest had knowingly violated R.C. 1345.02(A) by providing him with an electronically printed receipt containing more than the last five digits of his credit-card account number and the card's expiration date. He also claimed that he was entitled to the special remedy provisions of R.C. 1345.09(B) because, prior to Subvest's actions, an Ohio court "decision" holding similar acts to be unfair and deceptive in violation of R.C. 1345.02(A) had been published in the attorney general's public inspection file. This case, *Kimmel v. Ulrey, Inc.,* [4] involved a dispute between private parties and was resolved by a consent judgment.

4    (April 27, 2005), Franklin Mun. Ct. No.2005-CVH-006795.

{¶ 8} In count three of his complaint, Burdge claimed that Subvest had knowingly violated R.C. 1345.02(A) by conducting business with him under a fictitious name that Subvest had not registered with the Ohio Secretary of State. He added that, prior to September 17, 2005, an Ohio court "decision" holding similar acts to be unfair and deceptive in violation of R.C. 1345.02(A) had been published in the attorney general's public inspection file. This case, *State ex rel. Fischer v. Cheeseman,* [5] was filed by the attorney general against a private defendant, and the case was resolved by a consent judgment.

5    (Oct. 21, 1991), Franklin C.P. No. 91CVH-10-8592.

{¶ 9} Burdge did not allege any injury or damages caused by the alleged violations, and he sought statutory damages, attorney fees, costs, and injunctive and declaratory relief.

{¶ 10} Burdge moved for summary judgment on all counts. Subvest also moved for summary judgment on all counts,

asserting that the claims were precluded as a matter of law when the undisputed facts showed that Burdge had not been injured by Subvest's alleged acts. Subvest also challenged Burdge's use of a consent judgment to support an award of statutory damages.

{¶ 11} In his sole assignment of error, Burdge now argues that the trial court erred in granting summary judgment to Subvest and in denying his motion for summary judgment.

### Standard of Review

{¶ 12} We review a trial court's decision granting or denying a motion for summary judgment de novo. [6] Summary judgment is appropriate when the trial court, viewing the evidence in the light most favorable to the nonmoving party, determines that no genuine issue of material fact remains to be litigated, and that the evidence demonstrates that reasonable minds can only come to a conclusion that is adverse to the party opposing the motion. [7]

6    See *City of Sharonville v. Am. Emplrs. Ins. Co.,* 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, at ¶ 5.

7    See *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267; Civ.R. 56(C).

{¶ 13} In this appeal, Burdge argues that the trial court erred in granting summary judgment for Subvest because R.C. 1345.09(B) and the *Kimmel* and *Cheeseman* cases entitled him to statutory damages without proof of any tangible injury or damages. He further argues that, although the *Kimmel* and *Cheeseman* cases were disposed of as consent judgments and not in adversarial proceedings decided on the merits, this fact does not invalidate the authoritative quality of the cases for purposes of R.C. 1345.09(B).

### Failure-to-Truncate Claims

**\*3** {¶ 14} In his first two counts, Burdge alleged that Subvest had committed unfair and deceptive acts by failing to truncate his account information on his electronically printed credit-card receipt. Burdge alleged that these acts were CSPA violations and did not cite Ohio's credit-card-truncation statute in his complaint. But these allegations, if true, would be a violation of Ohio's credit-card-truncation

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

statute, codified at R.C. 1349.18. This court recently held that a consumer must suffer an actual injury before bringing a private cause of action under the CSPA for a violation of the truncation statute. [8] Burdge could not bring a private cause of action under the CSPA for Subvest's alleged violations of the truncation statute where he could not show that he had been injured by Subvest's violations.

[8]   See *Burdge v. Supervalu Holding, Inc.,* 1st Dist. No. 060194, 2007-Ohio-1318.

{¶ 15} Ohio's credit-card-truncation statute states, in part, that "[n]o person or limited liability company that accepts credit cards for the transaction of business shall print more than the last five digits of the credit card account number, or print the expiration date of a credit card, on any receipt provided to the cardholder." [9] This requirement is limited to electronically printed receipts. [10] The statute also specifies that a "violation of this section is deemed an unfair or deceptive act or practice in violation of section 1345.02 of the Revised Code." [11]

[9]   R.C. 1349.18(A).

[10]   See R.C. 1349.18(B).

[11]   R.C. 1349.18(C).

{¶ 16} Importantly, the statute provides that "[a] person **injured** by a violation of this section has a cause of action and is entitled to the same relief available to a consumer under section 1345.09 of the Revised Code," [12] the private-remedies section of the CSPA.

[12]   *Id.* (emphasis added).

{¶ 17} In *Burdge v. Supervalu Holdings Inc.,* this court held that a consumer could not bring a private cause of action under the CSPA for a business's failure to comply with the requirements of the credit-card-truncation statute unless he has suffered an actual injury. [13] The *Supervalu* court was persuaded by the 12th Appellate District's analysis in *Burdge v. Kerasotes Showplace Theatres, LLC.* [14] The *Kerasotes* court held that the legislature had used the "person injured" language specifically to qualify a private cause of action under the CSPA for a credit-card-truncation statute violation. [15] The *Kerasotes* court found this construction the only reasonable interpretation of the truncation statute, after construing it in para marteria with the CSPA. [16]

[13]   *Supervalu,* supra, at ¶ 20.

[14]   12th Dist. No. CA2006-02-023, 2006-Ohio-4560, discretionary appeal not allowed, 112 Ohio St.3d 1469, 2007-Ohio-388, 861 N.E.2d 144.

[15]   *Id.* at ¶¶ 56-58.

[16]   *Id.* at ¶ 59.

{¶ 18} In addition to the reasoning of the *Kerasotes* court, the *Supervalu* court was persuaded by the absence of lead time in the credit-card-truncation statute for a business to update equipment in order to comply with the electronically printed receipt requirements. [17]

[17]   *Supervalu,* supra, at ¶ 16.

{¶ 19} Interestingly, both the *Supervalu* and *Kerasotes* decisions involved claims brought by the plaintiff in this action. Neither the *Supervalu* nor the *Kerasotes* courts precisely defined the actual-injury requirement for a private cause of action under the CSPA. But both courts rejected Burdge's contention that, because he was wronged by the business's violation of the truncation statute, he was a "person injured" as contemplated by the statute. In *Supervalu,* this court additionally held that "Burdge's calculated behavior in returning to the offending establishment 12 times belie[d] any argument that he had been actually 'injured' as contemplated by the truncation statute." [18]

[18]   *Id.* at ¶ 18.

*4 {¶ 20} In this case, Burdge did not return to the offending establishment, but again, he has failed as a matter of law, to allege an actual injury. He has alleged only that he was "wronged" by the offending conduct.

{¶ 21} As in *Supervalu,* we decline to precisely define this "injury" requirement. But we note that because the statute's purpose is to prevent identity theft, a private cause of action depends upon a tangible injury directly related to identity theft. [19] Our holding does not dilute the power of the Ohio Attorney General to enforce the new truncation requirements for electronically created credit-card receipts. [20]

[19]   See, generally, *Kerasotes,* supra, at ¶ 45.

20    R.C. 1349.18(C). The parties in this case did not raise the preemptive effect, if any, of Section 1681c(g), Title 15, U.S.Code, which also requires businesses to print electronic receipts without more than the last five digits of the credit card account and without the expiration date of the credit card, but which further provides businesses with lead time to update their machinery.

{¶ 22} Because the credit-card-truncation statute sets out a specific-injury requirement, Burdge could not use the provisions of R.C. 1345.09(B) to obviate this requirement. Thus, we conclude that the trial court did not err in entering judgment in favor of Subvest and in denying summary judgment for Burdge on counts one and two of his complaint because Burdge did not, as a matter of law, meet the injury requirement of the truncation statute.

**Fictitious-Name Claim**

{¶ 23} In his third count, Burdge alleged that Subvest had knowingly committed an unfair or deceptive act because it had conducted business in Ohio under a fictitious name that it had not registered with the Ohio Secretary of State. Again, Burdge did not allege any injury from this alleged conduct or request any specific damages other than statutory damages, although he did seek declaratory and injunctive relief, attorney fees, and costs.

{¶ 24} Burdge sought statutory damages on the basis of the *Cheeseman* case, a consent judgment. Burdge maintains in this appeal that a consent judgment published in the Ohio Attorney General's file qualifies as a substantive consumer-protection law as authorized by R.C. 1345.09(B). Subvest argues that a consent judgment is only an agreement made by the parties and ratified by the court that should be given res judicata effect in actions between the same parties, but that may not serve as the substantive law of the state.

{¶ 25} We decline to address this issue because its resolution is not necessary for the resolution of this appeal. The issue is not determinative because the *Cheeseman* case referenced another court decision, *State ex rel. Celebrezze v. Lloyd Sports Car Body Shop,* [21] in which an Ohio court determined on the merits in an adversarial proceeding that a supplier's failure to register a fictitious name was an unfair and deceptive act. The *Lloyd Sports Car Body Shop* decision was made a part of the attorney general's public inspection file in 1983.

21    (May 25, 1983), Franklin Cty. C.P. No. 82 CV-06-3184.

{¶ 26} In this case, Burdge's reliance on the *Cheeseman* case was sufficient to notify the court of his basis for the special remedies found in R.C. 1345.09(B). Thus, Burdge demonstrated that conducting business under a fictitious name that had not been registered with the secretary of state is an act that an Ohio court had determined to be an unfair or deceptive act in a decision made a part of the attorney general's public inspection file prior to the alleged violation. Because Burdge met the requirements of R.C. 1345 .09(B) by establishing the existence of a prior court decision proscribing substantially similar conduct, he could proceed on his claim for statutory damages.

**\*5** {¶ 27} Even in the absence of the prior R.C. 1345.09(B) Ohio court decision, the trial court should have allowed Burdge to pursue his claim for equitable relief against Subvest. Thus, the trial court erred in granting summary judgment to Subvest on count three of the complaint.

**Burdge's Motion for Summary Judgment**

{¶ 28} Burdge also argues that the trial court erred in denying his motion for summary judgment. He urges this court to enter judgment in his favor and remand the case for further proceedings to determine his remedies.

{¶ 29} After reviewing the pleadings and the supporting evidentiary material, we determine that genuine issues of material fact remain as to whether Subvest was operating under a fictitious name without properly registering the name with the secretary of state and whether Subvest had a bona fide defense to the alleged violation. [22]

22    See R.C. 1345.11.

{¶ 30} We, therefore, hold that the trial court did not err in denying Burdge's motion for summary judgment on this count.

**Conclusion**

{¶ 31} Burdge's assignment of error is overruled in part and sustained in part. We affirm the trial court's entry of summary

**Burdge v. Subvest 4, L.L.C., Not Reported in N.E.2d (2007)**

2007 WL 949802, 2007 -Ohio- 1488

judgment for Subvest on counts one and two of the complaint, we affirm the trial court's denial of Burdge's motion for summary judgment on all counts, and we reverse the trial court's entry of summary judgment in favor of Subvest on Burdge's third count. We remand the cause for proceedings consistent with law and this decision.

Judgment affirmed in part and reversed in part, and cause remanded.

HILDEBRANDT, P.J., and WINKLER, J., concur.

RALPH WINKLER, retired of the First Appellate District, sitting by assignment.

**All Citations**

Not Reported in N.E.2d, 2007 WL 949802, 2007 -Ohio- 1488

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1995 WL 350081
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth
District, Cuyahoga County.

Ronald J. CSUHRAN, Plaintiff-Appellant,
v.
KAISER FOUNDATION HEALTH
PLAN OF OHIO, Defendant-Appellee.

67460.
|
June 8, 1995.

Civil Appeal from Court of Common Pleas, No. 226618.

**Attorneys and Law Firms**

Alan Belkin, Shapiro, Turoff & Belkin, Cleveland, for plaintiff-appellant.

David L. Parham, Thomas J. Piatak, Thompson, Hine & Flory, Cleveland, for defendant-appellee.

JOURNAL ENTRY AND OPINION

PORTER, Judge.

*\*1* Plaintiff-appellant Ronald J. Csuhran appeals from the summary judgment granted by the trial court in favor of defendant-appellee Kaiser Foundation Health Plan of Ohio on plaintiff's wrongful discharge claim. Plaintiff contends the court erred in that a provision of defendant's internal policies handbook required graduated disciplinary procedures before his employment could be terminated. We find no error in the result below and affirm.

Kaiser hired Csuhran in 1983 as a Repairman II for its Cleveland Medical Center, which consists of the Fairhill and Martin Luther King, Jr. facilities. Csuhran's final position with Kaiser was as Acting Supervisor of Plant Operations, a position he held from February 1989 until he resigned on October 12, 1990.

Csuhran's performance as supervisor of plant operations was not without criticism. In April 1990, he received a negative job evaluation, which he recognized was serious and that his job performance needed to improve within six months. The chief criticisms were that the Fairhill facility was in need of major repairs; that repairs were not being made in the required 72 hour period; that the employees under Csuhran's supervision had a high rate of absenteeism; and that there was a four percent variance in his department's non-wage expenditures with no supporting documentation. Csuhran conceded that these conditions were a problem in April 1990.

Despite these concerns, his job performance failed to improve over the next six months: the failure to perform the needed repairs at the Fairhill facility continued; he failed to meet his own timetable for the needed repairs; *e.g.,* on June 7, 1990, he pledged to complete repairs by July 7, 1990 in five additional areas identified by a Kaiser physician; by August 22, 1990, none of these repairs had been completed; and he proposed a new series of completion dates to his superior. By October 4, 1990, he had completed only six of the thirteen remaining repairs at Fairhill, even though all of them were to have been completed by October 5.

Plaintiff also had difficulties in his relations with Union Local 17 which was an important part of his job. Local 17 complained about his giving 1,300 hours of mechanical standby time to a certain painter, rather than spreading that time among all eligible union members and that he failed to fill open positions in a timely fashion.

His relationship with the medical facility administrator broke down because of his poor response time. The administrator complained about his failure to conduct promised environmental inspections. Other Kaiser employees complained about his failure to install promised signs in the human resources department and his removal of trees at one of the Kaiser facilities. Csuhran admitted knowledge of these complaints and that they were based on his actions or inaction.

In October 1990, Csuhran again received a negative performance evaluation. He knew from the April evaluation that his performance had to improve, but that it had not. He acknowledged that he had failed to correct several of the deficiencies noted on his earlier evaluation, including his failure to repair the Fairhill building in a timely fashion. After receiving this second negative evaluation, Csuhran was given the choice of termination or resignation with benefits and

Csuhran v. Kaiser Foundation Health Plan of Ohio, Not Reported in N.E.2d (1995)

1995 WL 350081

wages until the end of the month. Csuhran chose to resign on October 12, 1990. [1]

[1] Defendant, in its motion for summary judgment, stated "For purposes of this motion only, Defendant will treat the termination of Csuhran's employment as a discharge rather than a voluntary resignation." For sake of argument, we will assume the same.

**\*2** Following his resignation, Csuhran initiated an appeal under Kaiser's employee appeal process. His termination was upheld after he completed all six levels of the Kaiser appeal process with the assistance of an attorney. Csuhran testified that none of Kaiser's employment policies, including those relied on by him during the appeal process and Kaiser Policy No. 402 (on which he places substantial reliance herein), required Kaiser to have just cause for terminating an employee. Csuhran also admitted that Kaiser's disciplinary procedures, including Policy No. 402, were not exhaustive and that Kaiser could terminate an employee without any prior discipline for poor performance.

Csuhran also testified on deposition that he never received a copy of Kaiser Policy No. 402; that Policy No. 402 was intended only for internal use by Kaiser supervisors; that he was unsure as to when he first became aware of Policy No. 402; and Policy No. 402 was never raised during the six-step Kaiser appeal process. Csuhran stated in his deposition that he believed Kaiser regarded him as having both a job performance problem and a disciplinary problem, but he agreed that Kaiser's criticism of him all related to substandard job performance. Plaintiff's immediate superiors testified that Kaiser Policy No. 402 was used for employees with disciplinary problems, not job performance problems.

Following the submission of Kaiser's motion for summary judgment supported by deposition transcripts, affidavits, copies of plaintiff's job review documents, and plaintiff's opposition, on May 27, 1994, the trial court granted summary judgment in favor of Kaiser without opinion. This timely appeal ensued.

Plaintiff's sole assignment of error states as follows:

PLAINTIFF-APPELLANT PRESENTED EVIDENCE SUPPORTING ALL ESSENTIAL ELEMENTS OF HIS CLAIM THAT PLAINTIFF-APPELLANT WAS NOT AN "EMPLOYEE AT WILL" AND WAS FIRED IN CONTRAVENTION OF BINDING EMPLOYER POLICY. THEREFORE THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT-APPELLEE.

Plaintiff essentially argues that he was not an employee at-will because he was entitled to the benefit of the four disciplinary stages of Policy No. 402 before discharge. In other words, plaintiff claims he had an implied contract of employment assuring that he would not be discharged without application of Policy No. 402 even for poor performance. We disagree with plaintiff's reading of Kaiser Policy No. 402.

Plaintiff had no written contract of employment, nor did he assert an oral contract of employment for any specific term. It is well-settled that Ohio adheres to the doctrine of at-will employment. *Brzozowski v. Stouffer Hotel Co.* (1989), 64 Ohio App.3d 540, 543. Pursuant to that doctrine, either party may terminate the employment relationship for any reason not contrary to law. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, paragraph one of syllabus. Furthermore, in the area of employment contracts, there exists "a strong presumption in favor of a contract terminable at-will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." *Henkel v. Educational Research Council* (1976), 45 Ohio St.2d 249, 255; *Priebe v. O'Malley* (1993), 89 Ohio App.3d 8, 12.

**\*3** Consistent with the presumption of at-will employment, it is recognized that "the party asserting an implied contract of employment has a heavy burden. He must prove the existence of each element necessary to the formation of a contract." *Penwell v. Amherst Hospital* (1992), 84 Ohio App.3d 16, 21; *Rudy v. Loral Defense Sys.* (1993), 85 Ohio App.3d 148, 152; *Priebe, supra* at 12. Therefore, plaintiff must show a "meeting of the minds" of the parties that the employment was other than at-will. *Schwartz v. Comcorp., Inc.* (1993), 91 Ohio App.3d 639, 647; *Cohen & Co. v. Messina* (1985), 24 Ohio App.3d 22, 24; *Turner v. SPS Technologies* (June 4, 1987), Cuyahoga App. No. 51945, unreported at 5.

Plaintiff's claim requires that the mutual assent necessary to alter his at-will employment status was established by Kaiser Policy No. 402, which required four disciplinary steps

1995 WL 350081

prior to discharge. However, the undisputed facts of this case establish that there was never the requisite "meeting of the minds" to transform Kaiser Policy No. 402 into an employment contract. Csuhran's own testimony conceded that: Kaiser retained the right to unilaterally change its policies and procedures; Policy No. 402 was never given to Kaiser employees and was intended only for internal use by Kaiser supervisors; Csuhran never received a copy of Policy No. 402; he was not aware of Kaiser's policies and procedures manual until 1990, over seven years after he became employed by Kaiser; he was unsure when he first became aware of Policy No. 402; Policy No. 402 was not mentioned when Csuhran was hired or promoted by Kaiser and he never raised the policy during the six steps of Kaiser's employee appeal process; he was unaware of the procedures used by Kaiser in terminating employees; the disciplinary procedures contained in Policy No. 402 were not exhaustive and termination for poor job performance without any prior discipline was consistent with the policy; and Policy No. 402 did not limit Kaiser's ability to terminate any employee without just cause.

Csuhran presented no evidence to contradict these admissions in his deposition. Kaiser Policy No. 402 did not constitute an implied employment contract with plaintiff. See, *e.g., Clipson v. Schlessman* (1993) 89 Ohio App.3d 230, 234 (employee manual not a contract where, as here, it contained no promise of continued employment and employer had right to modify handbook); *Gargasz v. Nordson Corp.* (1991), 68 Ohio App.3d 149, 155 (employee manual not a contract where, as here, employee did know whether the procedures in the manual applied to other employees, employee was unsure as to when he became aware of the manual, and the employee did not discuss manual with his supervisors); *Mason v. United States Fidelity & Guaranty Co.* (1990), 69 Ohio App.3d 309, 315 (employee handbook not a contract where, as here, it was distributed only to supervisors and not to all employees); *Brandenburger v. Hilti, Inc.* (1989), 52 Ohio App.3d 21, 25 (employee handbook not a contract where, as here, employee never received a copy of the handbook, the handbook did not contain an attestation clause, and the employee was never told he could be terminated only for cause); *Curak v. Cleveland Clinic Foundation* (Dec. 22, 1988), Cuyahoga App. No. 54822, unreported at 10 (employee handbook not a contract where, as here, employee did not discuss handbook at the time of hire, the employer retained the right to make changes to the handbook, and the handbook did not contain an attestation clause); *Cohen & Co. v. Messina* (1985), 24 Ohio App.3d 22, 24-25 (employee handbook not a contract where, as here,

employee not aware of handbook until after his employment began, the employer retained the right to change the handbook and handbook did not contain an attestation clause).

**\*4** Even assuming *arguendo* that Csuhran was correct in asserting that Policy No. 402 was part of an implied employment contract, he presented no evidence that this policy was applicable to his termination. Both his superiors testified in these affidavits and depositions that it was not applicable. They testified that Csuhran was terminated because he had a job performance problem and not because he had a disciplinary problem. They also testified that Kaiser Policy No. 402 was applicable to disciplinary problems, but not poor performance situations. Csuhran himself was aware of the distinction between employees with disciplinary problems and those with job performance problems made by his superiors:

Q. Ron, you're aware of the difference between an employee with a discipline problem and an employee who has a performance problem, correct?

A. That's correct.

Q. And an employee with a discipline problem is someone who is violating specific work rules, an employee with a performance problem is someone who is not necessarily violating certain work rules but is not living up to the expectations, the job expectations of supervisors, is that an accurate statement?

A. That's correct.

(Depo. at 193).

He testified that he believed Kaiser regarded him as having both a performance and discipline problem; however, he admitted that the problems Kaiser complained of all dealt with his substandard job performance and not a violation of any work rules.

A review of Policy No. 402 indicates that it is aimed at correcting employee misconduct or misbehavior that warrants attention. "Discipline may begin at any step in the procedure depending upon the seriousness of the offense committed * * *." The form used to record disciplinary activities (Employee Performance Memo) recites that "on this form shall be recorded especially meritorious performance by any employee, and any action of misconduct which justifies discipline or which, if repeated, justifies future

1995 WL 350081

disciplinary action." Neither the policy language nor the specific disciplinary steps itemized are directed at deficient job performance which was the cause of plaintiff's discharge.

When confronted with defendant's motion for summary judgment cataloguing the documented instances of dissatisfaction with plaintiff's performance level, the burden was upon plaintiff to come forward with affidavits or other acceptable forms of admissible evidence to contradict or rebut the employer's history of dissatisfaction with his work. *Wing v. Anchor Media* (1991), 59 Ohio St.3d 108, 111. Plaintiff has failed to offer any competent and probative evidence to offset the history of deficiencies in the level of his performance and his failure to meet his employer's legitimate expectations.

Based on the record before us, we find that Kaiser Policy No. 402 did not create an implied contract of employment in favor of plaintiff; that there were no circumstances to vary the terms of his at-will employment; and that he was discharged for good cause in failing to meet his employer's legitimate expectations in the performance of his work. Summary judgment for the employer was appropriate.

**\*5** Plaintiff's sole assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

HARPER, P.J., and MATIA, J., concur.

N.B. This entry is made pursuant to the third sentence of Rule 22(D), Ohio Rules of Appellate Procedure. This is an announcement of decision (see Rule 26). Ten (10) days from the date hereof, this document will be stamped to indicate journalization, at which time it will become the judgment and order of the court and time period for review will begin to run.

**All Citations**

Not Reported in N.E.2d, 1995 WL 350081

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1027584, 2009 -Ohio- 1802

KeyCite Yellow Flag - Negative Treatment
Distinguished by ITS Financial, LLC v. Advent Financial Services, LLC,
S.D.Ohio, October 11, 2011

2009 WL 1027584

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF LEGAL
AUTHORITY.

Court of Appeals of Ohio,
First District, Hamilton County.

GATOR DEVELOPMENT
CORPORATION, Plaintiff–Appellant,
v.

VHH, LTD., MR Associates Holding, Ltd., NKB
Associates Holdings, Ltd., Shops at Harper's Point,
LLC., Original Partners Limited Partnership, Neil K.
Bortz, and Vance H. Harper, Defendants–Appellees.

No. C–080193.
|
Decided April 17, 2009.

**Synopsis**
**Background:** Prospective purchaser of real property brought
action against vendor and its principal for breach of contract,
and subsequently amended its complaint to assert claims
against ground lessees, their principal, and lessees' assignees
who eventually purchased the property. The Court of
Common Pleas, Hamilton County, No. A-0610424, dismissed
the two individual defendants and several of the claims.
Prospective purchaser appealed.

**Holdings:** The Court of Appeals held that:

[1] prospective purchaser failed to state a fraud claim against
vendor and its principal;

[2] lessees and their principal had no duty to disclose their
own negotiations with vendor to prospective purchaser;

[3] prospective purchaser could assert claim for tortious
interference with contract against lessees' principal; and

[4] trial court did not abuse its discretion by dismissing
prospective purchaser's claim for a declaratory judgment
invalidating the ground leases.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (5)

[1] **Fraud**  Effect of existence of remedy by
action on contract
Prospective purchaser's allegations that vendor
and its principal failed to disclose their
negotiations and agreements with ground lessees
that resulted in sale of the property instead to
lessee's assignees, and that they affirmatively
misrepresented that vendor was trying to
complete a like-kind exchange that was a
condition precedent to sale of the property to
prospective purchaser, were insufficient to state
a fraud claim against vendor and principal; claim
was a recapitulation of prospective purchaser's
breach of contract claim, seeking recovery of the
same economic damages, and no cause of action
existed for fraudulent breach of a contract.

8 Cases that cite this headnote

[2] **Fraud**  Duty to disclose facts
Ground lessees of real property and their
principal had no duty to disclose to prospective
purchaser of the property their own negotiations
with vendor that resulted in sale of the property
instead to lessees' assignees and, thus, could not
be held liable to prospective purchaser for fraud
arising out of such failure to disclose.

4 Cases that cite this headnote

[3] **Appeal and Error**  Particular Cases and
Contexts
Prospective purchaser of real property did not
waive, for purposes of appeal, its challenge to
the dismissal of its tortious interference claims
against principal of ground lessees, even though
such claims were not listed in the caption of
the assignment of error challenging dismissal
of claims against principal, where prospective

purchaser addressed dismissal of the claims in its presentation of issues under the assignment of error.

1 Cases that cite this headnote

---

**[4]**   **Torts**   Landlord and tenant

Prospective purchaser of real property could assert claim for tortious interference with contract against principal of ground lessees in his personal capacity, where complaint alleged that principal directly participated in lessees' improper and intentional interference with prospective purchaser's contract for the sale of the property. R.C. §§ 1705.48(C), 1775.14(C) (1).

1 Cases that cite this headnote

---

**[5]**   **Declaratory Judgment**   Leases

**Declaratory Judgment**   Grounds for involuntary dismissal in general

Trial court did not abuse its discretion in prospective purchaser's action against vendor, its principal, ground lessees, their principal, and eventual purchasers of the property by dismissing prospective purchaser's claim for a declaratory judgment invalidating the ground leases, where claim was predicated on prospective purchaser's assumption that it was the equitable owner of the property and its "suspicion" that the lessees had made improper lease payments, making the claim too remote to state a real justiciable controversy. R.C. § 2721.02.

1 Cases that cite this headnote

---

Civil Appeal from Hamilton County Court of Common Pleas.

**Attorneys and Law Firms**

William E. Santen, Jr., Deepak K. Desai, and Santen & Hughes, LPA, for Plaintiff–Appellant.

Brian G. Dershaw, Kristen M. Myers, and Beckham Weil Shepardson, LLC, for Defendants–Appellees VHH, Ltd., and Vance H. Harper.

Joseph L. Trauth, Jr., Brian P. Muething, and Keating Muething & Klekamp PLL, for Defendants–Appellees MR Associates Holding, Ltd., NKB Associates Holding, Ltd., Shops at Harper's Point, LLC, Original Partners Limited Partnership, and Neil K. Bortz.

**Opinion**

PER CURIAM.

**\*1** {¶ 1} Plaintiff-appellant the Gator Development Company ("Gator") appeals the Hamilton County Common Pleas Court's judgment dismissing several claims and two individual defendants who had been sued in their personal capacity in a multi-claim and multi-party lawsuit involving an agreement for the sale of real property commonly known as Harper's Point. We conclude that the trial court erred by dismissing defendant-appellee Neil K. Bortz, who had been sued in his personal capacity for tortious interference, and we therefore reverse the trial court's judgment in part. In all other respects, we affirm.

---

**Procedural History**

{¶ 2} Initially, Gator had filed only a breach-of-contract and promissory-estoppel action for specific performance against defendant-appellee VHH, Ltd. ("VHH"), alleging that VHH had breached the Harper's Point sale agreement. VHH answered and acknowledged the existence of the sale agreement. Gator amended its complaint after VHH allegedly sold the property to defendants-appellees MR Associates Holding, Ltd., ("MR") and NKB Associates Holdings, Ltd. ("NKB"). Gator added six new defendants and several new claims, including tortious interference, fraud, civil conspiracy, and declaratory judgment; Gator omitted the promissory-estoppel claim against VHH.

{¶ 3} In addition to VHH, MR, and NKB, the other defendants-appellees include Vance H. Harper, the alleged president of VHH; Shops at Harper's Point, LLC; and Original Partners Limited Partnership (together, "the Ground Lessees"), the ground lessees that allegedly assigned to MR and NKB their options to purchase the property; and Neil K. Bortz, the alleged "principal" of Shops at Harper's Point and

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

**Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)**

2009 WL 1027584, 2009 -Ohio- 1802

Original Partners and the sole member of NKB. None of the defendants answered the amended complaint; instead, they moved to dismiss some of the claims and to extend the time to answer. The trial court granted these motions.

{¶ 4} Despite the dismissals, Gator's claims for breach of contract and for specific performance against VHH remain in the action, as do Gator's tortious-interference claims against MR, NKB, and the Ground Lessees. The trial court certified that its judgment is subject to appellate review in accordance with Civ.R. 54(B).

### Civ.R. 12(B)(6) Standard

{¶ 5} The trial court dismissed the claims upon a Civ.R. 12(B)(6) motion to dismiss. We therefore rely upon Gator's allegations in its amended complaint and the sale agreement attached to the complaint to establish the material facts for our review on appeal. "A motion to dismiss can be granted only where the party opposing the motion is unable to prove any set of facts which would entitle him to the relief requested. When reviewing a complaint under this standard, the factual allegations contained in the complaint are taken as true. * * * [We] must construe all material allegations in the complaint and all reasonable inferences drawn therefrom in favor of the nonmoving party." [1]

1     *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 418, 1995–Ohio–61, 650 N.E.2d 863 (internal citations omitted).

### Gator's Allegations

**\*2** {¶ 6} In April 2006, Gator and VHH entered into a Sale and Purchase Agreement concerning real property in Hamilton County that has been improved with a development commonly known as "Harper's Point." The agreement provided for the purchase of the property by Gator for $5,125,000 on or about September 30, 2006. The agreement contained certain conditions precedent, including that VHH find a suitable like-kind exchange property. This condition was set out in paragraph 8.1.3 of the agreement.

{¶ 7} The agreement recognized that Harper's Point was subject to ground leases and that the Ground Lessees had options to purchase the property under certain conditions. Section 8.3 of the agreement provided that "[i]n the event

the tenant under the Ground Leases should exercise any of the Options * * *, Seller shall notify Buyer * * * within five (5) business days of the receipt of the notice of exercise. Thereupon, Buyer shall have thirty (30) calendar days thereafter from the date of the notice to notify Seller that either: a) Buyer will complete the purchase of the Property in accordance with the terms hereof, or b) Buyer may elect to terminate, in which event this Agreement shall be null and void and the Earnest Money shall be released to Buyer. In the event Tenant under the Ground Leases should exercise any of the Options, and purchase all or part of the Property, Seller's contingency set forth in Section 8.1.3 hereof shall be deemed waived." The Ground Lessees' purchase price under the options would be based on an appraised value of the property, which Gator alleged would be much higher than the amount that it had agreed to pay VHH. If Gator had proceeded with the purchase from VHH after the exercise of the options, Gator would have then sold the property to the Ground Lessees and would have been entitled to this excess.

{¶ 8} Prior to June 15, 2006, Gator's President, James A. Goldsmith, informed Bortz that Gator had a contract to purchase the property and asked Bortz if the Ground Lessees were interested in selling their leasehold interests. Bortz told Goldsmith that the Ground Lessees were content with their position and not interested. At about that time, VHH, the Ground Lessees, Bortz, and Harper agreed that VHH would sell the property to the Ground Lessees at a price higher than Gator's purchase price. This June "understanding" was confirmed in two letters from Bortz to Harper dated June 15 and June 23, 2006.

{¶ 9} Gator was not informed of the June understanding. VHH pretended to seek a like-kind exchange property and then informed Gator in September that it was terminating the sale contract on its purported failure to find a suitable like-kind exchange property. VHH directed the escrow agent to return an escrow deposit to Gator, which Gator rejected.

{¶ 10} The Ground Lessees waited until mid-November 2006, after the September 30 closing date in the Gator–VHH agreement, to "attempt to exercise the Options in the Ground Leases." At that time, VHH "was getting cold feet" about selling to the Ground Lessees instead of to Gator. Thus, to further induce VHH, the Ground Lessees entered into an agreement for the sale of the property that required the Ground Lessees to indemnify VHH against any claims by Gator arising out of VHH's agreement with Gator. VHH and the Ground Lessees entered into the sale and indemnification

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works.      3

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 152 of 259 PAGEID #: 7180
Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)
2009 WL 1027584, 2009 -Ohio- 1802

agreement "with the knowledge, participation, and consent of Bortz and Harper."

**\*3** {¶ 11} On November 30, 2006, Gator filed a complaint for breach of contract and specific performance. VHH, the Ground Lessees, Harper, and Bortz had knowledge of the lawsuit and "actual knowledge of Gator's continuing rights under the Agreement."

{¶ 12} VHH's "purported sale" of its interest in the Harper's Point property occurred on January 3, 2007. On that date, the Ground Lessees executed "Assignments of Right to Purchase" to MR and NKB, which were owned and controlled by the "principals" of the Ground Lessees. VHH purported to assign its interest under the ground leases to MR and NKB and then executed warranty deeds to MR and NKB for Harper's Point. VHH's Affidavit of Title disclosed Gator's pending lawsuit. At the closing, MR and NKB, at the direction of the Ground Lessees, paid VHH $5,700,000.

### Causes of Action

{¶ 13} Gator learned of VHH's sale of the property to MR and NKB through discovery in the breach-of-contract action and amended its complaint to include new parties and allegations. The first claim was for specific performance due to "VHH's multiple and substantial breaches and anticipatory breaches of the Agreement, and its refusal to close by September 30, 2006." The second and third claims alleged tortious interference against MR, NKB, the Ground Lessees, and Bortz. The fourth claim alleged fraud against VHH and Harper. The fifth and sixth claims alleged fraud, conspiracy to defraud, and aiding and abetting fraud against the Ground Lessees and Bortz. The seventh claim was for breach of contract against VHH, and it requested specific performance or, in the alternative, compensatory damages. The eighth claim was captioned "Breach of Duty of Good Faith and Fair Dealing—as to Defendant VHH (including invalidity of damage limitation provision.)" The final claim asked the court to "declare the [g]round [l]eases void."

{¶ 14} The trial court dismissed (1) Bortz and Harper in their personal capacities from the lawsuit entirely, (2) the fraud claim against VHH, (3) the fraud, conspiracy to defraud, and aiding-and-abetting fraud claims against the Ground Lessees, and (4) the claim for declaratory relief. Gator challenges all of these dismissals in this appeal.

### Claim Four: Fraud against VHH and Harper

{¶ 15} Gator alleged fraud against VHH and Harper for omissions and affirmative misrepresentations. Gator asserted that these parties had a duty to disclose, arising by contract and under the common law, in the "negotiations and agreements" with the Ground Lessees, including the June "understanding," the November sale-and-indemnification agreement, and the closing. Additionally, Gator charged that these parties had made affirmative misrepresentations after June 15, 2006, suggesting that VHH was trying to complete a Section 1031 like-kind exchange, and that VHH had terminated the agreement based on its inability to do so. Gator alleged in conclusory fashion that it had justifiably relied upon these misrepresentations and omissions to its detriment, resulting in at least $5,000,000 of damages. Gator requested these damages as well as punitive damages.

**\*4** {¶ 16} VHH and Harper argue that the trial court properly dismissed the fraud claims against them because they were nothing more than breach-of-contract claims. In support, they cite the Ohio Supreme Court's decision in *Ketcham v. Miller.* [2] In *Ketcham,* two lessees of a building, Miller and Williams, had sued Ketcham, their lessor, for "unlawfully, willfully, wantonly and maliciously" breaching the lease and evicting the lessees. The lessees sought the value of the lease as damages. At trial, evidence was adduced tending to establish that Ketcham had waived the breach of the conditions that she had relied upon for the forfeiture, and that she had leased the premises to others at a "greatly increased rental" and had covenanted to give possession to such parties at a time before the expiration of the Miller and Williams leases. Moreover, Ketcham had "connived" against the lessees "to bring about a forfeiture of the lease" and "to regain possession."

[2] (1922), 104 Ohio St. 372, 136 N.E. 145.

{¶ 17} The trial court in *Ketcham* treated the case as a tort action and allowed the jury to award punitive damages. The supreme court held that this was error, after determining that the "gravamen of the complaint" was for breach of a contract. [3] In arriving at this conclusion, the supreme court focused on the language the lessees had used to state their claim, including their request for damages to provide them with the benefit of their bargain. Absent from the pleading was any request for personal or property damage. The court held under these circumstances that the words "willfully, wantonly, and maliciously" were not enough to transform

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 4

**Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)**

2009 WL 1027584, 2009 -Ohio- 1802

that action from one in contact to one in tort. [4] The court recognized, however, that the ultimate facts of the case might justify pleading a claim in tort, but that the gravamen of the complaint as pleaded was for breach of a contract. [5]

3          *Id.* at paragraphs one and two of the syllabus.

4          *Id.* at 377, 136 N.E. 145.

5          *Id.*

[1]     {¶ 18} This case is similar to *Ketcham.* The gist of Gator's complaint was that it had been deprived of the benefit of its bargain. And Gator sought to recover the real estate or, in the alternative, a monetary figure equal to the difference between its offer for the property and either the appraisal-based price or the negotiated price the Ground Lessees were required to pay in exercising their options. The fraud claim was a recapitulation of the breach-of-contract claim, seeking recovery of the same economic loss contemplated by the contract. Thus, Gator was merely alleging a cause of action for the fraudulent breach of a contract, which is not recognized under such circumstances as a tort in Ohio. [6]

6          See *id.; Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 151–154, 684 N.E.2d 1261.

{¶ 19} Any duty to disclose arose only by contract, and Gator did not allege any detrimental reliance on a positive misrepresentation to establish a fraud claim. Our facts are distinguishable from this court's recent case of *Curran v. Vincent,* [7] which allowed a fraud claim to proceed against parties who had entered into a contract for the sale of real estate. In *Curran,* the sellers of a home were told that their buyer, who had signed a contract and had paid earnest money, had a medical emergency in his family and could no longer afford to purchase the property. [8] The sellers released the buyer from the contract and returned his earnest money, relying on the family emergency. [9] The same day that the buyer signed the release, the buyer agreed to purchase another, more expensive home on the sellers' street. [10]

7          175 Ohio App.3d 146, 2007–Ohio–3680, 885 N.E.2d 964.

8          *Id.* at ¶ 7, 885 N.E.2d 964.

9          *Id.*

10          *Id.* at ¶ 9, 885 N.E.2d 964.

*5     {¶ 20} After learning of the purchase, the sellers sued the buyer for fraudulently inducing them to release him from their sales contract and requested actual and punitive damages, plus attorney fees and costs. [11] The sellers did not make any contract claims. [12] The buyer moved for summary judgment on the grounds that fraud was a tort that could not be asserted in a contract action, and that punitive damages were not available in a contract action. [13] The trial court granted summary judgment for the buyer. [14] On appeal, we reversed, holding, in part, that the action had been for fraud, not for breach of contract, because the sellers had released the buyer from the contract. [15]

11          *Id.* at ¶ 10, 885 N.E.2d 964.

12          *Id.* at ¶ 17, 885 N.E.2d 964.

13          *Id.* at ¶ 11, 885 N.E.2d 964.

14          *Id.*

15          *Id.* at ¶ 15, 885 N.E.2d 964.

{¶ 21} Significantly, Gator did not release VHH from the contract for the sale of Harper's Point. According to the complaint, Gator rejected the return of its earnest money and initiated proceedings to enforce its rights under the contract, even before learning of the sale of the property to the assignees of the ground leases. Thus, Gator did not allege any unique, fraud-based injury, one that had resulted from inducement or reliance.

{¶ 22} VHH and Harper have presented additional arguments to support the dismissal, but we decline to address them in light of this analysis. We conclude that Gator failed to state a claim for fraud against VHH and Harper. Accordingly, we affirm the trial court's dismissal of the fourth claim.

### Claim Eight: Breach of the Implied Duty of Good Faith and Fair Dealing

{¶ 23} Gator alleged that the various acts or omissions of VHH constituted a breach of the duty of good faith and fair dealing. VHH characterized this claim as a contract claim "clothed in the garb of tort" and argued that it should be

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 154 of 259 PAGEID #: 7182
Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)
2009 WL 1027584, 2009 -Ohio- 1802

dismissed on this basis. Gator concedes on appeal that it is a contract claim.

{¶ 24} In Ohio, "public policy dictates that every contract contain an implied duty for parties to act in good faith and to deal fairly with each other." [16] This implied duty does not supplant express contract terms. [17] To the extent that Gator's claim seeks to supplement the pending breach-of-contract claim against VHH, it survives. Ohio, however, does not recognize the bad-faith breach of a contract as a tort claim, outside the context of an insurance dispute. [18] To the extent that Gator is attempting to recover in tort under this claim, the trial court properly dismissed it.

[16]   *Littlejohn v. Parrish,* 163 Ohio App.3d 456, 2005–Ohio–4850, 839 N.E.2d 49, ¶ 27.

[17]   See *Ed Schory & Sons, Inc., v. Francis,* 75 Ohio St.3d 433, 443–444, 1996–Ohio–194, 662 N.E.2d 1074.

[18]   See *Hoskins v. Aetna Life Inc. Co.* (1983) 6 Ohio St.3d 272, 452 N.E.2d 1315, paragraph one of the syllabus.

### Claims Five and Six: Fraud–Based Claims against Ground Lessees and Bortz

{¶ 25} Gator advanced several fraud-based claims against the Ground Lessees and Bortz in the amended complaint, but has clarified on appeal that it is only pursuing claims for fraud and conspiracy to defraud against these defendants. We first address the fraud claim.

{¶ 26} Under Ohio law, the elements of common-law fraud are "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." [19]

[19]   *Burr v. Stark County Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 491 N.E.2d 1101, paragraph two of the syllabus.

*6  [2]   {¶ 27} The fraud claim was based on Bortz's and the Ground Lessees' failure to disclose to Gator certain information, including the June understanding, the exercise of the options in November and the indemnification agreement, and MR and NKB's purchase of the real estate. Bortz and the Ground Lessees maintain that the fraud claim failed because they were under no duty to disclose any information to Gator. We agree.

{¶ 28} In alleging fraud by omission, Gator had to show that Bortz or the Ground Lessees owed Gator a duty to disclose the information. Generally, under Ohio law, this duty arises in business transactions only where (1) the parties are in a fiduciary relationship; (2) both parties to the transaction understand that a special trust or confidence has been reposed; or (3) full disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts. [20] Gator argues that these parties acted fraudulently without alleging the source of a duty to disclose. And Gator fails to state grounds upon which it can subject these defendants to a duty to disclose this information.

[20]   See *Blon v. Bank One, Akron, N.A.* (1988), 35 Ohio St.3d 98, 101, 519 N.E.2d 363.

{¶ 29} Moreover, even if there had been a duty to disclose, Gator did not allege any change in position and resulting injury from the omission, both necessary elements of a fraud claim. Thus, Gator failed to state a claim against these defendants for fraud.

{¶ 30} Gator's conspiracy-to-defraud claim against these defendants fails also. The tort of civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." [21] The acts of coconspirators are attributable to each other as a result of the agreement. [22]

[21]   *Williams v. Aetna Fin. Co.,* 83 Ohio St.3d 464, 475, 1998–Ohio–294, 700 N.E.2d 859 (internal citations omitted).

[22]   *Id.* at 476, 700 N.E.2d 859.

{¶ 31} A civil conspiracy claim requires an underlying tortious act that causes an injury. [23] Thus, if there is no underlying tortious act, there is no actionable civil conspiracy

**Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)**

2009 WL 1027584, 2009 -Ohio- 1802

claim.[24] Gator argues that the underlying tortious act in this case was VHH's and Harper's fraud.

23      *Id.*

24      *Wolfer Ent., Inc. v. Overbrook Dev. Corp.* (1999), 132 Ohio App.3d 353, 359, 724 N.E.2d 1251.

{¶ 32} We have already held that Gator failed to state a claim of fraud against VHH and Harper. Gator could not establish a civil conspiracy without an underlying tort, and therefore Gator failed to state a claim for conspiracy to defraud against the Ground Leasees and Bortz.

{¶ 33} Accordingly, we affirm the trial court's dismissal of claims five and six of the complaint.[25]

25      Gator has not appealed the trial court's dismissal of the "aiding and abetting" fraud claim against the Ground Lessees and Bortz.

**Dismissal of Tortious–Interference Claims Against Bortz**

**[3]**   {¶ 34} First, we address Bortz's argument that Gator has waived its right to challenge the dismissal of the tortious-interference claims against Bortz. A waiver is appropriate, according to Bortz, because Gator has failed to specifically identify these claims in the caption of the assignment of error challenging the dismissal of claims against Bortz. But Gator has specifically addressed the dismissal of these claims in its presentation of issues under the assignment of error. Although we do not condone the manner of Gator's briefing, we conclude that Gator has provided sufficient notice to the other parties and to this court that it is also challenging the dismissal of the tortious-interference claims against Bortz. Thus, we reject Bortz's waiver argument.

**\*7**   {¶ 35} Bortz argues that Gator failed to state a claim against him in his personal capacity for tortious interference. Bortz relies upon the Ohio Supreme Court's decision in *Miller v. Wikel Mfg. Co, Inc.*[26] to support this argument. But Bortz applies the holding in *Miller* out of its appropriate context.

26      *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 545 N.E.2d 76.

{¶ 36} The wrongdoer in a tortious-interference claim must be a nonparty to the contract.[27] Generally, an officer of a

corporation is considered to be the same party as his principal —the corporation.[28] The issue in *Miller* was whether David Wikel, the president and majority stockholder of Wikel Manufacturing, could be liable for tortiously interfering with a contract between the plaintiff Miller and Wikel Manufacturing.[29] The *Miller* court held that Wikel could be considered a third-party outsider only "where his actions benefited him solely in a personal capacity."[30]

27      *Castle Hill Holdings, LLC v. Al Hut, Inc.,* 8th Dist. No. 86442, 2006–Ohio–1353, ¶ 47, internal citations omitted.

28      *Id.;* see, also, *Miller v. Wikel Mfg. Co.* (June 17, 1988), 6th Dist. No. E–86–66, affirmed in relevant part (1989), 46 Ohio St.3d 76, 545 N.E.2d 76.

29      *Miller,* 46 Ohio St.3d at 79, 545 N.E.2d 76.

30      *Id.;* see, also, *Smiddy v. Kinko's Inc.,* 1st Dist. No. C–020222, 2003–Ohio–446, ¶ 9.

{¶ 37} In this case, there is no allegation that Bortz had a relationship with VHH that would have made him something other than a "third party" to the Gator–VHH agreement that he had allegedly interfered with. Thus, the holding of *Wikel* does not apply in this case for purposes of determining Bortz's personal liability.

**[4]**   {¶ 38} Further, although Bortz cannot be held personally liable for an obligation of the limited-liability companies or the limited-liability partnership merely due to his status as a member, manager, or partner,[31] he can be held liable for his own tortious acts or omissions. Thus, the shield of limited liability does not insulate a wrongdoer from liability for his own tortious acts.[32]

31      R.C. 1775.14(B); R.C. 1705.48(A) and (B).

32      R.C. 1775.14(C)(1); R.C. 1705.48(C); 2002, *Ltd. v. JRM Ltd.,* 5th Dist. No.2006–CA–00247, 2007– Ohio–2464, ¶ 54–60. See, also, *Artam v. Star Tool & Die Corp.* (1989), 64 Ohio App.3d 388, 393, 581 N.E.2d 1110; *Young v. Featherstone Motors, Inc.* (1954), 97 Ohio App. 158, 171, 124 N.E.2d 158.

{¶ 39} In the complaint, Gator alleged that Bortz had directly "participated" in the improper and intentional interference. Because the complaint contains allegations against Bortz based on his own conduct, the trial court erred by determining

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    7

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 156 of 259 PAGEID #: 7184
Gator Dev. Corp. v. VHH, Ltd., Not Reported in N.E.2d (2009)
2009 WL 1027584, 2009 -Ohio- 1802

that Gator had failed to properly plead a claim against Bortz in his personal capacity. If we were reviewing the claimed error under a summary-judgment standard, we might hold differently. But we are governed by the lenient rules of notice pleading. Accordingly, we reverse the trial court's dismissal of Bortz from the tortious-interference claims.

### Claim 10: Declaratory Judgment

{¶ 40} Gator also sought declaratory relief in this action, requesting the court to declare the ground leases invalid because (1) it "suspect[ed]" that the Ground Lessees had made improper lease payments in the past, and (2) the Ground Lessees had breached the terms of the ground leases by failing to pay rent to the equitable owner of the property (Gator) and by tortiously interfering with the sale of the property.

{¶ 41} Under R.C. 2721.02, courts "may declare rights, status, and other legal relations." A declaratory judgment is not precluded by the existence of another adequate remedy in appropriate cases.[33]

33      R.C. 2721.02(A); Civ.R. 57.

{¶ 42} A court may dismiss a claim for declaratory judgment and, therefore, not declare the rights of the parties, where there is no real justiciable controversy between the parties, or where a declaratory judgment will not resolve the uncertainty or controversy.[34] The question whether to entertain a declaratory-judgment claim is committed to the discretion of the trial court.[35] Thus, "where a court determines that a controversy is so contingent that declaratory relief does not lie," an appellate court will not reverse unless that decision "is clearly unreasonable."[36]

34      *Bilyeu v. Motorist Mut. Ins. Co.* (1973), 36 Ohio St.2d 35, 37, 303 N.E.2d 871.

35      *Mid–American Fire & Cas. Co. v. Heasley,* 113 Ohio St.3d 133, 2007–Ohio–1248, 863 N.E.2d 142, paragraph two of the syllabus.

36      *Bilyeu,* 36 Ohio St.2d 35, 303 N.E.2d 871, syllabus, followed by *Mid–American Fire & Cas. Co.,* supra.

*8 **[5]** {¶ 43} Gator's request for declaratory relief assumed that it was the equitable owner of the property and relied upon mere "suspicion." We hold that Gator's claim was so remote that it did not state a real justiciable controversy, and that the trial court was within its discretion in dismissing the declaratory-judgment claim.

### Conclusion

{¶ 44} The trial court erred by dismissing Bortz from the lawsuit on the basis that Gator failed to state a claim against him in his personal capacity. Thus, we reverse that part of the trial court's judgment and remand the case for further proceedings consistent with this decision. In all other respects, we affirm the judgment.

Judgment affirmed in part and reversed in part, and cause remanded.

Please Note:
The court has recorded its own entry on the date of the release of this decision.

SUNDERMANN, P.J., HENDON and CUNNINGHAM, JJ.

### All Citations

Not Reported in N.E.2d, 2009 WL 1027584, 2009 -Ohio-1802

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3885916
Court of Appeals of Ohio,
Second District, Miami County.

James L. HILLIER, Individually and as Executor
of Leslie R. Hillier's Estate, Plaintiff-Appellant

v.

FIFTH THIRD BANK, et al., Defendants-Appellees

No. 2019-CA-21
|
Rendered on July 10, 2020

**Synopsis**
**Background:** Executor of testator's estate brought action,
individually and on behalf of estate, against bank and alleged
payable on death (POD) beneficiary of testator's checking
and savings accounts, asserting numerous claims arising from
bank's payment of funds from accounts to alleged beneficiary
following testator's death. The Court of Common Pleas,
Miami County, No. 87766-B, granted summary judgment for
alleged beneficiary on executor's claim for unjust enrichment,
granted summary judgment for bank on executor's claims for
bad faith and estoppel, and granted summary judgment for
executor on alleged beneficiary's counterclaim for frivolous
conduct, then after reconsideration by new judge, granted
summary judgment for bank on all claims asserted against
it, granted summary judgment for alleged beneficiary on all
claims asserted against her, and granted summary judgment
for executor on both of alleged beneficiary's counterclaims.
Executor appealed.

**Holdings:** The Court of Appeals, Welbaum, P.J., held that:

[1] funds in accounts were payable to estate, and not alleged
beneficiary;

[2] bank could be held liable for breach of contract for
delivering funds to alleged beneficiary instead of estate;

[3] bank was not liable for bad faith or negligence claims;

[4] bank was liable for conversion claim;

[5] alleged beneficiary was not liable for conversion claim;
and

[6] alleged beneficiary was potentially liable for unjust
enrichment claim.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (20)

**[1]** **Contracts** ⟨⟩ Grounds of action
The elements of a breach of contract claim are
the existence of a contract, performance by the
plaintiff, breach by the defendant, and damage or
loss to the plaintiff.

**[2]** **Contracts** ⟨⟩ Intention of Parties
When confronted with an issue of contractual
interpretation, the role of a court is to give effect
to the intent of the parties to the agreement.

**[3]** **Contracts** ⟨⟩ Language of contract
**Contracts** ⟨⟩ Merger in Subsequent Contract
**Evidence** ⟨⟩ Contracts in General
Where parties, following negotiations, make
mutual promises which thereafter are integrated
into an unambiguous written contract, duly
signed by them, courts will give effect to
the parties' expressed intentions; intentions not
expressed in the writing are deemed to have
no existence and may not be shown by parol
evidence.

**[4]** **Finance, Banking, and Credit** ⟨⟩ Payable-
on-death (POD) accounts
"Written contract" required to establish payable
on death (POD) account means a writing signed
by the owner of the funds showing the intent to
dispose of property in contravention of his or her
will or the statutes of descent and distribution.

Hillier v. Fifth Third Bank, --- N.E.3d ---- (2020)

2020 WL 3885916, 2020 -Ohio- 3679

**[5]**    **Principal and Agent** 👈 Construction of letters or powers of attorney

A "power of attorney" is a written instrument authorizing an agent to perform specific acts on behalf of his principal.

**[6]**    **Contracts** 👈 Certainty as to Subject-Matter

**Contracts** 👈 Necessity of assent

In order to form any contract, there must be a meeting of the minds of the parties regarding the contract's essential terms, and those terms must be reasonably certain and clear.

**[7]**    **Contracts** 👈 Intention of Parties

**Contracts** 👈 Presumptions and burden of proof

The primary goal in construing any contract is to ascertain and give effect to the intention of the parties, and courts presume that the intent of the parties to a written contract is found in the writing of the contract itself.

**[8]**    **Finance, Banking, and Credit** 👈 Payable-on-death (POD) accounts

Funds in testator's checking account at time of his death were payable to testator's estate, and not to previously designated payable on death (POD) beneficiary; signature card signed by testator subsequent to designating POD beneficiary unambiguously stated that testator was sole owner of account and did not list any payable on death (POD) beneficiaries, and rules and regulations of bank clearly and unambiguously provided that when signature card designated beneficiary to receive account funds upon death of customer, it superseded and revoked appointment of any other beneficiary.

**[9]**    **Finance, Banking, and Credit** 👈 Payable-on-death (POD) accounts

Funds in testator's savings account at time of his death were payable to testator's estate, and not

to alleged payable on death (POD) beneficiary, even if there were indications in bank's internal records that POD beneficiaries might have been designated at one time; there was not sufficient evidence of a written agreement for the account, as was required to establish existence of POD beneficiaries as exception to statute of wills. Ohio Rev. Code Ann. §§ 1109.07(B), 2131.10.

**[10]**    **Finance, Banking, and Credit** 👈 Payable-on-death (POD) accounts

**Finance, Banking, and Credit** 👈 Wrongful payments and unauthorized withdrawals

Bank could be held liable for breach of contract for delivering funds from testator's checking and savings accounts to alleged payable on death (POD) beneficiary instead of testator's estate following testator's death, even if executor of estate failed to use statutory mechanism to assert his claim to the funds; bank was notified before it disbursed the funds that an adverse claim to the funds existed, but chose to release the funds instead of placing a hold on the accounts or instituting legal proceedings. Ohio Rev. Code Ann. § 1109.10.

**[11]**    **Contracts** 👈 Grounds of action

An allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim.

**[12]**    **Finance, Banking, and Credit** 👈 Wrongful payments and unauthorized withdrawals

Bank was not liable for bad faith claim asserted by executor of estate arising from bank's improper delivery of funds from testator's checking and savings accounts to alleged payable on death (POD) beneficiary instead of testator's estate following testator's death; there was no evidence that bank's actions were dishonest, willful, or malicious, and executor did not present evidence of damages beyond what was due to be paid under the contract between account owner and bank.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 159 of 259  PAGEID #: 7187
Hillier v. Fifth Third Bank, --- N.E.3d ---- (2020)

2020 WL 3885916, 2020 -Ohio- 3679

**[13]** **Finance, Banking, and Credit** ⚼ Wrongful payments and unauthorized withdrawals

Bank was not liable for negligence claim asserted by executor of estate arising from bank's improper delivery of funds from testator's checking and savings accounts to alleged payable on death (POD) beneficiary instead of testator's estate following testator's death; executor failed to present any evidence of an independent tort separate from breach of contract between account owner and bank, and did not outline any harm he or the estate suffered other than that attributable to the breach of contract.

**[14]** **Conversion and Civil Theft** ⚼ Assertion of ownership or control in general

"Conversion" is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another.

**[15]** **Conversion and Civil Theft** ⚼ In general; nature and elements

Typically, the elements of a conversion cause of action are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.

**[16]** **Finance, Banking, and Credit** ⚼ Conversion

Bank was liable for conversion claim asserted by executor of estate arising from bank's improper delivery of funds from testator's checking and savings accounts to alleged payable on death (POD) beneficiary instead of testator's estate following testator's death; executor established that funds belonged to estate, that bank wrongfully disposed of funds by paying them to alleged beneficiary, and that estate was damaged by bank's actions.

**[17]** **Conversion and Civil Theft** ⚼ Persons liable

Alleged payable on death (POD) beneficiary of testator's checking and savings accounts was not liable for conversion claim asserted by executor of estate arising from bank's improper delivery of funds from accounts to alleged beneficiary instead of testator's estate following testator's death; alleged beneficiary was not the party wrongfully disposing of the funds.

**[18]** **Implied and Constructive Contracts** ⚼ Unjust enrichment

Unjust enrichment occurs when a person has and retains money or benefits that in justice and equity belong to another.

**[19]** **Implied and Constructive Contracts** ⚼ Restitution

A person who has been unjustly enriched at the expense of another is required to make restitution to the other.

**[20]** **Implied and Constructive Contracts** ⚼ Unjust enrichment

Alleged payable on death (POD) beneficiary of testator's checking and savings accounts was potentially liable for unjust enrichment claim asserted by executor of estate arising from bank's improper delivery of funds from accounts to alleged beneficiary instead of testator's estate following testator's death; due to improper delivery, alleged beneficiary retained money that belonged to another.

(Appeal from Common Pleas Court-Probate Division), Trial Court Case No. 87766-B.

**Attorneys and Law Firms**

T. ANDREW VOLLMAR, Atty. Reg. No. 0064033, 40 North Main Street, Suite 2010, Dayton, Ohio 45423, Attorney for Plaintiff-Appellant.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  3

2020 WL 3885916, 2020 -Ohio- 3679

TODD E. BRYANT, Atty. Reg. No. 0072738, 122 West Main Street, Troy, Ohio 45373, Attorney for Defendant-Appellee, Judy Brown.

NATHAN H. BLASKE, Atty. Reg. No. 0076460 and HARRY W. CAPPEL, Atty. Reg. No. 0066513, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202, Attorneys for Defendant-Appellee, Fifth Third Bank.

<u>OPINION</u>

WELBAUM, J.

**\*1** {¶ 1} Plaintiff-Appellant, James L. Hillier, appeals individually and as executor of the Estate of Leslie R. Hillier, from summary judgments granted to Defendants-Appellees, Fifth Third Bank and Judith Brown.[1] James is Leslie's grandson, and Judith is Leslie's daughter. When Leslie died, he had $203,758.09 in two accounts at Fifth Third. The claims against Fifth Third and Judith arose from the bank's payment to Judith of the total balance in Leslie's accounts.

| 1 | For purposes of clarity, we will refer to Fifth Third Bank as "Fifth Third," to the other parties by their first names, and to Leslie Hilliard as "Leslie." |
|---|---|

{¶ 2} According to James, the trial court erred in granting summary judgment for Fifth Third because the bank could not create a contract for a payable on death account by any means other than a written contract signed by the account owner, and Leslie had not entered such a contract. James also argues that Fifth Third exercised bad faith by paying out the funds when it knew the accounts' ownership was disputed.

{¶ 3} As to Judith, James contends that the trial court incorrectly granted summary judgment in her favor on his unjust enrichment claim, because Judith did not to move for summary judgment. Additionally, on the merits, James maintains that Judith should not have received summary judgment on unjust enrichment because she received funds that the bank improperly administered.

{¶ 4} After reviewing the record, we conclude that the trial court erred in rendering summary judgment in favor of Fifth Third on the contract and conversion claims. Under the unambiguous terms of the contract between Leslie and the bank, Leslie's accounts were not payable on death accounts and should have been paid instead to Leslie's estate for

distribution under his will. The trial court also erred in awarding summary judgment to Judith, as she was not entitled to the amounts in Leslie's accounts and was unjustly enriched by the payments. The court did not err in awarding summary judgment to Fifth Third on James's bad faith, negligence, and estoppel claims, nor did the court err in granting summary judgment to Judith on James's conversion claim. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings consistent with this opinion.

I. Facts and Course of Proceedings

{¶ 5} Because we are reviewing this matter after a grant of summary judgment, we review the facts in a light most favorable to the non-movant (James). This case involves the disposition of proceeds in two alleged payable on death ("POD") accounts at Fifth Third, which were owned by Leslie Hillier. Leslie was 98 years old when he died on August 20, 2015.

{¶ 6} In June 1976, Leslie opened savings account XXXXXXXXXX ("XXX") with the bank. The record is not clear with respect to whether the account originated with Fifth Third or was purchased from another bank. Nonetheless, Fifth Third was not able to produce any copies of signature cards that were ever signed for this account, other than an August 2015 card that James signed as power of attorney ("POA").

**\*2** {¶ 7} In March 1983, Leslie opened checking account XXXXXXXXXX ("XXX"). Fifth Third produced four signature cards for this account. Two of the cards, which were signed in 2012, stated that Leslie and his wife, Glenna, had "joint – with survivor" ownership. On these signature cards, Judith Brown and James L. Hillier (the father of James, the plaintiff-appellant in this case) were listed as POD beneficiaries. Deposition of Jennifer Nicely (Fifth Third's retail operations manager), Ex. 5. Judith was Leslie's daughter, and James L. was his son.

{¶ 8} James L. died in November 2014. Shortly after James L. died, James, who lived in North Carolina, received a call from Leslie; Leslie asked if James would be his power of attorney. Leslie also said he was changing his will and asked if James would be the executor. Deposition of James Hillier, p. 38-39. According to James, Leslie was concerned that Judith would come in and take all his money, and he would be a beggar. In addition, neither Glenna nor Leslie wanted to deal with Judith.

*Id.* at p. 39-41. James could not recall whether there were one or more powers of attorney, but the only time he used a POA at Fifth Third was on August 13, 2015, when he went to the bank to obtain electronic access to Leslie's bank account. At that time, James was concerned because Leslie had been withdrawing sums of cash from the bank that appeared to be disappearing. *Id.* at p. 38-39, 42, and 45-46.

{¶ 9} Glenna died on April 8, 2015. *Id.* at p. 43. On April 17, 2015, James and Leslie went to the Fifth Third Bank in Piqua, Ohio, to remove Glenna's name from Leslie's accounts. After indicating what they wanted, they were asked to wait. A few minutes later, Lesley Swarts, a Fifth Third personal banker, took them into a small office. [2] This was the first time James had been to the bank. *Id.* at p. 62-66. When Swarts asked why they were there, James said his grandmother had passed away, and he (Leslie) wanted to take her off the account. *Id.* at p. 67-68. After that, Leslie did most of the talking. *Id.* at p. 68.

[2]     Swarts denied ever meeting James prior to her deposition, which was taken on September 2, 2016. Deposition of Lesley Swarts, p. 23. Other factual issues existed as well. However, for reasons that will become apparent, none of the factual issues are genuine issues precluding summary judgment. We provide the factual information as background.

{¶ 10} Leslie told Swarts that life was not fair, that his son had died in November, that his wife had died, and that his daughter did not talk to him. *Id.* During the conversation, Leslie indicated that James was his grandson and said his grandchildren were helping him. *Id.* at p. 69 and 78. Leslie also said that he wanted his estate to go to his grandchildren. *Id.* at p. 77-78. In addition, Leslie stated during the visit that his directions to the bank were for a distribution of the account funds to his grandchildren. *Id.* at p. 82.

{¶ 11} According to James, Leslie signed several documents that day. James did not read them, but pointed to where Leslie needed to sign. *Id.* at p. 71. One signature card was signed that day – for the 636 checking account. On this card, Leslie was listed as the sole owner, and no POD beneficiaries were listed. Nicely Deposition at p. 71-72, and Ex. 9.

{¶ 12} James and Leslie were at the bank for 30 to 45 minutes, and then immediately went to the office of Leslie's attorney, Thomas Buecker. Hillier Deposition at p. 63-64. Buecker had been Leslie's attorney for years, but James had never met or talked with him before that day. *Id.* at p. 42-43. James and

Leslie were at Buecker's office for about 30 to 45 minutes, but it was less time than they had spent at the bank. *Id.* at p. 64. At that time, Leslie signed a POA appointing James as his power of attorney and a new will that granted all his personal and real property to his grandchildren. One half of the estate was to be given James L.'s children, per stirpes, and the other half was to be distributed to Judith's children, per stirpes. In the will, Leslie also stated that "I make no provision for my daughter, Judith Brown." *Id.* at p. 72-73, 83, 100, and 141-144 and Ex. B; April 13, 2015 Will of Leslie Hillier, filed with the probate court on August 25, 2015.

**\*3** {¶ 13} As noted, the next time James went to Fifth Third was on August 13, 2015, when he met with an employee, Kathy McGill, and filed the POA so he could electronically access the accounts. Hillier Deposition at p. 83-84. On that day, James signed two signature cards using the POA. One card was for checking account 636 and the other was for savings account 518. These cards both listed Judith Brown and James L. Hillier as POD beneficiaries. *Id.* at p. 97 and 106 and Ex. E; Nicely Deposition at p. 129 and Exs. 13 and A; Deposition of Kathy McGill, p. 28-29 and Exs. 1-D and 1-F.

{¶ 14} Leslie died on August 20, 2015. Within a week or two after Leslie's death, James and the estate attorney went to Fifth Third. At that time, they found out that the accounts were supposedly designated POD. Hillier Deposition at p. 32, 37,100, and 149. Fifth Third then paid the total amounts of the checking and savings accounts ($203,758.09) to Judith, because the only other listed person (James L. Hillier) had already died.

{¶ 15} In June 2017, James filed an action, individually and on behalf of Leslie's estate, against Fifth Third and Judith. The complaint asserted claims against Fifth Third for breach of contract, negligence, conversion, bad faith, and estoppel, while the claims against Judith were based on conversion and unjust enrichment. In July 2017, Judith filed an answer and a counterclaim based on frivolous conduct and "punitive or exemplary damages."

{¶ 16} In May 2018, James filed a motion for summary judgment on all of his claims and on Judith's counterclaims. Fifth Third then filed a cross-motion for summary judgment. After holding an oral hearing in October 2018, the trial judge issued a decision in January 2019, overruling the motion and cross-motion with respect to the breach of contract claims, negligence claims, and conversion. The judge granted summary judgment to Judith on the issue of unjust

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    5

enrichment, even though she had not filed a motion for summary judgment, and also granted summary judgment to Fifth Third on the bad faith and estoppel claims. In addition, the judge granted summary judgment in favor of James on Judith's claim for frivolous conduct. The judge did not resolve the claim for punitive damages.

{¶ 17} Following an unsuccessful attempt at mediation, a new judge decided to reconsider the prior summary judgment ruling and gave the parties a chance to file optional supplemental memoranda. Only Fifth Third took that opportunity. On November 22, 2019, the new judge filed an amended entry on the motions for summary judgment. This time, the judge overruled James's motion for summary judgment as to all the claims against Fifth Third and granted Fifth Third's cross-motion as to all claims against it. The judge also granted summary judgment in favor of Judith on James's claims, even though he had not filed a summary judgment motion. And finally, the judge granted James's motion for summary judgment on both of Judith's counterclaims.

{¶ 18} James then filed a notice of appeal from the trial court's judgment. Judith did not appeal the dismissal of her counterclaims.

## II. Did the Trial Court Properly Grant Summary Judgment on James's Claims?

{¶ 19} On appeal, James presents one assignment of error (the propriety of the summary judgment decision), with the following two subparts:

A. The Trial Court Erred in Awarding Summary Judgment to Fifth Third.

B. The Trial Court Erred in Awarding Summary Judgment to Judith Brown.

{¶ 20} We will consider these subparts together, as they are interrelated. In rendering summary judgment against James, the trial court concluded that Leslie did not specifically inform Fifth Third that he wanted POD designations for the grandchildren on the accounts. The court further held that if any mistake were made, it was by James and Leslie in believing that the bank understood what Leslie wanted. Without discussing applicable legal principles, the trial court also concluded that the signature cards James signed on August 13, 2015, clearly designated Judith and James's father (who was then deceased) as POD beneficiaries, and that,

again, James was at fault because he failed to read the cards. The court therefore concluded that Fifth Third did not breach its contract with Leslie because the last cards that were signed designated POD beneficiaries.

**\*4** {¶ 21} Due to the existence of a contract, the court also rejected the negligence claim. Furthermore, based on the conclusion that payment to Judith was proper, the court rejected James's unjust enrichment and conversion claims against her. In addition, the court found that James failed to argue estoppel and entered judgment for Fifth Third on that claim as well. Finally, the court held that there was no claim for bad faith, essentially because such a claim is of recent origin and because lack of good faith, as relevant to some issues, is not the same as a cause of action for bad faith. We will consider the court's holdings, beginning with the contract claim.

### A. The Contract Claim

{¶ 22} In arguing that the trial court erred, James contends that statutory requirements for POD accounts require a written contact with the "account owner," which was not satisfied here because James was not the account owner. James notes that no proper signature card existed for the savings account, and that the April 17, 2015 signature card, which contained no POD designations, was the proper card. In contrast, Fifth Third argues that the August 13, 2015 signature cards were controlling because they superseded all prior signature cards. Both sides have also spent considerable time discussing Fifth Third's "Signature Card Procedures" (internal bank policies), whether those procedures were properly followed, and Fifth Third's internal distinction between "add" or replacement cards.

{¶ 23} In reviewing summary judgment decisions, we conduct de novo review, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**[1]** **[2]** {¶ 24} James filed a claim against Fifth Third for breach of contract. "The elements of a breach of contract claim are 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.' " *Becker v. Direct Energy, LP*, 2018-Ohio-4134, 112 N.E.3d 978, ¶ 38 (2d Dist.), quoting *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994). "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

**[3]** {¶ 25} "Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53, 544 N.E.2d 920 (1989). "Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence." *Id.* Thus, if we conclude that the contracts here are unambiguous, factual disputes as to what was said or not said to Fifth Third employees or Fifth Third's compliance or lack thereof with its internal procedures would be irrelevant.

{¶ 26} Under R.C. 1109.07(B), banks are permitted to "enter into a written contract with a natural person for the proceeds of the person's deposits to be payable on the death of that person to another person or to any entity or organization in accordance with the terms, restrictions, and limitations set forth in sections 2131.10 and 2131.11 of the Revised Code." According to R.C. 2131.10:

> **\*5** A natural person, adult or minor, referred to in sections 2131.10 and 2131.11 of the Revised Code as the owner, may enter into a written contract with any bank * * * whereby the proceeds of the owner's investment share certificate, share account, deposit, or stock deposit may be made payable on the death of the owner to another person or to any entity or organization, referred to in such sections as the beneficiary, notwithstanding any provisions to the contrary in Chapter 2107. of the Revised Code. In creating such accounts, "payable on death" or "payable on the death of" may be abbreviated to "P.O.D."

\* \* \*

No change in the designation of the beneficiary shall be valid unless executed in the form and manner prescribed by the bank, building and loan or savings and loan association, credit union, or society for savings.

{¶ 27} "The General Assembly enacted R.C. 2131.10 and 2131.11 in 1961 with the apparent intention of recognizing in Ohio the use of a deposit in a financial institution as a 'tentative trust,' whereby the depositor (settlor) can withdraw funds from the deposit during his lifetime, and at the same time allow the beneficiary of the deposit to have the remainder of the funds at the depositor's death, without regard to the depositor's will or the statute of descent and distribution. The tentative trust doctrine was recognized in the state of New York in the leading case of *In re Totten* (1904), 179 N.Y. 112, 71 N.E. 748, and resulted in widespread use of what many have called a 'Totten trust' or 'poor man's trust.' " *Powell v. City Nat. Bank & Tr. Co.*, 2 Ohio App.3d 1, 2, 440 N.E.2d 560 (10th Dist.1981).

**[4]** {¶ 28} "Although a P.O.D. account is contractual in nature, it has a special purpose. It allows a person to make a testamentary disposition of assets without following the formalities of the Statute of Wills, R.C. Chapter 2107. Although it is an exception to the Statute of Wills, one of the basic requirements of the Statute of Wills cannot be ignored; that is, the requirement of a writing signed by the testator evidencing his intent. Since a P.O.D. account is testamentary in nature, it follows that the term 'written contract' means a writing signed by the owner of the funds showing the intent to dispose of property in contravention of his or her will or the statutes of descent and distribution." *Witt v. Ward*, 60 Ohio App.3d 21, 26, 573 N.E.2d 201 (12th Dist.1989). The statutory language in R.C. 2131.10 gives "the depositor full ownership of a P.O.D. account's funds during her lifetime, whereas the beneficiary's interest does not vest until the owner's death." *Miller v. Peoples Fed. Sav. & Loan Assn.*, 68 Ohio St.2d 175, 178, 429 N.E.2d 439 (1981).

{¶ 29} In the case before us, the last signature card the account owner, Leslie, signed was the April 17, 2015 card without any POD beneficiaries. The parties have quibbled over the meaning of the first sentence in R.C. 2131.10 – "A natural person, adult or minor, referred to in sections 2131.10 and 2131.11 of the Revised Code as the owner * * *." James contends that this means that only the account owner (Leslie) may enter into the contract, while the bank asserts that the statutory language means that any natural person may enter into the contract, and that, therefore, the cards signed by

James on August 13, 2015, were valid. Our view of the statute is that the term "owner" and natural person are one and the same. In other words, "owner" is simply another means of referring in the statute to the person entitled to enter into a POD.

{¶ 30} We find that the distinctions both sides suggest are essentially irrelevant, because the real issues center on the terms of the contract and whether James's POA permitted him to change the beneficiaries.

**\*6 [5]** {¶ 31} "A power of attorney is a written instrument authorizing an agent to perform specific acts on behalf of his principal." *Testa v. Roberts*, 44 Ohio App.3d 161, 164, 542 N.E.2d 654 (6th Dist.1988). In Ohio, powers of attorney are controlled by statute. *See* R.C. Chap. 1337. As relevant here, R.C. 1337.49 provides that:

Unless the power of attorney otherwise provides, language in a power of attorney granting general authority with respect to banks and other financial institutions authorizes the agent to do all of the following:

(A) Continue, modify, and terminate an account or other banking arrangement made by or on behalf of the principal;

(B) Establish, modify, and terminate an account or other banking arrangement with a bank, trust company, savings and loan association, credit union, thrift company, brokerage firm, or other financial institution selected by the agent * * *.

{¶ 32} This authority, however, is qualified by R.C. 1337.42. which states, in pertinent part, that:

(A) An agent under a power of attorney may do any of the following on behalf of the principal or with the principal's property *only* if the power of attorney *expressly grants* the agent the authority and if exercise of the authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject * * *:

(3) Create or change rights of survivorship;

(4) Create or change a beneficiary designation;

    * * *

(C) Subject to divisions (A), (B), (D), and (E) of this section, if a power of attorney grants to an agent authority to do all acts that a principal could do, the agent has the

general authority described in sections 1337.45 to 1337.57 of the Revised Code.

(Emphasis added.)

{¶ 33} In *Dorsey v. Dorsey*, 11th Dist. Trumbull No. 2010-T-0043, 2011-Ohio-6336, 2011 WL 6179258, a son of the decedent held a POA and used it during the decedent's lifetime to change the joint and survivorship designations on some accounts. He also closed one joint and survivorship account on which the decedent and his brother were co-owners, and opened up a new account, listing the decedent and a sister as co-owners. After reviewing the issues, the court of appeals held that the changes were invalid, because "there is no provision in that instrument giving [the son] authority to remove co-owners from [the decedent's] joint and survivorship accounts or to designate others as co-owners on those accounts." *Id.* at ¶ 50. The court, therefore, agreed with the trial court that those amounts would have to be returned to the decedent's estate. *Id.*

{¶ 34} Reviewing the power of attorney involved in this case, it likewise did not expressly give James the right to designate beneficiaries. Specifically, the POA provided, in relevant part, that:

Know All Men by These Presents, that I, Leslie R. Hillier, * * * do appoint James Leslie Hillier as my true and lawful attorney in fact to act in, manage, and conduct all my business affairs, and for that purpose for me in my name, place, and stead, and for my use and benefit, and as my act and deed, to do and execute, to concur with persons jointly interested with myself therein in the doing or executing of, all or any of the following acts or deeds, and things, to wit:

    * * *

**\*7** 3. To make, do and transact all and every kind of business of whatsoever kind or nature, including the receipt, recovery, collection, payment, compromise, settlement and adjustment of all accounts, including checking, savings, and/or commercial accounts * * *;

    * * *

Giving and granting unto my said attorney full power and authority to do and perform any and every act, deed, matter, and things whatsoever in and about my estate, property, and affairs, as fully and effectually to all intents and purposes as I might or could do in my own proper person if personally present, the above specifically enumerated powers being in

and exemplification of the full, complete, and general power herein granted and not in limitation or definition thereof; and hereby ratifying all that my said attorney shall lawfully do or cause to be done by virtue of those presents.

Affidavit of Fifth Third Employee Kathy McGill, Ex. A., p. 1-2.

{¶ 35} The above powers, while broad and general, do not provide, as R.C. 1337.42(A)(4) requires, that James had the specific power to change or designate beneficiaries on Leslie's accounts. In this vein, Fifth Third argues that because R.C. 1337.49 lets POAs "modify" accounts, James was entitled to change beneficiaries and the August 2015 signature card, therefore, is binding. Fifth Third Brief, p. 11. However, the statutory limitations on POAs are quite specific, and the wording in the POA Leslie granted is not sufficient to satisfy the requirements in R.C. 1337.42(A). Consequently, the beneficiary designations on the August 13, 2015 signature card were invalid and had no effect. In view of these facts, whether James read or was aware of the designations was irrelevant.

{¶ 36} Furthermore, Fifth Third's assertion on appeal contradicts the admissions it made in the trial court. Specifically, in its answer, Fifth Third stated that "Fifth Third admits that Plaintiff, as Decedent's Power of Attorney or otherwise, did not authorize Fifth Third [to] change the payable on death beneficiaries listed on the Accounts." Answer of Fifth Third, ¶ 11.

{¶ 37} In its answers to requests for admissions, Fifth Third further stated that James's "execution of the Checking Account signature card dated August 13, 2015 did not create new payable on death beneficiaries for the Checking Account on August 13, 2015," and that "a power of attorney does not have the ability to change beneficiaries on accounts if the document creating the power of attorney does not permit it." See Fifth Third Notice of Filing Answers to Requests for Admissions #3, p. 5, and #4, p. 5. Fifth Third's contention in its answers to the requests for admissions was that the signature card James signed "confirmed" the beneficiaries already in the bank's system. Id. However, as the following discussion reveals, James could not confirm what did not exist.

{¶ 38} Accordingly, the signature card James signed in August 2015 had no effect and did not create POD beneficiaries for the account. The last signature card was the one that Leslie signed on April 17, 2015, which stated that

Leslie was the sole owner of the checking account and did not designate any POD beneficiaries.

{¶ 39} Fifth Third's argument on appeal (contrary to its above argument) is that the POD beneficiaries were in its "internal" system, and that its employee simply accidentally omitted them on the April 2015 signature card. In this respect, Fifth Third relies on its internal signature card procedures. However, whether Fifth Third followed these procedures or what its internal procedures may have been is irrelevant. As we indicated, individuals are statutorily allowed to enter into written contracts with banks for payments of their accounts.

*8 [6] [7] {¶ 40} There is no question that a contract existed between Leslie and Fifth Third. "In order to form any contract, there must be a meeting of the minds of the parties regarding the contract's essential terms, and those terms must be reasonably certain and clear." *Bank of New York Mellon v. Rhiel*, 155 Ohio St.3d 558, 2018-Ohio-5087, 122 N.E.3d 1219, ¶ 19. "The primary goal in construing any contract is to ascertain and give effect to the intention of the parties," and courts "presume that the intent of the parties to a written contract is found in the writing of the contract itself." *Id.* at ¶ 20. The law is well-established that "where * * * the parties following negotiations make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain language of the contract provides." *Aultman Hosp. Assn.*, 46 Ohio St.3d at 55, 544 N.E.2d 920.

{¶ 41} Although, in one sense, there is no real negotiating with a bank when one opens an account, the signature card is the legally binding contract between the customer and Fifth Third. Nicely Deposition, p. 52 and 53. In contrast, the signature card procedures are internal bank documents; customers are not given these procedures, nor do they have access to them. *Id.* at p. 51. As a result, these procedures could have no bearing on the contract, where the contract is not ambiguous.

{¶ 42} The signature card that Leslie signed on April 17, 2015, was for the checking account (636) only. As noted, Fifth Third has not been able to produce a signature card for the savings account. The 636 signature card provided, in pertinent part, under "Terms and Conditions," that:

1. The terms and conditions stated herein, together with resolutions or authorizations which accompany this signature card, if applicable and the Rules, Regulations,

Agreements, and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between the Individual (s) or entity (ies) and the named person herein ("Depositor") and the Bank.

2. This Agreement incorporates the Rules, Regulations, Agreements, and Disclosures established by Bank from time to time, clearing house rules and regulations, state and federal laws, recognized banking practices and customs, service charges as may be established from time to time and is subject to laws regulating transfers at death and other taxes.

\* \* \*

7. All signers agree to the Terms and Conditions set forth herein and acknowledge receipt of a copy of the Rules and Regulations, Agreements, and Disclosures of Bank and agree to the terms set forth herein.

Affidavit of Jennifer Nicely, Ex. C, p. 1.

{¶ 43} The Rules and Regulations of the bank that were in effect as of May 2015 were attached to Nicely's affidavit as Ex. H. Concerning POD accounts, these rules stated that:

> 17. Payable on Death Accounts. If your account type permits a payable on death beneficiary or custodian designation, this paragraph applies. *When the signature card designates the beneficiary to receive the account funds upon the death of the Customer, it supersedes and revokes any previous appointment of any other Beneficiary.* Customer may withdraw all or any portion of the account balance during his lifetime and Customer retains the right to revoke the designation of any Beneficiary. Bank has the right to deal with Customer as if a Beneficiary was not named. The amount on deposit in this account at the death of the Customer shall belong and be paid to the Beneficiary, if the Beneficiary survives the Customer, subject to the provisions of this Agreement, the rules of Bank and applicable laws. Payment to the Beneficiary after the

death of the Customer shall be a valid and full release and complete discharge of the Bank from any and all liability and shall be binding on the heirs, executors, administrators and assigns of Customer. Bank reserves the right to require satisfactory proof of death of the Customer and survival of Beneficiary.

**\*9** Ex. H, p. 15.

**[8]** {¶ 44} According to the clear and unambiguous meaning of this provision, the signature card that Leslie signed on April 17, 2015, superseded and revoked any prior beneficiary with respect to the checking account. There was also no ambiguity in the signature card. It stated that Leslie was the sole owner of the account and no POD beneficiaries were listed. Consequently, there was no need to consider extrinsic evidence of any kind. (In this regard, we note that the facts set forth in the statement of facts and proceedings were intended as background information only.)

{¶ 45} Based on the preceding discussion, and under the undisputed facts and applicable law, the trial court erred in granting summary judgment to Fifth Third on the breach of contract claim. To the contrary, summary judgment should have been granted to James, as executor, and the funds in checking account 636 ($82,647.72) should have been paid to Leslie's estate. Whether the bank is liable for this amount will be discussed shortly.

**[9]** {¶ 46} The facts concerning the savings account (518) are somewhat different. As noted, Fifth Third did not have a signature card for the 518 account. There were indications in Fifth Third's internal records that POD beneficiaries may have been designated at one time for that account. However, Fifth Third's argument likewise fails for this account because there was not sufficient evidence of a *written agreement* for the account. To establish the existence of POD beneficiaries as an exception to the Statute of Wills, both R.C. 1109.07(B) and R.C. 2131.10 require a *written contract* signed by the account owner. Fifth Third could not produce a written signature card, and its internal records were insufficient to substitute for the statutory requirements. As a result, the $121,145.13 in the savings account should have been paid to Leslie's estate, rather than to Judith, and the trial court erred in granting summary judgment to Fifth Third on this point as well.

Judgment should have been awarded to James, as executor for the estate.

{¶ 47} Even if judgment should have been awarded to the executor, an issue remains whether the bank is liable. According to Fifth Third, James, as executor, had a mechanism under R.C. 1109.10 by which he could have asserted his claim to the funds, but he failed to use it. Fifth Third contends that because James did not have a proper right to the funds and failed to assert his claim using the statutory procedure, Fifth Third was obligated to release the funds to Judith and is not liable.

{¶ 48} As a preliminary point, Fifth Third's contention is incorrect to the extent that it is based on the fact that James, as executor, did not have a right to the funds. We have already concluded that the estate had such a right, and James, as executor of the estate, was the appropriate party to bring claims on the estate's behalf. *E.g.*, R.C. 2107.46; *Ross v. Barker*, 101 Ohio App.3d 611, 615, 656 N.E.2d 363 (2d Dist.1995).

{¶ 49} As to the remainder of Fifth Third's argument, we note that R.C. 1109.10 was enacted in 1996 via H.B. 538, 1996 Ohio Laws File 187, for purposes of adopting a new section number for former R.C. 1107.11. No substantive changes were made in the content of the statute. At the time of the events at issue in this case, R.C. 1109.10 provided that:

*10 If any claim not clearly consistent with the terms of any applicable authority on file with a bank is made to any deposit, safe deposit box, property held in safekeeping, security, obligation, or other property in the bank's possession or control, in whole or in part, by any person, including any depositor, individual, or group of individuals, whether or not authorized to draw on or exercise any right or control with respect to the property, the bank is not required to recognize the claim without one of the following:

(A) A court order, issued by a court of competent jurisdiction and served on the bank, enjoining or restraining the bank from taking any action with respect to the property or instructing the bank to pay the balance of the, [sic] provide access to the safe deposit box, or deliver the property as provided in the order;

(B) A bond in the form and amount and with sureties satisfactory to the bank, indemnifying the bank against any liabilities, loss, and expenses it might incur because of its

recognition of the claim or because of its refusal, due to the claim, to honor or recognize any right with respect to the property. [3]

[3]  R.C. 1109.10 was subsequently amended in 2017 as part of a new banking law that repealed separate statutes pertaining to savings and loan associations (R.C. Chapters 1151 to 1157), savings banks (R.C. Chapters 1161 to 1165), and "regulated banks, savings and loan associations, and savings banks under the same statute" by modifying the law governing banks. Ohio Bill Analysis, 2017 H.B. 49. The contents of this amended version and the version in effect in 2015 do not differ in any appreciable way.

{¶ 50} The commentary to the former section, R.C. 1107.11 (which was adopted in 1967), says that "[t]his section is new and states the requirement which one making an adverse claim to a deposit or property held in safe deposit must meet before the bank will be required to deliver such deposit or property."

{¶ 51} The fact that a bank is not necessarily required to deliver the property to an adverse claimant does not mean that the bank lacks responsibility for delivering property to the wrong party. Thus, James's failure, as executor, to use the process in R.C. 1109.10 does not relieve the bank from liability for breach of contract.

{¶ 52} We note that Fifth Third's Rules and Regulations state that, "[i]n the event of a conflict between Account Owners or individuals with signing authority or those purporting to have signing authority on the Account, the Bank reserves the right to take action, which may include, without limitation, placing a hold on the Account or instituting legal proceedings." Nicely Affidavit, Ex. H, at p. 9.

[10]  {¶ 53} Fifth Third was notified before it disbursed the funds to Judith that an adverse claim to the funds existed. Hillier Deposition at p. 100 and 128-129. However, rather than placing a hold on the account or instituting legal proceedings, Fifth Third chose to release the funds. Even if this were otherwise, Fifth Third could have taken this action to protect itself from liability for breach of contract. Accordingly, Fifth Third may be held liable for breach of contract.

**WESTLAW**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  11

{¶ 54} As we noted, the trial court also granted summary judgment to Fifth Third on claims for bad faith, negligence, conversion, and estoppel. James has not addressed the estoppel issue on appeal, and we will not consider it further. We will next discuss the bad faith claim.

## B. Bad Faith Claim

{¶ 55} Concerning "bad faith," the trial court concluded that bad faith claims are of recent origin and a lack of good faith, as relevant to some issues, is not the same as a cause of action for bad faith. Decision on Summary Judgment, p. 10-11.

**\*11  [11]**  {¶ 56} "The duty of good faith and fair dealing being integral to any contract, the breach of that duty, when alleged, is thus integral to the plaintiff's cause of action for breach of contract. Accordingly, 'an allegation of a breach of the implied covenant of good faith cannot stand alone as a separate cause of action from a breach of contract claim * * *.' " *Krukrubo v. Fifth Third Bank*, 10th Dist. Franklin No. 07AP-270, 2007-Ohio-7007, 2007 WL 4532689, ¶ 19, quoting *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. Franklin No. 04AP-980, 2006-Ohio-638, 2006 WL 328679, ¶ 98. "In essence, a claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing." *Id.*

{¶ 57} In view of this authority, we agree that summary judgment was properly granted on James's bad faith claim. We do note that banks may be held liable in some situations for bad faith under R.C. Chap. 1334, which governs "Bank Deposits and Collections; Transfer of Funds." Under R.C. 1304.03(A), the parties may vary the effect of the provisions of R.C. Chap. 1334, but they "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable."

{¶ 58} R.C. 1304.03(E) further provides that, "[t]he measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there also is bad faith, the measure of damages includes any other damages the party suffered as a proximate consequence." This statute was effective in 1962 and corresponded with Uniform Commercial Code 4-103. It

was then amended in 1994, but no substantive changes were made to R.C. 1304.03(E). *See* S.B. 147, 1994 Ohio Laws File 145.

{¶ 59} This is not to say R.C. 1304.03(E) applies here. We raise the matter merely to indicate that a bank may, indeed, be found guilty of acting in bad faith in certain situations, even in light of a contractual relationship or breach of contract claim. For example, in *Natl. City Bank v. Rhoades*, 150 Ohio App.3d 75, 2002-Ohio-6083, 779 N.E.2d 799 (2d Dist.), we agreed that a bank was liable for improperly disbursing funds in its customer's account to the customer's girlfriend. *Id.* at ¶ 37-43. We recognized that a bad faith claim could exist, which would allow recovery of consequential damages under R.C. 1304.03(E). *Id.* at ¶ 68-69. However, we held that there was no evidence of the bank's bad faith.

{¶ 60} Banks may also be held liable for consequential damages like profit or for attorney fees where their acts are willful or malicious. *See Cincinnati Ins. Co. v. First Nat. Bank of Akron*, 63 Ohio St.2d 220, 226, 407 N.E.2d 519 (1980) (rejecting award of profits bank made when it improperly paid checks drawn on customer's account because the bank's acts were not willful; attorney fee award was also improper due to lack of statutory basis or evidence that bank's acts were malicious). *See also City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 66, 521 N.E.2d 814 (1988) ("[g]enerally a prevailing party may not recover attorney fees as costs of litigation in the absence of statutory authority unless the breaching party has acted in bad faith, vexatiously, wantonly, obdurately or for oppressive reasons.")

**\*12**  {¶ 61} " ' "Bad faith" is a legal term of art, which is not defined in the Ohio Uniform Commercial Code. Logically, it is the inverse of "good faith," which is defined as "honesty in fact in the conduct or transaction concerned." R.C. 1301.01(S). Thus, while not specifically defined, "bad faith" suggests dishonesty, fraud, or misrepresentation, which are intentional in nature and beyond the perimeters of mere negligence.' " *Fifth Third Bank v. Gen. Bag Corp.*, 8th Dist. Cuyahoga No. 92793, 2010-Ohio-2086, 2010 WL 1920046, ¶ 31, quoting *Johnson v. Third Fed. S. & L. Assn. of Cleveland*, 8th Dist. Cuyahoga No. 49236, 1985 WL 6888 (June 27, 1985).

**[12]**  {¶ 62} Assuming for purposes of argument that a bad faith claim could exist, the trial court did not err in granting summary judgment on this claim in this case. There was no evidence that Fifth Third's actions were dishonest, willful, or

malicious, and James did not present evidence of damages beyond what was due to be paid under the contract between the account owner and the bank. Accordingly, the trial court correctly rendered summary judgment against James on the claim that Fifth Third acted in bad faith.

## C. The Negligence Claim

{¶ 63} Regarding the negligence claim, the trial court rejected this claim as well, citing *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F.Supp.2d 956 (N.D. Ohio 2007). In *Solid Gold Jewelers*, the court explained that " '[u]nder Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim.' " *Id.* at 960, quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). Exceptions to this rule exist " 'if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed.' " *Id.*, quoting *Wolfe*.

{¶ 64} The authority that *Wolfe* relied on was *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922). *Wolfe* at 710,. The holding in *Ketcham* was essentially that, where the gravamen of a party's complaint is breach of contract, the perpetrator's motive in breaching is irrelevant, and a trial court errs if it admits evidence indicating that the case is one in which exemplary damages might be awarded. *Ketcham* at 377-378, 136 N.E. 145. As recently as 2018, the Supreme Court of Ohio approved and followed *Ketcham,* holding that "[p]unitive damages are not recoverable in an action for breach of contract." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, paragraph one of the syllabus.

{¶ 65} In *Lucarell*, the court acknowledged that Ohio cases have held that both a contract action and a tort action may exist where breach of an independent duty is involved. *Id.* at ¶ 36. The court cautioned, however, that while "we have noted that the conduct constituting a breach of contract can also constitute a tort, we have made clear that punitive damages are available only when the claimant 'suffered a harm distinct from the breach of contract action and attributable solely to the alleged tortious conduct.' " *Id.* at ¶ 37, quoting *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 86, 495 N.E.2d 391 (1986).

[13] {¶ 66} In the case before us, James failed to present any evidence of an "independent tort," and he has not outlined any

harm he or the estate suffered other than that attributable to the breach of contract. Accordingly, the trial court did not err in rendering summary judgment on the negligence claim.

## D. Conversion

**\*13** {¶ 67} The claim for conversion was brought against both Fifth Third and Judith. In rejecting the claim with regard to both parties, the trial court noted that Fifth Third acted properly in honoring Judith's claim. The court also remarked that Judith could have subjected the bank to a lawsuit had it not complied with the POD designation. Decision on Summary Judgment at p. 9-10. To the extent the court's conclusions rest on the fact that the balance of the accounts was properly owed to Judith, the court erred, for the reasons noted above.

[14] [15] {¶ 68} "Conversion is an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another." *Dice v. White Family Cos.*, 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 17 (2d Dist.). "Typically, '[t]he elements of a conversion cause of action are (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.' " *Id.*, quoting *Haul Transport of VA, Inc. v. Morgan*, 2d Dist. Montgomery No. 14859, 1995 WL 328995 (June 2, 1995).

[16] [17] {¶ 69} Given the undisputed facts in this case, James established that the checking and savings accounts belonged to Leslie's estate, that Fifth Third wrongfully disposed of the sums in the accounts by paying them to Judith, and that the estate was damaged by Fifth Third's acts. Consequently, the trial court erred in rendering summary judgment to Fifth Third on this cause of action. Instead, judgment should have been rendered in favor of James, as executor of the estate. We do agree that summary judgment on this point was properly granted to Judith, as she was not the party wrongfully disposing of the assets. The claim against Judith was more properly classified as one for unjust enrichment, as we will explain below. Accordingly, the assignment of error is sustained with respect to the summary judgment on conversion granted to Fifth Third, but overruled as to Judith.

### E. Unjust Enrichment

{¶ 70} The final issue relates to the summary judgment granted to Judith (subpart B). As indicated, the only claims against Judith were for conversion and unjust enrichment. The trial court granted summary judgment in Judith's favor on the unjust enrichment claim even though she had not moved for summary judgment, and it gave no reasons for doing so. Decision on Summary Judgment at p. 8-9. Presumably, the court's decision was based on its prior conclusion that the money in the accounts was properly paid to Judith as the POD beneficiary.

**[18]** **[19]** {¶ 71} "Unjust enrichment occurs when a person has and retains money or benefits that in justice and equity belong to another." *Union Sav. Bank v. White Family Cos., Inc.*, 167 Ohio App.3d 51, 2006-Ohio-2629, 853 N.E.2d 1182, ¶ 26 (2d Dist.), citing *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923 (1938). " 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.' " *Dixon v. Smith*, 119 Ohio App.3d 308, 317, 695 N.E.2d 284 (3d Dist.1997), quoting Restatement of the Law 1st, Restitution, Section 1 at 12 (1937).

**[20]** {¶ 72} For the reasons previously discussed, the trial court erred in entering summary judgment in Judith's favor

on this claim. Based on the undisputed facts and applicable law, the proceeds of Leslie's savings and checking accounts were improperly paid to Judith and should have been paid to Leslie's estate. Judith, therefore, retains money that belongs to another. Consequently, James's assignment of error is sustained as to the grant of summary judgment in Judith's favor on the unjust enrichment claim.

### III. Conclusion

**\*14** {¶ 73} James's sole assignment of error having been sustained in part and overruled in part, the judgment of the trial court is reversed as to the summary judgment rendered in favor of Fifth Third on the breach of contract and conversion claims. The summary judgment in favor of Fifth Third on the claims for bad faith, negligence, and estoppel are affirmed. In addition, the summary judgment in Judith's favor is affirmed as to the conversion claim and reversed as to the claim for unjust enrichment. This cause is remanded to the trial court for further proceedings consistent with this opinion.

FROELICH, J. and HALL, J., concur.

**All Citations**

--- N.E.3d ----, 2020 WL 3885916, 2020 -Ohio- 3679

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 171 of 259 PAGEID #: 7199
Lanning v. Delaware Rural Electric Cooperative, Inc., Not Reported in N.E.2d (1985)
1985 WL 9091

1985 WL 9091
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio,
Third District, Union County.

GLORIA JEAN LANNING, ADMINISTRATOR
OF THE ESTATE OF DAVID A.
LANNING, PLAINTIFF-APPELLANT
v.

DELAWARE RURAL ELECTRIC COOPERATIVE,
INC., ET AL., DEFENDANTS-APPELLEES.

CASE NO. 14-83-2.
|
March 14, 1985.

Civil Appeal from Court of Common.

**Attorneys and Law Firms**

ATTORNEYS: MR. WILLIAM L. STEHLE, 580 South High
Street, Columbus, Ohio 43215, For Appellant.

MR. TERRY M. MILLER, VORYS, SATER, SEYMOUR
AND PEASE, 52 East Gay Street, Post Office Box 1008,
Columbus, Ohio 43216, For Appellee.

OPINION

MILLER, J.

**\*1** This is an appeal by plaintiff from a summary judgment
entered by the Court of Common Pleas of Union County in
favor of defendant Delaware Rural Electric Cooperative, Inc.

On August 9, 1981, plaintiff filed her complaint against
defendants, Delaware Electric Cooperative, Inc., (hereinafter
Delaware Electric), Homelite Division of Textron, Inc.,
(hereinafter Homelite), and three other unknown defendants.

In her complaint plaintiff, as administratrix of her deceased
husband's estate, alleged that defendant Delaware Electric's
tortious and willful disconnection of electricity to decedent's
home and Homelite's negligent design, manufacture and sale

of an electric generator together with Homelite's failure to
warn decedent of the dangerous propensities of the generator
all caused the death of her husband by electrocution.

Defendants answered, discovery was sought, and defendant
filed its motion for summary judgment on September 9,
1982, the trial court setting a hearing date on the motion for
September 30, 1982.

On December 22, 1982, the trial court set a trial date
for February 8, 1983. On the date of trial the trial court
dismissed the action against Homelite and granted the motion
of Delaware Electric for summary judgment. On March 7,
1983, the trial court entered the following judgment:
"There came on for consideration the motion of Defendant
Delaware Rural Electric Cooperative, Inc. for summary
judgment dismissing all claims against it by Plaintiff Gloria
Jean Lanning. The Court, upon review of the pleadings
of the parties and the evidence cognizable for summary
judgment purposes in accordance with Rule 56 of the Ohio
Rules of Civil Procedure, concludes that there is no genuine
issue between Plaintiff Gloria Jean Lanning and Defendant
Delaware Rural Electric Cooperative, Inc. as to any material
fact and that Defendant Delaware Rural Electric Cooperative,
Inc. is entitled to judgment as a matter of law. It is, therefore,

"ORDERED that each and every claim of Plaintiff Gloria
Jean Lanning against Defendant Delaware Rural Electric
Cooperative, Inc. be, and the same hereby are, dismissed and
that Plaintiff shall pay the taxable costs of this action."

Plaintiff appeals from the above judgment setting forth five
assignments of error.

Assignment of error number one:

"THE TRIAL COURT ERRED
IN GRANTING DEFENDANT
DELAWARE RURAL ELECTRIC
COOPERATIVE, INC'S MOTION
FOR SUMMARY JUDGMENT,
BECAUSE A JURY QUESTION WAS
PRESENTED AS TO DEFENDANT'S
NEGLIGENCE"

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

Civil Rule 56 provides as pertinent:

"* * *

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof. If the action has been set for pretrial or trial, a motion for summary judgment may be made only with leave of court.

"The motion shall be served at least fourteen days before the time fixed for hearing. The adverse party prior to the day of hearing may serve and file opposing affidavits. Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"

**\*2** The motion for summary judgment, filed September 9, 1982, was accompanied by an affidavit of Samuel R. Chaney, manager of Delaware Electric, with exhibits thereto. Prior thereto on July 2, 1982, the deposition of David Zimmer was filed and, on September 29, 1982, the deposition of Samuel R. Chaney was filed.

On September 30, 1982, the deposition of plaintiff was filed.

The timely filing of evidentiary materials for the court's consideration on a summary judgment motion is keyed to the day set for hearing on the motion. See McCormac, Ohio Civil Rules Practice, Section 6.33 (1983 Supl. p. 70). Civil Rule 56(C) provides that the adverse party "prior to the day of the hearing" may serve and file opposing affidavits, but, absent anything to the contrary in the rule, we conclude that this time limit is applicable to all types of evidentiary material filed by the adverse party in summary judgment proceedings. Thus, only those evidentiary items set forth in Civil Rule 56(C) and filed prior to September 30, 1982, were subject to

consideration by the trial court on the motion for summary judgment. Plaintiff's deposition being filed on September 30, 1982, was not properly before the trial court for consideration on the motion for summary judgment.

Nor, were the items attached to plaintiff's unsworn memorandum contra the motion for summary judgment subject to consideration on the motion.

Based on the evidentiary items properly before the trial court on the motion for summary judgment the only conduct on the part of Delaware Electric to which liability could possibly attach was the disconnection of electric power to plaintiff's home. Plaintiff concedes that her decedent was not killed by electrical current transmitted by Delaware Electric, but contends that Delaware Electric's tortious conduct was the disconnection of power.

In Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St. 2d 64, a per curiam opinion the court said at page 66: "* * *.

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

"* * *."

The issue before the trial court in this matter was whether Delaware Electric, by disconnecting its service to plaintiff's home, negligently caused the death by electrocution of plaintiff's decedent.

An action for negligence involves three essential elements: First, the existence of a duty owing by defendant to plaintiff; second, defendant's failure to discharge that duty; third, injury to the plaintiff proximately resulting from such failure. Hadfield-Penfield Steel Co. v. Sheller (1923), 108 Ohio St. 106, 114.

The evidentiary matters before the trial court on the motion for summary judgment would indicate that Delaware Electric notified plaintiff and plaintiff's decedent of the impending

**Lanning v. Delaware Rural Electric Cooperative, Inc., Not Reported in N.E.2d (1985)**

1985 WL 9091

shut-off of electricity unless payment of their electric bill was made, that plaintiff and/or plaintiff's decedent gave Delaware Electric a check which was not honored and that Delaware Electric then shut off the electricity to plaintiff's and plaintiff's decedent's residence.

**\*3** The most frequent cause for discontinuance of service by a public utility is failure of a consumer to pay bills for service rendered. 45 O.Jur. 2d 233, Public Utilities, Section 85. The only limitation of such cut-off of power is that provided by R.C. 4933.121 effective between the fifteenth day of November and the fifteenth day of April, and not applicable herein.

Although Delaware Electric had an internal policy of giving a three-day notice to its customers (prior to cut-off) in case of dishonored checks this did not constitute a duty upon the electric company.

We conclude that Delaware Electric was not negligent in its actions in cutting off the electricity and, not being negligent, summary judgment was proper. Norris v. Ohio Std. Oil Co. (1982), 70 Ohio St. 2d 1.

The first assignment of error is not well taken.

Assignment of error number two:
"THE TRIAL COURT ERRED IN HOLDING THAT MR. LANNING'S CONDUCT CONSTITUTED CONTRIBUTORY NEGLIGENCE WHICH WOULD BAR RECOVERY BY PLAINTIFF."

In ruling upon defendant's motion for summary judgment at the hearing of February 8, 1983, the trial court stated:
"\* \* \* No current from Delaware Rural Electric injured plaintiff's decedent, and certainly in the defenses raised by Rural Electric, and the supporting affidavits and materials supplied with the summary judgment motion, certainly there is no question but what there was contributory negligence and assumption of risk. Contributory negligence is always a jury question, but certainly, there was an assumption of risk when a man tried to hook up a home generator to his electricity in the house. It wasn't hooking - it wasn't the electricity of the Delaware Rural Electric that caused his death.

"So summary judgment is granted Delaware Rural Electric, \* \* \*."

(Transcript, Feb. 8, 1983, p. 4.)

Plaintiff, relying on the recent cases of Wilfong v. Batdorf (1983), 6 Ohio St. 3d 100; and Anderson v. Ceccardi (1983), 6 Ohio St. 3d 110, contends that the granting of summary judgment in this case was inconsistent with current Ohio law because contributory negligence and assumption of risk are no longer a complete bar to recovery and the trier of fact should apportion the negligence of all parties according to the comparative negligence statute.

In Wilfong, supra, the Supreme Court stated, at page 104, that:

> "We therefore hold that the common-law bar of contributory negligence is no longer applicable in Ohio. The principle of comparative negligence, consistent with the provisions of R.C. 2315.19, applies in all negligence actions tried after June 20, 1980, irrespective of when the cause of action arose, as part of the common law of Ohio. To the extent that Viers v. Dunlap [(1982), 1 Ohio St. 3d 173] and Straub v. Voss [(1982), 1 Ohio St. 3d 182] are inconsistent with this determination, they are overruled."

As noted above, the trial date in the instant case was set for February 8, 1983.

In Anderson, supra, the first paragraph of the syllabus states:

> **\*4** "The defense of assumption of risk is merged with the defense of contributory negligence under R.C. 2315.19."

In view of these cases, the above-quoted statements by the trial court might have constituted prejudicial error had the trial court granted summary judgment for defendant solely on the basis of contributory negligence and assumption of risk. However, such was not the case.

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

**Lanning v. Delaware Rural Electric Cooperative, Inc., Not Reported in N.E.2d (1985)**

1985 WL 9091

Negligence need only be compared when both parties to an action can be found to be negligent. Thus, the principles dealt with in Wilfong and Anderson, supra, would apply only if there was an issue present as to defendant's negligence in disconnecting plaintiff's electricity, which negligence proximately caused decedent's death by electrocution.

Under assignment of error number one above, this court concluded that the trial court did not err in granting summary judgment based on a determination that defendant was not actionably negligent.

Therefore, any error that may have been precipitated by the court's statements, which incidently were not repeated in the entry granting summary judgment, and by the subsequent Wilfong and anderson decisions, supra, did not result in prejudice to plaintiff in this case.

Plaintiff's second assignment of error is without merit.

Assignment of error number three:

> "THE TRIAL COURT ERRED IN FAILING TO HOLD THAT DEFENDANT ELECTRIC COMPANY'S CONDUCT CONSTITUTED INTENTIONAL TORTIOUS CONDUCT AND/ OR RECKLESS DISREGARD OF THE SAFETY OF PLAINTIFF'S DECEDENT."

While it is true that defendant intentionally disconnected the electric current flowing to plaintiff's home, there is no evidence that such intentional conduct was tortious or done with reckless disregard for the safety of plaintiff's decedent.

First of all Delaware Electric owed no duty of care in disconnecting plaintiff's electricity under the circumstances of this case. The cases, such as Hetrick v. Marion-Reserve Power Co. (1943), 141 Ohio St. 347, upon which plaintiff relies, concern defendant's duty of care in maintaining, constructing and inspecting equipment such as poles and wire and their duty of care in transmitting and distributing electric current.

There is no evidence here that defendant's intentional conduct breached such duty or was done with reckless disregard for said duty and, although plaintiff contends that defendant failed to provide advance notice as to the termination, the Chaney affidavit contradicts this contention.

The third assignment of error is without merit.

The fourth assignment of error is:

> "THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE PUBLIC UTILITIES SHOULD BE STRICTLY LIABLE FOR WILLFUL DEVIATIONS FROM THEIR OWN PROCEDURES."

Plaintiff concedes that her husband's death was not caused by the transmission of power, by defendant, to plaintiff's home. Based upon the evidentiary items before the trial court, no causal connection existed between the non-transmission of electric power, i.e., disconnection, and decedent's death, as it occurred. While strict liability can, in some situations, be imposed regardless of fault, there still needs to be a causal connection between defendant's conduct and the resulting injury to plaintiff (or, in this case, her decedent).

**\*5** Plaintiff's fourth assignment of error is without merit.

Assignment of error number five:

> "THE TRIAL COURT ERRED IN ASSESSING COURT COSTS AGAINST PLAINTIFF."

In its March 7, 1983, entry granting summary judgment in defendant's favor, the trial court stated "that Plaintiff shall pay the taxable costs of this action."

Civil Rule 54(D) provides as follows:
"(D) Costs. Except when express provision therefor is made either in a statute or in these rules, costs shall be

1985 WL 9091

allowed to the prevailing party unless the court otherwise directs." (Emphasis added.)

The Staff Notes to the above rule indicate that the ultimate responsibility for the assessment of costs is placed on the court, in the exercise of its discretion. (See for example, Jones v. Pierson (1981), 2 Ohio App. 3d 447.)

In the absence of evidence of an abuse of discretion or manifest error, it has been a long standing principle in Ohio jurisprudence that a judgment for costs will not be reviewed. In Raabs Estate (1865), 16 Ohio St. 274, 280, the Supreme Court stated:

> "It follows, therefore, that where the costs may be awarded as the court may regard right and just, upon the facts and circumstances of the case, unless the evidence is disclosed upon the record, the reviewing court can not say that a sound and equitable discretion was not

exercised in the disposition of the costs. We have not the evidence before us in this case; and, if no other error appeared upon the record, the judgment for costs must stand as rendered below."

Plaintiff's fifth assignment of error is without merit.

Finding no error of the trial court prejudicial to plaintiff as assigned and argued, we affirm the trial court's judgment. Judgment affirmed.

GUERNSEY, P.J. and COLE, J., concur.

**All Citations**

Not Reported in N.E.2d, 1985 WL 9091

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 176 of 259 PAGEID #: 7204
Lesick v. Manning, Not Reported in N.E.2d (1992)
1992 WL 380284

1992 WL 380284
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Seventh
District, Columbiana County.

Deborah LESICK, Plaintiff–Appellant,
v.
Jefferson J. MANNING, et
al, Defendants–Appellees.

No. 91–C–70.
|
Dec. 17, 1992.

Civil Appeal from Common Pleas Court, Case No. 90 CIV
315. Affirmed.

**Attorneys and Law Firms**

Keith E. Spero, Alan H. Kraus, Cleveland, for plaintiff-
appellant.

Scott A. Washam, Harry R. Conn, Lisbon, for defendants-
appellees.

Before DONOFRIO, P.J., and COX and O'NEILL, JJ.

OPINION

DONOFRIO, Presiding Judge.

 *1 This is an appeal from an order of the Columbiana
County Court of Common Pleas granting motion for summary
judgment to defendants-appellees, Daniel Wittenmyer,
Westward Auto Wrecking, Westward Auto Sales, and
Westward Auto Inc.

Appellees, Daniel Wittenmyer and two companies owned by
him, Westward Auto Inc., and Westward Auto Wrecking, are
in the business of selling salvaged motor vehicles and used
cars. Defendant, Jefferson Manning, who has not filed an
answer below, is the owner of Manning's Body Shop in Salem,
Ohio.

Apparently, Manning had purchased two salvage vehicles
from Westward Auto, Inc., by paying for them in full and
taking possession of them. Because Manning did not have a
used-car-dealer's license, title to the vehicles remained with
Westward, allegedly until Manning could find a buyer for
them. The purpose of this was for Manning to avoid having
to pay sales tax when he "purchased" the vehicles.

Manning first purchased a 1984 New Yorker in June 1988,
and, after repairing it, was permitted to drive the car, titled
to Westward Auto Wrecking, to the State Highway Patrol
inspection garage by using a dealer license plate belonging to
Westward Auto, Inc. Upon passing inspection, a yellow title
was issued to Westward Auto Wrecking and then transferred
to Westward Auto Sales. Manning then found a purchaser for
the car and appellees transferred title to such purchaser.

Manning then purchased a 1985 Fifth Avenue in July 1988
and did the same thing as far as repairs, inspection and
obtaining a new yellow title. Manning, however, used the
license plate belonging to appellees to drive the vehicle for
personal use. This was allegedly done without the permission
or knowledge of appellees, Wittenmyer, Westward Auto
Wrecking or Westward Auto Sales.

On September 5, 1988, plaintiff-appellant, Deborah Lesick,
was a passenger in the 1985 Fifth Avenue driven by Manning,
then titled to Westward Auto Sales, and bearing Westward
Auto Sales' dealer license plate. An accident ensued, injuring
appellant. Manning was subsequently charged with, and
convicted of, D.U.I., among other things.

On June 13, 1990, appellant filed a civil complaint against
Manning, Wittenmyer, individually and d.b.a. Westward Auto
Wrecking and Westward Auto Sales, and against Westward
Auto Sales, Inc. The complaint stated that the defendants
were negligent and that such negligence resulted in injury to
appellant.

On May 17, 1991, Wittenmyer and Westward Auto, Inc. filed
a motion for summary judgment. Appellant filed an amended
complaint with leave from the court on June 10, 1991, adding
a cause of action under Ohio's "Little RICO" statute, R.C.
2923.31 *et seq.* On September 3, 1991, appellees filed a
motion for summary judgment on the amended complaint. On
October 18, 1991, appellant filed her response to such motion.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 1

**Lesick v. Manning, Not Reported in N.E.2d (1992)**

1992 WL 380284

After a hearing on November 1, 1991, the trial court granted appellees' motion for summary judgment on November 8, 1991. This appeal follows.

**\*2** In her first assignment of error, appellant contends the trial court erred in granting appellees' motion for summary judgment on appellant's first cause of action when it found as a matter of law that there was not a jury question as to whether appellees admitted involvement, and whether a criminal conspiracy to deprive the state of Ohio of sales tax was a proximate cause of appellant becoming a paraplegic in an accident.

Appellant cites *Mulholland v. Waiters' Union* (1902), 13 Ohio Dec. 342, at 352, for the proposition that all parties to a conspiracy are jointly and severally liable for damage occasioned by the wrongful combination. Appellant then argues that, contrary to the trial court's finding of fact at page 3 of its judgment entry, appellees admitted that they conspired with Manning and violated Ohio law so that Manning could take possession of and drive the two vehicles without paying sales tax. Appellant states that she presented evidence through affidavits and filed depositions that would allow a jury to conclude that the accident was furthering the interest of the criminal conspiracy. Appellant contends the trial court wrongly assumed that she argued that violations of Ohio automobile title and sales law create negligence *per se.* Rather, appellant points to the affidavit of Manning, filed with appellees' original motion for summary judgment, much of which was retracted in Manning's subsequent affidavit, in arguing that *Fenslage v. Dawkins* (C.A. 5, 1980), 629 F.2d 1107, is an analogous case in which it was held that a plaintiff may recover damages that naturally flow from a civil conspiracy. Appellant then argues that a jury is to decide whether her injuries flowed as a foreseeable result of the alleged conspiracy. According to appellant, the evidence would indicate such, especially when viewed in the light most favorable to her. Appellant further argues that, but for the conspiracy, Manning would not have had the car that appellant was injured in.

Appellant claims that Manning's first affidavit shows he had the car at the time in question in order to test drive it to see if it was adequately repaired for resale, and contends this was, therefore, in furtherance of the conspiracy.

Appellant next argues that the trial court erroneously found that Manning's drunk driving was the proximate cause of the accident (judgment entry, p. 6). Appellant points to Manning's

deposition at page 27 where he indicates that, while talking to appellant, he missed a "Y" in the road and that his ability to drive before the accident was normal. Appellant contends the issue of proximate cause is for a trier of fact to determine.

Appellees contend that no conspiracy existed between them and Manning, and that Manning was never given a dealer license plate to drive the 1985 Fifth Avenue. Appellees argue that Manning could have, at any time, picked up the vehicle and had the title transferred into his name. Appellees further argue that the underlying act was therefore not actionable and that the argument that it was done in pursuance of a conspiracy does not render it actionable. *Budinsky v. Universal Carloading & Distributing Co.* (1937), 23 Ohio Law Abs. 12, 15. Here, appellees argue that no illegal underlying act was aimed at or designed to injure appellant, and that no evidence was produced by appellant to establish proximate causation between the actions of appellees and appellant's injuries.

**\*3** Assuming that appellees granted Manning permission to use the license plate, that fact alone would not make appellees responsible for appellant's injuries. Even negligence *per se* brought about by violation of a statute is not alone enough to support a claim. A plaintiff must still demonstrate that the violation was the proximate cause of her injuries. *State Farm Ins. Co. v. Wood* (1989), 58 Ohio App.3d 11.

Appellees cite *Smith v. Nationwide Mut. Ins. Co.* (1988), 37 Ohio St.3d 150, as holding that, in all instances but those specifically excepted, motor vehicle ownership rights will be determined by the U.C.C. (R.C. 1302.42 [B] ), and not the Certificate of Title Act. Appellees than cite R.C. 1302.42(B), which indicates that under the facts of this case, Manning owned the automobile, as appellees were paid in full by Manning, who had received possession of the automobile and exercised full control over it, even though the certificate of title had not yet been transferred.

The court in *Wood, supra,* relied on *Mt. Nebo Baptist Church v. Cleveland Crafts Co.* (1950), 154 Ohio St. 185, in holding that where the violation of a statute enacted to protect the public health and safety gives rise to consequent damages, it must be shown that, in addition to the violation of the statute, such violation was the proximate cause of the alleged injury.

Even if appellees were in violation of the statute mentioned, the trial court did not err in finding that, as a matter of law,

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 2

**Lesick v. Manning, Not Reported in N.E.2d (1992)**

1992 WL 380284

such violation was not the proximate cause of appellant's injuries.

Appellant's first assignment of error is without merit.

In her second assignment of error, appellant argues the trial court erred in applying federal law when it construed R.C. 2923.31 and held that sufficient facts had not been shown to support the issue of proximate cause, and in thereby granting appellees' motion for summary judgment on appellant's second cause of action.

Although appellant cites R.C. 2923.34(F) in arguing that any person directly or indirectly injured by conduct in violation of that section shall have a cause of action, this court does not reach the conclusion that a person is relieved of the burden of demonstrating that the illegal conduct proximately caused their injury.

As appellees point out, R.C. 2923.34(F) clearly refers to any proceeding under R.C. 2923.34(B). That paragraph does not, in any way, remove the injured party's burden

of demonstrating proximate cause. There is nothing in the language of the statute that supports appellant's position. Also, the trial court's decision to seek guidance from federal case law construing the Federal RICO statute was not erroneous. The fact that the United States Supreme Court held in *Sedima, S.P.R.L. v. Imrex Co. Inc.* (1985), 473 U.S. 479, that the Federal RICO statute still requires a showing of connection between the violations and the claimed injuries is all the more reason to sustain the judgment of the trial court.

 **\*4** Appellant's second assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

COX and O'NEILL, JJ., concur.

**All Citations**

Not Reported in N.E.2d, 1992 WL 380284

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)

2001 WL 1352641

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Turturice v. AEP Energy Servs., Inc., Ohio App. 10 Dist., April 17, 2008

2001 WL 1352641
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eighth
District, Cuyahoga County.

NOVOMONT CORPORATION, Plaintiff-appellee,
v.
The LINCOLN ELECTRIC
COMPANY, Defendant-appellant.

No. 78389.
|
Nov. 1, 2001.

Civil appeal from Cuyahoga County Court of Common Pleas, Case No. 385,149. Affirmed.

**Attorneys and Law Firms**

Gary B. Garson, Cleveland, OH, For Plaintiff-Appellee.

James L. McCrystal and Richard J. Scislowski, Attorneys at Law, Brzytwa, Quick & McCrystal, Cleveland, OH, For Defendant-Appellant.

JOURNAL ENTRY AND OPINION

KENNETH A. ROCCO, P.J.

**\*1** In this action that resulted in the jury's award of $175,000 to plaintiff-appellee Novomont Corporation, defendant-appellant. The Lincoln Electric Company appeals from the trial court's denial at the close of evidence of its motion for a directed verdict.

Appellant argues appellee could not recover from appellant on claims of both quantum meruit and unjust enrichment; thus, the verdict forms provided to the jury were flawed. Appellant further argues appellee rendered services to appellant without expectation of compensation; therefore, judgment in appellee's favor was improper.

This court has reviewed the record and determines the trial court's order was appropriate. Consequently, the trial court's order is affirmed.

Appellant is a manufacturer of welding equipment and consumables, [1] i.e., materials used for the welding process, such as wire and solder. It has been in business for many years, has thousands of employees, and has offices in many countries.

[1]     Quotes indicate testimony given by a witness at trial.

As part of its effort to develop its sales potential, appellant created a program called Guaranteed Cost Reduction (GCR). Appellant's sales team, engineers and distributor partners would approach a customer, outline a plan designed to promote efficiency in the welding process, implement the idea with the customer's approval, and determine if the plan saved the customer money. If the plan did not meet the financial target promised to the customer by appellant, appellant would essentially pay the customer the difference between what was achieved and what the original target was.

Appellant's chief executive officer, Don Hastings, developed the GCR program; its manager of national accounts assumed responsibility for the program. In 1987, Larry Tyler became appellant's manager of national accounts. Although Tyler received promotions in 1992 and 1997, he remained involved in the GCR program. Similarly, although in 1997 Hastings retired from appellant and became its chairman emeritus, he continued his interest in the GCR program's progress.

Appellant had some success with the GCR program; its peak year was in 1995, with approximately 200 programs in place. Subsequently, however, the numbers began precipitously to decline. By 1997, appellant had only fifty customers subscribing to the program.

The GCR program's decline so concerned Hastings that, at a civic function, he mentioned it to Howard Rosenberg. Rosenberg was the president of appellee, a company in the business of providing manufacturing and operations and capital management consulting services. Appellee sought to work with companies in order to identify areas to improve their profitability and to work with [business] professionals in order to implement appellee's ideas.

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

**Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)**

2001 WL 1352641

Hastings' conversation with Rosenberg led to Hastings' sponsorship of a meeting between Rosenberg, Rosenberg's partner Robert Maguda, and Tyler. The meeting took place in late August, 1997.

**\*2** At Hastings' instigation, Tyler described to appellee's partners appellant's GCR program. Tyler then voiced his desire to see the program reach a better performance level so that it could be of better service to appellant. Finally, Tyler outlined the constraints he believed limited the program's usefulness to appellant. These constraints included, inter alia, a customer problemsolving approach that took place at the plant level rather than at the corporate level, a focus solely on the welding process itself rather than on upstream factors that also might affect the total costs involved in the welding process, and an inability for appellant to receive any remuneration for the technical consulting services it was providing to the customer.

Following the meeting, Rosenberg sent a letter to Tyler in which he summarized the topics of discussion and set forth options of how to proceed. Rosenberg strongly proposed the creation of a project oriented organization that provided appellant's customers an alternative, high value added distribution channel with full service capability. Rosenberg suggested another meeting and concluded the letter as follows:

> Larry, I look forward to exploring these, and any other options you might have, with you. Novomont's role could be to provide program management, consulting, and implementation skills to assist Lincoln in bringing the GCR program to the next level. In addition we might consider forming a joint venture with the appropriate strategic partners who have the necessary capabilities that Lincoln may not have.

(Emphasis added.)

A little over a month later, Rosenberg gave a power point presentation [2] to Tyler and two other executives responsible for appellant's GCR program. The purpose of this presentation was to put forward Rosenberg's proposed re-organization

of the GCR. Since the presentation was well received, Rosenberg prepared another for the following month.

2  Tyler described this as a computerized slide program.

By November 24, 1997, the date of the next presentation, Rosenberg had dubbed his proposal for the revamping of appellant's GCR program the Value Enhancing Services Enterprise (VASE). As Rosenberg envisioned it, appellant and appellee would form a joint venture that would be able to put together a variety of services for appellant's customers, thus improving appellant's customers' profitability and enabling appellant to charge for its professional expertise. The idea was to launch a project for which appellant would provide the resources and the welding expertise while appellee provided the management services to further appellant's customers' business efficiency.

Following the meeting, Tyler told Rosenberg his idea was exactly what [appellant] needed. He told Rosenberg to prepare to launch the project in January, 1998.

Subsequently,however, Tyler met with Rosenberg informally in late December, 1997 to request appellee to continue to refine the project. Tyler indicated a desire to present the VASE preliminarily to a few of appellant's customers.

On January 16, 1998 Rosenberg became aware that Tyler and a few of appellant's other executives wished first to develop a pilot program for a select group of customers rather than directly to launch the joint venture. At a March, 1998 meeting, Rosenberg expressed some apprehension about appellant's commitment. He informed Tyler that appellee ha[d] invested and continue[d] to invest significant amount[s] of time in the project to improve the GCR program. Rosenberg indicated he would like appellant to consider some type of compensation for appellee.

**\*3** Tyler reassured Rosenberg that the VASE concept was critical to appellant but that if appellee was to charge consulting fees, it would appear [to appellant] that [appellee] wanted to be a consultant rather than a partner. Tyler suggested that appellee would reap greater benefits from the concept as appellant's partner. He requested Rosenberg to continue working on the project and to present his plans to appellant's recently-hired manager of new business development, James Schilling.

Electronically Filed 11/09/2020 13:59 / MOTION / CV 20 935557 / Confirmation Nbr. 2112235 / CLJSZ

**Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)**

2001 WL 1352641

In February and March, 1998 meetings, Rosenberg reviewed for appellant the organizational structure of the proposed new enter-prise. On May 29, 1998 Rosenberg presented to Tyler and Schilling a pro forma financial analysis. Rosenberg, by this method, demonstrated VASE's funding sources, revenue stream, and specific service offerings.

Following this meeting, Tyler identified a customer that could be used for the initial pilot project. Rosenberg understood that the success of the pilot project would justify the full scale launching of the VASE and the formation of the joint venture. Tyler forwarded information to appellee about the customer, Manchester Tank, in order for Rosenberg to fully prepare to present a VASE application to its business. Tyler also worked with appellee to make the presentation attractive. The presentation to Manchester Tank was scheduled for July 21, 1998.

However, in the meantime, Schilling was soliciting opinions about the VASE proposal from a few of appellant's managers. The consensus, which persuaded Schilling, was that appellant could do it alone and did not need appellee to participate with it in a joint venture.

The presentation of the VASE application to Manchester Tank proceeded as scheduled. Although it seemed to be well received, Manchester Tank's CEO's told Rosenberg they needed some time to assess the program's benefit to their business. Rosenberg indicated he would check back with them in three weeks.

At the conclusion of the presentation, Rosenberg suggested to Tyler they initiate contacts regarding the VASE concept with other customers. Approximately two weeks later, however, without having received a reply from Manchester Tank to the VASE proposal, Rosenberg was called to a meeting at appellant. There he was informed by Tyler, Schilling and Paul Fantelli, one of appellant's vice presidents, that appellant was no longer interested in VASE. Appellant's officers told Rosenberg appellant could not provide the resources for the project.

Rosenberg sought out Tyler upon the meeting's termination. Tyler suggested that due to appellant's reputation for poor treatment of small contractors, Rosenberg should present a bill for appellee's services.

**\*4** Rosenberg did so in September, 1998. He recreated an estimate of the time he had spent in developing the VASE

project, multiplied it by his customary rate of pay, and then divided it by half for appellee's intended investment in the project in order to come to a final invoice figure of $175,000. Appellant, however, refused to pay appellee.

On June 1, 1999 appellee filed the instant action against appellant seeking recovery on claims of breach of contract, quantum meruit, unjust enrichment, and negligent misrepresentation. After a lengthy discovery process, the matter proceeded to a jury trial.

During its case-in-chief, appellee called as witnesses Tyler, Schilling and a few other officers of appellant, then called upon Rosenberg to testify. Appellee also introduced several documents into evidence.

Although appellant's subsequent motion for a directed verdict was granted with respect to appellee's claim of breach of contract, it was denied with respect to appellee's remaining claims. Appellant then presented its own two witnesses. Thereafter, the trial court denied appellant's renewed motion for directed verdict at the close of evidence.

Ultimately, the jury returned a verdict for appellee on its claims of quantum meruit and unjust enrichment, awarding appellee a total amount of $175,000 on the two claims. Since the jury could not come to a verdict on the remaining claim, appellee voluntarily dismissed it, thereby lending finality to the proceedings below.

On appeal, appellant presents one assignment of error for this court's review as follows:

> THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF EVIDENCE.

Appellant presents two distinct arguments that it asserts justify the foregoing statement. Appellant first argues that appellee's claims of quantum meruit and unjust enrichment were not separate causes of action but rather one equitable claim; therefore, the trial court acted improperly in otherwise instructing the jury and in submitting to the jury a verdict form for each.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 3

**Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)**
2001 WL 1352641

This court finds it unnecessary to address this argument. Appellant raised no objections to either the trial court's instructions to the jury in this regard or to the verdict forms themselves; hence, it has waived this argument for purposes of appeal. *State v. Williams* (1977), 51 Ohio St.2d 112, 364 N.E.2d 1364; *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 43, 322 N.E.2d 629.

Appellant next argues a directed verdict on appellee's equitable claims was appropriate since appellee rendered services without expectation of a present benefit. Appellant contends appellee engaged in only preliminary negotiations for an enforceable contract; therefore, appellee must bear any resulting costs as those of simply doing business. This court disagrees.

Civ.R. 50(A)(4) provides:

**\*5** RULE 50. Motion for a directed verdict and for judgment notwithstanding the verdict.

(A) Motion for directed verdict.

\* \* \*

(4) When granted on the evidence. When a motion for a directed verdict has been properly made, the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue. (Emphasis added.)

In *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 493 N.E.2d 293, the application of Civ.R. 50(A)(4) was explained as follows:

> The determination to be made by a trial court when a motion for directed verdict has been made is not whether one version of the facts presented is more persuasive than an other; rather, it is a determination that only one result could be reached under the theories of law presented in the complaint. When a motion for

directed verdict is entered, it is the legal sufficiency of the evidence to take the case to the jury that is being tested. The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. The reasonable minds test of Civ.R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the non-moving party's claim. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence rather than the conclusions to be drawn from the evidence. [Citation omitted.]

(Emphasis added.)

Thus, as the Ohio Supreme Court more succinctly stated:

> Simply because resolution of a question of law involves consideration of the evidence does not mean that the question of law is converted into a question of fact or that a factual issue is raised.

*Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St. 66 at 68.

Appellee in this case presented claims against appellant of both unjust enrichment and quantum meruit. These claims for relief carefully were explained by the court in *Caras v. Green & Green* (June 28, 1996), Montgomery App. Nos. 14943, 15089, unreported, as follows:
A quasi-contract is a contract implied in law. *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923. \* \* \* \* \* \* In contracts implied in law there is no meeting of the minds, but civil liability arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain and for which he may be made to respond to another in an action in the nature of assumpsit. Contracts implied in law are not true contracts; the relation

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 183 of 259 PAGEID #: 7211

Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)

2001 WL 1352641

springing therefrom is not in a strict sense contractual but quasi-contractual or constructively contractual.

[Keener on Quasi-Contracts (1893), 3]; see also *Rice v. Wheeling Dollar Savings & Trust Co.* (1951), 155 Ohio St. 391, 99 N.E.2d 301; 1 Willison on Contracts (4th Ed.1990), Sections 1:5 and 1:6.

**\*6** Quasi contracts developed from the desire of the law to bring about justice without any reference to the intention of the parties, and sometimes contrary to their intention. The principle upon which they are founded is prevention of unjust enrichment, and the remedy provided is by an action as though it were upon a contract. *Williams v. Goodyear Aircraft Corp.* (1948), 84 Ohio App. 113, 117, 85 N.E.2d 601; see also *Hummel v. Hummel,* 133 Ohio St., at 527-528; *Rice v. Wheeling Dollar Savings & Trust Co.,* supra, at 396.

A quasi-contract is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy. The two remedies most often associated with quasi-contracts are restitution and quantum meruit. Each of these remedies presupposes some type of unjust enrichment of the opposing party. *Paugh & Farmer, Inc. v. Menorah Home for Jewish Aged* (1984), 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (emphasis in the original).

Quantum meruit means as much as deserved. *Sonkin & Melena Co., L.P.A. v. Zaransky* (1992), 83 Ohio App.3d 169, 175, 614 N.E.2d 807. Quantum meruit is a doctrine derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implied a promise to pay a reasonable amount for the services rendered * * *, in the absence of a specific contract. *Id.*

The elements of an action in quasi-contract on a claim of unjust enrichment are a benefit conferred, knowledge of the benefit by the receiving party, and a retention of the benefit under circumstances which would make it unjust to do so without payment. *Advanced Marketing Services, Inc. v. Dayton Data Pro-cessing, Inc.* (March 6, 1992), 1992 Ohio App. LEXIS 994, Montgomery App. No. 12607, unreported, at 4; see also *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298.

From the foregoing, it is apparent that the concepts of quasi-contract, unjust enrichment and quantum meruit are interrelated. A claim for unjust enrichment arises when one person has unfairly benefitted from the services of another. In that event, courts have adopted a legal fiction, quasi-contract, to provide a remedy allowing the aggrieved party to seek recovery for as much as he deserves. That remedy is a claim for quantum meruit relief.

(Emphasis in original; underscoring added.) See, also, *Kraft Constr. Co. v. Bd. of Commrs.* (1998), 128 Ohio App.3d 33, 48, 713 N.E.2d 1075.

The evidence in this case, when viewed most strongly in appellee's favor, demonstrated the following: Appellee was in the business of designing operational improvement programs for businesses. Both Hastings and Tyler sought appellee's expertise in improving appellant's method of operating its GCR program. Appellee provided the expertise by formulating the VASE project, which subsequently was used by appellant in an effort to enhance its relationship with Manchester Tank. Thus, appellee rendered appellant a service, appellant had knowledge of and made use of that service, and appellee received nothing of value in return from appellant. *Donovan v. Omega World Travel, Inc.* (Oct. 5, 1995), Cuyahoga App. No. 68251, unreported.

**\*7** Under these circumstances, the trial court properly denied appellant's motion for a directed verdict on appellee's claims of unjust enrichment and quantum meruit. *Id.*; cf. *Shaw v. Pollock & Co.* (1992), 82 Ohio App.3d 656, 612 N.E.2d 1295. Accordingly, appellant's assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

**WESTLAW** © 2020 Thomson Reuters. No claim to original U.S. Government Works. 5

**Novomont Corp. v. Lincoln Elec. Co., Not Reported in N.E.2d (2001)**

2001 WL 1352641

JAMES D. SWEENEY, J. and JAMES J. SWEENEY, J., concur.

N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).

**All Citations**

Not Reported in N.E.2d, 2001 WL 1352641

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 185 of 259 PAGEID #: 7213
Wilson v. Mercy Medical Center, Not Reported in N.E.3d (2015)
2015 WL 5664500

2015 WL 5664500
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES
FOR REPORTING OF OPINIONS AND
WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio,
Fifth District, Stark County.

Isaac and Shawn WILSON, Plaintiffs–Appellants
v.
MERCY MEDICAL CENTER, Defendant–Appellee.

No. 2015CA00010.
|
Decided Sept. 21, 2015.

Appeal from the Stark County Court of Common Pleas, Case No.2014CV00444.

**Attorneys and Law Firms**

Stacie L. Roth, Allen Schulman & Associates, Canton, OH, for Plaintiffs–Appellants.

Stephen E. Matasich, Day Ketterer, Ltd., Canton, OH, for Defendant–Appellee.

**Opinion**

HOFFMAN, J.

*1 {¶ 1} Plaintiffs-appellants Isaac Wilson, et al. appeals the December 19, 2014 Judgment Entry entered by the Stark County Court of Common Pleas, which granted summary judgment in favor of defendant-appellee Mercy Medical Center ("Mercy").

STATEMENT OF THE FACTS AND CASE

{¶ 2} Appellant Isaac Wilson ("Mr.Wilson") was admitted as a patient into Mercy in February, 2011, for medical care following a fall at his home. One week after his admission, Mr. Wilson was transferred to Mercy's rehabilitation unit. Mercy determined Mr. Wilson to be a fall risk which, pursuant to internal policy and records, required he be checked on an hourly basis. Mr. Wilson was advised not to attempt to get out of bed without calling for assistance. At 9:30 p.m. on February

24, 2011, Mr. Wilson was found on the floor of his room with a severe laceration to his head. The last notation documented on Mr. Wilson's medical chart indicated staff administered medication to him at 7:15 that evening.

{¶ 3} Appellants filed suit on August 20, 2012, alleging medical negligence, premises liability, and loss of consortium. Mercy filed a motion for summary judgment on April 5, 2013. Appellants dismissed the case without prejudice approximately two weeks later.

{¶ 4} On February 18, 2014, Appellants refiled the complaint, asserting two causes of action. The second cause of action, which is not at issue in the instant appeal, set forth a premises liability claim. The first cause of action alleges medical malpractice/negligence, and reads:

9. Plaintiffs hereby incorporate paragraphs one (1) through eight (8), inclusive, of this Complaint as though fully rewritten herein.

10. Plaintiffs state that said Defendant, as described hereinabove, were engaged to attend and treat Plaintiff Isaac Wilson in a properly skillful manner by the exercise of the degree of care and skill ordinarily employed by members of their profession in the same line of medical practice in this or similar communities.

11. Plaintiffs further state that said Defendant was negligent in their care and treatment of Plaintiff by, among other things, failing to properly monitor and care for Plaintiff Isaac Wilson notwithstanding his known risk for falls, and said failure resulted in his fall and severe and permanent physical injury.

12. Plaintiffs further state that said Defendant was negligent in their care and treatment of Plaintiff Isaac Wilson in that they failed to exercise or possess the degree of care, skill and learning ordinarily exercised by other medical personnel having regard to the existing state of knowledge and medicine.

{¶ 5} Upon conclusion of discovery, Mercy filed a motion for summary judgment on September 23, 2014. Therein, Mercy argued Appellants' medical malpractice claim should be dismissed as such did not constitute a medical claim. Mercy further asserted the premises liability claim should be dismissed because Appellants failed to establish a duty of care was owed or breached. Mercy also maintained there was no

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 186 of 259 PAGEID #: 7214
Wilson v. Mercy Medical Center, Not Reported in N.E.3d (2015)
2015 WL 5664500

evidence to prove any alleged failure to monitor Mr. Wilson was the proximate cause of his fall and resulting injuries.

**\*2** {¶ 6} Appellants filed their response on October 10, 2014. Appellants agreed the first cause of action was not a claim of medical malpractice, but rather a claim for ordinary negligence. In the alternative, Appellants stated "if this Complaint could possibly be construed to be solely a medical malpractice claim", they "would respectfully request that this Honorable Court grant a motion to allow the evidence to conform to the pleadings" pursuant to Civ. R. 15(B). Plaintiffs' Memorandum Contra to Defendant's Motion for Summary Judgment at 5.

{¶ 7} Via Judgment Entry filed December 19, 2014, the trial court granted Mercy's motion for summary judgment and dismissed Appellants' complaint. The trial court found, even construing Appellants' first cause of action as a claim of ordinary negligence, or permitting Appellants to amend their complaint to assert a claim for ordinary negligence, Appellants failed to demonstrate Mercy owed Mr. Wilson a duty of care based upon Mercy's internal policy which required hospital staff to conduct hourly rounds to check on patients; or that Mercy breached such a duty. The trial court further found the deposition testimony of Michael Shaffer, a Patient Service Aide, sufficient to rebut Appellants' allegation Mr. Wilson had not been seen between 7:15 p.m. and 9:30 p.m. on February 24, 2011. Additionally, the trial court found Appellants did not present evidence to establish Mercy's alleged failure to check on Mr. Wilson was the proximate cause of his fall.

{¶ 8} It is from this judgment entry Appellants appeal, assigning as error:

{¶ 9} "I. THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' FIRST CAUSE OF ACTION RATHER THAN GRANTING LEAVE TO AMEND THEIR COMPLAINT PURSUANT TO OHIO CIVIL RULE 15(B).

{¶ 10} "II. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN ISSUES REMAINED AS TO WHETHER APPELLEE OWED A DUTY OF ORDINARY CARE TO MONITOR ITS PATIENTS.

{¶ 11} "III. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT WHEN ISSUES OF FACT REMAINED AS TO WHETHER APPELLEE'S FAILURE

TO MONITOR APPELLANT WAS A DIRECT AND PROXIMATE RESULT OF HIS INJURIES."

I

{¶ 12} In their first assignment of error, Appellants maintain the trial court erred in dismissing their first cause of action rather than granting leave to amend the complaint pursuant to Civ. R. 15(B).

{¶ 13} Civ.R.15(B) provides: "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The rule provides further that an amendment can be made at any time, even after judgment, and is to be liberally construed in an effort to decide cases on their merits. *Id. See, also, Monroe v. Youssef,* 11th Dist. Trumbull No.2009–T–0012, 2012–Ohio–6122, citing *Hall v. Bunn,* 11 Ohio St.3d 118, 121, 464 N.E.2d 516 (1984).

{¶ 14} Whether to grant or deny a Civ.R. 15(B) motion to amend pleadings is within the discretion of the trial court. *Everhart v. Everhart (In re Estate of Everhart),* 12th Dist. Fayette Nos. CA2013–07–019, CA2013–09–026, 2014–Ohio–2476. In order to find an abuse of that discretion, an appellate court must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Grimes v. Grimes,* 4th Dist. Washington No. 10CA23, 2012–Ohio–3562.

**\*3** {¶ 15} We find the trial court did not abuse its discretion in failing to grant Appellants leave to amend their complaint. First, Appellants never filed a motion to amend pursuant to Civ. R. 15(B) or otherwise. Appellants' statement in their memorandum contra Mercy's motion for summary judgment indicating they "would respectfully request that this Honorable Court grant a motion to allow the evidence to conform to the pleadings" pursuant to Civ. R. 15(B) does not constitute a proper motion for leave to amend the pleadings. As such, there was no motion for the trial court to grant or deny. *See, Miller–Wagenknecht v. Midland Mut. Life Ins. Co.* (May 4, 1994), 9th Dist. Summit No. 16457.

{¶ 16} Additionally, Civ. R. 15(B) is inapplicable to the instant action as the matter never proceeded to trial. In cases where there has been no trial, reviewing courts have found the use of Civ. R. 15(B) inappropriate. *See Merrill Lynch Mtge. Lending, Inc. v. 1867 W. Market, L.L.C.,* 9th

2015 WL 5664500

Dist. Summit No. 23443, 2007–Ohio–2198,–11; *Suriano v. NAACP,* 7th Dist. Jefferson No. 05 JE 30, 2006–Ohio–6131. Civ. R. 15(B) "is applicable only in cases that have gone to trial, not those determined on summary judgment." *Siegel v. LifeCenter Organ Donor Network,* First Dist. No. C–100777, 2011–Ohio–6031.

{¶ 17} We next consider whether Civ.R. 15(A) would have supported an amendment to Appellants' complaint.

{¶ 18} Civ. R.15(A) provides: "A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty-eight days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice so requires."

{¶ 19} An appellate court reviews a trial court's decision on a motion for leave to file an amended pleading under an abuse of discretion standard. *Wilmington Steel Products, Inc. v. Cleveland Electric Illuminating Co.,* 60 Ohio St.3d 120, 573 N.E.2d 622 (1991).

{¶ 20} "An attempt to amend a complaint following the filing of a motion for summary judgment raises the spectre of prejudice." *Brown v. FirstEnergy Corp.,* 9th Dist. No. 22123, 2005–Ohio–712, at ¶ 6, 159 Ohio App.3d 696. "A plaintiff must move to amend under Civ.R. 15(A) in a timely manner." *Cunningham v. Cunningham,* 9th Dist. No. 01CA007938, 2002–Ohio–2647, at ¶ 16. Appellants' request was untimely as such was not made until after Mercy filed its motion for summary judgment. *See, Robinson v. Omega Labs., Inc.,* 5th Dist. Stark No.2006–CA–00178, 2007–Ohio–2482.

{¶ 21} Based upon the foregoing, we overrule Appellants' first assignment of error.

{¶ 22} Despite the foregoing analysis of Civ.R. 15, we find paragraph No. 11 of Appellant's complaint sufficient to raise a common law negligence claim and, accordingly, will proceed with our analysis of their second and third assignments of error.

## II, III

**\*4** {¶ 23} Because Appellants' second and third assignments of error challenge the propriety of the trial court's granting summary judgment in favor of Mercy, we elect to address said assignments of error together. In their second assignment of error, Appellants contend the trial court erred in granting summary judgment when issues remained as to whether Mercy owed a duty to monitor its patients. In their third assignment of error, Appellants submit the trial court erred in granting summary judgment when issues of fact remained as to whether Mercy's failure to monitor Mr. Wilson was a direct and proximate result of his injuries.

{¶ 24} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987). As such, this Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶ 25} Civ.R. 56 provides summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

{¶ 26} It is well established the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986). The standard for granting summary judgment is delineated in *Dresher v. Burt,* 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): " * * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the

moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ,* 37 Ohio St.2d 150, 309 N.E.2d 924 (1974).

**\*5** {¶ 27} Appellants assert Mercy's internal policies and procedures established a duty of care owed to Mr. Wilson and the trial court erred in finding to the contrary. We disagree.

{¶ 28} We find, while hospital rules and regulations are, at the discretion of the trial court, admissible to provide evidence of the standard of care in a medical negligence action, such internal policies and procedures do not create an independent common law duty. *See, e.g., Luettke v. St. Vincent Mercy Med. Ctr.,* 6th Dist. No. L–05–1190, 2006–Ohio–3872.[1],[2] Furthermore, assuming, arguendo, Mercy's internal policies and procedures create a common law duty of care, Appellants' have failed to show Mercy's breach of that duty was the proximate cause of Mr. Wilson's injuries.[3]

[1]     Appellants did not establish Mercy had an independent common law duty to set an internal

"check" policy, let alone how often such "check" must occur.

[2]     Although we believe the absence of notation of Shaffer's check on Mr. Wilson's medical chart may be sufficient to create a genuine dispute of fact as to possible breach of duty, because we find no duty exists, such dispute become immaterial.

[3]     Unless Appellants can prove Mr. Wilson's fall happened at the exact time a check would have been occurring, rather than between the hourly checks, they cannot establish the failure to do so was the proximate cause of the fall. When asked at oral argument if there was any evidence of aggravation of injuries due to delay of discovery, Appellants' counsel candidly conceded none existed.

{¶ 29} Appellants' second and third assignments of error are overruled.

{¶ 30} The judgment of the Stark County Court of Common Pleas is affirmed.

GWIN, P.J., and DELANEY, J. concur.

**All Citations**

Not Reported in N.E.3d, 2015 WL 5664500

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**REPLY BRIEF**
**January 11, 2021 14:24**

By: RYAN A. DORINGO 0091144

Confirmation Nbr. 2153517

MICHAEL EMMONS                                    CV 20 935557

      vs.

FIRSTENERGY CORPORATION, ET AL          **Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 70

**IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO**

|  |  |
|---|---|
| MICHAEL EMMONS and ROBERT BROWN, individually and on behalf of all those similarly situated, | Case No. CV 20 935557 |
| Plaintiffs, | Judge Shannon M. Gallagher |
| v. | |
| FIRSTENERGY CORP. *et al.*, | |
| Defendants. | |

## FIRSTENERGY DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .......................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

I.      The Filed-Rate Doctrine Bars Plaintiffs' Recovery of Utility Payments ..................................... 2

II.     Plaintiffs Have No Viable Cause of Action in Any Event ........................................................... 5

CONCLUSION .............................................................................................................................. 10

## TABLE OF AUTHORITIES

Page

CASES

*Arthur v. Parenteau,*
  102 Ohio App.3d 302, 657 N.E.2d 284 (3d Dist. 1995) .................................................................7

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.,*
  42 Ohio St. 3d 40, 537 N.E.2d 624 (1989) .................................................................................6

*Cleveland v. JP Morgan Chase Bank, N.A.,*
  8th Dist. Cuyahoga No. 98656, 2013-Ohio-1035 ........................................................................9

*Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.,*
  106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701 .............................................................6

*Cromer v. Children's Hosp. Med Ctr. Of Akron,*
  142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921 ..................................................................6

*Empress Casino Joliet Corp. v. Johnston,*
  763 F.3d 723 (7th Cir. 2014) ......................................................................................................9

*Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.,*
  121 Ohio App.3d 434, 700 N.E.2d 94 (8th Dist.1997) ...............................................................6

*Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.,*
  54 Ohio St.3d 1, 560 N.E.2d 206 (1990) ....................................................................................6

*H.J. Inc. v. Northwestern Bell Telephone Co.,*
  954 F.2d 485 (8th Cir. 1992).......................................................................................................3

*Herakovic v. Catholic Diocese of Cleveland,*
  8th Dist. Cuyahoga No. 85467, 2005-Ohio-5985 ........................................................................9

*In the Matter of Establishing the Clean Air Fund Rider Pursuant to R.C. 3706.46,*
  No. 2020-1488 (Ohio Dec. 28, 2020).........................................................................................1

*Jeffers v. Olexo,*
  43 Ohio St.3d 140, 539 N.E.2d 614 (1989) ................................................................................5

*Johnson v. Microsoft Corp.,*
  106 Ohio St.3d 278, 834 N.E.2d 791 .........................................................................................8

*Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.,*
    166 Ohio St. 254, 141 N.E.2d 465 (1957) ...................................................................2, 9

*Lucarell v. Nationwide Mut. Ins. Co.,*
    152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458 ........................................................7

*Martin v. Lambert,*
    2014-Ohio-715, 8 N.E.3d 1024 (4th Dist.) ....................................................................5

*Merlitti v. Univ. of Akron,*
    2019-Ohio-4998 ...............................................................................................................8

*Otte v. Dayton Power & Light Co.,*
    37 Ohio St.3d 33, 523 N.E.2d 835 (1988) .....................................................................5

*Wallace v. Ohio DOC,*
    96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018 ................................................6

*Wegoland Ltd. v. NYNEX Corp.,*
    27 F.3d 17 (2d Cir. 1994) ..............................................................................................4

*Williams v. Duke Energy International, Inc.,*
    681 F.3d 788 (6th Cir. 2012) ........................................................................................3

## STATUTES

18 U.S.C. § 1961(1) ...............................................................................................................9

R.C. § 2923.31(I) ...................................................................................................................9

R.C. § 3706.46(A)(2) .............................................................................................................3

R.C. § 4905.32 .......................................................................................................................3

**INTRODUCTION**

Plaintiffs in this action are electricity customers of the FirstEnergy utilities who bring a series of statutory and common-law claims based on allegations of bribery in connection with the enactment of HB 6. Plaintiffs allege that FirstEnergy used their utility payments to pay illicit bribes, and that the effect of those alleged bribes was legislation that would increase their utility rates.

As FirstEnergy explained in its motion to dismiss ("MTD"), the threshold legal problem with these claims is that Plaintiffs effectively seek a refund of their electricity rates. That is their sole injury. But the filed-rate doctrine precludes courts from granting that relief or adjudicating objections to rates approved by the Public Utilities Commission of Ohio ("PUCO"). Plaintiffs' opposition ("Opp.") retorts that they object to *bribes*, not *utility rates*. But that is wordplay. The alleged bribes only harmed Plaintiffs insofar as they caused higher rates, which is why the relief Plaintiffs seek would amount to a partial refund of those rates. That puts this case into the heartland of the filed-rate doctrine.

Recognizing the legal reality that utility payments cannot be refunded after-the-fact, two other courts confronted with HB 6 issues (including the Ohio Supreme Court) have already enjoined its nuclear surcharges from taking effect.[1] Those orders confirm that the filed-rate doctrine precludes Plaintiffs' claims; they also mean that HB 6's threatened harm to Plaintiffs will not materialize. In both respects, the injunctions bolster FirstEnergy's case for dismissal of this now-redundant suit.

Each of Plaintiffs' claims also fails for other, independent legal reasons. At bottom, customers simply do not have viable claims against a business for supporting legislation that raises their prices:

- Businesses owe no common-law tort duty to protect customers from higher prices.

- Plaintiffs fail to identify any contractual promise that FirstEnergy breached.

- Providing utility service in exchange for rates fixed by law is not "unjust."

---

[1] *See* Motion & Procedural Ruling, *In the Matter of Establishing the Clean Air Fund Rider Pursuant to R.C. 3706.46*, No. 2020-1488 (Ohio Dec. 28, 2020); Entry & Order, *State of Ohio ex rel. Dave Yost v. FirstEnergy Corp.*, Nos. 20 CV 6281, 7005, 7386 (Ohio Com. Pl. Franklin Cty. Dec. 21, 2020).

- Plaintiffs abandon their statutory claim under the Consumer Sales Practices Act.

- Plaintiffs cannot allege that FirstEnergy was the proximate cause of their (no-longer-threatened) injuries from HB 6, as required for their Corrupt Practices Act claim.

Any legitimate interests Plaintiffs have related to HB 6 will continue to be vindicated by the U.S. Attorney in the criminal prosecution of former Speaker Larry Householder and his associates, by PUCO and the Ohio Supreme Court in ongoing ratemaking proceedings, by the Attorney General in his above-referenced Franklin County litigation that has already enjoined the surcharges from taking effect, and of course by Ohio's elected officials. This suit, however, has no legal basis.

## ARGUMENT

## I. THE FILED-RATE DOCTRINE BARS PLAINTIFFS' RECOVERY OF UTILITY PAYMENTS.

As FirstEnergy explained and Plaintiffs do not dispute, the filed-rate doctrine compels utilities to charge only the rates approved by PUCO and forbids any refund of those rates, including by courts in the context of common-law or statutory claims. (*See* MTD 4-6; Opp. 6-7.) That rule bars Plaintiffs' claims here, because their only alleged injury is their payment of utility rates—and the only relief for that injury would be to refund the payments as damages. This, the courts cannot do. *See Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 257-59, 141 N.E.2d 465 (1957).

**A.** Plaintiffs' principal response is to argue that the filed-rate doctrine does not apply because their claims focus on "misconduct and illegal acts" in connection with HB 6, not "the payment of utility rates." (Opp. 6.) That is an illusory distinction. Defendants' alleged *misconduct* relates to HB 6 and its enactment—but Plaintiffs' alleged *injury* from that purported misconduct stems from the rates they paid or will pay as a result. Indeed, the putative class is composed of FirstEnergy *customers*; payment of utility rates is all that binds them together. Plaintiff thus *are* suing over their "payment of utility rates," which is "the basis for the claim of injury" (Opp. 6), in arguing that Defendants' alleged bribery tainted how those rates were determined by the Legislature and by PUCO. In short, this case is a challenge to Plaintiffs' utility rates, based on the provenance of the legislation affecting them.

2

Rate challenges like this, based on allegations of bribery, fall squarely within the heartland of the filed-rate doctrine. Take, for example, *H.J. Inc. v. Northwestern Bell Telephone Co.*, 954 F.2d 485 (8th Cir. 1992), in which telephone customers alleged that the local telephone utility had bribed members of the state utilities commission to set higher telephone rates. *Id.* at 486. The plaintiffs contended that the filed-rate doctrine did not bar RICO and state-law claims based on bribery allegations. *See id.* at 490. But the Eighth Circuit disagreed, because "the underlying conduct does not control whether the rate doctrine applies." *Id.* at 489. Rather, it applies whenever a party seeks "damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue." *Id.* at 488. That was what the plaintiffs sought there—and it is also what Plaintiffs seek here.

Plaintiffs cite *Williams v. Duke Energy International, Inc.*, 681 F.3d 788 (6th Cir. 2012), but it is not to the contrary. That case involved claims that an energy company "paid unlawful and substantial rebates to certain large customers," thereby giving them a "competitive advantage over Plaintiffs." *Id.* at 793, 797. The Sixth Circuit held that those claims could proceed, because the case was an attack on rebate practices, not "an attack on filed rates." *Id.* at 798. By contrast, this case presents a direct "challeng[e]" to "the setting ... of a specific rate," *id.* at 796—namely, the electricity charges imposed by the allegedly tainted HB 6—and so is precluded by the filed-rate doctrine, as in the *H.J.* case.

**B.** In a single sentence, Plaintiffs also suggest that HB 6's nuclear surcharge is not a "rate" subject to the doctrine. (Opp. 7.) They point to R.C. § 3706.46(A)(2), which provides that the "level and structure *of the charge* shall be authorized ... *through a process* that the commission shall determine is not for an increase in any rate, joint rate, toll, classification, *charge*, or rental" (emphases added). All that does, however, is relieve PUCO of certain *procedural* duties that usually apply to increases in rates. The fact that the surcharges were expressly exempted from that ordinary process does not change the fact that they are a "charge," as the quoted provision itself confirms. And a utility "charge," just like a utility "rate" or "toll," is governed by the filed-rate doctrine. *See* R.C. § 4905.32.

But this Court need not take FirstEnergy's word for it: The Attorney General, when seeking to enjoin the nuclear surcharges in the Franklin County litigation, agreed that they constituted rates and therefore could not be recovered once paid. (Exh. A, Mot. Prelim. Inj. at 2-3, *State of Ohio ex rel. Yost v. Energy Harbor Corp.*, Case No. 20 CV 007386 (Ohio Com. Pl. Nov. 17, 2020).) PUCO likewise agreed that the HB 6 surcharge is "a rate to be charged to customers" and thus "within the exclusive jurisdiction of the PUCO." (Exh. B, Memo of Acting Chair of the PUCO in Opp. to Pls.' Mot. Prelim. Inj. at 8, *City of Columbus v. FirstEnergy Corp.*, No. 20 CV 007005 (Ohio Com. Pl. Dec. 1, 2020).)

In any case, Plaintiffs knock on an open door. Their argument focuses exclusively on the HB 6 nuclear surcharges—but, as noted above, two courts have already enjoined those. *Supra* n.1. That means neither Plaintiffs nor anybody else has been, or will be, on the hook for them. And Plaintiffs do not dispute that all other payments they have made to the Utilities are non-refundable "rates." In short, with the nuclear surcharges out of the picture and the rest of Plaintiffs' payments indisputably shielded from recovery by the filed-rate doctrine, there is nothing left of this case.

**C.** Finally, Plaintiffs warn that dismissal would let the Householder Enterprise "escape any scrutiny of its actions." (Opp. 8.) This argument suspends reality. For one thing, the Department of Justice has indicted Householder and others for serious federal crimes—that is the principal forum for protecting public integrity. For another, as the two injunctions demonstrate, other courts have been asked by state officials and agencies to address various related issues. Perhaps most importantly, the political branches are more "deeply familiar with the workings of the regulated industry" and thus best suited to "ferret[] out fraud in the rate-making process." *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994). The Legislature may choose to repeal HB 6 or to retain it; either way, that body is the proper forum for debates over energy policy. Indeed, that is one of the drivers of the filed-rate doctrine. Following that doctrine means dismissing Plaintiffs' case and allowing the criminal process, the ratemaking process, and the political process to run their courses.

## II.   PLAINTIFFS HAVE NO VIABLE CAUSE OF ACTION IN ANY EVENT.

Although the filed-rate doctrine renders unnecessary a claim-by-claim evaluation, that analysis leads to the same result: The claims are not legally viable. Plaintiffs fail to rebut the key points.

**A.   Negligence.** Plaintiffs' unprecedented theory is that FirstEnergy committed a tort by spending money to "assure passage of HB 6," because that legislation threatened "foreseeable harm for Plaintiffs" by increasing their electricity rates. (Opp. 9.) Their premise is apparently that businesses have a tort duty to avoid actions (even political lobbying or advocacy) that would increase costs for their customers. But there is no such duty. Plaintiffs cite no authority remotely suggesting otherwise. And it would be absurd to transform routine business-customer relationships into *fiduciary* ones, where the business has a duty to act in the customer's best interest, even on matters where they are naturally adversarial, such as *pricing*. Because there is no such duty as a matter of law, "no legal liability can arise on account of negligence." *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614 (1989).

Plaintiffs respond with boilerplate truisms about tort law—*e.g.*, "[e]ach person … in her daily activities" must exercise "a certain amount of care," and "foreseeability is a primary consideration" in defining the scope of duty. (Opp. 10.) None of that supports Plaintiffs' novel theory of tort liability. Decades of Ohio common-law reasoning and adjudication have developed these bedrock principles. In doing so, courts have explained it is the "relationship between the plaintiff and the defendant" that determines whether a duty exists and, if so, what that duty entails. *Martin v. Lambert*, 2014-Ohio-715, 8 N.E.3d 1024, ¶ 16 (4th Dist.). Plaintiffs are customers of FirstEnergy's utilities. As such, the law is clear that FirstEnergy must "exercise the highest degree of care" in the "construction, maintenance, and inspection" of its equipment and the transmission of electricity. *Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 38, 523 N.E.2d 835 (1988). Yet Plaintiffs nowhere dispute that FirstEnergy has done exactly that. Meanwhile, FirstEnergy owes no duty to customers to advocate only for legislation that would benefit *their* economic interests, as opposed to those of the company's shareholders.

Plaintiffs fail to adduce any authority demonstrating a legal duty in a context even remotely similar to this one. One case they cite features a medical malpractice claim against a children's hospital for the medical care provided to a patient—that is, for negligence in the service provided. *Cromer v. Children's Hosp. Med Ctr. Of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921. In another, persons injured in a fire brought suit against a fire marshal for negligently inspecting a fireworks store. *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018. Those might be relevant precedents if Plaintiffs claimed that FirstEnergy had negligently provided electricity service. This case is instead akin to suing a hospital for lobbying for higher Medicare co-pays. Unfathomable.

Finally, even if a legal duty existed, Plaintiffs' claim would be barred by the economic loss rule, which bars recovery by "a plaintiff who has suffered only economic loss due to another's negligence." *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. Plaintiffs insist this rule only applies when there is contractual "privity" between the litigants that addresses the issue. But their own cited case holds otherwise. (Opp. 13 (citing *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 8, 560 N.E.2d 206 (1990) (holding that "no cause of action exists in tort to recover economic damages," even "in the absence of privity of contract")).) To be sure, part of the *rationale* for this rule is that purely economic losses are viewed as the domain of contract. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 45, 537 N.E.2d 624 (1989). But if there is no "agreement between the parties" respecting their "economic expectations," *id.*, the consequence is *there is no recovery*—not that tort law magically reappears. It remains "the character of the loss, here the economic losses," that forecloses a negligence claim. *Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.*, 121 Ohio App.3d 434, 440, 700 N.E.2d 94 (8th Dist.1997).

**B. Contract.** Plaintiffs also maintain that FirstEnergy breached a contract with them. Yet they did not allege—and still cannot identify—any actual contract with FirstEnergy, let alone the breach of any particular term or provision. That must be fatal to their contract claim.

In their pleading, Plaintiffs identified FirstEnergy's internal Code of Business Conduct as the relevant contract, but they abandon that meritless position in their opposition. (MTD 10-11.) Instead, Plaintiffs say the Utilities "provide power" to them (Opp. 14), and attach bills issued by one of those Utilities to one of the named Plaintiffs for his electricity service (Opp. 15 & Exh. B).

Invoices for services rendered are not sufficient "to find that the parties had a contract, or, if they did, what the terms of the contract were." *Arthur v. Parenteau*, 102 Ohio App.3d 302, 305, 657 N.E.2d 284 (3d Dist. 1995). More importantly, however, where is the alleged breach? By Plaintiffs' admission, the "basis" of any "contractual relationship" with FirstEnergy was limited to *the provision of electricity*. (Opp. 15.) That is what the invoices show, after all. But their allegations have nothing to do with that arrangement. Indeed, Plaintiffs themselves acknowledge that their allegations involve acts that "were not contemplated as part of the service agreement." (Opp. 13.) At bottom, Plaintiffs received the electricity they paid for. This inconvenient truth defeats any contract claim.

Lacking any relevant contractual provision, Plaintiffs fall back on an implied duty of good faith and fair dealing, vaguely suggesting that FirstEnergy ran afoul of such an implicit contractual duty. (Opp. 15.) But that cannot substitute for the identification of a particular contractual promise that FirstEnergy allegedly breached or as to which FirstEnergy acted unfairly. The Ohio Supreme Court recently clarified that "there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 44. That is, "there is no violation of the implied duty unless there is a breach of a *specific obligation imposed by the contract*." *Id.* ¶ 43 (emphasis added). Needless to say, the duty of good faith is not the panacea Plaintiffs need. Again, Plaintiffs admit that, to the extent there was any "specific obligation" imposed on FirstEnergy through service contracts with Plaintiffs, it was for the provision of electricity (Opp. 13)—which has no relevance to Plaintiffs' factual allegations and therefore cannot support a contract claim.

Finally, Plaintiffs insist that any defective elements in their claim are merely fodder for a jury. The existence of a contract "is a question of fact to be determined at a later date," they say, and likewise it would be "premature" to identify "the exact terms" of the contract or "whether those terms have been satisfied or breached." (Opp. 14-15.) That is not how litigation works. Of course, factual disputes are not resolved at the motion-to-dismiss phase, but a claim cannot move forward unless the plaintiff alleges facts that, if proven, would satisfy its elements. For a contract claim, a plaintiff must therefore identify a contractual promise and explain how the defendant allegedly violated it—or else face dismissal. *E.g.*, *Merlitti v. Univ. of Akron*, 2019-Ohio-4998, ¶¶ 22-24 (affirming dismissal where "complaint fails to set forth the essential elements for a claim of breach of contract"). Plaintiffs have not done even that bare minimum. Count 4 must be dismissed.

**C. Unjust Enrichment.** Plaintiffs likewise fail to provide any coherent basis for their unjust enrichment claim. They argue that Defendants "misused" funds that Plaintiffs paid them for electricity, by allegedly using those funds for illegal purposes. (Opp. 17.) That does not amount to unjust enrichment, which is when a person "has and retains money or benefits which in justice and equity belong to another." *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 834 N.E.2d 791, ¶ 20. There is no dispute that Defendants had the right to Plaintiffs' payments in exchange for providing them with electricity. Plaintiffs complain about how Defendants allegedly *used* their payments, but they do not deny that *they received the electricity they paid for*—and offer no other basis to conclude that these payments somehow should still "belong to" them as a matter of "justice and equity."

Insofar as Plaintiffs' theory is that FirstEnergy has been unjustly enriched by HB 6's nuclear surcharges in particular, that fails for the additional reason that Plaintiffs have not paid a single cent of those surcharges. Nor are they likely ever to do so, given that they have been doubly enjoined by two different courts. *See supra* n.1. Any unjust enrichment claim based on the HB 6 surcharges has thus already been anticipatorily mooted by other courts, requiring its dismissal here.

Finally, alleging unjust enrichment from the payment of utility rates is the classic claim barred by the filed-rate doctrine—indeed, this was precisely the fact pattern in *Keco*. To be sure, the nature of the attack on the rates in *Keco* was different from the attack here (Opp. 17), but the take-away is that paying approved utility rates is not unjust and any common-law recovery has been "abrogated," even if the rates were unlawful. *Keco*, 166 Ohio St. at 257-259. That principle bars this claim too.

     **D.**    **OCPA.** Plaintiffs concede their OCPA claim requires proximate cause, meaning a "sufficiently direct" relationship between the defendant's corrupt acts and the plaintiff's injury. (Opp. 18.) If "there are several intervening factors necessary for the harm ... to materialize," proximate cause is not satisfied. *Cleveland v. JP Morgan Chase Bank, N.A.*, 8th Dist. Cuyahoga No. 98656, 2013-Ohio-1035, ¶ 13. This case is a perfect example. HB 6 could not become law without the "participation of other actors" (Opp. 19)—namely, Ohio's House, Senate, Governor, and voters. (MTD 16.)

     Plaintiffs' only response to these causal gaps is to claim that the inquiry is relaxed in the context of intentional acts. (Opp. 18.) But *all* OCPA and RICO claims are premised on intentional predicate acts of racketeering. *See* R.C. § 2923.31(I); 18 U.S.C. §1961(1). Yet Ohio courts consistently enforce the proximate cause requirement to dismiss claims with attenuated chains or intervening causes. *E.g.*, *Herakovic v. Catholic Diocese of Cleveland*, 8th Dist. Cuyahoga No. 85467, 2005-Ohio-5985, ¶¶ 31-32; *JP Morgan Bank*, 2013-Ohio-1035, ¶ 20. Plaintiffs ignore these authorities, and likewise ignore the most analogous precedent, where the court invoked proximate cause to reject claims based on a bill allegedly tainted by bribery. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 730-31 (7th Cir. 2014).

     In a bid to circumvent the insurmountable causation problem associated with the legislative process, Plaintiffs argue that FirstEnergy proximately caused harm by "availing itself of the decoupling mechanism" in HB 6. (Opp. 18.) That is not a predicate offense under OCPA, however. It is those unlawful predicate offenses—such as the alleged bribery—that Plaintiffs must directly link to their alleged injuries. Because they cannot do so, their OCPA claim is not viable.

**E.** **Civil Conspiracy.** Plaintiffs agree that their civil conspiracy claim is derivative. (Opp. 20.) Because their independent tort claims lack merit, their civil conspiracy claim does too.

**F.** **Declaratory or Injunctive Relief.** Finally, Plaintiffs argue that this Court should issue a declaration about "the validity" of HB 6 and enjoin it from taking effect, even though they do not challenge its constitutionality. (Opp. 20-21.) They ignore, however, that any such relief must run against the state officials who implement and enforce the law—none of whom is a party here—not against FirstEnergy or other private actors. (MTD 17-18.) And of course, such injunctions have already been issued by other courts in cases involving the *appropriate* parties. *See supra* n.1.

## CONCLUSION

For these reasons, Plaintiffs' claims against FirstEnergy should be dismissed.

Dated: January 11, 2021

Respectfully submitted,

*/s/ Ryan A. Doringo*
Michael R. Gladman (0059797)
mrgladman@jonesday.com
Tiffany D. Lipscomb-Jackson (0084382)
tdlipscombjackson@jonesday.com
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, Ohio 43215
Phone: (614) 469-3939

Ryan A Doringo (0091144)
radoringo@jonesday.com
JONES DAY
901 Lakeside Avenue East
Cleveland, Ohio 44114
Phone: (216) 586-3939

Yaakov M. Roth (*pro hac vice*)
yroth@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-7658

*Counsel for FirstEnergy Defendants*

## CERTIFICATE OF SERVICE

I certify that on January 11, 2021, a copy of the foregoing was filed via the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Ryan A. Doringo
*Counsel for FirstEnergy Defendants*

ATTACHMENT
Copies of Statutes, Regulations, Unpublished
Cases, and/or Out-of-State Cases

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or Preempted   Preempted by   Melanson v. U.S. Forensic, LLC,   E.D.N.Y.,   Apr. 30, 2016

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 96. Racketeer Influenced and Corrupt Organizations (Refs & Annos)

---

18 U.S.C.A. § 1961

§ 1961. Definitions

Effective: May 11, 2016
Currentness

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [1] sections 1831 and 1832 (relating to economic espionage and theft of trade secrets), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for

phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

**(2)** "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

**(3)** "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

**(4)** "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

**(5)** "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

**(6)** "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

**(7)** "racketeering investigator" means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

**(8)** "racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

**(9)** "documentary material" includes any book, paper, document, record, recording, or other material; and

Electronically Filed 01/11/2021 14:24 / BRIEF / CV 20 935557 / Confirmation Nbr. 2153517 / BATCH

**(10)** "Attorney General" includes the Attorney General of the United States, the Deputy Attorney General of the United States, the Associate Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

## CREDIT(S)

(Added Pub.L. 91-452, Title IX, § 901(a), Oct. 15, 1970, 84 Stat. 941; amended Pub.L. 95-575, § 3(c), Nov. 2, 1978, 92 Stat. 2465; Pub.L. 95-598, Title III, § 314(g), Nov. 6, 1978, 92 Stat. 2677; Pub.L. 98-473, Title II, §§ 901(g), 1020, Oct. 12, 1984, 98 Stat. 2136, 2143; Pub.L. 98-547, Title II, § 205, Oct. 25, 1984, 98 Stat. 2770; Pub.L. 99-570, Title I, § 1365(b), Oct. 27, 1986, 100 Stat. 3207-35; Pub.L. 99-646, § 50(a), Nov. 10, 1986, 100 Stat. 3605; Pub.L. 100-690, Title VII, §§ 7013, 7020(c), 7032, 7054, 7514, Nov. 18, 1988, 102 Stat. 4395, 4396, 4398, 4402, 4489; Pub.L. 101-73, Title IX, § 968, Aug. 9, 1989, 103 Stat. 506; Pub.L. 101-647, Title XXXV, § 3560, Nov. 29, 1990, 104 Stat. 4927; Pub.L. 103-322, Title IX, § 90104, Title XVI, § 160001(f), Title XXXIII, § 330021(1), Sept. 13, 1994, 108 Stat. 1987, 2037, 2150; Pub.L. 103-394, Title III, § 312(b), Oct. 22, 1994, 108 Stat. 4140; Pub.L. 104-132, Title IV, § 433, Apr. 24, 1996, 110 Stat. 1274; Pub.L. 104-153, § 3, July 2, 1996, 110 Stat. 1386; Pub.L. 104-208, Div. C, Title II, § 202, Sept. 30, 1996, 110 Stat. 3009-565; Pub.L. 104-294, Title VI, §§ 601(b)(3), (i)(3), 604(b)(6), Oct. 11, 1996, 110 Stat. 3499, 3501, 3506; Pub.L. 107-56, Title VIII, § 813, Oct. 26, 2001, 115 Stat. 382; Pub.L. 107-273, Div. B, Title IV, § 4005(f)(1), Nov. 2, 2002, 116 Stat. 1813; Pub.L. 108-193, § 5(b), Dec. 19, 2003, 117 Stat. 2879; Pub.L. 108-458, Title VI, § 6802(e), Dec. 17, 2004, 118 Stat. 3767; Pub.L. 109-164, Title I, § 103(c), Jan. 10, 2006, 119 Stat. 3563; Pub.L. 109-177, Title IV, § 403(a), Mar. 9, 2006, 120 Stat. 243; Pub.L. 113-4, Title XII, § 1211(a), Mar. 7, 2013, 127 Stat. 142; Pub.L. 114-153, § 3(b), May 11, 2016, 130 Stat. 382.)

## Footnotes

1       So in original.
18 U.S.C.A. § 1961, 18 USCA § 1961
Current through P.L. 116-258. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

---

Baldwin's Ohio Revised Code Annotated

   Title XXIX. Crimes--Procedure (Refs & Annos)

      Chapter 2923. Conspiracy, Attempt, and Complicity; Weapons Control (Refs & Annos)

      Corrupt Activity

---

R.C. § 2923.31

2923.31 Definitions for RC 2923.31 to 2923.36

Effective: January 22, 2019

Currentness

As used in sections 2923.31 to 2923.36 of the Revised Code:

(A) "Beneficial interest" means any of the following:

(1) The interest of a person as a beneficiary under a trust in which the trustee holds title to personal or real property;

(2) The interest of a person as a beneficiary under any other trust arrangement under which any other person holds title to personal or real property for the benefit of such person;

(3) The interest of a person under any other form of express fiduciary arrangement under which any other person holds title to personal or real property for the benefit of such person.

"Beneficial interest" does not include the interest of a stockholder in a corporation or the interest of a partner in either a general or limited partnership.

(B) "Costs of investigation and prosecution" and "costs of investigation and litigation" mean all of the costs incurred by the state or a county or municipal corporation under sections 2923.31 to 2923.36 of the Revised Code in the prosecution and investigation of any criminal action or in the litigation and investigation of any civil action, and includes, but is not limited to, the costs of resources and personnel.

(C) "Enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. "Enterprise" includes illicit as well as licit enterprises.

(D) "Innocent person" includes any bona fide purchaser of property that is allegedly involved in a violation of section 2923.32 of the Revised Code, including any person who establishes a valid claim to or interest in the property in accordance with division

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   1

(E) of section 2981.04 of the Revised Code, and any victim of an alleged violation of that section or of any underlying offense involved in an alleged violation of that section.

(E) "Pattern of corrupt activity" means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event.

At least one of the incidents forming the pattern shall occur on or after January 1, 1986. Unless any incident was an aggravated murder or murder, the last of the incidents forming the pattern shall occur within six years after the commission of any prior incident forming the pattern, excluding any period of imprisonment served by any person engaging in the corrupt activity.

For the purposes of the criminal penalties that may be imposed pursuant to section 2923.32 of the Revised Code, at least one of the incidents forming the pattern shall constitute a felony under the laws of this state in existence at the time it was committed or, if committed in violation of the laws of the United States or of any other state, shall constitute a felony under the law of the United States or the other state and would be a criminal offense under the law of this state if committed in this state.

(F) "Pecuniary value" means money, a negotiable instrument, a commercial interest, or anything of value, as defined in section 1.03 of the Revised Code, or any other property or service that has a value in excess of one hundred dollars.

(G) "Person" means any person, as defined in section 1.59 of the Revised Code, and any governmental officer, employee, or entity.

(H) "Personal property" means any personal property, any interest in personal property, or any right, including, but not limited to, bank accounts, debts, corporate stocks, patents, or copyrights. Personal property and any beneficial interest in personal property are deemed to be located where the trustee of the property, the personal property, or the instrument evidencing the right is located.

(I) "Corrupt activity" means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:

(1) Conduct defined as "racketeering activity" under the "Organized Crime Control Act of 1970," 84 Stat. 941, 18 U.S.C. 1961(1)(B), (1)(C), (1)(D), and (1)(E), as amended;

(2) Conduct constituting any of the following:

(a) A violation of section 1315.55, 1322.07, 2903.01, 2903.02, 2903.03, 2903.04, 2903.11, 2903.12, 2905.01, 2905.02, 2905.11, 2905.22, 2905.32 as specified in division (I)(2)(g) of this section, 2907.321, 2907.322, 2907.323, 2909.02, 2909.03, 2909.22, 2909.23, 2909.24, 2909.26, 2909.27, 2909.28, 2909.29, 2911.01, 2911.02, 2911.11, 2911.12, 2911.13, 2911.31, 2913.05, 2913.06, 2913.30, 2921.02, 2921.03, 2921.04, 2921.11, 2921.12, 2921.32, 2921.41, 2921.42, 2921.43, 2923.12, or 2923.17; division (F)(1)(a), (b), or (c) of section 1315.53; division (A)(1) or (2) of section 1707.042; division (B), (C)(4), (D), (E), or (F) of section 1707.44; division (A)(1) or (2) of section 2923.20; division (E) or (G) of section 3772.99; division (J)(1) of section 4712.02; section 4719.02, 4719.05, or 4719.06; division (C), (D), or (E) of section 4719.07; section 4719.08; or division (A) of section 4719.09 of the Revised Code.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    2

(b) Any violation of section 3769.11, 3769.15, 3769.16, or 3769.19 of the Revised Code as it existed prior to July 1, 1996, any violation of section 2915.02 of the Revised Code that occurs on or after July 1, 1996, and that, had it occurred prior to that date, would have been a violation of section 3769.11 of the Revised Code as it existed prior to that date, or any violation of section 2915.05 of the Revised Code that occurs on or after July 1, 1996, and that, had it occurred prior to that date, would have been a violation of section 3769.15, 3769.16, or 3769.19 of the Revised Code as it existed prior to that date.

(c) Any violation of section 2907.21, 2907.22, 2907.31, 2913.02, 2913.11, 2913.21, 2913.31, 2913.32, 2913.34, 2913.42, 2913.47, 2913.51, 2915.03, 2925.03, 2925.04, 2925.05, or 2925.37 of the Revised Code, any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree and that occurs on or after July 1, 1996, any violation of section 2915.02 of the Revised Code that occurred prior to July 1, 1996, any violation of section 2915.02 of the Revised Code that occurs on or after July 1, 1996, and that, had it occurred prior to that date, would not have been a violation of section 3769.11 of the Revised Code as it existed prior to that date, any violation of section 2915.06 of the Revised Code as it existed prior to July 1, 1996, or any violation of division (B) of section 2915.05 of the Revised Code as it exists on and after July 1, 1996, when the proceeds of the violation, the payments made in the violation, the amount of a claim for payment or for any other benefit that is false or deceptive and that is involved in the violation, or the value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds one thousand dollars, or any combination of violations described in division (I)(2)(c) of this section when the total proceeds of the combination of violations, payments made in the combination of violations, amount of the claims for payment or for other benefits that is false or deceptive and that is involved in the combination of violations, or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars;

(d) Any violation of section 5743.112 of the Revised Code when the amount of unpaid tax exceeds one hundred dollars;

(e) Any violation or combination of violations of section 2907.32 of the Revised Code involving any material or performance containing a display of bestiality or of sexual conduct, as defined in section 2907.01 of the Revised Code, that is explicit and depicted with clearly visible penetration of the genitals or clearly visible penetration by the penis of any orifice when the total proceeds of the violation or combination of violations, the payments made in the violation or combination of violations, or the value of the contraband or other property illegally possessed, sold, or purchased in the violation or combination of violations exceeds one thousand dollars;

(f) Any combination of violations described in division (I)(2)(c) of this section and violations of section 2907.32 of the Revised Code involving any material or performance containing a display of bestiality or of sexual conduct, as defined in section 2907.01 of the Revised Code, that is explicit and depicted with clearly visible penetration of the genitals or clearly visible penetration by the penis of any orifice when the total proceeds of the combination of violations, payments made in the combination of violations, amount of the claims for payment or for other benefits that is false or deceptive and that is involved in the combination of violations, or value of the contraband or other property illegally possessed, sold, or purchased in the combination of violations exceeds one thousand dollars;

(g) Any violation of section 2905.32 of the Revised Code to the extent the violation is not based solely on the same conduct that constitutes corrupt activity pursuant to division (I)(2)(c) of this section due to the conduct being in violation of section 2907.21 of the Revised Code.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    3

(3) Conduct constituting a violation of any law of any state other than this state that is substantially similar to the conduct described in division (I)(2) of this section, provided the defendant was convicted of the conduct in a criminal proceeding in the other state;

(4) Animal or ecological terrorism;

(5)(a) Conduct constituting any of the following:

(i) Organized retail theft;

(ii) Conduct that constitutes one or more violations of any law of any state other than this state, that is substantially similar to organized retail theft, and that if committed in this state would be organized retail theft, if the defendant was convicted of or pleaded guilty to the conduct in a criminal proceeding in the other state.

(b) By enacting division (I)(5)(a) of this section, it is the intent of the general assembly to add organized retail theft and the conduct described in division (I)(5)(a)(ii) of this section as conduct constituting corrupt activity. The enactment of division (I)(5)(a) of this section and the addition by division (I)(5)(a) of this section of organized retail theft and the conduct described in division (I)(5)(a)(ii) of this section as conduct constituting corrupt activity does not limit or preclude, and shall not be construed as limiting or precluding, any prosecution for a violation of section 2923.32 of the Revised Code that is based on one or more violations of section 2913.02 or 2913.51 of the Revised Code, one or more similar offenses under the laws of this state or any other state, or any combination of any of those violations or similar offenses, even though the conduct constituting the basis for those violations or offenses could be construed as also constituting organized retail theft or conduct of the type described in division (I)(5)(a)(ii) of this section.

(J) "Real property" means any real property or any interest in real property, including, but not limited to, any lease of, or mortgage upon, real property. Real property and any beneficial interest in it is deemed to be located where the real property is located.

(K) "Trustee" means any of the following:

(1) Any person acting as trustee under a trust in which the trustee holds title to personal or real property;

(2) Any person who holds title to personal or real property for which any other person has a beneficial interest;

(3) Any successor trustee.

"Trustee" does not include an assignee or trustee for an insolvent debtor or an executor, administrator, administrator with the will annexed, testamentary trustee, guardian, or committee, appointed by, under the control of, or accountable to a court.

(L) "Unlawful debt" means any money or other thing of value constituting principal or interest of a debt that is legally unenforceable in this state in whole or in part because the debt was incurred or contracted in violation of any federal or state law relating to the business of gambling activity or relating to the business of lending money at an usurious rate unless the

Electronically Filed 01/11/2021 14:24 / BRIEF / CV 20 935557 / Confirmation Nbr. 2153517 / BATCH

creditor proves, by a preponderance of the evidence, that the usurious rate was not intentionally set and that it resulted from a good faith error by the creditor, notwithstanding the maintenance of procedures that were adopted by the creditor to avoid an error of that nature.

(M) "Animal activity" means any activity that involves the use of animals or animal parts, including, but not limited to, hunting, fishing, trapping, traveling, camping, the production, preparation, or processing of food or food products, clothing or garment manufacturing, medical research, other research, entertainment, recreation, agriculture, biotechnology, or service activity that involves the use of animals or animal parts.

(N) "Animal facility" means a vehicle, building, structure, nature preserve, or other premises in which an animal is lawfully kept, handled, housed, exhibited, bred, or offered for sale, including, but not limited to, a zoo, rodeo, circus, amusement park, hunting preserve, or premises in which a horse or dog event is held.

(O) "Animal or ecological terrorism" means the commission of any felony that involves causing or creating a substantial risk of physical harm to any property of another, the use of a deadly weapon or dangerous ordnance, or purposely, knowingly, or recklessly causing serious physical harm to property and that involves an intent to obstruct, impede, or deter any person from participating in a lawful animal activity, from mining, foresting, harvesting, gathering, or processing natural resources, or from being lawfully present in or on an animal facility or research facility.

(P) "Research facility" means a place, laboratory, institution, medical care facility, government facility, or public or private educational institution in which a scientific test, experiment, or investigation involving the use of animals or other living organisms is lawfully carried out, conducted, or attempted.

(Q) "Organized retail theft" means the theft of retail property with a retail value of one thousand dollars or more from one or more retail establishments with the intent to sell, deliver, or transfer that property to a retail property fence.

(R) "Retail property" means any tangible personal property displayed, held, stored, or offered for sale in or by a retail establishment.

(S) "Retail property fence" means a person who possesses, procures, receives, or conceals retail property that was represented to the person as being stolen or that the person knows or believes to be stolen.

(T) "Retail value" means the full retail value of the retail property. In determining whether the retail value of retail property equals or exceeds one thousand dollars, the value of all retail property stolen from the retail establishment or retail establishments by the same person or persons within any one-hundred-eighty-day period shall be aggregated.

## CREDIT(S)

(2018 H 405, eff. 1-22-19; 2017 H 199, eff. 3-23-18; 2012 H 262, eff. 6-27-12; 2012 H 386, eff. 6-11-12; 2011 H 86, eff. 9-30-11; 2010 S 235, eff. 3-24-11; 2008 S 320, eff. 4-7-09; 2006 H 241, eff. 7-1-07; 2005 S 9, eff. 4-14-06; 2002 S 184, eff. 5-15-02; 1998 H 565, eff. 3-30-99; 1996 S 277, eff. 3-31-97; 1996 S 214, § 3, eff. 12-5-96; 1996 S 214, § 1, eff. 12-5-96; 1996 H 333, eff. 9-19-96; 1996 S 269, eff. 7-1-96; 1995 S 2, eff. 7-1-96; 1992 S 323, eff. 4-16-93; 1990 H 347; 1988 H 624, H 708; 1986 S 74; 1985 H 5)

Electronically Filed 01/11/2021 14:24 / BRIEF / CV 20 935557 / Confirmation Nbr. 2153517 / BATCH

R.C. § 2923.31, OH ST § 2923.31

Current through Files 67 and 69 through 78 of the 133rd General Assembly (2019-2020)

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Baldwin's Ohio Revised Code Annotated
Title XXXVII. Health--Safety--Morals
Chapter 3706. Air Quality Development Authority (Refs & Annos)
Nuclear Resource Credits and Renewable Energy Credits

R.C. § 3706.46

3706.46 Customer charges

Effective: October 22, 2019
Currentness

(A)(1) Beginning for all bills rendered on or after January 1, 2021, by an electric distribution utility in this state, such electric distribution utility shall collect from all of its retail electric customers in this state, each month, a charge or charges which, in the aggregate, are sufficient to produce the following revenue requirements:

(a) One hundred fifty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the nuclear generation fund;

(b) Twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the renewable generation fund.

(2) The public utilities commission shall determine the method by which the revenue is allocated or assigned to each electric distribution utility for billing and collection, provided that the method of allocation shall be based on the relative number of customers, relative quantity of kilowatt hour sales, or a combination of the two. The level and structure of the charge shall be authorized by the commission through a process that the commission shall determine is not for an increase in any rate, joint rate, toll, classification, charge, or rental, notwithstanding anything to the contrary in Title XLIX of the Revised Code.

(B) In authorizing the level and structure of any charge or charges to be billed and collected by each electric distribution utility, the commission shall ensure that the per-customer monthly charge for residential customers does not exceed eighty-five cents and that the per-customer monthly charge for industrial customers eligible to become self-assessing purchasers pursuant to division (C) of section 5727.81 of the Revised Code does not exceed two thousand four hundred dollars. For nonresidential customers that are not self-assessing purchasers, the level and design of the charge or charges shall be established in a manner that avoids abrupt or excessive total net electric bill impacts for typical customers.

(C) Each charge authorized by the commission under this section shall be subject to adjustment so as to reconcile actual revenue collected with the revenue needed to meet the revenue requirements under division (A)(1) of this section. The commission shall authorize each electric distribution utility to adopt accounting practices to facilitate such reconciliation. Notwithstanding any other provisions of the Revised Code, the charge or charges authorized by the commission may continue beyond December 31, 2027, only if it is necessary to reconcile actual revenue collected under this section during the period ending on December 31, 2027, with the actual revenue needed to meet the revenue requirements under division (A)(1) of this section for required

disbursements under section 3706.55 of the Revised Code that may be due and owing during the same period. Such continuation shall be authorized only for such period of time beyond December 31, 2027, as may be reasonably necessary to complete the reconciliation.


**CREDIT(S)**


(2019 H 6, eff. 10-22-19)


R.C. § 3706.46, OH ST § 3706.46

Current through Files 67 and 69 through 78 of the 133rd General Assembly (2019-2020)

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Baldwin's Ohio Revised Code Annotated
Title XLIX. Public Utilities (Refs & Annos)
Chapter 4905. Public Utilities Commission--General Powers (Refs & Annos)
Regulatory Provisions

R.C. § 4905.32

4905.32 Schedule rate collected

Currentness

No public utility shall charge, demand, exact, receive, or collect a different rate, rental, toll, or charge for any service rendered, or to be rendered, than that applicable to such service as specified in its schedule filed with the public utilities commission which is in effect at the time.

No public utility shall refund or remit directly or indirectly, any rate, rental, toll, or charge so specified or, any part thereof, or extend to any person, firm, or corporation, any rule, regulation, privilege, or facility except such as are specified in such schedule and regularly and uniformly extended to all persons, firms, and corporations under like circumstances for like, or substantially similar, service.

**CREDIT(S)**

(1953 H 1, eff. 10-1-53; GC 614-18)

R.C. § 4905.32, OH ST § 4905.32
Current through Files 67 and 69 through 78 of the 133rd General Assembly (2019-2020)

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

763 F.3d 723
United States Court of Appeals,
Seventh Circuit.

EMPRESS CASINO JOLIET
CORP., et al., Plaintiffs–Appellants,
v.
John JOHNSTON, Balmoral Racing
Club, Inc., and Maywood Park Trotting
Ass'n, Inc., Defendants–Appellees.

No. 13–2972.
|
Argued March 31, 2014.
|
Decided Aug. 15, 2014.

**Synopsis**
**Background:** Owners and operators of riverboat gambling casinos in Illinois brought action against Illinois governor and members of horse racing industry, alleging defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring to exchange campaign contributions for ensuring two bills were enacted imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry. The United States District Court for the Northern District of Illinois, Matthew F. Kennelly, J., granted defendants' motion for summary judgment. Casino owners appealed.

**Holdings:** The Court of Appeals, Wood, Chief Judge, held that:

[1] casino owners' RICO action was not barred by res judicata by two prior state court actions challenging the constitutionality of the bills; and

[2] there was no evidence that alleged scheme caused passage of first bill; but

[3] fact question as to proximate cause precluded summary judgment on casino owners' RICO claim as to passage of second bill.

Reversed in part and remanded.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (7)

**[1]** **Judgment** ⬥ Nature and requisites of former recovery as bar in general

Under Illinois law, for the doctrine of res judicata to apply, the following three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies.

13 Cases that cite this headnote

**[2]** **Judgment** ⬥ Identity of Cause of Action or Relief Sought

Casino owners' action against Illinois governor and members of horse racing industry, alleging defendants violated Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring to exchange campaign contributions for ensuring two bills were enacted imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry, was not barred by res judicata by two prior state court actions challenging the constitutionality of the bills; the claims in the state suits were materially different than the claims in casino owners' RICO action. 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[3]** **Racketeer Influenced and Corrupt Organizations** ⬥ Business, property, or proprietary injury; personal injuries

**Racketeer Influenced and Corrupt Organizations** ⬥ Causal relationship; direct or indirect injury

Plaintiff in civil action under Racketeer Influenced and Corrupt Organizations Act (RICO) must allege that an injury to his business or property resulted from the underlying acts of racketeering. 18 U.S.C.A. § 1964(c).

11 Cases that cite this headnote

**[4]** **Racketeer Influenced and Corrupt Organizations** ⟶ Business, property, or proprietary injury; personal injuries

**Racketeer Influenced and Corrupt Organizations** ⟶ Causal relationship; direct or indirect injury

Under section of the Racketeer Influenced and Corrupt Organizations Act (RICO) providing a civil remedy to any person injured in his business or property, the plaintiff can only recover to the extent that he has been injured in his business or property by the conduct constituting the violation. 18 U.S.C.A. § 1964(c).

8 Cases that cite this headnote

**[5]** **Racketeer Influenced and Corrupt Organizations** ⟶ Causal relationship; direct or indirect injury

Section of the Racketeer Influenced and Corrupt Organizations Act (RICO) providing a civil remedy to any person injured in his business or property borrows the doctrine of proximate cause from antitrust law; in both the antitrust and RICO contexts, the focus is on the directness of the relationship between the defendant's alleged conduct and the harm. 18 U.S.C.A. § 1964(c).

6 Cases that cite this headnote

**[6]** **Racketeer Influenced and Corrupt Organizations** ⟶ Causal relationship; direct or indirect injury

There was no evidence that alleged scheme of members of horse racing industry to bribe Illinois governor caused passage of bill that imposed a tax on certain in-state casinos and placed the funds into a trust for the benefit of the horse racing industry, as required to support casino owners' Racketeer Influenced and Corrupt Organizations Act (RICO) claim against governor and racetracks. 18 U.S.C.A. § 1964.

3 Cases that cite this headnote

**[7]** **Federal Civil Procedure** ⟶ Racketeering cases

In action brought by casino owners alleging that members of horse racing industry bribed Illinois governor to ensure that a bill was enacted to renew a prior bill imposing a tax on certain in-state casinos and placing the funds into a trust for the benefit of the horse racing industry, and that, in exchange for the governor's signature on the bill, the racetracks promised to give $100,000 to his campaign fund, fact question as to proximate cause precluded summary judgment on casino owners' Racketeer Influenced and Corrupt Organizations Act (RICO) claim against governor and racetracks. 18 U.S.C.A. § 1964.

3 Cases that cite this headnote

**Attorneys and Law Firms**

***724** Robert Andalman, A & G Law LLC, Chicago, IL, for Plaintiffs–Appellants.

***725** William J. McKenna, Jr., Attorney, Martin J. Bishop, Attorney, Foley & Lardner LLP, Chicago, IL, for Defendants–Appellees.

Before WOOD, Chief Judge, and WILLIAMS and HAMILTON, Circuit Judges.

**Opinion**

WOOD, Chief Judge.

Deals are the stuff of legislating. Although logrolling may appear unseemly some of the time, it is not, by itself, illegal. Bribes are. This case requires us once again to decide whether some shenanigans in the Illinois General Assembly and governor's office crossed the line from the merely unseemly to the unlawful. It involves a subject we have visited in the past: two industries that compete for gambling dollars. See *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,* 651 F.3d 722 (7th Cir.2011) (en banc). In 2006 and 2008, former Governor Rod Blagojevich signed into law two bills (to which we refer as the '06 and '08 Acts) that imposed a tax on certain in-state casinos of 3% of their revenue and placed the funds into a trust for the benefit of the horseracing industry. Smelling a rat, the

RICO Bus.Disp.Guide 12,518

plaintiff casinos brought suit under the federal Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964, alleging that the defendants, all members of the horseracing industry, had bribed the governor to ensure that the bills were enacted. Viewing the evidence in the light most favorable to the plaintiffs (and of course not vouching for anything), we conclude that there was enough to survive summary judgment on the claim that the governor agreed to sign the ′08 Act in exchange for a bribe. We therefore reverse in part and remand for further proceedings on that part of the case.

**I**

Illinois legalized riverboat casino gambling in 1990. Ever since, the state's once-thriving horseracing industry has been in decline. In late 2005 and early 2006, the state General Assembly considered legislation to help the horseracers. One bill would have imposed a 3% tax on casinos earning more than $50 million annually and deposited the proceeds into a fund for the benefit of the horseracing industry. It was modeled on similar initiatives in three other states. Lobbying on all sides was intense. On the first few votes in the General Assembly, the bill failed to garner a majority.

The bill's fortunes changed later in the spring of 2006. For one thing, it was modified so that the tax applied only to casinos earning more than $200 million annually, thereby limiting its effect to the large casinos in northern Illinois near Chicago. For another, Governor Blagojevich began to take an interest in the matter after his senior aide and alleged pay-to-play facilitator, Christopher Kelly, met with a horseracing executive, John Johnston. On the floor of the General Assembly, the bill's opponents cried foul. "Why are some of you called down to the Governor's office, then you come back up and change your vote?" asked Representative William Black. Added Representative Brent Hassert, "The Governor has weighed in on [the ′06 bill] ... heavily in the last night or so, calling people and asking people to vote on this. It is my understanding ... that there's promises have been made to support this bill." Soon after, the ′06 Act cleared the House by a vote of 70–32; a week later, the Senate passed it 40–16. Governor Blagojevich signed the bill into law the next day. Johnston and other racing executives thanked the governor for his support of the bill in a personal letter. Using various **\*726** subsidiaries, they then contributed $125,000 to his campaign fund.

The ′06 Act contained a two-year sunset provision. In early 2008, the General Assembly began to consider its renewal. Meanwhile, horseracing executive Johnston met with Governor Blagojevich and his chief of staff Alonzo Monk. Blagojevich gave no indication whether he would support the renewed bill, telling Johnston, "Appreciate your support in the past, hope you can continue to support me in the future." In the fall, with the bill stalled in the General Assembly, Blagojevich called Johnston to solicit campaign donations. Johnston pledged to give $100,000, but he did not send the money. Over the next few months, Monk repeatedly needled Johnston about following through on the pledge. In one conversation recorded by federal authorities, Johnston told Monk: "Look, tell the big guy [Blagojevich] I'm good for it.... I'm just figuring out which accounts to pull the checks from."

In November, the General Assembly voted to renew the Racing Act by a vote of 83–28; the Senate likewise did so by a vote of 37–13. Representative Robert Molaro, a sponsor of the original Racing Act legislation, testified later that Governor Blagojevich played no role in the passage of the ′08 Act. But in contrast to his immediate signing of the ′06 Act, the governor initially did nothing with the ′08 Act. Johnston complained to Monk in a recorded conversation that the governor's delay in signing the bill was costing him $9,000 per day. "This is getting goofier," Johnston told a colleague in an email, "We are going to have to put a stronger bit in his mouth!?!" In another recorded conversation, Monk told the governor that Johnston was breathing down his neck about the bill. The governor replied that the bill would be signed, but it was a "timing issue." Possibly alluding to Johnston's $100,000 commitment, the governor explained that he would "like some separation between that and signing the bill."

By December, Johnston still had not ponied up the $100,000 and Governor Blagojevich still had not signed the ′08 Act into law. In recorded conversations, the governor and Monk strategized about "how [Monk] [could] approach John Johnston to get the donation of one hundred thousand dollars." Monk made clear that Johnston was desperate to have the Racing Act renewal signed into law. He told the governor: "Look, I want to go to [Johnston] without crossing the line and say, give us the fuckin' money ... give us the money and one has nothing to do with the other.... But give us the fuckin' money, because they're losing 9,000 a day ... for every day it's not signed." Monk then met with Johnston to deliver a message, as he later recalled it, that "once [Johnston] made the contribution, the act would be signed." Johnston

asked Monk: "Do you want me to make some of the payment now and some of the payment after the beginning of the year?" Asked whether Johnston ever directly promised to deliver the money, Monk later testified: "I think he did to me." After the meeting, Monk called the governor to report that Johnston would soon pay up.

A few days later, federal authorities arrested Blagojevich. Despite the arrest, Blagojevich later signed the '08 Act into law. The charging documents against Blagojevich alleged that the governor had linked signage of the '08 Act to a commitment to donate $100,000 in discussions with an unnamed representative of the horseracing industry. Regarding that charge, Johnston admitted, "I didn't know if anybody else had given $100,000, but I knew I did." (Despite this statement, Johnston never actually delivered the money.) Johnston signed an immunity agreement **\*727** which represented that he "may have information relevant to the [Blagojevich] investigation" and acknowledged "that such information may tend to incriminate [himself]." Later, an investigative report by the General Assembly found that Blagojevich traded state action for campaign contributions, including from "Race Horse Executive 1," later revealed to be Johnston, in exchange for enactment of the '08 Act.

The appellants here are Empress Casino Joliet Corporation, Des Plaines Development Limited Partnership, Hollywood Casino–Aurora, Inc., and Elgin Riverboat Resort–Riverboat Casino (the Casinos). They are all Illinois casinos taxed under the '06 and '08 Acts. Their first move was to challenge the validity of the Acts in state court. The Illinois Supreme Court rejected their challenge to the '06 Act under the state and federal constitutions. *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill.2d 62, 324 Ill.Dec. 491, 896 N.E.2d 277 (2008), *cert. denied* 556 U.S. 1281, 129 S.Ct. 2764, 170 L.Ed.2d 270 (2009) (*Empress I* ). Illinois courts later rejected a similar challenge to the '08 Act. *Empress Casino Joliet Corp. v. Giannoulias*, 406 Ill.App.3d 1040, 347 Ill.Dec. 580, 942 N.E.2d 783 (2011), *app. denied*, 351 Ill.Dec. 2, 949 N.E.2d 1097 (Ill.2011) (*Empress II* ). The appellees here— horseracing tracks and executives that benefitted from the '06 and '08 Acts (the Racetracks)—intervened and participated in both state actions.

The Casinos then filed a federal RICO suit against the Racetracks and former Governor Blagojevich seeking damages and a constructive trust over the tax money received by the Racetracks under the '06 and '08 Acts. A panel of this court held that legislative immunity barred the

suit against Blagojevich but that the Tax Injunction Act permitted the constructive trust. *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519 (7th Cir.2011) (*Empress III* ). Sitting *en banc*, we rejected the position that the panel had taken with regard to the Tax Injunction Act. *Empress Casino Joliet Corp. v. Balmoral Racing Club*, 651 F.3d at 726 (*Empress IV* ). On remand, the district court granted summary judgment for the Racetracks on the Casinos' claims of a conspiracy to exchange campaign contributions for state action in violation of RICO, 18 U.S.C. § 1962(d). The district court found that the Casinos had offered evidence from which a reasonable jury could find that there was a pattern of racketeering activity. It also found that a jury could find that an enterprise-in-fact, consisting of Governor Blagojevich, his associates, and various other participants, existed. The court concluded that there was sufficient evidence to support a jury finding that the defendants bribed Blagojevich to secure his signature on the '08 Act, but assumed, without deciding, the sufficiency of the evidence relating to the '06 Act. The court went on to determine that the Casinos could not show that the alleged bribes proximately caused their injury. The only element on which the Casinos lost was therefore proximate cause. The Casinos appealed to this court.

**II**

We begin with the Racetracks' argument that the results of the two prior state actions foreclose the Casinos' claims under the claim preclusion branch of *res judicata.* We apply the same preclusive effect to a state court judgment as the state court itself would apply. 28 U.S.C. § 1738; see *Marrese v. Amer. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

[1]    Under Illinois law, "[f]or the doctrine of *res judicata* to apply, the following **\*728** three requirements must be satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction; (2) there is an identity of cause of action; and (3) there is an identity of parties or their privies." *River Park, Inc. v. City of Highland Park*, 184 Ill.2d 290, 234 Ill.Dec. 783, 703 N.E.2d 883, 889 (1998).

[2]    *Res judicata* does not bar the Casinos' claims here because the second element is not met: this action does not present the same claim under the transactional test Illinois adopted in *River Park, id.* at 893. In the first state action, the Casinos asked the court "to determine the constitutionality of [the '06 Act]," and the Illinois Supreme Court held that "[the

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    4

'06 Act] withst[ood] the constitutional challenges raised" under the state and federal constitutions. *Empress I,* 324 Ill.Dec. 491, 896 N.E.2d at 282. In the second state action, the Casinos "challeng[ed] the constitutionality of [the ' 08 Act]," and the Illinois courts upheld the new law. *Empress II,* 347 Ill.Dec. 580, 942 N.E.2d at 786, 789. Indeed, this is not the first time we have been asked to consider the *res judicata* effects of the earlier litigation. We concluded before that "the claims ... in the two [state] suits are materially different" than those involved here, see *Empress III,* 638 F.3d at 537, and we adhere to that assessment. (This conclusion makes it unnecessary for us to decide whether the cases involve the same parties.) The two state actions were facial challenges to the validity of the Racing Acts. Neither state action considered the question at issue here: whether the Racetracks are liable to the Casinos for bribing the governor to sign the '06 and '08 Acts.

### III

The circumstances surrounding the enactment of the two Acts differ significantly, and so we analyze them separately. We conclude that the Casinos failed to present sufficient evidence with respect to their allegations about the '06 Act. The '08 Act is another matter. For it, the Casinos presented sufficient evidence on proximate cause to withstand summary judgment. As we noted earlier, we naturally are not vouching for any of the facts on which we rely here; instead, as required, we are reviewing the district court's grant of summary judgment *de novo* and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Shaffer v. Amer. Med. Ass'n,* 662 F.3d 439, 442 (7th Cir.2011).

*The '06 Act.*—We begin with the allegation that the Racetracks bribed Governor Blagojevich to push the '06 Act through the state legislature. Even if a RICO suit could be based on such an allegation (a questionable proposition), the Casinos have not presented sufficient evidence to permit a trier of fact to find that Governor Blagojevich caused the legislature to pass the '06 Act.

 **[3]  [4]**  RICO's private civil remedy provision states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue

therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C. § 1964(c). Prohibited activities under RICO include the "conduct of [an] enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), as well as a conspiracy to do the same, *id.* § 1962(d). To state a claim under this provision, the plaintiff must allege that "an injury to [his] business or property result[ed] from the underlying acts of racketeering." *Haroco, Inc. v. Amer. Nat'l B & **\*729** T Co. of Chi.,* 747 F.2d 384, 398 (7th Cir.1984). Under RICO, the plaintiff "can only recover to the extent that [ ] he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985). Bribery of government officials is one offense that can serve as a predicate for a RICO violation. 18 U.S.C. § 1961(1); see also *Salinas v. United States,* 522 U.S. 52, 62–66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

 **[5]**   RICO borrows the doctrine of proximate cause from antitrust law. *Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In both the antitrust and RICO contexts, "the focus is on the directness of the relationship between the [defendant's alleged] conduct and the harm." *Hemi Grp., LLC v. City of New York, N.Y.,* 559 U.S. 1, 12, 130 S.Ct. 983, 175 L.Ed.2d 943 (2010); see also *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) ("[T]he central question [to] ask is whether the alleged violation led directly to the plaintiff's injuries."); *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311 (RICO requires "some direct relation between the injury asserted and the injurious conduct alleged"). As the Supreme Court has explained:

> '[P]roximate cause' [serves] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts, with a particular emphasis on the demand for some direct relation between the injury asserted and the injurious conduct alleged. The direct-relation requirement avoids the difficulties associated with attempting

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          5

to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors....

*Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

[6] The Casinos have not pointed to evidence that would allow a factfinder to conclude that the Racetracks' alleged bribery scheme caused the legislature to pass the '06 Act. To begin with, the Casinos make no allegation and have no evidence that the Racetracks ever bribed or attempted to bribe state legislators. Nor do the Casinos point to evidence that the governor agreed to exert improper influence over state legislators in order to win their support of the '06 Act in exchange for a bribe. See *McCutcheon v. Fed. Election Comm'n,* —— U.S. ——, 134 S.Ct. 1434, 1450, 188 L.Ed.2d 468 (2014) ("[W]hile preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—'*quid pro quo* ' corruption."). In fact, every legislator who was deposed testified that the governor had not attempted to induce his vote on the '06 Act.

A careful look at the record also reveals that the Casinos' suggestion that the governor threatened to withhold funding to various legislators' districts is unsubstantiated, but to the extent this was more simple logrolling, it falls short of evidence that could support a RICO claim. The Casinos refer us to several exhibits that purportedly show that "Blagojevich or his staff link[ed] changed votes on the ['06] Act to capital expenditures like highway spending in the representatives' districts." But this is an exaggeration of the record. Representative Phelps, for example, when asked whether it was possible that Governor Blagojevich had called him to discuss the 3% fee, claimed not to remember. At the same time, when asked if it was possible that the topic came up and he just did not recall, he answered "no" and said that he would have remembered something like **\*730** that. Representative D'Amico flatly denied that the governor raised the issue of the 3% fee in a phone call about a different bill. Representative Giles's testimony was the same. Other exhibits referenced by the Casinos contain nothing but inadmissible hearsay on the point. See Ex. 85 (declaration of Maddox); Ex. 86 (email from Maddox) ("Brandon Phelps said ..."); Ex. 87 (email from Satz based on reports he heard); Ex. 88 (emails from James Morphew) ("Hassert told me this morning ..."). Finally, an admissible email from one of the defendants says

nothing about the governor's linkage of the '06 Act to highway spending or any other improper exertion of influence. See Ex. 89 (email from Tim Carey, president of Hawthorne Race Course) ("[T]he fact that the Gov was working the phones for us was a great sign that this could make it to his desk.").

The fact that the bill failed to garner a majority on the first few votes does not suffice to raise a genuine issue of material fact. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Numerous reasons, including the change to the bill restricting its application to the highest-earning casinos or just the usual give-and-take of legislative lawmaking, might explain the change in outcome.

The Casinos also point to statements on the floor of the General Assembly and in various media reports, but these statements are not admissible to prove the matters asserted therein. See FED.R.EVID. 801(c), 802. Even if they were admissible, they show very little; the fact that the governor met with unnamed legislators during the months-long period when the bill was under consideration does not show anything untoward. We do not know which legislators met with the governor, nor what was discussed. The worst comment the Casinos identify is Rep. Hassert's obviously inadmissible statement that it was his "understanding ... [that] promises [were] made to support this bill." Not only is that comment an out-of-court statement offered to prove the truth of the matter asserted; the underlying sentiment is not based on personal knowledge. See FED.R.EVID. 805. Worse, we have no idea what promises he was talking about. If the promise referred to support for re-election, or a commitment to co-sponsor a bill, without any taint of bribery, nothing would be wrong.

We accept for present purposes that, in an appropriate case, a "finding that bribery of a [government official] proximately caused a plaintiff's injury can [ ] rest on evidence of that individual's influence over the proceedings." *Bieter Co. v. Blomquist,* 987 F.2d 1319, 1327 (8th Cir.1993). But that principle does not apply to the '06 Act. The record contains no admissible evidence that Governor Blagojevich unduly pressured members of the legislature to support the '06 Act. Nor is there competent evidence that would permit an inference that any identifiable group of legislators "voted as a bloc" at the governor's behest. No legislator was bribed. It takes more than the Casinos have shown here to support their proposed conclusion that the workings of an entire state legislature were coopted by the bribery of one official.

The work of state legislatures lies at the heart of the "Republican Form of Government" that the Constitution mandates. U.S. CONST. art. IV, § 4; see also THE FEDERALIST No. 51 (James Madison) ("In republican government, the legislative authority necessarily predominates."). The evidence would have to be extraordinary to conclude that one corrupt official, whether the governor or anyone else, had hijacked this foundational institution of **731 state sovereignty. And even if the evidence were strong, the cure may not lie in civil litigation in the courts. See *Fletcher v. Peck*, 10 U.S. 87, 131, 6 Cranch 87, 3 L.Ed. 162 (1810) ("[A] court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."). We do not need to explore the outer boundaries of the *Fletcher* holding here, because this record is devoid of admissible evidence that the governor exerted undue influence on legislators as they considered the '06 Act. The Casinos' case must fail insofar as it rests on that episode.

Evidence is similarly lacking to support a finding that the Racetracks bribed Governor Blagojevich to sign the '06 Act into law. The Casinos point to a meeting between Johnston and Blagojevich's aide Chris Kelly in 2006 while the Act was stalled in the legislature. But they provide no evidence that Johnston offered Kelly a bribe in exchange for Governor Blagojevich's signature during that meeting. The letter from the Racetracks to Blagojevich after the '06 Act passed merely thanked him for his support; it did not suggest that Blagojevich had agreed to sign the bill in exchange for a bribe. The fact that the Racetracks later made campaign contributions cannot, without more, support liability for acts of political corruption. To hold illegal an official's support of legislation furthering the interests of some constituents shortly before or after campaign contributions are solicited and received "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." See *McCormick v. United States*, 500 U.S. 257, 272, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991).

Because the evidence the Casinos presented in opposition to summary judgment with respect to the '06 Act would not permit a trier of fact to rule in their favor, the district court

properly granted summary judgment for the Racetracks on these claims.

**[7]** *The '08 Act.*—The circumstances surrounding the '08 Act are another matter. As with the '06 Act, the record contains little evidence to show that the Governor's influence caused the legislature to pass the '08 Act. But that is not all that the Casinos alleged. They also asserted that the Racetracks and the governor agreed to a *quid pro quo:* in exchange for the governor's signature on the '08 Act, the Racetracks promised to give $100,000 to his campaign fund.

The summary judgment record contains considerable evidence that, if credited, would support the allegation of a *quid pro quo* between the Racetracks and Governor Blagojevich. When Blagojevich did not immediately sign the '08 Act into law, Racetracks executive Johnston stated to a colleague in an email: "We are going to have to put a stronger bit in his mouth!?!" Johnston complained to Blagojevich's chief of staff Monk that the delays in signing the bill were costing Johnston $9,000 per day. A factfinder could conclude that Blagojevich was talking about Johnston's commitment to pay $100,000 when he informed Monk that he would "like some separation between that and signing the bill." After the FBI recorded Monk and Blagojevich scheming about getting Johnston to pay, Monk met with Johnston and, according to Monk, delivered the message that the bill would not be signed until he paid. According to Monk, Johnston countered **732 with an offer to pay half the money at once and half later. Monk called Blagojevich immediately after the meeting with Johnston to report his belief that Johnston would soon pay. After learning of the criminal allegation that Blagojevich threatened not to sign the '08 Act bill unless he was paid $100,000 by someone in the horseracing industry, Johnston admitted, "I didn't know if anybody else had given $100,000, but I knew I did." Finally, Johnston signed an immunity agreement in which he acknowledged that he had information that "may tend to incriminate" him. From this and other evidence in the record, a reasonable juror could conclude that the Racetracks agreed to pay $100,000 to Blagojevich's campaign fund in return for his signature on the '08 Act.

Blagojevich's signature on the bill caused the '08 Act to become law. Under Illinois law, bills passed by the General Assembly must be presented to the governor within 30 days. ILL. CONST., art. IV, § 9(a). "If the Governor approves the bill, he shall sign it and it shall become law." *Id.* "If the Governor does not approve the bill, he shall veto it by returning it with his objections to the house in which it

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

RICO Bus.Disp.Guide 12,518

originated." *Id.* § 9(b). If the factfinder believes the evidence supporting the Casinos' allegations, it could conclude that the bill was presented to the governor and he signed it in exchange for a lucrative campaign contribution. Unlike the allegation that the Race-tracks bribed the governor to persuade the 150–member legislature to enact the bill, the '08 Act became law as a direct result of the alleged agreement to trade money for one person's action—the governor's signature. A jury could find that the causal chain between the Racetracks' bribe and the governor's signing of the bill was not broken by any intervening acts of third parties. *Cf. Hemi Group,* 559 U.S. at 11, 130 S.Ct. 983 ("[T]he City's harm was directly caused by the customers, not Hemi."); *id.* at 25, 130 S.Ct. 983 (Breyer, J., dissenting) (taking issue with the majority's suggestion that "the intervening voluntary acts of third parties ... cut[ ] the causal chain"). Only the governor had authority to sign the bill into law, and he did so.

It does not matter that the '08 Act passed the legislature by veto-proof majorities. See ILL. CONST.,, art. IV, § 9(c). It cannot be assumed that a veto-proof majority will hold in the face of an executive veto. See, *e.g.,* McGrath, Rogowski, & Ryan, *Gubernatorial Veto Powers and the Size of Legislative Coalitions* (Dec. 11, 2013) (S.Pol.Sci.Ass'n), https://pages.wustl. edu/files/pages/imce/rogowski/mrrcoalitions-nov13.pdf (demonstrating how the threat of a veto affects legislative coalitions and influences policymaking); Steven Dennis & Emma Dumain, ROLL CALL, "The 39 House Democrats Who Defied Obama's Veto Threat," (Nov. 15, 2013), http://blogs.rollcall.com/218/the-39-house-democrats-who-defiedobamas-veto-threat/ (last visited August 15, 2014). Many legislators, especially those in the governor's party, may hesitate to override a veto even if they originally voted for the bill. That the '08 Act cleared the General Assembly by a veto-proof majority does not erase the significance of the governor's signature. If it did, it would be unnecessary to obtain the governor's signature on a bill that passed by veto-proof majorities.

Nor does it matter that the bill would have become law even if Governor Blagojevich had neither signed nor vetoed it. See ILL. CONST.,, art. IV, § 9(b) ("Any bill not so returned by the Governor within 60 calendar days after it is presented to him shall become law."). RICO claims sound in tort. See *Beck v. Prupis,* 529 U.S. 494, 501–06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (discussing historical relationship between tort and RICO claims and explaining **\*733** that "Congress meant to incorporate common-law principles when it adopted RICO"); *Anza,* 547 U.S. at

466–67, 126 S.Ct. 1991 (Thomas, J., concurring in part and dissenting in part) (applying causation and damages principles from RESTATEMENT (SECOND) OF TORTS (1977) to analysis of RICO claims). The alleged bribery here was an intentional tort. Like an arsonist who burns down a cabin the day before a natural forest fire, the Racetracks may be "jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct," regardless of innocent alternative causes. See RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT LIABILITY § 12 (2000).

That brings us to the heart of the matter: Was the Racetracks' alleged agreement to bribe the governor to sign the '08 Act sufficiently immediate to serve as a legal cause of the Casinos' injuries for purposes of RICO? The focus of the inquiry is the directness of the injury resulting from the defendants' conduct. The Supreme Court has spoken to RICO's proximate-cause requirement on several occasions, and so we begin with a look at its guidance.

In *Anza,* the plaintiff alleged that the defendant, its business competitor, defrauded the State of New York by failing to charge certain sales taxes. 547 U.S. at 454–55, 126 S.Ct. 1991. As a result, the defendant was able to offer lower prices than the plaintiff; those prices had the foreseeable effect of hurting the plaintiff's business. The Court held, however, that the "direct victim of [the defendant's] conduct [was] the State of New York," not the plaintiff. *Id.* at 458, 126 S.Ct. 1991. The cause of plaintiff's harm was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* The plaintiff's theory in *Anza* failed because it required a multi-step analysis: from the defendants' underpayment of taxes, to their reduced prices, to the plaintiff's loss of sales. The defendants' misconduct—underpayment of taxes—did not by itself harm the plaintiffs. That fact, in light of "the general tendency of the law, in regard to damages ..., not to go beyond the first step," *Hemi Grp.,* 559 U.S. at 10, 130 S.Ct. 983, quoting *S. Pac. Co. v. Darnell Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Holmes, J.), doomed the plaintiff's case. The case before us, by contrast, exemplifies direct effect. The object of the conspiracy was to bring the '08 Act into effect in exchange for a cash bribe; the Act harmed the Casinos to the tune of 3% of their revenue. The Casinos thus sat in the center of the target of the conspiracy.

*Hemi Group* offers another example of an effect that is too indirect. There, the plaintiff City alleged that the defendant fraudulently avoided filing certain tax reports with the State

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Empress Casino Joliet Corp. v. Johnston, 763 F.3d 723 (2014)**

RICO Bus.Disp.Guide 12,518

regarding cigarette sales. 559 U.S. at 4, 130 S.Ct. 983. The City used the reports to assess back sales taxes against cigarette buyers, and so the defendant's fraud against the State ultimately allowed some buyers to avoid paying taxes they owed the City. "[T]he conduct directly responsible for the City's harm was the customer's failure to pay their taxes," not the defendant's failure to file reports. *Id.* at 11, 130 S.Ct. 983. Thus, as in *Anza,* "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* Both *Anza* and *Hemi Group* stand for the same general proposition: only persons injured directly by the defendant's misconduct may recover under RICO.

Until the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014), parties *\*734* usually discussed this kind of limitation under the rubric of statutory interpretation. In *Lexmark,* however, the Supreme Court disapproved of the idea of "prudential" standing. Properly understood, the Court said, whether a plaintiff may sue "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 134 S.Ct. at 1387. The Court had already held in *Holmes* that Congress did not mean "to allow all factually injured plaintiffs to recover" under RICO. 503 U.S. at 266, 112 S.Ct. 1311. But in *Bridge,* the Court was equally clear that extra-statutory restrictions on the right to sue have no place. 553 U.S. at 648, 128 S.Ct. 2131. It therefore rejected a rule of first-party reliance that could be found nowhere in the statute.

We see nothing in RICO, as the Supreme Court has interpreted it, that would bar the Casinos from pursuing their claim with respect to the '08 Act. There was no more directly injured party standing between the Casinos and the alleged wrongdoer, and thus no one else to whom they could look for relief; their injuries were not derivative. The money they paid pursuant to the '08 Act did not compensate the State of Illinois for any losses to the state. Rather, the Casinos themselves suffered the only injury resulting from the Racetracks' alleged conspiracy to enact the '08 statute.

The Casinos do not occupy the role of disgruntled taxpayer here. That, too, would pose a problem for them, as *Ill. ex rel. Ryan v. Brown,* 227 F.3d 1042 (7th Cir.2000), demonstrates. There we rejected the plaintiffs' allegation that the defendant bribed the state treasurer in exchange for large deposits of state money. Plaintiffs, acting only in their capacity as ordinary Illinois taxpayers, sued to recover the state's losses.

But they had "suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty." *Id.* at 1045. Only "the State of Illinois itself was directly injured by the misdirection of its funds into ... the pockets of miscreants." *Id.* Therefore, we held, the "State [was] the proper party to be suing, not the plaintiffs." *Id.* at 1046.

Here, the general limitation on taxpayer standing found in Article III does not apply. The Casinos do not "challenge laws of general application where their own injur[ies] [are] not distinct from that suffered in general by other taxpayers or citizens." See *Hein v. Freedom from Religion Found., Inc.,* 551 U.S. 587, 598, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007), quoting *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 613, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (Kennedy, J.). The'08 Act taxed only five entities in the entire state. Other taxpayers and citizens were unaffected. Moreover, the Casinos are not challenging the tax itself in this litigation, having lost earlier efforts pursuing that theory. Rather, they seek damages from a private party for an alleged conspiracy to use the power of state government to take money from them. Their injury is easily measured, and it is directly traceable to the Racetracks' alleged conduct (bribing the governor to sign the '08 Act) and remediable by this court. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). They thus face no standing barrier to their lawsuit under Article III.

In closing, we stress that the only RICO element we are deciding is the issue of proximate cause. To sustain their section 1962(d) conspiracy claim, the Casinos must ultimately show "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern *\*735* of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *DeGuelle v. Camilli,* 664 F.3d 192, 204 (7th Cir.2011) (internal quotation marks omitted); see also *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.,* 424 F.3d 659, 674 (7th Cir.2005); *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 964 (7th Cir.2000). We recognize that our rejection of the Casinos' claims based on the '06 Act may have an impact on their ability to show that the defendants agreed to the commission of two predicate acts, see *Brouwer,* 199 F.3d at 964, or that the defendants "knowingly agreed to perform services of a kind [to] facilitate the activities of those ... operating the enterprise in an illegal manner," *id.* at 967. We are reluctant to delve into those issues without a proper adversary presentation. Instead, because the

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Empress Casino Joliet Corp. v. Johnston, 763 F.3d 723 (2014)**

RICO Bus.Disp.Guide 12,518

evaluation of the case as a whole may be affected by our decision on proximate cause, we confirm that the district court is free on remand to revisit its decisions on the other RICO elements should the parties choose to revisit them in light of this opinion.

### IV

If the Casinos are correct, the Racetracks agreed to pay Governor Blagojevich $100,000 in exchange for his signature on the '08 Act. The direct and immediate consequence of that illegal agreement was to deprive the Casinos of 3% of their annual revenue. There is "a direct relation between the injury asserted and the injurious conduct alleged." See *Bridge*, 553 U.S. at 654–55, 128 S.Ct. 2131. Accordingly, we REVERSE the district court's grant of summary judgment insofar as it relates to the signing of the '08 Act and REMAND for further proceedings consistent with this opinion.

**All Citations**

763 F.3d 723, RICO Bus.Disp.Guide 12,518

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

60 USLW 2475, RICO Bus.Disp.Guide 7917

---

☛ KeyCite Yellow Flag - Negative Treatment
Declined to Extend by  Brown v. Cassens Transport Co.,  6th Cir.(Mich.),
April 6, 2012

954 F.2d 485
United States Court of Appeals,
Eighth Circuit.

H.J. INC., a Minnesota corporation, Kirk Dahl,
Larry Krugen and Mary Krugen, individually and
d/b/a Photo Images, Susan Davis, Robert Neal,
Isaac H. Ward, Richard L. Anderson, Thomas J.
Mott, and all others similarly situated, Appellants,
v.
NORTHWESTERN BELL TELEPHONE
COMPANY, a subsidiary of U.S. West, A.B.C.
individually and D.E.F. as corporations, and
other unnamed Co-conspirators, Appellees.

No. 90–5245.
|
Submitted March 14, 1991.
|
Decided Jan. 15, 1992.

**Synopsis**
Customers brought action against telephone company and
others alleging scheme to illegally influence members of
Minnesota Public Utilities Commission (PUC) in connection
with proposed rate increase. Following grant of telephone
company's motion to dismiss, 648 F.Supp. 419, customers
moved to reconsider. The United States District Court for
the District of Minnesota, 653 F.Supp. 908, denied motion.
Customers appealed. The Court of Appeals, 829 F.2d 648,
affirmed and customers petitioned for writ of certiorari. The
United States Supreme Court, 492 U.S. 229, 109 S.Ct. 2893,
106 L.Ed.2d 195, reversed and remanded. On remand, the
District Court, Harry H. MacLaughlin, J., 734 F.Supp. 879
dismissed. Customers appealed. The Court of Appeals, John
R. Gibson, Circuit Judge, held that filed rate doctrine barred
Racketeer Influenced and Corrupt Organizations Act (RICO)
action.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

**West Headnotes (7)**

**[1]**  **Public Utilities** ⚖ Regulation of Charges
Filed rate doctrine forbids regulated entity from
charging rates for its services other than those
properly filed with appropriate federal regulatory
authority.

47 Cases that cite this headnote

**[2]**  **Public Utilities** ⚖ Regulation of Charges
Filed rate doctrine prohibits party from
recovering damages measured by comparing
filed rate and rate that might have been approved
absent conduct in issue.

59 Cases that cite this headnote

**[3]**  **Racketeer Influenced and Corrupt
Organizations** ⚖ Bribery
Filed rate doctrine barred Racketeer Influenced
and Corrupt Organizations Act (RICO)
class action brought by purchasers of
telecommunications goods and services alleging
that telephone company bribed members of
Minnesota Public Utilities Commission (PUC)
for purpose of influencing officials and setting
telephone rates in state, even though fraud that
had been committed may have been extrinsic
fraud or fraud committed upon agency itself. 18
U.S.C.A. §§ 1961–1968.

13 Cases that cite this headnote

**[4]**  **Public Utilities** ⚖ Regulation of Charges
Underlying conduct does not control whether
filed rate doctrine applies; rather, focus for
determining whether filed rate doctrine applies
is impact court's decision will have on agency
procedures and rate determinations.

91 Cases that cite this headnote

**[5]**  **Racketeer Influenced and Corrupt
Organizations** ⚖ Bribery

Filed rate doctrine precluded telephone company's customers from recovering under Racketeer Influenced and Corrupt Organizations Act (RICO) for company's alleged bribery of members of Minnesota Public Utilities Commission (PUC) in order to influence PUC in approving rate increase; relief which customers sought would disturb uniform rates and PUC's rate-making decisions, class was not necessarily entitled to forum to recover RICO damages, and another forum did exist for telephone customers to recover alleged overcharges. 18 U.S.C.A. §§ 1961–1968.

5 Cases that cite this headnote

[6]     **Racketeer Influenced and Corrupt Organizations** ⟜ Fraud in General

Filed rate doctrine applied to bar Racketeer Influenced and Corrupt Organizations Act (RICO) class action brought by telephone company's customers for company's alleged bribery of members of Minnesota Public Utilities Commission (PUC) to influence PUC in approving rate increase, even though rates in question were promulgated by state rather than federal regulatory agency.

49 Cases that cite this headnote

[7]     **States** ⟜ Federal Laws Invading State Powers

Clear statement doctrine counsels that federal court should not apply federal statute to area of traditional state concern unless Congress has articulated its desire in clear and definite language to alter delicate balance between state and federal power of application of statute to that area.

4 Cases that cite this headnote

## Attorneys and Law Firms

**\*486** Mark Reinhardt, St. Paul, Minn., argued (Susan Bedor and John Cochrane, on brief), for appellants.

John D. French, Minneapolis, Minn., argued (John F. Beukema, James L. Volling and Stephen T. Refsell, on brief), for appellees.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and DUMBAULD, [*] Senior District Judge.

[*]     THE HONORABLE EDWARD DUMBAULD, United States Senior District Judge for the Western District of Pennsylvania, sitting by designation, concurred in the result reached by the court at conference but became ill and had not returned to work so as to be able to participate in the preparation of the opinion.

## Opinion

JOHN R. GIBSON, Circuit Judge.

This is the second appeal in this class action arising under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961–1968 (West 1984 & Supp.1991). The H.J. class consists of all purchasers of "telecommunications goods and services" from Northwestern Bell Telephone Company between 1980 and 1986. The H.J. class alleged that Northwestern Bell bribed members of the Minnesota Public Utilities Commission for the purpose of influencing the officials in setting telephone rates in Minnesota. The H.J. class alleged violations of Minnesota's bribery statute, Minn.Stat.Ann. § 609.42 (West 1987), and Minnesota common law (Count I), and several provisions of RICO. [1] (Counts II–V). The district court [2] dismissed the H.J. class's complaint, holding that its RICO claims were barred by the filed rate doctrine and that its state law claims were barred by res judicata. *H.J., Inc. v. Northwestern Bell Tel. Co.,* 734 F.Supp. 879, 888 (D.Minn.1990). We affirm.

[1]     Count II alleged that Northwestern Bell received income through its alleged acts of bribery and invested such income in its own operation in violation of 18 U.S.C. § 1962(a). Count III alleged that Northwestern Bell acquired or maintained interest or control of the Minnesota Public Utilities Commission through its acts of bribery in violation of 18 U.S.C. § 1962(b). Count IV alleged that Northwestern Bell was associated with the Commission and conducted and participated in the conduct and affairs of the Commission through its

Electronically Filed 01/11/2021 14:24 / BRIEF / CV 20 935557 / Confirmation Nbr. 2153517 / BATCH

**H.J. Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485 (1992)**
60 USLW 2475, RICO Bus.Disp.Guide 7917

acts of bribery in violation of 18 U.S.C. § 1962(c). Count V alleged that Northwestern Bell and its employees conspired with Commission officials to violate RICO in violation of 18 U.S.C. § 1962(d).

2      THE      HONORABLE      HARRY      H. MACLAUGHLIN, United States District Judge for the District of Minnesota.

The procedural history of this case is lengthy. The district court first dismissed the H.J. class's complaint in 1986. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 648 F.Supp. 419 (D.Minn.1986). The district court held that: (1) the H.J. class did not allege facts constituting a "pattern of racketeering activity" under RICO; (2) the H.J. class failed to state a claim under section 1962(a) of RICO because it failed to allege a RICO "enterprise" separate and distinct from a RICO "person"; and (3) the filed rate doctrine barred the H.J. class's claims. *Id.* at 434–29. The court granted Northwestern Bell's motion to dismiss the RICO counts, dismissed the pendent state law claim without prejudice, *id.* at 429–30, and later denied the H.J. class's motion for reconsideration. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 653 F.Supp. 908, 916 (D.Minn.1987).

This court affirmed the dismissal, holding that the H.J. class failed to allege a pattern of racketeering activity under RICO. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 829 F.2d 648, 649–50 (8th Cir.1987). We did not consider the other bases for the district court's dismissal. *Id.* at 650.

**\*487**  The Supreme Court reversed, holding that the H.J. class's complaint should not have been dismissed for failing to plead a sufficient pattern of racketeering activity. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989). The Court did not consider the other two grounds on which the district court had relied in dismissing the action. *Id.* at 234 n. 1, 109 S.Ct. at 2898 n. 1.

Following the Supreme Court's reversal, we remanded the case to the district court, *H.J. Inc. v. Northwestern Bell Tel. Co.,* No. 87–5121, slip op. at 2 (8th Cir. Oct. 30, 1989), and Northwestern Bell renewed its motion for dismissal. The district court ordered dismissal of the H.J. class's complaint, ruling again that its RICO claims were barred by the filed rate doctrine. *H.J., Inc.,* 734 F.Supp. at 882–84. The court found further support for its dismissal of the H.J. class's RICO claims in the doctrines of abstention and clear statement, *id.* at 886–88, concluding that "Congress did not intend that the

additional sanction of treble damages ... be available against defendants under RICO for the actions alleged in plaintiffs' complaint." [3] *Id.* at 888.

3          Northwestern Bell had raised numerous other reasons for dismissal. In addition to claiming that Count II of the H.J. class's complaint should be dismissed because the H.J. class did not allege a "person" distinct from the RICO "enterprise" under section 1962(a), Northwestern Bell also argued that dismissal was appropriate because: (1) the Commission is not an appropriate "enterprise" under sections 1962(b) and (c); (2) the H.J. class did not allege the requisite "interest in or control of" the Commission on the part of Northwestern Bell within the meaning of section 1962(b); (3) Northwestern Bell is not "employed by or associated with" the Commission within the meaning of section 1962(c); (4) the H.J. class failed to allege Northwestern Bell's participation as a "principal" as required by section 1962(a); (5) the H.J. class failed to allege a "racketeering injury" by reason of Northwestern Bell's alleged violations of section 1962(a), (b), and (d); (6) the H.J. class failed to allege a proper RICO conspiracy pursuant to section 1962(d); and (7) RICO's pattern requirement is unconstitutionally vague. The district court declined to consider these alternate grounds for dismissal. 734 F.Supp. at 888 n. 3.

In addition to the lengthy procedural history of this case, there have been other proceedings relating to this case. Shortly after the district court's 1986 decision, the H.J. class brought a parallel action in Minnesota state court. In addition to its bribery and RICO claims, the H.J. class asserted a claim for unjust enrichment. The Minnesota Court of Appeals affirmed the state trial court's dismissal of the action, holding that: (1) there is no private right of action under Minnesota statutory or common law for damages caused by the alleged bribery of public officials; (2) the H.J. class's RICO claims were barred by res judicata; and (3) the H.J. class's unjust enrichment claim was barred by Minn.Stat.Ann. § 237.26 (West 1972) because it was a collateral attack on a ratemaking decision of the Commission. *H.J. Inc. v. Northwestern Bell Corp.,* 420 N.W.2d 673, 675–77 (Minn.Ct.App.1988). The Minnesota Supreme Court denied the H.J. class's petition for review. *H.J. Inc. v. Northwestern Bell Tel. Corp.,* 420 N.W.2d 673 (Minn. May 16, 1988). The district court dismissed with prejudice

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    3

the H.J. class's state law bribery claims (Count I), ruling that the claims were barred by res judicata. 734 F.Supp. at 888.

While this case was pending, the Minnesota Attorney General petitioned the Commission to reopen and reconsider NWB 83–600, a proceeding on a rate increase requested by Northwestern Bell in 1983 and granted in 1984. The Minnesota Court of Appeals held that the Commission could properly reopen and vacate this rate. *In re Minnesota Pub. Utilities Comm'n,* 417 N.W.2d 274, 279–83 (Minn.Ct.App.1987), *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). As a result of the reconsideration, the Commission lowered the rate increase from $57,148,000.00 to $45,603,000.00. In May 1987, Northwestern Bell implemented new rates that are approximately $9 million per year lower than the rates that were in effect when the H.J. class brought this case. Because the Commission lacked authority to order refunds, the Attorney General for the State of Minnesota brought an action in Minnesota **\*488** state court to compel Northwestern Bell to refund the difference between the original 1984 and reconsidered 1987 rates. The parties settled that action in September 1989, and Northwestern Bell has refunded approximately $32 million to telephone customers.

## I.

The H.J. class first argues that the district court erred in holding that its RICO claims are barred by the filed rate doctrine. The H.J. class argues that the filed rate doctrine does not apply because: (1) Northwestern Bell cannot use the filed rate doctrine to shield it from its own fraudulent conduct; (2) the H.J. class did not ask the district court to set new rates; and (3) the filed rate doctrine is a federal doctrine that applies only to federal agencies.

**[1]** **[2]** The filed rate doctrine "forbids a regulated entity [from charging] rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue. *Id.* at 578–79, 101 S.Ct. at 2930–31.

The purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness

of rates; and (2) insure that the regulated entities charge only those rates that the agency has approved or been made aware of as the law may require. *See id.* at 577–78, 101 S.Ct. at 2930–31. The Supreme Court recently explained: "The duty to file rates with the Commission ... and the obligation to charge only those rates ... have always been considered essential to preventing price discrimination and stabilizing rates." *Maislin Ind., U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990).

The district court, applying the same reasoning as it did in its 1986 dismissal, concluded that the filed rate doctrine barred the H.J. class's RICO claims because the class sought to recover damages amounting to the difference between the approved rates and the rates that would have been approved but for Northwestern Bell's wrongdoing. [4] *H.J., Inc.,* 734 F.Supp. at 882–84; *H.J., Inc.,* 648 F.Supp. at 428–29. In so ruling, the court relied on a line of federal cases, *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951); *Arkansas–Louisiana Gas Co.,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856; *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); and *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). These cases held that the filed rate doctrine barred the various claims when the measure of damages is determined by comparing the approved rate and the rate that allegedly would have been approved absent the wrongful conduct. 734 F.Supp. at 882–84. The court also relied on two district court decisions, *Carr v. Southern Co.,* 731 F.Supp. 1067 (S.D.Ga.1990) and *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387 (E.D.N.Y.1989) (*LILCO* ), to support its dismissal of the H.J. class's RICO claims. After the district court's dismissal, however, the Eleventh Circuit reversed the district court's decision in *Carr,* and the Second Circuit, although affirming on other grounds, rejected the lower court's analysis in *LILCO. See Taffet v. Southern Co.,* 930 F.2d 847 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990).

---

4          Plaintiffs' first amended complaint seeks damages for "the compensation Northwestern Bell was allowed to receive by the [Commission] ... in excess of what would be fair and reasonable charges to plaintiffs ... and that said unfair and unreasonable compensation was caused by the involvement ... in bribery, attempts to bribe, conspiracy and racketeering activities...."

Electronically Filed 01/11/2021 14:24 / BRIEF / CV 20 935557 / Confirmation Nbr. 2153517 / BATCH

**H.J. Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485 (1992)**

60 USLW 2475, RICO Bus.Disp.Guide 7917

A

**[3]** The H.J. class first argues that the filed rate doctrine does not apply because the "doctrine has never been extended to protect a defendant from its own wrongdoing." **\*489** The H.J. class claims that the doctrine has not been applied when the fraud that has been committed is extrinsic fraud or a fraud committed upon the agency itself. The H.J. class points to a footnote in *Arkansas Louisiana Gas Co.,* in which the Court stated: "We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct." 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13.

**[4]** It is true that the Supreme Court has not considered the question of whether the filed rate doctrine applies when plaintiffs complain that the regulatory agency itself was involved in the alleged fraudulent conduct. We are convinced, however, that the underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations. Support for this conclusion is found in the Supreme Court rulings applying the filed rate doctrine. For example, in *Montana–Dakota Utilities Co.,* the Supreme Court applied the filed rate doctrine even when one party allegedly defrauded the other in reaching an agreement as to the rates each would charge. 341 U.S. at 248, 71 S.Ct. at 693–94. In *Montana–Dakota,* the plaintiff sought to recover alleged overcharges from an electric company. Plaintiff exchanged electricity with the defendant electric company, and the electricity exchanges were made pursuant to contracts which had been filed with the Federal Power Commission. *Id.* Plaintiff alleged that the filed and approved rates were fraudulent and unlawful because they were the product of an interlocking directorate. *Id.* The Supreme Court affirmed the dismissal of the claim, holding that the Federal Power Commission had the exclusive power to determine the reasonable rate for the interstate sale of electric power and that its decision was conclusive. *Id.* at 251–52, 71 S.Ct. at 695–96.

Similarly, in *Square D Co.,* the Supreme Court held that the filed rate doctrine barred plaintiffs' antitrust claim. 476 U.S. at 415–23, 106 S.Ct. at 1926–30. Plaintiffs complained that carriers and the Tariff Bureau (a nonprofit corporation engaged in collective ratemaking activities) conspired to fix rates for transporting freight. *Id.* at 411–12, 106 S.Ct. at 1923–24. Because the rates had been filed with the Interstate Commerce Commission, the Court concluded it would have

to measure damages based on the difference between the filed rates and what the rates would have been in a freely competitive market, and thus the filed rate doctrine barred plaintiffs' antitrust action. *Id.* at 415–17, 106 S.Ct. at 1926–27. In reaching this conclusion, the Court relied on *Keogh,* specifically observing that Congress had not overruled that decision despite opportunities to do so. *Id.* at 424, 106 S.Ct. at 1930–31.

In *Keogh,* a shipper sued several carriers, alleging that the carriers conspired to set arbitrarily high rates in violation of federal antitrust laws. 260 U.S. at 159–60, 43 S.Ct. at 48. Plaintiff claimed that the carriers charged tariff rates that were "higher than the rates would have been" absent their illegal agreement. *Id.* at 160, 43 S.Ct. at 48. The carriers had filed the tariff rates with the Interstate Commerce Commission, and the Commission approved the rates. *Id.* The Supreme Court held that plaintiff failed to state an antitrust action because the exclusive remedy was contained in the Act to Regulate Commerce, which provided for a damage recovery. *Id.* at 162–63, 43 S.Ct. at 49–50. The Court also held that the plaintiff could not recover damages for the alleged overcharges because the Commission's approval of the rate established the lawfulness of the rate. *Id.* at 163, 43 S.Ct. at 49–50. The Court observed that antitrust relief would frustrate Congress' intent to ensure uniform rates and would require the Court to speculate about the rate that would have been set by the carriers and approved by the Commission absent the conspiracy. *Id.* at 163–65, 43 S.Ct. at 49–50. The Court explained: "The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier ... And they are not affected by the tort of a third party." *Id.* at 163, 43 S.Ct. at 49 **\*490** (citations omitted). The Supreme Court, recognizing the continuing validity of *Keogh,* recently quoted the first of these two sentences in *Maislin Industries,* 110 S.Ct. at 2766.

The H.J. class cites *Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465 (5th Cir.1987), to support its contention that the filed rate doctrine does not apply when there is "active fraud." In *Gulf States Utilities,* the Fifth Circuit held that contracts in which the plaintiff agreed to purchase electricity from the defendant at prices which were then incorporated in rate filings might be set aside if the plaintiff could show that it had been fraudulently induced to enter into the contracts. *Id.* at 1471–72. The court, however, distinguished setting aside the contracts from setting aside the rates, noting that "setting aside the contracts ... would not interfere with the [federal agency's] rate-making powers." *Id.* at 1472. The court stressed

**WESTLAW**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

that "the district court may not set aside the contracts on the theory that [the defendant's] rates are too high." *Id.*

The H.J. class also points to *Nordlicht v. New York Telephone Co.,* 617 F.Supp. 220 (S.D.N.Y.1985), *aff'd,* 799 F.2d 859 (2d Cir.1986), *cert. denied,* 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987). There, the plaintiff, a New York resident, made telephone calls in Canada and directed the Canadian telephone company to bill the cost of the calls to his account with defendant New York Telephone. 617 F.Supp. at 221. The Canadian company billed New York Telephone in Canadian dollars, and New York Telephone billed the plaintiff in the same amount of American dollars, despite a differing exchange rate. Plaintiff sought to recover the difference. *Id.*

The New York district court held that plaintiff's claim was barred by the filed tariff doctrine because the filed tariff authorized New York telephone to charge the specified rates in American dollars. *Id.* at 227. Nevertheless, the court observed that if the plaintiff had adequately alleged fraud, the outcome would be different:

> Claims of fraud are different. The filed tariff doctrine is designed to protect utilities charging filed rates for lawfully provided service. It is of no help to a defendant which fraudulently induces a plaintiff to pay a filed rate or which otherwise exacts payment by fraud. There is nothing in the policy underpinnings of the doctrine which would cause it to protect a defendant which unlawfully exacts payment, even at a lawful rate.

*Id.* at 227–28. The H.J. class says that this language shows that a fraud exception exists to the filed rate doctrine. However, the fraud claim in *Nordlicht,* which the court found to be inadequately pleaded, was that the plaintiff had been tricked into paying a rate that he should not have had to pay. *Id.* at 228. The claim did not attack the rate itself and did not require the court to "second-guess" the rate-making agency.

The H.J. class also argues that the filed rate doctrine does not apply when the fraud was "extrinsic to" the rates approved by the Commission. The class cites *City of Kirkwood v. Union Electric Co.,* 671 F.2d 1173 (8th Cir.1982), *cert. denied,*

459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983), for support. In that case, we held that the filed rate doctrine did not bar a city's antitrust action against an electric utility company. *Id.* at 1179. The city did not attack the individual rates, but instead complained of "anti-competitive effects resulting from the interaction of the rates." *Id.* We concluded that an award of antitrust damages based on an alleged price squeeze would not conflict with the regulatory agencies' authority to oversee rates because the city did not challenge the reasonableness determinations as to any of the filed rates. *Id.* We further supported our conclusion that the filed rate doctrine did not apply by observing that "the doctrine was created to protect customers, not competitors." *Id.* (citing *Essential Communications Sys., Inc. v. American Tel. & Tel. Co.,* 610 F.2d 1114, 1121 (3d Cir.1979)). Despite this latter statement, we made clear that if the city challenged the reasonableness of the individual rates in question, its claim would be barred. *Id.*

**\*491**  The district court in this case relied on *Carr v. The Southern Co.,* 731 F.Supp. 1067 (S.D.Ga.1990), in concluding that the filed rate doctrine barred the H.J. class's RICO claims. 734 F.Supp. at 884. In *Carr,* a class of electric power customers brought a RICO action alleging that the electric utilities had used fraudulent accounting methods to understate their net income in order to influence the rate-making process. *Id.* at 1068. The district court held that plaintiffs' claims were barred by the filed rate doctrine, *Burford* abstention, and the doctrine of clear statement. *Id.* at 1071–73.

After oral argument in this case, the Eleventh Circuit reversed the district court's decision in *Carr. Taffet v. Southern Co.,* 930 F.2d 847 (11th Cir.1991). The Eleventh Circuit concluded that the filed rate doctrine did not bar plaintiffs' RICO claims. *Id.* at 856. The court considered the underlying purposes of the filed rate doctrine, and concluded that "[t]he possibility of a RICO action against a utility which defrauds its [state rate-making agency] creates great incentive for that utility to present its [state agency] with accurate and truthful information...." *Id.* As a consequence, the court held that permitting a RICO action would enhance, rather than infringe upon the state's authority to set reasonable and uniform rates, and thus, the filed rate doctrine did not apply. *Id. Accord Wegoland Ltd. v. Nynex Corp.,* No. 90 Civ. 496, slip op. at 13–17 (S.D.N.Y. Sept. 26, 1991) (relying on reasoning of Second Circuit in *LILCO* to conclude that plaintiffs' RICO claims against telephone company are not barred by the filed rate doctrine).

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    6

The facts in this case differ from those in *Taffet*. Here, the Attorney General for the State of Minnesota petitioned the Commission to reopen certain of the rates charged by Northwestern Bell, resulting in a prospective rate decrease and a refund. The Minnesota Court of Appeals recognized that the Commission possessed "the implied authority to reopen judgments at any time based on the 'fraud on the court' doctrine" recognized by Minn.R.Civ.P. 60.02. 417 N.W.2d at 281–82.

It does not appear in *Taffet* that the states of Alabama or Georgia took such action. Indeed, in *Taffet* the court observed that state law prevented the plaintiffs from recovering any damages through the state agencies. 930 F.2d at 853 and n. 5. The *Taffet* court held that the filed rate doctrine did not apply based on its conclusion that allowing a RICO action would provide "great incentive" for the utility to present its rate-making agency with "accurate and truthful information" upon which to base its rate decisions. *Id.* at 856. The court held that permitting a RICO action "would enhance rather than infringe upon the [agency's] authority to set reasonable and uniform rates." *Id.*

The Eleventh Circuit's rationale for refusing to apply the filed rate doctrine does not apply here. In *Taffet,* the Commission did not reopen any prior rate decision. 930 F.2d at 853 and n. 5. In Minnesota, however, the Commission may reopen the rates, and indeed, with respect to the 83–600 rate, has done so. [5] Although the Second Circuit did not discuss the application of the filed rate doctrine in *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990) (*LILCO* ), the Attorney General for the State of New York stated that "an award of [RICO] damages ... would enhance, rather than conflict with, New York's regulatory scheme," *id.* at 1309, and the Commission directed a letter to the court saying that the Commission **\*492** did not intend to get involved in the federal action. *Id.*

conflicts with or infringes upon the Commission's authority or our settlement with respect to the 83–600 case." The important distinction between this case and *Taffet* is that in Minnesota a mechanism has been utilized whereby customers may recoup overcharges, and thus, the utilities have an incentive to provide truthful and accurate information to the Commission.

While the Second and Eleventh Circuits in *LILCO* and *Taffet,* respectively, rejected the legal reasoning of the two lower court decisions relied upon by the district court here, it is apparent that the district court's analysis of the underlying Supreme Court decisions addressing the filed rate doctrine correctly recognized the strength and scope of the Court's opinions.

For these reasons, we reject the H.J. class's argument that the filed rate doctrine does not apply in the face of fraudulent conduct.

B

[5] The H.J. class also argues that the filed rate doctrine does not apply because it does not ask the court to engage in rate-making activities. The H.J. class seemingly departs from its request for damages contained in its first amended complaint and says that it is not challenging the reasonableness of any rate the Commission previously approved, but instead, is seeking damages due to Northwestern Bell's RICO violations.

The H.J. class points to *Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785 (2d.Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). In *Litton,* the Second Circuit held that the filed rate doctrine did not bar the antitrust claims in issue:

> This case can be distinguished from *Keogh* and decisions holding the filed rate doctrine applicable, because the issue here is not the reasonableness of the interface tariff rate as compared to some other rate that might have been charged, but instead whether the [agency] requirement itself was

---

5    Here, the Attorney General for the State of Minnesota submitted a letter stating that the settlement of the 83–600 case "was limited solely to restitution for overcharges in the 83–600 case," and that the Attorney General did not "inten[d] ... to settle any other pending action." The Attorney General went on to state that "the continued litigation of the H.J., Inc. case can have no effect on the state's regulatory interest in the 83–600 case," and that he considers the "lawsuit to be a totally separate action that in no way

reasonable, i.e., whether there should have been any charge at all.

*Id.* at 820 (citations omitted). We are unpersuaded by *Litton.* The H.J. class cannot contend that there could be no charge for telephone services. Rather, the H.J. class's claim is simply that its members have been injured because they paid too much for telephone services or that there could be no rate increases for the 1980–1986 period, a damage concept that falls squarely within the filed rate doctrine. *Arkansas Louisiana Gas Co.,* 453 U.S. at 578–79, 101 S.Ct. at 2930–31 (plaintiffs request for damages "amounts to nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done had it been faced with the facts of this case").

The H.J. class also relies on *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 674 F.2d 1252 (9th Cir.1982), *rereported* at 690 F.2d 1240, *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). In that case, plaintiff claimed that it was damaged because defendant prevented it from filing its rate with the Interstate Commerce Commission for two years. 674 F.2d at 1276. The Ninth Circuit refused to apply the filed rate doctrine for three reasons. First, there was no remedy under the Act to Regulate Commerce for plaintiff's claim. *Id.* Second, the action did not challenge the legality of the rate approved by the Commission, and therefore, "would not disturb any uniform rates." *Id.* Third, judicial relief would not involve speculation as to what the rate "might have been." *Id.*

The H.J. class claims that the circumstances here are similar to those in *Clipper Exxpress* because no other forum exists for it to bring its RICO claims, and the relief it seeks would not disturb uniform rates or require the court to establish rates.

We are not convinced by the H.J. class's reasoning. First, the class is not necessarily entitled to a forum to recover RICO damages. Although the Supreme Court in *Arkansas Louisiana Gas* did not consider whether the filed rate doctrine applied in the face of "affirmative misconduct," 453 U.S. at 583, 101 S.Ct. at 2933, the Court did acknowledge that application of the filed rate doctrine would leave plaintiff's alleged state-law violation unredressed. *Id.* at 584, 101 S.Ct. at 2933. Nevertheless, the Court accepted this result to prevent state laws from upsetting federal authority. *Id.* Similarly, in *Square D,* the Court held that private treble damages were not available under the Sherman Act, **\*493** 476 U.S. at 417–24,

106 S.Ct. at 1927–31, even though plaintiffs "alleged a valid antitrust action." *Id.* at 414, 106 S.Ct. at 1925.

Moreover, here, another forum exists for telephone customers to recover the alleged overcharges. *See Keogh,* 260 U.S. at 162, 43 S.Ct. at 49 (plaintiff could recover damages under Act to Regulate Commerce). Indeed, at least so far as the 83–600 rate is concerned, Northwestern Bell implemented a prospective rate decrease and refunded $32 million to telephone customers.

Second, we are persuaded that the relief the H.J. class seeks would, in fact, disturb uniform rates and the Commission's ratemaking decisions. Despite its urging the contrary, the H.J. class seeks damages that necessarily and plainly challenge the rates previously approved by the Commission. *Cf. Clipper Exxpress,* 674 F.2d at 1276; *Litton,* 700 F.2d at 820. As the Supreme Court observed in *Arkansas Louisiana Gas,* the damages the H.J. class seeks "amount [ ] to nothing less than the award of a retroactive rate increase based on speculation about what the Commission might have done had it been faced with the facts of this case." 453 U.S. at 578–79, 101 S.Ct. at 2930–31.

The H.J. class responds that the court would not have to engage in a determination of just and reasonable rates because that amount has already been determined by the Minnesota administrative procedure, at least in relation to the 83–600 rate. The H.J. class asserts that the amount of the tainted increase was recognized as a matter of law when the Minnesota Court of Appeals ruled that the proceedings in the 83–600 case were tainted by Northwestern Bell's activities. *In re Minnesota Pub. Util. Comm'n,* 417 N.W.2d at 282–84. From this, the H.J. class gleans that all rates between 1980 and 1986 were tainted due to Northwestern Bell's bribery, and that its damages are equal to the amount of all rate increases during this time.

We cannot agree that the H.J. class's damages consist simply of all rate increases approved by the Commission between 1980 and 1986. Such a measure of damages would not only be speculative but also punitive. These damages would not be based on the H.J. class's alleged economic injury, as required by § 1964(c) of RICO. Section 1964(c) requires a RICO plaintiff to prove injury to his business or property. 18 U.S.C. § 1964(c). *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) ( "[T]he plaintiff only has standing if, and can only recover to the

**H.J. Inc. v. Northwestern Bell Telephone Co., 954 F.2d 485 (1992)**

60 USLW 2475, RICO Bus.Disp.Guide 7917

extent that, he has been injured in his business or property by the conduct constituting the violation.").

Moreover, we are persuaded that using all rate increases as the measure of damages would impede state regulatory principles even more than a determination of the amounts in which the filed rates were excessive. For example, in the 83–600 reconsideration, the Commission determined that Northwestern Bell was entitled to a $45,603,000.00 rate increase. To use the difference between that amount and the amount of the original increase ($57,148,000.00) as the basis for setting damages would result in an award far exceeding the H.J. class's economic injury and would be inconsistent with Minnesota law entitling Northwestern Bell to receive a "fair rate of return" and charge "just and reasonable" rates. Minn.Stat.Ann. §§ 237.075, subd. 6; 237.081, subd. 4 (West Supp.1992).

The H.J. class also asserts that other methods for determining damages exist without requiring the court to engage in judicial rate-making. The H.J. class points out that an administrative law judge initially examined all the rate requests, and that the Minnesota courts determined that the administrative law judge "was uninfluenced by [Northwestern Bell's] ex parte communications." 417 N.W.2d at 283. Based on this, the H.J. class suggests that the court can adopt as the basis for awarding damages the individual recommendations of the administrative law judge.

There is at least one fallacy in the H.J. class's reasoning. In the 83–600 case, the administrative law judge recommended a $36,100,000 rate increase. In its redeliberation, the Commission concluded that Northwestern Bell was entitled to a higher increase than the one recommended by the **\*494** administrative law judge. Thus, under the H.J. class's damage theory, it would recover the difference (trebled) between the originally approved rate of $57,148,000 and the $36,100,000 rate increase recommended by the administrative law judge, notwithstanding that the Commission, upon its redeliberation, approved the $45,600,000 rate.

We are convinced that the H.J. class's RICO damages can only be measured by comparing the difference between the rates the Commission originally approved and the rates the Commission should have approved absent the conduct of which the class complains. This is the exact measure of damages that the H.J. class requests in its first amended complaint. We reject the H.J. class's argument that the filed rate doctrine does not apply because it does not ask the court to engage in ratemaking activities.

## C

**[6]** The H.J. class also argues that the filed rate doctrine does not apply because the rates in question were promulgated by a state rather than a federal regulatory agency, and the filed rate doctrine is a federal doctrine that applies only to federal regulatory agencies. The H.J. class points out that all the cases relied on by the district court involved a federal cause of action and a federal agency. The H.J. class does not, however, direct us to any case law ruling that the filed rate doctrine applies only to rates promulgated by federal agencies, and we do not believe this distinction is the basis for the application of the filed rate doctrine.

In *City of Kirkwood,* we held that if the plaintiff challenged the reasonableness of wholesale power rates set by the Federal Energy Regulatory Commission or retail rates set by the Missouri Public Service Commission, the filed rate doctrine would bar its claim. *See id.* at 1179. We made no distinction between the rates approved by the federal or state agencies. *See id.*

Although little case law exists on this question, we see no reason to distinguish between rates promulgated by state and federal agencies. We are persuaded that the rationale underlying the filed rate doctrine applies whether the rate in question is approved by a federal or state agency.

## II.

We need not discuss in detail the district court's consideration of the clear statement doctrine or *Burford* abstention, as these rationales were not the basis for the district court's dismissal of the complaint, but simply provided "additional support" for its ruling that the filed rate doctrine barred the H.J. class's RICO claims. 734 F.Supp. at 884.

The district court rejected the H.J. class's argument that because the Commission has reconsidered the rates allegedly tainted by Northwestern's Bell's improper contacts and determined the amount of overcharging, no reason existed for the court to abstain. *Id.* at 886. The court reasoned that abstention doctrines "are concerned with preservation of the federal balance, and deference to the legitimate police

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works. 9

powers of the states." *Id.* at 886 (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)). The district court observed that the Minnesota Court of Appeals concluded that the H.J. class's unjust enrichment claim was barred by Minn.Stat. § 237.26 because such a claim constituted a collateral attack on the Commission's rate-making decisions. 734 F.Supp. at 886. The district court concluded that a treble damages award in the circumstances of this case would add "a severe sanction for the conduct in question for which the defendants would not otherwise be liable under state laws governing rate making," *id.*, and that the H.J. class's RICO claims similarly "constitute a collateral attack on state rate-making determinations." *Id.*

[7]    **\*495** The Second Circuit recently addressed the clear statement[6] and *Burford*[7] abstention doctrines. *LILCO*, 907 F.2d at 1305–09. In *LILCO*, a county sued a utility and its former managers under RICO claiming that the defendants lied to the New York Public Service Commission to obtain higher electric rates. *LILCO*, 710 F.Supp. at 1389. After a verdict in the plaintiff's favor, the district court entered judgment notwithstanding the verdict for the defendants. The district court relied on the clear statement doctrine, *Burford* abstention, and federalism concerns underlying the tenth amendment. *Id.* at 1395–1404.

6        The clear statement doctrine "counsels that a federal court should not apply a federal statute to an area of traditional state concern unless Congress has articulated its desire in clear and definite language to alter the delicate balance between state and federal power by application of the statute to that area." *Taffet*, 930 F.2d at 851. The rationale underlying the doctrine is to avoid Congress or the courts disturbing " 'the federal-state balance.' " *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Bass*, 404 U.S. at 349, 92 S.Ct. at 523).

7        *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

The Second Circuit rejected the district court's legal analysis, although affirming its judgment on other grounds. Concluding that the clear statement doctrine did not apply, the Second Circuit stated that the doctrine is a tool of statutory construction used when a statute or its legislative history is ambiguous, and that the RICO "statute is not ambiguous as

to whether its proscriptions extend to a state-regulated public utility." *Id.* at 1306.

The Second Circuit also concluded that three circumstances weighed against the application of *Burford* abstention: that the RICO action involved only federal claims; that it would not unduly disrupt the state's complex administrative process; and that treble damages and attorneys' fees were not available in an action before the state's regulatory agency. *Id.* at 1308–09.

Adopting much of the same reasoning, the Eleventh Circuit in *Taffet* held that *Burford* abstention did not warrant dismissal of plaintiffs' RICO claims. 930 F.2d at 852–54. In addition to relying upon the reasoning in *LILCO*, the Eleventh Circuit added that *Burford* abstention was not appropriate because the plaintiffs had no damage remedy before the state agency as the state agency could not award damages and could only set rates prospectively. 930 F.2d at 853 & n. 5. The Eleventh Circuit also concluded that an award of damages under RICO would not disrupt "the state's attempt to establish a coherent policy" because the court could calculate damages by applying a "set of pre-established decisions and procedures" to estimate what a prior rate would have been in the absence of fraud, without passing judgment on a decision of the state regulatory agency or setting a prospective rate. *Id.* at 853–54.

Although we do not decide whether the clear statement doctrine or *Burford* abstention bars the H.J. class's RICO claims, we observe that the foundations for those doctrines support our holding that the filed rate doctrine bars the claims. It cannot be disputed that regulation of public utilities is traditionally a state concern. *See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983) ("the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States"); 28 U.S.C. § 1342 (1988) (prohibiting courts in certain circumstances from "enjoin[ing], suspend[ing] or restrain[ing] the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision ...").

Here, as the district court observed, the Minnesota Court of Appeals concluded that Minn.Stat. § 237.26 barred the H.J. class's unjust enrichment claim. Allowing a RICO action for the identical conduct would similarly disrupt the state administrative process and constitute a "collateral attack on a rate order," contrary to state law. *See H.J. Inc.*, 420 N.W.2d at 676. We also observe that the Minnesota appeals court

concluded that no private right of action **\*496** existed under Minnesota's common or statutory law for the alleged bribery. *Id.* These rulings by the Minnesota appeals court support the district court's observation that allowing a cause of action under RICO would cause a "serious disruption of state regulatory policy." 734 F.Supp. at 887–88 n. 2.

We also note that the circumstances in both *Taffet* and *LILCO* are different from those here. In this case, the state agency, at least so far as the 83–600 rate is concerned, has already reviewed the 83–600 rate and determined it was "tainted." This resulted in a prospective rate decrease and a refund to telephone customers. Thus, not only are damages available through the state administrative process, they have actually been received.

### III.

Finally, the H.J. class argues that the court erred in dismissing its pendent state law claims. The district court dismissed the H.J. class's state law claims because the Minnesota state courts already had decided the claims. 734 F.Supp. at 888.

The H.J. class asserts that the state court proceeding is not binding on this court because the decision was from the Minnesota Court of Appeals, not the Minnesota Supreme Court.

The H.J. class's argument misses the mark. The decision of the Minnesota Court of Appeals is final as between these two parties and precludes relitigation in this action. *See, e.g., Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) ("A final judgment on the merits of an action precludes the parties ... from relitigating issues that were or could have been raised in that action").

We affirm the dismissal by the district court.

### All Citations

954 F.2d 485, 60 USLW 2475, RICO Bus.Disp.Guide 7917

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (1994)**

75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

. |
  KeyCite Yellow Flag - Negative Treatment
Declined to Extend by   Brown v. Cassens Transport Co.,   6th Cir.(Mich.),
April 6, 2012

27 F.3d 17
United States Court of Appeals,
Second Circuit.

WEGOLAND LTD., Michael Roth, executor
of the estate of Howard Weiner, Donna
Rutili Roazen, Plaintiffs–Appellants,

v.

NYNEX CORP., Peter L. Haynes, New England
Telephone & Telegraph Co., New York Telephone
Company, NYNEX Business Information Systems,
NYNEX Credit Co., NYNEX Information Solutions
Group, Inc., William G. Burns, William C.
Ferguson, NYNEX International Co., NYNEX
Material Enterprises Co., NYNEX Mobile
Communications Co., NYNEX Properties Co.,
NYNEX Systems Marketing, Paul C. O'Brien,
Delbert C. Staley, Paul D. Covill, Frederick Salerno,
NYNEX Service Co., Defendants–Appellees.

Nos. 603, 604, Dockets 93–7565, 93–7589.
|
Argued Jan. 26, 1994.
|
Decided May 20, 1994.

**Synopsis**
Rate payers brought actions against telephone companies
and subsidiaries. On report of magistrate, the United States
District Court for the Southern District of New York, Kimba
M. Wood, J., 806 F.Supp. 1112, dismissed the action and
appeal was taken. The Court of Appeals, Walker, Circuit
Judge, held that there is no fraud exception to the filed rate
doctrine that would save suit from dismissal.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (3)

**[1]      Public Utilities** ⬤ **Actions to Set Aside
Orders of Commissions**

Filed rate doctrine bars suits against regulated
utilities grounded on allegation that rates charged
by utility are unreasonable.

134 Cases that cite this headnote

**[2]      Public Utilities** ⬤ **Actions to Set Aside
Orders of Commissions**

There is no exception to filed rate doctrine for
actions claiming fraud upon regulatory agency.

227 Cases that cite this headnote

**[3]      Public Utilities** ⬤ **Regulation of Charges**

Filed rate doctrine is designed to insulate
from challenge filed rate deemed reasonable by
regulatory agency.

233 Cases that cite this headnote

**Attorneys and Law Firms**

***17** Kenneth A. Jacobsen, Haverford, PA (Michael D.
Donovan, Chimicles, Burt, Jacobsen & McNew, Haverford,
PA, Arnold Levin, Levin, Fishbein, Sedran & Berman,
Philadelphia, PA, of counsel), for plaintiffs-appellants.

Guy Miller Struve, New York City (James D. Liss, Nancy B.
Ludmerer, Vincent T. Chang, Davis Polk & Wardwell, New
York City, Raymond F. Burke, Gerald E. Murray, Richard
H. Wagner, White Plains, NY, of counsel), for defendants-
appellees.

Before: WALKER and JACOBS, Circuit Judges, and DALY,
District Judge. *

*          The Honorable T.F. Gilroy Daly, United States
           District Judge for the District of Connecticut,
           sitting by designation.

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    1

Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (1994)
75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

## Opinion

WALKER, Circuit Judge:

Plaintiff ratepayers appeal from a judgment of the United States District Court for the Southern District of New York (Kimba **\*18** M. Wood, *Judge*) dismissing their two putative class action suits brought pursuant to the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* and associated state statutes and causes of action. Judge Wood ruled that the plaintiffs' actions were barred by the filed rate doctrine. For substantially the reasons articulated in Judge Wood's thorough and commendable opinion reported at 806 F.Supp. 1112 (S.D.N.Y.1992), we affirm.

## BACKGROUND

Plaintiffs filed two nearly identical complaints in this matter, which name as defendants NYNEX, New England Telephone and Telegraph Co. ("NETel"), New York Telephone Co. ("NYTel"), numerous subsidiaries, and individual directors and executives of these corporate entities (collectively "NYNEX"). Plaintiffs are three purported NYNEX ratepayers. The facts necessary to dispose of this appeal are succinctly stated in the district court's opinion:

> The complaints allege that NYTel and NETel gave regulatory agencies and consumers misleading financial information to support the inflated rates they requested. More particularly, plaintiffs allege a scheme in which certain unregulated subsidiaries of NYNEX sold products and services to NYTel and NETel at inflated prices. NYTel and NETel then used those prices to justify inflated rates, resulting in high profits to the NYNEX corporate family, which profited by extracting higher rates from ratepayers, but did not suffer from the higher "cost" of products and services because these extra costs inured to the benefit of members of the corporate family. The net effect, the complaints allege, was that the

> ratepayers and the regulatory agencies were misled into believing that certain higher rates were justifiable, and the NYNEX corporate family was able to enjoy inflated profits as a result of its misrepresentations.

*Wegoland, Ltd. v. NYNEX Corp.,* 806 F.Supp. 1112, 1113 (S.D.N.Y.1992). The district court referred this matter to Chief Magistrate Judge Nina Gershon, who issued a Report and Recommendation recommending that four of the plaintiffs' seven claims be dismissed. These dismissals were not contested and are thus not before us. As for the remaining three claims, two RICO claims and one state claim, the Chief Magistrate Judge rejected the defendants' argument that the claims were barred by the filed rate doctrine. The Chief Magistrate Judge's recommendation relied primarily on the Eleventh Circuit's ruling in *Taffet v. Southern Co.,* 930 F.2d 847 (11th Cir.1991) ("*Taffet I*"), which was the only appellate decision directly addressing this issue and which held that the filed rate doctrine did not bar RICO claims by ratepayers against utilities.

After the Chief Magistrate Judge issued her recommendation, the Eleventh Circuit, sitting *en banc,* unanimously reversed itself, ruling that the filed rate doctrine does bar RICO claims by ratepayers against utilities. *Taffet v. Southern Co.,* 967 F.2d 1483 (11th Cir.) (*en banc*) ("*Taffet II*"), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). Also in the intervening period between the Chief Magistrate Judge's recommendation and Judge Wood's ruling, the Eighth Circuit applied the filed rate doctrine to bar a suit in similar circumstances. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485 (8th Cir.), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992).

In her thoughtful opinion, Judge Wood analyzed the history and purposes of the filed rate doctrine. Agreeing with the analyses in *Taffet II* and *H.J. Inc.,* she concluded that the filed rate doctrine barred the plaintiffs' actions, and accordingly she dismissed the complaints in their entirety. This appeal followed.

## DISCUSSION

**[1]** The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by

**Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (1994)**

75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

the utility are unreasonable. Simply stated, the doctrine holds that any "filed rate"—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers. In her opinion, Judge Wood carefully explained the history and rationale of the filed **\*19** rate doctrine. *See Wegoland,* 806 F.Supp. at 1113–16. We summarize briefly.

One of the earliest applications of what has become known as the filed rate doctrine came in *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh,* the plaintiff alleged a conspiracy to fix freight transportation rates at an unnaturally high level and asked for damages to the extent he had to pay inflated rates as a result of the conspiracy. Assuming the plaintiff's conspiracy allegations were true, Justice Brandeis writing for the Court held that the complaint still had to be dismissed because the rates had been filed with the Interstate Commerce Commission and deemed reasonable by that body. Justice Brandeis articulated several reasons for dismissing the complaint. Among them, he noted that the legal rights between a regulated industry and its customers with respect to rates are controlled by and limited to the rates filed with and approved by the appropriate regulatory agency, and that any attempt to reassess the reasonableness of rates would require the judiciary to "reconstitut[e] the whole rate structure" of the industry. He also explained that any retroactive relief would lead to discrimination in rates in that a victorious plaintiff would end up paying less than similarly situated non-suing customers. *Id.* at 163–64, 43 S.Ct. at 49–50.

Since *Keogh,* these two corresponding interests, one concerned with potential "discrimination" in rates as between ratepayers and the other concerned with the "justiciability" of determining reasonable rates, have turned up in Supreme Court decisions discussing the filed rate doctrine. For example, in *Maislin Industries, U.S. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), the Court emphasized the nondiscrimination strand of this rationale when discussing the policies behind strict adherence to the filed rate doctrine. *Id.* at 126–28, 110 S.Ct. at 2765–67. Likewise, in *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) ("*Arkla*"), the Court explained that allowing individual ratepayers to attack the filed rate "would undermine the congressional scheme of uniform rate regulation." *Id.* at 579, 101 S.Ct. at 2931.

In other instances, the Court is concerned that an attack on the filed rate would unnecessarily enmesh the courts in

the rate-making process. For example, in *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Court stressed the difficulty for courts "to determine what the reasonable rates during the past should have been" and explained that the "abstract" notion of reasonableness is best left a "function of the Commission." *Id.* at 251, 71 S.Ct. at 695. Although not referring to the filed rate doctrine or the *Keogh* decision by name, Justice Jackson maintained that a plaintiff "can claim no rate as a legal right that is other than the filed rate," and that a court "can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." *Id.* at 251–52, 71 S.Ct. at 695. More recently, in *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Court endorsed the district court's dismissal of the plaintiff's antitrust complaint seeking treble damages under the Sherman Antitrust Act measured by the difference between the artificially high rate actually filed and the "reasonable" rate absent the fraudulent conspiracy. The Court reaffirmed *Keogh* and its application to the case before it, one in which the district court had spoken of the "attendant complications" in calculating damages because the court would have to determine a "hypothetical" reasonable rate in order to determine the difference from the rate actually paid, and stated that "rate determinations are a matter for the ICC and not for the court." *See* 596 F.Supp. 153, 156 (W.D.N.Y.1984).

Drawing from the *Keogh* decision and these subsequent cases, Judge Wood pointed out that "two companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that courts are not institutionally well suited to engage in retroactive rate setting." *Wegoland,* 806 F.Supp. at 1115.

**\*20 [2]** Plaintiffs do not, nor could they, quarrel with the general applicability of the filed rate doctrine. Instead, they argue that there should be an exception to the filed rate doctrine when there are allegations of fraud upon the regulatory agency. Yet, apart from the *Taffet I* ruling, which was unanimously overturned *en banc,* every court that has considered the plaintiffs' argument has rejected the notion that there is a fraud exception to the filed rate doctrine. *See Taffet II,* 967 F.2d at 1494–95; *H.J. Inc.,* 954 F.2d at 489; *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 847 F.Supp. 281, 291 (D.Conn.1994) (Cabranes, J.); *Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.,* 805 F.Supp. 1277, 1295 (D.S.C.1992), *aff'd without opinion,* 998 F.2d 1009 (4th

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works. 3

*Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (1994)

75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

Cir.), *cert. denied,* 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993); *Cullum v. Arkla, Inc.,* 797 F.Supp. 725, 728–29 (E.D.Ark.1992), *aff'd without opinion,* 994 F.2d 842 (8th Cir.1993); *Hilling v. Northern States Power Co.,* No. 3–90 CIV 418, 1990 WL 597044, slip op. at 5 (D.Minn. Dec. 12, 1990). Furthermore, the Supreme Court has ruled that the filed rate doctrine acts to bar state causes of action. *See Arkla,* 453 U.S. at 584, 101 S.Ct. at 2933–34. Similarly, courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies. *See Taffet II,* 967 F.2d at 1494; *H.J. Inc.,* 954 F.2d at 494; *Sun City,* at 289; *Wegoland,* 806 F.Supp. at 1115.

In rejecting the plaintiffs' argument on this point, Judge Wood stated that creating a fraud exception would be both out of step with guiding Supreme Court caselaw, which has applied the filed rate doctrine in the face of allegations of fraud on the regulators, as well as contrary to the policies behind the doctrine. We agree.

The Supreme Court in *Square D* considered an alleged conspiracy to submit fraudulently inflated rates to the regulating agency. The Court in *Square D* did not hesitate to apply the filed rate doctrine and gave no intimation that there is an exception for fraud on the regulatory agency. Indeed, applying a general exception for fraud on the regulators would be inconsistent with the line of Supreme Court cases from *Keogh* to *Square D* which developed the filed rate doctrine "precisely for actions alleging a type of fraud on a regulatory agency." *Wegoland,* 806 F.Supp. at 1118.

We note that five years prior to *Square D,* the Court "save[d] for another day the question of whether the filed rate doctrine applies in the face of fraudulent conduct." *See Arkla,* 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13. The plaintiffs make the point that the Court in *Square D* made no mention of the fact that it seemed to be resolving that open question. But on closer examination, there is an explanation for the Court's silence.

In *Arkla,* a plaintiff utility company had a contract with the defendant-buyer that entitled it to charge higher rates in special circumstances. The utility alleged that the defendant fraudulently failed to notify the utility of the occurrence of these special circumstances, thus preventing it from filing the higher rates with the regulators. The utility further argued that the defendant's fraudulent omission, which kept the utility from filing the higher rate in the first place, estopped it from asserting as a defense the filed rate doctrine. The Court rejected as unsupported by the record plaintiff's allegations

of fraud; however, it reserved deciding the narrow legal question, which the district court accurately described as "whether a person's fraudulent failure to notify a seller of conditions triggering a contractual entitlement to a higher rate, thereby preventing the seller from filing a higher rate, estops that person from using the filed rate doctrine in an action against it for the higher rate." *Wegoland,* 806 F.Supp. at 1118 n. 4. Thus, we agree with the district court that the question reserved by the *Arkla* Court was actually a much "narrower question than whether there should be a general exception to the filed rate doctrine for fraudulent conduct." *Id.*

**[3]** Apart from its incompatibility with Supreme Court precedent, plaintiffs' proposed fraud exception is also inconsistent with the strong policies behind the filed rate doctrine. The doctrine is designed to insulate from challenge the filed rate deemed reasonable by the regulatory agency. Congress ***21** and state legislatures establish regulatory agencies in part to ensure that rates charged by generally monopolistic and oligopolistic industries are reasonable. This regime protects consumers while fostering stability. The regulatory agencies are deeply familiar with the workings of the regulated industry and utilize this special expertise in evaluating the reasonableness of rates. The agencies' experience and investigative capacity make them well-equipped to discern from an entity's submissions what costs are reasonable and in turn what rates are reasonable in light of these costs.

If courts were licensed to enter this process under the guise of ferreting out fraud in the rate-making process, they would unduly subvert the regulating agencies' authority and thereby undermine the stability of the system. For only by determining what would be a reasonable rate absent the fraud could a court determine the extent of the damages. And it is this judicial determination of a reasonable rate that the filed rate doctrine forbids.

As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates. Regulators employ their peculiar expertise to consider the whole picture regarding the reasonableness of a proposed rate. They make hundreds if not thousands of discretionary decisions about the submitted costs and ultimately arrive at the approved filed rate. Courts are simply ill-suited to systematically second guess the regulators' decisions and overlay their own resolution. Indeed, as Judge Wood perceptively noted, application of the filed rate doctrine is even more appropriate in the RICO context

**WESTLAW** © 2021 Thomson Reuters. No claim to original U.S. Government Works. 4

of alleged fraud on the agency (where "regulatory bodies are particularly well suited to determining whether utility costs borne within a corporate family are reasonable," *id.* at 1122) than in the antitrust context (where regulators are unlikely to have much special knowledge as to the existence of illegal conspiracies among competitors), and it is in the antitrust context that the Supreme Court has consistently applied the filed rate doctrine. *See, e.g., Square D,* 476 U.S. at 418–19, 106 S.Ct. at 1927–28; *Keogh,* 260 U.S. at 161–62, 43 S.Ct. at 49.

The plaintiffs respond that courts would not be required to determine a "reasonable" rate, but rather would only have to decide what damages arose from the fraud, a task courts routinely undertake. However, the two are hopelessly intertwined: "The fact that the remedy sought can be characterized as *damages for fraud* does not negate the fact that the court would be determining the reasonableness of rates," *Wegoland,* 806 F.Supp. at 1119, and that "any attempt to determine what part of the rate previously deemed reasonable was a result of the fraudulent acts would require determining what rate would have been deemed reasonable absent the fraudulent acts, and then finding the difference between the two." *Id.* at 1121.

Apart from the institutional competency concern, allowing courts to become enmeshed in the rate-making process would undermine our current regulatory regime, which is designed to be self-policing. Individual ratepayers are unlikely to have any special knowledge of the alleged wrongdoing that would make it advantageous to have private enforcement through the RICO or antitrust provisions. By contrast, regulators who are intimately familiar with the industry are best situated to discover when regulated entities engage in fraud on the agency and to remedy the wrongdoing when the specter of fraud arises. Indeed, that is precisely what has happened in this case, where the regulators in every state affected by NYNEX's alleged fraud have initiated administrative hearings to investigate the charges and issue appropriate remedies to benefit the ratepayers. *See Wegoland,* 806 F.Supp. at 1120–21. Apart from participating in the political process and filing complaints with the regulatory agencies, individual ratepayers simply have no role in attacking the reasonableness of filed rates. Nor is there room for judicial intervention in such a case.

Furthermore, application of the filed rate doctrine prevents discrimination in rates paid by consumers because victorious plaintiffs would wind up paying less than non-suing

ratepayers. *See Keogh,* 260 U.S. at 163–64, 43 S.Ct. at 49–50. Plaintiffs respond that the **\*22** class action nature of this suit eliminates any potential discrimination, and thus the filed rate doctrine should not apply. While not specifically raised in the district court, the importance of this purely legal issue warrants our attention. *See Austin v. Healey,* 5 F.3d 598, 601 (2d Cir.1993), *cert. denied,* 510 U.S. 1165, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994). To be sure, the concerns for discrimination are substantially alleviated in this putative class action. *See, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 760 F.2d 1347, 1352 (2d Cir.1985) (Friendly, J.), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); *Gelb v. American Tel. & Tel. Co.,* 813 F.Supp. 1022, 1028 (S.D.N.Y.1993). However, the class action nature of the proceeding in no way affects the important concerns of agency authority, justiciability, and institutional competence previously described. To the contrary, use of the class action to attack the rate-making process tends to frustrate these legitimate interests and might end up costing the consumers even more in litigation expenses. *See, e.g., Taffet II,* 967 F.2d at 1492 (explaining that application of the filed rate doctrine forecloses "strike suits that would be brought as eager lawyers, using the class action vehicle, circumvent the states' rate-making mechanisms—all at the expense of the consumers"). Just as important, court-ordered rate reductions potentially raise the cost of capital (and impede access to equity and bond markets) for capital-intensive utilities, and thereby affect the company and all of its future customers in ways that courts cannot afterwards undo. Moreover, the Supreme Court in *Square D* rejected the invitation of Judge Friendly and the Justice Department to overrule *Keogh* based upon the advent of various procedural developments to avoid discrimination in rates, like the class action. *Square D,* 476 U.S. at 423, 106 S.Ct. at 1930. Because most of the animating policies behind the filed rate doctrine are not diminished in the class action context, we hold that the filed rate doctrine applies whether or not plaintiffs are suing for a class.

Finally, we note that the filed rate doctrine does not leave regulated industries immune from suit under the RICO or antitrust statutes. While individual ratepayers are precluded from challenging the reasonableness of the rates, the proper government officials remain free to pursue this avenue in appropriate circumstances. *See, e.g., Sun City,* at 290–91.

In conclusion, because a fraud exception to the filed rate doctrine is both contrary to guiding Supreme Court precedent and important regulatory policies, we hold that there is no

**Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17 (1994)**

75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

fraud exception to the filed rate doctrine that would save this suit from dismissal.

As a final point, we note that the district court correctly discerned a tension between the applicability of the filed rate doctrine and this Court's ruling in *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990) ("*LILCO*"). In *LILCO,* we held that RICO is applicable to public utilities and examined the merits of a claim brought by individual ratepayers. *Id.* at 1305–08. The district court understandably was concerned that its ruling would contravene *LILCO* by immunizing utilities from RICO suits brought by ratepayers. The court therefore labored to distinguish the facts of this case from those in *LILCO* and pointed out that the filed rate doctrine was never raised in the *LILCO* opinion. *See Wegoland,* 806 F.Supp. at 1122–24.

We conclude that *LILCO* erects no barrier in this Circuit to the application of the filed rate doctrine to RICO suits brought by ratepayers against utilities. Since we had no occasion to consider the filed rate doctrine in *LILCO* because it was not brought to the panel's attention, the absence of such a discussion can by no means be construed as an implicit rejection of the filed rate doctrine. Accordingly, the *LILCO* decision does not alter the outcome in this case.

CONCLUSION

We have carefully considered the remainder of the arguments proffered by the parties and find them to be without merit. For the forgoing reasons, we affirm the district court's judgment dismissing the plaintiffs' actions as barred by the filed rate doctrine.

**All Citations**

27 F.3d 17, 75 Rad. Reg. 2d (P & F) 331, 62 USLW 2749, RICO Bus.Disp.Guide 8562

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Overruling Recognized by   FFP Holdings, LLC v. Moeller,   N.D.Ohio,
August 29, 2014

681 F.3d 788
United States Court of Appeals,
Sixth Circuit.

Anthony WILLIAMS; BGR, Inc.; Munafo, Inc.;
Aikido of Cincinnati, Plaintiffs–Appellants,

v.

DUKE ENERGY INTERNATIONAL, INC.;
Duke Energy Corporation; General Motors
Corporation, Defendants–Appellees.

No. 10–3604.
|
Argued: Jan. 11, 2012.
|
Decided and Filed: June 4, 2012.
|
Rehearing and Rehearing En
Banc Denied July 25, 2012.

**Synopsis**
**Background:** Electric utility customers brought action against state-regulated public utility, its subsidiaries, and large customer for violations of Robinson–Patman Act (RPA), and federal and state Racketeer Influenced and Corrupt Organizations Acts (RICO), based on allegations that they paid unlawful rebates to certain large customers. The United States District Court for the Southern District of Ohio, Edmund A. Sargus, Jr., J., 606 F.Supp.2d 783, dismissed action. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Tarnow, Senior District Judge, for the Eastern District of Michigan, sitting by designation, held that:

[1] filed-rate doctrine did not apply;

[2] electricity was "commodity" under RPA;

[3] RPA was not limited to resale of purchased product;

[4] customers stated injury and competitive disadvantage on claim under RPA;

[5] customers stated telecommunications fraud as predicate to their civil RICO claim;

[6] customers alleged injuries were fairly traceable to public utility;

[7] customers adequately stated predicate act requirements of Ohio Corrupt–Practices Act; and

[8] customers stated common-law civil conspiracy claim.

Reversed and remanded.

**Procedural Posture(s):** On Appeal; Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (25)

[1]    **Carriers** ⬅ Rates of freight
The filed rate doctrine requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies; in essence, the doctrine precludes a challenge to the reasonableness of the rates of common carriers if the rates have been approved by an appropriate regulatory agency.

6 Cases that cite this headnote

[2]    **Carriers** ⬅ Rates of freight
The filed-rate doctrine prevents carrier discrimination by committing the carriers to one set tariff and preserves the role of administrative agencies in approving and setting rates, a practice at which they are particularly adept.

4 Cases that cite this headnote

[3]    **Electricity** ⬅ Discrimination and Overcharge
Filed-rate doctrine did not apply to claim by electric utility customers against state-regulated public utility, its subsidiaries, and large customer, alleging that defendants had paid substantial sums of money to certain large customers in exchange for withdrawal of their objections

to defendants' proposed rate-stabilization plan (RSP), which amounted to "indirect rebate" that had effect of requiring plaintiffs to pay higher rate than those companies that received rebate.

5 Cases that cite this headnote

**[4]    Federal Courts** ⟿ Jurisdiction

Questions of subject-matter jurisdiction and statutory interpretation are reviewed de novo.

2 Cases that cite this headnote

**[5]    Federal Courts** ⟿ Limited jurisdiction; jurisdiction as dependent on constitution or statutes

The jurisdiction of federal courts is defined by Article III of the United States Constitution and by acts of Congress. U.S.C.A. Const. Art. 3, § 1 et seq.

3 Cases that cite this headnote

**[6]    Courts** ⟿ Exclusive or Concurrent Jurisdiction
**Federal Courts** ⟿ Power of states; effect of state or local law

Generally, the jurisdiction of a federal court will only be limited by state statute under special circumstances, such as when the federal court sits in diversity; even in such circumstances, a state cannot defeat federal jurisdiction over a matter by limiting jurisdiction to a specialized state court. 28 U.S.C.A. § 1332.

4 Cases that cite this headnote

**[7]    Federal Courts** ⟿ Tort claims
**Federal Courts** ⟿ Antitrust, unfair competition, and trade secret claims

District court's federal question subject-matter jurisdiction under Robinson–Patman Act and Racketeer Influenced and Corrupt Organizations Act (RICO) was sufficient to allow supplemental jurisdiction over state-law tort claims of fraud and civil conspiracy. Robinson–Patman Act, § 1

et seq., 15 U.S.C.A. § 13 et seq.; 18 U.S.C.A. § 1962(c); 28 U.S.C.A. §§ 1331, 1367.

3 Cases that cite this headnote

**[8]    Federal Courts** ⟿ In general; necessity

The Court of Appeals may address issues raised by the parties on appeal even where the district court has not explicitly ruled on the issues.

1 Cases that cite this headnote

**[9]    Antitrust and Trade Regulation** ⟿ Utilities

Electricity was "commodity" under RPA. Robinson–Patman Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.

2 Cases that cite this headnote

**[10]    Antitrust and Trade Regulation** ⟿ Purpose and construction in general

The Robinson-Patman Act (RPA) was enacted in response to the comparative competitive advantage of large purchasers, who could induce advertising allowances, rebates, and special services from sellers due to their size; small independent stores were at a hopeless competitive disadvantage compared to large stores and thus the RPA was enacted to eliminate those inequities. Robinson–Patman Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.

1 Cases that cite this headnote

**[11]    Antitrust and Trade Regulation** ⟿ Price Discrimination

To survive a motion to dismiss on a RPA claim, a plaintiff must allege that (1) the defendant discriminated in price between different purchasers of commodities of like grade and quality, and (2) the effect of that discrimination was to substantially lessen competition or tend to create a monopoly in any line of commerce. Robinson–Patman Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**Williams v. Duke Energy Intern., Inc., 681 F.3d 788 (2012)**

2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

2 Cases that cite this headnote

**[12]**   **Antitrust and Trade Regulation**  ⟜  Purpose and construction in general

RPA was not limited to resale of purchased product. Robinson–Patman Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.

**[13]**   **Antitrust and Trade Regulation**  ⟜  Utilities

Electric utility customers stated injury and competitive disadvantage on claim under RPA, on allegations that defendant state-regulated public utility and its subsidiaries discriminated in price between different purchasers of electricity on continuous basis between defendants and certain favored commercial customers within same geographic market in amount of $15 million and plaintiffs lost profits as result of discriminatory rebates and competitive advantage thus provided to favored customers; plaintiffs also referred to copy of side agreements that were heavily redacted such that names of favored companies were not available. Robinson–Patman Act, § 1 et seq., 15 U.S.C.A. § 13 et seq.

3 Cases that cite this headnote

**[14]**   **Telecommunications**  ⟜  Nature of scheme or device in general

Electric utility customers stated telecommunications fraud as predicate to their civil claim under Racketeer Influenced and Corrupt Organizations Act (RICO), on allegations that defendant state-regulated public utility and its subsidiaries repeatedly had transmitted unlawful rebates to certain favored companies and yet asserted through mail that all customers had to pay "mandatory and unavoidable" electricity charges, which implied that all customers paid same rate. 18 U.S.C.A. §§ 1341, 1343, 1962(c); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[15]**   **Currency Regulation**  ⟜  Money laundering

**Racketeer Influenced and Corrupt Organizations**  ⟜  Particular acts

Electric utility customers stated money laundering based upon unlawful activity of mail fraud as predicate to their civil claim under Racketeer Influenced and Corrupt Organizations Act (RICO), on allegations that money had been transferred from favored customers to state-regulated public utility, and from utility to affiliated company, and from that company back to favored customers as unlawful "rebates." 18 U.S.C.A. §§ 1956(a)(1), (c)(7)(A), 1961; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Cases that cite this headnote

**[16]**   **Federal Civil Procedure**  ⟜  Fraud, mistake and condition of mind

The rule requiring a party to state the circumstances constituting fraud with particularity does not require omniscience; it requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

36 Cases that cite this headnote

**[17]**   **Racketeer Influenced and Corrupt Organizations**  ⟜  Causal relationship; direct or indirect injury

Alleged injuries of electric utility customers, of paying higher rate than those companies that received illegal rebate through side agreements, were fairly traceable to public utility and its subsidiaries, on civil claim under Racketeer Influenced and Corrupt Organizations Act (RICO); although state, as "third party," regulated rates that utility charged, its actions did not disrupt proximate cause of customers' injuries from alleged fraudulent scheme. 18 U.S.C.A. §§ 1956(a)(1), (c)(7)(A), 1961; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[18]**   **Racketeer Influenced and Corrupt Organizations**  ⟜  Racketeering or criminal activity; predicate acts

**WESTLAW**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.     3

Williams v. Duke Energy Intern., Inc., 681 F.3d 788 (2012)
2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

Electric utility customers adequately stated predicate act requirements of Ohio Corrupt–Practices Act by properly alleging money laundering and telecommunications fraud as predicate to their civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim. 18 U.S.C.A. §§ 1956(a)(1), (c)(7)(A), 1961; Ohio R.C. § 2923.31.

[19] **Racketeer Influenced and Corrupt Organizations** ⬅ Racketeering or criminal activity; predicate acts

Electric utility customers adequately stated violation of Ohio's Corrupt–Practices Act, on allegations that state-regulated public utility, its subsidiaries, and large customer engaged in obstruction of justice, that is, "communicating false information to any person" for purpose of hindering discovery of crime, when defendants' legal counsel "consciously and deceptively denied having any knowledge of the existence of any side deals" in on-the-record proceedings before Ohio Supreme Court in "further attempt to hide their wrongdoing." Ohio R.C. §§ 2921.32(A), 4905.32, 4905.33(A), 4905.56, 4905.99.

[20] **Antitrust and Trade Regulation** ⬅ Offenses

The selective payment of rebates constitutes a felony under Ohio law. Ohio R.C. §§ 4905.32, 4905.33(A), 4905.56, 4905.99.

1 Cases that cite this headnote

[21] **Obstructing Justice** ⬅ Misprision of a Felony

Communicating false information to any person for the purpose of hindering the discovery of the selective payment of rebates would constitute obstruction of justice under Ohio law. Ohio R.C. §§ 2921.32(A), 4905.32, 4905.33(A), 4905.56, 4905.99.

1 Cases that cite this headnote

[22] **Obstructing Justice** ⬅ Falsifying or altering evidence

Corporate counsel are not permitted to freely make false statements before a court and evade charges of obstruction of justice under Ohio law, even were corporations not considered "persons" for many legal purposes. Ohio R.C. §§ 2921.32(A), 4905.32, 4905.33(A), 4905.56, 4905.99.

[23] **Obstructing Justice** ⬅ Falsifying or altering evidence

A false statement may be obstruction of justice under Ohio law even if it is not made in a criminal proceeding. Ohio R.C. § 2921.32(A).

[24] **Conspiracy** ⬅ Particular Subjects of Conspiracy

Electric utility customers stated common-law civil conspiracy claim under Ohio law, on allegations that defendant state-regulated public utility and its subsidiaries repeatedly had transmitted unlawful rebates to certain favored companies in violation of Ohio statutes that prohibited public utility from charging any person or corporation more or less for services, through use of rebates, than any other person or corporation, and statute that prohibited public utility from giving undue or unreasonable preference, advantage, or disadvantage to any person or corporation; competitive electric services were not exempted from authority of public utilities commission (PUC). Ohio R.C. §§ 4905.33(A), 4905.35, 4928.05(A)(1).

1 Cases that cite this headnote

[25] **Statutes** ⬅ Construction as written

**Statutes** ⬅ Departing from or varying language of statute

**Statutes** ⬅ Absent terms; silence; omissions

Under Ohio law, when determining legislative intent, it is the duty of the court to give effect to the words used, not to delete words used or to insert words not used.

**Attorneys and Law Firms**

**\*792 ARGUED:** Paul Michael De Marco, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, Ohio, for Appellants. Joseph R. Guerra, Sidley Austin LLP, Washington, D.C., for Appellees. **ON BRIEF:** Paul Michael De Marco, Stanley M. Chesley, W.B. Markovits, Christopher D. Stock, Waite, Schneider, BAYLESS & Chesley Co., L.P.A., Cincinnati, Ohio, Randolph H. Freking, George M. Ruel, Jr., Freking & Betz, LLC, Cincinnati, Ohio, for Appellants. James E. Burke, W. Jeffrey Sefton, Cincinnati, Ohio, Peter D. Keisler, Eric D. McArthur, Sidley Austin LLP, Washington, D.C., for Appellees.

Before: SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge. \*

\*          The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

# OPINION

TARNOW, Senior District Judge.

Plaintiffs appeal the dismissal of their case pursuant to Fed.R.Civ.P. 12(b)(1). The district court, following a hearing, found that the "filed-rate doctrine" denied the court federal question subject-matter jurisdiction. The district court also found that the Public Utilities Commission of Ohio ("PUCO") had exclusive jurisdiction over Defendants' state-law claims, depriving the court of diversity jurisdiction. The district court granted Defendants' motion to dismiss pursuant to 12(b)(1). The district court did not assess Defendants' arguments that dismissal was also proper under Fed.R.Civ.P. 12(b)(6). [1]

1          In a footnote the district court stated that "[a]s to Defendants motions pursuant to Rule 12(b)(6) for failure to state a claim, the Court would find under the filed rate doctrine, Plaintiffs' claims are barred." *Williams v. Duke Energy Int'l, Inc.,* 606 F.Supp.2d 783, 794 (S.D.Ohio 2009).

Plaintiffs raise three issues on appeal. First, Plaintiffs argue that the PUCO does not have exclusive jurisdiction over

the state-law claims raised by Plaintiffs. Second, Plaintiffs argue that the filed-rate doctrine does not apply to their federal claims. Third, Plaintiffs argue that even if the district court was correct in dismissing some of Plaintiffs claims under the filed-rate doctrine and because of PUCO's exclusive jurisdiction, the district court should still have considered Plaintiffs' request for injunctive and other non-monetary relief.

For the following reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.

# I. Background

Plaintiffs Anthony Williams, BGR, Inc., Munafo, Inc., and Aikido of Cincinnati, individuals and businesses based in Ohio, brought suit against Defendants Duke Energy International, Inc. and Duke Energy Corporation, retail electricity service providers, alleging violation of the Robinson–Patman Act of 1936, 15 U.S.C. § 13, *et seq.,* Ohio's Pattern of Corrupt Activity Act, Ohio Rev.Code § 2923.31, *et seq.,* a civil RICO claim pursuant to 18 U.S.C. § 1962(c), and common-law claims of fraud and civil conspiracy. Defendant Duke Energy International, Inc. [2] was dissolved in **\*793** May of 2005, and was a subsidiary of Duke Energy Carolinas, LLC [3] ("Duke"). Plaintiffs' case centers on a subsidiary of Duke Energy Carolinas, Duke Energy Ohio, Inc. ("DEO") and an affiliated company, Duke Energy Retail Sales [4] ("DERS").

2          Preceded by Cincinnati General & Electric ("CGE"). *Ohio Consumers' Counsel v. Pub. Util. Comm'n,* 111 Ohio St.3d 300, 856 N.E.2d 213, 218–19 (2006).

3          Known at the time of the Complaint as "Duke Energy Corporation."

4          Successor in interest to Cinergy Retail Services ("CRS").

Plaintiffs allege that Duke, [5] through subsidiaries and an affiliated company, paid unlawful and substantial rebates to certain large customers, including General Motors, in exchange for the withdrawal by said customers of objections to a rate-stabilization plan that Duke was attempting to have approved by the PUCO.

5      "Duke" is used as shorthand for Duke Energy Carolinas. Duke Energy Carolinas is the parent company of Duke Energy Ohio and Duke Energy Retail Sales, the subsidiary and affiliated company whom Plaintiffs accuse of wrongdoing.

In 1999, the Ohio General Assembly enacted legislation which "restructured Ohio's electric-utility industry to increase retail competition." *Ohio Consumers' Counsel v. Pub. Util. Comm'n,* 111 Ohio St.3d 300, 856 N.E.2d 213, 218 (2006). The restructuring legislation also provides for a transition "market development period," not to exceed five years, which was to end when specified numbers of customers switched suppliers of electricity. *Id.* After the market-development period, the legislation removed the authority of the PUCO to set electricity rates. *See* Ohio Rev.Code § 4928.05.

On January 10, 2003, Duke Energy International's predecessor-in-interest, Cincinnati Gas & Electric Company ("CGE"), filed an application with the PUCO to establish market-based pricing of electrical rates. *Ohio Consumers' Counsel,* 856 N.E.2d at 219. Thereafter, the PUCO directed CGE to file a proposed rate-stabilization plan ("RSP"). *Id.* at 302, 856 N.E.2d 213. A number of parties filed objections to the proposed RSP, which would govern the rates CGE would be permitted to charge until December 28, 2008. *In re Cincinnati Gas & Elec. Co.,* No. 03–93–EL–ATA, 2007 WL 3197045, at *2 (Ohio Pub.Util.Comm'n, Oct. 24, 2007). These parties included major consumer of electricity such as General Motors as well as the Ohio Consumers' Counsel ("OCC"), which represents Ohio consumers in actions before the PUCO. The hearing was adjourned to facilitate ongoing settlement negotiations. *Ohio Consumers' Counsel,* 856 N.E.2d at 219. Thereafter, CGE filed a stipulation regarding the outstanding rate issues. The stipulation was agreed to by a number of parties, including General Motors, who withdrew their objections to the RSP. *Id.* The OCC opposed the stipulation. *Id.*

Shortly after the stipulation was filed, the OCC sought discovery from CGE to determine whether the utility had entered into side agreements (not filed with the PUCO) in an effort to persuade General Motors and other large consumers to withdraw their objections to the rate-stabilization plan. *Ohio Consumers' Counsel,* 856 N.E.2d at 219. The PUCO denied the request for discovery of any side agreements. *Id.* Both the OCC and CGE requested a rehearing. *Id.* at 220. The PUCO denied the OCC's request for a rehearing on the issue of the side agreements, and accepted some of the alternative

aspects of the rate-stabilization plan proposed by CGE. *Id.* A second rehearing request by the OCC was denied on January 19, 2005, and a third on April 13, 2005. *Id.* In the second and third rehearing decisions, the PUCO approved additional modifications to the rate-stabilization plan. *Id.* **\*794** The OCC appealed to the Ohio Supreme Court. *Id.*

The Ohio Supreme Court unanimously reversed the PUCO's refusal to allow discovery of the side agreements between CGE and the parties that had withdrawn their objections to support the RSP stipulation:

> OCC argues that the existence of side agreements could be relevant to a determination that the stipulation was not the product of serious bargaining. OCC suggests that if [CGE] and one or more of the signatory parties agreed to a side financial arrangement or some other consideration to sign the stipulation, that information would be relevant to the commission's determination of whether all parties engaged in "serious bargaining." We agree.... [w]hether the stipulation was the product of serious bargaining ... cannot be resolved solely by reviewing the proposed stipulation. The commission cannot rely merely on the terms of the stipulation but, rather, must determine whether there exists sufficient evidence that the stipulation was the product of serious bargaining. Any such concessions or inducements apart from the terms agreed to in the stipulation might be relevant to deciding whether negotiations were fairly conducted ... [t]herefore, we hold that the commission erred in denying discovery of this information based on lack of relevancy.

*Ohio Consumers' Counsel,* 856 N.E.2d at 234–35.

In addition, the court found that the PUCO had failed to provide its reasoning in allowing additional charges and

fees to be included in the rate-stabilization plan after CGE's request for a rehearing. *Id.* at 223–25.

On remand, the PUCO ordered discovery of any documents relevant to side agreements between Duke[6] and its customers[7] that might be relevant to evaluate the seriousness of the bargaining. Thereafter, the PUCO conducted an evidentiary hearing on the issue of whether the rate-stabilization plan was reasonable.

[6]   In the commission order published following remand from the Ohio Supreme Court, CGE is referred to as "Duke." Duke Energy International was the successor in interest to CGE, and was a subsidiary of Duke Energy Corporation, the latter now being known as Duke Energy Carolinas, LLC.

[7]   The side agreements at issue were allegedly between CGE's (at this point Duke's) subsidiary DERS and certain parties to the stipulation. The PUCO found the fact that the contracting party "may have been an affiliate of Duke, rather than [Duke] itself" irrelevant. *In re Cincinnati Gas & Elec. Co.,* 2007 WL 3197045, at *18–19.

The PUCO expressly rejected the earlier stipulation:

> Certain of the parties to the stipulation had signed side agreements that required them to support the stipulation ... we have limited evidence ... regarding the willingness of Duke to compromise with parties who may not have been discussing side arrangements ... we find that the existence of side agreements, in which several of the signatory parties agreed to support the stipulation, raises serious doubts about the integrity and openness of the negotiation process related to that stipulation ... we now reach the inevitable conclusion that there is a sufficient basis to question whether the parties engaged in serious bargaining and, therefore, that we should not have adopted the

stipulation. We now expressly reject the stipulation on such grounds.

*Id.* at *19.

However, having rejected the stipulated RSP, the PUCO determined that the Ohio **\*795** Supreme Court's concerns about particular allowed charges in the plan were "moot" as the stipulation had been rejected. The PUCO then considered the original RSP submitted by Duke on January 26, 2004. The PUCO approved this plan with some modifications. *Id.* at *20–32.[8]

[8]   *See Ohio Consumers' Counsel,* 904 N.E.2d at 861–62 (Pfeifer, J., dissenting) (noting that the plan approved by the PUCO was largely the same plan set forth in the rejected stipulation); *see, supra,* p. 795 n.9.

The OCC again appealed to the Ohio Supreme Court, contending that the PUCO improperly limited the consideration of the side agreements to whether serious bargaining occurred. *Ohio Consumers' Counsel,* 904 N.E.2d at 856–57. The OCC contended that the PUCO should have considered whether Duke engaged in unlawful discounting or discrimination in the supply of electricity. *Id.*

The Ohio Supreme Court upheld the PUCO's decision, finding that the PUCO was not required to investigate Duke's alleged unlawful activities in the context of Duke's application to approve its market-based service rate-stabilization plan:

> Pursuant to our remand, the side agreements were relevant to the commission's evaluation of the serious bargaining aspect of the reasonableness review for stipulations before the commission. Because the side agreements included agreements that the signatory parties would support the stipulation, they raised serious doubts about the integrity and openness of the stipulation-negotiation process ... [b]ut in the absence of the stipulation, the commission was still required to consider Duke's rate-

stabilization application and set the market-based standard service offer. The side agreements are not relevant to this task.

*Id.*

The OCC also challenged substantive aspects of the RSP that had been approved by the PUCO and sought the refund of alleged excessive rates. *Id.* at 857–58. The Ohio Supreme Court granted the PUCO dismissal with respect to this issue, finding that a new RSP had been implemented effective July 31, 2008. *Id.* The court reasoned that it could not remand to the PUCO to enact lower rates because the rate structure at issue was no longer in effect, and could not order a refund of rates because such action would constitute "retroactive rate making." *Id.*[9]

[9] Justice Pfeifer issued a dissent in which he noted that the approved RSP was nearly identical to the rejected stipulated plan that the court had previously found to be flawed, inadequately explained, and not the product of serious bargaining:

> [W]hen [big customers] negotiate a better deal for themselves and stipulate to higher prices for everyone else, this court should carefully consider the circumstances before approving decisions of the [PUCO]. We did just that when we initially remanded this case ... [t]he problem here is that even though we rejected the stipulation and remanded the case, nothing has changed. The PUCO agreed to essentially the same deal that had been the product of the flawed stipulations. That isn't the way the process is supposed to play out ... [p]ublic utilities should not be able to hide their pricing. They are, after all, public utilities ... [p]roviding a lower price to a high-volume user is a legitimate business decision; hiding that lower price is not.

*Ohio Consumers' Counsel,* 904 N.E.2d at 861–62 (Pfeifer, J., dissenting).

Plaintiffs filed the instant suit in the United States District Court for the Southern District of Ohio on January 16, 2008. The district court granted the Motion to Dismiss on March 31, 2009. Plaintiffs timely filed a notice of appeal on April 29, 2010.

## II. Filed–Rate Doctrine

We "review de novo the district court's ruling on a motion to dismiss a claim." **\*796** *Jones v. City of Cincinnati,* 521 F.3d 555, 559 (6th Cir.2008).

[1] "The filed rate doctrine requires that common carriers and their customers adhere to tariffs filed and approved by the appropriate regulatory agencies." *MCI Telecomms. Corp. v. Ohio Bell Tel. Co.,* 376 F.3d 539, 547 (6th Cir.2004). An example of the doctrine is found in *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), in which the Supreme Court held that a passenger who purchased a train ticket at an incorrectly low rate due to a misquote by a ticket agent did not have a defense against the subsequent collection of the higher rate by the railroad company. 237 U.S. at 97, 35 S.Ct. 494. In essence, the doctrine precludes a challenge to the reasonableness of the rates of common carriers if the rates have been approved by an appropriate regulatory agency.

[2] We have described the two most important purposes of the filed-rate doctrine as "prevent[ing] carrier discrimination by committing the carriers to one set tariff and preserv[ing] the role of administrative agencies in approving and setting rates, a practice at which they are particularly adept." *MCI,* 376 F.3d at 547–48 (citing *Fax Telecomunicaciones Inc. v. AT & T,* 138 F.3d 479, 489 (2d Cir.1998)).

In *MCI* a telecommunications provider had applied to the PUCO for permission to begin providing telephone services to residents of three Ohio counties. MCI had to negotiate reciprocal compensation rates with Ohio Southern Bell, which also provided telephone service in the area. MCI and Southern Bell submitted the dispute to the PUCO. The PUCO determined that MCI could charge Southern Bell under the higher "tandem" reciprocal compensation rate rather than the lower "end office" rate. On appeal to this court, the PUCO argued that the district court lacked jurisdiction because Southern Bell could not receive a refund for, or challenge, the rates paid to MCI under the filed-rate doctrine. *MCI,* 376 F.3d at 545.

This court rejected the PUCO's argument and reversed the district court, finding that the filed-rate doctrine did not apply. This court noted that the first and most important issue was that the appellant, Southern Bell, was not "arguing that the

tandem rate itself should be different (i.e., [Southern Bell] is not arguing that the rate is incorrect or was unreasonably set) or that it is per se unreasonable." *Id.* at 547. Rather, "[t]he issue is whether [Southern Bell] is required to pay the tandem rate or the end office rate, which may depend upon the interpretation of the regulations governing symmetrical rates. A ruling by this court will have no effect on the filed tariff or rate. Thus, [Southern Bell] is not challenging the filed tariff, but is merely appealing the arbitration decision that applied one rate rather than another." *Id.*

Thus, this court distinguished between challenging the setting or reasonableness of a specific rate, which is barred by the filed-rate doctrine, and challenges that involve discussion of rates but do not challenge their reasonableness, which are permitted. This court found that a determination regarding whether one rate or the other applied to MCI would not intrude upon the fundamental purposes of the filed-rate doctrine, to prevent carrier discrimination and to preserve the administrative role of agencies in approving and setting rates.

 [3]    The district court erred in its determination that the Plaintiffs' challenge involved an attack on filed rates. The district court devoted a paragraph to this determination:

> **\*797**  The Plaintiffs contend that their claims involve only rebates and kickbacks which were neither filed with nor approved by the PUCO. The Court disagrees. Whether payments are rebates or kickbacks depends upon an analysis of the filed rate. A party claiming rate discrimination is contending that the effective rate charged one party is too low, while the charges to the plaintiffs are too high.

*Williams v. Duke Energy Int'l, Inc.*, 606 F.Supp.2d 783, 790 (S.D.Ohio 2009).

The district court's determination that the filed-rate doctrine applies to this case is inconsistent with legal precedent. The district court held that any claim that requires "analysis of [a] filed rate" is barred by the filed-rate doctrine. This is not a correct statement of the filed-rate doctrine. The filed-rate doctrine bars challenges to the reasonableness of a filed rate.

Plaintiffs' challenge does not concern the particular rate set by the PUCO, but rather payments made outside of the rate scheme. Plaintiffs allege that Defendants paid substantial sums of money to certain large customers in exchange for the withdrawal by the large customers of their objections to Defendants' proposed RSP. Plaintiffs contend that this amount to an "indirect rebate" which had the effect of requiring Plaintiffs to pay a higher rate than certain companies which received a rebate. Plaintiffs are arguing that Defendants, in violation of the law, indirectly granted rebates to favored large customers.

Further, as noted by the United States Court of Appeals for the First Circuit, "[i]t is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine." *Town of Norwood, Mass. v. New England Power Co.,* 202 F.3d 408, 419 (1st Cir.2000) (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc., et al.,* 476 U.S. 409, 417, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986)) (emphasis in original). In *Square D* the rates were "duly submitted, lawful rates under the Interstate Commerce Act...." 476 U.S. at 417, 106 S.Ct. 1922. That is not the case here. This case does not involve the challenge by Plaintiffs of any filed rates. Rather, Plaintiffs challenge the lawfulness and purpose of payments made by Appellee Duke's affiliate DERS pursuant to various side agreements. Plaintiffs argue that these side agreements were not filed with any agency, including the PUCO, and are unlawful. Defendants have presented no evidence to suggest that the side agreements were filed with any agency, and in fact have made every effort to resist discovery of the agreements or public revelations regarding the specific contents of the side agreements.

Defendants argue that this is a case about "rate discrimination," and that Plaintiffs seeks to challenge "PUCO-approved rates." (Br. of Appellees at 35.) However, as noted by Plaintiffs, "the side agreements at issue and the kickbacks paid pursuant to those agreements were not approved by, filed with, or even supervised by the PUCO...." (Reply Br. of App. at 3.) Nor do the alleged "rebates" or "kickbacks" actually involve a challenge to the reasonableness of any filed rate. Plaintiffs do not challenge whether the rates set by the PUCO were reasonable; rather, they contend that Defendants conspired to aid certain favored companies in avoiding paying the actual filed rate, and that this action on the part of Defendants harmed Plaintiffs by giving the favored companies competitive advantage over Plaintiffs. The allegation that certain large consumers, by receiving a rebate, effectively paid a lower rate than Plaintiffs

does not transform **\*798** this action into an attack on filed rates.

The district court's misreading of the filed-rate doctrine is inconsistent with this court's decision in *MCI.* If the standard for application of the doctrine was any case where "analysis of [a] filed rate" was required, then the doctrine would have barred Southern Bell's claim in *MCI,* which required this Court to examine different filed rates to determine which was the correct filed rate to apply. Indeed, were this Court to adopt Defendants' view of the filed rate doctrine, the railroad appellee in *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), would have been unable to collect the full price of its ticket from the ticket-holder appellant in that case, as any court seeking to make the plaintiff pay the full price would have had to engage in "analysis of the filed rate" to determine the rate the plaintiff should have paid. That is not the law.

The district court incorrectly applied the filed-rate doctrine when it held that it lacked jurisdiction to hear Plaintiffs' claims. Because the filed-rate doctrine applies only in challenges to the underlying reasonableness or setting of filed rates, the doctrine is inapplicable in this case. As "[a] ruling by this court will have no effect on the filed tariff or rate," we follow our precedent in *MCI* and reverse the district court's holding that the filed-rate doctrine deprived it of jurisdiction over this case. *MCI,* 376 F.3d at 547.

### III. Subject–Matter Jurisdiction

 **[4]**   We review "questions of subject-matter jurisdiction and statutory interpretation de novo." *Baze v. Parker,* 632 F.3d 338, 341 (6th Cir.2011) (citing *Mikulski v. Centerior Energy Corp.,* 501 F.3d 555, 560 (6th Cir.2007)).

 **[5]**   **[6]**   The jurisdiction of federal courts is defined by Article III of the United States Constitution and by acts of Congress. It is generally true that the jurisdiction of the federal courts "cannot be limited or taken away by state statutes." 17A Wright, et al., *Fed. Practice & Procedure* § 4211 (3d ed. 2012). Generally, the jurisdiction of a federal court will only be limited by state statute under special circumstances, such as when the federal court sits in diversity pursuant to 28 U.S.C. § 1332. Even in such circumstances, a state cannot defeat federal jurisdiction over a matter by limiting jurisdiction to a specialized state court. *See Marshall v. Marshall,* 547 U.S. 293, 314, 126 S.Ct. 1735, 164 L.Ed.2d

480 (2006) (holding that "jurisdiction of the federal courts ... 'cannot be impaired by subsequent state legislation creating courts of probate' ") (quoting *McClellan v. Carland,* 217 U.S. 268, 281, 30 S.Ct. 501, 54 L.Ed. 762 (1910)). This rule applies even if the cause of action was created by state statute. *Id.* (holding that " 'a State cannot create a transitory cause of action and at the same time destroy the right to sue ... in any court having jurisdiction' ") (quoting *Tennessee Coal, Iron & R.R. Co. v. George,* 233 U.S. 354, 360, 34 S.Ct. 587, 58 L.Ed. 997 (1914)).

 **[7]**   No circumstances exist here that would deprive the district court of jurisdiction over Plaintiffs' state-law claims. After dismissing Plaintiffs' federal claims, the district court found that it lacked jurisdiction over Plaintiffs' state-law claims because, sitting in diversity as an Ohio court, the PUCO had exclusive jurisdiction over Plaintiffs' state-law claims. However, because we find that the district court erred in dismissing Plaintiffs' federal claims, federal question subject-matter jurisdiction is available to the district court pursuant to 28 U.S.C. § 1331. The district court's federal **\*799** question subject-matter jurisdiction is sufficient to allow supplemental jurisdiction over Plaintiffs' state-law tort claims of fraud and civil conspiracy pursuant to 28 U.S.C. § 1367. We therefore need not reach the question of whether the district court sitting in diversity would have jurisdiction over Plaintiffs' state-law claims.

### IV. Claims Under 12(b)(6)

"Whether the district court properly dismissed [a plaintiff's] claims pursuant to Rule 12(b)(6) is a question of law, which we review de novo." *Hensley Mfg., Inc. v. ProPride, Inc.,* 579 F.3d 603, 608–09 (6th Cir.2009).

 **[8]**   Defendants sought dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Because the district court found that the filed-rate doctrine precluded "all claims of damages allegedly incurred by Plaintiffs," it did not reach or substantively analyze Defendants' 12(b)(6) argument. [10] However, Defendants raise the 12(b)(6) issue on appeal, and Plaintiffs address the 12(b)(6) arguments in their reply brief. This court may address issues raised by the parties on appeal even where the district court has not explicitly ruled on the issues. *See Howard v. Bouchard,* 405 F.3d 459, 476–77 (6th Cir.2005) (taking up procedural default issue where district court did not decide issue below).

**WESTLAW**   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case: 2:20-cv-03755-EAS-KAJ Doc #: 158-5 Filed: 10/11/22 Page: 255 of 259 PAGEID #: 7283
Williams v. Duke Energy Intern., Inc., 681 F.3d 788 (2012)

2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

10      The district court stated in a footnote "[a]s to Defendants motions pursuant to Rule 12(b)(6) for failure to state a claim, the Court would find under the filed rate doctrine, Plaintiffs claims are barred." *Williams,* 606 F.Supp.2d at 794 n. 7.

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. This standard is not "akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955). Nevertheless, the complaint need not set out the facts in detail; what is required is a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). Defendants challenge each of Plaintiffs' claims in turn.

### A. Plaintiffs' Robinson–Patman Act Claim

[9]   [10]    Plaintiffs bring a claim under the Robinson–Patman Act ("RPA"), 15 U.S.C. § 13, *et seq.,* which makes it unlawful for persons "engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality...." The RPA was enacted in response to the comparative competitive advantage of large purchasers, who could induce advertising allowances, rebates, and special services from sellers due to their size. Small independent stores were at a "hopeless competitive disadvantage" compared to large stores and thus the RPA was enacted "to eliminate these inequities." *FTC v. Simplicity Pattern Co.,* 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959).

[11]    To survive a motion to dismiss on a RPA claim, a plaintiff must allege that "(1) the defendant discriminated in price between different purchasers of commodities of like grade and quality, and (2) the effect of that discrimination was to substantially lessen competition or tend to create a monopoly in any line of commerce." *\*800 Schwartz v. Sun Co.,* 276 F.3d 900, 903–04 (6th Cir.2002) (citing *D.E. Rogers Assocs., Inc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1438–39 (6th Cir.1983)).

In their complaint, Plaintiffs allege that Defendant Duke discriminated in price between different purchasers of its sold commodity, electricity (all of which is of like grade and quality), and provide allegations laying out with specificity how this discrimination took place on a continuous basis between Defendants and certain favored commercial customers, within the same geographic market as Plaintiffs, from January 2005 to 2009. (*See* First Am. Compl. ¶¶ 3, 18, 21–24, 50.) Plaintiffs also allege the specific amount of price discrimination (in the form of payments or rebates to favored customers) in 2005: $15 million. (*Id.* ¶ 21.) One subclass of Plaintiffs, sellers of goods and services, compete in the same market as the favored customers and allege that they have lost profits as a result of the discriminatory rebates and the competitive advantage thus provided to favored customers. (*Id.* ¶ 50.)

Defendants first argue that electricity is not a "commodity" within the meaning of the RPA, citing a single district court case, *City of Newark v. Delmarva Power & Light Co.,* 467 F.Supp. 763, 772–74 (D.Del.1979) (holding that electricity is not a commodity because the RPA uses terms such as "goods, wares, or merchandise" to refer to commodities, terms not commonly applied to electricity, and finding significant Congress' amendment of Federal Power Act to allow for review of rate disparity one year prior to passage of RPA).

However, this court has already indicated support for the proposition that electricity is a commodity under the RPA. In *Metro Commc'ns Co. v. Ameritech Mobile Commc'ns, Inc.,* 984 F.2d 739, 745 (6th Cir.1993), this court discussed *City of Kirkwood v. Union Elec. Co.,* 671 F.2d 1173, 1181–82 (8th Cir.1982), in which the United States Court of Appeals for the Eighth Circuit held that electricity is a commodity as it is "produced, sold, stored in small quantities, transmitted, and distributed in discrete quantities." This court found that cellular telephone service was not a commodity because it is "very different from electricity. It cannot be produced, felt, or stored, even in small quantities. The plaintiffs do not buy a quantity of it, store it, and resell it their customers." *Metro Commc'ns Co.,* 984 F.2d at 745. Thus, this court by implication found that electricity, unlike cellular telephone service, was a commodity. *See also Town of Concord, Mass. v. Bos. Edison Co.,* 676 F.Supp. 396, 397–98 (D.Mass.1988) (holding that electricity is a commodity because other than being "not an obviously tangible item ... electricity is not significantly different from other items deemed commodities subject to the price discrimination prohibitions of the antitrust laws ... electrical energy is a thing

bought and sold in the market place"); *City of Gainesville v. Fla. Power & Light Co.,* 488 F.Supp. 1258, 1280–83 (S.D.Fla.1980) (holding electricity is a commodity because it is a product manufactured from other forms of energy, similar to commodities such as coal and gasoline, and is valued for its physical characteristics rather than legal meaning or ability to provide a service). We reaffirm that electricity is a commodity under the terms of the RPA and this court's decision in *Metro Commc'ns Co.,* 984 F.2d at 745.

[12] Defendants next argue that the RPA does not apply because Plaintiffs and the alleged favored customers do not compete in the electricity market; Defendants contend that the RPA "centrally addresses price discrimination in cases involving competition between different purchasers for resale of the purchased product." *Volvo* **\*801** *Trucks N. Am., Inc. v. Reeder–Simco GMC, Inc.,* 546 U.S. 164, 169–70, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006).

Defendants' contention that the RPA applies only to the resale of a purchased product is not consistent with case law. In *FTC v. Morton Salt Co.,* 334 U.S. 37, 39, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Supreme Court found that a manufacturer of salt had violated the RPA by discriminating in price between different purchasers. The salt manufacturer had violated the RPA because "the competitive opportunities of certain merchants were injured when they had to pay [the salt manufacturer] substantially more for their goods than their competitors had to pay." *Id.* at 46–47, 68 S.Ct. 822. The situation is precisely the same in this case: Plaintiffs allege that they were injured when they had to pay substantially more for electricity than their competitors due to the rebates provided to some of Defendants' large customers.

[13] Defendants next argue that Plaintiffs fail to adequately allege competitive disadvantage and damage to their business or property. Specifically, Defendants claim that Plaintiffs provide only "unadorned, conclusory allegations...." (Br. of Appellees at 47.)

The Supreme Court has held that "the [RPA] does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect." *Corn Prods. Refining Co. v. FTC,* 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945). This court endorsed the same view in *Schwartz v. Sun Co., Inc.,* finding that "[b]ecause damage issues in [RPA] cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts,

the Supreme Court has repeatedly held that ... the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business ... that defendants' wrongful acts had caused damage to plaintiffs." *Schwartz,* 276 F.3d at 904 (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.,* 63 F.3d 1267, 1273–74 (3d Cir.1995) (internal citations omitted)). Plaintiffs Munafo and BGR, Inc. allege that they have suffered competitive disadvantage compared to certain favored companies as a result of the alleged rebates provided to said companies. (First Am. Compl. ¶ 50.)

Defendants also argue that Plaintiffs do not allege the identity of the "favored" or "disfavored" purchasers, or the effect of the cost of electricity on their sales or profit margins. However, the primary reason that the side agreements and sales to the "favored" purchasers have not been set forth in detail is because discovery has not taken place and this information rests in the hand of the Defendants. Plaintiffs note that the copy of the side agreements they obtained is heavily redacted such that the names of favored companies are not available. Nevertheless, Plaintiffs have identified General Motors as one of the favored companies in their pleadings. (First Am. Compl. at ¶¶ 15, 21.)

We find that Plaintiffs have adequately alleged injury and competitive disadvantage sufficient to survive a 12(b)(6) motion to dismiss with respect to their Robinson–Patman Act claim.

**B. Plaintiffs' RICO Claim**

[14] Plaintiffs bring a civil RICO claim pursuant to 18 U.S.C. § 1962(c), making it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern **\*802** of racketeering activity...." Plaintiffs allege that Defendant Duke, through its affiliated company DERS, transmitted unlawful rebates to certain favored companies. (First Am. Compl. at ¶¶ 15–21.) Plaintiffs allege that the racketeering activity is primarily mail and wire fraud, but also includes money laundering. (*Id.* ¶¶ 33–40.) Plaintiffs allege that the pattern of repeated acts of mail and wire fraud from 2005 to the present demonstrates a relationship between the predicate acts and continuous criminal activity. (*Id.* ¶¶ 35–39;) *See H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (holding that in a civil or criminal RICO action, it must be shown that "racketeering

predicates are related, and that they amount to or pose a threat of continued criminal activity").

Defendants argue that Plaintiffs do not adequately allege mail or wire fraud as a predicate to racketeering. Defendants argue that bills sent to customers in the mail that stated that "certain electricity charges were mandatory and unavoidable" were "as a matter of indisputable state law ... true: The various charges Plaintiffs identify must be paid, and Plaintiffs do not allege that any 'favored' customers were excused from this obligation." (Br. of Appellee at 49.)

Plaintiffs respond by noting that, while the fact that the electricity charges at issue had to paid was true, Defendants used these true statements to conceal the alleged fraud. By engaging in secret side agreements with favored customers, Defendants provided rebates to already-paid "mandatory" charges. Plaintiffs also allege that Defendants engaged in wire fraud by receiving and transferring moneys to and from DERS and favored customers in furtherance of a fraudulent scheme. (First Am. Compl. ¶¶ 33–40.)

Defendants argue that Duke had no "duty to disclose" the rebates at issue. (Br. of Appellee at 50.) Defendants cite *Langford v. Rite Aid of Alabama, Inc.,* 231 F.3d 1308, 1314 (11th Cir.2000), for the proposition that "differential pricing alone is not a fraudulent practice; plaintiffs must assert some particular reason why the relationship ... was such that non-disclosure of the differential pricing structure constitutes a violation of the mail and wire fraud statutes." As Plaintiffs have pled, Duke's fraud was in asserting through the mail that all customers had to pay "mandatory and unavoidable" electricity charges, implying that all customers paid the same rate (which they were required to do under the RPA). Thus, Plaintiffs allege that Duke's non-disclosure of the side agreements constitutes fraud.

Defendants also cite *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 792 (1st Cir.1990), for the proposition that an "illegal rebate and kickback scheme ... did not amount to a scheme to defraud." Defendants omit the reason why, in *McEvoy,* the illegal scheme was not "a scheme to defraud": the United States Court of Appeals for the First Circuit found that the scheme was not intended to defraud the *plaintiff* who had brought the RICO action. *McEvoy* does not stand for the proposition that Defendants claim, that an "illegal rebate and kickback scheme" can never amount to a scheme to defraud.

**[15]** Defendants also make brief claims that Plaintiffs fail to plead with particularity as required by Fed.R.Civ.P. 9(b), and that Plaintiffs fail to state a predicate claim for money laundering because money laundering requires money that is the proceed of "some form of unlawful activity." 18 U.S.C. § 1956(a)(1). Defendants argue that the payment of "PUCO-approved rates" to Duke was not unlawful.

**\*803** **[16]** With respect to Defendants' 9(b) argument, this court has held that "[i]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir.1988). "Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Id.* We find that Plaintiffs have sufficiently set out the alleged fraudulent scheme in such a manner as to put Appellee on notice of the nature of Plaintiffs' claims.

With respect to Defendants' money-laundering argument, the alleged transfer of money from favored customers to Duke, and from Duke to DERS, and from DERS back to the favored customers as "rebates" tainted the funds, which became the "proceeds" of unlawful activities. Mail fraud constitutes an "unlawful activity" according to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). Thus, taking as true the allegations that Appellee Duke collected money through its use of the mails and funneled the money to DERS and thereafter back to favored customers in a fraudulent scheme, we find that Plaintiffs have set out a cognizable claim of money laundering based upon the unlawful activity of mail fraud.

**[17]** Defendants next argue that there is no proximate cause between the alleged racketeering and harm to Plaintiffs. Defendants argue that Plaintiffs' "theory of liability rests on the independent actions of third ... parties," namely the PUCO, and argue that the remedy sought by Plaintiffs would require the PUCO to enforce the law. We do not agree. Defendants' argument confuses proximate cause between an alleged wrongful act and an injury with the relationship between an alleged wrongful act and the remedy for injury. The PUCO was not the cause of injury to Plaintiffs. Rather, it was Defendants' alleged fraudulent scheme that Plaintiffs contend caused them injury. The fact that Plaintiffs are

Williams v. Duke Energy Intern., inc., 681 F.3d 788 (2012)

2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

required to bring a case before the PUCO or this court does not mean that there is a "third party" whose actions disrupt the proximate cause of Plaintiffs' injuries. Defendants' argument that proximate causation is "speculative" because the PUCO might not have found the rebates to be unlawful is similarly incorrect.

We find that Plaintiffs' alleged injuries, as set forth in the First Amended Complaint, are fairly traceable to Defendants, and that Plaintiffs' Civil RICO claim survives a motion to dismiss under 12(b)(6).

### C. Plaintiffs' Corrupt–Practices Claim

[18] Defendants argue that Plaintiffs fail to allege predicates for their Ohio Corrupt–Practices Act claim, Ohio Rev.Code § 2923.31. As we have already held, Plaintiffs have properly alleged money laundering and telecommunications fraud as a predicate to their civil RICO claim. This alone would be enough to satisfy the predicate act requirements of the Ohio Corrupt–Practices Act.

[19] [20] [21] Plaintiffs have also sufficiently alleged that Defendants engaged in obstruction of justice, that is, "communicating false information to any person" for the purpose of hindering discovery of a crime pursuant to Ohio Rev.Code § 2921.32(A). Plaintiffs allege that Defendants' legal counsel "consciously and deceptively denied having any knowledge of the existence of any ... side deals" in on- **\*804** the-record proceedings before the Ohio Supreme Court in "a further attempt to hide their wrongdoing." (First Am. Compl. ¶¶ 20, 39.) The selective payment of rebates constitutes a felony under Ohio law. *See* Ohio Rev.Code §§ 4905.32–.33(A), 4905.56, 4905.99. Thus, communicating false information to any person for the purpose of hindering the discovery of the selective payment of rebates would constitute obstruction of justice.

[22] [23] Defendants argue that the "alleged acts occurred in civil proceedings, and plaintiffs' allegations show at most that they were designed to assist [Duke], and not 'another' as the statute requires." (Br. of Appellees p. 55.) Defendants' arguments are inconsistent with the law. The fact that the alleged obstruction took place in a civil proceeding is irrelevant; the statute contains no requirement that a false statement be made in a criminal proceeding. *See* Ohio Rev.Code § 2921.32(A). Similarly, Defendants' contention that the alleged obstruction was in defense of the corporation does not shield Defendants' counsel from the statute. Even were corporations not considered "persons" for many legal

purposes, *see Citizens United v. FEC,* 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), corporate counsel are not permitted to freely make false statements before a court and evade charges of obstruction of justice.

We find that Plaintiffs have adequately alleged violation of Ohio's Corrupt–Practices Act sufficient to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6).

### D. Plaintiffs' Common–Law Fraud Claim

Defendants next challenge Plaintiffs' claim of common-law fraud by recycling their arguments regarding a lack of duty to disclose and a lack of proximate cause between their actions and the injury to Defendants. As we have already held, Plaintiffs have sufficiently argued that Defendants are not free to omit material facts in the commission of mail and wire fraud and have alleged proximate cause between the actions of Defendants and the injury to Plaintiffs.

We therefore find that Plaintiffs have adequately alleged a claim of common-law fraud sufficient to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6).

### E. Plaintiffs' Common–Law Civil Conspiracy Claim

[24] Plaintiffs base their common-law civil conspiracy claim on Defendants' alleged conspiracy to violate Ohio Rev.Code § 4905.33(A), which prohibits a public utility from charging any person or corporation more or less for services, through the use of rebates, than any other person or corporation, and § 4905.35, which prohibits a public utility from giving undue or unreasonable preference, advantage, or disadvantage to any person or corporation.

Defendants argue that Plaintiffs' conspiracy claim fails because, according to Defendants, they are no longer subject to the statutory restrictions prohibiting rebates or special rates in Ohio Rev.Code § 4905.33(A), or the restrictions prohibiting giving undue advantage or disadvantage in § 4905.35. Defendants make this argument based on Ohio Rev.Code § 4928.05(A)(1), enacted in 1999, which states in pertinent part that:

> On and after the starting date of competitive retail electric service, a competitive retail electric service supplied by an electric utility or electric services company shall not be

2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

subject to supervision and regulation ... by the public utilities commission under Chapters 4901. to 4909., 4933., 4935., and 4963. of the Revised Code, except sections 4905.10 and **\*805** 4905.31, division (B) of section 4905.33, and sections 4905.35 and 4933.81 to 4933.90; except sections 4905.06, 4935.03, 4963.40, and 4963.41 of the Revised Code....

Defendants argue that, by stating that electric services companies "shall not be subject to supervision and regulation ... by the public utilities commission ..." the Ohio General Assembly intended to entirely remove electric service companies from the reach of the listed sections of the Ohio Code. [11] Defendants argue that it is implausible that "competitive retail electric service remains subject to all of the requirements governing public utilities, that Chapter 4928 supplements rather than replaces those requirements, and that enforcement power has been transferred from the PUCO to private plaintiffs." (Br. of Appellees at 57.) Defendants contend that the exempted provisions of § 4298.05 "no longer apply to competitive retail electric service." (*Id.*)

[11] This argument is at odds with Defendants' argument that the PUCO retains "authority" to "remedy the underlying wrongs" caused by violation of 4905.33 and 4905.35; it is unclear how the PUCO could remedy harm caused by Defendants under said statutes if Defendants are no longer subject to the very same statutes, as Defendants argue in a separate portion of their brief.

**[25]** Defendants misread the plain language of § 4298.05. Had the Ohio legislature intended to remove competitive electric services completely from the ambit of the statutes listed in § 4298.05, then the words "by a municipal corporation under Chapter 743, of the Revised Code or by the public utilities commission" are superfluous to the statute.

Under Ohio law, "[i]n determining legislative intent it is the duty of [the] court to give effect to the words used, not to delete words used or to insert words not used." *Columbus–Suburban Coach Lines, Inc. v. Public Util. Comm'n of Ohio,* 20 Ohio St.2d 125, 254 N.E.2d 8, 9 (1969). The inclusion of "by the public utilities commission" means that the statute should be read exactly as written: competitive electric services are exempted from the authority of the PUCO under the specific chapters listed. Had the Ohio legislature meant to remove competitive electric services entirely from the reach of the statute, they could have done so with specific language.

Defendants' argument would require this court to ignore the plain language of the statute and inquire into the intent of the legislators of the General Assembly in enacting § 4298.05. Such an inquiry is unnecessary given the plain language of the statute. We find that Ohio Rev.Code §§ 4905.33 and 4905.35 apply to Defendant Duke, and that Plaintiffs have alleged a claim of common-law civil conspiracy sufficient to survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6).

### V. Injunctive Relief

Plaintiffs argue that if this court finds that the filed-rate doctrine applied to their federal claims, we could nevertheless provide them with injunctive and non-damage relief. Because we find that the filed-rate doctrine does not apply, we need not decide this question.

### VI. Conclusion

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.

### All Citations

681 F.3d 788, 2012-1 Trade Cases P 77,913, RICO Bus.Disp.Guide 12,222

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.