TAB 5



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**BRIEF IN OPPOSITION**
**December 21, 2020 15:49**

By: GREG M. GALVIN 0075612

Confirmation Nbr. 2140988

MICHAEL EMMONS

  vs.

FIRSTENERGY CORPORATION, ET AL

CV 20 935557

**Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 28

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

MICHAEL EMMONS and ROBERT
BROWN, individually and on behalf of all
those similarly situated,

               Plaintiffs,

v.

FIRSTENERGY CORP., *et al.*,

               Defendants.

Case No. CV 20 935557

Judge Shannon M. Gallagher

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT FIRSTENERGY**
**SOLUTIONS N/K/A ENERGY HARBOR COMPANY'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................1

STANDARD OF REVIEW .....................................................................................................5

ARGUMENT ...........................................................................................................................6

    I. Plaintiffs have Alleged Energy Harbor's Conduct Proximately Caused Their Injuries ..........6

        A. Because the Acts and Injuries were Foreseeable, there is no Break in the Chain of Causation .........................................................................................................................6

        B. Energy Harbor is not a Legislator and is Therefore not Entitled to Legislative Immunity .8

        C. Energy Harbor Misstates Plaintiffs' Assertion of Damages ...............................................11

    II. Plaintiffs have Alleged Duties Owed and Breached Under Contract....................................11

    III. Plaintiffs have Alleged Energy Harbor Breached Duties Arising in Tort...........................14

    IV. Plaintiffs State a Valid Claim for Unjust Enrichment........................................................18

    V. Plaintiffs' Claims for Declaratory and Injunctive Relief are Not Excused from Judicial Review..................................................................................................................................21

    VI. Plaintiffs have Plead Viable Claims Supporting the Civil Conspiracy Claim ...................21

CONCLUSION.........................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ada Exempted Vill. Sch. Dist. Bd. of Educ. v. Ada Wind, LLC*, 2020-Ohio-4017, 157 N.E.3d 232, (3d Dist.) ................................................................................................................................ 5

*Apex Tool Grp., LLC v. DMTCO*, No. 3:13–cv–372, 2014 WL 6748344 (S.D.Ohio Nov. 26, 2014) ............................................................................................................................ 22

*Banks v. Nationwide Mut. Fire Ins. Co.*, 10th Dist. Franklin No. 99AP-1413, 2000 WL 1742064, (Nov. 28, 2000) ................................................................................................................. 19

*Bigelow v. Brumley*, 138 Ohio St. 574, 37 N.E.2d 584 (1941) .................................................. 10

*Boyd v. Moore*, 184 Ohio App.3d 16, 2009-Ohio-5039, 919 N.E.2d 283 (2d Dist.) .................. 15

*Brown-Graves Co. v. Obert*, 98 Ohio App.3d 517, 648 N.E.2d 1379 (1994) .............................. 19

*Burckhardt v. Burckhardt*, 42 Ohio St. 474 (1885) .................................................................... 8

*Burns v. Prudential Securities, Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550 (3d Dist.) ........... 14

*Camp St. Mary's Assn. of the W. Ohio Conference of the United Methodist Church, Inc. v. Oterrbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, 889 N.E.2d 1066  (3rd Dist.) ....... 19

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989) 17

*Clinger v. Duncan*, 166 Ohio St. 216, 141 N.E.2d 156 (1957) .................................................... 7

*Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St. 3d 412, 2005-Ohio-5409, 414, 835 N.E.2d 701 .................................................................................................................... 17

*Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, 977 N.E.2d 742 (10th Dist.). .................. 18

*Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921 ...................................................................................................................................... 16

*Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268 ......... 6

*Dublin v. State*, 138 Ohio App.3d 753, 742 N.E.2d 232 (10th Dist. 2000) .................................. 9

*Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 662 N.E.2d 1074 (1996) ........... 12

*Eysoldt v. ProScan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359 (1st Dist.) ....................... 14

*Fisk Alloy Wire, Inc. v. Hemsath*, 6th Dist. Lucas No. L-05-1097, 2005-Ohio-7007, 2005 WL 3557392 ........................................................................................................................ 19

*Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335, 190 N.E. 924 (1934).............................. 15, 16

*In re Grand Jury Investigation Into Possible Violations of Title 18, U.S. Code, Sections 201, 371, 1962, 1952, 1951, 1503, 1343 & 1341*, 587 F.2d 589 (3d Cir. 1978) ............................ 9

*Iron Workers' Local Union No. 17 Ins. Fun v. Philip Morris, Inc.*, 23 F.Supp.2d 771 (N.D.Ohio 1998). ........................................................................................................................ 7, 8

*Kham v. Waters Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1990)....... 12

*Lloyd v. Rogerson*, 2019-Ohio-2606, *appeal not allowed*, 157 Ohio St. 3d 1442, 2019-Ohio-4211, 132 N.E.3d 708 ........................................................................................................ 7

*Longmire v. Donaci*, 2020-Ohio-3704, 155 N.E.3d. 1014 (10th Dist. 2020)............................ 19

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.2d 458 ........ 12

*McGrath v. Nationwide Mut. Ins. Co.*, 295 F.Supp.3d 796 (S.D.Ohio 2018) ............................ 13

*Miller v. Baltimore & Ohio Southwestern Rd. Co.*, 78 Ohio St. 309, 85 N.E. 499 (1908)............. 7

*Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 90 N.E.2d 859 (1950) ...................................... 7

*Mussivand v. David*, 45 Ohio St. 3d 314, 544 N.E.2d 265 (1989) ........................................... 15

*Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44 ................... 5

*Ross v. Nutt*, 177 Ohio St. 113, 203 N.E.2d 118 (1964) ........................................................... 7

*Saraf v. Maronda Homes, Inc. of Ohio*, 10th Dist. Franklin No. 02AP-461, 2002-Ohio-6741.... 18

*Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 597 N.E.2d 504 (1992) ............................. 16

*Strother v. Hutchinson*, 67 Ohio St.2d 282, 423 N.E.2d 467 (1981) .......................................... 7

*Sullivan v. State ex rel. O'Connor*, 125 Ohio St. 387, 181 N.E. 805, (1932)............................. 21

*The Bank of New York Mellon v. Lewis*, 6th Dist. Erie No E-13-051, 2014-Ohio-5599 (Dec. 19, 2014) ................................................................................................................................ 13

*Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 274, 2002-Ohio-4210, 773 N.E.2d 1018 ................. 15

*Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36 (1975)................. 15

*Widok v. Estate of Wolf*, 8th Dist. Cuyahoga No. 108717, 2020-Ohio-5178 (Nov. 5, 2020)......... 5

## STATUTES

18 U.S.C. § 1962(d) ......................................................................................................... 4

R.C. 1345.02 ...................................................................................................................... 1

R.C. 1301.304 .................................................................................................................. 12

## RULES

Civ.R. 12(B)(6) ................................................................................................................. 5

Civ.R. 8(E)(2) .............................................................................................................. 14,18

## TREATISES

70 Ohio Jurisprudence 3d (1986) 62, Negligence, Section 19 .................................... 15

Prosser, Law of Torts (4th ed. 1971) ........................................................................... 15

Restatement of Law 2d, Contracts, Section 205 (1981) .............................................. 12

## CONSTITUTIONAL PROVISIONS

Section 12, Article II of the Ohio Constitution........................................................... 9

## INTRODUCTION

This case arises from the conduct of Defendants FirstEnergy Corp. (FirstEnergy), FirstEnergy Service Company (FirstEnergy Service), Ohio Edison Company (Ohio Edison), Toledo Edison Company (Toledo Edison), the Cleveland Electric Illuminating Company (Illuminating Company) [collectively, FirstEnergy], and Defendant FirstEnergy Solutions n/k/a Energy Harbor (Energy Harbor), in orchestrating the illegal and unethical passage and implementation of House Bill 6 (HB 6), a law providing enormous financial benefits to Defendants to the direct detriment of Plaintiffs and the Class.

The Amended Complaint asserts Defendants undertook intentional and negligent conduct, engaged in criminal activity, sustained nuclear generation that is unsupported by the market, and burdened Plaintiffs with unwarranted expenses and the loss of clean energy standards and savings. Am. Compl. ¶¶ 28-29, 113. Specifically, Defendants improperly initiated a scheme to revive nuclear energy generation with guaranteed financing by all Ohio utility customers and implemented a decoupling mechanism that secures FirstEnergy dubious inflated revenue for the foreseeable future. Am. Compl. ¶¶ 28-29, 69-72, 109-110, 111-113. Plaintiffs have accordingly sought both monetary damages and injunctive relief.[1] Am. Compl. pp. 49-50 (setting forth Plaintiffs request for relief).

## FACTUAL BACKGROUND

In the last two decades, Ohio's electric utility industry has undergone three significant regulatory changes. Am. Compl. ¶¶ 39-65. First, in 1999, the General Assembly unbundled electrical services and charges for electricity generation, transmission, and distribution to create

---

[1] Plaintiffs' Amended Complaint alleges claims under the Ohio Consumer Sales Practices Act, R.C. 1345.02, against FirstEnergy Corp. and Energy Harbor. However, Plaintiffs now withdraw that cause of action as to both Defendants.

an open wholesale market. Am. Compl. ¶¶ 39-40. Finding this deregulation problematic and unprofitable for utilities, in 2008, the General Assembly set forth a new framework focused on providing stable and predictable electricity rates, development of renewable energy technologies, and an increase in energy efficiency through clean energy standards. Am. Compl. ¶¶ 41-42 (explaining Senate Bill 221). As part of these clean energy standards, utilities had to meet at least 12.5 % of electricity demand through renewable and decrease energy use by more than 22 % through energy efficient programs by 2025. *Id.* These changes were touted as both beneficial to the environment and providing significant cost savings to all Ohio customers. Am. Compl. ¶ 43. Following the enactment of new standards, energy efficiency programs realized more than $1 billion in savings for customers, and reports projected that customers could receive $4 billion in savings over a ten year-period. Am. Compl. ¶ 47. Moreover, the American Council for an Energy Efficient Economy reported that if the energy efficiency standards continued, customers could save $5.6 billion. Am. Compl. ¶ 48.

FirstEnergy and Energy Harbor, FirstEnergy's subsidiary that provided energy through nuclear generation, quickly realized that the cost savings for customers from energy efficiency resulted in their decreased profits. Am. Compl. ¶ 49. Additionally, the cost of natural gas decreased dramatically, which effectively reduced the financial appeal of other types of generation such as nuclear generation. With no natural gas generation of its own, FirstEnergy experienced these two shifts more acutely than other utilities. Am. Compl. ¶ 45.

By 2016, FirstEnergy reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses from Energy Harbor. Am. Compl. ¶ 53. Because of these circumstances, FirstEnergy publicly announced it would exit nuclear generation. Am. Compl. ¶ 54. Still, over the course of the next year, Defendants led unsuccessful legislative attempts to save

Defendants' nuclear facilities. By March 2018, Energy Harbor publicly announced its plans to decommission its two Ohio nuclear plants. Am. Compl. ¶ 58-59.

While the two plants were scheduled to be deactivated in May 2020 and October 2021, Defendants continued to push for a legislative solution to keep the plants fully functioning. Am. Compl. ¶¶ 60 & 102. This legislative solution came in the form of HB 6—a bill crafted to economically benefit Defendants to the detriment—both economically and environmentally—of all Ohio utility customers.

Specifically, HB 6 implemented three significant changes that directly benefited Defendants. First, it created a nuclear generation fund that pools $150 million annually from all Ohio utility customers from 2021 through 2027. Am. Compl. ¶ 110. Notably, Energy Harbor was the *only* utility eligible to apply for these funds because of a condition that only a company with nuclear generation in the state would be eligible. Am. Compl. ¶ 108. Second, HB 6 created a decoupling mechanism, which, according to FirstEnergy's then CEO, would operate to make FirstEnergy recession proof by guaranteeing inflated revenues at the expense of customers. Am Compl. ¶ 125. The decoupling mechanism tied the utility's revenue to the 2018 calendar year—a year in which Defendants allegedly increased their capital costs by hundreds of millions of dollars in anticipation of HB 6 and thereby resulting in a windfall to Defendants. Am. Compl. ¶¶ 111-12. Third, HB 6 removed the clean energy standards, thereby gutting customer savings and undermining all prior environmental efforts, all for Defendants' own gain. Am. Compl. ¶ 113. In July 2019, the General Assembly passed HB 6. Am. Compl. ¶ 120. The following day Energy Harbor announced it would suspend decommissioning of its nuclear facilities and instead refuel its stations at a cost of roughly $52 million, illegally subsidized through HB 6. Am. Compl. ¶ 121.

Following its passage, however, news quickly surfaced that this sweeping legislation, which seemed tailor-made to address the specific needs of FirstEnergy, was not obtained by honest means. On July 21, 2020, the United States of America indicted Larry Householder, Speaker of the House (Householder); Generation Now, Inc.; and several others (collectively, Householder Enterprise) alleging that they violated 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act (RICO). Am. Compl. ¶ 66. The Criminal Complaint alleged the Householder Enterprise's primary purpose was to increase Householder's political power to ensure passage of a legislative solution for Defendants' fiscal problems through corrupt means. Am. Compl. ¶ 69. Specifically, Defendants illegally paid to create the Householder Enterprise to coordinate, pass, and implement HB 6 in an effort to secure billions of dollars for FirstEnergy and its subsidiaries. Am. Compl. ¶ 70. These efforts included Householder accepting payments from Defendants for a 501(c)(4) organization, Generation Now, Inc., and the later use of those funds by Householder to further his own political interest and the interests of the Householder Enterprise. In total, Generation Now, Inc. received approximately $60 million from First Energy and/or Energy Harbor, along with an additional $890,000 to the Householder Enterprise. Am. Compl. ¶¶ 94-96, 113.

In addition to passage of the legislation, the Householder Enterprise illegally thwarted the ballot initiative to repeal HB 6. Am. Compl. ¶¶ 77, 82, 85-87, 90. Defendants contributed funds to "purchase media advertisements and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the ballot initiative." Am. Compl. ¶ 123.

Plaintiffs filed the original complaint August 8, 2020 and the Amended Complaint October 1, 2020.[2]  Energy Harbor now moves to dismiss, arguing Plaintiffs' allegations are insufficient to establish valid claims.  Energy Harbor's motion, however, misconstrues the applicable law and minimizes the breadth of Plaintiffs' pleading, and should therefore be denied.

## STANDARD OF REVIEW

"In reviewing whether a motion to dismiss should be granted, [the court] accept[s] as true all factual allegations in the complaint."  *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5.  "It is a longstanding principle that a plaintiff is not required to provide his or her case within the complaint at the pleading stage."  *Widok v. Estate of Wolf*, 8th Dist. Cuyahoga No. 108717, 2020-Ohio-5178, ¶ 27 (Nov. 5, 2020).  In ruling on a Civ.R. 12(B)(6) motion, the court must accept the factual allegations contained in the complaint as true and draw all reasonable inferences from these facts in favor of the plaintiff. *Ada Exempted Vill. Sch. Dist. Bd. of Educ. v. Ada Wind, LLC*, 2020-Ohio-4017, 157 N.E.3d 232, ¶ 19 (3d Dist.)."In order for a

---

[2] Plaintiffs bring this action on behalf of themselves and all those similarly situated.  The relevant Class and Subclasses are defined as:

    a.  All citizens of Ohio who paid costs or will pay costs associated with or affected by implementation of HB 6 (the "Class").

    b.  Included are the following subclasses:

        i.  All customers of Defendants who are citizens of Ohio and whose payments to Defendants were used by Defendants to fund efforts to pass and implement HB 6 (the "Customer Subclass").

        ii.  All citizens of Ohio who receive power from [Energy Harbor] and who paid costs or will pay costs associated with the refueling and continued operation of the Perry and Davis-Besse nuclear stations following the passage of HB 6 (the "[Energy Harbor] Customer Subclass").

Am. Compl. ¶ 140.

court to dismiss a complaint under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted, it must appear beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle the plaintiff to relief." *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶ 11.

## ARGUMENT

I.     **Plaintiffs have alleged Energy Harbor's Conduct Proximately Caused Their Injuries.**

Energy Harbor argues Plaintiffs cannot establish proximate cause because other actors broke the chain of causation and legislative immunity bars inquiry into its bad acts.   Neither assertion is faithful to the doctrines it seeks to invoke nor the breadth of the allegations in the Amended Complaint.   Energy Harbor took deliberate actions that caused damage to Plaintiffs and those acts are the focus of Plaintiffs' suit.

   A.     **Because the acts and injuries were foreseeable, there is no break in the chain of causation**.

Energy Harbor offers the sweeping argument that there are simply too may intervening acts between its affirmative acts and the injuries suffered by Plaintiffs, and therefore Plaintiffs cannot prove proximate cause.   This argument is specious at best.   Not only was it foreseeable that the injuries sustained by Plaintiffs would occur as a result of Defendants' actions, the injuries were the *intended* result.   The allegations in the Amended Complaint quite plainly assert that the bribes paid with customer funds as well as the HB 6 nuclear fees and decoupling mechanism are injuries created entirely by design and were the *purpose* of the illegal enterprise and conspiracy.

Initially, Plaintiffs note that pressing the merits of the allegations is not the posture of this motion, and Energy Harbor cannot contort a question of fact into a question of law simply because it believes the arguments are unpersuasive.   Moreover, proximate cause may generally be regarded as a quintessential jury question.   *Clinger v. Duncan*, 166 Ohio St. 216, 223, 141 N.E.2d 156, 162

(1957) ("Ordinarily, the existence of both negligence and proximate cause are, in a jury trial, questions of fact for the determination of the jury under proper instructions from the court * * *."). Alleging proximate cause does not require Plaintiffs to eliminate all other potential causes of injury; it only requires that the relationship between the harm and Plaintiffs' injuries be sufficiently direct.

The determination of whether a defendant should be deemed to have proximately caused an injury "require[s] examination of whether there is a reasonable connection between the defendant's acts and its consequences." *Iron Workers' Local Union No. 17 Ins. Fun v. Philip Morris, Inc.*, 23 F.Supp.2d 771, 782 (N.D.Ohio 1998). "Whether an intervening act breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 39, 90 N.E.2d 859, 863 (1950). "Thus, a reasonable foreseeability of injury is considered an element of proximate cause." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467, 471 (1981). "To establish proximate cause, the plaintiff must prove that her injuries were the natural and probable consequence of the negligent act." *Lloyd v. Rogerson*, 2019-Ohio-2606, ¶ 36, *appeal not allowed*, 157 Ohio St. 3d 1442, 2019-Ohio-4211, 132 N.E.3d 708, ¶ 36. "[I]n determining what is direct or proximate cause the rule requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." *Ross v. Nutt*, 177 Ohio St. 113, 114, 203 N.E.2d 118, 120 (1964), quoting *Miller v. Baltimore & Ohio Southwestern Rd. Co.*, 78 Ohio St. 309, 325, 85 N.E. 499, 504 (1908).

"In cases of willful or malicious injury, and injury from reckless or illegal acts, or from positive fraud, the damages are not so strictly confined to proximate consequences as when these elements do not exist." *Iron Workers'* at 783, quoting *Burckhardt v. Burckhardt*, 42 Ohio St. 474, 487 (1885). "Where there is fraud or other intentional wrong, there is not the same strictness to exclude remote or uncertain damages, even where punitory damages are not involved." *Iron Workers'* at 783, quoting *Burckhardt* at 487. Bribes paid with customer funds, as well as the HB 6 nuclear fees and decoupling mechanism, are injuries created by design, not happenstance. If Energy Harbor truly believed that bribing officials would have no effect, there would have been no reason to undertake those acts and squander that $60 million. To wit, even *legal* lobbying would become a strange enterprise if there was not means to directly influence legislation. Furthermore, damages flow directly from Energy Harbor availing itself of the nuclear fees created by legislation it knew was illegally enacted. Whether that act was just or reasonable has nothing to do with the legislative actions circling HB 6.

The injuries sustained by Plaintiffs and the Class are not remote or surprising, but are the result of pointed, deliberate acts. All the misdeeds alleged in the Amended Complaint were targeted at injuring the Plaintiffs and the Class. Defendants needed a bailout, and they wanted electric customers in Ohio and their own customers to pay for it. The scheme was elaborate and pervasive, but the fact that it had numerous facets does not undermine Defendants' liability. It highlights it. Energy Harbor knew full well what damage it was causing, and that the damage occurred with the sometimes-unwitting participation of other actors cannot undue causation.

### B. Energy Harbor is not a legislator and is therefore not entitled to legislative immunity.

Energy Harbor also argues it is entitled to legislative immunity from its bad acts, essentially claiming that because its scheme involved legislation, its conduct is immune from examination.

This assertion is nonsensical. Energy Harbor is not a legislator and this case does not involve any legislator defendants. Offering constitutional absolute privilege to a corrupt business would allow Section 12, Article II of the Ohio Constitution, the Speech or Debate Clause, a disconcerting breadth. Furthermore, at this early stage of litigation, it is presumptuous to assume Plaintiffs cannot prove their case without interviewing legislators as to their thoughts and motives. Finally, the argument ignores the Amended Complaint's expansive allegations of bad acts undertaken and the specifics of the damages claimed.

Reviewing the plain language of the relevant constitutional provision, it is clear the protections articulated are rights belonging to the legislators. "*Senators and Representatives*, during the session of the General Assembly, and in going to, and returning from the same, shall be privileged from arrest, in all cases, except treason, felony, or breach of the peace; and for any speech, or debate, in either House, they shall not be questioned elsewhere." (Emphasis added.) Ohio Const. Article II, Section 12. And it is designed to safeguard those legislators from attack in the courts for what they have said in the course of their work as legislators, not shroud valid inquiries into the democratic process. "Ohio cases applying legislative privilege are primarily concerned with immunity from criminal prosecution or civil actions for defamation, rather than protection from compelled testimony or discovery." *Dublin v. State*, 138 Ohio App.3d 753, 758, 742 N.E.2d 232, 236 (10th Dist. 2000); *see In re Grand Jury Investigation Into Possible Violations of Title 18*, *U.S. Code, Sections 201, 371, 1962, 1952, 1951, 1503, 1343 & 1341*, 587 F.2d 589, 597 (3d Cir. 1978) ("[T]o the extent that the Speech or Debate Clause creates a Testimonial privilege as well as a Use immunity, it does so only for the purpose of *protecting the legislator* and those intimately associated with him in the legislative process from the harassment of hostile questioning. It is not designed to encourage confidences by maintaining secrecy, for the legislative

process in a democracy has only a limited toleration for secrecy." (emphasis added)). Even in the context of the criminal prosecution or civil actions for defamation, the court has been reticent to expand the scope of privilege to shield co-conspirators and joint tortfeasors from suit simply because they undertook their bad acts with parties who may enjoy some immunity. *See Bigelow v. Brumley*, 138 Ohio St. 574, 589–90, 37 N.E.2d 584, 592–93 (1941) (holding defendant was not immune from suit for defamation even though his co-conspirators, who made the allegedly defamatory statements, were entitled to absolute legislative immunity). So although the Speech or Debate Clause provides expansive and absolute immunity, it does not provide it to Energy Harbor.

Yet Energy Harbor asserts that regardless of who asserts the privilege, Plaintiffs are unable to prove proximate cause without questioning the motives of legislators, and therefore the claims must all fail. But such a gloss over the allegations is unsupportable. Initially, it ignores the types of damages alleged. As Energy Harbor acknowledges, Plaintiffs assert they have been damaged by Defendants' misuse of customer monies in expending over $60 million in bribes. Proving those acts occurred and resulted in the loss of $60 million to the customers does not require inquiry into any legislators' motivations. Instead, this matter may be prosecuted on the bad acts of Energy Harbor alone. Even as to the damages flowing from HB 6, Plaintiffs allege Energy Harbor engaged in illegal conduct not involving legislators. In undermining the ballot initiative to repeal HB 6 after its passage, Energy Harbor is alleged to have contributed funds to "purchase media advertisements and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the ballot initiative." Am. Compl. ¶ 123.

The path to proving Energy Harbor's intentional conduct caused the injuries Plaintiffs now suffer is not dependent on the testimony of any legislator. And any legislator who is sought to be deposed may assert that privilege if the moment arises, and the Court may then assess to what extent the privilege may apply. It is evident, however, that Energy Harbor has no legal basis to assert any legislative privilege.

### C.   Energy Harbor misstates Plaintiffs' assertion of damages.

As a final attack on causation, Energy Harbor contends the Energy Harbor Customer Subclass cannot complain of damages from increased rates because its rates were set in 2011. Initially, the Energy Harbor Customer Subclass is not confined to residents of Beloit. Regardless, it is of no moment when the rates were set in considering the $60 million in bribe money that Plaintiffs include as damages. Plaintiffs are not arguing about rates, their formulation, or collection. Instead, Plaintiffs focus on the propriety of Energy Harbor's actions and the costs the subclass has had to pay as a result of Energy Harbor's bad acts. Central to these allegations is that Energy Harbor misused their funds in violation of statutory, contractual, and common law duties. While Energy Harbor now attempts to disguise this sum as a rate dispute, the reality is these funds were employed for improper purposes and are distinct damages that flow from the illegality of Energy Harbor's conduct.

## II.   Plaintiffs Have Alleged Duties Owed and Breached Under Contract.

Energy Harbor has also moved to dismiss the Customer Subclasses' causes of action for breach of contract, essentially arguing that because Plaintiffs have not pointed to specific contractual provisions expressly prohibiting it from illicit and/or improper use of customer funds, Plaintiffs' breach of contract claim fails. This assertion, however, is patently flawed. A review of

the terms of the two service agreements[3] attached to Energy Harbor's motion to dismiss reveal that nothing in the terms allow the acts undertaken. Moreover, Plaintiffs allege Energy Harbor violated its contractual obligations, including the duty of good faith and fair dealing inherent in every contract. These allegations are sufficient to survive a motion to dimiss.

"A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.2d 458, ¶ 41. "In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell* at ¶ 42. " 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443–44, 662 N.E.2d 1074, 1082–83 (1996), quoting *Kham v. Waters Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Lucarell* at ¶ 43, quoting Restatement of Law 2d, Contracts, Section 205 (1981); *see* R.C. 1301.304, Obligation of Good Faith (noting that duties arising under contract impose an obligation of good faith in performance). "The implied duty may give rise to a breach of contract claim when the term

---

[3] *See* Energy Harbor Mot. Dismiss, Exs. A, Aggregator Agreement, and Exhibit B, the Residential and Small Commercial Terms and Conditions (the Agreements). The Agreements may be illustrative but not dispositive of the contractual relationships between Energy Harbor and the Plaintiff customer classes. Discovery is needed to ascertain the various contractual agreements and arrangements governing the relationships between Energy Harbor and class members, which would be impossible for Plaintiffs to have at this time.

allegedly breached is the implied duty of good faith and fair dealing." *McGrath v. Nationwide Mut. Ins. Co.*, 295 F.Supp.3d 796, 808 (S.D.Ohio 2018).

The Amended Complaint plainly enunciates responsibilities Energy Harbor owed pursuant to the pertinent contract(s), stating:

> Defendants breached their contracts with Plaintiffs and the customer subclass members in one or more of the following particulars, including:
>
> (a) Failing to operate in good faith;
>
> (b) Misusing funds collected from Plaintiffs and the customer subclass members;
>
> (c) Engaging in illegal political activities using Plaintiffs' and the customers subclass members funds; and
>
>         * * *
>
> (f) Incurring additional nuclear costs following the passage of HB6.

Am. Compl., ¶ 166.

Energy Harhor categorically asserts the actions complained of by Plaintiffs do not constitute violations of its contractual obligations. At this early stage in the litigation, it is sufficient that a contractual relationship exists and Plaintiffs have readily identified the obligations they contend Energy Harbor violated. It is reasonable for the Subclasses to expect that their service provider would not use customer funds for illegal bribes and kickbacks in an effort to secure additional billions of dollars of revenue to be funded by Plaintiffs and the Class. Because the facts are in dispute as to the exact terms of the contractual relationship and whether those terms have been satisfied or breached, dismissal at this juncture would be premature. *The Bank of New York Mellon v. Lewis*, 6th Dist. Erie No E-13-051, 2014-Ohio-5599, ¶ 81 (Dec. 19, 2014) (noting while whether a contract had been breached is a question of law, where the facts are in dispute, whether a party satisfied the terms of the contract is a question of fact).

A contract should not have to expressly prohibit illicit use of customer funds or a scheme to gin up additional customer revenue—yet that is precisely what Energy Harbor asks this Court to conclude. Energy Harbor's argument is contrary to law and to public policy, and the motion to dismiss the breach of contract claim must be denied.

## III.     Plaintiffs have Alleged Energy Harbor Breached Duties Arising in Tort.

Energy Harbor then suggests that Plaintiffs' negligence claims must fail because they have only pled a violation of contractual duties, not tort liability. This is inaccurate. "[U]nder modern rules of pleading, an action for tort may be combined with and arise from the same operative facts as a breach- of-contract action." *Burns v. Prudential Securities, Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, ¶ 99 (3d Dist.). Additionally, overlooked by Defendant's assertions is that although the Customer Subclasses claim breaches of contract against Energy Harbor, the Class does not. There is no allegation that the Class of all Ohioans who are bearing the costs associated with HB 6 are in privity with Energy Harbor. And the existence of a contract between the Customer Subclasses and Energy Harbor is not the basis for the tort claims. Furthermore, because the negligence claims are not premised on contractual responsibilities, but grounded in independent duties created by Energy Harbor's own actions, the economic loss rule is inapplicable. *Eysoldt v. ProScan Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359, ¶ 21 (1st Dist.) (finding that the economic loss rule does not apply to intentional torts, as they are breaches of duties beyond those created by contract).

Energy Harbor first attempts to sidestep liability by asserting that Plaintiffs may not recover in tort for an alleged breach of contract.[4] In so doing, Energy Harbor disregards that duty may be

---

[4] Of course, Plaintiffs are entitled to plead alternative theories. *See* Civ.R. 8(E)(2) ("A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds.").

established by common law due care, as well as the particular circumstances of a case. *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 23 (explaining that duty may be established by common law, legislative enactment, or particular circumstances of a case). It is fundamental that "[a] person is to exercise that care necessary to avoid injury to others." *See Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335, 338, 190 N.E. 924, 925 (1934) (explaining common law duty of due care is the degree of care that a reasonable and prudent person exercises under the same or similar circumstances); 70 Ohio Jurisprudence 3d (1986) 62, Negligence, Section 19 ("[A] person is to exercise that care necessary to avoid injury to others"). "Each person has a duty to engage in her daily activities using a certain amount of care." *Boyd v. Moore*, 184 Ohio App.3d 16, 21, 2009-Ohio-5039, 919 N.E.2d 283, ¶ 10 (2d Dist.). Practically, the law expects both people and businesses to exercise reasonable precautions against risks that a reasonably prudent person would anticipate.

As such, the Court is not constrained by a rigid formula—and certainly not contractual terms—in ascertaining whether a duty exists. Rather, "[d]uty ' * * * is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts (4th ed. 1971) pp. 325–326.)'" *Mussivand v. David*, 45 Ohio St. 3d 314, 318, 544 N.E.2d 265, 270 (1989), quoting *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 471, 539 P.2d 36, 39 (1975). " 'Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. (Prosser, *Palsgraf Revisited* (1953), 52 Mich.L.Rev. 1, 15).' " " *Mussivand* at 318, quoting *Weirum* at 46.

When evaluating the circumstances to determine existence of duty, a court considers whether "the probability of injury to those in the plaintiff's general situation should have been perceived by a reasonably prudent and careful person." *Gedeon* at 339, 190 N.E. at 926. Thus, foreseeability is a primary consideration in all negligence claims. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 263, 2015-Ohio-229, 29 N.E.3d 921, ¶ 24. Succinctly stated, duty depends on the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645, 597 N.E.2d 504, 507 (1992).

In the context of the negligence claims, Energy Harbor's relevant relationship with the Class and Subclasses was manufactured by Energy Harbor's affirmative acts surrounding HB 6 and the foreseeable harm to both. As pled, HB 6 ensured the continued operation of Ohio's failing nuclear reactors—both owned by Energy Harbor—by establishing a process for an owner of a nuclear reactor to apply for bailout funds. Am. Compl. ¶ 108. Specifically, HB 6 created a monthly nuclear surcharge to be passed on to *all* Ohio electric customers—from January 2021 through December 2027, which will produce an annual collection of $150 million.[5] Am. Compl. ¶¶ 108-10. Only Energy Harbor qualifies for these funds. HB 6 allowed Energy Harbor to suspend decommissioning of its nuclear facilities and instead refuel its stations at a cost of roughly $52 million. Am. Compl. ¶ 121. To initiate this scheme, Defendants funded the Householder Enterprise with $60 million from monies paid to Defendants by the Customer Subclass to secure the drafting and passage of HB 6. Am. Compl. ¶¶ 94-96, 113. By improperly funneling customer money, Energy Harbor and the other Defendants guaranteed HB 6 would be customized for their

---

[5] Notably, HB 6 expressly states that the financer cost is not connected to any rate. Am. Compl. ¶ 109.

benefit to the direct detriment of Plaintiffs. Am. Compl. ¶ 70. The very success of Defendants' scheme, along with the viability of their companies, depended on Plaintiffs being harmed. Each set of injuries can be traced back to their affirmative acts. This relationship is neither derived from any pre-existing relationship nor based on any contract. Energy Harbor's conduct unreasonably exposed Plaintiffs to harm. In so doing, this harm became a dependent foreseeability that was cemented in law by the passage of HB 6. Thus, a duty exists separate and apart from any contract Energy Harbor may have with the Subclasses, and therefore, it would be improper to dismiss negligence claims at this stage.

Energy Harbor also seeks shelter in the economic loss rule. However, the economic loss rule is implicated where the relationship between the parties is governed by contract and *only* by contract. *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co*, 42 Ohio St.3d 40, 42, 537 N.E.2d 624, 625 (1989) (explaining the economic loss rule stems from a belief that tort law is designed to redress loss suffered by a breach of duty, and contract law is designed to be a commercial transaction in which parties may govern their own affairs).[6] Accordingly, the rule has no application to tort law based claims that arise separate and apart from any contractual agreement. In contrast to tort liability, examining damages that arise from an agreement requires the review of damages that were contemplated by the parties at the time of contract. *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 414, 835 N.E.2d 701, ¶ 6. Thus, for the economic loss rule to apply, there must be a contractual relationship between the parties regarding the alleged breach, along with privity.

---

[6] The transactions involved are not traditional commercial transactions but rather contracts of adhesion which class members must participate in to to obtain a basic necessity for modern life.

Energy Harbor is not in privity with all Ohio utility customers, and though Energy Harbor has some contractual relationship with its own customers, this fact alone does not implicate the economic loss rule. Instead, that contract must cover the alleged breaches and the damages must have been of the type contemplated by the parties. As previously discussed, Plaintiffs' negligence allegations stem from Energy Harbor's improper and illegal affirmative acts. Those acts and the corresponding damages were not contemplated as part of the service agreement. For this reason, the economic loss rule has no bearing on Plaintiffs' negligence claims.

## IV.  Plaintiffs State a Valid Claim for Unjust Enrichment.

Energy Harbor argues Plaintiffs' unjust enrichment claim must fail because any remedy would be in contract, and Plaintiffs have failed to plead the elements. Energy Harbor mistakes the relevant law.

As previously stated, Plaintiffs are permitted to plead claims in the alternative, and therefore, the mere fact that Plaintiffs plead breach of contract and unjust enrichment is not grounds for dismissal.

> A party may set forth two or more statements of a claim or defense alternatively either in one count or defense or in separate counts or defenses. * * * A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds.

Civ.R. 8(E)(2). "Because alternative pleading is permissible, a party may plead both a breach-of-contract claim and an unjust-enrichment claim without negating the validity of either claim." *Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, 977 N.E.2d 742, ¶ 26 (10th Dist.).

"The doctrine of unjust enrichment provides an equitable remedy, under which the court implies a promise to pay a reasonable amount for services rendered where a party has conferred a benefit on another without receiving just compensation for his or her services." *Saraf v. Maronda Homes, Inc. of Ohio*, 10th Dist. Franklin No. 02AP-461, 2002-Ohio-6741, ¶ 11. Under a theory

of unjust enrichment, "civil liability 'arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain' without compensating the individual who conferred the benefits." *Camp St. Mary's Assn. of the W. Ohio Conference of the United Methodist Church, Inc. v. Oterrbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, 889 N.E.2d 1066, ¶ 23 (3rd Dist.), quoting *Fisk Alloy Wire, Inc. v. Hemsath*, 6th Dist. Lucas No. L-05-1097, 2005-Ohio-7007, 2005 WL 3557392, ¶ 69.

To recover under a theory of unjust enrichment, "a plaintiff must demonstrate the following: (1) a benefit conferred by the plaintiff upon a defendant; (2) knowledge by the defendant of such benefit; and (3) retention of the benefit under circumstances where it would be unjust to do so without payment." *Brown-Graves Co. v. Obert*, 98 Ohio App.3d 517, 523, 648 N.E.2d 1379 (1994). Moreover, Ohio law does not bar unjust enrichment claims if a contract claim is ultimately deemed unenforceable. *Longmire v. Donaci*, 2020-Ohio-3704, 155 N.E.3d. 1014, ¶ 27 (10th Dist. 2020). "[I]f no remedy is available in contract or tort, then the equitable remedy in unjust enrichment may be afforded to prevent injustice." *Banks v. Nationwide Mut. Fire Ins. Co.*, 10th Dist. Franklin No. 99AP-1413, 2000 WL 1742064, at *5 (Nov. 28, 2000). Plaintiffs are therefore permitted at this stage of litigation to present alternative theories of recovery. Energy Harbor's apparent preference for contractual liability is irrelevant.

Plaintiffs have pled the elements of unjust enrichment. As discussed above, Energy Harbor's design to create the injuries now complained of undermines any proximate cause argument it attempts to present. Furthermore, Energy Harbor's argument that Plaintiffs have failed to allege it has been unjustly enriched because nuclear fees have not been received mischaracterizes and ignores the allegations of the Amended Complaint, including that upon

passage of HB 6, Energy Harbor immediately received funds for nuclear refueling from Plaintiffs and the Class valued at $52 million.  Am. Compl. ¶ 121.

Additionally, the Amended Complaint expressly pleads: "From March 2017 to March 2020, the Householder Enterprise received approximately $60 million from Defendants paid through Generation Now for the purpose of ensuring the ill-gotten gains created by HB 6." Am. Compl. ¶ 128).

The Amended Complaint further provides:

126. Collectively, HB 6 guarantees Defendants a bailout worth at least $1.3 billion – all funded by [Defendants'] customers and the people of Ohio.

* * *

129. Upon information and belief, Defendants' customers were their exclusive source of revenue. Thus, customers paid every dollar Defendants used for bribes, kickbacks, and illegal support of HB 6, and to quash the ballot initiative to repeal HB 6, and they will pay the majority of the money associated with implementation of HB 6.

*Id.* at ¶¶ 126, 129.  Plaintiffs also allege that for years leading up to Defendants' misuse of funds for the illegal and illicit passage of HB 6, Plaintiffs paid non-gratuitous benefits to Defendants for energy efficiency measures, whose impact will be completely annihilated by HB 6, thus causing Plaintiffs to lose the value associated with these measures.  *See* Am. Compl. ¶ 113.

Taken together, Plaintiffs allege Defendants, including Energy Harbor, used Plaintiffs' funds for illegal and illicit political activity designed to ensure an improper billion-dollar revenue stream to be funded by Plaintiffs. The Amended Complaint alleges that after using Plaintiffs' funds for illegal and/or illicit purposes, Energy Harbor received the immediate benefits valued at roughly $52 million, and that Plaintiffs, who for years conferred non-gratuitous benefits upon Defendants tied to energy efficiency, immediately lost the value of these benefits upon passage of HB 6. These

allegations more than suffice the pleading requirements for unjust enrichment, and Energy Harbor's motion to dismiss Plaintiffs' unjust enrichment claim must therefore be denied.

## V. Plaintiffs' Claims for Declaratory and Injunctive Relief Are Not Excused From Judicial Review.

In an attempt to muddy doctrines designed to protect the legislative process—not shield companies that have corrupted it—Energy Harbor weakly argues Plaintiffs cannot seek an injunction or declaratory relief because it is entitled to legislative immunity and its illegal behavior cannot be reviewed under the political question doctrine. As discussed *supra*, the doctrine of legislative immunity does not extend to Energy Harbor. And it fares no better with the political question. The acts scrutinized within the Amended Complaint are not the political process, but Defendants' malfeasance in subverting the authenticity of the political process. Engaging in a multi-million-dollar bribery scheme can hardly be characterized as "essentially legislative in character" so as to deserve the presumption of validity embodied in the political question doctrine. The courts have repeatedly acknowledged that although they may refrain from addressing questions clothed in the legal fulfilment of a political act, they do not sit idly when fraud and corruption are alleged. *See Sullivan v. State ex rel. O'Connor*, 125 Ohio St. 387, 392, 181 N.E. 805, 806 (1932) (acknowledging that although a decision of a board of election is generally not judicially reviewable as a political question, the court will not decline review if the results were "procured by fraud or corruption").

## VI. Plaintiffs Plead Viable Claims Supporting the Civil Conspiracy Claim.

Last, Energy Harbor argues Plaintiffs' civil conspiracy claim should be dismissed because their tort claims should fail. Circular logic cannot be the basis for a motion to dismiss. The pleadings and the inferences to be drawn from them present this Court with elements of a civil conspiracy claim. "[A] civil conspiracy consists of: (1) a malicious combination; (2) two or more

persons; (3) injury to person or property; and (4) results in actual damages." *Apex Tool Grp., LLC v. DMTCO*, No. 3:13–cv–372, 2014 WL 6748344, at *18 (S.D.Ohio Nov. 26, 2014). "In addition the existence of an unlawful act independent from the actual conspiracy in required for a conspiracy claim to succeed." *Id.* These items are present within the pleadings and will be part of the discovered facts. Plaintiffs articulate viable claims that Energy Harbor committed unlawful acts that caused Plaintiffs and the putative class actual damage. Plaintiffs' cause of action for civil conspiracy meets all criteria to move beyond the Motion to Dismiss phase.

## CONCLUSION

Given the foregoing, Plaintiffs respectfully request on behalf of themselves and the Class and Subclasses they seek to represent, that this Court deny Energy Harbor's motion to dismiss.

This 21st day of December 2020.

Respectfully submitted,

*s/ Greg M. Galvin*
Greg M. Galvin (0075612)
P.O. Box 887
Bluffton, SC 29910
Phone: (843) 227-2231
ggalvin@galvinlawgroup.com
*COUNSEL FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed this 21st day of December, 2020, via the Court's authorized E-Filing system and, by Local Rule, is being served on all counsel of record in this case, who are registered users of the E-Filing system.

*s/ Greg M. Galvin*
Greg M. Galvin (0075612)



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**BRIEF IN OPPOSITION**
**December 21, 2020 15:51**

By: GREG M. GALVIN 0075612

Confirmation Nbr. 2140994

MICHAEL EMMONS                                          CV 20 935557

      vs.

FIRSTENERGY CORPORATION, ET AL          **Judge:** SHANNON M. GALLAGHER

**Pages Filed:** 71

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| MICHAEL EMMONS and ROBERT BROWN, individually and on behalf of all those similarly situated, | Case No. CV 20 935557 |
| Plaintiffs, | Judge Shannon M. Gallagher |
| v. | |
| FIRSTENERGY CORP., *et al.*, | |
| Defendants. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## FIRSTENERGY DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................1

STANDARD OF REVIEW .....................................................................................................5

ARGUMENT ...........................................................................................................................6

    I. The Filed-Rate Doctrine is Inapplicable ......................................................................6

    II. Plaintiffs Have Pled Duty and Breach .........................................................................9

    III. Plaintiffs Have Alleged Breach of Contract..............................................................13

    IV. Plaintiffs Have Alleged Unjust Enrichment...............................................................16

    V. Plaintiffs Have Adequately Alleged Proximate Cause of Their OCPA Claim ....................18

    VI. Plaintiffs Pled Viable Claims Supporting the Civil Conspiracy Claim .............................20

    VII. Plaintiffs are Entitled to Declaratory and Injunctive Relief .............................................20

CONCLUSION........................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ada Exempted Vill. Sch. Dist. Bd. of Educ. v. Ada Wind, LLC*, 2020-Ohio-4017, 157 N.E.3d 232 (3d Dist.) ................................................................................................................ 6, 14

*Apex Tool Grp., LLC v. DMTCO*, No. 3:13–cv–372, 2014 WL 6748344 (S.D.Ohio Nov. 26, 2014) ........................................................................................................................ 20

*Boyd v. Moore*, 184 Ohio App.3d 16, 2009-Ohio-5039, 919 N.E.2d 283 (2d Dist.).................... 10

*Burckhardt v. Burckhardt*, 42 Ohio St. 474 (1885). ..................................................... 18

*Castle Hill Holdings, LLC v. Al Hut, Inc.*, 8th Dist. Cuyahoga No. 86442, 2006-Ohio-1353 (March 23, 2006) ................................................................................................. 14

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co*, 42 Ohio St.3d 40, 537 N.E.2d 624 (1989) 12

*Citibank N.A. v. Ebbing*, Twelfth Dist. Butler No. CA 2012-12-252, 2013- Ohio-4761, 2013 WL 5783722 (Oct. 28, 2013) .......................................................................................... 15

*Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, 977 N.E.2d 742 (10th Dist.). ................. 16

*Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921 ....................................................................................................................... 10

*Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268. ......... 6

*Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443–44, 662 N.E.2d 1074 (1996) ....................................................................................................................... 15

*Fletcher v. Univs. Hosp. of Cleveland*, 120 Ohio St.3d 167, 897 N.E.2d 147 (2008).................. 14

*Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 560 N.E.2d 206 (1990)................................................................................................. 13

*Gary Phillips & Assoc. v. Ameritech Corp.*, 144 Ohio App.3d 149, 759 N.E.2d 833, (2001) ... 6, 7

*Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335, 190 N.E. 924 (1934)....................................... 9

*Iron Workers' Local Union No. 17 Ins. Fun v. Philip Morris, Inc.*, 23 F.Supp.2d 771(N.D.Ohio 1998). ................................................................................................................... 18

*Keco Industries, Inc. v. Cincinnati Suburban Bell Telephone Co.*, 166 Ohio St. 254, 141 N.E.2d 465 (1957)............................................................................................................... 17

*Kham v. Waters Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351(7th Cir. 1990). ....... 15

*Lloyd v. Rogerson*, 9th Dist. Wayne No. 18AP0024, 2019-Ohio-2606, *appeal not accepted*, 157 Ohio St.3d 1442, 2019-Ohio-4211, 132 N.E.3d 708. ........................................................... 19

*Longmire v. Donaci*, 2020-Ohio-3704, 155 N.E.3d 1014 (10th Dist.). ....................................... 16

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.2d 458. ....... 15

*MCI Telecommunications Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539 (6th Cir.1994)................7

*Miller v. Baltimore & Ohio Southwestern Rd. Co.*, 78 Ohio St. 309, 85 N.E. 499 (1908).......... 19

*Moss v. Columbus Bd of Ed.*, 55 Ohio Misc. 7, 379 N.E.2d 275 (Ohio Com.Pl. 1978)............21

*Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 90 N.E.2d 859 (1950). ....................................... 19

*Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44. ................... 5

*Ross v. Nutt*, 177 Ohio St. 113, 203 N.E.2d 118 (1964) ............................................................. 19

*Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 597 N.E.2d 504 (1992). ............................ 10

*State ex rel. Ohio Edison, Co. v. Shaker*, 68 Ohio St.3d 209, 625 N.E.2d 608 (1994)...............9

*Strother v. Hutchinson*, 67 Ohio St.2d 282, 423 N.E.2d 467 (1981) ........................................... 19

*Textron Fin. Corp. v. Nationwide Mut., Ins. Co.*, 115 Ohio App.3d 137, 648 N.E.2d 1261 (9th Dist. 1996).................................................................................................................................... 13

*The Bank of New York Mellon v. Lewis*, 6th Dist. Erie No E-13-051, 2014-Ohio-5599 (Dec. 19, 2014) ............................................................................................................................................ 15

*Wallace v. Ohio Doc.*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018 (2002)................ 9

*Widok v. Estate of Wolf*, 8th Dist. Cuyahoga No. 108717, 2020-Ohio-5178 (Nov. 5, 2020)......... 5

*Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788 (6th Cir. 2012). ............................................... 7

*Wilson v. Mercy Med. Ctr.*, Fifth Dist. Stark No. 2015CA00010, 2015 WL 5664500 (Sept. 21, 2015) ............................................................................................................................................ 12

## STATUTES

R.C. 2721.03 .................................................................................................................... 20

R.C. 3706.46(A)(2) ............................................................................................................. 7

R.C. 4905.30 ...................................................................................................................... 6

## RULES

Civ.R. 12(B)(6) ................................................................................................................. 5,6

Civ.R. 10(D)(1) ................................................................................................................. 14

Civ.R. 8(E)(2) ................................................................................................................... 16

## TREATISES

Prosser, Law of Torts (4th ed. 1971) ............................................................................... 10

Prosser, *Palsgraf Revisited* (1953), 52 Mich.L.Rev. 1, 15 ........................................... 10

70 Ohio Jurisprudence 3d (1986) 62, Negligence, § 19 ................................................. 9

## INTRODUCTION

This case arises from the conduct of Defendants FirstEnergy Corp. (FirstEnergy), FirstEnergy Service Company (FirstEnergy Service), Ohio Edison Company (Ohio Edison), Toledo Edison Company (Toledo Edison), the Cleveland Electric Illuminating Company (Illuminating Company) [collectively, FirstEnergy], and Defendant FirstEnergy Solutions n/k/a Energy Harbor (Energy Harbor), in orchestrating the illegal and unethical passage and implementation of House Bill 6 (HB 6), a law providing enormous financial benefits to Defendants to the direct detriment of Plaintiffs and the Class.

The Amended Complaint asserts Defendants undertook intentional and negligent conduct, engaged in criminal activity, sustained nuclear generation that is unsupported by the market, and burdened Plaintiffs with unwarranted expenses and the loss of clean energy standards and savings. Am. Compl. ¶¶ 28-29, 113. Specifically, Defendants improperly initiated a scheme to revive nuclear energy generation with guaranteed financing by all Ohio utility customers and implemented a decoupling mechanism that secures FirstEnergy dubious inflated revenue for the foreseeable future. Am. Compl. ¶¶ 28-29, 69-72, 109-110, 111-113. Plaintiffs have accordingly sought both monetary damages and injunctive relief.[1] Am. Compl. pp. 49-50 (setting forth Plaintiffs' request for relief).

## FACTUAL BACKGROUND

In the last two decades, Ohio's electric utility industry has undergone three significant regulatory changes. Am. Compl. ¶¶ 39-65. First, in 1999, the General Assembly unbundled electrical services and charges for electricity generation, transmission, and distribution to create

---

[1] Plaintiffs' Amended Complaint alleges claims under the Ohio Consumer Sales Practices Act, R.C. 1345.02, against FirstEnergy and Energy Harbor. However, Plaintiffs now withdraw that cause of action as to both Defendants.

an open wholesale market. Am. Compl. ¶¶ 39-40. Finding this deregulation problematic and unprofitable for utilities, in 2008, the General Assembly set forth a new framework focused on providing stable and predictable electricity rates, development of renewable energy technologies, and an increase in energy efficiency through clean energy standards. Am. Compl. ¶¶ 41-42 (explaining Senate Bill 221). As part of these clean energy standards, utilities had to meet at least 12.5 % of electricity demand through renewables and decrease energy use by more than 22 % through energy efficient programs by 2025. *Id.* These changes were touted as both beneficial to the environment and providing significant cost savings to all Ohio customers. Am. Compl. ¶ 43. Following the enactment of new standards, energy efficiency programs realized more than $1 billion in savings for customers, and reports projected that customers could receive $4 billion in savings over a ten year-period. Am. Compl. ¶ 47. Moreover, the American Council for an Energy Efficient Economy reported that if the energy efficiency standards continued, customers could save $5.6 billion. Am. Compl. ¶ 48.

FirstEnergy and Energy Harbor, FirstEnergy's subsidiary that provided energy through nuclear generation, quickly realized that the cost savings for customers from energy efficiency resulted in decreased profits. Am. Compl. ¶ 49. Around the same time, the cost of natural gas decreased dramatically, which effectively reduced the financial appeal of other types of generation such as nuclear generation. With no natural gas generation of its own, FirstEnergy experienced these two shifts more acutely than other utilities. Am. Compl. ¶ 45.

By 2016, FirstEnergy reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses from Energy Harbor. Am. Compl. ¶ 53. Because of these circumstances, FirstEnergy publicly announced it would exit nuclear generation. Am. Compl. ¶ 54. Still, over the course of the next year, Defendants led unsuccessful legislative attempts to save

Defendants' nuclear facilities. By March 2018, Energy Harbor publicly announced its plans to decommission its two Ohio nuclear plants. Am. Compl. ¶ 58-59.

While the two plants were scheduled to be deactivated in May 2020 and October 2021, Defendants continued to push for a legislative solution to keep the plants fully functioning. Am. Compl. ¶¶ 60 & 102. This legislative solution came in the form of HB 6—a bill crafted to economically benefit Defendants to the detriment—both economically and environmentally—of all Ohio utility customers.

Specifically, HB 6 implemented three significant changes that directly benefited Defendants. First, it created a nuclear generation fund that pools $150 million annually from all Ohio utility customers from 2021 through 2027. Am. Compl. ¶ 110. Notably, Energy Harbor was the *only* utility eligible to apply for these funds because of a condition that only a company with nuclear generation in the state would be eligible. Am. Compl. ¶ 108. Second, HB 6 created a decoupling mechanism, which, according to FirstEnergy's then CEO, would operate to make FirstEnergy recession proof by guaranteeing inflated revenues at the expense of customers. Am Compl. ¶ 125. The decoupling mechanism tied the utility's revenue to the 2018 calendar year—a year in which Defendants allegedly increased their capital costs by hundreds of millions of dollars in anticipation of HB 6 and thereby resulting in a windfall to Defendants. Am. Compl. ¶¶ 111-12. Third, HB 6 removed the clean energy standards, thereby gutting customer savings and undermining all prior environmental efforts, all for Defendants' own gain. Am. Compl. ¶ 113. In July 2019, the General Assembly passed HB 6. Am. Compl. ¶ 120. The following day Energy Harbor announced it would suspend decommissioning of its nuclear facilities and instead refuel its stations at a cost of roughly $52 million, illegally subsidized through HB 6. Am. Compl. ¶ 121.

Following its passage, however, news quickly surfaced that this sweeping legislation, which seemed tailor-made to address the specific needs of FirstEnergy, was not obtained by honest means. On July 21, 2020, the United States of America indicted Larry Householder, Speaker of the House (Householder); Generation Now, Inc.; and several others (collectively, Householder Enterprise) alleging that they violated 18 U.S.C. § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Am. Compl. ¶ 66. The Criminal Complaint alleged the Householder Enterprise's primary purpose was to increase Householder's political power to ensure passage of a legislative solution for Defendants' fiscal problems through corrupt means. Am. Compl. ¶ 69. Specifically, Defendants illegally paid to create the Householder Enterprise to coordinate, pass, and implement HB 6 in an effort to secure billions of dollars for FirstEnergy and its subsidiaries. Am. Compl. ¶ 70. These efforts included Householder accepting payments from Defendants for a 501(c)(4) organization, Generation Now, Inc., and the later use of those funds by Householder to further his own political interest and the interests of the Householder Enterprise. In total, Generation Now, Inc. received approximately $60 million from First Energy and/or Energy Harbor, along with an additional $890,000 to the Householder Enterprise. Am. Compl. ¶¶ 94-96, 113.

In addition to passage of the legislation, Defendants illegally thwarted the ballot initiative to repeal HB 6. Am. Compl. ¶¶ 77, 82, 85-87, 90. Defendants contributed funds to "purchase media advertisements and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors who were seeking signatures to support the ballot initiative." Am. Compl. ¶ 123.

Plaintiffs filed the original complaint August 8, 2020 and the Amended Complaint October 1, 2020.[2]   FirstEnergy now moves to dismiss, arguing Plaintiffs' allegations are insufficient to establish valid claims.   FirstEnergy's motion, however, misconstrues the applicable law and minimizes the breadth of Plaintiffs' pleading.   As discussed in detail below, FirstEnergy's motion should be denied as Plaintiffs' have adequately pled their common law and statutory claims.

## STANDARD OF REVIEW

"In reviewing whether a motion to dismiss should be granted, [the court] accept[s] as true all factual allegations in the complaint." *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5.  "It is a longstanding principle that a plaintiff is not required to provide his or her case within the complaint at the pleading stage." *Widok v. Estate of Wolf*, 8th Dist. Cuyahoga No. 108717, 2020-Ohio-5178, ¶ 27 (Nov. 5, 2020).  In ruling on a Civ.R. 12(B)(6) motion, the court must accept the factual allegations contained in the complaint as true and draw all reasonable inferences from these facts in favor of the plaintiff. *Ada Exempted Vill. Sch. Dist.*

---

[2] Plaintiffs bring this action on behalf of themselves and all those similarly situated.  The relevant Class and Subclasses are defined as:

    a.  All citizens of Ohio who paid costs or will pay costs associated with or affected by implementation of HB 6 (the "Class").

    b.  Included are the following subclasses:

        i.  All customers of Defendants who are citizens of Ohio and whose payments to Defendants were used by Defendants to fund efforts to pass and implement HB 6 (the "Customer Subclass").

        ii.  All citizens of Ohio who receive power from [Energy Harbor] and who paid costs or will pay costs associated with the refueling and continued operation of the Perry and Davis-Besse nuclear stations following the passage of HB 6 (the "[Energy Harbor] Customer Subclass").

Am. Compl. ¶ 140.

*Bd. of Educ. v. Ada Wind, LLC*, 2020-Ohio-4017, 157 N.E.3d 232, ¶ 19 (3d Dist.). "In order for a court to dismiss a complaint under Civ.R. 12(B)(6) for failure to state a claim upon which relief may be granted, it must appear beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle the plaintiff to relief." *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶ 11.

## ARGUMENT

### I. The Filed-Rate Doctrine is Inapplicable.

FirstEnergy incorrectly asserts Plaintiffs' claims are barred by the filed-rate doctrine, arguing the Amended Complaint presents no more than a refund request for the electricity rates previously charged. As FirstEnergy itself acknowledges, "the filed rate doctrine bars recovery by those who claim injury by virtue of having paid utility rates approved by a regulator." FirstEnergy Mot. Dismiss, at 4. However, the payment of utility rates is not the basis for the claim of injury. As the language of the Amended Complaint makes plain, Plaintiffs' injuries emanate from Defendants' misconduct and illegal acts in orchestrating the passage and implementation of legislation designed to fleece Ohioans as a means to prop up their failing companies.

"The Ohio General Assembly has created a comprehensive statutory system for regulating the business activities of public utilities." *Gary Phillips & Assoc. v. Ameritech Corp.*, 144 Ohio App.3d 149, 153, 759 N.E.2d 833, 836 (2001). Under the provisions of R.C. 4905.30, "every public utility in the state is required to apply for PUCO approval of tariff schedules that detail the rates, charges, and classifications of their services." *Id.* The function of this framework gave rise to the filed-rate doctrine, which "mandates that a public utility must charge the tariff rates approved by the PUCO." *Id.*

"The filed rate doctrine prevents carrier discrimination by committing the carriers to one set tariff and preserves the role of administrative agencies in approving and setting rates, a practice at which they are particularly adept." *MCI Telecommunications Corp. v. Ohio Bell Tel. Co.*, 376 F.3d 539, 547–48 (6th Cir. 2004). "While public utilities are subject to pervasive regulation, and while the PUCO is vested with sweeping oversight, such authority is not all-encompassing, nor does it in any manner diminish the 'jurisdiction of the court of common pleas in other areas of possible claims against public utilities.'" *Gary Phillips*, 144 Ohio App.3d at 153, 759 N.E.2d at 836, quoting *Kazmaier Supermarket, Inc. v. Toledo Edison Co.*, 61 Ohio St.3d 147, 154, 573 N.E.2d 655, 660 (1991). To avoid overbroad application, courts have "distinguished between challenging the setting or reasonableness of a specific rate, which is barred by the filed-rate doctrine, and challenges that involve discussion of rates but do not challenge their reasonableness, which are permitted." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 796 (6th Cir. 2012).

Fundamentally, this case seeks a determination of whether Defendants' conduct violated Plaintiffs' rights and does not ask this Court to address the reasonableness of a utility rate. Not all claims will even require a *discussion* of rates. As it is statutorily defined, the nuclear surcharge is not a rate.[3] Bribery and intimidation of officials are not rates. FirstEnergy's effort to recast Plaintiffs' claims as a refund case ignores the depth of the claims. The Amended Complaint seeks redress for damages caused by Defendants' conduct related to the funding, passage, and implementation of HB 6. Specifically, Plaintiffs have asked this Court to determine whether

---

[3] The nuclear surcharge, R.C. 3706.46(A)(2), expressly provides:

> The level and structure of the charge shall be authorized by the commission through a process that the commission shall determine *is not for an increase in any rate, joint rate, toll, classification, charge or rental.*

*Id.* (emphasis added).

Defendants' illegal and illicit payments and activities to fund and implement HB 6, and Defendants' subsequent sabotage of the referendum to repeal HB 6, violated Plaintiffs' rights sounding in statute, contract, tort, and equity. Nothing in these claims invites this Court's inquiry into the reasonableness of the rate—rather, the claims request this Court's aide in reviewing the legality of Defendants' actions. So, Defendants' attempt to wriggle out of this lawsuit by claiming Plaintiffs are no more than disgruntled ratepayers who want a refund because they overpaid for electricity must fail.

Perhaps the most troubling part of this defective assertion is the unspoken result First Energy seeks— that as a utility, it may effectively evade review of its bad acts because no forum is permitted to examine the legality of its conduct. Defendants have not only claimed that this Court cannot review Plaintiffs' claims because the PUCO establishes rates for electric service, but they simultaneously argue before the PUCO that the specific allegations of wrongdoing asserted by Plaintiffs are not within the purview of that agency. Specifically, FirstEnergy has contended that "under both Ohio Supreme Court decisions and the [PUCO's] decisions, the Commission lacks jurisdiction to conduct a proceeding to investigate alleged 'illegal activities' that do not involve the provision of electric service to customers." Reply in Supp. Mot. Protective Order, *In re: Review of Political & Charitable Spending by Ohio Edison Co., the Cleveland Elec. Illuminating Co., & the Toledo Edison Co.*, Case No. 20-1501-EL-UNC. (Publ. Util. Comm. filed Nov. 9, 2020 (attached as **Exhibit A**). To allow FirstEnergy to escape liability on the basis of the filed-rate doctrine would thus permit them to escape any scrutiny of its actions.

A review of their wrongdoing is reposed in the jurisdiction of this Court. "[A]lthough the General Assembly has granted the [PUCO] exclusive jurisdiction to hear and determine rate and service-related matters, the basic jurisdiction of the court of common pleas is not diminished in

other areas of possible claims against utilities, including pure tort and contract claims." (citations omitted). *State ex rel. Ohio Edison Co. v. Shaker*, 68 Ohio St.3d 209, 211, 625 N.E.2d 608, 610 (1994). Because Plaintiffs' claims sound in tort and contract and seek a determination by this Court not about the reasonableness of a rate, but instead about the legal rights of the Plaintiff classes based on Defendants' conduct in the passage and implementation of HB 6, Plaintiffs' claims belong before this Court and are not barred by the filed-rate doctrine.

## II.    Plaintiffs have Pled Duty and Breach.

FirstEnergy makes the conclusory argument that it owes Plaintiffs and the Class no duties as a matter of law, so there can be no negligence. In offering this reductive analysis, FirstEnergy fails to account for its own affirmative acts and the ensuing circumstances it created to give rise to duty. FirstEnergy improperly advanced $60 million in customer funds to assure passage of HB 6 to revive nuclear energy generation through a nuclear bailout funded by the Class and to make itself recession-proof with a decoupling mechanism that forced the Customer Subclass to support an inflated revenue. Because FirstEnergy's conduct was carried out with the express purpose of creating foreseeable harm for Plaintiffs, FirstEnergy owes a duty to Plaintiffs.

In categorically claiming it owes no duties in tort to Plaintiffs or the Class and Customer Subclass, FirstEnergy disregards that duty may be established by common law due care, as well as the particular circumstances of a case. *Wallace v. Ohio DOC*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 23 (explaining that duty may be established by common law, legislative enactment, or particular circumstances of a case). It is fundamental that "[a] person is to exercise that care necessary to avoid injury to others." *See Gedeon v. East Ohio Gas Co.*, 128 Ohio St. 335, 338, 190 N.E. 924, 925 (1934) (explaining common law duty of due care is the degree of care that a reasonable and prudent person exercises under the same or similar circumstances); 70 Ohio

Jurisprudence 3d (1986) 62, Negligence, § 19 ("[A] person is to exercise that care necessary to avoid injury to others"). "Each person has a duty to engage in her daily activities using a certain amount of care." *Boyd v. Moore*, 184 Ohio App.3d 16, 2009-Ohio-5039, 919 N.E.2d 283, ¶ 10 (2d Dist.). Practically, the law expects both people and businesses to exercise reasonable precautions against risks that a reasonably prudent person would anticipate.

As such, the Court is not constrained by a rigid formula in ascertaining whether a duty exists. "Duty '* * * is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." (Prosser, Law of Torts (4th ed. 1971) pp. 325–326.)' " *Mussivand v. David*, 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270 (1989), quoting *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 46, 123 Cal.Rptr. 468, 471, 539 P.2d 36, 39 (1975). " 'Any number of considerations may justify the imposition of duty in particular circumstances, including the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall. (Prosser, *Palsgraf Revisited* (1953), 52 Mich.L.Rev. 1, 15).' " " *Mussivand* at 318, quoting *Weirum* at 46.

Assessing whether this duty arises requires examination of the foreseeability of the injury to someone in the plaintiff's "general situation." *See Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 24. Thus, foreseeability is a primary consideration in all negligence claims. *Id.* Succinctly stated, duty depends on the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645, 597 N.E.2d 504, 507 (1992).

As alleged in the Amended Complaint, Defendants engaged in a series of affirmative acts to resurrect FirstEnergy's failing business model using Plaintiffs and the Class and Customer

Subclass to unknowingly finance the scheme. Defendants' method for creating this scheme began by paying the Householder Enterprise $60 million to secure the drafting and passage of HB 6. Am. Compl. ¶¶ 94-96, 113. By improperly funneling customer money through illicit channels, FirstEnergy guaranteed HB 6 would be customized for its benefit, and to the direct detriment of Plaintiffs. Am. Compl. ¶ 70. Defendants and the success of their scheme depended on harm to Plaintiffs, the Class, and the Customer Subclass.

This conclusion is evidenced by HB 6 creating a nuclear generation fund that is financed by customers—all Ohio utility customers—to revive two nuclear plants, which in 2018 had started the expensive decommissioning process. Am. Compl. ¶¶ 108-110; ¶ 60; ¶ 102. Further, HB 6 established a decoupling mechanism that based a utility's future revenues on 2018 spending—a year in which FirstEnergy had inflated expenses. As written, HB 6 allowed FirstEnergy's subsidiaries to statutorily memorialize their most expensive year and continually charge their customers for that expense (and therefore reap increased profit) without regard to actual expenses. Am. Compl. ¶¶ 111-12. Finally, HB 6 gutted all clean energy standards and all cost savings being realized by Plaintiffs because it interfered with FirstEnergy's business model. Am. Compl. ¶ 113.

FirstEnergy's conduct unreasonably exposed Plaintiffs to harm. In so doing, this harm became a dependent foreseeability that was cemented in law by the passage of HB 6. Although FirstEnergy attempts to disclaim responsibility by suggesting no duty exists, such assertions ignore common law and common sense.

FirstEnergy's dismissive assertion that it is not a bank and can therefore spend money as impermissibly as it pleases ignores the circumstance in which it has left Plaintiffs. Improperly paying the Householder Enterprise $60 million altered the nature of the relationship with Plaintiffs and the Customer Subclass and the Class. Under FirstEnergy's scheme, Plaintiffs have been

statutorily mandated to serve as financiers of an illegal enterprise. Although FirstEnergy goes to great lengths to inform this Court that utilities do not generally have a duty, it fails to acknowledge that its own affirmative acts created a nontraditional relationship with not only its own customers, but with all Ohio utility customers. Based on the common law principles of duty of care and the particular circumstances in this case, Plaintiffs have alleged sufficient facts upon which the factfinder could conclude the foreseeability of harm created a duty that Defendants ultimately breached.

FirstEnergy also attempts to confuse the discussion of duty by asserting that internal policies and procedures cannot create common law duties. Policies and procedures may not establish a duty, but they do inform the standard of care, *i.e.*, the scope of that duty. *See Wilson v. Mercy Med. Ctr.*, Fifth Dist. Stark No. 2015CA00010, 2015 WL 5664500, at *5 (Sept. 21, 2015) ("We find, while hospital rules and regulations are * * * admissible to provide *evidence of the standard of care* in a medical negligence action, such internal policies and procedures do not create an independent common law duty." (emphasis added)).[4]

Moreover, FirstEnergy's reliance on the economic loss rule as a defense is misplaced. It does not preclude *any* claim of injury that is characterized by an economic loss. The economic loss rule is implicated where the relationship between the parties is governed by contract. *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co*, 42 Ohio St.3d 40, 42, 537 N.E.2d 624, 625

---

[4] While Plaintiffs intend to use FirstEnergy's internal policies and procedures to develop the standard of care, further discussion is unnecessary at this stage of litigation. Additionally, FirstEnergy contends Plaintiffs' use of "public trust" and "allowed by law" attempt to foster generalized duties that belong only to public officials. Plaintiffs' reliance on such phrases stems from the factual allegations that all Ohio utility customers—residential and commercial—are involved, as well as the inherent power of the courts to find duty based on public policy. *See, e.g., Estate of Ciotto v. Hinkle*, 2019-Ohio-3809, 145 N.E.3d 1013, ¶ 62 ("Under Ohio law, policy considerations play a part in determining whether a legal duty exists.").

(1989) (explaining the economic loss rule stems from a belief that tort law is designed to redress loss suffered by a breach of duty, and contract law is designed to be a commercial transaction in which parties may govern their own affairs). The fundamental purpose of the economic loss rule is to allow parties to freely govern themselves in contract, including their damages, so courts have held that tort law does not govern a breach of duties derived from an agreement. *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 3, 560 N.E.2d 206 (1990). Thus, for the economic loss rule to apply, a contractual relationship between the parties along with privity must govern the alleged breach.

Here, FirstEnergy is not in privity with all Ohio utility customers. Although FirstEnergy has some contractual relationship with its own customers, this fact alone does not implicate the economic loss rule. Instead, that contract must cover the alleged breaches. As previously discussed, Plaintiffs' allegations stem from FirstEnergy's improper and illegal affirmative acts. Those acts and the corresponding damages were not contemplated as part of the service agreement. For these reasons, the economic loss rule has no bearing on Plaintiffs' negligence claims.

### III. Plaintiffs Have Alleged Breach of Contract.

In the alternative, Plaintiffs have also alleged breach of contract. FirstEnergy argues this claim must be dismissed because Plaintiffs have not identified a contract that has been breached. As discussed below, this is not a basis for dismissal, and any defect is cured.

A claim for breach of contract requires a party to establish four elements: "[t]he existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse and the non-breaching party suffered damages as a result." *Textron Fin. Corp. v. Nationwide Mut., Ins. Co.*, 115 Ohio App.3d 137, 144, 648 N.E.2d 1261, 1266 (9th Dist. 1996). Principally, FirstEnergy

argues the Customer Subclass's claims for breach of contract should be dismissed because Plaintiffs fail to identify the contract between themselves and FirstEnergy.

However, FirstEnergy does not dispute that FirstEnergy Corp. is the parent of the subsidiary defendants that provide power to members of the Customer Subclass. In fact, in seeking dismissal of Plaintiffs' claims for unjust enrichment, FirstEnergy embraces this relationship, asserting that Plaintiffs' claims arising out of "existing contractual relationships" are somehow fatal to Plaintiffs' unjust enrichment claims. *See* FirstEnergy Mot. Dismiss, at 12. ("* * * Plaintiffs got the electricity they paid for – and if they hadn't they could simply sue to enforce that contract"). So FirstEnergy acknowledges the Amended Complaint pleads the existence of contracts for services between members of the Customer Subclass and FirstEnergy. At this juncture in the litigation, where the Court is required to construe these allegations as true, it is a fairly hollow argument for Defendants to then claim no contract has been alleged to exist. *See Ada Exempted*, 2020-Ohio-4017, ¶19. Moreover, to the extent FirstEnergy is suggesting there is *no* contractual relationship between it and the Customer Subclass, such an inquiry is a question of fact to be determined at a later date. *Castle Hill Holdings, LLC v. Al Hut, Inc.*, 8th Dist. Cuyahoga No. 86442, 2006-Ohio-1353, ¶ 37 (March 23, 2006) ("[W]here the parties are disputing whether a written contract ever existed this question is properly submitted to the jury for resolution.").

Apparently aware of the flimsiness of those legal assertions as a basis for dismissal, FirstEnergy attempts to argue dismissal by way of a procedural mechanism—namely that the absence of the contract as an attachment to Plaintiffs' pleadings warrants dismissal pursuant to Civ.R. 10(D)(1). However, that is not the function of that rule. *See Fletcher v. Univs. Hosp. of Cleveland*, 120 Ohio St.3d 167, 170, 897 N.E.2d 147, 151 (2008) ("[I]f a case was dismissed with prejudice on its first filing for failure to comply with Civ.R. 10(D)(2), then that plaintiff would be

foreclosed from seeking relief despite the fact that the plaintiff might very well have been able to obtain an affidavit of merit for purposes of refiling.").

And to the extent FirstEnergy attempts to move for a more definitive statement by way of footnote, Plaintiffs have included bills for Plaintiff Robert Brown as an attachment to this filing. (See Exhibit B). These documents represent the basis of the contractual relationships between the Customer Subclass and FirstEnergy and therefore satisfy Civ.R. 10(D)(1). *See Citibank N.A. v. Ebbing*, Twelfth Dist. Butler No. CA 2012-12-252, 2013- Ohio-4761, 2013 WL 5783722 at ¶ 12 (Oct. 28, 2013) (noting periodic billing statements met the requirements of Civ.R. 10(D)(1)). Furthermore, "[i]n addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.2d 458, ¶ 42. " 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443–44, 662 N.E.2d 1074, 1082–83 (1996), quoting *Kham v. Waters Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990). Because the facts are in dispute as to the exact terms of the contractual relationship and whether those terms have been satisfied or breached, dismissal at this juncture would be premature. *The Bank of New York Mellon v. Lewis*, 6th Dist. Erie No E-13-051, 2014-Ohio-5599, ¶ 81 (Dec. 19, 2014) (noting whether a contract had been breach is a question of law where the facts are not in dispute and whether a party satisfied the terms of the contract is a question of fact).

Plaintiffs have alleged the existence of valid contractual relationships between the Customer Subclass and FirstEnergy. Plaintiffs further alleged that FirstEnergy's conduct violated

these contracts in a number of particulars, including the implied duty of good faith. Defendants' motion to dismiss Plaintiffs' breach of contract claims must therefore be denied.

## IV. Plaintiffs have Alleged Unjust Enrichment.

FirstEnergy also contends Plaintiffs' unjust enrichment claim fails because unjust enrichment cannot lie where the parties allege breach of contract. Moreover, FirstEnergy alleges rates for electric service can never be unjust, which is essentially a repackage of its misplaced reliance on the filed-rate doctrine. Both of these arguments mistake the applicable law and should therefore be rejected.

Initially, Plaintiffs are permitted to plead claims in the alternative and therefore the mere fact that Plaintiffs plead breach of contract and unjust enrichment is not grounds for dismissal.

> A party may set forth two or more statements of a claim or defense alternatively either in one count or defense or in separate counts or defenses. * * * A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal or equitable grounds.

Civ.R. 8(E)(2). "Because alternative pleading is permissible, a party may plead both a breach-of-contract claim and an unjust-enrichment claim without negating the validity of either claim." *Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, 977 N.E.2d 742, ¶ 26 (10th Dist.). Accordingly, the presence of a potentially conflicting claim is not grounds for a motion to dismiss.

"A cause of action for unjust enrichment arises from a contract implied in law or quasi-contract." *Longmire v. Donaci*, 2020-Ohio-3704, 155 N.E.3d 1014, ¶ 32 (10th Dist.). Under the principle of contract implied in law or quasi-contract, a party may be liable where it retains benefits, which are inequitable for it to have received, without compensating the one who conferred the benefit. *Id.*

FirstEnergy argues Plaintiffs' cause of action for unjust enrichment fails because Plaintiffs received what they paid for—electric service. In support, FirstEnergy cites *Keco Industries, Inc.*

*v. Cincinnati Suburban Bell Telephone Co.*, where the Court determined no right to restitution is created based on a challenge to the reasonableness of a rate duly considered by an authorized administrative agency. 166 Ohio St. 254, 258, 141 N.E.2d 465, 268 (1957). *Keco* is inapplicable in this case. As discussed in depth above, no question related to the reasonableness of a rate or the provision of electric service is before this Court.

Plaintiffs have alleged Defendants misused funds conferred upon them by Plaintiffs for the purpose of enriching themselves. The Amended Complaint expressly states:

> 126. Collectively, HB 6 guarantees Defendants a bailout worth at least $1.3 billion – all funded by [Defendants'] customers and the people of Ohio.
>
> * * *
>
> 128. From March 2017 to March 2020, the Householder Enterprise received approximately $60 million from Defendants paid through Generation Now for the purpose of ensuring the ill-gotten gains created by HB 6.
>
> 129. Upon information and belief, prior to HB 6, Defendants' customers were the exclusive source of Defendants' revenue. Thus, customers paid every dollar Defendants used for brides, kickbacks, and illegal support of HB 6, and to quash the ballot initiative to repeal HB 6, and they will pay the majority of the money associated with implementation of HB 6.

*See* Am. Compl., ¶¶ 126-129. Additionally, Plaintiffs allege that for years leading up to Defendants' misuse of funds for the illegal and illicit passage of HB 6, Plaintiffs paid non-gratuitous benefits to Defendants for energy efficiency measures, whose impact will be completely annihilated by HB 6. Am. Compl., ¶ 113.

Plaintiffs' case is about the misuse and abuse of funds and power by the FirstEnergy Defendants, who received millions of dollars from Plaintiffs, all while Plaintiffs received nothing in return. Defendants' motion to dismiss Plaintiffs' claims for unjust enrichment is therefore without merit and must be denied.

## V.     Plaintiffs have Adequately Alleged Proximate Cause of Their OCPA Claim.

FirstEnergy also argues that Plaintiffs' OCPA claim fails because intervening acts have broken the chain of causation between Defendants' bribery and the damages wrought on Plaintiffs and the Class. This suggested attenuation falls flat in light of the fact that, as laid out plainly in the Amended Complaint, the entire purpose of Defendants' illegal enterprise and conspiracy was to injure Plaintiffs.

Alleging proximate cause does not require Plaintiffs to eliminate all other potential causes of injury; it only requires that the relationship between the harm and Plaintiffs injuries be sufficiently direct. The determination of whether a defendant should be deemed to have proximately caused an injury "require[s] examination of whether there is a reasonable connection between the defendant's acts and its consequences." *Iron Workers' Local Union No. 17 Ins. Fun v. Philip Morris, Inc.*, 23 F.Supp.2d 771, 782 (N.D.Ohio 1998). "In cases of willful or malicious injury, and injury from reckless or illegal acts, or from positive fraud, the damages are not so strictly confined to proximate consequences as when these elements do not exist." *Id.* at 783, quoting *Burckhardt v. Burckhardt*, 42 Ohio St. 474, 487 (1885). "Where there is fraud or other intentional wrong, there is not the same strictness to exclude remote or uncertain damages, even where punitory damages are not involved." *Iron Workers'* at 783, quoting *Burckhardt* at 487. Customer-funded bribery along with the HB 6 nuclear fees and decoupling mechanism are injuries created by design, not happenstance. If FirstEnergy truly believed that bribing officials would have no effect, there would have been no reason to undertake those acts and squander $60 million. Furthermore, damages flow directly from FirstEnergy availing itself of the decoupling mechanism created by legislation it knew was illegally enacted. That act led to the injuries alleged and requires inquiry to no one else's acts but its own.

FirstEnergy also feebly suggests in a footnote that Plaintiffs' claims in negligence, contract, and civil conspiracy must also fail for lack of proximate cause. However, the law in those instances also acknowledges that foreseeability of the injury must guide the inquiry. "Whether an intervening act breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence." *Mudrich v. Standard Oil Co.*, 153 Ohio St. 31, 39, 90 N.E.2d 859, 863 (1950). "Thus, a reasonable foreseeability of injury is considered an element of proximate cause." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287, 423 N.E.2d 467, 471 (1981). "To establish proximate cause, the plaintiff must prove that her injuries were the natural and probable consequence of the negligent act." *Lloyd v. Rogerson*, 9th Dist. Wayne No. 18AP0024, 2019-Ohio-2606, ¶ 36, *appeal not accepted*, 157 Ohio St.3d 1442, 2019-Ohio-4211, 132 N.E.3d 708, ¶ 36. "[I]n determining what is direct or proximate cause the rule requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." *Ross v. Nutt*, 177 Ohio St. 113, 114, 203 N.E.2d 118, 120 (1964), quoting *Miller v. Baltimore & Ohio Southwestern Rd. Co.*, 78 Ohio St. 309, 325, 85 N.E. 499, 504 (1908),

FirstEnergy undertook acts to directly injure Plaintiffs and the Class in the manner described in the Amended Complaint. The presence of other actors does not negate Defendants' culpability. FirstEnergy knew full well what damage it was causing and the damage that occurred—even with the sometimes-unwitting participation of other actors—cannot undermine the fact that FirstEnergy caused those injuries.

## VI.     Plaintiffs Pled Viable Claims Supporting the Civil Conspiracy Claim.

Defendants half-heartedly argue Plaintiffs' civil conspiracy claim should be dismissed because their tort claims should fail.."[A] civil conspiracy consists of: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) results in actual damages." *Apex Tool Grp., LLC v. DMTCO*, No. 3:13–cv–372, 2014 WL 6748344, at *18 (S.D.Ohio Nov. 26, 2014). "In addition the existence of an unlawful act independent from the actual conspiracy in required for a conspiracy claim to succeed." *Id.* As discussed above, Plaintiffs articulate viable claims that FirstEnergy committed unlawful acts that caused them actual damage. Accordingly, Plaintiffs' cause of action for civil conspiracy is equally valid.

## VII.     Plaintiffs Are Entitled to Declaratory and Injunctive Relief.

Defendants also argue that Plaintiffs' request for injunctive and declaratory relief must fail because they have not pointed to the relevant contract that needs be construed. FirstEnergy Mot. Dismiss, at 17. However, this ignores the provision allowing for a declaration of rights where the validity of a statute is questioned. R.C. 2721.03 ("[A]ny person whose rights, status, or other legal relations are affected by a * * * statute, * * * may have determined any question of construction or validity arising under the * * * statute * * * and obtain a declaration of rights, status, or other legal relations under it."); *Burger Brewing Co. v. Liquor Control Comm'n, Dep't of Liquor Control*, 34 Ohio St. 2d 93, 96, 296 N.E.2d 261, 264 (1973) ("This court has previously upheld the right to declaratory relief pertaining to the construction and validity of statutes and ordinances."). Therefore, Plaintiffs' challenge to the validity of the enactment of HB 6 falls well within the type of action contemplated by R.C. 2721.03.

And it would not be injudicious for this Court to consider the declaration of the invalidity of HB 6 prior to the start of the collection of nuclear fees. Rather, proactively preventing injury is

part of the rationale for issuing a declaration of a party's rights. "It is a practical action to invoke in order to secure relief before a loss occurs." *Moss v. Columbus Bd. of Ed.*, 55 Ohio Misc. 7, 10, 379 N.E.2d 275, 277 (Ohio Com. Pl. 1978). "It is said that the remedy afforded by R.C. Chapter 2721 is to be liberally construed and freely applied." *Id.* Although Plaintiffs may not be challenging the statute as unconstitutional, the injunction would prevent Defendants—the sole beneficiaries of the nuclear fee and decoupling provisions—from benefiting from their bad acts. This is well within the purview of the Court and the purpose of injunctive relief.

## CONCLUSION

Given the foregoing, Plaintiffs respectfully request on behalf of themselves and the Class and Subclasses they seek to represent, that this Court deny FirstEnergy's motion to dismiss.

This 21st day of December 2020.

Respectfully submitted,

*s/ Greg M. Galvin*
Greg M. Galvin (0075612)
P.O. Box 887
Bluffton, SC 29910
Phone: (843) 227-2231
ggalvin@galvinlawgroup.com
*COUNSEL FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed this 21st day of December, 2020, via the Court's authorized E-Filing system and, by Local Rule, is being served on all counsel of record in this case, who are registered users of the E-Filing system.


*s/ Greg M. Galvin*
Greg M. Galvin (0075612)

# EXHIBIT A:

Reply in Support of Motion for Protective Order,
*In re: Review of Political & Charitable Spending by Ohio Edison Co.,*
*the Cleveland Elec. Illuminating Co., & the Toledo Edison Co.,*
Case No. 20-1501-EL-UNC. (Publ. Util. Comm. filed Nov. 9, 2020

**BEFORE
THE PUBLIC UTILITIES COMMISSION OF OHIO**

In the Matter of the Review of the Political )
and Charitable Spending by Ohio Edison )
Company, The Cleveland Electric )          Case No. 20-1502-EL-UNC
Illuminating Company, and The Toledo )
Edison Company. )

---

**REPLY IN SUPPORT OF OHIO EDISON COMPANY, THE CLEVELAND ELECTRIC
ILLUMINATING COMPANY AND THE TOLEDO EDISON COMPANY'S
MOTION FOR PROTECTIVE ORDER**

---

The Office of the Ohio Consumers' Counsel ("OCC") repeatedly asserts in its Memorandum Contra that it wants to convert this proceeding into an investigation of "illegal activities" of "FirstEnergy" that are unrelated to "providing utility service to customers" for purposes of "public transparency."[1] Indeed, OCC confesses that, as far as it is concerned, whether Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company (collectively, the "Companies") included any costs of H.B. 6 spending[2] in their rates or charges is "beside the point," since OCC cares only about whether the Companies spent funds from their revenues on alleged "illegal activities" – none of which are attributed to the Companies – currently being investigated by the U.S. Department of Justice (as well as the U.S. Securities and Exchange Commission and the Ohio Elections Commission).[3] Through this proceeding, OCC hopes to be a  public prosecutor intent on uncovering criminal activity, and its Notice to Take

---

[1] OCC Memo. Contra, pp. 1, 3, 4, 6, 7, 19.

[2] References in this Reply to the "costs of H.B. 6 spending" include the costs of any political or charitable spending in support of Am. H.B. 6 – either supporting enactment of the bill or opposing the subsequent referendum effort.

[3] OCC Memo. Contra, pp. 2, 7. The alleged "illegal activities" also are the subject of a lawsuit filed by the Ohio Attorney General.

Deposition and Request for Production of Documents ("Notice") served in this proceeding is part and parcel of its hoped-for criminal investigation.[4]

But OCC has no prosecutorial authority, and neither does the Commission. Both the Commission and OCC are creatures of statute, and neither is authorized to prosecute alleged illegal activity. OCC's Memorandum Contra is devoid of any reference to a statute giving it law enforcement powers. OCC also fails to identify statutory authority for the Commission to investigate illegal activity that is unrelated to a public utility's provision of utility service to customers. To the contrary, the Commission's jurisdiction is confined to the supervision of public utilities when acting as public utilities.[5] A public utility is acting as a public utility when it is "engaged in the business of supplying electricity for light, heat, or power purposes" to retail customers.[6] In contrast, OCC asserts that any political and charitable spending by the Companies is unrelated to "providing public utility service to customers."[7] Thus, the allegedly criminal activity OCC wants to investigate does not involve the Companies acting as public utilities and falls outside the Commission's and OCC's jurisdiction.[8]

---

[4] In addition to the Memorandum Contra filed by OCC, a Memorandum Contra was filed by the Ohio Manufacturers' Association Energy Group ("OMAEG") and nearly identical memoranda were filed by Ohio Partners for Affordable Energy ("OPAE") and the self-styled "Environmental Advocates." Because these parties did not serve the discovery upon which the Companies' Motion for a Protective Order is based, this Reply will focus on OCC's arguments and reference OMAEG, OPAE and the Environmental Advocates only as appropriate.

[5] *In re Complaint of Direct Energy Business, LLC v. Duke Energy Ohio, Inc.*, 2020-Ohio-4429, ¶ 25 (Sept. 17, 2020).

[6] *Id.* ¶ 15.

[7] *See* OCC Memo. Contra, pp. 3, 4, 19.

[8] To the extent OCC or another party should claim that the recent employment termination of FirstEnergy Corp. executives for violation of the FirstEnergy Corp. code of conduct justifies expanding the scope of this proceeding, the Commission already has decided to review that matter in Case No. 17-974-EL-UNC. In contrast, the Commission has asked in this proceeding whether the cost of H.B. 6 spending is included in the Companies' rates and charges paid by customers. *See* Case No. 20-1502-EL-UNC, Entry ¶ 5 (Sept. 15, 2020) (hereinafter, "Sept. 15, 2020 Entry").

2

Notably, OCC defines "FirstEnergy" in footnote 3 of its Memorandum Contra as the Companies, but then also uses "FirstEnergy" to mean FirstEnergy Corp. or a related entity when OCC believes it helps its story. Indeed, OCC asserts in the second sentence of its Memorandum Contra that the backdrop of this proceeding is the federal complaint "apparently involving FirstEnergy," which is false if "FirstEnergy" means the Companies. The federal criminal complaint contains no allegations of wrongdoing by the Companies but, instead, involves allegations of past political activity by a social welfare organization, a state office holder and lobbyists that allegedly violated 18 U.S.C. § 1962. None of the allegations involve Ohio utility law or a Commission order, and none of the allegations, as OCC is careful to note, involve the provision of retail electric service by the Companies.

Therefore, OCC's own Memorandum Contra makes clear the Companies are entitled to an order that discovery only be had via written requests to protect them "from annoyance, embarrassment, oppression, or undue burden or expense" under O.A.C. 4901-1-24(A)(3). Since Mr. Fanelli is responsible for the Companies' rates and charges for electric utility service, he is an appropriate person to explain that the costs of any H.B. 6 spending were not included in rates or charges paid by the Companies' customers, in response to the Commission's specific question. OCC, however, is attempting to use the Affidavit of Santino Fanelli to open a door to annoy, embarrass and harass the Companies with OCC's desired criminal investigation, notwithstanding OCC's and the Commission's lack of any authority to conduct a criminal investigation, and notwithstanding the fact that Mr. Fanelli is not responsible for political and charitable expenditures or for the other subject matters raised in OCC's Notice and written discovery that are beyond those addressed by the Affidavit. In fact, OCC admitted in its Memorandum Contra that the specific question addressed in the Fanelli Affidavit – whether the cost of H.B. 6 spending is included in

rates or charges paid by the Companies' customers – is "beside the point."[9] Notably, OCC has not raised any factual concerns with the Companies' response and instead is focusing on other matters beyond the scope of this proceeding, thus demonstrating that OCC has no interest in the question posed by the Commission in its Sept. 15, 2020 Entry. OCC would rather dig into allegedly illegal spending by the Companies and other FirstEnergy entities despite that activity lying well outside the jurisdiction of OCC and the Commission. That is harassment that merits a protective order.

### A. The Commission lacks jurisdiction under R.C. 4905.04, 4905.05 or 4909.154 to review the Companies' political and charitable spending.

The Companies already have briefed on several occasions the Commission's lack of jurisdiction over the Companies' political and charitable spending generally, and over any H.B. 6 spending more specifically.[10] While OCC notes that the Commission has authority under R.C. 4905.05, 4905.06 and 4909.154 to investigate the Companies and its affiliates,[11] the relevant question is whether the Commission has authority under those statutes to independently investigate any H.B. 6 expenditures the Companies might have made. What OCC always conveniently overlooks is that R.C. 4905.05 and 4905.06 focus on costs associated with the provision of public utility service, which, understandably, is why the Sept. 15, 2020 Entry focused on whether H.B. 6 costs for political or charitable spending were included in rates or charges paid by the Companies' customers.[12] The Commission's legal authority does not extend as far as OCC and other

---

[9] OCC Memo. Contra, p. 7.

[10] *See*, *e.g.*, Memorandum Contra Interlocutory Appeal, Request for Certification and Application for Review by OCC (Sept. 28, 2020), and Memorandum Contra the Motion of ELPC/OEC to Expand the Scope of the Commission's Review (Oct. 14, 2020). *See also* Memorandum Contra Motions by the Office of the Ohio Consumers' Counsel (Sept. 23, 2020), filed in Case Nos. 17-974-EL-UNC and 17-2474-EL-RDR.

[11] OCC Memo. Contra, pp. 3-4.

[12] Sept. 15 Entry, ¶ 5.

intervenors would like, but that certainly has not stopped them from asking the Commission to exceed its jurisdiction.

OPAE and the Environmental Advocates confusingly suggest that ratepayers pay for all spending of the Companies because every "customer provides FirstEnergy with a little bit of profit" and, thus, that all expenditures related to H.B. 6 are within the Commission's jurisdiction.[13] They are mistaken. What ratepayers pay are the Commission-approved rates and charges for utility service. By paying for electric service, ratepayers do not possess a legal or equitable interest in utility assets or revenues:

> Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company, just as does that purchased out of proceeds of its bonds and stocks.

*Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U.S. 23, 34-35 (1926). By paying for electric service, the Companies' customers do not obtain an interest in how the Companies spend funds (and, of course, are not held responsible for any such spending).

Beyond the investment necessary to provide adequate service, an investor-owned public utility may spend its funds in the best interests of the utility as determined by its management. *See Elyria Tel. Co. v. Pub. Util. Comm.*, 158 Ohio St. 441, 447-448, 110 N.E.2d 59 (1953) (utility "is subject to extensive control and regulation" but "is still an independent corporation and possesses the right to regulate its own affairs and manage its own business"); *West Ohio Gas Co. v. Pub. Util. Comm.*, 128 Ohio St. 301, 381 (1934) ("It is a matter of common sense, as well as law, that

---

[13] OPAE Memo. Contra, pp. 7-10; Environmental Advocates Memo. Contra, pp. 7-10.

the members of the Public Utilities Commission of Ohio cannot substitute themselves as managers of the gas company or dictate its policies"). What OPAE and the Environmental Advocates are suggesting is that being the customer of a business gives one control over management decisions as to how to spend funds received from customers and other sources. This is not true for *any* investor-owned business. OPAE and the Environmental Advocates are simply wrong that the Commission has jurisdiction over any spending of funds of a public utility that may have flowed from Commission-authorized rates and charges.

OCC attempts to distinguish the Ohio Supreme Court's decision in *In re Complaint of Direct Energy Business, LLC v. Duke Energy Ohio, Inc.*, 2020-Ohio-4429 (Sept. 17, 2020), because it did not consider the exact fact pattern at issue here.[14] But the *Direct Energy Business* case is directly analogous. Indeed, the Court found in that case that the Commission lacked jurisdiction over Duke Energy Ohio under R.C. 4905.04 and 4905.05 because they only authorize the Commission to regulate "public utilities" as defined in R.C. 4905.03. When an electric distribution utility is not "supplying electricity for light, heat, or power purposes to consumers within this state," it is not acting as a public utility as defined in R.C. 4905.03 and is not subject to regulation by the Commission under R.C. 4905.05, R.C. 4905.06 or any other section of Chapter 4905.[15] OCC has not shown how the criminal investigation of H.B. 6 spending it wants to pursue involves public utilities acting as public utilities (or even involves any public utility, for that matter). To the contrary, OCC repeatedly notes that the alleged "illegal activities" involved money that was **not** spent on providing public utility service to customers.[16] Because the *Direct Energy*

---

[14] OCC Memo. Contra, p. 5.

[15] *Direct Energy Business*, 2020-Ohio-4429, ¶¶ 14-15, 23-25.

[16] OCC Memo. Contra, pp. 3, 4, 19.

*Business* decision is directly applicable, it supports the Commission's issuance of a protective order to prevent OCC from investigating questions outside the Commission's jurisdiction.

OCC also mischaracterizes *Cleveland Elec. Illuminating Co. v. Pub. Util. Comm.*, 69 Ohio St.2d 258, 431 N.E.2d 683 (1982), which held, in its syllabus, as follows: "Charitable contributions, as a category of expenditures, are not a cost of rendering the public utility service and can not be allowed as operating expenses." While OCC accurately quotes one line of the Court's discussion,[17] the Court's holding was clear – charitable contributions are not a cost of rendering public utility service within the meaning of R.C. 4909.15(A)(4) and, thus, cannot be included in base distribution rates.[18] While the Commission certainly has jurisdiction over a public utility's attempt to include political or charitable contributions in its rates, the Commission does not otherwise have jurisdiction over such spending because it is not a cost of rendering public utility service.

Likewise, OCC fails to distinguish the Commission's statement in *In re Chapter 4901:1-20, Ohio Adm. Code*, 2004 WL 1950732, Case No. 04-48-EL-ORD, Finding and Order at p. 14 (July 28, 2004), that prohibiting or restricting political contributions or donations is "a matter outside of our jurisdiction." OCC does not explain how the Commission would lack jurisdiction to regulate a utility's political contributions but would have jurisdiction to investigate a utility's political contributions. Simply put, under both Ohio Supreme Court decisions and the Commission's decisions, the Commission lacks jurisdiction to conduct a proceeding to investigate alleged "illegal activities" that do not involve the provision of electric service to customers.

---

[17] OCC Memo. Contra, p. 6.

[18] *CEI*, 69 Ohio St.2d 258, at syllabus. *See also id.* at 262.

## B. OCC lacks jurisdiction to investigate the Companies' spending.

OCC insists that it possesses broad statutory authority to investigate, seemingly without limitation, the Companies' political and charitable spending, regardless of whether such spending was included in or recovered by rates and charges paid by customers.[19]  Specifically, OCC contends that its jurisdiction is not governed solely by R.C. 4911.14 or R.C. 4911.15, but also by "a preceding and controlling enabling statute, R.C. 4911.02(B)(2)," which enumerates without limitation "broadly defined" power and duties of OCC.[20]  Not only does OCC claim it has broadly defined powers, OCC more boldly asserts it "has discrete authority to act" whenever "the PUCO is operating in a manner that does not serve the public's interest (by failing to adequately examine FirstEnergy's HB 6 activities)."[21]  Based on that sweeping interpretation of its statutory authority, OCC seeks Commission approval of an unconstrained fishing expedition into the spending of the Companies and other FirstEnergy entities.  The Commission must decline to sanction such a flagrant abuse of both OCC's statutory authority and the discovery process in Commission proceedings.  Although OCC might want to conduct its own criminal investigation in parallel with the proper authorities, OCC's arguments ignore and contravene the plain language of R.C. 4911.14, well-established Commission and judicial precedent, and public policy.

As an initial matter, OCC fails to cite a single statute, administrative rule, Commission order/entry, or any case law to support its naked assertion of plenary power to investigate the Companies' political and charitable spending.  OCC's inability to provide any citation or legal support for such sweeping investigatory powers is unsurprising because there is none.  To the

---

[19] OCC Memo. Contra, pp. 9-10.

[20] *Id.*, p. 8.

[21] *Id.*, p. 9.

contrary, the Commission has explicitly observed that "[t]he authority enumerated for OCC is ***not unlimited***; it is linked to rights and powers in the context of a party appearing before the Commission in an official proceeding."[22] Indeed, the Commission has explicitly cautioned that "[t]he boundaries of OCC's jurisdiction are found in its enabling statutes."[23] Here, OCC ignores those boundaries, positing that R.C. 4911.02(B)(2) confers seemingly limitless authority on OCC "to act" whenever the "PUCO is operating in a manner that does not serve the public's interest."[24] Tellingly, OCC does not clarify what type of "actions" it may lawfully take under such circumstances, nor does OCC identify the legal basis for applying an amorphous "public interest" standard. In truth, OCC's self-serving assertions of authority have no basis in law, fact, or reality.

In support of its claim that R.C. 4911.02 grants OCC the authority to broadly investigate the Companies' political and charitable spending, OCC cites Case No. 89-1031-EL-CSS[25] ("Condo Association Case").[26] In the Condo Association Case, OCC, acting on behalf of a condominium association, filed a complaint alleging that Ohio Edison improperly charged a commercial rate (instead of a residential rate) for electricity that serviced common areas of the condominiums.[27] In response, Ohio Edison argued, *inter alia*, that OCC lacked statutory authority under R.C. 4911.15 to sue on behalf of a non-profit condominium association – i.e., a non-

---

[22] *In re Amendment of Certain Rules of the Ohio Administrative Code to Implement Sections 4905.261 and 4911.021, Revised Code*, Case No. 05-1350-AU-ORD, 2006 WL 193640, Opinion and Order and Entry on Rehearing (Jan. 4, 2006) (emphasis added).

[23] *Id.*

[24] OCC Memo. Contra, p. 9.

[25] OCC incorrectly cited the Condo Association Case as Case No. 89-1032-EL-CSS. *Id.* at 8. The correct docket number is Case No. 89-1031-EL-CSS.

[26] *In the Matter of the Complaint of the Office of Consumers Counsel on Behalf of the Residents of Copley Village Condominium Association v. Ohio Edison Company*, Case No. 89-1032-EL-CSS, 1989 WL 1733762, Entry (Oct. 6, 1989) ("Condo Association Case").

[27] *Id.* at ¶ 1.

residential customer.[28]    The Commission found that the "without limitation because of enumeration" language in R.C. 4911.02 supported a broader interpretation of R.C. 4911.15 under which OCC could be understood as representing the interests of the individual residents of the condominiums.[29]

The Condo Association Case is inapposite for several reasons.    First, the Condo Association Case involved allegations of *unlawful rates* charged to residential customers.  Under R.C. 4911.14, "[t]he jurisdiction of the consumers' counsel extends to every case that he or another party brings before the public utilities commission *involving the fixing of any rate, joint rate, fare, charge, toll, or rental charged for commodities or services by any public utility*, the plant or property of which lies wholly within this state."[30]  Since the Condo Association Case involved a complaint about residential rates/charges, the Commission found that it fell squarely within the jurisdiction of the OCC under R.C. 4911.14.  Here, however, OCC's attempt to conduct a limitless probe into the Companies' and other FirstEnergy entities' political and charitable spending has nothing to do with customers' rates/charges given that the Companies have unequivocally demonstrated in their September 30 Response that they have not included any costs of HB 6 spending in any customer rates or charges.  Consequently, exploring such subject matter (via deposition, written discovery, or otherwise) falls well outside the bounds of OCC's statutorily circumscribed jurisdiction under R.C. 4911.14.

Second, the Condo Association Case never concerned or addressed the *type of subject matter* over which OCC has jurisdiction.  Rather, the Condo Association Case focused on the *type*

---

[28] *Id.* at ¶¶ 4, 11.

[29] *Id.* at ¶¶ 11-12.

[30] R.C. 4911.14 (emphasis added).

*of customer* OCC may represent. Here, the underlying dispute does not concern the type of customer OCC may represent under R.C. 4911.15; rather, the dispute is whether OCC possesses the statutory authority to act as a self-appointed special prosecutor with unbounded power to investigate the spending of public utilities. To no surprise, the Condo Association Case never once cites, references, or discusses R.C. 4911.14, *i.e.*, the controlling jurisdictional statute that delineates the type of cases/subject matter over which OCC has jurisdiction. Instead, the Condo Association Case focused primarily on R.C. 4911.15, the statute that delineates the types of customers OCC may represent. As such, the Condo Association Case is inapplicable and unavailing to OCC.

Third, despite OCC's baseless claims to the contrary, the Commission has never held – in the Condo Association Case or otherwise – that R.C. 4911.02 vests OCC with blanket authority to conduct a widespread investigation into the spending of a public utility. As referenced previously, OCC even goes so far as to argue that it enjoys the "discrete" statutory authority under R.C. 4911.02(B)(2) "to act" whenever "the PUCO is operating in a manner that does not serve the public's interest."[31] But oversight of the Commission is not OCC's responsibility. OCC does not enjoy the statutory authority to force the Commission "to act" whenever OCC is unhappy. Neither the Condo Association Case nor Ohio law grants OCC any legal authority to step in the shoes of the Commission when OCC deems it necessary, so long as some murky "public interest" standard is satisfied according to OCC.[32]

---

[31] OCC Memo. Contra, p. 9.

[32] *Id.* In fact, as discussed below, in examining the jurisdiction of both the OCC and the Commission, the Commission refuted OCC's argument that it has "discrete" statutory authority to assume the role/duties of the Commission whenever the Commission fails to protect the public interest: "The clear language of Sections 4905.05 and 4911.14, Revised Code, delineate the jurisdiction of the Commission and the OCC. ***The General Assembly did not duplicate nor imply in any fashion that the duties and authority of the***

In fact, the Commission has explicitly cautioned against adopting OCC's distorted interpretation of its statutory authority. For instance, in Case No. 96-1175-TP-ORD, the Commission found that OCC's jurisdiction under R.C. 4911.14 is limited because "[T]he General Assembly did not intend or imply that the OCC should monitor or supervise the operations and/or performance of public utilities, only to represent the interest of residential customers in such proceedings before the Commission.[33] Critically, the Commission recognized that R.C. 4911.14 explicitly permits OCC jurisdiction only "in cases before the Commission which affect the rates, tolls, or charges for the commodity or services offered by a public utility."[34] Similarly, the Tenth District Court of Appeals underscored in *Tongren v. D&L Gas Mktg., Ltd.*, that it is a violation of public policy for OCC to gain by administrative fiat investigatory powers that the legislature never granted to it.[35] Here, OCC does not have jurisdiction to probe the political and charitable expenditures of the Companies or other FirstEnergy entities, as it not within OCC's statutory purview to "monitor or supervise the operations and/or performance of public utilities."

Making matters even worse, OCC misrepresents the Companies' opposition to OCC's attempts to expand the scope of this proceeding beyond the Commission's and OCC's jurisdiction, by contending that the Companies are trying to prevent OCC from participating in this docket: "FirstEnergy argues that OCC has no jurisdiction to participate in this PUCO review."[36] To the

---

*Commission were also vested in the OCC." In the Matter of the Amendment of the Minimum Telephone Service Standards as Set Forth in Chapter 4901:1-5 of the Ohio Administrative Code, Case No. 96-1175-TP-ORD, 1997 WL 34878871, Finding and Order (June 26, 1997) (emphasis added).*

[33] *Id.*

[34] *Id.*

[35] *Tongren v. D&L Gas Mktg., Ltd., 149 Ohio App. 3d 508, 511, 2002-Ohio-5006, 778 N.E.2d 76 (10th Dist. 2002).*

[36] OCC Memo Contra, p. 8.

contrary, the Companies do not oppose OCC's intervention in this docket. Rather, the Companies oppose expanding this proceeding's scope to cover subjects over which OCC has no jurisdiction.[37]

Similarly, the Commission should reject OCC's attempt here to leverage R.C. 4911.02(B) to expand its jurisdictional reach beyond the explicit statutory boundaries set by R.C. 4911.14. OCC asks the Commission to simply ignore the plain language of R.C. 4911.14 and to focus instead on its allegedly broad implied powers in R.C. 4911.02(B). Just as the court of appeals in *Tongren* halted OCC's attempted overreach, so too should the Commission here find that it is a violation of public policy for a publicly funded agency like OCC to use taxpayer funds to investigate allegedly "illegal activities" – a subject matter over which OCC clearly lacks jurisdiction.

### C. OCC's Memorandum Contra affirms that OCC intends to exceed the scope of this proceeding.

OCC makes clear in its Memorandum Contra that its discovery in this proceeding, including its proposed deposition of Mr. Fanelli, should not be limited to the scope of this proceeding as set forth in the Sept. 15, 2020 Entry, namely, whether the Companies demonstrated that "the costs of any political or charitable spending in support of Am. Sub. H.B. 6, or the subsequent referendum effort, were not included, directly or indirectly, in any rates or charges paid by ratepayers in this state."[38] Tellingly, OCC admits that Mr. Fanelli's affidavit affirming that the costs of any H.B. 6 spending were not included in the Companies' rates or charges "is beside the

---

[37] OCC even cites Case No. 92-550-WS-COI to refute the argument (never made by the Companies) that OCC has no right to participate in this proceeding. *See id.* at 9, fn. 20. Yet Case No. 92-550-WS-COI merely demonstrates that OCC may intervene in a Commission ordered investigation – an irrelevant point that the Companies do not dispute. *See In the Matter of the Commission Investigation Into the Operations and Services of Ohio Utilities Company*, Case No. 92-550-WS-COI, 1992 WL 12719847, Entry (June 2, 1992).

[38] Sept. 15, 2020 Entry, ¶ 5.

13

point."[39]  In other words, asking Mr. Fanelli about the statements in his affidavit, or whether the costs of any H.B. 6 spending were included in the Companies' rates or charges, is not the purpose of the Notice.  Its true purpose – the "point" as described by OCC – is to question Mr. Fanelli concerning any "political or charitable contributions that funded the illegal activities alleged by federal prosecutors."[40]  According to OCC, the issue here is not a regulatory matter involving rates and charges, but whether the Companies can prove their "innocence."[41]

Because OCC's stated purpose for the Notice is to inquire into subject matter that is beyond the scope of this proceeding (as well as, as noted above, beyond the Commission's and OCC's jurisdiction), an order is necessary to protect the Companies and Mr. Fanelli "from annoyance, embarrassment, oppression, or undue burden or expense."[42]  OCC claims a broad right to discovery in Commission proceedings,[43] but that right is limited to matters "relevant to the subject matter of the proceeding."[44]  As OCC has no interest in discovering whether the costs of any H.B. 6 spending were included in the Companies' rates or charges, the Notice seeks matters not relevant to the scope of this proceeding.

OMAEG recommends that the deposition go forward so that the Companies' counsel can object to each question that is beyond the scope of this proceeding, the Commission's jurisdiction

---

[39] OCC Memo. Contra, p. 7.

[40] *Id.  See also id.*, p. 13.  OMAEG suggests that the Notice itself does not make OCC's purpose clear (OMAEG Memo. Contra, pp. 8-10), but this suggestion ignores everything OCC has filed and or served to date.

[41] *Id.*, p. 12.

[42] O.A.C. 4901-1-24(A).

[43] OCC Memo. Contra, pp. 10-17.  *See also* OMAEG Memo. Contra, pp. 6-7.

[44] O.A.C. 4901-1-16(B).

or OCC's jurisdiction,[45] but this would be a futile exercise given OCC's (and OMAEG's) position. If any party actually has an interest in the one question raised in the Sept. 15, 2020 Entry (as opposed to pursuing a criminal investigation into political and charitable spending generally), the most reasonable course of action is for discovery on that question to proceed via written questions. This affords all parties the same deliberative opportunity to present arguments regarding the proper scope of each written request while avoiding gamesmanship.

While OCC and other potential intervenors are correct that the Commission has authorized discovery in proceedings that did not involve an evidentiary hearing, the key question here is whether a deposition on the subject matter sought by OCC is reasonable under the circumstances presented given the scope of this proceeding. And OCC and the other potential intervenors have not rebutted the fact that the Commission ultimately has the discretion to decide this key question. In fact, they have completely ignored that the Commission has the right under O.A.C. 4901-1-24(A)(3) to order that discovery "may be had only by a method of discovery other than that selected by the party seeking discovery." Despite all their claims that "full" discovery equates to all methods of discovery in every case, the Commission's rules clearly authorize the relief requested here by the Companies.

Because OCC seeks through the Notice to delve into subject matter that is outside the scope of this proceeding and the Commission's and OCC's jurisdiction, the Companies are entitled to an order under O.A.C. 4901-1-24(A)(3). This is not a question of whether a deposition seeks relevant information but nonetheless presents "undue burden or expense" because it requires too much travel or too many hours to prepare responses, as in the cases cited by OCC.[46] Instead, the

---

[45] OMAEG Memo. Contra, pp. 10-11.

[46] OCC Memo. Contra, p. 18. *See also* OMAEG Memo. Contra, pp. 4-6, 11-14.

Notice imposes "annoyance, embarrassment, oppression, or undue burden or expense" simply because its purpose is to inquire into subject matter that is beyond the scope of this proceeding and the Commission's and OCC's jurisdiction.

While OCC and other potential intervenors argue that discovery is necessary to file comments in this case, they overlook two points: (1) the Sept. 15, 2020 Entry called for comments "regarding the Companies' response to this Entry,"[47] and (2) discovery on the Companies' response to the Sept. 15, 2020 Entry is not otherwise impeded. The Companies simply are asking for a limited and reasonable restriction as to one method of discovery because OCC's Notice clearly is not intended to assist OCC in filing comments regarding the Companies' response to the Sept. 15, 2020 Entry. And to the extent OCC seeks information specific to whether the costs of any H.B. 6 spending were included in the Companies' rates or charges paid by customers, the answer is unchanging: the Companies have not included, directly or indirectly, any costs of H.B. 6 spending in any rates or charges paid by ratepayers in Ohio.

The question presented in the Sept. 15, 2020 Entry is not a complex question shrouded in shades of grey. It does not involve witness credibility or hours of follow-up.[48] It does not give rise to questions that can only be asked in a deposition,[49] and OCC has not suggested otherwise. Nor does it require any analysis of spending made in support of H.B. 6. All that is needed is an

---

[47] Sept. 15, 2020 Entry, ¶ 6.

[48] *See* OCC Memo. Contra, pp. 16-17.

[49] OMAEG claims that a deposition should go forward so that OCC can ask questions "not covered by or not directly related to the prior discovery." OMAEG Memo. Contra, pp. 8-9. But neither OCC nor OMAEG have identified even one such question that is relevant to the subject matter of this proceeding. OCC already has asked numerous times whether the costs of any H.B. 6 spending were included in the Companies' rates or charges paid by customers, and that question has been answered "no" numerous times. Does OMAEG want a deposition so that OCC can ask Mr. Fanelli whether the answer is still "no?" Of course not. Instead OMAEG, like OCC, wants to investigate whether the Companies or other FirstEnergy entities made contributions in support of H.B. 6. *See* OMAEG Memo. Contra, p. 7.

understanding of what costs are included in the Companies' rates and charges, which is what Mr. Fanelli's affidavit provides.  Indeed, since Mr. Fanelli is responsible for the Companies' rates and charges for electric utility service but not their political and charitable expenditures or the other related subject matters raised in OCC's Notice and written discovery, he is not the person to answer OCC's questions about expenditures allegedly made "on illegal activities (and not on providing utility service to customers)."[50]  As such, compelling the requested deposition in this proceeding would be inappropriate and futile, as described above.

### D.    Conclusion

For the foregoing reasons and the reasons set forth in the Companies' Motion for Protective Order, the Companies respectfully request that the Motion be granted and that the Commission issue an order limiting discovery to written requests only.

Respectfully submitted,

/s/ James F. Lang
Brian J. Knipe (0090299)
FirstEnergy Service Company
76 South Main Street
Akron, OH 44308
(330) 384-5795
bknipe@firstenergycorp.com

James F. Lang (0059668)
Kari D. Hehmeyer (0096284)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114
(216) 622-8200
(216) 241-0816 (fax)
jlang@calfee.com
khehmeyer@calfee.com

---

[50] OCC Memo. Contra, p. 3.

*Attorneys for Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically through the Docketing Information System of the Public Utilities Commission of Ohio on this 9th day of November, 2020. The PUCO's e-filing system will electronically serve notice of the filing of this document on counsel for all parties.

/s/ James F. Lang
One of the Attorneys for Ohio Edison
Company, The Cleveland Electric
Illuminating Company, and The Toledo
Edison Company

4850-6454-6001, v. 1

This foregoing document was electronically filed with the Public Utilities

Commission of Ohio Docketing Information System on

11/9/2020 4:05:41 PM

in

Case No(s). 20-1502-EL-UNC

Summary: Reply in Support of Motion for Protective Order electronically filed by Mr. James F Lang on behalf of Ohio Edison Company and The Cleveland Electric Illuminating Company and The Toledo Edison Company

# EXHIBIT B:

Redacted Billing Statements for Robert Brown July 2019 – July 2020

**the Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, Equal
Payment Plan, eBill

August 14, 2019

**Account Number:** ▮▮▮▮▮▮▮

Page 1 of 2
I10

**Billing Period:** Jul 13 to Aug 12, 2019 for 31 days
**Bill For:** ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

**Amount Due: $0.00**

To report an emergency or an outage, call 24 hours a day 1-888-544-4877.  For Customer Service, call 1-800-589-3101.  For Payment Options, call 1-800-686-9901.    Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages |
|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. |

Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below.  In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.90 cents per KWH for the same usage that appears on the bill.  To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov.

**Residential Service - - 5.90 cents per KWH**

The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy.  These charges are not new, but are and previously were consolidated with other charges on your bill.

| | | | |
|---|---|---|---|
| Energy Efficiency | 2,068 KWH x 0.003206 | $6.63 |
| Peak Demand Reduction | 2,068 KWH x 0.000802 | $1.66 |
| Renewable Energy | 2,068 KWH x 0.001144 | $2.37 |

Your next meter reading is scheduled to occur on or about Sep 11, 2019.

We are required to include your name, address and usage information on a list of eligible customers that is made available to other competitive retail electric service providers. If you do not wish to be included on this list, please call us at our website - www.firstenergycorp.com or write to us at 76 S. Main St. Akron, OH 44308 Attn: FECC. Please note that an election to not be included on this list will not prevent Ohio Edison, The Illuminating Company or Toledo Edison from providing your information to governmental aggregators. If you previously made a similar election, your name will continue to be excluded from the list without any additional action on your part. If you previously decided not

**Additional messages, if any, can be found on back.**

| Usage History | | | | |
|---|---|---|---|---|
| Aug | 18 | 1,761 | Feb  19 | 1,520 |
| Sep | 18 | 1,752 | Mar  19 | 1,636 |
| Oct | 18 | 1,496 | Apr  19 | 1,387 |
| Nov | 18 | 1,705 | May  19 | 1,006 |
| Dec | 18 | 2,225 | Jun  19 | 1,639 |
| Jan | 19 | 2,444 | Jul  19 | 1,399 |
| | | | Aug  19 | 2,068 |



A-Actual          E-Estimate          C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 61 | 67 |
| Average Daily Temperature | 76 | 76 |
| Days in Billing Period | 29 | 31 |
| Last 12 Months Use (KWH) | | 20,277 |
| Average Monthly Use (KWH) | | 1,690 |

| Account Summary | Amount Due |
|---|---|
| Previous Balance | -371.67 |
| Payments/Adjustments | 0.00 |
| **Balance at Billing on Aug 14, 2019** | **-371.67** |
| The Illuminating Company - Payment Plan Amount | 177.00 |
| **Total owed by Aug 21, 2019** | **-$194.67** |

As an Automatic Credit Card Payment customer - Total charges of $0 will automatically be charged to your card account

**Your actual account balance is a credit of -$217.29.**

| Usage Information for Meter Number ▮▮▮▮▮▮ | |
|---|---|
| Aug 12, 2019 KWH Reading (Actual) | 13,094 |
| Jul 13, 2019 KWH Reading (Actual) | 11,026 |
| KWH used | 2,068 |

| Charges From The Illuminating Company | |
|---|---|
| Customer Number ▮▮▮▮▮▮▮ | |
| Rate:  Residential Service CE-RSF | |
| Customer Charge | 4.00 |
| Distribution Related Component | 116.96 |
| Cost Recovery Charges | 36.60 |
| Bypassable Generation and Transmission Related Component | 121.97 |
| **Current Consumption Bill Charges** | **279.53** |

| Equal Payment Plan (EPP) Summary | |
|---|---|
| Actual Charges Billed During 10 EPP Months | 2,185.38 |
| EPP Amount During 10 EPP Months | 2,208.00 |
| **Difference Between Actual Charges and EPP Amount** | **-22.62** |

---

**the Illuminating Company**
*A FirstEnergy Company*
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮▮

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH  44022

Automatic Credit Card Payment Customer $0 will be charged to your card account - DO NOT PAY

**THE ILLUMINATING COMPANY**
**PO BOX 3687**
**AKRON OH 44309-3687**

Account Number:    Page 2 of 4

## Messages (Continued)

to be included on the list and would like to reverse that decision, please call or write us at the same telephone number and address.

An important message to dog owners - to ensure that our meter readers' visits to your home are safe and productive, please keep your dog secured in an area away from the path to your meter.

## Explanation of Terms

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-In Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission, can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Generation Credit -** A credit for a qualifying rate and usage applied to all usage during the billing periods beginning October 31 and ending March 31.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 from Monday - Friday, 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 from Monday - Friday, 8 a.m. - 6 p.m.

**Visit our web site** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐ ☐

**The Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, Equal
Payment Plan, eBill

September 16, 2019

**Account Number:** ▮▮▮▮▮▮▮▮

**Amount Due: $0.00**

Billing Period: **Aug 13 to Sep 12, 2019 for 31 days**
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|

To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date.

Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.59 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov.

**Residential Service - 5.59 cents per KWH**

The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill.

| | | |
|---|---|---|
| Energy Efficiency | 1,138 KWH x 0.003206 | $3.65 |
| Peak Demand Reduction | 1,138 KWH x 0.000802 | $0.91 |
| Renewable Energy | 1,138 KWH x 0.001144 | $1.30 |

Your next meter reading is scheduled to occur on or about Oct 10, 2019.

Pursuant to Case No. 18-1604-EL-UNC, the Tax Savings Adjustment Rider will begin to decrease the price you pay for electric service rendered on or after September 1. This rider passes along to customers tax savings created by the federal Tax Cut and Jobs Act. The typical bill for a residential customer using 1,000 kWh will decrease, on average, by more than $4 per month.

| Account Summary | Amount Due |
|---|---|
| Previous Balance | -194.67 |
| Payments/Adjustments | 0.00 |
| **Balance at Billing on Sep 16, 2019** | **-194.67** |
| The Illuminating Company - Payment Plan Amount | 177.00 |
| **Total owed by Sep 23, 2019** | **-$17.67** |

As an Automatic Credit Card Payment customer - Total charges of $0 will automatically be charged to your card account

**Your actual account balance is a credit of -$67.50.**

**Usage Information for Meter Number** ▮▮▮▮▮▮

| | |
|---|---|
| Sep 12, 2019 KWH Reading (Actual) | 14,232 |
| Aug 13, 2019 KWH Reading (Actual) | 13,094 |
| KWH used | 1,138 |

**Charges From The Illuminating Company**

Customer Number ▮▮▮▮▮▮▮
Rate: Residential Service CE-RSF

| | |
|---|---|
| Customer Charge | 4.00 |
| Distribution Related Component | 61.99 |
| Cost Recovery Charges | 20.15 |
| Bypassable Generation and Transmission Related Component | 63.65 |
| **Current Consumption Bill Charges** | **149.79** |

**Equal Payment Plan (EPP) Summary**

| | |
|---|---|
| Actual Charges Billed During 11 EPP Months | 2,335.17 |
| EPP Amount During 11 EPP Months | 2,385.00 |
| **Difference Between Actual Charges and EPP Amount** | **-49.83** |

Additional messages, if any, can be found on back.

**Usage History**

| | | | | | |
|---|---|---|---|---|---|
| Sep | 18 | 1,752 | Mar | 19 | 1,636 |
| Oct | 18 | 1,496 | Apr | 19 | 1,387 |
| Nov | 18 | 1,705 | May | 19 | 1,006 |
| Dec | 18 | 2,225 | Jun | 19 | 1,639 |
| Jan | 19 | 2,444 | Jul | 19 | 1,389 |
| Feb | 19 | 1,520 | Aug | 19 | 2,068 |
| | | | Sep | 19 | 1,138 |



A-Actual   E-Estimate   C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 55 | 37 |
| Average Daily Temperature | 75 | 72 |
| Days in Billing Period | 32 | 31 |
| Last 12 Months Use (KWH) | 19,663 | |
| Average Monthly Use (KWH) | | 1,639 |

**The Illuminating Company**
*A FirstEnergy Company*
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮▮

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

Automatic Credit Card Payment Customer $0 will be charged to your card account - DO NOT PAY

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

**Messages (Continued)**

---

**Explanation of Terms**

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

---

**Important Information**

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

---

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

## Provide reading by telephone or on-line only: DO NOT MAIL

Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number

If you have a **DIGITAL METER** write the numbers here:

**Illuminating Company**
A FirstEnergy Company

Bill Based On: Actual Meter Reading, Equal
Payment Plan, Annual Review, eBill

Page 1 of 1
I10

**Billing Period:** Sep 13 to Oct 11, 2019 for 28 days
**Bill For:** ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

October 15, 2019
**Account Number:** ▮▮▮▮▮▮▮▮▮▮

**Amount Due: $34.52**

**Due Date: October 29, 2019**

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | Previous Balance | -17.67 |
| | Payments/Adjustments | 0.00 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.08 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | **Balance at Billing on Oct 15, 2019** | **-17.67** |
| | The Illuminating Company - Payment Plan Amount | 177.00 |
| | The Illuminating Company - Payment Plan Balance | -124.81 |
| | **Total Current Charges** | **52.19** |
| | **Total owed by Oct 29, 2019** | **$34.52** |
| | As an Automatic Credit Card Payment customer - Total charges of $34.52 will automatically be charged to your card account | |
| **Residential Service - ▮▮▮▮▮▮ - 5.08 cents per KWH** | **Your actual account balance is $34.52.** | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | Usage Information for Meter Number ▮▮▮▮▮▮ | |
| | Oct 11, 2019 KWH Reading (Actual) | 15,087 |
| | Sep 13, 2019 KWH Reading (Actual) | 14,232 |
| | KWH used | 855 |
| Energy Efficiency 855 KWH x 0.003206 $2.74 | **Charges From The Illuminating Company** | |
| Peak Demand Reduction 855 KWH x 0.000802 $0.69 | Customer Number ▮▮▮▮▮▮ | |
| Renewable Energy 855 KWH x 0.001144 $0.98 | Rate: Residential Service CE-RSF | |
| | Customer Charge | 4.00 |
| Your next meter reading is scheduled to occur on or about Nov 08, 2019. | Distribution Related Component | 39.40 |
| | Cost Recovery Charges | 15.15 |
| This is your last bill on the current budget season. The Amount Due on this bill is the amount that will bring your account balance to zero before the new budget season begins. If you are unable to pay the Amount Due in full, please contact us to make special payment arrangements. Starting next month, your Equal Payment Plan amount due will be $206.00. During the budget season, this amount will be reviewed and adjusted if necessary. | Bypassable Generation and Transmission Related Component | 43.47 |
| | **Current Consumption Bill Charges** | **102.02** |
| | **Equal Payment Plan (EPP) Summary** | |
| | Actual Charges Billed During 12 EPP Months | 2,437.19 |
| If termination of service would be especially dangerous to your health or the health of someone in your household, please contact our office regarding certification of the related medical condition by a licensed physician, physician assistant, clinical nurse specialist, certified nurse | EPP Amount During 12 EPP Months | 2,562.00 |
| | **Difference Between Actual Charges and EPP Amount** | **-124.81** |

**Additional messages, if any, can be found on back.**

**Usage History**

| | | | | |
|---|---|---|---|---|
| Oct | 18 | 1,496 | Apr 19 | 1,367 |
| Nov | 18 | 1,705 | May 19 | 1,006 |
| Dec | 18 | 2,225 | Jun 19 | 1,639 |
| Jan | 19 | 2,444 | Jul 19 | 1,399 |
| Feb | 19 | 1,520 | Aug 19 | 2,068 |
| Mar | 19 | 1,636 | Sep 19 | 1,138 |
| | | | Oct 19 | 855 |



A-Actual    E-Estimate    C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 52 | 29 |
| Average Daily Temperature | 70 | 69 |
| Days in Billing Period | 29 | 29 |
| Last 12 Months Use (KWH) | | 19,022 |
| Average Monthly Use (KWH) | | 1,585 |

**Illuminating Company**
A FirstEnergy Company
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮▮▮▮▮

Automatic Credit Card Payment Customer
$34.52 will be charged to your card account -
DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

### Messages (Continued)

practitioner, certified nurse-midwife or local board of health physician so that service can be maintained.

Pursuant to the recent Public Utilities Commission of Ohio (PUCO) Order in Case No. 14-1297-EL-SSO, the Distribution Modernization Rider (Rider DMR) was set to zero effective for service rendered on or after September 1, 2019. The Rider DMR amounts charged between July 2, 2019, and August 31, 2019, will be refunded to customers during the October billing cycle.

### Explanation of Terms

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

### Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

#### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐ ☐

**The Illuminating Company**
*A FirstEnergy Company*

Bill based On: Actual Meter Reading, Equal
Payment Plan, eBill

Page 1 of 2
110

November 13, 2019

**Account Number:** ▮▮▮▮▮▮

**Amount Due: $206.00**

**Due Date: November 27, 2019**

Billing Period: Oct 12 to Nov 11, 2019 for 31 days
Bill For:   ROBERT A BROWN
            68 WATERFORD RD
            CHAGRIN FALLS OH 44022

---

To report an emergency or an outage, call 24 hours a day 1-888-544-4877.  For Customer Service, call 1-800-589-3101.  For Payment Options, call 1-800-686-9901.   Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | Previous Balance | 34.52 |
|  | Payments/Adjustments | -34.52 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below.  In order for you to save money off of your utility's supply charges, a supplier must offer a price lower than The Illuminating Company's price of 5.05 cents per KWH for the same usage that appears on the bill.  To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | **Balance at Billing on Nov 13, 2019** | **0.00** |
|  | The Illuminating Company - Payment Plan Amount | 206.00 |
|  | **Total owed by Nov 27, 2019** | **$206.00** |
|  | As an Automatic Credit Card Payment customer - Total charges of $206.00 will automatically be charged to your card account |  |
| **Residential Service -  - 5.05 cents per KWH** | **Your actual account balance is $181.93.** | |
|  | **Usage Information for Meter Number** ▮▮▮▮▮ | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy.  These charges are not new, but are and previously were consolidated with other charges on your bill. | Nov 11, 2019 KWH Reading (Actual) | 16,670 |
|  | Oct 12, 2019 KWH Reading (Actual) | 15,087 |
|  | KWH used | 1,583 |
|  | **Charges From The Illuminating Company** | |
| Energy Efficiency          1,563 KWH  x  0.003206      $5.08 | Customer Number | |
| Peak Demand Reduction  1,583 KWH  x  0.000802      $1.27 | Rate:  Residential Service CE-RSF | |
| Renewable Energy         1,583 KWH  x  0.001144      $1.81 | Customer Charge | 4.00 |
|  | Distribution Related Component | 69.55 |
| Your next meter reading is scheduled to occur on or about Dec 10, 2019 | Cost Recovery Charges | 28.45 |
|  | Bypassable Generation and Transmission Related Component | 79.93 |
| We are required to include your name, address and usage information on a list of eligible customers that is made available to other competitive retail electric service providers. If you do not wish to be included on this list, please call us at 1-800-225-0444, go to the Customer Choice section of our website - www.firstenergycorp.com or write to us at 76 S. Main St. Akron, OH 44308 Attn: FECC. Please note that an election to not be included on this list will not prevent Ohio Edison, The Illuminating Company or Toledo Edison from providing your information to governmental aggregators. If you previously made a similar election, your name will continue to be excluded from the list without any additional action on your part. If you previously decided not | **Current Consumption Bill Charges** | **181.93** |
|  | **Detail Payment and Adjustment Information** | |
|  | 10/21/19  Payment | -34.52 |
|  | **Equal Payment Plan (EPP) Summary** | |
|  | Actual Charges Billed During 1 EPP Months | 181.93 |
|  | EPP Amount During 1 EPP Months | 206.00 |
|  | **Difference Between Actual Charges and EPP Amount** | **-24.07** |

**Additional messages, if any, can be found on back.**

**Usage History**

| | | | | |
|---|---|---|---|---|
| Nov | 18 | 1,705 | May  19 | 1,006 |
| Dec | 18 | 2,225 | Jun  19 | 1,639 |
| Jan | 19 | 2,444 | Jul  19 | 1,399 |
| Feb | 19 | 1,520 | Aug  19 | 2,068 |
| Mar | 19 | 1,636 | Sep  19 | 1,138 |
| Apr | 19 | 1,387 | Oct  19 | 855 |
| | | | Nov  19 | 1,583 |



N  D  J  F  M  A  M  J  J  A  S  O  N

A-Actual          E-Estimate          C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 59 | 51 |
| Average Daily Temperature | 48 | 49 |
| Days in Billing Period | 29 | 31 |
| Last 12 Months Use (KWH) | | 18,900 |
| Average Monthly Use (KWH) | | 1,575 |

---

**The Illuminating Company**
*A FirstEnergy Company*
76 South Main Street
Akron, OH  44308-1890

**Account Number:** ▮▮▮▮▮▮

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH  44022

Automatic Credit Card Payment Customer
$206.00 will be charged to your card account -
DO NOT PAY

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

**Messages (Continued)**

to be included on the list and would like to reverse that decision, please call or write us at the same telephone number and address

Don't miss the enclosed brochure on Co-Op. Fill out and return the form to contribute and help your neighbors.

---

**Explanation of Terms**

**Bypassable Generation and Transmission Related Component** - Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges** - Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge** - Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component** - Charge for moving electricity over distribution lines to a service location.

**Economic Development Component** - Charges related to economic development support.

**Estimated Reading** - On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour)** - A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge** - A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC)** - The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit** - A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit** - A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

---

**Important Information**

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion** - Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

---

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

## Provide reading by telephone or on-line only:  DO NOT MAIL

Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here:

---

**The Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, Equal Payment Plan, eBill

Billing Period: Nov 12 to Dec 11, 2019 for 30 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

December 13, 2019
**Account Number:** ▇▇▇▇▇▇
**Amount Due: $206.00**
**Due Date: December 27, 2019**

Page 1 of 1
I10

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | Previous Balance | 206.00 |
| | Payments/Adjustments | -206.00 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.05 cents per KWH for the same usage that appears on this bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | **Balance at Billing on Dec 13, 2019** | **0.00** |
| | The Illuminating Company - Payment Plan Amount | 206.00 |
| | **Total owed by Dec 27, 2019** | **$206.00** |
| | As an Automatic Credit Card Payment customer - Total charges of $206.00 will automatically be charged to your card account | |
| | **Your actual account balance is $215.77.** | |
| **Residential Service -** ▇▇▇▇ **- 5.05 cents per KWH** | Usage Information for Meter Number ▇▇▇▇ | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | Dec 11, 2019 KWH Reading (Actual) | 18,691 |
| | Nov 12, 2019 KWH Reading (Actual) | 16,670 |
| | KWH used | 2,021 |
| | **Charges From The Illuminating Company** | |
| Energy Efficiency 2.021 KWH x 0.003206 $6.48 | Customer Number ▇▇▇▇ | |
| Peak Demand Reduction 2.021 KWH x 0.000802 $1.62 | Rate: Residential Service CE-RSF | |
| Renewable Energy 2.021 KWH x 0.001144 $2.31 | Customer Charge | 4.00 |
| | Distribution Related Component | 96.61 |
| Your next meter reading is scheduled to occur on or about Jan 10, 2020. | Cost Recovery Charges | 37.21 |
| | Bypassable Generation and Transmission Related Component | 102.02 |
| Under State law, the amount you are being billed includes: (1) Kilowatt-hour taxes that have been in effect since 2001 and are currently at $86.92 and (2) Assessments to assist in the support of the operations of the PUCO and the office of the consumers' counsel that have been in effect since 1912 and 1977, respectively. | **Current Consumption Bill Charges** | **239.84** |
| | **Detail Payment and Adjustment Information** | |
| | 11/18/19 Payment | -206.00 |
| | **Equal Payment Plan (EPP) Summary** | |
| Best wishes for a joyous holiday season from all of us at The Illuminating Company. | Actual Charges Billed During 2 EPP Months | 421.77 |
| | EPP Amount During 2 EPP Months | 412.00 |
| | **Difference Between Actual Charges and EPP Amount** | **9.77** |

**Additional messages, if any, can be found on back.**

**Usage History**

| | | | | | | |
|---|---|---|---|---|---|---|
| Dec | 18 | 2,225 | Jun | 19 | 1,639 |
| Jan | 19 | 2,444 | Jul | 19 | 1,399 |
| Feb | 19 | 1,520 | Aug | 19 | 2,068 |
| Mar | 19 | 1,636 | Sep | 19 | 1,138 |
| Apr | 19 | 1,387 | Oct | 19 | 855 |
| May | 19 | 1,006 | Nov | 19 | 1,583 |
| | | | Dec | 19 | 2,021 |



A-Actual    E-Estimate    C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 70 | 67 |
| Average Daily Temperature | 35 | 38 |
| Days in Billing Period | 32 | 30 |
| Last 12 Months Use (KWH) | 18,696 | |
| Average Monthly Use (KWH) | | 1,558 |

**The Illuminating Company**
*A FirstEnergy Company*
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▇▇▇▇▇▇

Automatic Credit Card Payment Customer
$206.00 will be charged to your card account -
DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

**Messages (Continued)**

**Explanation of Terms**

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Important Information**

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL

Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number

If you have a **DIGITAL METER** write the numbers here:

**The Illuminating Company**
A FirstEnergy Company

Bill Based On: Actual Meter Reading, Equal
Payment Plan, Budget Review, eBill

January 15, 2020
**Account Number:** ███████████

**Amount Due: $206.00**

**Due Date: January 29, 2020**

Billing Period: Dec 12 to Jan 10, 2020 for 30 days
Bill For:   ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|

| | Account Summary | Amount Due |
|---|---|---|
| | Previous Balance | 206.00 |
| | Payments/Adjustments | -206.00 |
| | **Balance at Billing on Jan 15, 2020** | **0.00** |
| | The Illuminating Company - Payment Plan Amount | 206.00 |
| | **Total owed by Jan 29, 2020** | **$206.00** |

To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date.

Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.07 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov.

As an Automatic Credit Card Payment customer - Total charges of $206.00 will automatically be charged to your card account

**Your actual account balance is $269.49.**

**Residential Service - 5.07 cents per KWH**

The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill.

| Usage Information for Meter Number | ████ |
|---|---|
| Jan 10, 2020 KWH Reading (Actual) | 20,897 |
| Dec 12, 2019 KWH Reading (Actual) | 18,691 |
| KWH used | 2,206 |

| Charges From The Illuminating Company | |
|---|---|
| Customer Number | ████ |
| Rate: Residential Service CE-RSF | |
| Customer Charge | 4.00 |
| Distribution Related Component | 102.77 |
| Cost Recovery Charges | 41.03 |
| Bypassable Generation and Transmission Related Component | 111.92 |
| **Current Consumption Bill Charges** | **259.72** |

| Energy Efficiency | 2.206 KWH x 0.002779 | $6.13 |
|---|---|---|
| Peak Demand Reduction | 2.206 KWH x 0.000694 | $1.53 |
| Renewable Energy | 2.206 KWH x 0.001088 | $2.40 |

Your next meter reading is scheduled to occur on or about Feb 07, 2020.

As a customer in the Equal Payment Plan program, your account has been reviewed and your payment amount adjusted to better match your actual usage. Starting next month, your payment amount will be $189.00.

Pursuant to state law, the Universal Service Fund Rider rate has been adjusted effective with this bill.

| Detail Payment and Adjustment Information | |
|---|---|
| 12/18/19 Payment | -206.00 |

| Equal Payment Plan (EPP) Summary | |
|---|---|
| Actual Charges Billed During 3 EPP Months | 681.49 |
| EPP Amount During 3 EPP Months | 618.00 |
| **Difference Between Actual Charges and EPP Amount** | **63.49** |

**Additional messages, if any, can be found on back.**

**Usage History**

| | | | | |
|---|---|---|---|---|
| Jan | 19 | 2,444 | Jul | 19 | 1,399 |
| Feb | 19 | 1,520 | Aug | 19 | 2,068 |
| Mar | 19 | 1,636 | Sep | 19 | 1,138 |
| Apr | 19 | 1,387 | Oct | 19 | 855 |
| May | 19 | 1,006 | Nov | 19 | 1,583 |
| Jun | 19 | 1,639 | Dec | 19 | 2,021 |
| | | | Jan | 20 | 2,206 |



A-Actual          E-Estimate          C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 76 | 74 |
| Average Daily Temperature | 38 | 39 |
| Days in Billing Period | 32 | 30 |
| Last 12 Months Use (KWH) | | 18,458 |
| Average Monthly Use (KWH) | | 1,536 |

**The Illuminating Company**
A FirstEnergy Company
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ███████████

Automatic Credit Card Payment Customer $206.00 will be charged to your card account - DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

## Messages (Continued)

## Explanation of Terms

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-In Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here:

**The Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, Equal
Payment Plan, eBill

**March 11, 2020**

Page 1 of 1
I10

**Account Number:** ▓▓▓▓▓

Billing Period: Feb 08 to Mar 09, 2020 for 31 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

| **Amount Due: $189.00** |
|---|

**Due Date: March 25, 2020**

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call
1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | | | Account Summary | Amount Due |
|---|---|---|---|---|
| | | | Previous Balance | 189.00 |
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | | | Payments/Adjustments | -189.00 |
| | | | **Balance at Billing on Mar 11, 2020** | **0.00** |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.12 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | | | The Illuminating Company - Payment Plan Amount | 189.00 |
| | | | **Total owed by Mar 25, 2020** | **$189.00** |
| | | | As an Automatic Credit Card Payment customer - Total charges of $189.00 will automatically be charged to your card account | |
| | | | **Your actual account balance is $261.90.** | |
| **Residential Service –** – 5.12 cents per KWH | | | Usage Information for Meter Number ▓▓▓▓ | |
| | | | Mar 09, 2020 KWH Reading (Actual) | 24,211 |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | | | Feb 08, 2020 KWH Reading (Actual) | 22,665 |
| | | | KWH used | 1,546 |
| | | | Charges From The Illuminating Company | |
| | | | Customer Number ▓▓▓▓ | |
| Energy Efficiency | 1,546 KWH x 0.001928 | $2.98 | Rate: Residential Service CE-RSF | |
| Peak Demand Reduction | 1,546 KWH x 0.000482 | $0.75 | Customer Charge | 4.00 |
| Renewable Energy | 1,546 KWH x 0.000979 | $1.51 | Distribution Related Component | 68.87 |
| | | | Cost Recovery Charges | 30.22 |
| Your next meter reading is scheduled to occur on or about Apr 07, 2020. | | | Bypassable Generation and Transmission Related Component | 79.23 |
| | | | **Current Consumption Bill Charges** | **182.32** |
| On January 15, 2020, in Case No. 19-2060-EL-ATA, the Public Utilities Commission of Ohio approved the Conservation Support Rider for service rendered beginning February 1, 2020. This rider enables support for efficient use of electricity, pursuant to recently enacted state legislation. The initial impact of the rider is $0.90 on the monthly electric bill of a typical residential customer. | | | Detail Payment and Adjustment Information | |
| | | | 02/17/20 Payment | -189.00 |
| | | | Equal Payment Plan (EPP) Summary | |
| | | | Actual Charges Billed During 5 EPP Months | 1,068.90 |
| | | | EPP Amount During 5 EPP Months | 996.00 |
| The Earned Income Tax Credit (EITC) is a tax credit for certain lower-income families and individuals. For information and to determine if you qualify, simply dial 800-829-1040, or visit irs.gov/individuals. | | | **Difference Between Actual Charges and EPP Amount** | **72.90** |

**Additional messages, if any, can be found on back.**

**Usage History**

| Mar | 19 | 1,636 | Sep | 19 | 1,138 |
|---|---|---|---|---|---|
| Apr | 19 | 1,387 | Oct | 19 | 855 |
| May | 19 | 1,006 | Nov | 19 | 1,583 |
| Jun | 19 | 1,639 | Dec | 19 | 2,021 |
| Jul | 19 | 1,399 | Jan | 20 | 2,206 |
| Aug | 19 | 2,068 | Feb | 20 | 1,768 |
| | | | Mar | 20 | 1,546 |



A-Actual    E-Estimate    C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 58 | 50 |
| Average Daily Temperature | 30 | 35 |
| Days in Billing Period | 28 | 31 |
| Last 12 Months Use (KWH) | 18,616 | |
| Average Monthly Use (KWH) | | 1,551 |

**The Illuminating Company**
*A FirstEnergy Company*

76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▓▓▓▓▓

Automatic Credit Card Payment Customer
$189.00 will be charged to your card account -
DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

**THE ILLUMINATING COMPANY**
**PO BOX 3687**
**AKRON OH 44309-3687**

## Explanation of Terms

**Bypassable Generation and Transmission Related Component** - Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges** - Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge** - Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component** - Charge for moving electricity over distribution lines to a service location.

**Economic Development Component** - Charges related to economic development support.

**Estimated Reading** - On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour)** - A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge** - A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC)** - The utility's price per KWH for bypassable generation and transmission, can be compared with the price offered by another supplier.

**Residential Distribution Credit** - A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit** - A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion** - Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL

Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here:

**The Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, Equal
Payment Plan, Budget Review, eBill

**April 09, 2020**

Page 1 of 2
I10

**Account Number:** ▮▮▮▮▮▮

Billing Period: Mar 10 to Apr 07, 2020 for 29 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

**Amount Due: $189.00**

**Due Date: April 23, 2020**

---

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call
1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | | Account Summary | Amount Due |
|---|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | | Previous Balance | 189.00 |
| | | Payments/Adjustments | -189.00 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.15 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | | **Balance at Billing on Apr 09, 2020** | **0.00** |
| | | The Illuminating Company - Payment Plan Amount | 189.00 |
| | | **Total owed by Apr 23, 2020** | **$189.00** |
| | | As an Automatic Credit Card Payment customer - Total charges of $189.00 will automatically be charged to your card account | |
| | | **Your actual account balance is $204.08.** | |
| **Residential Service - 5.15 cents per KWH** | | **Usage Information for Meter Number** ▮▮▮▮ | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | | Apr 07, 2020 KWH Reading (Actual) | 25,301 |
| | | Mar 10, 2020 KWH Reading (Actual) | 24,211 |
| | | KWH used | 1,090 |
| | | **Charges From The Illuminating Company** | |
| Energy Efficiency | 1,090 KWH x 0.001928 | $2.10 | Customer Number ▮▮▮▮ | |
| Peak Demand Reduction | 1,090 KWH x 0.000482 | $0.53 | Rate: Residential Service CE-RSF | |
| Renewable Energy | 1,090 KWH x 0.000979 | $1.07 | Customer Charge | 4.00 |
| | | Distribution Related Component | 48.86 |
| Your next meter reading is scheduled to occur on or about May 07, 2020. | | Cost Recovery Charges | 22.18 |
| | | Bypassable Generation and Transmission Related Component | 56.14 |
| As a customer in the Equal Payment Plan program, your account has been reviewed and your payment amount adjusted to better match your actual usage. Starting next month, your payment amount will be $178.00. | | **Current Consumption Bill Charges** | **131.18** |
| | | **Detail Payment and Adjustment Information** | |
| | | 03/16/20 Payment | -189.00 |
| | | **Equal Payment Plan (EPP) Summary** | |
| Our utilities are continuing meter reading operations during the coronavirus health emergency. You may see these essential employees in your neighborhood if you're home during the day. Their work takes place entirely outdoors and without customer interaction. Please keep the path to your meter clear of snow and other debris, and keep dogs secured away from the area. Please do not approach our meter readers, as they are trained to maintain social distancing. All | | Actual Charges Billed During 6 EPP Months | 1,200.08 |
| | | EPP Amount During 6 EPP Months | 1,185.00 |
| | | **Difference Between Actual Charges and EPP Amount** | 15.08 |

**Additional messages, if any, can be found on back.**

**Usage History**

| Apr | 19 | 1,387 | Oct | 19 | 855 |
|---|---|---|---|---|---|
| May | 19 | 1,006 | Nov | 19 | 1,583 |
| Jun | 19 | 1,639 | Dec | 19 | 2,021 |
| Jul | 19 | 1,399 | Jan | 20 | 2,206 |
| Aug | 19 | 2,068 | Feb | 20 | 1,768 |
| Sep | 19 | 1,138 | Mar | 20 | 1,546 |
| | | | Apr | 20 | 1,090 |



A-Actual   E-Estimate   C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 48 | 38 |
| Average Daily Temperature | 44 | 45 |
| Days in Billing Period | 29 | 29 |
| Last 12 Months Use (KWH) | | 18,319 |
| Average Monthly Use (KWH) | | 1,527 |

**The Illuminating Company**
*A FirstEnergy Company*

76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

Automatic Credit Card Payment Customer
$189.00 will be charged to your card account -
DO NOT PAY

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

**Messages (Continued)**

of our employees wear photo ID badges. If you have concerns or questions, please contact your utility company.

Spring's warm weather often produces thunderstorms, which can cause power outages. If your power goes out, call 1-888-LIGHTSS (1-888-544-4877). For your safety, please treat all downed wires as live and dangerous. For more information on preparing for outages, visit www.firstenergycorp.com/storminfo.

On February 26, 2020 in Case No. 19-2120-EL-RDR, the Public Utilities Commission of Ohio (PUCO) approved an adjustment to the Non-Market-Based Services Rider for service rendered on or after March 1, 2020. This rider recovers costs imposed by the Federal Energy Regulatory Commission (FERC) or the regional transmission organization, PJM Interconnection. The estimated average impact of the adjustment is approximately $0.70 on the monthly electric bill of a residential customer using 750 kWh per month.

**Explanation of Terms**

**Bypassable Generation and Transmission Related Component** - Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges** - Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge** - Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component** - Charge for moving electricity over distribution lines to a service location.

**Economic Development Component** - Charges related to economic development support

**Estimated Reading** - On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour)** - A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge** - A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC)** - The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit** - A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit** - A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Important Information**

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:
**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.
**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.
**Visit our website** at http://www.firstenergycorp.com
**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.
**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).
**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.
**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.
**For your protection,** all of our employees wear Photo I.D. badges.
**Electronic Check Conversion** - Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

To provide a customer meter reading, use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only:  DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐ ☐

The Illuminating Company
A FirstEnergy Company

Bill Based On: Actual Meter Reading, Equal Payment Plan, eBill

**May 11, 2020**

**Account Number:** ▮▮▮▮▮▮▮▮

**Amount Due: $178.00**

**Due Date: May 26, 2020**

Billing Period: Apr 08 to May 07, 2020 for 30 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

Page 1 of 1
I10

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com

Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | Previous Balance | 189.00 |
| | Payments/Adjustments | -189.00 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.24 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | **Balance at Billing on May 11, 2020** | **0.00** |
| | The Illuminating Company - Payment Plan Amount | 178.00 |
| | **Total owed by May 26, 2020** | **$178.00** |
| | As an Automatic Credit Card Payment customer - Total charges of $178.00 will automatically be charged to your card account | |
| **Residential Service - ▮▮▮▮▮ - 5.24 cents per KWH** | **Your actual account balance is $153.40.** | |
| | Usage Information for Meter Number ▮▮▮▮▮ | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | May 07, 2020 KWH Reading (Actual) | 26,442 |
| | Apr 08, 2020 KWH Reading (Actual) | 25,301 |
| | KWH used | 1,141 |
| | Charges From The Illuminating Company | |
| Energy Efficiency 1,141 KWH x 0.001928 $2.20 | Customer Number ▮▮▮▮▮ | |
| Peak Demand Reduction 1,141 KWH x 0.000482 $0.55 | Rate: Residential Service CE-RSF | |
| Renewable Energy 1,141 KWH x 0.000979 $1.12 | Customer Charge | 4.00 |
| | Distribution Related Component | 51.25 |
| Your next meter reading is scheduled to occur on or about Jun 08, 2020. | Cost Recovery Charges | 23.32 |
| | Bypassable Generation and Transmission Related Component | 59.75 |
| We are required to include your name, address and usage information on a list of eligible customers that is made available to other competitive retail electric service providers. If you do not wish to be included on this list, please call us at 1-800-225-0444, go to the Customer Choice section of our website - www.firstenergycorp.com - or write to us at 76 S. Main St. Akron, OH 44308 Attn: FECC. Please note that an election to not be included on this list will not prevent Ohio Edison, The Illuminating Company or Toledo Edison from providing your information to governmental aggregators. If you previously made a similar election, your name will continue to be excluded from the list without any additional action on your part. If you previously decided not | **Current Consumption Bill Charges** | **138.32** |
| | Detail Payment and Adjustment Information | |
| | 04/14/20 Payment | -189.00 |
| | Equal Payment Plan (EPP) Summary | |
| | Actual Charges Billed During 7 EPP Months | 1,338.40 |
| | EPP Amount During 7 EPP Months | 1,363.00 |
| | **Difference Between Actual Charges and EPP Amount** | **-24.60** |

**Additional messages, if any, can be found on back.**

**Usage History**

| | | | | | |
|---|---|---|---|---|---|
| May | 19 | 1,006 | Nov | 19 | 1,563 |
| Jun | 19 | 1,639 | Dec | 19 | 2,021 |
| Jul | 19 | 1,399 | Jan | 20 | 2,206 |
| Aug | 19 | 2,068 | Feb | 20 | 1,768 |
| Sep | 19 | 1,138 | Mar | 20 | 1,546 |
| Oct | 19 | 855 | Apr | 20 | 1,090 |
| | | | May | 20 | 1,141 |



A-Actual     E-Estimate     C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 34 | 38 |
| Average Daily Temperature | 55 | 48 |
| Days in Billing Period | 30 | 30 |
| Last 12 Months Use (KWH) | | 18,454 |
| Average Monthly Use (KWH) | | 1,538 |

The Illuminating Company
A FirstEnergy Company

76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮▮▮

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

Automatic Credit Card Payment Customer
$178.00 will be charged to your card account -
DO NOT PAY

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

## Messages (Continued)

to be included on the list and would like to reverse that decision, please call or write us at the same telephone number and address.

We continue to find ways to assist customers during the coronavirus pandemic and its aftereffects. We will not resume normal collections or shut-off activity until at least July 1, 2020, and will comply with any state orders to postpone these activities as long as necessary. Customers who are having difficulty paying their bills should call us to arrange an affordable payment plan. These arrangements will not interfere with any future payment options customers may choose. We encourage all customers with overdue balances who are unable to reach a payment arrangement to pay what they can to keep their total balance as manageable as possible. For information about assistance programs residential customers may be eligible for, please visit www.firstenergycorp.com/billassist.

All late payment charges have been suspended effective April 3, 2020, until further notice due to the coronavirus health emergency. However, due to technical constraints, late charges will continue to appear on customer bills. If your bill includes a late payment charge, you have two options: 1. You can pay the late payment charge and it will be credited to your account on your next billing statement; 2. You can choose not to pay the late payment charge on your bill and that charge will be removed from your account on your next billing statement without penalty.

Our utilities are continuing meter reading operations during the coronavirus health emergency. You may see these essential employees in your neighborhood if you're home during the day. Their work takes place entirely outdoors and without customer interaction. Please keep the path to your meter clear of snow and other debris, and keep dogs secured away from the area. Please do not approach our meter readers, as they are trained to maintain social distancing. All

of our employees wear photo ID badges. If you have concerns or questions, please contact your utility company.

## Explanation of Terms

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing and speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐

**The Illuminating Company**
*a FirstEnergy Company*

Bill Based On* Actual Meter Reading, Equal Payment Plan, eBill

June 11, 2020

**Account Number:** ▉▉▉▉▉▉

Page 1 of 1
110

Billing Period: May 08 to Jun 09, 2020 for 33 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

**Amount Due: $178.00**

**Due Date: June 25, 2020**

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call 1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages | Account Summary | Amount Due |
|---|---|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. | Previous Balance | 178.00 |
| | Payments/Adjustments | -178.00 |
| Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer a price lower than The Illuminating Company's price of 5.31 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov. | **Balance at Billing on Jun 11, 2020** | **0.00** |
| | The Illuminating Company - Payment Plan Amount | 178.00 |
| | **Total owed by Jun 25, 2020** | **$178.00** |
| | As an Automatic Credit Card Payment customer - Total charges of $178.00 will automatically be charged to your card account | |
| **Residential Service - 5.31 cents per KWH** | Your actual account balance is $103.62. | |
| The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill. | **Usage Information for Meter Number** ▉▉▉▉ | |
| | Jun 09, 2020 KWH Reading (Actual) | 27,488 |
| | May 08, 2020 KWH Reading (Actual) | 26,442 |
| | KWH used | 1,046 |
| | **Charges From The Illuminating Company** | |
| Energy Efficiency     1.046 KWH x 0.001928     $2.02 | Customer Number ▉▉▉▉▉ | |
| Peak Demand Reduction  1.046 KWH x 0.000482     $0.50 | Rate: Residential Service CE-RSF | |
| Renewable Energy      1.046 KWH x 0.000979     $1.02 | Customer Charge | 4.00 |
| | Distribution Related Component | 47.24 |
| Your next meter reading is scheduled to occur on or about Jul 08, 2020 | Cost Recovery Charges | 21.42 |
| | Bypassable Generation and Transmission Related Component | 55.56 |
| Pursuant to Ohio law, it is illegal for your electric meter and associated equipment to be tampered with to obtain unauthorized use of electricity. As specified in the Ohio Revised Code, persons found guilty of stealing electricity or tampering may be subject to jail sentences up to five years and fines up to $10,000. Meter tampering is dangerous and could result in serious personal injury or damage to property. Ohio Law requires this message. | **Current Consumption Bill Charges** | **128.22** |
| | **Detail Payment and Adjustment Information** | |
| | 05/18/20 Payment | -178.00 |
| | **Equal Payment Plan (EPP) Summary** | |
| We continue to find ways to assist customers during the coronavirus pandemic and its aftereffects. We will not resume normal collections or shut-off activity until at least July 1, 2020, and will comply with any state orders to postpone these activities as long as necessary. | Actual Charges Billed During 8 EPP Months | 1,466.62 |
| | EPP Amount During 8 EPP Months | 1,541.00 |
| **Additional messages, if any, can be found on back.** | **Difference Between Actual Charges and EPP Amount** | **-74.38** |

**Usage History**

| | | | | | |
|---|---|---|---|---|---|
| Jun | 19 | 1,639 | Dec | 19 | 2,021 |
| Jul | 19 | 1,399 | Jan | 20 | 2,206 |
| Aug | 19 | 2,068 | Feb | 20 | 1,768 |
| Sep | 19 | 1,138 | Mar | 20 | 1,546 |
| Oct | 19 | 855 | Apr | 20 | 1,090 |
| Nov | 19 | 1,583 | May | 20 | 1,141 |
| | | | Jun | 20 | 1,046 |



| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 50 | 32 |
| Average Daily Temperature | 64 | 63 |
| Days in Billing Period | 33 | 33 |
| Last 12 Months Use (KWH) | | 17,861 |
| Average Monthly Use (KWH) | | 1,488 |

**The Illuminating Company**
*a FirstEnergy Company*
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▉▉▉▉▉▉

Automatic Credit Card Payment Customer
$178.00 will be charged to your card account -
DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

## Messages (Continued)

Customers who are having difficulty paying their bills should call us to arrange an affordable payment plan. These arrangements will not interfere with any future payment options customers may choose. We encourage all customers with overdue balances who are unable to reach a payment arrangement to pay what they can to keep their total balance as manageable as possible. For information about assistance programs residential customers may be eligible for, please visit www.firstenergycorp.com/billassist.

All late payment charges have been suspended effective April 3, 2020, until further notice due to the coronavirus health emergency. However, due to technical constraints, late charges will continue to appear on customer bills. If your bill includes a late payment charge, you have two options: 1. You can pay the late payment charge and it will be credited to your account on your next billing statement; 2. You can choose not to pay the late payment charge on your bill and that charge will be removed from your account on your next billing statement without penalty.

Our utilities are continuing meter reading operations during the coronavirus health emergency. You may see these essential employees in your neighborhood if you're home during the day. Their work takes place entirely outdoors and without customer interaction. Please keep the path to your meter clear of snow and other debris, and keep dogs secured away from the area. Please do not approach our meter readers, as they are trained to maintain social distancing. All of our employees wear photo ID badges. If you have concerns or questions, please contact your utility company.

## Explanation of Terms

**Bypassable Generation and Transmission Related Component** - Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges** - Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge** - Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component** - Charge for moving electricity over distribution lines to a service location.

**Economic Development Component** - Charges related to economic development support.

**Estimated Reading** - On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour)** - A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge** - A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC)** - The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit** - A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit** - A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion** - Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐ ☐

**The Illuminating Company**
*A FirstEnergy Company*

Bill Based On: Actual Meter Reading, eData
Payment Plan, Budget Review, eBill

July 13, 2020
**Account Number:** ▮▮▮▮▮▮▮
**Amount Due: $178.00**

**Due Date: July 27, 2020**

Billing Period: Jun 10 to Jul 09, 2020 for 30 days
Bill For: ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

To report an emergency or an outage, call 24 hours a day 1-888-544-4877. For Customer Service, call 1-800-589-3101. For Payment Options, call
1-800-686-9901. Pay your bill online at www.firstenergycorp.com
Bill issued by: The Illuminating Company, PO Box 3687, Akron OH 44309-3687

| Messages |
|---|
| To avoid a 1.50% Late Payment Charge being added to your bill, please pay the **Amount Due** by the Due Date. |

Your current **PRICE TO COMPARE** for generation and transmission from The Illuminating Company is listed below. In order for you to save money off of your utility's supply charges, a supplier must offer you a price lower than The Illuminating Company's price of 5.49 cents per KWH for the same usage that appears on the bill. To review available competitive supplier offers, visit the Public Utilities Commission of Ohio's "Energy Choice Ohio" website at www.energychoice.ohio.gov.

**Residential Service - 5.48 cents per KWH**

The information below shows specific charges for the costs of energy efficiency, peak demand reduction, and renewable energy. These charges are not new, but are and previously were consolidated with other charges on your bill.

| | | |
|---|---|---|
| Energy Efficiency | 1,155 KWH x 0.002485 | $2.87 |
| Peak Demand Reduction | 1,155 KWH x 0.000623 | $0.72 |
| Renewable Energy | 1,155 KWH x 0.000944 | $1.09 |

Your next meter reading is scheduled to occur on or about Aug 06, 2020.

As a customer in the Equal Payment Plan program, your account has been reviewed and your payment adjusted to better match your actual usage. Starting next month, your payment amount will be $141.00.

For a brochure describing your customer rights and obligations, please call our Customer Service phone number.

In Case No. 20-0568-EL-RDR, the Public Utilities Commission of Ohio approved the Rider GEN charges effective June 1, 2020. On an annualized basis, it is estimated that the change in Rider GEN will result in an average decrease of 4% on the bill of a typical residential

**Additional messages, if any, can be found on back.**

| Account Summary | Amount Due |
|---|---|
| Previous Balance | 178.00 |
| Payments/Adjustments | -178.00 |
| **Balance at Billing on Jul 13, 2020** | **0.00** |
| The Illuminating Company - Payment Plan Amount | 178.00 |
| **Total owed by Jul 27, 2020** | **$178.00** |

As an Automatic Credit Card Payment customer - Total charges of $178.00 will automatically be charged to your card account

**Your actual account balance is $69.75.**

| Usage Information for Meter Number ▮▮▮▮ | |
|---|---|
| Jul 09, 2020 KWH Reading (Actual) | 28,643 |
| Jun 10, 2020 KWH Reading (Actual) | 27,488 |
| KWH used | 1,155 |

| Charges From The Illuminating Company | |
|---|---|
| Customer Number ▮▮▮▮ | |
| Rate: Residential Service CE-RSF | |
| Customer Charge | 4.00 |
| Distribution Related Component | 53.27 |
| Cost Recovery Charges | 23.46 |
| Bypassable Generation and Transmission Related Component | 63.40 |
| **Current Consumption Bill Charges** | **144.13** |

| Detail Payment and Adjustment Information | |
|---|---|
| 06/16/20   Payment | -178.00 |

| Equal Payment Plan (EPP) Summary | |
|---|---|
| Actual Charges Billed During 9 EPP Months | 1,610.75 |
| EPP Amount During 9 EPP Months | 1,719.00 |
| **Difference Between Actual Charges and EPP Amount** | **-108.25** |

| Usage History | | | |
|---|---|---|---|
| Jul | 19 | 1,399 | Jan 20 | 2,206 |
| Aug | 19 | 2,068 | Feb 20 | 1,768 |
| Sep | 19 | 1,138 | Mar 20 | 1,546 |
| Oct | 19 | 855 | Apr 20 | 1,090 |
| Nov | 19 | 1,583 | May 20 | 1,141 |
| Dec | 19 | 2,021 | Jun 20 | 1,046 |
| | | | Jul 20 | 1,155 |



J A S O N D J F M A M J J
A-Actual   E-Estimate   C-Customer

| Comparisons | Last Year | This Year |
|---|---|---|
| Average Daily Use (KWH) | 47 | 39 |
| Average Daily Temperature | 74 | 73 |
| Days in Billing Period | 30 | 30 |
| Last 12 Months Use (KWH) | | 17,617 |
| Average Monthly Use (KWH) | | 1,468 |

**The Illuminating Company**
*A FirstEnergy Company*
76 South Main Street
Akron, OH 44308-1890

**Account Number:** ▮▮▮▮▮▮▮

Automatic Credit Card Payment Customer
$178.00 will be charged to your card account -
DO NOT PAY

ROBERT A BROWN
68 WATERFORD RD
CHAGRIN FALLS OH 44022

THE ILLUMINATING COMPANY
PO BOX 3687
AKRON OH 44309-3687

## Messages (Continued)

customer using 750 kWh and taking generation service from the company's Standard Service Offer.

We continue to find ways to assist customers during the coronavirus pandemic and its aftereffects. We will resume disconnects for non-payment no sooner than September 15, 2020 and will comply with any state orders to postpone these activities as long as necessary. However, field personnel following proper safety measures, may be in the community performing customer outreach starting in August. Customers who are having difficulty paying their bills should call us to arrange an affordable payment plan. These arrangements will not interfere with any future payment options customers may choose. We encourage all customers with overdue balances who are unable to reach a payment arrangement to pay what they can to keep their total balance as manageable as possible. For information about assistance programs residential customers may be eligible for, please visit www.firstenergycorp.com/billassist.

All late payment charges have been suspended effective April 3, 2020, until further notice due the coronavirus health emergency. However, due to technical constraints, late charges will continue to appear on customer bills. If your bill includes a late payment charge, you have two options: 1. You can pay the late payment charge and it will be credited to your account on your next billing statement; 2. You can choose not to pay the late payment charge on your bill and that charge will be removed from your account on your next billing statement without penalty.

Our utilities are continuing meter reading operations during the coronavirus health emergency. You may see these essential employees in your neighborhood if you're home during the day. Their work takes place entirely outdoors and without customer interaction. Please keep the path to your meter clear of snow and other debris,

and keep dogs secured away from the area. Please do not approach our meter readers, as they are trained to maintain social distancing. All of our employees wear photo ID badges. If you have concerns or questions, please contact your utility company.

For your safety and the safety of our crews, when using a generator follow the manufacturer's installation and operation instructions. Never connect a generator directly to your electrical system without an isolation device installed by an electrician. Otherwise, a fire could start or an employee restoring your power could be seriously injured. We suggest plugging lights/appliances in the outlets on the generator unit.

Tree branches and shrubs — and insects that nest in vegetation — can make it difficult and, at times, unsafe for our employees to read your meter. Please be sure your meter is easily accessible by clearing the path to it and the area around it.

## Explanation of Terms

**Bypassable Generation and Transmission Related Component -** Charges for purchasing power and delivering it through the transmission system. These charges are avoided when switching to a Certified Retail Electric Service provider.

**Cost Recovery Charges -** Recovers previously incurred costs, including PUCO-approved Phase-in Recovery Charges CEI collects from all customers on behalf of CEI Funding, LLC which owns the right to impose and collect such charges.

**Customer Charge -** Monthly charge that offsets costs for billing, meter reading, equipment, and service line maintenance.

**Distribution Related Component -** Charge for moving electricity over distribution lines to a service location.

**Economic Development Component -** Charges related to economic development support.

**Estimated Reading -** On the months we do not read a meter, we calculate the bill based on past electrical usage.

**KWH (Kilowatt Hour) -** A unit of measure for electricity usage equal to 1,000 watts used for one hour.

**Late Payment Charge -** A charge added to the bill on balances owed after the Due Date.

**Price to Compare (PTC) -** The utility's price per KWH for bypassable generation and transmission; can be compared with the price offered by another supplier.

**Residential Distribution Credit -** A distribution credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

**Residential Non-Standard Credit -** A generation credit for a qualifying rate applied to all usage over 500 KWH during the winter billing period.

## Important Information

If you have billing questions or complaints about your Illuminating Company account or for a written explanation of the Price to Compare:

**Call Customer Service** at 1-800-589-3101 Monday - Friday, from 8 a.m. - 6 p.m.

**Call Payment Options** at 1-800-686-9901 Monday - Friday, from 8 a.m. - 6 p.m.

**Visit our website** at http://www.firstenergycorp.com

**Write to us** at The Illuminating Company, 76 S. Main St., A-RPC, Akron, OH 44308-1890.

**Customers with hearing or speech impairments** can contact the Telecommunications Relay Service (TRS) at 711.

**We welcome the opportunity** to work with you and will try to answer your questions. If your complaint is not resolved after you have called your electric utility, or for general utility information, residential and business customers may contact the public utilities commission of Ohio (PUCO) for assistance at 1-800-686-7826 (toll free) from 8 a.m. to 5 p.m. weekdays, or at http://www.puco.ohio.gov. Hearing or speech impaired customers may contact the PUCO via 7-1-1 (Ohio relay service).

**The Ohio consumers' counsel (OCC)** represents residential utility customers in matters before the PUCO. The OCC can be contacted at 1-877-742-5622 (toll-free) from 8 a.m. to 5 p.m. weekdays, or at http://www.pickocc.org.

**For Energy Assistance:** Contact the Home Energy Assistance Program (HEAP) at 1-800-282-0880 (TDD/TTY 1-800-686-1557) Monday - Friday between 8 a.m. and 5 p.m.

**For your protection,** all of our employees wear Photo I.D. badges.

**Electronic Check Conversion -** Your check authorizes us either to make a one-time electronic funds transfer (EFT) from your account or process as a check. If you have questions about this program, call 1-866-283-8081.

**To provide a customer meter reading,** use the dials provided and enter the reading on-line at www.firstenergycorp.com/aboutyourbill or by calling 1-800-589-3101. Say "Meter Reading" when asked "Which of these can I help you with today?" Have the date you took the reading available.

### Provide reading by telephone or on-line only: DO NOT MAIL



Draw hands on the dials exactly as they appear on your electric meter. When reading your meter, if the hand falls between two numbers, always report the lower number.

If you have a **DIGITAL METER** write the numbers here: ☐ ☐ ☐ ☐ ☐